# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2012

**DENISE KANE, PH.D.**
**INSPECTOR GENERAL**

# OFFICE OF THE INSPECTOR GENERAL
# ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2012

To Governor Quinn and Members of the General Assembly:

The Department of Children and Family Services carries a promise to the people of Illinois that it will use its public funds to protect vulnerable children from harm. When corruption undermines the mission of the Department, ultimately it is the vulnerable child who is harmed if valuable resources that should have been dedicated to the child's well-being are siphoned off.  A child who faces substantial threats from a home riddled with domestic violence, untreated mental illness or substance abuse should not have to face the insidious threat of corruption in the very institution that was entrusted to protect him or her.  We hold those who harm children by abuse accountable for their actions and we must hold institutions and individuals who abuse state funds accountable. The public and its faithful servants expect and deserve no less.

With Warm Regards,

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................**1**

   INVESTIGATION CATEGORIES ............................................................ 1

   INVESTIGATIVE PROCESS ................................................................. 3

   REPORTS ....................................................................................... 4

   ADDITIONAL RESPONSIBILITIES ........................................................ 5

INVESTIGATIONS .............................................................................................................**7**

   DEATH AND SERIOUS INJURY INVESTIGATIONS .................................. 7

   CHILD DEATH REPORT ................................................................... 45

      SUMMARY ............................................................................... 46

      HOMICIDE ............................................................................... 53

      SUICIDE .................................................................................. 61

      UNDETERMINED ....................................................................... 62

      ACCIDENT ............................................................................... 69

      NATURAL ................................................................................ 81

   TWELVE-YEAR DEATH RETROSPECTIVE ............................................ 99

   GENERAL INVESTIGATIONS ............................................................. 103

PROJECTS AND INITIATIVES ......................................................................................**155**

   ERROR REDUCTION ....................................................................... 155

   ETHICS ........................................................................................ 175

   PREGNANT AND PARENTING TEENS ................................................. 179

   OLDER CAREGIVERS ...................................................................... 181

SYSTEMIC RECOMMENDATIONS ...............................................................................**187**

RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION ...........**195**

COORDINATION WITH LAW ENFORCEMENT ...........................................................**199**

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS .....................................**203**

UNRESOLVED RECOMMENDATIONS IMPACTING CHILD SAFETY ......................**253**

APPENDIX ....................................................................................................................**263**

      A.     TEN-YEAR REVIEW OF DEATHS OF CHILDREN OF DCFS PARENTING TEENS ........... A-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General (OIG) is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 and 35.6. To that end, this Office has undertaken numerous investigations and initiated projects designed to uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

### Death and Serious Injury Investigations

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding twelve months. The OIG is also a member of Child Death Review Teams around the state. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The OIG receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a ward of DCFS, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding twelve months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and

maintains a database of child death statistics and critical information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 2011:

### FY 11 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS MEETING THE CRITERIA FOR REVIEW | 113 |
| INVESTIGATORY REVIEWS OF RECORDS | 90 |
| FULL INVESTIGATIONS OPENED | 17 |
| CASES PENDING FOR CLUSTER REPORTS | 6 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. Summary of all child deaths reviewed by the Office of the Inspector General in FY 11 can be found on page 45 of this report.

### General Investigations

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, foster parents, biological parents and the general public. At the request of the Director, or when the OIG has noted a particularly high level of complaints in a specific segment of the child welfare system, the OIG will conduct a systemic review of that segment. Investigations yield both case-specific recommendations and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

### Child Welfare Employee Licensure Investigations

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License permits centralized

monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses (CWELs).

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The OIG investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the Office of the Inspector General, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Reg. 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2011, 10 cases were referred to the Inspector General's Office for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided technical assistance to the Office of Employee Licensure in 8 cases.

**FY 2011 CWEL Investigation Dispositions**

| CASES OPENED FOR FULL INVESTIGATION | 10 |
| --- | --- |
| FINAL REVOCATION | 6 |
| CHARGES RESCINDED | 1 |
| LICENSES VOLUNTARILY RELINQUISHED | 1 |
| INVESTIGATIONS COMPLETED/NO CHARGES | 2 |
| INVESTIGATIONS PENDING | 0 |
| | |
| PRIOR INVESTIGATIONS RESOLVED | 4 |
| FINAL REVOCATION | 2 |
| CHARGES RESCINDED | 2 |

### Criminal Background Investigations and Law Enforcement Liaison

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 11, the Inspector General's Office opened 2,925 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches. For the 2,925 cases opened in FY 11, the OIG conducted 5,827 searches for criminal background information. In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General will notify the Illinois State Police and may investigate the alleged act for administrative action.

The Office of the Inspector General assists enforcement agencies with gathering necessary documents. If law enforcement elects to investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the OIG will determine whether further investigation or administrative action is appropriate.

# INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury. Investigations may also be initiated when the Child Welfare Employee Licensure Team refers a case for investigation. In FY 2011, the OIG received 3,363 Requests for Investigation.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether there is a need for systemic change.  If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses.  The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies. The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency.  In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty, pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the Department. OIG files are not accessible to the Department. The investigations and the Investigative Reports and Recommendations are prepared without editorial input from either the Department or any private agency.  Once a Report is completed, the Inspector General will consider comments

received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the OIG may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Financial and Professional Regulation.

### Administrative Rules

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430.  The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

### Confidentiality

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential. To protect the confidentiality of the complainant, the OIG will attempt to procure evidence through other means, whenever possible.  The OIG and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the OIG. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense.

Office of the Inspector General Reports contain information that is confidential pursuant to both state and federal law.  As such, OIG Reports are not subject to the Freedom of Information Act. The Office of the Inspector General has prepared several reports deleting confidential information for use as teaching tools for private agency or Department employees.

---

[1] This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

*Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the OIG investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Office of Legal Services to ensure that the Department maintains a central file.

# REPORTS

Inspector General Reports are submitted to the Director of DCFS and the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for an ethical discussion on individual and systemic problems within the practice of child welfare. The reports are redacted to ensure confidentiality and then distributed to private agencies, schools of social work, and DCFS libraries as a resource for child welfare professionals. Redacted OIG reports are available from the Office of the Inspector General by calling (312) 433-3000.

*Recommendations*

In her investigative reports, the Inspector General may recommend systemic reform or case specific interventions. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should be constructive in that it serves to educate an employee on matters related to his/her misconduct. However, it must also function to hold employees responsible for their conduct. Discipline should have an accountability component as well as a constructive or didactic one. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the Director and Board of the involved private agency. Recommendations for discipline are subject to due process requirements. In addition, the OIG will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the Board of Directors of that agency. The agency may submit a response to address any factual inaccuracies in the report. In addition, the Board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child welfare system that the recommendation is

designed to strengthen.  The Inspector General's Office is a small office in relation to the child welfare system.  Rather than address problems in isolation, the OIG views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms.  The OIG may monitor to ensure that Department or private agency staff implement the recommendations made or may work directly with the Department or private agency to implement recommendations that call for systemic reform.   The OIG may also develop accepted reform initiatives for future integration into the Department.

# ADDITIONAL RESPONSIBILITIES

## Office of the Inspector General Hotline

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access.   Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Vendor Fraud;
- Complaints regarding DCFS workers and/or supervisors;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and
- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the OIG to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The number for the OIG Hotline is **(800) 722-9124**.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 11:

### CALLS TO THE OIG HOTLINE IN FY 11

| | |
|---|---|
| INFORMATION AND REFERRAL | 942 |
| REFERRED TO SCR HOTLINE | 126 |
| REFERRED FOR OIG INVESTIGATION | 97 |
| TOTAL CALLS | 1165 |

## Ethics Officer

The Inspector General is the Ethics Officer for the Department of Children and Family Services.  The Inspector General reviews Ethics Statements for possible conflicts of interest of those employees of the Department of Children and Family Services who are required to file Ethics Statements.

For FY 11, 754 Statements of Economic Interest were submitted to the Ethics Officer.  For the 754 statements submitted, 47 letters were issued to individual employees addressing potential conflicts of interest.

### OIG ACTION ON FY 11 STATEMENTS OF ECONOMIC INTEREST

| | |
|---|---|
| ECONOMIC INTEREST STATEMENTS FILED | 754 |
| STATEMENTS INDICATING POSSIBLE CONFLICTS | 47 |

The Office of the Inspector General Ethics staff also coordinated and monitored DCFS compliance with the statewide ethics training mandated under the Illinois State Officials and Employees Ethics Act of 2003.  In 2011, the Office of the Inspector General ensured that 2,963 DCFS employees completed the training.

In addition to DCFS employees, DCFS board and commission members were asked to have their members complete off-line training. In FY 2011, 398 DCFS board and commission members were required to complete the off-line Ethics training.

### Consultation

The Office of the Inspector General staff provided consultation to the child welfare system through review and comment on proposed rule changes and through participation on various ethics and child welfare task forces.

### Projects and Initiatives

Informed by the Office of the Inspector General investigations and practice research, the Project Initiatives staff assist the Department's Division on Training and Professional Development in the development of practice training models for caseworkers and supervisors. The model initiatives are interdisciplinary and involve field-testing of strategies. The initiatives are evaluated to ensure the use of evidence-based practice and to determine the effectiveness of the model. See page 155 of this Report for a full discussion of the current projects and initiatives.

# INVESTIGATIONS

This annual report covers the time from July 1, 2010 to June 30, 2011.  The Investigations section has three parts.  Part I includes summaries of child death and serious injury investigations reported to the Department Director and the Governor.  Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months.  Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, OIG recommendations and Department response.  For some recommendations, OIG comments on the Department's responses are included in italics in the "OIG Recommendation/Department Response" section of each case.

## DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION**   A two-and-a-half-year-old girl suffered a subdural hematoma, significant head trauma, eye hemorrhages, abdominal trauma, and liver contusion due to physical abuse. Upon discharge from the hospital three months later, the child was placed in specialized foster care because of her medical needs.  Fourteen months later she was returned home to her mother. Six weeks after the girl, now four, was returned to her mother's care, she again suffered multiple bruises and abdominal trauma.  The mother had no explanation for any of the injuries to the child.  The child's one-year-old sibling was unharmed and placed in the home of a relative.

**INVESTIGATION**   The Department had determined that the girl's first set of life-threatening injuries were the result of child abuse inflicted by an "unknown perpetrator" because neither the mother nor her boyfriend, the only adults that provided childcare, admitted guilt or named the person responsible.  The mother and her boyfriend were indicated for neglect. A few months later, the mother reported she was no longer involved with the boyfriend.

While the children were in foster care their mother attended weekly counseling with an intern at the private agency for 90 days.  Although the intern concluded that the mother had successfully completed counseling, the mother never accepted responsibility for the injuries and attributed the child's resulting special needs to the anesthesia the child had received at the hospital.  The permanency goal of Return Home remained constant and was achieved because the mother cooperated with services, parent-child visits, and court appearances. The mother's ability to protect her children or the possibility that she perpetrated the initial abuse remained an unresolved issue, and no one asked what changes the mother had made to give the Department and the court confidence that the children would be safe in their mother's care.

The private agency failed to follow rules and procedures regarding reunification and aftercare services: The agency worker failed to conduct unannounced visits to the home after the children were returned and did not confirm kept medical appointments or ensure that the children were attending daycare to provide another

measure of protection.  The worker accepted the mother's self-report for the cause of injuries to the child, such as a split lip or bruised mouth and a bruise on the back.  The worker failed to document these injuries or report them to her supervisor.

Six weeks after returning home, the mother took the child to the hospital where the child was diagnosed with blunt abdominal trauma and bruising to her stomach, face and legs. The Department indicated the mother for internal injuries by abuse, cuts welts bruises, and substantial risk of physical injury by neglect.

The Department's decision to indicate the mother for neglect after the first abusive incident only contributed to a general minimizing of the mother's role and knowledge of the child's earlier injuries that left the child with physical and developmental impairment and greater risk for further abuse.  The child's case presented difficulty with two possible perpetrators of the initial abuse, no admission of guilt, an indicated finding against an "unknown perpetrator" of the abuse, and a mother who either harmed or failed to protect her child from severe harm.

At the conclusion of the first investigation, the mandated hotline reporter received a letter from the Department that stated only that "we have determined your report to be indicated."  The letter excluded that the report had been indicated to an "unknown perpetrator." Because Mandated Reporters can ask for a review of findings, it is important that Mandated Reporters receive all information to which they are entitled.  According to statute, Mandated Reporters are entitled to "receive appropriate information about the findings and actions taken by the child Protective Services Unit in response to their report.  The information shall include the actions taken by the Child Protective Service unit to ensure a child's safety."

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1.  The private agency case manager should be disciplined in accordance with the agency's personnel policies and procedures for failing to (1) document any observed injury to the child or bring this information to the attention of her supervisor; (2) carry out casework responsibilities of After Care Services, as required by Department Rules and Procedures, including unannounced home visits, confirmation of kept medical appointments, confirmation of the child's attendance in school and/or day care, request the school notify her of consecutive days absent; and  (3) provide accurate information to DCFS and police investigators.  The case manager should be placed under close supervision to ensure that she is not exhibiting similar lack of credibility and objectivity in other assigned cases.**

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.  The agency has submitted a written response. The Inspector General will meet with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

The private agency's written response indicates that the case manager's cases have been monitored to ensure compliance with visitation policies.

**2.  The child's case should be reassigned to a different team within the private agency.  A redacted version of this report should be shared with the new team.**

The private agency conducted a staffing to determine case management responsibilities.

**3.  If a family member is to become the child's guardian or adoptive parent, full disclosure must be made to the family member confirming severe abuse and re-abuse to the child, and her long-term medical needs, developmental disabilities, and behavioral issues as a result of the injuries she sustained.**

**The child's future guardian must be prepared for significant behavior management difficulties as outlined by the child's pediatrician that included impulsivity, distractibility and hyperactivity.**

The agency's written response notes that full disclosure is given to all parties in this case.

**4.   The private agency must ensure that a multidisciplinary case staffing occurs at least 30 days following a child's admission into the specialized foster care program to review service planning and coordination of services.  Ensure that Child/Family Teams meetings are conducted at least quarterly. When a determination is made as to whether a child should be returned home, a professional staffing shall be convened.  Prior to the time a child returns home, all persons who provided services to the family in the last year should be required to attend a return home staffing.**

The private agency staff has been trained regarding required team meetings and staffings.  The private agency has developed a documentation form to ensure staffings and meetings are documented.

**5.   The private agency must ensure that foster care supervisors review cases, at least quarterly, with assigned workers and document case issues discussed and supervisory direction given.**

The private agency response notes that all supervisors are aware of case review and documentation requirements.  The agency's quality assurance manager conducts random file reviews to ensure that cases are being monitored and reviewed on a regular basis.

**6.  The State Central Register's notification letters of final findings to Mandated Reporters should list each final finding (indicated/unfounded) by allegation, and the identity of the perpetrator. The notification should also provide information regarding the Mandated Reporter's right to request an additional review of the findings.**

The Division of Child Protection and the Office of Legal Services are working to implement this recommendation.

**7. This report should be shared with the guardian *ad litem* representing the child.**

The Department does not agree.  Sharing this report with the guardian *ad litem* is not necessary for the protection of the child and could possibly open the Department up for legal actions.

## DEATH AND SERIOUS INJURY INVESTIGATION 2

| ALLEGATION | A one year-old girl died after being suffocated by her mother.  A child protection investigation of physical abuse to the girl was pending at the time of the infant's death. |
|---|---|

| INVESTIGATION | The child protection investigation was initiated two weeks before the girl's death after the State Central Register (SCR) was contacted and accepted a report of |
|---|---|

bruises observed on the girl's face and head.  The reporter stated that when questioned about the girls' bruises, the girl's mother had told others the reporter was responsible for causing the girl's injuries.  After initially failing to locate the girl or her three year-old sister at their family's residence, the assigned child protection investigator observed the children at the home of their day care provider, two days after the report was accepted.  The day care provider told the investigator that she had been caring for both girls consistently over the previous six months and that while she periodically saw bruises on the one year-old, she never observed the older girl to have any injuries.  Four days earlier, the day care provider had been particularly concerned by significant bruising to the one year-old's face and had taken pictures of the infant's injuries on her digital camera.  The day care provider showed the photos to the investigator on her camera.  The investigator then took additional photos of the girl, however the injuries documented by the day care provider were not visible in the new pictures.  In an interview with OIG investigators, the investigator acknowledged that he never followed up with the day care provider to obtain either her original digital picture files or printed copies of her photos.  The pictures taken by the investigator were the only ones included in the case file.

Four days later the investigator went to the family's home where he met with the two girls, their mother and her boyfriend, who was not the father of either child.  Both the mother and her boyfriend denied any physical abuse of the children.  The mother told the investigator the one year-old's facial injuries occurred accidentally when the three year-old dropped her while trying to take her out of her crib.  The mother also explained the one year-old was learning to walk which led to frequent falls resulting in bruises.  Later that day, after speaking to a friend of the family and the three year-old's doctor, who both stated they had no concerns about the children's safety, the investigator completed a Child Endangerment Risk Assesment Protocol (CERAP).  In the CERAP, the investigator marked 'yes' in response to whether any member of the household exhibited violent or out of control behavior.  The investigator noted bruises had been observed on the girl over an extended period of time and mischaracterized the injuries as being bruises to her legs accompanied by a black eye.  Despite this information, the investigator determined the children to be safe in their mother's care.  The investigator's conclusion was approved by his supervisor.  In an interview with OIG investigators, the supervisor could not recall whether she had reviewed the case file prior to approving the CERAP.  The supervisor stated she never saw the pictures the day care provider took of the one year-old's facial bruises and if she had, she would have instructed the investigator to take the children into protective custody.

Following the home visit, the investigator's trainee faxed a referral form to the one year-old's medical provider seeking evaluation of the girl's injuries.  The form incorrectly reiterated the girl's injuries as being bruises on her legs and a black eye and included the mother's explanation that the older child had pulled the one year-old from her crib.  The nurse practitioner who saw the girl at the medical provider's office the day after the form was faxed over observed only a faded bruise near the girl's eye.  The nurse practitioner concluded the healing injury was consistent with the mother's explanation the girl had been dropped by her sister and completed the referral form stating there were no concerns regarding the girl's care.  The form was faxed back to the investigator's trainee the following day.  The nurse practitioner did not speak directly with any involved child welfare personnel and was never contacted by the investigator.  She was unaware of the abuse allegation against the mother and was not provided with the pictures taken after the girl's injuries were initially discovered.  In an interview with OIG investigators the nurse practitioner was shown the photos taken

by the day care provider.  The nurse practitioner stated her assessment of the girl's injuries would have been different if she had seen the photos or been aware of the abuse concerns prior to her examination of the girl.

Six days after the girl was seen in the medical provider's office, the investigator made another visit to the family's home.  The investigator observed and photographed the playpen the mother said the girl had been pulled out of by her older sister.  In his interview with OIG investigators, the investigator stated he did not check either child for injuries during the visit.  In moving to close the investigation, the investigator recommended to his supervisor that the report of abuse against the girl be unfounded.  A decision was still pending at the time of the girl's death.

Three days after the investigator visited the family's home, the one year-old was transported to a hospital emergency room by ambulance.  Hospital personnel observed bruises to the infant's face and torso and a pulse could not be maintained.  The girl was pronounced dead and an autopsy found evidence of suffocation and blunt force trauma.  The older sister was taken into protective custody and during the subsequent criminal investigation the mother admitted hitting the girl on the head and putting her hand over her mouth.  A second child protection investigation initiated after the girl's death was indicated against the mother for death by abuse to the one year-old and substantial risk of injury to her older daughter.  The initial child protection investigation was also indicated.  The mother was arrested and charged with first-degree murder and aggravated battery.

In her interview with OIG investigators, the reporter who made the initial hotline call stated she had originally attempted to report the suspected abuse two days earlier.  The reporter explained that she is primarily Spanish-speaking and when she first contacted the SCR there were no Spanish language operators available to take her call.  The Department considers SCR to be fully staffed when there are a total of 89 call floor workers available to cover all five shifts.  At the time of the OIG investigation only 63 call floor workers were actively employed, just 71% of the optimal level.  While each of the five shifts is intended to have one Spanish-speaking operator assigned to take calls, the Department currently employs only four Spanish language operators.  As a result, one shift is always unstaffed and illness or unavailability leaves the Department vulnerable to even greater deficits of coverage.  If English-speaking call floor workers are aware that a Spanish-speaking operator will not be available for an extended time, they ask the callers to leave their personal information so that they can receive a call back at a later time.  As many reporters wish to remain anonymous, asking them to leave their contact information could discourage them from making a report.

In addition, when any caller contacts the hotline and an operator is not immediately available they are placed on hold.  Although a recorded message plays at the time the call is placed on hold urging the caller to stay on the line, the message is played only once and callers are then left holding the phone in silence.  Repeating the recorded message periodically while callers remain on hold might reassure callers that their report will be taken.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The child protection investigator should be disciplined for not taking protective custody or implementing a safety plan after seeing the digital images of the one year-old's injuries; not obtaining and sharing the photographs of her injuries with his supervisor and with the girl's nurse practitioner; not speaking with the nurse practitioner and advising her of the numerous injuries witnessed on the girl nine days prior to the nurse practitioner seeing the girl; and inaccurately describing the girl's injuries in the risk assessment (CERAP) and in the Referral Form for Medical Evaluation of a Physical Injury to a Child.**

The child protection investigator received a suspension.

**2.  The investigator's supervisor should receive non-disciplinary counseling for not requiring the investigator to obtain the daycare provider's photos and share them with the nurse practitioner who examined the child.**

The supervisor received non-disciplinary counseling.

**3.  The Department must work with the Department of Central Management Services to fill call floor worker vacancies in a manner that fully staffs the call floor.**

On September 6, 2011 SCR had eight (8) new Call Floor Workers begin employment/training.  On September 19, 2011 SCR is scheduled to start nine (9) more Call Floor Workers.  On October 16, 2011 the last Option 7 position will be filled with a transfer from the Field, a returning Call Floor Worker.  On September 13, 2011 nine (9) postings expired and are currently being processed by the Office of Employee Services.  This will fill all of vacant Call Floor positions with the exception of four (4) positions that will be retiring by December 31, 2011.  The positions by retirement are in the process of being readied for posting.  The current SCR working staff level is 88.8%.

**4.  The SCR Child Abuse Hotline recorded message requesting a caller to hold should be repeated throughout the wait period to assure callers that their call is important and will be answered as soon as the next operator becomes available.**

The recording has been updated with a second message being repeated every 30 seconds.

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

| ALLEGATION | A two year-old boy died of accidental suffocation while in the care of a babysitter. The babysitter had a lengthy history of involvement with the Department and two child protection investigations were pending against the boy's mother at the time of his death. |
|---|---|

**INVESTIGATION**    Just prior to the boy's death, the hotline received a report that on multiple occasions the boy's mother had left him with inadequate or no supervision. A child protection investigator was assigned to the case; however, the mother was in the process of getting married and was not available to meet until two days later. When that meeting occurred, it was conducted by a weekend on-call worker. The mother and her new husband, who had been living in the home, denied leaving the boy unsupervised and stated they only left him in the care of the husband's mother. The husband's mother told the on-call worker she had no concerns about the couple's care of the boy. The couple did not identify the babysitter as one of the boy's caretakers but listed the babysitter's husband as a collateral contact. The babysitter's husband told the on-call worker that the boy regularly came to his home to play with his children and that the parents were adequate caretakers. The on-call worker observed the couple's home and determined it to be in reasonable condition. The mother told the on-call worker that her oldest child had been removed from her custody as a result of her drug use and domestic violence issues with her former boyfriend. The mother said she had ended that relationship and moved to another state for a period of time and had also participated in substance abuse treatment.

Resuming his work on the case after the weekend, the investigator never attempted to verify the mother's claim of having participated in a drug treatment program. The investigator spoke with the boy's father who expressed his concern with the parenting abilities of the mother and her new husband. The father stated he had received reports that the couple's home was unkempt and that when his son came over for visits he often observed the boy to be dirty and suffering from diaper rashes. The father stated he wanted to obtain custody of the boy and had pursued an order of protection for the boy against the mother, however his request had been denied by the court. In an interview with OIG investigators, the investigator acknowledged that he did not observe the boy or meet with the family during his work on the case. The investigator stated he relied upon the on-call worker's assessment of the home. The investigator said he could not recall whether he knew the mother had previously had a child removed from her custody but was generally aware the family had a history with the Department.

Seven days after the first child protection investigation was opened, the hotline received another report regarding the family. The report alleged the mother and her new husband were heavy drinkers and that the mother told the reporter the couple regularly gave the boy liquid cough syrup to put him to sleep while they went out. At the time of the hotline call, the couple had left the boy in the care of the babysitter while they left town for the weekend to attend a social event out of state. This report was assigned to the same child protection investigator who had handled the case opened one week earlier.

The babysitter and her husband were well known to local police and child welfare professionals. Their family had been the subjects of 25 child protection investigations and 2 intact family cases during the previous 6 years. The family, which included six children ranging in age from eleven to one, had a history of physical abuse, domestic violence, substance abuse and chronic inadequate supervision. Local police were frequently called to the home to intervene in disputes and altercations amongst family members. Authorities were also often asked to respond to frequent reports of the children being seen unattended while playing near streets or other hazards while appearing disheveled. The biological daughter of the babysitter's husband, who had been granted an order of protection and placed in the guardianship of her grandmother, had assumed much of the

responsibility for caring for the younger children for several years before leaving the home at the age of 17. During the course of prior investigations, the babysitter and her husband had made statements that children under the age of five were capable of taking care of themselves for extended periods of time.  The couple had also acknowledged other extreme behavior, including the babysitter admitting to allowing the oldest girl to use marijuana in her presence when she was 13 years-old and the husband confirming that he struck the girl in the face because he did not approve of a boy she was spending time with.

The investigator assigned to the case was familiar with the babysitter's family and had handled five earlier reports that had been indicated against them.  The day after the report was taken, the investigator went to the babysitter's home and saw the boy, the babysitter and her children in the front yard.  The investigator observed some bruises and scratches on the boy's face, which he documented in photographs.   The investigator did not enter the babysitter's home to evaluate the living environment.  In his interview with OIG investigators, the investigator stated he asked the babysitter if he could enter her home but she did not give permission.  The babysitter told the investigator she had a dog that was known to bite people and she did not want to make the effort to secure the animal in order to allow him entry.  The investigator expressed his erroneous belief to the OIG investigators that since the babysitter herself was not the subject of the investigation, he had no standing to insist upon observing her home.  The investigator stated that while he was aware of the family's history with the Department and law enforcement, he believed the boy was safe in the babysitter's care at that time.  The investigator based his belief on the fact he did not observe any risk factors at that time while he was outside of the house.  The investigator said the boy did not appear to be under the influence of cough syrup at the time, however he did not attempt to have the boy medically evaluated. Although the boy's father had expressed his concerns about the boy's care and his desire to take custody of him, the investigator said the father was never considered as a placement option.  The investigator stated that the father was aware the boy was staying at the babysitter's home and had dropped the boy off there himself when he had to go to work, which he interpreted as the father's tacit approval of the placement.   The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) which he marked as safe, answering no to the question of whether any member of the household had previously abused or neglected a child.

The day after the investigator visited the babysitter's home, emergency units were called to the residence after the boy was found unresponsive in the front yard.  The boy was transported to the local hospital before being airlifted to a regional trauma center.  He was pronounced dead the following day.  The babysitter told police that the two year-old boy and her three year-old daughter had been playing in the yard, where a small inflatable bounce castle was attached to a mechanical air pump.  The babysitter stated she was keeping an eye on the children while performing chores around the house.  The babysitter stated she repeatedly heard the pump being turned on and off, causing the bounce castle to partially inflate and then deflate.  After some time, the babysitter looked out the window and saw the boy lying motionless inside the deflated castle.  When she went outside, the three year-old girl told the babysitter the boy was "sleeping" inside the castle.  The coroner's report determined the boy had died of cardiopulmonary arrest as a result of suffocation.  A doctor from the regional trauma center where the boy was taken concluded his brain had been without oxygen for 10 to 15 minutes.

As a result of the child protection investigation into the boy's death, the babysitter was indicated for death by neglect, inadequate supervision and risk of harm.  The six children who lived in the home were taken into protective custody and placed with relatives.  Nine months later, the three oldest children, ages eight, nine and ten, were returned to the home of the babysitter and her husband.  In an interview with OIG investigators, the local Chief of Police stated that since the older children have been returned to the home officers have observed them outside late at night unattended.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The child protection investigator should receive discipline for not observing the babysitter's home and not taking the family's prior Department history into account in his assessment of the** |

**mother's care plan.**

A pre-disciplinary hearing was convened with the investigator.  Discipline is pending.

**2.  This report should be shared with the private agency providing services to the family and the assigned foster care worker and their supervisor so that they may be able to utilize the information in their assessment and share full information with the juvenile court.**

The report was shared with the assigned private agency.

**3.   Given the recent information that the children were seen out late at night throughout the neighborhood, the private agency case manager and supervisor should contact the local chief of police to exchange information about the wellbeing of the older children and to open lines of communication.**

The private agency has been coordinating efforts with the local chief of police.

**4.  The foster care case manager should contact neighbors of the babysitter's family and introduce herself to open lines of communication about the wellbeing of the three oldest children that have been returned home.**

The report was shared with the private agency supervisor.  The supervisor's attempts to speak with the family's neighbors have been refused; however, the agency staff has developed a strong working relationship with the school and local law enforcement.

**DEATH AND SERIOUS INJURY INVESTIGATION 4**

| ALLEGATION | Twenty-year-old ward placed in a private agency's independent living program allegedly stabbed four members of his girlfriend's family, killing three and seriously wounding another. |
|---|---|

| INVESTIGATION | |
|---|---|

The ward entered Department custody when he was five years old. In the first two years of foster care, he began showing symptoms of rage and violence that resulted in a psychiatric hospital stay. He spent the next ten years in residential treatment settings. At the age of nine his behaviors qualified him for services for sexually aggressive youth. He was assigned to a DCFS Sexual Abuse Services Coordinator to monitor his treatment and intervention services, and to provide clinical oversight and ongoing case monitoring of progress. At the age of 13 he began a juvenile arrest history of aggravated battery, disorderly conduct, and possession of alcohol and cannabis. He fathered a child when he was 15 years old and when paternity was established two years later, he became eligible for services for parenting teen wards and was assigned staff to assess, service and monitor the teen parent through the remainder of wardship. At the age of 16 he was arrested for criminal sexual assault of a female schoolmate. He was convicted as a juvenile, placed on probation for two years, and was required to register as a sex offender for the next ten years. Four months prior to turning 18, while still in high school and living in a residential treatment facility, the agency transferred him to an apartment at their on-ground transitional living program. Within months of the transfer, he tested positive for marijuana, was caught with alcohol, injured a peer in a fight, threatened staff and was found with a switch blade. He was suspended from school and prohibited from attending his graduation ceremony for forwarding a frontal nudity video of himself to his classmates. He was found in violation of his probation and was detained in the juvenile detention center for two weeks. Despite these failures, he did not re-enter the residential treatment program. During 16 months in transitional living, he regularly left his apartment without permission, but continued to participate in therapy. Although he had shown no progress and was found to be involved in drug dealing activity, the residential facility requested the Department place him in independent living.

Just prior to entering independent living with a private agency, the 20-year-old ward had been staying at the family home of his girlfriend with whom he fathered a child. He was also charged with battery after a woman alleged he had raped her in a motel room. Although the independent living staff was aware of his sex offending and substance abusing history, they were unaware of the circumstances of the recent alleged incident as well as his drug dealing activity in his prior placement. While in the independent living program, he enrolled in a junior college, but soon dropped out. Staff could not verify his school status because of school privacy policies. He was engaging in alcohol use and showed signs of deteriorating behaviors and escalating mental health symptoms. He voluntarily sought help at a psychiatric hospital in fear of harming himself or others. He was violent during a four-day hospitalization and was criminally charged. After discharge he refused outpatient treatment. During the last 60 days of his placement, when his deterioration became even more marked, agency staff noted that his apartment was increasingly dirty, cluttered and damaged. He admitted alcohol use and involvement with "street pharmacy" activities. He appeared anxious and voiced paranoid thinking. The agency allowed him to keep a BB gun that resembled a semi automatic weapon. His apartment had several holes in the wall from BB gun pellets. He was not in school, but was about to start a new job before the tragic incident. These behaviors in combination with his long history of violence indicated an urgent need for services. The agency's case manager expressed a benign acceptance of the behaviors rather than exercising proactive intervention. At a minimum, the situation required a SASS referral and informing the court of his non-cooperation with mental health treatment to seek a court ordered mental health assessment. The firing of the BB gun in his apartment was illegal and agency staff could have requested police assistance to transport him to a hospital for a mental health assessment. The assessment could have included hospital admission by certificate and petition as the ward appeared to be unable to adequately care

for himself and had a history of violence.

There was a lack of communication among involved professionals, including the DCFS Sexual Abuse Services Coordinator who was responsible for clinical oversight and ongoing case monitoring of the ward's progress.  Important case information was not consistently shared among service providers and with the Sexual Abuse Services Coordinator who was not proactive in seeking reports. Consequently, services and supervision planning and implementation were not adequately carried out while the ward was placed in transitional and independent living.

The ward was arrested and charged with three counts of first degree murder, one count of attempted murder and three counts of aggravated unlawful restraint.  He is in custody awaiting trial.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The independent living agency must develop a corrective action plan to be submitted to the Department and the Inspector General.  The plan should address its failure to follow a previous Office of the Inspector General recommendation to develop and implement a violence prevention and intervention program for wards; failure to adjust the ward's services in light of the alleged rape incident; and failure to recognize and proactively respond to the deterioration and escalating mental health symptoms of a ward who had been hospitalized in the last 120 days and was refusing treatment.**

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.   The Inspector General will meet with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**2. The independent living agency should educate its program director and case managers on the standards for involuntary admission of wards to a mental health facility.**

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.   The Inspector General will meet with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**3. The Department should develop housing contracts with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well being of the ward. Housing contracts should make clear that funding for the apartment will stop and the court will be informed of transgressions involving criminal activity.**

Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

**4.  The Department should require that wards sign a release of information for the Department to receive information from the educational institutions on the student's academic problems. With a ward's signed consent, DCFS should arrange to be notified of any of the following:**

- ▪ **When a student has voluntarily withdrawn from the university or has been required by the university to withdraw;**
- ▪ **When a student has been placed on academic warning;**

- When the student's academic good standing or promotion is at issue;
- When a student engages in alcohol or drug-related behavior that violates school policies;
- When a student has been placed on disciplinary probation or restriction;
- In exceptional cases when a student otherwise engages in behavior calling into question the appropriateness of the student's continued enrollment in the university.

Amendments to the Independent Living (ILO) and Transitional Living Program (TLP) plans are being developed.

**5. The Department's Services Coordinators for the Sexual Behavior Problem Program (SBPP) should educate POS service providers regarding registration and reporting requirements of juvenile delinquent sex offenders, and insure the minor's compliance.**

The Department agrees that education for DCFS and POS staff regarding registration and reporting requirements for juvenile delinquent sex offenders is needed.  This is especially true given the many changes that have been made to the registration and reporting requirements in the past several years.  DCFS has provided this training in the past with assistance from the Illinois Sex Offender Registration Team (I-SORT) of the Illinois State Police.  I-SORT continues to provide Sex Offender Registration and Community Notification training on an ongoing basis throughout the state through the Illinois State Police Mobile Training Units (MTU) which are open to the public.  Additionally, the DCFS Acting Statewide Sexual Behavior Problems Program Coordinator has contacted the director of I-SORT and I-SORT has agreed to partner with DCFS and provide training specifically to DCFS and POS child welfare staff in trainings through out the state.

**6. For sex offending teen parenting wards, a risk assessment and risk management or safety plan must be completed and implemented when the ward enters transitional living or independent living programs. The assessment and plan must address the ward's offending behaviors, teen parenting needs, and mental health needs, and be reviewed annually with the Department's Services Coordinators monitoring these wards through the Sexual Behavior Problem Program. Deviations from the plan should be shared with the court.**

The Department agrees.  In addition to the risk assessment and risk management or safety plan that must be completed and implemented when a ward enters transitional living or independent living programs, for wards that are sex offending teen parents or non-adjudicated wards identified as having a sexual behavior problem, the CFS 685 Ward's Supervision Plan is required.  The supervision plan which addresses the ward's offending behaviors, is developed by the treatment team and approved by the Department's Sexual Abuse Services Coordinator, describes supervision that is to be provided and activities that are allowed or disallowed based on the youth's assessed risk for reoffending.

DCFS policy requires that the CFS 685 supervision plan be reviewed quarterly by the case manager and supervisor to assess if revisions are needed.  Revisions made to the plan must be submitted to the Sexual Abuse Services Coordinator for review and approval.  DCFS Sexual Abuse Services Coordinators monitoring the SBP ward review cases semi-annually by participation in Child and Youth Investment Team meetings, quarterly staffings and/or discharge staffings as well as reviewing Unusual Incident Reports, POS agency progress reports and Administrative Case Review feedbacks.

The Department disagrees/agrees.
This recommendation indicates that a risk assessment was completed by a TPSN supervisor in August 2008; about the same time he was accepted and placed into the independent living program.  Since the youth had a TPSN worker, he should have been receiving services aimed at his role as a teen parent and in addition any

other issues he presented.  All of these issues should have been addressed in the risk assessment completed by the TPSN supervisor.

The Department agrees that any information from a risk assessment or safety plan should be shared with the Department's service coordinators monitoring these wards through the Sexual Behavior Problem Program so that a coordinated approach to services could be provided to teen parenting wards, including those who have sex offending backgrounds.  It appears that there was no such coordination in this case, as there is no mention that the independent living worker, the TPSN worker or the Sexual Abuse Services Coordinator assigned to the youth's case were in contact with each other.  The sexual abuse coordinator will follow up when a ward's supervision plan is not received to ensure that difficult cases with sexual offending teen wards are actively managed.

**7. DCFS clinical staff needs to assess whether mental health services are being provided to older wards identified as having a mental illness. A clinical staffing should take place after a psychiatric hospitalization. If the ward refuses to sign consent for mental health information, DCFS legal should be notified in order to instanter the ward's case for an order to cooperate with services.**

The Department agrees to convene clinical staffings after a ward's psychiatric hospitalization.  With regards to the recommendation to instanter a ward's case for refusal to sign a consent for mental health information, the Department agrees in part and disagrees in part.  This recommendation is based on a statement in the OIG report that DCFS Legal can instanter a case for an emergency hearing to apprise the judge of recent developments and get an order for the ward to cooperate with services.  While this may be the practice in the Cook County Juvenile Court, some jurisdictions in the remaining 101 counties of the state will not allow the instantering of contested matters.  In these counties, DCFS legal will file an emergency motion for an order requesting an order for the ward to cooperate with services and follow the practices of the circuit in setting of the motion.  The recommendation also requires that both DCFS and POS staff realize this is an option and advise the DCFS Regional Counsel of the ward's deteriorating status.

In cases where the court has extended wardship beyond an individual's 19th birthday because of the need for mental health services and the Department recognizes barriers to providing those services, the Department will bring the problems to the attention of the court either by instantering the file or by emergency motion in accordance with the practices of that circuit.  For wards over 18 with developmental disabilities, the Department can seek a court order giving additional authority to our guardian to not only consent to medical and medication, but to also access medical and mental health information.

**DEATH AND SERIOUS INJURY INVESTIGATION 5**

| | |
|---|---|
| **ALLEGATION** | A one month-old girl died as a result of accidental suffocation.  The girl's mother had an open placement case with the Department and was the subject of a pending child protection investigation at the time of the girl's death. |

**INVESTIGATION**    The mother's involvement with the Department began one year earlier when she brought her then two year-old son to a hospital emergency room.  The boy was found to have suffered a fractured femur while he was in the care of his mother's boyfriend.  The boyfriend stated the boy had fallen while jumping on a bed, however doctors found the severity of the injury was inconsistent with the boyfriend's description of events.  Further examination of the boy found numerous injuries in various stages of healing.  The boy was taken into temporary custody and placed with his maternal grandmother.  During the course of the subsequent criminal investigation, the boyfriend admitted punching and hitting the boy and knocking him off of a bed after the boy urinated in his pants.  Despite the boyfriend's admission, the mother accompanied him to at least one court appearance and expressed her doubts to involved child welfare professionals that he had actually harmed her son.  The boy was removed and placed with his grandmother.

The family's case was referred to a private agency, which moved to engage both the mother and the boy's biological father in services.  Staff made some efforts to schedule mental health and parenting skills assessments.  The mother disclosed to private agency staff that she was not taking prescribed psychotropic medications.  The mother was reluctant and resisted participating in services.  Private agency staff failed to address the possible connection between the mother's lack of progress and her failure to address her own mental health issues.

Almost one year after the case was opened, during a scheduled supervised visit between the mother and her son at the grandmother's home, the mother disclosed to the caseworker that she had given birth to a baby girl a few weeks earlier.  Neither the caseworker nor any of the other child welfare, mental health or legal professionals involved with the family's case had been aware the mother was pregnant.  The mother had at various times denied she was pregnant to involved workers as well as the court.  The mother told the caseworker she had concealed the pregnancy because she did not want to have the new baby taken away from her.  The grandmother told the caseworker she knew the mother had delivered the baby but had only become aware of the pregnancy a few days prior to the birth.  The mother stated the boyfriend who had abused her son, with whom she had continued to remain in contact, could be the baby's father.  The revelation of the baby girl's birth prompted a call to the State Central Register (SCR) and a child protection investigation was opened.  The case was assigned to a child protection investigator whose caseload exceeded the standard established by the BH consent decree.

Upon accepting the case, the investigator spoke with the private agency caseworker, who expressed her concerns about the mother's behavior of hiding her pregnancy and maintaining contact with the boyfriend.  The caseworker also noted the mother had been largely non-compliant with services throughout the time her case was open until recently, just before the new baby was born.  The investigator then visited the mother at her current residence.  The mother denied the boyfriend was the baby's father and stated her caseworker had been aware of her pregnancy.  The mother also asserted she had been compliant with services.  After observing the house to be in suitable condition, the investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) finding the home to be safe.  The investigator instructed the mother to schedule a medical appointment for the infant as the baby, born two weeks premature, had not been seen by a doctor since birth.

In the case record, the investigator's notes failed to accurately reflect the information she had been provided.  The investigator minimized the caseworker's concerns regarding the mother's pattern of behavior and

characterized the mother as being compliant with services.  The investigator's instruction to the mother to take the baby to a doctor was recorded as a scheduled appointment.  Although the investigator was aware the mother had an older child removed from her care, she did not see the boy or attempt to contact the grandmother.  The investigator also failed to review the prior indicated report, preventing her from gaining a comprehensive understanding of the mother's history.  Other than speaking with the caseworker and the mother's roommate who was present at the time of the visit, the investigator conducted no interviews.  The investigator did not implement a safety plan or consult with her supervisor as to whether leaving the baby in the home was an appropriate course of action, nor did the investigator explore or question the conflicting information regarding the paternity of the newborn.   In an interview with OIG investigators, the investigator said she could not recall asking any professionals their opinion about whether the baby would be safe in the mother's care.   The investigator stated the issue of whether the caseworker knew about the mother's pregnancy came down to one woman's word against the other's and that she had no reason to doubt the mother.

Eight days after the investigator visited the mother's home, the baby was found unresponsive in her crib.  The baby's death was determined to be the result of accidental suffocation.  Since the time of her visit to the mother's home, the investigator performed no work on the case, including failing to obtain approval of the CERAP, until after the baby's death.  After learning the mother and grandmother continued to allow the boyfriend to have contact with the mother's three year-old son, the private agency removed the boy from the grandmother's custody and placed him in a traditional foster home.

---

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The child protection investigator should be disciplined for her insufficient assessment of risk to a one month-old infant, for failing to put a safety plan in place while gathering information, for not reading the prior investigation to inform her Child Endangerment Risk Assessment Protocol (CERAP), for not completing a CERAP within 24 hours of seeing the alleged victim, and for not obtaining her supervisor's approval of the safe CERAP decision.  Discipline should be mitigated by the investigator's caseload being over BH standards during the time the investigation was pending.**

The child protection investigator received a suspension.

**2.  This report should be shared with the child protection investigator's supervisor so she is aware of the manner in which the investigator recorded case information in this case and can monitor the investigator's case recordings for accuracy in future investigations.**

The report was shared.

**3.  The Department's Division of Clinical Services should study this case to determine how best to provide consultation to the private agency in cases involving mentally ill patients.**

The Department's clinical psychology consultant discussed with the private agency the role of the Clinical Division in their availability for staff consultations/staffing, the Parenting Assessment Team process and the relationship with the agency's consulting psychologist.  The agency's consulting psychologist reviewed the requests for psychological assessments, the Parenting Capacity Assessments, and his role with their agency. This agency did not attend the training that was given by the Office of the Inspector General.

**4.  This report should be shared with the private agency.**

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The agency submitted a written response. The Inspector General met with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

**DEATH AND SERIOUS INJURY INVESTIGATION 6**

| ISSUE | Over the last ten years (FY 2000-2010) the Office of the Inspector General has gathered data on the deaths of children whose family was involved with the Department within the twelve months prior to the child's death. This ten-year report focuses on those deaths of children of parenting teen wards. Between FY 2000 and FY 2010, fifty children's deaths met these criteria. OIG staff reviewed these deaths to explore the factors that may have contributed to the children's deaths and to make recommendations that could potentially lower infant mortality and improve services to teen wards and their children. |
|---|---|

In FY 2010 DCFS had 594 parenting wards, ages fourteen to twenty-one, who had 544 children in their care. Eighty-five percent of the parenting wards were mothers. Eighty-two percent lived in Cook or collar counties. In FY 2010, seven (1%) children of wards died. FY 2010 had the second highest number of deaths of children of wards since 2003, when twelve children died.

| DISCUSSION | **[SEE FULL REPORT – APPENDIX A]** |
|---|---|

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  This report should be shared with the Teen Parent Service Network provider and all agencies responsible for the case management of a pregnant or parenting ward. Pregnant and** |
|---|---|

**parenting youth will receive pertinent information from this report through the use of case scenarios in youth trainings.**

The Department agrees to share a redacted version of the report with TPSN and all agencies responsible for the case management of a pregnant or parenting ward.  This report will also be shared with the Teen Parent Consultant and counsel of record in the Hill v. Erickson Consent Decree.

DCFS staff met with management staff of the HealthWorks Lead Agency for Cook County. They were provided a copy of the redacted report and the recommendations were discussed.  DCFS staff met with the Chief of the Maternal and Infant Health Bureau of the Illinois Department of Human Services and provided her with a copy of the redacted report and discussed the recommendations.

During the regularly scheduled bi-monthly teleconference with the 20 HealthWorks lead agencies, DCFS provided all of them with a copy of the redacted OIG report and the recommendations.   A follow-up teleconference call will be conducted with the HealthWorks lead agencies serving large numbers of DCFS adolescents to discuss in further detail their access to adolescent-attentive health care providers.

**2.  In order to assist wards to make informed decisions and educated choices about health care, the Office of the Inspector General's staff will develop a resource guide in conjunction with the Teen Parent Consultant for pregnant and parenting teens which will include information about Title X services and other specialized adolescent clinics/providers. All case workers servicing pregnant wards should receive training on the comprehensive health care services available to teens in order to inform their clients of available resources and provide the ward with an opportunity to visit these specialty clinics.**

HealthWorks lead agencies will recruit Title X providers serving their counties to participate in the HealthWorks provider networks.  TPSN agrees to provide information about the Title X clinics to the specialty training providers as part of the new birth assessment included in the resource guide.  DCFS will post the Statewide Title X directory on the DNet and the Youth in Care website.  Upon development of the

OIG pamphlet, DCFS will ensure the pamphlet will be distributed throughout CAYITS,  Administrative Case Reviews and prior to a high school physical.

**3.    All case managers with a pregnant or parenting ward on their caseload should provide transportation and incentives to ensure 100% attendance at pre-natal and post-partum appointments.**

The DHS-certified medical case managers track the medical appointments for prenatal and post-partum care; provide reminder calls for scheduled appointments, and follow-up on missed appointments.  The medical case management agencies also provide assistance with transportation for medical appointments to pregnant/post-partum youth by providing public transportation cards and by coordinating with the TPSN caseworker.

The ultimate responsibility for assuring pregnant clients are transported and they attend their pre-natal doctor's appointment lies within the assigned caseworker. If transportation is a barrier, the case worker must provide transportation and accompany the youth to and from the appointment. TPSN will incorporate this transportation expectation into training.

**4.   TPSN must maintain statistics on pre-natal and post-partum care visits and Women, Infants and Children (WIC) participation.**

The Division of Service Intervention/Office of Health Services will provide to TPSN and the Teen Parent Consultant youth-specific reports on prenatal and post-partum visits completed which will come from Medicaid claims information in State Automated Child Welfare Information System (SACWIS).  Department of Human Services will provide to DCFS information on WIC participation by these youth and DCFS will provide this information to the Teen Parent Consultant.

**5.  The Department should consider referring all 14-15 year-old female wards to a Title X teen clinic for consultation on reproductive health and contraception education. All 14-15 year old male wards should be referred to a clinic with a community-based approach towards sexual health.**

Access to a youth's primary care physician and Title X clinics, such as Erie Family Health Center and the Rush Adolescent Clinic, are appropriate resources to meet this recommendation to provide guidance on sexual health issues for female and male youth.

HealthWorks lead agencies will recruit Title X providers serving their counties to participate in the HealthWorks provider networks.  TPSN agrees to provide information about the Title X clinics to the specialty training providers as part of the new birth assessment included in the resource guide.  DCFS will post the Statewide Title X directory on the DNet and the Youth in Care website.  Upon development of the OIG pamphlet, DCFS will ensure the pamphlet will be distributed throughout CAYITS, Administrative Case Reviews and prior to a high school physical.

**6.  All pregnant and parenting wards should be provided with a portable crib for use whenever they are away from their placement.**

TPSN has and will continue to provide portable cribs for all clients with a child 2 years-old and younger. TPSN now includes funds for a portable crib in all baby start up kits.

**7.   Expectant fathers who are wards should be required to participate in training to reduce infant mortality by helping them recognize the stress and anger that can be provoked by an inconsolably crying child, and identify resources that can be immediately used to deescalate a stressful parenting experience.  The training should include the participation of the Fussy Baby Network.**

Office of the Inspector General and TPSN staff will conduct a training for expectant fathers in an effort to reduce infant mortality and recognize stress and anger that can be provoked by an inconsolable crying child.

**8.  In any case where a mother has a history of severe mental illness and there is an Unusual Incident Report (UIR) for alcohol abuse, substance abuse, or domestic violence, the Teen Parent Services Network should, in addition to organizing protective day care, require quarterly clinical staffings to ensure the safety of the baby and effective treatment for the young parent.**

For youth not currently receiving clinical staffing at an agency, DCFS Clinical will staff TPSN cases where there are Unusual Incident Reports (UIRs) related to mental illness and/or substance abuse.

## DEATH AND SERIOUS INJURY INVESTIGATION 7

| | |
|---|---|
| **ALLEGATION** | An 11 day-old infant died as a result of accidental suffocation due to co-sleeping. The infant's mother was a Department ward with three other children, ages 3, 2 and 1 year. |

**INVESTIGATION**  The mother had become involved with the Department when she was taken into custody at age six after an indicated report of neglect.  Throughout her involvement with the Department, the mother exhibited inconsistent, volatile behavior and an inability to comply with services.  She moved through numerous placements and was frequently on run as a teenager, often times taking her children with her during periods of unstable or inadequate housing.  She abused illicit substances and often neglected her responsibilities as a parent in order to engage in high-risk behavior.  Her relationships often presented issues of domestic violence and, in addition to her four pregnancies prior to turning 19 years-old, she had a history of sexually transmitted diseases and poor prenatal care.

When the teen mother had her first child, she and her family already presented a complicated, high-risk situation, so her case was referred to a private agency with a specialized foster care program.  The case was assigned to a new caseworker who had only recently entered the professional child welfare field.  Although the private agency program was designed to provide specialized services to wards, throughout their handling of the case, the caseworker and her supervisor demonstrated a lack of understanding of or familiarity with available services to pregnant and parenting teens.  Neither the caseworker nor her supervisor adhered to Department Procedure 302 Appendix J, which addresses the needs and requirements of providing guidance and support for pregnant and parenting teens.

The caseworker and her supervisor did not secure necessary educational support for the mother, who had not finished high school.  Although the workers frequently attempted to engage the mother in General Education Development (GED) classes, she did not follow through and alternative options were not pursued.  The workers also failed to adequately address family planning issues and options with the mother, preventing her from making fully informed decisions.  During their involvement with the mother, the workers did not recognize the mother's ongoing ambivalence towards parenting as a significant risk factor to the safety of her children.  Repeatedly, the mother's periodic commitments to make a greater effort were interpreted as advances rather than the beginning of another cycle of incomplete tasks.  The workers also focused on the mother in relation to her oldest child while neglecting to adequately consider the safety of the mother's two younger children, who were not wards of the Department.

After learning the mother had become pregnant for the third time, the workers completed an Unusual Incident Report (UIR) seeking assistance in obtaining additional services for the family.  At the time, the Department position of Teen Parent Coordinator was vacant and an administrator temporarily assigned to the post received the request.  The administrator provided an inadequate and generalized response that there were no specialty Pregnant and Parenting Teen (PPT) programs in their county and referred them to a Department website for general information.  An OIG investigators' review of available resources in the area identified several programs for pregnant and parenting youth, one of which works specifically with young mothers with multiple children, located near where the mother lived.

Eleven days after the mother's fourth child was born, the mother awoke on the couch where she was sleeping with the infant and found him unresponsive.  The infant could not be revived and was pronounced dead at a local hospital.  An autopsy determined the cause of death to be suffocation as a result of co-sleeping and the mother was indicated for death by neglect.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
|---|

**1. The private agency must ensure its child welfare staff are familiar with and adhere to Department Procedure 302 Appendix J,** *Services Delivered by the Department, Pregnant and/or Parenting Program.*

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The agency submitted a written response. The Inspector General will meet with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

The agency's staff serving pregnant and parenting teens attended a training regarding the relevant Department procedures. The training will be replicated throughout the agency to ensure a comprehensive understanding of the procedures for working with pregnant and parenting teens.

**2. The private agency must ensure adolescent youth overseen by their agency receive pregnancy prevention services. If a youth becomes pregnant, the agency must ensure its child welfare staff expeditiously provide full options counseling upon discovery that a ward is pregnant, and that they document in the ward's case record that full options counseling was provided.**

The private agency is developing an internal protocol for serving pregnant and parenting teens.

**3. The private agency caseworker should be disciplined according to the agency's policies and procedures for failing to adhere to Procedure 302 Appendix J,** *Services Delivered by the Department, Pregnant and/or Parenting Program***, and for failure to monitor the safety of the mother's non-ward children.**

The private agency is addressing the case manager's management of this case through training and the agency's disciplinary process.

**4. The private agency caseworker's supervisor should be disciplined according to the agency's policies and procedures for failing to adhere to Procedure 302 Appendix J,** *Services Delivered by the Department, Pregnant and/or Parenting Program***, and for failure to monitor the safety of the mother's non-ward children.**

The private agency is addressing the supervision of this case through training and the agency's disciplinary process.

**5. In this case, the Department administrator serving as the Teen Parent Coordinator issued an inadequate and generalized referral for the Department of Human Services to an agency servicing a high-risk ward on her third pregnancy. The administrator should, upon receipt of a UIR informing her of a pregnant or parenting ward in a county without a specialty service provider, respond to the caseworker with specific available resources within the ward's county. This notification should include her contact information.**

The employee received additional training and improvements have been made in services.

**6. The Department administrator should receive non-disciplinary counseling for failing to provide the private agency with specific information regarding the various service agencies available in the area and for providing inadequate support.**

The employee received non-disciplinary counseling.

**7.  This report should be shared with the Teen Parent Consultant.**

The report has been shared with the Teen Parent Consultant.

*Note: The Department requests that the OIG look at this agency's organizational practice and deficits, review past OIG investigations related to the agency and see whether there is any pattern that needs to be addressed by DCFS.*

*The OIG notes that there have been multiple investigations involving this agency in this fiscal year.  The agency response was recently filed.  After review of the response and discussions with the private agency board, the OIG will determine whether further action is needed.*

## DEATH AND SERIOUS INJURY INVESTIGATION 8

| ALLEGATION | A 19 month-old boy died as a result of severe physical abuse inflicted by his mother's boyfriend. The boy's mother was a Department ward who lived with her son in a Transitional Living Program (TLP) at the time of his death. |
|---|---|

**INVESTIGATION**   The mother had been a ward since she was two years-old when she was removed from her family in response to the severe physical abuse suffered by her then four month-old brother. While placed in the home of her maternal grandmother, the mother was the victim of sexual abuse perpetrated by an older male relative beginning when she was nine years-old. At age 13, she was hospitalized after verbalizing suicidal thoughts and reported having flashbacks of her abuse. She was diagnosed with post-traumatic stress disorder and was prescribed psychotropic medication to manage her behavior. A diagnosis of mood disorder was added the following year. Over the next few years she moved through numerous placements and demonstrated sporadic compliance with services, punctuated with episodes of erratic behavior. She was known to use marijuana and was injured at age 16 when a paramour struck her in the head with a piece of wood. She was often resistant to the efforts of child welfare workers to transfer or stabilize her placements and at one point went on run for four months when she did not agree with a decision to move her from a relative's house to a traditional foster home.

At age 17, the mother arrived at an emergency shelter and disclosed she was five months pregnant and was continuing to use marijuana. The mother identified the father but said she was no longer involved in a relationship with him. She was enrolled in the Department's Teen Parent Services Network (TPSN) and a Child And Youth Investment Team (CAYIT) meeting was conducted to consider placement options. It was determined the mother should be placed in a Transitional Living Program (TLP) and it was recommended she complete a substance abuse evaluation, attend individual therapy and receive mentoring services. Following the meeting, the mother tested positive for marijuana and ran away for 10 days.

Upon her return the mother moved into the TLP and four months later she gave birth to her son. Throughout the time she resided in the placement the mother's attendance at required meetings and sessions fluctuated. Although she demonstrated an increased willingness to engage in services during the year after her son was born, she remained inconsistent in her participation. Workers documented numerous missed classes and counseling sessions and expressed frustration with the mother's lack of follow through with tasks. Over time the mother's commitment worsened and workers began expressing concerns about her care for her son. The mother eventually told staff she wanted to leave the TLP and enter a self-selected placement with her boyfriend.

After fifteen months of residing in the TLP the mother's behavior began to deteriorate significantly. At a staffing called to address her frequent absences from the placement, the mother informed workers she was pregnant and had dropped out of school. The mother stated the TLP was too restrictive and expressed her desire to live with her family where she could enjoy more freedom. The mother agreed to remain in the program but continued to leave without permission on a consistent basis. The mother ultimately decided to terminate her pregnancy and soon afterward ceased participating with TLP services altogether. In an interview with OIG investigators, the caseworker's supervisor described the mother's attitude as being ambivalent at another staffing held in an attempt to reengage her with services. The supervisor stated the TLP was unable to provide effective services to the mother because of her frequent absences and that in retrospect, the case might have been better handled being transferred back to TPSN to provide services to the mother in her community. In her interview with OIG investigators, the caseworker stated she and other workers were concerned about the influence the boyfriend was having on her and that both he and the mother were unwilling to provide any identifying information about him. Although the mother maintained contact with

her son's father and took the boy for visits with him, the father was never approached or engaged by workers involved with the mother's case.

The result of the staffing was an agreement to pursue placing the mother and her son in the home of her maternal aunt, where the mother said she and her son stayed when not at the TLP.  Workers' efforts to complete an assessment of the home were hindered by the aunt's failure to make herself available to meet with workers.   Meanwhile, the mother continued to be absent from the TLP and did not maintain communication with staff.  One week after a home visit was finally performed, the mother told the supervisor she wanted to return to the TLP.  When the mother made a subsequent visit to the TLP one week later to discuss her possible readmission she brought her son with her.  It was the first time the caseworker had seen the boy in eight weeks.  One week later, the mother arrived at the TLP seeking documents she needed for an Administrative Case Review (ACR) being held later that day.  The mother told the caseworker that her son would not be present at the ACR because he had traveled out of state with his father and his family.  The caseworker had never met the boy's father and had no information regarding how to contact him or his family.  The mother told her she would provide the father's contact information at a later time.  Ultimately, the ACR was conducted without the mother because the worker agreed to begin the ACR at an earlier hour believing that the mother would not return.  The mother did return but the ACR had already concluded.

One week after the ACR, and two weeks after the caseworker had last seen the boy, he was brought to a medical office by the mother and her boyfriend.  The office receptionist observed the boy to be unresponsive and cold to the touch and called 911.  The boy was transported to a hospital emergency room and was pronounced dead on arrival.  His internal body temperature was 89 degrees, indicating he had been dead for several hours prior to being brought to the clinic.  Both the mother and her boyfriend were arrested at the hospital and charged with murder and endangering the life and health of a child.  The boyfriend admitted to police he had struck the boy repeatedly and thrown him around the room after he continued to cry while the boyfriend was trying to sleep.  The mother told police that one week earlier the boy had been badly burned on his legs by scalding water while in the care of the boyfriend.  The mother stated she hid the boy's burns and attempted to treat them herself because she feared the Department would take her son into custody if his injuries came to light.  The mother acknowledged the boy had never traveled out of state with his father and that she had concocted the story in order to explain his absence from her appointments with involved workers.  A subsequent child protection investigation indicated both the mother and her boyfriend for death by abuse, head injuries, internal injuries, burns and cuts, welts and bruises.   The mother was later convicted of endangering a child causing death and sentenced to three years in prison.  The boyfriend is currently awaiting trial.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   The Department and the Teen Parent Services Network should ensure that children of parenting teen wards with a history of mental illness, substance abuse, violence or developmental delays who are not eligible for school or employment related daycare services be enrolled at least two days a week in protective daycare.** |

TPSN is able to identify and track clients meeting this criteria. A TPSN staff member will review daycare enrollment status of children's whose parent meets these criteria and assess the need for daycare. We will also have workers encourage these clients to enroll their child(ren) in protective daycare and secure consents from the client to contact the daycare facility. TPSN will generate a quarterly report on the clients who meet these criteria and notify workers of clients whose children are not enrolled in daycare.

**2.  The Department and the Teen Parent Services Network should require a well being check, with consent, when a child of a teen ward misses daycare two consecutive scheduled days.**

TPSN is able to identify and track clients meeting this criteria. A TPSN staff member will review daycare enrollment status of children's whose parent meets these criteria and assess the need for daycare. We will also have workers encourage these clients to enroll their child(ren) in protective daycare and secure consents from the client to contact the daycare facility. TPSN will generate a quarterly report on the clients who meet these criteria and notify workers of clients whose children are not enrolled in daycare.

**3.   The Department and the Teen Parent Services Network should ensure that service providers develop a child care plan with the teen parent when the ward's child is on an "extended visit" or "out of state."**

TPSN will develop a training module in conjunction with the Teen Parent Consultant on developing a childcare plan with teen parents who authorize their child(ren) to be on extended or out of state visits. The training will note that if a client's non-ward child is on an extended or out of state visit, an Unusual Incident Report (UIR) should be completed. TPSN will review any UIRs on any client's non ward child who is on an extended or out of state visit. TPSN staff will contact the worker to ensure an appropriate child care plan is established as well as staff the case as appropriate.

**4. The Department and the Teen Parent Services Network should work with service providers to develop casework practice that engages teen parents in discussions regarding the importance and benefits of providing the name, date of birth and address of their child's father even in cases in which the ward and the father are no longer a couple.**

Current practice is at the time of a child's birth a request is completed by the worker requiring the aforementioned information on fathers.  In instances where the father's information is not available at that time, TPSN expects that the worker will continue to engage the teen parent in discussions on the importance of acquiring that information.

**5. The Department should ensure that service providers make diligent efforts to engage teen fathers in case planning and encourage paternal involvement, including parent child visits.**

When notified of a teen father enrolled in the network, TPSN will conduct an intake on the father for parenting services.  Services include case planning, parental/father involvement and parent/child visitation.

**6.   The Transitional Living Program's policy on child care arrangements should be expanded to require that the service provider develop a child care plan with the teen parent when the ward's child is on an "extended visit" or "out of state."   The child care policy should distinguish biological fathers from a general "list of child care providers."**

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The Inspector General met with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

In response to the report, the private agency strengthened their policy on child care arrangements.

**7. Staff at the Transitional Living Program should make diligent efforts to engage teen fathers in case planning and encourage paternal involvement, including parent-child visits.**

The private agency developed a policy regarding paternal involvement.

## DEATH AND SERIOUS INJURY INVESTIGATION 9

| | |
|---|---|
| **ALLEGATION** | A three year-old boy died as a result of a stroke caused by a blood clot in his brain. The boy was a Department ward living in a traditional foster home placement at the time of his death. |

**INVESTIGATION**   The boy became a ward of the Department four months before his death after police encountered him and his mother at a train station. The mother was behaving erratically and verbalized paranoid delusions when speaking with the officers. The mother was transported to a hospital for psychiatric evaluation and the boy was taken into protective custody. After remaining in one placement for three weeks, the boy was transferred to the home of a non-relative foster mother. Prior to placing the boy in the new home, staff from the private agency handling the case advised the foster mother the boy had special needs and exhibited developmental delays.

At birth, the boy's Infant Genetic Metabolic Screen tested abnormal for sickle cell trait. During the investigation the Inspector General consulted with a pediatric hematologist who noted that when a person with sickle cell trait dies, for any reason, the autopsy will show sickle cells in the veins. This is because when the oxygen levels in the blood drop very low, sickle cell trait cells will sickle. It is for this reason that many deaths in sickle trait persons are incorrectly attributed to the sickle cell disease. While those with the trait do not require any specific treatment, it is recommended that any health care provider be alerted to the presence of the trait in their patients. Upon entering Department custody the boy was assigned a medical case manager through HealthWorks, a health care program administered by the Department in collaboration with the Department of Human Services. OIG investigators' review of the HealthWorks medical file found the results of the boy's metabolic screen had never been requested. The OIG investigators learned that while newborn screens are routinely requested for all children who become Department wards, HealthWorks only requests the metabolic screen for children who are less than two months-old when they enter state care. According to the HealthWorks file, the medical case manager accessed the names of the boy's healthcare providers the day after he entered foster care. However, the medical case manager did not request his healthcare information as required by Department Procedures. The boy's medical records from the clinic he attended while in the care of his mother contained the results of the Newborn Metabolic Screen.

The day before the boy was hospitalized, the foster mother called both the private agency caseworker and her supervisor with concerns about the boy's behavior. The boy had been living in the foster home for two months when she reported that the boy began exhibiting self-injurious behavior including scratching himself to point of causing sores, pulling out patches of his hair and throwing himself on the ground. The foster mother also informed agency staff that the boy had fallen over the weekend which resulted in a bump on his head and a chipped tooth, injuries for which she said she sought emergency treatment. The foster mother stated she had been advised by a nurse at the emergency room to monitor him for seizure activity. Over the remainder of the weekend, the foster mother observed that the boy slept excessively and on the same evening of the phone calls she saw his body stiffen before he fell asleep. In interviews with OIG investigators, both the caseworker and her supervisor denied ever observing any of the behaviors described by the foster mother. Both were unaware the foster mother had spoken with the other until the following morning and found at that time there were substantive differences in the information provided to each, though the calls occurred less than two hours apart. The foster mother also told the caseworker she was contemplating asking for the boy to be removed from her home, a consideration she did not express to the supervisor.

The next morning the foster mother reported that the boy became unresponsive while dressing him and she took him to the hospital emergency room after he suffered what she believed to be a seizure. After two days in the hospital, during which time the boy experienced multiple seizures, doctors determined he had a massive

blood clot in his brain which had led to major swelling and a massive stroke. Although the physicians were able to identify the blood clot as the cause of the stroke, their attempts to ascertain the source of the clotting were inconclusive. The boy's condition continued to deteriorate and he passed away three days after being admitted to the hospital.

One year after the boy's death, a child protection investigation of the foster mother was opened after bruises were observed on the face of a four year-old girl who had been placed in her care. The girl consistently reported the foster mother had hit her in the face with a belt. During the course of the investigation, neither the foster mother nor her boyfriend were able to provide credible explanations for how the bruises occurred or why they had not sought treatment for the girl after recognizing her injuries. Private agency staff learned the foster mother had falsified portions of her licensing application related to her employment status and the composition of her household. The girl's primary physician told the child protection investigator the foster mother regularly failed to keep the girl's scheduled appointments and as a result her immunizations were not up to date. The foster mother was ultimately indicated for cuts, welts and bruises by abuse and cuts, welts and bruises by neglect. At the time of the investigation the foster mother's license renewal was pending. The private agency requested that the Department's Central Office of Licensing close the foster mother's license and categorize it as closed/expiring.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering Department care. If the results of the genetic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks comprehensive exam or by the child's primary care physician.**

With the signed Inter-Agency Agreement between DCFS and the Department of Public Health (IDPH) for the Exchange of Health Information, the Division of Service Intervention has requested the Office of Information Technology Services (OITS) to complete the task of "mapping" the IDPH data to be included in the weekly electronic interface with the Department's database, SACWIS. For those children for whom there is no match in the IDPH database for results of Neonatal Screening for Genetic and Metabolic Disorders, HealthWorks Lead Agencies are instructed to follow-up with the child's primary care physician for the appropriate follow-up screening and testing.

**2. The Department should sanction the HealthWorks agency for failure to comply with HealthWorks Program Plan and ensure that medical case managers obtain medical records from previous health care providers when a child enters the state system.**

Division of Service Intervention staff met with the staff of the HealthWorks Agency, to present the recommendations from the investigative report and to implement a corrective action plan. The HealthWorks agency has provided the Department with a corrective action plan.

**3. The Department should ensure that children with sickle cell trait receive age appropriate genetic counseling from a sickle cell center.**

Division of Service Intervention staff have requested a comprehensive report of all DCFS children and youth who are known to the Illinois Department of Public Health (IDPH) with sickle cell trait for two purposes: 1. to identify all children and youth with sickle cell trait; and 2. to refer those children/youth and their caregivers for age-appropriate genetic counseling.

**4. The foster mother's foster home license should be placed on permanent hold at the Placement**

**Clearance Desk to prevent any future placements.  This report should be shared with the Department's Chief of Licensing Enforcement, to ensure that the foster mother is not licensed in the future.**

The foster home has been placed on placement hold by the Division and the Director's Office.  Placing children in the home would not be allowed until both Divisions released their hold.  In addition, the home is no longer licensed.

**5.  The private agency should develop a corrective action plan to address staff response to caregivers who report behaviors that may be symptomatic of underlying medical conditions, such as severe headaches, loss of balance and seizure-like activity.  This report, along with the Department Guide, *Caring for Children With Chronic Health Care Conditions*, should be shared with the private agency.**

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The agency submitted a written response. The Inspector General met with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.

The agency developed a corrective action plan to address staff response to caregivers who report injuries to children.

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

| ALLEGATION | A 17 year-old boy with severe cerebral palsy died as a result of aspiration pneumonia. A child protection investigation of physical abuse by the mother against his twin brother had been unfounded seven months earlier. |
|---|---|

| INVESTIGATION | The child protection investigation of the alleged abuse was initiated after the brother arrived at school with stitches closing a wound over his left eye. The |
|---|---|

brother reported he had been struck in the face with a fist by his mother's boyfriend. The reporter also noted that the teenager had a shunt in his head. The investigator assigned to the case contacted the school and learned the boy had been treated at a nearby hospital, however he did not seek to obtain documentation of the visit from either the hospital or the family. After being instructed by his supervisor to conduct a search of data records to determine family history, the investigator found no information suggesting the family had previous involvement with the Department. The investigator failed to perform a search of the State Automated Child Welfare Information System (SACWIS), which would have revealed the single mother of seven had previously been indicated for medical neglect and inadequate supervision of her oldest children. A SACWIS check would have also informed the investigator of an incident eight years earlier when the brother was beaten with leather belts by his siblings. At that time, the mother admitted having previously hit her son with a belt leaving marks that were still visible. As a result, the mother was indicated for cuts, welts and bruises by abuse and cuts, welts and bruises by neglect for failing to seek treatment for her son's injuries.

After leaving the school, the investigator attempted a visit to the family's home but was informed by the current resident the family had moved out one year earlier. The investigator performed no other work on the case for six weeks after the failed visit. Although the brother was attending the high school where the injury was first observed for the first four weeks of that time period, the investigator never attempted to locate the brother there. When the investigator finally did visit the family's home he spoke with the mother, who contradicted her son's report. The mother denied she had a boyfriend and stated she had struck her son with a broom accidentally while the two were arguing. The mother described her son as being disrespectful and said he had lied about the nature of his injury. The investigator then met with the brother who asserted that his mother did have a boyfriend and reaffirmed his allegation he had been struck by the man with a fist while attempting to protect his mother during an altercation with him.

In an interview with OIG investigators, the investigator said he assessed the episode to be a typical dispute between a mother and her teenage son. The investigator said he gave less credence to the brother's account of being struck by the mother's boyfriend because he was unable to provide the man's name. The investigator expressed his belief teenagers are often not entirely forthcoming when relating their own actions leading up to discipline.

In the case record, the investigator documented contact with a doctor he identified as being the physician who treated the brother's injury. The case note showed the doctor had concluded the cut above the brother's eye was consistent with the mother's explanation and determined the injury to have been inflicted accidentally. During his interview, the investigator said the contact note he entered in this investigation was entered erroneously. The doctor he spoke with involved a different child with a similar injury in a separate investigation. The investigator did not attempt to obtain records from a local medical clinic where the mother said her son received routine medical care. Since the investigator did not obtain the original documentation regarding the emergency room visit he was unaware the brother had been transported and released into the custody of an 18 year-old sibling. The investigator never spoke with the sibling, despite the sibling's presence in the home during a home visit. The investigator did not ask the mother about the composition of her household or any other children in her home; she had three younger children in addition to the twins and

the two adult siblings.  He did not observe the brother's twin, who had severe cerebral palsy and was confined to a wheelchair in the home.  The investigator ultimately recommended the report against the mother be unfounded and his conclusion was approved by his supervisor.  In an interview with OIG investigators, the investigator's supervisor said he was unaware of the presence of other children in the home at the time the report was unfounded but it would be his assumption the investigator would have interviewed them.

Five months after the report was unfounded, an ambulance responded to the family's home in response to a 911 call that the boy with severe cerebral palsy was not breathing.  The boy was taken to a local hospital where he later died.  Hospital staff found the boy, who required a gastrointestinal tube for feeding, had soft food lodged in his throat.  At the time of his death, the 17 year-old boy weighed 42 pounds.  Physicians who assessed the boy's condition determined he had been well cared for physically and determined his death was the result of aspiration pneumonia.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The child protection investigator should be disciplined for failing to complete basic investigative duties.  He did not conduct a State Automated Child Welfare Information System (SACWIS) data search, he documented a contact with a physician who had no involvement with this family and included it in this investigation, he did not obtain medical information regarding the minor's injury, he did not interview an adult family member with knowledge of the incident and he failed to interview all members of the household.** |
|---|---|

The child protection investigator received a suspension.

## DEATH AND SERIOUS INJURY INVESTIGATION 11

**ALLEGATION**   A mother brought her 3 month-old daughter to a hospital and claimed that the child's father had held them hostage for two days and had beaten the infant by throwing her against various objects; the infant was severely bruised around her forehead and eyes. The infant was diagnosed with skull fractures with a "small bleed." The Office of the Inspector General investigated the serious injury to the infant pursuant to its mandate to investigate serious injuries of children who were involved with the Department of Children and Family Services (the Department) within a year of the injury.

**INVESTIGATION**   The parents were involved in a long term physically abusive relationship, characterized by chronic allegations of violence that the mother would recant. Both parents had substance abuse problems. After several years of trying to work with the mother, the caseworker determined that the children should be removed because of the mother's consistent lack of progress. The mother however, began to cooperate with services and procured an initial order of protection against the father. When the worker went to court to extend the order of protection, however, the mother recanted again. The worker immediately contacted the Assistant State's Attorney to report that based on the occurrence in court, the children were at risk and needed to be removed. The Assistant State's Attorney noted however, that she would not be able to support a finding against the father because of her history of making allegations and then recanting them. The case was complicated by the fact that the only documented act of violence occurred three years earlier when the parents were fighting. The father was leaving the home with a washing machine he had purchased. The father pushed the machine into the mother, injuring the mother and a child she was carrying.

Ten days before the child was seriously injured, the Department received an anonymous call that the child was covered in bruises. An investigator went to the home that day and did not see any bruises, except a faint mark on the child's forehead that the mother pointed out and claimed had occurred when her son knocked over the baby seat while the child was in it. The mother told her that she had already brought the child to the doctor for the bruise. The investigator contacted the doctor who confirmed that the child could have received the bruise by falling while in her baby seat. She did not, however, confirm with the doctor that bruise had been viewed by the doctor. After the child was seriously injured, it was learned that the mother had not brought the child to the doctor for the bruise.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.   This case should be discussed with the investigator, her supervisor and manager. The discussion should emphasize the importance of ensuring that any infant six months or younger with even a minor bruise to the head is seen by a doctor immediately and that the investigator share relevant information with the doctor regarding potential household abuse risks known by the investigator, such as domestic violence, substance abuse and mental illness.**

The case was discussed with the involved employees.

**2.   This case, along with two other OIG investigative reports, should be used as a teaching tool in domestic violence training.**

The Division of Clinical Services and Specialty Services will work with the Office of Training to update the Domestic Violence Policy Training curriculum to include the referenced reports. The reports will be reviewed.

**3.   The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with DCFS Clinical and the Office of Legal Services.**

Statewide Administrator of Specialty Services and the Administrator of Domestic Violence Intervention Program will schedule a series of meetings with Cook and Downstate Deputy Legal Counsel to review the Domestic Violence protocol, to assess the efficacy of current protocol, review current research as well as evidence-based practice recommendations and revise the existing protocol.   A redacted copy of this investigation and the recommendation will be shared with participants at the meeting.

## DEATH AND SERIOUS INJURY INVESTIGATION 12

**ALLEGATION**    A two year-old ward who had been removed from her mother's care was killed in her mother's home during a court-approved unsupervised overnight visit.  Both her mother and her mother's paramour have been charged with First Degree Murder and Endangerment to a Child.

The Office of the Inspector General (OIG) investigated the death pursuant to its mandate to investigate the deaths of children whose families were involved with the Department of Children and Family Services (DCFS) within a year of their deaths.  At the time of her death, the ward and her two siblings had a court-approved goal of return home. The Office of the Inspector General received an additional request for investigation following the ward's death: that the private agency casemanager persisted in recommending reunification despite knowing that the mother was involved with a man who had been convicted of murder.

**INVESTIGATION**    The ward had been removed from her mother's care at birth because her brother had been severely beaten at the home when he was only two months old.  His injuries included a fractured femur and several other skeletal injuries at different stages of healing.  At the time of the abuse investigation concerning the two-month old brother, the Department was unable to determine whether the mother or her paramour had abused the infant.  During the investigation, the mother provided false information to the child protection investigator concerning whether her paramour was ever alone with the infant.  The paramour left the home and the mother was indicated for abuse.  The brother and a step-sister were removed from the home and placed with a relative.

Soon after the abuse investigation was completed, the mother married the paramour.  For several years following the removal of her children, the mother refused to accept that her husband had caused the injuries and attempted to conceal her marriage and continued relationship with her husband from child welfare authorities.  Two years after removal, the husband filed for divorce.  In therapy, the mother was encouraged to view herself as a victim of domestic violence.  Gradually, the mother began to agree with the therapist that her husband had abused her son and that she was a victim of domestic violence because of his frequent betrayals of her with other women.  The mother was never asked to confront her own behavior in providing false information to protect her husband or to address why it had taken her two years to admit that her child had, in fact, been abused.  Based on positive reports from her therapist and parenting coach, the private agency recommended to the court that the children be returned home.  The case progressed in court to a point where mother had unsupervised overnight visitation with her children five days and nights a week.

Just before her children were to be returned home, the mother disclosed to her therapist and caseworker that she had a new man in her life.  The therapist and private agency staff advised the mother not to get into a new relationship just before the children were returned.  The mother assured the therapist she would not and explained to the private agency staff that although she was having sexual relations with the new man, they did not have an "exclusive" relationship.  On this basis, the private agency staff determined that the new man did not meet the definition of a "paramour" and the home did not have to be further assessed, as would be required if a paramour relationship was present.  The caseworker did, however, conduct a criminal background check on the man and learned that he had been convicted of murder as a minor.  The mother told the caseworker that he had only been incarcerated until his 21st birthday and had had a clean record for the last 20 years.  In fact, the man had been tried as an adult, incarcerated for 16 years and had only recently been released from prison.

When the Department's legal representative and the Assistant Guardian *ad litem* learned of the paramour's violent past, they questioned the private agency casemanager, who continued to insist on immediate return

home.  The legal representatives requested a clinical staffing, at which the decision to return the children home was questioned.  The staffing did not, however, address whether continued unsupervised visitation should be continued after the questions had been raised concerning the mother's judgement.

Two days before the ward was killed, the mother called her caseworker and reported that the ward had a bruise on her stomach and the mother did not know how it happened.  The worker told the mother if the ward didn't get better, to take her to the emergency room.

This investigation was pending at the close of FY 11.  The Inspector General issued the following interim recommendation. Final recommendations were issued in FY 12.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department should integrate into its Domestic Violence protocol the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child.** |
| --- | --- |

This case was presented as an in-service training at the regular Regional Clinical Managers meeting.  The managers were provided guidance as to what actions to take in the future on similar case situations. Specifically, if such a situation happens again where Clinical staff in the process of staffing a case have safety concerns they are to take proactive action.  The Regional Clinical Manager will make sure that the worker's supervisor, POS and DCFS Agency executive casework staff and APT monitor (for POS) are made aware of the concerns and seek action.  If the manager is not able to resolve this at their level they are to immediately inform (both by phone and in writing) their immediate supervisor and the Associate Deputy of Clinical.  The Associate Deputy will intervene and seek to resolve the issue(s). If needed he/she will seek the intervention of the Deputy Director to assure that safety concerns are addressed at the highest level warranted.

The Administrator of the Specialty Services Unit and the Administrator of the Domestic Violence Intervention Program will update and revise the Domestic Violence Practice Guide to reflect the practice dynamics of this case.  The dynamics of this case are indicative of power and control that occurs in domestic violence cases, and will be incorporated as examples in the training on the Domestic Violence Practice Guide.

## DEATH AND SERIOUS INJURY INVESTIGATION 13

**ALLEGATION**  The Office of Inspector General reviewed files of the death of a 1 ½ month old infant who died in the care of his parents.  Prior to the infant's death, the Department of Child Protection was investigating allegations that the infant was born positive for amphetamines, vicodin, morphine, and norpropoxy.  It was also reported that the mother was not bringing the infant in for medical appointments and was avoiding telephone contact with hospital staff.

The preliminary review by staff at the Office of the Inspector General suggested that the child protection investigator may have falsified contact notes.

**INVESTIGATION**  The DCFS records for the child protection investigation prior to the death indicated that the child had been removed from his parents' care and placed with his grandmother.  When the child died, the investigator of the child's death learned that the child was in the care of his parents.  When the investigator of the child's death interviewed the grandmother, the grandmother insisted that she had never been given custody of the baby and was only asked to ensure that the mother brought the baby to doctors' appointments.

The investigator of the child's death reviewed the online safety plan, giving custody to the grandmother and interviewed the child protection investigator, who expressed disbelief of the grandmother's story and insisted that the grandmother was well aware that she was to have the care and custody of the baby and was not to allow the child to be returned to the mother and father.  Based on the information from the computer system and the interview with the first investigator, the investigator of the child's death and her supervisor determined that the grandmother should be indicated for death by neglect, because she had allowed the mother and father to have the baby back in violation of the safety plan.

The OIG investigation discovered that although the safety plan entered on the DCFS computerized system provided for custody with the grandmother, the actual hard copy of the safety plan located in the paper file did not.  In fact, the handwritten safety plan form was just as the grandmother had described it – it did not address any change of custody and stated that the grandmother would assist the mother in ensuring that the child went to all medical appointments.  The OIG investigators interviewed other family members who corroborated the grandmother's version of events and explained that the grandmother was physically unable to perform caretaking functions as she was on crutches at the time and did not have a crib.  The grandmother had stated that the investigator had never been to her home and provided pictures of her home that included a spray painted dragon, brightly painted walls and large Chinese lettering on walls.  When asked by the investigator of the child's death whether he could identify anything unusual about the grandmother's home, the first child protection investigator was unable to do so.  There were no casenotes evidencing a conversation with the grandmother or visits to the grandmother's home.

OIG staff learned that the indicated finding against the grandmother was overturned upon appeal.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**  **1.  The first investigator's Child Welfare Employee License should be revoked.**

The investigator's Child Welfare Employee License was revoked.

## DEATH AND SERIOUS INJURY INVESTIGATION 14

| | |
|---|---|
| **ALLEGATION** | A seven month-old boy died as a result of brain injuries caused by physical abuse by his mother.  A child protection investigation of the boy's parents was indicated against them for physical abuse two months prior to his death. |

| | |
|---|---|
| **INVESTIGATION** | The family's involvement with the Department was initiated after the parents called an ambulance to their home to transport their son to a hospital for treatment |

of a leg injury.  A bone survey revealed the then three month-old boy had a fractured femur.  Medical personnel were skeptical of the parents' explanation that the injury had been caused accidentally when their three year-old daughter stepped on the boy's leg while playing inside his crib.  A hotline call was made reporting the injury to the State Central Register (SCR) and a child protection investigation was opened.

The assigned child protection investigator went to the hospital where she observed the boy and spoke with the treating physician.  The doctor told the investigator that the mother's apparent disinterest and lack of emotion regarding her son's injury was suggestive of post-partum depression.  The doctor also stated he observed the father to be "very controlling" and said he was concerned about possible domestic violence in the home.  The investigator then went to the family's home where the parents reiterated their account of their son being stepped on by their daughter in his crib.  The mother disclosed she had been psychiatrically hospitalized as a teenager and was not currently taking any psychotropic medications.  The couple denied any domestic violence issues.

Following the visit, the investigator contacted the father and asked him to identify anyone who could take custody of the child or stay with them in their home while the investigation was pending.  The father named the boy's maternal grandmother and a female family friend as possible caretakers; however, neither was able to accept full responsibility for the boy's welfare.  The investigator then created a fraudulent safety plan which purported that the grandmother would temporarily move into the family's home to ensure the boy and his sister were supervised while with their parents while the friend provided additional support.  The investigator did not seek nor receive approval of the safety plan from her supervisor.  Three days later, when the boy was ready to be released from the hospital, the investigator spoke to the family friend and advised her that she and the grandmother should pick the boy up from the hospital but not allow the parents to accompany them.  The boy was released from the hospital into the custody of the family friend, who then delivered him to the parents' home.  In an interview with OIG investigators, the hospital's child welfare specialist stated the investigator had told her the boy would be cared for in the home of the family friend for the duration of the investigation.  The investigator ultimately indicated the abuse report against both parents based on the determination of medical personnel that the boy's injury could not have occurred in the manner the parents described.

A review of the case file compiled by the investigator found several crucial documents had been falsified.  A comparison with other documents showed the names of the parents had been forged on the original safety plan claiming the grandmother and friend would ensure the couple's children were supervised at all times.  The case record also included a home safety checklist, a body chart and a consent for release of information which all contained the forged signatures of required participants.  The investigator fabricated case notes of contacts that never occurred.  In an interview with OIG investigators, the father stated that while the case record showed the investigator had made multiple visits to the home she had only been there on two occasions.  In an interview with OIG investigators the grandmother denied meeting the investigator in person until after the baby's death, despite case entries documenting that the grandmother was seen in the family's home.  The father said that from the outset of the case the investigator advised him that she would allow the boy to remain in their home under a fraudulent safety plan provided he and the mother used discretion and did

not reveal the truth.  The investigator told her supervisor the case had been opened for intact family services though she had not followed through on the hand-off of the case referral.  The investigator falsely documented that the mother had successfully completed a mental health evaluation despite being informed by staff from the mental health agency where the mother had sought services that she had not completed the evaluation or responded to calls from the agency.  Through her contact with the hospital's child welfare specialist, the investigator was aware the baby had missed five scheduled medical appointments since being released from the hospital; however, she withheld this information from other involved professionals.

Four months after the boy was initially injured he was transported to a hospital emergency room after the father found him limp and unresponsive in the morning.  The child was pronounced dead at the hospital and the cause of death was determined to be the result of a subdural hematoma due to blunt head trauma.  The mother confessed to police she had shaken the infant numerous times during the preceding week and slammed his head against a changing table.  The mother stated she harmed the boy when she was frustrated and depressed and that shaking the infant made her feel better.  The mother was indicated for death by abuse to the boy and both parents were indicated for substantial risk of physical injury to their daughter.  The mother pled guilty to aggravated battery of a child and was sentenced to 10 years in prison.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The child protection investigator should be terminated from Department employment.** |
| --- | --- |

A pre-disciplinary conference was convened with the employee.  Discipline is pending.

## DEATH AND SERIOUS INJURY INVESTIGATION 15

| ALLEGATION | An eight year-old boy died in an automobile accident while riding in a car driven by his mother. A child protection investigation alleging substance abuse by the mother was unfounded six months prior to the child's death. |
|---|---|

**INVESTIGATION**  The child protection investigation was initiated after the hotline received a report that the mother, who had a history of substance abuse and involvement with the Department, had been seen removing the boy from inside the trunk of her car. The report also claimed bags of cocaine had been observed inside the mother's home. The case was assigned to a child protection investigator who made an unsuccessful attempt to contact the family. The investigator waited one month before making another attempt to establish contact, which was also unsuccessful. One week later, the investigator performed a criminal history check on the mother and learned she had been arrested for possession of a controlled substance and retail theft four days after the hotline report was made. Two more weeks elapsed before the investigator spoke with the mother. The mother admitted being arrested and acknowledged past involvement with the Department but maintained she was not using drugs. The mother stated she was living in a facility operated by a private agency's housing program and regular drug screens were a condition of residency. The investigator interviewed the Reporter, who stated that she had no personal knowledge of the allegation, but was only reporting what someone else had told her. The reporter said that the person with information refused to be interviewed.

One week after meeting with the mother, the investigator entered a contact note into the case record documenting a conversation with the mother's caseworker from the housing program. In the note, the investigator wrote that the caseworker acknowledged the mother's participation in the program and stated all residents were subject to two random drug tests per month. The note stated the caseworker said the mother had consistently tested negative for all illegal substances. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the boy to be safe and identified no signs of abuse or neglect. The investigator recommended the report be unfounded and her decision was approved by her supervisor.

Six months later, following the fatal car accident, a second child protection investigation was opened. While attempting to construct an understanding of the family's status at the time, the worker assigned to the investigation contacted the housing worker at the housing program, where the mother continued to reside. The housing worker stated he could not answer any questions about the mother without her having signed a consent for release of information. The housing worker then spoke with the supervisor and cited the housing worker's previous cooperation in providing information regarding the program's drug testing policy to the investigator. The supervisor informed the worker the information contained in the earlier file was inaccurate and did not reflect the program's drug treatment policy.

In an interview with OIG investigators, the housing program caseworker stated he never spoke with the first investigator and had not had any contact with any representative of the Department prior to being contacted following the accident. The housing worker asserted it was agency policy not to discuss any aspect of a client's care without receiving written consent and the approval of their supervisor and the agency's legal staff. The housing worker refuted the information included in the case record by the investigator pertaining to the criteria for and frequency of administering drug tests to clients. Although clients were subject to an initial drug screening, clients were not subsequently routinely tested. When shown the investigator's contact note purporting to document her conversation with the caseworker, the caseworker said, "that's not my statement." However, subsequent interviews with the housing worker cast doubt on his ability to recall the conversation, and OIG investigators determined the Department would be unable to sustain its burden of proof with respect to falsification.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs.** |
|---|---|

If during a child protection investigation, a DCP investigator observes large quantities of drugs, they will notify law enforcement.  The Department plans to issue a Law Enforcement Notification Policy Guide to implement this practice.

## CHILD DEATH REPORT

The Office of the Inspector General (OIG) staff investigate the deaths of Illinois children whose families were involved in the child welfare system within the preceding twelve months. OIG staff receive notification from the Illinois State Central Register (SCR) when a child dies, when the death is reported to SCR.[1] OIG staff investigate the Department's involvement with the deceased and his or her family when (1) the child was a ward of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case within the preceding twelve months.[2]  If OIG investigators learn of a child death meeting this criteria that was not reported to the SCR, staff will still investigate the death.

Notification of a child's death initiates a preliminary investigation in which the death report is reviewed, databases are searched and results reviewed, autopsy reports are requested, and a chronology of the child's life, when available, is reviewed.  The next level of investigation is an investigatory review of records in which records may be impounded, subpoenaed, or requested, and reviewed. When warranted, OIG investigators conduct a full investigation, including interviews.  A full investigation usually results in a report to the Director of DCFS.  The majority of cases are investigatory reviews of records, often including social service, medical, police and school records, in addition to records generated by the Department.

In Fiscal Year 2011 OIG staff investigated **113** child deaths meeting criteria for review, an increase (of 29) from 84 deaths in FY 2010 and the first increase in the number of child deaths reviewed since 2007.[3] A description of each child's death and DCFS involvement is included in the annual report for the fiscal year in which the child died. This year's annual report includes summary information for children who died between July 1, 2010 and June 30, 2011. During this fiscal year investigatory reviews of records were conducted in 90 cases; and full investigations were opened in 17 cases, 3 of those investigations have been completed with 2 reports to the Director, and 14 investigations pending. Six cases are included in a pending cluster report. Comprehensive summaries of death investigations reported to the Director in FY 11 are included in the Investigation section of this annual report.

Individual cases may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. OIG staff continues to address systemic issues through a variety of means, including cluster reports, initiatives, and trainings. One such cluster report, A Ten Year Review of Deaths of Children of DCFS Parenting Teens, was submitted to the Director this fiscal year.  (See Appendix A of this report). OIG staff continued to meet with regional administrators and managers to discuss results of the Quality Assurance and OIG-reviewed random samples of cuts, bruises

---

[1] SCR relies on coroners, hospitals, and law enforcement in Illinois to report child deaths, even when the deaths are not suspicious for abuse or neglect.  The deaths are not always reported.  Therefore, true statistical analysis of child deaths in Illinois is difficult because the total number of children that die in Illinois each year is unknown.  The Illinois Child Death Review Teams have requested that individual county registrars forward child death certificates to SCR to compile a list of all the children who die in Illinois.  It is not known whether this is regularly occurring; in addition, some death certificates are sent to the Child Death Review Team Coordinator well after the fiscal year in which the death occurred.  The Cook County Medical Examiner's policy is to report the deaths of all children autopsied at the Medical Examiner's office.  The OIG acknowledges all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

[2] Prior to August 2010, some unfounded investigations were expunged from the Department's computer system in less than one year. Therefore, not all child deaths meeting the criteria for review were brought to the attention of the OIG. In July 2010 Governor Quinn signed legislation to maintain unfounded reports for 12 months following the date of the final finding.

[3] Child deaths meeting criteria for review: 86 in FY 2006; 111 in FY 2007; 99 in FY 2008; 89 in FY 2009; 84 in FY 2010; 113 in FY 2011.

and welts investigations as a follow-up to the child protection trainings. OIG staff will meet with Northern Region administrators and managers in January 2012.  A second review of investigations will start in Spring of 2012.  For more information see Error Reduction Training on page 155.

This year saw an increase of eight deaths, from FY 2010, of children dying in fires.  A 2003 FEMA report, covering ten years (1990-2000) indicated that Illinois had the highest rate of fire deaths in the nation. According to the report, Illinois children under the age of five are more than twice as likely to die in a fire than the rest of the country's populations. A number of deaths from fires reviewed by OIG investigators in the early 2000's (11 deaths in 2002) prompted the development of the Office of the Inspector General Home Safety training, the first error reduction effort.  FEMA's most recent data (2008), though it does not have specific statistics for Illinois, indicate the nationwide trend is a decrease in deaths of children (a 20% decrease in deaths of children under age five) from 2004-2008 which they believe may be attributed to an increase in public fire education and prevention efforts.  Despite the progress, this fiscal year OIG investigators reviewed deaths of nine children who died in five fires. Two fires each killed two children, one fire killed three children and two children died in individual fires.  Two of the fires were caused by four year olds playing with lighters. According to the National Fire Protection Association almost half of house fires are started by children under the age of five.  One fire was caused by a faulty stove, one by a candle being used by a DCFS guardianship family because the home had no electricity and one of undetermined cause though clutter in the home complicated rescue efforts. None of the fire reports indicated a lack of smoke detectors.  According to the State Fire Marshall Illinois Fire Department Incident Reporting System all of the communities where the fires occurred had an increase in fires from 2009 to 2010. The one exception was the community where the fire was caused by an unattended candle, which experienced a slight decrease.

**Summary**
Following is a statistical summary of the 113 child deaths investigated by OIG staff in FY 11, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and substance exposure status and manner of death. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[4]

---

[4] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

*Key for Case Status at the time of OIG investigation:*

Ward . . . . . . . . . . . . . . . . . . . . Deceased was a ward

Unfounded DCP . . . . . . . . . . . Family had an unfounded DCP investigation within a year of child's death

Pending DCP . . . . . . . . . . . . . Family was involved in a pending DCP investigation at time of child's death

Indicated DCP . . . . . . . . . . . . Family had an indicated DCP investigation within a year of child's death

Child of Ward . . . . . . . . . . . . Deceased was a ward's child, but not a ward themselves

Open/Closed Intact . . . . . . . . Family had an open intact family case at time of child's death / or within a year of child's death

Open Placement/Split Custody   Deceased, who never went home from hospital, had sibling(s) in foster care or child in care of parent with other children in foster care.

Return Home . . . . . . . . . . . . . Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death

Child Welfare
Services Referral. . . . . . . . . . . A request was made for DCFS to provide services, but no abuse or neglect was alleged (Preventative Service also falls into this category)

**Table 1: Child Deaths by Age and Manner of Death**

| | Child Age | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | 2 | | | 1 | 5 | 8 |
| | 0 to 3 | | | 8 | 6 | 15 | 29 |
| | 4 to 6 | 1 | | 3 | 2 | 1 | 7 |
| | 7 to 11 | | | 2 | 1 | 1 | 4 |
| | 12 to 24 | 4 | | | 4 | 3 | 11 |
| Year of Age | 2 | 2 | | 1 | 3 | 3 | 9 |
| | 3 | 1 | | | 3 | 4 | 8 |
| | 4 | 1 | | | 1 | 2 | 4 |
| | 5 | 1 | | | 1 | | 2 |
| | 6 | | | | 2 | | 2 |
| | 7 | | | | | 2 | 2 |
| | 8 | | | | | | |
| | 9 | | | | 1 | | 1 |
| | 10 | | | | | 1 | 1 |
| | 11 | | 1 | | | 2 | 3 |
| | 12 | | | | 2 | | 2 |
| | 13 | 1 | | | | | 1 |
| | 14 | | | | 1 | | 1 |
| | 15 | | | | 2 | | 2 |
| | 16 | 2 | 3 | | | 1 | 6 |
| | 17 | 1 | | | | 2 | 3 |
| | 18 or older | 2 | 1 | | 1 | 3 | 7 |
| | **TOTAL** | **18** | **5** | **14** | **31** | **45** | **113** |

**Table 2: Child Deaths by Case Status and Manner of Death**

| Reason for OIG investigation* | | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|---|
| DCP | Pending | | 1 | 3 | 9 | 4 | **17** |
| | Unfounded | 2 | 2 | 3 | 7 | 9 | **23** |
| | Indicated | 3 | | 1 | 2 | 2 | **8** |
| Ward | | 8 | 2 | 2 | 3 | 10 | **25** |
| Former Ward | | | | | 1 | | **1** |
| Return Home | | | | | | 2 | **2** |
| Open Placement/Split Custody | | | | 2 | 2 | 4 | **8** |
| Open Intact | | 4 | | 2 | 3 | 12 | **21** |
| Closed Intact | | | | | 3 | | **3** |
| Child of a Ward** | | 1 | | 1 | | 2 | **4** |
| Child Welfare Services Referral | | | | | 1 | | **1** |
| TOTAL | | **18** | **5** | **14** | **31** | **45** | **113** |

* When more than one reason existed for the OIG investigation, it was categorized based on primary reason.

** Includes children of a ward who aged out of the system within the year prior to the death.

CHILD DEATH REPORT

**Table 3: Child Deaths by County of Residence and Manner of Death**

| County | Homicide | Suicide | Undetermined | Accident | Natural | TOTAL |
|---|---|---|---|---|---|---|
| Carroll | | | | 1 | | 1 |
| Champaign | 2 | | 2 | 3 | 1 | 8 |
| Clark | | | | | 1 | 1 |
| Coles | | | | 3 | | 3 |
| Cook | 12 | 3 | 5 | 9 | 25 | 54 |
| DeKalb | | 1 | | | | 1 |
| Du Page | | 1 | | | | 1 |
| Franklin | | | | | 1 | 1 |
| Henry | | | | 1 | | 1 |
| Iroquois | | | | | 1 | 1 |
| Jackson | | | | | 2 | 2 |
| Jefferson | | | | | 1 | 1 |
| Kane | | | | | 1 | 1 |
| Knox | | | | 1 | 1 | 2 |
| Lake | 1 | | 1 | 1 | 1 | 4 |
| Livingston | 1 | | | | | 1 |
| Madison | | | 1 | 4 | 2 | 7 |
| Marshall | | | 1 | | | 1 |
| McHenry | | | | 1 | | 1 |
| McLean | | | | | 1 | 1 |
| Peoria | | | 1 | 1 | 1 | 3 |
| Richland | | | | 1 | | 1 |
| Rock Island | | | | 1 | | 1 |
| St. Clair | 1 | | | 2 | 3 | 6 |
| Sangamon | | | | | 1 | 1 |
| Vermillion | | | 1 | | | 1 |
| Washington | | | 1 | | | 1 |
| Williamson | | | 1 | | | 1 |
| Winnebago | 1 | | | 2 | 1 | 4 |
| Other (out of state) | | | | | 1 | 1 |
| **TOTAL** | **18** | **5** | **14** | **31** | **45** | **113** |

**Table 4: Child Death by Substance Exposure and Manner of Death**

| Substance exposure | Homicide | Undetermined | Accident | Natural | TOTAL |
|---|---|---|---|---|---|
| Child exposed at birth*** | 2 | 1 | 4 | 7 | 14 |
| Mother has history of substance abuse | 3 | 0 | 2 | 4 | 9 |

*** This includes children who tested positive for a substance at birth or whose mother tested positive for a substance at birth.  Others may have been exposed to drugs during the pregnancy, but the drug usage was not recent enough to cause the newborn or mother to test positive.

# FY 2011 DEATH CLASSIFICATION BY MANNER OF DEATH

## HOMICIDE
*Eighteen deaths were classified homicide in manner.*

| Cause of death | Number |
|---|---|
| Gunshot wound(s) | 4 |
| Multiple injuries due to child abuse | 7 |
| Abusive head trauma | 3 |
| Death due to parental neglect | 4 |
| **TOTAL** | **18** |

### PERPETRATOR INFORMATION:

| Perpetrator | Number |
|---|---|
| Father | 2 |
| Mother | 3 |
| Mother's Boyfriend | 3 |
| Mother and Mother's Boyfriend | 2 |
| Father's Girlfriend | 1 |
| Foster Mother | 1 |
| Unrelated Peer | 1 |
| Unrelated Adult | 1 |
| Unknown/Unsolved | 4 |
| **Total** | **18** |

| Perpetrator Gender | Perpetrator age range | Charges |
|---|---|---|
| Males | Teen- 37 | 6 |
| Females | 24-34 | 5 |

## SUICIDE

*One 11 year old, three 16 year olds and one 20 year old hung themselves this year. In two cases the deceased was a ward. In two of the deaths a child protection investigation involving the family was unfounded within a year of the children's deaths. In one case there was a child protection investigation pending on the family at the time of the child's death.*

## UNDETERMINED

**Fourteen deaths were classified as undetermined in manner**.

| Cause of death | Number |
|---|:---:|
| Undetermined | 6 |
| Sudden Unexplained Death in Infancy (SUDI) | 3 |
| Suffocation | 2 |
| Drowning | 1 |
| Sepsis complicating prematurity | 1 |
| Subdural hematoma | 1 |
| **TOTAL** | **14** |

## ACCIDENT

**Thirty-one deaths were classified accident in manner.**

| Cause of death | Number |
|---|:---:|
| Asphyxia/Suffocation/Overlay | 9 |
| Injuries from Fire | 9 |
| Motor vehicle accident related injuries | 5 |
| Drowning | 4 |
| Blunt trauma | 1 |
| Prematurity due to maternal cocaine use | 1 |
| Sudden Unexplained Death in Infancy (SUDI) | 1 |
| Hyperthermia due to environmental temperature | 1 |
| **TOTAL** | **31** |

<u>NATURAL</u>
**Forty-five deaths were classified natural in manner.**

| Cause of death | Number |
|---|:---:|
| Pneumonia or respiratory illness (including asthma) | 11 |
| Sudden Infant Death Syndrome (SIDS) | 8 |
| Complications from premature birth | 5 |
| Cardiac disease or complications from heart problems | 5 |
| Congenital issues | 3 |
| Sepsis/Septic shock | 3 |
| Cancer | 2 |
| Chronic medical syndrome | 2 |
| Seizure Disorder | 2 |
| Cerebral Palsy | 1 |
| Complications of Sickle Cell Anemia | 1 |
| Hypoxic encephalopathy | 1 |
| Multiple organ failure | 1 |
| **TOTAL** | **45** |

## HOMICIDE

| Child No. 1 | DOB 2/94 | DOD 7/10 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 16 years |
| Substance exposed: | No, however, mother has a history of substance abuse |
| Cause of death: | Gun shot wound to the abdomen |
| Perpetrator: | Unrelated male |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Sixteen-year-old boy was pronounced dead at a local hospital after being shot a block away from his home. The police responded to a call about shots being fired around 7:00 a.m. The responding officer found the 16-year-old boy on the ground in the parking lot of a gas station. Family and friends believed the boy's brother was the target. A witness who recognized the offender reported that he went up to the victim on a bicycle, exchanged words, and fired. A 26-year-old man has been charged with first degree murder.

**Prior History:** The deceased was one of seven siblings, ages 21 to 5 years. The 36-year-old mother was involved with the Department as a child and as a parent in 1995 and 1998. In December 2009 the hotline was contacted with a report that the youngest child was playing with his mother's lighter and accidentally set his pajamas on fire causing second degree burns to his leg. The mother immediately sought medical help and the child was taken to the hospital. The mother admitted that the lighter was hers and the boy reported that he got it off his mother's television. She had never seen him play with fire before. An investigation for burns by neglect was unfounded.

| Child No. 2 | DOB 9/08 | DOD 7/10 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 21 months |
| Substance exposed: | No |
| Cause of death: | Craniocerebral injuries due to blunt head trauma due to child abuse |
| Perpetrator: | Mother |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Full investigation pending |

**Narrative:** Twenty-one-month-old boy became unresponsive while in the care of his 22-year-old mother. His 23-year-old father was at work. The mother called 911 and the boy was taken by ambulance to a children's hospital where he died the following day. The mother eventually told police that she had been drinking and accidentally threw the boy into a radiator while playing with him, then slapped him because he would not stop crying, and shook him when he became unresponsive. The mother's 4-year-old daughter witnessed the abuse. The mother has been charged with first degree murder. She also was indicated for death by abuse. The mother and the 23-year-old father of the deceased were indicated for substantial risk of physical injury to the two surviving siblings who were placed in foster care.

**Prior History:** The deceased was the subject of a hotline call made two months earlier alleging failure to thrive. The boy was born prematurely at 27 weeks gestation. At 19 months old he weighed just under 13 pounds (less than the 3d percentile for age). The mother took the boy to multiple medical providers so that no one provider had all of the child's medical history. The investigation was unfounded for failure to thrive five days before the boy's death because there appeared to be a medical (organic) component to the boy's failure to thrive. The investigation was indicated for substantial risk of physical injury because of concerns about domestic violence in the home. The case was to be referred for intact family services.

| Child No. 3 | DOB 3/10 | DOD 7/10 | Homicide |
|---|---|---|---|
| Age at death: | 4-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Dehydration due to gastroenteritis with failure to thrive a significant contributing factor | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Child of a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Four-and-a-half-month-old baby was found unresponsive by his twenty-year-old father in the bed that they had been sharing. The infant had been residing with his father for the past ten days. The ward mother, then age 18, resided in a traditional foster home placement with her 19-month-old son. The deceased was born prematurely at 34 weeks gestation. After his birth he had difficulty keeping his formula down and was prescribed medicine to help reduce his spitting up. Two days before his death an aunt cared for the baby and gave him 7 ounces of water after which he began to have diarrhea. The following day, while in the care of his father, the baby was unable to hold down formula and frequently vomited. In the hours before his death, the father attempted to feed the baby twice but he vomited on both occasions.  After these attempts to feed the baby, the father administered the medicine to stop the baby from spitting up. Approximately one hour later the father awoke to find his son unresponsive. An autopsy revealed that the infant died from dehydration due to gastroenteritis with failure to thrive a significant contributing factor, but it also noted multiple healed rib fractures with callous formation. A child protection investigation was conducted. The parents were unfounded for bone fractures, failure to thrive, and the child's death. They were indicated for substantial risk of physical injury by neglect to the baby. An "unknown perpetrator" was indicated for death by neglect and bone fractures by abuse.

Prior History:     The father had been involved with the Department as a victim of neglect in 2005. He was indicated as a perpetrator of sexual abuse in 2005 and 2008. He was not criminally prosecuted in either case. The father's history was not known until the death of his son. The mother had been a ward since 1992. Since their son's death the parents have been the subject of two additional child protection investigations. The first alleged that the father violated a safety plan that had been implemented after the father's sexual abuse history was disclosed. That investigation was unfounded.  A second investigation was initiated after the birth of the mother's third child (the father's second) in September 2011. It also alleged that the father had violated a safety plan. That investigation is pending.  By the mother's voluntary arrangement, the two surviving children are living with a previous foster parent of the mother. The mother is placed in a transitional living program for pregnant and parenting wards. She visits her children regularly, receives parenting support services through the Teen Parent Services Network (TPSN) and is enrolled in a GED program. The father has agreed to complete a sex offender assessment after which visitation with his children will be determined.

| Child No. 4 | DOB 5/08 | DOD 9/10 | Homicide |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Anoxic encephalopathy due to multiple injuries due to child abuse | | |
| Perpetrator: | Father | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Two-year-old medically complex ward was found unresponsive in the morning by staff at his nursing care facility. The boy had lived in the facility since he was three months old after being the victim of severe head trauma caused by his father.

Prior History:     The child became a ward after he was severely injured at the age of 3 months by his 21-year-old father. His 19-year-old mother was a ward in a teen parent independent living program at the time of the boy's injuries. The mother and infant were staying with the father in his family's home. Both parents said the baby cried non-stop. The father admitted to police that he squeezed the baby and that he shook him 20 to 30 times over the last two months. The father was charged with aggravated battery of a child, attempted murder with intent to kill, and aggravated domestic battery. After the child died, the father was indicted on charges of first-degree murder. He is in jail awaiting trial. The 19-year-old mother was not charged. The father was indicated for head injuries and bone fractures by abuse. The mother was also indicated for head injuries and bone fractures by abuse based on the father's statements that the mother was present during some of the incidents in which he hurt the baby. After the baby died, the Department indicated both parents for death by abuse.

| Child No. 5 | DOB 6/05 | DOD 9/10 | Homicide |
|---|---|---|---|
| Age at death: | 5 years | | |
| Substance exposed: | No | | |
| Cause of death: | Blunt force traumatic injuries | | |
| Perpetrator: | Father's girlfriend | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Five-year-old boy was beaten and tortured to death by his father's girlfriend over the course of two days. The 25-year-old father left his son with the 34-year-old girlfriend for the weekend. The girlfriend was nine months pregnant with her seventh child (her third with the boyfriend) and caring for her six children, ages one to 13 years, while living in a motel room. The girlfriend had a friend take her and the boy to a local hospital when her water broke. She told hospital staff that the boy, who was already dead, had fallen while playing. The girlfriend later admitted to police what she had done and that she did it in front of her children. She has been charged with first degree murder. She was indicated for death by abuse and torture of the boy and for substantial risk of physical injury to her own children, including her newborn. Two of the children are living with their father; two are in foster care with a maternal uncle; and three are in foster care with a paternal aunt.

Prior History:     The family came to the attention of the Department in November 2009 after the mother sought medical attention for burns to her two-year-old daughter's arm. The mother explained that the two-year-old pulled a pot of boiling water off the stove onto herself. A child protection investigator visited the home and had the child demonstrate reaching the pot. The treating physician opined that the explanation was consistent with the burn and the injury appeared to be accidental. The investigation was unfounded. The hotline was contacted a second time in June 2010 with a report that the children were home alone for part of the day while their mother worked. The mother was indicated for inadequate supervision and substantial risk of physical injury and an intact family services case was opened. The mother was evicted during the investigation and went to stay at a shelter. The intact family services worker assisted the mother with getting a housing voucher and a social services agency paid for a motel room while the mother waited for the voucher. The worker saw the family weekly and did not observe any signs of abuse or neglect. The worker and his supervisor met with the mother and her children about their service plan five days before the boy's death and the mother agreed to participate in services.

| Child No. 6 | DOB 8/92 | DOD 9/10 | Homicide |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | Unknown, mother has history of substance abuse | | |
| Cause of death: | Gun shot wound to the chest | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eighteen-year-old ward was shot in the chest following an argument with an unidentified man. The ward, who was taken to the hospital by a private vehicle, was pronounced dead at 9:22 p.m.  A police investigation of the teen's murder remains unsolved but open.

Prior History:     The ward's mother, who has seven children, has a history with DCFS dating to 1994 because of neglect. None of her children are in her care. In 1997 the deceased and a sibling went to live with their father. Ten years later, the boy ran away from home. An agency working with the family called the hotline after the father refused to take the child back or make provisions for his care. The father was indicated for inadequate shelter of the fourteen-year-old boy and the boy entered foster care. The boy went on run from numerous placements and also spent some time in detention. In March 2010 the boy returned to a previous placement with his great-grandfather. He remained in that placement but repeatedly requested that his case be closed. He refused to participate in any services, even after a court order was entered that he comply with services.

| Child No. 7 | DOB 12/93 | DOD 9/10 | Homicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Sixteen-year-old ward was shot and killed around 3:00 a.m. on a Friday morning. The ward had been hanging out with friends in an alley. When he walked out to the street someone yelled out from a passing car and shot the ward, killing him.  A police investigation of the teen's murder remains unsolved but open.

Prior History:     The ward was one of seven children. In 1996 the ward, then 2, and his 4 and 6-year-old siblings entered foster care after a service provider came to the house finding the mother intoxicated and the children unsupervised. Subsequently born children also entered foster care. The mother did not complete services and stopped visiting her children within 9 months of their entering foster care. The deceased had mental health issues and used substances. He had multiple placements and as he got older frequently ran from them. At the time of his death, he was on run from his placement with a paternal half-brother. Of the six surviving siblings, one has aged out of the system; one is in a traditional foster home; one is with her father; and three were adopted by the same family.

| Child No. 8 | DOB 8/08 | DOD 10/10 | Homicide |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple blunt trauma injuries due to child abuse | | |
| Perpetrators: | Mother and boyfriend | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation, Reports to Director 6/30/11 and 9/9/11 | | |

Narrative:     Two-year-old girl died in the home of her 33-year-old mother during the fifth night of a court-approved, unsupervised, overnight visit. The mother reported finding the child face down on the bedroom floor around 7:00 a.m. The girl was dead when paramedics arrived. An autopsy revealed multiple injuries including blunt trauma to her stomach and her heart. The mother and her 37-year-old boyfriend were charged with first degree murder. DCFS indicated both the mother and boyfriend for death by abuse to the girl and substantial risk of physical injury to her 4 and 7-year-old siblings.

Prior History:   In October 2006 the mother took her 2-month-old son to the hospital with an unexplained femur fracture. The boy's 26-year-old father had previously similarly abused two of his infant children with other mothers but he was not added to the investigation of abuse as a possible perpetrator. The mother was indicated for bone fractures by abuse and substantial risk of physical injury and the 2-month-old boy and his 3-year-old sister entered foster care. The deceased joined her siblings in foster care as a newborn. In April 2010 the children began court-approved, unsupervised, overnight visits with their mother in anticipation of their returning home. In August 2010 court personnel became aware that the mother had a boyfriend who was previously convicted of murder and a motion for return home was continued until October 2010 to gather more information. The court allowed the mother to continue her unsupervised overnight visits with her children, but ordered that the boyfriend not be present.  See Death and Serious Injury Investigation 12.

| Child No. 9 | DOB 2/97 | DOD 11/10 | Homicide |
|---|---|---|---|
| Age at death: | 13 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound to head | | |
| Perpetrator: | Friend | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:   Thirteen-year-old boy was shot in the head by a friend and killed. The boy and two other teenagers were hanging out on the back porch of a friend's home around 3:00 p.m. when one of the teenagers started playing with a handgun. The teen chambered a bullet in the gun and it went off, fatally striking the boy. Police considered the shooting an accident.

Prior History:   At the time of the boy's death, the Department was in the process of closing the family's intact family services case. The case was opened in June 2009 when the father of the boy's 3 and 4-year-old siblings was indicated for slapping and leaving a handprint on the face of the 4-year-old boy. Both parents participated in services and a relative and the little boy's teacher reported seeing an improvement in family functioning. After the teen's death, the family was offered grief counseling and the case remained open an additional 2-1/2 months.

| Child No. 10 | DOB 5/93 | DOD 3/11 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Diabetic ketoacidosis resulting from respiratory syncytial viral pneumonia | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:   Seventeen-year-old ward died in the hospital. She was taken to the local emergency room for respiratory difficulties and was transferred to another hospital where she died later the same day.

Prior History:   In 1993, at the age of three months, the infant was taken to the emergency room by her 36-year-old mother and her maternal aunt. The infant was diagnosed with abusive head trauma and found to have suffered multiple broken bones. The mother was indicated for the infant's abuse and the infant and her two siblings entered foster care. The girl suffered severe health and developmental problems for the remainder of her life, including hearing loss, visual impairment, quadriplegia, and mental retardation from the abuse. The mother was indicated for the abuse (and later, the child's death). She was tried for aggravated battery, but was acquitted. The girl's two siblings were in foster care together with a relative. One turned 21 and was released from DCFS custody and the other was placed in the subsidized guardianship of the relative.

| Child No. 11 | DOB 1/08 | DOD 3/11 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | No |
| Cause of death: | Multiple injuries due to child abuse, pending |
| Perpetrator: | Mother and boyfriend |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Full investigation pending |

<u>Narrative</u>:      Three-year-old girl was allegedly found unresponsive in the morning by her mother. The 29-year-old mother and her 37-year-old boyfriend have since been charged with first degree murder of the 3-year-old and aggravated battery to her and her 4 and 10-year-old sisters. They are in jail awaiting trial. The sisters, since entering foster care, have reported ongoing abuse by their mother, her boyfriend, and their 35-year-old father, who was engaged in a custody dispute with their mother. The girls are placed together in the home of a relative and their mother has surrendered her parental rights to the girls. A baby born to the mother and boyfriend in September 2011 is also in foster care with a relative.

<u>Prior History</u>:      In September 2010 police called the hotline with a report that the girls' father had called the police about marks on his 4-year-old daughter. The police investigated the father's complaint by interviewing the father, the mother, and the 4 and 10-year-old girls. The mother reported that while disciplining the child with a belt, the child moved and she accidentally incurred marks on her shoulder and cheek. The police called DCFS and took no further action. DCFS investigated the complaint and unfounded an allegation of cuts, bruises, welts to the girl. While the investigation was pending, the mother sought an order of protection against the girls' father, alleging sexualized behaviors by them following a visit with their father. A child protection investigation was conducted and unfounded with none of the girls making an outcry of abuse.

| Child No. 12 | DOB 4/92 | DOD 3/11 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 days shy of 19 years |
| Substance exposed: | Unknown, mother has a history of substance abuse |
| Cause of death: | Gunshot wound to the head |
| Perpetrator: | Unknown |
| Reason For Review: | Deceased was a ward |
| Action Taken: | Investigatory review of records |

<u>Narrative</u>:      Eighteen-year-old ward was walking down the street around 7:00 p.m. on his way to play basketball when he was shot in the head. He was discovered by a passerby lying on the ground, unresponsive. He was taken to the hospital where he was pronounced dead. A police investigation of the teen's murder remains unsolved but open.

<u>Prior History</u>:      The young man had been a ward of the Department since he was 2 years old. His mother lost all nine of her children to DCFS because of her substance abuse and resulting neglect of her children. The ward had been through numerous placements, including homes of relatives and potential adoptive homes. In 2009 his permanency goal was changed to independence and he was placed in a transitional living program where he was still living at the time of his death. The ward had a daughter who was born in June 2010. He was working and participating in services at the time of his death.

| Child No. 13 | DOB 4/11 | DOD 4/11 | Stillborn |
|---|---|---|---|
| Child No. 14 | DOB 4/11 | DOD 4/11 | Homicide |

| | |
|---|---|
| Age at death: | 0 |
| Substance exposed: | Yes, cocaine, marijuana |
| Cause of death: | Prematurity due to spontaneous rupture of membranes due to maternal cocaine use |
| Perpetrator: | Mother |
| Reason For Review: | Indicated child protection investigation within a year of child's death and Closed placement case (sibling adopted within a year of child's death) |
| Action Taken: | Investigatory review of records |

Narrative:    Twin infant boys delivered at 18 weeks gestation died. One baby was stillborn and the other lived only 24 minutes. The boys were their 24-year-old mother's fifth and sixth substance-exposed infants and her fourth and fifth children to die. The mother was indicated for death by neglect. The county coroner consulted with the county state's attorney's office, but no charges could be brought against the mother.

Prior History:    The Department became involved with the mother in November 2008 when her second child died. The boy was born at 25 weeks gestation and remained hospitalized for three months. His mother admitted smoking marijuana and drinking alcohol throughout her pregnancy. The baby boy died within 24 hours of being discharged from the hospital. His mother fell asleep on a couch while holding him. His cause of death was asphyxia due to overlay, accidental. A child protection investigation revealed that the mother had not purchased a crib or made other safe sleep arrangements for the baby. She was indicated for death by neglect. In October 2009 the mother gave birth to a girl. The mother admitted to drinking alcohol and using drugs while pregnant. She was indicated for substance misuse and substantial risk of physical injury to the infant and the baby entered foster care. The mother did not visit the child or participate in services and her parental rights were terminated in December 2010. In August 2010 the mother gave birth to a baby boy at 22 weeks gestation. He died an hour after birth. The mother was indicated for death by neglect and substance misuse. (See Case No. 43 in Accident section).

| Child No. 15 | DOB 2/10 | DOD 4/11 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 months |
| Substance exposed: | No |
| Cause of death: | Blunt force injuries and suffocation |
| Perpetrator: | Mother's boyfriend |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Fourteen-month-old infant was found unresponsive in his crib by his 35-year-old maternal grandmother. The baby's 18-year-old mother had gone out the night before from 10:00 pm until 2:00 am leaving the toddler in the care of her 20-year-old boyfriend of one month. At autopsy the boy was found to have multiple injuries. The boyfriend was charged with first degree murder. He is being held in jail without bond. He also was indicated for death by abuse. The mother was indicated for death by neglect and substantial risk of physical injury to her son.

Prior History:    In January 2011 the grandmother was indicated for inadequate housing and environmental neglect. Seven of her eight children ages 2 to 17 years were living in a 5-bedroom home with four beds. There were also two one-year-old grandchildren living in the home. The home was dirty and had several broken windows and holes in the walls. Four of the seven children were not attending school. The intact family case remains open. The mother of the deceased is pregnant. She is receiving prenatal care and participating in parenting classes.

| Child No. 16 | DOB 2/07 | DOD 5/11 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 years |
| Substance exposed: | No |
| Cause of death: | Subdural hematoma and cerebral injuries due to blunt trauma of the head |
| Perpetrator: | Foster mother, alleged |
| Reason For Review: | Child was a ward |
| Action Taken: | Full investigation pending |

Narrative:      Four-year-old foster child was allegedly beaten by her 27-year-old foster mother while her 30-year-old foster father was at work. The foster mother called 911 stating the child had a seizure. The child was taken by ambulance to the hospital where she was found to have severe head injuries and numerous bruises on her body. She was airlifted to a children's hospital where surgery was performed. She died the next day with her biological parents present. The foster parents reported the child's injuries were self-inflicted from falling and throwing tantrums. Child protection and criminal investigations are pending. The foster parents' biological children, ages 8 and 5, are now in foster care. They are placed together with a relative.

Prior History:      The child and her two younger siblings entered foster care in August 2010 because of domestic violence by the mother's boyfriend, whom she allowed to care for her children. The children were placed together in the foster home. When their sibling was born in December 2010, he joined them in the foster home. After their sister's death, the three surviving siblings were removed from the foster home. They remain in foster care in three separate foster homes. They have a permanency goal of return home.

| Child No. 17 | DOB 11/09 | DOD 5/11 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 18 months |
| Substance exposed: | No |
| Cause of death: | Cerebral injuries due to child abuse |
| Perpetrator: | Father |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:      Eighteen-month-old ward died in her nursing care facility where she had resided in a vegetative state since May 2010.

Prior History:      In April 2010 the child was the victim of abusive head trauma while in the care of her 22-year-old father. Her 18-year-old mother was at school. DCFS and the police investigated. The county state's attorney's office did not approve charges against the father. The father was indicated for head injuries by abuse and the mother was indicated for head injuries by neglect. After the child died, the father was indicated for death by abuse and the mother was indicated for death by neglect.

| Child No. 18 | DOB 1/10 | DOD 6/11 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1-1/2 years |
| Substance exposed: | No |
| Cause of death: | Multiple blunt force injuries due to child abuse |
| Perpetrator: | Mother's boyfriend |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Full investigation pending |

Narrative:     One-and-a-half-year-old boy died in the hospital one day after being beaten by his mother's 23-year-old boyfriend. The 18-year-old mother returned home to find her son unresponsive and she immediately called 911.  The boyfriend has been charged with first degree murder. He was indicated by DCFS for death, head injuries, internal injuries, bone fractures, and cuts, bruises, welts to the deceased and substantial risk of physical injury to his 6-month-old daughter with the mother. The mother was indicated for substantial risk of physical injury to her daughter. The girl is in foster care.

Prior History:     In August 2010 the boy suffered a broken femur while in the care of the boyfriend. The boyfriend's explanation for the injury was determined by a physician to be consistent with the injury and the child protection investigation for bone fracture was unfounded. An intact family services case was opened because the mother was young, had a history of abuse as a child, and was pregnant with her second child. In April 2011 the boy went to the hospital with a fever, extended abdomen, and a fingerprint-looking bruise on his cheek. The boy was found to have a liver infection and the investigation was unfounded for cuts, bruises, welts three days before the boy's death.

## SUICIDE

| Child No. 19 | DOB 2/95 | DOD 5/11 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Cluster suicide report pending | | |

| Child No. 20 | DOB 4/91 | DOD 5/11 | Suicide |
|---|---|---|---|
| Age at death: | 20 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Cluster suicide report pending | | |

| Child No. 21 | DOB 11/98 | DOD 10/10 | Suicide |
|---|---|---|---|
| Age at death: | Two weeks shy of 12 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Cluster suicide report pending | | |

| Child No. 22 | DOB 5/94 | DOD 8/10 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Cluster suicide report pending | | |

| Child No. 23 | DOB 8/94 | DOD 9/10 | Suicide |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Cluster suicide report pending | | |

## UNDETERMINED

| Child No. 24 | DOB 3/08 | DOD 7/10 | Undetermined |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-year-old boy was found drowned in his neighbor's above-ground swimming pool by his 27-year-old father. The father was mowing the grass while the two-year-old boy and his 3-1/2-year-old brother played in the yard. Their 21-year-old mother was not home at the time. The pool was fenced in and had a locked gate. The boy apparently accessed the pool by a ladder that had been left near an opening at the back of the fence to make a repair. The boy's death was undetermined because his drowning was not witnessed. The father was indicated for death by neglect and for inadequate supervision of his sons. An intact family services case was opened following the boy's death.

Prior History:    In May 2010 the hotline was called with an allegation of inadequate supervision after the 2-year-old boy was found with his dog on the street at 6:30 a.m. A bystander identified the boy. When police went to the boy's home, the family was asleep and were unaware the boy had left the home. The parents changed the lock on the door to prevent the boy from leaving the house unsupervised again. The investigation of inadequate supervision was unfounded.

| Child No. 25 | DOB 5/10 | DOD 7/10 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-month-old boy was found unresponsive by his 33-year-old mother. The mother gave the baby a bottle in the early morning hours, burped him, and laid him back down between her and the father on their queen-sized bed. When she awoke around 8:30am, she discovered the baby unresponsive lying on his stomach. The mother called 911 and attempted CPR. The infant was taken by ambulance directly to the medical examiner's office where he was pronounced dead. The baby had been seen for a well-baby check in June, was up to date on his immunizations, and seemed to be healthy.

Prior History:    In June 2010, a state agency staff called the hotline to report inadequate supervision of the newborn and his 5-year-old brother after the mother entered their office and left the two children alone in the waiting area for over 45 minutes. The mother did not have an appointment at the office. Upon returning, she explained that her 5-year-old son had been babysitting the infant. During the investigation, the investigator discussed safe sleep with the mother. The investigation was pending at the time of the infant's death. The mother was subsequently indicated for inadequate supervision of the children. Both the mother and the 23-year-old father were indicated for substantial risk of physical injury to the deceased because they slept with the baby after having been instructed to always place the infant to sleep on his back in his baby bed. An intact family services case was opened and remains open.

| Child No. 26 | DOB 4/10 | DOD 7/10 | Undetermined |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Subdural hematoma due to unknown cause | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-month-old infant was found unresponsive in the morning by his 32-year-old mother who went to wake him to feed him. She had last seen the infant alive when she fed him three hours earlier. The baby had been sleeping in a pack-n-play, but after she fed him at 2:00 a.m. they both fell asleep in the mother's queen-sized bed. The baby was born prematurely at 28 weeks gestation and remained in the hospital for eight weeks. At autopsy the baby had a subdural hematoma of unknown cause. Differential diagnoses included prematurity; infection; dural sinus thrombosis; and blunt head trauma, though there were no other indicators of trauma injury to the baby. The mother has a history of a stillborn baby and a baby that lived for only two days. A child protection investigation of the baby's death was unfounded.

Prior History:    Thirteen days before the baby died, the mother was indicated for substantial risk of physical injury to the infant because of her history with DCFS. In December 2003 the mother's three children, ages 2, 5, and 6, entered foster care. The mother did not make progress in services and did not visit the children regularly. Her parental rights were terminated in August 2005. The mother reported having turned her life around since losing her three children. She received prenatal care, she and the infant tested negative for substances, and hospital staff reported she did well with the baby. She was referred to community services.

| Child No. 27 | DOB 11/10 | DOD 11/10 | Undetermined |
|---|---|---|---|
| Age at death: | 1 day | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Sepsis complicating prematurity | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      One-day-old substance-exposed infant, born at 24 weeks gestation, died in the hospital.

Prior History:    The infant was her 20-year-old mother and 26-year-old father's fourth child. The mother's family had an open intact family case for most of her childhood. She began using drugs at the age of 11, became involved with her drug dealer, and had their first baby when she was 15 and their second at 17. The couple struggled with substance abuse and homelessness and experienced domestic violence in their on again off again relationship. In March 2009 the mother requested assistance from the Department because she and her two children were homeless and an intact family services case was opened. In September 2009 the children entered foster care because of escalating domestic violence between their parents. A third child born in March 2010 tested positive for prescribed opiates. He was believed at risk because of his parents' history and was placed in foster care with his siblings. Initially, the parents participated in some services and visited their children, but in the latter half of 2010 the mother relapsed and visitation waned. The father was still selling drugs. In July 2011 the children's permanency goals were changed from return home to substitute care pending court determination on termination of parental rights. The parents signed specific consents for their children's foster parents to adopt them and the adoption is pending.

| Child No. 28 | DOB 5/10 | DOD 11/10 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 months |
| Substance exposed: | No |
| Cause of death: | Sudden Unexpected Death in Infancy (SUDI) |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Five-month-old infant was found unresponsive on his stomach around 6:30 a.m. by his 31-year-old father who went to check on him when he did not awaken at his usual 6:00 a.m. The father reported that he put the baby to sleep on his back alone in a twin bed the night before around 9:00 p.m. He checked on the baby at 1:00 a.m. and he was sleeping and breathing normally. It is unknown if there was a crib in the home.

Prior History:    There was a child protection investigation pending against the baby's 25-year-old mother. A relative called the hotline reporting concern about the mother's care of the infant, including overfeeding him and not taking him to the doctor. The mother often dropped the baby off with the father, leaving him there for days at a time. The mother's three other children were being raised by their fathers or grandparents. While the investigation was pending, the father sought and was awarded custody of the baby boy. The child protection investigation was unfounded against the mother after talking to the baby's doctor.

| Child No. 29 | DOB 11/10 | DOD 12/10 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 16 days |
| Substance exposed: | No |
| Cause of death: | Undetermined |
| Reason For Review: | Open intact family services case at time of child's death and pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Sixteen-day-old infant was found unresponsive by his 33-year-old mother around 6:00 a.m. The infant had been placed to sleep on his back on a queen-sized bed at approximately 3:00 a.m. The infant was sharing a bed with his mother and three siblings. The mother and her seven children, ages 2 weeks to 12 years, were residing in a shelter. The mother refused a crib that had been offered by the shelter. The mother was indicated for death by neglect and for substantial risk of physical injury to her six surviving children. The children were taken into custody and are placed in two licensed foster homes. The mother gave birth to her eighth child in November. She and the infant reside in Indiana. An investigation for risk to the infant is pending.

Prior History:    The family had an intact family services case open since October 2009 following an indicated report of sexual molestation to the mother's 8-year-old daughter by the mother's husband and substantial risk of physical injury/environment injurious to the children by their mother. The mother had married her husband knowing that he was a sexual offender. He was incarcerated when the intact family case was opened. The mother lived in a shelter with her children. The intact family caseworker attempted to work with the mother who was resistant to services. She called the hotline four times between February 2010 and August 2010; one call was not taken for investigation and three other reports were unfounded. She also consulted with the DCFS Office of Legal Services about screening the case into court.

| Child No. 30 | DOB 7/10 | DOD 1/11 | Undetermined |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death and closed extended family support services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Five-month-old baby boy was found unresponsive by his 46-year-old maternal grandfather. The grandfather reported laying the baby on an adult bed and leaving for work. When he returned a couple of hours later, the baby was not on the bed and he assumed another family member had taken the baby and he returned to work. Later he discovered the baby face down and unresponsive in a pile of clothes beside the bed. He placed the baby on the floor of his van and went in search of the baby's mother and grandmother who then took the infant to the hospital where he was pronounced dead.

Prior History:    In August 2010 a police officer called the hotline to report that the 17-year-old mother had left the family home without her child and her whereabouts were unknown. The officer voiced concern about the newborn's safety in the family's apartment because the home was excessively cluttered with stacks of various items suggesting family members were hoarders. The report was investigated and unfounded because the family cleared and cleaned the apartment and the mother had written a care plan for her child to remain with the maternal grandparents. The case was referred for Extended Family Support Services to assist the grandmother in obtaining guardianship of the child. The maternal grandmother was awarded guardianship of the child the day before his death.

| Child No. 31 | DOB 9/10 | DOD 1/11 | Undetermined |
|---|---|---|---|
| Age at death: | 3-1/2 months | | |
| Substance exposed: | Yes, opiates (prescribed to mother) | | |
| Cause of death: | Sudden Unexpected Death in Infancy (SUDI) | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Three-and-a-half-month-old infant was found unresponsive in a crib at the home of his unlicensed babysitter.

Prior History:    The infant and his two sisters entered foster care two days after his birth. The infant was born exposed to opiates and his 27-year-old mother tested positive for opiates and benzodiazepines. Four months earlier, the mother had been indicated for substantial risk of physical injury to her 3 and 6-year-old daughters based on her prescription drug abuse and an intact family case had been opened. When the children were taken into custody, a foster home could not be identified for all three children so the two sisters were placed together in one home and the infant was placed alone in a newly licensed foster home. The foster mother, who was single and worked full-time, placed the infant in daycare with an unlicensed babysitter. When the baby died, the Department learned that the woman had been caring for more than three children in violation of the Child Care Act and a licensing complaint investigation was conducted because of the violation. In addition, the infant's worker was disciplined for her failure to follow proper procedures for the baby to be cared for in an unlicensed day care home.

| Child No. 32 | DOB 4/10 | DOD 1/11 | Undetermined |
|---|---|---|---|
| Age at death: | 9 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Nine-month-old baby was found unresponsive by his 27-year-old mother who reportedly checked on him a few hours after placing him down for a nap. Responders to the home found it unkempt and dirty and the infant's diaper had not been changed in some time. The mother was indicated for substantial risk of physical injury and her two-year-old daughter was placed in foster care where she remains.

Prior History:    In July 2010 the hotline was called with an allegation of substantial risk of physical injury to the baby, then 3 months old. According to the caller, the mother had planned to put the baby up for adoption, but changed her mind and wanted to give the baby to her mother, who had an extensive history with DCFS. When interviewed by the child protection investigator, the mother said that she planned to parent the baby boy herself along with her two-year-old daughter. The mother was engaged in community services and the provider reported that the mother took care of her daughter. The investigation was unfounded. In November 2010 the hotline was called by the mother's roommate who had just moved out. The roommate reported the home was a mess, the mother did not care adequately for her two children, and the mother had threatened to kill the baby boy. Attempts to interview the family were unsuccessful until five days before the baby's death when the mother made an appointment with the investigator. At that time, the investigator saw the baby and his two-year-old sister who appeared healthy, well-nourished, and clean. The apartment was also clean. The investigation was pending at the time of the baby's death, but was ultimately indicated for environmental neglect and substantial risk of physical injury. The investigator and supervisor were disciplined for failing to contact the community services agency involved with the mother, reviewing the prior investigation, and talking to the prior investigator before the infant's death.

| Child No. 33 | DOB 8/10 | DOD 1/11 | Undetermined |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No, however, mother has a history of substance abuse | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Split custody (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Five-month-old infant was found unresponsive in his infant carrier on a couch in the middle of the night when his 40-year-old mother woke to feed him. The mother reported that the baby was sleeping in his infant carrier because she was in the process of moving to her mother's home and she had already moved the infant's bassinette. She said the baby was in front of the television because watching it made him sleepy. When she discovered the infant, the mother called her boyfriend first, then her sister, and then 911. The mother was indicated for substantial risk of physical injury to the deceased's 2-year-old sibling who was taken into custody and is in foster care.

Prior History:      The mother has a history with the Department dating to 1989. The deceased was her ninth child. The five eldest children were adopted between 1995 and 2001. At the time of the deceased's birth, two children were in the process of being adopted (and are now in the subsidized guardianship of a relative) and the eighth child, a 2-year-old girl, was in the care of the mother. An investigation for substantial risk of physical injury to the newborn based on his mother's history with DCFS was unfounded. The mother had participated in services, including residential and outpatient substance abuse treatment, and had the support of her mother.

| Child No. 34 | DOB 12/10 | DOD 2/11 | Undetermined |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Two-month-old baby was found unresponsive in the morning by her 27-year-old mother between her 26-year-old father's legs while the father was sleeping in bed. The parents had gone to bed late. When the baby awoke, the mother asked the father to feed her. The father got a bottle and lay down with the baby in bed and apparently fell asleep. The father has a history of sleep apnea. The parents had been advised by more than one service provider that they should not sleep with the baby. Both parents were indicated for death by neglect.

Prior History:      In April 2010 an intact family case was opened on the parents and their 3 children, ages 4, 6, and 7 following an indicated report of inadequate supervision of the children. The intact family worker assisted the parents with creating a budget, obtaining beds for the children, giving housekeeping and hygiene support, and providing counseling and in-home parent education and coaching. The intact family case remains open.

| Child No. 35 | DOB 6/10 | DOD 3/11 | Undetermined |
|---|---|---|---|
| Age at death: | 8-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Eight-and-a-half-month-old infant was found unresponsive around 9:30 pm. in his crib by his 27-year-old foster mother. She screamed for the 26-year-old foster father who called 911. The baby was taken to the hospital where he was pronounced dead. A child protection investigation was conducted. The foster mother was indicated for death by abuse and for inadequate supervision and cuts, bruises, welts to a 3-year-old foster child in her care. The 3-year-old and her 1-year-old sister were removed from the home. Investigation revealed that the foster mother had placed the baby in his crib around noon with a bottle. She checked on him at 3:00 and he was playing in his crib and appeared fine. She did not check on the baby again until 9:30 in the evening after eating dinner with the foster father who had returned home from work about an hour earlier. During the investigation, the 3-year-old reported being hit by the foster mother for pooping on the floor. The girl was taken for a medical evaluation that revealed multiple linear marks, loop marks and pattern bruising on her upper thigh, buttocks, and lower back. She and her 1-year-old sibling had skeletal surveys which were negative. The foster mother admitted to placing multiple blankets in the crib to restrict the baby's movement and to cover up the crib so that he would sleep. She admitted to not checking on the baby for at least six hours and to leaving the 3-year-old alone in a bedroom for four to five hours. The foster mother was arrested for felony child endangerment, but no charges were filed.

Prior History:      In July 2009 the foster parents began caring for the foster mother's two younger sisters whose adoptions had disrupted. In January 2010 the couple became licensed to care for four unrelated children. At the end of January the 1 and 3-year-old sisters (then a newborn and 2-year-old) were placed with them. After the mother's sisters departed in June 2010, the deceased, then a newborn, was placed with the couple. Workers visiting the home did not express any concerns about the foster parents. The deceased was the fifth child born to his mother. He entered foster care because of his mother's history. She has surrendered her parental rights to three of her children, had her rights terminated on one child, and has one child in foster care in another state. The foster parents had expressed interest in adopting the deceased.

| Child No. 36 | DOB 12/10 | DOD 4/11 | Undetermined |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Three-month-old infant was found unresponsive in her crib by her 25-year-old father who had been her caregiver all day while her 21-year-old mother was at work. The father reported that he put the baby in her crib for a nap, on her stomach, at 10:30 am and did not check on her again until 5:00 pm at which time he called 911. At autopsy the infant had multiple injuries at different stages of healing, including blunt trauma of the scalp, fractured ribs, a fractured femur, and a recent contusion of the tongue. The pathologist listed the infant's cause of death as suffocation but noted that an autopsy could not distinguish between accidental versus inflicted suffocation and the case needed investigation. Police and DCFS investigated, with police interviewing both parents who gave possible explanations for the baby's various injuries. Both investigations are still pending; abuse is suspected because of the number and extent of the infant's injuries.

Prior History:      In 2008, when the father was 22 years old, he had sexual intercourse with a 13-year-old girl who was staying at his home. He was charged with aggravated criminal sexual abuse and indicated by DCFS for sexual penetration. In December 2010 the father's probation officer called the hotline to report that he and his girlfriend had just had a baby, the deceased. An investigation for substantial risk of sexual injury to the baby was unfounded because the father was compliant with his probation, he was actively involved in sexual offender treatment, his therapist believed he was at low-risk to offend, particularly with his children, and the court in his divorce case allowed the father to be unsupervised with his 5 and 7-year-old sons.

| Child No. 37 | DOB 3/11 | DOD 4/11 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 weeks |
| Substance exposed: | No |
| Cause of death: | Undetermined, cannot exclude overlay or suffocation |
| Reason For Review: | Child of a ward |
| Action Taken: | Investigatory review of records |

Narrative:      Six-week-old baby was found unresponsive by his mother around 2:30 in the morning. The 20-year-old mother had breast-fed the baby and went to sleep with the baby between her and the 19-year-old father in a twin bed. The father admitted to smoking marijuana before going to sleep. The mother had been in a transitional living program but because of conflict in the home, she was given permission two weeks earlier to stay temporarily at her boyfriend's father's house. The mother's worker had purchased an infant pack-n-play and brought it to the father's home for the baby to sleep in. Both parents were indicated for death by neglect.

Prior History:      The mother became a ward in 2007 at the age of 17. In December 2010 she was placed in a transitional living program for pregnant and parenting youth. Shortly after her baby was born, the mother was observed sleeping with the baby by program staff. The mother was counseled on a number of occasions about the dangers of bed sharing and was encouraged to put the baby to sleep in the crib which was placed in her room.

## ACCIDENT

| Child No. 38 | DOB 6/10 | DOD 7/10 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 weeks |
| Substance exposed: | Yes, mother used opiates during her pregnancy |
| Cause of death: | Overlay |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Three-week-old infant was found unresponsive around 11:00 a.m. by his 23-year-old mother. The mother laid down on the couch with the baby around 3:00 a.m. and awoke to find the baby underneath her. A child protection investigation ensued. The infant was born out of state. While he tested negative for drugs at birth, the mother had tested positive for opiates ten days before the birth. On the day of the baby's death, the mother tested positive for opiates, benzodiazepines and cannabis. The mother had been prescribed Vicodin and Xanax, but she admitted to also taking her sister's Valium and family members reported that she was abusing prescription drugs. The mother was indicated for death by neglect to the infant and substantial risk of physical injury to her two surviving children, ages 2 and 3. The children were taken into custody and placed with a family member because their father was in jail. The children remain in foster care.

Prior History:      In August 2009 the hotline was called when the two children were found outside their home in the early morning hours with no supervision. Both parents were asleep when police arrived and did not know that the children were awake and outside. The child protection investigator interviewed several neighbors who reported that they had never previously seen the children outside unsupervised and the investigation was unfounded.

| Child No. 39 | DOB 10/09 | DOD 7/10 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 9 months |
| Substance exposed: | No |
| Cause of death: | Drowning |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Full investigation pending |

Narrative:     Nine-month-old infant was found unresponsive by her 21-year-old mother in a plastic tub full of water in the bathtub. The mother had been giving the infant and her 19-month-old sibling a bath and left them unsupervised.  The mother was indicated for death by neglect and for inadequate supervision of both her daughters. The surviving child was taken into custody. She is placed with a paternal aunt.

Prior History:     An intact family case was opened in May 2009 following an indicated report of substantial risk of physical injury. The developmentally delayed mother had overmedicated her then 5-month-old daughter on a pain reliever and an antibiotic. The case was closed in September 2009 when mother and child left the shelter they had been staying in and their whereabouts could not be determined. The case was reopened in December 2009 following an unfounded child protection investigation. While the intact family case was open, there were two more child protection investigations against the mother because her second child, the deceased, was diagnosed malnourished and failure to thrive.

| Child No. 40 | DOB 3/10 | DOD 7/10 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | No |
| Cause of death: | Suffocation |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Four-month-old infant was found unresponsive by his 31-year-old father who checked on the baby during the night. The 24-year-old mother had placed the baby to sleep on his back with a rolled up blanket by his head. When the baby was found, he was lying on his stomach between the blanket and the side of the bassinette. The family's caseworker had told the mother on more than one occasion that no pillows or blankets should be in the bassinette. After the infant's death, the mother reported that their older daughter had been put to sleep in the same manner without incident. The parents were indicated for death by neglect and for substantial risk of physical injury to their daughter and the father's two sons for whom he had custody. The children entered foster care and were placed with their paternal grandparents. In September 2010 the juvenile court returned the children to their parents under an order of supervision. The case was closed in April 2011.

Prior History:     In July 2006 the father was indicated for burns by neglect after he burned his 4-year-old son while taking him out of his car seat while holding a lit cigarette. In August 2009 the Department became involved with the family because of allegations that the father was acting erratically. The mother participated in services, but the father refused and became increasingly hostile toward the worker, refusing her access to the children. In January 2010, at the worker's request, the county state's attorney's office filed a petition in juvenile court. The court entered orders for the parents to allow the worker access to the children and to participate in services, which they did.

| Child No. 41 | DOB 7/07 | DOD 7/10 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | No |
| Cause of death: | Drowning |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Three-year-old girl was found by her father drowned in a swimming pool a half a block away from her home. The pool was an inflatable pool that had a ladder leading into it. There was no fence around the pool. The 3-year-old girl and her almost 4-year-old sister had left home in the morning after their 20-year-old mother went back to sleep. The girls' 22-year-old father discovered them missing when he came home on a break from work. The almost 4-year-old sister was found in the home next to the swimming pool. The mother was indicated for death by neglect and for inadequate supervision and substantial risk of physical injury. The surviving sister entered foster care and is placed with her paternal grandparents. She has a permanency goal of return home.

Prior History:      Six days prior to the girl's drowning, the hotline was called with an allegation that the trailer the family lived in was a mess and the children appeared neglected. The next morning, a child protection investigator went to the family's home but no one was there. Two days later another investigator and a police officer, who lived across the street from the family, went to the trailer but the family was not home. The police officer's wife said she had seen the mother and her daughters leave in the car. This occurred on a Friday, the little girl died on Monday. After the girl's death, both parents were indicated for environmental neglect and substantial risk of physical injury. The trailer did not have running water or electricity and it was cluttered; the parents admitted to using marijuana on a daily basis.

| Child No. 42 | DOB 10/08 | DOD 8/10 | Accident |
|---|---|---|---|
| Age at death: | 22 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to displacement of a tracheostomy tube for tracheal stenosis | | |
| Reason For Review: | Open child welfare services referral at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Twenty-two-month-old child was discovered by her mother to have dislodged her tracheostomy (breathing) tube while napping. The 24-year-old mother called 911 and an ambulance took the child to the hospital where she was pronounced dead. The child had been born three months prematurely and her prematurity was considered a significant contributing factor to her death. The mother has a surviving 6-year-old son. They are not involved with DCFS.

Prior History:      In December 2008 the mother called the hotline requesting assistance with housing. She had recently moved to another part of the state, was laid off from her job a short time after, and had given birth two months earlier to a premature infant who was hospitalized several hours away. The mother did not want a case opened so a worker provided her with information about available resources. In March 2009 a hospital social worker called the hotline to request that mother be provided with services including a reliable telephone so that the hospital could contact her when necessary. A worker assisted the mother with applying for temporary assistance for needy families and obtaining a housing advocate and provided the mother with train tickets to visit her baby. The baby was transferred to a hospital near her mother in the summer of 2009 and was released to her mother's care a few months later. The mother's case remained open for several months after the baby's death.

| Child No. 43 | DOB 8/10 | DOD 8/10 | Accident |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, cocaine, marijuana, alcohol | | |
| Cause of death: | Prematurity with maternal cocaine abuse a significant contributing condition | | |
| Reason For Review: | Open placement case (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Infant born at 22 weeks gestation died about an hour after birth. He was his 23-year-old mother's fourth substance-exposed infant and her third child to die. The mother was indicated for death by neglect and substance misuse. At the conclusion of the investigation, she was referred to and encouraged to engage in community services because she was pregnant again. (See Case Nos. 13 and 14 in Homicide section).

Prior History:    The Department became involved with the mother in November 2008 when her second child died. The boy was born at 25 weeks gestation and remained hospitalized for three months. His mother admitted smoking marijuana and drinking alcohol throughout her pregnancy. The baby boy died within 24 hours of being discharged from the hospital. His mother fell asleep on a couch while holding him. His cause of death was asphyxia due to overlay, accidental. A child protection investigation revealed that the mother had not purchased a crib or made other safe sleep arrangements for the baby. She was indicated for death by neglect. In October 2009 the mother gave birth to a girl. The mother admitted to drinking alcohol and using drugs while pregnant. She was indicated for substance misuse and substantial risk of physical injury to the infant and the baby entered foster care. The mother did not visit the child or participate in services. Her parental rights were terminated in December 2010.

| Child No. 44 | DOB 6/10 | DOD 8/10 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Overlay | | |
| Reason For Review: | Split custody (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Two-and-a-half-month-old infant was found unresponsive in the morning by his 23-year-old mother. A couple of hours earlier, the mother had taken him out of his crib, fed him, and laid him on his back next to her on a queen-sized bed. The mother took a breathalyzer test and no alcohol was detected. The mother was indicated for death by neglect of the baby because she slept with him after hospital staff (following the infant's birth) had informed her orally and in writing about the risk of sleeping with an infant.

Prior History:    In June 2008 the mother was indicated for inadequate supervision of her then one-year-old and four-month-old children and an intact family case was opened. The children and their 3-year-old sister entered foster care in March 2009 because their mother was not participating in services. The children were placed with their maternal grandmother. The mother became increasingly compliant with services and was doing so well that the newborn was allowed to remain in her custody. The three surviving children were returned to their mother's care in September 2011 and the family is receiving aftercare services.

| Child No. 45 | DOB 5/08 | DOD 8/10 | Accident |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Full investigation, Report to Director June 21, 2011 | | |

Narrative:    Two-year-old boy, while in the care of a babysitter, was found unresponsive in an enclosed inflatable trampoline. He died in the hospital the following day. The 28-year-old babysitter, the only adult home, was in charge of seven children, ages 3 months to 10 years. Six of the children were her own. The babysitter left the 2-year-old and 3-year-old children unsupervised in the inflatable trampoline, hearing the 3-year-old turn the pump to the trampoline on and off, inflating and deflating it. The babysitter was indicated for death by neglect, inadequate supervision, and substantial risk of physical injury.

Prior History:   The boy's 28-year-old mother has a history with DCFS dating to 2002. Her parental rights to a son were terminated in 2009. That boy is in foster care and has a goal of adoption. The mother gave birth to her second son, the deceased, in another state. She returned to Illinois with the child in July 2010. In August, when the boy died, there were two pending child protection investigations against the mother involving inadequate supervision and substance misuse. Both were subsequently unfounded. The babysitter caring for the boy had previously been investigated 25 times. She had an intact family services case open from 2004 to 2006 and again from August 2007 to February 2009 when a court order of supervision entered one year earlier was dismissed.  See Death and Serious Injury Investigation 3.

| Child No. 46 | DOB 1/96 | DOD 9/10 | Accident |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Seizure disorder due to multiple medical injuries due to a motor vehicle striking a pedestrian | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fourteen-year-old medically complex boy was found unresponsive in bed in the morning at the long term nursing care facility where he lived. He was taken by ambulance to the hospital where he was pronounced dead. In 1998, when he was 2 years old, the boy was hit by a car and suffered a traumatic brain injury that resulted in multiple medical conditions. He had been cared for in his home with the help of direct nursing care 60% of the time. In September 2010, however, his family became at risk of losing their home and his parents decided he would be better cared for in a facility.

Prior History:      The family has a history of indicated reports with DCFS dating to 1991 prior to the boy's birth. The Department provided intact family services from April 2002 until March 2003 and again from March 2010 through September 2010.

| Child No. 47 | DOB 12/94 | DOD 9/10 | Accident |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fifteen-year-old developmentally delayed boy, who functioned at the level of a six-year-old, was found drowned in a lake outside of town two days after he went missing. The boy was allowed to ride his bike around the neighborhood but was supposed to check in with his parents every hour. When he failed to check in his parents called the police and a search ensued.

Prior History:      In January 2010 the hotline was called by a school counselor who said the boy told her that his 42-year-old mother had stabbed him and police had come to his house. The child protection investigator contacted the police who reported they were called to the house because the boy struck his mother in the head with his skateboard. According to the police, the boy was the aggressor. His mother, who is also developmentally delayed, had a scratch on her head; the boy had no injuries. The boy denied to the child protection investigator that his mother hurt him. The mother said her son had never acted aggressively previously and she made an appointment for him to be seen by his doctor. The investigation was unfounded. The family was offered services but they declined them.

| Child No. 48 | DOB 8/07 | DOD 9/10 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | No |
| Cause of death: | Cerebral infarct and thromboses due to a subdural hematoma due to blunt trauma of the head |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Three-year-old child died ten days after being taken to the emergency room by his 24-year-old mother for allegedly falling off a kitchen counter. The boy had been in the care of his mother's 25-year-old boyfriend of ten months while she was at work. The boy was transferred to a children's hospital, treated, evaluated for abuse, and released to his mother's care. Nine days later, the boy became unresponsive again while in the care of the boyfriend. The boyfriend took him to the emergency room. He was transferred to the children's hospital where he died the next day. It is believed the child's death was related to the head injury he suffered ten days earlier. Post-mortem evaluation of the injuries strongly suggested abuse. No criminal charges have been filed. DCFS indicated the boyfriend for death, head injuries, and cuts, bruises and welts by abuse. The mother was not indicated for any of the boy's injuries. The boy was an only child.

Prior History:     In May 2010 the boy, then 2-1/2 years old, was taken to the emergency room by his mother who reported that he was irritable since falling the day before after tripping on a t-ball set. The boy had been in the care of the mother's boyfriend of six months. The boy was found to have a fractured elbow and was transferred to the children's hospital for surgery. DCFS investigated the fracture and unfounded the report based on medical opinion that the injury was consistent with the mother and boyfriend's explanation of what happened.

| Child No. 49 | DOB 6/10 | DOD 10/10 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 months |
| Substance exposed: | No |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) with a history of co-sleeping |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:     Four-month-old boy was found unresponsive by his 21-year-old mother. The mother and baby had slept on the couch overnight at the maternal grandmother's home. The mother's younger sister heard the child cry around 3:40 a.m. when she left for her paper route. The mother awoke a little before 7:00 a.m. and found the baby on the floor beside the couch. The mother called 911. When paramedics arrived the baby was deceased and he was taken by ambulance to the coroner's office.

Prior History:     The infant's mother is a former ward. In May 2005, when she was 15, she gave birth to a daughter. In April 2006 the daughter entered foster care. The teen mother participated in services and her daughter was returned to her care. She reentered foster care in January 2009. In May 2010 the mother signed consents for her daughter's foster parents to adopt her. The following month the mother gave birth to the deceased. The hotline was called with an allegation of substantial risk of physical injury based on the mother's history. The investigation was indicated and the case was screened with the county state's attorney's office. A petition was filed, but the court did not grant temporary custody of the child, instead entering an order of court supervision. An intact family services case was opened. The mother did not engage in recommended services and in August 2010 the judge awarded guardianship of the baby to the Department but allowed him to remain in the care of his mother with agency monitoring. Nine months after her son's death, in July 2011, the mother gave birth to another son who was taken into custody upon his discharge from the hospital.

CHILD DEATH REPORT

| Child No. 50 | DOB 9/10 | DOD 10/10 | Accident |
|---|---|---|---|

|  |  |
|---|---|
| Age at death: | 7 weeks |
| Substance exposed: | No |
| Cause of death: | Possible suffocation in a setting of co-sleeping |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Seven-week-old infant was found unresponsive by his 20-year-old mother around 10:00 in the morning. The mother's sister called 911 and the baby was taken by emergency services to the hospital where he was pronounced dead. The mother had breast-fed the baby in the early morning hours in her bed. The baby normally slept in a bassinette next to the mother's bed, but the mother fell asleep with the baby on top of her. The mother was unfounded for death by neglect.

Prior History:    In December 2009 the mother and her 23-year-old boyfriend (the father of the deceased) had a physical altercation while their 7-month-old daughter was present. The altercation took place in the maternal grandmother's home where the mother lived with the baby. The fight started because the baby was crying and the mother wanted the father to pick her up, but the father refused because he didn't want to spoil the baby by holding her all the time. The father admitted to pushing the mother. He was indicated for substantial risk of physical injury to the baby and was given a referral for community services.

| Child No. 51 | DOB 10/98 | DOD 10/10 | Accident |
|---|---|---|---|

|  |  |
|---|---|
| Age at death: | 12 years |
| Substance exposed: | No |
| Cause of death: | Complications from smoke inhalation injuries due to house fire |
| Reason For Review: | Child was a ward within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Twelve-year-old boy died in the hospital from injuries sustained in a house fire five weeks earlier. The boy and his 10-year-old brother were in the subsidized guardianship of their 46-year-old maternal great aunt and 52-year-old great uncle. The guardians' 18-year-old daughter died from the fire and the 10-year-old boy suffered second-degree burns to his face, neck, and upper body. The family's electricity had been turned off and they were using candles for light. They let the candles burn while they were sleeping. The guardians had not asked the Department for assistance. They were indicated for death by neglect, burns by neglect, and inadequate shelter. The 10-year-old boy was removed from their care. He is placed in the licensed foster home of another maternal great aunt and uncle.

Prior History:     The family has a history with DCFS dating to 2003 because of domestic violence. The boys and two younger siblings entered foster care in 2005. A fifth child, born in 2008, was allowed to remain in the mother's custody based on her participation in services. In 2009 the two younger siblings returned home, but the older two children were placed in the subsidized guardianship of the aunt and uncle who had been their foster parents since they entered care. The mother's case was closed, but reopened in March 2010 as an intact family case.

| Child No. 52 | DOB  10/09 | DOD 12/10 | Accident |
|---|---|---|---|
| Child No. 53 | DOB  6/08 | DOD 12/10 | |

|  |  |
|---|---|
| Ages at death: | 14 months and 2-1/2 years |
| Substance exposed: | No |
| Cause of death: | Carbon monoxide intoxication due to inhalation of smoke and soot due to a house fire |
| Reason For Review: | Unfounded child protection investigation within a year of children's deaths |
| Action Taken: | Investigatory review of records |

**Narrative**:      Fourteen-month-old and 2-1/2-year-old siblings died in a fire in their home.  Four and 6-year-old siblings survived, as did the 29-year-old mother and 32-year-old father. The family was staying in a home that was so cluttered it was difficult for the family to exit the home; the family members that survived the fire went out through a bathroom window on the second floor. The parents were unable to reenter the house to find the two smaller children because of smoke and flames. The cause of the fire was undetermined. Both parents were indicated for death by neglect to the two deceased children and substantial risk of physical injury to the two surviving children and an intact family case was opened. The case remains open.

**Prior History**:    In February 2010, the local sheriff's office responded to a domestic violence call at the home. The agent discovered the condition of the home and advised the parents that it was not safe for the children to stay in the home until the clutter was removed. When the agent returned to check the condition of the home, she saw no improvement and contacted the father's sister who was responsible for the belongings in the home since her parents' death. The family made a plan for two of the children to stay with one relative and the other two children to stay with another relative until the house was cleared. A relative called the DCFS hotline to report what was happening. An investigator interviewed the parents and visited the relatives to confirm the plan the parents made for the children and ensure the homes were appropriate. The investigator unfounded the investigation for inadequate supervision and environmental neglect and offered the family services which they refused. After the children's death, the mother reported that they had only been staying at the house for a couple of days because the relative with whom they were living was ill and they were giving her a chance to recuperate.

| Child No. 54 | DOB 11/10 | DOD 12/10 | Accident |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No, however, the mother has a history of marijuana use | | |
| Cause of death: | Likely suffocation due to co-sleeping | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative**:      Six-week-old infant was found unresponsive by his mother around 2:00 in the afternoon. The 27-year-old mother had laid down with the baby on a couch to take a nap. The mother, who had been drinking, placed the baby between herself and the back of the couch. There was a crib in the home. Police officers who responded to the 911 call found empty alcohol bottles and the mother tested positive for marijuana. The mother was indicated for death by neglect to the infant and substantial risk of physical injury to her 5-year-old son. The 5-year-old was taken into protective custody and placed with his maternal grandparents who were granted temporary custody of the boy in court.

**Prior History**:    In April 2010, the mother and her sister were indicated for inadequate supervision for leaving their four children, ages 6 months to 5 years, alone in their apartment while they were outside smoking. They agreed not to leave the children alone in the apartment in the future and the investigation was closed noting no services were needed.

| Child No. 55 | DOB 12/10 | DOD 1/11 | Accident |
|---|---|---|---|
| Age at death: | 4 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation due to sibling overlay | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:** Four-week-old infant was found unresponsive by her 28-year-old mother. The mother had placed the infant to sleep in her pack-n-play crib and had put her 22-month-old son to bed on an air mattress in another room. She went to take a bath and when she came out of the bathroom, she discovered her 22-month-old son sitting on the 4-week-old in the pack-n-play. There was a suitcase in the room that the boy was believed to have stood on to get into the pack-n-play. The infant's 34-year-old father had gone out a couple of hours earlier. A police investigation and a DCP investigation were conducted. The mother reported that her son was initially jealous of the baby, but had been less jealous lately and liked to cuddle with the baby. After the baby's death, the boy went to stay with his grandfather for a little while. The investigations into the baby's death were unfounded. An intact family case was opened to provide services, including grief counseling, to the family. The case remains open.

**Prior History:** In September 2010 the maternal grandmother called the hotline to report that her daughter was pregnant and unpredictable and had flung her one-year-old son onto the couch. An investigation for substantial risk of physical injury to the boy was unfounded after the mother's brother and father vouched for the mother's good care of her son and an emergency room nurse raised concerns about the maternal grandmother.

| Child No. 56 | DOB 9/04 | DOD 1/11 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 years |
| Substance exposed: | No |
| Cause of death: | Smoke inhalation due to house fire |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Six-year-old boy died in a house fire. The boy and his 4-year-old brother were home alone in the early evening while their 32-year-old mother was visiting a neighbor in a nearby apartment. Their 39-year-old father was not home. The 4-year-old reported that he saw his brother pick up a red lighter from his mother's bedroom and take it to his bed and set his bed on fire. The 6-year-old boy's body was found in his bedroom. The 4-year-old boy had gone downstairs and he survived. He was taken into custody and is placed with his maternal grandparents. The mother was charged with felony child endangerment.

**Prior History:** In August 2010 the mother was investigated for neglect after the deceased, then 5 years old, began having auditory and visual hallucinations and the mother took him to the hospital believing that he got into her bottle of Benadryl pills which she had discovered open on her dresser. The boy told a doctor that he ate two red pills. The boy was able to demonstrate for the child protection investigator how he opened the bottle. The child protection investigator conducted a Home Safety Checklist with the mother and she agreed to put all medications in the home out of the reach of her children. The incident was determined to be an accident and the investigation was unfounded.

| Child No. 57 | DOB 1/06 | DOD 2/11 | Accident |
|---|---|---|---|
| Child No. 58 | DOB 11/04 | DOD 2/11 | |

| | |
|---|---|
| Age at death: | 5 & 6 years old |
| Substance exposed: | Yes, methamphetamines |
| Cause of death: | Carbon monoxide intoxication due to house fire |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

**Narrative:** Five and six-year-old siblings, whose grandmother was their guardian, died in a house fire at their mother's home where they were visiting for the weekend. Around 11:30 p.m. the mother's 24-year-old boyfriend awoke to use the bathroom and smelled smoke. He woke up the 25-year-old mother, grabbed her 2-month-old baby girl and ran out of the home. The boyfriend went back in the home to try to get the two older children, but was unsuccessful. The cause of the fire was determined to be a malfunctioning stove.

Prior History:   In December 2010 the mother gave birth to her fourth child; the hospital called the hotline because the mother did not have her other children in her custody. The mother had a history with DCFS and the criminal justice system because of substance abuse. In 2009 she relapsed and violated her probation when she gave birth to her third child, a son exposed to benzodiazepines. The mother was sentenced to two years in prison and signed over guardianship of her two eldest children to their maternal grandmother. She and the father of the newborn boy gave him up for adoption. When the fourth child was born, neither the mother nor the baby girl tested positive for substances; the maternal grandmother still had guardianship of the older children; and the grandmother reported her belief that the mother was ready to parent the newborn. The infant was released to her parents' care and the investigation was pending with a plan to open a case for intact family services.

| Child No. 59 | DOB 11/90 | DOD 3/11 | Accident |
|---|---|---|---|
| Age at death: | 20 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Multiple injuries due to automobile striking fixed object | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:   Twenty-year-old ward died after crashing the car he was driving into the brick wall of a restaurant while being pursued by police. The ward, and his 19-year-old girlfriend who suffered nonlife-threatening injuries in the crash, had carjacked and kidnapped a 22-year-old man that the girl knew. After they let him out of the car, the man called police; an officer who heard the bulletin and spotted the car set off in pursuit.

Prior History:   When he was 8 years old the deceased and his 2-year-old brother were given up for adoption by their mother who could not provide for them. The boys were adopted in 1998 by a couple who had adopted another son in 1994. The deceased displayed an array of emotional and behavioral difficulties from the start. His parents sought help from doctors, therapists, and an adoption preservation program. At age 12, the boy was placed on probation for criminal activity. Over the years, the boy's problems became worse. In 2007, when he was 16 years old, the boy assaulted his brother and threatened his mother. It was believed the boy could no longer safely remain at home and he became a ward of DCFS through a no-fault dependency petition. His parents remained committed to his care and hoped residential treatment would allow him to return home one day. Unfortunately, the ward engaged in a pattern of running away from his placements and criminal activity that had him in and out of detention. At the time of his death the ward had been on run for two weeks from his transitional living program. The agency servicing his case filed a missing person's report with police, requested a juvenile arrest warrant, and tried to contact the ward by calling his girlfriend.

| Child No. 60 | DOB 4/08 | DOD 4/11 | Accident |
|---|---|---|---|
| Child No. 61 | DOB 3/07 | DOD 4/11 | |
| Child No. 62 | DOB 2/02 | DOD 4/11 | |
| Age at death: | 2-1/2, 4, and 9 years old | | |
| Substance exposed: | No | | |
| Cause of death: | Smoke inhalation due to a house fire | | |
| Reason For Review: | Closed intact family services case within a year of children's deaths | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Two-and-a-half, four, and nine-year-old siblings died after the 4-year-old accidentally set his family's home on fire while playing with a cigarette lighter. The 31-year-old mother and 36-year-old father were awakened around 2:00 a.m. by their almost-5-year-old son who said that his brother was playing with a lighter. The home was already on fire. The parents and seven of their ten children, ranging in age from 6 months to 12 years, survived the fire. The parents reported that the 4-year-old liked playing with fire, so they were careful to keep only one lighter in the home and they kept it hidden in a drawer.

Prior History:     The family has a history with DCFS dating to 2002 because of domestic violence. Intact family services were provided. In 2009 the parents were indicated for environmental neglect and another intact family services case was opened with court supervision. The case was closed in September 2010.

| Child No. 63 | DOB 6/09 | DOD 5/11 | Accident |
|---|---|---|---|
| Age at death: | 1-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Nearly 2-year-old boy was found unresponsive by his cousins floating in the family swimming pool. The boy was at home with his 32-year-old adoptive father while his 37-year-old adoptive mother had taken other children to the store. The father was not feeling well so he went to lie down and asked the boy's teenaged cousins to watch the boy. The cousins believed the boy snuck out to the backyard when one of the boys went outside to get something. A child protection investigation against the father was unfounded for neglect.

Prior History:     The mother and father are parents to nine children ranging in age from 6 months to 18 years. Three of the children are the mother's biological children and the other children were adopted. Six days before the boy's death the mother went to the police station to report that two of the adopted children, girls ages 12 and 15, had stolen from her and one of them may have sexually abused the boy. The police called the hotline and an investigation ensued. The mother recanted her allegation of sexual abuse stating that she misunderstood a minor accident that had occurred. The family was planning to move to Florida and the mother did not want to take the two girls with the family. The child protection investigator assisted the mother by finding community agencies for counseling and the mother worked with family members to make alternative living arrangements for the girls. The investigation was eventually unfounded because the mother recanted the allegations.

| Child No. 64 | DOB 3/08 | DOD 6/11 | Accident |
|---|---|---|---|
| Child No. 65 | DOB 12/98 | DOD 6/11 | |
| Child No. 66 | DOB 7/95 | DOD 6/11 | |
| Age at death: | 3, 12, and 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries sustained in an auto accident | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-year-old girl died two days after sustaining injuries in a vehicle accident. The deceased child's two half-sisters, ages 12 and 15, died in the accident. A 4-year-old brother survived critical injuries. The 15-year-old was not wearing a seat belt. The children's 35-year-old mother was a passenger and survived non-life-threatening injuries. The mother's 26-year-old friend was the driver of the van. She and her two children, ages 8 and 2, suffered non-life-threatening injuries. The driver lost control of the van and collided with a semi truck. The driver of the van was ticketed for improper lane usage, not wearing a seat belt, not having a valid driver's license, and speeding. There is a pending child protection investigation of the mother for death by neglect to her daughters and substantial risk of physical injury to her son.

Prior History:    From 1999 to 2003 the mother and her three daughters received preventative services from the Department. In 2008 the mother's 38-year-old boyfriend was indicated for cuts, bruises, welts to the mother's eldest daughter. In January 2010 the boyfriend was incarcerated for domestic battery. Around the time he was paroled in May 2010 the Department indicated the boyfriend for sexual abuse to the two oldest girls that occurred between 2007 and 2009. The boyfriend was prohibited from returning to the family home and contacting the mother's daughters. He was to have only supervised visitation with his two children with the mother. The girls were linked to community services and the eldest daughter went to live with friends. In April 2011 the Department was called with an allegation of substantial risk of physical injury/environment injurious because the mother was attempting to get her daughters to change their testimony against the mother's boyfriend. This investigation was pending at the time of the girl's death.  Criminal charges of sexual assault against the boyfriend were dropped in June 2011.

| Child No. 67 | DOB 10/23/09 | DOD 6/8/11 | Accident |
|---|---|---|---|
| Age at death: | 1-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Pulmonary edema and congestion due to clinical hyperthermia due to Environmental temperature | | |
| County: | Richland | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    One-and-a-half-year-old child was found unresponsive in a playpen by his 12-year-old aunt. He had been napping in a room without air conditioning. He was in the care of his 39-year-old grandmother in her home. Neither parent was at the home. Police and child protection investigations are pending. The boy's 3-month-old sister was taken into custody one week after her brother's death when a worker discovered that the mother had left the infant in the care of the maternal grandmother in violation of a safety plan.

Prior History:    There were two pending child protection investigations against the 19-year-old mother and 27-year-old father involving the deceased. In April 2011 the hotline was called with an allegation of environmental neglect. The report was unfounded two days after the boy's death because the parents had moved from the home at issue to live with the maternal grandmother. In May 2011 the hotline was called by a physician for the parents' 2-month-old daughter who was concerned about the baby girl's failure to gain weight. The parents were indicated a month after their son's death for medical neglect and failure to thrive.

| Child No. 68 | DOB 6/11 | DOD 6/11 | Accident |
|---|---|---|---|
| Age at death: | 6 days | | |
| Substance exposed: | No, however, the mother has a history of substance abuse | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Six-day-old ward was found unresponsive when his 27-year-old aunt awoke with the baby face down on her lap. The aunt had been sitting in an upright position and had placed the baby face down in a horizontal position on her lap to sleep. The aunt also fell asleep. The aunt called 911 and emergency personnel took the baby to the hospital where he was pronounced dead. The baby was placed with his aunt upon his release from the hospital because of his mother's history with DCFS.

Prior History:     The family has been involved with the Department since 1994. The mother was 15 years old when she gave birth to her first child in 1988. The deceased was the 38-year-old mother's tenth child. The mother has a history of drug addiction and does not have any of her children in her care. Six of the ten children have been adopted; one child is in the guardianship of a relative; one child is in foster care with a relative; and two children are deceased.

## NATURAL

| Child No. 69 | DOB 7/06 | DOD 7/10 | Natural |
|---|---|---|---|
| Age at death: | 4 years | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Bronchopneumonia with multiple congenital heart defects a significant contributing condition | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Four-year-old child was found unresponsive by his 46-year-old father. The child was lying face down in his playpen. The child had a medical history of seizures, developmental delays, and hypotonia. He had been seen by a doctor two days earlier for a respiratory infection. A month prior to the child's death, the mother was diagnosed with cancer. Four days after the child's death, she tested positive for cocaine. The father tested negative for substances. The family is currently receiving court supervised intact family services.

Prior History:     The family first became involved with DCFS in July 2006 when the deceased tested positive for cocaine at his birth. Both parents admitted to using cocaine. They were indicated for substance misuse and an intact family services case was opened on them, their newborn, and their 2 and 4-year-old children. Both parents successfully participated in services and the intact family services case was closed in October 2007. In September 2009 a child protection investigation was initiated on the belief that the 32-year-old mother had relapsed on alcohol. The investigation was unfounded after interviewing the mother, father, children, and school personnel.

| Child No. 70 | DOB 9/02 | DOD 7/10 | Natural |
|---|---|---|---|
| Age at death: | 7 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seven-year-old girl died after having an asthma attack while in the care of her grandparents. The girl had begun coughing and complaining of shortness of breath. The grandparents gave her a nebulizer treatment but the child continued to have trouble breathing until she suddenly collapsed. The grandparents called 911 and emergency personnel took the child to the hospital where she was pronounced dead. The girl had a history of asthma and took prescription medication daily.

Prior History:   In April 2010 the hotline was called with an allegation of substantial risk of physical injury to the deceased's 14-year-old half sister. The 14-year-old girl told someone that her stepfather pushed her down the stairs and locked her out of the house. Investigation revealed that the stepfather was disciplining the teen for sneaking boys into the house and for having a hickey. When he tried to take away her phone and computer she resisted. The stepfather denied pushing the teen, saying he took her outside to calm down and that she was not locked out because the garage door was left open. Professional collateral contacts confirmed the teen's history of defiant, aggressive, and self-injurious behavior. The teen's mother, as well as collateral contacts including the teen's paternal grandmother, did not believe that the teen was at risk of injury and the investigation was unfounded against the stepfather.

| Child No. 71 | DOB 12/05 | DOD 7/10 | Natural |
|---|---|---|---|
| Age at death: | 4-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Congenital heart disease | | |
| Reason For Review: | Unfounded child protection investigations within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-and-a-half-year-old girl began having trouble breathing and turned blue. Her 29-year-old mother called 911 and the girl was taken to the hospital where she was pronounced dead. Following the child's death, an investigation was conducted for substantial risk of sexual injury when police learned and reported that the mother's 32-year-old recent ex-boyfriend was a registered sexual offender of a 14-year-old when he was 25 years old. The mother was indicated on the report because she regularly left the deceased and the deceased's 7-year-old brother in the care of the boyfriend while she worked, knowing that he was a registered sexual offender.

Prior History:     In August 2009 the mother was staying in a shelter with her children. The shelter called in two reports against the mother and both were unfounded. The first report alleged that the then 6-year-old boy had bruises on him from his mother restraining him. The boy was confirmed to have a mental illness and his therapist said it was appropriate for the mother to restrain him when necessary and she was trained on how to do so. The second report alleged that the mother was not properly supervising her children in the shelter. Investigation revealed that the mother was having trouble regulating a medication she was taking which caused her to be extremely sleepy. She had made an appointment to be seen by her doctor. Shelter staff reported that the mother normally cared for her children well, was involved with services, and was going to move into transitional housing, which she did in October 2009.

| Child No. 72 | DOB 4/10 | DOD 8/10 | Natural |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Multi-organ failure due to pulmonary overcirculation due to atrioventricular canal defect | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Three-month-old infant, who was born four weeks prematurely with multiple heart defects, died in the hospital. He underwent a surgical procedure on his heart two weeks earlier and never recovered from it. Because of his multiple heart defects which would require numerous surgeries, the infant's long-term prognosis was poor.

Prior History:    The hotline was called following the infant's birth because of concerns that his 21-year-old mother, who is low-functioning and has a mental health diagnosis, would be unable to care for him. During the investigation, it was determined that the infant's 22-year-old father is also low functioning with a mental health diagnosis and would be unable to care for the infant. The infant was placed in foster care with his maternal grandmother through a dependency petition. The maternal grandmother was already caring for the infant's 10-month-old sister and she was added to the petition. The infant boy was home with his grandmother for approximately seven weeks before being placed back into the hospital. The grandmother is in the process of adopting her granddaughter. The mother had a tubal ligation in June 2010.

| Child No. 73 | DOB 8/10 | DOD 8/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 0 |
| Substance exposed: | Yes, cocaine |
| Cause of death: | Prematurity due to maternal cocaine abuse |
| Reason For Review: | Siblings returned home within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Baby girl born at 23 weeks gestation died several hours after birth. The 31-year-old mother had no prenatal care and tested positive for cocaine at the time of the infant's birth. The mother was indicated for death by neglect, substance misuse, and substantial risk of physical injury to the two sons she had in her custody. The boys, ages 15 and 5, were placed in the legal guardianship of their godfather.

Prior History:    The deceased girl was the mother's eighth child. She gave up five children for adoption at their births. The two boys she kept entered foster care in July 2007 because of their mother's cocaine use. The boys were returned to their mother's care in November 2009 after she successfully completed substance abuse treatment and other services. An after care case was open for six months after the boys went home. When the case was closed, the caseworker did not know that the mother was pregnant.

| Child No. 74 | DOB 1/99 | DOD 8/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 11 years |
| Substance exposed: | No |
| Cause of death: | Multisystem organ failure due to chronic renal disease |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Full investigation pending |

Narrative:    Eleven-year-old boy died in the hospital where he had been treated over the past six weeks for renal failure. The boy was medically complex with kidney problems, epilepsy, and mental retardation.

Prior History:    In May 2010 a hospital social worker called the hotline to report that recent blood work performed at the hospital showed that the boy was in renal failure. Hospital staff wanted the boy to return to the hospital right away, but their attempts to reach the family were unsuccessful. A report was taken for investigation of medical neglect. The Department asked police to go out to the home immediately which they did. An aunt in the home told police that she would give the parents the message, but she would not give them information on how to reach the parents. The next morning a child protection investigator went to the home and was told the child was admitted to the hospital the previous day when the parents brought him there. The investigator confirmed the boy was being treated in the hospital. The investigation was pending at the time the child died, but it was ultimately unfounded.

| Child No. 75 | DOB 7/10 | DOD 8/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 month |
| Substance exposed: | No, however, the mother has a history of marijuana use |
| Cause of death: | Septic shock due to necrotizing enterocolitis |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     One-month-old infant born to a 15-year-old mother at 27 weeks gestation died while hospitalized.

Prior History:     In February 2010 an intact family case was opened on the infant's 36-year-old maternal grandmother, her 16-year-old son, and her 15-year-old daughter because of risk identified following a report of lock-out of the 16-year-old. The mother and the two teenagers had mental health and substance abuse issues. The case was closed in September 2010 with referrals to community service agencies.

| Child No. 76 | DOB 6/09 | DOD 9/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 14 months |
| Substance exposed: | No |
| Cause of death: | Hemophagocytic Lymphohistiocytosis |
| Reason For Review: | Split custody (siblings in foster care) |
| Action Taken: | Investigatory review of records |

Narrative:     Fourteen-month-old medically complex child was found in respiratory distress by his 40-year-old father during the night. The father performed CPR and called an ambulance which took the child to the hospital where he was pronounced dead a short time later. The child, who was a twin, had a rare disorder of the immune system. His twin brother died in the hospital at 2 months of age.

Prior History:     In August 2008 the mother gave birth to her fifth child. The baby girl tested positive for cocaine, the 34-year-old mother was indicated for substance misuse by neglect, and an intact family services case was opened. In November 2008 the baby and her 4-year-old sister (the older children lived with their maternal grandmother) entered foster care after the 3-month-old baby suffered a broken arm without explanation. In October 2009, while the deceased was still hospitalized following his birth, the hospital called the hotline with concern about the mother's level of functioning since the death of one of the twin boys and her ability to care for the other when he was released from the hospital. The boy's case was screened with the county state's attorney's office but was not accepted. The mother was engaged in services, the baby's father (who was not the father of the other children) was going to be the infant's primary caregiver, and family members had offered their support. The boy was discharged to his father's care in December 2009. The boy was seen in his home by a visiting nurse and speech and physical therapists. Beginning in 2010, the mother's participation in services declined and eventually her daughters' permanency goals were changed from return home to substitute care pending court determination on termination of parental rights. The girls are placed together and their foster parent wants to adopt them.

| Child No. 77 | DOB 8/07 | DOD 9/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | No, however, mother has a history of substance abuse |
| Cause of death: | Aspiration pneumonia due to spinal muscular atrophy |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Three-year-old child who was born with spinal muscular atrophy died from the illness one day after being brought to the hospital by his parents. He had been hospitalized several times for complications related to his illness and had been receiving hospice care at home for a couple of weeks before his death.

Prior History:    The deceased was the second of three children. His family became involved with DCFS a month after his birth because he was not gaining weight adequately. A child protection investigation was indicated for inadequate food after the mother admitted she had been diluting the infant's formula substantially. An intact family services case was opened. Within a year, the mother gave birth to her third child, who was the second to be born with cocaine in her system. The family was placed under a court supervision order and participated in services. Court supervision ended in December 2009 and the intact family services case was closed. It was reopened in June 2010 because of the mother's inappropriate behavior toward the deceased, including calling him names and yelling and cursing at him. The intact family case remains open as these parents have chronic parenting issues.

| Child No. 78 | DOB 8/10 | DOD 9/10 | Natural |
|---|---|---|---|
| Age at death: | 1 month | | |
| Substance exposed: | No | | |
| Cause of death: | Hypoxic ischemic encephalopathy | | |
| Reason For Review: | Split custody (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    One-month-old baby died in the hospital where she had been cared for since her birth. The 24-year-old mother, who had no prenatal care, went into labor and called emergency services two hours after her water broke. She gave birth in the ambulance. The baby girl coded and required extensive life-saving measures. The baby was transferred to a children's hospital where she remained until her death.

Prior History:    The mother and the 27-year-old father have one other child together. That child, a boy, entered foster care in August 2009, a month after his birth. He was placed with his maternal great-grandparents. The mother is mentally ill and incapable of caring for a baby. The father has a history of depression and substance abuse. Neither parent participated in services. The great-grandparents are in the process of adopting the child.

| Child No. 79 | DOB 6/10 | DOD 9/10 | Natural |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Three-month-old baby was found unresponsive in the morning by her 32-year-old mother. The mother had last seen the baby alive five hours earlier when she placed the baby in bed with her. The mother and her six children were temporarily staying with the maternal grandmother because of threats by the mother's husband who was the father of two of the children. The baby did not have a crib at the maternal grandmother's home, although she did have one at her own home.

Prior History:    In April 2010 the mother's 11-year-old daughter told a therapist that her step-father had fondled her six months earlier when the family was living in Wisconsin. At the time of her disclosure, the 32-year-old step-father was in jail in Wisconsin for domestic abuse. The Department indicated allegations of sexual molestation and substantial risk of physical and sexual abuse and an intact family case was opened. The case had been open for ten weeks at the time of the baby's death. The family has since completed services and the case was closed in August 2011.

| Child No. 80 | DOB 8/10 | DOD 10/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) |
| Reason For Review: | Indicated child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Two-month-old infant was found unresponsive around 7:30 a.m. by her 25-year-old father. The infant's 7-year-old brother had entered the room to look for the TV remote and woke up his stepfather because the baby looked pale. The 26-year-old mother had worked the night shift and was not home. The night before the father had put the baby in bed with him, placing her on her stomach with her head turned to the side and putting a blanket on the bottom half of the baby. He said that he slept on the other side of the bed away from the baby. The baby had a crib in another room, but the father didn't use it because he was afraid he wouldn't hear her cry.

Prior History:    There was an investigation involving the 7-year-old and his stepfather prior to the infant's birth. In February 2010 the boy's school called the home when he didn't show up for school. The boy answered the phone and told school staff that he had stayed home sick. When asked who was with him, the boy said he was home alone. School staff went to the home and also called the stepfather and police. The stepfather returned home. The stepfather was indicated for inadequate supervision of the boy. He admitted leaving the boy home alone for an hour while he went to help his brother fix his car. He said he had not done it before and he told the child not to answer the door or the phone. The boy said that he had not been left home alone previously. The mother was working at the time and assured the investigator that the child would not be left home alone again.

| Child No. 81 | DOB 3/07 | DOD 10/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3-1/2 years |
| Substance exposed: | No, however, mother smoked marijuana during her pregnancy |
| Cause of death: | Multiple organ failure |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Three-and-a-half-year-old medically complex boy was taken to the emergency room by his maternal grandmother who was also his foster parent. The boy was transferred to another hospital where he died later that same day.

Prior History:    The boy, who was born at 37 weeks gestation with multiple birth defects, entered foster care at 13 months of age when his 28-year-old mother was indicated for failure to thrive and medical neglect for improperly feeding and under-medicating the boy. After spending three months in a nursing care facility, the child was placed with his grandmother who received training to provide for the child's special needs and who became licensed as a specialized foster home. The boy had an older sibling who is healthy and remains with her mother.

| Child No. 82 | DOB 9/89 | DOD 10/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 21 years |
| Substance exposed: | No |
| Cause of death: | Seizure due to sickle cell disease |
| Reason For Review: | Ward |
| Action Taken: | Investigatory review of records |

Narrative:    Twenty-one-year-old ward had a seizure in her foster home and was taken by ambulance to the emergency room where she had another seizure and died. The ward had multiple medical problems and suffered from chronic pain as a result of having sickle cell disease.

Prior History:    The ward entered foster care in 1993 because of physical abuse of an older sibling. She and her siblings returned home in 1997 but reentered foster care in 1998 when their mother violated a court order of protection by using excessive corporal punishment. The ward was doing well in care and had been attending college out of state, but had to return to Illinois because of the severity of her disease. Her worker was helping her to get into a local university and a transitional living program where her medical needs could be addressed.

| Child No. 83 | DOB 8/10 | DOD 11/10 | Natural |
|---|---|---|---|
| Age at death: | 11 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchopneumonia | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Full investigation, no report to Director | | |

Narrative:    Eleven-week-old infant was found unresponsive by his 28-year-old father. The 29-year-old mother had just returned home from work when the father went to check on the baby. The mother called 911 and the infant was taken by ambulance to the hospital where he was pronounced dead. An investigation for death by neglect was unfounded because the only symptom the infant had exhibited in the weeks before his death was diarrhea, which the parents had reported to his doctor.

Prior History:    The mother was a ward from the age of three until 21 when she was assigned a state adult guardian because she is mentally retarded. When the deceased was born, the mother's guardian called the hotline to report that the mother could not take care of the baby because of her mental retardation, mental health concerns, and domestic violence by the baby's father. An investigation for substantial risk of physical injury was investigated and indicated against both parents. The case was screened with the county state's attorney's office for a petition, but it was not accepted and an intact family case was opened.

| Child No. 84 | DOB 12/93 | DOD 11/10 | Natural |
|---|---|---|---|
| Age at death: | 1 month shy of 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Disseminated aspergillosis due to chemotherapy for acute myeloid leukemia with osteosarcoma a significant contributing factor | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Sixteen-year-old girl died from complications arising from her treatment for leukemia. In June 2009, at the age of 15, the girl was diagnosed with a malignant bone tumor and was successfully treated. About three weeks before her death, the girl was hospitalized for sepsis due to a bacterial infection. She was diagnosed with leukemia and never left the hospital.

Prior History:    The girl entered foster care when she was five years old because of neglect. She was adopted in 2001 when she was seven years old. In 2004 after a two-month psychiatric hospitalization, her adoptive parents refused to take her home and the hotline was called. An investigation for "lock-out" ensued, but the investigation was unfounded when a psychiatrist opined that she could not return home because she was a danger to herself and her family. The girl entered the temporary custody of the Department and was placed in a residential treatment center where she remained for four years with the exception of periodic psychiatric hospitalizations. She moved to a different residential treatment center in 2008. Her adoptive parents did not wish to visit her, but received reports about her care.

| Child No. 85 | DOB 9/10 | DOD 11/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Two-month-old twin boy was found unresponsive in the morning by his 20-year-old mother. The mother had been sleeping on a queen-sized bed with the baby boy and his twin sister. There were two cribs in the home. A child protection investigation of the baby boy's death was conducted. While it was pending, the baby girl stayed with her presumed father (a later paternity test ruled him out). During a visit by the mother, an incident of domestic violence occurred between the mother and presumed father and the baby was taken into custody and placed with the maternal grandfather. The mother was unfounded in her son's death, but was indicated for substantial risk of physical injury to her daughter. She is working toward return home of the child.

Prior History:     The hotline was called by a hospital social worker following the infants' births because of concern about the mother's history of mental health issues. The mother underwent a psychiatric evaluation that did not find her to be an immediate risk to the children; she was to follow up with her own psychiatrist in a couple of weeks. The babies were discharged from the hospital to their mother based on a care plan that the family would live with the maternal grandmother and she and the maternal grandfather and his wife would assist the mother in the daily care of the infants. At the time of the baby boy's death, the investigator was in the process of obtaining the mother's prior psychiatric records and the investigation was pending.

| Child No. 86 | DOB 10/07 | DOD 11/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | No |
| Cause of death: | Cor Pulmonale due to Bronchopulmonary Dysplasia |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Three-year-old twin boy was found dead in the early morning by his 31-year-old mother who had comforted him back to sleep a half hour earlier. The boy and his twin brother were born prematurely at 25 weeks gestation and had resulting health complications.

Prior History:     In December 2009 the hotline was called by a police officer who responded to a call from the mother's boyfriend. The mother was moving out of the boyfriend's residence and she and the boyfriend got into a physical altercation in front of the boys. The mother was indicated for substantial risk of physical injury to the boys and an intact family case was opened. The mother and children were engaged in services at the time of the boy's death. The intact family case was closed in July 2011.

| Child No. 87 | DOB 5/10 | DOD 11/10 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 months |
| Substance exposed: | No |
| Cause of death: | Multiple congenital defects |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Six-month-old infant was found unresponsive by her 23-year-old mother at approximately 5:30 in the morning. The infant, who was born with problems with her heart, lungs, and eyes, had been hospitalized for nearly a month and had been discharged only seven days prior to her death.

Prior History:   In August 2010 the infant's father called the hotline to report that when the mother went to work she was leaving the infant and the infant's 2 and 6-year-old siblings in the care of their maternal grandmother who was incompetent to care for them. Investigation revealed that while the maternal grandmother had learning disabilities, she could read, write, and have a conversation with the investigator. The investigation further showed that the two older children were in day care and that it was the children's great-grandmother, not the grandmother, who provided the majority of care when the mother needed it. The infant's medical providers had no concerns about the mother's care of the infant and the investigation was unfounded.

| Child No. 88 | DOB 12/98 | DOD 11/10 | Natural |
|---|---|---|---|
| Age at death: | 11-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Malignant thymoma | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:   Eleven-year-old girl was found dead by her 36-year-old mother who checked on her while she was sleeping. The girl died from an uncommon tumor of the thymus. It did not appear that the girl or her mother were aware of the tumor prior to her dying. The girl was an only child.

Prior History:   In April 2010 the hotline was called after a school employee reported that the mother hit the girl in the face. Both the mother and daughter denied the girl was hit in the face. The mother admitted taking her daughter into the school bathroom and spanking her because of a phone call she received about her daughter's declining grades. The girl was crying and red in the face when she exited the bathroom. The girl's maternal grandmother and pediatrician were contacted and had no concerns about the girl's safety with her mother.

| Child No. 89 | DOB 6/08 | DOD 12/10 | Natural |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Dilated hypertrophic cardiomyopathy | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:   Two-and-a-half-year-old ward was eating dinner at his 29-year-old mother's home when he fell off his chair, cried, and stopped breathing. He died from an undiagnosed heart condition. The child and his three older sisters were living in foster care in the unlicensed home of a relative. By court order the mother was only to have supervised visits with the children and they should not have been in her home on the day the boy died. The mother and the 31-year-old father were indicated for substantial risk of physical injury to the children. The three sisters were removed from the relatives' care and placed in two separate licensed foster homes. Testing of their hearts revealed that one of the girls had a hole in her heart that would eventually require surgery. The mother and father separated and the mother continues to work toward the girls' return home.

Prior History:   The children entered foster care in August 2010 for substantial risk of physical injury because their parents were selling heroin.

| Child No. 90 | DOB 9/03 | DOD 12/10 | Natural |
|---|---|---|---|
| Age at death: | 7 years | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis due to bronchopneumonia due to multiple congenital anomalies | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:  Seven-year-old medically complex ward died in the hospital after being removed from a heart-lung bypass machine. His foster mother was with him. Twelve days earlier the boy had been taken to the emergency room by his foster mother in respiratory distress. The child was stabilized and airlifted to a children's hospital where he was diagnosed with sepsis and pneumonia and placed in intensive care for treatment.

Prior History:  The child was born at 35 weeks gestation with multiple congenital anomalies. He entered foster care in March 2004 because neither his 20-year-old mother nor his 32-year-old father had visited him in the hospital for two months. Once the child was in foster care, neither parent participated in services or visited with the child. Their parental rights were terminated in July 2007. In September 2009, the boy was placed with his foster parent who was trained to care for him and who was interested in adopting him.

| Child No. 91 | DOB 1/11 | DOD 1/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 0 |
| Substance exposed: | Not tested, however, mother tested positive at birth for cocaine |
| Cause of death: | Edwards syndrome |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:  Infant delivered at 26 weeks gestation died shortly after birth. The infant had been diagnosed in utero with Trisomy 18 (also referred to as Edwards syndrome), a genetic disorder in which a person has a third copy of material from chromosome 18, instead of the usual two copies, which interferes with normal development. The hotline was called with a report of substantial risk of physical injury to the 41-year-old mother's two surviving children because of the mother's drug use. The investigation was unfounded because the 12-year-old son was in the guardianship of his grandmother, the 10-month-old son was living with his mother and maternal grandmother and being co-parented by his 49-year-old father, and the mother was beginning services as a condition of probation for a drug offense.

Prior History:  Four months prior to the baby's death, the hotline was called with a report of substantial risk of physical injury to the 41-year-old mother and 49-year-old father's then six-month-old son together. The reporter called the hotline with misinformation and the investigation was unfounded.

| Child No. 92 | DOB 11/10 | DOD 1/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 weeks |
| Substance exposed: | No |
| Cause of death: | Congenital heart defect |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:  Six-week-old infant was found unresponsive in his crib by his 26-year-old mother. The parents called 911 and the infant was taken to the local hospital before being transported to a children's hospital where he later died. Testing revealed that the infant suffered from Anomalous left coronary artery from the pulmonary artery (ALCAPA), an undiagnosed heart defect that is linked to sudden death. The infant was the second of his parents' three children to die. The surviving child completed testing on her heart with normal findings.

Prior History:  In August 2009 paramedics responded to a call of a deceased 2-month-old and found the family living in an overcrowded, uninhabitable home. The 2-month-old was determined to have died from idiopathic pulmonary hemorrhage, a natural cause of death, but the mother and 24-year-old father were indicated for environmental neglect and an intact family case was opened. The family stayed with family members until August 2010 when they moved into their own apartment with the aid of Norman (housing) funds. The intact family services case was closed in March 2011.

| Child No. 93 | DOB 11/10 | DOD 1/11 | Natural |
|---|---|---|---|
| Age at death: | 1-1/2 months | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       One-and-a-half-month-old infant was found unresponsive by her mother approximately 30 minutes after being fed and placed to sleep on her stomach on a comforter in her playpen/bed.  The infant had a cold at the time of her death. An intact family services case was opened following the infant's death. The case remains open and the parents are participating in services.

Prior History:   The infant was the third child born to her 23-year-old mother and 32-year-old father. Both parents were involved with DCFS as children.  The hotline was called regarding them as parents in July 2010 when they left their one and three-year-old children home alone sleeping while they went to get a polish sausage to satisfy the 7-months pregnant mother's craving for one. The police responded and a criminal case ensued with the parents being placed on probation. The parents were indicated for inadequate supervision, but an intact family services case was not opened to monitor the family. Because an intact family services case was not opened and because of deficiencies in the investigation, the investigator was disciplined by the Department.

| Child No. 94 | DOB 4/89 | DOD 1/11 | Natural |
|---|---|---|---|
| Age at death: | 21 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Pneumonia | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Twenty-one-year-old ward died in the hospital. Ten days earlier she had been hospitalized and discovered to have pneumonia. A week into her hospitalization, she was transferred to another hospital because she was not responding to treatment at the first hospital and she needed a higher level of care. She died three days later. The ward lived in a community integrated living arrangement (CILA) and was in the process of being transferred to an adult guardian at the time of her death.

Prior History:     The ward and her three siblings had been adopted by their grandmother in 1997. The grandmother died in 2001 and the children were placed with and then adopted by their uncle. In 2002 the children were found to be living in squalor and they were taken into custody. The ward, who was mentally ill, went on to have multiple placements and was psychiatrically hospitalized on numerous occasions. Her siblings remain in the care of the Department. They are in group homes with goals of independence.

| Child No. 95 | DOB 10/08 | DOD 1/11 | Natural |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchopneumonia due to DiGeorge syndrome | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Two-year-old medically complex boy died in the hospital. His 23-year-old mother took him to the hospital when she found him vomiting. The boy had DiGeorge syndrome, a disorder caused by a defect in chromosome 22 which results in the poor development of several body systems. He had a medical history of seizures, strokes, pneumonia and anemia.

Prior History:    In August 2010 a child protection investigation was initiated for substantial risk of physical injury when the mother and child missed an appointment at an early intervention program. Program staff were concerned that the developmentally delayed mother was overwhelmed and unable to care for her special needs child and that the child's father seemed uninvolved. The child's medical providers reported that although the mother was cognitively delayed, she was compliant with all appointments for her child, she watched and learned, and she was doing the best she could to meet the child's needs. By the end of the investigation, the child's parents separated and the mother and child were living with the mother's parents who were helping with the boy's care.

| Child No. 96 | DOB 2/00 | DOD 1/11 | Natural |
|---|---|---|---|
| Age at death: | 10-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchopneumonia due to cerebral palsy | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Nearly eleven-year-old medically complex girl was pronounced dead at the hospital after her grandmother called 911 when she stopped breathing. The girl was diagnosed with cerebral palsy, a seizure disorder, and developmental delays. She was non-verbal, required a g-tube for feeding, and used a wheelchair. The girl was seen by her doctor a week before her death and received a nebulizer. On the day she died, the girl was being cared for by her 55-year-old grandmother who reported the child had not been feeling well. The grandmother had given the girl a breathing treatment a couple of hours before she became unresponsive.

Prior History:    In May 2010 a hospital social worker called the hotline to report medical neglect of the girl by her 30-year-old mother. The girl had missed multiple medical appointments with various departments involved in her care. Investigation revealed that the mother worked full-time and the grandmother took care of the girl and her eight-year-old sibling. The grandmother had transportation difficulties and was being treated for cancer, making it difficult to keep the girl's appointments. The investigation was indicated and an intact family case was opened to assist the family. The case remained open for nine months following the girl's death.

| Child No. 97 | DOB 12/10 | DOD 1/11 | Natural |
|---|---|---|---|
| Age at death: | 1-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Split custody (siblings in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    One-and-a-half-month-old infant was found unresponsive in the morning by her 31-year-old mother. The infant had been sleeping on a full-sized mattress on the floor between her mother and the mother's boyfriend.

Prior History:    The deceased was the mother's fifth child. In 2004 the mother's three children entered foster care after their maternal grandmother took them to a DCFS office and said she could no longer care for the 5, 7, and 9-year-old children because of housing and financial problems. Their mother could not be found. The mother and unknown father's parental rights were terminated in 2008. The two younger of the three children were adopted in 2009. The oldest child is still a ward. He is in an independent living program. The fourth child was born in 2009 after the mother's parental rights to her other children had been terminated. The boy had the same father as the deceased. At the time of the infant's death, the 2-year-old boy was staying with his father. An investigation for substantial risk of physical injury to the boy was unfounded with the father and paternal grandmother reporting they had no concern about the mother's care of the boy.

| Child No. 98 | DOB 7/08 | DOD 1/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2-1/2 years |
| Substance exposed: | No |
| Cause of death: | Sepsis due to bronchopneumonia |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Two-and-a-half-year-old child died. She had had a liver transplant in January 2009 at six months because of biliary atresia, a rare form of bile duct disease occurring in infants and the most common reason for liver transplants in children in the United States.

Prior History:    In November 2010 a neighbor called the hotline because of concern about the girl's living conditions given her fragile health. The 22-year-old mother was living with the child in the paternal grandfather's apartment which was being rehabbed. While the investigation was pending, the mother and child moved to the apartment of a cousin who said they could stay with her as long as needed. The girl's doctor reported good care of the child with good medical follow-through on the liver transplant. The investigation was unfounded.

| Child No. 99 | DOB 8/09 | DOD 1/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 months |
| Substance exposed: | No |
| Cause of death: | Complications from heart surgery |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:       Seventeen-month-old child died six days following his final surgery to correct a congenital heart defect, hypoplastic left heart syndrome. His biological family and his foster mother were with him when he died. Five months later, the child's infant uncle died. (See Child No. 113 below).

Prior History:    The medically complex infant was born full-term to a 15-year-old mother. Hospital staff called the hotline to report their concern that the young mother and the maternal grandmother had not demonstrated the ability to adequately care for the infant's complex medical needs. The infant entered DCFS care through a no-fault dependency petition. After several months in the hospital, the infant was placed in a nursing care facility until he was stable enough to be placed in a specialized foster home. The child was placed in a specialized foster home in June 2010 and remained in that placement until his death.

| Child No. 100 | DOB 4/93 | DOD 2/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 years |
| Substance exposed: | No |
| Cause of death: | Bronchopneumonia due to H1N1 influenza |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:       Seventeen-year-old ward died in the hospital one day after being admitted. A week earlier the boy had a root canal. He was not given any antibiotics. Four days later he felt ill and slept for most of the weekend. On the sixth day following the root canal, the ward stayed home from school with flu-like symptoms. He stayed home the next day as well and that night when he spiked a fever and began to hallucinate his relative foster mother called for an ambulance.

Prior History:    The boy lived with his parents and brother until 1998 when his mother left his father after having a baby with the father's coworker. The mother and children moved in with the boyfriend and he and the mother had another child. The three adults have multiple problems. The boyfriend was physically abusive to the brothers and an intact family case was open between 2007 and 2008. In May 2008 the youngest child, an 8-year-old girl, disclosed that her father had sexually abused her and all four children were taken into custody. The three surviving siblings remain in foster care. They are placed in three different foster homes and have goals of independence.

| Child No. 101 | DOB 2/11 | DOD 2/11 | Natural |
| Child No. 102 | DOB 2/11 | DOD 2/11 | |

| | |
|---|---|
| Age at death: | 0 |
| Substance exposed: | No |
| Cause of death: | Extreme prematurity |
| Reason For Review: | Open intact family services case at time of the children's death |
| Action Taken: | Investigatory review of records |

Narrative:    Twin baby boys, born 4-1/2 months prematurely, died in the hospital four hours after their birth. Their 20-year-old mother had been receiving weekly prenatal care in a high risk pregnancy clinic.

Prior History:    In April 2010 the mother took her 16-month-old daughter to the emergency room. The toddler had unresolved pneumonia for nearly a year. She had been hospitalized in May and treated again in February and the mother had poor follow-up with the child's primary care physician. The mother and her daughter were homeless and stayed with various family and friends. The investigation was indicated for medical neglect and an intact family services case was opened. The worker assisted the mother with obtaining housing, daycare, and early intervention services for her daughter. The worker also helped the mother make and keep medical appointments. The case remains open and the mother is again pregnant with twins who are due in February 2012.

| Child No. 103 | DOB 4/93 | DOD 2/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 17 years |
| Substance exposed: | No |
| Cause of death: | Seizure disorder |
| Reason For Review: | Child of a ward |
| Action Taken: | Full investigation pending |

Narrative:    Seventeen-year-old ward was found unresponsive in the morning in his hospital room. He had been in a psychiatric unit of the hospital for a little over a month. The ward had a history of seizures, but he was taken off his seizure medication while hospitalized.

Prior History:    The ward's mother has a history with DCFS dating to 1989 when she gave birth to her third child. Medical personnel were concerned about the 39-year-old mother's ability to care for the child. Following an investigation, all three of the mother's children were placed in foster care. When the deceased was born he also entered foster care. One of the siblings has aged out of DCFS care; a second sibling was adopted; and the third is in an independent living program.

| Child No. 104 | DOB 7/07 | DOD 3/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3-1/2 years |
| Substance exposed: | No |
| Cause of death: | Complications from congenital birth defects |
| Reason For Review: | Open intact family services case at time of child's death and |
| | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Three-and-a-half-year-old severely medically complex child died in the hospital the same day she was taken there by ambulance with extremely low blood pressure. The child was bleeding internally and did not respond to a blood transfusion or blood clotting medication.

Prior History:   In May 2010 the child's 22-year-old mother and 23-year-old father were indicated for medical neglect because the child missed testing appointments. The girl had multiple diagnoses including cerebral palsy, epilepsy, diabetes, blindness, and hydrocephalus (water on the brain). The Department opened an intact family services case. Two months prior to the child's death, the hotline was called with allegations of medical and environmental neglect and inadequate food. The Department investigated the report. Information from medical collaterals and the intact family services worker did not support the allegations and the investigation was unfounded.

| Child No. 105 | DOB 1/11 | DOD 3/11 | Natural |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | Yes, cocaine & opiates | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Pending child protection investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Two-month-old infant was found unresponsive in the morning by her 34-year-old mother. The infant was lying next to the mother in a twin-sized bed. The mother had been staying with the infant for two months in a substance abuse treatment center. While the center provided a bassinette for the baby and staff cautioned the mother against co-sleeping, the mother admitted that she regularly slept with the baby in the twin bed.

Prior History:   The hotline was called after the baby tested positive at birth for cocaine and opiates. The baby was the mother's sixth child. None of her five other children were in her care: one child was in the care of her father, three were in the care of relatives, and the fifth was adopted after being in foster care. The mother and newborn baby went directly into inpatient substance abuse treatment upon their discharge from the hospital. The child protection investigation, which was pending at the time of the baby's death, was ultimately indicated for substance misuse.

| Child No. 106 | DOB 2/91 | DOD 3/11 | Natural |
|---|---|---|---|
| Age at death: | 20 years | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Seizure disorder | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Twenty-year-old medically complex ward was admitted to the hospital after suffering multiple seizures. He died in the hospital the following day with his foster/adoptive parents at his side.

Prior History:   The ward and his twin brother were born exposed to cocaine and had extensive medical issues. Nine months after their birth, they were placed in a specialized foster home together. In 2007 the foster mother married and she and the twin boys moved to Utah where they lived when the ward died. The family had daily nursing care for the twins and the Department continued to monitor the boys' care. The foster mother was in the process of adopting the boys as they were aging out of the Department's care and would need an adult guardian. There were many complications and delays in the process because of the boys' age, their multiple medical problems, and the interstate nature of the case. The surviving twin brother's adoption was completed a few days after the ward's death.

| Child No. 107 | DOB 1/11 | DOD 4/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Substance exposed: | No |
| Cause of death: | Multifocal interstitial and alveolar pneumonitis due to acute viral infection |
| Reason For Review: | Open intact family services case at time of child's death |
| Action Taken: | Full investigation pending, to be included in a cluster report on fractures |

Narrative:      Three-month-old infant was found unresponsive in the morning by his 36-year-old father who had returned home from work. The infant was found face down in an adult bed where he had been sleeping with his 21-year-old mother. The mother had taken the baby to the doctor two days earlier because of breathing issues. The baby was diagnosed with an upper respiratory infection but was not prescribed any medication. A child protection investigation of the infant's death was conducted. At autopsy the baby was found to have elevated levels of Benadryl in his blood system; while not a lethal amount, the medication should not have been given to a 3-month-old infant. The parents were indicated for substantial risk of physical injury and their 1-1/2-year-old daughter was placed in foster care. The parents separated after the infant's death. The father is not participating in services; the mother is working toward return home of their daughter.

Prior History:      The mother had two indicated reports and an open intact family case when the baby died. In March 2010, her then-boyfriend's son suffered burns to his buttocks and genitals while in the mother's care. The mother reported that she started a bath for her 6-month-old daughter and left the 1-1/2-year-old boy on the bathroom floor while she went to get the baby. When she returned she reportedly found the boy sitting on the floor in hot water from a cup he had put under the faucet. Sheriff investigators tested the water which reached 144 degrees. The mother was indicated for burns by neglect. In December 2010 the mother brought her then 1-year-old daughter to the hospital because of pain to her shoulder. The toddler was found to have a broken clavicle and the various explanations the mother provided did not fit the injury. The girl was taken into protective custody, but was ordered to return home with her parents at the temporary custody hearing. The court entered an order of supervision and an intact family case was opened. The worker engaged the mother in counseling and other services. When the baby was born, the worker provided the family with a bassinette and went over safe sleep practices.

| Child No. 108 | DOB 1/11 | DOD 4/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Necrotizing enterocolitis due to prematurity |
| Reason For Review: | Siblings returned home within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Two-month-old infant, who was born prematurely and never left the hospital, underwent bowel surgery for necrotizing enterocolitis, a complication of prematurity. He died during the operation.

Prior History:      An intact family services case was opened in March 2009 after police responded to complaints of a party at the 19-year-old mother's home and found the mother too intoxicated to care for her 2-month-old and 1-year-old children. The mother participated in services inconsistently and she continued to drink. In March 2010 the children were taken into custody after the mother went out drinking and did not return home as expected. Her babysitter had to leave and called the grandparents to come get the children. The children were placed in foster care with their grandparents. The mother continued to be inconsistent in services, but in December the court ordered that the children be returned home. The children's daycare provider reported that the 2-year-old boy's behavior was out of control after his return home and he was put into counseling. The mother continues to drink and her court case remains open.

| Child No. 109 | DOB 4/11 | DOD 4/11 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | No | | |
| Cause of death: | Extreme prematurity | | |
| Reason For Review: | Child of a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Seventeen-year-old ward gave birth to a baby boy at 23 weeks gestation. The baby lived for only a few minutes. The mother had received regular prenatal care.

Prior History:    The ward's mother died when the girl was three years old. The girl was raised by her father. They moved often to live with her father's girlfriends. The girl had a history of extensive sexual abuse by the son of one of her father's girlfriends, who was incarcerated for the abuse. In December 2010 the Department initiated an investigation for allegations of inadequate supervision and lock-out to the girl by her father. The father reported the girl stole a television from him and pawned it; he kicked her out of their home and would not allow her to return. The father was indicated on both allegations and the girl entered foster care. She was one month pregnant and initially placed in a group home for pregnant teens. In February 2011 the girl moved into a foster home. She was doing well, attending school and teen mother group meetings, and getting prenatal care.

| Child No. 110 | DOB 4/10 | DOD 5/11 | Natural |
|---|---|---|---|
| Age at death: | 1 year | | |
| Substance exposed: | No, however, mother has a history of substance abuse | | |
| Cause of death: | Congenital heart disease | | |
| Reason For Review: | Split custody (sibling in foster care) | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     One-year-old medically compromised child stopped breathing at home while being cared for by his 23-year-old mother and his paternal grandmother. The child had spent much of his life in the hospital having had several heart surgeries. The child had spent approximately 6 to 8 weeks outside of the hospital. He last went home eight days before his death. A nurse had left the home shortly before the child stopped breathing. The paternal grandmother, who had been trained as a caregiver, administered CPR as did emergency services personnel, but the child died.

Prior History:    The deceased was the mother's fourth child. One child resides with her father, another lives with the maternal grandfather and the third child was in foster care until he was returned to his mother's care in July 2011. The third child had entered foster care following his methamphetamine-exposed birth in February 2009. The mother participated in services and when the deceased was born he remained in her custody though he stayed in the hospital for his first six months of life.

| Child No. 111 | DOB 4/11 | DOD 5/11 | Natural |
|---|---|---|---|
| Age at death: | 2 days shy of 2 months | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Open intact family services case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     One-and-a-half-month-old infant was found unresponsive by his father around 11:00 a.m. The infant had last been fed and placed down for a nap by his father about 6:15 a.m. The infant was laid alone on his stomach in the middle of a full-sized bed.

Prior History:    The deceased was the only child that his 26-year-old mother and 40-year-old father had together. His mother has an older son who is in the private guardianship of his maternal grandmother. The father has 18 other children. The hotline was called when the mother gave birth to the deceased who tested positive for cocaine. The mother was indicated for substance misuse and an intact family services case was opened to engage the mother in services. The worker was helping the mother gather the necessary documents to refer her for substance abuse treatment. After the baby's death, the parents did not respond to the worker's attempts to contact them so he mailed them information about substance abuse treatment programs and grief counseling and the case was closed.

| Child No. 112 | DOB 4/11 | DOD 6/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) |
| Reason For Review: | Unfounded child protection investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Two-month-old infant was found by her 23-year-old mother unresponsive in her bassinette following a nap. The infant, who received some immunizations a day prior, was running a slight fever and had been given some pain reliever before being placed to sleep on her stomach with her head turned to one side. She was found in the same position.

Prior History:    The infant's mother came to the Department's attention in October 2010 when a neighbor called the hotline with separate reports against her and her 25-year-old sister with whom she lived. The information in the reports was not substantiated and investigation revealed that the sister was pregnant by the neighbor's husband. The reports appeared to have been made to harass the sisters and both were unfounded.

| Child No. 113 | DOB 8/10 | DOD 6/11 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 10 months |
| Substance exposed: | No |
| Cause of death: | Sepsis due to bronchopneumonia |
| Reason For Review: | Pending child protection investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Ten-month-old boy was found unresponsive in the morning by his 37-year-old mother. The infant had been sick and was being treated with oxygen and albuterol. Though he had a crib, his mother had placed him in her bed to sleep so she could monitor him through the night.

Prior History:    The deceased was his mother's tenth child. His siblings range in age from one to 20. The family's DCFS involvement dates to May 2008 when the mother was indicated on a report of environmental neglect. The family was given community referrals at that time. The next contact with DCFS was when the mother's 15-year old daughter gave birth to an infant with a congenital heart defect. (See Child No. 99 above). Between June 2010 and June 2011, the hotline was called three times. Two investigations, initiated by neighbors, were unfounded for inadequate supervision and inadequate food. The third investigation, involving an argument between two siblings that turned physical, was also unfounded.

## 12-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2011**

| FISCAL YEAR | 2000 | | 2001 | | 2002 | | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 29 | 31% | 42 | 41% | 23 | 24% | 28 | 23% | 31 | 22% | 37 | 27% | 17 | 20% | 24 | 22% |
| Unfounded DCP | 7 | 7% | 14 | 13% | 7 | 7% | 21 | 15% | 29 | 21% | 29 | 20% | 25 | 29% | 35 | 31% |
| Pending DCP | 10 | 11% | 6 | 6% | 8 | 8% | 15 | 12% | 12 | 8% | 15 | 11% | 7 | 8% | 16 | 14% |
| Indicated DCP | 8 | 8% | 14 | 14% | 9 | 9% | 12 | 10% | 6 | 4% | 1 | 1% | 1 | 1% | 6 | 5% |
| Child of Ward | 5 | 5% | 4 | 4% | 6 | 6% | 12 | 10% | 2 | 1% | 2 | 1.5% | 1 | 1% | 4 | 4% |
| Open Intact | 9 | 9% | 12 | 12% | 20 | 21% | 19 | 15% | 15 | 11% | 31 | 22% | 20 | 23% | 13 | 12% |
| Closed Intact | 5 | 5% | 3 | 2% | 7 | 9% | 7 | 5% | 13 | 9% | 0 | 0% | 1 | 1% | 2 | 2% |
| Open Placement/Split Custody | 13 | 14% | 4 | 4% | 9 | 8% | 3 | 2.5% | 17 | 13% | 5 | 3.5% | 4 | 5% | 2 | 2% |
| Closed Placement/ Return Home | 3 | 3% | 1 | 1% | 4 | 4% | 2 | 1.5% | 2 | 1% | 0 | 0% | 0 | 0 | 5 | 4% |
| Others | 7 | 7% | 3 | 3% | 4 | 4% | 8 | 6% | 12 | 10% | 19 | 14% | 10 | 12% | 4 | 4% |
| **TOTAL** | **96** | **100%** | **103** | **100%** | **97** | **100%** | **127** | **100%** | **139** | **100%** | **139** | **100%** | **86** | **100%** | **111** | **100%** |

TWELVE-YEAR DEATH RETROSPECTIVE

99

100

TWELVE-YEAR DEATH RETROSPECTIVE

| Fiscal Year | 2008 | | 2009 | | 2010 | | 2011 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| Case Status | # | % | # | % | # | % | # | % | # | % |
| Ward | 19 | 22% | 21 | 24% | 20 | 24% | 25 | 22% | 316 | 25% |
| Unfounded DCP | 18 | 31% | 19 | 21% | 17 | 20% | 23 | 20% | 244 | 19% |
| Pending DCP | 13 | 14% | 14 | 16% | 14 | 17% | 17 | 15% | 147 | 11% |
| Indicated DCP | 12 | 5% | 4 | 4% | 7 | 8% | 8 | 7% | 88 | 7% |
| Child of Ward | 3 | 4% | 2 | 2% | 7 | 8% | 4 | 4% | 52 | 4% |
| Open Intact | 18 | 12% | 12 | 14% | 9 | 11% | 21 | 18% | 199 | 16% |
| Closed Intact | 2 | 2% | 6 | 7% | 2 | 2.5% | 3 | 3% | 51 | 4% |
| Open Placement/Split Custody | 4 | 4% | 6 | 7% | 1 | 1% | 8 | 7% | 76 | 6% |
| Closed Placement/ Return Home | 1 | 1% | 1 | 1% | 5 | 6% | 2 | 2% | 26 | 2% |
| Others | 9 | 4% | 4 | 4% | 2 | 2.5% | 2 | 2% | 84 | 6% |
| TOTAL | 99 | 100% | 89 | 100% | 84 | 100% | 113 | 100% | 1283 | 100% |

**CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH 2000 THROUGH 2011**

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Deaths | 96 | 103 | 97 | 127 | 139 | 139 | 86 | 111 | 99 | 89 | 84 | 113 |
| **Ward** | **29** | **42** | **23** | **28** | **31** | **37** | **17** | **24** | **19** | **21** | **20** | **25** |
| Natural | 13 | 20 | 14 | 18 | 16 | 28 | 10 | 13 | 11 | 9 | 16 | 10 |
| Accident | 6 | 9 | 3 | 3 | 3 | 1 | 2 | 6 | 5 | 4 | 1 | 3 |
| Homicide | 7 | 9 | 3 | 6 | 8 | 5 | 4 | 3 | 3 | 4 | 1 | 8 |
| Suicide | 0 | 0 | 3 | 1 | 2 | 3 | 0 | 0 | 0 | 3 | 0 | 2 |
| Undetermined | 3 | 4 | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 1 | 1 | 2 |
| **Unfounded Investigation** | **7** | **14** | **7** | **21** | **29** | **29** | **25** | **35** | **18** | **19** | **17** | **23** |
| Natural | 0 | 5 | 2 | 9 | 16 | 17 | 8 | 9 | 6 | 7 | 4 | 9 |
| Accident | 2 | 6 | 0 | 6 | 8 | 8 | 8 | 16 | 7 | 7 | 4 | 7 |
| Homicide | 4 | 2 | 3 | 5 | 2 | 1 | 7 | 5 | 3 | 2 | 4 | 2 |
| Suicide | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 4 | 2 |
| Undetermined | 1 | 1 | 1 | 1 | 3 | 3 | 2 | 4 | 1 | 1 | 1 | 3 |
| **Pending Investigation** | **10** | **6** | **8** | **15** | **12** | **15** | **7** | **16** | **13** | **14** | **14** | **17** |
| Natural | 0 | 1 | 7 | 6 | 6 | 4 | 3 | 8 | 3 | 6 | 0 | 4 |
| Accident | 5 | 1 | 1 | 3 | 1 | 5 | 2 | 2 | 1 | 4 | 7 | 9 |
| Homicide | 3 | 3 | 0 | 5 | 3 | 3 | 2 | 4 | 3 | 2 | 2 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 |
| Undetermined | 2 | 1 | 0 | 1 | 2 | 3 | 0 | 2 | 4 | 2 | 5 | 3 |
| **Indicated Investigation** | **8** | **14** | **9** | **12** | **6** | **1** | **1** | **6** | **12** | **4** | **7** | **8** |
| Natural | 1 | 4 | 7 | 7 | 3 | 1 | 0 | 2 | 4 | 1 | 4 | 2 |
| Accident | 4 | 7 | 0 | 4 | 3 | 0 | 0 | 4 | 2 | 3 | 1 | 2 |
| Homicide | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 3 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Undetermined | 2 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 1 | 1 |
| **Child of Ward*** | **5** | **4** | **6** | **12** | **2** | **2** | **1** | **4** | **3** | **2** | **7** | **4** |
| Natural | 3 | 1 | 1 | 6 | 1 | 2 | 1 | 2 | 1 | 0 | 3 | 2 |
| Accident | 1 | 1 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 2 | 0 |
| Homicide | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 1 |
| **Open Intact** | **9** | **12** | **20** | **19** | **15** | **31** | **20** | **13** | **18** | **12** | **9** | **21** |
| Natural | 6 | 6 | 6 | 4 | 8 | 23 | 12 | 5 | 6 | 5 | 5 | 12 |
| Accident | 0 | 5 | 7 | 10 | 1 | 5 | 3 | 4 | 4 | 4 | 1 | 3 |
| Homicide | 1 | 1 | 5 | 1 | 1 | 2 | 4 | 2 | 4 | 2 | 0 | 4 |
| Suicide | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Undetermined | 2 | 0 | 2 | 4 | 4 | 1 | 1 | 2 | 3 | 1 | 3 | 2 |
| **Closed Intact** | **5** | **3** | **8** | **7** | **13** | **0** | **1** | **2** | **2** | **6** | **2** | **3** |

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Natural | 2 | 2 | 2 | 3 | 3 | 0 | 0 | 1 | 2 | 2 | 1 | 0 |
| Accident | 2 | 0 | 4 | 1 | 5 | 0 | 1 | 1 | 0 | 1 | 0 | 3 |
| Homicide | 1 | 0 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| **Open Placement/Split Custody** | **13** | **4** | **9** | **3** | **17** | **5** | **4** | **2** | **4** | **6** | **1** | **8** |
| Natural | 6 | 4 | 6 | 3 | 12 | 3 | 3 | 1 | 4 | 1 | 1 | 2 |
| Accident | 1 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 2 | 0 | 4 |
| Homicide | 1 | 0 | 1 | 0 | 3 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 5 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 |
| **Closed Placement** | **3** | **1** | **4** | **2** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Natural | 3 | 0 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accident | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Adopted** | **0** | **2** | **2** | **1** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Former Ward** | **5** | **1** | **0** | **1** | **1** | **0** | **1** | **1** | **1** | **0** | **1** | **1** |
| **Open Return Home** | **0** | **0** | **0** | **1** | **0** | **3** | **0** | **4** | **1** | **1** | **5** | **2** |
| **Closed Return Home** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Homicide by a ward\*\*** | **1** | **0** | **1** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Interstate compact** | **0** | **1** | **0** | **0** | **1** | **0** | **1** | **0** | **0** | **0** | **0** | **0** |
| **Preventive services** | **0** | **0** | **1** | **3** | **4** | **13** | **5** | **2** | **3** | **2** | **0** | **0** |
| **Subsidized Guardianship** | **0** | **0** | **0** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Child of former ward** | **0** | **0** | **0** | **0** | **3** | **1** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Extended family support** | **0** | **0** | **0** | **0** | **2** | **2** | **0** | **1** | **0** | **1** | **0** | **0** |
| **Child Welfare Referral** | **0** | **0** | **0** | **0** | **0** | **0** | **3** | **1** | **5** | **1** | **1** | **1** |

*In FY 01 a child of a ward was also a ward and was only counted once in the total.
**In FY 00, FY 02 and FY 03 the victims of the homicide by a ward were either not involved with DCFS and therefore not included in the total or the victims were involved with DCFS and had been included in another category.

# GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

**ALLEGATION**  The Inspector General reviewed Program Plans of a private agency which received seven Department grants totaling nearly $3 million each year.  The Inspector General noted that some of the grants did not appear to service Department children or families and had unmeasurable deliverables.  Upon further review, the Inspector General noted that the agency operated both a not for profit and several for profit agencies and maintained grants and contracts for similar services with several other governmental entities.  The Inspector General initiated a review of supporting documentation and monitoring records from the Department and other government agencies to determine whether Department funds were being appropriately allocated and spent.

**INVESTIGATION**  The review of available supporting documentation revealed significant double and triple billing for the same services to different governmental agencies.  The OIG investigators further noted that, in five instances, sign-in sheets submitted to support billing to a different State Agency had been forged.

Between 2008 and 2011, the private agency was awarded over $18 million in grants from numerous State agencies and the City of Chicago.  In 2008, DCFS awarded the agency $2,622,392 in grants, which did not require monthly submission detailing clients served.  By 2011, the amount of the grants the Department awarded the agency had increased to $3,121,707.  In order to justify payments received from the Illinois Department of Human Services – Division of Alcohol and Substance Abuse, the agency submitted sign-in sheets to the OIG investigators purportedly signed by service providers or those who received services.  When the OIG investigators interviewed the community agency staff who had purportedly signed the documents, however, they stated that the signatures were not theirs.

In one instance, the agency submitted the same invoice for reimbursement to three government funders.  Services provided at a single private school were billed to three different government funders.  In one year, the agency billed for $130,500 in rental costs, but a lease for the property reflects an annual rental of $30,000.

Grant funds were disbursed based on budgets submitted by the agency, which in several instances were found to contain "ghost" positions and expenses, such as a program budget for three full-time therapists, when only two full-time therapists provided program services.  Similarly, two of the programs billed for non-existent "Consultants."

The investigation also found that the agency was paid far in excess of the allowable limit for administrative costs.  In one instance, the agency was paid 76% of its direct costs for administrative expenses.  Department Rules limit allowable reimbursement for administrative expenses to 20% of direct expenses.

Under one DCFS grant, the agency had dispensed psychotropic drugs to children without assuring the proper dosage (because the agency did not have the basic equipment of scales to weigh children) and without first obtaining necessary consent from the DCFS Guardian.

The investigation also examined the lax monitoring within the Department that had permitted the overpayments to continue for so many years.  The investigation found that the Director of the private agency

was described by the Director of DCFS as a "personal friend and mentor."

Although this investigation primarily focused upon Grants awarded to the private agency by DCFS, the investigation revealed that other State agencies including Chicago State University, the Illinois Department of Human Services, the Illinois State Board of Education, the Illinois Department of Mental Health and the City of Chicago also provided grants to the agency with little or no effort to determine whether services were actually provided. As the OIG investigation began to reveal fraud that potentially spread across several government agencies, the Inspector General enlisted the assistance of the Executive Inspector General for the Agencies of the Governor and conducted a joint investigation into the billing practices, possible fraud and lack of monitoring within the Department and across other State agencies.

During the course of the joint investigation, both the DCFS Director and the Director of the private agency failed to cooperate with the investigation.

| OIG/OEIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
| --- |

**1. The State of Illinois should seek civil recovery and criminal prosecution for fraudulent billing practices outlined in this report from the contractor or any business entity in which he has or held an ownership interest that received State funds pursuant to a grant or contract.**

The recommendation has been agreed to by the Governor and is being implemented.

**2. The State of Illinois should permanently bar the contractor and any business entity in which he has or acquires an ownership interest from ever being awarded a State grant or contract.**

The recommendation has been agreed to by the Governor and is being implemented.

**3. The State of Illinois and every State agency that has awarded the contractor or any of his business entities a grant or contract – in particular the Illinois Department of Children and Family Services, Chicago State University, the Illinois State Board of Education and the Department of Human Services – should take immediate and appropriate action to acquire a refund of any and all grant funds to which they are entitled under the law.**

The recommendation has been agreed to by the Governor and is being implemented.

**4. The State of Illinois should take appropriate action to prohibit the distribution of State funds by any other entity that might provide such funds – including the City of Chicago and the Department of Human Services funds – to the contractor or any business entity in which he has or acquires an ownership interest.**

The recommendation has been agreed to by the Governor and is being implemented.

**5. The Governor and his advisor on Child Welfare issues should review the DCFS Director's actions and inactions as outlined in this Report and take whatever action they deem appropriate to ensure the Illinois Department of Children and Family Services is managed in compliance with State law requirements.**

The recommendation has been agreed to by the Governor and is being implemented.

**6.  The manager should be disciplined for his approval of the fourth-quarter FY 2009 $112,500 payment to contractor and other actions or inactions as outlined in this Report.**

The manager was disciplined.

**7.  The assistant manager should be disciplined for her failure to discharge the duty of supervisor by verifying that goods and services were delivered prior to allowing the business manager to sign and process a FY 2009 fourth-quarter payment under the Contract, as well as for her failure to ensure that employees of the agency completed criminal background checks.**

The assistant manager was disciplined.

**8.  The business manager should be disciplined for signing and processing the FY 2009 fourth-quarter payment to the agency without verifying that any goods and services had been received.**

The business manager was disciplined.

**9.  The Illinois Department of Children and Family Service should implement the following safeguards to their training and procedures:**

> ➢ **Vendors, grantees and contractors should be required to disclose all public contracts held by related parties in the Consolidated Financial Report (CFR). Instructions to the CFR should require contractors to report public funding of affiliates and related entities. Vendors, grantees and contractors should also be obligated to provide a description of programs supported by the public funding.**

> ➢ **Grants, contracts, program plans and independent audits should be electronically scanned, stored in a central location and made accessible to program and financial monitors for review.**

> ➢ **DCFS contract and financial monitoring training must be required for all DCFS program and financial monitors, as well as those reviewing annual audits, within three months of receipt of a contract monitoring assignment and every two years thereafter. Training should emphasize that the Program Monitor's *chief duty* is to verify, by personal knowledge, the receipt of goods and services provided.**

>   **Any training should address, at minimum:**

>   ✓ **General grant monitoring responsibilities;**

>   ✓ **Audits including comparison of audit figures with approved budgets and related responsibilities;**

>   ✓ **Approval of Quarterly Reports and related responsibilities;**

>   ✓ **Rules and procedures regarding under spending and related responsibilities;**

>   ✓ **Rules and procedures regarding disallowable costs and related responsibilities;**

>   ✓ **Rules and procedures regarding reduction in grant amounts responsibilities;**

✓ **Rules and procedures regarding excess revenue and allowable offset and related responsibilities; and**

✓ **Rules and procedures involving inquiries into expenses to related entities and related responsibilities.**

➢ **In addition, all DCFS Program Monitors should be required to certify that:**

✓ **the report of direct versus administrative expenses have been verified and is appropriately allocated;**

✓ **the Program Monitor has considered whether to reduce future contract or grant amounts based on under-spending or disallowable costs;**

✓ **the quarterly reports have been reviewed and compared to the budget; and**

✓ **the Program Monitor has reviewed and approved leases supporting rental costs.**

➢ **On a biannual basis, each DCFS Deputy Director must submit to the DCFS Director and the DCFS Division of Budget and Finance, a list of each contract monitored by his or her division and listing the program monitor assigned to each individual contract. The DCFS Division of Budget and Finance should be required cross-check the list to ensure that all contracts are assigned a Program Monitor, and also to ensure that all Program Monitors receive the required Contract Monitoring Training. Every six months the DCFS Division of Budget and Finance should be required to forward to the DCFS Office of the Inspector General a list of any unmonitored contracts.**

The following is provided in response to recommendation #9 to the OEIG's Final Report relating to the implementation of further safeguards to training and procedure on behalf of both the Office of the Governor and the Department of Children and Family Services:

Vendors, grantees and contractors will be required to disclose all public contracts held by related parties and public funding of affiliates and related entities as well as a description of the programs supported by the public funding in the Consolidated Financial Report ("CFR") to the DCFS Divisions of Budget and Finance and Monitoring, which receive and analyze CFRs. These requirements will be incorporated into requests to vendors, grantees, and contractors for their CFR submissions for annual contract budget and financial desk audit activities. Estimated completion date and recommendations for compliance is 4th Qtr FY12.

Evaluation of the existing DCFS Division of Procurement and Contracts/Office of Contract Administration Access database, used to determine if grants, contracts, program plans and independent audits can be electronically scanned, stored in a central location and made accessible to monitors, is currently underway. Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

The current contract and financial monitoring training program for grants will be updated by Division of Procurement and Contracts/Office of Contract Administration in conjunction with Divisions of Budget and Finance and Support Services. This effort will be coordinated and/or led by staff of the newly formed Office of Contract Compliance. Estimated completion date and recommendations for compliance is 3rd Qtr FY12.

Interim process controls include the tracking of monitors' visits to grantees and the tracking of metrics (i.e. number of clients and cost per client served) of all grantees.  Tracking of metrics for all grantees awarded over $10,000 should be complete by the end of 2nd Qtr FY12.

A DCFS Administrative Procedure is being developed by the Division of Budget and Finance.   This effort will be coordinated with staff of the Office of Contract Compliance once hired.  Estimated completion date and recommendations for compliance is by 3rd Qtr FY12.

Subject to Senate confirmation, Richard Calica will become the Director of DCFS on December 15, 2011. He will be undertaking a comprehensive review of DCFS, including contracts, grants, and controls relating to the same. Under Mr. Calica, the processes above may be modified and/or added to.

**GENERAL INVESTIGATION 2**

| | |
|---|---|
| **ISSUE** | Asthma is one of the most common chronic childhood disorders (American Lung Association, February 2010) and can be a life-threatening disease if not properly |

managed.  Rapid growth in asthma prevalence within the general population occurred from 1980 to 1996, which called for asthma management strategies based on clinical guidelines for the treatment of asthma. The asthma-related deaths of three children whose families had involvement with DCFS prompted a 1999 study by the Office of the Inspector General (OIG) of asthma and its implications for Illinois' child welfare case management.  A decade after the initial asthma study the OIG investigators reviewed developments in the Department's asthma management and prevention strategies, and child impact outcomes.

| | |
|---|---|
| **DISCUSSION** | Although increases in asthma prevalence have slowed since the mid-1990s, asthma prevalence remains at historically high levels, especially in Illinois.  Nine percent |

(9%) of children in Illinois had asthma in 2009 (U.S. Centers for Disease Control and Prevention). Current asthma prevalence differs between groups in the general population, with higher rates among children, non-Hispanic black and Puerto Rican persons, those with family income below the poverty level, and those residing in the Northeast and Midwest regions. Although children with asthma have higher health care use than adults, they have much lower death rates (National Health Statistics Reports, 2011). Nevertheless, Illinois has one of the highest asthma mortality rates with the majority of deaths occurring in Cook County (Chicago and suburban Cook County.)

<u>Education and Training</u>
In January 2002 the Department adopted a policy guide establishing Case Management Guidelines for Children's Asthma Management.  The guidelines are intended to provide investigators, caseworkers, supervisors and regional nurses with the information and guidance needed to ensure proper and timely treatment of DCFS wards with asthma and to reduce exposure of asthmatic children and youth to allergens and stimuli that exacerbate respiratory distress.

At the request of the DCFS Director, the OIG staff developed a curriculum titled *Asthma Within DCFS* and formally initiated an asthma education training program in fiscal year 2001.  A collaborative relationship was established with the American Lung Association, Illinois Departments of Human Services and Public Health, and the Chicago Asthma Consortium to provide comprehensive asthma training on medically sound asthma practices. Training and education were designed for DCFS and private agency child welfare workers and foster parents. The training objectives were: 1) to identify and understand the significance of "triggers" for asthma, and the main effects of asthma on the lungs; 2) to understand Asthma Action Plans, peak flow monitoring; long-acting versus short-acting medications; and 3) identify at least one asthma resource in the trainee's region.  Between 2001 and 2004, asthma training reached nearly 2,600 participants including case managers, foster parents, child protection investigators and staff of the Cook County Office of the Public Guardian.  In 2004, the OIG staff began transitioning management of the statewide asthma training program to the Department.

In 2005, after several OIG investigations revealed that child welfare investigators were not knowledgeable about certain chronic medical conditions affecting children, such as sickle cell anemia, diabetes and cerebral palsy, the Inspector General collaborated with the University of Illinois at Chicago, College of Nursing, to produce a user-friendly reference workbook: *A Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions*.  The information, which was made available to all child welfare workers and incorporated into training for new workers, contains the most common features of chronic health conditions, including asthma, and their relevant caretaker issues.  The workbook was updated in FY 2007 and is currently under revision.

Development of a Database and Tracking System

In an effort to identify wards with asthma, assess its severity and educate foster parents about dangers and asthma management, in 1999 the Department began to survey case managers to determine how many DCFS wards had a diagnosis of asthma.  As of January 2011, case managers reported 740 wards with asthma [4.6% of nearly 16,000 wards], which is likely an underestimation. [Source:  DCFS Division of Service Intervention-Office of Health Services (OHS).]  With the cooperation of the Illinois Department of Healthcare and Family Services, DCFS is currently making strides to develop a database system that will not only accurately identify DCFS children with medical diagnoses, but will help track children's utilization of emergency services, hospitalizations, medications, and ensure that, for example, a child with asthma has an Asthma Action Plan and peak flow meter.

Impact Potential

Prior to the release of Department policy and case management guidelines for managing children with asthma in fiscal year 2002, DCFS wards represented eight of ten asthma-related deaths (80%) in Illinois between 1998 and 2001. Since 2002 and through fiscal year 2010 there were six asthma-related deaths, none of whom were DCFS wards; however, families of three of the six children (50%) were receiving Intact Family Services from the Department in the year prior to their deaths.  Although some intact family workers have received training on asthma management and prevention, as a group intact family workers were not targeted as primary users of the Policy Guide.  While it is encouraging that there have been no asthma-related deaths among DCFS wards since the inception of asthma education in the field, there was an increase in asthma deaths of children in families receiving intact family services. These children's deaths accentuate the importance of educating intact family workers to provide prevention education to intact families on managing their child's asthma and to help lower mortality rates.

By the end of fiscal year 2011, the Department would have the capability to generate reports from Medicaid data that will provide a more complete picture of wards with a diagnosis of asthma or other chronic health conditions. For children diagnosed with asthma, the database system will enable the Department's Health Services staff to better monitor their asthma management and care in keeping with Department policy and guidelines.

---

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department should share this report with POS Intact Family Services Providers at the scheduled semi-annual meetings in May 2011.** |
|---|---|

The report was shared with each Intact Family Services provider agency as well as with members of the Child Welfare Advisory Council (CWAC) Front End Subcommittee.

**2.  The Department should provide DCFS and POS intact family workers with a copy of the newly revised *Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions*. Using the Guide, intact family workers should discuss the section, relevant to the child's health condition, with the family, and the intact services record should reflect the discussion.**

The  Division of Child Protection, DCFS Monitoring and DCFS Nurses formed a committee to review and revise policies related to the recommendation. A draft has been developed and is  in review by the committee.

**3.  The Department should include intact family services workers as primary users of Policy Guide 2002.01: *Case Management Guidelines for Children's Asthma Management*.**

The  Division of Child Protection, DCFS Monitoring and DCFS Nurses formed a committee to review and revise policies related to the recommendation. A draft has been developed and is in review by the committee.

**4.   The Department's Agency Performance Team (APT) monitors should ensure that POS Intact Family Services Managers review this report, Policy Guide 2002.01:** *Case Management Guidelines for Children's Asthma Management***, and the guide on chronic health care conditions with intact services supervisors and workers.**

The private agency Intact Family Services Managers will be provided this information, including the redacted report, once the draft is finalized.

## GENERAL INVESTIGATION 3

| ISSUE |
|-------|

In preparation for the then-proposed merger between the Department of Children and Family Services and the Department of Juvenile Justice, the Office of the Inspector General reviewed all external investigative reports at Illinois youth centers for an 18 month period beginning in January 2009. At the time, external investigations (those concerning employee misconduct and death of youth) were performed and reports were prepared by staff from the Department of Corrections. In addition, the Office reviewed internal Incident Reports (those concerning youth) for the youth facilities for the same period of time. The incident reports were prepared by staff of the Department of Juvenile Justice. The review was complicated by the fact that many investigations and incidents involving youth did not include the youth's age, length of confinement, or information on whether the child abuse hotline had been called. In addition detailed descriptions of antecedents to the events were absent. In specific investigations, OIG investigators noted that appropriate law enforcement or professional regulation referrals did not appear to have been made.

| INVESTIGATION |
|---------------|

The OIG investigators' review disclosed four areas of concern that should be addressed prior to any merger between the agencies. First, a comparison between scholarly studies of the youth incarceration system in Illinois and complaints to Juvenile Justice authorities suggested a significant amount of underreporting by youth of incidents of violence and harm. Studies suggested that approximately 11% of youth in Illinois facilities reported having been sexually victimized while at a facility, either by another youth, or by staff. In contrast, only 4 internal investigations and one incident report over an 18 month period concerned allegations of sexual victimization.

The OIG investigators reviewed specific incident and internal investigations and identified the following concerns:

- Some incidents appeared to involve allegations that are mandated to be reported to the Child Abuse and Neglect Hotline, but contained no information on whether the Hotline had been called;
- One incident report was initiated after three women alleged that a contractual doctor had behaved inappropriately. The investigation was substantiated but was not reported to the Department of Financial and Professional Regulation;
- Parents were not notified of substantiated attacks on their children;
- Resolution appeared not to differentiate between attacker and victim, even when the investigation disclosed physical evidence of victimization;
- The scope of reportable events differed within the two systems. Specifically, Juvenile Justice staff were required to report far fewer categories of incidents through their incident reporting system than DCFS was required to report through its Unusual Incident Reporting requirements.
- Many incidents involved homemade weapons and other contraband. The OIG investigators noted that the agency could benefit from an analysis of factors contributing to such instances in an effort to lower the number of offenses from year to year.

While deaths and serious injuries are investigated in Illinois Youth Centers by law enforcement, the facilities have lacked a contextual and systemic review that focuses on possible contributing factors and recommendations for reform. In contrast, deaths and serious injuries in Department facilities are reviewed and investigated contextually for reform recommendations by this Office. They are also reviewed by local Child Death Review Teams that analyze interdisciplinary risk factors and make recommendations to the Director.

The OIG investigators noted the wealth of literature in the field supporting positive effects both for confinement and rehabilitation when youth are visited.  The OIG investigators made recommendations designed to encourage and support visitation to incarcerated youth.   The review also noted that nearly 2/3 of all committed youth in Illinois have not graduated grade school.  In addition, ½ of the population suffers from educational disabilities (although only 42% have existing Individual Education Plans).  Yet, education funding per student at youth centers hovers as just 1/3 of the minimum in other school districts.  The statistics are stunning in terms of the critical importance that addressing educational needs has within the youth centers.

The OIG investigators noted that many of the individual risk factors for delinquency exist across the Juvenile Justice population, such as violence, gangs, guns and sexual aggression.  Needed counterinfluences can include cognitive-behavioral treatment, the development of a moral and caring community among the youth and ideally, a viable family member who can support the child upon his/her return to his/her home community.

Lastly, the review noted that the Department of Juvenile Justice may benefit from a re-exploration of the Consent Decree, which resulted in adult offenders being incarcerated in separate youth facilities.   The Consent Decree was entered at a time when adult facilities in Illinois suffered from overcrowding.  Currently, the situation is reversed.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

*Reporting*
**1.  If the merger occurs, staff at the youth correctional facilities will need to be equipped and trained to enable them to report the broader range of unusual incidents required by Rule 331, which includes notice to parents.**

**2.  All investigations should include the age of any youth involved as well as the length of incarceration and a full description of antecedents to the event.**

**3.  All reports and investigations involving youth should include a checkbox as to whether the DCFS hotline was contacted.**

**4.   All reports and investigations involving possible criminal acts should include a checkbox as to whether the Inspector General or law enforcement was contacted.**

**5.  Reports and investigations involving substantiated allegations against professionals should include a checkbox as to whether the allegation was referred to the Department of Financial and Professional Regulation.**

**6.  The Department should work with local Child Advocacy Centers to interview younger or vulnerable youth who report sexual victimization.**

**7.  All reports and investigations involving the placement of a youth in confinement should indicate the measures taken prior to confinement and the length of confinement.**

*Other Issues*
**8.  For the mutual protection of the incarcerated youth and the involved professionals, a female medical staff person should be present for all physical examinations of female inmates by male doctors.**

**9.  If the merger occurs, investigations of juvenile deaths and serious injuries should be treated the same as juvenile deaths in child welfare institutions and should be investigated by the Inspector**

General (in addition to law enforcement) and reviewed by Child Death Review Teams.

10.  Staff at juvenile justice facilities should receive mandated reporter training.

11.  The use of polygraph tests at juvenile justice facilities should be discontinued.

12.  The Department should explore revisiting the judicial order allowing the Sheriff of Cook County to house adults awaiting criminal trials in youth correctional facilities, when the adults were arrested while serving juvenile parole.  At the time of the judicial order, Cook County jail was overcrowded. Currently, youth correctional facilities at Harrisburg, Kewanee and St. Charles are overcrowded and the Cook County Jail has had to shut down facilities because of underuse.

13.  The Department should develop a protocol for assignment of caseworkers from the community of origin of youth offenders.  The protocol should include directions for convening a family staffing within the first 48 hours after sentencing to develop a reconnection plan and to determine critical visitors/mentors, education plan while incarcerated and to facilitate visitation.

14.  The Department should explore a simple virtual family visitation model, in which  laptop computers with audio/video capabilities are placed at DCFS offices, available for families, and laptops with audio/video capabilities are placed at each institution to facilitate visitation of youth by families and caseworkers.

15.  The Department should consider requesting that social investigations for youth committed to Illinois Youth Centers should include information about family members and significant others in the child's support system that could facilitate the rehabilitation of the youth either through visitation during incarceration or post-release mentoring.

Note:  These recommendations were made pending the proposed merger of the Department of Children and Family Services and the Department of Juvenile Justice.  Since the merger did not occur, no responses to the recommendations are provided.

**GENERAL INVESTIGATION 4**

| ISSUE | The Parenting Assessment Teams (PAT) were developed by the Mental Health Task Force in 1995 as part of a response to a child's tragic murder by his mentally ill mother. |

The PATs were developed to examine the relationship between DCFS and the Department of Mental Health and determine issues and problems related to families with parents suffering from mental illness by providing "comprehensive, methodologically sound, non-adversarial assessments of parenting capabilities" for mentally ill parents. The goal of the evaluations was to enable DCFS, the courts and the Guardian *Ad Litem* to best serve the needs of the children. Functionally, the PAT performs comprehensive records review, interviews family members and other relevant individuals in the child's life and assesses the family's social support network, dynamics between the child(ren) and parent(s), the developmental status of the children in the home and can consult on a parent's diagnoses and medications.

PATs are available for mentally ill parents involved with the Department and residing within the Cook County Region or the Northern Region of Illinois.

| DISCUSSION | ***Intact Family Services & Mental Health*** |

The OIG's Error Reduction Project identified an overly generalized approach to Intact Family Service cases with parental mental illness. OIG staff conducted a random sample of Parenting Assessment Team reports involving intact family cases from Cook county over the three year period of Fiscal Years 2008 through 2010. Roughly 10% (25) of the 227 Parenting Assessment Team evaluations completed during that period were for intact cases.

OIG staff conducted an in-depth analysis of 12 of the Parenting Assessment Team evaluations for families receiving intact family services to learn: (1) whether the Parenting Assessment Team's recommendations were being followed, (2) whether child welfare professionals considered and recognized how the parent's mental illness affected the child and (3) whether child welfare professionals were communicating with mental health professionals about the parent's mental illness and its effects on the children in the home. A summary of the Inspector General's findings follows.

***Adherence to Parenting Assessment Team Recommendations***
In the 12 sample cases the OIG review revealed that:
- Case managers followed the PAT recommendations approximately 63% of the time;
- If the PAT recommendations were incorporated into the family's service plan, they were followed 75% of the time;
- Recommendations for therapy and counseling services received the highest rate of case manager referrals (83%), suggesting that case managers tended to act in accordance with recommendations that fell within their typical knowledge base.

The OIG's review identified commonalities regarding the recommendations case managers were less likely to follow, and found that recommendations that were not followed generally had one or more of the following characteristics:
- The recommendations were not incorporated into the family's service plan (77%);
- The recommendation was unclear;
- The case manager *assumed* the client was engaged with the recommended service without verifying participation; or,
- If, rather than a referral, the recommendation required the direct intervention/action of the case manager.

The OIG review also identified that, for PAT recommendations pertaining to services for a child:

- Case managers followed 13 out of 22 (59%) recommendations made;
- In the nine instances where the PAT recommendations were not followed, none of the recommendations had been incorporated into the family's service plan;
- 12 of the 13 referrals (92%) for children's services made by case managers were followed-through on by the parent or caretaker, revealing a high rate of family participation provided that the worker followed the recommendation by initiating a service referral.

### Recognition of How Parent's Mental Illness Affects the Child

In the cases reviewed by the OIG investigators, case notes generally did not indicate that case managers considered or recognized the effects of the parent's mental illness upon the child. This lack of recognition creates a blind spot in identifying risk to the child and in giving context to and understanding of reasons behind the child's behaviors. Case managers who do not link how a parent's mental illness symptoms impact the child cannot respond appropriately to meet the child's short or long-term needs. The Error Reduction training for Intact Family workers uses an empirically based clinical practice guide to train workers on how a parent's mental illness symptoms affect the child, in order to increase worker's recognition of the link and enable them to successfully screen cases for orders of protection.

### Communication between Child Welfare and Mental Health Fields

In 6 (50%) of the 12 cases analyzed, the case managers engaged the mental health professionals in in-depth conversations regarding the parent's mental health, shared information and observations about the family including historical information, asked about potential risks to the child and whether a medication's side effects could hinder parenting. Conversely, in the other six cases conversations between the child welfare worker and mental health provider were limited to discussions about intake, scheduling and progress reports; sharing of relevant information did not occur. The Error Reduction training for Intact Family workers addresses the importance of communication between fields. The random sample highlights the need for continued training on the importance of in-depth on-going communication with the mental health field.

### Mental Illness and Cognitive Delays

Parents struggling with both mental illness and cognitive delays present complex issues that necessitate careful and comprehensive assessment. One unexpected finding in reviewing the Parenting Assessment Team evaluations of Intact Family cases was the significantly high rate of clients (5 out of 12, or 42%) with a co-occurrence of mental illness and developmental delays. Of the 5 cognitively impaired parents in the sample, 4 (80%) were diagnosed with Mental Retardation in addition to either major depression, bipolar disorder or intermittent explosive disorder.

The Parenting Assessment Team recommended therapy and parenting coaching for four of the five parents with co-occurring mental illness and cognitive impairment. However, locating the recommended services able to competently work with cognitively delayed parents is challenging. Case managers referred some of the parents in the sample to parenting coaching and homemaking programs that were not specifically designed for cognitively impaired parents since there is a scarcity of programs for this population. The parents were discharged from these programs because of their inability, lack of engagement and poor attendance. In one case, a therapist declined, upon intake, to work with a family in which the mother was diagnosed as mentally retarded and depressed, explaining that the depth of the family's issues was too great.

The re-integration of people with cognitive delays into the community in the 1970's enabled adults who previously would have been institutionalized, to develop relationships and in some cases, to become parents. Despite the need, there is a scarcity of services for cognitively impaired parents. According to the Center for Tax and Budget Accountability, in FY 2008, Illinois ranked 34th among states in per-capita human services spending:

In spite of being one of the wealthiest states in the nation, it consistently ranks near the bottom in

funding services for vulnerable populations, like individuals with mental health or developmental disability issues.[1]

This…lack of specialized services for this population more than forty years after their reintegration into the community is a growing concern…[2]

_____

[1] Center for Tax and Budget Accountability. (2010)  *Funding Our Future: Reforming Illinois Tax Policy.* Chicago, IL: CTBA.

[2] MacLean, Katie & Marjorie Aunos. (2010) "Addressing the needs of parents with intellectual disabilities: Exploring a parenting pilot project." *Journal on Developmental Disabilities.* 16(1), 18-33.

| |
|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** |

*The Department*

**1.  The Department should maintain the Parenting Assessment Team (PAT) program and should develop a funding mechanism to ensure the Parenting Assessment Teams are reimbursed for their work on partial assessments that could not be completed because of lack of parent or case manager follow-through.**

The Department agrees.  At the end of FY 11, the Department lost one of the two PAT programs in Cook County.  The Department agrees that the PAT program is a viable assessment option to serving the needs of families with parental mental illness and is therefore working to replace the lost provider and to expand the program geographically in Cook and Downstate.  The Department expects to have a replacement PAT program in place to serve Cook North and Central families by the end of 2011.  To address challenges associated with erratic client compliance and fee-for-service contracting, the Department has developed and implemented a payment mechanism that will compensate PAT providers for partial assessment reports (e.g., contractor begins the assessment process with the client but fails to complete the assessment due to client dropout.)  Agency performance team (APT) monitors will work with the PAT provider to ensure caseworker follow-through during the assessment process.

**2.  The Agency Performance Team for Intact Family Services should measure the performance of Intact Family Services' follow-through regarding Parenting Assessment Team recommendations as part of their monitoring and oversight duties to ensure that all of the Parenting Assessment Team recommendations are incorporated into the family's service plan.**

Upon notification, and during (minimum) quarterly intact family services case reviews, the Statewide POS Intact Monitoring Unit will identify, review, document and track PAT recommendations on POS intact family cases.  Regular consultation with POS intact agencies that request PAT involvement and are issued recommendations on those referrals will be monitored and reported to the respective POS intact supervisor and unit manager.

**3.  Upon the Parenting Assessment Team accepting a referral, DCFS Clinical must generate a letter to the referring case manager's supervisor stating that the Parenting Assessment Team has accepted the case that the worker referred, that all Parenting Assessment Team recommendations that are made for the family must be incorporated into the family's service plan, and that if the worker or supervisor has any questions or concerns regarding the Parenting Assessment Team evaluations, process, or recommendations, they may contact DCFS Clinical. The letter should be copied to the Agency Performance Team monitor to alert them of the assessment so that they monitor for follow-through regarding the recommendations.**

The Department agrees.  All referrals will generate a letter to the caseworker and supervisor informing them of the status of the referral and whether or not it has been accepted.  The letter, signed by the Department's

Division of Clinical Services' PAT Administrator and copied to the agency monitor, will serve to: acknowledge acceptance of the referral, introduce and explain the purpose of the assessment, emphasize the need for timely caseworker/supervisor collaboration, and underscore the urgency for implementing PAT findings and recommendations.  The PAT provider will also notify the Department's PAT Administrator of any barriers or obstacles that arise during the clients' assessment process.

**4.  As part of the Error Reduction effort, this report should be shared with DCFS Clinical and with all Intact Family Services supervisors.**

The report has been shared with all DCFS intact teams.  Reports are reviewed by the PAT Administrator, a member of the Clinical Services Division.  In addition every report is formally reviewed with the intact family team (worker and supervisor), as well as the parent during a scheduled feedback session.  Monitoring will share the report with POS intact teams.

*Parenting Assessment Team*
**5.  The Parenting Assessment Teams should have easily identifiable, clear and articulate recommendations to facilitate case manager oversight and increase the likelihood the recommendations are followed through, included in the service plan and recognized/ordered by court personnel. Rationales for the recommendations should be explained, and where applicable, broken down into tasks with a consideration of the potential obstacles to recommendation follow-through and ways to respond to the obstacles. Recommendations should be broken down into clearly identified tasks— general as well as specific—for the respective family members. Recommendations should also clearly identify tasks for the worker, to enable the worker to support and facilitate the family's positive changes. The Parenting Assessment Team could utilize a task planner to "map out a range of tasks" for each family member to pursue in order to resolve the identified problem, along with tasks for the worker to facilitate the family member's accomplishment of the task.  [Reid, William J. (2000) *The Task Planner: An Intervention Resource for Human Service Professionals)* Columbia University Press. New York.]**

The Department agrees.  Using the rationale and procedures proposed in these OIG recommendations as framework, the Department's PAT Administrator has revised the current PAT Program Plan, procedures and training materials to develop an established format, practice and policy that will ensure that PAT findings and recommendations are identified and articulated clearly, and that upon sharing results a clinically appropriate time table is established with the clients and caseworker for implementing all recommendations.  The PAT will present findings and recommendations in the report and to the caseworker and client in a manner that reflects awareness of and sensitivity to the client's cognitive, developmental and social-emotional functioning.

**6.  The recommendations involving service delivery to clients with co-occurring mental illness and developmental delays should address common obstacles with this population by:**
   **a.  Recognizing the challenges of securing appropriate services for this population**
   **b.  Scaling down client's tasks into manageable steps**
   **c.  Involving others to support client**

The Department agrees.  Using the rationale and procedures proposed in these OIG recommendations as framework, the Department's PAT Administrator has revised the current PAT Program Plan, procedures and training materials to develop an established format, practice and policy that will ensure that PAT findings and recommendations are identified and articulated clearly, and that upon sharing results a clinically appropriate time table is established with the clients and caseworker for implementing all recommendations.  The PAT will present findings and recommendations in the report and to the caseworker and client in a manner that reflects awareness of and sensitivity to the client's cognitive, developmental and social-emotional functioning.

**GENERAL INVESTIGATION 5**

| | |
|---|---|
| **ALLEGATION** | A parent complained that her adopted daughter was not receiving adoption preservation services as promised. A check of recent billings showed that the agency was billing for counseling services to the child. |

**INVESTIGATION**    When the Inspector General impounded records at the private counseling agency that allegedly supported the billing, staff noted that the counselor who had claimed that counseling had been provided was a former private agency worker whose Child Welfare Employee License had been revoked for submitting false statements to a court of law and for engaging in a pattern of deception that demonstrated unfitness for providing child welfare services. The counselor had been convicted in federal court of state benefits fraud for using funds under her control for childcare to benefit herself.

The investigation disclosed that the agency billed for several months of counseling that both the adoptive mother and child said did not occur. Several of the sessions billed for covered periods of time during which the child was hospitalized. The notes supporting the billing were repetitive and lacking in detail.

The investigation also noted that when the counselor and her supervisor were hired by the agency, they had both disclosed felony convictions: the counselor had a felony theft conviction and the supervisor had several felony drug convictions. The agency opted to hire them and would have been permitted to hire the counselor because financial crime convictions are not bars to employment under the Child Care Act. Both the counselor in question and her supervisor had been permitted to provide counseling services to families without receiving criminal background clearances from the State Police. The supervisor, who had several felony drug convictions, had avoided the check by simply writing a letter to the agency director claiming that he had contacted the State Police and was told he did not need to be fingerprinted. The supervisor had also misrepresented his educational credentials, claiming a Masters Degree that he did not have. The investigation also disclosed that since May 2009, the CEO had resided outside the United States and operated the agency through phone and e-mail correspondence with her employees.

Although the Department had a monitoring process in place to ensure that employees cleared criminal background checks, the process had failed to identify the two employees of the private agency, who had initiated documentation for the background checks but had never submitted fingerprints.

The Inspector General prepared an Addendum to this Report when it learned that the agency director had reported the theft of several guns, including assault rifles, some of which were housed at the counseling agency.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1. Contract Monitors should be given access to background check screens so that they can be certain that those billing for services have passed required background checks prior to authorizing payment. Monitors should be required to check background screens prior to approving payments.**

A revised background check policy (Policy Guide 2011.03) has been issued. The policy allows workers access to view background check screens and governs procedures for non-substitute care providers.

Language to include felony financial crimes as a barrable offense will be introduced during the Spring 2012 legislative session. Contract monitors are required to check for background clearance prior to authorizing

payments for services provided.

**2. The initial contract monitor should be disciplined for failing to communicate critical information regarding incomplete criminal background checks to the new contract monitor.**

The contract monitor received a non-disciplinary counseling.

**3. The new contract monitor should be disciplined for failing to note lack of evidence of cleared background checks and failure to verify education credentials when reviewing personnel files and for failing to incorporate new training for tracking criminal background checks.**

The contract monitor received a suspension.

**4. The Department should review prior billing from the agency based on records supplied by the counselor to determine whether additional fraudulent billing was submitted.**

All payments were reviewed to determine whether additional fraudulent billing was submitted for services. No additional fraudulent billing was identified.

**5. The Department should not contract with the private agency or its director in the future.**

The Department ended its contractual relationship with the provider and its principal.   The provider and its principal were placed on the Office of Contract Administration and the Department's list of vendors barred from future contracting with the Department.

**6. The Department should pursue a legislative change to the Child Care Act to include felony financial crimes on the list of barrable offenses.**

The Department agrees.  DCFS Office of Legal Services and legislative staff will work together to propose legislation for next year's legislative session.

**7. The state employment application (CMS 100) should be amended to include a question asking whether an applicant has ever had a license revoked, and, if so, when and what type of license.**

The CMS 100 application is released from Central Management Services and is not exclusively used by DCFS.  Therefore, the Office of Employee Services (OES) is not able to amend the application.  The Office of the Inspector General shared the recommendation and report with Central Management Services.

**8. The Department should amend procedures to require the CWEL Division to notify the Department of Professional and Financial Regulation of any revocation of a CWEL license.**

The requirement to notify the Department of Professional and Financial Regulation has been included in the draft of the amendments to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*. The amendments will be submitted to the Joint Commission on Administrative Rules (JCAR).

**9. The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* to require that all counselors and therapists subcontracted or employed to provide services through a DCFS contract possess a CWEL license.**

The draft amendments to Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors,* require that all counselors and therapists subcontracted or employed to provide services through a DCFS contract possess a CWEL license.

**GENERAL INVESTIGATION 6**

| ALLEGATION | In FY 2010, the Office of the Inspector General had investigated a private agency and determined that the agency was receiving significant Department funds to which it was not entitled. |

In FY 2010, the Office of the Inspector General had investigated a private agency and determined that the agency was receiving significant Department funds to which it was not entitled. Specifically, the agency was using Department funds to subsidize a public high school's basketball team, none of whose members were Department wards or clients. In addition, the Inspector General found that the agency lacked a viable system for allocating costs among different funders and among programs. The investigation also found that the agency had used Department funds to pay a subcontractor to lobby, a disallowable expense. The lobbyist was a former Deputy Director of the Department who left the Department after a prior Inspector General investigation determined that he had misappropriated over $220,000 of Department funds intended for children and families to his own private account. The former Deputy Director was later criminally convicted of the offenses. The Office of the Inspector General recommended in FY 2010 that the Department audit the agency for disallowable expenses paid in the prior two years.

**INVESTIGATION**

The Office of the Inspector General reviewed the "draft audit" conducted by the Department in response to the Inspector General recommendation and found that it failed to address basic questions of allocation of management salaries and possible overpayments. Although referred to as a "draft audit," the document had been shared with the agency and concluded that the agency did not owe the Department significant funds. The auditors had not reviewed the original OIG report that detailed the abuses. The OIG Report identified the following questions or concerns, none of which were addressed in the audit:

- The OIG report identified that the Department was paying approximately 95% of the Executive Director's salary, while funding only 28% of the agency's revenues. The OIG report identified that while the Executive Director's salary was allocated as a direct cost, she admitted to little involvement in direct service operations of the contract and had little knowledge of day-to-day operations. Therefore, it appeared that a large portion of the Executive Director's salary should have been classified as an administrative rather than a direct cost. The proper classification of the Executive Director's salary would have caused the agency's administrative costs to exceed the 20% limit of allowable costs.
- The OIG report identified that the Department paid 93% to 100% of a program staff's salary despite the fact that a substantial portion of the staff member's time was spent on both an Illinois State Board of Education funded project and another project funded by the Department of Human Services.
- The OIG Report identified that while the Department was billed for 100% of the former Deputy Director's subcontract with the agency, a substantial portion of the work performed was described in interviews as political lobbying and would be disallowable.

The draft audit created the appearance that the OIG's report was without basis and that no money is owed to the State.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department must conduct a program/financial audit/review to determine the amount of disallowable expenses and/or excess revenue that should be recovered from the agency based on the findings of the previous OIG Report, which should be shared with staff conducting the audit/review.**

The program audit was completed and identified over $50,000 in disallowable expenses to be refunded to the Department.

**GENERAL INVESTIGATION 7**

**ALLEGATION**  The Office of the Inspector General investigated a complaint alleging that a private agency failed to provide services to a pregnant and parenting teen ward. The complaint also alleged a conflict of interest in that the case worker provided overnight childcare in her home for the teen's infant daughter. During the course of the investigation, the OIG investigators learned that the agency failed to notify the Department when the ward was on-run from her placement and thus collected full board payments to which they were not entitled.

**INVESTIGATION**  The OIG investigation disclosed that the agency failed to ensure the teen ward was receiving prenatal care as well as care for her newborn following the birth.   The teen had contacted her case manager and reported that two weeks earlier her older sister had accidentally burned the teen's six-month-old daughter with hot water and the child had not been seen by a doctor.  The casemanager modeled medical neglect in failing to obtain medical treatment for the six-month-old's second degree burns until instructed by the Transitional Living Program and Independent Living monitor 1½ days later.

The investigation also disclosed that the private agency had neglected the teen's educational needs.  Staff assisted Department wards in applying for a High School Diploma through a high school that is not recognized as accredited by the United States Department of Education or the Illinois State Board of Education and allows students to earn a High School diploma in as little as 30 days by completing a take home, open book test and scoring at least a 70% on the test. The fee for the test and diploma is $150.00.

Using Department funds to pay for fraudulent educational programs, perpetuates fraud. Allowing wards to participate in these types of scams gives false expectation to our wards and leaves them ill prepared for transition to adulthood. The Department and service providers have a duty to ensure that wards are participating in educational institutions that are appropriately accredited.

A ward's academic records are necessary to identify educational supports needed to help achieve educational goals. Had the agency requested that the teen sign a consent for the release of her educational records, they would have known of the teen's non enrollment status and could have been more proactive in assisting her attainment of educational goals. Although agency staff referred the teen to a job placement program, workers did not request the teen's records or find out that the teen had a 6th grade reading level and 5th grade math level.

The teen was on-run and not living at the facility for much of her first 15 month's in the program. Case records appear to support only 5 days of actual placement at the agency during this time. Agency staff failed to report the teen's on-run status and unauthorized placement for absences, violating Department Rules and Procedures and the specifications outlined in the agency's contract. As a result, the agency continued collecting the full board payment and case management rate of $161 per day for days the teen was not in placement and no casework was performed. The agency's inadequate case record documentation made it difficult to determine how many days the ward actually resided at the transitional living program. During a 15 month period, the agency collected $76,807 to provide board and case management services to the teen.  At the time the teen's daughter was burned, the teen was living in an unauthorized placement, where she stayed for nearly a month, during which time the agency failed to report the teen's unauthorized placement status to the Department. Two case managers stated to OIG investigators that their Supervisor had directed case workers not to complete the Change of Placement Forms.

The role of the DCFS Transitional Living Program and Independent Living monitor is to ensure that DCFS

wards are enrolled in quality services and programming. The monitor and her supervisor failed to address case specific and programmatic issues and failures in the agency's transitional living program. The monitoring supervisor was not concerned that Department funds were used to send wards to schools not officially accredited.

The monitor was aware that the teen had not been residing at the program as noted in monthly monitoring reports.  However, during a review of the agency's file for the teen, the monitor incorrectly marked the CFS-906 (Change of Placement) as current, the Incident Reporting information as up to date and noted "minor has been on run."  The monitor also failed to complete required monitoring reports (only 43% were completed) and the submitted monitoring reports were inadequate and fraught with inconsistencies.

Conflicts of Interest

The case manager violated professional boundaries when she began providing childcare for her client's daughter. The conflict was compounded when the case manager contacted the hotline and became the relative placement (godmother) for the teen's daughter and later became the relative caregiver.

During the investigation, the OIG investigators learned that a supervisor violated the agency's Code of Ethics by providing supervision to her sister-in-law, and failed to report the relationship to her supervisor.

In violation of the agency's FY 2011 contract with the Department, the agency failed to conduct a background check on the therapist who had subcontracted with the agency since 2007.

In addition, the Executive Director stated to OIG investigators that neither he nor the agency's other Directors and supervisors maintained timesheets.  The OIG investigators noted that the failure to maintain timesheets would be a violation of the contract and cast doubt on the agency's ability to determine how to allocate salaries between direct and indirect costs.  The agency claimed 77% of the Director's salary as direct costs, but the OIG investigators noted that the Director did not have a SACWIS identification number which would allow him to review information on the system.  He stated that he did not maintain any supervisory notes.  In reviewing existing supervision and client staffings in casenotes, the OIG found no mention of the Executive Director's attendance or involvement.  The report also noted that between 2009 and 2010, the Executive Director's salary, as reported on the agency's state not for profit tax form reflected a 37% increase, while funding from the Department remained static.

---

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.    As provided for in the Transitional Living Program/Independent Living Only (TLP/ILO) contract, the Department should conduct a *Fidelity 906 Review* of the agency** |

**to determine the amount of payments fraudulently collected by the agency.  As the OIG has found that the agency is in violation of DCFS contract requirements by not maintaining time records for the CEO/President, TLP Director or TLP Supervisor, in the course of the 906 Review, the Department should ascertain whether the CEO/President, TLP Director and TLP Supervisor provided direct versus indirect services.  Based on the results of the review and the issues identified in this report, the Department should determine whether to continue contracting with the agency.  A copy of this report should be shared with Department employees conducting the *Fidelity 906 Review*.**

The private agency's contract with the Department has been terminated.

**2.   The Department should prohibit the use of any public funding for youth's enrollment in unaccredited educational institutions.**

Office of Education and Transition Services (OETS) does not allow youth to participate in the Youth in College (YIC) or Scholarship program unless they are attending an accredited program, nor does it award Education and Training Voucher (ETV) funds to a youth unless they are in an accredited program. Service Intervention agrees with this recommendation and the Department follows it for Department programs.

The Division of Monitoring and the Division of Placement & Permanency will collaborate with the Department's Contract Administrator to include in FY13 contracts: "No department funds may be used to support sending a ward to a non-accredited educational program."

**3.  The Department should require that wards sign a release of information for the Department to receive information from the educational institutions on the student's academic problems. (See prior OIG Report.)**

The Department agrees.  For enrollment in the Department programs, it is required that youth sign a consent for release of information. The consent for the Youth in College and Youth in Scholarship (YIS) programs gives permission for the Department to use the student's SSN to verify enrollment through the National Student Clearinghouse.  The consent that is part of the ETV application allows access to:  Financial Aid Information including (i.e., student billing; account summary, ledger card, or other billing student account summary; and financial aid award/denial letter); Grades; Schedule; and Attendance.

**4.  The program monitor should be disciplined for her failure to adequately monitor the agency's compliance with its contract and failure to ensure the provision of quality programming and services to Department wards.**

A pre-disciplinary meeting was convened with the employee.  Discipline is pending.

**5.  The monitoring supervisor should be disciplined for her failure to ensure that the private agency complied with its contract provisions to provide Transitional Living Program and Independent Living Only services.**

A pre-disciplinary meeting was convened with the supervisor.  Discipline is pending.

**6.  The private agency should be transferred to a new agency monitor and monitoring supervisor and this report should be shared with the new DCFS monitor and supervisor who will ensure that the problematic practices identified in this report are corrected.**

The agency's contract with the Department has been terminated; therefore, the agency will not be reassigned. The report will be shared with monitoring staff for training.

**7.  The private agency manager should be terminated for her failure to discharge her fiduciary duties as manager.**

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.  The private agency submitted a written response. The private agency rejected this recommendation and did not discharge the program manager.

## GENERAL INVESTIGATION 8

| ALLEGATION | The Office of the Inspector General received a complaint alleging that a private agency failed to consider the placement of two young children with their grandparents out of state. |
|---|---|

| INVESTIGATION | The 25-year-old mother and her then one month old son came to the attention of the Department in response to another state's request for a well being check after |

the mother and infant moved to Illinois during a pending investigation involving child abuse. The mother had a history of mental illness accompanied with psychiatric hospitalizations and two prior reports of abuse in the other state. The Department conducted a visit to the home where the mother and infant were living and found no concerns. The mother had enrolled her infant in the Women, Infant and Children (WIC) program and planned to access community services to address mental health issues and medication monitoring. The information was shared with the other state and both cases were closed.

Two years later, the mother left her two-year-old and four-month-old children in the care of a 16-year-old babysitter and did not return. The Department opened an investigation for abandonment/desertion and inadequate supervision against the mother and indicated her for both allegations. Within a day of the Department taking protective custody of the children, their maternal grandparents, who lived out of state, started diligent efforts to secure the placement of their grandchildren. The grandparents had guardianship of the children's older sibling who at the age of two-months was abandoned in a trash can by the mother. The child protection investigator notified the court that the out of state grandparents wanted to care for the children. The court granted temporary custody to the Department and the children were placed in a traditional foster home of a private agency.

Private agency staff met with the mother during the first week of case assignment and she reported that she wanted the two-year-old returned to her care and the grandparents to adopt the four-month-old. Within one month the family's case was transferred to a second private agency to meet the Burgos Consent Decree that requires the Department to provide Spanish speaking services to families whose primary language is Spanish. The new agency was informed of the grandparents' request for placement and the grandparents were provided contact information for the new agency.

In the third month of the foster care case the children were moved to another foster home. At this time, the children's mother informed the private agency that she had no intention of complying with services and wanted her children placed with their grandparents. An Integrated Assessment was completed in which the mother reported that she had been in foster care as a child. Despite the fact that no state agency reported a history, the private agency staff and court personnel operated under the assumption that the mother had been abused or neglected by the grandparents.

Ten months passed before private agency staff requested an Interstate Compact that would enable the children's placement with the grandparents. Although the other state completed a home study and approved the grandparents for placement, the private agency and court personnel determined to keep the children in non-relative foster care. The joint decision cited the lack of a relationship between the grandparents and grandchildren. Neither took into consideration that the private agency had made no effort to foster a relationship despite the grandparents' repeated requests for contact via visits, correspondence and photo sharing. Over the three years the children remained in foster care, the grandparents were allowed two short visits. In violation of the Aristotle Consent Decree the children never visited with their sibling who lived out of state with the grandparents.

Chronic staff turnover contributed to the agency's failure to comply with Department Rules, Procedures and policies.  In two years, five case managers were assigned to the family and during staff shortages supervisors covered the case.  At one point, the private agency foster care director covered the case and met with court personnel to determine future placement of the children.  In an interview with the OIG investigators, the foster care director stated she was unaware that the grandparents had guardianship of an older sibling and wanted their grandchildren in their care.  The director never arranged for contact between the grandparents and grandchildren or instructed staff to do so.

After two years the private agency closed their foster care program and the case was transferred to a third agency.  Information provided in the transfer summary included the grandparents' repeated requests for placement of their grandchildren and included the grandfather's letters written to the private agency and the juvenile court judge expressing their frustration.  The letters were often rambling expressions of increased agitation.

The new agency requested a second Interstate Compact home study of the grandparents after the first assessment expired.  At the time of the second assessment, a third state placed an infant grandchild with the grandparents after the mother gave birth to a fourth child.  The grandparents planned to adopt the infant.  Shortly after the home study was approved, the court terminated the mother's parental rights, the children's goals were changed to adoption, but the two children were not placed with their grandparents.  The foster parents, who were approved to adopt, had previously agreed to foster a relationship between the grandparents and the children after the adoption was completed.  The grandfather was allowed to voice his concerns to the judge during a court hearing and was given the opportunity to work with the private agency, however, by this time the grandfather was discouraged and distrustful of the Department and the private agency.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.    When new information is received that contradicts information in the Integrated Assessment, the Department should have a mechanism for amending the original Integrated Assessment.** |
|---|---|

The Department already has in existence a mechanism for amending the original Integrated Assessment report with new information, whether contradictory or corroborating.  The Department views the assessment process for serving cases, both intact and placement, to be an ongoing process. The Integrated Assessment report, by policy and procedure, is continually updated and revised in SACWIS by the assigned DCFS/POS caseworker and supervisor throughout the life of a case.  As with any documentation the Department does, including case notes, service plans, integrated assessments, etc., once a document is completed and approved by the supervisor it is "frozen", locked and cannot be changed.  The way inaccurate or contradictory or even supportive and corroborating information is documented is with new case notes, service plans, integrated assessments, etc.  If the Department were to institute a practice of going back and correcting documents that have been previously completed and approved by the supervisor, the Department would fail to maintain any chain of evidence or accurate historical record of what information the Department had at the time the information was recorded.  The mechanism for documenting new information that is part of the Integrated Assessment is by adding it into a current Integrated Assessment pointing out the discrepancy.  Amending an original Integrated Assessment is not practical nor is it allowable under Department practice with SACWIS.

The Department will consider developing procedures and training for clinical staff on recognizing when information is learned that contradicts critical information that forms the basis of decision making.   The Integrated Assessment report by policy and procedure is continually updated and revised in SACWIS.   The revisions and updates are included in the service plan that is shared with all entities that received the initial assessment.

*OIG Response:  The Inspector General believes that when newly learned information contradicts critical information, there must be a mechanism that corrects and prevents the original error from being disseminated.*

**2.  A corrective memo should be attached to the Integrated Assessment in this case clarifying that there was no record that the grandparents or their daughter were involved in the child welfare systems in other states.**

The children have been adopted.  Their DCFS case is closed.

**3.  The Department should explore a remedy that addresses reliance on self-reported information in the Integrated Assessment.  Where there is a self report of out of state child welfare history during an Integrated Assessment, the Intake Coordinator should contact the Office of the Inspector General to request verification.**

The Department will consider developing procedures and training for clinical staff on recognizing when information is learned that contradicts critical information that forms the basis of decision making.  The Integrated Assessment report by policy and procedure is continually updated and revised in SACWIS.  The revisions and updates are included in the service plan that is shared with all entities that received the initial assessment.

**4.  This investigation should be shared with the Clinical Screener.**

The screener is no longer with the Integrated Assessment program.

**5.  This investigation should be used as a training tool for clinical screeners.**

The investigative report is being used with new hires to the Integrated Assessment program.

**6.  This report should be shared with the private agency currently assigned the case.**

The report was shared with the private agency.

**7.   The private agency currently assigned the case should arrange for mediation between the grandparents and foster parents for the benefit of future relationships between the families.**

The private agency contacted the grandparents.

**8.  Arrangements should be made for the employees of the closed private agency in this case to review this report in the OIG office.**

The report has been made available for review by the involved case managers and supervisors.

**GENERAL INVESTIGATION 9**

| ALLEGATION | The Office of the Inspector General received a complaint alleging that the Department placed three siblings ages six months, two years and five years in a relative placement without an appropriate assessment of the home or relative caregivers.  The placement did not have a crib for the six month old, who had special needs resulting from prematurity and head injuries by the mother, which brought all three children into foster care. |
|---|---|

| INVESTIGATION | The 29-year-old mother first came to the attention of the Department when her six-month-old infant was hospitalized for subdural and subarachnoid hematomas. The |
|---|---|

mother had no explanation for the infant's injuries.  The infant was born premature at 27 weeks gestation and was seen frequently by medical professionals during the first six months of life for poor feeding, colic, gastroesophageal reflux disease (GERD), diarrhea, dehydration, bacterial infection and anemia.  The infant was hospitalized four days prior to the head injury for high temperature, muscle tensing and eye deviation. The examining physician told the investigator that the infant's head injuries resulted from blunt force trauma that caused bleeding in the brain and retinal hemorrhages.  The mother was indicated for head injuries to the infant and substantial risk of injury to the two siblings.

A week after the hotline call, while the infant remained hospitalized, the court awarded the Department temporary custody of the infant and the two-year-old and five-year-old siblings.  The siblings had been staying with the grandmother under a safety plan after the investigator completed a background check.  At the court hearing, the investigator learned the grandmother had provided false identifying information to the investigator, who had not required a picture identification to complete the initial background check.  The mother identified a different relative placement for her children.  All three children were moved to the relative's home after the court hearing and the investigator completed a walk through of the home.  In an interview, the investigator reported that she did not document her visit to the relative's home in the Department's database and did not complete a Home Safety Checklist of the home.  She reported that she had never attended the Home Safety Checklist training, which was verified by OIG investigators.

The day after the Department obtained temporary custody, the Statewide Foster Care Administrator sent a referral to a private agency to assess the relative foster home for acceptance into the agency's specialized foster care program.  The six-month-old met the criteria for specialized foster care services based on his multiple medical conditions:  head injury, polymicrobial bacteria, non-immune hemolytic anemia, a possible immune deficiency and possible vascular malformation.  The Department assigned a case manger to the family until the case would be transferred to a specialized foster care agency.

The specialized foster care agency assessed the home during the children's first week of placement and alerted Department staff, including the assigned case manager, of multiple concerns in the home including that the medically fragile six-month-old did not have a crib and the relative foster parent's ability to meet the infant's special needs.  Ultimately the first specialized agency declined to accept the case.  The Department then referred the family to a second specialized agency for assessment.

Over the next two weeks the assigned case manager did not see the children in their foster home, violating the Department's policy.  The investigator knew of the first specialized agency's concerns, yet did not complete her own assessment of the home, the foster parent's ability to care for a medically fragile infant and two young children or ensure a medically fragile infant had safe sleeping arrangements.  The case manger relied on the mother, who had no car and stopped taking medication for her mental illness, to ensure that a crib was taken to a foster home.   The case manager did not document any case activities in SACWIS or the case record, including multiple emails sent during the assessment process for specialized foster care.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The child welfare case manager should be disciplined for failing to assess risk to a medically complex infant and two young children by failing to visit the children in the foster home within 72 hours, even after being alerted to concerns in the home.  The case manager failed to complete any documentation during her involvement with this family.**

The employee received a suspension.

**2.   The child protection investigator should receive non-disciplinary counseling for failing to request state identification when completing a background check for placement of a medically complex infant and two children under five.   The child protection investigator should attend the portion of Foundations Training that covers the Home Safety Checklist and her supervisor should monitor her investigations to ensure that she is completing the checklist as required.**

The investigator received non-disciplinary counseling.

**3.   Cook County Child Protection Managers should ensure that supervisors remind investigators of the importance of requesting state identifications in order to accurately complete background checks.**

A memorandum was issued to child protection staff.

**4.   In this case, a premature infant, compromised by a head injury and a possible heart defect was left in a high risk sleeping situation for several days.   The situation required an immediate response.   The Department should notify all placement agencies of the need to have the capability to immediately respond to such high risk situations by providing portable cribs on a temporary basis.**

A memorandum was posted on the Department's internal notification system (D-Net) and the Department's website.

**GENERAL INVESTIGATION 10**

**ALLEGATION**   The Inspector General's Office (OIG) received a complaint alleging that when a daycare center was found to be servicing children younger than those they were licensed to serve, the Department amended the license instead of substantiating the violation.  At the time, the daycare center was operating under a Conditional License, which indicates that a license or permit has been revoked or surrendered because of repeated substantiated violations.

**INVESTIGATION**   Among the violations previously substantiated at the facility were many that affected the health and safety of children: broken outdoor equipment (exposed screws, nails, ends of metal pipes and broken boards with splintered edges), medications and syringes left on the toddler counter, unlocked medications accessible to children, refrigerator full of unlabeled bottles, an extension strip and cord hanging over a hand washing sink, urine soaked cardboard on a broken toilet, doors left open, daycare staff were observed to not wash their hands between diaper changes and daycare staff confirmed this was standard operating procedure, daycare staff did not direct toddlers or assist them with hand washing as required, lack of documentation to show that all staff met required qualifications, and nurse's monthly visits were not occurring and there were no nurse's logs regarding infant/toddler care as required.

Because of the prior substantiated findings, several licensing staff refused to perform licensing functions associated with the amended Conditional License and were uncomfortable with management's decision to expand licensed capacity instead of revoking the license.  The Department initiated disciplinary proceedings against the licensing staff for insubordination.

During the course of the investigation the OIG investigators learned that the Department administrator who permitted the continued operation of the facility had provided false information to the Department and the OIG investigators concerning her educational credentials.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  The Administrator should be discharged for falsification of her academic credentials.**

The Administrator was discharged.

**2.  DCFS Office of Employee Services staff should be reminded to read all required documentation submitted by prospective employees, with special attention given to academic information. Official school transcripts that are not received in a sealed envelope need to be verified.**

Office of Employee Services staff will continue to work in conjunction with Central Management Services to verify that the academic credentials of applicants match the positions for which they are being hired.  The Office of Employee Services will conduct a refresher training for its staff.

**3.  This report should be shared with DCFS Labor Relations.**

The report has been shared.

**4.  Because of the appearance of a conflict of interest, the Department should not pursue disciplinary action against subordinates who refused to accept assignment of the licensing case after the license capacity was increased and the age range amended during the conditional licensing period.**

The Department agrees.

**GENERAL INVESTIGATION 11**

| | |
|---|---|
| **ALLEGATION** | The Office of the Inspector General received a complaint that noted discrepancies in the Rules, Procedures and Statute authorizing the Department's use of Conditional Licenses for child welfare facilities. |

**INVESTIGATION**    The Department will issue a Conditional License to a child welfare facility after a licensee has had continuing, unresolved and substantiated licensing violations. The Conditional License is issued for six months, after which the Department determines whether to reissue a regular license.

While the statute authorizing Conditional Licenses requires the Department to revoke a License before issuing a Conditional License, the Rule permits a licensee to surrender the License instead of having it revoked. The practical effect of permitting a licensee to surrender is that the licensee avoids the 12 month bar on reapplication that accompanies a revocation.

The OIG investigators noted that regardless of whether the original license was revoked or surrendered, a 12 month bar should apply whenever the Department has determined not to issue a regular license after a Conditional License expires.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1.   Rule 383, *Licensing Enforcement*, should be amended to provide that a new License application cannot be filed for 12 months following the Department's refusal to issue a new license following the expiration of a Conditional License.**

Rule 383, *Licensing Enforcement*, is being amended to reflect this requirement.

**GENERAL INVESTIGATION 12**

**ALLEGATION**   The Illinois State Police alleged that two confidential LEADS (Law Enforcement Agencies Data System) printouts, which provided confidential criminal background information on two individuals being investigated by the Department for alleged physical abuse, were improperly disseminated to the subjects of the investigation.

**INVESTIGATION**   Two adoptive parents came under investigation by the Department for alleged physical abuse of their five-year-old adoptive daughter.  As a regular part of the hotline intake process, the State Central Register conducted a LEADS check on the adults mentioned in the allegation.  The investigation ultimately resulted in both adoptive parents being indicated – the adoptive father was indicated for Cuts, Welts and Bruises and Oral Injuries, and the adoptive mother was indicated for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect.

The adoptive parents filed a notice of appeal requesting expungement of the indicated findings against them. When a party files an appeal, he or she is entitled to request a copy of the investigation.  Before a copy of the investigation is forwarded to the party, confidential information is removed.  In this case, the adoptive parents received a copy of the investigation which improperly contained copies of the LEADS printouts.  It was not possible to determine who prepared the copy of the investigation that contained the confidential LEADS printouts.

The Department's access to LEADS is an essential tool for the protection of children.  LEADS printouts are to be used for investigative purposes only and are never to be disseminated beyond the point of inquiry.  The criminal background information in the printouts can be used to make safety determinations, and it can be shared for use in integrated assessments or with agencies providing services to clients and wards of the Department.  Under no circumstances should the LEADS printouts be redisclosed beyond the Department. An agency that has access to LEADS for inquiry purposes only, as is the case with DCFS, risks losing that access if there is improper use of LEADS or if the printouts are improperly disseminated.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  Procedure 300, *Reports of Child Abuse and Neglect*, should be amended as follows:**

*Records of Child Abuse and Neglect Investigation*
*3)  Redacted Police Reports and Criminal History Printouts*
**When the subject of a report requests a copy of his/her file from the local field office all police reports, LEADS and criminal history printouts shall be redacted from the file.  The Police Report Redaction Notice (CANTS 13) shall be completed to document either 1) the removal of police reports, LEADS and criminal history printouts or 2) confirm that documentation contained in the investigative file did not include police reports, LEADS and criminal history printouts.  A copy of the CANTS 13 shall be placed in the investigative file.**

Department Procedures 300.20, *Reporting Child Abuse or Neglect to the Department*, and 300.100, *Child Abuse and Neglect Investigative File*, have been revised in accordance with the recommendation.

**2.  State Central Register should use a notation mechanism on all LEADS printouts that states that it is for DCFS use only and cannot under any circumstances be disseminated beyond the Department.**

The State Central Register (SCR) now uses a rubber stamp with red ink which states, "LEADS printouts may

not be disseminated beyond DCFS/POS Agencies."  This is stamped on each LEADS printout mailed from SCR.

**3.  This report should be shared with the LEADS Coordinator for the Illinois State Police.**

The report was shared.

**GENERAL INVESTIGATION 13**

| **ALLEGATION** | The Office of the Inspector General received a request for investigation concerning a 13-year-old child that had been adopted by her paternal grandmother. There was |

concern that the grandmother was no longer able to care for her adopted daughter because the elderly grandmother was diagnosed with dementia, diabetes, depression and paranoia. A recent child protection investigation had been unfounded as to the grandmother for risk of harm to the child.

| **INVESTIGATION** | At the time of the child's birth, her mother was suffering from lung and brain cancer and died within a few months of the birth. The infant had been treated for |

substance exposure and was placed with her grandmother when released from the hospital. When the child was two years of age, the grandmother called the hotline complaining that people were breaking into her apartment, setting up video cameras and endangering the child. The call was taken for risk of harm and the child was removed from the grandmother's home during the investigation. The Department indicated the grandmother for risk of harm. The grandmother successfully appealed the indicated finding. Because of the grandmother's behaviors, the agency was hesitant to return the child to her care. After she was out of the home for almost 18 months, the child was returned to the grandmother's home. The child's Guardian *ad litem* was concerned about the child's return to the grandmother and filed two actions in Chancery Court asking for reversal of the DCFS Director's granting of the expungement of the indicated finding and the Department's decision to return the child to the grandmother's care. When the child was almost eight years old, the parties reached an agreement, which allowed the grandmother to go forward with the adoption, and allowed for termination of the cases in Chancery Court and Juvenile Court. The basis of the agreement was that a stand-by guardian was appointed in Probate Court at the same time as the Judgment for Adoption was entered. One week after dismissal of the Chancery and Juvenile cases the stand-by guardian changed her mind and filed a petition in Probate Court to vacate her guardianship, which was granted.

Following the adoption, the grandmother continued to display confusion and increasing cognitive difficulties. Four reports were called into the hotline within 18 months for abuse, risk of harm and inadequate shelter. All four were unfounded. One investigator referred the family to a community agency. The agency had the grandmother evaluated by her doctor who found her deficient in orientation, displaying characteristics of dementia and paranoia. The doctor stated that he was concerned for the safety of the child with the grandmother. The Department's post adoption staff finally brought the situation to the attention of the State's Attorney. A petition was filed based on dependency, and the child was removed from her grandmother's home and placed in a foster home.

The grandmother's cognitive difficulties were apparent as early as 2000 and she continued to show deterioration that resulted in four reports to the hotline. The case was difficult because of the strong bond between the child and her grandmother and the absence of family willing to come forward and provide care. Child protection staff were reluctant to screen the case into Court thinking the treating physician's findings and recommendations were not sufficient.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. DCFS should make sure that the child's placement allows her to have frequent contact and visits with her grandmother.** |

The youth continues to have visits with her grandmother.

**2. The caseworker should assist the child in getting into an academically enriched high school.**

The youth enrolled in an academically enriched high school.

**3. The report should be shared with the child protection manager.**

The report was shared with the manager.

**GENERAL INVESTIGATION 14**

| ALLEGATION | A foster parent complained that her case manager was inaccessible and had not conducted a home visit in six months. |
| --- | --- |

| INVESTIGATION | A review of the case manager's case notes, taken from a sample of her assigned cases, indicated that she reported consistently and regularly visiting clients (1-2 |

visits per month, depending on whether the foster home was licensed), and was knowledgeable about each child and family on her caseload. She reported visiting the children at school and meeting their teachers, she noted their grades and documented regular home visits and contact with foster parents. When OIG investigators interviewed foster parents and teachers with whom the case manager documented in-person contacts, it became clear that the case manager was not consistently visiting the homes on her caseload, and that she was falsifying records to conceal it, and in many instances collected travel reimbursement for visits that never occurred.

Department Procedure 315.110, *Permanency Planning, Worker Contacts and Interventions*, requires case managers to make monthly home visits for traditional foster homes, and twice monthly visits for unlicensed relative homes. OIG investigators conducted an in-depth analysis of 12 of the case manager's assigned cases during a seven-month period. In 7 of the 12 cases reviewed there were large discrepancies between how frequently the case manager reported visiting a home as compared to the foster parents' reports of her visits. In each record reviewed, the case manager documented regular monthly (or bi-monthly) home visits and in-person contacts in accordance with Department procedure. In seven cases, however, foster parents that the OIG investigators interviewed stated that the case manager did not visit regularly. In several instances a foster parent reported not having seen the case manager for months. Further, in some unlicensed homes where the case manager is required to visit twice monthly, and where she documented that those visits occurred, foster parents reported seeing her "only once in 2010"; or "quarterly" or "at Christmas time and Easter time."

In addition to home visits, the case manager falsely documented numerous school visits where she reported visiting a child and meeting his or her teacher. Of the nine teachers and principals that the OIG investigators interviewed, each of whom the case manager documented meeting in-person, not one recalled ever meeting the case manager. In one instance the case manager reported having contact with a third grade teacher about a child and documented in the file that the child had a "normal grade point average of As and Bs." In an interview with the OIG investigators, the child's teacher stated that the child was failing subjects, almost failed third grade, received special education services and was not receiving the tutoring he required because of the foster parent's transportation problems. In two other cases, the case manager documented in-person school visits at schools that reported to the OIG investigators that all school visitors are required to sign-in upon arrival. One of the schools reported having a special form that any visiting caseworker has to complete before visiting a child. A review of the records from both schools showed no indication that the caseworker had ever visited.

Apart from falsifying case records, the case manager also submitted falsified travel expense reports. In reviewing the expense reports, significant discrepancies were noted between the dates the case manager documented in SACWIS that she conducted home visits and the dates reflected on her travel vouchers. Additionally, in over half of her assigned cases the case manager requested reimbursement for travel that never occurred. For example, in one case over a 7-month period, she submitted travel expense reports totaling $417.50 for 11 home visits that never occurred.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The private agency case manager should be disciplined up to and including discharge for falsification of records and for not visiting her clients monthly or twice monthly as required by** |

**Department procedure.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The private agency discharged the case manager from employment with the agency. This investigation was referred for revocation of the Child Welfare Employee License. After the Inspector General filed charges against the case manager's license, the case manager voluntarily surrendered her license.

**GENERAL INVESTIGATION 15**

| | |
|---|---|
| **ALLEGATION** | The Office of the Inspector General (OIG) received a complaint alleging that a private agency foster care worker may have falsified DCFS casenote entries. |

**INVESTIGATION**   The Program Plan for the foster care agency required that workers conduct two in-person visits each month, with one of the visits to occur in the foster home.  In the months prior to leaving the agency for a new job, the worker falsely documented in-person visits on half of his caseload.  The worker had documented seven visits to one client, living in a shelter, which had sign-in procedures for child welfare workers.  The worker's name was not found on any of the sign-in sheets and the client and shelter workers did not recall seeing the worker at the shelter.  In another case, the worker documented nine visits to the foster home while the foster parent was there, but the foster parent stated that the worker had only been there two or three times.  He also entered a false casenote purportedly reflecting a conversation he had with the ward about her vacation plans.  In a third case, the worker documented nine visits in the foster home and only one visit could be substantiated.  In a fourth case, he documented two school visits when only one could be substantiated.  The worker also submitted false travel reimbursements to the agency.  At the time of the investigation, the worker had left the agency.

The Inspector General issued charges against the worker's Child Welfare Employee License, which resulted in a voluntary relinquishment of the License.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   This report should be shared with the worker's prior employer and the worker's new employer to ensure proper delivery of services to children.**

The report was shared.

**GENERAL INVESTIGATION 16**

| | |
|---|---|
| **ALLEGATION** | A Department child welfare worker made false claims as to his whereabouts during work hours. |

| | |
|---|---|
| **INVESTIGATION** | The worker was contacted by the grandmother of a male Department ward, who was formerly on the worker's caseload. The grandmother told the worker the boy |

had run away from her home and she believed he was at the home of his mother in a nearby town. The worker informed his colleague who was handling the boy's case. The colleague asked the worker if he could pick up the boy. The worker agreed to transport the boy and left the Department field office. Five hours later the worker still had not arrived to get the boy from the police station where he was waiting and another employee was dispatched to pick him up.

In an interview with OIG investigators, the worker stated that prior to leaving the office he had contacted local police who agreed to see if the ward was at his mother's home. He left the office thinking that he did not need to pick up the ward. However, while he was out, circumstances developed that required the ward to be picked up, but efforts to contact the worker throughout the day were fruitless. When asked to explain why he was unavailable that day, the worker claimed that he went to the county jail to pick up another ward who had been arrested for committing an assault at school. The worker stated that upon his arrival at the jail he was informed the ward was no longer in custody and may have been transferred to another facility in a second county. The worker said he then accessed the second county's inmate search center by phone and learned the ward was not being held. The worker stated he then made attempts to reach relatives of the ward by phone and made an in person contact at the home of the ward's aunt trying to ascertain his whereabouts; although, the aunt was not at home and he did not have the name of the person who answered the door. The worker told OIG investigators he then drove past several locations known for drug activity looking for the ward before completing his work for the day.

A review of the worker's phone records showed he made no calls during the two-hour period corresponding with the time he claimed to be contacting the ward's relatives. Phone records also showed the worker had never contacted the inmate search center on that day. Records maintained by the county jail where the worker said he was summoned to transport the ward found he had not been incarcerated there at the time. The ward he identified had been arrested for an assault at his school, but it had occurred two weeks prior to the date in question. Similarly, OIG investigators verified that the series of events related to the ward's arrest and transfer corresponding to the worker's account had also transpired two weeks earlier.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   The child welfare worker should be disciplined for falsification of case notes and time sheets and for being unavailable for work on a scheduled work day.** |

The employee received a suspension.

**GENERAL INVESTIGATION 17**

| **ALLEGATION** | The Office of the Inspector General received a complaint alleging chronic failure to assess risk in child protection investigations involving a family that had been the subject of five unfounded child protection investigations during the previous year. |
| --- | --- |

| **INVESTIGATION** | The family presented serious issues related to sexual abuse, mental illness, |
| --- | --- |

substance misuse, environmental neglect, inadequate supervision and most notably, domestic violence. The household consisted of a divorced couple who remained together in the home with their three children, ages two to five. The mother had another child, age 10 from a previous relationship who resided with the child's paternal grandmother. The family had a history of interactions with law enforcement in addition to involvement with the Department.

OIG investigators' review of the six unfounded child protection investigations identified a chronic failure on the part of investigators to pursue and develop a comprehensive understanding of the family dynamic or conditions in their home. Investigators consistently neglected to consider events or information not directly related to their immediate investigations. In other instances, investigators disregarded pertinent facts and neglected to recognize factors that presented obvious risks to children in the home.

The first investigation came in response to an allegation the father regularly confined the family by locking them in the trailer the family lived in from the outside. The report also claimed the home was in a state of disrepair and lacked running water. The assigned child protection investigator spoke with a local police officer who stated the family was well known to law enforcement and the most recent response to the home was two months earlier. Despite being provided with this information, the investigator did not document who he spoke with or attempt to learn what precipitated police being called to the home or the outcome of their involvement. Family members confirmed to the investigator the home did not have running water but stated they retrieved water in buckets from the homes of relatives and neighbors. The investigator did not identify the flaws and potential gaps inherent in this system of delivering fresh water to a home where four young children were present. The investigator observed a locked padlock on the outside of one of the trailer doors, however he was assured the lock was present only for reasons of security. The investigator did not recognize the potential danger of utilizing a lock to secure one of only two exits from a home, particularly one in which domestic violence is a concern.

Each successive investigation followed similar patterns in which risk factors were minimized and the concerns voiced by reporters were characterized as intrusions into the family's home life. Issues such as the lack of water and poor condition of the home repeated themselves throughout multiple investigations performed by multiple investigators. Five of the six investigations included Law Enforcement Agencies Database System (LEADS) checks showing at least one conviction for domestic violence, yet not one indicated a history of domestic violence in the screens. Other information provided by police and other professionals involved with the family suggested deep-seated hostility within the family. When asked at school what he was thankful for, the family's four year-old son stated he was, "thankful daddy beats mom because she deserves it." While family members at times made admissions of substance abuse and related histories of mental illness to law enforcement, those reports were not obtained by investigators to inform their decision-making and assessment of the home. Although the investigator was aware the father had been ordered by the court to complete an anger management course following an arrest for domestic violence, the investigator did not confirm whether the father completed the class. The father never attended the program and after his second domestic violence arrest his having neglected to comply with the court order triggered an upgrade to a felony charge. The failure of investigators to conference with law enforcement prevented them from being aware of the severity of the charges against the father or conditions in the home. Similar lapses in

communication with medical professionals prohibited the investigators from developing a complete picture of the health statuses of the children.  During a later investigation, the oldest boy, who was not the father's biological son, alleged sexual abuse against him by the father during visits at the home.  Although the investigator and her supervisor found the boy's reports to be credible, they determined the allegation could not be indicated solely on that basis.

All six unfounded investigations were overseen and approved by the same child protection supervisor.  Throughout her monitoring of the investigations, the supervisor demonstrated an unwillingness to deviate from previously held beliefs.  In an interview with OIG investigators, the supervisor said she was familiar with the family through her time working in the area and that since they always refused services, the Department had no leverage to compel them to comply.  She characterized many of the reports against the household as the result of disputes between the parents and extended family members.  The supervisor stated that in her experience with certain families, "you know when an allegation is called in, its not going to go anywhere."

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   This report should be shared with the child protection investigation supervisor and her manger for educational purposes.** |

The report was reviewed with the supervisor and manager.

**2.   In a previous FY 04 investigation the Inspector General recommended: When DCP investigators contact a local police department for a copy of a report on a specific incident, they should also ask about the availability of other reports.  The Department responded: "Regional management meetings have been scheduled to address the issue of requesting if there are multiple police reports to a home of a family under investigation."  Given the passage of time Procedures 300, _Reports of Child Abuse and Neglect_, should be amended to reflect this recommendation.**

The Division of Child Protection drafted a policy transmittal regarding contacts with law enforcement. The policy will be added to P300, _Reports of Child Abuse and Neglect_, and also includes the Child Abuse Notification form initially drafted by Office of the Inspector General staff.  The Office of Child and Family Policy will issue the revised procedures in January 2012.

**3.   In cases where there is uncertainty as to the current status of criminal charges in cases involving violence or drugs with prior or pending convictions, child protection staff should contact the prosecuting attorney for more information.**

The Division of Child Protection drafted a policy transmittal regarding contacts with law enforcement. The policy will be added to P300, _Reports of Child Abuse and Neglect_, and also includes the Child Abuse Notification form initially drafted by Office of the Inspector General staff.  The Office of Child and Family Policy will issue the revised procedures in January 2012.

**4.   In child protection cases with a recent history or pattern of law enforcement involvement, a joint child protection safety planning conference should take place with law enforcement and child protection within the first five days of the child protection investigation.  Past and current information should be exchanged at the conference and participants should discuss how the information can be utilized to maintain the safety of the child in the future.**

The Division of Child Protection drafted a policy transmittal regarding contacts with law enforcement. The

policy will be added to P300, *Reports of Child Abuse and Neglect*, and also includes the Child Abuse Notification form initially drafted by Office of the Inspector General staff.  The Office of Child and Family Policy will issue the revised procedures in January 2012.

**5.    The child protection investigator who conducted the first investigation should receive non-disciplinary counseling for failure to recognize the fire and confinement hazards associated with a padlocked trailer home door.**

The investigator received non-disciplinary counseling.

**GENERAL INVESTIGATION 18**

| **ALLEGATION** | The Office of the Inspector General received a complaint that the Department negligently failed to produce sufficient evidence at an administrative hearing to |

sustain an indicated report of cuts, welts and bruises against a foster parent.  In addition, the complaint alleged that the foster home licensing agency, failed to conduct a thorough licensing investigation of the foster home after two hotline calls were made.

| **INVESTIGATION** | A foster mother adopted a child.  When she learned that a younger sibling was in need of placement, she asked to have the sibling placed in her home.  For the first |

four years the placement was stable.  Then the 4 year-old arrived at preschool with bruising under her right eye and to her lower back.  The child's teacher consulted with the principal and called the hotline.  The caller reported that the child had identified her foster mother as the source of the bruises.  When interviewed, school staff also told the investigator about a knot the child had had on her head a few weeks earlier that had been attributed to the child playing outdoors at the foster home.  The investigator noted that the current bruises appeared to be loop marks, consistent with having been beaten with an object.

While the allegation of bruises was being investigated, the hotline received a new allegation concerning the foster home.  The foster mother had been arrested for attacking and injuring someone with a hatchet.  The two sisters were present but not injured.  When the second hotline call was received, the Department determined that the foster child should be removed from the home pending the outcome of the two investigations.  When the foster child was taken into protective custody, an initial screening failed to document the marks and bruises identified by the investigator and the school staff.  A second screening the next day noted all injuries.

The second investigation was unfounded because there was no indication that either of the children in the home had been at risk of harm.  The first investigation was indicated for Cuts, Welts and Bruises.  While the investigation of Cuts, Welts and Bruises was being investigated, the private agency that monitored the foster care license conducted a licensing investigation to determine whether licensing rules had been violated through the use of corporal punishment, which is prohibited in foster homes.   During the licensing investigation, the foster mother claimed that her own mother had probably used corporal punishment on the child.  Despite ample evidence in the agency's licensing file and the Department's investigation of the foster mother, that the foster child had consistently identified her foster mother as the source of the beating, the private agency maintained during the OIG investigation, that the child never said who had hit her.  The licensing investigation was unsubstantiated and the foster mother agreed not to use her mother for childcare.

The foster mother appealed her indicated finding for Cuts, Welts and Bruises.  Although the investigator and her supervisor received a subpoena to testify at the expungement hearing, they failed to appear and the investigative finding was overturned.  The foster mother then presented the overturned finding to the licensing agency, arguing that the foster child should be returned to her home and the agency agreed.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.    The first child protection investigator should receive discipline for failing to appear at the administrative expungement hearing of the indicated finding.** |

A pre-disciplinary meeting was convened with the investigator.  Discipline is pending.

**2.    The former supervisor of the child protection investigator should receive non-disciplinary counseling for failing to ensure that the first investigator appeared at the hearing and for failing to**

**forward her failure to appear for disciplinary proceedings.**

The supervisor received non-disciplinary counseling.

**3.  The licensing agency needs to provide a corrective action plan to address the substandard licensing investigation in this case, specifically addressing:**

- **the need to review all statements provided by a child regarding a possible licensing violation, even if contained in an expunged investigation;**
- **the need to conduct an independent licensing violation concerning corporal punishment that does not overly depend on self-serving denials;**
- **that an expunged or even unfounded abuse investigation does not mean that corporal punishment did not occur;**
- **and the need to ensure that a licensing investigation file contains all relevant conversations and statements of the children.**

The Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.  The Inspector General met with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.  The private agency agreed to develop a corrective action plan to address the substandard licensing investigation in this case.

**4.  The Department should review the performance of the Healthworks Provider hospital that failed to note the marks and bruises on the foster child to determine whether the omissions identified in the foster child's Initial Health Screen require a corrective action plan.**

The HealthWorks Lead Agency for Cook County has completed a review of the performance of the hospital as an Initial Health Screening provider and developed a corrective action plan; has provided the hospital's emergency department administrative and clinical managers with this performance review and this specific case; and has scheduled a re-orientation of hospital staff on the requirements and expectations of the Department for Initial Health Screenings.

**GENERAL INVESTIGATION 19**

| ALLEGATION | A 17 year-old died of a stroke brought on by a heroin overdose.  A child neglect report was indicated against the father following the girl's death. |
|---|---|

**INVESTIGATION**  The girl's family became involved with the Department when she was 13 years-old as a result of her mother's ongoing substance abuse issues and domestic violence in the home the two shared with the mother's boyfriend.  The girl, who was already drug involved, was removed from the home and placed in the custody of her grandmother.  The girl's drug use continued while in the grandmother's home and her behavior became increasingly erratic.  She actively sought drugs and employed whatever means necessary to obtain them, relying upon verbal and physical aggression to meet her ends.  Despite being moved through multiple placements and ongoing attempts to engage her in services, the girl's behavior continued to deteriorate.  During the four years following her removal from her mother's home, the girl ran away from at least 20 placements.

Three weeks prior to her death, the girl ran away from an in-patient treatment center.  She was located one week later by her father who contacted local police and she was transported to a detention center.  Three days later the girl was released, however the treatment center was at capacity and could not readmit her at the time so the father agreed to keep her at his home until an opening at the treatment center became available.  Based on her past behavior, the father was convinced he had to monitor the girl 24 hours a day or she would attempt to flee.  The father took a leave from work and did not sleep in order to ensure the girl remained in his home.  After three days the father required rest and, seeking a placement the girl would not attempt to run from, transported her to her mother's house.  When he returned to pick her up the following day the girl refused to leave with him and police were called to the home.  She was taken to the police station where she was picked up the following morning by an emergency worker from the private agency assigned to handle her case.  The emergency worker took the girl to her grandmother's home, however the grandmother was unable to manage her behavior and was forced to call the police to intervene.  The girl was again transported to the police station where she was picked up by a private agency worker and taken to the agency's field office.  The girl ran away from the office and was found the following day at the home of a friend.  The girl had suffered a stroke as a result of a heroin overdose and was transported to a hospital where she remained in a vegetative state for over four months until her death.

A child protection investigation opened following the girl's stroke was indicated against the father for substantial risk of harm.  The rationale for the finding was based on the fact the father had taken the girl to the mother's home and allowed her to remain there overnight.  The investigator concluded the father had knowingly placed the girl at risk because he was aware of the mother's past drug involvement.  The father appealed the indicated finding.  While his appeal was pending, the Department amended the allegation to inadequate supervision.  At the administrative hearing the father testified he believed the mother was a reasonable short-term placement and his understanding of the girl's history informed his decision to place the girl at the one location she would not run away from.  The father also stated that to his knowledge the mother was not using drugs at the time and that the girl's placement at the mother's home did not lead to her death.  The Administrative Law Judge (ALJ) who heard the father's appeal determined him to be credible in establishing a timeline of events and relating his best efforts to ensure the girl's safety.   The ALJ recommended the indicated finding against the father be expunged.  His decision was approved by the Director of the Department and the expungement was granted.

Upon the girl's death, which occurred while the father's appeal was pending, the State Central Register (SCR) was alerted to the death of a ward.  In response, SCR added an allegation of death by neglect to the earlier indicated report against the father.  The additional allegation was indicated without review based on the

indicated status of the initial report.  As the allegation of death by neglect was added and indicated after the fact, its validity was not considered during the appeal process.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department should review and determine whether to expunge the indicated finding of death by neglect against the father.** |
|---|---|

An administrative hearing was held and the indicated finding was overturned.

**GENERAL INVESTIGATION 20**

| ALLEGATION | The Office of the Inspector General received a complaint regarding the Department's expungement procedures. |
| --- | --- |

| INVESTIGATION | A 12 year-old made an allegation that her father had sexually abused her.  The allegations were made by the girl to child welfare workers in another state where the mother had moved with the couple's three children while the parents were experiencing marital difficulties.  The report was subsequently indicated against the father for sexual molestation of the girl and substantial risk of physical abuse to the two younger children. |
| --- | --- |

The next month the couple reconciled after the mother returned from out of state.  Following her return, the mother was arrested on an outstanding warrant.  During the police investigation of the mother's case the 12 year-old stated she had invented the allegations against her father at the behest of her mother and grandmother to enable the mother to obtain a restraining order against him.  Police notified the Department the couple had reunited and the father was residing in the same home as his children.  A second child protection investigation was opened and the children were removed from the home and placed with family friends.  Two weeks later the children were returned to their parent's custody by the friends after they determined they could not accept the responsibility of caring for them.  Although the Department sought to take protective custody, the State's Attorney declined to file a petition and the Department closed the case.  The second child protection investigation was indicated against both parents for substantial risk of sexual abuse because the father, who had been indicated in the first report, had access to the children.  Soon thereafter, the couple separated once again.  The mother moved back to the state she had returned from, taking the couple's son and youngest daughter with her while the oldest daughter refused to accompany her and remained with her father.

Four years later, another child protection investigation was opened after the State Central Register received a report the father had abused his younger daughter, then 11 years-old, several years earlier.  The result of the report was an indicated finding against the father for sexual penetration of his younger daughter and substantial risk of sexual abuse to his two young sons, ages three and one, he had with his second wife.  The wife was also indicated for substantial risk of sexual abuse to the boys with the rationale she allowed her husband, an indicated perpetrator of child sexual abuse, to have access to them.

The father and his wife appealed the indicated findings.  During the appeal process the oldest daughter, then 16, reiterated her recantation of the prior sexual abuse allegations.  The girl stated she had originally complied with her mother's plan to accuse her father of abuse, but became scared upon learning he had been arrested and could be incarcerated.  The girl stated she had never been sexually abused by her father and had no knowledge of him sexually abusing her younger sister, who had named the older girl as a witness to her abuse.  A police detective who interviewed the older girl when she originally recanted her allegations testified she had been credible at the time and had remained consistent in denying the allegations.  The father testified he had never sexually abused his daughters and was unaware of the prior indicated reports against him.  The father stated he believed the cases had been resolved in his favor four years earlier based on the fact his children were returned to his home and no action was taken by the Department.

The Administrative Law Judge (ALJ) presiding over the hearing found the father and the older daughter to be credible witnesses and dismissed the allegations of the younger daughter as unsubstantiated and improbable.  The ALJ recommended granting the appeals for expungement of the most recent indicated report against both the father and his wife, and her decision was approved and accepted.  The father was informed the time period for appealing his two previous indicated reports had elapsed.  The mother was the subject of several child protection reports in the state she had returned to and her two children were removed from her custody.  The

father has attempted to regain custody of the children but his efforts have been impeded by the two indicated reports against him.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The Department should review and determine whether to expunge the indicated finding against the father for the first abuse investigation.   The Department should review and determine whether the indicated findings for the second report should be expunged, as those findings were based only on the findings of the first investigation.**

The Department voluntarily overturned the indicated finding.

## GENERAL INVESTIGATION 21

**ALLEGATION**   A Department child protection investigator conducted a counseling group with Department clients through a private company.  The investigator previously had been advised by the Inspector General in a previous investigation that such an arrangement constituted a conflict of interest.

**INVESTIGATION**   During the course of the earlier investigation, OIG investigators learned the investigator had a part-time position as a group facilitator in a counseling program for men seeking help with issues of domestic violence.  In an interview conducted at that time, the investigator stated the private company's domestic violence counseling group was the only one of its kind in the area and as a result, Department clients were sometimes referred to the program.  The investigator stated clients were only referred "on rare occasions" and did not feel his position as a group leader was a conflict of interest.  The investigator's supervisor was aware of his work as a counselor and approved of it, as he believed it broadened the investigator's skill set.  OIG investigators determined the investigator's secondary employment did constitute a conflict of interest when he provided counseling to Department clients.  OIG investigators advised the investigator to inform the company's director in writing he could no longer admit men who were Department clients into his counseling group.  OIG investigators determined that the investigator had not been in violation of Department Rule 437, *Employee Conflict of Interest*, since the company did not have a contract with the Department.

In the current investigation, OIG investigators learned the investigator had enrolled into his counseling group a Department client who had been the subject of a report indicated by the investigator for domestic violence.  In an interview with OIG investigators, the investigator stated his employment with the private company had ended nine months earlier when the business closed.  He said he felt an obligation to continue working with the men who had been enrolled, as there was still no other similar program in the area.  The investigator did charge the men a fee for participating in the sessions and had been using a Department field office that had been closed to hold the meetings until he was instructed by his current supervisor to stop.  The investigator stated he had finished working with the remaining group members two months prior to his interview with OIG investigators.  The investigator's explanation contradicted statements he made to his current supervisor that he added the client he had indicated to the group two weeks after he claimed meetings had ceased.  The current supervisor had not been aware of the investigator's counseling work until it was brought to her attention by others.  The investigator stated he "vaguely recalled" writing the letter to the company director concerning the conflict of interest and acknowledged the potential problems that could arise from providing counseling to a Department client he had previously investigated.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  The child protection investigator should be disciplined for violating Rule and Procedure 437, *Employee Conflict of Interest*, in using Department facilities for his private business, failing to inform his current supervisor of secondary employment as a private practitioner and ignoring the conflicts of interest in secondary employment.**

The employee received a suspension.

**GENERAL INVESTIGATION 22**

| | |
|---|---|
| **ALLEGATION** | A Department placement worker deposited a female Department ward's allowance allotment payments into the worker's personal bank account. |

**INVESTIGATION**    While living in a residential facility the girl accumulated more than $800 dollars in her internal account through allowance payments and clothing allotments.  At the time the ward prepared to move to another facility, discussions began between facility staff and the placement worker about how to provide the girl with her funds.  The placement worker asked facility staff if the girl would be able to receive her funds in cash.  The placement worker explained the girl had neither a state-issued identification card to cash a check nor a certified birth certificate that would enable her to procure a state-issued ID.  Soon after the girl moved to the new facility the girl ran away.  Staff from the first residential facility asked the placement worker to identify someone at the new facility for whom a check for the girl could be made.  However, the placement worker did not respond to the request.  One month after the girl left the first facility staff there issued a check for the full amount of the girl's funds to the placement worker.

In an interview with OIG investigators, an administrator from the first residential facility stated it is their practice not to write checks directly to workers and that all checks in excess of $500 must receive her approval, however her staff did not follow policy in this case.  The administrator said as a result of the episode she had learned facility staff did not have a consistent understanding or interpretation of the check writing procedures.  The administrator stated since that time she had developed a written policy detailing facility guidelines for writing checks.

The placement worker held the uncashed check for six months.  During that time the girl moved between numerous placements and went on run multiple times.  By the time the girl settled at a third residential facility the check had expired.  The placement worker requested and received a newly issued check, again made out to her.  In an interview with OIG investigators, the placement worker stated she asked for the check to be reissued to her because she could not obtain the certified birth certificate the girl needed to present in order to receive a state ID.  The placement worker explained the girl's birth certificate had been placed on hold because of her frequent run away status, however OIG investigators found the certificate was not on hold at that time.  The placement worker said she did not request the check to be written to the third residential facility because the facility did not accept checks on behalf of residents.  An administrator from the third facility stated the facility had no such policy against accepting checks on behalf of wards.

Upon receiving the new check, the placement worker cashed the check and took the girl shopping for winter clothes.  She deposited the remainder of the money, more than half the total, in her personal bank account.  The placement worker did not inform her supervisor or the girl's Guardian *ad litem* that she had put the money into her personal account, nor did she note the activity in the State Automated Child Welfare Information System (SACWIS).  It was not until the girl entered a new program for pregnant mothers eight months later that program staff learned from her of the outstanding funds and insisted the placement worker write a check to the program administration for the balance of the funds.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The placement worker should receive counseling for her failure to document in SACWIS and to inform her supervisor and the girl's Guardian *ad litem* that the placement worker had deposited the girl's money into the worker's personal account.** |

Discipline is pending.

**2.  The Department should assure that when wards turn 16 years of age they obtain state-issued identification cards.**

Department procedures will be drafted to require the obtaining of State Identification Cards for wards.

**3.  As part of a ward's emancipation plan the ward should receive a certified copy of their birth certificate.**

The Youth Driven Transition Plan (CFS 2032-1) requires all youth to be provided a certified copy of their birth certificate. The policy and form was distributed to staff.

**4.  The Department should review the first residential living facility's revised procedures to ascertain if private agencies should adopt similar procedures governing wards' funds upon discharge.**

The Department has reviewed procedures governing wards' funds upon discharge and agrees to discuss with private agencies incorporating a procedure in their discharge process.

**GENERAL INVESTIGATION 23**

| ALLEGATION | Since 2009 the Office of the Inspector General has received complaints from child protection staff and DCFS legal staff involved in Administrative Hearings before a |

Since 2009 the Office of the Inspector General has received complaints from child protection staff and DCFS legal staff involved in Administrative Hearings before a particular Administrative Law Judge.  The complaints allege that the judge is biased against the Department; that the judge does not apply the law correctly; and, that the judge has treated Department staff rudely during hearings.

**INVESTIGATION**    The Inspector General requested a statistical comparison of Expungement Hearing Recommendations of the Administrative Law Judges.  The range of expungements granted goes from a low of 30% to a high of 91%.  The Administrative Law Judge complained of had the highest percentage (91%) of overturned investigations.  The Administrative Law Judge with the next highest percentage was 61%.

After an administrative expungement hearing, the ALJ issues a written recommendation to the Director with findings of fact and conclusions of law.  *Rule 336.120 (15)*.  The Director must determine whether to accept, reject or modify the opinion.  The Director's decision becomes the final administrative action of the Department.  Only the appellant can appeal an adverse final administrative decision.

Current administrative expungement hearing practice does not include serving the proposed decision on the parties prior to submitting it to the Director.  Administrative Expungement Hearings are subject to severe time constraints, both through caselaw and rule, which render circulating a proposal and receiving comments prior to submitting the decision to the Director difficult.

Despite the severe time constraints of expungement appeals, the Administrative Procedure Act, appears to require that when the proposal for decision is adverse to the appellant, and the Director has not read the full record, the proposed decision must be circulated to the parties and the parties must have an opportunity to comment on the proposed decision, prior to issuance of the final administrative decision.

The complaints received by the OIG investigators, however, were all cases in which the decision was adverse to the *Department.*  We note, however, that the reasoning of Section 10-45 is that when the ultimate decision-maker (the Director) has not been present for the testimony or reviewed the entire record (including: the transcript; pleadings; offers of proof, objections and rulings thereon) the accuracy of the final decision may be compromised unless the decision-maker has the benefit of comments and objections from the parties.

While due process belongs to the appellant, decisions adverse to the Department in expungement hearings carry serious consequences to the safety and well-being of children.  In consideration of children who the Department has found to be victims of abuse or neglect, we should ensure that decisions adverse to the Department have as much reliability as decisions that are adverse to the appellant.  It is critical that the Director have full facts when making a final administrative determination.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1. The Department should develop an expedited process for distributing proposed decisions to all parties in expungement appeals, with opportunity to file written objections, prior to the issuance of final administrative decisions in expungement appeals.**

The Department rejected the recommendation based on caselaw that interprets the section of the Administrative Procedure Act quoted above not to include the final administrative decision by a Director.

**GENERAL INVESTIGATION 24**

| ALLEGATION | A private agency employee posted confidential information about a pending child protection investigation on a public social networking website. |
| --- | --- |

| INVESTIGATION | The private agency employee had a personal relationship with a couple who had adopted two siblings. |

After learning the children's biological mother had given birth to another child, the adoptive mother posted a comment to the social networking site questioning the biological mother's fitness as a parent. The private agency employee posted a response informing the adoptive mother that the Department had opened an investigation of the biological mother following the baby's birth.

In an interview with the OIG investigators, the employee stated he had learned of the birth of the biological mother's child from the adoptive mother, who asked him if the Department had opened a new child protection investigation in response. In his position with the agency the employee did not have access to the State Automated Child Welfare Information System (SACWIS) so he asked a colleague who worked in foster care to check for him. The foster care worker accessed the system and confirmed to the employee a new investigation had been opened. In an interview with the OIG investigators, the foster care worker said she assumed at the time the employee requested the information because he was somehow involved in the family's case, but did not question him as to why he had inquired.

In his interview with the OIG investigators, the employee stated he was aware of his agency's policy against disclosing confidential information to the public, but thought his actions had not been a violation since neither he nor the adoptive mother had used the names of any members of the biological family. The employee stated that prior to meeting with the OIG investigators he spoke with his supervisor about the situation and was informed he had in fact violated the agency's confidentiality policy. The employee stated that since his conversation with his supervisor he had discontinued using social media sites altogether.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The private agency should discipline the employee for violating Department Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services*, and the private agency's policy on confidentiality.** |

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors. The employee was disciplined.

**2. The private agency should discipline the foster care worker for violating Department Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services,* and the private agency's policy on confidentiality.**

The private agency employee was disciplined.

**3. The private agency should distribute a memorandum on confidentiality and social network sites.**

The private agency issued a memorandum to all staff regarding confidentiality with respect to social networking sites.

## GENERAL INVESTIGATION 25

**ALLEGATION**   The Office of the Inspector General received an allegation that a DCFS placement team supervisor, who was sometimes responsible for assigning DCFS cases to private child welfare agencies, may have retaliated against one private agency for not hiring his daughter by diverting case assignments to another private agency in the area.   The supervisor was also accused of channeling a large number of cases to the second private agency, who had hired his daughter.

**INVESTIGATION**   Typically DCFS cases are centrally distributed by the Case Assignment Placement Unit.   When the need arises for a case to be assigned to a private agency after regular business hours, certain DCFS staff may be permitted to make the assignment decision.  The placement team supervisor, whose primary job responsibility was to sign consents as an authorized agent for certain agencies, on occasion also made case assignment decisions that affected those agencies.

In 2008, the daughter of the supervisor was denied an internship at one of the private child welfare agencies in the area.  She was advised by the agency that it would create a conflict of interest for them to employ her since her father was a DCFS employee.  Soon thereafter the daughter was hired by a second private agency, over which her father also potentially exercised some influence in case assignment.

Five months after his daughter began employment with one of the area agencies, the placement team supervisor contacted the DCFS Conflict of Interest Committee to inquire about whether a conflict existed if his daughter worked at a private child welfare agency in the same community where he was a DCFS supervisor.  He reported to the Committee that his only job function with respect to the agency who employed his daughter was to sign consents as an authorized agent.  He also informed the Committee that his daughter had not been hired by a different agency because they thought it might create a conflict due to his employment with the Department.  Neither the supervisor nor the manager (who was copied on all emails between the supervisor and the Committee) ever informed the Committee that, under certain circumstances, the supervisor determined assignment of cases to the private agency.  With the limited information provided, the Committee advised the placement team supervisor that in order to avoid potential conflicts of interest a different authorized agent should sign consents for cases assigned to the private agency where his daughter worked.

OIG staff interviewed private agency administrators at the agency who employed the daughter and there was no evidence indicating that the supervisor had used his DCFS position to try and gain an internship or employment for his daughter.  Further, a review of case assignments between the two agencies over nearly a two year period showed no evidence that the supervisor gave preferential treatment, or failed to act impartially to one agency over the other.

Once his daughter was employed by an agency over which he had influence or authority, Rule 437, *Employee Conflict of Interest*, required that the placement team supervisor be removed from any decision-making impacting either agency.  The supervisor was forthright in informing his supervisors of the status of his daughter's job search for a child welfare position in the region.  It was incumbent on management to have ensured that he was removed from any decision-making or case assignments involving the agency.  The Department missed another opportunity to address a conflict of interest situation by failing to recognize the implications created when one of the private agencies who the father supervised denied employment to his daughter.  Identifying the potential conflicts that could arise and openly addressing them with the agencies would likely have successfully managed the conflict.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. DCFS management in the region should meet with private agencies in the area to openly discuss various potential conflicts of interest and appropriate responses. The *Handbook to the Code of Ethics for Child Welfare Professionals* could be used to provide a discussion format.** |

A discussion was held with DCFS management and the private agencies in this region. It was resolved that local agency and DCFS management will take measures to alert/avoid and/or mitigate conflictual situations through mutual communication and action.

## PROJECTS AND INITIATIVES

### ERROR REDUCTION

***Error Reduction Training – Cuts, Welts, and Bruises***
In 2008, legislation was enacted requiring the Office of Inspector General (OIG) to remedy patterns of errors or problematic practices that compromise or threaten the safety of children as identified in OIG death and serious injuries investigations and by Child Death Review Teams (20 ILCS 505/35.7).  When the Office of Inspector General initiated its Error Reduction effort, one of the basic tenets of the trainings was to offer lessons learned from the Inspector General's investigations and Death Review Teams' evaluations.

The initial set of Error Reduction lessons addressed child protection investigations focusing on bruising of infants and young children. After analyzing data from previous death and serious injury allegations, OIG staff noted a correlation between prior unfounded cuts, welts and bruises allegations and the subsequent death or serious injuries of the same child.  The review found that bruising on children, even as young as a few months old, was often minimized, leading to high risk of harm to young children. Investigators routinely did not communicate concerns to medical professionals and were hesitant to and/or did not share relevant facts with medical professionals from whom they were seeking an opinion about whether a child's injuries were caused by abuse.  For example, medical personnel would not be informed when the parents had a history of domestic violence, mental illness or substance abuse. The first round of Error Reduction trainings emphasized that communication with concerned physicians had to include an exchange of relevant information. As of June 2010, all of Illinois' child protection investigators, supervisors and managers were trained on Error Reduction in investigations of cuts, welts, and bruises abuse allegations.

Following the training, the Office of the Inspector General and DCFS' Office of Quality Assurance conducted reviews of closed investigations to measure child protection teams' application of the trainings. The reviews were completed by sub-region to provide information relevant to the particular community where the reviews were conducted.  DCFS Regions have received region specific feedback from these reviews.  The regional administrators also received the review data specific to their region and a letter explaining the results (an example of a review letter is included below).  The Office of the Inspector General staff then met with the regional administrators to discuss the findings.   The regional administrators agreed that they would work with supervisors so that all investigative staff received copies of the letter with the data for that sub-region. In FY 2012, a second random sample of cuts, welts and bruises investigation will be selected and reviewed to ascertain the field application of review findings.

***Error Reduction Training —Intact Family Services: Mental Health***
Office of the Inspector General investigations involving intact families with mentally ill parents have revealed patterns of practice errors similar to errors identified in cuts, welts and bruising investigations. Similar to the patterns evident with child protection investigators, intact family services workers had not routinely been obtaining relevant records and had been reluctant to or did not share relevant facts with the treating psychiatrist, therapist, or other medical professionals, and failed to inform mental health professionals when the parents had a history of domestic violence or substance abuse.  In 2010, in response to these deficiencies, the Office of the Inspector General piloted an Error Reduction training to

Cook County intact family services workers working with families with severely mentally ill parents.  Dr. Teresa Ostler, one of the members of the independent multidisciplinary team created in response to the Joseph Wallace Task Force recommendations, was the principal trainer.[1]  Each participant received a clinically based practice guide for communicating with mental health professionals on issues of parental behavior and child well-being.  Each supervisor received two additional resources, Assessment of Parenting Competency in Mothers with Mental Illness, by Dr. Teresa Ostler and  The Task Planner: An Intervention Resource for Human Service Professionals, by William J. Reid.  The training also included a roundtable discussion on how to screen cases for orders of protection with representatives from Juvenile Court, DCFS Office of Legal Services, DCFS Clinical Division, and local community based mental health providers.

In 2011, 173 Southern and Central Region DCFS and private agency intact workers, supervisors and managers were trained on working with intact families with mentally ill parents.  In 2012, Mental Health/Error Reduction training is scheduled for the Northern Region DCFS and private agency intact family services workers and Cook Region DCFS intact family services workers.

To support these trainings, the Department issued policy guidelines directing child protection investigators to ask parents/caregivers about mental health issues and requiring the investigator to obtain the relevant mental health records (*see* Policy Guide 2011.07, *Obtaining Records of Patients with Mental Illness*, below).  The Department also revised procedures for intact family services detailing the types of questions an intact family services worker should ask a mental health professional (*see CFS 968-90 Questions for Mental Health Professionals*, below).

---

[1] On April 18, 1993, three-year-old Joseph Wallace was hanged by his severely mentally ill mother. In the *Wallace* case, the mother's extensive history of self destructive behaviors (recognized by the Family First Intact professionals prompting them to support a petition for Joseph's custody) was later minimized by the placement caseworker.  Even when critical, troubling information came forward, the caseworker and a private agency worker chose not to share this information with the court.  An agreed Order for Return Home went forward without the information being presented.  The former Chief Judge of the Cook County Circuit Court, Chief Judge Comerford, commissioned a panel to investigate Joseph's death and then-Governor Edgar commissioned a special independent multidisciplinary Mental Health Task Force to examine DCFS practices in cases with severely mentally ill parents.

**OFFICE OF THE INSPECTOR GENERAL**
**Department of Children and Family Services**
**2240 West Ogden Avenue**
**Chicago, IL 60612**
**(312) 433-3000**
**(312) 433-3032 FAX**

Dear [Regional Administrator and Managers],

All investigative staff participated in an Error Reduction training regarding investigations involving cuts, welts and bruises in 2010.  The training emphasized, and the data review is meant to reinforce many aspects of investigations regarding young children with bruises.  These aspects include:

- accurately documenting the injury to the child;
- having a child's injury evaluated by a doctor;
- exchanging information with doctors;
- identifying additional risk factors in the child's home, such as substance abuse, domestic violence or parents with a mental illness;
- obtaining police reports,
- involving a child's biological father and/or an identified child-centered-collateral in safety planning.

The information in this letter outlines the data regarding each of these areas specific to the Aurora region.

To ascertain the Aurora sub-region's field application of the cuts, welts and bruises Error Reduction trainings, Quality Assurance and Office of the Inspector General staff reviewed a random sample of 50[1] investigations (three from each team).  Forty-six of these investigations were formal.  Many of the topics addressed in this letter only apply to formal investigations.  The purpose of this letter is to share with you the salient results of the Aurora review. To facilitate discussion we have attached the Aurora specific data report to this letter.  Both should be fully shared with field staff.  After the Aurora managers and supervisors have had an opportunity to review the findings and share them with the field another random sample will be selected and reviewed.

The Error Reduction training for cuts, welts, and bruises began after a review of Inspector General Reports on young children who had been seriously harmed or killed found that many of those children had been the subject of prior child protection investigations where the investigator defined the child's bruises to be minor not necessitating the involvement of the child or family's doctor.  "Bruising is one of the most common and most readily visible injuries resulting from physical child abuse, but it is missed as a warning sign in up to 44% of fatal and near-fatal cases."[2]  The training and this follow up meeting are both opportunities to enhance child safety through better investigations.

---

[1] One investigation was not available for review.
[2] Bruising Characteristics Discriminating Physical Child Abuse from Accidental Trauma by Mary Clyde Pierce, Kim Kaczor, Sara Aldridge, Justine O'Flynn and Douglas J. Lorenz, Pediatrics Official Journal of the American Academy of Pediatrics.  December 7, 2009.

**Documentation of Injuries**

Accurate and timely documentation of a child's injury, especially a bruise, is important in an investigation because bruises heal quickly in children and should a case go to court the investigator will need complete documentation to strengthen the case.  Reviewers assessed documentation of injuries by noting whether investigators completed body charts, photographed the injuries, and described the injuries in case notes. Formal investigations require completion of a body chart. CPIs completed body charts in fourteen[3] investigations; eight of which also had photographs of the injuries.  Thirteen investigations had only photographs; leaving twenty-three with neither body charts nor photographs in the file.[4]  In the Aurora sample, twenty of the photographs were taken by CPIs; eight were taken by the police; one by medical personnel and two were taken by family members. It should be noted that photographs may not always sufficiently depict injuries, and provide no information unless they are included in the file; therefore when pictures are used a body chart should also be completed. In addition procedures require a body chart be done in formal investigations for cuts, welts and bruises even when photographs have been taken (see Procedures 300 Appendix B). An impressive 100% of the reviewed investigations included case entries describing the child's injuries allowing supervisors to review descriptions of the injuries as well as body chart or photo documentation.

**Medical Evaluation of Injuries**

We acknowledge that child welfare is an evolving discipline. The Aurora training occurred and the investigative sample was collected before the Department issued its August 19, 2011 Memorandum mandating that any child who is reported or suspected to have an injury must be evaluated by a physician unless the Investigation Manager approves a waiver.

> The CANTS 65-A was developed for use during investigations when a child is reported and/or suspected to have an injury as a result of child abuse or neglect.  The intent of involvement and interview of primary care physicians is to document possible injuries, determine if the caregiver explanation is consistent, obtain medical opinion regarding likely cause of injuries, and learn about any prior concerns about the child/children's care that may not have risen to level of report, etc.[5]

Thirty children saw a medical professional, including those investigations where the hotline call was made by a medical professional, those seen by primary care physicians, and those seen by another provider during the investigation. Emergency room physicians made five of the eleven hotline calls reported by medical professionals and involved injuries to children age two or younger.  The other reports were made by primary care physicians (2), school nurses (2), an in home nurse (1) and a community clinic nurse (1). Thirty-seven investigations progressed to formal and were not initiated by a medical professional; children in 21 of those investigations were seen by a doctor and afforded anticipatory guidance.  It is an expectation in formal investigations that injured children are seen by a physician.

*Children three and younger*

Six children ages three and younger were not seen by medical professionals. In one investigation the mother reported to the CPI that she lost her temper and hit a 3 month old girl, resulting in a

---

[3] One initial investigation included a body chart.
[4] Eight of those investigations had written documentation that pictures were taken, but a copy of the photograph was not in the investigative file.
[5] DCFS Inter-Office Memorandum dated August 19, 2011 regarding CANTS 65-A.

bloodshot eye. The family reported they took the infant to the doctor, but it was not verified that the child saw the doctor, nor did the CPI gather information from the doctor. Although an Intact Family Services case was opened, the CPI did not build a strong case regarding the injury by obtaining doctor's records in the investigation if the case goes to court in the future. In another case, the hotline was notified that a mother hit her 2 year old son on the face leaving a mark. By the time the CPI observed the child the mark had faded. The CPI indicated the investigation because the mother admitted hitting her son's face and reported "I can hit the child in any manner I desire," but did not offer services to the family. The troubling aspect of the lack of remorse on the part of the mother as it is not mitigated by ongoing services could at least have been partially monitored by a child's physician. If the child had been seen by the family doctor that doctor could have had a discussion with the mother about appropriate discipline techniques and would hopefully see the child again at future visits.

**Communication with Medical Professionals**
The cuts, welts and bruises Error Reduction training emphasized the importance of an exchange of information between medical professionals and child protection investigators as part of determining if an injury is abusive or accidental.

To assist investigators with sharing information with doctors the Referral Form for Medical Evaluation of a Physical Injury (CANTS 65A) has been revised to include check boxes for domestic violence, substance abuse, and/or mental illness concerns.

> Dear Medical Provider:
> As part of a pending investigation of child abuse or neglect conducted in pursuant to the Department of Children and Family Services Act [20 ILCS 505/1 *et seq.*] and the Abused and Neglected Child Reporting Act [325 ILCS 5/1 *et seq.*], the parents of the above child have been directed to bring the child for evaluation and treatment of the following injuries:
>
>
> In addition to the injury or injuries, there are concerns regarding:
> ☐ Domestic Violence     ☐ Substance Abuse     ☐ Mental Illness

See the domestic violence/mental illness/ and substance abuse sections for more information on families with these identified risk factors.

The CANTS 65A is meant as a stepping stone for that exchange of information by assuring that DCFS, not parents or caretakers, is the provider of the initial information presented to doctors. In addition to completing the form, investigators were advised to have a conversation with the medical professional. In keeping with the preponderance of evidence standard for child protection investigations, investigators were advised to ask doctors the question in terms of whether the injury was "more likely" abuse. In order to answer that question the medical professional needs information from the investigator as to the explanations and timelines provided to them, their observations and conclusions, including prior history, scene investigation information and witness accounts. While the medical professional can offer a medical opinion, the CPI is also a professional with skills and knowledge to bring to the conversation. The CPI is often the only one who will have interacted with other members of the family or observed the home environment of the child and can provide more context to the doctor to determine if the injury is abusive or accidental.

In twenty-one investigations, reported by non-medical professionals or families, the child victim was seen at a doctor's office or in an emergency room.  In thirteen investigations the alleged child victim was seen by his or her primary care physician for the injuries.  Seven CPIs asked the doctor to complete the CANTS 65A, four of those were the primary care physician and three were other doctors. In five cases the CANTS 65A was completed and in the investigative file and in the other two cases CPI's documented that the doctor had shared information with the investigator. For example, in one investigation the doctor wrote "left cheek slap mark that fits fingers" and checked the box "injury shaped like an object, hand or pattern".  These details can provide a context for further discussion with the doctor as well as a written record of the physician's concerns, which may be especially important in cases that go to court.  (See attached Appendix A for more information from the CANTS 65A).

Twenty-five CPIs documented a conversation with a doctor.  In twenty-two investigations CPIs noted that the doctor discussed the child's injuries and a majority of investigators shared the explanation given for the injuries with the doctor and they discussed whether or not the explanations provided by the family were consistent with the injury. Nine doctors disclosed knowledge of prior injuries to the children, and seventeen expressed concerns about family members.

In the twenty-five investigations that CPIs noted exchanging information with the doctor, sixteen asked the doctor "do you think it is more likely that the child suffered this injury as a result of abuse or accident?" All sixteen of the doctors who were asked stated their opinions about the injury in "more likely" terms.

When the child is *not* evaluated by the primary care physician Procedure 300 Appendix B dictates that the CPI contact the primary care physician.  The CPI can both gather historical information about the child and share current information about the incident with the doctor.  In 21 of the 33 formal investigations in which the child was not evaluated by his or her primary care physician for the injury the CPI documented speaking with someone at the physician's office. Seven of the case files contained no documented reasons for why the CPIs did not speak to someone in the doctor's office, in five investigations a CPI attempted to reach the doctor but did not receive a response. The training also emphasized the importance of obtaining and reviewing the medical records. Thirty children saw a medical professional and thirteen of the fourteen CPIs who requested copies of the medical records received them.

**Mental Health, Substance Abuse and Domestic Violence**
In any investigation the risk to the child increases if there is parental mental illness, domestic violence or substance abuse in the family.  The Error Reduction training stressed the importance of completing the Mental Health section of the Adult Substance Abuse Screen to obtain information about parental mental illness.  This portion of the letter will present the data regarding these three risk factors: parental mental illness, domestic violence and substance abuse in the Aurora sample.

Thirty-five CPIs completed the mental health section of the revised Adult Substance Abuse Screen.  Nine CPIs used the older version of the Adult Substance Abuse Screen which does not contain the mental health section.  While Aurora region showed a high compliance rate, managers and supervisors should assure that investigators have updated files in each office so that CPIs are able to gather the mental health information.  The review found that when individuals were asked about mental health they answered the questions as did relatives when investigators sought corroboration.  In three investigations the screen was completed on some

but not all subjects of the investigation and in two investigations no substance abuse screens were completed.  It is critical to note that it is only during an open DCP investigation that the Department is able to gather mental health records without a consent.

*Multiple Risk Factors*

Twenty-six investigators identified a combination of domestic violence, and/or substance abuse, and/or parental mental illness in the family.  In sixteen of those investigations the CPI and the doctor discussed the case; however, only three investigators documented sharing their concerns with the doctors. As a result, an opportunity to help protect these children's future well-being was squandered as their physicians were not made aware of issues in the home.   Whether information was not shared because of misconceptions of confidentiality or the information was shared and simply not documented is concerning and should be addressed by managers and supervisors.  For more information about these multiple risk factors refer to diagram below.

## Multiple Risk Factors



**Multiple Risk Factors Diagram** In addition to mental illness, substance abuse and domestic violence are also risk factors. Twenty-four (48%) of the fifty investigations involved families with multiple risk factors. Investigations involving a combination of these risk factors should be viewed with caution, warranting careful assessment for the child's safety and the parents' need for intervention.

*Mental Health*

By gathering mental health information early in the investigation, investigators have time to obtain records which may further assist in making safety determinations and then can be shared should an intact or placement case be opened. Gathering information, including family strengths and needs, is an ongoing process that can serve to support an intervention plan and should be seen as a priority (Meisels, S. J. & Atkins-Burnett, S. The Elements of Early Childhood Assessment In J. P. Shonkoff & S. J. Meisels Eds., *Handbook of early childhood intervention* New York: Cambridge University Press 2000). Recently the Department issued Policy Guide 2011.07, which instructs child protection investigators: "When a parent/caregiver discloses that he/she or the other parent/caregiver has sought treatment for a current or previous mental health issue, the investigation specialist shall obtain the mental health records for assessment purposes."

Nine investigations involved parents with identified mental health problems. The review showed that when a CPI took the time to ask the parent about their mental health the parents provided information. The diagnoses included: panic attacks, anxiety panic disorder, post traumatic stress disorder, obsessive compulsive disorder, ADHD, depression, depression and anxiety, post-partum depression, bipolar disorder and schizophrenia. Three of the nine parent's diagnoses were documented in the Adult Substance Abuse Screen. The remaining information was found in case notes, police records and hospitalization records. Five investigations reviewed involved a child with a documented mental illness. The diagnoses included: ADD, ADHD, oppositional defiant disorder, conduct disorder, bipolar disorder and one child was undergoing testing during the investigation.

*Domestic Violence*

In twenty investigations the CPI identified domestic violence as a risk factor. Too often, extended family members face dilemmas in trying to maintain protective relationships with young victims. Safety plans are often dictated by the preference of the parent, not what is the best safety plan for the child. In an effort to be more child focused, seventy-five percent (15) of the investigations with domestic violence had identified child centered collaterals. Children have a right to have people who they feel safe with or have protected them in the past involved in their life while DCFS is involved with the family.

When there is domestic violence in a family it is paramount that the CPI communicates the risk to other professionals working with the family. If the child and parents see the family's physician about the domestic violence event, or even if the physician is informed of the domestic violence, the family can receive anticipatory guidance from the health care professional on their approach to parenting (Hagen JF, Shaw JS, Duncan PM eds. 2008 *Bright Futures: Guidelines for Health Supervision of Infants, Children and Adolescents*, Third Edition, Elk Grove Village, IL: American Academy of Pediatrics). The health care response to domestic violence is a blend of medical care, public health, and advocacy approaches (Chalk & King eds. *Violence In Families; Assessing Prevention and Treatment Programs,* National Academy Press, 1998). Healthcare professionals can ask questions in a sensitive manner about the safety of all family members and be in a position of support and guidance.

It is particularly troubling that a two year old girl in the sample was not seen by a medical professional as the injury reportedly happened during a domestic violence incident. The girl sustained a bloody lip when her dad punched her mom in the face while she was held by her mom. Any child who suffers a trauma during a domestic violence episode, inadvertently or otherwise, should be seen by a medical professional because children who are exposed to domestic violence are at an increased risk for emotional and behavioral problems as well as

adverse mental and physical health outcomes.  According to Fantuzzo and Mohr (1997), 40% to 70% of children exposed to domestic violence are also victims of abuse.  It is especially important that a child's physician be informed in order to have a baseline and then hopefully be more observant during future visits.

*Substance Abuse*

Investigators noted issues with substance abuse in ten investigations. These investigations included an infant, five children between one and three years old, and four children between four and six years old.  In five investigations the information was captured on the Adult Substance Abuse screen; in five investigations the parent had police history showing substance abuse, and in nine cases the information was documented in SACWIS notes.  In one investigation the Department took protective custody and in seven investigations the child centered collateral was asked to keep eyes and ears on the child for safety. Investigators in Aurora did a good job of recognizing that when the caretaker of a young child is someone with an identified substance use issue, the investigator must address the increased risk to the child and one way to increase safety is to identify and involve a child centered collateral.

## Police Reports



**Police Report of Hotline Call** — **Prior Family Police Involvement**

4    12    11

**Both police report of hotline call and prior police involvement**

**Police Reports Diagram** In 16 investigations there was a police report regarding the incident that prompted the hotline call. In 23 investigations the family had police involvement prior to the investigation. Investigators obtained 12 of the sixteen reports regarding the hotline call.

In twenty-seven investigations there were existing police reports for the family (see Appendix C for more information).  Seventeen CPIs requested reports, and all seventeen obtained a copy of the report. CPIs were conscientious about incorporating the information into their safety assessments for the children.  For example, in an investigation involving a nine year old boy with bruises on his arms and chest he said were caused by his mother's boyfriend the CPI obtained

informative police records. The mother reported that after she and her two sons, age 9 and 10, had moved in with her boyfriend he became controlling, isolating her from family and friends. He took away her cell phone and began monitoring her calls. He had the mother seek an order of protection against the grandmother when the grandmother tried to act as a protective factor for the boys. When the mother's brother came to the home to check on his nephews the boyfriend assaulted him and then obtained an order of protection against the uncle. The police reports corroborated the mother's story and added further information to be used in an assessment. The CPI accompanied the mother the day she moved herself and her children out of the boyfriend's home and assisted the mother in obtaining an order of protection against the boyfriend. The CPI then referred the family for intact services.

Ten CPIs did not obtain existing police reports and missed an opportunity to gather valuable information about the incident leading to the hotline report or about the family's history. Police reports may also provide information about who has been protective towards the children, such as the grandmother and uncle, in the example above. When police reports are not requested investigators miss the opportunity to more thoughtfully assess present and potential safety and risk factors.

**Child Centered Safety Planning and Father Involvement**
Most children four years and older have the insight and capacity to identify persons they are special to and can trust. Asking a child to identify their collaterals validates their insight and belief about who has their best interest at heart. Additionally, child selected collaterals can be a good candidate to monitor a safety plan, provide mentorship, keep eyes and ears on the child, and if needed, be a placement option. Children younger than four years cannot reasonably be expected to identify their collateral. In those instances the identification of child centered collaterals should be sought from caregivers and institutional collaterals such as daycare providers.

The three investigations in which protective custody was taken were not included in the following evaluation of child centered collaterals, making the sample size 47 investigations, including both initial and formal investigations. Twenty-four of the children were three or younger, twenty-three children were four years and older. In 39 investigations, investigators identified at least one child centered collateral; however, only one child was asked to identify her own collateral. Given the number of children four years and older it stands to reason that most of those children should have been asked to identify their collaterals. Forty-seven percent of the identified collaterals were family members; ten percent were friends of the family and the rest were institutional collaterals, such as teachers and day care workers. CPIs interviewed 100% (39) of the identified child centered collaterals.

When a child is unable to identify their own collateral the value in identifying institutional collaterals cannot be overstated. Teachers and daycare providers play a strong role in ensuring children's safety and well being and are in key positions to recognize indicators of child maltreatment; they are often the first professional to notice and report if a child appears to be abused or neglected. In one investigation involving a five year old with bruises the CPI spoke with the school teacher who saw the child daily. The teacher reported she was aware that the child lived sometimes with his mother and sometimes with his father and that the child may be evaluated for a learning disability. The school teacher agreed to continue to monitor the child's behaviors and watch for suspicious injuries.

Safety plans were initiated in six investigations; investigators involved child centered collaterals in all six of the safety plans. In eighteen investigations without a safety plan, the investigator asked the identified collateral to keep eyes/ears on the child. In 92% of the investigations where collaterals were asked to keep eyes/ears on the child, the collaterals were given explanations for the investigators' concerns.  It should be noted that Aurora had a much higher rate of use of collaterals than other areas of the state.

*Involving Fathers with Safety Planning*
A significant body of scientific research clearly documents the vital role a father plays in the formative years of a child's life (Yeung & Duncan, 2000; Harris & Marmer, 1996).  The consistent and frequent presence of a father makes a powerful difference in the development and socialization of a child.  Children who grow up with fathers who stay involved in their lives enjoy all kinds of benefits: better school performance, less trouble with the law, better jobs and careers, better relationships with others, higher self-esteem

In twenty-two of 50 investigations the father was the alleged perpetrator: nineteen of those fathers lived in the home, three did not. The remaining twenty-eight biological fathers were not the alleged perpetrator: nine fathers lived in the home, nineteen did not. If a biological father was not the alleged perpetrator and did not live in the home he was not automatically a subject of the investigation, however, best practice would suggest that the CPI identify and involve the father to strengthen the safety net for the child.  Twelve (63%) of the nineteen fathers who were neither the perpetrator nor living in the home were identified by the CPIs; eight of those identified fathers were interviewed by CPIs. It should be noted when CPIs asked for information about a biological father the family easily provided the information, and when CPIs attempted to interview fathers 100% were receptive, therefore investigators should be encouraged to seek out this information and engage fathers to be a positive safety factor in their child's life.

As such, it is imperative that our investigators seek out fathers when they are not living in the home as well as reach out to those living in the homes in hopes to educate them that loving involvement requires more than words.  For example the father of a six year old girl called the hotline to inquire about caring for his daughter.  She lived with her mother who had left her in the care of a boyfriend for the last year during her work hours.  When police intervened the little girl had extensive bruising over her body, the police took 32 pictures to document the injuries.  The mother moved out, the boyfriend was arrested and the mother obtained an order of protection against the boyfriend because he had also physically abused the mother.   The Department opened an Intact Family Services case.  The biological father of the girl stepped forward to offer support to his child and the CPI told him that in order to obtain custody he should petition family court.  The CPI conducted one minimal interview with the father, and as such, missed an opportunity to engage that father in the safety of his daughter, for example by having him monitor the safety plan, to provide further information to that father about his rights, or to gather more information about the child's history.  CPIs need to take the time to involve fathers and see them as an added link to strengthen a child's safety net.

**Conclusion**
As noted earlier another sample of cuts, welts and bruises investigations will be reviewed by Quality Assurance in the Spring of 2012.  Recognizing that child welfare is an evolving discipline, it is our hope that the information gleaned in the assessment of these investigations can be used in the education of administration and the field to facilitate change. The review did not bear out that there is a reluctance to provide information when requested. Supervisors and managers should continue to encourage investigators to ask the questions and obtain the records

as well as working to make sure the requests are completed in an efficient and timely manner. The lasting effects of such efforts may be an improved safety net for the child when DCFS is no longer involved. The training was meant to enhance child safety through better investigations. The inclusion of child centered collaterals and increased communication with medical professionals assists in building protective factors for the child. Through dialogue practice wisdom grows. Thank you for your cooperation and we look forward to our discussion.

Respectfully,

Denise Kane, Ph. D.
Inspector General
        and
Error Reduction Staff

Appendix A                 Aurora (2A)

| Survey | Front (CPI) | Back (Doctor) | Comments (by OIG) |
|---|---|---|---|
| 253 | Ten-twelve bruises on her back, four to five bruises on each arm, one large bruise that extends from the right of her forehead to the temple and behind the ear, black left eye, bruising and pain on the left hip area.  Sunburn on her face.  Parent explanation unknown.  Child reported that she fell, ran into a wall, and that mom's boyfriend did it. | Most injuries not known to parent, although aware of abusive behavior of husband since she herself (the mother) has been physically abused by same man (husband, step-father, the perpetrator). Unwitnessed injury. Various stages of healing of injuries.  Multiple injuries. | 6 year old girl.  Investigation was indicated and an intact family services case was opened. |
| 269 | Child came to school with a black eye and a bruise on the bridge of his nose.  Parent does not know how child sustained the injury but advised she did not cause the injury. | *Form blank.* | 5 year old boy with bruise on his face, first he told teacher his mom did it, then he told teacher he ran into a table.  Though the CANTS 65A information from the Dr. is not in the file the rationale section states "the attending physician advised that the bruise wasn't a result of any physical abuse".  This was sequence 'B' for the family, the investigation was unfounded. |
| 275 | Child has multiple bruises on arms and legs.  Mom says child is very hyperactive climbing on everything and also bruises from the trampoline. | 3 y/o female child with a lot of energy. She is climbing on everything-trampoline, tables-beds, also she is learning how to roller skate- reason why she bruises easily on things. | 3 year old girl.  Investigation was unfounded. |
| 273 | Bruising to left side of arm w/ scab, bruise to right cheek on face, circular scar on stomach, 2 circular marks on left foot, significant bruising to both sides of buttocks, bruising to both outer thighs, + mark on buttocks.  Mother reports on Wednesday the child was at daycare + when she bathed him that evening she observed redness to outer thighs and buttocks.  Mark on stomach reportedly occurred because he grabbed her lighter. | Mom denies any knowledge or cause of injury.  Noted bruising on return from daycare. Unexplained injury.  Unwitnessed injury.  Multiple injuries. | Protective custody was taken of this one year old boy. |

| 282 | One year old boy was picked up from day care with numerous scratches, bruises and a bite to his face, ears, etc. He was seen at the ER and subsequently brought to the doctor for follow up. Babysitter stated that most of the marks were caused by another child in the day care.  A few of the bruises were accounted for as accidents from falling. Mother states child was brought in for follow up.  Were there any remaining or new injuries?  Any concern for long term effects, scarring, etc.? | Multiple superficial scratches and bruises on forehead and cheeks, started eight weeks ago, mom alleges that wounds were not present when dropped off at daycare. Pt. was evaluated in ER and in my office. Unexplained injury, un-witnessed injury.  Multiple injuries. | 1 year old boy.  Investigation Indicated. The reporter was a DCP supervisor who saw the baby when he was picked up from daycare. |
|---|---|---|---|
| 281 | The child reportedly has bruises on her legs. The father's explanation is that his daughter is getting bruises when she is at her mother's home.  Unknown as to how the child is receiving bruises. | *Form blank.* | 1 year old girl.  Investigation was unfounded. Though the CANTS 65A information from the Dr. is not in the file the rationale section states: "doctor stated that injuries are childhood related due to age of the child". |
| 283 | Child presented with redness to his left cheek/jaw area and redness to his right neck area.  Child stated that his father had hurt him.  No injuries noted to the brother, but body exam needed. Mother explained that the boys are very rough and often hit each other.  The boys recently have been trying to poke each other in the eye.  She spanked child on the butt but never in the area of the head. Please note any suspicious or unexplained marks or indications of abusive behavior toward the children. | Left cheek slap mark that fits fingers.  No marks seen on brother's body! Unexplained injury, unwitnessed injury.  Injury shaped like an object, hand or pattern. Regular medical appointments met I never have seen marks on body.  Dad works long hrs. leaves early in AM returns after 8:00 pm Mother very stressed going to school part time. | Investigation of a hand shaped bruise to the face of the 5 year old.  His brother was age 4.  The investigation was unfounded against the parent but indicated against an unknown perpetrator because the parents denied knowing how the injury occurred but the doctor said it looked like a hand print. |

## DEPARTMENT OF CHILDREN AND FAMILY SERVICES

Distribution: X & Z

### Policy Guide 2011.07

### OBTAINING RECORDS OF PARENTS WITH MENTAL ILLNESS

**DATE:**           September 15, 2011

**TO:**             DCFS Investigation and Intact Family Specialists and Supervisors
                    and Rules and Procedures Bookholders

**FROM:**           Erwin McEwen, Director

**EFFECTIVE:**      Immediately


### I.    PURPOSE

Mental illness presents one of the most complex safety factors encountered in child welfare. Assessing a parent's known or suspected mental health issues can significantly impact a child abuse/neglect investigation and services offered to the family.

The purpose of this Policy Guide is to direct investigation specialists to ask parents/caregivers who are subjects in child abuse and neglect investigations about mental health issues affecting themselves or the other parent/caregiver. When a parent/caregiver discloses that he/she or the other parent/caregiver has sought treatment for a current or previous mental health issue, the investigation specialist shall obtain the mental health records for assessment purposes.

### II.   PRIMARY USERS

Primary users of this Policy Guide are the Department's investigation and intact family specialists and their supervisors.

### III.  REQUIRED ACTIVITIES: INVESTIGATION SPECIALISTS

During initial contact with parents/caregivers who are listed as subjects of the report, the investigation specialist shall ask the parents/caregivers about their overall mental health, current and previous medications to treat mental health issues (type, dosage, prescribing doctor, reason, medication compliance, etc.), prior mental health-related hospitalizations (when, where, reason, length of time, etc.), currently involved mental health professionals (name, contact information, last visit, etc.) compliance with treatment and support systems. The investigation specialist shall refer to the **Investigation/Intact Parental**

**Mental Health Case Matrix** (see Appendix A of this Policy Guide) during the interview as a guide to types of information to be obtained regarding the parents/caregivers' mental health. All information obtained from the parents/caregivers shall be documented in the investigation file.

When a parent/caregiver discloses that he/she or the other parent/caregiver has a known or suspected mental health issue (including treatment and/or hospitalization), the investigation specialist shall immediately ask the affected parent/caregiver to sign a **CFS 600-3, Consent for Release of Information** authorizing the Department to obtain his/her mental health records from the identified hospitals, physicians and therapists. If a parent or caregiver refuses to sign a **CFS 600-3**, the investigation specialist shall request an administrative subpoena for these records within **two business days** of the refusal.

**Note:** Refer to Procedures 300.60(j), Administrative Subpoenas for instructions for requesting an administrative subpoena, and follow-up actions to be taken if a mental/medical health facility does not comply with the subpoena.

The investigation specialist shall send the signed **CFS 600-3** along with a **CFS 600-5 (Request for Records cover letter)**, to the identified hospitals, physicians and therapists. All efforts to obtain mental health records shall be documented in the investigation file.

Requests for mental health records shall be made within **two business days** after initial contact with the affected family member whether by a signed **CFS 600-3** or administrative subpoena. Investigations shall not be approved until all formal requests for mental health records have been made and subpoenaed records received.

If subpoenaed documents and/or information have not been forwarded to the investigation specialist within 10 days of the date on the subpoena, the investigation specialist must immediately contact the Keeper of Records at the medical/mental health facility to determine if there is a valid reason for the delay. All contacts with the Keeper of Records regarding subpoenaed files must be documented on a SACWIS contact note. If the Keeper of Records fails or refuses to comply with the subpoena, the investigation supervisor shall immediately notify the DCFS Regional Counsel and the Office of Inspector General of the situation and provide documentation explaining why the information is important to the investigation. Consultation with the Regional Counsel and the OIG regarding subpoenaed records/information shall be documented on a SACWIS contact note.

If mental health records are received prior to supervisory approval of the investigation, the investigation supervisor and specialist shall meet to review and assess these records to determine the impact, if any, to the child's safety. The investigation supervisor shall document the meeting in the investigation file and note that all requested mental health records have been received.

### IV.    REQUIRED ACTIVITIES FOR OPENING AN INTACT FAMILY CASE

An intact family case <u>shall not be opened</u> unless the affected parents/caregivers have signed a **CFS 600-3** for mental health records or administrative subpoenas have been issued to obtain the mental health records, as this information may determine the course of service delivery and need for juvenile court intervention.

Investigation and intact managers shall discuss any identified safety and risk issues and determine whether it is appropriate to open an intact family case before receipt of requested mental health records (when consents have been obtained / subpoenas issued).

**Case Handoff Meeting.** The investigation specialist shall share all parent/caregiver mental health information and records with the intact family specialist at the case handoff.

During the case handoff meeting, the investigation and intact supervisors shall use the **Investigation/Intact Parental Mental Health Case Matrix** (Appendix A) to determine urgent service planning needs for the family. The supervisors shall document, in the investigation and intact family files, the topics on the Matrix checklist reviewed at the meeting, as well as any other relevant topics not listed in the Matrix.

The investigation supervisor shall note in the investigation file if any specific safety decisions were shared with the intact supervisor at this meeting.

If mental health records are received by the investigation specialist after the case handoff meeting, a conference including the investigation and intact supervisors shall occur immediately to address safety and risk implications noted in subpoenaed records and required protective action, up to and including involvement of juvenile court.

### V.    QUESTIONS

Please refer all questions concerning these requirements to the DCP administrative chain of command.

### VI.    FILING INSTRUCTIONS

**Investigation Specialists:** File this Policy Guide immediately following Procedures 300.60 (j).

**Intact Family Specialists:** File this Policy Guide immediately following Procedures 302.388 (e).

# Appendix A

## Investigation/Intact Parental Mental Health Case Matrix
### (Before accepting case for intact-discuss at case handoff meeting)

| Mental Health Records | Medication | Support System |
|---|---|---|
| Has DCP obtained records? Subpoenas sent? (Note investigation **should not be closed** until all records received; include date sent and date received)<br><br>Consents Signed: | (Get consents signed before or at hand-off)<br><br>Prescribing Physician: (Note: primary care physician, physician's assistant, Psychiatrist, Ob/Gyn, etc.)<br><br>How long seeing physician? | (Get consents signed before or at hand-off)<br><br>Extended Family members: (note nature of contact- frequent or isolated)<br><br>Alternate care providers |
| **Inpatient Hospitalizations (last five years)**<br><br>(note hospital and dates of stays) | **Current Prescriptions:**<br><br>(include name, dosage and reason)<br><br>Past Prescriptions: | **Collaterals**<br><br>Child Centered:<br><br>Others: |
| **Outpatient Records**<br><br>____ Psychiatrist/prescribing physician<br>      Name/Contact:<br><br>____ Therapist/counselor<br>      Name/contact :<br><br>____ Community mental health center<br>      Name/contact:<br><br>____ Social Service Agency<br>      Name/contact: | **Compliance**<br><br>Reported compliance (self)<br><br>Reported compliance (professional)<br><br>Reported compliance (family/collateral)<br><br>Drug/alcohol use: | **Involved Professionals (besides mental health)**<br><br>(Get consents signed before or at hand-off)<br><br>Daycare/Schools<br><br>Pediatrician/family doctor<br><br>Early intervention services<br><br>Community Services |

This checklist is not meant to be comprehensive; additions based upon information received and family dynamics are encouraged.



**Pat Quinn
Governor**

Erwin  McEwen
Director

**Illinois Department of Children & Family Services**

Date:
From:
To:
Subject:  Client Information Concerning:

Parent's Name:                                          Date of Birth:
Parent's Name:                                          Date of Birth:
Child's Name:                                            Date of Birth:
Child's Name:                                            Date of Birth:

Dear Mental Health Professional:

Your client _____ has been referred to the Department of Children and Family Services (or designated agency) for intact family services.  The family came to the attention of the Department regarding:

_____
_____
_____

The client has identified you as a mental health services provider. Attached is the signed consent for release of information.  Also attached are questions that can provide us with the requisite knowledge needed to safely and effectively service the family and assure safety of the children.   We understand your time is valuable. We are asking for your professional ethics in taking the time to fill out the questionnaire.  If you have time and are willing to participate in a staffing, even by phone, we can arrange the staffing at your convenience and would limit your participation according to your schedule, even if you can only allow fifteen minutes. The following significant concurrent problems have been identified:

☐ Domestic Violence              ☐ Substance Abuse              ☐ Physical Abuse

Respectfully,

Intact Family Services Caseworker
Agency:
Address:
Supervisor:
Telephone:
Facsimile:

CFS 968-90
6/2011      ACCREDITED • COUNCIL ON ACCREDITATION FOR CHILDREN AND FAMILY SERVICES

**Questions for Mental Health Professionals**

**Client's Name:**

**Diagnosis:**     Axis I
                   Axis II
                   Axis III
                   Axis IV
                   Axis V

**Treatment Plan:**
*Please include your frequency of contact with the client, and the client's last appointment.*

**Medications:**

**Client Insight to His or Her Diagnosis:**

**Prognosis:**

Is the client compliant with treatment?  Is the client responsive to treatment?

Have you met the client's children?  Do you speak with members of the client's support system?

Do the client's symptoms of mental illness place the child or children at an increased risk of maltreatment or harm?

Are there long-term effects of the client's mental illness symptoms on the child's or children's well-being that need to be considered in developing a treatment plan?

If the client's current treatment plan is changed, will it likely bring about an improvement in the client's parenting skills?

What would need to be, or could be, added to the client's treatment plan that would improve the client's parenting skills?

Do you communicate with any other of the client's treatment providers?

CFS 968-90
6/2011

| ETHICS |
| --- |

**ETHICS OFFICER**

The Inspector General also operates as Ethics Officer for the Department of Children and Family Services under the *State Officials and Employees Ethics Act*. 5 ILCS 430/20-23 (2011). One important role of the Ethics Officer is to provide guidance to Department officers and employees in interpreting the Ethics Act, the Child Welfare Code of Ethics and Rule 437, *Employee Conflicts of Interest*.

The Ethics Officer monitors the mandated annual ethics training; reviews all Statements of Economic Interest submitted by over 700 specified Department employees annually; receives reports of *ex parte* communications made during any rulemaking process and transmits the reports to the Executive Ethics Commission; and provides a revolving door waiver analysis to the Office of the Executive Inspector General (OEIG) for certain employees leaving Department employment. A member of the ethics staff sits on the Conflicts of Interest Committee, which responds to Department employee inquiries that fall under the purview of Rule 437.

During the past fiscal year the Ethics Officer received several requests from Ohio, California and Toronto, Ontario for its training materials about child welfare ethics including a request from one state government to utilize the Department's *Code of Ethics for Child Welfare Professionals* as a model for developing their own state's child welfare ethics code.

**Ethics Inquiries from the Field**

- **Personal Relationships:** The Ethics Officer consulted with DCFS management regarding a request from the field to review an appearance of a conflict of interest. The conflict involved a DCP investigation that was assigned to a DCFS field office where two different Department employees each had personal relationships that involved parties to the pending DCP investigation. Although neither DCFS employee was assigned to that investigation, because of the personal relationships that existed there was concern that keeping the investigation within that field office created an appearance of a conflict of interest, as it could be construed that investigatory decisions were made based on the working relationship between the assigned investigator and the Department employees that knew the parties to the case. The Ethics Officer advised management that, upon learning that two employees in the office had relationships related to the investigation, it would have been prudent to transfer the investigation to a different office. A transfer would serve the dual purposes of avoiding any inappropriate involvement by the Department employees, and also to protect those employees from accusations of inappropriate involvement with the investigation. Absent a case transfer, the Ethics Officer advised that both employees would have to be walled off to prevent them from exposure to the flow of information related to the investigation, and also to prevent them from discussing the investigation with the investigator. The Ethics Officer further consulted with DCFS management on different methods of managing internal conflicts of interest, and provided managers with tools to address future conflicts of interest.

- **Gifts and Honoraria:** The Ethics Officer received numerous inquiries from the field regarding accepting gifts from DCFS clients, child welfare entities or other institutions/groups that contract with the Department.

➤ **Gifts from DCFS Clients:**  The Ethics Officer received multiple inquiries about whether it was permissible for a Department employee to accept a nominal gift from a DCFS client.  In these instances the Ethics Officer advised that, although a child welfare worker or administrator touched by such an act of kindness and appreciation does not want to appear ungrateful, nevertheless under Rule 437 the appropriate response is to express gratitude for the gesture, but graciously decline to accept the gift.

In one instance, a supervisor sought advice from the Ethics Officer regarding a case manager who had accepted home grown produce from the biological mother of a family on her caseload.  The case manager reportedly prepared a dish for the family with some of the produce, and brought the remainder into the office.  The biological father of the family complained to the supervisor, arguing that the case manager's acceptance of the gift showed bias toward the biological mother.  The supervisor had already counseled the case manager that she should not have accepted the gift.  The Ethics Officer agreed that the case manager's behavior did give the appearance of bias.  She therefore advised that in order to address the trust issues and concerns about bias that arose from the case manager accepting the gift, the supervisor and the case manager should talk together to the father to inform him that the case manager had been counseled against accepting gifts from clients and to thank the father for bringing his concerns to the supervisor.  Further, the supervisor should document the counseling in a supervisory memo.  Although the father had requested assignment of a new case manager, the Ethics Officer advised that reassignment was a clinical decision to be made by the supervisor, considering all aspects of the case.

➤ **Donations:**  The Ethics Officer received an inquiry about whether it was proper for DCFS employees to receive free tickets to a sporting event from a child welfare entity that contracts with the Department.  The Ethics Officer advised that accepting the tickets created an appearance of a conflict of interest prohibited by Rule 437, as a reasonable person could perceive that the recipients of the tickets (Department employees) might unfairly favor that entity in the future.

The Ethics Officer received another inquiry regarding whether it would be ethical for a DCFS Advisory Committee to receive a monetary donation from AFSCME to assist with retention costs of the Committee's members.  The Ethics Officer advised the Committee against accepting the donation.  The Ethics Officer's response focused on maintaining the integrity of the Committee, one of whose functions is to advise the DCFS Director, and on the public perception of an advisory committee accepting gifts/donations.  The Ethics Officer advised that accepting the donation would create an appearance of a conflict of interest prohibited by Rule 437 if it was perceived that AFSCME had a vested interest in the advice the Committee provides to the Director.

➤ **Honoraria:**  The Ethics Officer fielded several inquiries from Department employees about accepting an honorarium from a University or other organization for participating in an event, such as being a one-time guest lecturer.  In each case, the Department employee was volunteering his or her services and used personal benefit time to participate; however, because the entities offering the honoraria also contracted with the Department, the Ethics Officer advised against accepting any honoraria for participation.

• **Placement Issues:**  The Ethics Officer received an inquiry from a private agency employee regarding placement of a six year old boy who was residing in a relative foster placement that was being monitored by the private agency.  The relative foster parent, however, was also an agency employee.  The Ethics Officer determined that it was an actual conflict for the agency to monitor

176                                       PROJECTS AND INITIATIVES

the placement case of one of their employees, and advised the agency to transfer the case to another agency.

## Rule Making

- **Revolving Door**:  Within one year after certain Department employees leave state employment, they are required to seek approval from the Executive Inspector General for the Agencies of the Illinois Governor (OEIG) prior to accepting any employment or compensation (5 ILCS 430/5-45). Pursuant to policies developed under the Ethics Act, the Ethics Officer is charged with 1) compiling information regarding Department involvement with the employee's prospective employer; 2) gathering specific information regarding the (former) Department employee's DCFS job responsibilities; and 3) advising the OEIG as to whether the employee should be barred from accepting the proposed employment or compensation offer.  The Ethics Officer completed the required revolving door waiver analysis in six cases during fiscal year 2011.  To assist Department supervisors with timely and efficiently providing the Ethics Officer with the information necessary to facilitate the review, ethics staff developed a Revolving Door Information form.

- *Ex parte* **Communications in Rulemaking:**  The Ethics Officer received and referred one report of *ex parte* communications in rulemaking to the Executive Ethics Commission, in accordance with the *State Officials and Employee Ethics Act (* 5 ILCS 430/5-50(c)).

  An *ex parte* communication in rulemaking is "any written or oral communication by any person who imparts or requests material information or makes a material argument regarding potential action concerning regulatory, quasi-adjudicatory, investment, or licensing matters pending before or under consideration by the agency"  (5 ILCS 430/5-50(b)).

- **Procurement Communications Reporting:**  Effective January 1, 2011, new legislation required state employees who have communications (written or oral) with vendors that are intended to influence a state decision to enter into or renew a state contract to report all such conversations to the Illinois Procurement Policy Board.  The Ethics Officer attended training and facilitated educating Department employees on their new reporting duties, including developing a notice of the legislation's requirements which was sent to all Department employees.  The Ethics Officer also provided advice to employees concerning their new reporting duties.  The reporting requirement includes conversations with a vendor concerning the bidding process or whether the contract will need to be bid out.  The purpose of the legislation is to provide transparency to the public in the process of awarding state contracts.  Once reported to the Procurement Policy Board, the reports are placed on a public website.

  The legislation creating the new reporting requirement is available in its entirety at 30 ILCS 500/50-39.  An employee who knowingly and intentionally violates this Section shall be subject to suspension or discharge.

  **Procurement Reporting Advice:**  The Ethics Officer fielded several inquiries from DCFS staff who routinely discuss procedural issues related to contracts with vendors, such as ensuring that the vendors submit required documentation.  Through coordination with the Executive Ethics Office, the DCFS Ethics Office was able to assure staff that strictly procedural discussions, unrelated to decision-making for procurement or change orders do not need to be reported.

  In addition, the Ethics Officer was asked about conversations with a vendor concerning entering into a bridge contract while a Request for Proposal was outstanding.  The Ethics Officer advised

the employee that the conversation with the vendor concerning the bridge contract was a reportable event under the new Procurement Reporting legislation.

**Statements of Economic Interest Reviews**

The Office of the Inspector General received and reviewed 754 Statements of Economic Interest that were required to be filed by persons in the Department who:

> (1) are, or function as, the head of a department, commission, board, division, bureau, authority or other administrative unit within the government of this State, or who exercise similar authority within the government of this State;

> (2) have direct supervisory authority over, or direct responsibility for the formulation, negotiation, issuance or execution of contracts entered into by the State in the amount of $5,000 or more;

> (3) have authority for the issuance or promulgation of rules and regulations within areas under the authority of the State;

> (4) have authority for the approval of professional licenses;

> (5) have responsibility with respect to the financial inspection of regulated nongovernmental entities;

> (6) adjudicate, arbitrate, or decide any judicial or administrative proceeding, or review the adjudication, arbitration or decision of any judicial or administrative proceeding within the authority of the State;

> (7) have supervisory responsibility for 20 or more employees of the State;

> (8) negotiate, assign, authorize, or grant naming rights or sponsorship rights regarding any property or asset of the State, whether real, personal, tangible, or intangible; or

> (9) have responsibility with respect to the procurement of goods or services.  5 ILCS 420/Art. 4A-101.

Ethics staff from the Office of the Inspector General reviewed 754 Statements of Economic Interest filed for fiscal year 2011.  The review by the ethics staff and Ethics Officer identifies potential conflicts of interest and ensures that supervisors are notified and that employees are made aware of the boundaries and ethical requirements in conjunction with their disclosed interests.  In furtherance of this goal, the Ethics Officer issued 47 letters to staff (and also to an employee's supervisor in 29 instances) detailing ethical obligations specific to an individual's disclosed interests.  Two persons filed their Statements of Economic Interest (SOEI) late and were fined by the Office of the Secretary of State.

In previous years, the Director has mailed notification to the home of each employee required to file a SOEI, providing instruction to *only* mail completed forms to the Ethics Officer for required review, and not to submit forms directly to the Office of the Secretary of State.  In 2011, for the first time, the Director's notice was sent by electronic mail in an effort to save on labor and mail costs.  In this transition, of the 754 Department employees required to file Statements of Economic Interest, 120 (16%)

employees failed to forward their Statements to the Ethics Officer for the required review prior to submission to the Office of the Secretary of State.  In speaking with these employees, the ethics staff learned that many employees reported missing the Director's instructive email due to the high volume of emails received on a daily basis and stated that they simply submitted Statements to the Secretary of State because that is who mails the original form.

**Annual Ethics Training**

As required by the *State Officials and Employees Ethics Act,* the Office of the Inspector General staff coordinated and monitored the Department's compliance with the mandatory statewide Ethics Training. The ethics training for state employees consisted of lessons on various ethical dilemmas. OIG ethics staff notified those registered to complete the training and monitored their compliance and completion status. In 2011, the Office of the Inspector General ensured that 2,963 DCFS employees completed the annual training. (Only one DCFS employee failed to complete the Ethics Training as required and was referred for discipline. That individual subsequently completed the training.) In addition to DCFS employees, 398 DCFS board and commission members were also required to complete training.

## PREGNANT AND PARENTING TEENS

During FY 2011, the Office of the Inspector General conducted a Ten-Year Review (2000-2010) of Deaths of Children of DCFS Parenting Teens (see full report in Appendix A of this report). The review of 27 deaths found that 11 infants died as the result of sleep related events and 6 deaths were attributed to Sudden Infant Death Syndrome (SIDS).  Seven of the eleven accidental infant deaths were the result of infants being unintentionally suffocated when someone rolled over onto the baby; three deaths occurred when infants suffocated after becoming trapped in a position from which they could not extricate themselves, such as being caught between an adult and the back of a couch/sofa or between the mattress and the wall; and in one instance, the infant died from hyperthermia after the baby was left bundled in a crib next to a heated radiator.

Ten of the twenty-seven infants were the victims of homicide. In six of the ten cases, the mother, who was a ward or former ward, was implicated, including two cases where the mother and her boyfriend were charged.  Four of the ten homicides were committed by fathers; three of the fathers were wards.

Based on the findings of this report, the Office of the Inspector General developed and implemented a risk reduction training for parenting wards and their case managers.  The training was developed in an effort to lower the infant mortality rate of babies born to parenting wards, and to reduce instances of subsequent pregnancy by promoting educational achievement.

### Risk Reduction Training

According to current Teen Parent Service Network (TPSN) statistics, the average age of conception for teen wards is 16.3 and 28% of parenting wards have two or more children.[1]  As of FY 2010, 58.7% of pregnant/parenting wards were one year or more behind in school.[2]  To reduce instances of secondary pregnancy and encourage scholastic achievement, Regional DCFS Educational Advisors presented pre-developed educational plans as part of the training. These plans were specifically designed to address the educational and vocational needs of the individual wards to whom they had been assigned. Trainers also

---

[1] TPSN Year in Review, 2010
[2] TPSN, Year in review fiscal year 2010

discussed with case workers how to help teen parents identify and reach their goals, with special emphasis on education.

In an effort to lower the incidents of accidental sleep related deaths, the training instructed the young parents on safe sleep practices and SIDS.  The young parents also participated in role plays to demonstrate their understanding of safe sleep practices and strategies they learned to negotiate safe sleep arrangements when others cared for their infants.[3]

As noted in the Ten Year Report, three infant deaths were attributed to the ward father's inability to cope with their baby's behavior.  In each death the baby's crying appears to have been the event that precipitated the murder.  In an effort to reduce homicides of young infants, the risk reduction training educated the teen parents on how to cope with an infant's developmental challenges. The training included discussions on considering the appropriate temperament and skills needed to care for young children.[4]

### Two Models of Risk Reduction Training

The Office of the Inspector General developed and piloted both a day-long and modified half-day model of this training.  In the longer format, safe sleep practices, nonviolent responses to the challenging developmental phases and academic planning were presented to the wards and their case managers. In the half-day format, only the youth attended and the training focused on lowering infant mortality through safe sleep practices.

The full-day format training was introduced to non-Cook County case managers working with pregnant/parenting wards. The trainings took place at four locations: Rockford, Ina, Champaign, and Peoria.  To help ensure that their child always has a safe place to sleep, parenting wards with a baby age one or younger received a portable crib. To encourage attendance and participation, all wards received a children's book to share with their child.

The half-day format was presented to Cook County youth from pregnant/parenting Transitional Living Programs (TLP) at Lakeside Community Committee and Aunt Martha's Youth Services.

In addition to the above trainings, in order to provide staff with the tools to conduct the half-day model independently, the OIG staff and the Teen Parent Service Network (TPSN) trained the trainers who had been identified by their agencies.  The potential trainers were supplied with all of the materials necessary to conduct the training on their own and were provided an opportunity to practice presenting the material. This training also featured a presentation from the Illinois Department of Health Services (DHS), which consisted of an overview of DHS Services available to DCFS parenting wards.

### Future Training for Male Parenting Wards

To address the specific needs of male parenting wards, the Office of the Inspector General is developing a training curriculum that addresses safe sleep practices, caregiving, and appropriate responses to the challenging developmental phases that young children experience. This interactive training that will incorporate the use of baby simulators will be piloted in Cook County beginning January 2012.

---

[3] The training features the National Institute of Child Health & Human Development's Safe Sleep Top 10 which emphasizes placing babies on their backs on a firm, un-crowded, safety-approved mattress in a crib.
[4] The training features Barton D. Schmitt's article: Seven Deadly Sins of Childhood: Advising Parenting About Difficult Developmental Phases.

## OLDER CAREGIVERS

In 2011 there were 5,529 caregivers over the age of 60.  They were caring for 7,295 former wards and 1,900 children in adoptive or subsidized guardianship placements. Placed in the context of the entire universe of DCFS involved caregivers and children, the older caregiver population represents 28.5% of the total pool of 22,236 DCFS caregivers.

In FY 2010 several downstate cases involving older caregivers were referred to the Office of the Inspector General and revealed a need for a more comprehensive process to evaluate the long-term viability of some older caregiver cases.  In one case, the agency was moving toward permanency of a 5 year-old child placed with his 85 year-old grandmother.  The grandmother showed signs of confusion and would forget the child's medical appointments, the caregiver's open medications were in the child's room, there was an open child protection investigation, and the home was cockroach infested and littered with rotten food on the counters and in the refrigerator.  In addition, there was no back-up plan in place in case the grandmother became unable to care for the child. Another case was moving toward an adoption of a substance exposed 16-month old child by a 70 and 73 year-old couple who were the adoptive parents of four other children ages 13 to 17.  A 21 year-old relative was the designated back-up for the child.  In a third case, maternal great grandparents ages 67 and 68 were the adoptive parents of their two great grandchildren, ages 7 and 8, and were preparing to adopt a 2 year-old great grandchild.  The great grandfather was diagnosed with organic heart disease and the great grandmother had hypertension and Diabetes Mellitus.  The relative identified for the back-up plan lived out of state. In March 2011, the Department revised Rule 302.40, *Department Service Goals* to include the Back-Up Caregiver Program (*see* Policy Transmittal 2011.07).

Previous trainings on older caregiver casework included use of the *60+ Checklist* and were last offered by Office of the Inspector General Project Initiative staff to adoption caseworkers and managers in FY 2007. The training stressed use of a "life-span approach" to permanency planning that included assessments of the older caregiver, the child and the back up plan regarding the long term stability of the adoption or guardianship. Borrowing from the work of Atul Gawande, OIG Project Initiative staff reviewed a sample of completed older caregiver checklists and discovered that a majority of the checklists were inaccurately completed and staff seemed not to understand the purpose of using a checklist to support thorough reviews of older caregiver cases.[5]  Gawande argues that many professions in the 21st century require highly trained and highly skilled staff to perform complex tasks.  The ability to manage all of the steps required in these complex tasks is unmanageable; therefore, avoidable failures are common and persistent. He posited that a strategy is needed that builds on a worker's experience or lessons learned from the field, takes advantage of our knowledge and makes up for inevitable human failures, i.e. a checklist.  The use of a checklist sets out minimum steps in a process, establishes a higher standard of baseline performance, and enhances the power of communication within a team.  The Department's *60+ Checklist* was reviewed and revised with this argument in mind.  Establishing a clear, easy to read and complete checklist that must be reviewed by the worker, the supervisor and the adoption liaison reduces the most common obstacle to effective teams, that being, as Gawande terms it, "silent disengagement" where specialized workers stick narrowly to their jobs and do not, as a team, assess whether the end results are satisfactory.  Project Initiative staff revised the checklist making it easier to use and initiated training of adoption staff which is continuing into FY 2012.  It is the expectation that the checklist will be given an official Child and Family Services form in FY 2012.  (See attached *60+ Subsidy Checklist*)

Beginning in FY 2011 and continuing into FY 2012, OIG Project Initiative staff provided training to Cook Central staff, TASC and two private agencies.

---

[5] *The Checklist Manifesto – How to Get Things Right* Atul Gawande 2009

**60+ SUBSIDY CHECKLIST**
**Revised 10/2011**
<u>**Child Information**</u>

1. ☐ **Child name**:_____ Male ___ Female ___ D.O.B. _____

2. ☐ **Child I.D**:_____

3. ☐ **Child's special needs**: (specify all)
_____
_____

4. ☐ **Child's contact with bio-family**: (specify who, frequency)
_____
_____

5. ☐ **Services currently in place for the child**:_____
    Counseling: _____
    O.T.: _____
    P.T.: _____
    Respite: _____
    Other: _____

6. ☐ **Names/ages of others in home and their relationship to the child**:
_____
_____

7. ☐ **Child's collaterals**: e.g. who does the child identify as important to the child (for children age 4 and older).
_____
_____

8. ☐ **Hotline called in past 6 months**: No____ If Yes, ___Unfounded ____Indicated _____ Outcome:
_____

9. ☐ **Name of current GAL**:
_____

10. ☐ **Does the GAL have concerns about caregiver or placement**:
_____
_____

11. ☐ **Date of last conversation with GAL**:_____
    (Must be within 6 months of date checklist is submitted for review.
<u>**Placement Information**</u>

12. ☐ **Current placement**: Name _____
              D.O.B. _____
              Name _____
              DOB _____
              Address _____
              Phone _____

Licensed _____     Unlicensed _____
Relative _____     Non-relative _____
Date of placement _____
CANTS/LEADS:  Date:     _____Outcome_____

13. ☐ **Currently rent or own home**:_____ How long_____

14. ☐ *Home Safety Checklist* **(CFS 2025)** completed in accordance with Administrative Procedure #25?
___ (Unlicensed homes only)
Date completed _____

**Caregiver Information**

15. ☐ **Informal Supports**:  Who comes into home to assist/support caregiver/s_____
_____
Frequency of assistance: _____
Reason for Assistance:  _____
N/A:  _____

16. ☐ **Formal Supports**:  Other agency/ies involved in home or with caregiver/s
Agency name  _____
How involved  _____
N/A  _____

17. ☐ **Department on Aging** services in place or needed (1-800-252-8966):

For Caregiver/s:  _____ Other Family Member:  _____
Homemaker services: _____
Meals on Wheels: _____
Transportation Assistance: _____
Respite: _____
Other: _____

18. ☐  Caregiver health status:
      a.  **Caregiver #1**: _____
      b.  **Caregiver #2**: _____

19. ☐ **Received & reviewed medical evaluation form**: (Attach CFS 604)
    **a.** Caregiver #1
    Dated_____ from (Dr./Clinic)_____
    **b**. Caregiver #2
    Dated _____ from (Dr./Clinic) _____

20. ☐ **Household income: (not including child's stipend)**

Amount - Annual or monthly: _____
How verified:  _____

**Back-Up Caregiver Information**

21. ☐ **Caregiver participated in conference**: in person _____ by telephone _____

22. ☐ **Back-up caregiver**:

      Name(s):_____
      D.O.B(s): _____
      Address:_____
      Phone:_____
    Relationship to child:_____
      Does child agree: (children 4 and older) _____

23. ☐ **Date back-up identified**:_____

24. ☐ **Back-up currently involved with child**: Yes_____  No_____
    How:_____
    Frequency: _____

25. ☐ **Caseworker reviewed future role/responsibilities for child with back-up**: Yes__ No__

26. ☐ **Caseworker reviewed future circumstances of the caregiver that may require back-up to assume care of the child**: _____
    When: _____
    Who else present:  _____
    Back-up prepared to assume future role: _____

27. ☐ **Copy of authorization for background check for back-up care provider** Yes__ No __
**(Please complete CFS 718, *Authorization for Background Check*, and attach to this checklist)**

_____
28. ☐ **Placement/Permanency Caseworker**      **PRINT NAME**


Signature:_____Date:_____

Phone Number: _____

_____
29. ☐ **Placement/Permanency Supervisor**      **PRINT NAME**

Signature: _____ Date _____


Phone Number**:**_____

30. ☐ **Agency or DCFS Region, Site and Field**: _____

**I have reviewed answers to each of the above questions.**
    **( ) I have concerns regarding**
        **( ) the living arrangement (e.g. housing, finances, health, safety, etc.)**
        **( ) the back-up plan**
    **AND I will ask the caseworker to**
- *(in Cook County)* **refer the family to the Child Protection Mediation Program or to Metropolitan Family Services - Older Caregiver Program;**
- *(in all other counties)* **confer with the supervisor for additional planning and/or services**

_____    _____

**Adoption Liaison /Coordinator    PRINT NAME                          Date**

Signature**:** _____

OR

**I have reviewed answers to each of the above questions.**
    **( ) I am satisfied that appropriate plans have been made for this child,**
        **including a back-up plan.**

_____    _____

31. ☐ **Adoption Liaison /Coordinator                                 Date**

Signature**:** _____

**32**. ☐ Adoption/Liaison Coordinator participated: **by phone _____ in person _____**

This checklist, to be completed by the caseworker, is REQUIRED for each child when the pre-guardianship or pre-adoptive caregiver(s) is (are) age 60 and older.  The completed checklist will be reviewed in detail at the Child and Family Team Meeting in conjunction with the assigned Adoption Liaison/Coordinator (this may be done in conference or by phone) and a determination made as to whether additional permanency planning is necessary. If additional permanency planning is required, the family will be referred to the Child Protection Mediation Program (in Cook County), Metropolitan Family Services Older Caregiver Program (in Cook County), or to additional planning or services.  If no additional permanency planning is required, the assigned DCFS Adoption Liaison/Coordinator signs the completed checklist reflecting agreement with the planning, and the original checklist will be maintained in EACH individual child's file.

Rev. 10/11

# SYSTEMIC RECOMMENDATIONS

The Inspector General's investigative reports contain both systemic and case specific recommendations. The systemic reform recommendations for Fiscal Year 2011 have been categorized below according to the function that the recommendation is designed to strengthen within the child welfare system.  The Office of the Inspector General (OIG) is a small office in relation to the child welfare system.  Rather than address problems in isolation, the OIG views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- ADMINISTRATIVE HEARINGS UNIT
- CHILD PROTECTION INVESTIGATIONS
- CONTRACT MONITORING
- LICENSING
- SERVICES
- STATE CENTRAL REGISTER

## ADMINISTRATIVE HEARINGS UNIT
- The Department should develop an expedited process for distributing proposed decisions to all parties in expungement appeals, with opportunity to file written objections, prior to the issuance of final administrative decisions in expungement appeals.

## CHILD PROTECTION INVESTIGATIONS
### General
- Procedure 300, *Reports of Child Abuse and Neglect*, should be amended as follows:
  <u>Records of Child Abuse and Neglect Investigations</u>
  *3)  Redacted Police Reports and Criminal History Printouts*
  When the subject of a report requests a copy of his/her file from the local field office all police reports, LEADS and criminal history printouts shall be redacted from the file.  The Police Report Redaction Notice (CANTS 13) shall be completed to document either 1) the removal of police reports, LEADS and criminal history printouts or 2) confirm that documentation contained in the investigative file did not include police reports, and LEADS and criminal history printouts.  A copy of the CANTS 13 shall be placed in the investigative file.

- The Department should integrate into its Safety Assessment Protocol the following question:  *If the caregiver has ever been indicated for abusing, neglecting or failing to protect a child or has previously been assessed to lack Protective Capacity, please state reasons, other than the self-report of the caregiver, which lead you to believe that the caregiver's Protective Capacity has changed.*

- Cook County child protection managers should ensure that supervisors remind investigators of the importance of requesting state identification in order to accurately complete background checks.

### Law Enforcement
- When child protection investigators contact a local police department for a copy of a report on a specific incident they should also ask about the availability of other reports.  Procedures 300, *Reports of Child Abuse and Neglect*, should be amended to reflect this recommendation.

- In instances where there is uncertainty as to the current status of criminal charges in cases involving violence or drugs with prior or pending convictions, child protection staff should contact the prosecuting attorney for more information.

- In child protection cases with a recent history or pattern of law enforcement involvement, a joint child protection safety planning conference should take place with law enforcement and child protection investigators within the first five days of the child protection investigation. Past and current information should be exchanged at the conference and participants should discuss how the information can be utilized to maintain the safety of the child in the future.

## CONTRACT MONITORING

- When reviewing audits of grantees, financial monitors must cease the practice of approving payment for overspending in non-substitute care programs, based on the same vendor underspending in other DCFS funded programs.

- When reviewing audits of grantees, audit line items should be compared against approved budget line items.  Deviations from the budget must be approved by Program Monitors before the audit is approved.  Unapproved expenses should be referred for overpayment recoupment.

- The Department of Children and Family Services should implement the following safeguards to their training and procedures:

  ➢ Vendors, grantees and contractors should be required to disclose all public contracts held by related parties in the Consolidated Financial Report (CFR). Instructions to the CFR should require contractors to report public funding of affiliates and related entities. Vendors, grantees and contractors should also be obligated to provide a description of programs supported by the public funding.

  ➢ Grants, contracts, program plans and independent audits should be electronically scanned, stored in a central location and made accessible to program and financial monitors for review.

  ➢ DCFS contract and financial monitoring training must be required for all DCFS program and financial monitors, as well as those reviewing annual audits, within three months of receipt of a contract monitoring assignment and every two years thereafter. Training should emphasize that the Program Monitor's *chief duty* is to verify, by personal knowledge, the receipt of goods and services provided.

  Any training should address, at minimum:
  ✓ General grant monitoring responsibilities;
  ✓ Reading audits including comparison of audit figures with approved budgets and related responsibilities;
  ✓ Approval of quarterly reports and related responsibilities;
  ✓ Rules and procedures regarding underspending and related responsibilities;
  ✓ Rules and procedures regarding disallowable costs and related responsibilities;
  ✓ Rules and procedures regarding reduction in grant amounts responsibilities;
  ✓ Rules and procedures regarding excess revenue and allowable offsets and related responsibilities; and

> ✓ Rules and procedures involving inquiries into expenses of related entities and related responsibilities.

> ➢ In addition, all DCFS program monitors should be required to certify that:

>> ✓ the report of direct versus administrative expenses has been verified and is appropriately allocated;
>> ✓ the program monitor has considered whether to reduce future contract or grant amounts based on under-spending or disallowable costs;
>> ✓ the quarterly reports have been reviewed and compared to the budget; and
>> ✓ the program monitor has reviewed and approved leases supporting rental costs.

> ➢ On a biannual basis, each DCFS Deputy Director must submit to the DCFS Director and the DCFS Division of Budget and Finance, a list of each contract monitored by his or her division and list the program monitor assigned to each individual contract. The DCFS Division of Budget and Finance should be required to cross-check the list to ensure that all contracts are assigned a program monitor, and also to ensure that all program monitors receive the required Contract Monitoring Training. Every six months the DCFS Division of Budget and Finance should be required to forward to the DCFS Office of the Inspector General a list of any unmonitored contracts.

- Contract monitors should be given access to background check screens so that they can be certain that those billing for services have passed required background checks prior to authorizing payment. Monitors should be required to check background screens prior to approving payments.

## LICENSING

- Rule 383, *Licensing Enforcement*, should be amended to provide that a new license application cannot be filed for 12 months following the Department's refusal to issue a new license after the expiration of a Conditional License.

## SERVICES

### Assessment

- The Department should maintain the Parenting Assessment Team program and should develop a funding mechanism to ensure the Parenting Assessment Teams are reimbursed for their work on partial assessments that could not be completed because of lack of parent or caseworker follow-through.

- The Agency Performance Team for Intact Family Services should measure the performance of Intact Family Services' follow-through regarding Parenting Assessment Team recommendations as part of their monitoring and oversight duties to ensure that all of the Parenting Assessment Team recommendations are incorporated into the family's service plan.

- Upon the Parenting Assessment Team accepting a referral, the DCFS Clinical Division must generate a letter to the referring caseworker's supervisor stating that the Parenting Assessment Team has accepted the case that the worker referred, that all Parenting Assessment Team recommendations that are made for the family must be incorporated into the family's service plan, and that if the worker or supervisor has any questions or concerns regarding the Parenting Assessment Team evaluations, process, or recommendations, they may contact the DCFS Clinical Division. The letter should be

copied to the APT monitor to alert them of the assessment so that they monitor for follow-through regarding the recommendations.

▪ The Parenting Assessment Teams should have easily identifiable, clear and articulate recommendations to facilitate caseworker oversight and increase the likelihood the recommendations are followed through, included in the service plan and recognized/ordered by court personnel. Rationales for the recommendations should be explained, and where applicable, broken down into tasks with a consideration of the potential obstacles to recommendation follow-through and ways to respond to the obstacles. Recommendations should be broken down into clearly identified tasks—general as well as specific—for the respective family members. Recommendations should also clearly identify tasks for the worker, to enable the worker to support and facilitate the family's positive changes. The Parenting Assessment Team could utilize a task planner to "map out a range of tasks" for each family member to pursue in order to resolve the identified problem, along with tasks for the worker to facilitate the family member's accomplishment of the task. (Reid, William J. (2000) *The Task Planner: An Intervention Resource for Human service Professionals*, Columbia University Press, New York.)

▪ The recommendations involving service delivery to clients with co-occurring mental illness and developmental delays should address common obstacles with this population by:

> ➤ Recognizing the challenges of securing appropriate services for this population;
> ➤ Scaling down client's tasks into manageable steps;
> ➤ Involving others to support the client

### *Domestic Violence*

▪ The Department should integrate into its Domestic Violence practice the need for increased scrutiny and heightened risk when a person suspected of being a victim of domestic violence has provided false information to protect an abuser of his or her child.

▪ The Domestic Violence protocol should be revised to address the cumulative effect of domestic violence and strategies for addressing cases of chaotic family life in which the victim/abuser dynamic results in an incalculable emotional toll to the children, including collaboration with the DCFS Clinical Division and Office of Legal Services.

### *Education*

▪ The Department should prohibit the use of any public funding for youths' enrollment in unaccredited educational institutions.

▪ The Department should require that wards sign a Release of Information for the Department to receive information from educational institutions on their academic progress.

### *Health*

▪ The Department should provide DCFS and private agency intact family services workers with a copy of the newly revised *Guide for Caseworkers and Caregivers: Caring for Children with Chronic Health Care Conditions*.  Using the Guide, intact family services workers should discuss the section relevant to the child's health condition with the family, and the intact services record should reflect the discussion.

- The Department should include intact family services workers as primary users of Policy Guide 2002.01: *Case Management Guidelines for Children's Asthma Management*.

- The Department's Agency Performance Team (APT) monitors should ensure that private agency intact family services managers review, Policy Guide 2002.01, *Case Management Guidelines for Children's Asthma Management,* and the guide on chronic health care conditions with intact services supervisors and workers.

- HealthWorks should obtain the results of newborn genetic metabolic screens on all children, regardless of their age, upon entering DCFS care.  If the results of the genetic metabolic screen are unavailable, the Department should ensure that the screen is completed during the HealthWorks Comprehensive Exam or by the child's primary care physician.

- The Department should ensure that children with sickle cell trait receive age appropriate genetic counseling from a sickle cell center.

- DCFS clinical staff need to assess whether mental health services are being provided to older wards identified as having a mental illness. A clinical staffing should take place after a psychiatric hospitalization of a ward. If the ward refuses to sign a consent for mental health information, DCFS Office of Legal Services should be notified in order to ask the court for an order to cooperate with services.

### Placement

- When new information is received that contradicts information in the Integrated Assessment the Department should have a mechanism for amending the original Integrated Assessment.

- The Department should explore a remedy that addresses reliance on self-reported information in the Integrated Assessment.  When there is a self report of out of state child welfare history during an Integrated Assessment, the Intake Coordinator should contact the Office of the Inspector General to request verification.

- A premature infant, compromised by a head injury and a possible heart defect, was left in a high risk sleeping situation for several days. The situation required an immediate response. The Department should notify all placement agencies of the need to have the immediate capability to respond to such high risk situations by providing portable cribs on a temporary basis.

### Teens

- The Department and the Teen Parent Services Network should ensure that children of parenting teen wards with a history of mental illness, substance abuse, violence, or developmental delays and who are not eligible for school or employment related daycare services, be enrolled at least two days a week in protective daycare.

- The Department and the Teen Parent Services Network should require a well being check, with consent, when a child of a teen ward misses daycare for two consecutive scheduled days.

- The Department and the Teen Parent Services Network should ensure that service providers develop a child care plan with the teen parent when the ward reports his or her child is on an "extended visit" or "out of state."

- The Department and the Teen Parent Services Network should work with service providers to develop casework practice that engages teen parents in discussions regarding the importance and benefits to providing the name, date of birth and address of their child's father, even in cases in which the ward and the father are no longer a couple.

- The Department should ensure that service providers make diligent efforts to engage teen fathers in case planning and encourage paternal involvement, including parent-child visits.

- Expectant fathers who are wards should be required to participate in Teen Parent Service Network training to reduce infant mortality by helping them recognize the stress and anger that can be provoked by an inconsolably crying child, and identify resources that can be immediately used to deescalate a stressful parenting experience.

- In any case where a mother has a history of severe mental illness and there is an Unusual Incident Report (UIR) for alcohol abuse, substance abuse, or domestic violence, the Teen Parent Services Network should, in addition to organizing protective day care, require quarterly clinical staffings to ensure the safety of the baby and effective treatment for the young parent.

- In order to assist wards to make informed decisions and educated choices about healthcare, the OIG will develop a resource guide in conjunction with the teen parent consultant for pregnant and parenting teens which will include information about Title X services and other specialized adolescent clinics/providers. All case managers servicing pregnant wards should receive training on the comprehensive healthcare services available to teens in order to inform their clients of available resources and provide the ward with an opportunity to visit these specialty clinics.

- Case managers with a pregnant or parenting ward on their caseload should provide transportation and incentives to ensure 100% attendance at pre-natal and post-partum appointments.

- The Teen Parent Services Network must maintain statistics on pre-natal and post-partum care visits and participation in the Women, Infants and Children (WIC) program.

- The Department should consider referring all 14-15 year-old female wards to a Title X teen clinic for a consultation on reproductive health and contraception education. All 14-15 year old male wards should be referred to a clinic with a community-based approach towards sexual health.

- All pregnant and parenting wards should be provided with a portable crib.

### *Wards*

- DCFS should assure that when wards turn 16 years of age, wards obtain State Identification Cards.

- As part of a ward's emancipation plan, the ward should receive a certified copy of his or her birth certificate.

- The Department should develop housing contracts with wards and enforce regulations addressing the use of drugs, alcohol, firearms, and violence. Institutional sanctions should be consistent across programs and the juvenile court should be immediately notified when a ward is violating housing contracts that threaten the safety or the well being of the ward. Housing contracts should make clear

that funding for the ward's apartment will stop and the court will be informed of transgressions involving criminal activity.

- The Department should require that wards sign a release of information for the Department to receive information from the educational institutions on the student's academic progress. With a ward's signed consent, DCFS should arrange to be notified of any of the following:
    - ➢ When a ward has voluntarily withdrawn from the university or has been required by the university to withdraw;
    - ➢ When a ward has been placed on academic warning;
    - ➢ When the ward's academic good standing or promotion is at issue;
    - ➢ When a ward engages in alcohol or drug-related behavior that violates school policies;
    - ➢ When a ward has been placed on disciplinary probation or restriction;
    - ➢ In exceptional cases when a ward otherwise engages in behavior calling into question the appropriateness of the student's continued enrollment in the university.

- The Department's Services Coordinators for the Sexual Behavior Problem Program (SBPP) should educate private agency service providers regarding registration and reporting requirements of juvenile delinquent sex offenders, and ensure the minor's compliance.

- For sex offending teen parenting wards, a risk assessment and risk management or safety plan must be completed and implemented when the ward enters transitional living or independent living programs. The assessment and plan must address the ward's offending behaviors, teen parenting needs, and mental health needs, and be reviewed annually with the Department's Services Coordinators monitoring these wards through the Sexual Behavior Problem Program. Deviations from the plan should be shared with the court.

## STATE CENTRAL REGISTER

- SCR should use a notification mechanism on all LEADS printouts that states that it is for DCFS use only and cannot under any circumstances be disseminated beyond the Department.

- For the safety of the worker and child, the State Central Register should notify local police when allegations include information about a large quantity of illegal drugs.

- The SCR Child Abuse Hotline recorded message requesting a caller to hold should be repeated throughout the wait period to assure callers that their call is important and will be answered as soon as the next operator becomes available.

- The State Central Register's notification letters of final findings to mandated reporters should list each final finding (indicated/unfounded) by allegation, and the identity of the perpetrator. The notification should also provide information regarding the mandated reporter's right to request an additional review of the findings.

# RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION

In FY 2011, the Inspector General recommended discipline of Department and private agency employees and termination or audit of Department contracts for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

## RECOMMENDATIONS FOR DISCIPLINE

### *Failure to Properly Assess Risk*

- A foster care worker failed to assess risk to a medically complex infant and two young children when she did not observe the children in the foster home within 72 hours even after being alerted to concerns in the home. The worker also failed to complete any documentation regarding her involvement with the family.

- A child protection investigator failed to assess risk to an infant born to a mother who had a child previously removed from her care. The child protection investigator failed to: (1) implement a safety plan; (2) read the prior investigation; (3) complete a risk assessment (CERAP) within 24 hours of seeing the alleged victim; and, (4) obtain supervisor's approval of the safe CERAP decision until seven days after the infant died.

- A private agency foster care supervisor and caseworker failed to service a pregnant/parenting ward with three children by not addressing family planning, options counseling, or educational resources. The worker and supervisor failed to create and enforce a plan to address the risk to the children created by the ward's high risk behaviors, which included running away, staying out all night and drug use.

### *Failures in Service Provision/Investigative Work*

- A child protection investigator failed to: (1) conduct a DCFS data search that would have revealed a prior history with DCFS; (2) obtain medical information regarding a minor's injury; (3) interview an adult family member with knowledge of the incident; and (4) identify all members of the household. The investigator included a case note in his investigation of an interview with a physician who had no involvement in the case.

- A private agency foster care worker falsified contact records and did not visit clients as required in the agency's Program Plan.

- A child protection investigator failed to take protective custody and implement a safety plan after a witness showed him digital images of a child's injuries. The investigator did not obtain and share the digital images of the child's injuries with his supervisor, or with the child's nurse practitioner; did not speak with the child's nurse practitioner and advise her of the numerous injuries witnessed on the child nine days prior to the nurse practitioner seeing the child; and inaccurately described the child's injuries in the record and in the Referral Form for Medical Evaluation of a Physical Injury to a Child.

- A child protection investigator failed to assess the appropriateness of a family's care plan to leave their two-year-old child with a babysitter who had an extensive history with DCFS, which included physical abuse, domestic violence, substance abuse and chronic inadequate supervision.

- A foster care worker deposited a ward's money into her personal bank account without approval from her supervisor and the ward's guardian *ad litem*. The worker also failed to document her actions in SACWIS.

- A private agency foster care worker failed to document observed injuries to a child and inform her supervisor; inaccurately reported to DCFS and police investigators that she had not observed any marks to the child since the child was returned home; and failed to provide services, including making unannounced home visits, confirmation of medical visits, confirmation of the child's attendance in school and/or day care, or request notification from the school of consecutive days absent.

- A private agency program manager instructed employees to avoid reporting to the Department when a ward was out of placement, resulting in unwarranted payments to the private agency. The program manager also failed to ensure that wards received quality programming and services, including education, medical care and family planning.

### Contract Monitoring

- A contract monitor failed to ensure employee background checks were conducted, failed to incorporate new procedures for tracking criminal background checks, and failed to verify education credentials when reviewing personnel files.

- A DCFS monitor and supervisor failed to adequately monitor a private agency's compliance with its contract and ensure that wards received quality programming and services, including education, medical care and family planning.

- A manager approved a quarterly payment to a private agency, despite knowledge that the agency had failed to provide proof that services were delivered.

- An assistant manager failed to discharge the duty of supervisor by verifying that goods and services were delivered prior to allowing the business manager to sign and process a quarterly payment and failed to ensure that employees of the agency completed criminal background checks.

- A business manager signed and processed a quarterly payment to an agency without verifying that any goods and services had been received and despite personal knowledge that the agency had not submitted adequate documentation of services to the contract monitor.

### Unprofessional Conduct

- An associate deputy director falsified academic credentials.

- A private agency employee violated DCFS Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services,* and the agency's confidentiality policy, when he posted client information on a social network internet site.

- A private agency supervisor violated DCFS Rule 431, *Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services*, and the agency's confidentiality policy, when she accessed SACWIS and gave client information to a co-worker that had no professional involvement with the client.

- A caseworker claimed to have spent the day responding to a notification that one of his clients was in lockup, when the lockup had occurred two weeks earlier. The worker could not be reached on the day in question and could not explain his whereabouts.

- A child protection investigator lied about case information to her supervisor and falsified SACWIS notes, a body chart, the home safety checklist and an intact family services referral. The investigator also forged the parents' signatures on two safety plans and on a Consent to Release Information form.

### Misuse of State Resources

- A child protection investigator used DCFS facilities for his private counseling business, failed to inform his current supervisor of secondary employment and ignored the conflicts of interest in secondary employment.

### Ethics Training

- An employee failed to complete the mandatory statewide ethics training program.

## CONTRACT TERMINATION or AUDIT

- A contractual agency submitted forged documentation to support billing for a related state agency, submitted false budgets reflecting staff that were never used for the programs, and hired staff without conducting background checks on employees.

- A contractual agency fraudulently collected board payments for a ward who was not residing in their program for at least 15 months and failed to report the ward's absence to the Department.  In addition the Executive Director reported that management and supervisors did not maintain timesheets, as required by the contract.

- An agency that was contracted with to provide post-adoption counseling to former wards was found to have submitted billing for services that did not occur and hired staff without ensuring criminal background checks were completed, including one therapist who had disclosed a felony theft conviction, based on theft of state funds just a few years prior to hire and another employee, hired to supervise the counselors, who had several felony drug convictions.  The investigation also disclosed that the staff person hired to provide supervision to the therapists did not have the required educational credentials to provide supervision, and had a felony drug conviction, and the Executive Director, who had the educational credentials, could not provide supervision because she had been living out of the country for the last two years and operated the agency through phone and e-mail correspondence with her employees.  Just after completing the investigation, the Inspector General learned that the Executive Director had been storing assault weapons at the counseling agency.

198

# COORDINATION WITH LAW ENFORCEMENT

## CRIMINAL PROSECUTION RESULTING FROM PRIOR INSPECTOR GENERAL INVESTIGATIONS

- *Former Deputy Director*

  In 2005, the Office of the Inspector General investigated a Deputy Director of the Department.  The investigation uncovered a scheme whereby the Deputy Director directed fiscal agents of Department contracts and others to direct payments for promotional goods to a company owned by the Deputy Director.  The investigation determined that the Deputy Director had diverted approximately $220,000 of funds intended for children and families for the benefit of his own company.  The case was referred to the Federal Bureau of Investigation.

  After the referral for federal investigation, the Deputy Director resigned his position with the Department, but remained active in child welfare.  The Inspector General was notified several years after the federal referral that the former Deputy Director was receiving Department funds as a subcontractor to a Department provider. The provider was one for which the Deputy Director had approved a large increase in the contract amount prior to leaving state employment.  The second Inspector General investigation disclosed that a large portion of the services actually provided by the former Deputy Director were disallowable as lobbying expenses.

  In September 2010, the former Deputy Director was federally indicted for fraud arising from the facts disclosed in the Inspector General investigation and a subsequent investigation by the Federal Bureau of Investigation.  In October 2010, the former Deputy Director pled guilty and on February 17, 2011, he was sentenced to federal prison for a six month term to be followed by an additional six months of home confinement.  He was ordered to pay $84,469 in restitution.

- *Contractor for Drug Analyses*

  In January 2007, the Inspector General reported on the activities of a contractor hired to perform drug analyses for Department clients.  The Inspector General's investigation found that the contractor had billed for significant numbers of "ghost" clients, who had not been tested by the contractor.  In one year, the Inspector General found that the contractor had billed for over $400,000 in "ghost" charges.  The Inspector General referred her findings for criminal prosecution and recommended that the Department end its contracting relationship with the agency and its principal.  On August 22, 2011, the principal of the contractor, pled guilty to Class 1 Felony Theft.  She was sentenced to 48 months probation, 1500 hours of community service and ordered to pay restitution of $125,000 plus approximately $70,000 in fines and costs.  A civil judgment in the amount of $268,105 was also obtained against the contractor and its principal by the Attorney General's Office on behalf of the State of Illinois.

- *Child Death*

  In 2010, the Inspector General investigated a child death in which no one had been charged with the homicide.  Although the child was killed under circumstances that suggested homicide, charges had never been issued because the autopsy was performed by a doctor, who was not Board Certified as a Forensic Pathologist, who had determined the child's death to be from natural causes.  The Inspector General's Office sent the autopsy results to two Board Certified Forensic Pathologists who agreed that the child's death should have been classified as a homicide.  The Inspector General prepared a report, sharing its findings and recommending that the Department insist that autopsies of child deaths be conducted only by Board Certified Forensic Examiners.  The Inspector General

shared her report with local police, who reinvestigated the child's death and charged the boyfriend of the mother with murder. Other persons who were aggrieved by the county coroner's choice of a doctor who was not Board Certified as a Forensic Pathologist came forward.  Subsequent to the Inspector General's Report, the local State's Attorney initiated an investigation into the autopsy practices within the Coroner's Office.  Ultimately, the County Coroner agreed to stop contracting with the non-certified doctor for performing autopsies.

## REFERRALS FOR FURTHER INVESTIGATION

- The Office of the Inspector General referred an investigation for criminal prosecution in which a contractor of the Department submitted forged and fraudulent supporting documentation for state funding and received funding from the Department for "ghost" positions and expenses.  In addition, the contractor received funding from multiple governmental entities for the same services.

- The Office of the Inspector General referred a private agency post-adoption counselor to the Cook County State's Attorney's Office for prosecution of felony theft charges.  The counselor had billed the Department for services that were not provided.

- The Office of the Inspector General referred a sexual misconduct case against a physician to the Department of Professional Regulation.

- The Office of the Inspector General referred a case of suspected unemployment fraud to the Illinois Department of Employment Security.

- The Office of the Inspector General contacted local police when a former employee called several DCFS employees threatening harm to staff and property, and blaming DCFS for her problems.

## COORDINATION WITH LAW ENFORCEMENT

- The Office of the Inspector General coordinated with federal law enforcement when a complainant presented information which may have been relevant to a pending federal investigation.

- The Office of the Inspector General coordinated with a multi-county narcotics enforcement group on behalf of the Department when an employee was arrested.

- The Office of the Inspector General coordinated with local police on behalf of the Department after an employee was arrested on a fraud warrant.

- The Office of the Inspector General coordinated with a county sheriff's office on behalf of the Department when an employee was arrested on a warrant for theft of funds.

## REQUESTS FOR ASSISTANCE

- The Office of the Inspector General provided assistance to the Public Defender's Office in Tucson, Arizona by locating information in a capital murder case.

- The Office of the Inspector General for the Social Security Administration requested assistance from the Office of the Inspector General in three pending federal fraud cases.

- The Office of the Inspector General assisted an investigator from the Illinois Attorney General's Office who was investigating a fraudulent billing case with Department connections.

- The Office of the Inspector General assisted an investigator from the Office of the State's Attorney of Cook County in locating a child protection investigator who was needed as a witness in a trial.

- The Office of the Inspector General assisted an Illinois State Police Officer performing a background check on a candidate for the Illinois Gaming Board.

- The Office of the Inspector General assisted the Independent Police Board in obtaining needed information on the assigned investigator and supervisor investigating a police officer reported to the hotline for abuse of his son.

202

# DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The Inspector General made the following recommendations in previous Fiscal Years, but the recommendations were not fully implemented before the Annual Report was issued.  The current implementation status of these recommendations is detailed below in the following categories.

- Child Protection
- Child Welfare Employee Licensure (CWEL)
- Contract Monitoring
- Foster Home Licensing
- Information Technology
- Law Enforcement
- Legal
- Medical
- Mental Health
- Personnel
- Services

## CHILD PROTECTION

**The Department should develop and incorporate into its trainings and rules and procedures information regarding polygraphs for child protection staff (from OIG FY 10 Annual Report, Systems Investigation 1).**

> *FY 10 Department Response:* The Department agrees. Procedure 300, *Reports of Child Abuse and Neglect*, is being revised to incorporate procedures regarding polygraph examinations. The Department's Office of Training has begun training staff on the proper procedure and protocol for the use of polygraphs.

> *FY 11 Department Update:* The recommendation has been incorporated into draft Procedures 300, *Reports of Child Abuse and Neglect*.  The targeted implementation date is June 2012.

**The Department should articulate its position regarding the use of polygraph examinations and refusal to submit to polygraph testing in child protection investigations.  The Department's position should consider prohibiting the use of polygraph results or refusals as determining factors in the evidence or rationale to indicate or unfound an investigation (from OIG FY 10 Annual Report, Systems Investigation 1).**

> *FY 10 Department Response:* The Department agrees. There is an existing DCFS policy prohibiting the use of polygraphs in child protection investigations which comports with this recommendation.  A memorandum reiterating this policy was issued.  Department Procedure 300.60, *The Formal Investigative Process*, is also being revised to reflect this.

*FY 11 Department Update:* In December 2010, the Department issued policy transmittal 2010.21 *Revised Procedures 300.60, The Formal Investigative Process* to address this recommendation.

**The Department should amend Rule 431.30, *Maintenance of Records*, to maintain unfounded reports that are currently kept for only 30 or 60 days for a period of 12 months following the date of the final finding.  The Illinois Child Death Review Team Executive Council concurs with this recommendation (from OIG FY 09 Annual Report, General Investigation 11).**

*FY 09 Department Response:* The Office of Legal Services reviewed this issue and concluded that a legislative change is required to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding.  The Office of Legal Services has drafted and submitted proposed legislation amending the Abused and Neglected Child Reporting Act that has been approved by the Director.

*FY 10 Department Update:* The Office of Legal Services submitted a legislative proposal amending the Abused and Neglected Child Reporting Act (ANCRA 325 ILCS 5) to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding.  Proposed legislation was included in our legislative package for the Spring 2010 Session.  The Department anticipates that the legislative process and subsequent revision to Rule 431.30, *Maintenance of Records*, can be completed by the second quarter of 2011.

*FY 11 Department Update:* The Abused and Neglected Child Reporting Act (ANCRA 325 ILCS 5/7.7 and 7.14) was amended and now requires that unfounded reports be maintained for 12 months. The Department is in the process of revising Rule 431.30, *Maintenance of Records,* to reflect this change.

**With all allegations, indicated or unfounded, the post-adoption unit or the adoption agency must assess the continued suitability of the caretakers (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

*FY 09 Department Response:* The Department agrees that adoptive suitability must be reassessed after a child protection investigation, whether indicated or unfounded. The child protection investigative findings are critical to such a determination.  Management is working to ensure that communication and access to relevant child protection investigations is provided as needed for adoption and guardianship decisions of continued suitability.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Child protection information is now being shared with post adoption and follow-up staff. Notification of an investigation is sent by the hotline to the post adoption supervisor and statewide post adoption/guardianship administrator. Post adoption staff contact the child protection investigator to gather information and once the investigation is completed post adoption staff request a reassessment of the adoptive parent and refer for services as appropriate.

**The Department must review B.H. investigative caseload levels on a quarterly basis to determine whether there is substantial compliance with the B.H. Consent Decree and whether there are**

**pockets of areas or offices where non-compliance levels put children at risk (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 09 Department Response:* The review is currently being conducted.

> *FY 10 Department Update:* DCFS Legal continues to work with DCP on this issue.

> *FY 11 Department Update:* DCFS Legal continues to work with DCP on this issue.

**The Department must ensure that notifications of investigation findings to mandated reporters from the State Central Register conform to Rule 300.130, *Notices Whether Child Abuse or Neglect Occurred*, and include the name of the child victim (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 08 Department Response:* The Department agrees.  Implementation of this recommendation is in progress.

> *FY 09 Department Update:* This requires a change to the Statewide Automated Child Welfare Information System (SACWIS), since the letter is generated in SACWIS.  Several notification letters will need to be changed and all changes will be made at the same time.  A meeting will be convened in January 2010 between the Office of Legal Services, the Division of Child Protection and the State Central Register to make revisions.

> *FY 10 Department Update:* The Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit.  Litigation is currently in the final stages. The anticipated completion date is summer 2011.

> *FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

**The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate.  Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending and completed investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 09 Department Update:* A policy/information transmittal is being developed to notify staff.

> *FY 10 Department Update:* The DCFS Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit.  Litigation is currently in the final stages.  The anticipated completion date is summer 2011.

> *FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

**As previously recommended by the Office of the Inspector General in FY 2007, Department procedures should be amended to require that in child protection investigations in which the plan is for a family member to obtain private guardianship of the child/ren, the family should be referred to the Extended Family Support Program (EFSP) for assistance in securing private guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 08 Department Response:* The Service Intervention Deputy has reviewed and approved the draft procedure. The procedure has been sent to the Office of Child and Family Policy for the revision process.

> *FY 09 Department Update:* The Department studied the Procedure and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year. The Division of Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response: The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region. The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

> *FY 10 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

> *FY 11 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

**Extended Family Support Program (EFSP) Managers should meet with Child Protection Program Managers and Supervisors to assure an efficient referral process. Training should take place once the Extended Family Support Program Plan is finalized (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 08 Department Response:* The Department has drafted a request for proposal for a statewide Extended Family Support monitoring agency. One of the responsibilities of the contracted monitoring agency will be to provide training to DCFS staff on the Extended Family Support Program.

> *FY 09 Department Update:* The Department studied the Procedures and determined that the change could increase the Extended Family Support Program budget by as much $400,000 per year. Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response: The Department should explain the necessity of establishing a contracted monitoring agency in order to provide training to DCFS staff on the Extended Family Support Program. The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region. The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

*FY 10 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

*FY 11 Department Update:* The recommendation has been incorporated into draft Procedures 302.385, *Extended Family Support Program*. Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

**The Division of Service Intervention should meet with management to address targeted training on the Substance Affected Family Policy, Procedure 302, *Services Delivered by the Department*, Appendix A- *Substance Affected Families* (2006) and the use of short-term guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 14).**

*FY 08 Department Response:* The Department agrees. The Division of Service Intervention will meet with the Division of Child Protection Management to develop and implement a training. DCFS Investigative and Intact staff in the Cook Regions will be trained beginning in December 2008.

*FY 09 Department Update:* The Substance Affected Family Policy was incorporated into the Reunification Training, and the Division of Child Protection will conduct a training on short term guardianship.

*FY 10 Department Update:* Trainings are being scheduled beginning January 2011.

*FY 11 Department Update:* Trainings were held in March and April 2011.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Response:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The targeted date of completion is May 2008.

*FY 08 Department Update:* The Office of Legal Services has assigned an attorney to draft amendments to the Abused and Neglected Child Reporting Act (ANCRA), which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The anticipated date of completion is February 2009.

*FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update:* Amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Spring Session 2011.

*FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

**Department Procedures should be amended to include a provision that when someone walks into a Department office with a concern about child abuse or neglect, they should be invited into the office to make a hotline report or to talk to an investigative supervisor if they have questions or concerns about making the report (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Update:* The Office of Child and Family Policy has forwarded the final draft of Procedures 300, *Reports of Child Abuse and Neglect*, to the Division of Child Protection. The Procedures 300 workgroup is reviewing the final draft.

*FY 07 OIG Response: The final draft of Procedure 300 does not contain language that addresses this recommendation.*

*FY 09 Department Update:* The issue has been addressed in a revised draft of Procedure 300, *Reports of Child Abuse and Neglect*.

*FY 10 Department Update:* Amendments will be made to include language on handling anyone "walking" into a DCFS office with information that might constitute a child abuse/neglect report. The estimated date of completion is January 2011.

*FY 11 Department Update:* Policy Transmittal 2010.22, *Revised Procedures 300.20 and 300.100,* was issued and distributed December 14, 2010.

**The Department should ensure that child protection investigations, both unfounded and indicated, are not expunged while a subsequent investigation, involving the same family, is pending (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* The Department is considering whether to pursue a change in legislation to implement this recommendation.

*FY 08 Department Update:* The Department is continuing to examine this and other legislative amendments to ANCRA.

*FY 09 Department Update:* The Department has drafted proposed legislation to be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update*: The Department is continuing to examine this and other legislative amendments to the Abused and Neglected Child Reporting Act (ANCRA).

*FY 11 Department Update*: Proposed changes to the Abused and Neglected Child Reporting Act have been drafted and will be submitted during the Spring 2012 legislative session.

**The Department should ensure that available fathers be explored as potential placements. If a safety plan is likely to last longer than six months, the Department should facilitate a legal**

**relationship between the child and the caretaker (from OIG FY 06 Annual Report, General Investigations 11).**

> *FY 06 Department Response:* A committee has been formed to revise the safety assessment process. The committee continues to work on the safety assessment framework protocol. Targeted completion date is June 2007.

> *FY 07 Department Update:* The Child Endangerment Risk Assessment Protocol (CERAP) draft, currently being field tested, directs the attention of the worker to consider available fathers as potential placements.

> *FY 08 Department Update:* The Child Endangerment Risk Assessment Protocol draft provides that non-custodial parents should be identified and assessed first for potential out-of-home placement when a safety plan is needed.

> *FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 09 OIG Response: According to the most recent data, just over 100 families have been referred statewide to agencies that the Department contracts with to provide services to fathers. The Department needs to encourage broader participation for fathers of DCFS involved children.*

> *FY 10 Department Update:* The recommendation has been incorporated into the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

> *FY 11 Department Update:* The training for Enhanced Safety Model began in the Fall of 2011 and will be completed in Spring 2012. The Enhanced Safety Model includes prompts to be sure that available fathers are considered as placement options. However, the Enhanced Safety Model does not include facilitating a legal relationship with substitute care givers should the safety plan last longer than 6 months. This facilitation of a legal relationship between the substitute caregiver and the children will be considered by the incoming Director in consultation with the Office of Legal Services.

**The State Central Register should revise the Notice of Indicated Finding sent to parents to ensure that parents know the identity of the indicated perpetrator or whether the allegation was indicated to an unknown perpetrator (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 6).**

> *FY 05 Department Response*: This recommendation is under review by the DCFS Office of Legal Services because of the impact it may have on the DuPuy Federal lawsuit.

> *FY 06 Department Update*: Revisions are on hold pending implementation of the changes required by the DuPuy Federal lawsuit. Changes will be implemented as soon as possible, but no later than July 17, 2007.

> *FY 07 Department Update:* Revisions were placed on hold by the Office of Legal Services due to changes required by DuPuy Federal Lawsuit. As of November 2007, litigation is ongoing and it appears additional changes to the notice form may be required. The Office of Legal Services will

continue to monitor and will draft an updated form when legal issues have been resolved.  The anticipated implementation date is May 2008.

*FY 08 Department Update:* Revisions to the notification letter are in process and will be completed by June 2009.

*FY 09 Department Update:* Recommendation in progress. Estimated completion date: Summer 2010.

*FY 10 Department Update:* Implementation was delayed due to ongoing litigation now in final stages.  The estimated completion date is Summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.

**A third box should be added to each safety factor in the Child Endangerment Risk Assessment Protocol (CERAP), acknowledging that information for that factor may be "unknown" or "uncertain" and add a section at the conclusion of the factors list for identifying information that needs to be gathered in the future to further assess safety (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 07 Department Response:* The current draft Child Endangerment Risk Assessment Protocol (CERAP) that is being field-tested provides two assessment tools. The first is used at the outset and permits workers to note that more information is needed before the question can be answered.

*FY 08 Department Update:* The current draft of the initial CERAP acknowledges the option that more information is needed to assess safety.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012.

**Devise a supervisory form to accompany the safety assessment that would allow a supervisor to determine the source of information that formed the basis of the particular safety factor decision and provide a check that basic available objective sources (such as the hotline report, prior child protection investigations, police reports and interviews with police, and criminal history information) as required by Administrative Procedure 6 (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 08 Department Update:* The current draft CERAP identifies the source of the information.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation will be incorporated in the draft Safety Enhancement Protocol *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for the Enhanced Safety Model began in the Fall of 2011 and will be completed in Spring 2012. The ability of the supervisor to review and approve the source of the information has been incorporated into the Enhanced Safety Model in SACWIS.

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information.  Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours.  The Department should develop procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

*FY 07 Department Update:* The draft Child Endangerment Risk Assessment Protocol, currently being piloted, addresses this recommendation.

*FY 08 Department Update:* The recommendations resulting from the pilot were submitted to the Safety Workgroup, which is meeting regularly to incorporate these recommendations. There is a possibility of some additional slight modifications to incorporate the recent Department focus on Trauma-Informed practices. Procedures 300, Appendix G: Safety Assessment Enhancement, has been revised and will be implemented when changes to SACWIS are completed. The anticipated date of implementation is July 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment*. The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012. The Enhanced Safety Model allows the investigator to complete an initial Safety Assessment that includes gathering additional information before completing the assessment.

**DCFS Procedure 300, *Reports of Child Abuse and Neglect*, should be amended to provide that the decision to take protective custody of a child whose parent is receiving services from the Department (e.g., intact family, independent living, or residential programs) must include consideration of the degree of the parent's cooperation with services and the extent to which services provided address the allegation (from OIG FY 04 Annual Report, Death and Serious Injury 19).**

*FY 04 Department Response*:  The Child Endangerment Risk Assessment Protocol (CERAP) Advisory Council is currently reviewing the CERAP.  The OIG recommendations will be shared with the group at their next meeting, January 2005.

*FY 05 Department Update*:  Procedure 300.80, *Delegation of the Investigation*, has been revised and the draft includes this consideration.  The Office of Legal Services is currently reviewing Procedures 300, *Reports of Child Abuse and Neglect*, and it is projected all related tasks will be complete by Spring 2006.

*FY 06 Department Update*:  The Division of Child Protection Committee has not completed its review and final revisions to Procedures 300, *Reports of Child Abuse and Neglect*.  Once completed, these will be returned to the Office of Child and Family Policy to begin the process of approval from the Joint Commission on Administrative Rules (JCAR).  Implementation date: Spring 2007.

*FY 07 Department Update:*  The Office of Child and Family Policy has forwarded the final draft of Procedures 300, *Reports of Child Abuse and Neglect,* to the Division of Child Protection.  The Procedures 300 workgroup is reviewing the final draft and expects completion by December 2007.

*FY 08 Department Update:* The internal and external review of Procedures 300, *Reports of Child Abuse and Neglect,* has been completed and comments were forwarded to the Associate Deputy for review. The revisions to Procedures 300, *Reports of Child Abuse and Neglect* are expected to be finalized by January 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation will be incorporated in the draft Safety Enhancement Protocol, *Procedure 300, Appendix G: Child Endangerment Risk Assessment.* The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012.

**OIG FY 04 Annual Report, Death and Serious Injury Investigation 24 included the following six recommendations (labeled below a-f).  The responses and updates follow the six recommendations.**

**a) The Procedure for the allegation of Poisoning (#6/56) should include information from literature:**

- **Common sources of intentional poisoning of children include:  ipecac, laxatives, black and red pepper, salt, water (intoxication), acetaminophen and aspirin, insulin, adult prescription drugs (e.g. barbiturates, antidepressants, diuretics), alcohol and illicit drugs, and arsenic;**

- **Common symptoms associated with intentional poisoning include: chronic diarrhea, vomiting, lethargy, dehydration, and seizures;**

- **Intentional poisoning has an extremely high mortality rate and when found, children who are intentionally poisoned should not be left with the perpetrator.**

**b) The Department should establish guidelines for the investigation of abusive poisoning cases and suspected Factitious Disorder by Proxy cases in accordance with the published literature.**

Allegations should be amended to provide that in cases where intentional poisoning is suspected, the investigator should also suspect and investigate Factitious Disorder by Proxy.

c) **Department Procedures should acquaint workers with the following critical information necessary to investigate Factitious Disorder by Proxy:**

- Critical to any investigation of poisoning, and especially Factitious Disorder by Proxy, is a detailed determination of who provides care for the child when;

- Investigators must retrieve all available medical records for the affected child and siblings; an affidavit of history care, completed by the parents, will be a useful first step in attempting to get all available records;

- While not dispositive, the typical perpetrator is a mother who has some medical background;

- Typically, perpetrators of Factitious Disorder by Proxy appear particularly bonded with their children and are particularly adept at convincing professionals of their sincerity and abiding interest in their children;

- Most victims of Factitious Disorder by Proxy are infants and toddlers;

- As much as 98% of the time, the perpetrator continues victimizing the child in the hospital;

- The most common presentation of Factitious Disorder by Proxy is apnea. Other common presenting conditions include seizures, bleeding, central nervous system depression, diarrhea, vomiting, fever (with or without sepsis or other localized infection), and rash. Probably the most common cause of death in homicidal Factitious Disorder by Proxy is suffocation, but there are many causes of death, among which are poisoning with various drugs, inflicted bacterial or fungal sepsis, hypoglycemia, and salt or potassium poisoning;

- Factitious Disorder by Proxy is not limited to directly causing conditions (e.g. poisoning and suffocation); it may also include, over and under reporting signs or symptoms (e.g. exaggeration of symptoms), creating a false appearance of signs and symptoms (e.g. tampering of specimens) and/or coaching the victim or others to misrepresent the victim as ill (Ayoub, et al., 2002). The presence of valid illness does not preclude exaggeration or falsification (Ayoub, et al., 2002).

d) **A Factitious Disorder by Proxy investigation should include a thorough review of available medical records for all children in the family. If a child abuse team is available at the treating hospital, they should conduct the review. If a child abuse team is not available, this review should be conducted by DCFS nurses and should be subject to the following procedures:**

- Interview medical personnel regarding symptoms. If intentionally caused, how long after administration would symptoms be expected to occur? How long would symptoms be expected to last per dose?

- Determine context of onset of symptoms. Who is present prior to onset of symptoms?

- Prepare a medical chronology of symptoms, charting the onset of symptoms and the access of possible perpetrators;

- Do siblings' records contain evidence of false pediatric reporting?

- Interview treating doctor to determine whether appropriate laboratory tests have been ordered to detect the presence of poisons or emetics.

e) **Whenever investigators suspect intentional poisoning or Factitious Disorder by Proxy, an immediate referral must be made to law enforcement and the State's Attorney.**

**f) Whenever investigators suspect intentional poisoning or Factitious Disorder by Proxy, investigators must employ a multi-disciplinary approach that includes sharing of information and frequent contact with law enforcement and any child abuse team at the hospital. If no child abuse team is available, the investigator and DCFS nurse must maintain an open dialogue throughout with treating medical professionals to ensure sharing of all information.**

*FY 04 Department Response*: A workgroup was convened to revise and update Procedures 300, *Reports of Child Abuse and Neglect*. Reference to allegations 5/56, 15/65 and 10/60 will be included in the draft protocol for conducting investigations when Factitious Disorder by Proxy is suspected. The workgroup decided not to limit Factitious Disorder by Proxy to the poison allegation. Completion date: April 2005.

*FY 05 Department Update*: The draft policy is complete. It was reviewed with the OIG for final comments and subsequent revisions. Distribution to staff is expected within the first quarter of 2006.

*FY 06 Department Update*: The Division of Child Protection Committee has not completed its review and final revisions to Procedures 300, *Reports of Child Abuse and Neglect*. Once completed, these will be returned to the Office of Child and Family Policy to begin the process of approval from the Joint Committee on Administrative Rules (JCAR). Implementation date: Spring 2007.

*FY 09 Department Update*: Rule 300 is currently being reviewed by the Joint Committee on Administrative Rules and Procedures 300, *Appendix B, Child Abuse and Neglect Allegations*, is being revised.

*FY 10 Department Update:* This information has been incorporated into draft Procedures 300, *Reports of Child Abuse and Neglect, Appendix K- Factitious Disorder by Proxy*. The anticipated date of completion is July 2011.

*FY 11 Department Update:* The draft policy on Factitious Disorder by Proxy/Medical Child Abuse is still under review. Upon completion the policy will be incorporated into Procedure 300, Appendix B, Allegation #10-*Substantial Risk of Physical Injury/ Environment Injurious to Health and Welfare by Abuse* and #60-*Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect*, as well as issued as a separate Policy Transmittal.

## CHILD WELFARE EMPLOYEE LICENSURE (CWEL)

**The OIG recommended that Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant licensure revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**

- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue a license to include any crime of which dishonesty is an essential element;**

- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**

- **To provide guidelines for assessing whether certain unbarred criminal convictions and abuse or neglect findings should prevent licensure because of the characteristics of the crime;**
- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

> *FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*. The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

> *FY 08 Department Update:* The revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

> *FY 09 Department Update:* The amended Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

> *FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first notice again by January 2011, subject to approval.

> *FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, to provide specific provisions for voluntary relinquishment of a Child Welfare Employee License (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**

- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**

- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the CWEL Division. The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings. Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished his or her license shall be considered a Request for Reinstatement rather than an Application for License.**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Revisions to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisor,* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors,* with the Joint Committee on Administrative Rules.

**Section 412.100,** ***Restoration of Revoked or Suspended License***, **should be amended as follows: Section 412.100,** ***Restoration of Revoked, Suspended or Relinquished License***: **A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request.  In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation.  For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown.  The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so.  Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to:  the nature of the offense for which the license is revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License,* was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rules 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* with the Joint Committee on Administrative Rules.

**CONTRACT MONITORING**

**Mentoring program plans for the Department's Youth Stabilization Network should include requirements for the number of contacts with identified youth, the percentage of participating youth and a requirement for open communication with residence staff.  The contracts must be monitored to trigger program audits when the requirements are not met (from OIG FY 10 Annual Report, General Investigation 6).**

> *FY 10 Department Response:* The Office of Contract Administration will work with the Division of Service Intervention and the Deputy Director to update program plans for FY 2012.

> *FY 11 Department Update:* The Office of Contract Administration staff will continue to work with Division of Service Intervention staff to update the program plans and amend them into contracts during fiscal year 2012.

**Subcontractors under Department contracts should be subject to the same transparency as contractors.  All subcontracts to Department contracts should be listed and available for public viewing on the internet (from OIG FY 10 Annual Report, General Investigation 2).**

> *FY 10 Department Response:* The Department agrees.  The Budget and Finance Division will work with the Office of Communication to determine if this is possible through the current system developed for public viewing of contracts on the internet.  An initial discussion was held and anticipated resolution is in 2011.

> *FY 11 Department Update:* Contract Administration and Office of Information Technology Services staff will meet to determine how to implement this recommendation utilizing the Department's current technological systems.

**Instructions and training for Consolidated Financial Reports should require agencies to disclose all sources of public financing and allocate accordingly.  Consolidated Financial Reports must be critically reviewed to ensure that costs are appropriately allocated to various programs and that funding is not duplicated (from OIG FY 10 Annual Report, General Investigation 2).**

*FY 11 OIG Update: The Office of Inspector General is working with the Department to implement this and other FY 11 OIG recommendations to strengthen contract monitoring.*

**For non-foster care agencies, contract monitors must be required to visit the site where services are being provided to determine which staff provide direct service and to ensure that services are being delivered (from OIG FY 10 Annual Report, General Investigation 2).**

> *FY 11 Department Response:* The Office of the Inspector General is working with the Department and the Office of the Attorney General to develop fraud detection training for Contract Monitors.

**Contracts should require quarterly reports from mentoring and counseling agencies on progress toward achievement of program plan goals, both in relationship to individual clients and, in the**

**aggregate, for all clients served under the contract (from OIG FY 08 Annual Report, General Investigation 24).**

> *FY 08 Department Response:* The Department agrees.  Revised requirements will be included in FY10 contracts.

> *FY 09 Department Update:* The Department continues to include revised requirements in contracts.  The estimated date of completion is July 2010.

> *FY 10 Department Update:* Implementation of the recommendation is still in progress.

> *FY 11 Department Update:* The standardized counseling program plans are currently under review for inclusions of changes to program plan goals and submission requirements. In addition, the Office of Contract Administration will continue to work with other Divisions to make needed changes to their non-standardized program plans to meet this requirement. Fiscal year 2013, (effective July 1, 2012) counseling and mentoring contracts should reflect this recommendation.

*FY 11 OIG Response: The OIG reviewed the standardized program plan submitted by the Department and determined that it contained many of the same problems identified in two recent OIG fraud investigations. Specifically, the program plan does not require that the agency serve DCFS-involved families (such as intact families, subsidized guardianship families, teen parents and their significant others). The quarterly reports required in the program plan fail to provide objective measures of services provided, such as number of DCFS clients served, hours and type of services provided and progress toward achieving set goals. In addition, the program plan promises counseling and casework services, but provides for staff without the credentials to offer such services. While mediation is an offered service, the program plan does not specify training or certification for mediators.*

**Drug and alcohol toxicology contracts should be competitively bid (from the OIG FY 07 Annual Report, General Investigation 1).**

> *FY 07 Department Response:* The Department agrees. This will be implemented with fiscal year 2009 contracts.

> *FY 08 Department Update:* Due to the program plan and protocol changes, this service was not bid in FY 2009. It is anticipated that the service will be out for bid in fiscal year 2010.

> *FY 09 Department Update:* Due to retirement and staff changes and the new committee that developed recommendations, it is still anticipated that services will be put out for bid for fiscal year 2011.

> *FY 10 Department Update:* The Procurement Office is preparing to release the request for proposals (RFP) in February 2011 and the award is expected in fiscal year 2011.

> *FY 11 Department Update:* The Procurement Office posted the Invitation For Bid for toxicology contracts but the Invitation for Bid was cancelled by the State Procurement Officer. The Office of Contract Administration and the Procurement Office are working to resolve questions received from potential vendors before reposting the Invitation for Bid.

**The Department must immediately ensure that no further advance payments are issued without procurement of a surety bond and without signed verification that the expected billings and proposed budget will support timely repayment of the advance.  Contract monitors must ensure that contractors are not incurring needless expenditures, such as the rental payments that the new agency incurred (from OIG FY 06 Annual Report, General Investigations 13).**

> *FY 11 Department Update:* The Department revised the fiscal year 2012 standardized contract to require surety bonds. The Director may authorize advance disbursements for any new program initiative to any agency contracting with the Department. As a prerequisite for an advance disbursement, the contractor must post a surety bond in the amount of the advance disbursement and have a purchase of service contract approved by the Department. The bond must be submitted within 10 days of the effective date of the contract and must be from a surety licensed to do business in Illinois by the Illinois Department of Insurance or other applicable regulatory entity. An irrevocable letter of credit from an Illinois financial institution in good standing is an acceptable substitute.  The form of surety must be acceptable to the Department.

**The Department must separately track all advance payments and ensure they are repaid in a timely manner (from OIG FY 06 Annual Report, General Investigations 13).**

> *FY 11 Department Update:* The Department has implemented a new reconciliation program to be utilized for all contracts effective fiscal year 2012. The reconciliation program has a field to enter revenue to the vendor and the grantee. After all entries are made the program notifies the Department of any overpayment which in turn results in the Department requesting repayment.

**The Department must develop a reliable Contract Monitoring process that would provide checks and balances and separation of functions to prevent the abuses.  The process must include (from OIG FY 06 Annual Report, General Investigation 12):**

- **Quarterly review of expenditures to ensure that expenditures were related to the Contract**;
- **Quarterly review of services, to ensure that the goods or services were provided;**
- **Contractual and Rule requirement that any contractual spending for services or items not specifically covered under the Contract must be approved, in writing, by the Contract Division;**
- **Lapsed funds and obligation of funds must be approved in writing by the Contract Division.**

> *FY 11 Department Update:* Standards for each contract and responsibilities are in place.  Training for fiscal year 2012 started in October and will be completed this year. The OIG is continuing to work with the Attorney General to develop targeted monitoring and fraud detection training.

**The Department must develop specific guidelines for disbursement when Fiscal Agents are used. The guidelines must include checks and balances to ensure that Fiscal Agents ascertain that the services or goods for which they issue checks have been provided.  The use of Fiscal Agents must also be monitored by the Contracts division to ensure separation of functions.  Fiscal Agents must understand that their role is not limited to check-writing and that they maintain fiduciary responsibility for expenditure of public funds (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 11 Department Update:* The Department will add the following language to the program plan of each fiscal agent agreement effective July 1, 2012 as part of the fiscal year 2013 contracts, "If the contract is an agreement that allows for a fiscal agent, the program plan must reflect that all disbursements must be to or on behalf of the private agency for which the fiscal agent acts and all disbursements must be evidenced by signed certifications that the services or goods were delivered and used for the fulfillment of the program plan. This must be reflected in the program plan and completed by signing the contract that includes this certification." In addition the Department will add similar language to the boiler plate and sub-contract agreements to ensure that each agreement has been completed and both fiscal agent and sub-contractor are required to certify that funding and disbursements made are evidenced by signed certifications that the services or goods were delivered and used for the fulfillment of the contracted program.

**The Department needs to systematically track public monies spent by contractors through subcontracts. The Department must be able to track who is ultimately responsible for providing services and who is ultimately receiving DCFS funds, in order to guard against conflicts of interest and double-billing (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 11 Department Update:* The Department will attempt to implement this recommendation if/when funding is available for additional staff to manage the subcontractors' funding.

**The Department must develop a conflict of interest protocol, whereby entities are identified that the Department should not be contracting with, because of conflicts of interest, and the Department must purchase anti-conflict software that would identify Department funds expended on prohibited entities, similar to the practice at law firms (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 11 Department Update:* The Department maintains a Barred Vendor List of vendors that may not contract with the Department based upon past inappropriate activity. Contract Administration examines all contractors and subcontractors to determine if any State or Federal debt is owed by the potential vendor that would prohibit contracting with the Department. The Conflict of Interest Committee also reviews any other possible vendor conflict to determine if the issue prohibits contracting with the Department.

**FOSTER HOME LICENSING**

**The DCFS Division of Monitoring should review placement practices at the private agency's field office to ensure that children are not being placed in unrelated, unlicensed homes in accordance with Procedures 301, Appendix D, *Unrelated, Unlicensed Homes* (from OIG FY 10 Annual Report, General Investigation 15).**

*FY 10 Department Response:* The review is in process. Anticipated completion is in 2011.

*FY 11 Department Update:* In December 2010 the Department's Agency Performance Team did a case-by-case review of all placement cases at the private agency and provided specific information to the private agency's administration and supervisory staff regarding applicable sections of Procedures 301, *Placement and Visitation Services.*

**The Department should amend Procedures 301, Appendix E, *Placement Clearance Process*, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months (from OIG FY 10 Annual Report, General Investigation 4).**

> *FY 10 Department Response:* A Department committee is drafting revisions regarding involuntary placement holds.

> *FY 11 Department Update:* Revisions to Procedures 301, Appendix E, *Placement Clearance Process* have been drafted and submitted to the Office of Child and Family Policy for further review.

**The Department's foster home licensing application should be revised to include questions asking the applicant and other adult members of the household for any e-mail addresses or membership in social networking sites within the last five years (from OIG FY 10 Annual Report, General Investigation 1).**

> *FY 10 Department Response:* The application has been revised to include the applicant's e-mail address.  However, there are too many barriers to researching social networking sites to implement the second part of the recommendation.

> *FY 11 Department Update:* The Office of Information Technology Services is working to incorporate the recommended revisions to the licensing application.

**The Department should develop procedures that incorporate the potential licensee's internet activity into background checks (from OIG FY 10 Annual Report, General Investigation 1).**

> *FY 10 Department Response:* The implementation is in progress.

> *FY 11 Department Update:* The Department has established a committee that will begin meeting in January 2012 to develop procedures that incorporate potential licensees' internet activity into background checks.

**This report should be redacted and used as a basis for a round table discussion by licensing staff (from OIG FY 10 Annual Report, General Investigation 1).**

> *FY 10 Department Response:* The implementation is in progress.

> *FY 11 Department Update:* A redacted copy of the report will be discussed during the January 2012 meeting with Regional Licensing Administrators.

**In order to satisfy Department Rule 402.8, *General Requirements for the Foster Home*, the Department should incorporate into a licensing safety assessment the guidelines set forth by the American Humane Society regarding the observation of family pets in their natural environment. These guidelines, detailed below, should also be incorporated into Part 300, *Reports of Child Abuse***

*and Neglect* **and Part 406,** *Licensing Standards for Day Care Homes* **(From OIG FY 09 Annual Report, Death and Serious Injury Investigation 11).**

<u>*Guidelines from the American Humane Society*</u>

*In a publication entitled "A Common Bond: Maltreated Children and Animals in the Home" published by the American Humane Society, authors Mary Lou Randour and Howard Davidson propose that a child welfare safety assessment of animals and children should include animal related questions and observation of interactions between family members and family pets.   The Humane Society recommends observation of the animal in its daily environment, and that when making a home visit the observer can incorporate the following questions into the interview:*

- *Do you have any family pets or other animals in your home?*
- *May I see them, or can you bring them out?*
- *What can you tell me about your pets?*
- *Who takes care of them?*
- *What happens when one of them is disobedient?*
- *Who disciplines them?  How do they do that?*
- *Have you had any other pets?  What happened to them?*

*When observing interactions between the family members and their pets, the following should especially be considered:*

- *Are there any family pets that might be classified as a breed that is associated with animal fighting or other crimes?  The presence of a high-risk pet could place children and other family members in danger.*
- *Do the animals seem relaxed around all family members, or do they seem to avoid, or appear anxious around, one or two particular family members?*
- *How does the presence of the animals affect the family interactions?*
- *If there is a dog in the home, does the child have access to the area where the dog is kept?*
- *If the child is near the dog, how is s/he supervised?*
- *How much time does the dog spend interacting with family members?*
- *What socialization has the dog had with children?*
- *Has the dog received obedience training?*
- *Does the dog have a history of aggressive behaviors?*

*FY 09 Department Response:* The Office of Child and Family Policy and the Licensing Unit are developing a form to be signed by the foster parent responding to several questions about dangerous pets listed in the American Humane Society guide.  Once this language is drafted, similar language will be drafted for other Department Procedures. In addition, new legislation requires cross-reporting between child abuse investigators and animal abuse investigators.

*FY 10 Department Update:* After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive or not is beyond the scope and expertise of the licensing workers.  Procedures 300, *Reports of Child Abuse and Neglect,* and the Safety Checklists have been drafted.

*FY 10 OIG Response: After a child was viciously mauled and killed by dangerous animals in a foster home, the OIG recommended that Licensing address this clear safety hazard. The Child Death Review*

*Team supported the OIG's recommendation. It is unconscionable that the Department refuses to recognize its responsibility to address this safety issue in licensed foster homes.*

> *FY 11 Department Update:* On July 8, 2010, the Department issued Policy Transmittal 2010.11, *Revised Procedures 300.50 (j) and the Home Safety Checklist.* The Policy Transmittal addresses the expectations for Child Protection Investigation Specialists.  After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive or not is beyond the scope and expertise of the licensing workers.

**The Department should amend Department Rule and Procedure 402,** *Licensing Standards for Foster Family Homes***, to require that licensing workers identify alternate caregivers, determine where the alternate care will take place and perform background checks in accordance with Rule 385,** *Background Checks***, of all adults and those over 13 years of age residing in the alternate care home when the care will take place other than in the foster parent's home (from OIG FY 09 Annual Report, General Investigation 3).**

> *FY 09 Department Response*: Revisions to Rule 402, *Licensing Standards for Foster Family Homes*, are being drafted that would require that licensing staff identify alternative caregivers and perform background checks in accordance with Rule 385, *Background Checks*, of all adults and those over 13 years old residing in the alternate care home.

*FY 09 OIG Response: The critical information that needed to be gathered in this case was where the care was being provided.  Unless the Department requires information about where the care is being provided, the harm that the children were subjected to in this case could be repeated.*

> *FY 10 Department Update: No update provided.*

> *FY 11 Department Update:* The Department will be further reviewing this recommendation before amending Rule and Procedure 402, *Licensing Standards for Foster Family Homes*, to determine if Part 301, *Placement and Visitation Services*, also needs amending, with regards to children not in a licensed home receiving care or placement with an alternate caregiver.

**The Department should pursue an amendment to the Abused and Neglected Child Reporting Act (ANCRA)  extending the 30-day retention period to six months after a final finding is entered for unfounded reports involving licensed foster homes made by non-mandated reporters (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 08 Department Response*: The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA which address the above issue as well as other proposed changes to ANCRA, and will submit these amendments as a single legislative package.

> *FY 09 Department Update:* The Office of Legal Services reviewed and concluded that a legislative change is required to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding.  Legal has drafted and submitted proposed legislation amending ANCRA – 325 ILCS 5 that has been approved by the Director for inclusion in our legislative package for the upcoming Spring Session.  We anticipate that the legislative process and subsequent revision to Rule 431.30, *Maintenance of Records*, can be completed by the beginning of Spring 2011.

*FY 10 Department Update:* DCFS Office of Legal Services submitted a legislative proposal amending ANCRA 325 ILCS 5 to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding.  The proposed legislation was included in the Department's legislative package for the Spring 2010 Session.  The anticipated date that the legislative process and subsequent revision to Section 431.30, *Maintenance of Records,* will be completed in the second quarter of 2011.

*FY 11 Department Update:* The Abused and Neglected Child Reporting Act (ANCRA 325 ILCS 5/7.7 and 7.14) was amended and now requires that unfounded reports be maintained for 12 months. The Department is in the process of revising Rule 431.30, *Maintenance of Records,* to reflect this change.

**The Department should develop guidelines for shared monitoring responsibilities when a single foster home has children monitored by different agencies or when the case monitoring and license monitoring functions are split between agencies. The guidelines should include the following requirements:**

    a.  **a staffing of all involved case and licensing workers;**

    b.  **written agreement of roles and responsibilities of each worker;**

    c.  **written guidelines concerning the responsibility to share information and the process for sharing information (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. The Department may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response: When shared cases are transferred, the agency loses funding. The agency transferring the children should receive immediate consideration for new placements.*

**INFORMATION TECHNOLOGY**

**The Office of Information Technology Services (OITS) should explore the feasibility of streamlining the search function of the State Automated Child Welfare Information System (SACWIS) concerning ease of locating prior history with the Department (from OIG FY 09 Annual Report, General Investigation 1).**

*FY 09 Department Response:* The Department does not have the funding or manpower to undertake this project.

*FY 09 OIG Response: Given the high caseloads of investigators and caseworkers, efficient search engines are critical to protecting children.*

*FY 10 Department Update:* After further review, the Department has determined that unless the database is reviewed and cleaned up by operations, there will be little improvement from using an improved search engine.  The Department cannot determine what improvement is possible until the database is cleaned up.  The cost estimates of a new search engine, which would have to be obtained under a new license and then modified, are well in excess of $1 million.  The Office of Information Technology Services does not have the money for such an upgrade, especially given the inability to guarantee that this upgrade would improve performance.

*FY 10 OIG Response: The rationale behind this recommendation was that child protection investigators needed a user-friendly, efficient computer search to ascertain if any family member or adult involved in the current child protection investigation has previously lost custody of any children because of abuse or neglect.  In this case, the alleged perpetrator had had his parental rights terminated, but the indicated findings that were the basis for the termination of parental rights were expunged from the State Central Register. The Department should retain indicated findings as recommended by the Child Death Review Teams when the indicated allegations were the basis for termination of parental rights.*

*FY 11 Department Update:* Following exploration by Office of Information Technology Services staff, the Department has determined that the recommendation cannot be implemented at this time due to fiscal constraints.

*FY 11 OIG Response: The OIG appreciates the Department's exploration but disagrees with the cost-benefit analysis, given the impact on child safety when prior abuse or neglect concerns are missed.*

**The Department's electronic records database, State Automated Child Welfare Information System (SACWIS) should be changed to ensure that intact family supervisors and managers have access to investigations linked to cases of their workers.  SACWIS photographs should be viewable by anyone who has access to the investigation (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 1).**

*FY 09 Department Response:* Both of the requested changes will be included in the planned release of an updated version of SACWIS, Version 4.1.

*FY 10 Department Update:* This is part of the planned SACWIS release 4.1.  The estimated implementation date is early 2011.

*FY 11 Department Update:* Child Welfare supervisors and managers now have access to work (cases/investigations) assigned to their supervisees.

**The Department must implement security safeguards prior to enabling remote access to the State Automated Child Welfare Information System (SACWIS) on personal computers.  Office of Information Technology Services (OITS) must obtain direct approval from the private agency's executive director prior to enabling remote access for private agency employees.  Two documents should be developed in connection with remote access:  (1) The agency director should sign a form agreeing to notify OITS within 24 hours of the employee's change in status or departure from the agency, and (2) The employee should sign a document specifically acknowledging the confidential nature of the remote access application and agree to ensure that outside persons do not have access to the application.  The employee should be informed and agree to the requirement that, in order to maintain confidentiality, the Department prohibits transferring or downloading any confidential information onto their personal computer or email.  The OITS should maintain and routinely update a database of remote access to SACWIS users (from OIG FY 08 Annual Report, General Investigation 24).**

*FY 08 Department Response:* The Director and the Office of Legal Services are reviewing this recommendation.

*FY 09 Department Update:* The documents have been developed and issued.

*FY 09 OIG Response: The Illinois DCFS Virtual Private Network (VPN) usage agreement should also require a signature by the Executive Director to ensure the Executive Director's knowledge and approval of remote access.*

*FY 10 Department Update:* Approval of Administrative Procedure 20, *Electronic Mail/Internet Usage/SACWIS Search Function* is pending for internal/external review.

*FY 11 Department Update:* The Office of Information Technology Services (OITS) revised its policy and procedures and now requires that prior to authorizing individual access to the Virtual Private Network (VPN) the Director, CEO, or designee of a contracted agency must review and sign the External Business Partner Virtual Network Usage Agreement form, which states that "by signing this form, the Agency Director agrees to notify OITS within 24 hours of an employee's departure from the agency." Following completion of this agreement, a supervisor or above may request access for individual users by submitting a New Account Request on the D-net. OITS maintains a database of access to the Virtual Private Network.

## LAW ENFORCEMENT

**When a child is hospitalized for injuries or conditions that are suspected to be the result of abuse or neglect by a primary caregiver and there is a concurrent law enforcement and child protection investigation, there must be a safety planning conference between law enforcement and child protection before the child is discharged (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

*FY 10 Department Response:* The Department agrees. Department Procedure 300.50, *Reports of Child Abuse and Neglect, Initial Investigation,* will be amended to include the recommended language.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy.

**In cases where police have a pending criminal investigation, Division of Child Protection investigators should not reveal a preliminary finding of unfounded to the family prior to a supervisory conference to explore whether another conference with law enforcement should take place (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 8).**

*FY 10 Department Response:* A practice memo will be distributed to child protection staff.

*FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy.

**The Department should pursue an interagency agreement with the Illinois Law Enforcement Alarm System to identify the local law enforcement agency with jurisdiction to provide written notification of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

*FY 10 Department Response:* A letter was sent to the Illinois Law Enforcement Alarm System (ILEAS) Director requesting access to the ILEAS System. Upon receipt of access to the system, State Central Register staff will be trained.

*FY 11 Department Update:* The meeting with the Illinois Law Enforcement Alarm System and State Central Register (SCR) occurred and determined it is not possible to develop the interface as recommended.  It was determined SCR is not the most efficient unit to pinpoint the law enforcement office of jurisdiction. Rather, the Division of Child Protection team supervisor is responsible for ensuring notification to the local law enforcement and following up for their decision. This information was incorporated into a draft policy transmittal detailing the Child Abuse Law Enforcement Notification process, including the notification form drafted by the OIG. The policy transmittal and notification form have been submitted to the Office of Child and Family Policy for review and the targeted implementation date is June 2012.

*FY 11 OIG Response: The State Central Register (SCR) is the best unit for first response. The critical importance of such notifications, along with the harm that can result from failure to notify, warrants a two-pronged approach that would allow SCR to coordinate with the Illinois Law Enforcement Alarm System and also allow child protection staff to follow-up with local law enforcement. The Illinois Law Enforcement Alarm System is an emergency response system that coordinates federal disaster response with State agencies. The Department should take advantage of this coordinated System.*

**The State Central Register should adopt a form to provide written notification to local law enforcement of the Hotline reports required by statute and Department Rule (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 10).**

>  *FY 10 Department Response:* The form is currently being developed.

>  *FY 11 Department Update:* Notification to local law enforcement in child abuse investigations has been developed and all documents, including the notification form have been submitted to the Office of Child and Family Policy. Procedures 300, *Reports of Child Abuse and Neglect*, will be revised to incorporate these changes. The targeted implementation date is June 2012.

**In rural areas where there is suspicion of drug involvement or domestic violence, the Department should consider requiring investigators to include the local sheriff's department when requesting incident reports (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 11).**

>  *FY 10 Department Response:* The Department agrees.  The recommended language is being added to Department Procedure 300.60 (g), *Other Required Investigative Contacts.*

>  *FY 11 Department Update:* This information was incorporated into a draft policy transmittal concerning law enforcement involvement in child abuse investigations and includes the Child Abuse Law Enforcement Notification form developed by the OIG. All documents have been forwarded to the Office of Child and Family Policy. The targeted implementation date is June 2012.

**Department Procedures should be revised to require that in cases where domestic violence is present, child protection investigators and intact workers should contact the local police department and request the complete police record involving the family, including 911 contacts at the home (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 6).**

*FY 09 Department Response:* A work group of representatives from the Department, the Office of the Inspector General and the police will be convened to address any difficulties in obtaining 911 records.

*FY 10 Department Update:* A workgroup will be convened in January 2011 to address this issue.

*FY 11 Department Update:* Policy Transmittal 2011.04, *Revised Procedures 300.60 (g)*, was issued in February 2011 and revised 300.60 (g), *The Formal Investigative Process*, to now state "When a case involves domestic violence and/or drug abuse/misuse contact must be made with all law enforcement agencies that have jurisdiction (i.e. local police, sheriff, Illinois State Police)."

**Department Procedure 300.70, *Special Types of Reports,* should be amended to include second-degree burns as injuries requiring referrals to local law enforcement and the State's Attorney (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* Language regarding this recommendation is being drafted and will be submitted to the Office of Child & Family Policy for approval.

*FY 08 Department Update:* The OIG's recommendation was based on a request by the Children's Advocacy Center (CAC). The Department continues to review the feasibility of the recommendation.

*FY 09 Department Update:* In Procedures 300, *Reports of Child Abuse and Neglect* (Appendix B, Allegations, Burns 5/55), the Department will add "notification to State's Attorney on 2nd, 3rd, and 4th degree burns" in order to implement the recommendation.

*FY 10 Department Update:* Procedure 300, *Reports of Child Abuse and Neglect*, Appendix B-*The Allegation System*, Allegation #5-Burns will be amended to include notification to State's Attorney in cases of 2nd, 3rd, and 4th degree burns. The Department is awaiting approval from the Joint Committee on Administrative Rules (JCAR) to move forward.

*FY 11 Department Update:* The Office of Child and Family Policy is currently drafting amendments to 300.70, *Special Types of Reports*, to include the new law enforcement child abuse notification form and referrals to law enforcement for second degree burns. The estimated completion date is December 2011.

**LEGAL**

**The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court. The Short-Term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year (from OIG FY 10 Annual Report, General Investigation 9).**

*FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

*FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*.  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

**Child Protection managers, supervisors and investigators and intact family services workers should be trained on the guidelines for referring a family to the Extended Family Support Program (from OIG FY 10 Annual Report, General Investigation 9).**

*FY 10 Department Response:* This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

*FY 11 Department Update:* The recommendation has been incorporated in draft Procedures 302.385, *Extended Family Support Program*.  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

**The Department should revise procedures to conform to federal requirements and ensure that relatives are advised of their options under state and federal law and the potential consequences of declining placement (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Department agrees.  Department procedures will be revised as recommended.

*FY 11 Department Update:* Revisions to Rule and Procedure are in progress.

**The Department should pursue state legislation to formalize a preference for relative placement when such placement is safe and does not delay permanency (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Director will consult with the Legislature.

*FY 11 Department Update:* A new Director will be starting on December 15, 2011 and he will be consulted thereafter about this recommendation.

**The Department should ensure that all family advocacy centers develop expertise in DCFS Rules and Procedures concerning Service Appeals and placement to provide more effective advocacy for families (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Department agrees.

*FY 11 Department Update:* The training was delayed until all Advocacy Centers were provided access to the Department's intranet.  Once the Advocacy Centers are provided access training will be provided. The planned implantation date is fiscal year 2012.

**Caretakers should receive written notice of a Fair Hearing at the same time that the appellant receives written notice that apprises them when placement of the child is at issue (from OIG FY 10 Annual Report, General Investigation 11).**

*FY 10 Department Response:* The Department issued a memorandum requiring written notice to caretakers when an appeal involves placement of the child.  The requirement will be incorporated into Department Rules.

*FY 11 Department Update:* The proposed rule change will be submitted to the Joint Committee on Administrative Rules (JCAR).  The anticipated date of completion is February 2012.

**The Department should amend Rule 431.60, *Subject Access to Records of Child Abuse and Neglect Investigations* to reflect current practice mandated by a federal court order in the *Dupuy* decision (from OIG FY 10 Annual Report, General Investigation 7).**

*FY 10 Department Response:* An initial draft of the revisions is complete; however, further review is required in order to guard against improper disclosures.

*FY 11 Department Update:* Office of Legal Services is in the process of revising Rule 336, *Appeal of Child Abuse and Neglect Investigation Findings,* and reviewing related rules which may need to be amended.

**DCFS Office of Legal Services should determine whether to file a petition to compel compliance with services themselves or advocate with the Assistant State's Attorney to file the petition (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* As part of the referral process, the Department's Office of Legal Services will review case referrals with the Division of Child Protection and advocate with the Office of the State's Attorney to file petitions to compel compliance with services where appropriate.

*FY 11 Department Update:* In November 2011, DCFS Office of Legal Services issued a memo to child protection staff regarding contacting the Office of Legal for assistance with screening and advocacy with the State's Attorney's office.

**Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response.  Child protection offices should share this information with DCFS Office of Legal Services (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Department issued a memorandum to child protection staff instructing staff to refer cases of critical parental non-compliance in which the State's Attorney has refused to file a petition to the Office of Legal Services.  Child protection managers will track such responses monthly.

*FY 11 Department Update:* The Division of Child Protection is currently refining a process implemented in 2010 to track juvenile court petitions.  The division is also exploring the

development of shared drives specifically dedicated to screening results and subsequent activities and decision-making by the assigned child protection investigator and supervisor.

**The Office of the Inspector General should request that the Administrative Office of Illinois Courts require that Juvenile Courts in substantive matters, such as change of custody or visitations, be required to have such hearings on the record so that a record would be available when necessary (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 09 Department Response:* The Inspector General has contacted the Administrative Office of the Illinois Courts with regards to this matter. The Inspector General will meet with a representative from the Administrative Office of the Illinois Courts to discuss this issue.

*FY 10 OIG Update: The OIG is continuing to work with the Administrative Office of the Illinois Courts to address issues of mutual concern.*

*FY 11 OIG Update: House Bill 3807 was introduced September 2011 and is currently pending legislation.*

**The Department's Interstate Compact Procedures should be revised to require:**
- **When an interstate compact is denied, the Interstate Compact Unit shall notify the Office of Legal Services. The Office of Legal Services will then monitor the case to ensure that the interstate compact is neither violated or circumvented in a manner that compromises the safety of children;**

- **If an interstate compact is disputed or violated, the Office of Legal Services will notify DCFS Clinical and DCFS Clinical will convene a staffing with the agency caseworker and supervisor, and the GAL;**

- **Notification of the Interstate Compact Unit, by the agency, if an interstate compact placement request is pending and the children are sent to the placement under consideration (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 09 Department Response:* Revisions are being made to Procedure 328, *Interstate Placement of Children*, in order to incorporate these requirements. The Interstate Compact Office has been directed to report all such situations immediately to DCFS Office of Legal Services who then monitors the case to ensure that the Interstate Compact Agreement is not violated or circumvented in a manner that compromises the safety of children. Copies of that notification are sent to an Associate Deputy Director to verify that direction is being carried out.

> *FY 10 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process. In the event an interstate compact is disputed or violated the Department's Office of Legal Services notifies the DCFS Division of Clinical Services. The Office of Legal Services receives and monitors notifications received from the Interstate Compact Unit.

> *FY 11 Department Update:* Revisions to Procedure 328, *Interstate Placement of Children*, are still in process.

**The Deputy Director of the Division of Affirmative Action should issue a communication to Department staff in the affected regions instructing them of their obligation to comply with the Burgos Consent Decree as detailed in Section 302.30(c)** *Accessibility of Services to All Persons***. The Department should also educate staff about the availability of the tele-interpreters resource through quarterly announcements on the D-Net and include on the D-Net a list of qualified interpretation/translation providers in each region (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 09 Department Response:* The interpreter information has been submitted to the Office of Legal Services for review prior to posting on the D-Net.

> *FY 10 Department Update:* The Office of Legal Services continues to work with DCP on this issue.

> *FY 11 Department Update:* The Bilingual Services Resource Directory is available on the D-Net and an email was sent to DCFS staff instructing them of their obligation to comply with the Burgos Consent Decree.

**Procedure 300, Appendix E,** *Burgos Consent Decree* **requires that whenever an initial report of child abuse or neglect is received by the State Central Register, the report taker will attempt to determine whether the parents/children who are the subjects of the report are of Hispanic origin and/or Spanish speaking. In order to ensure substantial compliance with the Burgos Consent Decree and consistent application of existing Department Rules and Procedures, the Burgos Coordinator shall:**

> a) **Identify all Spanish speaking cases/investigations within 48 hours of receiving a report of abuse/neglect and determine if the case is assigned to a Spanish speaking investigator.**
> b) **Submit a weekly alert to respective Regional Administrator (RA) of any case NOT assigned to a Spanish speaking investigator.**
> c) **On a weekly basis, review all Spanish surname cases to determine and verify if Spanish surname cases are in fact a Spanish speaking family (through language determination forms, indication made in SACWIS, et. al.)**
> d) **Determine if a Spanish surname family which has identified Spanish as their primary language is assigned to a Spanish speaking worker/investigator.**
> e) **Include in weekly report/alert to Regional Administrators any families/cases with a Spanish surname that have identified Spanish as their primary language and are NOT assigned to a Spanish speaking worker/investigator (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 14).**

*FY 10 Department Response:* A memo was e-mailed to State Central Register (SCR) Call Floor Workers noting the options for identifying families of Hispanic origin and the requirement of an interpreter. The Department's Office of Affirmative Action is working with the Department's Office of Information and Technology Services (OITS) to update the State Automated Child Welfare Information Services database (SACWIS) to provide notification to the Burgos Coordinator when a Spanish speaking family is entered into SACWIS.

*FY 11 Department Update:* The modifications to SACWIS have been completed and the Burgos Coordinator now receives the information outlined in the recommendation. The Burgos Coordinator utilizes the information to identify Spanish speaking families that have not been

assigned a Spanish speaking worker, in which case the Burgos Coordinator notifies the respective regional administrator.

**The Department's legislative liaison should pursue legislative amendment to Illinois Statute 430 ILCS 65/4-65/10, *Public Safety*, to address the need to revoke firearm registration of parents who demonstrate an inability to keep their firearms from minors under a set of conditions that include: minors, age 16 and under, with a mental condition or behavior that poses clear and present danger to self or other persons (e.g., discharging firearms in the absence of parental supervision, shooting guns at other persons, taking weapons or ammunition to school) (from OIG FY 07 Annual Report, General Investigation 3).**

> *FY 07 Department Response:* The Department believes that any legislation to amend Illinois Statute 430 ILCS 66/4-65/10 should be negotiated by the Illinois State Police and the Department of Natural Resources.  The Department of Children and Family Services has no involvement in firearms law.

*FY 07 OIG Response:  The OIG is pursuing the legislative change.*

*FY 08 OIG Update: House Bill-5191, which would amend the Firearm Owners Identification Card Act, was introduced to the Illinois General Assembly by State Representative Greg Harris.  Through a collaborative effort by the OIG and Representative Harris, the House passed the Bill on April 30, 2008. On May 1, 2008 the Bill arrived in the Senate and is being sponsored by State Senator Heather Steans. The Bill is currently pending in the Senate.*

*FY 09 OIG Update: The bill was not passed prior to the end of the last session. The OIG will work to have the bill reintroduced and passed in the next session.*

*FY 11 OIG Update: The OIG contacted the Illinois Council Against Handgun Violence for consideration of pursuing this legislation.*

**MEDICAL**

**The Multidisciplinary Pediatric Evaluation and Education Consortium (MPEEC) will conduct a child abuse training for the hospital's child protection team and appropriate pediatric and emergency room staff.**

**Physicians of Medical Resource Providers should also target education and training efforts to best assist child protection. Each medical resource provider should identify and prioritize training of:**
- **Medical personnel of emergency departments approved for pediatrics by the Illinois Emergency Medical Services for Children (EMSC)**
- **Medical personnel at hospitals affiliated with partner hospitals of the medical resource providers**
- **Medical personnel at hospitals that serve as a resource for Children's Advocacy Centers (from OIG FY 10 Annual Report, Systems Investigation 2 and OIG FY 10 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 10 Department Response:* The Department will discuss this with the Medical Resource Providers and develop a training schedule for 2011.

*FY 11 Department Update:* The Medical Resource Providers reported that the physicians would be willing to conduct training to better assist child protection however the hospitals and medical facilities would have to initiate the request for Medical Resource providers to train their personnel.

*FY 11 OIG Response: The OIG recommends that the Medical Resource Providers develop and disseminate to community hospitals information regarding the availability of the training curriculum.*

**The Department should follow up with development of a curriculum for emergency department medical professionals (from OIG FY 10 Annual Report, Systems Investigation 2).**

*FY 10 Department Response:* The curriculum has been developed.

*FY 11 Department Update:* The curriculum has been completed.

**The Department should require and help to develop more uniform reporting by the contracted Medical Resource Providers (from OIG FY 10 Annual Report, Systems Investigation 2).**

*FY 10 Department Response:* The Department will work with the Medical Resource Providers to develop a Reporting Protocol.

*FY 11 Department Update:* This recommendation was implemented the first quarter of fiscal year 2012. A quarterly reporting format was developed and used by a Medical Resource Provider, and details required data to report, timeframe for submittal, and the individual to whom the report is to be submitted. All agencies use the protocol developed by the Division of Child Protection.

**The Department should determine whether to restrict its contractual agents from using polygraph information when rendering a medical opinion (from OIG FY 10 Annual Report, Systems Investigation 1).**

*FY 10 Department Response:* A representative of the Department met with the contractor to discuss the use of polygraphs. The Department representative will meet again with the contractor to share and discuss the findings from the Office of the Inspector General investigation.

*FY 11 Department Update:* The Department held a meeting with contractor physicians in March 2011, during which time the Department's position on polygraphs was discussed.

**The Department's Medical Director should review this report along with prior Office of the Inspector General reports that address suspected Factitious Disorder by Proxy (OIG 03-0214, OIG 03-0214B) and determine how best to handle investigations involving Munchausen Syndrome by Proxy/Factitious Disorder by Proxy (from OIG FY 10 Annual Report, General Investigation 8).**

*FY 10 Department Response:* The reports were provided to the Department's Medical Director for review.

*FY 11 Department Update:* The draft policy on Factitious Disorder by Proxy/Medical Child Abuse is still under review.  Upon completion the policy will be incorporated into Procedure 300, Appendix B, Allegation #10-*Substantial Risk of Physical Injury/ Environment Injurious to Health and Welfare by Abuse* and #60-*Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect*, as well as issued as a separate Policy Transmittal.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (DHFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Department of Healthcare and Family Services (DHFS) notified DCFS that the 2004 interagency agreement allows for the necessary access. Representatives from DCP and the Guardianship Administrator's Office will coordinate with the Department of Healthcare and Family Services to implement this recommendation.

*FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from DHFS.  While no one has denied access to the Department, access has not been authorized.  Efforts to gain access will continue.

*FY 09 OIG Response: The recommendation concerned access by child protection staff.  Any access arranged must be available to child protection staff.*

*FY 10 Department Update:* The Department continues to work with the Department of Healthcare and Family Services to obtain needed access to Recipient Claim Detail information.

*FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS) Medicaid Claims information on a weekly electronic interface with the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody.  The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects for whom the Department does not have legal custody.

**Training for child protection staff should incorporate information about the availability and benefit of recipient claim details from the Department of Healthcare and Family Services and their Recipient Restriction Unit (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Office of Training will update training modules to reflect the use and benefit of the Recipient Claim Detail. In addition the Office of Training, Service Intervention and the Division of Child Protection will incorporate the information from these divisions to develop one coordinated training module.

*FY 11 Department Update:* The Department is now receiving Department of Healthcare and Family Services (DHFS)  Medicaid Claims information on a weekly electronic interface with

the DHFS Medical Data Warehouse which goes directly into SACWIS E-Health screens. However, this is only for children for whom DCFS has legal custody.  The Department has been unable to reach an agreement with DHFS to allow child protection staff access to the Recipient Claim Detail information and DHFS has informed the Department that they cannot share information from their Recipient Restriction Program. The Department is convening a meeting among the Division of Service Intervention, Child Protection, Legal Services, and Office of Information Technology staff to address child protection's need for access for children and subjects whom the Department does not have legal custody.

**Division of Child Protection staff should obtain consultation from DCFS nurses through the Administrator for Substance Abuse Services, in child protection investigations where there is a concern about misuse of prescription medication and/or mixing of alcohol and narcotic medications.  Department of Healthcare and Family Services (DHFS) has requested a point person for referrals to the Recipient Restriction Unit.   The Administrator should serve as the Department's liaison to the Department of Healthcare and Family Services Recipient Restriction Unit to report the potential misuse of prescription medications (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 7).**

*FY 10 Department Response:* The Department is continuing to work with the Department of Healthcare and Family Services to implement this recommendation.

*FY 11 Department Update:* An administrator in the Division of Service Intervention has been identified as the point person for referrals to the Recipient Restriction Unit when there is concern of potential misuse of prescription medications.

**This case reinforces the recommendation made in a separate OIG investigation: Division of Child Protection staff, as well as intact family services and placement staff, should obtain consultation from a Department nurse through the Administrator for Substance Abuse Services in child protection investigations and intact and placement cases where there is a concern about misuse of prescription medication and/or mixing of alcohol and narcotic medications Department of Healthcare and Family Services (DHFS) has requested a point person for referrals to the Recipient Restriction Unit (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 6).**

*FY 10 Department Response:* The Department is continuing to work with the Department of Healthcare and Family Services to implement this recommendation.

*FY 11 Department Update:* An administrator in the Division of Service Intervention has been identified as the point person for referrals to the Recipient Restriction Unit when there is concern of potential misuse of prescription medications.

**Department Procedures should be amended to include that any time a foster child is hospitalized or taken to the emergency room complete medical records should be obtained and placed in the child's file.  Procedure should also require that the records are shared with the foster child's pediatrician (from OIG FY 09 Annual Report, General Investigation 7).**

*FY 09 Department Response:* A Department form is being prepared for a procedural change to amend Procedure 402, *Licensing Standards for Foster Family Homes*, in case of a foster child's hospitalization.  The revised procedure will require that complete emergency room medical

records be obtained and placed in the child's file and the record shared with the child's pediatrician.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Licensing staff will work with the Office of Child & Family Policy to draft procedures by June 2012.

## MENTAL HEALTH

**The private agency's behavior analysts should have specialized training in the treatment of psychiatric diagnoses. They should be taught how to conceptualize cases in terms of behavioral excesses and deficits, and how to design comprehensive behavioral interventions to ameliorate problematic behavior (from OIG FY 10 Annual Report, General Investigation 5).**

*FY 10 Department Response:* The private agency agrees with the recommendation and will implement.

*FY 11 OIG Update: The private agency staff participated in specialized trainings to address the recommendation.*

**The private agency's behavior analysts should undergo training in identifying empirically supported interventions. Specifically, they should have access to PsychInfo databases to allow them access to the literature on the treatment of behavior problems (from OIG FY 10 Annual Report, General Investigation 5).**

*FY 10 Department Response:* The private agency agrees with the recommendation and will implement.

*FY 11 OIG Update: The private agency staff now have internet access to reference research articles regarding the treatment of behavior problems.*

**The private agency should require its education services staff to proactively service foster children presenting mental health and behavior concerns by helping to determine whether evaluations are needed through the child's school and ensuring that the child receives an Individualized Education Plan and appropriate services when indicated (from OIG FY 10 Annual Report, General Investigation 5).**

*FY 10 Department Response:* The private agency agrees with the recommendation and will implement.

*FY 11 OIG Update: At the 30 day post admission staffing, the private agency's education services staff are now required to address school issues, including needed evaluations and services to address behavior and academic issues that impact school performance.*

**The Department should require that behavior services programs of private agencies' specialized foster care programs be staffed by board certified behavior analysts to work with foster children with mental health and behavioral concerns.   Board certified behavior analysts should have expertise in the treatment of psychiatric disorders if the agency continues to serve this population (from OIG FY 10 Annual Report, General Investigation 5).**

*FY 10 Department Response:* The Department will amend the program plans of specialized foster care agencies having behavioral analysts to ensure this is the requirement.

*FY 11 Department Update:* Language was added to fiscal year 2012 contracts through an amendment.

**In cases of severe mental illness of a parent or caretaker, the Department should require child protection investigators and intact family services workers to ask mental health professionals the following three questions:**
**(1) Do the parents' or caretakers' symptoms of mental illness place the child at risk for maltreatment or harm?**
**(2) Are there long-term effects of the parents' or caretakers' mental illness symptoms on the child's well-being that need to be considered in developing a treatment plan?**
**(3) If the parents' or caretakers' current treatment plan is changed, will it likely bring about an improvement in parenting skills? (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 11)**

*FY 10 Department Response:* The Department agrees.

*FY 11 Department Update:* This recommendation will be incorporated into revised Procedures 300, *Reports of Child Abuse and Neglect.*  During the interim,  a Policy Transmittal will be developed and provided to child protection staff that includes information about obtaining parents' and/or caretakers' mental health records, the recommended questions and the mental health records prompting checklist developed by the OIG. The target implementation date is June 2012.

**When a pregnant or parenting teen ward with serious medical or mental health issues is placed with a non-Teen Parent Services Network (TPSN) agency, quarterly clinical staffings should occur to monitor the implementation and outcomes of recommended service interventions (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 4).**

*FY 10 Department Response:* The Teen Parent Services Network (TPSN) will identify youth within the network with serious medical or mental health problems and ensure that clinical staffings are held quarterly by the assigned caseworker.  A procedure reflecting this requirement is being developed.

*FY 11 Department Update:* The Teen Parent Services Network (TPSN) is currently looking at the cases of youth within the network with identified Medical health problems or subsequent Unusual Incident Reports and will schedule a clinical staffing as agreed. TPSN will submit number of youth serviced in monthly reports.

**When a pregnant or parenting teen parent with a serious medical or mental health issue is placed in a transitional living program or an independent living program, the assigned case manager should be required to attend specialized training provided by Teen Parent Services Network (TPSN). The Office of the Inspector General will assist TPSN in the development of the specialized curriculum (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 10 Department Response:* The Office of the Inspector General will work with the Teen Parent Services Network (TPSN) to enhance the TPSN curriculum and the training process.

*FY 11 OIG Update: In Spring 2011 Risk Reduction/Education training was provided to pregnant and parenting youth and their case managers in Rockford and downstate. The training continued in Cook County during Summer 2011 for parenting teen wards and a training workshop was conducted to instruct case managers to present the training curriculum.*

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families. Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

> *FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program. However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases. The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

> *FY 10 Department Update:* Revisions to Policy Guide 99.13, *Services for DCFS Substance Affected Families*, are currently being drafted.

> *FY 11 Department Update:* The Divisions of Service Intervention, Child Protection and Monitoring will form a committee to review policy and resources to address this issue.

**The Department should adapt questions found in the book authored by Teresa Ostler, *Assessment of Parenting Competency in Mothers with Mental Illness* for child protection investigators to utilize when interviewing mental health professionals to determine a parent's ability to adequately care for his/her children. These questions should be incorporated into child protection investigator training (from OIG FY 08 Annual Report, General Investigation 4).**

> *FY 08 Department Response:* The Department agrees. The Department's Safety Workgroup is reviewing the questions to determine how best to incorporate the material into training.

> *FY 09 Department Update:* The DCFS Office of Training is incorporating the questions into the 2010 training curriculum for all investigative staff.

*FY 10 Department Update:* The Office of Training is in the process of incorporating this material in the Enhanced Child Endangerment Risk Assessment Protocol curriculum and will begin training this material in April 2011.

*FY 11 Department Update:* The Mental Health Assessment Questions were included in the Enhanced Safety Assessment curriculum for child protection specialists, child welfare specialists and supervisors. The training began October 2011 and will continue through December 2011. The OIG and the Department provided Error Reduction Training to intact workers to address issues and practice related to working with mentally ill parents. Training for the Northern region is scheduled for January 2012.

**The procedures for completing a Child Endangerment Risk Assessment Protocol (CERAP) and the decision tree for mentally ill parents should be amended so that the guidelines note the need to assess risk to the child when a parent incorporates a child into their delusional system, even in the absence of overt negative statements (from OIG FY 06 Annual Report, Death and Serious Injury 2).**

*FY 06 Department Response:* The committee revising the safety assessment continues to work on the safety framework protocol.  Targeted completion date is June 2007.

*FY 08 Department Update:* Department procedures require a rule out of dependency. Revised safety enhancement factors have been expanded.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

*FY 11 Department Update:* The training for Enhanced Safety Model began in the fall of 2011 and will be completed in spring 2012. The Enhanced Safety Model alerts staff to the dangers associated with a mentally ill parent who incorporates the child into their delusional system.

## PERSONNEL

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

**Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*, should be amended to provide for automatic suspension or denial of license application after a licensee or applicant has failed a drug test required by Administrative Procedure 24, *Drug Testing of Employment Applicants* (from OIG FY 08 Annual Report, General Investigation 32).**

*FY 08 Department Response:* The Department agrees.  The Department convened a task force that has developed language to amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*.

*FY 09 Department Update:* Pre-employment drug testing (Administrative Procedure 24) was suspended indefinitely due to budget constraints.

*FY 10 Department Update:* The Department began pre-employment drug testing in February 2008, but had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*  to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50, *Misconduct* (from OIG FY 10 Annual Report, General Investigation 21).**

*FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response:   The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years.    The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable

suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

**The Department should amend Rules and Procedures and develop protocol and contracts to provide an infrastructure of testing facilities for reasonable suspicion testing; definition of reasonable suspicion; procedure for developing a finding of reasonable suspicion and training for management and supervisors as necessary concerning reasonable suspicion determinations. Private agencies with Department contracts should also be required by contract or licensing rule to have policies at least as stringent as Department policies regarding training, testing and response to reasonable suspicion of drug or alcohol use on the job (from OIG FY 10 Annual Report, General Investigation 21).**

*FY 10 Department Response:* Management will seek to negotiate reasonable suspicion testing with the Union in the future.

*FY 10 OIG Response:   The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years. The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point. Management agrees that private agencies should be required by contract or licensing rule to have policies at lease as stringent as Department policies. If a reasonable suspicion policy is promulgated the Office of Employee Services will convene the Reasonable Cause Workgroup and ensure that private agencies are held to the same standard.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union*

*as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

**The Department should promulgate a Solicitation Policy to clarify that permissible solicitation is limited to break-time, in break rooms and only for not-for-profit activities (from OIG FY 10 Annual Report, General Investigation 20).**

> *FY 10 Department Response:* The Department agrees. A solicitation policy is being developed.

> *FY 11 Department Update:* The Department has drafted a solicitation policy to include in the Employee Handbook. The policy and Employee Handbook revisions are currently under review by management.

**Rule 437, *Employee Conflict of Interest*, should be amended to clarify that secondary employment must always be reported to one's supervisor.  The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict.  The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes (from OIG FY 09 Annual Report, General Investigation 25).**

> *FY 09 Department Response:* The conflict of interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest.*

> *FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

> *FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in fiscal year 2012.

**The Director should review whether the employee's contractual commitments compromise her appointment to the task force (from OIG FY 09 Annual Report, General Investigation 33).**

> *FY 09 Department Response:* This issue is currently under review by the Department.

> *FY 10 Department Update:* This issue remains under review.

> *FY 11 Department Update:* This recommendation will be sent to the Conflict of Interest Committee for review.

**The Department's Certification of License and Automotive Liability Coverage form for employee's signature should be amended to state "by the Illinois Secretary of State or other State _____" to address Department employees who live in states contiguous to Illinois (from OIG FY 09 Annual Report, General Investigation 8).**

*FY 09 Department Response:* The Budget and Finance Division will review the current form, modify the form and require use of the revised form for the next reporting period.

*FY 10 Department Update:* Revisions to the Auto Liability Coverage form is in process.

*FY 11 Department Update:* A revised form has been drafted and scheduled to be used starting in 2012. The revised form requires the employee to state that he/she is licensed to drive in Illinois (either directly by the Secretary of State or another State that is recognized by the Secretary of State of Illinois). Additionally, each employee is currently required to certify on each travel reimbursement request that "I am a duly licensed driver and carry minimum coverage as required by Illinois Vehicle Code." Management will address failure to file the required insurance form through the existing supervisory and disciplinary processes.

**A task group should be assembled to revise Rule 437,** *Employee Conflict of Interest***, and draft related Procedures. Procedural additions should include:**

     **a. If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer. In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**

     **b. The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**

     **c. Instructions on how to contact the Conflict of Interest Committee.**
        **All DCFS employees should receive training on the revised Rule and Procedures 437,** *Employee Conflict of Interest* **(from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 07 Department Response:* A task group was assembled, but is currently in abeyance, and the Director is currently reviewing possible changes to Rule 437.

*FY 08 Department Update:* The conflict of interest workgroup has reconvened and is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*, and in drafting new procedures that support the revised rule. The anticipated completion of revised Rule 437, *Employee Conflict of Interest*, is March 2009.

*FY 09 Department Update:* The workgroup has reconvened to address outstanding issues, including fire walls and secondary employment. We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011. A copy will be sent to the OIG upon completion. Draft procedures will follow once the rule has been adopted.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in fiscal year 2012.

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

*FY 06 Department Response:* The procedures have been drafted by the Conflict of Interest Committee.

*FY 07 Department Update:* The Director is considering the recommended changes.

*FY 08 Department Update:* A Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest,* and is drafting new procedures that support the revised rule.  The anticipated date of completion is March 2009.

*FY 09 Department Update:* The workgroup has been reconvened to address outstanding issues, including fire walls and secondary employment.  We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee.  The Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437, *Employee Conflict of Interest*.  The anticipated completion date for submission of the draft of Rule 437, *Employee Conflict of Interest,* for internal and external comment is January 2010.

*FY 10 Department Update:* Anticipated completion date for submission of draft Rule 437, *Employee Conflict of Interest,* for internal and external comment is the first quarter of 2011.

*FY 11 Department Update:* Revisions to Rule 437, *Employee Conflict of Interest*, have been drafted. It is anticipated that the first notice will be published in fiscal year 2012.

## SERVICES

**The Department should provide training to Day Care Coordinators in the region on teen parents' rights to education services including daycare allowing the teen to attend school (from OIG FY 10 Annual Report, Death and Serious Injury Investigation 3).**

*FY 10 Department Response:* The training curriculum for Day Care Coordinators has been revised to incorporate specific information about teen parents' rights to education services including providing daycare for their children so that the teen can attend school.  The revised training is scheduled to be conducted by the Day Care Licensing Administrative staff in January, 2011.

*FY 11 Department Update:* DCFS Monitoring staff will collaborate with Teen Parent Service Network program staff and the Teen Parent Consultant to provide training during fiscal year 2012.

**Pre-adoptive Home Studies of wards or former wards must require children's collaterals and professional collaterals, especially school personnel to objectively ensure the accuracy of information provided (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

*FY 09 Department Response:* Child protection investigators make this determination as they go through the investigative process.

*FY 09 OIG Response: The Department response does not address pre-adoptive home studies, which need to inform the courts of direct information from collaterals in the child's life, such as teachers.*

*FY 10 Department Update:* Rule and Procedure will be revised as well as the template outline for the information included in the adoption study.

*FY 11 Department Update:* The template outlined for the adoption home study as well as Rule and Procedures are still in the process of being revised.

**The Subsidized Guardianship Agreement (CFS-1800) should be amended.  At a minimum this agreement should allow for payment suspension and termination of the agreement when custody of a minor is restored to a biological parent.  In the interest of complete and full disclosure however, the possibility of a child returning to his/her biological parent and the steps necessary for that to occur should be clearly identified in the General Provisions Section of the Agreement (from the OIG FY 07 Annual Report, Older Caregivers Addendum).**

*FY 07 Department Response:* The Department agrees.

*FY 08 Department Update:* The Department is continuing to review implementation of the recommendation.

*FY 09 Department Update:* The forms, as well as rule and procedure, do currently provide termination criteria that would cover the return of the youth to a birth parent.     There is no language in a subsidy agreement about return to a birth parent, since it is not expected; and it is inappropriate to provide this type of language in a contractual agreement with the subsidized guardians.

*FY 09 OIG Response: OIG investigations as well as reports from the field support that return to a birth parent does occur and needs to be subject to procedures when it does occur. Recent amendments to the Adoption Act (705, ILCS, 405/12-34) also support the need for the Department to recognize the possibility of return home.*

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The termination criteria outlined in the body of the subsidy includes any circumstance in which the guardian is no longer legally or financially responsible for the child, including situations in which a birth parent regains custody or guardianship of their child.

**The Department must monitor and enforce contract compliance of POS agencies with Department contracts to acknowledge and include fathers and paternal family members as an integral part of case management services.  Department monitors must ensure that Department Procedures 302:** *Services Delivered by the Department* **and Appendix J,** *Pregnant and/or Parenting Program***, is followed (OIG FY 07 Annual Report, General Investigation 22).**

*FY 07 Department Response:* The Department agrees.  A memorandum is being drafted to DCFS and private agency staff.  Target completion date:  December 2007.

*FY 08 Department Update:* The newly appointed Deputy for Monitoring is reviewing this recommendation and will address this issue by February 2009.

*FY 09 Department Update:* The Fatherhood Initiative addresses this issue.

*FY 09 OIG Response: The Fatherhood Initiative expresses an important goal of the Department but does not provide practical means of monitoring or assessing the adherence to that policy. Moreover, only 104 cases statewide have been referred to the Fatherhood Initiative Programs, according to the most recent data. The Department needs to secure broader participation for father of DCFS involved children.*

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Learning Collaborative on Father Involvement was held in the spring of 2011 for DCFS and POS placement staff.  In addition, Field Operations staff will provide information on the current Fatherhood Initiative to Agency Performance Team monitoring staff, which will in turn be shared with POS providers during fiscal year 2012.

**Procedures for Child And Youth Investment Teams (CAYIT) should be amended to include situations in which a move is requested for any reason other than a ward's best interest (OIG FY 07 Annual Report, General Investigations 14).**

*FY 07 Department Response:* The Child and Youth Investment Teams (CAYIT) Policy is currently under review.  Target completion date:  February 28, 2008.

*FY 08 Department Update:* The Child and Youth Investment Teams (CAYIT)  procedures, *Policy Guide 2006.04*, have been revised to clarify and differentiate the referral process for placement changes through CAYIT, Clinical Placement Staffing Review and Residential Transition Discharge Planning Protocol.  The revised procedure will be sent to the Office of Child and Family Policy for review and then sent out for comment.

*FY 09 Department Update:* Draft revisions to the Child and Youth Investment Teams (CAYIT) policy have been completed and submitted to the Office of Child & Family Policy for review and completion of revision process.

*FY 10 Department Update:* The Child and Youth Investment Teams (CAYIT) Policy was amended March 2010 which clarified the referral processes.

*FY 10 OIG response: The amended Child and Youth Investment Teams (CAYIT) policy does not address this referral issue.*

*FY 11 Department Update:* The Child and Youth Investment Teams (CAYIT) policy has been submitted to the Office of Child and Family Policy for revision. The revised CAYIT policy will address the OIG recommendation by requiring that any request to move a youth deemed other than in the ward's best interest will be referred to the assigned caseworker's supervisor and Regional Administrator or private agency Director for follow-up.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues.  When it is completed the informational transmittals will go out to DCFS and private agency staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The Emergency Reception Center Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

*FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

**When a medical report indicates that a caregiver, regardless of age, may not be capable of caring for a child into adulthood, the back-up caregiver should sign a statement that he/she is aware of that fact and is still willing to serve as the back-up caregiver (from OIG FY 05 Annual Report, General Investigation 19).**

*FY 07 Department Update:* Revisions to Rule 309, *Adoption Services,* have been made by the Office of Child and Family Services and it is under review. Target completion date is March 2008.

*FY 08 Department Update:* The CFS 486, *Adoption Conversion Assessment*, section 16, addresses the back-up caregiver issue.

*FY 08 OIG Response: The CFS 486, Adoption Conversion Assessment, provides for discussion with a back-up caregiver, but it does not address the back-up caregiver's awareness of the caregiver's potential incapacity and need for signature reflecting that awareness and willingness to serve as the back-up caregiver.*

*FY 09 Department Update:* The Department has submitted draft amendments to Rule 302.40, *Department Service Goals,* to implement this change.

*FY 10 Department Update:* The amendments to Section 302.40, *Department Service Goals,* are expected to be adopted by the first quarter of 2011.

*FY 11 Department Update:* Policy Transmittal 2011.07, *Department Service Goals*, was issued in March 2011, to announce amendments to Rule 302.40, *Department Service Goals*, which includes information on the back-up caregiver program.

**In split custody cases with a history of substance abuse and relapse, the Department should require random drug drops to assist the Department in securing necessary services for the children and family. In cases of alcoholism, random urine testing is not reliable. Breathalyzers are preferable. The OIG reiterates its prior recommendation that DCFS acquire breathalyzers and train on their use (from OIG FY 04 Annual Report, Death and Serious Injury Investigation 21).**

*FY 07 Department Update:* The Department has implemented new substance affected family policies that include drug testing requirements. Staff are being trained on the procedures as part of the Reunification training. An inter-division work group is developing additional guidelines for drug testing DCFS clients and monitoring DCFS drug testing contracts. The work group is developing standards for frequency and duration of drug testing, use of breathalyzers, and the panel of drugs for which to test. Anticipated completion date is the fourth quarter of FY 08.

*FY 08 Department Update:* The recommendation is in progress and the anticipated date of completion is March 2009.

*FY 09 Department Update*: A drug testing protocol was developed in November 2008 which addressed frequency of testing, random testing, drugs to be tested, and custody and control procedures. A list of review criteria identifying potential red flags was developed for DCFS contract monitors reviewing drug testing vouchers. A revised Program Plan for DCFS toxicology testing contracts was developed. The Program Plan incorporates the requirements and procedures of the drug testing protocol by reference and also adopts the random testing requirements of the protocol. The new Program Plan is expected to be implemented for the FY11 contracts.

*FY 10 Department Update:* The Department and the OIG agreed to train workers to use the urine screen technology and contractors in cases of suspected alcohol abuse. Alcohol will be one of the 10 substances tested and workers will be trained on special procedures relevant to suspicions of alcohol abuse. The Procurement Office is preparing to release the request for proposal (RFP) by the end of February 2011 and the award is expected for FY 2012.

*FY 11 Department Update:* The Request for Proposals from potential vendors for toxicology services is due November 2011. The solicitation includes provisions for random drug testing and testing for alcohol.

252

> # UNRESOLVED RECOMMENDATIONS
> # IMPACTING CHILD SAFETY

The following Inspector General recommendations impact child safety and have been either rejected by the Department or pending for at least 4 years without resolution.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 07 Department Response:* The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The targeted date of completion is May 2008.

> *FY 08 Department Update:* The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package.  The anticipated date of completion is February 2009.

> *FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

> *FY 10 Department Update:* Amendments to ANCRA addressing this issue will be submitted as part of the legislative package for the spring 2011 session.  The estimated date of completion is spring 2012.

> *FY 11 Department Update:* The Office of Legal Services will work with Legislative Affairs to incorporate language into the Abused and Neglected Child Reporting Act pertaining to sharing unfounded reports during a criminal or child protection investigation.

**The State Central Register should revise the Notice of Indicated Finding sent to parents to ensure that parents know the identity of the indicated perpetrator or whether the allegation was indicated to an unknown perpetrator (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 6).**

> *FY 05 Department Response*:  This recommendation is under review by the DCFS Office of Legal Services because of the impact it may have on the DuPuy Federal lawsuit.

> *FY 06 Department Update*:  Revisions are on hold pending implementation of the changes required by the DuPuy Federal lawsuit.  Changes will be implemented as soon as possible, but no later than July 17, 2007.

> *FY 07 Department Update:* Revisions were placed on hold by DCFS Office of Legal Services due to changes required by DuPuy Federal Lawsuit.  As of November 2007, litigation is ongoing and

it appears additional changes to the notice form may be required. DCFS Office of Legal Services will continue to monitor and will draft an updated form when legal issues have been resolved. The anticipated implementation date is May 2008.

*FY 08 Department Update:* Revisions to the notification letter are in process and will be completed by June 2009.

*FY 09 Department Update:* Recommendation in progress. Estimated completion date: Summer 2010.

*FY 10 Department Update:* Implementation was delayed due to ongoing litigation now in final stages. The estimated completion date is summer 2011.

*FY 11 Department Update:* The Office of Legal Services is working with the Administrator of State Central Register to revise all notification letters.


**The OIG recommended that Rule 412,** *Licensure of Direct Child Welfare Services Employees and Supervisors***, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**

- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue to include any crime of which dishonesty is an essential element;**

- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**

- **To provide guidelines for assessing criminal convictions and abuse or neglect findings that are not bars to licensure;**

- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26)**.

*FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412 *Licensure of Direct Child Welfare Services Employees and Supervisors*. The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

*FY 08 Department Update:* The revisions to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The amended Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* with the Joint Committee on Administrative Rules.

**The Department should amend Rule 412, *Licensure of Direct Child Welfare Services Employees and Supervisors*, to provide specific provisions for voluntary relinquishment of a child welfare employee license (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**

- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**

- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the Division.   The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings.  Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished shall be considered a Request for Reinstatement rather than an Application for License.**

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* with the Joint Committee on Administrative Rules.

**Section 412.100, *Restoration of Revoked or Suspended License*, should be amended as follows: Section 412.100, *Restoration of Revoked, Suspended or Relinquished License*: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request.  In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board**

shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation.   For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown.   The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so.   Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to:   the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).

*FY 08 Department Response:* The Department agrees.  The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, *Restoration of Revoked or Suspended License*, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

*FY 11 Department Update:* The Department will resubmit the amendments to Rule 412 *Licensure of Direct Child Welfare Services Employees and Supervisors* with the Joint Committee on Administrative Rules.


**Contracts should require quarterly reports from mentoring and counseling agencies on progress toward achievement of program plan goals, both in relationship to individual clients and, in the aggregate, for all clients served under the contract (from OIG FY 08 Annual Report, General Investigation 24).**

*FY 08 Department Response:* The Department agrees.  Revised requirements will be included in FY10 contracts.

*FY 09 Department Update:* The Department continues to include revised requirements in contracts.  The estimated date of completion is July 2010.

*FY 10 Department Update:* Implementation of the recommendation is still in progress.

*FY 11 Department Update:* The standardized counseling program plans are currently under review for inclusions of changes to program plan goals and submittal requirements. In addition the Office of Contract Administration will continue to work with other Divisions to make needed changes to their non-standardized program plans to meet this requirement. Fiscal year 2013, (effective July 1, 2012) counseling and mentoring contracts should reflect this recommendation.

*FY 11 OIG Response: The OIG reviewed the standardized program plan submitted by the Department and determined that it contained many of the same problems identified in two recent OIG fraud investigations. Specifically, the program plan does not require that the agency serve DCFS-involved families (such as intact families, subsidized guardianship families, teen parents and their significant*

*others). The quarterly reports required in the program plan fail to provide objective measures of services provided, such as number of DCFS clients served, hours and type of services provided, progress toward achieving set goals. In addition, the program plan promises counseling and casework services, but provides for staff without the credentials to offer such services. While mediation is an offered service, the program plan does not specify training or certification for mediators.*

**Drug and alcohol toxicology contracts should be competitively bid (from the OIG FY 07 Annual Report, General Investigation 1).**

> *FY 07 Department Response:* The Department agrees. This will be implemented with fiscal year 2009 contracts.
>
> *FY 08 Department Update:* Due to the program plan and protocol changes, this service was not bid in FY 2009. It is anticipated that the service will be out for bid in fiscal year 2010.
>
> *FY 09 Department Update:* Due to retirement and staff changes and the new committee that developed recommendations, it is still anticipated that services will be put out for bid for fiscal year 2011.
>
> *FY 10 Department Update:* The Procurement Office is preparing to release the request for proposals (RFP) in February 2011 and the award is expected in fiscal year 2011.
>
> *FY 11 Department Update:* The Procurement Office posted the Invitation For Bid for toxicology contracts but the Invitation for Bid was cancelled by the State Procurement Officer. The Office of Contract Administration and the Procurement Office are working to resolve questions received from potential vendors before reposting the Invitation for Bid.

**In order to satisfy Department Rule 402.8, *General Requirements for the Foster Home*, the Department should incorporate into a licensing safety assessment the guidelines set forth by the American Humane Society regarding the observation of family pets in their natural environment. These guidelines, detailed below, should also be incorporated into Part 300, *Reports of Child Abuse and Neglect* and Part 406, *Licensing Standards for Day Care Homes* (From OIG FY 09 Annual Report, Death and Serious Injury Investigation 11).**

*<u>Guidelines from the American Humane Society</u>*
*In a publication entitled "A Common Bond: Maltreated Children and Animals in the Home" published by the American Humane Society, authors Mary Lou Randour and Howard Davidson propose that a child welfare safety assessment of animals and children should include animal related questions and observation of interactions between family members and family pets. The Humane Society recommends observation of the animal in its daily environment, and that when making a home visit the observer can incorporate the following questions into the interview:*

- *Do you have any family pets or other animals in your home?*
- *May I see them, or can you bring them out?*
- *What can you tell me about your pets?*
- *Who takes care of them?*
- *What happens when one of them is disobedient?*
- *Who disciplines them?  How do they do that?*

- *Have you had any other pets?  What happened to them?*

*When observing interactions between the family members and their pets, the following should especially be considered:*

- *Are there any family pets that might be classified as a breed that is associated with animal fighting or other crimes?  The presence of a high-risk pet could place children and other family members in danger.*
- *Do the animals seem relaxed around all family members, or do they seem to avoid, or appear anxious around, one or two particular family members?*
- *How does the presence of the animals affect the family interactions?*
- *If there is a dog in the home, does the child have access to the area where the dog is kept?*
- *If the child is near the dog, how is s/he supervised?*
- *How much time does the dog spend interacting with family members?*
- *What socialization has the dog had with children?*
- *Has the dog received obedience training?*
- *Does the dog have a history of aggressive behaviors?*

*FY 09 Department Response:* The Office of Child and Family Policy and the Licensing Unit are developing a form to be signed by the foster parent responding to several questions about dangerous pets listed in the American Humane Society guide.  Once this language is drafted, similar language will be drafted for Department Procedures 406 and 408 *Licensing Standards for Daycare Homes*. In addition, new legislation requires cross-reporting between child abuse investigators and animal abuse investigators.

*FY 10 Department Update:* After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive or not is beyond the scope and expertise of the licensing workers.  Procedures 300 *Reports of Child Abuse and Neglect* and the Safety Checklists have been drafted.

*FY 10 OIG Response: After a child was viciously mauled and killed by dangerous animals in a foster home, the OIG recommended that Licensing address this clear safety hazard. The Child Death Review Team supported the OIG's recommendation. It is unconscionable that the Department refuses to recognize its responsibility to address this safety issue in licensed foster homes.*

*FY 11 Department Update:* On July 8, 2010, the Department issued Policy Transmittal 2010.11, *Revised Procedures 300.50 (j) and the Home Safety Checklist.*  The Policy Transmittal addresses the expectations for Child Protection Investigation Specialists.   After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive or not is beyond the scope and expertise of the licensing workers.

**The Department should develop guidelines for shared monitoring responsibilities when a single foster home has children monitored by different agencies or when the case monitoring and license monitoring functions are split between agencies. The guidelines should include the following requirements:**

    a.  **a staffing of all involved case and licensing workers;**

    b.  **written agreement of roles and responsibilities of each worker;**

c.  **written guidelines concerning the responsibility to share information and the process for sharing information (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. POS may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* The Deputy Director of Monitoring will co-chair a subcommittee with Agency Performance Team, Licensing, private agency and Department staff to address these issues.  The anticipated start date is January 2012.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

*FY 11 Department Update:* Agencies are not penalized when case responsibility is transferred to a single agency.

*FY 11 OIG Response: The recommendation did not concern assignment of cases but rather transfer of existing cases. To level the playing field, the agency transferring the children should receive immediate consideration for new placements.*

**Rule 412,** *Licensure of Direct Child Welfare Service Employees and Supervisors***, should be amended to provide for automatic suspension or denial of license application after a licensee or applicant has failed a drug test required by Administrative Procedure 24,** *Drug Testing of Employment Applicants* **(from OIG FY 08 Annual Report, General Investigation 32).**

>*FY 08 Department Response:* The Department agrees.  The Department convened a task force that has developed language to amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors*.

>*FY 09 Department Update:* Pre-employment drug testing Administrative Procedure 24, *Drug Testing of Employment Applicants*, was suspended indefinitely due to budget constraints.

>*FY 10 Department Update:* The Department began pre-employment drug testing in February 2008, but had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

>*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors.  Direct child welfare service employees and supervisors are bargaining unit members.  As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units.  Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements.  Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements.  Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile.  The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years.  The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services.  Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses.  The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure.  The Department has failed to act on the recommendation.*

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

>*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

>*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

>*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement

this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 11 Department Update:* Management fully supports reasonable suspicion testing for direct child welfare service employees and supervisors. Direct child welfare service employees and supervisors are bargaining unit members. As such implementation of reasonable suspicion drug/alcohol testing, unless legislatively mandated, must be negotiated with the collective bargaining units. Management routinely proposes to CMS Labor Relations that reasonable suspicion testing be included in collective bargaining agreements. Management also routinely proposes that reasonable suspicion testing be added to supplemental collective bargaining agreements. Without a reasonable suspicion testing policy in place amendment of Rules and Procedures is futile. The State will be involved in contract negotiations with AFSCME in 2012 and the Department intends to continue pressing this point.

*FY 11 OIG Response: The OIG notes that the City of Chicago and both the Illinois State Police and the Department of Corrections have had Reasonable Suspicion Testing for several years. The City of Chicago and the Department of Corrections employees are represented in large part by the same union as most employees with the Department of Children and Family Services. Moreover, Direct Child Welfare employees and supervisors at DCFS must possess Child Welfare Employee Licenses. The OIG has urged since 2005 that Reasonable Suspicion Testing be added as a requirement for Child Welfare Licensure. The Department has failed to act on the recommendation.*

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families. Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

*FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program. However, the Division of Service Intervention

gets a weekly report from Quality Assurance on Cook County substance exposed infant cases. The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

> *FY 10 Department Update:* Revisions to Policy Guide 99.13, *Services for DCFS Substance Affected Families*, are currently being drafted.

> *FY 11 Department Update: FY 11 Department Update:* The Divisions of Service Intervention, Child Protection and Monitoring will form a committee to review policy and resources to address this issue.

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

> *FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues.  When it is completed the informational transmittals will go out to DCFS, POS, CWS, and DCP staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

> *FY 08 Department Update:* The ERC Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

> *FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

> *FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

> *FY 11 Department Update:* Restructuring of the Emergency Reception Center (ERC) is still planned therefore the implementation of the ERC Protocol is still on hold at this time.

**The Director should issue a letter to the Coroner requesting that she appoint or designate a board certified forensic pathologist to conduct the autopsies of children when there is an open child protection investigation (from OIG FY 10 Annual Report, Death and Serious Injury Investigation1).**

> *FY 10 Department Response:* The Department does not agree.

# APPENDIX

**APPENDIX A:**

**TEN-YEAR REVIEW OF DEATHS OF CHILDREN OF DCFS PARENTING TEENS**

# OFFICE OF THE INSPECTOR GENERAL
## Department of Children and Family Services

**File No:**      11-3380
**Subjects:**    Ten-Year Review of Deaths of Children of DCFS Parenting Teens
**Date:**         June 30, 2011

## Introduction

Over the last 10 years (FY 2000-2010) the IDCFS Office of the Inspector General has gathered data on the deaths of children who were involved with the Department or whose family was involved with the Department within the 12 months prior to the child's death. This ten-year report focuses on the deaths of children of wards where the ward was involved with DCFS within a year of their child's death, and the child was not him or herself a ward.[1]  Between FY 2000 and FY 2010, fifty children's deaths met these criteria. The OIG reviewed these deaths to explore the factors that may have contributed to the children's deaths and make recommendations to potentially lower infant mortality and improve services to teen wards and their children.

In FY 2010, DCFS had 594 parenting wards, ages fourteen to twenty-one, who had 544 children in their care.[2]  Eighty-five percent of the parenting wards were mothers.  Eighty-two percent lived in Cook or collar counties. In FY 2010, seven (1%) children of wards died. FY 2010 had the second highest number of deaths of children of wards since 2003, when 12 children died.[3]

### FY 2010: DEATHS OF CHILDREN OF WARDS

| Child | Age of child | Cause of death | Manner of death |
|-------|-------------|----------------|-----------------|
| 1 | 0 | Stillborn | Natural |
| 2 | 2-1/2 months | Sudden Infant Death Syndrome (SIDS) | Natural |
| 3 | 6 months | Bronchopneumonia | Natural |
| 4 | 11 days | Suffocation | Accidental |
| 5 | 2 months | Overlay | Accidental |
| 6 | 4 months | Dehydration due to gastroenteritis with failure to thrive a significant contributing factor | Homicide |
| 7 | 17 days | Undetermined, cannot exclude suffocation | Undetermined |

## Ten Year Review FY 2000 – FY 2010

The deaths of infants and young children are classified in one of four manners: natural, accidental, homicide, or undetermined.

---

[1] One ward who emancipated 15 months prior to her child's homicide was included.
[2] 115 additional children were in the custody of the Department.
[3] In 2003, ten of the parents were wards at the time of their child's death and two parents had recently been emancipated from the Department's care.

*Manner of Death: Natural*
Forty-three percent (21) of the 50 children's deaths were from natural causes: complications from birth, birth defects, illnesses, and SIDS. Seven of the infants died at birth, and a seven-day-old infant, who never left the hospital, died from congenital cardiac abnormalities. One ten-day-old infant died from myocarditis and a twenty-six-day-old infant died from sepsis, likely contracted at labor. The mother of the sepsis infant had received regular prenatal care. Four infants between the ages of 13 days and 6 months died from bronchopneumonia, a common and often undetected illness in infants. One four-month-old died from septic shock metabolic acidosis. Six infants between the ages of 1½ months and 4 months died from SIDS. Deaths attributed to SIDS accounted for 29% of the natural deaths.

**FY 2000-2010: DEATHS RULED NATURAL**

| Child(ren) | Age of child | Cause of Death | Manner of Death |
|---|---|---|---|
| 1 to 7 | Birth | Stillborn, prematurity, amnionitis | Natural |
| 8 | 7 days | Congenital Cardiac Abnormalities | Natural |
| 9 | 10 days | Myocarditis | Natural |
| 10 | 26 days | Sepsis | Natural |
| 11 to 14 | 13 days - 6 months | Bronchopneumonia | Natural |
| 15 | 4 months | Septic Shock Metabolic Acidosis | Natural |
| 16 to 21 | 1.5 months - 4 months | SIDS | Natural |

*Manner of Death: Undetermined*
The death of an infant or young child is classified as undetermined when the medical examiner or coroner cannot determine conclusively another manner of death (i.e., natural, accident, or homicide). Ten percent (5) of the deaths of children of wards were ruled undetermined in manner.

In the first of the five cases, a three-month-old had been left in the care of her twenty-one-year-old father and later with her eighteen-year-old paternal uncle. The uncle laid her to sleep on an adult bed, face down on a soft pillow. The medical examiner could not rule out asphyxia. In the second case, a two-year-old died of drowning in the bathtub while being cared for by her nineteen-year-old father while her mother, a DCFS ward, was at work. At autopsy, unexplained bruises were found on the child, so the manner of death was listed as undetermined.

In the third case, a 1½ month-old was found unresponsive by his mother, a twenty-year-old DCFS ward. An autopsy and scene investigation were conducted. The autopsy did not reveal a cause of death and the scene investigation did not uncover any problems. During the police investigation, however, witnesses reported some small inconsistencies. One witness reported that they heard the mother fighting with someone. Another witness said they saw the mother's boyfriend running out of the building. Neither of the witnesses or their stories was deemed credible, which in addition to the reported inconsistencies, led the manner of death to be ruled undetermined.

The fourth case involved a three-week-old infant who was in the care of her mother, a DCFS ward, who woke up and found the baby unresponsive in the morning. The mother had breast-fed the baby and fallen asleep. It was unclear in what position the baby was placed when the mother fell asleep; thus, the medical examiner could not determine if the death was natural or accidental.

In the fifth case, a sixteen-day-old infant was placed on his mother's chest to sleep and was found unresponsive. The pathologist reported the cause of death as undetermined, but could not exclude suffocation.

**FY 2000-2010: DEATHS RULED UNDETERMINED**

| Child | Age of child | Cause of Death | Manner of Death |
|-------|--------------|----------------|-----------------|
| 1 | 3 months | Undetermined | Undetermined |
| 2 | 2 years | Drowning | Undetermined |
| 3 | 1.5 months | Unknown | Undetermined |
| 4 | 3 weeks | Undetermined | Undetermined |
| 5 | 16 days | Undetermined Pathologist reported not to exclude suffocation | Undetermined |

*__Manner of Death: Accidental__*

Twenty-eight percent (14) of the 50 children's deaths were ruled accidental. Seventy-nine percent (11) of the accidental deaths were attributed to sleep-related events. Seven deaths of infants, all four months of age or younger, were from overlay. Of the remaining deaths, two were caused by asphyxia from trapping; one was from accidental suffocation; and one was from hyperthermia, after the infant was left bundled in a crib next to a heated radiator.

Of the remaining three accidental deaths, three children died in fires in Chicago. In 2001, a sixteen-year-old mother and her eight-month-old daughter died in an apartment fire. In 2002 a twenty-one-month-old toddler of ward parents died in an apartment fire at his grandmother's home after his mother had left him unattended while she went out in front to talk to his father. In 2004 an emancipated teen mother's three-and-a-half-year-old died in a fire in his aunt's home.

Seventy-two percent of the mothers had more than one child at the time of their infant's sleep-related death. Five of the mothers had two children; one mother had three children; and one mother had four children. In the seven cases involving mothers with more than one child, four infants died while sharing a bed with more than one other person. One died in a bed that he shared with his parents. Two died while placed in bed with their mother and their two-year-old sibling, and one infant died while placed in bed with his parents and his one-year-old brother.

**FY 2000-2010: DEATHS RULED ACCIDENTAL**

| Child(ren) | Age of child | Cause of Death | Manner of Death |
|------------|--------------|----------------|-----------------|
| 1 to 7 | 4 months or younger | Overlay | Accidental |
| 8 to 9 | 2 months | Asphyxia from Trapping | Accidental |
| 10 | 11 days | Accidental Suffocation | Accidental |
| 11 | 8 months | Hyperthermia | Accidental |
| 12 | 21 months | Fire | Accidental |
| 13 | 3.5 years | Fire | Accidental |
| 14 | 8 months | Fire | Accidental |

### *Manner of Death: Homicide*

Twenty percent (10) of the children were determined to be victims of a homicide. In six of the ten cases mothers were charged, including two cases where both the mother and her boyfriend were charged. Four of the 10 homicides were committed by fathers; three fathers were wards and one was not.

Homicide is the leading cause of infant deaths due to injury.[4] According to a National Institute of Health study, "The most important risk factors of infant homicide are a second subsequent infant born to a mother less than 17-years-old, no prenatal care and less than 12 years of education among mothers who were at least 17-years-old."[5]

*Mother Involved Homicides*
The six children killed by their mothers ranged in age from six months to three years; five of the children were over the age of fourteen months, eight to twelve months older than the fathers' infant victims (see section entitled *Father Involved Homicides*). At the time of the homicides, one mother had three children; two mothers had two children (including one caring for twins), and three were caring for a single child. Of the six homicides that involved ward or former ward mothers, all of the mothers had a history of mental illness. One mother had co-occurring mental illness and alcohol abuse problems, and one mother had only alcohol abuse problems.

*Mothers with a Diagnosis of Mental Illness*
The first of the six homicides involving a mother with a history of mental illness involved a twenty-one-year-old mother diagnosed with sickle cell anemia, with a history of depression and suicide. Twenty days prior to the death of her child, she was emancipated from the Department and moved into her own apartment. On the day of her child's death, she suffocated her 1-½-year-old by slamming a mattress on top of the toddler. The mother stated she was angry and stressed out from the move. She was found guilty of involuntary manslaughter and sentenced to 10 years.

In the second homicide, an eighteen-year-old ward with a history of mental illness and alcohol abuse, who had recently moved into her own apartment and enrolled in college, suffocated her three-year-old child by putting her hand over the child's mouth and nose because the child would not go to bed. The mother had been drinking for a number of hours before her child's death. She was found guilty, but mentally ill, of first degree murder and sentenced to 45 years.

The third homicide involved an eighteen-year-old mother of twins who had given birth while she was a runaway. She had a history of elopements, problems with alcohol and marijuana use and faced a delinquency petition after discharging a .357 Magnum at a housing project. She entered the care of the Department at the age of fourteen, had a borderline IQ and a history of depression and anger. Four months prior to killing her child, the ward had been emancipated from the Department. On the day of her baby's death, the mother repeatedly threw one of her seven-month-old twins down, hitting the child's head against objects and her twin sister's head. The surviving twin had a fracture to the back of her skull and subdural hematoma. The mother was convicted of murder and aggravated battery and was sentenced to 20 year and 10 year terms to run consecutively.

---

[4] Overpeck MD , New England Journal of Medicine. 1998 Oct 22;339 (17) 1211-6
[5] Ibid

The fourth homicide involved a nineteen-year-old mother of two children living in an independent living program, whose seventeen-month-old died of blunt force head trauma. Her surviving child was seven months old at the time of the toddler's death. The mother had a history of hospitalization, suicidal ideation, aggression and had been previously diagnosed with borderline personality disorder. The mother was convicted of murder and sentenced to 26 years.

In two of the homicides that involved ward mothers and their boyfriends, the mothers also had a history of mental illness or past psychiatric hospitalization.  In the first of these two homicides, the nineteen-month-old child of a mother with a history of psychiatric hospitalization and depression was scalded by hot water while in the care of her twenty-eight-year-old boyfriend.[6] The boyfriend was a former ward and father of three young children who often came to visit at his apartment. When the mother, who was a ward, discovered her son's burns, she kept the child from her caseworker and her transitional living staff, saying the child was visiting his biological father.  She did not seek medical care for the child, fearful, she later said, that her son might be taken from her. On the morning of his death, the mother left her son in her boyfriend's care. Her boyfriend later stated that he began hitting the crying child because he needed to sleep. Both were charged in the child's death. The mother entered a plea agreement, was convicted of child endangerment and was recently released from prison after having served a three-year sentence. She was emancipated from the Department shortly after her release from prison.

In the second homicide involving a mother and her boyfriend, the twenty-two-year-old mother had emancipated from the Department 15 months prior to her two-year-old child's homicide. The mother had a history of mental illness. The child died from multiple injuries and was drowned. At the time of the toddler's death, the mother also had a three-year-old and a five-month-old. The boyfriend was convicted of murder and sentenced to 29 years and the mother was sentenced to 15 years for aggravated battery of a child.

*Father Involved Homicides*
Four of the ten homicides of ward's children were committed by fathers. Of these four homicide deaths, three involved ward fathers and one involved a non-ward father. The victims in homicides involving fathers were infants between the ages of two months and six months.  The events that precipitated the father's actions included the baby crying, not taking a bottle and not falling asleep. At the time of the homicide, three of the fathers were caring for one child and one father was caring for two children.

A twenty-year-old father explained he began shaking his six-month-old daughter when he became frustrated with her crying.  He was not the primary caregiver of this child, but he was babysitting the child while her mother attended school. Three weeks prior to the infant's death, the caseworker discovered that his client was a father and had attempted to arrange for services, such as parenting and life skills classes.  The father was convicted of murder and sentenced to 26 years in prison.

The second ward father involved in a homicide was nineteen years old. He had been living with his nineteen-year-old girlfriend and her mother in a "self-selected" placement, as he had been running from his previous residential placements. In addition to the infant, the mother had a two-year-old child. The children's mother left the four-month-old and two-year-old in the father's care while she went to work. The father's caseworker had previously cautioned the mother not to leave the baby in his care because of his past violent/aggressive behavior**.** The infant was killed from injuries due to blunt trauma to the abdomen. He confessed to punching

---

[6] It was later learned that she also had a substance abuse problem.

his four-month-old daughter five to six times because she would not stop crying.  The father was charged with murder and is awaiting trial.

The last of the three homicide cases that involved a ward father was of a twenty-one-year-old youth, whose case was still open with the Department. He was caring for his two-month-old son at the time of his child's death. The ward had been described as a caring father who became upset when his son wouldn't take a bottle. He threw the infant into a bouncy seat and violently bounced the infant in the seat. The infant died of a subdural hematoma. The father was acquitted at trial.

The fourth homicide involved a twenty-two-year-old non-ward father who was not the primary caretaker of his child. His child died after he put alcohol in his baby's bottle to try to get the five-month-old to fall asleep. The child's mother was a ward. The father was sentenced to 5½ years for involuntary manslaughter.

**FY 2000-2010: DEATHS RULED HOMICIDE**

| Child | Age of child | Cause of Death | Manner | Perpetrator |
|-------|-------------|----------------|--------|-------------|
| 1 | 7.5 months | Abusive Trauma | Homicide | Mother |
| 2 | 3 years | Smothering | Homicide | Mother |
| 3 | 17 months | Multiple Injuries due to Blunt Force Trauma | Homicide | Mother (alleged) |
| 4 | 2 years | Multiple Injuries due to Child Abuse, Drowning | Homicide | Mother and Mother's Boyfriend |
| 5 | 19 months | Multiple Injuries | Homicide | Mother and Mother's Boyfriend |
| 6 | 1.5 years | Suffocation | Homicide | Mother |
| 7 | 4 months | Multiple Injuries due to Blunt Trauma | Homicide | Father |
| 8 | 6.5 months | Multiple Injuries due to Blunt Trauma | Homicide | Father (alleged) |
| 9 | 5 months | Excessive Alcohol Poisoning | Homicide | Father |
| 10 | 2 months | Injuries due to Blunt Trauma | Homicide | Father |

**Recommendations for Intervention**

***Use of Title X Clinics***

Nationally, the average age of first-time mothers is twenty-five and in Illinois the average is approximately the same (25.4). The average age of first birth nationally has increased 3.6 years from 1970 to 2006, from 21.4 to 25.0.[7] According to current TPSN statistics, the average age of conception for teen wards in Illinois is 16.3. Seventy-two percent of parenting wards have one child or are expecting their first child. Twenty-eight percent of parenting wards have two or more children. This data supports a more proactive approach towards pregnancy prevention.

A 2002 OIG report on the Teen Parent Service Network recommended utilizing Title X clinics to target the needs of high-risk teen mothers in a more coordinated and dependable way. For many young women, Title X clinics are the entry point into the health care system, and more

---

[7] NCHS Data Brief, August 2009

than half report it to be their primary source of care.[8] Some Chicago Title X clinics, such as those funded through the Chicago Department of Public Health, are staffed with nurse midwives who have specific training in providing family planning and pregnancy support to teens and young mothers. The nurse midwives are affiliated with community hospitals. After delivery, the parents are encouraged to return to the clinic for family planning services, as well as ongoing pediatric care for their child.

In Chicago, Title X clinics are managed by the Department of Human Services (DHS). DHS involvement makes these clinics a natural setting to assess client eligibility and assist workers in applying for teen-oriented DHS programs, which include Chicago Healthy Start, Targeted Intensive Prenatal Case Management, Healthy Families Illinois, Parents Too Soon, and the Illinois Subsequent Pregnancy Program. These programs are community-based and can help establish a support system with a social institution that mothers can continue to access after emancipation.  Furthermore, DHS maintains a record of program outcomes which can help workers determine which supports may be most effective, given their clients' particular needs. Historically, TPSN has not established a collaborative relationship with DHS. A misperception appears to have developed, which led case managers to believe that ward parents are not eligible for DHS services because they were already receiving services through TPSN or the Department. As a result, many TPSN workers are not aware that their clients are eligible for DHS programs located in the communities where they reside.

Two nationally recognized Title X programs emblematic of the type of programs our teen wards would most benefit by attending are: Rush University Medical Center Teen and Young Adult Family Center and Erie Family Health Center Teen Health Services. Both programs offer comprehensive family planning and prenatal care. The Rush Adolescent Family Center has two locations, one in Evergreen Park and the other on the main hospital campus located on the near west side of Chicago. Services are provided to teens and young adults ages 12 through 23 years. Teen mothers deliver their babies at Rush University Medical Center and return to the teen program for follow-up, family planning and pediatric care for their child.

Erie Teen Health Services has locations in West Town, Humboldt Park, North Kedzie Avenue, Uptown and in a clinic located at Clemente High School. Teens receiving prenatal care are enrolled in the Centering Pregnancy program, where they participate in services with a group of other expectant teen parents who are due to deliver their child at approximately the same time. Youth enrolled in the Erie Teen Health program deliver their babies at Northwestern Memorial Hospital and Prentiss Hospital. Also, similar to Rush's program, the parents return to the Teen Health program for family planning and pediatric follow-up. Both programs offer services that encourage fathers' involvement during prenatal appointments and during contraception decision-making.

As medical and social service supports are established, it is equally important to create data collection systems for tracking utilization patterns. Currently, TPSN does not maintain statistics on prenatal care visits or utilization of nutrition support programs, such as WIC. Increased utilization of these resources would benefit both mother and infant. For example, in addition to providing access to grocery store foods and farmers' market produce, WIC also gives breastfeeding support, nutrition education, and referrals to health and social service agencies, such as the DHS teen parent support programs mentioned above. Collecting prenatal and WIC data are important prevention strategies for reducing premature births and decreasing child

---

[8] Susan Moskosky, MS, RNC, Director, Office of Family Planning, Office of Population Affairs, Fourth National Title X Grantee Meeting Chicago, IL August 19-21, 2009

death within the first year of life. TPSN and the Department, for contract purposes, should identify which agencies are most effective in linking teen parents with targeted Title X and WIC services.

### *Providing Transportation and Incentives for Pre-natal, and Post-partum Appointments*

State contracted Managed Care programs, such as Harmony and Family Health Network pregnancy programs, provide extensive supportive services to ensure consistent attendance at pre-natal and well baby appointments. Both programs provide transportation (not tokens, not bus passes), financial incentives and baby equipment to increase the number of moms-to-be that attend 100% of pre-natal appointments and return for post-partum checkups and well baby care.

### *Sleep Patterns of Adolescents*

Approximately 30% of all parenting wards have two or more children.[9] Extra precautions should be taken with wards with more than one child, as it appears that they are more likely to engage in unsafe sleep practices. For some parents who may have slept "safely" with their first child, they may not consider the decision to sleep with their second child a risky behavior. In addition to the demands of caring for multiple children, adolescents also experience shifts in sleep patterns. These changes in adolescent sleep needs may contribute to situations where wards' children are placed to sleep in unsafe locations.

According to the American Pediatric Society, adolescents require approximately nine hours of sleep, 23% of which is spent in slow wave sleep (commonly called "deep sleep") where it becomes very difficult to wake the sleeper. As the chart illustrates, during the early- to mid-twenties, deep sleep decreases by up to 40%.



**Figure 2**—Age-related trends for stage 1 sleep, stage 2 sleep, slow wave sleep (SWS), rapid eye movement (REM) sleep, wake after sleep onset (WASO) and sleep latency (in minutes).

Meta-Analysis of Quantitative Sleep Parameters From Childhood to Old Age in Healthy Individuals: Developing Normative Sleep Values Across the Human Lifespan. Ohayon M., Carskadon M, Guilleminault C, Vitiello M (2004) *SLEEP, Vol. 27, No. 7, p. 1255 – 1273.*

---

[9] TPSN Year in Reviews, 2008, 2009, 2010

These sleeping trends highlight that young persons ages 12 – 20 are more difficult to rouse.[10] Deep sleep can present increased risk if a young parent inadvertently rolls onto their child, or is unable to respond to their child's cries if their child becomes trapped in bedding. Also, being awakened from deep sleep is associated with increased grogginess and impaired mental performance. It is likely that a parenting ward receives much less sleep than what is considered optimal. Insufficient sleep is associated with irritability, mood swings, behavioral problems and difficulty waking up.

It is not uncommon for adolescents to experiment with marijuana, the use of which increases the duration of deep sleep, and further increasing the difficulty of wakening the sleeper. Thus, a parenting ward caring for an infant may place her child at greater risk of overlay should she use and then sleep with her child. Also, for sleep deprived youth, the effects of alcohol on the body are magnified, so that exhausted youth may experience more severe impairment affecting their ability to use good judgment and potentially placing their child to sleep in unsafe locations.

Makeshift sleeping situations place an infant at greater risk of overlay death. Making portable cribs available to wards is an important prevention strategy to minimize overlay death and provide an opportunity to encourage safe sleep practices. In addition to providing cribs, case managers must make regular home visits to encourage and monitor appropriate crib use. This reinforcement is particularly crucial during the first six months of the infant's life as this period is associated with heightened risk for sleep-related death. Portable crib use should also be supported wherever and whenever a ward is away from placement. For example, a young mother who visits her child's father with their baby should have a portable crib available for use at his home. To further reduce the rate of sleep related deaths, case managers should provide education to both the mother and father about safe sleep practices, such as always placing the child in a crib, on its back to sleep, tucking in blankets around the crib mattress, and keeping pillows and stuffed toys out of the crib.[11]

### _Reduce Violent Responses to an Inconsolable Infant_

Studies show that 80% of infants between the ages of three and twelve weeks have a sustained period of irritable crying that occurs in a cyclic fashion at the end of each day.[12] This can be particularly stressful for young parents whose frustrated attempts to alleviate crying may increase infant overstimulation and emotional distress. In addition, one out of five infants by age three weeks begins to cry more than most infants and may be diagnosed with colic. Babies with colic may cry inconsolably for more than three hours a day, until the colic resolves on its own around four months of age although, there are reports that colic can last as long as six months. Infant crying can be so stressful that it is identified as the number one trigger for abusive head trauma, commonly known as "Shaken Baby Syndrome."

As noted previously, children killed by their fathers were younger than six months of age and crying was reported to be a contributing factor in most of their deaths. The young age of children killed by fathers in our group is consistent with the age that crying peaks illustrated in the following chart.

---

[10] Carskadon, M. & Dement, W. (2005). Normal Human Sleep: An Overview. In Principles and Practice of Sleep Medicine, (Eds.) Meir Kryger, Thomas Roth, & William Dement, pgs 13 – 25.
[11] Children's Memorial Research Center (2010). Understanding Sleep-Related Infant Deaths.
[12] Brazelton, T.B. (1990). Crying and Colic. Infant Mental Health Journal, 11_(4)_, p 349–356.



Reprinted from Erikson Institute Fussy Baby Network (2008) Partners in Care: Supporting Fussy Babies in Child Care

As part of error reduction training, the Inspector General's office will help TPSN pilot specialty training for expecting ward fathers and the partners of expecting ward mothers. The training will occur over multiple sessions, during which the fathers will be responsible for a RealCare© Infant Simulation doll, which will simulate the experiences associated with daily care of an infant. During the last session, the fathers will share their experiences, as well as receive information about Abusive Head Trauma and its deadly consequences.

*Mentally Ill Parents*
All six mothers who killed their children had issues with co-occurring mental illness, substance abuse, and/or domestic violence.

### ***Training Opportunities***
The Office of the Inspector General is authorized by statute to develop Error Reduction Implementation Plans, providing a feedback loop to the field of lessons learned through the Inspector General's death and serious injuries investigations and Illinois Child Death Review Team Recommendations (20 ILCS 505/35.7). Error reduction training was developed to help lower the mortality rate of wards and wards' children. The strategy behind error reduction training was to remedy problems by harnessing the knowledge and collective wisdom gathered over time by those entrusted to review child deaths and serious injuries. This wealth of knowledge was then brought back to the field in an effort to lower serious injuries and deaths.

Teen wards share the same need as their case managers to acquire practical knowledge, in order to better protect their children from harm.  In an effort to reach out directly to parents, the Office of the Inspector General developed a series of vignettes adapted from death investigations involving the death of wards' children.  These vignettes were used as part of a training, which included strategies for safe sleep, developing healthy relationships and choosing appropriate caregivers. The vignettes generated discussion among the youth, as well as disseminated knowledge on the topics. The series of vignettes presented situations that a teen parent could readily imagine themselves experiencing, such as the death of an infant who became trapped in a bed shared with his mother and her boyfriend, or a boyfriend who out of

anger injures his crying child. The discussions were followed by a brief presentation that included pertinent information on the risk factors associated with overlay deaths and Abusive Head Trauma, after which the young parents had an opportunity to reflect on the information they had received.

<u>**Recommendations**</u>

1.  This report should be shared with TPSN, and all agencies responsible for the case management of a pregnant or parenting ward. Pregnant and parenting youth will receive pertinent information from this report through the use of case scenarios in youth training.

2.  In order to assist wards to make informed decisions and educated choices about healthcare, the OIG will develop a resource guide in conjunction with the teen parent consultant for pregnant and parenting teens which will include information about Title X services and other specialized adolescent clinics/providers.  All case managers servicing pregnant wards should receive training on the comprehensive healthcare services available to teens in order to inform their clients of available resources and provide the ward with an opportunity to visit these specialty clinics.

3.  Case managers with a pregnant or parenting ward on their caseload, should provide transportation and incentives to ensure 100% attendance at pre-natal and post-partum appointments.

4.  TPSN must maintain statistics on pre-natal and post-partum care visits and WIC participation.

5.  The Department should consider referring all 14-15 year-old female wards to a Title X teen clinic for a consultation on reproductive health and contraception education. All 14-15 year-old male wards should be referred to a clinic with a community-based approach towards sexual health similar to that of Project Brotherhood.

6.  All pregnant and parenting wards should be provided with a portable crib.

7.  Expectant fathers who are wards should be required to participate in TPSN training to reduce infant mortality by helping them recognize the stress and anger that can be provoked by an inconsolably crying child, and identify resources that can be immediately used to deescalate a stressful parenting experience.  The training should include the participation of the Fussy Baby Network.

8.  In any case where a mother has a history of severe mental illness and there is an Unusual Incident Report (UIR) for alcohol abuse, substance abuse, or domestic violence, TPSN should, in addition to organizing protective day care, require quarterly clinical staffings to ensure the safety of the baby and effective treatment for the young parent.

**- END OF REPORT -**