3:18-cv-03085-SEM-TSH # 62-12 Page 1 of 282
E-FILED
Friday, 17 December, 2021 06:28:37 AM
Clerk, U.S. District Court, ILCD

## OFFICE OF THE INSPECTOR GENERAL
### ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2011

**DENISE KANE, PH.D.**
**INSPECTOR GENERAL**

# OFFICE OF THE INSPECTOR GENERAL
# ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2011

To Governor Quinn and Members of the General Assembly:

On October 5, 2010, a former DCFS administrator pled guilty in federal court to mail fraud. Five years ago, this administrator was found to be involved in the misappropriation of Department funds in an Office of the Inspector General report that was the basis for the federal investigation. In the wake of the Office of the Inspector General's investigation, the administrator, who resigned from his Department position, told the press that the Office of the Inspector General's investigation was "laughable." Because justice was delayed, many DCFS employees who had been bullied by this administrator's high handed dealings became weary, believing that child welfare could not be protected from corruption.

This year, the Office of the Inspector General again investigated the administrator after learning he had renewed his involvement with DCFS through state funded subcontract arrangements. Since the administrator had not yet been convicted, some in the Department who were aware of the arrangement thought they could not move to block the subcontractor agreements. The Office of the Inspector General found the same administrator had again used state funds in order to benefit himself and bolster his own influence. In the past five years poverty levels have risen in every county in the state. Economic hardships have affected every state agency, making it essential that every state contract be monitored with due diligence to assure that state monies are honestly and efficiently spent. When multiple state agencies are funding similar services, the agencies need to communicate with one another to assure accountability.

Collaboration between state agencies is vital to ensure that effective and appropriate services are provided to the citizens of Illinois. The appendix of this year's Annual Report contains two investigations that illustrate the need for timely exchange of information between the Department of Healthcare and Family Services and the Department of Children and Family Services during a child protection investigation. If child protection staff had access to the Department of Healthcare and Family Services' Recipient Claim Detail information, they may have been able to consult with medical providers to stem the parents' misuse of prescription drugs which presented lethal risks to their children. Harnessing the expertise and resources of both agencies for the sake of child protection is within our grasp. We should make it happen.

With Warm Regards,

Denise Kane

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

**INTRODUCTION ..... 1**

- INVESTIGATION CATEGORIES ..... 1
- INVESTIGATIVE PROCESS ..... 3
- REPORTS ..... 4
- ADDITIONAL RESPONSIBILITIES ..... 5

**INVESTIGATIONS ..... 7**

- DEATH AND SERIOUS INJURY INVESTIGATIONS ..... 7
- CHILD DEATH REPORT ..... 41
  - SUMMARY ..... 42
  - HOMICIDE ..... 48
  - SUICIDE ..... 52
  - UNDETERMINED ..... 53
  - ACCIDENT ..... 59
  - NATURAL ..... 68
- ELEVEN-YEAR DEATH RETROSPECTIVE ..... 83
- GENERAL INVESTIGATIONS ..... 87
- SYSTEMS INVESTIGATIONS ..... 129

**PROJECTS AND INITIATIVES ..... 137**

- ERROR REDUCTION ..... 137
- ETHICS ..... 151
- PREGNANT AND PARENTING TEENS ..... 154
- OLDER CAREGIVERS ..... 155

**SYSTEMIC RECOMMENDATIONS ..... 157**

**RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION ..... 163**

**COORDINATION WITH LAW ENFORCEMENT ..... 167**

**DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS ..... 171**

**APPENDICES ..... 209**

- A. BRIAN JASKO DEATH INVESTIGATION ..... A-1
- B. CAROLINE & MACKENZIE HANES DEATH INVESTIGATION ..... B-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General (OIG) is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 and 35.6. To that end, this Office has undertaken numerous investigations and initiated projects designed to uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

***Death and Serious Injury Investigations***

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding twelve months. The OIG is also a member of Child Death Review Teams around the state. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The OIG receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a ward of DCFS, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding twelve months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and maintains a database of child death statistics and critical information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 2010:

**FY 10 CHILD DEATH CASES REVIEWED**

| | |
|---|---|
| **CHILD DEATHS IN FY 10 MEETING THE CRITERIA FOR REVIEW** | **84** |
| **INVESTIGATORY REVIEWS OF RECORDS** | **65** |
| **FULL INVESTIGATIONS** | **19** |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. Summary of all child deaths reviewed by the OIG in FY 10 can be found on page 42 of this report.

***General Investigations***

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, foster parents, biological parents and the general public. At the request of the Director, or when the OIG has noted a particularly high level of complaints in a specific segment of the child welfare system, the OIG will conduct a systemic review of that segment. Investigations yield both case-specific recommendations and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

***Child Welfare Employee Licensure Investigations***

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare Employee License permits centralized monitoring of all persons providing direct child

welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses (CWELs).

A committee composed of representatives of the Office of the Inspector General, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The OIG investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the OIG, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Reg. 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 2010, 18 cases were referred to the Inspector General's Office for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided technical assistance to the Office of Employee Licensure in 4 cases.

### FY 2010 CWEL Investigation Dispositions

| FY 10 CASES OPENED FOR FULL INVESTIGATION | 18* |
|---|---|
| FINAL REVOCATION | 6 |
| LICENSURE SANCTIONS | 2** |
| LICENSES VOLUNTARILY RELINQUISHED | 3 |
| INVESTIGATIONS COMPLETED/NO CHARGES | 4 |
| CASES PENDING WITH THE ADMINISTRATIVE HEARINGS UNIT (AHU) | 2 |
| INVESTIGATIONS PENDING | 1 |

*Includes revocation based on technical assistance
**Pending Board approval

| FY 09 CASES RESOLVED | 2 |
|---|---|
| FINAL REVOCATION | 1 |
| CHARGES RESCINDED | 1 |

### *Criminal Background Investigations and Law Enforcement Liaison*

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 10, the Inspector General's Office opened 3,147 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches. For the 3,147 cases opened in FY 10, the OIG conducted 5,289 searches for criminal background information. In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police, or it may investigate the alleged act for administrative action only.

The Office of the Inspector General assists enforcement agencies with gathering necessary documents. If law enforcement elects to investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the OIG will determine whether further

investigation or administrative action is appropriate.

## INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury. Investigations may also be initiated when the OIG learns of a pending criminal (or child abuse investigation for referral to CWEL) against a child welfare employee. In FY 2010, the OIG received 3,610 Requests for Investigation.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether there is a need for systemic change. If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses. The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies. The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency. In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty, pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the Department. OIG files are not accessible to the Department. The investigations and the Investigative Reports and Recommendations are prepared without editorial input from either the Department or any private agency. Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the Office of the Inspector General, the OIG may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Professional Regulations.

### *Administrative Rules*

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430. The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

### *Confidentiality*

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential. To protect the confidentiality of the complainant, the OIG will attempt to procure evidence through other means, whenever possible. The OIG and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the OIG. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense.

Office of the Inspector General Reports contain information that is confidential pursuant to both state and federal law. As such, OIG Reports are not subject to the Freedom of Information Act. The Office of the Inspector General has prepared several reports deleting confidential information for use as teaching tools for private agency or Department employees.

[1] This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

### *Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the OIG investigator. Impounded files are returned as soon as practicable. However, in death investigations, the Office of the Inspector General forwards original files to the Department's Division of Legal Services to ensure that the Department maintains a central file.

## REPORTS

Inspector General Reports are submitted to the Director of DCFS and the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for an ethical discussion on individual and systemic problems within the practice of child welfare. The reports are redacted to ensure confidentiality and then distributed to private agencies, schools of social work, and DCFS libraries as a resource for child welfare professionals. Redacted OIG reports are available from the Office of the Inspector General by calling (312) 433-3000.

### *Recommendations*

In her investigative reports, the Inspector General may recommend systemic reform or case specific interventions. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should be constructive in that it serves to educate an employee on matters related to his/her misconduct. However, it must also function to hold employees responsible for their conduct. Discipline should have an accountability component as well as a constructive or didactic one. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the Director and Board of the private agency. Recommendations for discipline are subject to due process requirements. In addition, the OIG will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the Board of Directors of that agency. The agency may submit a response to address any factual inaccuracies in the report. In addition, the Board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child welfare system that the recommendation is

designed to strengthen. The Inspector General's Office is a small office in relation to the child welfare system. Rather than address problems in isolation, the OIG views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms. The OIG may monitor to ensure that Department or private agency staff implement the recommendations made or may work directly with the Department or private agency to implement recommendations that call for systemic reform. The OIG may also develop accepted reform initiatives for future integration into the Department.

## ADDITIONAL RESPONSIBILITIES

### *Office of the Inspector General Hotline*

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access. Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to general incompetence;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and
- General questions about DCFS and the Office of the Inspector General.

The Office of the Inspector General's Hotline is an effective tool that enables the OIG to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The number for the OIG Hotline is **(800) 722-9124**.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 10:

**CALLS TO THE OIG HOTLINE IN FY 10**

| | |
|---|---|
| **INFORMATION AND REFERRAL** | **915** |
| **REFERRED TO SCR HOTLINE** | **101** |
| **REFERRED FOR OIG INVESTIGATION** | **152** |
| **TOTAL CALLS** | **1168** |

### *Ethics Officer*

The Inspector General is the Ethics Officer for the Department of Children and Family Services. The Inspector General reviews Ethics Statements for possible conflicts of interest of those employees of the Department of Children and Family Services who are required to file Ethics Statements.

For FY 10, 760 Statements of Economic Interest were submitted to the Ethics Officer. Of the 760 submitted, 80 were further reviewed and when necessary potential conflicts were addressed.

**FY 10 STATEMENTS OF ECONOMIC INTEREST**

| | |
|---|---|
| **ECONOMIC INTEREST STATEMENTS FILED** | **760** |
| **STATEMENTS INDICATING POSSIBLE CONFLICTS** | **80** |

The Office of the Inspector General Ethics staff also coordinated DCFS compliance with the statewide ethics training mandated under the Illinois State Officials and Employees Ethics Act of 2003. In 2010, 2,917 DCFS employees were trained. In addition to DCFS employees, DCFS board and commission members were asked to have their members complete off-line

training. In FY 2010, a total of 395 individuals completed the off-line Ethics training.

***Consultation***

The Office of the Inspector General staff provided consultation to the child welfare system through review and comment on proposed rule changes and through participation on various ethics and child welfare task forces.

***Projects and Initiatives***

Informed by the Office of the Inspector General investigations and practice research, the Project Initiatives staff assist the Department's Division on Training and Professional Development in the development of practice training models for caseworkers and supervisors. The model initiatives are interdisciplinary and involve field-testing of strategies. The initiatives are evaluated to ensure the use of evidence-based practice and to determine the effectiveness of the model. See page 137 of this Report for a full discussion of the current projects and initiatives.

# INVESTIGATIONS

## DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION** A two year-old boy died two months after his family was involved in an indicated report of abuse against another child in the household. The Office of the Inspector General received a complaint regarding the integrity of the autopsy of the boy which ruled his death to be the result of natural causes.

**INVESTIGATION** The boy, his mother and his six year-old sister resided in a home with the mother's boyfriend. The boyfriend had two daughters, ages seven and four, who lived with another relative. The family's involvement with the Department was initiated after the hotline received a report the boyfriend had physically abused his seven year-old daughter. The day the report was taken, a child protection investigator went to the family's home and interviewed the boyfriend. The father stated he had spanked his daughter with an open hand but denied striking her with any objects or engaging in excessive corporal punishment. The investigator did not ask the boyfriend to identify all the members of the household and was therefore unaware the mother and her two young children also lived in the home. After speaking with the boyfriend's children at their home and completing the rest of her tasks, the investigator recommended the report be indicated against the boyfriend and her supervisor approved the finding.

Six weeks after the report was indicated, paramedics were called to the home in response to the boy being found unresponsive in his bed by the boyfriend. The boy was pronounced dead less than an hour after arriving at the hospital. The boyfriend told police and medical personnel that while he was giving the boy a bath, the child fell and hit the edge of the tub before landing in the water. The boyfriend reported the boy's face was submerged for three to four seconds before he was lifted out of the water. The boyfriend stated the boy initially seemed fine after burping a few times and that he laid him down before going about his household chores. The boyfriend stated he returned to the boy's room after hearing him scream and found him lethargic and with his lips turning blue, at which time he called 911. An autopsy performed on the boy concluded he had died of natural causes. Bruises found on his body as well as an internal laceration of his liver and a large amount of blood pooled inside his torso were attributed to attempts to resuscitate him by emergency personnel. Although there were concerns regarding the previous indicated report against the boyfriend, who was the only adult home at the time of the incident, and discrepancies in his description of the boy's body position while he was in the water, the autopsy findings resulted in an unfounded child protection investigation and the end of law enforcement involvement in the case.

The physician who performed the autopsy on the boy was a board certified pathologist, however she was not a board certified forensic pathologist. While pathologists are trained to study and diagnose disease, forensic pathologists specialize in determining causes of death through the examination of corpses. Physicians seeking to be recognized as forensic pathologists must pass a separate board certification examination. Illinois law allows for coroners in less populated counties to select which physicians perform autopsies. Currently there is no requirement that those physicians be board certified forensic pathologists.

The OIG asked two board certified forensic pathologists who are experts in child abuse to review the autopsy materials and findings. Independently, both experts determined the boy's death was the result of physical

abuse suffered while he was alive and that his death should be ruled a homicide. Both experts found that the amount of blood found in the boy's abdominal cavity showed his liver had been lacerated several hours before resuscitation attempts were initiated and that the injury was directly related to his death. The OIG shared the experts' findings with local law enforcement.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Office of the Inspector General referred this case for possible prosecution to the State's Attorney's Office and the Illinois Attorney General's Office.**

**2. The Director should issue a letter to the Coroner requesting that she appoint or designate a board certified forensic pathologist to conduct the autopsies of children when there is an open child protection investigation.**

The Department does not agree.

**3. The child protection investigator who investigated the initial report of the boyfriend's abuse of his daughter should receive non-disciplinary counseling regarding the importance of ascertaining and interviewing all the members of a household.**

The child protection investigator was counseled.

**4. The Department should request that this case be fully reviewed by the Child Death Review Team in that area. The Child Death Review Team should receive the initial and the final autopsy, the opinions of the two expert forensic pathologists and any other relevant materials.**

The case was reviewed at the Child Death Review Team (CDRT) meeting and the team made two recommendations for legislative change:

1. Legislation requiring autopsies by board certified forensic pathologists for all children under the age of 18 who die under suspicious, obscure, mysterious, or otherwise unexplained circumstances.
2. Legislation requiring a blind peer review of autopsy reports for children under the age of 18 who die under circumstances that are suspicious, obscure, mysterious, or otherwise unexplained.

The Department is working on a plan to implement these recommendations with the President of the Coroner's Association.

**DEATH AND SERIOUS INJURY INVESTIGATION 2**

**ALLEGATION** A five month-old boy died as a result of physical abuse. A child protection investigation of the infant's parents was unfounded six weeks prior to his death.

**INVESTIGATION** The initial child protection investigation was opened after the boy was brought to a pediatrician's office for his two-month check up with bruises to both sides of his face and a healing cut above his eye. The mother had called the pediatrician the day before the scheduled appointment and informed her she had just noticed the bruises. Upon examination, the pediatrician believed the bruises were several days old and were unlikely to have gone unnoticed for that amount of time. She also observed the bruises to be symmetrical and suggestive of the baby having been slapped. A child protection investigation was opened and local police went to the family's home the following day to conduct a well child check. Officers noted the injuries to both sides of the baby's face and recorded the mother's explanation that the scar above his eye was the result of his head accidentally hitting a chair while being rocked by his father. Police took photographs of the baby's injuries as well as the location where the mother said the accident occurred. Officers then contacted the assigned child protection investigator and informed her of their findings. Although the police had compiled a case file including the photos of the baby's injuries, the investigator did not request that it be sent to her.

The next day the investigator went to the family's home and interviewed the mother, who gave an explanation for how the baby received the cut above his eye that varied from the one she had provided earlier. The investigator observed the baby and decided the bruises were actually Mongolian spots, areas of natural skin discoloration that are present from the time of a child's birth. The investigator spoke to the father but did not address all of the baby's injuries with him. The investigator's notes were inconsistent in their recording of the infant's injuries and failed to fully represent marks that were observed. The investigator completed a body chart showing one mark to the baby's face and identifying it as a Mongolian spot. She did not record the healing scar above the infant's eye or the mark on the other side of his face observed by the pediatrician and police. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the baby to be safe in the parents' custody. The investigator's rationale was based in part on the absence of any family history with the Department, failing to recognize the baby, the couple's first child, was only two months-old at the time. The investigator completed the CERAP prior to contacting the pediatrician or obtaining the medical report. The investigator's supervisor failed to recognize the inconsistencies in the investigator's assessment and did not request that she verify statements made by the parents.

Four days later the medical report was received in the investigator's field office. The pediatrician noted the bruises to both sides of the baby's face and that the healing cut was deep and would have bled significantly and that the mother had not sought medical treatment when the injury occurred. After reviewing the safe CERAP and the pediatrician's hotline report, the child protection manager questioned the disparity. The manager contacted the pediatrician in the presence of the investigator and supervisor; however, they did not participate in the call and could not hear the responses to questions posed by the manager. In an interview with the OIG, the manager stated he spoke with the pediatrician solely to clarify whether the cut above the baby's eye was fresh when she saw the child. The manager did not engage the pediatrician in a conversation about the nature of the baby's injuries or her medical opinion as to whether they were accidental or inflicted. The manager told the OIG that performing additional inquiry into the pediatrician's observations was the responsibility of the investigator and supervisor. The manager stated that while he is required to sign off on CERAPs involving infants with cuts and bruises, he does not "approve" the CERAPs.

The next day the investigator informed the pediatrician that she did not believe abuse had occurred. The pediatrician gave her opinion that the marks on the baby's face were not Mongolian spots because they do not suddenly appear and fade within days, and faxed her notes from a follow-up appointment she conducted with the infant that day. The fax included a cover sheet noting that during the follow-up visit the facial marks were

almost no longer visible and the pediatrician felt strongly that the bruising to the baby's face was not Mongolian spots.  Although the pediatrician's report was present in the case file a copy of the cover letter was not found.  Copies of a fax number confirmation from the field office and the full transmission of the pediatrician's report were present in files maintained by the doctor.  In their interviews with the OIG, both the investigator and her supervisor stated they had never seen the cover letter from the pediatrician.  The investigator stated to the OIG that despite being told directly by the pediatrician the marks on the baby's face were not Mongolian spots, she continued to accept the mother's explanation that the discolorations had occurred on their own.  The investigator ultimately determined to unfound the report against the parents and her decision was approved by the supervisor.  The investigator told the OIG she relied upon her own observation of the child to reach her conclusion.  The supervisor stated to the OIG that following the manager's conversation with the pediatrician the conclusion was reached there was insufficient evidence to support an indicated finding.  The supervisor closed the case without seeking final approval from the manager as required in cases involving injury to infants.

Six weeks later an ambulance was called in response to the baby suffering apparent seizures.  The infant was transported to the hospital where he was pronounced dead.  Examination revealed the baby had suffered extensive subdural bleeding and multiple injuries.  The father admitted to shaking the baby and was charged with first degree murder and aggravated battery to a child.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The Department should discipline the child protection investigator for failing to properly assess risk to an infant, ignoring critical medical information as she held to her personal uninformed opinion, failing to obtain an explanation for each injury reported, and selectively incorporating relevant information. Discipline of the investigator should be mitigated by the involvement of the supervisor and manager.**

The child protection investigator received a suspension.

**2.  The Department should discipline the child protection supervisor for dereliction of her supervisory duties that contributed to poor judgment and decision-making throughout the investigation.  Discipline should be mitigated by the involvement of the manager.**

The supervisor received a suspension.

**3.  The Department should discipline the child protection manager for failing to properly assess risk to an infant and approving a safe risk assessment (CERAP) against the weight of evidence available at the time.**

The child protection manager was issued non-disciplinary counseling.

*OIG Response: The Office of the Inspector General maintains that the manager should have been disciplined.*

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

**ALLEGATION**

A three year-old girl died of suffocation after being smothered by her mother, an eighteen year-old Department ward.

**INVESTIGATION**

The mother's family had an extensive history of involvement with the Department dating to when she was three months-old. Throughout her childhood the mother was the victim of physical and sexual abuse and moved between multiple placements as she was removed from and returned to the custody of her parents. A psychological evaluation conducted when the mother was 14 diagnosed her with Major Depressive Disorder and Post Traumatic Stress Disorder and a program of prescription drugs and therapy was recommended to addresses her illness, which included behavior described in clinical notes as "out of control."

After the birth of her daughter, the mother and her baby were placed along with the mother's younger sister in a specialized residential foster home. Once the mother began attending high school, locating daycare for her baby proved to be problematic as the foster mother lived in a rural area beyond the transportation boundaries of local daycare agencies. As a parenting ward attending high school, the mother was entitled to child care services, including transportation, in accordance with a judicial decree governing Department policy. Rather than pursue these funds, the private agency handling the mother's case submitted a dependency petition to the court and the baby was made a ward of the Department. While this maneuver allowed for daycare funds to be paid to the foster mother it was in violation of the judicial decree and unnecessarily made the baby a ward.

Five months after the baby became a ward she was removed from her mother's custody in response to the mother expressing feelings of being overwhelmed and her belief it would be better for the girl to reside elsewhere temporarily. The mother was granted unsupervised visitation with her daughter. Following the permanency hearing, the mother told a worker that although she loved her daughter very much she sometimes felt like beating the girl in order to get her to be quiet. The mother's anger management and behavioral issues persisted, prompting the private agency to request a psychological evaluation to determine whether she would eventually be able to live independently and care for her daughter.

Although the interviews comprising the psychological evaluation had been completed, six months elapsed before the psychologist submitted his final report to the private agency. During that time, the mother had begun requesting the return of her daughter to her custody. Although many of her behavioral issues continued to surface she demonstrated an increased ability to exert self-control, compliance with required services and appropriate interactions with her daughter. Based on these criteria the private agency advocated for the girl to be returned to the mother's custody at a scheduled court date and Department guardianship of the girl was terminated. Despite the fact the agency had not yet received the evaluation it had requested specifically to determine whether custody should be returned to the mother, agency staff did not seek a continuation of the court hearing. Two weeks after the court returned the girl to the mother, the private agency received the psychologist's evaluation. The psychologist who performed the evaluation noted the mother struggled with numerous issues including depression, injurious and self-destructive behavior, alcohol abuse and mood volatility he identified as the possible onset of bipolar disorder. He speculated the mother might require treatment with psychotropic medication and recommended she be engaged in regular psychological counseling, assessed for substance abuse and monitored for self-mutilation and suicidal ideation. The psychologist stated that while the mother was an invested and conscientious caretaker, her tenuous emotional state greatly inhibited her ability to function effectively as a parent and concluded that returning the girl to her custody at the time would be "a setup for failure." These findings were not shared with the Department or the court. Although the agency had 30 days after the hearing to file a motion for the court to reconsider its decision, no action was taken.

After the girl was returned to the mother's custody, the mother's foster parents announced their intention to relinquish their foster care license, requiring the mother to be moved to another placement. The private agency arranged for a Child And Youth Investment Team (CAYIT) meeting to assess housing options for the mother. The result of the CAYIT meeting was a decision to place the mother and her daughter in their own apartment operated by an Independent Living Program (ILP). In an interview with the OIG, a worker from the private agency stated that while the psychologist's evaluation was considered, the CAYIT decision placed greater emphasis on observations made by private agency staff and the mother's foster parents who had observed her recent behavior. The fact the mother was no longer taking psychotropic medication was also viewed as a positive development denoting her continued progress. The ILP was selected over another available transitional living program because the ILP was in closer proximity to the area where the mother had lived with the foster parents. The CAYIT identified the former foster parents as sources of support for the mother, although no support arrangement was ever developed or formalized. It was also noted that the mother's biological father, who had been sporadically involved in her life, lived in the area. However, the mother was cautioned that the grandfather's history of involvement with the Department precluded her utilizing him as a resource for child care.

Three months after the mother and her daughter moved into the Independent Living Program apartment, police responded to a report the daughter was not breathing. Officers arrived to find the grandfather attempting to resuscitate the girl on the floor of a bedroom inside the mother's apartment. The mother, who admitted to police she had been drinking alcohol, stated she became angry with the girl for refusing to go to bed and placed her hand over the girl's mouth. An autopsy determined the girl died as a result of suffocation and ruled her death a homicide. The mother was arrested and charged with murder. While she was awaiting trial, the mother's juvenile neglect case was heard. The court discharged guardianship of the mother and her case with the Department was closed.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This report should be shared with the private agency to institute a corrective action plan to address the failure to secure daycare payments for the mother, as a parenting ward, without resorting to taking guardianship of her daughter.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the private agency's Board of Directors. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report. The private agency addressed the failure to secure daycare payments and has developed and conducted a training that includes a review of protocol and expectations for working with teen parents.

**2. The private agency should conduct an internal training regarding alerting the DCFS Office of Legal Services and relevant court personnel when legal issues concerning children arise after a ward's case has been closed.**

The private agency developed and conducted an agency wide training addressing a review of DCFS Office of Legal Services and protocols for reunification services and aftercare.

**3. The Department should issue a clarifying memo to private agencies regarding the necessity of alerting the DCFS Office of Legal Services of arising legal issues and critical information that had not been presented to the court concerning minors whose wardships were dissolved within the prior 30 days.**

The memo was sent to Purchase of Service (POS) agencies.

**4.  This report should be shared with the Department's monitor for teen parent services.**

The report was shared with the monitor.

**5.  The Department should assure that Transitional Living Programs have provisions in their contracts to provide enhanced services to Pregnant and Parenting Teen wards.**

The revised language is included in the 2011 contracts.

**6.  The Child And Youth Investment Team (CAYIT) Reviewer should attend the Office of the Inspector General's  training on Intact Families and Mental Illness Error Reduction and should use this case to develop in-depth critical questioning in the CAYIT process when a ward with a history of mental illness is moving to independent living.**

The employee participated in the training.

**7.  The Department should provide training to Day Care Coordinators in the region on teen parents' rights to education services including daycare allowing the teen to attend school.**

The training curriculum for Day Care Coordinators has been revised to incorporate specific information about teen parents' rights to education services including providing daycare for their children so that the teen can attend school.  The revised training is scheduled to be conducted by the Day Care Licensing Administrative staff in January, 2011.

**8.  This report should be shared with the Independent Living Program agency.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.  The agency has enhanced its practice when providing independent living services to parenting adolescents.  Agency staff conduct home visits with parenting wards at high-stress times such as dinner time, evening, and bed time.  The agency has also explored and implemented screening tools for substance abuse, depression, stress, and tendency toward violence.

**DEATH AND SERIOUS INJURY INVESTIGATION 4**

**ALLEGATION** A six month-old girl died of accidental suffocation while sleeping in a bed with her mother at the home of a friend. Six months prior to the baby's death, the mother, an 18 year-old Department ward, had been the subject of an indicated hotline report.

**INVESTIGATION** The mother's family had been involved with the Department since she was two years-old and she and her siblings had been removed from their parents' custody when she was twelve. The mother's time as a ward was characterized by constant placement disruptions and frequent volatile and hostile behavior. The mother was diagnosed with significant cognitive deficits as well as serious mental health issues including Bipolar Disorder with psychotic features, Intermittent Explosive Behavior Disorder and Post Traumatic Stress Disorder. The mother often expressed suicidal ideation and required psychiatric hospitalization on several occasions. Although the mother was prescribed a number of psychotropic medications for her conditions, she consistently resisted complying with her treatment schedule. Her inability to manage her mental illness contributed to her erratic behavior which included violent outbursts, substance abuse and chronic episodes of running away from placements. It was noted by involved workers that the mother often utilized running away as a means of gaining influence over placement decisions, agreeing to reestablish contact if she were moved to a residence she preferred. Maintaining any placement proved exceptionally challenging as the mother's aggression and combativeness routinely resulted in her either being asked to leave or running away again.

The birth of the mother's first child prompted a hotline call expressing concerns regarding her living situation and ongoing non-compliance with services. The mother had run away from her residential living program and moved into the home of her sister. Since the placement with the sister was unauthorized the mother was not eligible to receive financial assistance and an involved worker had already visited the sister's home and determined it to be an inappropriate environment for the mother and her baby. The mother's Guardian *ad litem* (GAL), noted that unless the Department took protective custody, it was the mother's right to leave with the child at any time. The home of the baby's paternal grandmother was offered as an alternative placement and the assigned child protection investigator asked hospital staff not to release the baby until an assessment could be completed. The mother agreed to wait until the assessment was completed, however during a hospital staffing the GAL asserted the mother's right to leave with the child and the hospital released the baby to the mother's custody.

One month after the baby was born, management of the mother's case was transferred from a private agency to the Department. The GAL had requested the change so that the mother's case could be handled by the Department employee who had worked with her in the past. However, the mother had moved outside the geographic boundary serviced by the employee and her case was assigned to a caseworker with whom she had no prior relationship. Although the mother was engaged in services through the Teen Parent Services Network (TPSN), TPSN administration was never consulted about the transfer and had no input in the decision.

Throughout her involvement with the mother, the new caseworker failed to complete adequate documentation of her efforts and recorded only a minimal amount of activity overall. During the eight months the caseworker was responsible for handling the case she entered only ten notes into the State Automated Child Welfare Information System (SACWIS). None of these entries were made in a timely fashion and six were completed on the same day, two months after the baby died. The caseworker made no entry in SACWIS regarding the baby's death despite the relevance the incident would have for future workers involved with the family. In an interview with the OIG, the caseworker stated it was standard procedure in her field office for workers to call in progress reports to their supervisor who would then enter the notes into SACWIS. The caseworker said she maintained written case notes detailing her efforts but was unable to provide any of them to the OIG. The caseworker stated she did not complete a safety plan or a Child Endangerment Risk Assessment Protocol (CERAP) when the case was assigned because, at the time, the mother was living in a

shelter and the caseworker mistakenly believed such a placement prevented these tasks from being performed.

When the baby was six months-old, the mother brought the infant unresponsive to a hospital emergency room where she was pronounced dead. The cause of death was ruled to be accidental suffocation caused when the baby became wedged between a mattress and a wall while sleeping. The mother's case remained open and her unstable lifestyle continued as she moved between placements and engaged in aggressive and destructive behavior. Seven months after the baby's death, the mother learned she was pregnant again. TPSN services were put in place to assist her, however she habitually missed pre-natal appointments and therapy sessions. The mother continued to resist complying with her prescription drug regimen and failed to complete her course of treatment after being diagnosed with gonorrhea. Upon the birth of the mother's second child a hotline report was made and the baby was taken into protective custody. The mother was granted supervised visitation but has continued to be non-compliant with required services. The mother was living with her new boyfriend in his family's home, however after a paternity test determined he was not the baby's father the relationship ended and she was forced to leave the residence.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The caseworker should receive non-disciplinary counseling for her failure to document her case work in SACWIS. A review of the caseworker's case notes should be conducted to determine whether her failure to document her work on this case was an isolated incident or reflects a pattern of poor record keeping.**

The employee was issued non-disciplinary counseling.

**2. The caseworker's supervisor should receive non-disciplinary counseling for failing to implement a corrective action plan regarding the caseworker's poor record keeping.**

The supervisor was issued non-disciplinary counseling.

**3. When a pregnant or parenting teen ward with serious medical or mental health issues is placed with a non-Teen Parent Services Network (TPSN) agency, quarterly clinical staffings should occur to monitor the implementation and outcomes of recommended service interventions.**

The Teen Parent Services Network (TPSN) will identify youth within the network with serious medical or mental health problems and ensure that clinical staffings are held quarterly by the assigned caseworker. A procedure reflecting this requirement is being developed.

**4. When a pregnant or parenting teen parent with a serious medical or mental health issue is placed in a transitional living program or an independent living program, the assigned case manager should be required to attend specialized training provided by Teen Parent Services Network (TPSN). The Office of the Inspector General will assist TPSN in the development of the specialized curriculum.**

The Office of the Inspector General will work with the Teen Parent Services Network (TPSN) to enhance the TPSN curriculum and the training process.

**5. This report should be shared with Teen Parent Services Network for training purposes.**

The report has been shared with the Teen Parent Services Network (TPSN).

**6. This report should be shared with the Office of the Public Guardian for review.**

The Office of the Inspector General shared this report with the Office of the Public Guardian.

**DEATH AND SERIOUS INJURY INVESTIGATION 5**

**ALLEGATION**

A five year-old boy died as a result of multiple-drug toxicity after being given an overdose of medications by his mother. A child protection investigation of the family was unfounded two months before the boy's death and during the two and-a-half years prior to the boy's death, the family had been the subject of five child protection investigations, one of which was indicated for medical neglect of the boy.

**INVESTIGATION**

Throughout the family's involvement with the Department, child protection investigators and supervisors failed to develop a comprehensive understanding of the family's issues and how pertinent information acquired during the various investigations related to assessing the situation as a whole.

The first two child protection investigations centered on allegations that the mother used methamphetamine, the family's home was in disrepair and the boy was frequently absent from school. The investigator assigned to these reports met with the mother, who was pregnant at the time, and deemed her to be appropriate in her conduct and behavior towards the boy. The mother denied having any history of substance abuse issues and provided the names of two individuals who visited her home frequently as collateral contacts. The investigator spoke to the individuals who both denied the mother was a drug user. Both individuals acknowledged having been methamphetamine addicts in the past but each asserted they were not using at the time. Although the mother consented to a drug test none was ever conducted. The investigator also did not obtain the boy's school records. In an interview with the OIG, the investigator stated that since the boy, who was three at the time, was not of regular school age she was not concerned with his attendance at preschool. An OIG review of the records found the boy was absent 29 of 107 days. The investigator ultimately found insufficient evidence to support the allegations and unfounded the reports against the mother.

Eleven months after the investigations were closed, a third hotline call was made alleging medical neglect of the boy. The day after the report was made a mandate worker interviewed the mother at her home. Upon being questioned by the worker the mother initially denied being pregnant but eventually acknowledged she was expecting her third child. She had recently married the third child's father and the couple was planning on moving into their own home. The mother told the worker she had previously been a methamphetamine user and had taken the drug during both of her pregnancies, but quit on her own approximately three months before her second child was born. The investigator did not note the discrepancy between this statement and information previously provided by the mother. The investigator also failed to recognize the unlikelihood that a methamphetamine addict was able to quit using the drug without outside intervention. The mother stated she was not currently taking any illicit drugs or prescription medications, however the boy had previously been prescribed Adderall for Attention Deficit Disorder (ADD). The worker observed the boy and noted he was calm and well behaved and did not display behavior she had previously seen associated with ADD.

Following the mandate worker's initial efforts, the case was assigned to the investigator who had handled the first two reports. The mother stated that the issue of medical neglect, which was related to the boy's ongoing treatment for problems with his inner ears, was a result of miscommunication and missed connections between herself and the various doctors involved with his care. Physicians involved with the boy's current care complained to the investigator that the mother habitually rescheduled and cancelled appointments and often adopted a combative attitude despite the necessity that he receive prompt treatment. One doctor also expressed the concern the mother was attempting to use the boy to obtain Adderall for her own use and had inquired about alternative over the counter drugs that could be used to the same effect. In previous investigations, the OIG has found a great degree of uncertainty among child protection staff regarding how to obtain Medicare Benefit Claim information that can be used to determine an individual's prescription drug transactions. Access to this information can provide child protection staff with a more accurate measure of a family's acquisition of prescription drugs and possible attempts to obtain them from multiple sources.

Although the investigator spoke with several involved physicians, she concluded her work on the case before receiving the boy's medical records. An OIG review of the medical record found notes from a visit with one medical provider during which the mother denied the boy had ever been diagnosed with or treated for ADD. In her interview with the OIG, the investigator stated she could not recall whether she had read the medical record after receiving it or if she identified the mother's conflicting statements regarding the boy's treatment for ADD. The report was ultimately indicated against the mother for medical neglect based on her ongoing resistance to comply with the boy's medical care.

A fourth hotline report was received seven months later after concerns were raised regarding the boy's overall physical condition. He had arrived at school one day with a large sore on the top of his head and staff over time had observed him to be lethargic and pale and consistently sleepy with dark circles under his eyes. When asked about his injury the boy was evasive and offered answers described as seeming "scripted." The report was assigned to a second child protection investigator who interviewed the mother and father at their home. The parents stated the boy had been injured when he moved while the mother was cutting his hair and presented the instrument used. The second investigator found that the mark on the boy's head matched the pattern of the object. The second investigator did not recognize that the unusually long time the injury took to heal suggested the boy's overall health might be compromised.

The second investigator spoke with the children's primary physician who reported she had not seen the boy for five months and that at his last visit he had gained only two pounds over a five-month span. The physician also stated the mother's second child, who was 16 months-old, had not been seen for a well child visit and recommended all three children be examined. The parents agreed to take the children in for medical examinations, however the second investigator never confirmed any visits took place. The second investigator also did not consult with the boy's teacher or obtain his school record. An OIG review of the boy's attendance record found he had missed 20 days of school so far that year. In an interview with the OIG, the second investigator stated she would have questioned the parents about the boy's absences if she had been aware of them. The second investigator said that since the hotline report was accepted for abuse she focused her attention on determining the nature of the injury to the boy's head. Since no allegation was made regarding his health she determined his medical concerns to be secondary and not a focus of her efforts on the case. The report for cuts, welts and bruises was unfounded based on the second investigator's determination the parents' explanation for the boy's head injury was plausible.

Four months after the report was unfounded, a fifth hotline call was received alleging that the family's home was unsafe, the children were ill and the parents were involved in reselling drugs prescribed to the mother and the boy. A third child protection investigator was assigned to the case and her work was overseen by the supervisor who had monitored the previous report. The third investigator visited the family's home and found it to be appropriate and observed the two youngest children to be healthy. The mother acknowledged having a prescription for Xanax but both parents denied taking the boy's Adderall or reselling any prescription drugs. The parents theorized the hotline call was a punitive action taken by an acquaintance who had recently quarreled with the father. Later that day the third investigator went to the boy's school and observed him while he stood in line to board the bus but did not speak with him or consult with other school personnel about him. The report was unfounded after only three days during the initial stage of the investigation. In an interview with the OIG the third investigator's supervisor stated the report was unfounded quickly because the allegations appeared to have no merit and it was believed the report had not been made in good faith.

Two months after the report was unfounded, an ambulance was called to the family's home in response to the boy being found unresponsive in his bed. Paramedics arrived to find the boy dead on the scene. Post-mortem tests found the boy's death was the result of an overdose of Codeine and Diphenhydramamine, an active ingredient in cold medicine. During the subsequent investigation the mother told police she had given the boy large doses of both medications on the day before his death. The parents also admitted reselling the boy's Adderall as well as anti-anxiety and pain relieving drugs prescribed to them. Both parents were indicated for death, inadequate supervision, substantial risk of physical injury and medical neglect. Both were also charged

criminally with manufacture and delivery of a controlled substance and the mother was additionally charged with drug induced homicide.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. Child protection investigators should be trained on the multiple uses the Department of Healthcare and Family Services Recipient Claim Detail can provide.**

The redacted report was used to train child protection staff. The training curricula were updated accordingly.

**2. This report should be shared with the second child protection investigator and her supervisor and used as a teaching tool on the importance of collectively analyzing information gathered during the course of an investigation.**

The report was shared and reviewed with the involved child protection staff.

**3. This report should be redacted and incorporated into training for child protection staff on investigations involving substance abusing families.**

The redacted report was used to train child protection staff. The relevant training curricula were updated.

**DEATH AND SERIOUS INJURY INVESTIGATION 6**

**ALLEGATION** A mother and her two daughters, ages six and seven, were killed in a traffic accident. The mother and her daughters were receiving Intact Family Services from the Department at the time of their deaths.

**INVESTIGATION** The family had a long and complicated history of involvement with the Department over a five-year period. During that time, the family was involved in two intact family services cases totaling twenty seven months in duration. The mother was the subject of six hotline reports alleging child abuse or neglect, two of which were indicated. The mother had significant mental health issues including bi-polar disorder, depression and borderline personality disorder. These conditions were exacerbated by her persistent substance abuse issues, characterized by her ongoing dependency on both illicit and prescription drugs. The mother's erratic behavior and fluctuating moods made it difficult for professionals to accurately gauge her emotional state at a given point in time or extrapolate how her current presentation related to future behavior.

The mother demonstrated a pattern of doctor shopping and medication seeking in order to obtain multiple prescriptions for numerous psychotropic drugs, anti-depressants and pain killers. The mother selectively provided and withheld information from her mental health providers in order to influence their assessments of her and obtain prescriptions for additional drugs. The mother's involvement with multiple mental health providers also complicated her substance abuse issues as the various doctors were not fully aware of what others were prescribing. This practice allowed her to both take drugs that were contraindicated against each other and stockpile them for later use. One therapist noted the mother's familiarity with various pharmaceuticals and that when he mentioned certain medications he might recommend, the mother reported already having the drugs at home. The therapist concluded the mother had, "quite a war chest of medications in her possession." In addition, the mother visited numerous doctors simultaneously but was sporadic in her attendance with each. When she did visit with them they largely found her to be a troubled but loving parent who was hindered by her mental health issues and lack of a support system. The mother was consistently found to be a capable parent by the mental health professionals involved with her care, however these opinions were shaped in part by the control the mother exercised over her interactions with them. When one psychiatrist expressed his belief that suicidal and homicidal thoughts voiced by the mother should be taken seriously, the mother stopped seeing the psychiatrist and began visiting another doctor.

The positive reports made by mental health professionals inhibited the Department's ability to screen the case into court, as experts had provided their professional opinions that the mother was an adequate caretaker. Absent the opportunity to compel the mother's compliance with required services through court intervention, child welfare professionals continued to operate within the framework of the intact family services cases. The mother's inability to recognize the extent of her substance abuse issues or the impact it had on her ability to function as a parent, coupled with her emotional instability made it extraordinarily difficult for child welfare professionals to effectively manage her case. In contrast to her disposition with mental health professionals, the mother's behavior toward child welfare workers was largely oppositional and confrontational. The mother repeatedly pressed for the closure of her case before required tasks had been performed and pushed for the removal of workers she felt were biased against her. The mother failed to recognize her own culpability and minimized the negative effects her actions. The second indicated report against the mother was prompted by her overdose on heroin while at the home of a friend. During the subsequent child protection investigation, the mother denied being a heroin user and stated she had not taken the drug recreationally but as a suicide attempt. Focused on deflecting concerns regarding her drug use, the mother failed to identify attempted suicide as a behavior child welfare workers would find problematic.

At the time of the fatal car accident, the mother was driving with the children along a two lane road on a Saturday morning when her vehicle swerved into oncoming traffic. The mother and the older daughter were

killed at the scene while the younger girl died four days later from her injuries. Post-mortem toxicology tests performed on the mother returned positive for morphine, valium and tramadol, a synthetic opiate. While it could not be proven that the drugs in the mother's system were the cause of the accident, her ongoing dependence upon such drugs and resistance to effectively controlling her use of them were likely factors contributing to the accident.

In situations where multiple health care, mental health and child welfare professionals are involved, managing the various observations, opinions and interests of all parties is a challenging task. In order to negotiate such complicated cases, collaboration is necessary to develop a complete picture of the causes and effects of actions taken by both clients and professionals. Enlisting the cooperation of other involved professionals on a consistent basis can mitigate the erratic and non-compliant behavior of clients and increase the likelihood of a positive outcome for their children.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This case reinforces the recommendation made in another OIG investigation:**

> **Division of Child Protection staff, as well as intact family services and placement staff, should obtain consultation from a Department nurse through the Administrator for Substance Abuse Services in child protection investigations and intact and placement cases where there is a concern about misuse of prescription medication and/or mixing of alcohol and narcotic medications.**

The Department is continuing to work with the Department of Healthcare and Family Services to implement this recommendation.

**2. In cases involving mental illness, especially when complicated by substance use, DCFS Clinical Division should be consulted.**

During the recent Error Reduction Training for the private agencies conducted by the Office of the Inspector General, the Department's Clinical Services staff have provided information and guidance to facilitate early identification of parental mental health and substance abuse and develop strategies to move beyond the fragmentation and a lack of coordination of services typically found in the field in these cases. The role of caseworkers in learning how to identify risk of harm to the children and simultaneously recognize and work with the parental mental illness and co-occurring mental disorders will be supported through referrals for clinical consultation in those cases. Clinical Services staff are accessible, and the training and revisions of policies to facilitate the early identification, access to records and services planning for the family at the onset of the case within the Division of Child Protection should help raise awareness among caseworkers regarding requesting assistance from Clinical Services.

**3. This case should be shared with DCFS Clinical Division to develop strategies to support the field in these difficult cases.**

During a statewide meeting of DCFS Clinical Services and Nursing staff, specialty services and how to access them were discussed. The Clinical Services and Nursing staff made presentations to DCFS and private agency (POS) offices instructing staff how to consult with Clinical Services staff. Referral documents have been developed and are in the approval process.

**DEATH AND SERIOUS INJURY INVESTIGATION 7**

**ALLEGATION**

A brother and sister, ages three and one, died after they became trapped inside their mother's truck which rolled to the bottom of a retention pond. Two child protection investigations were indicated against the mother during the year preceding the children's deaths.

**INVESTIGATION**

The initial hotline report against the mother was made after she was observed at a bar late at night along with her younger daughter, then nine months old. The mother was intoxicated and other bar patrons and staff had to care for the child until the maternal grandfather arrived and transported them home. The child protection investigator assigned to the case spoke with the mother, who also had three sons, then ages 18, 17, and 2, and a 12 year-old daughter. Only the two youngest children lived with the mother, although the other children frequently visited her home. The mother and the two children lived in a home on property adjacent to the residence of the maternal grandparents, who were a frequent presence and assumed much of the child care responsibility. The mother told the investigator she had not driven with her daughter while under the influence of alcohol but admitted becoming intoxicated after arriving at the bar. The investigator noted the mother's speech was slurred during the interview and that she smelled strongly of alcohol.

During a second meeting a week later, the mother completed an Adult Substance Abuse Screen in which she reported sometimes using more drugs than intended. In an interview with the OIG, the investigator stated she and the mother did not discuss any substances other than alcohol and she believed that was the drug the mother referred to during the screen. Unbeknownst to the investigator at the time, the mother had multiple prescriptions for narcotic pain relievers, anti-depressants and muscle relaxants. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the children to be safe based on the mother's denial of substance abuse issues and the extensive support provided by the grandparents. The report was indicated against the mother, however she refused an offer from the Department to provide services to the family.

The second child protection investigation stemmed from a request for local law enforcement to perform a well-child check at the mother's residence. Upon arriving at the home at 11:45 am, police observed the mother through the window unconscious on the couch. After 10 minutes of attempts to rouse her, the mother came to the door and told police she had consumed alcohol that morning after taking some medication. The case was assigned to a second child protection investigator who went to the home the same day and interviewed the mother and paternal grandfather. The mother stated she suffered from chronic pain and depression and realized she should not have mixed her medications with alcohol. The investigator recorded the various drugs the mother took but did not note the names of the prescribing doctors. Although the mother identified her primary physician and signed a consent for release of information, the investigator never spoke with him.

An OIG review of records obtained from the Department of Healthcare and Family Services (DHFS) found that during the four months between the first and second hotline reports, the mother had been denied refills for her prescription medications 23 times. On 18 of those occasions the mother was denied because she had attempted to refill the prescriptions too soon. In an interview with the OIG, the second investigator said she was unaware of any resource to assist Department personnel with concerns regarding prescription medications. The Department has an agreement in place with DHFS to allow access to detailed accounts of recipients' prescriptions, as well as visits to doctors or emergency rooms. DHFS also operates a Recipient Restriction Unit which can monitor potential prescription abuse and place limitations on where prescriptions can be filled.

As the second child protection investigation proceeded, the mother initially agreed to participate in substance abuse counseling but later refused and acted belligerently toward the second investigator when pressed on the

importance of compliance with services. The report was indicated against the mother for inadequate supervision and the second investigator contacted the local State's Attorney's office to request the case be screened into court to compel the mother's participation. The State's Attorney's office denied the request, asserting that since the children had not been taken into protective custody court intervention was not required. In an interview with the OIG, the second investigator's supervisor stated it was extremely difficult to persuade the State's Attorney in that county to file a petition to require compliance with Intact Family Services (IFS). The Assistant State's Attorney for the county stated that she had only filed two petitions for custody in her eight years of service. The supervisor said her office does not track the cases in which requests to file petitions are denied.

Four months after the second investigation was closed, emergency personnel were called to the mother's home in response to her truck being submerged in a retention pond with her two youngest children inside. According to the mother, she had left the truck running in her driveway while she checked the mailbox when the one year-old, who was unrestrained, put the vehicle into gear and sent it rolling backwards into the water. Responders were unable to free the children in time and both died from drowning. The mother was cited for failure to restrain her child in a vehicle and a criminal investigation against her is pending.

During crisis intervention counseling immediately following the children's deaths the mother was diagnosed with Post Traumatic Stress Disorder and therapists noted that her 12 year-old daughter felt a great deal of responsibility for what had occurred. The mother was encouraged to continue counseling for both herself and her daughter. After initially agreeing she again refused to secure services for the family. Throughout the next year the mother demonstrated increasingly erratic behavior, including an indicated report for inadequate supervision of the 12 year-old and an arrest at the girl's school for possession of drug paraphernalia among other charges. Three months after the arrest, custody of the 12 year-old was returned to the mother. Another request was made by the Department to petition the case into court, however it was again denied by the State's Attorney's office. Although the mother moved away from her residence and into the home of a new boyfriend, her new living situation was not assessed in terms of the daughter's safety, particularly in regards to the influential role the grandparents had played in mitigating the mother's behavior.

The mother's continuing problems with substance abuse and mental health continued to cause instability for her daughter and resulted in her missing a great deal of school. In the most recent semester, the daughter had missed 37% of the days class was in session. In an interview with the OIG, the principal of the girl's school stated they had been told by the mother that she was purposely keeping the girl out because of ongoing disputes with the administration.

## OIG RECOMMENDATIONS / DEPARTMENT RESPONSES

**1. The Division of Child Protection should refer to the DCFS Office of Legal Services those cases with parental non-compliance, risk to children and refusal to screen.**

A memo was issued to child protection staff instructing staff to refer cases of parental non-compliance to the Department's Office of Legal Services.

**2. DCFS Office of Legal Services should determine whether to file a petition to compel compliance with services themselves or advocate with the Assistant State's Attorney to file the petition.**

As part of the referral process, the Department's Office of Legal Services will review case referrals with the Division of Child Protection and advocate with the Office of the State's Attorney to file petitions to compel compliance with services where appropriate.

**3. Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response. Child protection**

**offices should share this information with DCFS Legal.**

The Department issued a memorandum to child protection staff instructing staff to refer cases of critical parental non-compliance in which the State's Attorney has refused to file a petition to the Office of Legal Services.  Child protection managers will track such responses monthly.

**4.   Division of Child Protection staff should obtain consultation from DCFS nurses through the Administrator for Substance Abuse Services, in child protection investigations where there is a concern about misuse of prescription medication and/or mixing of alcohol and narcotic medications. Department of Healthcare and Family Services (DHFS) has requested a point person for referrals to the Recipient Restriction Unit.   The Administrator should serve as the Department's liaison to the Department of Healthcare and Family Services Recipient Restriction Unit to report the potential misuse of prescription medications.**

The Department is continuing to work with the Department of Healthcare and Family Services to implement this recommendation.

**5.   Training for child protection staff should incorporate information about the availability and benefit of recipient claim details from the Department of Healthcare and Family Services and their Recipient Restriction Unit.**

The Office of Training will update training modules to reflect the use and benefit of the Recipient Claim Detail. In addition the Office of Training, Service Intervention and the Division of Child Protection will incorporate the information from these divisions to develop one coordinated training module.

**DEATH AND SERIOUS INJURY INVESTIGATION 8**

**ALLEGATION**

A newborn baby survived being delivered into a toilet by her mother, who had concealed her pregnancy. Following a brief hospitalization, the Department released the baby into the custody of her parents despite a pending criminal investigation into the circumstances of the birth.

**INVESTIGATION**

The mother delivered the baby while attending a party at the home of a relative. The family contacted police and reported the baby was deceased, however after officers arrived the baby, which was still in the toilet, was found to be alive. Immediate life-saving measures were taken and paramedics transported the baby to a hospital. Police interviewed the mother, her boyfriend and several relatives who claimed they were unaware the mother was pregnant. As police began their inquiry into the incident the Department opened a concurrent child protection investigation. The investigator assigned to the case began his work by contacting police to obtain the information they had gathered up to that point. The investigator then spoke with the mother, her boyfriend and relatives who were present at the party who all asserted the mother had complained of being ill and excused herself to the bathroom. The mother stated she had not experienced any change in menstruation or noticeable weight gain and did not know what was happening until the baby appeared. After an extended period of time she called for the boyfriend who entered the bathroom briefly before emerging requesting assistance. The couple explained they left the baby in the toilet because they didn't believe the newborn had survived the birth and thought they should not move the body.

The investigator then interviewed hospital staff who reported that both the mother and her boyfriend seemed concerned and involved in the newborn's treatment and had expressed a desire to keep the baby. Physicians surmised the baby was born three to four weeks premature and stated it was possible the mother had not known she was pregnant. The investigator also spoke to the mother's boss who denied any knowledge the mother was pregnant and expressed her opinion that the mother would make an excellent parent. The investigator conducted background checks on the mother and her boyfriend and found neither had any criminal history or prior child abuse and neglect reports. After two weeks in the hospital, the baby was released into the custody of her parents. Meanwhile, the criminal investigation into the circumstances of the baby's birth remained ongoing. The investigator did not complete a safety plan prior to the baby's release.

Two months later, the investigator reached the conclusion the report should be unfounded based on doctors' conclusions it was plausible the mother did not know she was pregnant, positive reports from collaterals, the absence of any criminal history and the parents' appropriate behavior in response to the baby's care. When the investigator informed local police of his intention to unfound the report he was told officers were following new leads that cast doubt on the mother's story. Police were considering information provided by several of the mother's co-workers that they suspected she had been pregnant once before, one year earlier. The co-workers reported the mother at the time had denied being pregnant and attributed her appearance to the effects of a medical condition. When the mother returned to work after a few days away she no longer appeared pregnant and said her condition had been effectively treated with medicine. Some of the same co-workers reported the mother's recent appearance was similar to how she looked at that time, but they assumed she had a recurrence of the medical condition and did not question her about it. The police faxed the investigator a list of the co-workers with synopses of their statements. Police also requested that he refrain from closing the case or conducting further interviews with the family until they had completed additional work in their investigation.

Although the investigator did not close the case, he did not contact any of the co-workers included on the list provided by the police. Furthermore, the investigator did not inform his supervisor of the new information provided to him by law enforcement regarding suspicions the mother had been pregnant before. In an interview with the OIG, the investigator stated he did not speak to the co-workers because of his concern his

intervention might have a negative impact on the ongoing police investigation. The investigator believed his questioning of the co-workers would be redundant and that police would supply him with the results of their inquiry when it was completed. The investigator stated police did not request that they be informed when the baby was released from the hospital and since he understood that officers were in regular contact with the mother, he believed they were aware when the child arrived in the parents' home. The investigator had requested a copy of the police report and intended to rely upon it to provide the additional information obtained by police, however it is standard procedure not to disseminate such reports until all work is completed. In an interview with the OIG, the local police chief offered to make arrangements in the future for Department personnel to review police reports at headquarters while investigations are still pending.

In situations where police and child protection investigations of the same incident are ongoing, the Department often defers to the wishes of law enforcement. Concerns that criminal investigations might be compromised by Department activity often prompt workers to delay or abstain from proceeding with tasks they would otherwise perform. While police often rely on the subjects of investigations being unaware of activity being conducted, the Department's primary obligation is to ensure the safety of children, requiring direct contact with the central parties involved. As police and child protection workers pursue independent investigations, the information they obtain often differs and may lead towards divergent conclusions. An open and ongoing exchange of information between law enforcement and the Department allows for more comprehensive and accurate assessment of a situation and can result in a more thoroughly considered outcome.

Three months after the baby was born, the mother confessed to police she had been aware of her pregnancy and knew the baby was alive when she placed it in the toilet. The mother also confessed to having delivered a baby one year earlier and hiding its body in the basement of her home. The three month-old was removed from the parents' home and placed in the home of her paternal great-grandparents. The mother was arrested and charged with attempted murder. She pled guilty but mentally ill and was sentenced to six years in prison. The criminal investigation into the death of the first child is ongoing.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. A law enforcement and child protection safety planning conference must take place when there are concurrent investigations. Developing information can be exchanged at the conference and participants should discuss how the information can be utilized to maintain the safety of the child without jeopardizing the criminal investigation.**

A teleconference was held with the Department and law enforcement.

**2. When a child is hospitalized for injuries or conditions that are suspected to be the result of abuse or neglect by a primary caregiver and there is a concurrent law enforcement and child protection investigation, there must be a safety planning conference between law enforcement and child protection before the child is discharged.**

The Department agrees. Department Procedure 300.50, *Reports of Child Abuse and Neglect, Initial Investigation,* will be amended to include the recommended language.

**3. In cases where police have a pending criminal investigation, Division of Child Protection investigators should not reveal a preliminary finding of unfounded to the family prior to a supervisory conference to explore whether another conference with law enforcement should take place.**

A practice memo will be distributed to child protection staff.

**4. The Director of the Department and the local chief of police should convene a meeting between the**

**Chiefs of Police and child protection supervisors of the local municipalities of the sub-region to develop a collaborative relationship so that investigative information can be exchanged between the parties, including information about police contacts to the home of alleged perpetrators and individuals involved with a potential safety plan.**

The Department agrees.  A meeting was held with law enforcement.

**5. The child protection investigator should be counseled for:**
- **not establishing a safety plan when the baby was discharged from the hospital**
- **not interviewing persons with possible knowledge of her prior pregnancy that were identified by the police**
- **not sharing the faxed document from local police with his supervisor.**

The child protection investigator was counseled.

**6. The Department should invite the lead detectives who investigated this case for local police to present their investigation to program managers, DCP supervisors and designated investigative staff in the region.**

Law enforcement presented their investigation to child protection staff.

**DEATH AND SERIOUS INJURY INVESTIGATION 9**

**ALLEGATION**

A three month-old boy died as a result of injuries inflicted by physical abuse. A child protection investigation was indicated against the baby's father for abuse two months prior to the infant's death.

**INVESTIGATION**

The baby was brought to a hospital emergency room near the family's home when he was less than three weeks-old because he was "pale, blowing bubbles, limp, and lethargic." Hospital personnel discovered that the infant had a head injury and bone fractures and he was hospitalized for 13 days. A nurse contacted the hotline as well as law enforcement. A child protection investigator was assigned to the case and an investigation was conducted into allegations of head injuries and bone fractures by abuse to the infant.

The investigator conducted a cursory investigation. The parents' explanation for the head injury was that the father's seven-year-old son, who had been visiting from another state, fell while carrying the baby six days earlier. The parents' explanation for the infant's fractures was that they must have been caused when the father exercised the baby's legs to relieve gas. In her investigation, the investigator accepted the parents' explanations without corroboration. She did not establish when the seven year-old visited, the duration of his stay, or the date and circumstances of the alleged fall. The investigator never spoke with the seven year-old or his regular caretakers and did not question the father's refusal to provide her with his seven year-old son's contact information. Although physicians stated that the exercises could have caused the fractures, a significant amount of force would have been necessary and would cause a reasonable person to believe the force was excessive. The investigator never asked the father to demonstrate with a doll how he did the exercises with the infant. She completed a home safety checklist determining the family's residence to be safe while meeting with the mother in the hospital, three weeks before she ever saw the home. She completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the baby to be unsafe, but no safety plan was created because the child was in the hospital. The investigator did not complete another CERAP until almost two weeks after he had been discharged. The investigator also failed to follow up with local police who were conducting their own inquiry into the case and did not request the police reports.

The investigator indicated the report against the father for head injuries by abuse and for bone fractures by abuse. The baby was allowed to remain in the parents' custody. While the indications were correct, they were not supported by the investigation or by the rationales. In separate interviews with the OIG, neither the investigator nor her supervisor was able to explain how the rationales given supported indications of abuse rather than neglect. The findings would be unlikely to be upheld on appeal.

Numerous professionals, including multiple physicians, law enforcement, and DCFS were involved in this case; however, there was a lack of communication amongst them. A nurse served as a liaison between hospital staff and the child protection investigator, relaying information given to her and facilitating a sit-down with the child protection investigator and the pediatric radiologist. A child protection team staffing should have been called, which would have enabled all involved to share detailed information, and come to a consensus opinion about the likelihood that the infant's injuries were the result of abuse or accident.

Approximately two months after the baby was first injured, and one day before he was scheduled for surgery related to those injuries, his parents brought him to the emergency room unresponsive. Hospital personnel determined the infant had a fresh subdural hematoma. He was pronounced brain dead two days later. An autopsy found epidural, subdural and subarachnoid hemorrhages on his brain as well as a skull fracture and fractured ribs. The medical examiner determined the baby died of blunt force trauma due to child abuse and ruled his death a homicide. Both parents were indicated for death and head injuries by abuse as they were the baby's only caretakers. Local police have investigated the crime but no charges have yet been filed.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The child protection investigator should be disciplined for failing to conduct a thorough investigation, including (1) failing to corroborate the parents' explanations for the infant's injuries; (2) failing to assess continued risk to the infant given the father's refusal to cooperate with providing contact information for his son in another state; (3) failing to conduct a home visit and complete a second/safe CERAP upon the infant's discharge from the hospital; (4) for giving inconsistent rationales for her investigative findings; and (5) for not completing a home safety checklist in the child's home.**

The child protection investigator was disciplined.

**2.   The child protection investigator's supervisor should be disciplined for approving an investigation not supported by the findings or rationales.**

The supervisor was disciplined.

**3.   The Office of the Inspector General will share this report with the head of the hospital's child protection team.**

The Office of the Inspector General shared a redacted report with the hospital.

**4.   The Multidisciplinary Pediatric Evaluation and Education Consortium (MPEEC) will conduct a child abuse training for the hospital's child protection team and appropriate pediatric and emergency room staff.**

The Department agrees.  The training is scheduled for March 2011.

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

**ALLEGATION** A two year-old girl suffered serious injuries as a result of physical abuse inflicted by her mother's boyfriend. A child protection investigation into another injury the girl received one week earlier was open at the time of the second incident.

**INVESTIGATION** The initial child protection investigation was opened after the girl and her four year-old sister were brought to a day care center by the mother's boyfriend. Upon arriving, the boyfriend placed the two year-old in a chair and told day care staff her leg was asleep because a third sibling, a six year-old brother, had laid on it while the children slept the night before. When a staff member later attempted to check the girl's diaper she realized the girl could not put weight on her leg and was in significant pain. Staff called the family and the boyfriend returned and took the girl home. Once the mother returned home from work she transported the girl to the local hospital where x-rays showed her leg was fractured in two places. The girl was then referred to a surgical hospital where her leg was placed in a cast. Although the surgical hospital has a child protection team, physicians who treated the girl did not request a consult to consider possible abuse. Neither hospital contacted the State Central Register to report the girl's injury, however a hotline report was received and a child protection investigator was assigned to the case.

The morning after the report was received, the assigned investigator unsuccessfully attempted to locate the mother at both her home and workplace. After learning the mother and her children often stayed with her boyfriend the investigator attempted to identify his residence, but had insufficient information to do so. The investigator continued his efforts by contacting local police to ask for assistance and spoke with a detective who offered to use law enforcement resources to assist in locating the family. The investigator also called area hospitals to find out where the girl had been treated and eventually received a positive response from the local hospital confirming the girl had been seen there, but offering no new information as to the family's whereabouts.

In an interview with the OIG, the investigator stated he had exhausted his options in trying to contact the mother and thought the police would be best able to continue the effort to locate the family. The investigator expressed his belief that at the time, because the girl's injury was of unknown origin and the hospital had not contacted the hotline, it was likely a case of neglect rather than abuse. The Abused and Neglected Child Reporting Act requires the Department to notify local law enforcement of reports it receives regarding death, serious injury or sexual abuse. Since he had been in direct contact with the detective and told her the hotline call stemmed from the girl's broken leg, the investigator felt he had reasonably informed the police of the child protection investigation. The investigator did not make a formal, written report of his investigation to local police, however he complied with the standard practice followed by the majority of field offices and law enforcement agencies throughout the state who rely on verbal transmission of such information. It is only in one area of the state that it is standard procedure for information regarding death and serious injury reports to be submitted in written form.

One week later, neither the investigator nor police had located the family when the girl was brought to the local hospital for incessant vomiting. Physicians noted the girl's stomach was hard and observed her to be pale and lethargic. She was also found to have extensive bruises to her head and torso and patches of her hair were missing. The girl was transferred to the surgical hospital where a CAT scan showed her liver had been lacerated as a result of blunt force trauma, causing severe internal bleeding. During the ensuing police investigation the boyfriend admitted punching the girl in the stomach and face because she was crying. He was charged with Aggravated Battery to a child. After three weeks in the surgical hospital, the girl was released and placed in the custody of her father. The mother's other two children and the boyfriend's daughter who lived with him were all removed from their respective parents' custody and placed with relatives.

At the outset of the criminal investigation it was learned the boyfriend lived in a rural area just outside town that fell within the jurisdiction of the county sheriff rather than the local police department.  The inability to locate the family during the first child protection investigation raised concerns regarding the Department's process for relaying death and serious injury reports to the appropriate law enforcement agency.  The Illinois Law Enforcement Alarm System (ILEAS), created in 2002 to bolster communication with and between law enforcement agencies, maintains a secure database which includes critical contact information for every law enforcement agency in the state.  Utilization of ILEAS by State Central Register operators would allow them to immediately identify and communicate with the appropriate agencies in cases of death and serious injury to a minor.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The Department should pursue an interagency agreement with the Illinois Law Enforcement Alarm System to identify the local law enforcement agency with jurisdiction to provide written notification of the Hotline reports required by statute and Department Rule.**

A letter was sent to the Illinois Law Enforcement Alarm System (ILEAS)  Director requesting access to the ILEAS System.  Upon receipt of access to the system, State Central Register staff will be trained.

**2.   The State Central Register should adopt a form to provide written notification to local law enforcement of the Hotline reports required by statute and Department Rule.**

The form is currently being developed.

**DEATH AND SERIOUS INJURY INVESTIGATION 11**

**ALLEGATION** A three month-old boy died of physical abuse inflicted by his parents. A child protection investigation of the parents was open at the time of the infant's death.

**INVESTIGATION** The child protection investigation was initiated after the hotline received a report the boy and his one year-old sister were at risk because of their parent's behavior and home environment. The report alleged the parents were drug users whose substance abuse had left them visibly scarred and that domestic violence incidents between the couple had resulted in police intervention on numerous occasions. The report was accepted with an "Action Needed" designation, requesting the children be observed and their safety assessed immediately.

The child protection investigator assigned to the case went to the family's home and met with the parents. The parents denied being substance abusers and the investigator did not observe any physical signs of drug use or evidence of such in the home. The mother spoke to the investigator outside the presence of the father and denied any history of domestic violence between them. The investigator was unable to observe the children who were with their paternal aunt and would not be home until later that day. The parents asked the investigator not to visit the children at the aunt's home but agreed to make them available three days later and scheduled another meeting for that time. The parents stated they were preparing to move to another home and agreed to provide the investigator with their new contact information. Prior to the meeting with the children, the father contacted the investigator and asked to reschedule for the following week due to an illness in the family.

In an interview with the OIG, the investigator stated she was not concerned with the delay in seeing the children because the parents were cooperative and did not appear to present any of the risk factors offered in the hotline report. The investigator also explained her understanding that the "Action Needed" designation required an appropriate and immediate response but did not specifically require the children to be seen. In a separate interview, the investigator's temporary supervisor confirmed approving the agreement to delay seeing the children and said the discrepancies between the hotline report and the investigator's observations led them to question the credibility of the report itself.

Nine days after the hotline report, the investigator made her initial visit with the children at the family's new home. She observed the children to be healthy and the home to be appropriate. During the interim between the two meetings, the investigator had obtained Law Enforcement Database System (LEADS) checks on the parents. The father had previously been charged with several crimes, including three arrests apiece for assault and drug possession, and had past convictions for burglary and disturbing the peace. The mother had previously been convicted of assault. The father denied he was the individual identified in the drug-related crimes and maintained he had no history of substance abuse. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) concluding the home was safe. In her interview, the investigator stated she was aware at the time that the family was residing in the home of the paternal aunt and acknowledged she did not meet with the aunt, her husband or their two children. After contacting the family's pediatrician, who reported no concerns regarding the children's care, the investigator and her temporary supervisor reached a preliminary decision to unfound the case.

During her handling of the case, the investigator had requested and received records from the local police department regarding their interactions with the family, which included one incident where a family friend alleged the father had held the mother at their home against her will. An OIG review of law enforcement records found two occasions where local sheriffs responded to incidents involving the family at the nearby home of the children's paternal grandmother. One involved the father's overdose on alcohol and pain medication. The other was related to the grandmother's reluctance to return the children to the mother's custody because of her stated concern the parents were involved with drugs and domestic violence. The

sheriff who responded to that incident noted that he observed the mother to have a black eye, however she refused to discuss the cause of her injury. Because the grandmother lived in an outlying area just beyond the city limits, her home fell within the jurisdiction of the local sheriff's office and the records of these incidents were not included in the city police reports reviewed by the investigator.

Four days after the investigator met with the family at their new home, an ambulance was called to the residence. Emergency personnel arrived to find the boy unresponsive lying on a couch where the parents said he had been sleeping. The infant was pronounced dead on arrival. An autopsy found multiple, recently inflicted bruises to the boy's body, which the coroner determined had been contributing factors in his death by suffocation. Police responding to the home found drugs and drug paraphernalia, including empty heroin packets and syringes. The father admitted to police he was a heroin user and the paternal aunt and uncle stated they were the primary caretakers in the home and only allowed the parents to stay with them in order to try and protect the children from their lifestyle. The parent's daughter was taken into custody by the Department and the pending child protection investigation was indicated against the parents. The mother later pled guilty to aggravated battery of a child and was sentenced to 10 years in prison. The father was found guilty of first-degree murder and was sentenced to 35 years in prison.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. In rural areas where there is suspicion of drug involvement or domestic violence, the Department should consider requiring investigators to include the local sheriff's department when requesting incident reports.**

The Department agrees. The recommended language is being added to Department Procedure 300.60 g), *Other Required Investigative Contacts*.

**2. This report should be shared with the child protection investigator, her temporary supervisor and her assigned supervisor.**

The report has been forwarded to the Acting Assistant Regional Administrator to share with the child protection investigator and supervisors.

**DEATH AND SERIOUS INJURY INVESTIGATION 12**

**ALLEGATION**   A four year-old boy and his grandfather died in a fire in the grandfather's home.  The boy's family had an extensive history of involvement with the Department and a child protection investigation was indicated against his mother six months prior to his death.

**INVESTIGATION**   The boy's mother first became involved with the Department six years earlier after she was arrested for leaving her older son, then age four, and another child alone in a park while she went to a nearby building to use drugs.  The subsequent child protection investigation of the incident resulted in an indicated finding against the mother.  Six months later she gave birth to her second son, who tested positive for cocaine at birth.  During the child protection investigation that followed the mother told the investigator that while heroin was her drug of choice, she had used cocaine 10 days before giving birth to combat feelings of loneliness and depression.  The report was indicated against the mother and an Intact Family Services (IFS) case was opened.

At the inception of the IFS case it was learned that the children's elderly grandfather was primarily responsible for their care and supervision, although he suffered from emphysema and required oxygen tanks to assist his breathing.  The mother and the father of the younger son lived with the grandfather and the children in his home.  Three months after the IFS case was opened, the mother was arrested for possession of a controlled substance and spent nine months in prison.  At the time, the father was already incarcerated for delivery of a controlled substance.  The IFS case remained open and the mother was referred to outpatient substance abuse counseling and parenting classes upon her release, but she did not participate in services and the case was later closed.

During the six years the mother and her family were involved with the Department, she was the subject of ten child abuse and neglect hotline reports, seven of which were indicated against her.  Throughout that time both she and the father demonstrated an unwillingness to address the substance abuse issues they both faced, the ramifications of their criminal behavior stemming from their addictions or the impact their lifestyle had on the children.  On multiple occasions local police were forced to intervene with the family and noted "on-going problems" with a lack of supervision of the children in the residence.  The mother's oldest son frequently displayed aggressive and problematic behavior both around the home and at school.  After the oldest son set fire to a swing set in a neighbor's back yard a call was made to the hotline.  The assigned child protection investigator identified a psychological evaluation of the boy as a requirement of the family's participation in services.  The mother failed to obtain the evaluation and while the report was still pending, police caught the boy attempting to set fire to a bag of shotgun shells, prompting another call to the hotline.  The family's continuing problems led to the opening of a second IFS case.  Although both parents had extensive histories of drug involvement, the IFS case was not referred to an agency that specialized in dealing with families with substance abuse issues.

The family's pattern of resistance and non-compliance with service requirements continued through the second IFS case.  Consistently, the mother would initially agree to perform necessary tasks but would not follow through.  When questioned or challenged the mother alternated between apologetic and aggressive stances, effectively forestalling further intervention by child welfare professionals.  In addition, the family consistently relied upon the grandfather to bear the majority of the responsibility for childcare despite his declining health, physical limitations and frequent hospitalizations.  Although the grandfather readily accepted his role as a care provider, involved workers failed to recognize how his health issues compromised his ability to serve effectively in that capacity.  After the second IFS case was ultimately closed for lack of compliance, the mother's erratic behavior continued.  On two occasions police were called in response to reports the mother had used her children in shoplifting schemes, allowing goods to be stuffed into their clothing in attempts to evade detection.  The second incident, in which the mother concealed bottles of vodka inside the coat of her younger son, then four years-old, resulted in the tenth hotline report and seventh indicated finding

involving the family. The mother was convicted of retail theft and sentenced to two years in jail.

During the child protection investigation following the incident, the mother admitted attempting to steal the vodka in order to sell it to obtain money to buy heroin. The mother also informed the investigator she was pregnant with her third child. When the mother delivered the baby, a girl, two months later the infant's birth was noted by hospital staff as being complicated by the mother's heroin use. One month after the baby's birth the mother was released from jail, however the status of the family's home was not reevaluated following her return. Additionally, no effort was made to refer the case for intact services specializing in working with substance abusing families or have it screened into court for risk of harm.

In an interview with the OIG, the investigator assigned to the seventh child protection investigation stated she and her supervisor were unaware of the likelihood the mother would be released well before the duration of her sentence and never knew how long she would remain in jail. In her interview with the OIG, the supervisor stated she had consulted with the investigator and determined that intact substance abuse services case was unnecessary since the mother was receiving services in jail and because the parents had no known issues at the time.

Three months later a fire broke out in the family's home while the grandfather, the four year-old boy and the infant girl were present. Witnesses reported the four year-old emerged from the house but reentered after hearing his grandfather calling out. The four year-old and the grandfather both died of smoke inhalation while the infant survived. Officials were unable to determine the cause of the fire and no criminal charges were filed. The two children were placed in the home of maternal relatives and guardianship of the siblings was established.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This report should be shared with relevant child protection and intact family services managers. The appropriate regional administrator should lead a review of this case with the managers and design a corrective action plan.**

The report was shared and a corrective action plan developed.

**2. The child protection supervisor who oversaw the investigation of the tenth hotline report should be counseled for not assuring that this case was either screened into court or referred for intact family services.**

The child protection investigator was counseled.

**DEATH AND SERIOUS INJURY INVESTIGATION 13**

**ALLEGATION**

Three months after an Intact Family Services (IFS) case involving a mother and her four children was closed, the mother was responsible for the beating death of her new husband's two year-old son.

**INVESTIGATION**

The mother's involvement with the Department began 18 months earlier when she went to a hospital emergency room after overdosing on antidepressants. At the time the mother had custody of the two sons from her second marriage, ages four and two. Her two older sons from her first marriage, ages eight and seven, resided with their father but visited her home frequently. During the subsequent child protection investigation of her hospitalization, the mother reported being diagnosed with bipolar disorder and experiencing a history of depression, for which she saw a psychiatrist and took prescribed medications. The mother also stated she sought regular counseling at a local social service agency for additional support. The hotline report was indicated against the mother for substantial risk of physical injury/environment injurious by neglect and a case was opened to provide Intact Family Services.

During the 15 months the case was open, the intact services worker supported the mother's efforts to stabilize her family and manage her mental health issues. The mother's behavior was marked by extended periods of compliance punctuated with episodes of mildly erratic behavior. While the case was open, the mother was involved in relationships with four different men, all of whom had extensive roles as caretakers for the children. The intact worker performed background checks on all of the paramours and attempted to ensure each was a positive influence in the mother's life. Eight months after the case was opened, the mother was arrested in her home for possession of drug paraphernalia. An OIG review of the mother's psychiatrist's notes found that she admitted to him that she was smoking marijuana around the same time the arrest occurred, but repeatedly denied drinking alcohol. Alternatively, the mother told the intact worker she was arrested after police found a marijuana pipe belonging to an ex-boyfriend she found while cleaning her home. The mother told the worker she did not use marijuana but admitted occasionally drinking alcohol while taking her medications. While both the intact worker and the psychiatrist counseled the mother about the dangers of mixing her medications with other drugs or alcohol, neither was fully aware of the extent of the mother's substance use. Recent research indicates that individuals with schizophrenia may be at increased risk of psychotic episodes when using marijuana.

The mother's mental illness was identified as her primary obstacle throughout and while the intact worker was in contact with the psychiatrist, a greater degree of communication between the two could have provided each with a more complete picture of the family's issues. Written correspondence between the intact worker and the psychiatrist addressed some of the concerns each had regarding the mother's progress, however more thorough, focused dialogue may have allowed both professionals to identify specific concerns and courses of action. The mother's compliance with her medicinal regimen continued to be an issue both the psychiatrist and the intact worker repeatedly addressed. More extensive coordination between the two might have led to greater success in monitoring her adherence to the plan. Integrating the efforts of mental health professionals, who are responsible for improving their clients' well-being, and child welfare workers, dedicated to the best interests of children and families, can help bridge the gap between the two and provide more comprehensive assistance to families.

The IFS case was ultimately closed after it was determined the mother had made satisfactory progress in her goals to manage her mental health issues and stabilize her home. The mother had an established, if unorthodox, support system which included both her ex-husbands and their families. While the mother was engaged in a custody dispute with her second husband over her two younger sons, the two managed to resolve issues regarding their care. Violence by the mother towards her children or others was never identified as a factor in the case. In an interview with the OIG, the intact worker stated she never saw the mother act aggressively towards her children and did not recognize in her behavior the mood fluctuations that typically

accompany manic behavior.

Three months after the IFS case was closed, the mother married her most recent boyfriend after a five-month relationship. The father and his two children, a five year-old girl and the two year-old boy, moved into the mother's home. One week after the wedding, while the father was at work, the mother lost her temper with the two year-old boy and beat the child, swinging his head into a door frame and pushing him to the floor. The boy died as a result of his injuries and the mother admitted to having abused the boy previously, stating she told the father that bruises on the boy were the result of injuries he caused to himself while throwing tantrums when the father was away. The other children in the home reported they were unaware of any history of the mother abusing the boy. The children were all removed from the home and went to live with their respective fathers. The mother pled guilty to first-degree murder and was sentenced to 40 years in prison.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This report should be redacted and used as a training tool for intact family services workers.**

The redacted case has been incorporated into the Department's Foundation Training for Child Welfare workers, the Intact Family Casework Training and the Child Endangerment Risk Assessment Protocol (CERAP) training.

**2. In cases of severe mental illness of a parent or caretaker, the Department should require child protection investigators and intact family services workers to ask mental health professionals the following three questions:**

**(1) Do the parents' or caretakers' symptoms of mental illness place the child at risk for maltreatment or harm?**
**(2) Are there long-term effects of the parents' or caretakers' mental illness symptoms on the child's well-being that need to be considered in developing a treatment plan?**
**(3) If the parents' or caretakers' current treatment plan is changed, will it likely bring about an improvement in parenting skills?**

The Department agrees. No further response provided.

**DEATH AND SERIOUS INJURY INVESTIGATION 14**

**ALLEGATION** A child protection investigator failed to adequately assess allegations of physical and sexual abuse of three siblings, girls ages 16 and 8 and a 14 year-old boy, by their mother. The investigator also neglected to properly utilize translation services while interacting with the non-English speaking family.

**INVESTIGATION** The hotline was contacted after police responded to a report the boy had been physically abused by the mother. At the time the report was received, the family was identified as not being primarily English-speaking and a bilingual mandate worker made an immediate attempt to meet with the family. The mandate worker's attempt was unsuccessful and the case was subsequently assigned to a child protection investigator who spoke only English.

According to the investigator's case notes she visited the family the next day, however statements made by family members, Department personnel and others involved in the investigation stated her first meeting with the family did not take place until four days after the incident. Throughout her work on the case, the investigator failed to provide accurate dates for the activities she performed and the OIG identified numerous inconsistencies between when the investigator claimed events occurred and the accounts provided by other witnesses. Since the language barrier prevented the investigator from communicating directly with the family, she enlisted the children's maternal aunt, who lived next door, to translate the interviews. The two younger children denied any abuse by their mother and provided alternative explanations for the boy's injuries. When the investigator interviewed the oldest daughter at her school she was assisted by a member of the school staff, who acknowledged not being fluent in the girl's native language. The investigator also later interviewed the mother who denied any abuse and reported that scars visible on the boy were the result of a bus accident that had occurred several years before in the family's home country. As proof the mother provided an undated newspaper account of the accident written in the family's native language. Although the Burgos Decree guarantees those involved with the Department the right to have their cases handled in their native language, the mother was never advised of this right by the investigator. Prior to meeting with the mother or her older daughter, the investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the children to be safe.

Three weeks after the hotline call, while the report was still pending, another call alleging sexual abuse by the mother against the boy was made. The case was directed to a unit specializing in sexual abuse allegations and assigned to a bilingual worker. The boy described severe physical and sexual abuse to the bilingual worker and his account was corroborated by the younger daughter. The boy told the worker he had not told the investigator about the sexual abuse because he was unwilling to discuss the subject in the presence of his aunt, who had interpreted the interview. After the bilingual worker completed initial tasks the case was transferred to the child protection investigator per Department policy. The investigator either directly observed or was informed of interviews with the two younger children and the maternal grandparents detailing an extensive history of physical and sexual abuse of the children by their mother, dating prior to their arrival in the United States. These accounts were supported by physical examinations of the children conducted by a physician, the results of which were provided to the investigator. Based on the evidence of physical injuries and the information provided by the children, the physician concluded the children were in danger of being seriously injured or killed if left in the mother's custody. The grandparents also produced documentation of the involvement of the family with child welfare workers in their home country. Despite the relevance of these documents to assessment of the family's situation, the investigator did not seek to have them translated at the time. Another child welfare worker assisting on the case conducted a Substance Abuse Screen on the mother, who reported having no history of substance abuse issues. Although the children and grandparents reported to the investigator the mother frequently abused alcohol, this information was not provided to the worker conducting the screen.

The investigator completed a second CERAP determining the children to be safe based on the mother's agreement to allow them to reside with the maternal grandparents. The investigator consulted with her supervisor and concluded the two reports should be unfounded against the mother. In an interview with the OIG, the investigator stated her decision was based on the conflicting accounts provided by the children and the absence of concrete evidence of abuse. An OIG review of the children's statements throughout the course of the investigation found the two younger children were forthright and consistent in their descriptions of abuse by their mother with the only exception of the interview with the investigator translated by their aunt. In her interview with the OIG, the investigator's supervisor acknowledged she did not know what information was contained in the child welfare documents from the family's home country and was unaware as to how to obtain translated copies.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should discipline the child protection investigator for failure to properly assess risk to the children during the A sequence investigation, for falsification of case records, and for violating the *Burgos* Consent Decree by using a relative to interpret during the A sequence.**

The child protection investigator received a suspension.

**2. The Department should discipline the child protection investigator's supervisor for not ensuring that the *Burgos* Consent Decree was followed in the first investigation by permitting the investigator to use a relative to interpret during the first investigation and for failing to integrate information from the first and second investigation into the substance abuse screen concerning the mother's possible alcohol abuse.**

The child protection supervisor received a suspension.

**3. Procedure 300, Appendix E, *Burgos* Consent Decree requires that whenever an initial report of child abuse or neglect is received by the State Central Register, the report taker will attempt to determine whether the parents/children who are the subjects of the report are of Hispanic origin and/or Spanish speaking. In order to ensure substantial compliance with the *Burgos* Consent Decree and consistent application of existing Department Rules and Procedures, the *Burgos* Coordinator shall:**

- **a) Identify all Spanish speaking cases/investigations within 48 hours of receiving a report of abuse/neglect and determine if the case is assigned to a Spanish speaking investigator.**
- **b) Submit a weekly alert to respective Regional Administrator (RA) of any case NOT assigned to a Spanish Speaking investigator.**
- **c) On a weekly basis, review all Spanish surname cases to determine and verify if Spanish surname cases are in fact a Spanish speaking family (through language determination forms, indication made in SACWIS, et. al.)**
- **d) Determine if a Spanish surname family which has identified Spanish as their primary language is assigned to a Spanish Speaking worker/investigator.**
- **e) Include in weekly report/alert to Regional Administrators any families/cases with a Spanish surname that have identified Spanish as their primary language and are NOT assigned to a Spanish speaking worker/investigator.**

A memo was e-mailed to State Central Register (SCR) Call Floor Workers noting the options for identifying families of Hispanic origin and a requirement of an interpreter.

The Department's Office of Affirmative Action is working with the Department's Office of Information and Technology Services (OITS) to update the State Automated Child Welfare Information Services database (SACWIS) to provide notification to the Burgos Coordinator when a Spanish speaking family is entered in SACWIS.

**4.  The Department should include the certified translation of the child protection documentation from the family's home country in the second investigation case file.**

A certified translation was completed and placed in the file.

**5.  The Department should share this report with the Attorney General's Office to gain insight into the Department's failure to comply with the *Burgos* Consent Decree.**

The Department shared the report with the Attorney General's Child Welfare Litigation Bureau. The Department's General Counsel subsequently reviewed the findings with the Assistant Attorney General.

40

# CHILD DEATH REPORT

The Office of the Inspector General (OIG) investigates the deaths of Illinois children whose families were involved in the child welfare system within the preceding twelve months. The OIG receives notification from the Illinois State Central Register (SCR) when a child dies, when the death is reported to SCR.[1] The OIG investigates the Department's involvement with the deceased and his or her family when (1) the child was a ward of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case within the preceding twelve months.[2] If the OIG learns of a child death meeting this criteria that was not reported to the SCR, the office will still investigate the death.

Notification of a child's death initiates a preliminary investigation in which the death report is reviewed, databases are searched and results reviewed, autopsy reports are requested, and a chronology of the child's life, when available, is reviewed. The next level of investigation is an investigatory review of records in which records may be impounded, subpoenaed, or requested, and reviewed. When warranted, OIG investigators conduct a full investigation, including interviews. A full investigation usually results in a report to the Director of DCFS. The majority of cases are investigatory reviews of records, often including social service, medical, police and school records, in addition to records generated by the Department.

In Fiscal Year 2010 the OIG investigated 84 child deaths meeting criteria for review, a decrease from 89 deaths in FY 2009, and further decrease from 99 deaths in FY 2008. A description of each child's death and DCFS involvement is included in the annual report for the fiscal year in which the child died. This year's annual report includes summary information for children who died between July 1, 2009 and June 30, 2010. During this fiscal year, investigatory reviews of records were conducted in 65 cases, and full investigations were opened in 19 cases. Of the 19 full investigations opened, 2 of the investigations have been completed with reports to the Director and 17 are pending. Comprehensive summaries of death investigations reported to the Director in FY 10 are included in the Death and Serious Injury Investigations section of this annual report.

In Fiscal Year 2010 the OIG also reviewed 37 cases in which children were seriously injured within a year of their families' involvement with DCFS. A report was issued to the Director in one case. See Death and Serious Injury Investigation 10. Full investigations are pending in four cases.

Cases, individually, may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention. The OIG continues to address systemic issues through a variety of means, including cluster reports, initiatives, and trainings. Systemic issues addressed include: substance abuse, infant sleep safety, and home safety.

---

[1] SCR relies on coroners, hospitals, and law enforcement in Illinois to report child deaths, even when the deaths are not suspicious for abuse or neglect. The deaths are not always reported. Therefore, true statistical analysis of child deaths in Illinois is difficult because the total number of children that die in Illinois each year is unknown. The Illinois Child Death Review Teams have requested that individual county registrars forward child death certificates to SCR to compile a list of all the children who die in Illinois. It is not known whether this is regularly occurring; in addition, some death certificates are sent to the Child Death Review Team Coordinator well after the fiscal year in which the death occurred. The Cook County Medical Examiner's policy is to report the deaths of all children autopsied at the Medical Examiner's office. The OIG acknowledges all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.

[2] Since the implementation of SACWIS, some investigations were expunged from the system in less than a year. Therefore, not all child deaths actually meeting the criteria for review were brought to the attention of the OIG. In July 2010, Governor Quinn, at the urging of the OIG, the Department and the Child Death Review Teams, signed legislation requiring the Department to maintain unfounded investigations in SACWIS for a minimum of 12 months.

Ensuring safe sleeping practices continues to be a target of intervention. In 21 of the 84 child deaths the children (ages 18 months and younger) were co-sleeping with at least one other person at the time they were found unresponsive. The Department addresses safe sleep for infants and children by conducting the home safety checklist and educating families, providing playpens to families without cribs, and securing Norman funds for beds. As a follow-up to the cuts, bruises and welts training for Division of Child Protection (DCP) Investigators Quality Assurance, the OIG reviewed random samples of investigations and have begun meeting with managers to share the results. See Error Reduction Training on page 137. This fiscal year saw an increase in deaths of children of wards, from 2 deaths last year to 7 this year. The OIG is conducting training for downstate pregnant and parenting wards in Fiscal Year 2011. See Pregnant and Parenting Teens on page 154.

## Summary

Following is a statistical summary of the 84 child deaths investigated by the OIG in FY 10, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and substance exposure status and manner of death. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural.[3]

*Key for Case Status at the time of OIG investigation:*

Ward . . . . . . . . . . . . . . . . . . . . . Deceased was a ward

Unfounded DCP . . . . . . . . . . . . Family had an unfounded DCP investigation within a year of child's death

Pending DCP . . . . . . . . . . . . . . Family was involved in a pending DCP investigation at time of child's death

Indicated DCP . . . . . . . . . . . . . Family had an indicated DCP investigation within a year of child's death

Child of Ward . . . . . . . . . . . . . Deceased was a ward's child, but not a ward themselves

Open/Closed Intact . . . . . . . . . Family had an open intact family case at time of child's death / or within a year of child's death

Open Placement . . . . . . . . . . . Deceased, who never went home from hospital, had sibling(s) in foster care

Return Home . . . . . . . . . . . . . . Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death

Child Welfare Services Referral . . . . . . . . . . . .A request was made for DCFS to provide services, but no abuse or neglect was alleged

[3] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

**Table 11: Child Deaths by Age and Manner of Death**

| Child Age | | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | | | | | 2 | **2** |
| | 0 to 3 | 1 | | 9 | 9 | 8 | **27** |
| | 4 to 6 | 1 | | 1 | | 8 | **10** |
| | 7 to 11 | | | 2 | | 3 | **5** |
| | 12 to 24 | 2 | | 2 | 3 | 1 | **8** |
| Year of Age | 2 | 1 | | 1 | 2 | 1 | **5** |
| | 3 | | | | | 1 | **1** |
| | 4 | | | | | 2 | **2** |
| | 5 | | | | | 2 | **2** |
| | 6 | | | | | 1 | **1** |
| | 7 | | | | | | **0** |
| | 8 | | | | | 1 | **1** |
| | 9 | | | | 1 | | **1** |
| | 10 | | | | | | **0** |
| | 11 | | | | 2 | 1 | **3** |
| | 12 | | 1 | | | | **1** |
| | 13 | | 1 | | | | **1** |
| | 14 | | | | | 1 | **1** |
| | 15 | 1 | 3 | | | 1 | **5** |
| | 16 | | | | | | **0** |
| | 17 | 2 | | | | 1 | **3** |
| | 18 or older | 1 | | | 2 | 2 | **5** |
| **TOTAL** | | **9** | **5** | **15** | **19** | **36** | **84** |

**Table 22: Child Deaths by Case Status and Manner of Death**

| Reason for OIG investigation* | | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 2 | | 5 | 7 | | **14** |
| | Unfounded | 4 | 4 | 1 | 4 | 4 | **17** |
| | Indicated | | 1 | 1 | 1 | 4 | **7** |
| Ward | | 1 | | 1 | 2 | 16 | **20** |
| Former Ward | | 1 | | | | | **1** |
| Return Home | | | | 2 | 1 | 2 | **5** |
| Open Placement | | | | | | 1 | **1** |
| Open Intact | | | | 3 | 1 | 5 | **9** |
| Closed Intact | | | | 1 | | 1 | **2** |
| Child of a Ward** | | 1 | | 1 | 2 | 3 | **7** |
| Child Welfare Services Referral | | | | | 1 | | **1** |
| TOTAL | | **9** | **5** | **15** | **19** | **36** | **84** |

* When more than one reason existed for the OIG investigation, it was categorized based on the primary reason.
** Includes children of a ward who aged out of the system within the year prior to the death.

**Table 33: Child Deaths by County of Residence and Manner of Death**

| County** | Homicide | Suicide | Undetermined | Accident | Natural | TOTAL |
|---|---|---|---|---|---|---|
| Boone | | | | 1 | | **1** |
| Champaign | | | | | 1 | **1** |
| Clay | | | | 1 | | **1** |
| Cook | 6 | 1 | 8 | 7 | 19 | **41** |
| Crawford | | | 1 | | | **1** |
| Fulton | | | | | 1 | **1** |
| Grundy | | | | 1 | | **1** |
| Hancock | | | | 1 | | **1** |
| Jackson | | | 1 | | | **1** |
| Jefferson | | | 1 | | | **1** |
| Kane | | 1 | | | | **1** |
| Kankakee | 1 | | | | | **1** |
| Lake | | | 1 | 1 | | **2** |
| Livingston | | | 1 | | | **1** |
| Macon | | | | | 2 | **2** |
| Macoupin | | | | | 1 | **1** |
| Madison | 1 | | | 1 | 1 | **3** |
| Marion | | | | 1 | 1 | **2** |
| Massac | | | | | 1 | **1** |
| McHenry | | | | 1 | | **1** |
| Rock Island | | | 1 | | | **1** |
| Sangamon | | | | 1 | 1 | **2** |
| St. Clair | | 1 | | 1 | | **2** |
| Tazwell | | | 1 | | 1 | **2** |
| Union | | | | | 1 | **1** |
| Vermillion | 1 | | | | 1 | **2** |
| Will | | 2 | | 1 | 1 | **4** |
| Winnebago | | | | 1 | 4 | **5** |
| **Total** | **9** | **5** | **15** | **19** | **36** | **84** |

** Some children died in counties outside of their county of residence.

**Table 44: Child Deaths by Substance Exposure and Manner of Death**

| Substance exposure | Homicide | Undetermined | Accident | Natural | TOTAL |
|---|---|---|---|---|---|
| Child exposed at birth*** | 0 | 4 | 1 | 5 | **10** |
| Mother has history of substance abuse | 2 | 3 | 0 | 3 | **8** |

*** This includes children who tested positive for a substance at birth or whose mother tested positive for a substance at birth. Others may have been exposed to drugs during the pregnancy, but the drug usage was not recent enough to cause the newborn or mother to test positive.

## FY 2010 DEATH CLASSIFICATION BY MANNER OF DEATH

### HOMICIDE

Nine deaths were classified homicide in manner.

| Cause of death | Number |
|---|---|
| Gunshot wound | 4 |
| Blunt trauma due to child abuse | 3 |
| Suffocation | 2 |
| **TOTAL** | **9** |

### PERPETRATOR INFORMATION:

| Perpetrator | Number* |
|---|---|
| Mother | 3 |
| Father | 2 |
| Mother's boyfriend | 2 |
| Unknown/Unsolved | 2 |
| Unrelated | 1 |
| Home owner (killed home invader) | 1 |

* In one death both parents were charged, in another death the mother and boyfriend were charged.
.

| Perpetrator Gender | Perpetrator age range | Charges |
|---|---|---|
| Males | 20-29 years | 3 charged (1st degree murder) awaiting trial, 1 conviction of 1st degree murder sentenced to 35 years |
| Females | 19-23 years | 1 guilty plea of aggravated battery, 1 guilty plea of child endangerment and 1 charged (1st degree murder) awaiting trial |

### SUICIDE

Five children, three girls and two boys, ranging in age from 12 to 15 years old, hung themselves this fiscal year. It does not appear as though any of the children left notes indicating why they killed themselves.

## UNDETERMINED

A death is classified as undetermined in manner when there is insufficient information to classify the death as homicide, suicide, accident, or natural. This situation usually arises because of deficiencies in the investigation, most of which are impossible to overcome. When a case is classified as undetermined, the decision usually lies between two of the four possible manners of death. In nearly all cases involving infants and children the decision rests between homicide and two other possible manners: accident and natural.

Fifteen deaths were classified as undetermined in manner

| Cause of death | Number |
|---|---|
| Undetermined | 8 (one noted "cannot exclude suffocation") |
| Sudden Unexplained Death in Infancy | 3 (one with co-sleeping) |
| Asphyxia | 2 (one with additional healing blunt trauma injuries) |
| Viral Myocarditis | 1 |
| **TOTAL** | **14** |

## ACCIDENT

Nineteen deaths were classified accident in manner.

| Cause of death | Number |
|---|---|
| Suffocation/Asphyxia/Overlay | 10 |
| Pedestrian struck by motor vehicle | 3 |
| Drowning | 2 |
| Injuries from fire | 1 |
| Accidental overdose | 1 |
| Complications of near drowning | 1 |
| Electrocution | 1 |
| **TOTAL** | **19** |

## NATURAL

Thirty-six deaths were classified natural in manner.

| Cause of death | Number |
| --- | --- |
| Sudden Infant Death Syndrome (SIDS) | 4 |
| Pneumonia | 4 (two with congenital heart disease contributing) |
| Congenital heart disease | 4 |
| Congenital birth defect/disease | 4 |
| Sepsis | 3 |
| Cerebral Palsy | 3 |
| Multiple Medical Problems | 2 |
| Prematurity | 2 |
| Stillbirth | 2 |
| Meningoencephalitis | 1 |
| Small Bowel Obstruction | 1 |
| Viral myrocarditis | 1 |
| Sickle Cell Anemia | 1 |
| Aneurysm | 1 |
| Complications from brain surgery | 1 |
| Pulmonary Embolism | 1 |
| Sudden Unexplained Death in Infancy | 1 |
| **TOTAL** | **36** |

## HOMICIDE

| **Child No. 1** | **DOB 12/07** | **DOD 7/09** | **Homicide** |
|---|---|---|---|
| Age at death: | 19 months | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to child abuse | | |
| Perpetrator: | Mother and mother's boyfriend | | |
| Reason For Review: | Child of a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative: Nineteen-month-old child was taken by his 19-year-old ward-mother and her 28-year-old boyfriend to a chiropractic clinic where the receptionist found the child unresponsive and cold to the touch. She called for an ambulance and the child was taken to the hospital where he was pronounced dead. Medical personnel believed the child had been dead for several hours. At autopsy the child was found to have both internal and external injuries including full-thickness burns to the lower half of his body. The burns were caused two weeks earlier but the mother did not seek medical care for them because she was afraid the Department would take custody of the boy. The mother and boyfriend were arrested and charged in the child's death. The mother entered a plea agreement and was sentenced to three years in prison for endangerment in the death of a child. The boyfriend is charged with first degree murder and endangerment in the death of a child. He is awaiting trial.

Prior History: The child's mother first became a ward at age two when her mother physically abused her infant brother causing serious head injuries and permanent hearing loss. Six years later their maternal great-grandmother, who had cared for them for five years, received subsidized guardianship of the children. When the mother was 13 she and her two siblings were removed from the great-grandmother because the mother had been sexually abused in the home by an uncle whom the great-grandmother allowed back in the home after learning of the sexual abuse. As a ward the mother went through several placements before becoming pregnant with the deceased and entering a pregnant and parenting teen transitional living program. In early 2009 the mother began dating the boyfriend and her participation in services waned. The child had not been seen by program staff in the two weeks leading up to his death.

| **Child No. 2** | **DOB 3/09** | **DOD 9/09** | **Homicide** |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Blunt trauma due to child abuse | | |
| Perpetrator: | Father | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Full investigation, Report to Director May 14, 2010 | | |

Narrative: Five-month-old baby was having seizure-like activity when his 26-year-old mother returned home. She called 911. The baby was taken to the hospital where he later died. Examination revealed the baby had suffered multiple injuries. The baby's 29-year-old father had been watching him all day. He admitted to shaking his son and has been charged with first degree murder and aggravated battery to a child. The mother fled the country.

Prior History: Three months prior to the baby's death the hotline accepted a report for investigation of cuts, bruises, welts by abuse. The baby's pediatrician reported that she had seen the baby for his two-month check-up and he had bruises on both sides of his face and a healing cut above his eye. The investigator saw the baby two days later and observed what she believed was a Mongolian spot on one side of the baby's face. The investigator maintained that the baby had a Mongolian spot even after being told by the pediatrician that it had faded and was not a Mongolian spot. The investigator did not address the several injuries on the baby. The investigator's supervisor and a child protection manager were also involved in the investigation but did not properly assess risk to the two-month-old baby. See Death and Serious Injury Investigation 2.

| **Child No. 3** | **DOB 10/91** | **DOD 9/09** | **Homicide** |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gun shot wounds | | |
| Perpetrator: | Home owner | | |
| Reason For Review: | Former ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Seventeen-year-old former ward was shot and killed during a home invasion and attempted robbery. The 17-year-old and a 22-year-old accomplice were shot and killed by the male owner of the home. A 17-year-old accomplice waiting in a pick-up truck outside the home was arrested and charged with home invasion. The male home owner was not charged in either intruder's death.

Prior History: The deceased had suffered severe physical and emotional abuse at the hands of his father for the first half of his life. After his step-mother left his father and his father went to prison, his step-mother became his legal guardian. As he got older, he started using drugs. In October 2008 the teenager pled guilty to a charge of arson stemming from his setting fire to an abandoned house. He was detained in a juvenile detention center and his step-mother said that she would not take him back when he was released because he needed help. The State filed a dependency petition and DCFS was awarded temporary custody of the teenager. While in the custody of DCFS the teenager participated in services including counseling. He was released back to his step-mother's custody in April 2009 and they were linked to community services.

| **Child No. 4** | **DOB 7/09** | **DOD 10/09** | **Homicide** |
|---|---|---|---|
| Age at death: | 3-1/2 months | | |
| Substance exposed: | No, however, parents are substance abusers | | |
| Cause of death: | Asphyxia by suffocation | | |
| Perpetrator: | Mother and father | | |
| Reason For Review: | Child protection investigation pending at the time of child's death | | |
| Action Taken: | Full investigation, Report to Director June 11, 2010 | | |

Narrative: Three-and-a-half-month-old baby was reportedly found by his 20-year-old mother face down on a couch deceased around 4:00 a.m. An autopsy revealed the baby was suffocated and had multiple bruises. Both parents were charged with murder. The mother pled guilty to aggravated battery and was sentenced to 10 years in prison. The 23-year-old father was convicted of first degree murder and was sentenced to 35 years in prison. The mother testified that she and the father shot up heroin that night and the baby was crying and the father shook and punched the baby and put his hand over the baby's face and pushed him into the couch. She then laid the baby face down on the couch.

Prior History: Two weeks prior to the infant's death an anonymous reporter called the hotline alleging drug use and domestic violence by the parents. A child protection investigation of substantial risk of physical injury to the infant and his one-year-old sister was pending approval to unfound. See Death and Serious Injury Investigation 11.

| **Child No. 5** | **DOB 10/92** | **DOD 2/10** | **Homicide** |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gun shot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Seventeen-year-old boy was shot three times as he ran into a backyard at approximately 2:00 p.m. 911 responded and the victim was transported to the hospital where he was pronounced dead. The victim was unarmed. A police investigation of the boy's murder remains unsolved but open.

Prior History: In June 2009 the boy, who was placed in a youth detention facility, alleged that a facility employee choked him during an altercation. The hotline was called with a report of substantial risk of physical injury to the boy. The child protection investigation was unfounded because the boy had no injuries and the staff member described using an appropriate restraint technique after the boy attempted to strike him.

| **Child No. 6** | **DOB 12/07** | **DOD 2/10** | **Homicide** |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to blunt trauma due to child abuse | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-year-old boy threw up and complained of stomach pain and diarrhea to his 22-year-old mother and her 29-year-old boyfriend. The mother reported that she gave him some children's pain reliever and he appeared to feel better before going to bed. Early the following morning while the mother was getting ready for work, the boy reportedly woke up and asked for some juice which the boyfriend got. After taking a few sips the boy gave the cup back. The boyfriend went back to the kitchen and when he returned to the bedroom the child was unresponsive. The child was taken by ambulance to the hospital where he was pronounced dead. Two days later the boyfriend confessed that while the mother was at work he punched the child in the stomach as hard as he could after he became enraged by the boy getting diarrhea on him. The child had no outward signs of abuse and the mother was unaware of the beating. The boyfriend was charged with first degree murder and is in jail awaiting trial. He was indicated for death by abuse and substantial risk of physical injury to the deceased's two older siblings.

Prior History: The mother met the boyfriend in January 2009. She began dating him two months later and moved in with him four months after that. The boyfriend has three living children among two mothers; a fourth child died at 6 months of age from a natural cause. Neither of the mothers of his children allowed him visitation with the children. The boyfriend was indicated in three child protection investigations prior to his involvement with the mother. In 2002, when he was 21, he was indicated twice for causing bruises to his sister. In 2005 he was indicated for causing a bruise to his girlfriend's son during a domestic dispute with the girlfriend. The girlfriend obtained an order of protection against him and accepted intact family services. There was one child protection investigation involving the mother of the deceased. In April 2009 the mother took her 4-year-old daughter to the emergency room with blood in her underwear and a complaint of pain when urinating. The doctor observed redness and a laceration on the girl's labia. The hotline was called and a child protection investigation was conducted with the local child advocacy center. The child made no outcry and findings from a medical exam were normal with the doctor believing that the laceration might be a scratch or an irritation. The mother was not yet living with the boyfriend and the investigation was unfounded.

| **Child No. 7** | **DOB 1/09** | **DOD 2/10** | **Homicide** |
|---|---|---|---|
| Age at death: | Thirteen months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Child protection investigation pending at the time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative: Thirteen-month-old child was beaten and suffocated by her 23-year-old mother. The mother has been charged with first degree murder and aggravated battery. She was indicated for death by abuse to the child and substantial risk of physical injury to her 4-year-old daughter.

Prior History: Two weeks prior to the child's death, the child's day care provider called the hotline to report that the child came to day care with bruises on her face for which the mother had no explanation and that the child had previously come to day care with bruises. The investigation was pending with a recommended finding of unfounded at the time of the child's death.

| **Child No. 8** | **DOB 2/90** | **DOD 3/10** | **Homicide** |
|---|---|---|---|
| Age at death: | 20 years | | |
| Substance exposed: | Unknown, but mother has a history of substance abuse | | |
| Cause of death: | Gun shot wound to the back | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Twenty-year-old ward arrived at a party to meet his 17-year-old brother. As he got out of the car, shooting erupted and he was shot in the back. His brother held him in his arms until an ambulance arrived. A 22-year-old second victim was taken to the hospital by an unidentified party and survived a gun shot wound to his leg. A 20-year-old local man has been charged with one count of murder and one count of attempted murder.

Prior History: The deceased was the second oldest of nine children born to his now 41-year-old mother. Several of the children were born substance exposed and the family has a history with DCFS dating to 1994. None of the children are in their mother's care. The four youngest children (ages 5 to 13) are to be adopted by their foster parent. The deceased had been placed in foster care with his maternal grandmother, but as he got older he stayed there less and less. Despite attempts by his caseworker to help him, toward the end of his life the deceased was not attending school or working and had refused all services.

| **Child No. 9** | **DOB 2/95** | **DOD 6/10** | **Homicide** |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gun shot wound to head | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Unfounded child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Fifteen-year-old boy was standing outside a school with his 16-year-old sister and others around 8:30 p.m. when they were confronted by suspected gang members. The two groups exchanged words, some bricks were thrown, and someone left and returned with a gun. Several shots were fired and the boy was struck in the head. His sister held him as he lay dying. He was taken by ambulance to the hospital where he was pronounced dead. A police investigation of the boy's murder remains unsolved but open.

Prior History: In March 2010 the hotline was called because the deceased's 9-year-old sister had a bruise on her knee that she said was caused by her father who hit her. All family members agreed that the father hit the children for discipline, but that he used an open hand and did not leave bruises. The girl had no injuries when checked by a school nurse several weeks later. School personnel did not have concerns about the parents' care of the children and the investigation was unfounded.

## SUICIDE

| Child No. 10 | DOB 3/96 | DOD 10/09 | Suicide |
|---|---|---|---|
| Age at death: | 13 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 11 | DOB 4/94 | DOD 10/09 | Suicide |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child protection investigation indicated within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 12 | DOB 7/94 | DOD 4/10 | Suicide |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 13 | DOB 9/97 | DOD 5/10 | Suicide |
|---|---|---|---|
| Age at death: | 12-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Child No. 14 | DOB 6/95 | DOD 6/10 | Suicide |
|---|---|---|---|
| Age at death: | Almost 15 years | | |
| Substance exposed: | Unknown | | |
| Cause of death: | Hanging | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**UNDETERMINED**

| **Child No. 15** | **DOB 6/09** | **DOD 7/09** | **Undetermined** |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | Yes, methadone | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Child protection investigation pending at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative: Six-week-old infant was found unresponsive shortly before 8:00 a.m. by her 30-year-old father. The father took the infant to the emergency room by bus because he did not have a phone and did not want to disturb his neighbors. The infant was dead on arrival. The father was the sole caretaker of the infant because the 27-year-old mother had been arrested and jailed on a parole violation almost two weeks earlier. The father reported that he last saw his daughter alive around 4:00 a.m. when he fed her and put her back to sleep in her crib lying on her back.

Prior History: Two weeks before the infant's death a staff member at the parents' methadone maintenance program called the hotline to report that the mother had failed a breathalyzer test and appeared to be intoxicated and incapable of caring for the infant. Both parents were in the program for dependence on prescription pain killers. The mother told the child protection investigator that she had a drink with lunch, but denied being intoxicated. The couple agreed that the infant would not be left unsupervised with the mother until an intact family case was opened.

| **Child No. 16** | **DOB 6/09** | **DOD 8/09** | **Undetermined** |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No, however, mother has a history of substance abuse | | |
| Cause of death: | Sudden Unexplained Death in Infancy with co-sleeping | | |
| Reason For Review: | Siblings returned home within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-month-old baby was found unresponsive around 6:30 a.m. by his mother. The 24-year-old mother and 32-year-old father took the baby to the hospital where he was pronounced dead. The baby had been sleeping in an adult bed next to his mother with his mother in the middle and his 32-year-old father on the other end. The mother had last seen the baby alive around 11:00 p.m. the previous evening. The baby had slept in his parents' bed since birth.

Prior History: Prior to becoming involved with the deceased's mother, the father had four children with two other women. The oldest child lives with his mother and is not DCFS-involved. The other three children are in foster care because of abuse by the father. Prior to giving birth to the deceased, the mother had two children with different men. The second child was born substance-exposed in June 2007 and he and his 3-year-old sister entered foster care. The mother participated in services and the children were returned to her care in June 2008. The court case was closed in October 2008 with no one aware that the mother was seeing the father. After the deceased's death, the mother's children were placed under an order of protection and the father ordered into services. The mother gave birth to another baby with the father in May 2010. After an incident of domestic violence, the mother broke up with the father and obtained an order of protection against him. Her case was closed in August 2010.

| **Child No. 17** | **DOB 7/09** | **DOD 9/09** | **Undetermined** |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | Yes, amphetamines, vicodin, morphine, norpropoxyphene | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Child protection investigation pending at the time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative: Six-week-old substance-exposed infant died while in the care of his 28-year-old mother and 27-year-old father. The parents refused to cooperate with the investigation of their child's death other than the father stating that he was going to bathe with the baby around 7:00 p.m. when the baby fell in the water and went under; he pulled the baby out and started doing CPR. Both parents were under the influence of drugs at the time. At autopsy there was no water in the infant's lungs, he had multiple rib fractures that were not consistent with cardiopulmonary resuscitative efforts, and he had small contusions to the back of his head and his back. The parents were indicated for death by abuse. A police investigation remains open.

Prior History: Approximately two weeks after the infant's birth, the infant's doctor called the hotline to report that she was concerned that the mother had been unable to show her prescriptions for the medications the infant had been exposed to in utero; the infant had only been seen for one follow-up visit; and the mother had not responded to a visiting nurse. An investigation for medical neglect was pending. During the investigation the infant was supposed to have been under a safety plan with the maternal grandmother. The child protection investigator documented that the infant was in the care of the maternal grandmother, but after the infant's death the grandmother denied that the infant was supposed to be staying with her. The child protection investigator is no longer employed by the Department.

| **Child No. 18** | **DOB 10/09** | **DOD 10/09** | **Undetermined** |
|---|---|---|---|
| Age at death: | 2 weeks | | |
| Substance exposed: | No, but mother has a history of alcohol use during pregnancy | | |
| Cause of death: | Sudden Unexplained Death in Infancy | | |
| Reason For Review: | Child protection investigation pending at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-week-old infant was found unresponsive at approximately 8:00 a.m. by his 22-year-old father. He was last seen alive around 2:00 a.m. when he was fed. The infant had been sleeping in a playpen alongside his twin sister. Emergency services were called and the infant was taken to the hospital where he was pronounced dead. The twins had been to their two-week check-up a day earlier and were found to be healthy.

Prior History: A month earlier, the hotline was called with an allegation of inadequate supervision to the 27-year-old mother's 5-year-old son because she left him alone in the house while she was outside fighting with neighbors. Police reported that she appeared intoxicated. The mother, who was eight months pregnant with twins, admitted to having a shot and a beer to celebrate her birthday, but denied being intoxicated. The investigation was pending at the time of the infant's death. Collateral contacts were interviewed who reported concerns about domestic violence between the mother and the twins' father, and following the infant's death, the investigation was indicated for substantial risk of physical injury to the surviving children. Services were offered to the mother, but she refused them.

| **Child No. 19** | **DOB 8/09** | **DOD 1/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 4-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Four-and-a-half-month old ward was found unresponsive in the morning by his 22-year-old mother. The mother took the infant ward from his foster placement with his maternal grandmother while he was being babysat by his great-grandparents. She took the infant to her boyfriend's house where they spent the night. The mother placed the infant to sleep on a blow-up air mattress with herself and her boyfriend. The infant was found deceased, lying face down in the morning. The mother was indicated for death by neglect and charged with and convicted of kidnapping the infant.

Prior History: The deceased was the mother's third child. The maternal grandmother obtained private guardianship of the mother's first child in July 2007 following two indicated investigations and the provision of intact family services for almost one year. In April 2008 the mother's second child entered foster care because of the mother's mental health problems and physical violence. He was placed with his paternal grandparents. Because of his mother's history, the deceased entered foster care directly following his birth and was placed with his maternal grandmother.

| Child No. 20 | DOB 1/10 | DOD 1/10 | Undetermined |
|---|---|---|---|
| Age at death: | 2 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined at press time | | |
| Reason For Review: | Sibling was returned home within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-week-old infant was found unresponsive at approximately 8:00 a.m. and taken by ambulance to a local hospital. He was transferred to a children's hospital where he was pronounced dead at 11:30 a.m.

Prior History: The deceased's 1-1/2-year-old sibling was in foster care for two months beginning in April 2008 because of domestic violence between her 18-year-old mother and 22-year-old father. The court returned the child to her mother's care in June 2008 but retained guardianship of the child until May 2009. During that time, the mother participated in services targeted to domestic violence, conflict resolution, and parenting skills. The father did not participate in services and moved to another city.

| Child No. 21 | DOB 11/09 | DOD 1/10 | Undetermined |
|---|---|---|---|
| Age at death: | 2-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexplained Death in Infancy | | |
| Reason For Review: | Intact family case open at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Three-month-old baby was found unresponsive shortly before noon by his 19-year-old mother who was sleeping in an adult bed with the baby. The baby had a history of colic and the mother reported that the only thing that seemed to soothe him was to lie beside her. The baby lived with his mother and his 40-year-old father who had slept on the couch. The mother was indicated for death by neglect based on a pathologist saying it was "reckless and dangerous" for her to sleep with the baby after being advised against it by three professionals. The father was also indicated for death by neglect because he knew that the mother had a pattern of sleeping with the infant and he did not attempt to stop her.

Prior History: The mother was involved with DCFS as a child with three preventative services cases opened between 1993 and 1999 because of her mother's physical and mental health issues. The mother became involved with the Department again in July 2008 as an 18-year-old parent when she was accused of blowing marijuana smoke in her 6-month-old daughter's face to calm her. A safety plan was put into place for the baby to live with relatives while the mother initiated services. The baby's father sought custody of the baby in family court and in March 2009 the mother agreed for him to have custody and for her to have visitation. The intact family case remained open because the father agreed to services and the mother was pregnant with the deceased.

| **Child No. 22** | **DOB 11/08** | **DOD 2/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 15 months | | |
| Substance exposed: | No, however, mother tested positive for cocaine use | | |
| Cause of death: | Asphyxia | | |
| Reason For Review: | Intact family case closed within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Fifteen-month-old twin was found unresponsive by her ten-year-old sibling. The ten-year-old girl reportedly woke up and found herself lying on top of her sister and was unable to wake her. The girl started screaming and ran out of the house hysterical. The girl's 32-year-old mother was not home at the time. The toddler's 58-year-old father called 911 and the toddler was taken to the hospital where she was pronounced dead. A week later the hotline was called by an anonymous reporter who alleged that the ten-year-old had purposefully suffocated her sister because she was often left to care for the twins while her mother was out using drugs and that the mother had beaten the girl after the toddler's death. DCFS and the police investigated. The girl had a victim sensitive interview in which she reported having to care for her younger siblings and admitted she was hit by an extension cord and belt by her mother. She did not disclose intentionally harming her sister. The mother was indicated for substantial risk of physical injury and the girl and the surviving twin were placed in foster care.

Prior History: The twins were the mother's fifth and sixth children, though only the 10-year-old lived with the mother. The two oldest children lived with relatives and the fourth child, who was born substance-exposed in a neighboring state, was adopted by a relative. The twins were born prematurely at 29 weeks gestation. While they did not test positive for illegal substances, their mother tested positive for cocaine use. The mother was indicated in a child protection investigation for substantial risk of physical injury and an intact family case was opened in January 2009. The family participated in recommended services and the case was closed in November 2009.

| **Child No. 23** | **DOB 12/09** | **DOD 3/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | Yes, methadone | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Intact family case open at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-month-old infant was found unresponsive lying on his back in his bassinet at 9:30 a.m. by his 35-year-old mother. She had last seen him alive at 6:30 a.m. The mother called 911 and the infant was taken to the hospital where he was pronounced dead.

Prior History: The family became involved with the Department in October 2008 when the mother tested positive for opiates when she gave birth to her daughter. The mother was indicated for substantial risk of physical injury to the baby girl and an intact family case was opened. The mother enrolled in a methadone maintenance treatment program and was participating in it when she gave birth to the deceased at 37 weeks gestation. The mother was regularly tested for substances while in the program. She frequently tested positive for marijuana and occasionally tested positive for opiates. At the birth of the deceased the mother tested positive for opiates and marijuana and the baby tested positive for marijuana. The baby remained hospitalized for five weeks before going home. The intact family case remains open and the mother continues to attend treatment.

| **Child No. 24** | **DOB 8/09** | **DOD 3/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 7 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Child protection investigation pending at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative: Twenty-eight-year-old mother reported awakening in the morning and finding her 7-month-old son unresponsive. The baby was sleeping in an adult bed with his mother and twin 4-year-old siblings. The mother called for her brother who attempted CPR while 911 was called. The baby was taken by ambulance to the hospital where he was pronounced dead. A child protection investigation of the baby's death was unfounded, but a case was opened to provide short-term intact family services.

Prior History: A month prior to the baby's death a report was taken by the hotline for investigation of inadequate supervision and substantial risk of physical injury to the deceased and his three older siblings by their mother. The investigation was unfounded after the baby's death. In 2006 the mother was indicated for substantial risk of physical injury to newborn twins who were born prematurely and had resulting health problems. An intact family case was open from September 2006 until November 2007.

| **Child No. 25** | **DOB 3/10** | **DOD 4/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 16 days | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined, cannot exclude suffocation | | |
| Reason For Review: | Child of former wards | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Sixteen-day-old baby was found unresponsive at 7:00 a.m. by his 21-year-old mother who had laid the baby boy on her chest to sleep. The baby's 21-year-old father performed CPR while waiting for paramedics to arrive. The parents last saw the baby alive around 3:00 a.m. when the mother fed the baby and changed his diaper.

Prior History: Both parents were wards who aged out of the DCFS system a few months prior to the birth of their child. The mother had been a ward since the age of 4; the father had been a ward since the age of 6. In the years leading to their emancipation, the teens had participated in transitional living (supervised yet independent housing) and independent living programs.

| **Child No. 26** | **DOB 10/07** | **DOD 4/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Child protection investigations pending at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-and-a-half-year-old boy drowned in a river. The boy's 52-year-old grandmother, who was caring for the boy and his 5 and 7-year-old siblings, took the children for a walk. An 11-year-old neighbor accompanied them. The 7-year-old wanted a book she had forgotten at home so the grandmother told the children to wait while she ran back home. The children continued walking and when they got to some stairs the 11-year-old girl took the 2-1/2 year old boy out of his stroller. He ran into the river. The girl found a stick and got the boy out of the water while the boy's siblings ran back to the grandmother to tell her what happened. The drowning took place 3 to 4 blocks from the family's home and the grandmother was believed to have been gone for approximately 30 minutes. She was indicated for death by neglect and inadequate supervision. The two surviving children were placed in foster care and the 11-year-old neighbor was referred for counseling.

Prior History: The family has been investigated by DCFS for neglect multiple times since 2005. Services have been offered to the family but refused. At the time of the boy's death there were two pending child protection investigations involving the family. The first report alleged that the 7-year-old had a bruise on her arm from being squeezed too hard by a family friend who had been staying with the family, but who had since gone back to prison for violating parole. The second report alleged heroin use by the children's stepfather who had since been arrested on a parole violation. The maternal grandmother lived with the family and was often the primary caretaker of her 22-year-old daughter's three children.

| **Child No. 27** | **DOB 11/08** | **DOD 5/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 17 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Intact family case open at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative: Seventeen-month-old child was reportedly checked in the middle of the night and found unresponsive by his 20-year-old mother's 26-year-old boyfriend. While it could not be determined how the child died, at autopsy he had signs of prior physical abuse. The mother admitted that her boyfriend and his brother had harmed her son in the months prior to his death. The mother and boyfriend were indicated in a child protection investigation for death by neglect and substantial risk of physical injury to their 3-month-old daughter who has been placed in foster care. Within a month of the child's death the boyfriend was arrested and charged with first degree murder of a teenage girl.

Prior History: In September 2009 the hotline was called by a family member who reported that the deceased, then 10 months old, had suspicious marks and the mother missed a doctor appointment so the doctor would not see them. The mother was indicated for cuts, bruises, welts by neglect and an intact family case was opened. While the intact family case was open, in February 2010, the boy suffered a fractured tibia which the mother said was from trying to climb out of his playpen. A child protection investigation of that injury was unfounded.

| **Child No. 28** | **DOB 3/10** | **DOD 5/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia with multiple healing blunt trauma injuries contributing | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-month-old baby was found unresponsive when his 32-year-old father awoke to find himself on top of the baby. The 24-year-old mother was at work. Emergency personnel who responded noted bruising on the baby's chest and abdomen. They also noticed healing burns that had been reported to the hotline just three weeks earlier. An autopsy further revealed broken ribs and a fracture in the upper arm. The parents separated after the baby's death and the mother has an active order of protection against the father. The father was indicated for death by abuse, bone fractures, and substantial risk of physical injury to the mother's 5-year-old daughter.

Prior History: Three weeks earlier the baby was taken to the hospital by his parents with first and second degree burns on the front and back of his torso, his right arm, and his right thigh. The father told medical staff that he cared for the baby and the baby's 5-year-old sister while the mother worked. He was giving the baby a bath and the baby was under the faucet; when he turned away for a second to get soap he sneezed and bumped the faucet and burned the baby. The hotline was called and the baby was transferred to a hospital with a burn unit where it was determined the baby had burns on 10% of his body. The attending physician, who had 20 years of experience with burns, opined that the father's story was consistent with the burns and the incident was more likely accidental than abusive. The investigator went to the home and observed the bathroom and had the father reenact what happened. The investigator also observed a bassinet in the home. The investigation was unfounded following the baby's death.

| **Child No. 29** | **DOB 9/09** | **DOD 5/10** | **Undetermined** |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | Yes, opiates | | |
| Cause of death: | Viral myocarditis | | |
| Reason For Review: | Indicated child protection investigation; awaiting order of supervision for intact family services | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eight-month-old baby was found dead by her 49-year-old paternal grandmother face down inside a plastic trash can next to a bed. The baby's 27-year-old father had put her in bed with him and a bottle when she woke up early that morning. When the father got up several hours later, he didn't see the baby and asked the paternal grandmother about her. They began searching and the grandmother found her. Following the baby's death, a 3-year-old sister was in foster care for four months and the family continues to receive services from the Department.

Prior History: The family first became involved with DCFS when the deceased was born. The 23-year-old mother took medication prescribed to her for anxiety and pain during her pregnancy and the baby was born exposed to opiates and suffering from withdrawal symptoms. A child protection investigation for substance misuse was unfounded because the medication was prescribed to the mother. There were concerns about both parents abusing prescription drugs and services were offered, but refused. In January 2010 the hotline was called with a report that the parents were abusing prescription drugs and going to multiple doctors to obtain anti-anxiety and pain medications and using them while caring for their 3-year and 4-month-old daughters. In March the investigation was indicated and a request made to the county State's Attorney's Office for a court order compelling the parents to participate in intact family services. In May the court entered an order of supervision and on the same day, the father admitted himself to the hospital for medical stabilization from opiate withdrawal. When the baby died, he had been home from the hospital for three days and had a good prognosis. At the time the baby died, the mother was hospitalized for medical stabilization from opiate withdrawal.

## ACCIDENT

| **Child No. 30** | **DOB 1/91** | **DOD 7/09** | **Accident** |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis complicating multiple injuries sustained as a pedestrian struck by a bus | | |
| Reason For Review: | Teenager was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eighteen-year-old ward died after being taken from her nursing home to the hospital because of rapid respiration. Six months earlier, the ward had been walking in the cross walk on a green light with her sister when she was hit by a bus making a right turn. It was daylight, conditions were clear, and the road was dry. The driver of the bus, who told police that she did not see the ward, was cited for failure to yield to a pedestrian. The ward suffered multiple injuries including head trauma, a fractured pelvis and deep vein thrombosis. She spent six months in three different hospitals before being placed in the nursing home. She was visited by relatives including her biological mother and her siblings. The DCFS guardian retained an attorney to represent the ward in a potential action against the bus company.

Prior History: The ward was the third child in a sibling group of eight. She and her five younger siblings entered foster care in 1999 because of neglect. The ward was in foster care with an aunt and lived with her sister who is in the subsidized guardianship of the aunt. One sibling is in the subsidized guardianship of another aunt. The youngest sibling is in the specialized relative foster home of an aunt. One sibling has a goal of independence and is in college. The remaining sibling is on run; his caseworker makes attempts to locate him and the boy has been in touch with his siblings.

| **Child No. 31** | **DOB 7/07** | **DOD 7/09** | **Accident** |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Craniocerebral injuries sustained as a pedestrian struck by a motor vehicle | | |
| Reason For Review: | Child welfare services referral case closed within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-year-old child wandered away during her second birthday party and was struck by a car leaving the party. Police investigating the accident called the hotline. The 29-year-old mother and 34-year-old father were indicated for death by neglect and inadequate supervision based on a witness's report that she had seen the child out of the yard several times during the party, the child was discovered run over by someone other than a parent, and it took several minutes to locate the parents once the child was discovered. An intact family case was opened to provide services to the parents and surviving siblings. The case was closed in July 2010 after the parents participated in services including parenting education through homemaker services. A second intact family case was opened in November 2010 following allegations of abuse, domestic violence, and substance abuse by the father.

Prior History: The family first became involved with DCFS in June 2007 when the mother was pregnant with the deceased. The deceased's father called the hotline to report that the mother was smoking marijuana while pregnant and not supervising her 4 and 6-year-old daughters. The mother reported that she was pregnant with the reporter's child but she had recently reconciled with her husband and the reporter was harassing her. The husband said his wife did not use drugs and both he and the daughters denied the girls were ever unsupervised. In January 2009 a hospital physician made a child welfare services referral following the birth of the deceased's younger brother who tested positive for marijuana. The mother declined services and the worker left her card in case the mother changed her mind.

| **Child No. 32** | **DOB 8/91** | **DOD 8/09** | **Accident** |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Anoxic encephalopathy due to opiate intoxication | | |
| Reason For Review: | Teenager was a ward | | |
| Action Taken: | Full investigation pending, to be included in a cluster report | | |

Narrative: Seventeen-year-old ward died a day shy of her eighteenth birthday, five months after overdosing on heroin and suffering a massive stroke. In the five months before her death she had been going back and forth between the hospital and a rehabilitation center.

Prior History: The girl became involved with DCFS in 2005 when she was 13 years old because of substance abuse and domestic violence involving her mother and step-father. An intact family case was opened but the following year the girl and her two half-sisters were placed in foster care. By then the girl had begun to use drugs and would not stay in her placements. At the time of her overdose, she had run from at least 20 placements, most recently a substance abuse treatment center. In the six days prior to her overdose, the girl was temporarily in the care of her biological father, mother, grandmother, police, and caseworker while waiting for a space to become available at a treatment center. The girl last ran from the agency office where her caseworker was working to get her placed in a shelter. After she overdosed, the girl's father was indicated in a child protection investigation for substantial risk of physical injury because he allowed the girl to be in the care of her mother before she ran from the agency office and overdosed. When the girl died an allegation of death by neglect was automatically added and indicated against the father. While he successfully appealed the risk indication, the death by neglect indication was not automatically corrected.

| **Child No. 33** | **DOB 6/09** | **DOD 9/09** | **Accident** |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | Yes, methadone | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Intact family case open at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Three-month-old infant was found unresponsive by his 25-year-old mother when she returned home after taking her older child to school. The mother had last fed the infant around 2:00 a.m. and placed him on his back to sleep on one couch while she fell asleep watching TV on another couch in the living room. When she checked on the infant at 7:00 a.m. he had rolled over onto his stomach with his face to the side. When she returned home at 9:00 a.m. the maternal grandmother asked her where the baby was and the mother found him face down on the couch with blankets covering his face. The infant normally slept in a crib and mother usually told a family member if she was leaving the baby at home while she took her son to school. Four months after the baby died, the mother's surviving son witnessed her injecting herself with drugs and the maternal grandmother called the hotline. The boy was placed in foster care with a maternal great-aunt and the mother is working toward his return home.

Prior History: An intact family case was opened on the 24-year-old mother and her 4-year-old son in June 2008 after the mother overdosed on Xanax. The mother was already participating in a methadone treatment program. She continued in that program while also receiving parenting and homemaker services. In August 2009, two months after giving birth to the deceased, the mother relapsed and a safety plan was put into place for the mother and her children to live with the maternal grandmother and her husband so they could provide supervision of the children.

| **Child No. 34** | **DOB 4/08** | **DOD 10/09** | **Accident** |
|---|---|---|---|
| Age at death: | 18 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation due to entrapment between the mattress and wall | | |
| Reason For Review: | Child protection investigation pending at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Twenty-eight-year-old mother found her 18-month-old developmentally delayed son unresponsive in the morning lying on top of some clothes between a mattress on the floor and the wall. He was facing the mattress with his back toward the wall. The child was born prematurely at 24 weeks gestation and had bronchopulmonary dysplasia, a lung condition. The mother regularly placed him to sleep with her on a king-sized mattress on the floor so she could monitor his breathing. Her 4-1/2-year-old son was also sleeping in the bed. A child protection investigation of the child's death was unfounded, but the mother accepted intact family services.

Prior History: Three weeks prior to the child's death, the police called the hotline to report substantial risk of physical injury to the mother's five children. The oldest child, a 9-year-old boy, ran to a neighbor's house yelling that his mother had held a knife over him and his siblings while they were sleeping and chased him with it. All five children were taken into protective custody. The allegation of risk was unfounded and the children returned to their mother after a thorough investigation involving interviews with multiple collaterals including a 7-year-old brother who said that his mother was watching television when his brother woke him up and ran out of the home. The 9-year-old boy was going to start counseling because he was having difficulty accepting his parents' impending divorce and the added responsibility it placed on him.

| **Child No. 35** | **DOB 11/07** | **DOD 11/09** | **Accident** |
|---|---|---|---|
| Age at death: | 2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Complications of near drowning | | |
| Reason For Review: | Indicated child protection investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Twenty-four-month-old medically complex child was checked on by his 28-year-old mother in the early morning and found to be unresponsive. His 32-year-old father performed CPR but was unable to resuscitate the child.

Prior History: Six months earlier the child nearly drowned in his grandparents' swimming pool. The child, his three older sisters, and his parents were staying with the grandparents. The mother reported that she had been on the phone with the children's father and left the children unattended for about 10 minutes while her parents were making dinner. When the child did not come to the table for dinner, the family began looking for him and found him floating face down in the pool. The child nearly drowned and remained hospitalized for over a month. After his release, he required a feeding tube and nursing and therapeutic services. He was subsequently hospitalized on three occasions for seizure disorder, a result of the near drowning. His mother was indicated for inadequate supervision of the child and substantial risk of physical injury to her three other children. The family was referred to community services.

| **Child No. 36** | **DOB 11/98** | **DOD 1/10** | **Accident** |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eleven-year-old boy took his dog out for a walk in the morning. When he didn't return home, his step-father searched for him and then called the police. Police observed prints leading to a retention pond near the boy's home. The boy and his dog were found in the pond which contained an aerator to prevent the water from freezing in the middle of the pond.

Prior History: In February of the prior year, the hotline was called with an allegation of substantial risk of physical injury to the deceased by his step-father. The child told someone he had a headache because his step-father hit him in the back of the head. Investigation revealed that the child had received corporal punishment for talking back and losing his dog's leash, but no marks or bruises were left. Neither the child nor his sister was fearful of the step-father. Collateral contacts, including the maternal grandmother and the child's pediatrician, did not believe the child was abused and the investigation was unfounded.

| **Child No. 37** | **DOB 11/09** | **DOD 1/10** | **Accident** |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlay | | |
| Reason For Review: | Child of a former ward | | |
| Action Taken: | Full investigation pending | | |

Narrative: Two-month-old baby boy was found unresponsive by his 22-year-old father whose wardship had ended six months earlier. The baby had been placed to sleep with his father and his 17-year-old mother in an adult bed at the father's home where the mother and baby were visiting. A day prior to his death, the baby was seen by his primary care physician for a well-child check and immunizations. The baby lived with his mother and one-year-old brother in his grandparents' home.

Prior History: The father entered DCFS care in 2003 after his guardian died unexpectedly. After two relative placements failed, he was placed in a traditional foster home and then an independent living program. The ward enrolled in a state university but did not complete his first semester of studies. He held a series of part-time jobs and was supportive of his girlfriend who gave birth to their first child in January 2009. The father actively participated in his children's lives.

| **Child No. 38** | **DOB 12/09** | **DOD 2/10** | **Accident** |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlaying and co-sleeping in an adult bed | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative: Six-week-old infant was found unresponsive in the early morning by his 19-year-old mother who awoke and checked on him. The infant had been sleeping in an adult bed with his mother and his 2-1/2 year-old sibling.

Prior History: A month before the infant's birth, the hotline was called by hospital staff that had seen the infant's sibling for second degree burns to his eye area and leg. The mother explained that the 2-1/2-year-old child had pulled a hot coffee cup off a countertop and burned himself. The mother's two sisters corroborated her explanation. The child's doctor, who saw the child twice for follow-up medical care of the injuries, believed the burns occurred as mother stated and the investigation was unfounded. Mother gave birth to the deceased while the investigation was pending, but a home safety checklist, which includes infant sleep safety, was not completed.

| **Child No. 39** | **DOB 11/09** | **DOD 3/10** | **Accident** |
|---|---|---|---|
| Age at death: | 3-1/2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| | |
|---|---|
| Narrative: Three-and-a-half-month-old infant was found in the morning by his 22-year-old mother sleeping face down in a bassinet with a blanket over his head. He had been seen at a medical center twice in the past month for respiratory issues. A preventive services case was opened following the infant's death to assist the mother with the care of her three surviving children. However, the mother refused services and her case was closed. She obtained grief counseling on her own. The mother had another child die in 2007 eight days after birth from natural causes. | |
| Prior History: In December 2009 school personnel called the hotline to report that the mother's oldest child, a 7-1/2-year-old girl, was not coming to school wearing appropriate clothing for the weather. The child protection investigator observed the girl at school wearing long pants, sneakers, and a cap-sleeved t-shirt. The school staff member felt the child should be in long sleeves and wear a warmer winter coat than she did. The child protection investigator went to the family's home and observed appropriate clothing for all of the children. The mother agreed to dress the girl warmer for school. | |

| **Child No. 40** | **DOB 12/09** | **DOD 3/10** | **Accident** |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No, however, the parents have a history of substance abuse | | |
| Cause of death: | Suffocation by overlay due to bed sharing | | |
| Reason For Review: | Child protection investigation pending at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Three-month-old baby was found unresponsive by his 36-year-old mother. The baby normally slept in a crib, but he had been fussy the previous night and the mother put him in bed with her to calm him. The mother admitted to having a couple of alcoholic drinks that night, but denied rolling over on the baby in the full-sized bed.

Prior History: This family has a history with DCFS because of substance abuse. In 2006 parental rights were terminated on the parents' seven children and all were adopted by relatives. When the deceased was born, the hotline was called by someone familiar with the family's history. An investigation was initiated for substantial risk of physical injury to the baby and was pending at the time of his death. Hospital staff reported that the parents were appropriate and interacted positively with the baby who remained hospitalized for one week; the mother had received prenatal care including drug testing which was negative; the parents were living with the maternal grandmother who was to assist in the care of the newborn; the parents reported that they were both working and no longer using drugs; and there was no recent criminal history for either parent. The investigation was unfounded after the baby's death.

| **Child No. 41** | **DOB 3/99** | **DOD 4/10** | **Accident** |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | No | | |
| Cause of death: | Electrocution due to shock from electrical device used to harvest earthworms | | |
| Reason For Review: | Return home case closed within one year; child protection investigation unfounded within one year | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eleven-year-old child was found by a neighbor outside the child's home face down on the ground. In his arms was a metal rod that was plugged into an exterior outlet. The rod was used to "shock" the ground to bring up earthworms, a common practice in the area. Police and child protection investigations were conducted and closed with the child's death determined to be an accident. The child's father had earlier taken the rod away from his son telling him it was dangerous and to go play basketball across the street. When police responded to the neighbor's 911 call, they found the child's father asleep in the home. The father, who suffered from a seizure disorder, had had a seizure and fallen asleep. The child protection investigation of the child's death was unfounded and the father and his surviving 12-year-old daughter moved back to another state where they had previously lived.

Prior History:   The child and his sister entered foster care in July 2005 when their parents were arrested for the manufacture and possession of drugs.  After several placements failed to work out, including an out of state placement with a relative who planned to adopt the children, the father began to participate in services to have his children returned to him.  In January 2009 the children were returned to their father's care under court supervision.  In May 2009 the father was wrongly arrested for drug possession and the Department took protective custody of the children.  Police investigation uncovered that methamphetamine-making materials found in the father's vehicle were placed there by a person fleeing the scene of a traffic stop.  The State did not file charges against the father or proceed with a temporary custody hearing and the children were returned to their father.  The child protection investigation was unfounded with the children and school personnel reporting that they were doing well in their father's care.  In May 2009 the court case was closed and the family moved out of state.

| Child No. 42 | DOB 10/08 | DOD 5/10 | Accident |
|---|---|---|---|
| Age at death: | 18 months | | |
| Substance exposed: | No, but mother subsequently gave birth to a substance-exposed infant | | |
| Cause of death: | Thermal injuries due to an apartment fire | | |
| Reason For Review: | Child protection investigation pending at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Eighteen-month-old girl died in the hospital from injuries she suffered in her father's apartment hours earlier.  The girl and her 4-year-old brother were on a weekend visit with their 22-year-old father.  While their father was taking the garbage out around 11:00 p.m., the 4-year-old played with his father's cigarette lighter and accidentally started his mattress on fire.  He got scared and fled the apartment for a neighbor's apartment.  When the father returned, he found the apartment on fire, grabbed his 18-month-old daughter, and ran out.  A child protection investigation of the child's death was unfounded against the father.

Prior History:     There was a child protection investigation pending against the 19-year-old mother at the time of the girl's death.  In March, the mother gave birth to her third child and both she and the infant tested positive for cocaine.  After the child protection investigator determined the infant could be released to his mother and intact family services would be provided, the mother moved without telling the investigator.  After her daughter died, the mother voluntarily placed her children in a Safe Families home until she began her intact family services.

| Child No. 43 | DOB 3/10 | DOD 5/10 | Accident |
|---|---|---|---|
| Age at death: | 5 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Anoxic hypoxia due to positional asphyxia with respiratory compromise and history of premature labor significant contributing conditions | | |
| Reason For Review: | Sibling in foster care at the time of child's death; child protection investigation pending at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Five-week-old baby was found unresponsive in the morning on her side in the corner of her bassinette by her 20-year-old mother.  The baby was pronounced dead at the hospital.

Prior History:     The mother's first child entered foster care in June 2009 at the age of two after his mother's 21-year-old boyfriend broke his leg.  The mother hid her pregnancy with the deceased, her second child, from her caseworker.  The caseworker found out about the birth of the baby nine days before the baby's death; she called the hotline the same day to report substantial risk of physical injury because the mother's son had been in foster care for almost one year and the mother had just begun to participate in services.  The investigation was pending at the time of the baby's death with the baby remaining in the mother's care.

| Child No. 44 | DOB 3/10 | DOD 5/10 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Positional asphyxia | | |
| Reason For Review: | Child protection investigation pending at the time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Two-month-old infant was found unresponsive in the morning by his mother's friend. The friend had been sleeping on one end of a couch while the infant was sleeping on the other end with his 8-year-old sister.  The infant suffocated; either his sister rolled over him or he was trapped in the couch cushions.  His 27-year-old mother was indicated for substantial risk of physical injury because it was routine for the infant to sleep on the couch with his sister.  Following the infant's death, a case was opened to provide intact family services, including grief counseling.

Prior History:      At the time of the infant's death, there was a twelve day old child protection investigation pending for inadequate supervision to the deceased and his 9-year-old sister.  The hotline was called with a report that the two children had been left home alone.  Investigation revealed that mother's brother was at home with the children while the mother ran an errand and the investigation was ultimately unfounded.  During a visit to the family's home, the investigator discovered that none of the six children (ages 2 months to 11 years) had beds and she made a request for NORMAN funds to purchase beds for the children.  The request was approved and the beds were purchased three days after the infant's death.

| Child No. 45 | DOB 8/07 | DOD 6/10 | Accident |
|---|---|---|---|
| Age at death: | 2-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Two-and-a-half-year-old child was found by a search party in a small pond in approximately three feet of water, submerged in brush.  The pond was on the family's property.  The child was being watched by her 13 and 16-year-old developmentally delayed siblings while their parents ran an errand.  The 37-year-old mother and 62-year-old father were indicated for death by neglect and inadequate supervision for leaving the child with her siblings who were not capable of properly supervising her.  They were also indicated for environmental neglect because of the dirty, cluttered, and unsanitary condition of their home.  An intact family case was opened.

Prior History:      In December 2009 the parents were indicated for medical neglect in a child protection investigation involving their 16-year-old daughter.  The girl had sores on her leg and elbow which school personnel felt needed medical attention.  The parents did not want to take her to the doctor, stating they did not have the money to spend.  After the hotline was called the parents took the girl to the emergency room where she was diagnosed with cellulitis, a bacterial skin infection.  She was prescribed an antibiotic which the parents did not fill until two days later.  The parents applied for medical cards for the children.  In January 2010 the parents were investigated a second time for medical neglect to their 16-year-old daughter.  School personnel were concerned that the girl's teeth were rotting and she was in need of dental care.  The girl's teeth were found to be brown but they did not hurt.  The parents reported that they obtained the children's medical cards and planned to take the girl to the dentist in the near future.  The investigation was unfounded with no services needed.

| **Child No. 46** | **DOB 7/00** | **DOD 6/10** | **Accident** |
|---|---|---|---|
| Age at death: | 9-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Acute craniocerebral trauma due to blunt force injury due to motor vehicle collision: pick up truck versus pedestrian | | |
| Reason For Review: | Child protection investigation pending at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Nine-and-a-half-year-old girl was playing in the front yard outside her uncle's home when her ball rolled into the street. The girl ran after her ball and was hit by a pick up truck. The girl was taken by ambulance to the hospital where she died. The incident was deemed an accident and no charges were brought against the driver.

Prior History: A child protection investigation involving the girl's 16-year-old brother was pending at the time of her death. It was subsequently indicated against the father for human bites. The boy and his father got into a physical altercation in which the boy put his father in a headlock and the father bit his son's face so he would release him. The father admitted using bad judgment, but expressed that he was worried about his son's gang involvement. His son had come home with facial injuries and wouldn't tell his parents what had happened. The boy told the child protection investigator that he had been boxing at a friend's house, but lied to his parents and said that he was at soccer. The boy's school counselor confirmed that both parents were worried about their son's gang involvement and that she hadn't previously had concerns about the family.

| **Child No. 47** | **DOB 6/10** | **DOD 6/10** | **Accident** |
|---|---|---|---|
| Age at death: | 11 days | | |
| Substance exposed: | No | | |
| Cause of death: | Co-sleeping | | |
| Reason For Review: | Child of a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative: Nineteen-year-old mother found her 11-day old son unresponsive in the morning. She had fed the baby a bottle around 4:00 a.m. and put him back to sleep propped in a "boppy" type pillow on one end of a loveseat. She went back to sleep on the other end of the loveseat. When she awoke a couple of hours later the baby was unresponsive.

Prior History: The deceased was the teen mother's fourth child. The mother first became a ward in 1997. She was adopted five years later, but after three-and-a-half years, in October 2006, her adoptive mother gave guardianship of her to a friend. Three months later, 15 years old and pregnant, the teen ran away. She re-entered the Department's custody in December 2007. Her 8-month-old baby also entered custody at that time. When the baby died, only he and his two-year-old sister were in their mother's care. The eldest child was in the care of a foster parent who had the mother's consent to adopt and her third-born was in the guardianship of his paternal grandmother.

| **Child No. 48** | **DOB 5/10** | **DOD 6/10** | **Accident** |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlaying | | |
| Reason For Review: | Child protection investigation pending at the time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seven-week-old baby was found unresponsive by his 26-year-old mother around 2:30 a.m. when his 22-year-old father woke the mother asking her to move the baby away from his back.  The baby had been placed to sleep on his back on a queen-sized bed between the mother and the father.  The father called 911 and the baby was taken by ambulance to the hospital where he was pronounced dead.  The father, who weighed in excess of 300 pounds, thought it was possible that he rolled over the baby.  The baby had a crib in the parents' bedroom and the parents had been educated about safe sleep.  However, the baby had recently been hospitalized with pneumonia and the mother said she wanted to keep him close to her to keep an eye on him.  An investigation for death by neglect was unfounded, but a case was opened to provide intact family services.

Prior History:      Three weeks prior to the baby's death the hotline was called with an allegation that the mother was not adequately feeding or bathing her eight children ranging in age from one month to eleven years.  The investigation was pending at the time of the baby's death, however, the investigator had already determined that the children were being fed and bathed appropriately and the investigation was later unfounded.  The family was poor and had recently moved into a new apartment because their old one had mold and rats.  The investigator obtained a smoke detector for the new apartment.  She also discussed family planning with the mother.

## NATURAL

| Child No. 49 | DOB 7/98 | DOD 7/09 | Natural |
|---|---|---|---|
| Age at death: | 11 years | | |
| Substance exposed: | Yes, cocaine, amphetamines, marijuana | | |
| Cause of death: | Small bowel obstruction | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Eleven-year-old severely medically complex ward was taken to the emergency room from her residential care facility with vomiting and respiratory distress.  She was discovered to have a small bowel obstruction.  The child had a do not resuscitate order and she died the next day.

Prior History:      The ward's 38-year-old mother has a history with DCFS dating to 1991 because of substance abuse.  None of her six children remained in her care.  The ward had lived in her residential care facility her entire life.

| Child No. 50 | DOB 3/09 | DOD 8/09 | Natural |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Meningoencephalitis | | |
| Reason For Review: | Child protection investigation indicated within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Five-month-old infant was found unresponsive in the morning by his 27-year-old mother, who had placed him to sleep with her in an adult bed to keep an eye on him.  He was reported to have been sweaty and fussy within the 72 hours preceding his death which was consistent with an infectious cause of death.

Prior History: The hotline was called two-and-a-half weeks after the infant's birth because of an incident of domestic violence between the mother and the infant's 29-year-old father, who was also the father of another of the mother's five children. There was no history of domestic violence between the parents. The father admitted to recently drinking too much which fueled the incident. The mother obtained an emergency order of protection and the father was indicated for substantial risk of physical injury to the children. The father acknowledged needing help for his drinking and agreed to undergo a substance abuse evaluation. The Department offered intact family services, but the family declined.

| **Child No. 51** | **DOB 7/09** | **DOD 8/09** | **Natural** |
|---|---|---|---|
| Age at death: | 1 month | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Bronchopneumonia with prematurity a significant contributing factor | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: One-month-old ward was found unresponsive in his crib in the afternoon by his foster mother. She immediately took the baby down the block to his pediatrician's office. The pediatrician performed CPR and accompanied the baby and foster mother to the hospital where the infant was pronounced dead.

Prior History: The baby was born substance exposed prematurely at 32 weeks gestation. He was his 33-year-old mother's sixth child and the fourth to be born substance-exposed. The mother has a lengthy history of substance abuse and mental illness. All of her children have been adopted and the deceased entered foster care upon his release from the hospital following his birth. He was placed with a foster parent who had adopted a sibling. The baby's mother was indicated for substance misuse and substantial risk of physical injury to the baby because of his substance exposure and her history of neglect to her children.

| **Child No. 52** | **DOB 8/09** | **DOD 8/09** | **Natural** |
|---|---|---|---|
| Age at death: | 13 days | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis due to hepatitis due to cholelithiasis (gallstones) | | |
| Reason For Review: | Child protection investigation indicated within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Thirteen-day-old infant began gasping for air while lying face up in her crib. Her 14-year-old mother picked her up and brought her to the infant's grandmother who tried to clear the infant's nose. The infant became unresponsive; the family called 911; and the infant was taken to the hospital where she was pronounced dead. In February 2010 the family called DCFS seeking assistance because their home was foreclosed. A preventive services case was opened for two months to provide the family with Norman funds for housing.

Prior History: The family came to the attention of DCFS in March 2008 when the infant's mother, then 13, and her 11-year-old sister, disclosed to a relative that their 40-year-old father was sexually abusing them. The children, who saw their mother but lived with their father, did not tell their mother because their father had threatened to kill her. The father was prosecuted and convicted of sexual abuse and the children went to live with their mother who put them into counseling. In July 2009 the mother took the 14-year-old to the hospital after she found out that the girl and her 24-year-old cousin were having sex. It was discovered at that time that the girl was pregnant with the deceased. The cousin, who had been living with the family temporarily, was criminally charged. He was indicated by the Department for sexual penetration. The family was referred to the local child advocacy center for therapy and to other community resources, including prenatal care.

| **Child No. 53** | **DOB 11/04** | **DOD 9/09** | **Natural** |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4-1/2 years |
| Substance exposed: | No |
| Cause of death: | Airway obstruction due to abnormal airway anatomy |
| Reason For Review: | Intact family case open at time of the child's death |
| Action Taken: | Investigatory review of records |

Narrative: Four-and-a-half-year-old with multiple medical problems had a tonsillectomy and adenoidectomy. He developed complications after surgery and died while hospitalized. The surgery was considered high risk because of the child's medical complexities.

Prior History: A report in January 2009 alleging medical neglect of the child by his 33-year-old mother and 31-year-old father was unfounded. The parents were having difficulty getting the child to his various medical appointments because of work commitments and transportation problems, but his medical providers did not consider the child neglected. The parents, who also had a six-year-old son, accepted intact family services until three weeks after their son's death when they requested that their case be closed.

| **Child No. 54** | **DOB 10/04** | **DOD 9/09** | **Natural** |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4-1/2 years |
| Substance exposed: | No |
| Cause of death: | Congenital cyanotic heart disease |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative: Four-and-a-half-year-old severely medically complex child was found unresponsive in the middle of the night by a staff member at his nursing care facility. The staff member called 911 and the child was taken to the nearest hospital emergency room where he was pronounced dead.

Prior History: The child entered foster care as dependent because his mother, who was low-functioning, could not care for him because of his extensive medical issues. The child required 24 hour nursing care. He had lived in his nursing care facility since leaving the hospital several months after his birth. His caseworker brought his mother there to visit him. Two siblings, who were also placed in foster care, have been adopted.

| **Child No. 55** | **DOB 12/06** | **DOD 9/09** | **Natural** |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2-1/2 years |
| Substance exposed: | No |
| Cause of death: | Multiple medical problems |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative: Two-and-a-half-year-old medically complex ward was found unresponsive by a nurse in his nursing care facility where he had lived since entering DCFS custody in July 2008. The nurse performed CPR until emergency personnel arrived. The child was taken to the hospital where he later died. The ward's condition had deteriorated in the last week and his case manager had been working with the Guardianship Administrator to obtain a Do Not Resuscitate Order. The child's medical conditions included heart problems, injuries to his brain and central nervous system, and seizure disorder.

Prior History: The Department became involved with this family in June 2008 when the hotline was called by ER staff who witnessed the 21-year-old mother striking her 2-year-old son on his back and legs and twisting her 6-month-old daughter's arms behind her back while staff administered medicine. The mother was overwhelmed with being pregnant and caring for her three small children, one of whom was medically complex. A safety plan was put into place with the maternal grandmother and intact family services were initiated. Within a week of the case opening the deceased entered the hospital and staff expressed concern about the mother's management of her anger and her ability to care for the child's medical needs. In July 2008 all three children entered foster care. The deceased was placed in his nursing care facility. The other two children and their sibling born in November 2008 have changed placements at least twice because of the mother's harassment of the relative foster parents. They have permanency goals of guardianship.

| **Child No. 56** | **DOB 6/06** | **DOD 10/09** | **Natural** |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Spinocerebellar ataxia type 7 | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Three-year-old child died in the hospital after being removed from a ventilator upon agreement of her doctors, foster parents, and biological father. The child was born with Spinocerebellar Ataxia type 7, a progressive autosomal dominant neuro-degenerative disorder characterized clinically by cerebellar ataxia associated with progressive macular dystrophy. Her mother also suffers from a cerebellar degenerative disease as did four siblings who died earlier. The child was placed with a foster family shortly after her birth. She remained with the foster family until her death and was extremely well-cared for and loved.

Prior History: The child entered foster care shortly after her birth because of her parents' inability to care for her. Her 29-year-old mother had multiple medical problems due to her own illness and the father was taking care of the mother and did not feel he could also care for the child. The parents visited regularly with their daughter and her foster parents often provided transportation to and from and supervision of the visits.

| **Child No. 57** | **DOB 8/09** | **DOD 10/09** | **Natural** |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | Yes, cocaine, heroin, benzodiazepines | | |
| Cause of death: | Congenital cardiac anomaly | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Two-month-old infant died in a children's hospital where he had lived since being transferred there following his premature and substance-exposed birth. The infant was born with a congenital heart defect that was considered inoperable. Hospital staff made him as comfortable as possible. DCFS was granted temporary custody of the child a month after his birth and a Do Not Resuscitate order was put into place. His mother visited him only once and was noted to be high at the time. The mother was notified about her child's death and despite offers of assistance did not claim his body. The county provided for the burial of the child.

Prior History: The 33-year mother has a long-standing serious substance abuse problem. The deceased was the mother's fifth child and the fourth to be born substance-exposed. The mother lost custody of her first child when he was six months old. She then lost custody of her subsequent children following their substance-exposed births. The mother failed to participate in substance abuse treatment and other services. Her oldest child was adopted by his maternal grandmother; two children were adopted by their respective foster parents; and one child is in the custody of her father.

| **Child No. 58** | **DOB 10/09** | **DOD 10/09** | **Natural** |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | No, however, mother has a history of substance abuse | | |
| Cause of death: | Stillbirth | | |
| Reason For Review: | Child of a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Twenty-year-old ward delivered a stillborn daughter at 39 weeks gestation. The mother had received regular prenatal care. She saw her doctor two days before she gave birth and her blood pressure was high so she was scheduled to see the physician again in three days. The day before her next appointment she woke up feeling sick and went to the doctor. Her blood pressure was high and her doctor sent her to the hospital where medical staff was unable to detect the baby's heartbeat. The mother's wardship ended in August 2010 when she turned 21 years old.

Prior History: The mother and her two siblings became wards in 2002. Their mother is cognitively delayed and has chronic mental and physical health issues. From 1986 to 2002 the ward's mother was investigated numerous times for issues of neglect, primarily environmental neglect but inadequate supervision, inadequate food, and inadequate shelter as well. Intact family services were provided several times, but could not prevent the children's removal from their mother's care. Throughout her wardship the mother struggled with mental health and substance abuse issues. Prior to her emancipation she was provided with housing advocacy, vocational counseling, and parenting classes. Two weeks after her wardship was terminated she gave birth to a baby.

| **Child No. 59** | **DOB 9/09** | **DOD 10/09** | **Natural** |
|---|---|---|---|
| Age at death: | Six weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Viral myocarditis | | |
| Reason For Review: | Child protection investigations unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Six-week-old infant was found unresponsive around 4:00 a.m. by his 20-year-old father who called 911. The infant was taken by ambulance to the hospital where he was pronounced dead. The infant had been sleeping in the same bed as his parents and was found face up. He was last seen alive a few hours earlier when he was fed by his 18-year-old mother.

Prior History: In November 2008 a child protection investigation was initiated when the infant's mother alleged that her step-father had fondled her over her clothing. The girl's mother and 14-year-old sister denied that the girl was abused. During the investigation, the girl sought an order of protection against her mother and step-father and moved into the home of her two-month-old daughter's father. The 20-year-old father reported that he and the girl planned to marry when she turned 18. The investigation was unfounded. In January 2009 a second child protection investigation was initiated involving the same facts; because there was no new information to support the allegations, the investigation was closed.

| **Child No. 60** | **DOB 5/09** | **DOD 10/09** | **Natural** |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Narrative: Five-month-old infant was found unresponsive in the morning an hour-and-a-half after being fed a bottle by his 26-year-old father. The baby had been lying on his back in a bassinet. The father ran to a neighbor's house with the baby to call 911 (he did not have a phone) and performed CPR on the baby while the call was made. The infant's 23-year-old mother was at work at the time. |
|---|
| Prior History: In August 2009 the hotline was called with an allegation of burns to the couple's other child, a fourteen-month-old boy. The toddler suffered redness to his chin and 2d degree burns to 10% of his upper chest. The parents reported that the mother had heated a cup of coffee in the microwave for the father. The father set the coffee down in the middle of the coffee table while he went to attend to the infant who was crying and the toddler grabbed the coffee. The parents acted appropriately by cooling the burns, putting antibiotic ointment on them and taking the child to the doctor. The child protection investigator conducted a scene investigation/reenactment in which she determined the incident could have happened as described. She consulted with the child's doctor who agreed that the child's injuries were consistent with the parents' explanation and scene investigation. Family members vouched for the good care of the children by their parents and the investigation was unfounded without service recommendations. |

| **Child No. 61** | **DOB 2/09** | **DOD 10/09** | **Natural** |
|---|---|---|---|
| Age at death: | 8 months | | |
| Substance exposed: | No, however, mother has a history of drug use including methamphetamines | | |
| Cause of death: | Multiple medical problems | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

| Narrative: Eight-month-old medically complex ward died in the hospital after being taken there by her foster mother because she was breathing abnormally and her nose was bleeding. |
|---|
| Prior History: The infant was the third child born to her parents. The parents' first child was adopted and the second was in the care of her paternal grandparents. Prior to the infant's birth, her parents arranged for her to be adopted by a specific couple, however, the infant was born prematurely with multiple medical problems and the couple elected not to adopt her. The court found the infant to be dependent and DCFS was awarded custody of her. The infant was placed with a foster mother who was also a nurse. The infant was extremely well-cared for by her foster mother and was involved in multiple medical and developmental services. The foster mother wanted to adopt the child and her biological parents signed specific consents for her to do so, but the adoption had not yet been finalized at the time of the child's death. |

| **Child No. 62** | **DOB 6/09** | **DOD 11/09** | **Natural** |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Child welfare services referral open at time of child's death; child protection investigation indicated within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

| Narrative: Five-month-old baby, born prematurely at 29 weeks gestation, was found unresponsive lying on her back by her mother around 8:00 a.m. The baby had been sleeping with her 28-year-old mother and 3-year-old sibling in a queen-sized bed. The mother last saw the baby alive at 2:00 a.m. when she fed her and put her back to bed. The single mother has four surviving children. |
|---|

Prior History: In November 2008 the mother was indicated for cuts, bruises, and welts after hitting her eldest child, a 10-year-old son, with a hanger and leaving marks. The mother admitted to hitting her son, stating she was angry at him because he hurt his 2-year-old sister. The mother was referred to community services to learn more appropriate discipline techniques. The child protection investigator discussed the incident with an early intervention therapist who visited the home, the maternal grandmother, and the maternal aunt and all agreed to keep an eye on the family and notify the Department if there were further problems. In June, upon giving birth prematurely to her fifth child, the mother told a hospital social worker that she was open to services from the Department and the social worker called DCFS. A child welfare services worker wrote that he had made several attempts to contact the mother, but she had not responded. Following the baby's death, additional calls were made to the hotline and an intact family case was opened in July 2010.

| **Child No. 63** | **DOB 11/09** | **DOD 11/09** | **Natural** |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | No, but mother has a history of heroin use | | |
| Cause of death: | Stillborn | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Seventeen-year-old girl gave birth to a stillborn daughter at 35 weeks gestation.

Prior History: The mother was the alleged victim in numerous reports involving her mother dating to 1999. Intact family services were provided three times between 1999 and 2005. In June 2009 the county probation department called the hotline to report that the 16-year-old girl was pregnant and a 21-year-old convicted sexual offender was suspected to be the father. Both the girl and the young man denied that he was the father of the baby and that they had had sex. The girl's father, with whom she lived, said that the young man was his daughter's boyfriend, but that he was not the father of her baby. All family members were aware that when the man was 20 he had sex with a 15-year-old girl and was prosecuted and convicted for sexual abuse. The girl's father was advised that the young man could not live in his home. The investigation was unfounded because a sexual relationship could not be proved.

| **Child No. 64** | **DOB 6/89** | **DOD 12/09** | **Natural** |
|---|---|---|---|
| Age at death: | 20 years | | |
| Substance exposed: | No | | |
| Cause of death: | Sickle cell anemia | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Twenty-year-old ward with sickle cell anemia died in the hospital one week after being admitted for a sickle cell crisis.

Prior History: The deceased first became a ward of the state in 1992. He and his brother were adopted by their foster parent in 1999. The sixteen-year-old minor reentered foster care in 2005 when his adoptive parent locked him out the home and refused to let him return because he was involved with a gang, weapons, and drugs. Over the next several years the youth went between a foster home and detention. His foster parent and case managers encouraged the youth to take care of himself, but he drank alcohol and smoked marijuana and often missed medical appointments. Three months prior to his death the youth found out that his girlfriend was pregnant. He wanted to obtain his high school diploma and go to school to become a barber so that he could participate in raising his child.

| **Child No. 65** | **DOB 8/09** | **DOD 12/09** | **Natural** |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Child protection investigation indicated within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Four-month-old infant was found unresponsive in his crib by his mother shortly after he was put to sleep for the night.

Prior History: In December 2008, the 30-year-old mother and 31-year-old father got into an argument over the father trying to take their 3-month-old daughter outside dressed inappropriately for the weather. While arguing, the father pushed the mother and threatened to put the infant in the dryer, but was stopped by his wife (who was not the mother). The mother went to domestic violence court to obtain an order of protection for herself and her daughter and the court added the father's wife and their son to the two-year order of protection. Both women left Illinois after getting the order of protection. The father admitted to the child protection investigator that he pushed the mother and pretended to put the baby in the dryer to scare the mother and that it was stupid of him. He was indicated for substantial risk of physical injury to his daughter. He pled guilty to a charge of domestic battery and was required to go to anger management classes and get a psychological evaluation. While the mother was back in Illinois at the time of the infant's death, police noted that the father was living out of state.

| **Child No. 66** | **DOB 9/09** | **DOD 12/09** | **Natural** |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Child of a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative: Two-month-old baby was found unresponsive by her fourteen-year-old mother who is a ward of the state. The mother informed staff at the residential facility where she and the baby lived and they began CPR and contacted emergency services. The mother reported that she had breastfed the baby earlier that morning. Another resident observed the baby in bed with the mother less than an hour before the baby was found unresponsive and noted it appeared as though the mother had just finished breast feeding the infant. Staff reported that the baby usually slept in a bassinet or crib and was only in bed with the mother for nursing. The father of the baby, another teen, was not involved in the care of the baby.

Prior History: The baby's grandparents, mother, and mother's three siblings have a history with the Department dating to 2001 when the mother's youngest sibling tested positive at birth for PCP. The grandmother was indicated for substance misuse and an intact family case was open until December 2002. Two more intact family cases were opened and closed between 2003 and 2005 because of alcohol abuse by the grandmother. The four children entered foster care in May 2007 after the grandmother cut the mother's arm with a knife while intoxicated. Once in foster care the mother and her sister reported that they had been sexually abused by their father. The mother changed placements several times and in June 2009 was placed in a group home for pregnant and parenting teens. The mother and her siblings remain in foster care and the mother continues to reside in a group home.

| **Child No. 67** | **DOB 12/09** | **DOD 12/09** | **Natural** |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Prematurity | | |
| Reason For Review: | Siblings in foster care (open placement) | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Infant born at 22 weeks gestation died several hours after birth. The infant's 35-year-old mother tested positive for cocaine when admitted to the hospital; the baby was too fragile to be tested. The mother reported she was in a methadone treatment program for opiate addiction. The mother left the hospital against medical advice without making plans for the baby. The mother was indicated in a child protection investigation for abandonment and death by neglect.

Prior History: The mother, who is cognitively delayed, has a history of substance abuse and giving birth prematurely. The deceased was the mother's eighth child and the fourth to be born substance exposed. She has been the subject of eight child protection investigations. None of her children are in her care.

| **Child No. 68** | **DOB 6/09** | **DOD 12/09** | **Natural** |
|---|---|---|---|
| Age at death: | 6 months | | |
| Substance exposed: | No | | |
| Cause of death: | Pneumonia with multiple congenital heart defects significantly contributing | | |
| Reason For Review: | Children returned home within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Six-month-old infant had heart surgery postponed because he had an upper respiratory infection. Two weeks later he went to a preoperative medical appointment where it was determined he was still sick and the surgery was postponed again. Shortly after returning home the infant looked pale so his mother took him to the emergency room. They were in the emergency room for six hours with the infant receiving breathing treatments while they waited to be admitted. The child began to crash and stopped breathing after an attempt to intubate him. Resuscitation efforts were unsuccessful.

Prior History: The deceased and his 2-1/2-year-old sister were returned to their parents' care six days prior to the infant's death after spending two months in foster care. The children entered foster care after the infant was taken to a medical appointment with facial bruising and was found to have an unexplained femur fracture. The parents visited their children weekly and were observed to be appropriate and affectionate with them; they were knowledgeable about the infant's medical needs and how to care for him; and they had a good support system. The parents immediately engaged in services and the court allowed the children to return home under supervision. The family's case was closed six months after the infant's death.

| **Child No. 69** | **DOB 6/09** | **DOD 1/10** | **Natural** |
|---|---|---|---|
| Age at death: | 6 months | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Sudden Unexplained Death in Infancy | | |
| Reason For Review: | Intact family services case open at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Six-month-old infant was found unresponsive by her 19-year-old mother. The infant was born prematurely at 24 weeks gestation and had a history of a heart murmur, respiratory issues, and difficulty bottle feeding. The infant, the infant's twin sister, and their one-year-old brother were staying overnight with their mother at a friend's house and the family all slept together in an adult bed.

Prior History: In September 2009 the hotline was called after the mother took her 3-month-old twins to a clinic for their immunizations. The twins were dirty, smelled of urine, and had colds, and the deceased twin was sent to the hospital for treatment. The investigator learned during the child protection investigation that the family was on the verge of being evicted and the home had no gas. The mother was indicated for environmental neglect and inadequate shelter and an intact family case was opened to initiate a substance abuse assessment, assist the mother with purchasing cribs, and provide homemaker services.

| **Child No. 70** | **DOB 5/92** | **DOD 1/10** | **Natural** |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Aspiration pneumonia due to cerebral palsy | | |
| Reason For Review: | Child protection investigation unfounded within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative: Seventeen-year-old medically complex minor started choking while being fed noodles by his twin brother. An 18-year-old sister called 911. When emergency personnel arrived the minor was in cardiac arrest. He was resuscitated and taken to the nearest hospital where he was stabilized before being transferred to a pediatric hospital. At the pediatric hospital he went into cardiac arrest again and resuscitation efforts were unsuccessful. The hotline was called because hospital staff thought the minor appeared profoundly malnourished. A child protection investigation was unfounded after a child abuse and neglect expert was consulted who did not feel the minor appeared neglected, but rather that his appearance was consistent with his medical condition.

Prior History: The deceased was one of seven siblings. The mother had her first child when she was 16 years old. She had an intact family case open from 1991 to 1994 for failure to thrive and medical neglect. In 2002 the mother was indicated for cuts, bruises, and welts to the deceased's twin brother after he was discovered to have bruises caused by his older siblings who hit him with a belt for lying about his homework when their mother was not home. The mother admitted to causing old marks on the child. The mother acknowledged needing help for her family and was referred to a community agency. The family's most recent DCFS involvement was in May 2009 when the Department investigated a report that the deceased's twin brother went to school with stitches over his eye stating that his mother's boyfriend beat him up. The investigation was unfounded.

| **Child No. 71** | **DOB 3/91** | **DOD 1/10** | **Natural** |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Brain aneurysm | | |
| Reason For Review: | Teenager was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eighteen-year-old ward was talking to a staff member at her residential facility when she began holding her head and crying, screaming she couldn't hear. Shortly thereafter she began to vomit, have trouble breathing, and experience seizure-like activity. Staff called the facility's nurse who examined the ward and called 911. An ambulance took the ward to the hospital where she was diagnosed with a ruptured brain aneurysm. She remained hospitalized receiving treatment for the aneurysm but died after eighteen days.

Prior History: The teenager and her three siblings were in foster care for 2-1/2 years in the 1990s. Their mother successfully participated in services and the children were returned home. In 2006 the teenager was hospitalized for increasingly problematic behavior. After her release, the teenager's negative behavior increased including using drugs, not attending school or therapy, disappearing for days at a time, and threatening family members. Intact family services were put into place. Within six months the teenager was hospitalized again and following her discharge, her mother refused to let the teenager return home because she was afraid for the safety of her other children. The court found the teenager dependent and the Department was granted custody and guardianship. The ward lived at her residential facility for two years, always returning there from run, detention or hospitalization. While there she participated in services and attended school.

| **Child No. 72** | **DOB 7/09** | **DOD 1/10** | **Natural** |
|---|---|---|---|
| Age at death: | 6 months | | |
| Substance exposed: | No | | |
| Cause of death: | Hypoplastic left heart syndrome with pulmonary hypertension a significant contributing condition | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Five-month-old baby died in the hospital where he had been admitted three weeks earlier. He suffered from a congenital heart abnormality in which the left side of the heart is severely underdeveloped. He was diagnosed with the condition five weeks prior to his death and was awaiting a heart and lung transplant.

Prior History: The baby and his 1-1/2-year-old brother were placed in foster care four weeks before the baby's death. Toward the end of December 2009 the 21-year-old mother took the baby to his pediatrician where he had not been seen since August, having missed both his two-month and four-month well-child visits. At the December appointment the baby weighed only eleven pounds and his doctor noticed he appeared anxious and uncomfortable, prompting the doctor to send the baby to the hospital where his heart condition and failure to thrive were diagnosed. The surviving sibling remains in foster care with his paternal grandparents. He has several developmental delays and is being assessed for autism.

| **Child No. 73** | **DOB 7/01** | **DOD 2/10** | **Natural** |
|---|---|---|---|
| Age at death: | 8-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Seizure disorder due to cerebral palsy | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eight-and-a-half-year-old medically complex ward was taken to the emergency room from her residential care facility after she twice stopped breathing during routine care. She was taken by ambulance to the hospital where continued resuscitation efforts were unsuccessful.

Prior History: The deceased was one of four siblings, the only child born with multiple medical problems. In 2004 the Department opened an intact family case to monitor the 29-year-old mother's medical care of the child as the child had been missing medical appointments and was losing weight. After two years of intact family services, the child was taken into protective custody and placed in a residential care facility where her needs could be better met. The mother visited her child inconsistently and had not visited her in the six months prior to her death.

| **Child No. 74** | **DOB 10/09** | **DOD 3/10** | **Natural** |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Streptococcal sepsis with gastroesophageal reflux disease a significant contributing factor | | |
| Reason For Review: | Sibling returned home within a year of child's death | | |
| Action Taken: | Investigatory review of records. | | |

Narrative: Four-month-old twin infant was found deceased in her crib in the morning by her 26-year-old mother. A child protection investigation was conducted because of the family's prior history. No abuse or neglect of the deceased or surviving children was found and the investigation was unfounded.

Prior History: In April 2006 the 22-year-old mother and 25-year-old father were indicated for head injuries to their one-month-old daughter. The baby and her 4-year-old brother were placed in foster care with their maternal grandmother. A few months later, with court approval, the 4-year-old was returned to his parents' care. The parents participated in services and their other child was returned to their care in January 2009. Services continued to be provided until July 2009 when their court case was closed.

| **Child No. 75** | **DOB 9/08** | **DOD 3/10** | **Natural** |
|---|---|---|---|
| Age at death: | 18 months | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchopneumonia with significant contributing conditions of congenital heart disease and Down Syndrome | | |
| Reason For Review: | Child of a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative: Eighteen-month-old toddler with Down Syndrome was taken to a neighborhood clinic by her 20-year-old ward-mother for cold symptoms that had persisted for three days. When the toddler was seen by a nurse she was unresponsive. She was transferred to the closest children's hospital where she was admitted in full arrest and was pronounced dead shortly after. Allegations of neglect in the child's death were unfounded, but the ward's 5-month-old twins were placed into foster care because of concern about the mother's ability to care for them and her non-cooperation with services.

Prior History: The toddler's mother was in foster care from 1996 until 2002. In 2004 she was removed again from her mother and made a ward of the state. She experienced a number of disrupted relative placements over the next several years. After the toddler's birth the mother's case was transferred to an agency that provides case management services for pregnant and parenting youth.

| **Child No. 76** | **DOB 3/10** | **DOD 3/10** | **Natural** |
|---|---|---|---|
| Age at death: | 3 days | | |
| Substance exposed: | No | | |
| Cause of death: | Pneumonia | | |
| Reason For Review: | Intact family case open within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Three-day-old infant became unresponsive shortly after being fed by his 21-year-old mother. He was taken by ambulance to the hospital where he was pronounced dead.

Prior History: In August 2009 the hotline was called after the paternal grandmother brought her thirteen-month-old granddaughter to the emergency room with an eye infection. A child protection investigation was unfounded for medical neglect, but indicated for substantial risk of physical injury because the mother and 22-year-old father admitted to arguing and fighting in front of the child and being in need of parenting skills training. Intact family services were attempted over the next five months, but aside from accepting beds for the child and her 3-year-old half sister, the mother was not interested in participating in services and the case was closed.

| Child No. 77 | DOB 3/05 | DOD 3/10 | Natural |
|---|---|---|---|
| Age at death: | 5 years | | |
| Substance exposed: | No | | |
| Cause of death: | Batten disease | | |
| Reason For Review: | Intact family case open at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Five-year-old boy died from a fatal inherited disorder of the nervous system. Diagnosed with Batten disease at age 3-1/2, the little boy lost his ability to walk, talk, and eat. He died at home.

Prior History: The deceased and his two older siblings moved with their parents to Illinois from another state in May 2009. The deceased was frequently hospitalized and while his mother stayed with him in the hospital, the two older children, ages 7 and 13, were cared for by their father. An intact family case was opened to assist the family after the father was indicated for inadequate supervision for leaving the children alone overnight to go to work. The Department referred the family to the Division of Specialized Care for Children, provided a family support specialist, assisted with transportation, and referred family members to counseling services. The case remained open for several months following the child's death.

| Child No. 78 | DOB 3/10 | DOD 3/10 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | No | | |
| Cause of death: | Prematurity | | |
| Reason For Review: | Intact family case open at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Premature newborn weighing only one pound, one ounce died shortly after birth.

Prior History: The newborn's 17-year-old mother is the third generation parent to be involved with DCFS. She had been a ward of the Department from 1998 to 2002 when she was adopted. In July 2009 the girl and her 5-month-old daughter were living with the girl's biological mother. The girl got into a physical altercation with her mother and she was indicated in a child protection investigation for substantial risk of physical injury to her 5-month-old daughter. An intact family services case was opened and the family was referred to services including prenatal care, domestic violence counseling, and parenting skills training. The case was closed in September 2010.

| Child No. 79 | DOB 5/95 | DOD 3/10 | Natural |
|---|---|---|---|
| Age at death: | 14-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Sepsis due to pneumonia | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Fourteen-year-old medically complex ward's foster parents took her to the emergency room for pain and bloating in her abdomen. She was admitted to the hospital and two days later underwent bowel surgery to remove a small obstruction. After surgery she developed pneumonia and was not healing. On the sixth day she underwent exploratory surgery but nothing definitive was found and she died that night.

Prior History: The ward's 35-year-old mother has a history dating to July 2006 for allegations of inadequate supervision and environmental neglect. Two of the mother's three children were conceived through romantic relationships with first cousins. The Department attempted to provide intact family services with little cooperation. A request to the local State's Attorney's Office to file for an order of protection compelling participation was denied. After several more investigations involving environmental neglect, the children entered foster care in August 2007. While she was in foster care the ward changed placements only once. The ward's younger brother was released to his father's custody in March 2008 and her younger sister is going to be adopted by her foster parents.

| **Child No. 80** | **DOB 4/04** | **DOD 4/10** | **Natural** |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 6 years |
| Substance exposed: | No |
| Cause of death: | Complications from surgery to remove a brain tumor |
| Reason For Review: | Intact family case open at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative: Six-year-old boy died in the hospital during a procedure to address complications following surgery to remove a rare benign brain tumor known as hypothalamic hamartoma. The tumor caused the boy to have near constant seizures and extreme rages that made him a danger to himself and his family. For this reason, surgery was performed even though removal of this type of tumor is extremely difficult.

Prior History: A child protection investigation was initiated in October 2009 for physical abuse to the boy by his 22-yer-old mother because of multiple bruises on his body. The mother was arrested and charged with domestic battery but the charges were later dismissed. The child protection investigation was unfounded after numerous interviews with medical personnel, service providers, and other people familiar with the family who attributed the boy's injuries to self-inflicted behavior. An intact family case was opened to assist the mother who was struggling to care for her son in addition to a 2-year-old daughter and 1-year-old son. The case is expected to close in the next couple of months.

| **Child No. 81** | **DOB 6/09** | **DOD 4/10** | **Natural** |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 9 months |
| Substance exposed: | No |
| Cause of death: | Complications from deletion on chromosome 4 |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative: Nine-month-old infant with multiple medical problems died in a hospital for children with complex medical needs. The infant was born with a genetic abnormality of a deletion on chromosome 4 that caused multiple congenital anomalies and medical problems. The infant was not expected to live more than one to two years.

Prior History: DCFS became involved with this family shortly after the infant's birth when medical personnel contacted the hotline concerned that the infant's 11-year-old mother and 34-year-old maternal grandmother could not adequately care for the infant. In November 2009 the mother and grandmother were indicated for the infant's failure to thrive and she was placed in foster care. In December 2009 a family member revealed that the 11-year-old child's pregnancy was the result of being raped by her 26-year-old step-father. The mother left the step-father. He was prosecuted and convicted of predatory criminal sexual assault and sentenced to 10 years in prison.

| Child No. 82 | DOB 5/09 | DOD 4/10 | Natural |
|---|---|---|---|
| Age at death: | 11 months | | |
| Substance exposed: | No, however, parents have a history of substance abuse | | |
| Cause of death: | Complex congenital heart defect | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Eleven-month old Down Syndrome child died in the hospital. She had been hospitalized for three months while being treated for a complex congenital heart defect.

Prior History: The deceased's 41-year-old mother has 9 children and a history with DCFS dating to 1999. She and the child's 53-year-old father have multiple problems including mental health, substance abuse, and domestic violence.

| Child No. 83 | DOB 3/95 | DOD 5/10 | Natural |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Seizure disorder with quadriplegia due to cerebral palsy a significant contributing condition | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative: Fifteen-year-old medically fragile child was found unresponsive in her bed by her foster mother shortly after being given her morning bath. The foster mother called 911 and the girl was taken by ambulance to the hospital where she was pronounced dead. At autopsy the child had no prescribed seizure medication in her system which the foster mother reported was because of her severe reflux disease which caused her to vomit multiple times on a daily basis. A child protection investigation was conducted and the foster mother was indicated for death by neglect to the deceased and for medical neglect to the deceased and another foster child who was removed from her care following this ward's death.

Prior History: The child and her three siblings entered foster care in 2005. Shortly thereafter, two of the children were released to the care of their fathers. The third child remained in foster care until she was adopted by her relative foster parent in August 2010. The deceased was placed with her maternal grandmother but after two years her care became too much and in April 2007 the girl was moved to her foster home where her special needs could be met. She remained in that foster home and appeared well-cared for until her death.

| Child No. 84 | DOB 8/04 | DOD 6/10 | Natural |
|---|---|---|---|
| Age at death: | 5-1/2 years | | |
| Substance exposed: | No | | |
| Cause of death: | Pulmonary embolism | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Five-and-a-half-year-old ward with multiple medical problems died in the hospital after experiencing a pulmonary embolism. He was being treated for renal failure of his transplanted kidney.

Prior History: The ward entered foster care in 2006 when it became apparent that neither his 20-year-old mother, who was herself a ward, nor his 25-year-old father could manage his medical care, including daily dialysis until he got a kidney transplant which he did in March 2008. The child was placed with a foster mother who loved him and provided excellent care for him until he died. The child's mother and great-grandmother visited him on occasion.

# 11-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2010**

| FISCAL YEAR | 2000 | | 2001 | | 2002 | | 2003 | | 2004 | | 2005 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 29 | 31% | 42 | 41% | 23 | 24% | 28 | 23% | 31 | 22% | 37 | 27% |
| Unfounded DCP | 7 | 7% | 14 | 13% | 7 | 7% | 21 | 15% | 29 | 21% | 29 | 20% |
| Pending DCP | 10 | 11% | 6 | 6% | 8 | 8% | 15 | 12% | 12 | 8% | 15 | 11% |
| Indicated DCP | 8 | 8% | 14 | 14% | 9 | 9% | 12 | 10% | 6 | 4% | 1 | 1% |
| Child of Ward | 5 | 5% | 4 | 4% | 6 | 6% | 12 | 10% | 2 | 1% | 2 | 1.5% |
| Open Intact | 9 | 9% | 12 | 12% | 20 | 21% | 19 | 15% | 15 | 11% | 31 | 22% |
| Closed Intact | 5 | 5% | 3 | 2% | 7 | 9% | 7 | 5% | 13 | 9% | 0 | 0% |
| Open Placement | 3 | 3% | 4 | 4% | 5 | 5% | 2 | 1.5% | 10 | 7% | 3 | 2% |
| Closed Placement/ Return Home | 3 | 3% | 1 | 1% | 4 | 4% | 2 | 1.5% | 2 | 1% | 0 | 0% |
| Split Custody | 10 | 11% | 0 | 0 | 4 | 3% | 1 | 1% | 7 | 6% | 2 | 1.5% |
| Others | 7 | 7% | 3 | 3% | 4 | 4% | 8 | 6% | 12 | 10% | 19 | 14% |
| **TOTAL** | **96** | **100%** | **103** | **100%** | **97** | **100%** | **127** | **100%** | **139** | **100%** | **139** | **100%** |

| FISCAL YEAR | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 17 | 20% | 24 | 22% | 19 | 22% | 21 | 24% | 20 | 24% | 291 | 25% |
| Unfounded DCP | 25 | 29% | 35 | 31% | 18 | 31% | 19 | 21% | 17 | 20% | 221 | 19% |
| Pending DCP | 7 | 8% | 16 | 14% | 13 | 14% | 14 | 16% | 14 | 17% | 130 | 11% |
| Indicated DCP | 1 | 1% | 6 | 5% | 12 | 5% | 4 | 4% | 7 | 8% | 80 | 7% |
| Child of Ward | 1 | 1% | 4 | 4% | 3 | 4% | 2 | 2% | 7 | 8% | 48 | 4% |
| Open Intact | 20 | 23% | 13 | 12% | 18 | 12% | 12 | 14% | 9 | 11% | 178 | 15% |
| Closed Intact | 1 | 1% | 2 | 2% | 2 | 2% | 6 | 7% | 2 | 2.5% | 48 | 4% |
| Open Placement | 2 | 2.5% | 1 | 1% | 3 | 1% | 1 | 1% | 1 | 1% | 35 | 3% |
| Closed Placement/ Return Home | 0 | 0 | 5 | 4% | 1 | 4% | 1 | 1% | 5 | 6% | 24 | 2% |
| Split Custody | 2 | 2.5% | 1 | 1% | 1 | 1% | 5 | 6% | 0 | 0 | 33 | 3% |
| Others | 10 | 12% | 4 | 4% | 9 | 4% | 4 | 4% | 2 | 2.5% | 82 | 7% |
| **TOTAL** | **86** | **100%** | **111** | **100%** | **99** | **100%** | **89** | **100%** | **84** | **100%** | **1170** | **100%** |

## CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH 2000 TO 2010

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Deaths** | **96** | **103** | **97** | **127** | **139** | **139** | **86** | **111** | **99** | **89** | **84** |
| **Ward** | **29** | **42** | **23** | **28** | **31** | **37** | **17** | **24** | **19** | **21** | **20** |
| Natural | 13 | 20 | 14 | 18 | 16 | 28 | 10 | 13 | 11 | 9 | 16 |
| Accident | 6 | 9 | 3 | 3 | 3 | 1 | 2 | 6 | 5 | 4 | 1 |
| Homicide | 7 | 9 | 3 | 6 | 8 | 5 | 4 | 3 | 3 | 4 | 1 |
| Suicide | 0 | 0 | 3 | 1 | 2 | 3 | 0 | 0 | 0 | 3 | 0 |
| Undetermined | 3 | 4 | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 1 | 1 |
| **Unfounded Investigation** | **7** | **14** | **7** | **21** | **29** | **29** | **25** | **35** | **18** | **19** | **17** |
| Natural | 0 | 5 | 2 | 9 | 16 | 17 | 8 | 9 | 6 | 7 | 4 |
| Accident | 2 | 6 | 0 | 6 | 8 | 8 | 8 | 16 | 7 | 7 | 4 |
| Homicide | 4 | 2 | 3 | 5 | 2 | 1 | 7 | 5 | 3 | 2 | 4 |
| Suicide | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 4 |
| Undetermined | 1 | 1 | 1 | 1 | 3 | 3 | 2 | 4 | 1 | 1 | 1 |
| **Pending Investigation** | **10** | **6** | **8** | **15** | **12** | **15** | **7** | **16** | **13** | **14** | **14** |
| Natural | 0 | 1 | 7 | 6 | 6 | 4 | 3 | 8 | 3 | 6 | 0 |
| Accident | 5 | 1 | 1 | 3 | 1 | 5 | 2 | 2 | 1 | 4 | 7 |
| Homicide | 3 | 3 | 0 | 5 | 3 | 3 | 2 | 4 | 3 | 2 | 2 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| Undetermined | 2 | 1 | 0 | 1 | 2 | 3 | 0 | 2 | 4 | 2 | 5 |
| **Indicated Investigation** | **8** | **14** | **9** | **12** | **6** | **1** | **1** | **6** | **12** | **4** | **7** |
| Natural | 1 | 4 | 7 | 7 | 3 | 1 | 0 | 2 | 4 | 1 | 4 |
| Accident | 4 | 7 | 0 | 4 | 3 | 0 | 0 | 4 | 2 | 3 | 1 |
| Homicide | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Undetermined | 2 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 1 |
| **Child of Ward*** | **5** | **4** | **6** | **12** | **2** | **2** | **1** | **4** | **3** | **2** | **7** |
| Natural | 3 | 1 | 1 | 6 | 1 | 2 | 1 | 2 | 1 | 0 | 3 |
| Accident | 1 | 1 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 1 | 2 |
| Homicide | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 1 |
| **Open Intact** | **9** | **12** | **20** | **19** | **15** | **31** | **20** | **13** | **18** | **12** | **9** |
| Natural | 6 | 6 | 6 | 4 | 8 | 23 | 12 | 5 | 6 | 5 | 5 |
| Accident | 0 | 5 | 7 | 10 | 1 | 5 | 3 | 4 | 4 | 4 | 1 |
| Homicide | 1 | 1 | 5 | 1 | 1 | 2 | 4 | 2 | 4 | 2 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| Undetermined | 2 | 0 | 2 | 4 | 4 | 1 | 1 | 2 | 3 | 1 | 3 |

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Closed Intact** | **5** | **3** | **8** | **7** | **13** | **0** | **1** | **2** | **2** | **6** | **2** |
| Natural | 2 | 2 | 2 | 3 | 3 | 0 | 0 | 1 | 2 | 2 | 1 |
| Accident | 2 | 0 | 4 | 1 | 5 | 0 | 1 | 1 | 0 | 1 | 0 |
| Homicide | 1 | 0 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 2 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 |
| **Open Placement** | **3** | **4** | **5** | **2** | **10** | **3** | **2** | **1** | **3** | **1** | **1** |
| Natural | 3 | 4 | 4 | 2 | 9 | 2 | 2 | 1 | 3 | 0 | 1 |
| Accident | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| **Closed Placement** | **3** | **1** | **4** | **2** | **2** | **0** | **0** | **0** | **0** | **0** | **0** |
| Natural | 3 | 0 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accident | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Split Custody** | **10** | **0** | **4** | **1** | **7** | **2** | **2** | **1** | **1** | **5** | **0** |
| Natural | 3 | 0 | 2 | 1 | 3 | 1 | 1 | 0 | 1 | 1 | 0 |
| Accident | 1 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 2 | 0 |
| Homicide | 1 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |
| **Adopted** | **0** | **2** | **2** | **1** | **1** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Former Ward** | **5** | **1** | **0** | **1** | **1** | **0** | **1** | **1** | **1** | **0** | **1** |
| **Open Return Home** | **0** | **0** | **0** | **1** | **0** | **3** | **0** | **4** | **1** | **1** | **5** |
| **Closed Return Home** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Homicide by a ward**** | **1** | **0** | **1** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Interstate compact** | **0** | **1** | **0** | **0** | **1** | **0** | **1** | **0** | **0** | **0** | **0** |
| **Preventive services** | **0** | **0** | **1** | **3** | **4** | **13** | **5** | **2** | **3** | **2** | **0** |
| **Subsidized Guardianship** | **0** | **0** | **0** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Child of former ward** | **0** | **0** | **0** | **0** | **3** | **1** | **0** | **0** | **0** | **0** | **0** |
| **Extended family support** | **0** | **0** | **0** | **0** | **2** | **2** | **0** | **1** | **0** | **1** | **0** |
| **Child Welfare Referral** | **0** | **0** | **0** | **0** | **0** | **0** | **3** | **1** | **5** | **1** | **1** |

*In FY 01 a child of a ward was also a ward and was only counted once in the total.
**In FY 00, FY 02 and FY 03 the victims of the homicide by a ward were either not involved with DCFS and therefore not included in the total or the victims were involved with DCFS and had been included in another category.

86

# GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

**ALLEGATION**

A man who had applied for a foster care license was involved with internet sites promoting pedophilia.

**INVESTIGATION**

While conducting an investigation of a reported crime at the man's home, law enforcement learned of his pending foster care license application. An officer recognized the man's name from a previous alert regarding pedophilia-related internet activity and notified the Department.

The Office of the Inspector General contacted the officer and obtained material he had been provided by a private anti-child pornography organization. The OIG reviewed the materials and found a number of entries on multiple web sites containing blogs and chatroom discussions centered on pedophilia and fantasy fiction glorifying incest and child molestation posted under multiple pseudonyms. By identifying multiple social media sites known to belong to the man and cross-referencing information contained on those pages with email addresses, screen names and other information presented on the pedophilia-related postings, the OIG was able to establish a link between the two.

In an interview with the OIG, the man initially denied any connection to the pseudonyms or email addresses associated with the pedophilia-related postings. However, after being presented with a representative blog posting, he admitted to being the individual responsible for registering the email attached to the materials.

A review of the man's licensing application file found he had no criminal history or prior involvement with the Department. The application included information provided by the man that he was a volunteer with children's ministries at two local churches. The Office of the Inspector General made a Hotline call for risk of harm because of the man's contact with children at the church where he volunteered. The OIG also contacted the Department's regional foster care licensing manager who stated she had received the information regarding the man's internet activity from law enforcement. The manager stated the information had been placed in the licensing file as a community reference and that it would serve as the basis for the denial of his license. The licensing manager also stated her intention to place a foster care license hold on the man's residence as an additional safety measure.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department's licensing application should be revised to include questions asking the applicant and other adult members of the household for any e-mail addresses or membership in social networking sites within the last five years.**

The application has been revised to include the applicant's e-mail address. However, there are too many barriers to researching social networking sites to implement the second part of the recommendation.

**2. The Department should develop procedures that incorporate the potential licensee's internet activity into background checks.**

The implementation is in progress.

**3. This report should be redacted and used as a basis for a round table discussion by licensing staff.**

The implementation is in progress.

**4. This report should be shared with the Department's Chief of Licensing Enforcement, to ensure that the man is not licensed in the future.**

The report was shared with the Chief of Licensing Enforcement.

**5. This report and attachments should be placed in the man's foster care licensing file.**

The report and attachments have been placed in the closed licensing file.  There is also a placement clearance desk hold on this home.

## GENERAL INVESTIGATION 2

**ALLEGATION**

A private agency with a contract with the Department entered into subcontracts with two individuals barred from doing business with the state. One of those individuals, a Department administrator, had been the subject of a previous OIG investigation in which the OIG had found that he had diverted over $220,000 in state funds to companies owned or controlled by him. The OIG also noted that the agency subcontracted with a third individual who had also been the subject of a previous OIG investigation, in which he had abused his position with the Department by putting his interests as a basketball coach over the best interests of a Department ward.

**INVESTIGATION**

The private agency first began contracting with the Department five years earlier through an agreement facilitated by the Department administrator.+ The administrator provided final approval for the agency's initial contract as well as several funding increases over the next two years. The administrator's employment with the Department ended following an OIG investigation that found he had been involved with the ongoing misappropriation of Department funds. A year after the administrator left the Department, he began working at the agency but the Department did not learn of his employment until more than two years after the administrator terminated state employment. The Department did not believe that the subcontract could be voided because the administrator had never been convicted of a crime associated with the misappropriation. The OIG was not alerted to the employment until several years later, when contract staff reviewing subcontracts noted that the former administrator and another subcontractor with the agency were delinquent on debts to the state, which is a bar to subcontracting under a state contract. The Department disallowed all contractual costs associated with the two subcontracts for one of the two years. The OIG investigation also disclosed that a large portion of the services paid for under the contract were for lobbying state legislators on behalf of the agency. Lobbying fees may not be paid with state funds.

Although the agency was paid to conduct mentoring classes in Chicago Public Schools, the program plan did not specify which schools, how frequently they would meet or whether the children receiving mentoring had to be involved with the Department. In fact, the agency was unable to document any children receiving mentoring services under the contract whose families were involved with the Department either as wards or intact families. The agency also received funding for mentoring services from the Illinois State Board of Education and one site was also funded by the Chicago Public School System. The Department had no system in place to allow it to determine whether the agency was appropriately allocating expenses among funders and was not receiving double funding for the same services.

Because the program plan did not specify which mentoring programs at which schools were covered by the DCFS contract, it was difficult to determine the extent to which service funding overlapped. When providing documents to the Department for monitoring purposes, the agency provided sign-in sheets and other documentation for mentoring programs at 6 Chicago Public Schools. The OIG investigation found that in several of the schools identified, the agency was also receiving funds from other sources for what appeared to be the same programs. When interviewed by the OIG, however, the agency director clarified that the records from four of the schools had been sent to the Department and the OIG in error; the agency only provided services at 3 schools.

The OIG investigation also noted discrepancies between the documentation that the agency had provided the Department's contract monitor and the documentation that the agency provided when the OIG impounded records during the investigation. Sign-in sheets for two of the three schools had been altered to make it appear as though the two subcontractors who had been previously investigated by the OIG had been present for the mentoring sessions. During her interview with the OIG, the director of the agency admitted that she

had directed the two subcontractors to add their names to the sign-in sheets previously submitted.

An OIG review of agency records presented as part of the investigation found the files provided to be incomplete, uninformative and misleading. Basic details in program plans, such as where services were provided, were incorrect. Progress reports describing actions performed were scarce. The agency failed to produce employee timesheets, personnel records or vouchers for services performed by subcontractors, including those previously investigated by the OIG. Although workers and participants were required to sign in at the locations where services were provided, signatures were often missing. In addition, consent forms required for participation in programs were often completed by staff rather than parents or guardians. In interviews with the OIG, staff admitted either regularly signing documents themselves in place of the appropriate individual.

At two schools, the list of students receiving mentoring services corresponded to the roster of the school's basketball teams. One of the school's basketball coaches, who was the subject of the prior OIG investigation, had selected the participants for the program. Several of the sessions appeared to overlap with basketball games or practices. None of the basketball players involved in the mentoring program were involved with the Department.

Despite the fact the agency received more than $1.4 million in Department funds since the inception of its contractual relationship, the agency was unable to show that it had provided services to Department clients. The agency received its funding through a grant, which provides a set monthly or quarterly payment. The agency is then required to submit quarterly and annual reconciliation reports detailing how funds are used. The agency did not submit the reconciliation reports and continued to receive the grant funds. The OIG has noted similar failures in other grant funded contracts. While Consolidated Financial Statements are required by the Department and could be used to detail the full extent of the amount and sources of funding received by private agencies, they are not currently used for that purpose.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should cease contracting with the private agency.**

The contract was terminated.

**2. This report should be shared with the Illinois State Board of Education.**

The Inspector General shared the report with the Illinois State Board of Education.

**3. This report should be shared with the Inspector General of the Chicago Board of Education, which provided substantial investigative assistance in this investigation.**

The Inspector General shared this report with the Inspector General of the Chicago Board of Education.

**4. Subcontractors under Department contracts should be subject to the same transparency as contractors. All subcontracts to the Department contracts should be listed and available for public viewing on the internet.**

The Department agrees. The Budget and Finance Division will work with the Office of Communication to determine if this is possible through the current system developed for public viewing of contracts on the internet. An initial discussion was held and anticipated resolution is in 2011.

**5.  The Department should audit the agency for disallowable costs for FY 2007 through FY 2009.**

An audit by the DCFS Internal Audit staff is pending.  A completion date and report is expected by the end of 2010.

**6.  Instructions and training for Consolidated Financial Reports should require agencies to disclose all sources of public financing and allocate accordingly.  Consolidated Financial Reports must be critically reviewed to ensure that costs are appropriately allocated to various programs and that funding is not duplicated.**

The Department agrees. However, the implementation of this recommendation was placed on hold to allow the Office of the Inspector General to complete a pending investigation which raises related issues.

**7.  For non-foster care agencies, contract monitors must be required to visit the site where services are being provided to determine which staff provide direct service and to ensure that services are being delivered.**

Monitoring visits are required by Regional Contract Monitors for Non-substitute care agreements.  The Office of the Inspector General is working with the Department and the Office of the Attorney General to develop a training for Contract Monitors targeted to fraud detection.

**GENERAL INVESTIGATION 3**

**ALLEGATION** A private agency caseworker allowed three children to remain in their foster home despite knowledge the foster mother was intoxicated and had ongoing substance abuse issues.

**INVESTIGATION** The three children, girls aged 15 and 14 and a 13 year-old boy, had an extensive history of involvement with the Department. The children were taken into custody when the oldest was three and subsequently adopted by relatives. The adoption failed to provide stability and the children moved through multiple placements while dealing with the effects of physical and sexual abuse, the death of their adoptive father and the incarceration of their adoptive mother for abusing them. The children were ultimately placed together in the home of the foster mother when the oldest girl was 10. The foster mother's two adopted children, a 16 year-old girl and a 12 year-old boy, also resided in the home. At the time his other siblings were placed, the boy had been living in the home for one year. The home was licensed to receive foster children through a private agency.

After the children were placed in the home, involved child welfare personnel began noting concerns the foster mother appeared intoxicated while interacting with workers and was consuming alcohol during visits. Workers also received reports that the foster mother used corporal punishment to discipline the children. Prior to the sisters' placement, the boy, the foster mother's adopted son and two other foster children had been temporarily removed because of the foster mother's reliance upon corporal punishment. The children had been returned following the foster mother's successful completion of parenting classes. The foster mother confirmed to workers at various times she had consumed alcohol prior to or during visits with workers, but denied being intoxicated when interacting with them or while transporting or caring for the children. The foster mother also denied using corporal punishment. Upon her initial licensing, the foster mother had stated she was widowed and that her husband had been deceased for approximately 15 years. However, the private agency later learned the foster mother's husband was still alive and resided in another state.

Though staff from the private agency that licensed the foster mother identified these multiple issues with the home, a licensing investigation was never opened. Throughout their involvement with the foster mother, agency staff minimized the concerns regarding her behavior as "complaints" that did not rise to the level requiring a full investigation. An OIG review of the agency case file found the agency's desire to maintain the bond the children had established with the foster mother superseded the potential problems that existed in the home. In an interview with the OIG, the former private agency licensing representative assigned to the foster mother's home stated he did not believe the agency had enough information to open a licensing investigation. In her dealings with the agency, the foster mother frequently deflected addressing potentially problematic issues by citing the difficulty she had dealing with the behavior of the children, agency staff or other child welfare professionals. Agency staff never contacted the foster mother's physician (with consent) to inquire about suspected alcohol abuse. In review of the agency's case file, the OIG noted that there was not a current medical form for the foster mother.

The ongoing issues in the foster home surfaced after the adopted daughter called 911 to report the foster mother had wielded a knife while intoxicated in the home. Officers responding to the call found the foster mother, while no longer in possession of a weapon, was under the influence of alcohol and noted her drinking as an ongoing problem with the household. During the week following the incident, the siblings reported the foster mother drank heavily in their presence and was physically and verbally abusive. The children also reported that the foster mother's husband and adult son also lived in the home and that their presence in the residence had been concealed from workers. In response, a staffing was held among the various involved child welfare personnel to determine a course of action. A decision was made to allow the caseworker newly

assigned to the children's case, who had been working for the agency for only three days, to conduct a home visit and assess the home. During the visit, conducted on a Friday afternoon, the foster mother was combative and openly consumed alcohol. The caseworker completed a safety plan which the foster mother refused to sign. The children remained in the home over the weekend, however after the foster mother again refused to sign the safety plan the following Monday, the siblings were removed from her care. At the time of the removal, the home's foster care license had expired pending the completion of required paperwork by the foster mother. The foster mother ultimately failed to complete the required tasks and her foster home license was not recommended for renewal. The caseworker did not complete her probationary period with the agency and her employment was terminated.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The licensing agency needs to develop a corrective action plan to include training on Department Rule 383, *Licensing Enforcement,* and the need to complete licensing investigations when serious allegations are made. Training should also include the need to share full information with assessors and doctors.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The private agency submitted a corrective action plan that was approved by the Department. The Department conducted a training on Rule 383, Licensing Enforcement, with the agency. The private agency has developed and implemented procedures to ensure that all staff are knowledgeable of licensing enforcement procedures and are able to resolve complaints related to both licensed and unlicensed foster homes.

**2. The licensing agency's licensing department should review their current licensing files and ensure that all medical forms for foster home licensing renewals are current.**

The private agency's licensing division has reviewed current licensing files and implemented a tracking system to ensure that the medical forms are current and that providers whose licenses are approaching renewal are provided with sufficient notice to renew.

**GENERAL INVESTIGATION 4**

**ALLEGATION** Private agency staff failed to remove three siblings from a foster home despite learning a hold had been placed on the home prohibiting children from being placed there and being ordered to do so by the court.

**INVESTIGATION** The three children, girls ages 10 and 9 and a 7 year-old boy, were removed from their placement in the home of a relative after concerns were raised regarding their safety in the home. Private agency staff identified a foster home that had been licensed through the agency since 1998, however the feasibility of the home was not checked with the Placement Clearance Desk. Department Rule states workers seeking to place children in a foster home must contact the Placement Clearance Desk to ensure there are no restrictions on the home.

The foster parents' home had been placed on involuntary hold by the Department Director's Office one and a half years earlier in response to allegations of corporal punishment being used against children in the home. Although the foster parents had completed the required tasks to have the hold removed, the information had never been provided to the Department by the agency. In interviews with the OIG, the private agency licensing supervisor stated that at the time he learned from the children's caseworker they needed a new placement he was not in the office and was unable to contact the placement clearance desk. The supervisor believed someone else from the agency had cleared the placement. In a separate interview with the OIG, the agency licensing worker said she identified the home as being the only one in the area that would accept a group of three siblings.

After the children were placed in the home, the licensing worker submitted a request for a waiver of the home's licensing standards, as the three children would increase the number of children in the home beyond the approved capacity. In her interview with the OIG, the licensing worker acknowledged the children had already been placed when she sought the waiver but stated she had not denied to the Department Director's Office that the children were in the home. Three weeks later, the licensing worker contacted the placement clearance desk to give notification the children were in the home and learned of the hold on the license. In separate interviews the agency's licensing worker, licensing supervisor, administrator and director all stated that once they learned of the hold on the license, the agency chose to pursue having the hold removed rather than move the children. They were confident the foster parents were appropriate caretakers and would provide valuable support to the siblings. All reported that since there was no documentation in the licensing file, they had been unaware the hold was in effect.

Three days after the agency learned of the hold, the children's Guardian ad litem (GAL), who knew of the unresolved previous allegations against the foster parents, discovered the siblings had been placed in the home. Based on her concerns the GAL filed an emergency motion to have the children removed and the court heard the case the same day, a Friday. In an interview with the OIG, the Department attorney assigned to the case stated she contacted the private agency's director prior to the hearing and advised her that if the court granted the motion the children would have to be moved immediately. The attorney said she advised the director to have a staff member remain at the agency's office to receive notification of the ruling. After the court granted the motion the Department attorney contacted the office but got no answer and left a message. The agency's director and administrator both told the OIG they remained at the office until the end of the business day and left before the attorney called, presuming the case had not been heard. After receiving the message Monday morning the administrator attended a status hearing to advocate for maintaining the placement, but the judge ordered the agency be removed from the children's case. The siblings were taken from the home to the Emergency Reception Center where they remained for one month before being placed together in a traditional foster home.

Prior to entering Department custody the children had been involved in an Intact Family Services case following the conviction of their stepfather for sexual abuse of the oldest girl. During the course of this investigation, the OIG learned that the oldest girl had disclosed to the intact worker that her mother had been complicit in her sexual abuse by the stepfather. Despite her status as a mandated reporter and awareness of the family's circumstances, the intact worker did not inform anyone of the girl's statements. The disclosure was not known to anyone but the intact worker until six days later when the hotline receive a report the mother had hit the girl and the child protection supervisor reviewed the intact worker's notes in the case file. In an interview with the OIG, the intact worker stated that although all three siblings lived with the mother at the time she learned of her involvement in the sexual abuse, she did not believe the children were at risk of harm because she did not inform the mother of the girl's statement. The intact worker said she did not contact the hotline because she believed the child protection investigation, which had been closed six days earlier, was still open.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should amend Procedures 301, Appendix E, *Placement Clearance Process*, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months.**

A Department committee is drafting revisions regarding involuntary placement holds.

**2. The licensing agency should institute a corrective action plan to ensure that the placement clearance desk is always called prior to placement.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the private agency's Board of Directors. The private agency no longer has foster care cases.

**3. The licensing agency's foster care director, foster care administrator, licensing supervisor, and licensing worker should be disciplined in accordance with the agency's practice for placing children in a foster home with a placement hold, failing to respond to a court order, failing to ensure that the placement clearance desk was contacted prior to placement, failing to ensure that a capacity waiver was requested prior to placement and the handling of the foster home license.**

The employees were terminated from the private agency.

**4. The Department's intact family services worker should be disciplined for her failure to proactively respond to the oldest daughter's outcry that her mother was complicit in her sexual abuse.**

The intact family services worker received non-disciplinary counseling.

*OIG Response: The Office of the Inspector General maintains that the worker should have been disciplined.*

## GENERAL INVESTIGATION 5

**ALLEGATION**

A private agency caseworker failed to provide services to nine year-old boy residing in a foster home.

**INVESTIGATION**

The boy and two younger brothers, ages six and three, were placed in the home of a newly licensed foster mother after their placement in a previous foster home was disrupted. The foster mother had no experience raising children prior to the siblings being placed in her home. The boy presented numerous mental health and behavioral issues including Anxiety disorder, major depression, Post Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, severe impulse control and behavioral problems including headbanging and violent outbursts. Two months after the children were placed, the foster mother requested the boy's removal because of her concern he would injure her, his siblings or himself. At a staffing held to address the foster mother's concerns, a Department clinical worker recommended the boy be placed in a residential diagnostic program, however no spaces were available at the time. Instead child welfare personnel worked with the foster mother for three months to attempt to stabilize the boy's behavior before a Child And Youth Investment Team (CAYIT) meeting was convened to address the future of the placement. The result of the meeting was a decision to provide specialized foster care to the boy while he remained in the home. In an interview with the OIG, the Department clinical worker who previously recommended the boy be placed in the diagnostic program stated that although she participated in the CAYIT meeting, she did not receive advance notice of the meeting and was involved only briefly by telephone.

The boy's case was opened for specialized services through a private agency that did not hold the foster mother's foster home license. At the inception of the case several services were identified including individual and family therapy, nursing and educational consulting and respite care. The program also called for a behavior analyst to conduct monthly visits and develop an intervention plan based on an assessment of behavioral goals. The behavior analyst was to be on call 24 hours a day to deal with behavioral emergencies. Despite identifying services that could address the numerous issues the boy faced, the private agency did not communicate effectively with the foster mother or the licensing agency in order to develop a comprehensive plan for addressing the full scope of his problems. The private agency did not assess the foster mother's ability as a working single parent to manage the boy's behavior in her home. No contact was made with the boy's school to determine how to improve the boy's performance though he was already one year behind. In an interview with the OIG, the private agency's education coordinator stated that while she provides assistance to workers with educational matters she, "[does not] have input" and "[does not] make decisions." The behavior analyst assigned to develop the intervention plan was not board certified and had no clinical training for the position and was not supervised by a qualified professional. Although the boy had been referred for therapy, a staffing shortage at the agency prevented a counselor from being assigned for two months and he did not see a counselor until after he was removed from the foster home.

Throughout his handling of the boy's case, the assigned caseworker failed to perform necessary tasks and maintain adequate contact with the family. During the four months the boy remained after his case was referred for specialized services, the caseworker conducted two home visits. Case workers are required to conduct two visits per month to homes receiving specialized services. An OIG review of the case file found the caseworker had created minimal notes and those that were present were lacking information and detail. The OIG also identified a home visit report signed by the caseworker from a day he did not go to the home. In an interview with the OIG, the caseworker admitted he asked the behavioral analyst to complete the form while he went to the home that day. The caseworker expressed his belief that as long as an agency staff member went to the home, the obligation had been met. The falsified home report had also been signed by the caseworker's supervisor. The OIG's review of the case file found the supervisor did not make a single entry while the case remained open.

Four months after the specialized service case was opened, the foster mother brought the boy to the agency's office and reported several incidents that had occurred in the home, concluding she could no longer safely manage his behavior. The foster mother also stated the boy's siblings had told her he had been responsible for a documented serious injury to the youngest brother while they lived in their previous foster home. Four days later the foster mother left a message at the agency's office requesting the boy's removal, citing the potential threat he posed to everyone in the home. During a permanency hearing for the siblings three days later, the caseworker testified the foster mother had threatened to relinquish the children by dropping them off at the agency's office. In his testimony, the caseworker mischaracterized the foster mother's actions and presented inaccurate information to the court in order to minimize his inactivity on the family's behalf. In doing so, the caseworker prejudiced the court against the foster mother, compromising her ability to pursue adoption of the children.

One week after the hearing, a staffing was held to assess the boy's placement. The boy was removed from the foster mother's home and placed in a residential facility. He was later admitted to the diagnostic program initially recommended by the Department clinical worker. The two younger siblings remain in the foster mother's home.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The private agency caseworker should be disciplined in accordance with the agency's personnel policies and procedures for: (a) falsification of a child's case record and misrepresentation of facts in court testimony; (b) failure to meet the requirement of home visits for specialized foster children; and (c) ineffective services, minimizing serious case problems, and inadequate case recordings.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the private agency's Board of Directors. The Inspector General met with agency's administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report. The case manager is no longer employed by the private agency and is not eligible for rehire with the agency.

**2. While the boy's case is under the monitoring or case management responsibility of the private agency, the child should be re-assigned to a case manager other than the case worker.**

The case has been transferred to another case manager.

**3. The private agency should review the caseworker's caseload to ensure that he is seeing assigned foster children as required, that their case records are properly documented, and to evaluate the quality of his case entries and service coordination.**

The private agency conducted a review of all of the case manager's cases to ensure compliance in documentation and follow-up services. Any deficiencies noted were reviewed and corrected.

**4. The caseworker's supervisor should be disciplined in accordance with the agency's personnel policies and procedures for inadequate supervision, and failure to record supervisory notes in the child's case record.**

The supervisor was disciplined and issued a plan of correction. In addition, the private agency has initiated a requirement for supervisors' monthly reports.

**5. The private agency's behavior analysts should have specialized training in the treatment of psychiatric diagnoses. They should be taught how to conceptualize cases in terms of behavioral excesses and deficits, and how to design comprehensive behavioral interventions to ameliorate problematic**

**behavior.**

The private agency agrees with the recommendation and will implement.

**6. The private agency's behavior analysts should undergo training in identifying empirically supported interventions. Specifically, they should have access to PsychInfo databases to allow them access to the literature on the treatment of behavior problems.**

The private agency agrees with the recommendation and will implement.

**7. The private agency should require its education services staff to proactively service foster children presenting mental health and behavior concerns by helping to determine whether evaluations are needed through the child's school and ensuring that the child receives an Individualized Education Plan and appropriate services when indicated.**

The private agency agrees with the recommendation and will implement.

**8. The Department should require that behavior services programs of private agencies' specialized foster care programs be staffed by board certified behavior analysts to work with foster children with mental health and behavioral concerns. Board certified behavior analysts should have expertise in the treatment of psychiatric disorders if the agency continues to serve this population.**

The Department will amend the program plans of specialized foster care agencies having behavioral analysts to ensure this is the requirement.

**9. This report should be shared with the Department clinical worker.**

This report was shared and reviewed.

**10. This report should be shared with the Child And Youth Investment Team (CAYIT) reviewer and implementation coordinator. CAYIT teams should ensure that all parties involved with a child to be reviewed are given sufficient notice of the scheduled meeting and that relevant documentation from all parties is submitted to CAYIT prior to the meeting. When reviewing a child's case for type of placement and services in which the child's behavior is central to decision-making, consideration must be given to the child's medications and prescription start dates, prior placement issues, confirmed school status, and clinical reports.**

The report was shared. Child And Youth Investment Team (CAYIT) policy and CAYIT Intake procedures provide clear guidelines on the CAYIT referral process, particularly in areas of timely scheduling and notification to participants of staffing date, required documentation and specification of required and preferred staffing participants. The Department believes that current CAYIT policy and practice adequately address the errors identified in this case. The Department believes that the errors in this case represent an anomaly to CAYIT practice.

**GENERAL INVESTIGATION 6**

**ALLEGATION**

A private agency contracted by the Department to provide mentoring to wards did not provide adequate services.

**INVESTIGATION**

In 2005, the Department established a program to target services to Department wards between the ages of 16 to 21 with a history of unstable placements or running away. The private agency received a contract to provide mentoring to youths involved in the program through interpersonal interaction and activities intended to help provide stability and offer advice and support.

In an interview with the OIG, the agency's executive director described their mentoring approach as "non-traditional." The executive director stated mentors regularly contacted the wards directly by cell phone rather than through their homes or guardians and meetings frequently occurred in locations other than the youth's residences, including at school or at court hearings. The agency's contract called for regular contact with wards, open communication with staff at the youth's residential facilities and thorough documentation of all efforts performed. The agency identified a "goal" of conducting two visits per month with each ward, however it was not established as a requirement as the agency asserted clients could not be forced to participate.

An OIG review of agency records found minimal evidence of work performed with wards on behalf of the Department. Furthermore, the scant information that was provided was inaccurate and misleading, overstating the number of youths involved in the program and offering unsupported statistics in attempt to legitimize continuing the contractual relationship.

In interviews with the OIG, staff from residential facilities involved with the agency stated that while a strong effort was made at the inception of the program, after a vital staff member departed the agency services tailed off to such a degree the involvement with wards was negligible. Visits occurred sporadically without advance notice and little effort was made to engage the wards, with workers instead relying upon the wards to seek out the mentors. Staff described events planned by the agency as haphazard and disorganized with no consideration given to the distances youths would have to travel independently in order to participate. Although the agency claimed to maintain contact with the vast majority of its clients by cell phone, staff at the residential facilities stated that most of the wards in their care did not have cell phones and if they did it was usually for only a brief time.

Over the course of its contractual relationship with the Department, the agency received more than $650,000 to work with wards. The agency submitted a letter to the Department terminating its agreement effective November 2009, one month after the opening of the OIG investigation. The Department identified $85,649 in excess revenue accrued by the agency and requested its return by the agency. After the agency contested the determination, the Department asked for a further response. The agency failed to respond and in doing so abandoned its right of appeal. The agency has not yet returned the funds to the Department.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. Mentoring program plans for the Department's Youth Stabilization Network should include requirements for the number of contacts with identified youth, the percentage of participating youth and a requirement for open communication with residence staff. The contracts must be monitored to trigger program audits when the requirements are not met.**

The Office of Contract Administration will work with the Division of Service Intervention and the Deputy Director to update program plans for FY 2012.

**GENERAL INVESTIGATION 7**

**ALLEGATION**

The statements and identity of a witness in a child protection investigation were given to the subject of the investigation during her appeal of the indicated finding.

**INVESTIGATION**

The parents of two girls, ages 11 and 8, were indicated for Substantial Risk of Physical Injury and Sexually Transmitted Disease. The parents appealed the indicated findings through the Administrative Hearings Unit. As part of the appeals process, the parents requested and were provided a copy of the Department's investigative file. The file contained notes of the investigator's interview with a member of the staff from the girls' school. The witness, whose name was not redacted in the documents, spoke openly with the investigator and offered candid assessments of the parents.

The witness complained to the OIG that by disclosing her comments about the parents to them, the Department had compromised a relationship she had cultivated with them over time. The witness stated she would be forced to reconsider her future dealings with the Department as a result.

Department Rule, which is available to the public, states that the identities or locations of those participating in child protection investigations will not be disclosed except under limited circumstances. However, in 2003 a federal court ruled that while the Department could refrain from specifying the reporter of a child abuse or neglect allegation, the identities of all those cooperating with an investigation must remain unaltered in the record.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should amend Rule 431.60, *Subject Access to Records of Child Abuse and Neglect Investigations* to reflect current practice mandated by a federal court order in the *Dupuy* decision.**

An initial draft of the revisions is complete; however, further review is required in order to guard against improper disclosures.

**GENERAL INVESTIGATION 8**

**ALLEGATION**　　In the course of conducting another investigation, the Office of the Inspector General learned of two cases where suspected cases of Munchausen Syndrome by Proxy (or Factitious Disorder by Proxy) were complicated by the parents' pursuit of medical attention across state lines. In both cases, child protection investigations were initiated in Illinois; however the children were taken into custody in Missouri.

**INVESTIGATION**　　Hospital staff from Missouri were concerned that in the two cases in which their doctors had diagnosed Munchausen Syndrome by Proxy involving Illinois children, they had to seek the assistance of Missouri courts to protect the children despite pending child protection investigations in Illinois.

While cases involving Munchausen Syndrome by Proxy are infrequent, investigations are complex, confusing and can be very time consuming. The nature of these investigations requires an even more collaborative approach than the typical case investigated by the Department. During a previous investigation, the OIG found that Department Rules and Procedures did not specify any special handling of Factitious Disorder by Proxy cases, despite a recommendation by the Child Death Review Team that they develop a protocol for reporting, investigation, and follow-up of allegations of Munchausen Syndrome by Proxy.

The OIG recommended that the Department establish guidelines for the investigation of suspected Factitious Disorder by Proxy cases in accordance with the published literature and detail what should be done in a Factitious Disorder by Proxy investigation including: a thorough review of available medical records for all children in the family by either a child abuse team at the treating hospital or in the alternative by DCFS Nurses; an immediate referral to law enforcement and the State's Attorney; and a multidisciplinary approach to investigation that includes sharing of information and frequent contact with law enforcement and any child abuse team at the hospital. The Department accepted the recommendations. In 2007 the Department drafted a Factitious Disorder by Proxy protocol but never completed it.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**　　**1.  The Department should assign a Department liaison to the Missouri hospital's child protection team.**

The Department agrees and has assigned a liaison to the hospital's child protection team.

**2.  The Department's Medical Director should review this report along with prior Office of the Inspector General reports that address suspected Factitious Disorder by Proxy (OIG 03-0214, OIG 03-0214B) and determine how best to handle investigations involving Munchausen Syndrome by Proxy/Factitious Disorder by Proxy.**

The reports were provided to the Department's Medical Director for review.

## GENERAL INVESTIGATION 9

**ALLEGATION**    The Office of the Inspector General was contacted by staff from the Guardianship Assistance Desk at Probate Court in regards to a guardianship case that appeared better suited for resolution in Juvenile Court than Probate Court.  The OIG examined the appropriateness of utilizing Probate Court to establish guardianship of an infant boy by his maternal grandmother.

**INVESTIGATION**    The baby's mother had an extensive history of substance abuse, homelessness and erratic behavior.  At birth the baby tested positive for cocaine and was HIV exposed as a result of his mother's HIV positive status.  The mother's 10 year-old son frequently resided with his grandmother, however no formal guardianship agreement was ever established.  Shortly after the baby was born, the mother and infant moved into the grandmother's home.

The grandmother had previously rejected obtaining formal guardianship as she did not want further Department involvement with her household.  As the baby approached three months-old, however, the grandmother became concerned after the mother, who was incarcerated at the time, contacted her stating she was going to be released soon and wanted the baby returned to her custody.  The grandmother did not believe the mother would maintain the rigorous schedule of medical appointments necessitated by the baby's HIV exposure and was willing to pursue guardianship in order to maintain custody.  The Department gave the grandmother a Short-Term Guardianship Form, which allows for the transfer of guardianship without going to court, to use until formal guardianship could be established in Probate Court.

According to the Probate Act of Illinois, a person at least 18 years of age, a resident of the United States and having no felony convictions may seek guardianship of a minor.  Proper notice of the petition for guardianship must be served on both parents and the minor.  There is a rebuttable presumption that parents are willing and able to care for their minor children.  If the parents agree, a guardian can be appointed by the Probate Court or the Court has to find the parents unwilling or unable.  If a parent or parents petition the Court to vacate a guardianship by agreement of their minor child, the petition will be granted.

The Circuit Court of Cook County as a public service has set up a Guardianship Assistance Desk for Minors to assist those persons requesting guardianship of a minor. The staff for the desk will provide the forms for petitioning the Probate Court and will review the circumstances that brought about the request for guardianship.  At the time of this investigation, Probate Court would not base a determination on the best interests of the child.  However, in Juvenile Court when custody of a minor child is at issue after a finding of abuse or neglect, best interest of the minor is always the consideration.  There are no services provided by the Probate Court for the family.  The family has to find its own resources, if necessary.  The Department has no involvement with the family and there is no outside monitor to ensure the minor receives proper care. At Juvenile Court, until private guardianship is given, the Department is almost always involved.  Services are provided and the Department or the private agency monitors the placement.  Children are not returned to the parents unless they have corrected the conditions that led to their involvement with the court and the Department.

Guardianship through Probate Court should be used when the intended caretaker is capable of providing for the needs of the minor without services and without follow up and when parents demonstrate that they are going to use the opportunity provided by someone else having the responsibility of their children to work on their issues and correct the situation which caused their children to be under guardianship of another party.  The Short-term Guardianship form should be used only when the problem requiring guardianship is likely to be resolved in one year.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should develop guidelines for when it is appropriate to refer a family to the Extended Family Support Program for consideration of guardianship of a minor through Probate Court and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court. The Short-term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year.**

This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

**2. Child Protection managers, supervisors and investigators and intact family services workers should be trained on the guidelines for referring a family to the Extended Family Support Program.**

This recommendation and the redacted report are currently under review by a Department contractor responsible for review of guardianship and extended family support service issues.

**GENERAL INVESTIGATION 10**

**ALLEGATION** An indicated report against a mother and her boyfriend for physical abuse of her two year-old son was overturned on appeal. A physician specializing in child abuse who confirmed the boy was the victim of physical abuse was never contacted prior to the finding being overturned.

**INVESTIGATION** The child protection investigation was initiated after the mother brought the boy to the physician's hospital for evaluation of a possible blood disorder. The boy presented with massive bruising to his leg, which the mother said had persisted for several months and diminished before reappearing and spreading. The physician examined the boy and reviewed photographs provided by the mother showing the leg bruise in an earlier state and other bruises to his head she had previously observed.

The mother and her boyfriend claimed the leg bruise was initially caused when the boy fell off a skateboard while playing with his siblings in their home. In statements provided to hospital staff, child protection investigators and local police, the mother and her boyfriend offered inconsistent accounts of whether the boyfriend ever served as a caretaker for the children and which one of them had witnessed the skateboard accident. Before visiting the hospital the mother had taken the boy to his regular pediatrician as well as several other doctors for examination of the bruising. All of the boy's blood tests returned negative for any disorder and no medical explanation for the injuries could be reached. None of the other doctors were aware of the photographs showing other injuries. The physician who treated the boy at the hospital conveyed to child protection investigators she was "99.9 percent" certain his injuries were the result of physical abuse.

One month after the child protection investigation was opened, the boy and his two siblings, a seven year-old boy and six year-old girl, were removed from the home and placed with relatives. An order of protection was entered against the boyfriend prohibiting him from having contact with the family. Throughout the child protection investigation, doctors, teachers and child welfare workers described the mother as an invested and conscientious parent unlikely to cause harm to her son. While some doctors characterized the numerous medical consultations the mother sought as proof of her diligence, others speculated she was unable to accept the fact her son had been abused and was searching exhaustively for an alternative explanation. In an interview with the OIG, the hospital physician referred to one set of photos documenting bruises to the boy's head and face the mother said were not present when he went to bed. The physician concluded that based on the nature and circumstances of the injuries they could not have been accidental and told the mother that whoever had cared for the boy that night had committed the abuse. In response, the mother told the physician the boy had woken up screaming that night and her boyfriend had risen to attend to him.

Two months after the children were removed from the home, the child protection investigation was indicated against the mother and her boyfriend for cuts, welts and bruises to the boy. The mother was also indicated for substantial risk of injury to all three of her children. The decision was based on a determination that the explanation for the boy's injuries was not plausible, the lack of any medical cause and the hospital physician's certainty the boy had been abused. The decision also cited the mother's statements that the boyfriend had cared for the boy the night before new injuries were found and that the bruises had cleared up after the children were placed in foster care.

As part of their investigation, local police asked the mother and her boyfriend to submit to polygraph tests administered by the Illinois State Police. The mother agreed while the boyfriend initially refused before later conducting a test with a private examiner. Both answered questions related to their knowledge of how the boy's injuries occurred and were deemed to have passed the tests satisfactorily. During his examination, the boyfriend was only questioned about the boy's leg injuries but not the bruises to his face. In light of the results of the polygraph test, the local Assistant State's Attorney asked the court to dismiss the petition for adjudication requested on behalf of the children. The court complied with the request and vacated the order

of protection against the boyfriend. The children were returned to the mother's home.

Both the mother and her boyfriend appealed the indicated findings of the child protection investigation. The Department attorney assigned to the case spoke to the Assistant State's Attorney who informed her the court case had been dismissed. The Department attorney then recommended a voluntary withdrawal of the indicated findings. In an interview with the OIG, the Department attorney stated she was heavily impacted by the State's Attorney's decision not to pursue the child abuse and neglect petition. The Department attorney was unaware the boyfriend had not been asked about the boy's facial injuries. The attorney made her recommendation without speaking directly with local police or the hospital physician. In her interview with the OIG, the physician said that if she had been contacted by the Department she would have stated her willingness to present her testimony in court.

The Department attorney's recommendation to withdraw the indicated findings was amended and the findings were upheld against unknown perpetrators. Findings overturned on appeal are expunged, however maintaining the indicated reports will preserve the information gathered during the course of the investigation.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This report should be shared with the Department attorney and the supervising DCFS attorney in the county.**

The Department agrees. The report was shared.

## GENERAL INVESTIGATION 11

**ALLEGATION**

The Director referred for investigation a case in which the Department had issued a final decision to move a child from a relative placement into a pre-adoptive foster home. The case raised serious issues about relative caregivers.

**INVESTIGATION**

A woman gave birth to a child while incarcerated awaiting trial for a drug offense. Several years earlier, the woman had had the child's three siblings removed from her care because of neglect issues associated with drug abuse. The siblings had been adopted by an out of state family. A child welfare specialist visited the mother in jail and asked her to identify family members as potential caretakers for the child. The woman identified her mother and her aunt. The worker called the grandmother and great-aunt and other possible family members. Only the great-aunt called back. When asked if she would be willing to take custody of the child, the great-aunt stated that she thought her sister, the grandmother, would be taking custody and that she would have to think about it. Unbeknownst to the great-aunt, the grandmother had been ruled out based on her lack of interest and the recommendation of a nurse at the hospital where the child had been born, who had observed interactions between the grandmother and the mother.

Federal law requires that when relatives are contacted, they be informed of options, including the fact that they may lose the option of adopting the child in the future. The worker never re-contacted the great-aunt or informed her of the potential loss of future adoption and instead, the case was transferred to placement and the child was placed in a traditional foster home. Three months later, the mother was sentenced to five years in prison. As a result of the long sentence, the placement worker approached the foster parents to determine whether they were interested in pursuing adoption of the child. Because of their advanced ages, the foster parents were not interested in adoption. The agency then transferred the child to a pre-adoptive traditional foster home. State law requires that a search for relatives be renewed with placement changes, but the great-aunt was never re-contacted to determine if she were willing to become a pre-adoptive resource for the child.

After the child had been in the pre-adoptive foster home for just over two months, the great-aunt came forward and expressed her interest in fostering and adopting the child. A family advocacy agency, funded by the Department to help keep families together, was assisting the great-aunt in her efforts to adopt her grandnephew. In addition, the great-aunt had contacted the Department's Advocacy Office for assistance. (The OIG noted that rather than paying the advocacy agency directly, the Department was incurring significant additional costs by working through a fiscal agent for the agency, even though the agency had operated for several years in the community.) The great-aunt stated that she was a foster parent. When the placement agency contacted foster care agency responsible for the great-aunt's license, they were told that she was not licensed, because her license had expired and she had not completed paperwork for re-licensure. The only paperwork remaining was a medical form. The great-aunt complied and provided the medical form to her licensing agency within the week. The placement agency, however, considered the great-aunt dilatory because she failed to contact the placement agency to tell them that she had turned the form in. In fact, Department rules provide that a child can be placed with an unlicensed relative, so the missing medical form should not have hampered efforts to move the child to his great-aunt's home.

While the great-aunt was working to get re-licensed, the foster parents acquired the right to contest any change of placement. The placement agency believed that the child's best interest lay in remaining with the traditional foster home, because the child was thriving there. The placement notified the great-aunt that it had determined that the child should not be moved. The great-aunt complained to a Department manager because she believed that the placement agency was biased against her. Specifically, she noted that the director of the placement agency used to work at the Department and recommended indicating an investigation of her which was later unfounded. The manager agreed and transferred responsibility of the case to the Department. Department personnel conducted a home visit and recommended that it was in the child's best interests to

remain in the traditional foster home. The Department held a Clinical Placement Review which determined that the child's best interest lay in maintaining biological ties and the child, then almost one year old, was moved to his great-aunt's home.

The foster parents filed an appeal. On the day of the fair hearing, the great-aunt was notified by the child's daycare that he was sick and needed to be picked up. The great-aunt did not attend the hearing or notify the Department attorney that she could not attend. The Department did not seek a continuance to assure her presence. The only witness called by the Department was the Clinical Placement Reviewer. The foster parents presented several witnesses regarding the care they had provided to the child. In addition, the out of state adoptive parents of the child's siblings testified that they would maintain ties between the siblings and the child if the child were raised by the traditional foster parents. They stated that they would have trouble maintaining such ties with the great-aunt because of a history of tension that resulted when the siblings came into care.

The Administrative Law Judge recommended that the child should be returned to the traditional foster home. The recommended decision then went to Director for approval. The manager intended to contact the Director to inform him not to accept the recommendation but failed to contact the Director. It is prohibited for anyone from the Department to contact the Director while considering to accept or reject a recommendation from an Administrative Law Judge because it is considered an *ex parte* communication which taints the fairness of the process. The Director accepted the recommendation of the Administrative Law Judge and the child was returned to the foster home.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. Given the facts disclosed in this Report, the Department should immediately seek to vacate the decision of the Fair Hearing and seek a new Fair Hearing in the interests of justice with presentation of full facts. The request should include a motion for an expedited hearing.**

The juvenile court judge gave guardianship to the foster parents, ending DCFS' involvement in this case.

**2. The Department should revise procedures to conform to federal requirements and ensure that relatives are advised of their options under state and federal law and the potential consequences of declining placement.**

The Department agrees. Department procedures will be revised as recommended.

**3. The Department should pursue state legislation to formalize a preference for relative placement when such placement is safe and does not delay permanency.**

The Director will consult with the Legislature.

**4. The Office of the Inspector General will meet with the placement agency to form a corrective action plan to address problems noted in this report, specifically:**

- **a. workers were unaware of the necessity of a new relative search at each change of placement;**
- **b. workers relied on inaccurate information for a critical decision (that the relative had declined placement);**
- **c. workers were unaware that Licensing rules are only relevant for placement of relative children when there is a bar to licensure or when the relative possesses an active license;**
- **d. workers did not provide meaningful assistance to the relative and instead drew**

**conclusions from small acts, such as failure to return phone calls.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and the agency's Board of Directors.  The Inspector General met with agency administrators and a member of the Board of Directors to discuss the findings and recommendations made in the report.  All foster care staff and supervisors of the private agency have been informed, and are aware of and held accountable for the following:

    a.  The necessity of conducting a new diligent search to locate potential relative placements each and every time a child experiences a change of placement, regardless of whether or not a relative has previously declined to have the child placed into their care;

    b.  Obtaining verification directly from a first hand source is necessary in order to make an informed critical decision;

    c.  A foster care license held by a relative that has lapsed and is not on hold does not present a barrier to placement and that the relative status will supersede licensing status. Workers also know they still need to call these placements in to the Placement Clearance desk for approvals.

    d.  Providing meaningful assistance to all relatives considering relative placement of children placed in foster care. Workers will problem solve with relatives if there are any obstacles conflicting with a successful placement, and attempt to offer assistance to eliminate those obstacles whenever possible

.

**5.  The Department should ensure that all family advocacy centers develop expertise in DCFS Rules and Procedures concerning Service Appeals and placement to provide more effective advocacy for families.**

The Department agrees.

**6.  The Department should contract directly with the advocacy agency, without the use of a fiscal agent, unless there is reason to believe that the agency needs assistance with financial management.**

The Department agrees. The Office of the Inspector General determined to place implementation of this recommendation on hold pending completion of a pending OIG investigation that raises similar issues.

**7.  Caretakers should receive written notice of a Fair Hearing at the same time that the appellant receives written notice that apprises them when placement of the child is at issue.**

The Department issued a memorandum requiring written notice to caretakers when an appeal involves placement of the child.  The requirement will be incorporated into Department Rules.

**8.  The Department should alert upper-level management to avoid *ex parte* communications during and after the Fair Hearing Process.**

The Director has addressed this issue with the involved management.  An announcement was also posted on the D-Net.

**9.  The Department's Advocacy Office should develop a specialist who would be available to assist and provide expertise to relatives attempting to navigate through the child welfare system.**

All Advocacy Office staff were trained on assisting relative caregivers.  The Inspector General report was distributed and discussed as part of the training.

**GENERAL INVESTIGATION 12**

**ALLEGATION**

While conducting a child protection investigation, Department personnel failed to establish contact with the parents or see the child for three months after the hotline report was received.

**INVESTIGATION**

The hotline report was made after a seven month-old boy was brought to a hospital emergency room with a broken leg. The parents told hospital staff the boy was injured after he became stuck between a bed and a wall in their home. The assigned investigator's supervisor instructed him to perform several tasks including contacting the reporter, interviewing the parents, observing the child and assessing the family's home. The supervisor also advised the investigator to consult with a physician from the Multidisciplinary Pediatric Education and Evaluation Consortium (MPEEC) about the boy's injury.

One week after the boy was injured, during a follow-up visit at the hospital, the mother told the physician she had not yet been contacted by anyone from the Department. One month after the injury occurred, the supervisor noted in the case file that none of the requested tasks had been performed by the investigator. The supervisor made a similar notation in the case file two months after the report was initially received. Two days later the case was transferred to another worker. In an interview with the OIG, the investigator was unable to explain why he had not performed any work on the case while it was assigned to him. The investigator stated he had attempted one unsuccessful visit to the family's home but could not recall when it occurred or what the house looked like. The investigator also was uncertain why he had not documented the attempted visit or left a note alerting the family he was trying to reach them. The investigator stated that at the time he was assigned the case his caseload was above the limits established by the Department, however records showed his caseload at the time was in fact well below the threshold.

An OIG review of other cases handled by the investigator found a pattern of incomplete tasks and a failure to comply with supervisory directives. In his interview, the investigator stated his supervisors had never raised any concerns with him regarding his performance, however his personnel file documented progressive disciplinary measures taken with him including both oral and written reprimands as well as three periods during which he was suspended from duty.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The child protection investigator should be disciplined for his failure to perform investigative duties.**

The child protection investigator received a suspension.

**GENERAL INVESTIGATION 13**

**ALLEGATION**

A child protection investigator engaged in a romantic relationship with the father of a family involved in two pending abuse reports.

**INVESTIGATION**

The investigator was assigned to the first report against the father after it was alleged he was drug-involved and had used excessive corporal punishment to discipline his children. The investigator ultimately determined there was insufficient evidence to support the allegation and unfounded the report. The rationale was based in part on the investigator's report to her supervisor that the father had passed a drug test at a local hospital. An OIG review of hospital records found the father had never been tested at the facility.

Ten days after the case was closed a second hotline report was made following an altercation between the father and his 15 year-old son. Upon learning of the new report, the investigator made a request to her supervisor that she be assigned the case. After her request was denied, the investigator approached another supervisor in the office who was directly responsible for case assignment. The second supervisor informed the investigator that office protocol prohibited her from handling two cases involving the same family within a six month period. In an interview with the OIG, the second supervisor stated the investigator became very angry when her request was denied.

The worker assigned to the second hotline report began her efforts on the case by obtaining the police report of the incident and contacting the jail where the father had been detained following the altercation. Upon calling the jail, the worker learned the father was in the process of posting bail and arranged for him to come to the field office for an interview. The investigator of the first report had gone to the jail, which was nearby the field office, and personally posted the father's bond. After the father was released, the investigator called the worker and offered to conduct a required interview with the father's 15 year-old son, who had gone to stay with relatives in another town following the incident. The investigator told the worker she was able to conduct the interview because she was in the other town where the relatives lived. Three weeks after the hotline call was made and while the case was still pending, the investigator accessed the State Automated Child Welfare Information System (SACWIS) in order to view information gathered by other workers on the case. As the investigator's co-workers continued their efforts they began receiving reports from witnesses who gave descriptions of a woman frequently in the company of the father who matched the first investigator's physical description and drove a similar vehicle. An OIG review of the investigator's telephone records found almost daily contact between her and the father beginning while she handled the initial report against him and lasting throughout the time the second report was pending.

In an interview with the OIG, the investigator initially denied having a personal relationship with the father. After being presented with the telephone records, the investigator admitted becoming romantically involved with the father while she was assigned to his case. The investigator acknowledged she had never informed her supervisor or other Department administrators of the relationship and had participated in the work conducted following the second report without disclosing her personal interest. The investigator stated she had accessed the SACWIS system in order to learn if her involvement with the father had been revealed to her co-workers. Following her interview with the OIG, the investigator resigned her position with the Department and relinquished her child welfare license.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should place a "do not rehire" notification in the child protection investigator's personnel file.**

The child protection investigator was terminated with no reinstatement rights.

**GENERAL INVESTIGATION 14**

**ALLEGATION**

A child protection investigator accumulated exorbitant charges on her Department-issued cell phone.

**INVESTIGATION**

A program initiated by Central Management Services to track heavy use of Department cell phones identified the phone issued to the investigator, who lived outside Illinois, as the single highest user. During the 10-month period usage was tracked, the investigator compiled $14,934.93 in charges to her phone. Ninety percent of the total, $13,458.40, represented roaming charges imposed on all calls originating from her phone outside the state of Illinois.

In an interview with the OIG, the investigator stated her home was located a short distance across the border in another state. The investigator also cited the proximity of the region she serves to the other state as a cause of the roaming charges, as she stated many of her cases involve contacts in the neighboring state. The investigator said her duties required her to make frequent calls to hospitals across the state line where children are often transported for treatment. The investigator also stated she frequently assists co-workers by performing tasks in the other state, including making calls to contacts.

The OIG reviewed the investigator's phone records, cross-referencing her call list with phone numbers utilized in all investigations originating in her field office. After excluding all phone numbers associated with area hospitals, the OIG was unable to identify a single call made by the investigator related to any case handled by the field office. Although the investigator was asked to provide a list of phone numbers she had called in the other state while conducting her investigations, she failed to do so. The OIG identified nearly 7,000 minutes of calls made to individuals who were friends or family members of the investigator along with calls to other states that were not associated with any investigations.

When presented with a list of personal numbers frequently called from her phone, the investigator identified two she considered to be examples of "reasonable use." While the Department's Telephone Usage Policy allows for reasonable use of state-issued phones, the extraordinarily high volume and extended duration of the calls belie the investigator's claim the expenses she incurred were reasonable.

Based on a comprehensive review of the cell phone charges accumulated by the investigator, the OIG determined that, after the exclusion of verifiable work-related calls, the investigator owes the Department $5,549 in restitution, plus surcharges and administrative fees.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The investigator should be disciplined for abusing the State Telephone Usage Policy and violating the Employee Handbook Section 3.18, Use of State Telephones.**

The child protection investigator was discharged for unrelated conduct. The child protection investigator filed an appeal with the Civil Service Commission. The appeal is pending.

**2. The investigator should repay the Department for the $5,549 in local and long distance charges and any appropriate surcharges and administrative fees.**

The child protection investigator was issued a Certified letter requiring that $5,549 was to be paid for unauthorized usage of DCFS phones. The Department's Budget and Finance Division has established an Involuntary Withholding to offset the amount due with the Comptroller. To date, through the involuntary withholding, the Department has received and applied a warrant in the amount $3,487.90 (less dollars for

vacation, personal time, sick time).

**3. The Department should analyze the cellular telephone plans of any employee living outside of the state of Illinois, or in areas where a Department-issued phone would incur roaming charges, to insure the most fiscally responsible plan.**

The Department's Division of Child Protection has been monitoring phone usage and has noted a significant drop in usage.  Central Management Systems has been issuing recommendations over the past year on changes to the phone plan and have changed the packages over the past few months based on usage and area used.

**GENERAL INVESTIGATION 15**

**ALLEGATION** A private agency program director failed to ensure services were provided to two sisters, ages 16 and 13. The program director also signed blank medical consent forms and provided them to the girls' foster mother.

**INVESTIGATION** The girls entered Department custody when they were 10 and 7 years old after their mother, who suffered from a terminal illness that compromised their care, was indicated for inadequate supervision. Seven years earlier their father had been convicted of aggravated criminal sexual abuse of their babysitter and sentenced to four and a half years in prison. He was also indicated for risk of sexual abuse of the girls. After experiencing a series of placement disruptions the younger girl moved in with an adult sister while the older girl resided in a traditional foster home. Their case was handled by a private agency.

Throughout his involvement with the case, the private agency program director responsible for monitoring case management demonstrated a disregard for Department Rule and Procedure and an unwillingness to actively ensure the girls' needs were met. The Integrated Assessments in the sisters' case file contained no information related to indicated abuse and neglect reports against both their parents though the events were critical elements of their history. Both sisters and their foster parents complained repeatedly about the director's failure to respond to their attempts to contact him or provide information in a timely manner. Although the caseworker assigned to the younger sister's case did not perform a home visit for the first four months after she moved to a new placement, the director did not compel the caseworker to perform her duties or take action to rectify the situation. The younger girl's change in placement prompted a request to transfer her case to another agency office closer to her new home, however the director did not respond to the request from colleagues for 10 months. The program director allowed the older sister to select her own placement in the unlicensed home of a friend and was aware the girl's current foster parents were giving a portion of the funds they received to the friend. In an interview with the OIG, the program director initially identified the friend as a respite caregiver but, as the arrangement did not comply with Department guidelines regarding respite care, adjusted his characterization of the arrangement to that of babysitting. The program director stated that his interpretation of respite care differed from the definition used by the Department.

When the younger sister's foster parent inquired about obtaining necessary medicine for the girl, the program director faxed her blank consent forms pertaining to medical and dental care, mental health treatment and release information with instructions to copy the forms for future use as needed. The consents had been signed by the program director, although he was not authorized to do so. In an interview with the OIG, the program director stated he regularly signed blank consents for wards and had been advised by agency staff that his position with the agency allowed him to complete the consents. In separate interviews with the OIG, other agency staff denied advising the program director he could perform that function and the Department Guardian confirmed he was not authorized to sign consents and that blank consent forms are not provided to foster parents to use at their discretion.

An OIG review of the program director's personnel file found that upon being hired by the agency, he affirmed he held a valid driver's license and that his license had not been suspended during the previous three years. The program director also provided his driver's license to be photocopied and kept on file. The OIG found that the driver's license presented to the agency by the program director at the time he was hired was fraudulent. An OIG check of Department of Motor Vehicle Records found the program director's license had been suspended on more than one occasion and was invalid at the time he signed the affirmation certificate. In his interview with the OIG, the program director stated that at the time he was hired he did not consider his license to be suspended.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The private agency should discharge the program director for misrepresentation of his driving history in his employment application and presenting a counterfeit driver's license; condoning an unlicensed unrelated placement; misrepresenting himself as an authorized agent of the Guardianship Administrator.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The manager's employment was terminated and his Child Welfare Employee License was revoked.

**2. The program director's personnel file with the private agency should reflect that he was terminated with cause with no rehire.**

The manager's personnel file notes that he was terminated with cause and is not eligible for rehire.

**3. The private agency should conduct an audit of every family/child file assigned to the program director's team and mark all consent forms signed by him as "Invalid."**

The private agency conducted a file audit of all the clients served by this team. All consent forms signed by the manager were marked "Invalid" and, if not expired, were resubmitted to the guardian's authorized agent for signature.

**4. The private agency should ensure that all employees at the program director's field office understand the Department's rules and procedures regarding obtaining consent for wards.**

The private agency employees were trained on obtaining consents and releases of information.

**5. The DCFS Division of Monitoring should review placement practices at the private agency's field office to ensure that children are not being placed in unrelated, unlicensed homes in accordance with Procedures 301, Appendix D, *Unrelated, Unlicensed Homes*.**

The review is in process. Anticipated completion is in 2011.

**6. The private agency should amend the sisters' Integrated Assessments to reflect the family's history with DCFS, including the indicated findings.**

The private agency updated the Integrated Assessments to reflect the indicated findings.

**GENERAL INVESTIGATION 16**

**ALLEGATION**

A Department employee engaged in a personal relationship with a client who had an open Intact Family Services (IFS) case with the Department.

**INVESTIGATION**

The employee worked in a Department field office when the family's IFS case was opened and began communicating with the father when he came to see his worker. In an interview with the OIG, the father stated that he and the employee began a personal relationship that included seeing each other outside of the office and corresponding by phone. The father stated the employee had initiated contact with him and described her behavior as "aggressive." The father presented numerous messages sent to his phone by the employee which frequently contained suggestive language and sexually explicit photographs. The father stated that on several occasions he had observed the employee parked in her car outside his house for extended periods of time and that when she first began contacting him he believed she was doing so on behalf of the Department.

The mother informed the IFS worker the employee had come to her home, claiming she had been directed to do so by the worker. The mother's relatives also reported seeing the employee in her car in the vicinity of the family's home. According to the mother, on one occasion the employee called the mother at her home, telling her she was the father's girlfriend and requesting a meeting. The employee then told the mother to look out the window where the mother saw the employee outside sitting in her car. Both parents stated they felt the employee was "stalking" them and related a threatening statement the employee made to the father regarding the mother's future safety.

In her interview with the OIG, the employee admitted sending many, but not all, of the text messages sent from her phone to the father and stated she had sent the obscene pictures as a joke. An OIG review of the employee's cell phone records confirmed all of the messages had originated from her phone. The employee denied ever going to the family's home or meeting the mother but stated she had called and sent text messages to the mother. The employee acknowledged engaging in a personal relationship with the father after meeting him at the field office and said the two had spent time together "like a date" on multiple occasions.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department employee should be discharged for conduct unbecoming a Department employee.**

The employee is on medical leave. Discipline will be imposed when the employee returns from leave.

## GENERAL INVESTIGATION 17

**ALLEGATION**

A child protection supervisor engaged in a romantic relationship with a Department intern who was in his direct chain of command.

**INVESTIGATION**

The intern was a college student who joined the Department to complete field work required as a prerequisite for attaining a Bachelor of Social Work degree. The intern was assigned to a team headed by the supervisor and worked directly with him. Although the intern was scheduled to work in the office for a four month period, she terminated her field instruction several weeks early without fulfilling the requirements of her degree program.

In interviews with the OIG, members of the Department staff in the field office gave varying accounts of the relationship between the supervisor and the intern. Regardless of their level of actual knowledge of events, all were aware of reports the two were romantically involved and the speculation was a divisive issue in the office. Uncertainty about the nature of the relationship resulted in tension between workers and suspicion amongst those stationed in the field office.

After at first denying any outside relationship during two interviews with the OIG, the intern ultimately acknowledged she had become romantically involved with the supervisor during the course of her work for the Department. The intern provided dates she had been at a hotel with the supervisor. The intern also stated she had been advised by the supervisor to make false statements to the OIG regarding their relationship. An OIG review of phone records found a high volume of calls between the supervisor and the intern, the vast majority of which occurred during late night hours or weekends. The OIG also identified three occasions when the supervisor stayed at a hotel near his home and utilized the reduced room rate received by state employees.

In an initial interview with the OIG, the supervisor asserted he had never been engaged in a personal relationship with the intern and cited rumors spread by hostile co-workers as the source of the reports. During a second interview, at which the information regarding the telephone and hotel records was presented, the supervisor admitted the two had in fact been romantically involved. The supervisor confirmed the intern had accompanied him to the hotel on the three occasions in question and that they had met at other times as well. The supervisor stated he had never informed his superior of the relationship and at no time requested the intern be transferred to another team outside the scope of his professional authority.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should discipline the supervisor up to and including discharge for violating the Code of Ethics for Child Welfare Professionals, engaging in a sexual relationship with an intern he directly supervised, and for violating Rule 430.50, *Cooperation with Office of the Inspector General Investigations*.**

After a hearing before the Civil Service Commission, the child protection supervisor resigned with no reemployment rights to DCFS. The supervisor's Child Welfare Employee License was revoked.

**2. The Department Field Placement Coordinator should consult with the head of the supervisor’s field office team to complete a student evaluation for submission to the intern’s school through interviews with those investigators the intern accompanied in the field.**

A final student evaluation was completed.

**GENRERAL INVESTIGATION 18**

**ALLEGATION**

A Department employee used his state computer to access non-work related websites and download images of adult pornography during work hours.

**INVESTIGATION**

The OIG initiated its investigation in response to a finding by the Office of Information Technology Services (OITS) that computers in a single Department office were using an inordinate amount of bandwidth, which determines a system's capacity for transmitting data. After the usage was traced to an individual computer, the unit was checked for viruses and other malfunctions. After those potential causes were ruled out, further review of the computer's hard drive revealed an internet history detailing extensive accessing of various websites that could not be justified as having any relationship to Department business. The extent of internet activity consumed a great deal of time, a random review of one work day found that, on average, a new web site was accessed on the computer every eight minutes. Several websites were determined to be adult in nature and photos depicting pornographic material had been downloaded from these and other sites and saved in the computer. The location of the saved files within the computer's hard drive demonstrated a deliberate attempt to obtain and preserve the pornographic materials.

In an interview with the OIG, the Department employee primarily assigned to the computer admitted accessing numerous websites unrelated to his duties while at work. However, the employee denied any knowledge of the pornographic materials found on the computer and asserted he had no role in locating or saving the images. The user ID issued to the employee was identified as the one used to log into the computer at the times the sites were accessed, and he denied any other workers had knowledge of his password. The employee was the only individual who had access to the computer during the time periods the pornographic images were viewed and saved.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The employee should be disciplined for misuse of state time and equipment and for conduct unbecoming a state employee.**

The employee received a suspension.

**GENERAL INVESTIGATION 19**

**ALLEGATION**

A Department employee misappropriated Department resources by using the internet excessively during work hours.

**INVESTIGATION**

In response to a Security Administration report of employee's excessive internet activity, the OIG reviewed the employee's computer activity and found a high volume of traffic to websites unrelated to the performance of his duties with the Department. In an interview with the OIG, the employee stated his duties required him to perform a large number of internet searches in order to gather historical information regarding child abuse and neglect cases. In a separate interview with the OIG, the employee's supervisor stated the internet searches were not part of the employee's job responsibilities.

The employee confirmed to the OIG he had not shared his sign on or computer password with any other workers. The OIG provided the employee a list of websites accessed from his computer and asked him to identify the ones he had visited. The employee acknowledged visiting approximately half of the web sites listed. None of these sites contained content related to his duties with the Department.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The employee should be counseled for misuse of state time and equipment.**

The employee was counseled.

**2. The employee's supervisor should meet with him and explore whether he would benefit from the Personal Support Program (PSP) for personal issues or time management.**

The supervisor discussed these issues with the employee.

**GENERAL INVESTIGATION 20**

**ALLEGATION**

Department management interfered with the ability of a supervisor to discipline a caseworker who overstated the mileage she claimed on travel vouchers submitted to the Department. The OIG also investigated complaints regarding bias in the office, favoritism in case assignment and the pursuit of outside business interests by employees during work hours.

**INVESTIGATION**

The caseworker had stated during a team meeting that on occasions when her duties required her to travel toward the end of the day, it was her regular practice to continue home but bill the Department for the mileage she would have traveled back to the office. After making the disclosure the caseworker was informed by her supervisor that such mileage claims were not allowable. The caseworker then contacted the Department's vouchering unit and requested guidance in rectifying the situation. The supervisor wanted to pursue discipline of the caseworker for falsification of records, but management determined the vouchers were submitted in error and allowed the caseworker to submit corrected vouchers.

A Department employee involved in an outside venture selling cosmetics stated she had her shipments sent to the office and that office staff accepted the deliveries. The employee stated she only conducted the business on her personal time and denied doing so while at work for the Department.

The employee also operated a workplace lottery that relied upon a complicated system of gift cards, rebates and merchandise credits. Several workers in the office acknowledged either past or current involvement in the lottery and one reported being approached to join by the supervisor. The instructions for the lottery were disseminated throughout the office during work hours, and the employee approached coworkers about participating on state time. The convoluted nature of the lottery and the employee's reinvestment of the funds gathered for it prevented simple assessment of the benefits to the employee or other workers. In addition, the employee had posted an advertisement for a time share property, in which she held an ownership stake. The advertisement was posted in a public area and acknowledged she would have received credits if any co-workers rented the property.

While it is reasonable to expect Department workers to engage in outside endeavors and business ventures, bringing those interests into the workplace can create an uncomfortable environment. While the Department does not currently have a solicitation policy, the OIG proposed one in 2005 and shared the draft policy with the Office of Employee Services.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department should audit the caseworker's travel vouchers for two years prior to the earliest travel voucher that she identified as incorrect. The Department should recover any additional monies owed from the caseworker.**

An audit was completed on 2 years of travel vouchers and no discrepancies were found. The employee repaid monies on vouchers in question before the audit was conducted. Vouchers were corrected and resubmitted.

**2. The employee should be disciplined for her use of the state mail system and staff time to receive secondary employment related packages.**

The employee received counseling and a written reprimand.

**3.   The employee should receive ethics counseling from management to ensure that non-work related activities are not conducted using any state resources.   While it is permissible to post her vacation rental on the lunchroom bulletin board, it is not permissible to approach co-workers on state time to solicit timeshare rentals.   Since one interviewee noted that she was approached to join the lottery by both the employee and the field office supervisor, the supervisor should not administer the counseling. The employee should also be directed to discontinue the lottery and gift card transactions.**

The employee was counseled on ethics issues by the Assistant Regional Administrator. The lottery and gift card transactions have ceased.

**4.   The Department should promulgate a Solicitation Policy to clarify that permissible solicitation is limited to break-time, in break rooms and only for not-for-profit activities.**

The Department agrees. A solicitation policy is being developed.

## GENERAL INVESTIGATION 21

**ALLEGATION**

A Department licensing worker allegedly stole prescription medication from a prospective foster home while conducting an assessment.

**INVESTIGATION**

The licensing worker visited the home of a man who was seeking licensure as a foster parent on three occasions. Following the third visit, the man's mother who also lived in the home, contacted the worker's office and reported some of her prescription medications were missing. Both the mother and the man had significant health issues and between the two were prescribed multiple powerful narcotic painkillers. In an interview with the OIG, the mother and the man stated the worker placed particular focus on the pharmaceutical drugs in their home and said she described her behavior during the third visit as strange. Following the mother's call to the worker's office, the worker called the family's home and cell phones numerous times throughout the rest of the day. The mother reported that the family felt harassed by the worker's repeated calls and feared she would use her position to deny the foster care license.

In her interview with the OIG, the worker stated she identified the presence of powerful prescription drugs in the home as a potential risk to children and revisited the issue with the family to convey the seriousness of ensuring they are properly secured. The worker acknowledged she had called the family's home several times after the third visit and stated she initially pursued a follow-up conversation and later sought an explanation of the mother's accusation. The worker denied having any past or present substance abuse issues. The OIG found insufficient evidence to support the allegation the worker had stolen prescription drugs from the family's home.

In interviews with the OIG, two of the licensing worker's fellow employees reported occasions when they had either witnessed the worker consuming alcohol while on the job or being told by her she had done so. Neither employee reported observing the worker intoxicated while on duty. The worker's supervisor stated she had no reason to believe the worker had any substance abuse issues.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The licensing worker should receive counseling for her unprofessional and persistent phone calls to members of the family.**

The licensing worker was counseled.

**2. The licensing worker's supervisor should offer her an Employee Assistance Program Referral based on professional colleagues' observation of the worker's consumption of alcohol during or just prior to work.**

The licensing worker was offered an Employee Assistance Program Referral.

**3. The Department should amend Rule 412, *Licensure of Direct Child Welfare Service Employees and Supervisors* to add "failure to timely comply with an order for drug or alcohol testing after a finding of reasonable suspicion" as a basis for licensure action under Rule 412.50, *Misconduct*.**

Management will seek to negotiate reasonable suspicion testing with the Union in the future.

***OIG Response:*** *The Office of the Inspector General has been continuously recommending this critical*

*change in policy for 11 years. The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

**4. The Department should amend Rules and Procedures and develop protocol and contracts to provide an infrastructure of testing facilities for reasonable suspicion testing; definition of reasonable suspicion; procedure for developing a finding of reasonable suspicion and training for management and supervisors as necessary concerning reasonable suspicion determinations.**

Management will seek to negotiate reasonable suspicion testing with the Union in the future.

***OIG Response****: The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years. The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

**5. Private agencies with Department contracts should be required by contract or licensing rule to have policies at least as stringent as Department policies regarding training, testing and response to reasonable suspicion of drug or alcohol use on the job.**

Management will seek to negotiate reasonable suspicion testing with the Union in the future.

***OIG Response****: The Office of the Inspector General has been continuously recommending this critical change in policy for 11 years. The lack of a reasonable suspicion testing policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk. The policy change sought by the Office of the Inspector General would have minimal budgetary impact.*

**GENERAL INVESTIGATION 22**

**ALLEGATION**

The Office of the Inspector General reviewed whether a Citizen Review Panel associated with the Department should remain active.

**INVESTIGATION**

An Advisory Council was impaneled in 2003 in accordance with the Citizen Review component of the Child Abuse Prevention and Treatment Act (CAPTA). The Council was established to examine the policies and procedures of the agencies administering state and local child protective services. The Council is currently identified as an Executive Agency Board associated with the Department.

An Office of the Inspector General review of minutes from Council meetings and its 2008 annual report found the last meeting of the Council occurred in November 2007. While the statue creating the Council mandated it be comprised of 17 members, attrition through resignation and term expiration reduced membership to the 4 who currently remain. In an interview with the OIG, the former Department liaison to the Council stated she submitted lists of potential appointees to the offices of the Governor and the Director of the Department in 2005, 2006 and 2008, but received minimal response. As membership dwindled and the Council lost its ability to establish a quorum, several members chose to resign or join other advisory groups. The diminished membership led those who remained to question what functions could still be performed and effectively brought about the Council's hiatus. After several years of trying to operate with far below the requisite membership, Council members elected to discontinue convening until new members were appointed.

Members of the Council are required to participate in annual ethics training and submit yearly statements of economic interest to the OIG. For the past two years, issues of non-compliance have arisen as members have failed to perform the tasks, citing the absence of any Council activity as evidence it no longer exists.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. This report should be shared with the Executive Office of the Inspector General for clarification as to whether the members of a non-functioning advisory council are required to complete the annual ethics training.**

The Office of the Inspector General shared the report with the Executive Office of the Inspector General.

**2. The Department should determine whether this Advisory Council should continue to operate. If the Department determines that the Council should continue, the current Department liaison, should resubmit names of viable appointees to the Governor's Office.**

The Department is discussing potential Advisory Council members with the Governor's Office. Revisions will be made to the list of persons required to submit Statements of Economic Interest once the Governor makes the appointments.

**GENERAL INVESTIGATION 23**

**ALLEGATION**

The Office of the Inspector General received a complaint concerning the Department's expansion of a contract with a charitable foundation.

**INVESTIGATION**

The Department contracted with the foundation to collect and coordinate donation of goods to client families, including the distribution of holiday gifts. From Fiscal Year (FY) 07 to FY 08, the amount of the contract grew from $150,000 to $280,000. The increase was approved based on the foundation's projection of program expansion, which was scheduled to begin in FY 08. The OIG found that while the foundation had expanded its operations, the increase did not reach the levels projected when the contract was awarded. As a result, it was unclear how the funds originally requested to support the proposed expansion were ultimately utilized. The OIG also determined that some of the initiatives the funds were used for, such as development of property leased to the foundation by one of its administrators, appeared to be non-reimbursable. The initiatives in question represented non-arms length transactions of the company and reflected non-depreciated capital improvements, which would not qualify as expenditures approved for use of grant funds.

The contract with the foundation was paid for by the Department through a grant, which resulted in the foundation receiving a set monthly payment. Although Department Rule requires grant awards to be supported by expenditure reports at the end of the fiscal year, these reports had not been submitted by the foundation. Neither foundation staff nor Department administrators involved with monitoring the contract were aware of the provision necessitating grant expenditure reports. The foundation had also neglected to conduct annual independent audits in accordance with Department Rule. The OIG has noted in other investigations the absence of grant expenditure reports and that currently the Department does not have a system in place to ensure these documents are received or reviewed.

Another record keeping issue was identified in relation to the distribution of donated goods from the foundation. While individual clients were required to sign for materials they received, products obtained from the foundation by Department or private agency staff on behalf of clients were not recorded. The creation of an inventory system detailing when and how goods are accepted or distributed by the foundation and the Department would assist in formulating a more accurate representation of the foundations efforts and help ensure the items reached their intended recipients.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The OIG notes that the Department is in the midst of its Contract Review Process and recommends that the charitable foundation's contract be included for a field audit of grant expenditures to ensure that Department funds are being spent in accordance with the contract and that independent auditor reports have been filed as required.**

The Department received the audit and it is being reviewed.

**2. The Department must review all grantees to ensure that the Department has received and reviewed Grant Expenditure Reports as required.**

The Department agrees. No further response provided.

**3. The Department must establish a process that ensures that financial documents required by the**

**Contract or Grant are received in a timely manner and reviewed for disallowable costs, and that there is a written plan to recover any excess or disallowable funds.**

The Department agrees.   The Division has a procedure to recover excess revenue when and where it is identified.   The Office of the Inspector General is working with the Department and the Office of the Attorney General to develop training targeted to critical review of financial documents to better identify disallowable costs.

**4.   The Department must identify staff to ensure that an inventory is taken of the number of toys received and distributed from the charitable foundation.  In addition, a system should be put in place to randomly audit receipt of toys when the toys are to be delivered by a caseworker or other Department staff person through signed receipts.**

The inventory tracking process and forms were developed and implemented.

**GENERAL INVESTIGATION 24**

**ALLEGATION**

A Department supervisor conducted secondary employment during work hours.

**INVESTIGATION**

The supervisor had been involved with a business owned by her then-boyfriend several years earlier and had helped facilitate another Department employee's efforts to invest with the company. In an interview with the OIG, the supervisor stated she never solicited investments from Department employees but had passed on information to an interested co-worker with whom she had a social relationship. Although the co-worker was not in the supervisor's chain of command, she did serve in a subordinate position within the same office. The supervisor stated she was only formally involved with the company for a brief time and had ended her official capacity prior to the co-worker becoming an investor. The supervisor said she had only passing knowledge of the details of their arrangement and had no role in brokering the deal. At the time, the supervisor did not consult with Department administrator's as to her interest with the business or the co-worker's involvement with the company.

A review of the supervisor's email account on the state system found two four year-old emails between herself and her then-boyfriend. The supervisor had previously denied any misuse of the state email system but conceded she had most likely done so on those occasions and considered the instances errors in judgment. The supervisor was engaged in another outside business but insisted she performed no work for that company while working for the Department. The supervisor disclosed her relationship with the company in her Statement of Economic Interest provided to the Department and conferred with an administrator annually about the extent of her role with the business.

The OIG determined that while the supervisor had not acted inappropriately in regards to the co-worker's investment with her then-boyfriend's business, the personal and professional relationships she had with both parties created several potential conflicts of interest. Given that the primary responsibility of the Department is to its clients, all workers, particularly those in supervisory or administrative positions, must be especially diligent in avoiding situations that may compromise the public's trust.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The supervisor should receive non-disciplinary counseling for failing to seek consultation from her manager on the potential appearance of a conflict of interest.**

The employee was counseled.

**GENERAL INVESTIGATION 25**

**ALLEGATION**

A Department cell phone issued to a child protection investigator transmitted an extremely high volume of text messages during a one-month span.

**INVESTIGATION**

The Office of the Inspector General reviewed text message activity from the phone over a six-month period which totaled 2,067 transmissions either sent or received. The phone numbers associated with the messages were checked against a list of numbers for Department personnel the investigator might have contacted during the course of her work activities, however no correlation was found. In an interview with the OIG, the investigator stated her phone had never been lost or stolen and said she did not regularly use the phone to send messages. When presented with a list of the names and addresses associated with the phone numbers that had sent and received the texts the investigator identified three individuals as either relatives or family friends. The investigator also recognized that many of the numbers were registered to addresses in another city where her 14 year-old son, who stayed with her frequently, lived with his father.

The investigator had recently purchased a cell phone for her son, a development that corresponded with the time when text activity on her phone ceased. Further research into the phone numbers related to the text messages confirmed the investigator's son had personal relationships with other teenagers connected to those numbers. The investigator stated she was unaware her son had been using her Department cell phone to send personal text messages to his friends and offered to reimburse the Department for the cost of the messages.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The investigator should reimburse the Department $132.51 for unauthorized personal text message charges.**

The employee reimbursed the Department.

## GENERAL INVESTIGATION 26

**ALLEGATION**  The husband of a Department regional administrator was hired to give a presentation to Department staff.

**INVESTIGATION**  The regional administrator's husband, who works for an agency that provides counseling services, was asked to present information to Department investigative, intact and placement staff during a meeting.  In an interview with the OIG, the Department public service administrator who organized the meeting stated the husband provided his services to the Department pro bono and was not paid for his time.

While conducting the investigation, the OIG learned the only private agency in the region with a Department contract to provide sex offender services had recently discontinued its program.  As a result, the Department was forced to obtain sex offender services from providers without Department contracts.  One of the alternative service providers identified was the counseling agency that employs the regional administrator's husband.  Payment to the service providers required approval from the regional administrator.  No such contract had yet been sought or approved.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**  **1.  If the Department determines that it is desirable to contract with the husband's agency for services, a written explanation should be provided to all staff in the region as to the basis for selecting the agency he works for, the fact that the regional administrator was not involved in any way in the selection; and going forward, the administrator should not be involved in any way in any discussions or decisions about the husband's agency.**

The Department agrees. Should the agency come under consideration for contracting, an Associate Deputy will make the decision. Should the agency be awarded a contract through the Department, the announcement of the new provider will be accompanied by a description of the basis for the selection of the agency.

**2. This report should be shared with the public service administrator for the region, and he should meet with supervisory staff in the region to discuss the ethical issues involved in the husband's presentation at the meeting.**

The report was shared.

**3. To the extent possible, Department sponsored education programs should include more than a single agency presenting on any topic in an effort to deliver a balanced format and avoid the appearance of impropriety.**

The Department agrees.  In an effort to maintain fairness and avoid the appearance of a conflict of interest, the Department will take steps to include more than a single agency when sponsoring topic training for staff. There are times, however, when a "single agency" is the only option available.  In these instances, the Department will address directly with staff issues related to conflict of interest.

# SYSTEMS INVESTIGATIONS

## USE OF POLYGRAPH EXAMINATIONS

**ISSUE**

While conducting a review of 135 bone fracture allegations, Office of the Inspector General staff noted several child protection investigations in which polygraph exams had been used, requested or otherwise figured in the determination to indicate or unfound the investigation. The Inspector General determined that further review was warranted because of the Department's longstanding practice against the use of polygraphs.

**DISCUSSION**

The Office of the Inspector General identified 23 investigations in which polygraph exams had been used or requested. The Office of the Inspector General reviewed the investigations and with pro bono assistance from the Edwin F. Mandel Legal Aid Clinic of the University of Chicago, School of Law, conducted an extensive literature review. The report noted that many of the investigations involved requests from consultants in difficult child protection investigations of possible abuse.

A polygraph exam uses an instrument to measure physiological responses (for example, increased heart rate, perspiration) that are associated with deceit. While law enforcement continues to use polygraph exams in investigations, they are generally not admissible in courts of law because, despite decades of testing and research, there is no existing scientific study that demonstrates the reliability of polygraph results.

Based on the questionable scientific basis of polygraph testing, the Department, in May 2000, issued a Policy Action Transmittal requesting that all Department and purchase of service agency child welfare staff refrain from requesting and using polygraph examinations when considering allegations of child abuse or neglect. The Action Transmittal was never incorporated into existing Rules and Procedures.

The OIG conducted a case and literature review which noted the dangers of over reliance on polygraph results. Since the physiological signs associated with deceit can also be generated with fear or anxiety, polygraph exams can result in false positive results, causing the investigator to improperly focus on an innocent person while failing to develop hard evidence through more reliable investigative techniques. The report noted a recent criminal investigation in which a false positive polygraph examination had caused the police to focus on a dead child's parent as the killer, while DNA evidence later exonerated the parent; subsequent investigation showed that evidence at the scene, identifying the actual killer, had been overlooked because of over reliance on the polygraph results. Also of concern is that negative polygraph results may cause the police and child protection to stop short of fully investigating an allegation of harm.

**OIG RECOMMENDATIONS/DEPARTMENT RESPONSES**

1. **The Department should articulate its position regarding the use of polygraph examinations and refusal to submit to polygraph testing in child protection investigations. The Department's position should consider prohibiting the use of polygraph results or refusals as determining factors in the evidence or rationale to indicate or unfound an investigation.**

   The Department agrees. There is an existing DCFS policy prohibiting the use of polygraphs in child protection investigations which comports with this recommendation. A memorandum reiterating this policy was issued. Department Procedure 300.60, *The Formal Investigative Process*, is also being revised to reflect this.

2. **The Department should determine whether to restrict its contractual agents from using polygraph information when rendering a medical opinion.**

   A representative of the Department met with the contractor to discuss the use of polygraphs. The Department representative will meet again with the contractor to share and discuss the findings from the Office of the Inspector General investigation.

3. **The Department should develop and incorporate into its trainings and rules and procedures information regarding polygraphs for child protection staff.**

   The Department agrees. Procedure 300, Reports of Child Abuse and Neglect, is being revised to incorporate procedures regarding polygraph examinations. The Department's Office of Training has begun training staff on the proper procedure and protocol on the use of polygraphs.

4. **This report should be reviewed in conjunction with the OIG General Investigation 10, see page 104.**

   The Department agrees.

## STATEWIDE MEDICAL EVALUATION RESPONSE: COMMUNITY EDUCATION AND TRAINING

**ISSUE**

A previous Office of the Inspector General investigation into the death of a three month old who suffered an acute head injury two months prior to his death revealed a lack of communication and coordination among hospital staff, the Department and law enforcement. Involved medical personnel identified the need for specialized training from child abuse medical experts in order to work more effectively with child protection and law enforcement. In an effort to better understand factors that contribute to an effective medical response within the child protection services system, the OIG conducted a literature review and a review of 135 child protection investigations of alleged bone fractures by abuse or neglect to children ages three and under and living in Cook County.

**DISCUSSION**

*Literature Review*

Child abuse is not always apparent, cases are not always clear cut and it is hard to distinguish non-accidental from accidental injury. There are a number of victims of child abuse missed because of a knowledge deficit and/or lack of skill in assessing abuse and/or fear of making a mistake or a false accusation of child abuse or neglect. For those children whose injuries are not recognized as abuse, there is a 35-50% risk of repeat injury and a 10% risk of death.[1]

Research suggests that a large number of medical professionals, notably those in emergency departments, are ill-prepared to screen, examine, assess and diagnose child abuse and neglect. Most general emergency departments and emergency medical service agencies do not require specialized pediatric training for their clinical staff.[2] A study by *Ravichandiran et al* (2010) found that presenting at a non-pediatric emergency department or a primary care setting was a risk factor for a missed diagnosis of child abuse.[3]

In an integrated literature review by *Piltzand and Wachtel* (2009),[4] factors that influenced identification of child abuse and neglect included a lack of education on signs and symptoms of abuse and techniques to solicit information. *Flaherty et al* (2000) concluded that education makes a difference in reporting and further stated that efforts must be made to ensure that all primary care providers receive continuing education about child abuse. To decrease the number of missed cases, clinicians need to be meticulous in their initial assessment of children, be alert to indicators of abusive trauma, assess risk factors, include abusive trauma as a differential diagnosis, and take steps to rule out or confirm abuse;[5] if available the child protection team should be consulted.

---

[1] Baldwin, K., Pandya, N.K., Wolfgruber, H., Drummond, D.S., & Hosalkar, H.S. (2010); Ravichandrian, N. et al. (2010)

[2] Krug, S. (2009). *Developing Pediatric Emergency Preparedness Performance Measures* [PowerPoint Slides]. Retrieved from www.aap.org/disasters/ppt/Krug_Performance-Measures.ppt

[3] An OIG review of 135 child protection investigations revealed that 25 or 18% of the children initially presented at one of 13 hospitals that do not have a pediatric emergency department or pediatric critical care center.

[4] Piltz, A. & Wachtel, T. (2009). Barriers that inhibit nurses reporting suspected cases of child abuse and neglect. *Australian Journal of Advanced Nursing*, 26(3), 93-100.

[5] Oral, R., Yagmur, R. Nashelsky, M., Turkmen, M., and Kirby, P. (2008). Fatal abuse head trauma cases: consequence of medical staff missing milder form of physical abuse. *Pediatric Emergency Medicine, 24(12),* 816-821.

*Pediatric Fractures*

Fractures account for the second most common presentation of abuse behind soft-tissue injuries and burns.[6] The incidence of abusive fractures is highest in infants and young children. Eighty percent (80%) of fractures due to child abuse occur in children under the age of 18 months[7] and fractures of the extremities are the most common skeletal injuries occurring in abused children.[8]

In contrast to other forms of abuse such as burns or cuts, fractures are not visible, making them difficult to assess especially among those who are non-verbal and non-ambulatory. For this reason a thorough history must be conducted with attention given to age of the child and the mechanism of injury while looking for indicators of abuse such as incompatible history or unreasonable delay in presentation. No single fracture type can distinguish those children who have been victims of child abuse from those of accidental trauma[9] yet certain types of fractures raise suspicion for abuse: metaphyseal “corner or bucket handle” lesions, posterior rib fractures, scapular fractures, spinous process fractures, and sternal fractures.[10]

One study found that a rib fracture in those less than three years of age had a positive predictive value of 95% for the diagnosis non-accidental trauma.[11] Acute rib fractures may go undetected on the initial x-ray hence follow-up x-rays within 2 weeks are recommended.

Spiral fractures used to be highly associated with abusive trauma due to the mechanism of twisting.[12] More recent research primarily focusing on a spiral fracture of the tibia (toddler fractures), has found this not to be the case if the child is ambulatory. *Mellick & Reesor* (1990) reviewed 10 reports of children with isolated spiral tibial fractures and found that only one was due to non-accidental trauma. No child was younger than 18 months besides the case found to be non-accidental. A retrospective study looking at 55 isolated spiral tibial fractures contributed none to abuse.[13] No patient was less than 12 months of age. This is not to say, that spiral fractures at any part of the body are not abusive and thus should be thoroughly evaluated, especially in those who are non-ambulatory.

*Findings from Bone Fracture Investigations*

Table 1 reflects a distribution of the 135 investigations by final findings within age groups. Children reported most frequently for bone fractures by abuse or neglect fall in the age category of 0 to 6 months. This finding is consistent with current literature.

---

[6]Nirav, P.K., Baldwin, K., Wolfgruber, H., Christian, C.W., Drummond, D.S., & Holsalkar, H.S. (2009). Child abuse and orthopaedic injury patterns: Analysis at a Level I Pediatric Trauma Center. *Journal of Pediatric Orthopaedics, 29(6),* 618-625.

[7] 85 of the 135 (63%) investigations reviewed by the OIG, involved children less than 18 months

[8]Taitz, J., Moran, K., & O’Meara, M. (2004). Long bone fractures in children under 3 years of age: Is abuse being missed in Emergency Department presentations? *Journal of Paediatrics and Child Health, 40(4),* 170-174.

[9] Nirav, P.K. et al. (2009); Pressel, D.M. (2000). Evaluation of Physical Abuse in Children. *American Family Physician, 61,* 3057-64.

[10]Pressel, D.M. (2000) - In our review there were no cases of scapular or sternal fractures.

[11] Barsness, K.A., Cha, E., Bensard, D.D. Calkins, C.M., Patrick, D.A., Karrer, F.M., & Strain, J.D. (2003). The Positive Predictive Value of Rib Fractures as an Indicator of Nonaccidental Trauma in Children*. The Journal of Trauma- Injury Infection & Critical Care, 54(6),* 1107-1110

[12]Mellick, L.B. & Reesor, K. (1990). Spiral Tibial Fractures of Children: A commonly accidental spiral long bone fracture. *American Journal of Emergency Medicine, 8(3),* 234-237.

Pierce, M.C., Bertocci, G.E., Vogeley, E., & Moreland, M.S. (2004). Evaluating long bone fractures in children: a biochemical approach with illustrative cases. *Child Abuse and Neglect, 28,* 505-524

[13] Mellick, L.B., Milker, L., & Egsieker, E. (1999). Childhood accidental spiral (CAST) fractures. *Pediatric Emergency Care, 15(5),* 307-309.

**Table 1:  Final Findings by Age Group**



The data extracted from the 135 investigations shows that a fracture of the rib is more common in non-accidental injury versus accidental. Twelve children from the indicated investigations sustained a rib fracture compared with four from unfounded investigations.[14] Rib fracture was the most common bone fracture in the indicated cases. This is consistent with the literature -- rib fractures (notably those located posterior and/or lateral) are more frequent in non-accidental injury versus accidental, are highly suspicious for abuse hence there is a strong association with non-accidental trauma, especially in those younger than 12 months.[15]

Of the 135 investigations reviewed, 24 children had spiral fractures (6 non accidental and 18 accidental). Four of the six non accidental cases occurred in children under 12 months of age and the number of humeral and femoral fractures were equal (3 and 3). In the accidental cases, one child was under 12 months and 5 of 18 children were under 18 months of age. The distribution of spiral fractures by accident was 4 humeral, 5 tibia/fibula, and 9 femur.

In three investigations hospital staff (nurse, physician) called the hotline because the fracture type was spiral.  During these investigations medical staff reported that either the parent's story appeared plausible or that the injury was not suspicious, but that the hotline call was made because of protocol.[16] The children were 21 months, 32 months, and 33 months of age; the spiral fracture was isolated to the tibia or femur, and all the children were capable of walking and running. A common mechanism of injury is a fall often involving a twisting or torque of the extremity. These investigations demonstrated a need for training as it appears that the reporters were generalizing and categorizing all spiral fractures as suspicious for abuse regardless of literature to the contrary.

The OIG found that 89% of the 135 children involved in bone fracture investigations were seen at a hospital with an emergency department approved for pediatrics.  Efforts must be made to ensure that all primary care providers receive continuing education about child abuse. Better trained professionals on the

---

[14] Two of the four children were born with weak and brittle bones, making them more susceptible to breaks.

[15] Barsness, K.A., (2003);  Bulloch, B., Schubert, C.J., Brophy, P.D., Johnson, N., Reed, M.H., & Shapiro, R.A. (2000). Cause and Clinical Characteristics of Rib Fractures in Infants. *Pediatrics, 105(4);*
Worlock, P., Stower, M., & Barbor, P. (1986). Patterns of fractures in accidental and non-accidental injury in children: a comparative study. *British Medical Journal, 293,* 100-102.

[16] A description of the protocol is not given in the investigations or whether the protocol is universal for the hospital or for the emergency room only.

front line will benefit the health care of the child, and provide better medical opinions to child protection investigators.

*Statewide Medical Evaluation Response*

In 1995, the Department of Children and Family Services (DCFS) began contracting with four regionally-based Medical Resource Providers to ensure that children who are reported for serious physical abuse and neglect have access to physicians and nurses with specialized training and expertise in the area of child maltreatment. The Medical Resource Providers[17] vary in size and composition (number of partner hospitals and physicians, advance practice nurse on staff), each are uniquely structured, and services are designed to meet the needs of the communities they serve. Each group provides services into two general categories: medical evaluations of suspicious physical injuries (including consults and second opinions), and community education and training.

*Medical Evaluations*

Child abuse expert physicians work in collaboration with law enforcement, DCFS child protection staff and treating hospital teams, to provide a comprehensive and timely written expert medical assessment, evaluation and diagnosis. Second opinion cases are generated by DCFS investigators seeking another medical opinion. Second opinions are generally sought when there are conflicting medical opinions or unclear statements made by general physicians, or to answer medical questions as related to investigations of Serious Harm injuries of children. The physician reviews medical records, photographs, imaging studies and DCFS investigative notes. Medical consultation is given on a case by case basis in writing or by phone consults.

*Education and Training*

In addition to the coordination and delivery of medical expert evaluations and consultations, the medical resource providers are required to offer trainings to DCFS, police investigators and the medical community on the medical diagnoses of child abuse, identification of common abuse indicators in physical abuse, sexual abuse and severe neglect, and the investigative process. The medical community includes area hospitals, physicians, advanced practice nurses, and other health care professionals. Medical resource doctors are also required to provide physician mentoring and consultation, training Fellows and Residents at their hospitals on assessing and diagnosing children for physical abuse and neglect. One program's trainings include information on methamphetamines and its effects on children and caregivers, and the methamphetamine protocol for children at risk of harm because of a methamphetamine manufacturing environment.

*Medical Resource Providers' Quarterly Reports*

A requirement of the Department's grant funding is the submission of quarterly reports of projected and actual services delivered, and progress towards meeting program objectives. In a review of the Providers' quarterly reports in FY 2009, the OIG found a lack of uniformity. Definitions or descriptions of similar service activities are varied, some Providers describe delivered services within a written narrative format, and some training events do not identify the audience.

All four Providers reported training to DCFS staff and/or new hires regarding their programs, the diagnosis of child abuse, and the referral process for medical evaluation and/or second opinions. A high priority is placed on education and training of students in affiliated medical schools. Particular emphasis is given to training physicians and other health care providers to guide them in the recognition and

[17] The Multidisciplinary Pediatric Education and Evaluation Consortium (MPEEC) serves the City of Chicago, Cook County and collar counties. The Medical Evaluation Response Initiative Team (MERIT) is based in Rockford and serves the northwest region of the state. The Pediatric Resource Center (PRN) is located in Peoria and serves the central region of the state. The Children's Medical Resource Network (CMRN) is based in Anna and serves the southernmost counties.

reporting of child maltreatment, and to enable them to gain skills in performing quality child abuse evaluations or identify situations to refer to specialized providers.

While it is important to continue child abuse training in schools of medicine, it is equally important to provide training to medical personnel in emergency department settings. The OIG found that a majority of the children involved in the 135 bone fracture investigations, 110 (81%) were seen at a hospital with an emergency department approved for pediatrics.[18]

## CONCLUSION

Hospital emergency departments (ED) are frequently the point of entry for abused children where medical personnel may provide the first opportunity for initiating protective services. There are factors inherent in the ED setting, including high patient volume, time constraints, a multitude of interruptions and distractions for clinicians, limited clinician feedback, and complexity of care, that all contribute to a practice environment that is prone to high stress and clinical error.[19] These and other factors, including lack of expertise and knowledge of current literature, are most likely to impede the assessment and management of child abuse which can be time consuming. The OIG found that several hotline calls were made by emergency department personnel for spiral fractures, not because there was a suspicion of abuse, but because of previously held knowledge that spiral fractures are highly suspicious for abuse.

Nationally, abuse is the fourth leading cause of death for children. Multidisciplinary investigation of serious physical injury is particularly important for children under 3 years old because they have the highest death rate from abuse and also because they often cannot communicate how they were injured. Now that child abuse pediatrics is recognized as a medical subspecialty by the American Board of Pediatrics,[20] as leaders, child abuse medical experts in Illinois can demonstrate the importance of recognizing child abuse by educating pediatric medical emergency and primary care communities, and giving doctors and nurses the skills necessary to provide medical opinions that ultimately strengthen the child protection investigations. The Department should encourage further establishment of child protective teams in hospitals outside the Chicago metropolitan area and the strengthening of existing child protection teams in hospitals.

Given existing relationships among medical resource partner hospitals, affiliated hospitals, and children's advocacy centers, it may be more cost efficient and prudent for the medical resource programs to target education and training to affiliated hospitals with emergency departments approved for pediatrics and working with Child Advocacy Centers in their respective regions.

---

[18] In 1984 the federal government implemented legislation to address the special needs of children in Emergency Medical Services (EMS) and allotted grants to state EMS systems. Many states, including Illinois, used the funding to establish and enhance the ability to serve children in times of emergency. The Illinois EMS Act provides definitions and requirements for hospital and medical center accreditation. The Illinois Emergency Medical Services for Children (EMSC) developed guidelines for standards of care, equipment, protocols, and education and training in medical facilities designed to ensure emergency care meets the needs of injured children. The EMSC established a three-level system for approved pediatric designation, starting with the highest level: Pediatric Critical Care Center [PCCC]; Emergency Department Approved for Pediatrics [EDAP]; Standby Emergency Department for Pediatrics [SEDP].

[19] Newton, A.S., Zou, B., Hamm, M.P., Curran, J., Gupta, S., Dumonceaux, C., & Lewis, M. Improving child protection in the emergency department: A systemic review of professional interventions for health care providers. *Academic Emergency Medicine, 17(2),* 117-125.

[20] Board certification was established and in January 2010 the American Board of Pediatrics, a certifying board of the American Board of Medical Specialties, issued the first certificates to nearly 200 physicians nationwide. Of the eight physicians certified in Illinois, seven doctors are Medical Resource Providers. Certification exams are administered biannually; the next exam is scheduled for November 2011.

**OIG RECOMMENDATIONS/DEPARTMENT RESPONSES**

1. **Physicians of Medical Resource Providers should target education and training efforts to best assist child protection. Each medical resource provider should identify and prioritize training of:**

   - **Medical personnel of emergency departments approved for pediatrics by the Illinois Emergency Medical Services for Children (EMSC)**
   - **Medical personnel at hospitals affiliated with partner hospitals of the medical resource providers**
   - **Medical personnel at hospitals that serve as a resource for Children's Advocacy Centers**

   The Department will discuss this with the Medical Resource Providers and develop a training schedule for 2011.

2. **The Department should follow up with development of a curriculum for emergency department medical professionals.**

   The curriculum has been developed.

3. **The Department should require and help to develop more uniform reporting by the contracted medical resource providers.**

   The Department will work with the Medical Resource Providers to develop a Reporting Protocol.

# PROJECTS AND INITIATIVES

## ERROR REDUCTION

In 2008, legislation was enacted requiring the Office of the Inspector General to remedy patterns of errors or problematic practices that compromise or threaten the safety of children as identified in Office of the Inspector General death and serious injuries investigations and by Child Death Review Teams. (20 ILCS 505/35.7)  When the Office of the Inspector General initiated its error reduction effort, one of the basic tenets of the trainings was to offer lessons learned from the Inspector General and Death Review Teams.

The initial set of error reduction training addressed child protection investigations focusing on bruising of infants and young children. After analyzing data from previous death and serious injury allegations, the Office of the Inspector General noted a correlation between subsequent death and serious injuries and prior unfounded cuts, welts and bruises allegations.  The review found that bruising on children even as young as a few months old was often minimized, leading to high risk of harm to young children. Investigators routinely did not communicate concerns to medical professionals. Many investigators were hesitant and often did not share relevant facts with medical professionals from whom they were seeking an opinion.  Medical personnel would not be informed when the parents had a history of domestic violence, mental illness or substance abuse. The first round of error reduction training emphasized that communication with concerned physicians had to include an exchange of relevant information. As of June 2010, all of Illinois' child protection investigators, supervisors and managers were trained on error reduction in investigations of cuts, welts, and bruises abuse allegations. Investigators were given pediatric literature on children's bruising and training on effective communications with medical professionals. Following the training, the Office of the Inspector General and DCFS' Office of Quality Assurance have conducted reviews of investigations closed six months after the trainings to measure child protection teams' application of the trainings to their investigations. Two sub-regions, both in the Southern Region, have received feedback from these reviews. The reviews were presented in a letter to be shared with all investigatory staff. (The review letters sent to the Southern Region child protection teams are included below.) The Cook County Regions are scheduled to receive their review letters in January 2011.

The second round of error reduction training addresses intact family services to families with parental mental illness. Almost twenty years have passed from that day on April 18, 1993, when three year-old Joseph Wallace was hanged by his severely mentally ill mother. His mother was later convicted of murder and killed herself while she was in prison.  Joseph's death was the first investigation by the DCFS' Office of the Inspector General.  In addition to this Office's investigation, others examined the child welfare system's management of the case. The former Chief Judge of the Cook County Circuit Court, the Honorable Comerford, commissioned a panel to investigate Joseph's death and then-Governor Edgar commissioned a special independent multidisciplinary Mental Health Task Force to examine DCFS practices in cases with severe parental mental illness.  Several facts about this troubling case should have remained in our institutional memories so as not to repeat them. Sadly, they did not. The recent death of a three year-old Southern Illinois child showed similar patterns of minimization and omission errors. In the *Wallace* case, the mother's extensive history of self destructive behaviors (recognized by the Family First Intact professionals prompting them to support a petition for Joseph's custody) was later minimized by the placement caseworker.  Even when critical troubling information came forward, the caseworker and a private agency worker chose not to share this information with the court.  An agreed order for return home went forward without the information being presented.  In the recent Southern Illinois case, multiple bruising of a three year-old was minimized in spite of an outcry from the child that the man

responsible for his previous injuries, who was under an order of protection prohibiting contact with the child, was again hurting him.  An agreed order for a return of the child to his mother went forward without the court and court personnel hearing about the child's recent outcry of abuse. The medical experts that rendered an opinion that the first set of a series of injuries on the child were accidental were never informed of the child's new injuries. The child was not seen again by the medical experts until after he suffered the lethal blows.

Informed decisions require institutional parties to share relevant information in the same spirit that created the nation's first Juvenile Court.  When it comes to the protection of children, professionals cannot operate within silos of knowledge without integrating and sharing relevant information from other sources.  The Error Reduction training for Intact Family workers draws on the professional expertise of Dr. Teresa Ostler, one of the members of the independent multidisciplinary teams that came about from the Joseph Wallace Task Force recommendations. In addition to an empirically based clinical practice guide on communication with mental health professionals on a parent's behaviors and their effect on the child's well-being, the training includes a roundtable discussion on how to screen cases for orders of protection with representatives from Juvenile Courts, DCFS Office of Legal Services, and DCFS Clinical Divisions. One hundred and three Cook County intact services workers, supervisors and managers were trained in FY 10. The state-wide training rollout is scheduled for 2011.

**OFFICE OF THE INSPECTOR GENERAL**
**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**2240 West Ogden Avenue**
**Chicago, IL 60612**
**(312) 433-3000**
**(312) 433-3032 FAX**

Dear [Regional Administrator and Manager],

To ascertain the field's application of the cuts, welts and bruises error reduction trainings, a random sample of 18 investigations (three from each team) pulled from the East St. Louis sub-region following the training was reviewed by staff of Quality Assurance and the Office of the Inspector General. The purpose of this letter is to share with you the salient results of the East St. Louis review. Another random sample will be selected and reviewed after the East St. Louis managers and supervisors have had an opportunity to review the field's learning application. To facilitate discussion the data report is attached and a discussion of the salient results is contained in this letter. Both may be fully shared with field staff. Dr. McCracken is available to assist the supervisors and managers in enhancing practice through facilitated discussions prior to the re-sampling.

We wish to thank the Southern Region staff who helped in the piloting of this training. Because the training was piloted in the Southern region, some of the procedures that were the result of the training were not institutionalized until after the region's training. (For example, the Referral Form for Medical Evaluation of a Physical Injury to a Child and child centered collateral contacts were in process at the time of the pilot.) Thus, other regions that demonstrate higher field applications had certain timing advantages not available to the Southern region.

**Documentation of Injuries**
In fourteen (78%) of the eighteen East St. Louis investigations photographs of the child's injuries were taken; the majority of the photos (13) were taken by the CPI. Of the fourteen investigations with photographs, only three cases also had completed body charts. Perhaps the CPIs believed that the photographs were sufficient documentation, negating the need to complete a body chart. Because photos do not always sufficiently depict injuries, a body chart should also be completed; additionally, procedures require a body chart be done in formal investigations for cuts, welts and bruises even when photographs have been taken (See Procedures 300 Appendix B). In a fairly good percentage of cases (14 of 18 - 78%) the injuries were described in case entries.

**Injuries Involving Children Three and Under**
The region's emergency room doctors called in six of the eighteen (33%) reports; twelve reports were not reported by medical personnel. The majority (nine) of the reports not called in by medical personnel involved children three years old and younger.

- There were three children reported that were under the age of one year: one infant was not seen by a doctor or nurse practitioner and two infants (67%) were evaluated by a doctor after the call.

- There were six children reported between the ages of one and three years old; four children (67%) were not seen by a doctor or nurse practitioner after the injury was reported.

The percentage of one to three year-olds not seen by doctors was the direct reverse (67%) of the percentage of children under one year that were seen by a medical professional. Since children who cruise often bruise, there could be a reasonable assumption that the older children did not need to be seen because of the increased likelihood of normal childhood injuries.

However, there are situations that challenge that assumption. An investigation involving a two-year-old child not seen by her pediatrician or family doctor raised questions for reconsideration of that decision. The report indicated that the two-year-old child suffered a bloody nose during an incident of parental domestic violence. The investigator noted there was no sign of external injury. Thus, the investigator perceived there was no medical referral needed. The nose is a highly vascular structure and bleeding usually results from direct trauma, including blows to the nose. Nosebleeds are often a frightening experience for a child. The bleeding usually stops spontaneously or with minimal pressure and usually requires no medical evaluation or therapy (Whaley & Wong, *Nursing Care of Infants and Children*, 1991). A two-year-old child's nosebleed could occur within the normal course of a child's day; in this case, the child suffered a trauma event involving domestic violence between the parents. A hypothetical question could be posed: Should the family's treating physician be given the opportunity to see the child and the parent?

A two-year-old, who inadvertently suffered a trauma during a domestic violence episode, should be seen by a medical professional for the following reasons: children who are exposed to domestic violence are at an increased risk for emotional and behavioral problems and adverse mental and physical health outcomes. Domestic violence has an adverse impact across a range of a child's functioning increasing the child's risk of child abuse. According to Fantuzzo and Mohr 40%-70% of children exposed to domestic violence are also victims of abuse (Fantuzzo, J.W. and Mohr, W.K. (1997). "Prevalence & Effects of Child Exposure to Domestic Violence in *The Future of Children*, 9(3)). If the child and parents see the family's physician about the domestic violence event, the family can receive anticipatory guidance from the health care professional on their approach to parenting (Hagen JF, Shaw JS, Duncan PM eds. 2008 *Bright Futures: Guidelines for Health Supervision of Infants, Children and Adolescents*, Third Edition. Elk Grove Village, Il: American Academy of Pediatrics). It might be helpful for your supervisors to know that since the training occurred in other regions of the state, it is more likely (75%) that the investigators will refer the younger children (1-3 years old) to the family's doctor. The doctor is afforded a baseline and hopefully will be more observant of the child at future visits.

A review of Inspector General Reports on young children who had been seriously harmed disclosed that many of the children had been the subject of prior child protection investigations where the investigators defined the child's bruises as minor not necessitating the involvement of the child or family's doctor. Paradoxically, not involving the child's doctor weakened a potential safety net for the child. The health care response to domestic violence is a blend of medical care, public health, and advocacy approaches (Chalk & King eds. *Violence In Families; Assessing Prevention and Treatment Programs,* National Academy Press, 1998). Healthcare professionals can ask questions in a sensitive manner about the safety of all family members and be in a position of support and guidance.

To assist investigators the Referral Form for Medical Evaluation of a Physical Injury to a Child (CANTS 65A) has been revised to include check boxes for domestic violence, substance abuse, and/or mental illness concerns. See attachments.

Dear Medical Provider:

As part of a pending investigation of child abuse or neglect conducted pursuant to the Department of Children and Family Services Act [20 ILCS 505/1 *et seq*.] and the Abused and Neglected Child Reporting Act [325 ILCS 5/1 *et seq*.], the parents of the above child have been directed to bring the child for evaluation and treatment of the following injuries:

In addition to the injury or injuries, there are concerns regarding:

☐ Domestic Violence ☐ Substance Abuse ☐ Mental Illness

**Communication with Medical Professionals**

The training emphasized the importance of an exchange of information between doctors and medical professionals and child protection investigators as part of determining if an injury is abusive or accidental. The Referral for Medical Evaluation for Physical Injury form is meant as a stepping stone for that exchange of information by assuring that DCFS is the provider of the initial information presented to doctors as opposed to parents or caretakers. Investigators were advised to still have a conversation with the medical professional. In keeping with the preponderance of the evidence standard for child protection investigations, investigators were encouraged to ask doctors the question in terms of whether the injury was "more likely" abuse. In order to answer that question the medical professional needs information from the investigator as to the explanations and timelines provided to them, their observations and conclusions, including prior history, scene investigation information and witness accounts.

In ten (56%) of eighteen investigations there was consultation between the investigator and the doctor. In 40% of those cases the CPI documented sharing the explanation given to them with the doctor. Only two investigators (20%) documented sharing their observations of the scene with the doctor. In six of the ten investigations the CPI identified problems with parental mental illness, substance abuse or domestic violence but did not document sharing that information with the doctor. We wish to emphasize that at the point of time that the East St. Louis investigators were trained the CANTS 65A Medical Referral Form had not yet been institutionalized. Because each of these children lost their physician's concerned eyes over their future well-being, the lack of involving the family's physician is concerning. This failure should be addressed by managers and supervisors.

In those cases when the investigator did talk to the doctor and exchanged information with the doctor, 50% of the doctors stated their opinions about the injury/ies that the child suffered the injury "more likely" as a result of abuse or an accident. In addition, 40% of the doctors stated they had other concerns about family members. Other regions had a higher percentage of doctors rendering opinions in the "more likely" term (60-75%). The regions with higher percentages of doctors describing the injuries as more likely abuse or accident shared several variables: the medical referral forms were used more often and the investigators exchanged more information with the doctors. In one East St. Louis case the investigator gave the doctor the family's explanation for the injury on a seven month old infant, but did not ask the doctor any questions. Investigators may need more prompting or practice role plays to facilitate more exchanging of information with doctors.

In fifteen investigations (88%) the child victim was not seen by their primary care physicians for the injury. In five of those fifteen cases (33%) the CPI contacted the physician's office and four

CPI's documented sharing the reason for the DCFS investigation.  Of the ten remaining cases seven investigators documented attempting to contact the doctor but not reaching them. Managers may need to help facilitate communication and linkage with medical practices that seem to not respond to individual investigators requests.  Three investigators did not document any effort to contact the doctor.

Ten of the eighteen investigations had medical records related to the injury. Encouragingly, in eight (80%) of those investigations CPI's requested and obtained the medical records.  Four investigations contained documentation that the investigator read the records.  Two of the investigations had information that contradicted other information obtained during the investigation and in both cases the investigator resolved the contradiction. The training emphasized the importance of obtaining and reviewing the medical records.

**Medical, Mental Health, Substance Abuse and Domestic Violence**
Seventy-two percent of the East St. Louis investigators completed the medical and mental health section of the Adult Substance Abuse Screen. This was a fair outcome for using the revised Adult Substance Abuse Screen that contained a medical and mental health section especially since the revised form was introduced shortly before the training. In the East St. Louis sub-region four (22%) of the investigations involved parents with mental health problems.  One mother was diagnosed with an anxiety disorder, one father had bipolar disorder and two investigations mentioned mental illness but not the specific diagnosis. Only one case note documented information about a parent's mental illness. By gathering mental health early in the investigation investigators have time to obtain records which may assist further in making a safety determination.  There were no children noted as having a mental health diagnosis.  Other sub-regions' samples reflected older children who are alleged victims of bruising having concurrent mental health diagnoses.  Thirty-three percent of the East St. Louis investigations involved parental substance abuse. Twenty-eight percent of cases involved domestic violence. Three of the investigations had the combination of mental illness, substance abuse and domestic violence. One investigation involved mental illness and substance abuse, five other investigations involved substance abuse, mental illness or domestic violence only.  Investigations involving a combination of these factors should be viewed as potentially high-risk cases warranting careful assessment.

Police reports existed in 11 of the investigations, six investigations documented requesting reports and reports were contained in five of the investigative files.  In four of those five cases the investigator integrated the information from the police reports into their assessment.

**Child Centered Safety Planning and Father Involvement**
Most children older than four years have the insight and capacity to identify persons they are special to and can trust. Asking a child to identify their collaterals validates their insight and belief about who has their best interest at heart. Additionally, a child selected collateral can be a good candidate to monitor a safety plan, provide mentorship, keep eyes and ears on the child, and if needed, be a placement option. Children younger than three years cannot reasonably be expected to identify their collateral. In those instances the identification of child centered collaterals should be sought from caregivers and institutional collaterals.

In 88% (14) of East St. Louis investigations, investigators identified at least one child centered collateral; however, none of those collaterals were identified by a child. Investigators interviewed 93% (13) of the identified child centered collaterals. At least three-fourths of the collaterals were family members or family friends; the remainder were institutional collaterals, such as teachers and social service providers.

The East St. Louis sample had only three children older than four years-old; the remaining fifteen children (89%) were younger than four. Given the high percentage of children four years and younger it stands to reason that few of those children were asked to identify their collaterals. Family members (65%) constituted the majority of identified child centered collaterals.

In the absence of a child identified collateral the value in identifying institutional collaterals cannot be overstated. Teachers and daycare providers play a strong role in ensuring children's safety and well being and are in key positions to recognize indicators of child maltreatment; they are often the first professional to notice and report if one of their children appears to be abused or neglected.

Safety plans were initiated in 25% (4) of the region's investigations. Investigators involved child centered collaterals in all four of the safety plans. In those investigations without a safety plan (12), investigators asked six of the identified collaterals to keep eyes/ears on the child. In those investigations with and without safety plans where collaterals were asked to keep eyes/ears on the child (10), eight collaterals were given explanations for the investigators' concerns.

*Involving Fathers with Safety Planning*
A significant body of scientific research clearly documents the vital role a father plays in the formative years of a child's life (Yeung & Duncan, 2000; Harris & Marmer, 1996). The presence of a father has a positive impact in many ways, as children with involved fathers have fewer behavioral problems, obtain better academic results, and are economically better off. The consistent and frequent presence of a father makes a powerful difference in the development and socialization of a child. Children who grow up with fathers who stay involved in their lives enjoy all kinds of benefits:

- better school performance
- less trouble with the law
- better jobs and careers
- better relationships with others
- higher self-esteem

A father must not only see spending time with his children as important, he must also see his role as critical to their well-being. While men easily see the value in pursuing education to help them in their vocations, rarely do they see the same value in improving their skills at fathering. Even if more men did value such skills, few programs are aimed at educating fathers in their family role, and those that do exist are not very successful.

In 50% of the families in the East St. Louis population, the father was the alleged perpetrator (N= 3 not living in the home; N=6 living in the home). For those families in which the father was not the alleged perpetrator, 44% (N=8) of the families had fathers not living in the home as well as not being the alleged perpetrator. Out of these eight fathers not living in the home, only three fathers were identified by the investigators. However, all three identified fathers were subsequently interviewed by the investigator. In all five cases where the father was not identified, the CPI did not ask for any information related to biological fathers. In only six percent of the families in the East St. Louis population, the biological fathers were living in the home.

Most men and women are responsible and loving people who are capable of nurturing children, and most men share the desire to rear their children in a responsible way. Perhaps for many it isn't

a matter of not wanting to do the job but of not knowing *how* to do it. Education, in fact, may be the simple key to successful fathering. As such, it is imperative that our investigators seek out fathers when they are not living in the home as well as reach out to those living in the homes in hopes to educate them that loving involvement requires more than words. A father plugged in to the daily operation of his family can more clearly understand his children's needs and behave responsibly.

**Conclusion**

As noted earlier another sample will be reviewed by Quality Assurance in the near future. There is some concern that in only 67% of the investigations did the investigator establish who lives in the home. It is not clear if that is an issue of not asking the question or of a lack of good documentation. Recognizing that child welfare is an evolving discipline, it is our hope that the information gleaned in the assessment of these investigations can be used in the education of administration and the field to facilitate change. Through dialogue practice wisdom grows. Thank you for your cooperation and we look forward to our discussion.

Respectfully,

Denise Kane

Denise Kane, Ph. D.
Inspector General

and

Error Reduction Staff

cc: George Vennikandam
Arlene Grant-Brown

**OFFICE OF THE INSPECTOR GENERAL**
**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**2240 West Ogden Avenue**
**Chicago, IL 60612**
**(312) 433-3000**
**(312) 433-3032 FAX**

Dear [Regional Administrator and Manager],

To ascertain the field's application of the cuts, welts and bruises error reduction trainings, a random sample of 27 investigations pulled from the Marion sub-region following the training were reviewed by staff of Quality Assurance and the Office of the Inspector General. The purpose of this letter is to share with you salient results of the Marion review. Another random sample will be selected and reviewed after the Marion managers and supervisors have had an opportunity to review the field's learning application to facilitate discussion with their staff.  Both may be fully shared with field staff. Dr. McCracken is available to assist the Southern Region supervisors and managers in enhancing practice through facilitated discussions prior to a re-sampling.   The data report is attached and a discussion of the salient results is contained in this letter.

We wish to thank the Southern Region staff who helped in the piloting of this training. Because the training was piloted in the Southern region, some of the procedures that were instituted as a result of the training were not institutionalized until after the region's training. (For example, the Referral Form for Medical Evaluation of a Physical Injury of a Child and child centered collateral contacts were in process at the time of the pilot.) Thus, other regions that demonstrate higher field applications may have had certain timing advantages not available to the Southern region.

**Documentation of Injuries**
Twenty-seven investigations were reviewed in Marion (3 from each team).  In 67% (18) of the Marion investigations, the CPI completed a body chart, in the 33% where a chart had not been completed: 44% contained photographs while 56% had neither a chart nor photographs.  Because photos do not always sufficiently depict injuries, a body chart should also be completed; additionally, procedures require a body chart be done in formal investigations for cuts, welts and bruises even when photographs have been taken (See Procedures 300 Appendix B). Encouragingly, 85% (23) of the investigations had the injuries described in a case entry.

**Injuries of Children Six Years Old and Younger**
Only 11% (3) of the Marion region's reports were called in by medical personnel; emergency room doctors called in on 2/3 of these reports. The majority of the reports (16) not called in by medical personnel involved children younger than six years old and most of these children were never seen by a doctor.

- Only one child under the age of one was included in the sample. This child whose report was not called in by medical personnel was seen by a medical doctor. The sample is too small in this age range to generalize but it appeared that caution was heeded with bruising in a young infant

- There were six children between the ages of one and three years old reported; they were evenly divided with 50% of these children seen by a doctor and 50% not seen.

- Nine children between the ages of four and six years-old were injured; 89% of these children were not seen by doctors.

Since children who cruise often bruise, there could be a reasonable assumption that older children may not need to be seen because of the increased likelihood of normal childhood injuries. However, several of the narratives in the investigatory notes suggest otherwise. For example, a report indicated that a four-year-old child suffered a black eye when he was accidentally struck by a full can of beer during an incident of domestic violence between his mother and her paramour. The investigator determined the injury was minor. Thus, the investigator perceived there was no medical referral needed. According to Whaley and Wong to avoid possible complications from an eye injury the emergency treatment of a child's black eye (hematoma) includes using a flashlight to check for gross hyphema (Hemorrhage into anterior chamber: visible fluid meniscus across iris; more easily seen in light-colored than brown eyed) (Whaley & Wong, *Nursing Care of Infants and Children*, 1991). A four-year-old's black eye caused by an acute trauma could be within the normal course of events; but in this case, the trauma event involved domestic violence between the mother and her boyfriend. A hypothetical question could be posed: Should the family's treating physician be given the opportunity to see the child and the mother?

A four-year-old, hit in the face by a flying object during a domestic violence episode, should be seen by a medical professional for the following reasons: children who are exposed to domestic violence are at an increased risk for emotional and behavioral problems and adverse mental and physical health outcomes. Domestic violence has an adverse impact across a range of a child's functioning increasing the child's risk of child abuse. According to Fantuzzo and Mohr 40-70% of children exposed to domestic violence are also victims of abuse (Fantuzzo, J.W. and Mohr, W.K. 1997). "Prevalence & Effects of Child Exposure to Domestic Violence in *The Future of Children*, 9(3)). If the child and parents see the family's physician about the domestic violence event, the family can receive anticipatory guidance from the health care professional to come to an agreement on their approach to parenting (Hagen JF, Shaw JS, Duncan PM eds. 2008 *Bright Futures: Guidelines for Health Supervision of Infants, Children and Adolescents*, Third Edition. Elk Grove Village, IL: American Academy of Pediatrics). It might be helpful for your supervisors to know that since the training in the other regions of the state, it is more likely (75%) that the investigators will refer the younger children (1-3 years old) to the family's doctor. The practice of involving the family's doctor affords the physician a baseline and hopefully the physician can be more observant of the child in the future. In another Marion investigation a six year old boy had a large red mark on his back that he reported was from his father hitting him with his hand. The child was not seen by the doctor because the injury observed was considered superficial or minor. Again the opportunity for anticipatory guidance to be given was lost.

A review of Inspector General Reports on young children who had been seriously harmed identified a pattern that many of these children had been the subject of prior child protection investigations where investigators defined the child's bruises as minor, not necessitating the involvement of the child's doctor. Paradoxically, not involving the child's doctor weakened a potential safety net for the child. The current health care response to domestic violence is a blend of medical care, public health, and advocacy approaches (Chalk & King eds. *Violence In Families; Assessing Prevention and Treatment Programs,* National Academy Press, 1998). Healthcare professionals can ask questions in a sensitive manner about the safety of all family members and be in a position of support and guidance.

To assist investigators the Referral Form for Medical Evaluation (CANTS 65A) has been revised to include check boxes for domestic violence, substance abuse, and/or mental illness concerns:

Dear Medical Provider:

As part of a pending investigation of child abuse or neglect conducted pursuant to the Department of Children and Family Services Act [20 ILCS 505/1 *et seq.*] and the Abused and Neglected Child Reporting Act [325 ILCS 5/1 *et seq.*], the parents of the above child have been directed to bring the child for evaluation and treatment of the following injuries:

In addition to the injury or injuries, there are concerns regarding:

☐ Domestic Violence        ☐ Substance Abuse        ☐ Mental Illness

**Communication with Medical Professionals**

The training emphasized the importance of an exchange of information between doctors, medical professionals and child protection investigators as part of determining if an injury is abusive or accidental. The Referral for Medical Evaluation of Physical Injury form is meant as a stepping stone for that exchange of information by assuring that DCFS is the provider of the initial information presented to doctors as opposed to parents or caretakers. Investigators were advised to still have a conversation with the medical professional. In keeping with the preponderance of the evidence standard for child protection investigations, investigators were encouraged to ask doctors the question in terms of whether the injury was "more likely" abuse. In order to answer that question the medical professional needs information from the investigator as to the explanations and timelines provided to them, their observations and conclusions, including prior history, scene investigation information and witness accounts.

In 85% of investigations (23/27) reviewed there was no exchange of information between the doctor and the investigator. While we wish to emphasize that at the time the Marion investigators were trained the CANTS 65A Medical Referral Form had not yet been institutionalized, because each of these children lost their physician's concerned eyes over their future well-being the lack of involving the family's physician is concerning. In an investigation a five year old had extensive bruising to her buttocks and was sent home from school sick. The father's girlfriend took the child to see the doctor but the doctor only saw the child from the waist up and did not see the bruises.

Three investigators mentioned using the Referral Form for Medical Evaluation though none of those forms were contained in the investigation. Other sub regions had a higher percentage of doctors rendering opinions in the "more likely" term (60-75%). The sub regions with higher percentages of doctors describing the injuries as "more likely" abuse or accident shared several variables: the medical referral forms were used more often and the investigators exchanged more information with the doctors. In Marion, four investigations (15%) had documented conversations between the doctor and the investigator though others could have had conversations they did not document. Two of the investigators documented asking the doctor if it was more likely that the injury was from abuse. Investigators may need more prompting or practice role plays to facilitate more exchanging of information with doctors.

In the four cases the investigators did not inform the doctor about the family's prior involvement with Child Protection. All four cases documented sharing the injuries the CPI found on the child, but little additional information was documented as being shared such as observations of the scene investigation and a prior history of abuse or neglect. In three of the four cases where the investigator documented a conversation with the doctor the CPI did not document sharing

information about domestic violence, possible drug use or mental illness issues that had been identified during the investigation. This failure should be addressed by managers and supervisors.

Seventeen children (77%) did not see their primary care physician during the course of the investigation. In five of those 17 investigations (29%) the CPI spoke with staff at the primary care physician's office. In three of those five cases the CPI documented explaining the reasons DCFS was investigating. Of the remaining 12 investigations 11 CPI's did not document any attempt to contact the physician's office.

Six of 27 investigations (22%) contained medical records in the investigative files. Only three of those cases documented asking for the records and there was no documentation regarding the content of the medical records. The training emphasized the importance of obtaining and reviewing the medical records. Having these records in the case file enhances the investigator's documentation and provides support for the finding in an appeal.

**Medical, Mental Health, Substance Abuse and Domestic Violence**
Eighty-five percent of the Marion investigators completed the medical and mental health section of the adult substance abuse screen. This was an impressive outcome for using the revised Adult Substance Abuse Screen that contained a medical and mental health section especially considering the revised form was introduced at the training. In those cases where the investigator completed the medical and mental health sections 26% of the parents had mental health diagnoses, including bi-polar, schizophrenia and major depression. Thirty-three percent of the cases involved mental illness of a child, most commonly ADHD. In four investigations both the parent and the child had mental illness diagnoses, and one investigation had mental illness of parent and child and parental substance abuse and domestic violence. Four of the investigations had substance abuse and domestic violence. Marion investigators made competent inquires into these areas of concern. The findings from this sample suggest investigators may need timely clinical consultations and resources in these high risk situations.

Police reports existed in 13 of the investigations and 11 of those 13 contained a copy of the police reports. In only five of those 11 investigations was the information from the police report integrated into the assessment. In one investigation both parents had a history of police involvement because of substance abuse and domestic violence but this was not considered in the investigation. In another home where the police and DCFS were involved because of domestic violence prior convictions of assault were not considered.

**Child Centered Safety Planning and Father Involvement**
Most children older than four years have the insight and capacity to identify persons they are special to and can trust. Asking a child to identify their collaterals validates their insight and belief about who has their best interest at heart. Additionally, a child selected collateral can be a good candidate to monitor a safety plan, provide mentorship, keep eyes and ears on the child, and if needed, be a placement option. Children younger than three years cannot reasonably be expected to identify their collateral. In those instances the identification of child centered collaterals should be sought from caregivers and institutional collaterals.

In 96% (25) of the Marion region investigations, investigators identified at least one child centered collateral; however, only three of those collaterals were identified by a child. Investigators interviewed twenty-four of the identified child centered collaterals. Almost two-thirds of the collaterals were institutional collaterals, such as teachers, daycare providers, and nurses. The remaining collaterals included family members and neighbors, a foster grandparent, and a sibling.

The Marion sample included twenty children four years and older; it is reasonable to expect investigators to ask children older than four to identify a collateral.  It is concerning that only three of the twenty children (12%) were asked to identify their collateral. This finding may be the result of faulty documentation or the reluctance of investigators to ask older children to identify suitable collaterals.  It should be reiterated that older children can readily identify people they feel connected to and who provide consistent support and guidance.

In the absence of a child identified collateral the value in identifying institutional collaterals cannot be overstated. Teachers and daycare providers play a strong role in ensuring children's safety and well being. Institutional collaterals are in key positions to recognize indicators of child maltreatment, and are often the first professional to notice and report when one of their children appears to be abused or neglected. To the Marion region's credit, 52% of the child centered collaterals were teachers and daycare providers.

One safety plan was initiated in the sample of investigations reviewed for Marion; the child centered collateral was involved in that safety plan. In those investigations without a safety plan (25), investigators asked ten of the identified collaterals to keep eyes/ears on the child. In those investigations with and without safety plans where collaterals were asked to keep their eyes/ears on the child (11), all eleven collaterals were given explanations for the investigator's concerns.

*Involving Fathers with Safety Planning*
A significant body of scientific research clearly documents the vital role a father plays in the formative years of a child's life (Yeung & Duncan, 2000; Harris & Marmer, 1996).  The presence of a father has a positive impact in many ways, as children with involved fathers have fewer behavioral problems, obtain better academic results, and are economically better off.   The consistent and frequent presence of a father makes a powerful difference in the development and socialization of a child.  Children who grow up with fathers who stay involved in their lives enjoy all kinds of benefits:

- better school performance
- less trouble with the law
- better jobs and careers
- better relationships with others
- higher self-esteem

A father must not only see spending time with his children as important, he must also see his role as critical to their well-being. While men easily see the value in pursuing education to help them in their vocations, rarely do they see the same value in improving their skills at fathering. Even if more men did value such skills, few programs are aimed at educating fathers in their family role, and those that do exist are not very successful.

Of the 27 families in the Marion sample, 11 families had the biological father living in the home. In 22% of the families in the Marion population, the father was the alleged perpetrator (N=2 not living in the home; N=4 living in the home).  For those families in which the father was not the alleged perpetrator, 67% (N=18) had fathers not living in the home.  Out of the18 fathers not living in the home, 10 fathers were identified by the investigators and 70% of the identified fathers were interviewed by the investigator.  In seven of the cases where the father was not identified, the CPI did not ask for any information related to biological fathers and in one case the mother/caregiver refused to give the investigator any information.

Most men and women are responsible and loving people who are capable of nurturing children, and most men share the desire to rear their children in a responsible way. Perhaps for many it isn't a matter of not wanting to do the job but of not knowing *how* to do it. Education, in fact, may be the simple key to successful fathering. As such, it is imperative that our investigators seek out fathers when they are not living in the home as well as reach out to those living in the homes in hopes to educate them that loving involvement requires more than words. A father plugged in to the daily operation of his family can more clearly understand his children's needs and behave responsibly.

**Conclusion**

As noted earlier another sample will be reviewed by Quality Assurance in the near future. In general we found that when investigators asked for information they received some reply. In only one case did an investigator document a physician not returning their call and in only one case did a mother refuse to provide information about a father. Recognizing that child welfare is an evolving discipline, it is our hope that the information gleaned in the assessment of these investigations can be used in education of administration and the field and to facilitate change. Through dialogue practice wisdom grows. Thank you for your cooperation and we look forward to our discussion.

Respectfully,

Denise Kane

Denise Kane, Ph. D.
Inspector General

and

Error Reduction Staff

CC: George Vennikandam
Arlene Grant-Brown

# ETHICS

**Ethics Officer**

The Inspector General operates in a dual role as Ethics Officer for the Department of Children and Family Services under the State Officials and Employees Ethics Act 5 ILCS 430/20-23. One important role of the Ethics Officer is to provide guidance to Department officers and employees in interpreting the Act, the Child Welfare Code of Ethics and Rule 437 (Conflicts of Interest). The Child Welfare Ethics Advisory Board was formed in March 1996 as an advisory body to the DCFS Inspector General/Ethics Officer. Its members are an interdisciplinary group appointed by the Inspector General.[1] Though the Board did not meet formally this year, individual Board members provided consultation to the Inspector General as needed.

A member of the Ethics staff also sits on the Conflicts of Interest Committee, which responds to Department employee inquiries that fall under the purview of Rule 437. In addition, the Ethics Officer monitors the annual Ethics Training and reviews the Statements of Economic Interest submitted by specified Department employees annually in May. The Ethics Officer is also responsible for accepting statements of *ex parte* communications made during any rulemaking process and forwarding the statements to the Executive Ethics Commission.

**Child Welfare Ethics Advisory Board**

- The Ethics Officer consulted with the Chair of the Child Welfare Ethics Advisory Board about a re-opened child protection investigation that the Office of the Inspector General was also investigating. After the child protection investigation was completed, additional information was learned that became the basis for the Inspector General making a report to the Hotline, as a mandated reporter, because of the risk of harm posed to other children in the household. The ethical consultation centered around the Inspector General continuing an investigation in which her office was required to call the Child Abuse and Neglect Hotline because of facts learned during the course of the investigation.

- The Ethics Officer also consulted with the Chair of the Advisory Board and an Advisory Board member regarding a private agency case manager who wanted to foster an infant whose mother had previously been on her caseload. The 19 year-old biological mother of the foster child had been a DCFS ward whose case manager was the same person now making this inquiry. The teen mother's case had been closed approximately two years earlier when the teenager was returned to the home of her biological father. The private agency case manger and the teen mother had maintained contact. The case manager acted as a support for the mother who continued to deal with difficult issues in her life, such as mental health issues and domestic violence. Upon the birth of her daughter, the former ward named her former case manager as the baby's godparent. The baby was taken into DCFS custody at birth due to the hospital's concerns about the mother's ability to parent. Both the mother

[1] During this fiscal year, the members of the Child Welfare Ethics Advisory Board were:
Michael Bennett, Ph. D., Director, Egan Urban Center and Professor of Sociology, DePaul University
Jennifer Clark, Psy. D., Director, Child Protection Clinical, Cook County Juvenile Court Clinic
Michael Davis, Ph.D., Senior Fellow and Professor of Philosophy, Illinois Institute of Technology's Center for the Study of Ethics in the Professions
Arman Gonzales, M.D., pediatrician
James C. Jones, President and CEO, ChildServ
Jimmy Lago, M.S.W., M.B.A., Chancellor, Archdiocese of Chicago
David Ozar, Ph.D., Professor of Philosophy, Loyola University Chicago
David Schwartz, M.D., John H. Stroger Jr. Hospital of Cook County
Ada Skyles, Ph.D., J.D., Associate Director and Resource Fellow, Chapin Hall Center for Children, University of Chicago (Chair)

and the former case manager expressed interest in having the baby placed in foster care with the case manager. The Advisory Board Chair and another Board member reviewed the facts with the Ethics Officer to consider the various competing interests, including the short and long term interests of the baby, the value in client self-determination and the ethical issues that can arise when a case manager maintains a relationship with a ward after case closing. Given that the private agency servicing the baby's case had an internal ethics committee, after thoroughly reviewing the facts, the Ethics Officer referred the inquiry back to the agency's committee providing the Executive Director with a synopsis of the relevant facts and concerns about the case as well as literature about the ethical decision-making process and how to consider multiple relationships in the social work context.

- The DCFS Department of Legal Services requested that the Ethics Officer determine whether a conflict existed with respect to the concurrent roles of the DCFS Medical Director, who is also the President/CEO of a children's hospital, and any current or pending contracts between the Department and that hospital. The Ethics Officer reviewed all contracts and program plans and noted that the hospital had instituted walls and limitations, which effectively addressed potential and actual conflict issues that permitted the Medical Director to exercise independent judgment and perform her duties objectively.

- The Ethics Officer consulted with the Director of the American Bar Association's Center on Children and the Law concerning Illinois' Code of Ethics for Child Welfare Professionals, the unique relationship between child welfare workers and the courts, and the responsibilities that child welfare professionals hold to be proactive in keeping the court informed of developments in a case. The Ethics Officer will collaborate with the American Bar Association to develop regional ethics discussions to address case managers' responsibilities to the court.

**Inquiries from the Field**

The Ethics Officer fielded numerous inquiries from Department and private agency workers, as well as from various Department advisory councils, regarding fundraising activities and donations to DCFS clients. The Ethics Office worked with the Department to develop a solicitation policy that clarifies that:

> Employees *shall* never conduct business for profit with, or accept or solicit anything from clients, clients' close associates or relatives or from anyone who has or expects to have business dealings with the Department or entities over whom they have decision-making authority, except as otherwise provided in the State Officials and Employees Ethics Act.
>
> Employees shall not conduct any outside business for profit on state property or during work time. For example, employees are prohibited from canvassing for sales, taking orders or selling any article (including but not limited to food, kitchenware or other home furnishings, paper products, or cosmetic products) in person or by distributing or posting literature, advertising matter or any other graphic matter in or on state-owned or occupied property or while otherwise engaged in state business.
>
> Employees may solicit donations from or sell merchandise to fellow employees for recognized charitable organizations and local fundraising efforts during break times and only in break rooms. However, supervisors should never solicit such donations or purchases from their subordinates. *DCFS Employee Handbook 3.1.2*

**Rule Making**

The Ethics Officer received and referred nine reports of *ex parte* communications in rulemaking to the Executive Ethics Commission, in accordance with the *State Officials and Employee Ethics Act* 5 ILCS 430.

An *ex parte* communication in rulemaking is "any written or oral communication by any person who imparts or requests material information or makes a material argument regarding potential action concerning regulatory, quasi-adjudicatory, investment, or licensing matters pending before or under consideration by the agency." 5 ILCS 430/5-50

To assist Department employees in complying with the requirement to report all *ex parte* communications to the Ethics Officer, the Ethics Officer developed a revised reporting form.

**Ethics Testing**

The Office of the Inspector General Ethics staff also coordinated Department compliance with the statewide annual Ethics Training mandated by the Illinois *State Officials and Employees Ethics Act* 5 ILCS 430. In 2010, the Office ensured that 2,917 Department employees received their annual training. In addition to Department employees, 395 Department Board and Commission members were also required to complete training. Three persons failed to complete Ethics Training as required and were referred for discipline.

**Statements of Economic Interest Reviews**

The Office of the Inspector General reviewed 760 Statements of Economic Interest that are required to be filed by persons in the Department who:

> (1) are, or function as, the head of a department, commission, board, division, bureau, authority or other administrative unit within the government of this State, or who exercise similar authority within the government of this State;
>
> (2) have direct supervisory authority over, or direct responsibility for the formulation, negotiation, issuance or execution of contracts entered into by the State in the amount of $5,000 or more;
>
> (3) have authority for the issuance or promulgation of rules and regulations within areas under the authority of the State;
>
> (4) have authority for the approval of professional licenses;
>
> (5) have responsibility with respect to the financial inspection of regulated nongovernmental entities;
>
> (6) adjudicate, arbitrate, or decide any judicial or administrative proceeding, or review the adjudication, arbitration or decision of any judicial or administrative proceeding within the authority of the State;
>
> (7) have supervisory responsibility for 20 or more employees of the State;
>
> (8) negotiate, assign, authorize, or grant naming rights or sponsorship rights regarding any property or asset of the State, whether real, personal, tangible, or intangible; or

(9) have responsibility with respect to the procurement of goods or services.

5 ILCS 420/Art. 4A-101

The Office of the Inspector General reviewed 760 Statements of Economic Interest.  The review by the Inspector General identifies potential conflicts of interest and ensures that supervisors are notified and that employees understand the boundaries and ethical requirements in conjunction with the disclosed interests.  In furtherance of this goal, the Office of the Inspector General issued 23 letters to staff and their supervisors detailing ethical obligations specific to the disclosed interests.  Seven persons filed their Statements of Economic Interest late and were fined by the Office of the Secretary of State.

## PREGNANT AND PARENTING TEENS

During FY 2010, Dr. Ron Rooney, author of the book *Strategies for Work with Involuntary Clients*, provided off-site consultations and training to pregnant and parenting teen ward case workers who represented approximately seventy-five wards and their children. The training took place through the use of web-cams and included role play demonstrations.  Dr. Rooney conducted 43 one-hour video consultations with two TPSN regional service providers, Lakeside and UCAN Partners in Parenting, as well as providing two days of in-person training.

In order to better understand the needs of this special population, the Office of the Inspector General designed and conducted a comprehensive survey and interviewed all downstate case managers who are currently working with a pregnant and/or parenting ward. The survey focused on influential factors, such as maternal mental health, current educational attainment, and paternal involvement. Additionally, the Office of the Inspector General collected information on early child development of parenting wards' children.

In an effort to lower the mortality rate of babies born to parenting wards, the Office of the Inspector General has developed a training curriculum that addresses safe sleep practices, choosing an appropriate caregiver and effective approaches to educational achievement. The training, *Risk Reduction Training for Parenting Wards and their Case Managers,* is a one-day mandatory training for all downstate case managers who are currently working with a pregnant or parenting ward. The interactive training will take place beginning in February 2011 at four locations: Rockford, Peoria, Bloomington and East St. Louis. A unique feature of this training is that the 84 downstate wards who are currently pregnant and/or parenting will also participate.

Dr. Ron Rooney and Dr. Glenda Dewberry-Rooney will facilitate the training.  Dr. Rooney has provided training to the TPSN in Chicago and developed a video role play that modeled engagement and appropriate support toward achieving educational goals. This video will be used as part of the downstate training and will be readily available as an Adobe Presenter presentation, which can be downloaded and viewed. As part of the training, Regional DCFS Educational Advisors will develop and present an educational eco-map specifically designed to address the educational and vocational needs of the individual ward.

While case managers participate in Dr. Ron Rooney's education achievement training, the parenting wards will participate in a training that focuses on safe sleep and choosing an appropriate caregiver. At each of the trainings, a member from the local Child Death Review Team, such as a maternal health practitioner, will assist Dr. Glenda Dewberry-Rooney in facilitating the discussion.  The curriculum will

include hands on "safety games" activities to encourage the wards' participation. In an effort to discourage co-sleeping, all parenting wards whose children are younger than one year-old will receive a portable crib to be used when the parent visits friends or relatives. As a way of encouraging literacy, parenting ward participants will also receive an age appropriate children's book to share with their child.

## OLDER CAREGIVERS

Since its inception as a pilot program in 2001, the Office of the Inspector General's Older Caregiver's Project has developed and provided training to child welfare professionals addressing the needs of older caregivers and the challenges they face in caring for children. In 2001, over 4,000 relative and traditional foster parents 60 years of age and older were caring for almost 8,800 children. At that time, about half (52%) of the 8,800 children were in adoptive or subsidized guardianship placements. As of November 2010, the number of older caregiver families increased to 5,868 caring for 9,255 children.

In FY 2010, the Inspector General's Project Initiatives staff developed a specialized training for Intact Family Services and Adoption Preservation Services staff. This training was developed in response to a 2009 child death investigation in which a four year-old and his grandfather perished in a house fire. The 72 year-old grandfather suffered from emphysema, Chronic Obstructive Pulmonary Disease, congestive heart failure, asthma, and pulmonary hypertension and required daily oxygen and a walker for mobility. As part of the Intact Family Services plan, the grandfather was identified as the alternate non-drug using caretaker of the four year-old boy, his nine year-old brother and three month-old sister despite his deteriorating condition and a previous evaluation by the Department on Aging, of which the intact family services worker was unaware, describing the grandfather as a safety risk to evacuate and someone who should not be left home alone. When the lethal fire broke out in the home, the four year-old, who had exited the home, re-entered the home to help his grandfather.

From July 2009 through October 2009, Project Initiatives staff, in collaboration with the Illinois Department on Aging and representatives from Local Area Agencies on Aging, delivered this specialized interdisciplinary training to 462 DCFS and private agency intact family services caseworkers, supervisors and managers at 11 sites statewide (Chicago, Wheaton, Bloomington, Springfield, Carterville, Fairview Heights, Rock Island, Peoria, Rockford, Mt. Vernon and Aurora).

In May 2010, the relevant portion of this specialized training was presented to Department Post-Adoption staff and their contractors in Chicago (The Cradle, Family Matters, The Older Caregiver Project at Metropolitan Family Services) and to the Department's Downstate Agency Performance Team Adoption/Guardianship Unit in Springfield.

Following the trainings delivered to Intact Family Services and Adoption Preservation staff, Project Initiatives staff, with support from the Department's Division of Training, provided an updated *Train the Trainers* presentation to train staff in Chicago and in Springfield. This updated training addressed adequate assessments of older caregiver families incorporating resources available through the Aging Network, and solving practical problems, such as deteriorating health, assisted living resources, and homemaker services. Continuing work with web-based links available through the DCFS internet (under development) will help foster more collaboration between child welfare and the Aging Network.

# SYSTEMIC RECOMMENDATIONS

Inspector General investigative reports contain both systemic and case specific recommendations. The systemic reform recommendations for Fiscal Year 2010 have been categorized below to allow for analysis of the recommendations according to the function that the recommendation is designed to strengthen within the child welfare system. The Office of the Inspector General is a small office in relation to the child welfare system. Rather than address problems in isolation, the Office of the Inspector General views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- **ADMINISTRATION**
- **CHILD PROTECTION INVESTIGATIONS**
- **CONTRACT MONITORING**
- **ETHICS**
- **FOSTER CARE**
- **LEGAL ISSUES**
- **PERSONNEL**
- **SERVICES**
- **STATE CENTRAL REGISTER**

**ADMINISTRATION**

- The Department should analyze the cellular telephone plans of any employee living outside of the state of Illinois, or in areas where a Department-issued phone would incur roaming charges, to insure the most fiscally responsible plan.

**CHILD PROTECTION INVESTIGATIONS**

***Mental Health***

- In cases of severe mental illness of a parent or caretaker, the Department should require child protection investigators and intact family services workers to ask mental health professionals the following three questions: (1) Do the parents' or caretakers' symptoms of mental illness place the child at risk for maltreatment or harm? (2) Are there long term effects of the parents' or caretakers' mental illness symptoms on the child's well-being that need to be considered in developing a treatment plan?; (3) If the parents' or caretakers' current treatment plan is changed, will it likely bring about an improvement in parenting skills?

***Law Enforcement***

- A law enforcement and child protection safety planning conference must take place when there are concurrent investigations. Developing information can be exchanged at the conference and participants should discuss how the information can be utilized to maintain the safety of the child without jeopardizing the criminal investigation.

- When a child is hospitalized for injuries or conditions that are suspected to be the result of parental abuse or neglect and there are concurrent law enforcement and child protection investigations, there must be a safety case conference between law enforcement and child protection before the child is discharged.

- In cases where police have a pending criminal investigation, Division of Child Protection investigators should not reveal a preliminary finding of unfounded to the family prior to a supervisory conference to explore whether another conference with law enforcement should take place.

- In rural areas where there is suspicion of drug involvement or domestic violence, the Department should consider requiring investigators to include the local sheriff's department when requesting incident reports.

***Confidentiality***

- The Department should amend Rule 431.60, Subject Access to Records of Child Abuse and Neglect Investigations, to reflect the current practice, mandated by a federal court order, of requiring disclosure to investigation subjects of the identity of those interviewed during the investigation and the content of the interview.

***Prescription Medicine***

- Child Protection Investigators should be trained on the multiple uses that the Medicaid Recipient Claim Detail can provide.

- Child Protection staff, Intact Family Services staff, and Placement staff should obtain consultation from a DCFS nurse through the Administrator for Substance Abuse Services in child protection investigations where there is a concern about misuse of prescription medication and/or mixing of alcohol and narcotic medications. (*Also included in Foster Care and Services - Intact Family Services*)

- Training for child protection staff should incorporate information about the availability and benefit of recipient claim details from the Department of Healthcare and Family Services and their Recipient Restriction Unit.

***Use of Polygraph Examinations***

- The Department should articulate its position regarding the use of polygraph examinations and refusal to submit to polygraph testing in child protection investigations. The Department's position should consider prohibiting the use of polygraph results or refusals as determining factors in the evidence or rationale to indicate or unfound an investigation.

- The Department should determine whether to restrict its contractual agents from using polygraph information when rendering a medical opinion.

- The Department should develop and incorporate into its trainings information regarding polygraphs for child protection staff.

***Medical Professionals***

- Physicians of medical resource providers should target education and training efforts to best assist child protection. Each medical resource provider should identify and prioritize training of:

    - Medical personnel of emergency departments approved for pediatrics by the Illinois Emergency Medical Services for Children (EMSC);
    - Medical personnel at hospitals affiliated with partner hospitals of the medical resource providers; and
    - Medical personnel at hospitals that serve as a resource for Child Advocacy Centers.

- The Department should work with outside providers to develop a curriculum for emergency department medical professionals.

- The Department should require and help to develop more uniform statewide reporting by medical contractors who provide consultation in Child Protection Investigations.

### CONTRACT MONITORING

- Mentoring Program Plans should include requirements for number of contacts with identified youth and percentage of participating youth and a requirement for open communication with residence staff. The contracts must be monitored to trigger program audits when the requirements are not met.

- Subcontractors under Department contracts should be subject to the same transparency as contracts. All subcontracts to DCFS contracts should be listed and available for public viewing on the internet.

- Instructions and training for Consolidated Financial Reports should require agencies to disclose all sources of public financing and allocate accordingly. Consolidated Financial Reports must be critically reviewed to ensure that costs are appropriately allocated to various programs and that funding is not duplicated.

- For non-foster care agencies, Contract Monitors must be required to visit sites where services are being provided to determine which staff provide direct service and to ensure that services are being delivered.

- The Department must review all grants to ensure that the Department has received and reviewed Grant Expenditure Reports as required.

- The Department must establish a process that ensures that financial documents required by the Contract or Grant are received in a timely manner and reviewed for disallowable costs, and that there is a written plan to recover any excess or disallowable funds.

### ETHICS

- The Department should promulgate a Solicitation Policy to clarify that permissible solicitation is limited to break-time, in break rooms and only for not-for-profit activities.

### FOSTER CARE

- The Department should amend Procedure 301, Appendix E, Placement Clearance Process, to provide guidelines for the monitoring and resolution of involuntary placement holds. These guidelines should include instructions for requesting the removal of an involuntary placement hold. The guidelines should also require that when an involuntary placement hold is placed on a foster home, the licensing worker and licensing supervisor should re-evaluate the placement hold every six months.

- Child Protection staff, Intact Family Services staff, and Placement staff should obtain consultation from Department nurses through the Administrator for Substance Abuse Services, in child protection investigations where there is a concern about misuse of prescription medication and/or mixing of

alcohol and narcotic medications. *(Also included in Child Protection Investigations and Services - Intact Family Services*)

- The Department's foster home licensing application should be revised to include questions asking the applicant and other adult members of the household for any e-mail addresses or membership in social networking sites within the last five years.

- The Department should develop procedures that incorporate the potential licensee's internet activity into background checks.

- Caretakers should receive written notice of a Fair Hearing at the same time that the appellant receives written notice that apprises them when placement of the child is at issue. (*Also included in Legal Issues)*

***Relative Caregivers***

- The Department should revise procedures regarding relative caregivers to conform to federal requirements and ensure that relatives are advised of their options under state and federal law and the potential consequences of declining placement.

- The Department should pursue state legislation to formalize a preference for relative placement when such placement is safe and does not delay permanency.

- The Department's Advocacy Office should develop a specialist who would be available to assist and provide expertise to relatives attempting to navigate through the child welfare system.

**LEGAL ISSUES**

- The Division of Child Protection should refer to the Office of Legal Services those cases with parental non-compliance over time, risk to children and refusal to screen.

- In cases involving chronic paternal non-compliance with service plans, the Office of Legal Services should determine whether to file a petition to compel compliance with services or advocate with the State's Attorney's Office to file the petition.

- Child protection managers should track and maintain data on cases presented to the State's Attorney's Office for filing of petitions and the State's Attorney's Office's response. Child protection offices should share this information with the Department's Office of Legal Services.

- The Department's Office of Legal Services should draft a letter for use by child protection staff denied access to child victims in school settings that delineates the legal basis for child protection's right to have access to child victims.

- The Department should issue a memorandum to Purchase of Service (POS) agencies clarifying the need to alert the Department's Office of Legal Services of legal issues and critical information that had not been presented to the court concerning minors whose wardships were dissolved within the prior 30 days.

- Caretakers should receive written notice of a Fair Hearing at the same time that the appellant receives written notice that apprises them when placement of the child is at issue. *(Also included in Foster Care)*

- The Department should alert upper-level management to avoid *ex parte* communications during and after the Fair Hearing Process.

**PERSONNEL**

- Assessment and waiver of indicated CANTS (Child Abuse and Neglect Tracking System) reports for Department employees must be documented, with a signed determination of decision, centrally filed for future reference and assessed in accordance with Department Rule 385, Background Checks.

**SERVICES**

***Teen Parents***

- When a pregnant or parenting teen ward has a serious medical or mental health problem, the Teen Parent Service Network clinical personnel should staff the case and monitor the implementation and outcomes of recommended service interventions.

- When a pregnant and parenting teen placed in a transitional living program or an independent living program has a serious medical or mental health issue, the assigned case manager should be required to attend specialized training provided by the Teen Parent Services Network. The Office of the Inspector General will assist the Teen Parent Service Network in the development of the specialized curriculum.

- The Teen Parent Service Network should assure that Downstate Transitional Living Programs have provisions in their contracts to provide enhanced services to pregnant and parenting teen wards.

- The Teen Parent Service Network should provide training to downstate Day Care Coordinators on teen parents' rights to education services, including daycare so that the teen can attend school.

***Behavioral***

- The Department should require that Behavior Services programs of private agencies' specialized foster care programs be staffed by board certified behavior analysts to work with foster children with mental health and behavioral concerns. Board certified behavior analysts should have expertise in the treatment of psychiatric disorder.

***Mental Illness***

- In cases involving mental illness, especially complicated by substance use disorder, the Clinical Division should be consulted.

***Family Advocacy***

- The Department should ensure that all family advocacy centers develop expertise in Department Rules and Procedures concerning Service Appeals and placement to provide more effective advocacy for families.

***Guardianship/ Adoption***

- The Department should develop guidelines for when it is appropriate to refer a family to Extended Family Services for consideration of guardianship of a minor through Probate Court, and also train them on the differences of guardianship through Probate Court versus referring a case to Juvenile Court. The Short-term Guardianship Form should never be used when it appears that the problem requiring guardianship will not be resolved within one year.

- Child Protection managers, supervisors and investigators, Extended Family Service Program workers and intact workers should be trained on the guidelines for referring a family to Extended Family Services.

***Intact Family Services***

- Child Protection staff, Intact Family Services staff, and Placement staff should obtain consultation from Department nurses through the Administrator for Substance Abuse Services, in child protection investigations where there is a concern about misuse of prescription medication and/or mixing of alcohol and narcotic medications. *(Also included in Child Protection Investigations and Foster Care)*

**STATE CENTRAL REGISTER**

- The State Central Register should utilize the Illinois Enforcement Alarm System to identify the local law enforcement agency with jurisdiction to provide written notification of the hotline reports required by statute and Department rule.

- The State Central Register should adopt a form to provide written notification to local law enforcement of the hotline reports required by statute and Department rule.

***Language Barriers***

- In order to ensure substantial compliance with the Burgos Consent Decree[1] and consistent application of existing Department Rules and Procedures, the Burgos Coordinator shall:
  a) Identify all Spanish speaking cases and investigations within 48 hours of receiving a report of abuse/neglect and determine if the case is assigned to a Spanish speaking investigator;
  b) Submit a weekly alert to respective Regional Administrators of any case not assigned to a Spanish speaking investigator;
  c) On a weekly basis, review all Spanish surname cases to determine and verify if Spanish surname cases are, in fact, Spanish speaking families – via language determination forms, indication made in SACWIS;
  d) Determine if the Spanish surname family, which has identified Spanish as their primary language, is assigned to a Spanish speaking worker/investigator; and
  e) Include in a weekly report/alert to Regional Administrators any families/cases with Spanish surnames that have identified Spanish as their primary language and are not assigned to a Spanish speaking worker/investigator.

- Per Procedure 300, Appendix E, Burgos Consent Decree, whenever an initial report of child abuse or neglect is received by the State Central Register, the report taker will attempt to determine whether the parents/children who are the subjects of the report are of Hispanic origin and/or Spanish speaking. This will be indicated on a CANTS 1 form.

---

[1] The Burgos Consent Decree of 1977 is a federal mandate which requires the Department of Children and Family Services to provide services in Spanish to Spanish speakers and those requesting services in Spanish. The Burgos Consent Decree legally covers only the Cook and Aurora regions, but its principles are applied statewide.

# RECOMMENDATIONS FOR DISCIPLINE AND CONTRACT TERMINATION

In FY 2010, the Office of the Inspector General recommended discipline of Department and private agency employees and termination of Department contracts for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

***Failure to Properly Assess Risk***

- A child protection investigator recommended a finding that was not supported by the rationale provided. The investigator also failed to corroborate explanations for the child's injuries, follow-up on conflicting information obtained, share information with medical personnel, conduct a home visit, update a risk assessment (CERAP) in a timely manner, and complete a home safety checklist.

- A Department intact worker failed to recognize risk of harm to a child after the child disclosed details that her mother was not only aware that her step-father had sexually abused her, but was also complicit in the abuse by exposing her to pornography.

- A child protection investigator failed to properly assess risk to children, falsified case records, and violated the Burgos Consent Decree by using a relative to interpret during an investigation.

- A child protection investigator failed to properly assess risk to an infant, ignored critical medical information, failed to obtain an explanation for each injury reported, and failed to incorporate all relevant information learned.

- A child protection manager failed to properly assess risk to an infant and approved a safe risk assessment (CERAP) despite critical medical evidence available.

***Errors in Service Provision/Investigative Work***

- A foster care caseworker failed to enter contact notes into the Department's electronic database (SACWIS).

- In a serious injury case, a child protection investigator failed to establish a safety plan, interview a collateral contact, and failed to share pertinent information with the supervisor.

- A private agency director, foster care supervisor, licensing supervisor, and licensing worker facilitated the placement of children in a foster home that had a placement hold on the home; failed to ensure that the placement clearance desk was contacted prior to placement; and failed to ensure that a capacity waiver was requested prior to placement.

- A child protection investigator failed to conduct monitoring visits on a safety plan, document case work accurately or in a timely manner, obtain underlying records (such as police, medical, mental health or criminal background information), and complete supervisory directives.

- A child protection supervisor violated the Burgos Consent Decree when she permitted an investigator to use a relative to interpret during an investigation and failed to integrate information obtained in a prior investigation.

- A child protection manager viewed an elderly bed ridden grandfather as a capable primary caretaker for the children in the home, and as a result failed to ensure that a multiple sequence investigation was either screened into court or referred for intact services.

- A private agency case manager provided misleading information in a child's case record and in court testimony, failed to meet the requirement of home visits, minimized serious case problems and completed inadequate case notes.

***Failure to Perform Supervisory Duties***

- A foster care supervisor failed to monitor a supervisee despite knowledge that the supervisee was not entering contact notes into the Department's electronic database (SACWIS).

- A child protection supervisor signed off on an investigation in which the findings were not supported by the rationale provided.

- A child protection supervisor neglected her supervisory duties, which resulted in poor judgment and decision-making throughout the investigation.

- A private agency supervisor failed to provide adequate supervision, and failed to record supervisory notes in a child's case record.

***Unprofessional Conduct***

- After being notified that a foster parent applicant had accused her of stealing medication, the licensing worker acted unprofessionally in making persistent phone calls to the family's home.

- A private agency director approved the placement of a child in an unauthorized and unrelated placement, falsely represented himself as an authorized agent of the Guardianship Administrator, provided inaccurate information regarding his driving history and presented a counterfeit driver's license at the time of employment.

- A child protection supervisor violated the Code of Ethics for Child Welfare Professionals when engaging in a sexual relationship with an intern he directly supervised and violated Rule 430.50, Cooperation with Office of the Inspector General Investigations.

- A Department office associate used her position to further a romantic interest with a client who had an open case with the Department.

***Misuse of State Resources***

- An office assistant used the state computer to access personal e-mail accounts, visit social networking websites, and access pornographic material during work hours.

- A child protection investigator used a Department issued cell phone to make an unreasonable amount of personal calls during work and non-work hours.

- A child welfare specialist used the state mail system during state time to operate a personal business.

- A Department office associate used his state supplied workstation to access non-work related websites during work hours.

***Ethics Training***

- Three employees were disciplined for failure to complete the ethics training program.

**CONTRACT TERMINATION**

- A provider appeared to be using state funds to subsidize athletic programs in public schools for non-DCFS children rather than providing mentoring services needed for DCFS wards.

- A contractual agency failed to provide mentoring services to DCFS clients as required by the contract.

166

# COORDINATION WITH LAW ENFORCEMENT

## REFERRALS FOR FURTHER INVESTIGATION

***Autopsy in Child Death***

While reviewing DCFS involvement in the FY 08 death of a two-and-one-half year-old boy, the Office of the Inspector General received a complaint questioning the integrity of the boy's autopsy, performed by the local County Coroner. The boyfriend was the only one present when the boy suffered his fatal injuries. Despite a large amount of pooled blood in his abdominal cavity, and the fact that the boy had not been previously diagnosed with cancer and had no tumors, the Coroner had attributed the manner of his death as "natural" and the cause of death to "cancer." Based on the findings of the autopsy, the child abuse investigation into the boy's death was unfounded.

Office of the Inspector General investigators noted that while the doctor performing the autopsy was a board certified pathologist, the doctor was not a board certified *forensic* pathologist, a preferred credential for performing autopsies. The Office of the Inspector General subpoenaed all documentation from the Coroner's Office and sought opinions from two forensic pathologists concerning the boy's cause and manner of death. After reviewing available laboratory reports and documentation, both consultants concluded that the child died from inflicted wounds.

The Office of the Inspector General contacted the hotline with new information to initiate a new child protection investigation into the boy's death. That investigation resulted in an indicated finding of death by abuse.

The OIG referred the case to the State's Attorney for possible criminal prosecution of the boyfriend and also contacted the Illinois Attorney General. Due to insurmountable conflicts of interest, the State's Attorney's Office referred the investigation for possible criminal prosecution to a Special Prosecutor. The investigation is pending.

In addition to criminally investigating the homicide of the boy, the State Police had initiated a broader investigation of the Coroner's office as a result of multiple complaints of the Coroner's handling of other deaths. The Office of the Inspector General furnished critical information to the State Police, which supported a search warrant of the Coroner's Office. In addition, the Office referred a second child death to the Illinois State Police for investigation, which also raised questions about the integrity of the autopsy.

***Additional Referrals***

- The Office of the Inspector General investigated and referred to federal authorities a case of alleged human trafficking.

- The Office of the Inspector General coordinated efforts with a neighboring state's State Police and referred an allegation of an altered state driver's license by a private agency employee to the Illinois Secretary of State's Identity Crimes Unit.

- The Office of the Inspector General referred a contract case involving a registered charity to the Illinois Attorney General.

- The Office of the Inspector General referred to the Illinois State Police a complaint of theft of toy donations by Department employees. The Illinois State Police declined to investigate.

- The Office of the Inspector General referred to local law enforcement a report by a former resident of a group home that staff at the group home were dealing drugs to residents.

- The Office of the Inspector General compiled and referred information to the State's Attorney of a foster family allegedly attempting to sell their foster child for adoption.

- The Office of the Inspector General referred to the Illinois State Police an employee with excessive use of state cell phone for what appeared personal use.  The Illinois State Police declined to investigate.

## COORDINATION WITH LAW ENFORCEMENT

- The Office of the Inspector General coordinated a contract investigation with the Chicago Board of Education's Inspector General, the Illinois Attorney General, and federal authorities.

- The Office of the Inspector General requested assistance from a local police department when investigating an allegation about a Department employee's possible drug abuse.  The allegation was not substantiated.

- The Office of the Inspector General contacted officers, and offered assistance to a county Sheriff's Office when investigating an allegation that individuals had gained access to a home by falsely claiming they were employees of the Department of Children and Family Services.

- The Office of the Inspector General provided assistance to Special Agents from the Criminal Division of the Internal Revenue Service and the Office of the Inspector General for the Social Security Administration.

- The investigation of an allegation of misconduct and violation of an order of protection against a Department employee was coordinated with a local Sheriff's Office and State's Attorney.

- The Office of the Inspector General contacted a local police department when a private agency worker was arrested on a drug charge.

## REQUESTS FOR ASSISTANCE

- The United States Secret Service requested the assistance of the Office of the Inspector General in a pending federal fraud case.

- The Office of the Inspector General assisted the Department by contacting federal authorities to locate information on an individual who was arrested on a federal warrant for healthcare fraud and conspiracy.

- The Office of the Inspector General for the Social Security Administration requested assistance from the Office of the Inspector General in five pending federal fraud cases, one of which raised questions about possible abuse to children.

- The State's Attorney's Office requested assistance from the Office of the Inspector General in locating the victim of domestic battery for trial.

- The Illinois State Police requested assistance regarding a child protection investigation that had been unfounded against a mother and that the father attempted to use in his custody battle with the mother.

**OUTCOMES OF PRIOR OIG REFERRALS**

***Former Deputy Director Pleads Guilty to Federal Fraud Charges***

In July 2005, the Office of the Inspector General alerted the Department and referred a case to the Federal Bureau of Investigation concerning misuse of Department funds by a Deputy Director of the Department. The investigation disclosed that the Deputy Director had directed fiscal agents to issue checks (in amounts that totaled approximately $220,000) to business entities owned or controlled by the Deputy Director. Fiscal agents are entities that provide financial management services to other entities providing direct service to the Department.

After the referral for federal investigation, the Deputy Director resigned his position with the Department, but remained active in child welfare. The Office was notified several years after the referral that the former Deputy Director was receiving Department funds as a subcontractor to a Department provider. The provider was one for which the Deputy Director had approved a large increase in the contract prior to leaving state employment. The second investigation disclosed that a large portion of the services actually provided by the former Deputy Director were disallowable as lobbying expenses.

In September 2010, five years after the OIG referred the investigation to the FBI, the former Deputy Director was indicted on federal fraud charges. He has pled guilty and the sentencing is scheduled for 2011.

***Additional Outcomes of Prior Referrals***

- The Illinois State Police completed their investigation of a DCFS employee for cyber-stalking. The State's Attorney declined to bring charges.

- In a child death case in which the Office of the Inspector General assisted the State's Attorney, the perpetrator pled guilty to murder and was sentenced to 60 years. The mother pled guilty to child endangerment and is awaiting sentencing.

- In a child death case in which the Office of the Inspector General assisted the State's Attorney, the perpetrator was arrested and charged with murder. Charges are still pending.

# DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The following Office of the Inspector General recommendations were made in previous Fiscal Years, but were not fully implemented before the Annual Report was issued. The current implementation status of these recommendations is detailed below in the following categories.

- Child Protection
- Child Welfare Employee Licensure (CWEL)
- Contract Monitoring
- Foster Home Licensing
- Information Technology
- Legal
- Medical
- Personnel
- Services

## CHILD PROTECTION

**The Department should amend Rule 431.30, Maintenance of Records, to maintain unfounded reports that are currently kept for only 30 or 60 days for a period of 12 months following the date of the final finding. The Illinois Child Death Review Team Executive Council concurs with this recommendation (from OIG FY 09 Annual Report, General Investigation 11).**

> *FY 09 Department Response:* The Department's Office of Legal Services reviewed this issue and concluded that a legislative change is required to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding. The Office of Legal Services has drafted and submitted proposed legislation amending the Abused and Neglected Child Reporting Act that has been approved by the Director.
>
> *FY 10 Department Update:* The DCFS Office of Legal Services submitted a legislative proposal amending the Abused and Neglected Child Reporting Act (ANCRA 325 ILCS 5) to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding. Proposed legislation was included in our legislative package for the Spring 2010 Session. The Department anticipates that the legislative process and subsequent revision to Rule 431.30 can be completed by the second quarter of 2011.

**With all allegations, indicated or unfounded, the post-adoption unit or the adoption agency must assess the continued suitability of the caretakers (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

> *FY 09 Department Response:* The Department agrees that adoptive suitability must be reassessed after a child protection investigation, whether indicated or unfounded. The child protection investigative findings are critical to such a determination. Management is working to ensure that

communication and access to relevant child protection investigations is provided as needed for adoption and guardianship decisions of continued suitability.

*FY 10 Department Update: No update provided.*

**The Department must review B.H. investigative caseload levels on a quarterly basis to determine whether there is substantial compliance with the B.H. Consent Decree and whether there are pockets of areas or offices where non-compliance levels put children at risk (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

*FY 09 Department Response:* The review is currently being conducted.

*FY 10 Department Update:* DCFS Legal continues to work with DCP on this issue.

**The Department must ensure that notifications of investigation findings to mandated reporters from the State Central Register conform to Rule 300.130, Notices Whether Child Abuse or Neglect Occurred, and include the name of the child victim (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

*FY 08 Department Response:* The Department agrees.  Implementation of this recommendation is in progress.

*FY 09 Department Update:* This requires a change in Statewide Automated Child Welfare Information System (SACWIS), since the letter is generated in SACWIS.  Several notification letters will need to be changed and all changes will be made at the same time.  A meeting will be convened in January 2010 between the Office of Legal Services (OLS), the Division of Child Protection (DCP) and the State Central Register (SCR) to make revisions.

*FY 10 Department Update:* The DCFS Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit.  Litigation is currently in the final stages.  The anticipated completion date is summer 2011.

**The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate.  Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending and completed investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

*FY 09 Department Update:* A policy/information transmittal is being developed to notify staff.

*FY 10 Department Update:* The DCFS Office of Legal Services is reviewing the definition of "involved parent" in conjunction with other changes to the Abused and Neglected Child Reporting Act (ANCRA) required by the DuPuy Federal Lawsuit.  Litigation is currently in the final stages.  The anticipated completion date is summer 2011.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (HCFS) allowing DCFS Division of Child Protection staff access to Recipient Claim Detail information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 08 Department Response:* The Department of Healthcare and Family Services (HCFS) notified DCFS that the 2004 interagency agreement allows for the necessary access. Representatives from DCP and the Guardianship Administrator's Office will coordinate with the Department of Healthcare and Family Services to implement this recommendation.

> *FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from HCFS.  While no one has denied access to the Department, access has not been authorized.  Efforts to gain access will continue.

*FY 09 OIG Response: The recommendation concerned access by child protection staff.  Any access arranged must be available to child protection staff.*

> *FY 10 Department Update:* The Department continues to work with HFS to obtain needed screens.

**As previously recommended by the Office of the Inspector General in FY 2007, Department procedures should be amended to require that in child protection investigations in which the plan is for a family member to obtain private guardianship of the child/ren, the family should be referred to the Extended Family Support Program (EFSP) for assistance in securing private guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

> *FY 08 Department Response:* The Service Intervention Deputy has reviewed and approved the draft procedure.  The procedure has been sent to the Office of Child and Family Policy for the revision process.

> *FY 09 Department Update:* The Department studied the Procedures and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year.  The Division of Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response: The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region.  The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

> *FY 10 Department Update:* The recommendation has been incorporated in draft Procedures 302.385 (Extended Family Support Program).  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

**Extended Family Support Program (EFSP) Managers should meet with Child Protection Program Managers and Supervisors to assure an efficient referral process.  Training should take place once the Extended Family Support Program Plan is finalized (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 12).**

*FY 08 Department Response:* The Department has drafted a request for proposal for a statewide Extended Family Support monitoring agency.  One of the responsibilities of the contracted monitoring agency will be to provide training to DCFS staff on the Extended Family Support Program.

*FY 09 Department Update:* The Department studied the Procedures and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year.  Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response: The Department should explain the necessity of establishing a contracted monitoring agency in order to provide training to DCFS staff on the Extended Family Support Program. The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region.  The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

*FY 10 Department Update:* The recommendation has been incorporated in draft Procedures 302.385 (Extended Family Support Program).  Once the draft procedures are approved the Division of Service Intervention will begin training on the referral process.

**The State Central Register (SCR) Administrator should issue a policy memo instructing SCR operators that when a mother delivers a stillborn (20 weeks gestation or more) and either the mother or the placenta tests positive for illegal substances, SCR should immediately initiate an investigation for death by abuse.  In addition, SCR should accept the call for information only (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 13).**

*FY 08 Department Response:* The memo was issued but the DCFS Office of Legal Services requested that the memo be rescinded until the allegation system is amended, which is in progress.

*FY 09 Department Update:* The Department and the OIG agreed to amend the recommendation. The SCR should accept the hotline call as "Information Only."

*FY 10 Department Update:* A memo was sent to all SCR operators December 2010.

**The Division of Service Intervention should meet with management to address targeted training on the Substance Affected Family Policy, Procedure 302, Services Delivered by the Department, Appendix A- Substance Affected Families (2006) and the use of short-term guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 14).**

*FY 08 Department Response:* The Department agrees.  The Division of Service Intervention will meet with the Division of Child Protection Management to develop and implement a training. DCFS Investigative and Intact staff in the Cook Regions will be trained beginning in December 2008.

*FY 09 Department Update:* The Substance Affected Family Policy was incorporated into the Reunification Training, and the Division of Child Protection will conduct a training on short term guardianship.

*FY 10 Department Update:* Trainings are being scheduled beginning January 2011.

**The Department should adapt questions found in the book authored by Teresa Ostler, *Assessment of Parenting Competency in Mothers with Mental Illness* for child protection investigators to utilize when interviewing mental health professionals to determine a parent's ability to adequately care for his/her children. These questions should be incorporated into child protection investigator training (from OIG FY 08 Annual Report, General Investigation 4).**

*FY 08 Department Response:* The Department agrees. The Department's Safety Workgroup is reviewing the questions to determine how best to incorporate the material into training.

*FY 09 Department Update:* The DCFS Office of Training is incorporating the questions into the 2010 training curriculum for all investigative staff.

*FY 10 Department Update:* The Office of Training is in the process of incorporating this material in the Enhanced Child Endangerment Risk Assessment Protocol curriculum and will begin training this material in April 2011.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1, Disclosure of Information for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Response:* DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The targeted date of completion is May 2008.

*FY 08 Department Update:* DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The anticipated date of completion is February 2009.

*FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update:* Amendments to ANCRA addressing this issue will be submitted as part of the legislative package for the spring 2011 session. The estimated date of completion is spring 2012.

**Department Procedures should be amended to include a provision that when someone walks into a Department office with a concern about child abuse or neglect, they should be invited into the office to make a hotline report or to talk to an investigative supervisor if they have questions or concerns about making the report (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

*FY 07 Department Update:* The Office of Child and Family Policy has forwarded the final draft of P300 to the Division of Child Protection.  The P300 workgroup is reviewing the final draft.

*FY 07 OIG Response: The final draft of Procedure 300 does not contain language that addresses this recommendation.*

*FY 09 Department Update:* The issue has been addressed in a revised draft of Procedure 300, Reports of Child Abuse and Neglect.

*FY 10 Department Update:* Amendment will be made to include language on handling anyone "walking" into a DCFS office with information that might constitute a child abuse/neglect report. The estimated date of completion is January 2011.

**The Department should ensure that child protection investigations, both unfounded and indicated, are not expunged while a subsequent investigation, involving the same family, is pending (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* The Department is considering whether to pursue a change in legislation to implement this recommendation.

*FY 08 Department Update:* The Department is continuing to examine this and other legislative amendments to ANCRA.

*FY 09 Department Update:* The Department has drafted proposed legislation to be submitted as part of the legislative package for the Fall Session 2010.

*FY 10 Department Update*: The Department is continuing to examine this and other legislative amendments to the Abused and Neglected Child Reporting Act (ANCRA).

**The procedures for completing a Child Endangerment Risk Assessment Protocol (CERAP) and the decision tree for mentally ill parents should be amended so that the guidelines note the need to assess risk to the child when a parent incorporates a child into their delusional system, even in the absence of overt negative statements (from OIG FY 06 Annual Report, Death and Serious Injury 2).**

*FY 06 Department Response:* The committee revising the safety assessment continues to work on the safety framework protocol.  Targeted completion date is June 2007.

*FY 08 Department Update:* Department procedures require a rule out of dependency. Revised safety enhancement factors have been expanded.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

**The Department should ensure that available fathers be explored as potential placements. If a safety plan is likely to last longer than six months, the Department should facilitate a legal relationship between the child and the caretaker (from OIG FY 06 Annual Report, General Investigations 11).**

*FY 06 Department Response:* A committee has been formed to revise the safety assessment process. The Committee continues to work on the safety assessment framework protocol. Targeted completion date is June 2007.

*FY 07 Department Update:* The Child Endangerment Risk Assessment Protocol (CERAP) draft, currently being field tested, directs the attention of the worker to consider available fathers as potential placements.

*FY 08 Department Update:* The CERAP draft provides that non-custodial parents should be identified and assessed first for potential out-of-home placement when a safety plan is needed.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 09 OIG Response: According to the most recent data, just over 100 families have been referred statewide to agencies that the Department contracts with to provide services to fathers. The Department needs to encourage broader participation for fathers of DCFS involved children.*

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

**The State Central Register should revise the Notice of Indicated Finding sent to parents to ensure that parents know the identity of the indicated perpetrator or whether the allegation was indicated to an unknown perpetrator (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 6).**

*FY 05 Department Response*: This recommendation is under review by the DCFS Legal Division because of the impact it may have on the DuPuy Federal lawsuit.

*FY 06 Department Update*: Revisions are on hold pending implementation of the changes required by the DuPuy Federal lawsuit. Changes will be implemented as soon as possible, but no later than July 17, 2007.

*FY 07 Department Update:* Revisions were placed on hold by DCFS Legal due to changes required by DuPuy Federal Lawsuit. As of November 2007, litigation is ongoing and it appears additional changes to the notice form may be required. DCFS Legal will continue to monitor and will draft an updated form when legal issues have been resolved. The anticipated implementation date is May 2008.

*FY 08 Department Update:* Revisions to the notification letter are in process and will be completed by June 2009.

*FY 09 Department Update:* Recommendation in progress. Estimated completion date: Summer 2010.

*FY 10 Department Update:* Implementation was delayed due to ongoing litigation now in final stages.  The estimated completion date is summer 2011.

**Add a third box to each safety factor in the Child Endangerment Risk Assessment Protocol (CERAP), acknowledging that information for that factor may be "unknown" or "uncertain" and add a section at the conclusion of the factors list for identifying information that needs to be gathered in the future to further assess safety (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 07 Department Response:* The current draft CERAP that is being field-tested provides two assessment tools. The first is used at the outset and permits workers to note that more information is needed before the question can be answered.

*FY 08 Department Update:* The current draft of the initial CERAP acknowledges the option that more information is needed to assess safety.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

**Devise a supervisory form to accompany the safety assessment that would allow a supervisor to determine the source of information that formed the basis of the particular safety factor decision and provide a check that basic available objective sources (such as the hotline report, prior child protection investigations, police reports and interviews with police, and criminal history information as required by Administrative Procedure 6) (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 08 Department Update:* The current draft CERAP identifies the source of the information.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation will be incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

**DCFS Procedure 300, Reports of Child Abuse and Neglect, should be amended to provide that the decision to take protective custody of a child whose parent is receiving services from the Department (e.g., intact family, independent living, or residential programs) must include consideration of the degree of the parent's cooperation with services and the extent to which services provided address the allegation (from OIG FY 04 Annual Report, Death and Serious Injury 19).**

*FY 04 Department Response*:  The CERAP Advisory Council is currently reviewing the CERAP Protocol.  The OIG recommendations will be shared with the group at their next meeting, January 2005.

*FY 05 Department Update*:  Procedure 300.80, Delegation of the Investigation, has been revised and the draft includes this consideration.  Legal is currently reviewing Procedures 300 and it is projected all related tasks will be complete by Spring 2006.

*FY 06 Department Update*:  The Division of Child Protection Committee has not completed its review and final revisions to Procedures 300, Reports of Child Abuse and Neglect.  Once completed, these will be returned to the Office of Child and Family Policy to begin the process of approval from the Joint Commission on Administrative Rules (JCAR).  Implementation date: Spring 2007.

*FY 07 Department Update:*  The Office of Child and Family Policy has forwarded the final draft of Procedures 300 to the Division of Child Protection.  The Procedures 300 workgroup is reviewing the final draft and expects completion by December 2007.

*FY 08 Department Update:*  The internal and external review of Procedures 300 has been completed and comments were forwarded to the Associate Deputy for review. The revisions to Procedures 300 are expected to be finalized by January 2009.

*FY 09 Department Update:*  A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:*  The recommendation will be incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information.  Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours.  The Department should develop tight procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

*FY 07 Department Update:*  The draft CERAP, currently being piloted, addresses this recommendation.

*FY 08 Department Update:*  The recommendations resulting from the pilot were submitted to the Safety Workgroup, which is meeting regularly to incorporate these recommendations. There is a possibility of some additional slight modifications to incorporate the recent Department focus on Trauma-Informed practices. Procedures 300, Appendix G: Safety Assessment Enhancement, has been revised and will be implemented when changes to SACWIS are completed. The anticipated date of implementation is July 2009.

*FY 09 Department Update:*  A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

*FY 10 Department Update:* The recommendation has been incorporated in the draft Safety Enhancement Protocol (Procedure 300, Appendix G). The estimated date of implementation is July 2011.

**OIG FY 04 Annual Report, Death and Serious Injury Investigation 24 included the following six recommendations (labeled below a-f). The responses and updates follow the six recommendations.**

**a) The Procedure for the allegation of Poisoning (#6/56) should include information from literature:**

- **Common sources of intentional poisoning of children include: ipecac, laxatives, black and red pepper, salt, water (intoxication), acetaminophen and aspirin, insulin, adult prescription drugs (e.g. barbiturates, antidepressants, diuretics), alcohol and illicit drugs, and arsenic;**

- **Common symptoms associated with intentional poisoning include: chronic diarrhea, vomiting, lethargy, dehydration, and seizures;**

- **Intentional poisoning has an extremely high mortality rate and when found, children who are intentionally poisoned should not be left with the perpetrator.**

**b) The Department should establish guidelines for the investigation of abusive poisoning cases and suspected Factitious Disorder by Proxy cases in accordance with the published literature. Allegations should be amended to provide that in cases where intentional poisoning is suspected, the investigator should also suspect and investigate Factitious Disorder by Proxy.**

**c) Department Procedures should acquaint workers with the following critical information necessary to investigate Factitious Disorder by Proxy:**

- **Critical to any investigation of poisoning, and especially Factitious Disorder by Proxy, is a detailed determination of who provides care for the child when;**

- **Investigators must retrieve all available medical records for the affected child and siblings; an affidavit of history care, completed by the parents, will be a useful first step in attempting to get all available records;**

- **While not dispositive, the typical perpetrator is a mother who has some medical background;**

- **Typically, perpetrators of Factitious Disorder by Proxy appear particularly bonded with their children and are particularly adept at convincing professionals of their sincerity and abiding interest in their children;**

- **Most victims of Factitious Disorder by Proxy are infants and toddlers;**

- **As much as 98% of the time, the perpetrator continues victimizing the child in the hospital;**

- **The most common presentation of Factitious Disorder by Proxy is apnea. Other common presenting conditions include seizures, bleeding, central nervous system depression, diarrhea, vomiting, fever (with or without sepsis or other localized infection), and rash. Probably the most common cause of death in homicidal Factitious Disorder by Proxy is suffocation, but there are many causes of death, among which are poisoning with various drugs, inflicted bacterial or fungal sepsis, hypoglycemia, and salt or potassium poisoning;**

- **Factitious Disorder by Proxy is not limited to directly causing conditions (e.g. poisoning and suffocation); it may also include, over and under reporting signs or symptoms (e.g. exaggeration of symptoms), creating a false appearance of signs and symptoms (e.g. tampering of specimens) and/or coaching the victim or others to misrepresent the victim as ill (Ayoub, et al., 2002). The presence of valid illness does not preclude exaggeration or falsification (Ayoub, et al., 2002).**

**d) A Factitious Disorder by Proxy investigation should include a thorough review of available medical records for all children in the family.  If a child abuse team is available at the treating hospital, they should conduct the review.  If a child abuse team is not available, this review should be conducted by DCFS nurses and should be subject to the following procedures:**

- **Interview medical personnel regarding symptoms.  If intentionally caused, how long after administration would symptoms be expected to occur?  How long would symptoms be expected to last per dose?**

- **Determine context of onset of symptoms.  Who is present prior to onset of symptoms?**

- **Prepare a medical chronology of symptoms, charting the onset of symptoms and the access of possible perpetrators;**

- **Do siblings' records contain evidence of false pediatric reporting?**

- **Interview treating doctor to determine whether appropriate laboratory tests have been ordered to detect the presence of poisons or emetics.**

**e) Whenever investigators suspect intentional poisoning or Factitious Disorder by Proxy, an immediate referral must be made to law enforcement and the State's Attorney.**

**f) Whenever investigators suspect intentional poisoning or Factitious Disorder by Proxy, investigators must employ a multi-disciplinary approach that includes sharing of information and frequent contact with law enforcement and any Child Abuse Team at the hospital.  If no child abuse team is available, the investigator and DCFS nurse must maintain an open dialogue throughout with treating medical professionals to ensure sharing of all information.**

*FY 04 Department Response*:  A workgroup was convened to revise/update Procedures 300.  Reference to allegations 5/56, 15/65 and 10/60 will be included in the draft protocol for conducting investigations when Factitious Disorder by Proxy is suspected.  The workgroup decided not to limit Factitious Disorder by Proxy to the poison allegation.  Completion date:  April 2005.

*FY 05 Department Update*:  The draft policy is complete.  It was reviewed with the OIG for final comments and subsequent revisions.  Distribution to staff is expected within the first quarter of 2006.

*FY 06 Department Update*:  The Division of Child Protection Committee has not completed its review and final revisions to Procedures 300.  Once completed, these will be returned to the Office of Child and Family Policy to begin the process of approval from the Joint Committee on Administrative Rules (JCAR).  Implementation date:  Spring 2007.

*FY 09 Department Update*: Rule 300 is currently being reviewed by the JCAR and Procedures 300, Appendix B, Child Abuse and Neglect Allegations, is being revised.

*FY 10 Department Update:* This information has been incorporated in draft Procedures 300, Reports of Child Abuse and Neglect, Appendix K- Factitious Disorder by Proxy.  The anticipated date of completion is July 2011.

**CHILD WELFARE EMPLOYEE LICENSURE (CWEL)**

**The OIG recommended that Rule 412, Licensure of Direct Child Welfare Services Employees and Supervisors, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**
- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue to include any crime of which dishonesty is an essential element;**
- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**
- **To provide guidelines for assessing criminal convictions and abuse or neglect findings that are not bars to licensure;**
- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

*FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412. The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

*FY 08 Department Update:* The revisions to Rule 412 were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The amended Rule 412 has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

*FY 10 Department Update:* The first notice of Section 412.100, Restoration of Revoked or Suspended License, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

**The Department should amend Rule 412, Licensure of Direct Child Welfare Services Employees and Supervisors, to provide specific provisions for voluntary relinquishment of a child welfare employee license (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**
- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as *"relinquished during licensure or disciplinary investigation or proceeding."***
- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the Division. The form must contain an**

**acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings. Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished shall be considered a Request for Reinstatement rather than an Application for License.**

*FY 08 Department Response:* The Department agrees. The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, Restoration of Revoked or Suspended License, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

**Section 412.100, Restoration of Revoked or Suspended License, should be amended as follows: Section 412.100, Restoration of Revoked, Suspended or Relinquished License: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request. In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation. For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown. The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so. Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to: the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees. The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 is currently being reviewed by the Joint Committee on Administrative Rules.

*FY 10 Department Update:* The first notice of Section 412.100, Restoration of Revoked or Suspended License, was filed in October 2009. The second Notice was never filed due to failure to obtain a fiscal note. The Office of Child and Family Policy will resubmit the first Notice again by January 2011, subject to approval.

**Rule 412, Licensure of Direct Child Welfare Service Employees and Supervisors, should be amended to provide for automatic suspension or denial of license application after a licensee or**

**applicant has failed a drug test required by Administrative Procedure 24 Drug Testing of Employment Applicants (from OIG FY 08 Annual Report, General Investigation 32).**

*FY 08 Department Response:* The Department agrees. The Department convened a task force that has developed language to amend Rule 412.

*FY 09 Department Update:* Pre-employment drug testing (Administrative Procedure 24) was suspended indefinitely due to budget constraints.

*FY 10 Department Update:* The Department began pre-employment drug testing in February 2008, but had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

**CONTRACT MONITORING**

**Contracts should require quarterly reports from mentoring and counseling agencies on progress toward achievement of program plan goals, both in relationship to individual clients and, in the aggregate, for all clients served under the contract (from OIG FY 08 Annual Report, General Investigation 24).**

*FY 08 Department Response:* The Department agrees. Revised requirements will be included in FY10 contracts.

*FY 09 Department Update:* The Department continues to include revised requirements in contracts. The estimated date of completion is July 2010.

*FY 10 Department Update:* Implementation of the recommendation is still in progress.

**Drug and alcohol toxicology contracts should be competitively bid (from the OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department agrees. This will be implemented with FY 2009 contracts.

*FY 08 Department Update:* Due to the program plan and protocol changes, this service was not bid in FY 2009. It is anticipated that the service will be out for bid in FY 2010.

*FY 09 Department Update:* Due to retirement and staff changes and the new committee that developed recommendations, it is still anticipated that services will be put out for bid for FY2011.

*FY 10 Department Update:* The Procurement Office is preparing to release the request for proposals (RFP) in February 2011 and the award is expected in FY 2011.

**The Department must immediately ensure that no further advance payments are issued without procurement of a surety bond and without signed verification that the expected billings and proposed budget will support timely repayment of the advance. Contract monitors must ensure**

**that contractors are not incurring needless expenditures, such as the rental payments that the new agency incurred (from OIG FY 06 Annual Report, General Investigations 13).**

*FY 06 Department Response:* The Division of Budget and Finance will work with the Office of Legal Services to develop an appropriate protocol for implementing a surety bond process as it relates to advance payments for non-board contracts.

*FY 07 Department Update:* Protocol development is in process.   Anticipated completion date: May 2008

*FY 08 Department Update:* Boilerplate language was modified for FY09 contracts to include language specific to refunding excess revenues with timelines for a) termination of an agreement and b) end of contract year. A surety bond is not required since statutory language removing a conflict between the Child and Family Act and the State Finance Act has not been resolved. It was suggested to try to amend the Child and Family Act to bring it up to date with the law recognized by the comptroller and that has not been accomplished.

*FY O8 OIG Response: Absent a legislative change, the Department must comply with current law and procure surety bonds. In addition, contract liaisons need to determine that budget and billings will support payback.*

*FY 09 Department Response:* Proposed revisions to the Children and Family Services Act (20 ILCS 505) were provided to DCFS Legislative Office in November 2009, to begin the legislative process. The Legislative Office submitted the legislative proposal to the Governor's Legislative Office for their approval to move forward.

*FY 09 OIG Response: The Legislative proposal submitted was to eliminate the statutory requirement for surety bonds. The OIG opposes this legislative proposal because it believes that surety bonds are an appropriate safeguard for public funds. The OIG's recommendation concerning surety bonds came from an investigation in which public funds were lost because a surety bond was not procured.*

*FY 10 Department Update:* The Department will revise policy to require surety bonds for all contracts that have advance payments attached. Estimated completion date is FY 2012.

**The Department must separately track all advance payments and ensure they are repaid in a timely manner (from OIG FY 06 Annual Report, General Investigations 13).**

*FY 06 Department Response:* The Department's Office of Contract Administration and Office of Financial Management will work together to develop a separate tracking mechanism for advances made with non-board contracts.  Estimated date of completion is February 28, 2007.

*FY 07 Department Update:* The tracking mechanism is under development.   Anticipated completion date: May 2008.

*FY 08 Department Update:* The system development project was stopped prior to implementation and has not been completed.  The practice of making advances was changed to provide advances in very few situations, and then only for no more than two months; more of these types of contracts were changed to grants; the program plan was modified to include a reconciliation to recover the advances in the last two months and/or lapse period.  The excess revenue audit

process also lowered the threshold for audit review in order to identify and recover advances if not captured in the program plan/reconciliation process.

*FY 08 OIG Response: The Department should track even the few advance payments it currently makes, whether through grants or contracts.*

*FY 09 Department Update:* The Contract Monitors/Liaisons maintain individual tracking of all advance payments for new services or vendors and initiate a reconciliation plan during the last two months of service of the contract period.

*FY 09 OIG Response: The absence of tracking recoupment and reconciliation was found in several OIG investigations. The recommendation is that all advance payments must be centrally tracked to ensure that individual monitors are enforcing requirements.*

*FY 10 Department Update:* The Office of Financial Management currently tracks all advances made to the provider for the purpose of providing working capital for service provision. Contract Liaisons maintain individual tracking of advance payments for new services or vendors and initiate a reconciliation plan during the last two months of service of the contract period.

**The Department must develop a reliable Contract Monitoring process that would provide checks and balances and separation of functions to prevent the abuses. The process must include:**

- **Quarterly review of expenditures to ensure that expenditures were related to the Contract**;
- **Quarterly review of services, to ensure that the goods or services were provided;**
- **Contractual and Rule requirement that any contractual spending for services or items not specifically covered under the Contract must be approved, in writing, by the Contract Division;**
- **Lapsed funds and obligation of funds must be approved in writing by the Contract Division.**

**The Department must develop specific guidelines for disbursement when Fiscal Agents are used. The guidelines must include checks and balances to ensure that Fiscal Agents ascertain that the services or goods for which they issue checks have been provided. The use of Fiscal Agents must also be monitored by the Contracts division to ensure separation of functions. Fiscal Agents must understand that their role is not limited to check-writing and that they maintain fiduciary responsibility for expenditure of public funds.**

**The Department needs to systematically track public monies spent by contractors through subcontracts. The Department must be able to track who is ultimately responsible for providing services and who is ultimately receiving DCFS funds, in order to guard against conflicts of interest and double-billing.**

**The Department must develop a conflict of interest protocol, whereby entities are identified that the Department should not be contracting with, because of conflicts of interest, and the Department must purchase anti-conflict software that would identify Department funds expended on prohibited entities, similar to the practice at law firms (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 06 Department Update:* The Department is developing a workgroup that will consist of Contract Administration staff, Budget and Finance staff, and a representative(s) of the Conflict of

Interest Committee to analyze the current processes and make recommendations to the Director for changes/enhancements.

*FY 07 Department Update:* A workgroup is being developed. Anticipated completion date: May 2008.

*FY 07 OIG Response: These recommendations were made after the Inspector General's Office discovered that a quarter of a million dollars of Department funds intended to assist children and families was diverted into the private bank account of a Department manager. These recommended changes are critical to ensuring that such abuse of trust does not occur in the future. The Department has had more than two years to institute these basic changes.*

*FY 08 Department Update:* The workgroup is reviewing the monitoring and disbursement processes and will provide recommendations for revisions/changes to Executive Staff by March 2009. It is anticipated that execution of approved recommendations will be prior to finalization of the fiscal year 2010 contracts. The ability to purchase and/or implement software is dependent on available funding.

*FY 09 Department Update:* The review of the monitoring and disbursement processes was completed. Final draft has been submitted to Executive staff for recommendations for revisions/changes. As a part of the contract process for FY2010, Contract Administration established and followed a protocol of using federal web-based sites to research each vendor/provider as a part of processing contracts to identify potentially prohibited vendors and/or look for vendors with potential conflicts of interest and/or a suspended and debarred status. Procedures 436 are currently under revision by a workgroup to address record keeping procedures for Purchase of Service (POS) agencies.

*FY 09 OIG Response: Revisions must include checks and balances when fiscal agents are used. The OIG has not had an opportunity to review the final draft.*

*FY 10 Department Update:* The Department will ensure that there are standards that Fiscal Agents are held to included in the Program Plan for each applicable contract. Each Fiscal Agent's duties vary based on the agency needs for those contracted vendors they are working with. Office of Contract Administration and the contract liaisons are required to review and train each Fiscal Agent on their duties and responsibilities as a part of the annual contract process. Office of Contract Administration and Budget & Finance (Budget Office) personnel will provide additional focused training in FY 2012 to Fiscal Agents and outline the duties for each Fiscal Agent in program plans attached to FY 2012 contracts. In addition, the OIG is working with the Office of the Attorney General and the Department to develop a training targeted to Contract Monitoring and fraud detection.

## FOSTER HOME LICENSING

**In order to satisfy Department Rule 402.8, General Requirements for the Foster Home, the Department should incorporate into a licensing safety assessment the guidelines set forth by the American Humane Society regarding the observation of family pets in their natural environment. These guidelines, detailed below, should also be incorporated into Part 300, Reports of Child Abuse and Neglect and Part 406, Licensing Standards for Day Care Homes (From OIG FY 09 Annual Report, Death and Serious Injury Investigation 11).**

***Guidelines from the American Humane Society***

***In a publication entitled "A Common Bond: Maltreated Children and Animals in the Home" published by the American Humane Society, authors Mary Lou Randour and Howard Davidson propose that a child welfare safety assessment of animals and children should include animal related questions and observation of interactions between family members and family pets. The Humane Society recommends observation of the animal in its daily environment, and that when making a home visit the observer can incorporate the following questions into the interview:***

- ***Do you have any family pets or other animals in your home?***
- ***May I see them, or can you bring them out?***
- ***What can you tell me about your pets?***
- ***Who takes care of them?***
- ***What happens when one of them is disobedient?***
- ***Who disciplines them? How do they do that?***
- ***Have you had any other pets? What happened to them?***

***When observing interactions between the family members and their pets, the following should especially be considered:***

- ***Are there any family pets that might be classified as a breed that is associated with animal fighting or other crimes? The presence of a high-risk pet could place children and other family members in danger.***
- ***Do the animals seem relaxed around all family members, or do they seem to avoid, or appear anxious around, one or two particular family members?***
- ***How does the presence of the animals affect the family interactions?***
- ***If there is a dog in the home, does the child have access to the area where the dog is kept?***
- ***If the child is near the dog, how is s/he supervised?***
- ***How much time does the dog spend interacting with family members?***
- ***What socialization has the dog had with children?***
- ***Has the dog received obedience training?***
- ***Does the dog have a history of aggressive behaviors?***

*FY 09 Department Response:* The Office of Child and Family Policy and the Licensing Unit are developing a form to be signed by the foster parent responding to several questions about dangerous pets listed in the American Humane Society guide. Once this language is drafted, similar language will be drafted for Department Procedures 406 and 408. In addition, new legislation requires cross-reporting between child abuse investigators and animal abuse investigators.

*FY 10 Department Update:* After further review, the Licensing Division has determined that responsibility to determine whether a pet is aggressive or not is beyond the scope and expertise of the licensing workers. P300 Reports of Child Abuse and Neglect and the Safety Checklists have been drafted.

*FY 10 OIG Response: After a child was viciously mauled and killed by dangerous animals in a foster home, the OIG recommended that Licensing address this clear safety hazard. The Child Death Review Team supported the OIG's recommendation. It is unconscionable that the Department refuses to recognize its responsibility to address this safety issue in licensed foster homes.*

**The Department should amend Department Rule and Procedure 402, Licensing Standards for Foster Family Homes, to require that licensing workers identify alternate caregivers, determine where the alternate care will take place and perform background checks in accordance with Rule 385, Background Checks, of all adults and those over 13 years of age residing in the alternate care home when the care will take place other than in the foster parent's home (from OIG FY 09 Annual Report, General Investigation 3).**

> *FY 09 Department Response:* A CFS 109 is being prepared for a revision of Part 402 that would require that licensing staff identify alternative caregivers and perform background checks in accordance with Rule 385 of all adults and those over 13 years old residing in the alternate care home.

*FY 09 OIG Response: The critical information that needed to be gathered in this case was where the care was being provided. Unless the Department requires information about where the care is being provided, the harm that the children were subjected to in this case could be repeated.*

> *FY 10 Department Update: No update provided.*

**The Department should pursue an amendment to the Abused and Neglected Child Reporting Act (ANCRA)  extending the 30-day retention period to six months after a final finding is entered for unfounded reports involving licensed foster homes made by non-mandated reporters (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 9).**

> *FY 08 Department Response*: The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA which address the above issue as well as other proposed changes to ANCRA, and will submit these amendments as a single legislative package.

> *FY 09 Department Update:* DCFS Legal reviewed and concluded that a legislative change is required to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding. Legal has drafted and submitted proposed legislation amending ANCRA – 325 ILCS 5 that has been approved by the Director for inclusion in our legislative package for the upcoming Spring Session. We anticipate that the legislative process and subsequent revision to Rule 431.30, Maintenance of Records, can be completed by the beginning of Spring 2011.

> *FY 10 Department Update:* DCFS Legal submitted a legislative proposal amending ANCRA 325 ILCS 5 to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding. The proposed legislation was included in the Department's legislative package for the Spring 2010 Session. The anticipated date that the legislative process and subsequent revision to Section 431.30 Maintenance of Records will be completed in the second quarter of 2011.

**The Department's licensing standards should require a reassessment of a foster home license when the licensing agency becomes aware of a major change in the family composition, such as a spouse/paramour moving out of the home. The reassessment should include a review of the foster parent's capability to care for the children in light of the loss of a second caretaker as well as the**

**circumstances surrounding the change and any ensuing custody or other legal disputes (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* Appropriate revisions have been sent to the Office of Family and Child Policy.

*FY 09 Department Update:* CFS 597-FFH has been revised and will be distributed when revisions to P402 are complete. This information is included in draft P402, Licensing Standards for Foster Family Homes, but additional revisions to the procedure are currently in process.

*FY 10 Department Update*: The Family Foster Home Licensing Monitoring Record (CFS 597-FFH) was revised effective November 2010 and the recommendation was incorporated in Section 402.12 Qualification of Foster Parents and distributed September 2010.

**The Department should develop guidelines for shared monitoring responsibilities when a single foster home has children monitored by different agencies or when the case monitoring and license monitoring functions are split between agencies. The guidelines should include the following requirements:**

- **a. a staffing of all involved case and licensing workers;**
- **b. written agreement of roles and responsibilities of each worker;**
- **c. written guidelines concerning the responsibility to share information and the process for sharing information (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. POS may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

*FY 10 Department Update: No update provided.*

**INFORMATION TECHNOLOGY**

**The Office of Information Technology Services (OITS) should explore the feasibility of streamlining the search function of the State Automated Child Welfare Information System (SACWIS) concerning ease of locating prior history with the Department (from OIG FY 09 Annual Report, General Investigation 1).**

*FY 09 Department Response:* The Department does not have the funding or manpower to undertake this project.

*FY 09 OIG Response: Given the high caseloads of investigators and caseworkers, efficient search engines are critical to protecting children.*

*FY 10 Department Update:* After further review, the Department has determined that unless the database is reviewed and cleaned up by operations, there will be little improvement from using an improved search engine. The Department cannot determine what improvement is possible until the database is cleaned up. The cost estimates of a new search engine, which would have to be obtained under a new license and then modified, are well in excess of $1 million. OITS does not have the money for such an upgrade, especially given the inability to guarantee that this upgrade would improve performance.

*FY 10 OIG Response: The rationale behind this recommendation was that child protection investigators needed a user-friendly, efficient computer search to ascertain if any family member or adult involved in the current child protection investigation has previously lost custody of any children because of abuse or neglect. In this case, the alleged perpetrator had had his parental rights terminated, but the indicated findings that were the basis for the termination of parental rights were expunged from the State Central Register. The Department should retain indicated findings as recommended by the Child Death Review Teams when the indicated allegations were the basis for termination of parental rights.*

**The Department should expand information contained in the D-Net related to research to include at least: contact information for the Department's Research Director, the frequency with which the Research Review Board meets, and reference to Rule 432, Research Involving Children and Families, and the requirements set forth therein (from OIG FY 09 Annual Report, General Investigation 22).**

*FY 09 Department Response:* All Research Review Board research proposal submission forms, examples of consents, and list of committee members have been submitted to the Office of Communications as part of the Governor's Sunshine Project and will be accessible to the general public through the portal being created by Central Management Services.

*FY 10 Department Update:* The information has been placed on the DCFS internet site.

**The Department's electronic records database (SACWIS) should be changed to ensure that intact family managers have access to investigations linked to cases of their workers. SACWIS photographs should be viewable by anyone who has access to the investigation (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 1).**

*FY 09 Department Response:* Both of the requested changes will be included in the planned release of an updated version of SACWIS, Version 4.1.

*FY 10 Department Update:* This is part of the planned SACWIS release 4.1. The estimated implementation date is early 2011.

**The Department must implement security safeguards prior to enabling remote access to the State Automated Child Welfare Information System (SACWIS) on personal computers. Office of Information Technology Services (OITS) must obtain direct approval from the private agency's executive director prior to enabling remote access for private agency employees. Two documents should be developed in connection with remote access: (1) The agency director should sign a form agreeing to notify OITS within 24 hours of the employee's change in status or departure from the agency, and (2) The employee should sign a document specifically acknowledging the confidential nature of the remote access application and agree to ensure that outside persons do not have access to the application. The employee should be informed and agree to the requirement that, in order to maintain confidentiality, the Department prohibits transferring or downloading any confidential information onto their personal computer or email. The OITS should maintain and routinely update a database of remote access to SACWIS users (from OIG FY 08 Annual Report, General Investigation 24).**

*FY 08 Department Response:* The Director and the Office of Legal Services are reviewing this recommendation.

*FY 09 Department Update:* The documents have been developed and issued.

*FY 09 OIG Response: The Illinois DCFS Virtual Private Network (VPN) usage agreement should also require a signature by the Executive Director to ensure the Executive Director's knowledge and approval of remote access.*

*FY 10 Department Update:* Approval of Administrative Procedure 20 Electronic Mail/Internet Usage/SACWIS Search Function is pending for internal/external review.

## LEGAL

**Child Protection investigators should consult with the DCFS Office of Legal Services when they are having difficulty coordinating their investigation with police or obtaining information from police in a timely manner (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 1).**

*FY 09 Department Response:* DCFS Rules and Procedures have a pre-established chain of command. In situations described by this OIG recommendation, the investigator consults with management, who, in turn, assumes the responsibility for resolution. In addition, the Department utilizes the existing legal avenues (e.g., Administrative Subpoena process), to obtain any information necessary for the investigation.

*FY 09 OIG Response: DCFS Office of Legal Services must, however, proactively ensure that administrative subpoenas for police records are complied with and any failures to comply are forwarded to the Attorney General for enforcement proceedings.*

> *FY 10 Department Update:* A reminder was issued to child protection staff December 2010.

**The Office of the Inspector General should request that the Administrative Office of Illinois Courts require that Juvenile Courts in substantive matters, such as change of custody or visitations, be required to have such hearings on the record so that a record would be available when necessary (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 09 Department Response:* The Inspector General has contacted the Administrative Office of the Illinois Courts with regards to this matter. The Inspector General will meet with a representative from the Administrative Office of the Illinois Courts to discuss this issue.

*FY 10 OIG Update: The OIG is continuing to work with the Administrative Office of the Illinois Courts to address issues of mutual concern.*

**DCFS Office of Legal Services should to the extent permitted by operational needs be present in the involved county's County Juvenile Court a maximum of two (2) days per week over the next six (6) months to focus on cases brought to the DCFS attorney's attention by the State's Attorney, the Judge or DCFS staff. DCFS staff should be instructed to notify DCFS Office of Legal Services of contested or problematic cases. At the conclusion of the six month period, all parties should meet to assess the effect of increased DCFS Office of Legal Services involvement and determine a future plan (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 1).**

> *FY 09 Department Response:* DCFS is currently in the six month assessment period. Staff has been instructed to notify DCFS Office of Legal Services of contested or problematic cases.
>
> *FY 10 Department Update:* DCFS legal has completed the six month assessment period. Initial feedback from the Court, the State's Attorney's Office and DCFS staff is favorable. DCFS Legal will continue to attend the County Juvenile Court call on a regular basis to resolve court issues.

*FY 10 OIG Update: The Inspector General met with the Judge, Assistant State's Attorney and DCFS legal to review this case. Issues identified in this investigation will be incorporated into future Error Reduction Trainings.*

**The Department's Interstate Compact Procedures should be revised to require:**

- **when an interstate compact is denied, the Interstate Compact Unit shall notify the Office of Legal Services. The Office of Legal services will then monitor the case to ensure that the interstate compact is neither violated or circumvented in a manner that compromises the safety of children;**

- **if an interstate compact is disputed or violated, the Office of Legal Services will notify DCFS Clinical and DCFS Clinical will convene a staffing with the agency caseworker and supervisor, and the GAL;**

- **notification of the Interstate Compact Unit, by the agency, if an interstate compact placement request is pending and the children are sent to the placement under consideration (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 4).**

  *FY 09 Department Response:* Revisions are being made to Procedure 328: Interstate Compact, in order to incorporate these requirements. The Interstate Compact Office has been directed to report all such situations immediately to DCFS Office of Legal Services who then monitors the case to ensure that the ICPC is not violated or circumvented in a manner that compromises the safety of children. Copies of that notification are sent to an Associate Deputy Director to verify that direction is being carried out.

  *FY 10 Department Update:* Revisions to Procedure 328 Interstate Placement of Children are still in process. In the event an interstate compact is disputed or violated the Department's Office of Legal Services notifies the DCFS Division of Clinical Services. The Office of Legal Services receives and monitors notifications received from Interstate Compact.

**Department Procedures should be revised to require that in cases where domestic violence is present, child protection investigators and intact workers should contact the local police department and request the complete police record involving the family, including 911 contacts at the home (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 6).**

  *FY 09 Department Response:* A work group of representatives from the Department, the Office of the Inspector General and the police will be convened to address any difficulties in obtaining 911 records.

  *FY 10 Department Update:* A workgroup will be convened in January 2011 to address this issue.

**The Deputy Director of the Division of Affirmative Action should issue a communication to Department staff in the affected regions instructing them of their obligation to comply with the Burgos Decree as detailed in Section 302.30(c) Accessibility of Services to All Persons. The Department should also educate staff about the availability of the tele-interpreters resource through quarterly announcements on the D-Net and include on the D-Net a list of qualified interpretation/translation providers in each region (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 9).**

  *FY 09 Department Response:* The interpreter information has been submitted to the Office of Legal Services for review prior to posting on the D-Net.

  *FY 10 Department Update:* The Office of Legal Services continues to work with DCP on this issue.

**In any case in which a change in guardianship essentially represents a return home, DCFS Office of Legal Services should be involved to ensure that the appropriate petition is filed in the appropriate court and to represent the Department at any subsequent hearing on the matter  (from the OIG FY 07 Annual Report, Older Caregivers Addendum).**

  *FY 07 Department Response:* The Department agrees.

*FY 08 Department Update:* The Department is continuing to review implementation of the recommendation.

*FY 09 Department Update:* The Department's Office of Legal Services has reviewed this issue and concluded that the burden is on the moving party to present evidence as to why the minor should be returned to their care.  The Office of Legal Services will be involved to the extent requested or ordered by the court.

*FY 09 OIG Response: If the Department is aware of a Return Home, and is not contesting it, it is the duty of the Department to inform the court.*

*FY 10 Department Update:* It is the practice of DCFS Office of Legal Services to share all relevant information in their possession with the court.

**The Department's legislative liaison should pursue legislative amendment to Illinois Statute 430 ILCS 65/4-65/10 Public Safety to address the need to revoke firearm registration of parents who demonstrate an inability to keep their firearms from minors under a set of conditions that include: minors, age 16 and under, with a mental condition or behavior that poses clear and present danger to self or other persons (e.g., discharging firearms in the absence of parental supervision, shooting guns at other persons, taking weapons or ammunition to school) (from OIG FY 07 Annual Report, General Investigation 3).**

*FY 07 Department Response:* The Department believes that any legislation to amend Illinois Statute 430 ILCS 66/4-65/10 should be negotiated by the Illinois State Police and the Department of Natural Resources.  The Department of Children and Family Services has no involvement in firearms law.

*FY 07 OIG Response:  The OIG is pursuing the legislative change.*

*FY 08 OIG Update: House Bill-5191, which would amend the Firearm Owners Identification Card Act, was introduced to the Illinois General Assembly by State Representative Greg Harris.  Through a collaborative effort by the OIG and Representative Harris, the House passed the Bill on April 30, 2008. On May 1, 2008 the Bill arrived in the Senate and is being sponsored by State Senator Heather Steans. The Bill is currently pending in the Senate.*

*FY 09 OIG Update: The bill was not passed prior to the end of the last session. The OIG will work to have the bill reintroduced and passed in the next session.*

*FY 10 OIG Update: The OIG will continue to work with the legislature to pursue new legislation.*

**Department Procedure 300.70, "Referrals to the local law enforcement agency and State's Attorney" should be amended to include second-degree burns as injuries requiring referrals to local law enforcement and the State's Attorney (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

*FY 07 Department Response:* Language regarding this recommendation is being drafted and will be submitted to the Office of Child & Family Policy for approval.

*FY 08 Department Update:* The OIG's recommendation was based on a request by the Children's Advocacy Center (CAC). The Department continues to review the feasibility of the recommendation.

*FY 09 Department Update:* In Procedures 300 (Appendix B, Allegations, Burns 5/55), the Department will add "notification to State's Attorney on 2nd, 3rd, and 4th degree burns" in order to implement the recommendation.

*FY 10 Department Update:* Procedure 300 Reports of Child Abuse and Neglect, Appendix B-The Allegation System, Allegation #5 Burns will be amended to include notification to States Attorney in cases of 2nd, 3rd, and 4th degree burns. The Department is awaiting approval from the Joint Committee on Administrative Rules (JCAR) to move forward.

**MEDICAL**

**The contracted medical experts' program plan should require an interdisciplinary discussion with all relevant treating or consulting doctors and specialists before rendering an opinion. If there are areas of disagreement among the consultants and/or specialists, they must be resolved before the report is issued or noted in the final report (from OIG FY 09 Annual Report, General Investigation 13).**

*FY 09 Department Response:* This will be included in the FY 2011 program plan.

*FY 10 Department Update:* This was included in the FY 2011 contract plans.

**Department Procedures should be amended to include that any time a foster child is hospitalized or taken to the emergency room complete medical records should be obtained and placed in the child's file. Procedure should also require that the records are shared with the foster child's pediatrician (from OIG FY 09 Annual Report, General Investigation 7).**

*FY 09 Department Response:* A Department form, CFS 109, is being prepared for a procedural change to amend Procedure 402 in case of a foster child's hospitalization. The revised procedure will require that complete emergency room medical records be obtained and placed in the child's file and the record shared with the child's pediatrician.

*FY 10 Department Update: No update provided.*

**The Department's Guardianship Administrator should identify and review all wards who have a current diagnosis of Reactive Attachment Disorder (RAD) and develop and implement a plan to determine whether these children and youth were properly diagnosed and are receiving appropriate treatment or whether they require an evaluation that follows recommended guidelines of the American Academy of Child and Adolescent Psychiatry, and the American Professional Society on the Abuse of Children. The OIG will provide the Guardianship Administrator with the two investigations where RAD was misused (OIG FY 07 Annual Report, General Investigations 2).**

*FY 07 Department Response:* The Department's Clinical Division will review all wards with a current diagnosis of Reactive Attachment Disorder.

*FY 08 Department Update:* Using the guidelines and standards proposed by the American Academy of Child and Adolescent Psychiatry, the Department's Chief Consulting Psychologist will identify all children in placement who have a diagnosis of RAD. A random clinical review of at least five children will be completed to ensure proper assessment, diagnosis and treatment. In addition, a letter delineating the American Academy's standards and guidelines for the assessment and treatment of RAD will be drafted and distributed to all therapy and counseling providers. This should be completed by the end of February 2009.

*FY 09 Department Update:* Clinical will complete all parts of this recommendation.

*FY 10 Department Update:* Historically, the Department has had difficulty identifying child welfare cases involving youth with a diagnosis of Reactive Attachment Disorder (RAD). The Division of Clinical Services' Psychology Program provides clinical consultation to child welfare staff and receives all psychological evaluations statewide for DCFS/POS youth in care, including those in psychiatric hospital and residential settings. The Psychology Program's Program Administrator will from here on identify and review all consults and psychological evaluations involving those youth with a DSM diagnosis of Reactive Attachment Disorder (RAD) to determine appropriateness of diagnosis and treatment. The Psychology Program Administrator will subsequently alert and direct these cases to the Department's Guardianship Administrator for further review and follow-up.

**The Guardianship Administrator's Office should regularly obtain information from Medicaid Prescription Use Screens to better service wards who are prescribed multiple medications (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 06 Department Response:* The Department's consulting psychiatrist has been in discussions with staff from DHS, regarding linking the DCFS Psychotropic Medication Consultation Program database and the IDPA Medication Screens to provide more timely access to Medicaid Payment Data.

*FY 07 Department Update:* DHS General Counsel is working to secure approval. After approval is secured, DCFS Legal will work to secure the signatures required to implement the Intergovernmental Agreement. The anticipated completion date is May 2008.

*FY 07 OIG Response: The Intergovernmental Agreement addresses only access to records of psychotropic medication and only for wards that the Department is unable to locate. This does not address the recommendation, which was to monitor multiple medications of all wards. It should not be limited to wards that cannot be found, and it should not be limited to psychotropic medications, since non-psychotropic medications can be counter-indicated for use with psychotropic medications.*

*FY 08 Department Update:* DCFS is working with the Department of Healthcare and Family Services (HCFS) to obtain access to the Medicaid prescription use screens. The anticipated date of completion is January 2009.

*FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from HCFS. While no one has denied access to the Department, access has not been authorized. Efforts to gain access will continue.

*FY 10 Department Update:* A contractor through the Division of the Guardian and Advocacy has access and will provide the needed information.

**PERSONNEL**

**Rule 437, Employee Conflict of Interest, should be amended to clarify that secondary employment must always be reported to one's supervisor. The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict. The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes (from OIG FY 09 Annual Report, General Investigation 25).**

*FY 09 Department Response:* The conflict of interest workgroup is in the process of finalizing the proposed changes to Rule 437.

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437 Employee Conflict of Interest for internal and external comment is the first quarter of 2011.

**The Director should review whether the employee's contractual commitments compromise her appointment to the task force (from OIG FY 09 Annual Report, General Investigation 33).**

*FY 09 Department Response:* This issue is currently under review by the Department.

*FY 10 Department Update:* This issue remains under review.

**The Department should audit time records of employees who earn twice the amount of their base salary in a given year to determine whether documentation supports reported time or whether it is more economical to hire an additional employee (from OIG FY 09 Annual Report, General Investigation 8).**

*FY 09 Department Response:* The Department will review its use of existing overtime and earnings reports and modify, as needed, to identify DCFS employees earning more than twice the annual base salary. The identified instances will then be analyzed and reviewed with appropriate Deputies and supervisors. The first review will take place in February 2010 after annual earnings compilations are complete.

*FY 10 Department Update:* In February 2010 a new reporting system was established that allows each Deputy to follow budgeted overtime versus actual. Each Deputy receives an allotted portion of the Department's total overtime, which s/he manages. Furthermore, Deputies are notified separately of the instances where an employee appears to incur excessive amounts of overtime. Deputies conduct cost benefit analysis to guide their decision.

**The Department's Certification of License and Automotive Liability Coverage form for employee's signature should be amended to state "by the Illinois Secretary of State or other State ___________________" to address Department employees who live in states contiguous to Illinois (from OIG FY 09 Annual Report, General Investigation 8).**

*FY 09 Department Response:* The Budget and Finance Division will review the current form, modify the form and require use of the revised form for the next reporting period.

*FY 10 Department Update:* Revisions to the Auto Liability Coverage form is in process.

**The Department should enforce its policy that all employees who are required to drive as a condition of employment should certify annually that they have a valid driver's license and automotive liability coverage (from OIG FY 09 Annual Report, General Investigation 8).**

*FY 09 Department Response:* The Department's Office of Employee Services (OES) will develop a report from OES's system in May of each year to notify the Division Deputy and Personnel Liaison of every employee that needs a Certification of License and Automotive Liability Coverage form completed for the next fiscal year. The Liaison will notify the employee and their supervisor of the need to complete the form and submit it prior to June 30. The supervisor will be responsible for collecting and sending forms to the Personnel Liaison. The Liaison will provide copies of the forms to the Vouchering Unit and also to OES for the employee's file.

*FY 10 Department Update:* The Office of Employee Services (OES) is currently contacting each Division for travel requirements for their employees. As they receive the information, the job descriptions are being updated and a travel field is being entered as "Yes" into the Personnel system. This will allow a report to be generated for employees who travel and OES will then require the Certification of License and Automotive Liability Coverage form be completed and sent to them.

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement

this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 10 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

**A task group should be assembled to revise Rule 437, Employee Conflict of Interest, and draft related Procedures. Procedural additions should include:**

a. **If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer. In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**
b. **The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**
c. **Instructions on how to contact the Conflict of Interest Committee.**
**All DCFS employees should receive training on the revised Rule and Procedures 437 Employee Conflict of Interest (from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 07 Department Response:* A task group was assembled, but is currently in abeyance, and the Director is currently reviewing possible changes to Rule 437.

*FY 08 Department Update:* The conflict of interest workgroup has reconvened and is in the process of finalizing the proposed changes to Rule 437 and in drafting new procedures that support the revised rule. The anticipated completion of revised Rule 437 is March 2009.

*FY 09 Department Update:* The workgroup has reconvened to address outstanding issues, including fire walls and secondary employment. We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The anticipated completion date for submission of the draft of Rule 437 for internal and external comment is January 2010.

*FY 10 Department Update:* The anticipated completion date for submission of draft Rule 437 Employee Conflict of Interest for internal and external comment is the first quarter of 2011. A copy will be sent to the OIG upon completion. Draft procedures will follow once the rule has been adopted.

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

*FY 06 Department Response:* The procedures have been drafted by the Conflict of Interest Committee.

*FY 07 Department Update:* The Director is considering the recommended changes.

*FY 08 Department Update:* A Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437 and is drafting new procedures that support the revised rule. The anticipated date of completion is March 2009.

*FY 09 Department Update:* The workgroup has been reconvened to address outstanding issues, including fire walls and secondary employment. We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437. The anticipated completion date for submission of the draft of Rule 437 for internal and external comment is January 2010.

*FY 10 Department Update:* Anticipated completion date for submission of draft Rule 437 Employee Conflict of Interest for internal and external comment is the first quarter of 2011.

**SERVICES**

**In future training, the Teen Parent Services Network (TPSN) should replicate a task-centered community approach that includes caseworkers visiting community resources during the training (from OIG FY 09 Annual Report, General Investigation 34).**

*FY 09 Department Response:* The Department agrees. TPSN will revamp eco-map training using a task-centered approach to identifying resources. The training incorporates a "hands on" case management approach to locating community services. The training will include visits to neighborhood agencies to identify resources available to pregnant/parenting teen wards. TPSN will develop and/or include on the current monitoring instrument documentation which reflects that completed Eco-maps are in all case files. The Eco-map training for TPSN caseworkers is scheduled for April 2010.

*FY 10 Department Update:* TPSN revised the eco-map training. The mandatory training is now a regular part of pregnant and parenting teen specialty training. Eco-maps are a part of Utilization Reviews and are mandatory.

**The Teen Parenting Service Network (TPSN) should set incremental goals to increase the number of teen parent children enrolled in early childhood programs (from OIG FY 09 Annual Report, General Investigation 33).**

*FY 09 Department Response:* The Teen Parent Services Network (TPSN) will identify eligible 3+ year olds to determine whether they are enrolled in an early childhood education program. For those not enrolled, TPSN will identify the obstacles to enrollment. TPSN will educate all staff on the importance of exploring early childhood education options with each ward. In January 2010, TPSN will include enrollment in an early childhood education program as part of the Performance Incentive Program for all Regional Service Providers.

*FY 10 Department Update:* TPSN has determined which clients' children are eligible for early childhood educational programming and have reported on the number actually enrolled.  They are developing the campaign on educating staff on these programs and their importance as well.  This has been added as an incentive.

**Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families.  Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 10).**

*FY 09 Department Response:* There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program.  However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases.  The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*FY 09 OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

*FY 10 Department Update:* Revisions to policy guide 99.13 Services for DCFS Substance Affected Families are currently being drafted.

**DCFS Service Intervention Director of Substance Abuse Services should issue a memo to all private agencies informing them of available consultation services including interpretation of urine screen results involving prescription medication.  This report should be shared with DCFS Service Intervention Director of Substance Abuse Services (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 4).**

*FY 09 Department Response:* A memo detailing the availability of consultation services has been drafted and is in approval stage prior to distribution.  The report has been shared with the Administrator of Substance Abuse Services for the Service Intervention Division.

*FY 10 Department Update:* An Information Transmittal was disseminated February 2010.

**Pre-adoptive Home Studies of wards or former wards must require children's collaterals and professional collaterals, especially school personnel to objectively ensure the accuracy of information provided (from OIG FY 09 Annual Report, Death and Serious Injury Investigation 2).**

*FY 09 Department Response:* Child protection investigators make this determination as they go through the investigative process.

*FY 09 OIG Response: The Department response does not address pre-adoptive home studies, which need to inform the courts of direct information from collaterals in the child's life, such as teachers.*

*FY 10 Department Update:* Rule and Procedure will be revised as well as the template outline for the information included in the adoption study.

**The Department should not allow counseling services to be provided by bachelor level professionals with no supervision (from OIG FY 08 Annual Report, General Investigation 24).**

*FY 08 Department Response:* The Department requires a minimum of a master's degree for professionals providing counseling services. Those agencies that may have been grandfathered in to allow a bachelor's level professional to provide counseling will be reviewed on a more frequent basis to ensure that adequate supervision is provided.

*FY 08 OIG Response: This was not a grandfathered agency. This agency's Executive Director had a master's degree. However, those providing services, for the most part, only had bachelor's degrees and were not provided supervision.*

*FY 09 Department Update:* The Department monitors counseling contracts which provide therapeutic services on an annual basis, at a minimum, in order to make sure that all service providers have at least a master's or doctorate degree.

*FY 10 Department Update:* The Department requires that all Bachelor level counselors be supervised by a supervisor with a Master's degree.

**The Department's Division of Clinical Practice should assist child protection and case management staff in managing cases involving caregivers with a developmental disability (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 8).**

*FY 07 Department Response:* The content of the training is developed and will be converted into web-based training. It will be included in the pre-service training for all job specialties and caregivers. The anticipated completion date is December 2007.

*FY 08 Department Update:* The on-line course was completed and effective February 25, 2008. The on-line course is incorporated in pre-service Foundation training for all new direct service child protection and child welfare staff and supervisors. The on-line course is open for registration to all veteran child protection and child welfare staff for in-service training. The DD Administrator convened a tele-conference meeting with Cook DCP Administrators to discuss the need for a statewide centralized consultation process with DCP investigators and staff. The discussion identified necessary and practical information regarding developmental disabilities that could be used with staff, advising them of when to seek immediate consultation from the DD Administrator. The training on this information is scheduled for March 2009.

*FY 09 Department Update:* To meet training needs, 24 training presentations were scheduled with DCP and Intact staff. As of November 2009, 12 sessions were completed. The remaining sessions are scheduled for the weeks of November 2009 and December 2009.

*FY 10 Department Update:* The Division of Clinical Practice's Office of Developmental Disabilities provided the last of the recommended 24 training sessions to DCP and Intact staff.

**The Department should train Child Protection and Intact Family staff on utilization of the Social Security Administration's consent for release of information to obtain information on a parent or**

**child's qualifying disability (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 8).**

*FY 07 Department Response:* This is included in the on-line orientation training. Confidentiality and release of information is currently covered in training for all staff and will be included in the revised Foundations, which will be ready for delivery in December 2007.

*FY 07 OIG Response: The orientation training does not include training on securing consent to access relevant social security disability information. The material is not covered in Foundation training for child protection and child welfare staff. The OIG will work with the Department to ensure that this material will be included in the Foundations training.*

*FY 10 Department Update:* The Office of Training incorporated information on securing consents from the Social Security Administration in the Child Protection Investigation Foundation.

**The Subsidized Guardianship Agreement (CFS 1800) should be amended. At a minimum this agreement should allow for payment suspension and termination of the agreement when custody of a minor is restored to a biological parent. In the interest of complete and full disclosure however, the possibility of a child returning to his/her biological parent and the steps necessary for that to occur should be clearly identified in the General Provisions Section of the Agreement (from the OIG FY 07 Annual Report, Older Caregivers Addendum).**

*FY 07 Department Response:* The Department agrees.

*FY 08 Department Update:* The Department is continuing to review implementation of the recommendation.

*FY 09 Department Update:* The forms, as well as rule and procedure, do currently provide termination criteria that would cover the return of the youth to a birth parent. There is no language in a subsidy agreement about return to a birth parent, since it is not expected; and it is inappropriate to provide this type of language in a contractual agreement with the subsidized guardians.

*FY 09 OIG Response: OIG investigations as well as reports from the field support that return to a birth parent does occur and needs to be subject to procedures when it does occur. Recent amendments to the Adoption Act (705, ILCS, 405/12-34) also support the need for the Department to recognize the possibility of return home.*

*FY 10 Department Update: No update provided.*

**The Department must monitor and enforce contract compliance of POS agencies with Department contracts to acknowledge and include fathers and paternal family members as an integral part of case management services. Department monitors must ensure that Department Procedures 302: Services Delivered by the Department and its Appendix J: Pregnant and/or Parenting Program is followed (OIG FY 07 Annual Report, General Investigation 22).**

*FY 07 Department Response:* The Department agrees.  A memorandum is being drafted to DCFS and POS staff.  Target completion date:  December 2007.

*FY 08 Department Update:* The newly appointed Deputy for Monitoring is reviewing this recommendation and will address this issue by February 2009.

*FY 09 Department Update:* The Fatherhood Initiative addresses this issue.

*FY 09 OIG Response: The Fatherhood Initiative expresses an important goal of the Department but does not provide practical means of monitoring or assessing the adherence to that policy. Moreover, only 104 cases statewide have been referred to the Fatherhood Initiative Programs, according to the most recent data. The Department needs to secure broader participation for father of DCFS involved children.*

*FY 10 Department Update: No update provided.*

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues.  When it is completed the informational transmittals will go out to DCFS, POS, CWS, and DCP staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The ERC Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

*FY 10 Department Update:* At the request of the Division of Child Protection (DCP), the ERC Protocol was placed on hold due to a planned reorganization and remains on hold as of November 2010.

**Procedures 302 Services Delivered by the Department should be revised to show that certified copies of vital records will be assessed a fee and that the fee on administrative copies of vital records will be waived by the Department of Public Health, but not necessarily by the local county clerk.  This procedure should also address the issue of prepaid postage (from OIG FY 07 Annual Report, Birth Certificates).**

*FY 07 Department Response:* Language is being drafted that will be submitted to the Office of Child & Family Policy by December 2007.

*FY 08 Department Update:* Operations is currently revising Procedures 302. The anticipated date of completion is February 2009.

*FY 09 Department Update:* Revised Procedure 302.390 incorporating needed language is complete and awaiting Director approval prior to being issued.

*FY 10 Department Update:* Section 302.390 Placement Services subsection (a)(3) has been amended to incorporate changes in procedures and fees for obtaining birth certificates. The amendment was distributed December 2009.

**Procedures for Child And Youth Investment Teams (CAYIT) should be amended to include situations in which a move is requested for any reason other than a ward's best interest (OIG FY 07 Annual Report, General Investigations 14).**

*FY 07 Department Response:* The CAYIT Policy is currently under review. Target completion date: February 28, 2008.

*FY 08 Department Update:* CAYIT procedures (Policy Guide 2006.04) have been revised to clarify and differentiate the referral process for placement changes through CAYIT, Clinical Placement Staffing Review and Residential Transition Discharge Planning Protocol. The revised procedure will be sent to the Office of Child and Family Policy for review and then sent out for comment.

*FY 09 Department Update:* Draft revisions to the CAYIT policy have been completed and submitted to the Office of Child & Family Policy for review and completion of revision process.

*FY 10 Department Update:* The CAYIT Policy was amended March 2010 which clarified the referral processes.

*FY 10 OIG response: The amended CAYIT policy does not address this referral issue.*

**In split custody cases with a history of substance abuse and relapse, the Department should require random drug drops to assist the Department in securing necessary services for the children and family. In cases of alcoholism, random urine testing is not reliable. Breathalyzers are preferable. The OIG reiterates its prior recommendation that DCFS acquire breathalyzers and train on their use (from OIG FY 04 Annual Report, Death and Serious Injury Investigation 21).**

*FY 07 Department Update:* The Department has implemented new substance affected family policies that include drug testing requirements. Staff are being trained on the procedures as part of the Reunification training. An inter-division work group is developing additional guidelines for drug testing DCFS clients and monitoring DCFS drug testing contracts. The work group is developing standards for frequency and duration of drug testing, use of breathalyzers, and the panel of drugs for which to test. Anticipated completion date is the fourth quarter of FY 08.

*FY 08 Department Update:* The recommendation is in progress and the anticipated date of completion is March 2009.

*FY 09 Department Update*: A drug testing protocol was developed in November 2008 which addressed frequency of testing, random testing, drugs to be tested, and custody and control

procedures. A list of review criteria identifying potential red flags was developed for DCFS contract monitors reviewing drug testing vouchers.

A revised Program Plan for DCFS toxicology testing contracts was developed. The Program Plan incorporates the requirements and procedures of the drug testing protocol by reference and also adopts the random testing requirements of the protocol. The new Program Plan is expected to be implemented for the FY11 contracts.

*FY 10 Department Update:* The Department and the OIG agreed to train workers to use the urine screen technology and contractors in cases of suspected alcohol abuse. Alcohol will be one of the 10 substances tested and workers will be trained on special procedures relevant to suspicions of alcohol abuse. The Procurement Office is preparing to release the request for proposal (RFP) by the end of February 2011 and the award is expected for FY 2012.

**When a medical report indicates that a caregiver, regardless of age, may not be capable of caring for a child into adulthood, the back-up caregiver should sign a statement that he/she is aware of that fact and is still willing to serve as the back-up caregiver (from OIG FY 05 Annual Report, General Investigation 19).**

*FY 07 Department Update:* Revisions to Rule 309 Adoption Services have been made by the Office of Child and Family Services and it is under review. Target completion date is March 2008.

*FY 08 Department Update:* The CFS 486, Adoption Conversion Assessment, section 16, addresses the back-up caregiver issue.

*FY 08 OIG Response: The CFS 486, Adoption Conversion Assessment, provides for discussion with a back-up caregiver, but it does not address the back-up caregiver's awareness of the caregiver's potential incapacity and need for signature reflecting that awareness and willingness to serve as the back-up caregiver.*

*FY 09 Department Update:* The Department has submitted draft amendments to Rule 302.40 to implement this change.

*FY 10 Department Update:* The amendments to Section 302.40 Department Service Goals are expected to be adopted by the first quarter of 2011.

# APPENDICES

## APPENDIX A:

**Brian Jasko Death Investigation**

## APPENDIX B:

**Caroline & Mackenzie Hanes Death Investigation**

.

# OFFICE OF THE INSPECTOR GENERAL
# DEPARTMENT OF CHILDREN AND FAMILY SERVICES

**REDACTED REPORT**

***This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.***

**File:** **092832**

**Minors:** **Brian Jasko (DOB: 6-03, DOD: 6-09)**
**April Jasko (DOB: 4-07)**
**Jacob Ford (DOB: 5-08)**

**Subject:** **Death**

## SUMMARY OF COMPLAINT

In June 2009, five-year-old Brian Jasko died while in the care of his mother, stepfather and family friend. According to the autopsy report, Brian Jasko had several days' history of nausea, vomiting and a headache. Approximately 24 hours prior to his death, Brian reportedly had cried out, had seizure-like activity, had a temperature of approximately 100 degrees Fahrenheit, had nausea and vomited approximately seven times during the day. When Brian was put to bed one evening in early June 2009, Brian's lips were said to be purple and Brian's level of consciousness was said to be not normal. Brian was subsequently found by his mother to be non-responsive, essentially without vital signs in the early morning hours of the next day. According to the autopsy report, Brian's cause of death was multiple drug toxicity, due to excessive levels of codeine and diphenhydramine (i.e. Benadryl).

Brian's mother, Cheryl Jasko, had been investigated by the Department five times, the most recent being two months prior to Brian Jasko's death. Of the five investigations, Cheryl Jasko was indicated once for medical neglect to Brian Jasko, when he was four years old, and the rest were unfounded.

## INVESTIGATION

### Family Background

When Cheryl Jasko was 18 years old, she gave birth to her first child, Brian Jasko (DOB: 6-03). Four years later, Cheryl gave birth to her second child, April Jasko (DOB: 4-07). Randall Oakley is the father of Brian Jasko, and Lance Carrig is the father of April Jasko. Neither father maintained relationships with their children. In 2007, Cheryl Jasko married David Ford, and in May 2008 gave birth to her third child, Jacob Ford (DOB: 5-08).

**Family's History with the Department**

**First Child Protection Investigation (January 2007 – February 2007)**
On January 24, 2007, the hotline received a call alleging substantial risk of physical injury by neglect against Cheryl Jasko. According to the hotline narrative:

> Reporter states that Cheryl's son, Brian, and Marci's child Cheyenne are in the same class at school. Marci just got divorced and has been living temporarily with Cheryl. Marci told the teacher of the children, on 1-23-07, that Cheryl is a meth user and that she often takes Brian with her to homes where they are making meth. Reporter suggested the teacher call also, but did not know if she did. Reporter says that Cheryl had a learning disability growing up, and Brian has some sort of disability but Reporter does not know his diagnosis. Reporter denies knowing of any other disabilities or AKAs. Reporter was also concerned that Cheryl is pregnant and still using meth.

A teacher from Allen High School also contacted the hotline the same day. The teacher reported concerns that Cheryl was pregnant and using methamphetamine. The teacher also stated that Cheryl's house was "filthy" and, although her son attends school, he misses many days." The teacher stated that Cheryl "does sex in exchange for drugs and does not work."

The investigation was assigned to child protection investigator Tracy Quinn. On January 25, 2007, child protection investigator Quinn contacted the school counselor. The school counselor reported that she had heard that Cheryl was pregnant and using methamphetamine from a woman named Marci, who is currently living with Cheryl.

According to child protection investigator Quinn's contact notes, on January 25, 2007, she went to three-year-old Brian Jasko's school, but school personnel reported that Brian was absent due to a virus. Child protection investigator Quinn reported to OIG investigators that she could not recall if she interviewed Brian's teacher, since there was no documented interview with his teacher in the investigative file. Child protection investigator Quinn reported that if she did interview Brian's teacher, she may have documented the interview in the second investigation, which had been initiated around the same time as the first investigation for similar allegations.[1] Child protection investigator Quinn reported that she did not request Brian's attendance records, but knew that he had missed several days of school. Child protection investigator Quinn stated that she was not as concerned about Brian's school attendance, because he was only three years old and not school age.

According to Abrams Elementary School records subpoenaed by OIG investigators, Brian was enrolled in preschool on December 4, 2006, and was absent 29 out of 107 days.

Also on January 25, 2007, child protection investigator Quinn interviewed Marci's son, Cheyenne, at Abrams Elementary School. Child protection investigator Quinn documented that Cheyenne reported that he and his mother were living with Cheryl, and Cheryl drove around with Brian in the car at night. Child protection investigator Quinn also documented that it was difficult to understand Cheyenne and was unsure if Cheyenne understood the questions.

Child protection investigator Quinn documented that she attempted to interview the family at their home on January 25, 2007, and January 26, 2007; however, no one answered the door. Child protection

[1] The second investigation had been expunged from the system prior to Brian's death and could not be reviewed. Based on a reference in the first investigation, it appears that the second investigation was initiated around the time of the first investigation and the allegations were also similar to those in the first investigation.

investigator Quinn informed OIG investigators that she did not discuss with the family why Brian had not been at school or why the family had not been home.

On January 26, 2007, child protection investigator Quinn contacted the Allen Police Department. According to child protection investigator Quinn's contact notes, Doris Donovan advised the child protection investigator that, "the only thing they have on Cheryl Jasko is a suspect in a retail theft in 2004, no drug charges."

On January 30, 2007, child protection investigator Quinn went to the Jasko family's residence. Quinn documented in contact notes that Brian was, "very active, outgoing and did not appear in any distress. He was warmly dressed and very demanding of mom, to get him some cheese, a drink, etc." According to contact notes, child protection investigator Quinn documented that the home was, "sparsely furnished but clean" and the furnace was being repaired while child protection investigator Quinn was at the residence. Cheryl informed child protection investigator Quinn that she thought the hotline call was because her parents Matthew and Maureen Jasko wanted to see Brian, but she would not let them. Cheryl reported that when her parents found out she was pregnant again, they kicked her out of the house. Cheryl reported that her second child was due in April 2007. Cheryl reported that the baby's father, Randall Oakley, did not want anything to do with the pregnancy or the baby. Cheryl reported that her friend Eryn Morris watches Brian if she leaves the house. Cheryl denied having used meth and denied that she took Brian out late at night. Child protection investigator Quinn documented that "Cheryl reported that she sees Dr. Crawford at AMG (American Medical Group).... She has no objection to being drug tested; and, as a matter of fact, every time she goes to her doctor, they drug test her as a matter of course. She said they are doing that with all pregnant women there."

This same day, on January 30, 2007, child protection investigator Quinn interviewed Cheryl's roommate, Marci Keeler. Child protection investigator Quinn documented the following in a contact note:

> CPS talked alone with Marci Keeler. She said that she thinks that Cheryl is doing much better. She said that Cheryl got Brian to the hospital when he was sick and she regularly gives him the breathing treatments. She gives him his medications every night, also nasal spray and antibiotics. Marci said that Cheryl does not run around at night and that she does not often leave at night. CPS asked her what she meant by Cheryl is doing "better" and Marci said that her own son is asthmatic and she is very protective and bossy where her children are concerned. She said that Cheryl had taken Brian first to Westfield Hospital and they just sent him home, saying he had the flu. He then started turning purple and Cheryl called an ambulance to take him to Lakeland. It was not her fault she had taken him to the ER but they sent him home. CPS asked about any suspicions of meth use. She said that she is a meth addict, having been a user until 7 years ago when she was pregnant with her first child so she thinks she would know what to look for. She said that Cheryl sleeps well every night and she has seen nothing that would make her think she was using meth. During the day, Cheryl often goes to Marci's sister, Eryn Morris, to babysit and visit…Marci said that Eryn Morris had had problems with meth and Marci had kept her five children with DCFS approval while she went to 2 months of rehab…She has no reason to think that either Eryn is involved in meth…Marci said that the bus forgot to pick up Brian this morning or he would have been at school. The bus driver yelled to her that she would come get Brian in the morning.

On February 5, 2007, child protection investigator Quinn documented in a contact note that she located Cheryl Jasko at Marci's sisters' residence. Cheryl Jasko reported that "her doctor did drug test her and she signed a release of information."

Also while at Marci's sisters' residence, child protection investigator Quinn interviewed Marci's sister privately. She denied any knowledge of drug use by Cheryl Jasko and reported that she sees Cheryl Jasko everyday.

According to child protection investigator Quinn's contact notes, on February 8, 2007, Quinn left a message for the second reporter from this investigation.

Also on February 8, 2007, child protection investigator Quinn contacted Dr. Crawford's office, where Cheryl Jasko received prenatal care. Child protection investigator Quinn documented the following regarding her conversation with Dr. Crawford's nurse.

> …The mothers are not drug tested but are asked to give urine and probably think they are being drug tested. She has not seen anything about this mother that would suggest drug use, or meth use. She has not changed any. They have not seen anything that would cause them to drug test her, has seen her since September and seen no significant changes. She has gained weight every time she has been there. If she misses appointments, they send letters and she calls to reschedule.

Staff at American Medical Group (AMG) informed OIG investigators that "AMG has had the ability to complete drug screen urinalysis long before 2007 so if the (child protection) investigator had requested a drug screen urinalysis on Cheryl Jasko they would have been able to provide that information."

According to the Adult Substance Abuse Screen (CFS 440-5), located in the attachments to the child protection investigation, Cheryl denied any current drug use, but stated that she would be willing to complete a drug test. OIG investigators did not find any urinalysis reports in the attachments to the investigation. Child protection investigator Quinn reported to OIG investigators that she did not think Cheryl was sent for a urinalysis because there was no indication from Cheryl's appearance or behavior that suggested drug abuse at the time of the investigation. Child protection investigator Quinn also reported that she did not find any evidence of drug use in the home. When asked by OIG investigators if it concerned her that both of Cheryl Jasko's collaterals admitted to being former methamphetamine addicts, child protection investigator Quinn maintained that she was not as concerned, because there was no indication of current use by either collaterals or Cheryl Jasko.[2]

This same day, child protection investigator Quinn also contacted Lakeland Memorial Hospital regarding Brian Jasko. Child protection investigator Quinn documented the following regarding her conversation with Nurse Nancy Wainright:

> …They have seen him several times, mom took him for a cat scan (sic), took him to Lakeland to the emergency room (sic). They see him quite often. They started seeing him in November, from AMG. She could not get him into AMG and they agreed to see him if she kept bringing him and she has brought him regularly. She seems genuinely concerned and calls about cat scan (sic), and the PA has had concerns about the child but not about mom's care of the child.

The child protection investigation was closed on February 9, 2007, with "No Services Needed." Allegation 60-substantial risk of physical injury by neglect was unfounded against Cheryl Jasko. According to the rationale for the finding:

> The reporter's information came from a third- or fourth-hand source on one part and that is the second investigation, which is still being investigated. The source for the rest of her information

[2] Child protection investigator Quinn reported to OIG investigators that she had previously received Meth Training and was aware that methamphetamine is "instantly addictive and very difficult to quit on their own."

> has denied any concerns and expressed her opinion that there is no drug use and other collaterals verify that Cheryl does not go out at night and no one admits concerns about her having Brian in a situation that might be an injurious environment or likely to put him at risk of harm.

**Third Child Protection Investigation (January 2008 – February 2008)**

One year after the first hotline call, on January 4, 2008, Brian's pediatrician, Dr. Driscoll contacted the hotline alleging medical neglect against Cheryl Jasko for her failure to follow through with her four-year-old son, Brian's ear infections. The hotline narrative stated:

> Brian has a perforated ear and was to have an appointment with Dr. Wong on January 2, 2008. That appointment was missed as well as a possible missed appointment on December 14, 2007. Cheryl acknowledged the most recent appointment on December 31st. Dr. Driscoll also expressed concerns that Cheryl may be attempting to obtain drugs through Brian. On December 31st Cheryl told a doctor that she needed Brian assessed for ADD (Attention Deficit Disorder) and that he had never been assessed before. In October of 2007, Cheryl had called Dr. Driscoll's office stating that Dr. Cho was treating Brian for ADD and that she needed to obtain the drug Adderall for the boy. Cheryl is currently pregnant….

The day after the hotline call, the mandate worker Sienna Hines interviewed Cheryl Jasko and observed Brian and Cheryl's second child, April Jasko in their home. According to child protection investigator Hines's contact notes, Cheryl reported that she and her children were living with her biological father and stepmother; however, she recently married David Ford and was planning on finding a place to live with David Ford and her children. Cheryl at first denied being pregnant with her third child, but later admitted being pregnant, but did not want her parents to find out. Cheryl reported that she previously used meth during both of her pregnancies, but quit on her own. Cheryl reported that she quit using meth when she was approximately 5 ½ months pregnant with April. Cheryl denied current use of meth, illegal substances, alcohol, or prescription medications.[3] Cheryl informed child protection investigator Hines that she had missed two medical appointments for Brian in the last month because she did not have transportation. Cheryl reported that Brian had a tube in his ear that fell out and left a hole in the ear drum so she took Brian to Dr. Crawford at American Medical Group on December 31, 2007. Cheryl stated that Dr. Crawford did not prescribe further medication and told her to return if Brian had any further problems. Cheryl denied that she had been asking doctors for medication for Brian. Child protection investigator Hines documented the following concerning her interview about Brian's medication:

> She (Cheryl) said that in the past she took Brian to Dr. Cho and he prescribed Adderall for Brian and said that Brian was ADD. She said that Brian only took the medicine for 2 days and then had an allergic reaction to it. Cheryl says that the Adderall gave Brian severe migraine headaches. She says they did not return to Dr. Cho as he got into some trouble and cannot practice medicine. She said she has talked with the Doctors at the American Medical Group and they have all told her that they will not medicate a child until they are age 5 or have been in school at least a year. She said the doctors have said they would refer Brian to someone else in Northwood for an assessment. She does not know who they were going to refer Brian to. She says his behavior has been better of late. She says sometimes his behavior is more problematic than at other times…The home was neat and clean and free from safety hazards.

Child protection investigator Hines documented the following regarding her observation of Brian and April Jasko:

[3] While at the family's residence, child protection investigator Hines completed the Adult Substance Abuse Screen with Cheryl Jasko. Child protection investigator Hines noted, "Cheryl reports using meth during both pregnancies." Child protection investigator Hines documented on the Substance Abuse Screen that Cheryl Jasko was not currently taking any medications.

> Both children appeared to be clean, appropriately dressed, healthy and on track developmentally. April is nearly 9 months old and unable to communicate. Brian was playing on the floor with his Aunt Patricia and not interested in talking with me. He appeared to be feeling okay and was enjoying his Aunt's one on one attention. He did not appear to have Attention Deficit Disorder during my brief visit. He and his aunt were playing on the floor and he was attentive, focused and engaged in the play. I asked him how he felt and he said "fine."

Also, while at the home, child protection investigator Hines interviewed Cheryl Jasko's stepmother. Cheryl's stepmother reported that she had been off work from December 21, 2007, through January 2, 2008, and had not observed Brian to be ill or complain of any pain associated with his ears.

The investigation was assigned to child protection investigator Tracy Quinn, the child protection investigator that had investigated the two prior hotline calls on the family. On January 9, 2008, child protection investigator Quinn went to Cheryl Jasko's residence. Child protection investigator Quinn documented that she observed Brian to be clean and appropriately dressed and Brian denied that his ears hurt, burned or itched. Child protection investigator Quinn documented the following regarding her interview with Cheryl Jasko:

> …Cheryl said they did not see a specialist, that Dr. Crawford saw Brian because Dr. Driscoll was not there and she is their pediatrician. Brian has chronic ear problems and has had the tubes come out several times because his ears keep rejecting them. Dr. Wong in Lakeland put the tubes in but they have not seen him in years and they were put in years ago. She wants to get Brian evaluated for ADHD as Dr. Cho had him on medication but Dr. Cho quit practicing and the clinic acted like she was trying to get medication for herself when she went in. She uses only time outs and does not otherwise discipline Brian. The only time he is quiet is when he has a headache like today. Dr. Barth said the perforation in his eardrum came from the tube coming out. She said she has always lacked transportation and missed appointments for that reason but recently married and her husband lives with his own dad until they can get their own place as there is no room here but she now has transportation…She lived briefly in Kentucky with David Ford[4]….Dr. Crawford said that Brian's ear is fine and she would have to talk to her pediatrician, Dr. Driscoll, about the ADHD and she has an appointment with Dr. Driscoll for January 14.... CPS will check with Dr. Driscoll and check back with her after she sees Dr. Driscoll to see if Brian needs to see a specialist.

On January 15, 2008, child protection investigator Quinn contacted the reporter, Dr. Dana Driscoll. Child protection investigator Quinn documented the following regarding her interview:

> Dr. Crawford told Cheryl to follow up on the Ear Nose and Throat (ENT) appointment January 2 as Dr. Wong was going to have to address the hole in his ear. She will bring him in and complain about his ears and then not show up for the appointments. Child could suffer permanent or long term harm or permanent hearing loss if she keeps neglecting his ear problem. Mom has 2:30 appointment today for 2 week recheck and mom called yesterday and said he was sick again and it was his ears. She called twice yesterday. Mom is always no showing appointments. Sometimes she will call multiple times a day, moving appointments and then cancelling them. April gets shots at health department. She no showed well child visit at 4 months, has not had one since 2

[4] According to contact notes, child protection investigator Quinn contacted the State of Kentucky's Department of Child Protection in Forrest County on January 22, 2008, and spoke to Susan Duggin. Ms. Duggin informed child protection investigator Quinn that there are no prior reports of abuse or neglect involving Cheryl Jasko or David Ford.

> months. Mom needs to call Dr. Wong and make another appointment for Brian if he will still take him as a patient.

When asked by OIG investigators if child protection investigator Quinn discussed with Dr. Driscoll the allegation that Cheryl may be attempting to obtain medication from different doctors through Brian, child protection investigator Quinn reported that she thought that she had discussed the allegation with Dr. Driscoll, but could not recall specifics about the interview.

According to the medical records located in the attachments to the child protection investigation, Brian Jasko's medical records from American Medical Group (AMG) were faxed to child protection investigator Quinn on February 19, 2008, five days after the investigation was closed. The medical records included all contacts with Brian Jasko from March 8, 2007, to January 15, 2008. According to the medical records, Brian Jasko was seen at AMG on December 31, 2007, five days before the hotline was called, at which time Cheryl requested that Brian be evaluated for Attention Deficit Disorder (ADD). The December 31st contact stated:

> ...he is seeing an ear, nose and throat doctor in 3 days for perforated left drum that has been going on for awhile. He is also having a hard time sleeping and she would like him evaluated for ADD. She says he has not had any workup in the past. She denies him being seen by Dr. Cho and being given any medication by Dr. Cho for ADD. She says that he basically goes to sleep at 10 o'clock at night and wakes up at midnight screaming and will not stop screaming unless she gets up to let him out of his bedroom and so he then runs around the house the rest of the day. She says he does not take naps during the day, however, she just cannot take him getting up and she thinks he has ADD and she wants him tested. She says that this not being able to sleep has been going on ever since he has been a year and a half and she says "the doctors just won't do anything for this and refused to treat him like he has ADD." I do look through the notes and she was given some information about being seen in Northwood, however, she has not kept this because she has had transportation problems. Meanwhile during today's exam he is sitting quietly on the table and laughing and joking at times….

According to the medical records, Brian was also seen at AMG on January 15, 2008, nine days after the hotline was called and Cheryl Jasko again told Dr. Driscoll that she thought Brian needed to be evaluated for Attention Deficit Hyperactivity Disorder (ADHD). At this appointment Cheryl reported that Brian had "previously (been) seeing Dr. Cho in Bay City, but Dr. Cho had him on Adderall, 1.5 daily, but he was "unable to prescribe it anymore when he was in trouble with the law." Dr. Driscoll documented in her contact note, "I explained to the mother that, according to our records, he had previously been referred to psychology per her request but she says that she was unable to keep that appointment because Brian had impetigo that day. Brian is currently not participating in preschool. The mom said that this is because they moved back into the Allen school system too late to get him enrolled. Previously they were in Bay City. She said that he did participate last year and his teachers had no complaints." Also during the appointment Cheryl reported that Brian "frequently wakes up crying during the night, wanting to get up and play and that she has been letting him do so (sic) that she can go back to sleep and then usually he falls asleep when he wears himself out around 3-4 in the morning." Dr. Driscoll documented that she provided Cheryl with hand outs regarding bedtime resistance and stressed the importance of teaching Brian to go back to sleep during the night and not letting him get up and play. Dr. Driscoll documented:

> The mom asked if there was any type of medication OTC (over the counter) that she could give him to help him sleep and I strongly discouraged this. The mom again expressed frustration and was tearful during the encounter and I offered to set up a referral to a child psychologist, however, the mom opted to wait on that as she is not sure of her transportation or that she would actually be able to make the appointment.

Child protection investigator Quinn told OIG investigators that when the medical records were received after the investigation had closed she may have reviewed the records but could not recall. When asked if she could recall reading conflicting statements that Cheryl had given to the doctors regarding Brian's ADD, child protection investigator Quinn stated that she could not recall specifically if she saw conflicting information in the medical records but that it would not have concerned her anymore than the concerns found earlier in the investigation such as Cheryl not taking the child to the doctor and not following through with his medical care.

Child protection investigator Quinn also reported to OIG investigators that she did not attempt to contact Dr. Cho to verify Cheryl's report that his office had closed because she knew from other investigations that the doctor's office was in fact closed. Child protection investigator Quinn reported to OIG investigators that she did not make a referral for Cheryl to complete a urinalysis because she, "didn't have any indication of current use…didn't have any suspicions" that Cheryl was abusing drugs.

According to Brian Jasko's medical records from Bay City Health Clinic, subpoenaed by OIG investigators, Brian Jasko was seen on January 21, 2008 by Dr. Cho for refill of ADHD medication and compliant of "runny nose and itchy eyes."[5] While at the January 21st appointment, Dr. Cho prescribed Clonidine (Antihypertensive), Risperdal (Antipsychotic), Amoxicillin, Ibuprofen 100 MG, and Diphenhist (Antihistamine).[6] According to CVS pharmacy records, subpoenaed by OIG investigators, the prescriptions were filled this same day.[7]

OIG investigators contacted Dr. Baker at Bay City Health Clinic. Dr. Baker reported that he purchased the practice from Dr. Cho and started working at the clinic on June 16, 2008. Dr. Baker stated that Dr. Cho's last day at the clinic was on June 20, 2008. Dr. Baker reported that the clinic never closed. According to Brian Jasko's Medicaid Recipient Claim Detail report, obtained by OIG investigators, Brian Jasko was not seen at Bay City Health Clinic from March 1, 2008 to June 15, 2008. Brian Jasko began attending the clinic again and saw Dr. Baker on June 16, 2008, the same day Dr. Baker started working at the clinic. According to the State of Illinois Division of Professional Regulation records, Dr. Cho was fined and put on probation on May 15, 2008 for "failure to properly supervise physician assistant and failure to properly evaluate patients." On April 6, 2010, Dr. Cho "pled guilty in a criminal case related to illegal dispensing of controlled substances."

According to child protection investigator Quinn's contact notes on January 17, 2008, she reviewed Cheryl Jasko's prior involvement with the Department and documented the following:

> Two unfounded priors made 3 days apart by reporters with third hand information. 174A 01/2007 [First Child Protection Investigation] Report involved allegations of Cheryl being pregnant, using meth and taking Brian places where people were using meth….The source for the rest of her information has denied any concerns and expressed her opinion that there is no drug use and other collaterals verify that Cheryl does not go out at night and no one admits concern about her having Brian in a situation that might be an injurious environment or likely to put him at risk of harm. This report was retained for harassment. 174B 01/2007 [Second Child Protection Investigation]

---

[5] OIG investigators subpoenaed Brian Jasko's medical records from Bay City Health Clinic, however, Brian Jasko's records prior to October 29, 2007 were missing from the file. Staff at Bay City Health Clinic reported that they were unable to locate the remainder of the file. According to the pharmacy records, Brian Jasko had been a patient at Bay City Health Clinic dating back to May 2004.

[6] See Appendix for entire listing of Brian Jasko's prescription medications from January 29, 2007 to June 2, 2009.

[7] According to Brian Jasko's medical records from Bay City Health Clinic, Brian was also seen after the child protection investigation was closed, on February 29, 2008, for a refill of Clonidine (Antihypertensive) and Risperdal (Antipsychotics). According to CVS pharmacy records, these prescriptions were filled this same day.

> Allegations of drug use and not using Brian's inhaler were unfounded. Cheryl has retail theft arrest in Hayward.

According to child protection investigator Quinn's contact notes on January 22, 2009, child protection investigator Quinn went to Cheryl Jasko's residence. Cheryl Jasko informed child protection investigator Quinn that she was in the process of moving to an apartment in Blackstone with her husband. Child protection investigator Quinn told Cheryl that when she moved she needed to inform the investigator of her new address. During the visit to the home, child protection investigator Quinn questioned Cheryl about Brian Jasko's medical appointments and documented the following regarding the interview:

> …CPS talked with Cheryl about the appointment for Brian with Dr. Wong. She started making excuses why she could not get there and said they wanted her to come to Hayward instead of Lakeland which was closer and they were not in Lakeland until January 30. CPS asked if she had gone ahead and made that appointment and she had not. She said she could not call long distance unless someone was home and CPS asked if she could not go ahead and use her sister's cell phone which CPS saw in her sister's hand right now. Her sister gave her the phone and she called and made an appointment for January 30 at 1:45 pm. She said that the children had been sick today and she had not had time to call to make an appointment…Neither child appeared in any distress or sick…She said that the doctor told her that she called DCFS and she needs to keep her appointments or she will call DCFS again….CPS talked with her about CCA Head Start and Thoreau Family Agency and she has had them before but the children have been sick, she was busy, she has to move, etc. and could not work with them. CPS pointed out that she needs to start making the medical appointments and children's welfare a priority and if a report is indicated she may be referred for services and should think about getting services through CCA or Thoreau Family Agency on her own. She will think about it but does not want a referral at this time. She was clearly angry that CPS insisted that she make the appointment and insisted that it is her responsibility to keep appointments and make arrangements for them. She did not appear angry with the children or aggressive, just upset with CPS.

Child protection investigator Tracy Quinn documented that she contacted Dr. Wong on February 5, 2008. Dr. Wong's staff confirmed that Brian Jasko had been seen on January 30, 2008. Child protection investigator Quinn also noted that she would, "fax a release with a detailed request for the information needed and Dr. Wong will be asked to return the call."

According to child protection investigator Quinn's contact notes, on February 1, 2008, child protection investigator Quinn attempted to contact Cheryl Jasko at her parents' home, but was informed by Cheryl's sister that Cheryl moved to an apartment in Blackstone, but did not have an address or phone number for her. Six days later, on February 7, 2008, child protection investigator Quinn and child protection investigator Dawn Silva went to Cheryl Jasko and David Ford's new apartment. Child protection investigator Quinn documented the following regarding her visit to the home:

> …Met with Cheryl and Dave at their new apartment in Blackstone. It is clean and in good order. Brian had fallen and hit the coffee table and had stitches in the corner of his lip and he has also had surgery on his ears since CPS saw him. He was in no distress and seemed to be doing well. Child protection investigator conducted Adult Substance Abuse Screen with Dave and shared results. He had a ticket once for open alcohol and denies any other substance abuse issues. He had a half brother and sister with alcohol problems but they are not around. Dr. Wong did the ear surgery. Dr. Driscoll is following up on it. Child protection investigator again discussed 0-3, CCA and Family Connections and Cheryl signed releases and child protection investigator will make referrals and let the agencies decide who is more appropriate to provide services. Cheryl will talk with them about her concerns about ADHD. She agrees to continue keeping medical

> appointments also. Child protection investigator explained the repercussions if she does not continue keeping them and she understands why it is necessary.

Child protection investigator Quinn informed OIG investigators that when she went to the family's home on February 7, 2008, she observed the injury to the child's lip but did not follow up with medical personnel because the injury appeared consistent with the explanation provided.[8]

On February 8, 2008, child protection investigator Quinn also contacted Dr. Wong and documented the following regarding the interview:[9]

> Child protection investigator called Dr. Wong, Hayward, IL to determine any current concerns about Brian, to verify his treatment and seek an opinion on whether Dr. Wong believed him to be medically neglected. He did not have a high opinion of the mother and did not know if she is slow or just does not take care of her child. She had numerous no shows to the point he once sent her a letter and terminated Brian as a patient. She should have followed up after the tubes were put in Brian's ears, if not with him, with someone else. There was no surgery this time, he had to put him to sleep to clean his ears and the right one had some wax and the left one has a large hole in the eardrum which is chronic. He was very hesitant in giving an opinion about medical neglect but did state that this could have caused permanent or long term harm and should have been addressed. When he sedated Brian for the cleaning, she did not tell him that Brian had eaten or been nauseated and he threw up after the surgery and it was not blood from him busting his lip, but instead food, that he threw up. He turned Brian over to Dr. Driscoll and learned later that mom had not wanted to take the time to have Brian admitted for observation and there was a problem over that but Dr. Driscoll insisted. Child protection investigator asked him to call the hotline if the mother does not continue with the required follow-up. He was concerned about liability issues and child protection investigator explained that with him being a mandated reporter, if he had concern of abuse or neglect that should not be any problem for him.

According to child protection investigator Quinn's contact notes on February 8, 2008, child protection investigator Quinn contacted Lisa Abbieto at the Chesterton Community Head Start program. Child protection investigator Quinn documented, "CPS will fax the information and they have a 0-3 program and 3-5 program and will see if they have openings and if the children are appropriate for their programs.

OIG investigators located a letter in the attachments to the investigation that was not addressed to any one person that stated:

> …I have talked to her about 0-3, CCA Head Start and Thoreau Family Agency to provide education and other services. Brian is 4½ and I think that Cheryl at one time had him enrolled in one of these programs but she did not follow through and I am concerned that he might be behind when he starts kindergarten, especially with his ear problem. April also may need evaluated and Cheryl is currently pregnant. I have releases signed to talk with you. I think that the best thing to do is to have you talk with mom and between mom and the various programs, perhaps you can decide which one or ones are more appropriate for her. I have strongly encouraged her to receive

---

[8] According to Brian Jasko's medical records from Chesterton General Hospital, subpoenaed by OIG investigators, Brian Jasko was treated for a laceration to the lip on February 3, 2008. The medical records stated that the cause of the injury was a fall. There were no concerns noted regarding suspected abuse or neglect noted in the February 3, 2008 contact.

[9] According to the attachments to the investigation, child protection investigator Tracy Quinn requested Brian Jasko's medical records from Dr. Wong on February 5, 2008 and received the medical records on February 9, 2008. According to the medical records from Dr. Wong's office, Brian Jasko had been a patient of Dr. Wong's dating back to June 2004 for the treatment of chronic ear infections. From 2005 to 2008, Cheryl had a history of "no showing" or cancelling appointments including failure to follow up after Brian underwent surgery to have tubes placed in his ear.

> your services in order to prevent further problems and the necessity of us opening a case to monitor her.

Child protection investigator Quinn told OIG investigators that the letter in the attachments was a referral letter that she faxed to both CCA Head Start and Thoreau Family Agency.[10] Child protection investigator Quinn reported that earlier in the investigation, Cheryl did not want any services; but by the end of the investigation, she was more receptive to a referral for community based services, so the plan was to refer the family to the Chesterton Community Head Start Program and the Thoreau Family Agency. Child protection investigator Quinn stated that she also told Brian Jasko's doctor to call the hotline if Cheryl did not follow through with Brian's medical care.

There was no indication from the CCA Head Start and Thoreau Family Agency records, subpoenaed by OIG investigators, that a referral from DCFS was ever received. OIG investigators also spoke to staff at both CCA Head Start and Thoreau Family Agency and neither agency had any record that the referral letter from child protection investigator Quinn was ever received.

On February 11, 2008, child protection supervisor George Clark documented in a supervisory note that he reviewed and approved the closing CERAP as safe and also reviewed and approved the submitted risk assessment. Two days later, on February 13, 2008, supervisor Clark held a final supervision meeting with child protection investigator Quinn regarding the investigation. Supervisor Clark documented the following regarding the supervision meeting:

> …PSA agreed with child protection investigator recommended finding. Allegation: 79, child victim: 4; sibling 8 months old, reporter: physician, victim has missed 2 appointments; child has perforated ear and doc is also concerned that mother may be using 4-year-old's ADHD medication for personal use. Investigation revealed…Primary care physician states child could suffer permanent hearing loss if mother continues to neglect his ear problems. Primary care physician states mother has missed numerous appointments for the child. Ear, nose and throat specialist states mother has had numerous missed appointments. Doctors are frustrated because mother continues to complain about child's ear problems but she doesn't follow up with appointments. Sufficient credible evidence to support the allegation. Report is indicated. Family referred to community based services.

The investigation was closed on February 14, 2008. Cheryl Jasko was indicated for allegation 79-Medical Neglect. The rationale for the indicated finding stated:

> Cheryl does not appear to take any responsibility for Brian's medical care. She reports that he and April are sick a lot but she often misses appointments and had not made any real effort to return to the ENT doctor, Dr. Wong, not even making an appointment (sic)…There was a lack of medical treatment for a health problem or condition which, if untreated, could become severe enough to constitute a serious or long-term harm to Brian. This was verified by Dr. Dana Driscoll, her pediatrician, who also indicated that mom often missed other appointments for the children also…The parent's knowledge and understanding of the treatment and the probable medical outcome-mom reported that the doctor said that everything was fine when she took Brian to see a different doctor but that is not supported by Dr. Driscoll. Mom reports continuing ear problems but does not relate that to her not getting appropriate medical care.

[10] According to the Thoreau Family Agency website "Thoreau Family Agency is…responsible for ensuring…referrals of children under the age of three to the Early Intervention Services System receive a timely response...Thoreau Family Agency will help families with children between birth and age three to obtain evaluations and assessments. They will help determine eligibility for early intervention services. If eligible, an Individualized Family Services Plan (IFSP) will be developed to help a child learn, grow and receive needed services."

**Head Start Records for April Jasko -Chesterton Community Agency** [11]

Six months after the second investigation closed, April Jasko started receiving Head Start services from Chesterton Community Agency (CCA). April Jasko was enrolled in the program from August 13, 2008, to May 27, 2009. According to CCA Head Start records, subpoenaed by OIG investigators, Hattie Lewis was the assigned worker for April Jasko. The program plan was for Ms. Lewis to go to the home once a week for "parent education, gross motor skill development, and health and nutrition education." There were a total of 31 home visits scheduled; however, a total of 13 visits actually occurred, because the Head Start worker cancelled four visits and Cheryl Jasko cancelled or was not home for 14 visits. The Head Start program also provided Cheryl with transportation services for April's medical and dental appointments. During the nine months that Head Start was providing services, two child protection investigations were completed against Cheryl Jasko, in which DCFS investigators Tracy Quinn and Mandy Thompkins were not aware of the Head Start Services being provided to April Jasko.

*April's Dental Care*

According to Head Start records, in September 2009, Cheryl reported concerns to the Head Start worker regarding April's teeth. Head Start agreed to pay for April's dental care. A month later, April was taken to the dentist and found to have four cavities. The dentist referred April to a pediodontist because April would have to be put to sleep in order to have the cavities filled. In January 2009, the Head Start worker cancelled April's dental appointment, due to inclement weather. In February 2009, the Head Start worker took Cheryl and April to the pediodontist appointment and documented that April was scheduled to have dental surgery on March 6th and April would need a pre-operation physical. Also in February 2009 Cheryl called the Head Start worker to request gas assistance to take April to her dental surgery and Head Start staff approved a $15 gas voucher. On March 4, 2009 Head Start worker Gwen Larson documented the following:

> The pediodontist's office called. April's supposed to have surgery on March 6. They were supposed to call Cheryl and give her the surgery time. Cheryl just got a new phone and they couldn't reach her. Cheryl called me during all of this to cancel her home visit and the surgery. April has strep throat, a fever, and rash over her whole body…I told her I would call them and cancel and give them her new phone number…I called Cheryl and told her the surgery date (April 3rd).

Cheryl Jasko failed to take April Jasko to the pediodontist on April 3, 2009. During a home visit on April 8, 2009, the Head Start worker asked Cheryl what she was going to do about April's dental surgery, and Cheryl stated that every time the dental appointment gets close, April ends up getting sick. During a home visit on May 12, 2009, the Head Start worker again discussed when April would have her surgery and Cheryl reported that she was going to have surgery herself and would be laid up and April's appointment would have to wait. The Head Start worker told Cheryl that it was important to keep the next appointment for April or the doctor may not see her anymore. Also, during the home visit, the Head Start worker discussed all the missed Head Start visits with Cheryl and Cheryl reported that everyone had been sick, but should be able to make visits now.

[11] When asked by OIG investigators how April Jasko became involved with the Head Start program, Head Start worker Geri Buxton reported that her supervisor had been doing some recruitment at Blackstone Elementary School, the same day Cheryl Jasko was registering her son Brian. Ms. Buxton stated that Cheryl was interested in the program for her daughter, April Jasko, and enrolled her in the program.

*April's Hearing and Speech*

According to CCA Head Start records, in September 2008, Cheryl reported to the Head Start worker that April had a "busted ear drum" from too many ear infections and the Head Start worker suggested that April have her hearing tested at Thoreau Family Agency. In December 2008, the Head Start worker made a referral to Thoreau Family Agency. The screening was scheduled for January 14, 2009. Initially, Cheryl told the Head Start worker that April was doing so much better and was not going to pursue the referral to Thoreau Family Agency; however, Cheryl ended up taking April to the appointment. The Head Start worker documented that the audiologist that completed the hearing screening told Cheryl that follow-up with April's pediatrician was needed.

During a home visit on February 18, 2009, the Head Start worker documented that Cheryl showed the Head Start worker a report from April's physical with Dr. Ryan and Cheryl reported that Dr. Ryan said she should contact early intervention for speech screening. The Head Start worker documented that she reminded Cheryl that a referral was already made to Thoreau Family Agency (TFA) before and TFA staff were unable to get a hold of her.

On March 11, 2009, Cheryl contacted the Head Start worker and reported that she would have to cancel the home visit and speech therapy appointment at TFA. The Head Start worker documented that she contacted TFA staff to cancel the speech therapy visit for April Jasko and TFA staff reported that they would be closing out Cheryl's case because this was the third time she cancelled.

The Head Start worker completed a home visit on April 15, 2009, and documented that Cheryl was not home during the visit, but Dave was home. The Head Start worker completed the 22-month screening on April and noted that April again failed in the area of communication. The Head Start worker informed Dave of April's communication problems and discussed having April screened through Thoreau Family Agency and Dave reported that they were very busy, but he would talk to Cheryl.

*Cheryl requested program termination*

According to Head Start records, on May 27, 2009 Cheryl went to the Head Start office to get a food order. While at the office, Cheryl asked if April could be put back on the Early Head Start waiting list because "they had too much going on right now." The Head Start worker informed Cheryl that they would not be able to pay for April's dental surgery if she was not in the program, and Cheryl stated that April was doing fine and if she needed a dentist, she would take her. Cheryl stated they would probably have to move because they can't pay their bills. Cheryl signed the program termination form while at the Head Start office.

*April's Head Start Records referencing Brian Jasko*

During a home visit on September 16, 2008, Cheryl reported to the Head Start worker that the ADHD medication for Brian was no longer working. On April 8, 2009, Cheryl reported to the Head Start worker that Brian's school and EC teacher suggested that she file for SSI benefits for Brian, because of his ADHD and significant hearing loss. Cheryl asked the Head Start worker how to file for SSI and the Head Start worker told her where the office was located.

The Head Start worker documented that on September 23, 2008, Cheryl reported that they were running low on food and the worker suggested going to the food pantry, but Cheryl reported that they had already received food from the food pantry that month and the worker suggested a different food pantry. In January 2009, Cheryl reported to the Head Start worker that Dave got laid off of work and she didn't know if they would be able to pay the light bill. The Head Start worker suggested that they call the CCA office, but Cheryl reported that CCA had already helped them in November 2008.

On October 2, 2008, staff at Woolf Elementary School in Blackstone contacted Head Start worker Geri Buxton with concerns about Brian.[12]  The Head Start worker documented the following:

> I had a voicemail from Mary Lou Molloy, special education coordinator for Blackstone Elementary School. Mary Lou said they really had some concerns about Brian Jasko (older sib). The special education teacher Joyce Floyd had come to her with some red flags. Mary Lou said she hoped Head Start could make a home visit. She put Joyce Floyd on the phone. Joyce said (speech pathologist) Brian had a bruise on his forehead. He was very very very pale white. He had dark circles under his eyes. His eyes were fluttering-he could barely keep his eyes open. She said his response was scripted. When she asked him what happened, he said "I don't remember my mommy knows." Joyce said he said everything's fine. Joyce said "physically he doesn't look fine." He said this before when I asked about sores on his body. Joyce said "just concerns-nothing concrete." We did a home visit there but mom was reluctant to let us inside. I returned Mary Lou's voicemail. I explained I would be happy to make a home visit, but wanted to make sure I wasn't interfering with a possible DCFS hotline call. Mary Lou asked, "do you want us to call?" I said you have to base your decision to call or not on your training and procedures. I told her I thought it might end up in a call and knew from my DCFS training that DCFS asks us not to inform the parent before an investigator goes to the home. Mary Lou put Charlene Bionco on the phone (Brian's EC teacher). Charlene said she "did not see the bump on Brian's head." I asked if she and Mary Lou were aware of him taking medication for ADHD and any possible side effects that might explain his appearance as far as pale-tired-dark circles. Charlene said "no." She said mother had told her Brian was "hyper" but Charlene does not see this in the school setting. Charlene said "do you think we should call DCFS?" I again explained they must base that on their training and procedures. Charlene said we will take care of it. I asked if she was going to make a call; she said yes. A few minutes later, Joyce Floyd called me. She had left work and Mary Lou had contacted her about making a hotline call. She said "all I have is suspicion, nothing concrete, so I wasn't going to make a call." She again repeated her observations. She asked for DCFS Hotline number and family address and Brian's birth date. We gave it to her."

October 9, 2008- Head Start worker Sandy contacted Cheryl by phone and documented the following:

> …I told her I wanted to see how she was feeling after her car accident she said she was feeling some better (sic). I also told her the school called me the other day with concerns about April's older brother Brian. Cheryl said "yeah they called DCFS, they saw a bump on Brian's head and thought it was abuse." She said DCFS didn't think it was. She said she'd be available for Geri's visit next week. Mary Lou Molloy, special education coordinator, mentioned concerns to me about mom's newest baby not gaining weight. Mary Lou said mom told her the baby weighed 8 lbs at birth and now weighs only 10 lbs. The baby is 4 months old. She also observed mom keeping bottle of formula in stroller under blanket with baby when walking to school. Concern about temperature of formula and wether (sic) it is safe for baby. I told Mary Lou we would follow up with a conversation about bottle prep and storage, WIC, well child checks as well as offer to bring infant scales to monitor baby's weight.

**Fourth Child Protection Investigation (October 2008 – November 2008)**
Seven months after the previous investigation was closed, Brian's speech therapist, Joyce Floyd from Woolf Elementary School in Blackstone, contacted the hotline. According to the hotline narrative:

---

[12] There is no indication in either the DCP investigation or Head Start records indicating that the DCFS workers were aware that the family was receiving Head Start services.

> Joyce states as follows: Brian's overall condition is poor. Brian is pale, thin, has dark circles under his eyes, flutters his eyelids like he is sleepy, walks slow, and seems lethargic. Brian does not complain of being hungry and, in fact, refuses food. In August 2008, Brian came to school with a large sore on top of his head. When questioned about the sore, Brian states that his mother cut his hair and said, "Mommy knows." Brian now has a sore on the corner of his mouth. Reporter asked Brian about the sore and Brian pointed out that it was his head that is hurt. Brian has a large knot on the top of his head. When reporter asked Brian how he got the knot, Brian stated that he did not remember and that "mommy knows." Reporter states that Brian's answer sounded "scripted." Due to the overall set of circumstances and the age of the child, a report is being taken for investigation. Brian has 2 younger siblings that live in the home but reporter did not have any identifying information on those children. Brian attends morning kindergarten…. Brian sees reporter for speech difficulties.

The child protection investigation was assigned to child protection investigator Mandy Thompkins. Following the hotline call, Supervisor Sharon Alexander documented the following in a supervisory note:

> Allegation of cuts welts bruises taken against mother to 5 yr old boy. Boy has a sore on his mouth and a bump to his head. Prior to this he had a sore on his head but this report was not called in. Reporter says child won't eat, appears lethargic and unhealthy. Mother was indicated for medical neglect 1-08 to Brian – no service case opened. 1-07 mother unfounded for risk for neglect with suspected drug use. It was noted in the narrative of the 1-08 report that mother appeared to be drug seeking for the child possibly to obtain drugs for herself. Worker to make contact with the child at school to interview about incident and injuries as well as document. Worker to contact reporter. Worker to complete police and background checks. Worker to make in person contact with mother and other child in the home to interview and further assess safety. Worker to get releases for Dr. who may be seeing Brian. Worker to develop other collaterals.

On October 3, 2008, child protection investigator Thompkins contacted the Blackstone Police Department and spoke to Sandi Scolera. According to child protection investigator Thompkins' contact notes, Sandi Scolera reported that Cheryl did "community service at the police department for DHS." Sandi Scolera described Cheryl and Dave Ford as "good" parents. Child protection investigator Thompkins also documented that Sandi Scolera reported that neither Cheryl nor Dave had any arrests.

Also on October 3, 2008, child protection investigator Thompkins contacted the reporter, Brian's speech therapist, Joyce Floyd. Child protection investigator Thompkins documented the following regarding her interview:

> Joyce Floyd stated she is Brian's speech therapist and she sees him twice a week. She noted concerns that Brian is pale all year long. She stated he has marks that consist of an open sore on the top of his head since beginning of school year. She stated he has a bruise and cut on his hair line. She stated when she asks what happened she stated he would say "mommy cut my hair." She stated he would also say "mommy tried to cut my hair and he didn't know if mommy hurt him, mommy knows." She stated he will say he loves his mommy, almost like it was scripted. Joyce stated Brian has old scars on his hand that appear to be burn scars. Joyce noted concerns that Brian appears to be tired a lot and appears undernourished, noting he doesn't eat snacks. She stated Brian takes the trash home stating he want (sic) to take it to his mother. She stated he doesn't interact with other children. Joyce stated there are three children under five years old in the home. She stated at her home visit mother was guarded to let her in the house.

Child protection investigator Quinn reported to OIG investigators that she thought she had also spoken to Brian's teacher on the phone, but could not recall specifics about the conversation and no contact notes

with Brian's teacher were found in the investigation. Child protection investigator Thompkins stated that she typically does not request school records, but will call school personnel to obtain attendance information.

According to Brian Jasko's preschool records from Woolf Elementary School, subpoenaed by OIG investigators, Brian began attending the early education program on August 25, 2008, and attended half days. According to the attendance records, from August 2008-November 2008, Brian was absent seven days and was picked up early by Cheryl on two other days. From August 2008-May 2009, Brian had missed a total of 20 days of school. Child protection investigator Thompkins told OIG investigators that had she known that Brian had so many absences, she would have discussed the absences with Cheryl.

Later this same day, child protection investigator Thompkins went to Cheryl Jasko and Dave Ford's apartment. According to child protection investigator Thompkins' contact notes, she observed and interviewed Brian Jasko while at the home and documented the following:

> Worker observed and interviewed Brian Jasko, age five, while at his residence. He reported no concerns of abuse or neglect. He did appear to have some sort of delay, more specifically a learning delay. Worker observed an open sore on top of Brian's head and a scab approximately 3 inches on the left side of his forehead. Worker documented marks via photos and CANTS 2B. Brian initially stated he didn't know how he got the marks and said mommy knows. Brian then stated he fell yesterday and couldn't remember the details, such as "where did you fall," "who was around," "what did you hit." Worker observed the rest of Brian's body per policy and procedure and there were no other marks or bruises. Worker observed his hand and there were no visible scabs or scars. Brian's facial color appeared normal, with slight dark circles under his eye. His weight appeared to be normal. Brian reported no one uses alcohol or drugs, nor are there domestic violence issues in the home.

Child protection investigator Thompkins also observed one-year-old April Jasko and four-month-old Jacob Ford. Child protection investigator Thompkins documented that neither child had any visible marks or bruises. During child protection investigator Thompkins' interview with Cheryl Jasko, Cheryl reported that, "about 30 days ago, she was cutting Brian's hair and he must of moved and the clipper got him." Child protection investigator Thompkins documented that she observed the clippers and the end of the clippers matched the mark on Brian's head. Cheryl reported that Brian picks at his scabs, which is the reason the sore on his head had not healed. Cheryl stated that she puts medication on the sore, but has not taken Brian to the doctor regarding the sore. Cheryl also explained that, "about a week ago, Brian was coming down the stairs and he slipped on his brother's bottle and fell. She stated she is not sure how he fell, because she was in the kitchen. She stated after this incident she observed a bruise, bump and scratch on his forehead. She stated she put ice and ointment on the injury and did not take him to the physician. Cheryl also reported that Brian has been diagnosed with asthma, ADHD and has ear problems. Cheryl reported that she has difficulty getting Brian to sleep because he is a light sleeper. Cheryl reported that she has talked to doctors about Brian's sleep, but they "laugh and tell her to ignore it." Cheryl also reported that Brian eats like a normal child and has always been pale with dark circles. Cheryl reported that Dave Ford was out looking for employment.

In an interview with OIG investigators, child protection investigator Thompkins stated that the clippers that Cheryl showed her had a round attachment on the top of the clippers, which matched the injury to Brian's head. Child protection investigator Quinn told OIG investigators that she thought the explanations for the injuries to Brian appeared plausible. When asked about child protection investigator Quinn's interview of Brian Jasko, child protection investigator Quinn reported that given Brian's age she did not find it unusual that Brian could not retell how his injuries occurred and stated that "sometimes five-year-olds can recall and sometimes can't" and "a five-year-olds sense of time is not always accurate." Child

protection investigator Quinn reported that she could not recall if she asked Cheryl or Brian about the reporter's concerns that Brian took the trash home.

Following child protection investigator Thompkins' interviews at the family's residence, child protection investigator Thompkins interviewed a neighbor, Priscilla Golden. Ms. Golden reported that she visits the family on a frequent basis and has had no concerns of abuse or neglect of the children. Ms. Golden stated that the marks on Brian are from him being a kid and falling a lot.

On October 3, 2008, supervisor Sharon Alexander documented the following in a supervisory note:

> Staffed safe CERAP with manager Richard Litwell-neither injury rose to the level of PC. CERAP safe with weekly monitoring waived. Doctor contact for injury waived. Worker observed child at school. He has a sore to his head and a greenish bruise/scrape to his forehead. School thought his response sounded scripted as he stated that I fell, ask mommy. Child was very pale skinned with bags under his eyes, he did not appear underfed. Worker went to home and interview (sic) mother who stated that she was clipping child's head with clippers and he jumped up causing her to nick him with clippers. Worker observed the guard on the clippers and the injury to the head does match the configuration of the clippers. Mother said that child fell down the stairs resulting in the bruise scrap (sic). It happened last week. She was in the kitchen and did not see it. Child tripped on one of the younger children's toys. Worker observed that child is somewhat delayed. Mother stated he has always been pale skinned and that he does not sleep well. She has talked to the Dr. about this and gotten little response. Child has ADHD. Worker to talk to Dr. about med and hole in child's ear. Home observed as clean with ample food. 1 and 2 yr old were both clean and had no injuries to either of their bodies. Mother was cooperative and honest about her meth history and prior indicated report. Worker to contact collaterals and child's Dr. as well as speak to husband/father/step-father. Bio father is not involved.

On October 8th, 20th and 27th 2008, supervisor Sharon Alexander documented in a supervisory note instructions for child protection investigator Thompkins to interview Dave Ford and contact Brian's doctor.

On October 28, 2008, child protection investigator Thompkins contacted Brian's ear, nose and throat doctor, Dr. Wong. Child protection investigator Thompkins documented in a contact note that Dr. Wong reported that he had last observed Brian Jasko eight months ago, on February 20, 2008, and had no concerns of abuse or neglect at this time. Dr. Wong reported that Brian had been referred to him as a result of his ear problems.

This same day, child protection investigator Thompkins also contacted Brian's primary care physician, Dr. Ryan. Child protection investigator Thompkins documented the following regarding her interview with Dr. Ryan:

> Purpose: interview primary care physician. Dr. Ryan (primary care physician) stated Dana Driscoll has reported the children for medical neglect in January. She stated she has only seen Brian twice in a year and a half, in February and May of 2008. She stated there was no note of concern about Brian being pale. She stated his hemoglobin test on 1-19-07 was right at the edge of being normal. She stated in February of 2008, Brian was referred to an Ear, Nose and Throat Specialist. Dr. Ryan noted that between January of 2008 and May of 2008, Brian has lost 2 lbs and hasn't made any progress from (sic) January of 2007, noting this was abnormal. She stated she did not know the cause and noted this could be a possibility of parent not supervising calorie intake. Dr. Ryan stated she is concerned not that he is low weight but more so that he has not gained weight. She stated she has no diagnose (sic) to cause this nor has there been follow up. Dr.

> Ryan stated mother has not brought the baby out since April of 2008. She noted the baby has not been seen for 15 to 18 month well child exam. Dr. Ryan stated it is hard to tell if the children are victims of medical neglect since they have not been seen since May of 2008 in regards to Brian Jasko. She stated possibly if Jacob has not had his shots. Dr. Ryan stated she recommends all kids have an examine (sic) by a physician.

Almost a month later[13], on November 25, 2008, child protection investigator Thompkins went back to Cheryl Jasko and Dave Ford's apartment and interviewed Cheryl Jasko's husband, Dave Ford. According to child protection investigator Thompkins' contact notes, Dave reported that Brian's ADD medication, Adderall, caused Brian to be tired and noted that Brian's grandfather also had dark circles under his eyes. Dave attributed Brian's bumps and bruises to the fact that he is very hyper at times and only has 30% of his hearing, which makes him off balance. Dave also reported that Brian does not have an appetite, which could also be caused by the ADD medication. Dave reported about three weeks prior to the hotline call, while Cheryl was cutting Brian's hair, he moved and "the clipper got hold of him." Dave reported that he was at work during the incident in which Brian fell on the stairs and got a bump on his head.

Also while at the residence, child protection investigator Thompkins observed Brian and documented that Brian had no visible marks or bruises and noted that the prior sores, bruises and bumps had healed. While at the residence, child protection investigator Thompkins informed Cheryl Jasko that the investigation would be unfounded.

Child protection investigator Thompkins documented in a contact note that during her interview with Cheryl, "Cheryl disclosed to (the) worker (that) a doctor from Bay City would provide Brian his medical care. She stated his prior physician would always call reports on her that were unfounded. She stated Jacob recently had his well child exam and she needs to have April seen by the physician. Worker recommended she do this in the near future."

In an interview with OIG investigators, child protection investigator Thompkins reported that she did not verify with medical personnel if Jacob was actually seen by a physician for his well child exam and did not ensure that the other children were seen by a physician, as recommended by Dr. Ryan, before closing the investigation. Child protection investigator Thompkins stated that the only allegation was cuts, welts and bruises, but if there had been an allegation related to Brian's health, then she would have been sure to follow up with medical personnel. Child protection investigator Thompkins stated that she could not recall if she discussed with her supervisor the possibility of adding an allegation related to Brian's health. Child protection investigator Thompkins also stated that, "looking back, I should have ensured that the children were seen."

On November 25, 2008, supervisor Sharon Alexander documented in a contact note that the allegation of cuts, welts and bruises would be unfounded because "mother was able to offer plausible explanations for injuries noted and there is no evidence to contradict these explanations."

Also on November 25, 2008, child protection investigator Thompkins contacted the reporter, Joyce Floyd, and informed her that the report would be unfounded. Child protection investigator Thompkins documented that Joyce Floyd stated that she "expected the report to be unfounded and noted she was pressured by administration to make the hotline call."

---

[13] According to child protection investigator Mandy Thompkins' employee attendance record from October 28, 2008-November 25, 2008 there were two holidays (11/4/08 and 11/11/08) in which child protection investigator Thompkins did not work her normally scheduled work days.

The allegation of cuts, welts and bruises against Cheryl Jasko was unfounded and the investigation was closed on December 1, 2008. The rationale for the finding stated:

> …Worker observed a sore on Brian's head that he stated he didn't know how he got. His mother Cheryl Jasko reports it is from the hair clipper guard that accidentally caught his head. The end of the guard matched the size of the sore on his head. Worker observed another scab on his forehead in which Brian reported he fell. His mother confirmed he fell coming down the stairs. Brian reported no concerns of abuse or neglect. The neighbor reported no concerns of abuse or neglect and noted Brian is clumsy. Brian's physicians (Dr. Ryan and Dr. Wong) report no current abuse or neglect issues; however, the children have not been to a physician since May of 2008.

The child protection investigation record stated that there was a "referral for community based services." Child protection investigator Thompkins stated that she could not recall making any referrals to community based services, but told Cheryl to have the children seen by their doctors. Child protection investigator Thompkins stated that Cheryl told her that she had a plan to have the children seen by a doctor.

According to the Adult Substance Abuse Screen, located in the attachments to the investigation and dated November 25, 2008, Dave Ford denied present and past substance abuse. Cheryl Jasko denied present drug use, but reported that she had used meth 6 years prior, but quit on her own. Cheryl reported that she was prescribed Xanax for anxiety and Loratab for back pain. On Dave Ford's Substance Abuse Screen, he named Cheryl Jasko as a collateral contact. On Cheryl Jasko's Substance Abuse Screen, Cheryl Jasko named her father, Matthew Jasko. Matthew Jasko was not contacted during the investigation. Child protection investigator Thompkins told OIG investigators that she did not have Cheryl complete a urinalysis screen, because there was no indication of current substance abuse, noting that Cheryl did not appear under the influence of drugs or alcohol and there was no drug paraphernalia found in the home.

Consents for release of information were signed by Cheryl Jasko for Brian's medical records from Dr. Wong and Dr. Ryan's offices; however, no medical records were located in the attachments to the investigation. Child protection investigator Thompkins told OIG investigators that she would not have requested the medical records, because this was not a medical neglect case.  OIG investigators found a faxed request from DCFS for medical records in Brian Jasko's medical records from American Medical Group dated October 28, 2008.

**Fifth Child Protection Investigation (March 2009 – March 2009)**
On March 24, 2009, Eryn Morris contacted the hotline alleging environmental neglect. The reporter stated that she was Cheryl Jasko's friend and was concerned about the children, because Cheryl and Dave had been using and selling Brian's prescription Adderall and Cheryl was abusing Xanax. The hotline narrative also stated:

> Reporter saw kids a week ago and Jacob had such a bad diaper rash it was blistered and bleeding in areas from the groin down to the knee. April is always filthy and in a dirty diaper. The inside conditions of the home recently were bad. There were dirty dishes everywhere, old food and dirty diapers. The two younger ones are kept in playpens when the parents want to go upstairs. Reporter's sister (Marci Keeler) went over and Brian answered the door and it took 30 minutes for Dave to wake up. The reporter also stated that Cheryl and Dave have a friend named TR staying with him who is a severe alcoholic, plays rough with the kids, screams at the kids and has said they would be better off without Brian. The reporter did not know the street address where the family lived, only that it is the low income housing but said they have lived there for over 9 months.

According to a supervisory note dated March 24, 2009, Supervisor Sharon Alexander instructed the worker to, "complete DV and substance use screens on adults in home, contact police for background check, get releases to Dr's prescribing meds for consult, develop other collaterals for children from community providers and complete school contacts." Supervisor Alexander also documented prior history, "1-07 UNF 60 to 5yr old, 10-08 IND 79 to 5 yr old, 10-08 UNF 11 to 5 yr old."

On March 24, 2009, child protection investigator Clair Ralston contacted the reporter, Eryn Morris. Ms. Morris informed child protection investigator Ralston that, although she had never witnessed Dave or Cheryl selling Brian's Adderall, she had overheard Cheryl on the phone offering to sell her pills and then leave and come back with money. Ms. Morris also reported that Dave told her that he was a sex offender of his niece, Latrice Odell.[14] Ms. Morris stated that she saw Jacob one week ago and he had, "blisters with his diaper rash." Ms. Morris also reported that Cheryl and Dave had "a picture of Jacob laying on a grill." According to child protection investigator Ralston's contact note, Ms. Morris reported that Cheryl's children were always dirty, but "would not answer about the condition of the home."

According to child protection investigator Ralston's contact notes, the day after the hotline call on March 25, 2009, child protection investigator Ralston went to the family's home and observed ten-month-old Jacob Ford and one-year-old April Jasko. Child protection investigator Ralston documented that she observed no injuries to either child and observed the apartment to be clean.

In an interview with OIG investigators, child protection investigator Ralston stated that while she was at the family's home, she had Cheryl remove Jacob and April's clothes and diapers and found no diaper rash or injuries to either child. Child protection investigator Ralston also stated that she observed both the first and second floor of the apartment and found the home to be clean and organized. Child protection investigator Ralston also stated that it did not appear that any other adults lived in the home.

According to child protection investigator Ralston's contact notes, while at the home, child protection investigator Ralston interviewed Cheryl Jasko and Dave Ford. Both Cheryl and Dave reported that they thought Marci Keeler, sister of the reporter, called the report in due to an argument the previous week. Both Cheryl and Dave stated that Terrence Rivers (TR) was a friend of Dave's and came over sometimes, but denied that Terrence Rivers lived at the home. Child protection investigator Ralston documented the following regarding her interview with Cheryl Jasko:

> …Cheryl states having a disc problem, and she takes Xanax PRN…Cheryl states Brian sees Dr. Baker in Bay City for ADHD, and Jacob see (sic) Dr. Driscoll in Bay City. Cheryl denied using or selling drugs or prescription drugs. CPI observed Brian's medication Adderall and Clonadine which was filled 3-18-09.

On March 25, 2009, child protection supervisor Sharon Alexander documented the following:

> House observed with no safety or health hazards-there is diaper rash to child and worker checked medications with no problems noted. Father suspects reports stem from him making a police report about a man who threatened to kill him. CERAP safe with weekly monitoring waived.

Also, on March 25, 2009, child protection investigator Clair Ralston documented that she went to Woolf Elementary School in Blackstone and observed five-year-old Brian Jasko boarding the bus to go home. Child protection investigator Ralston documented that the child appeared happy.

---

[14] According to the Illinois Sex Offender Registry, David Ford is not listed as a registered sex offender.

In an interview with OIG investigators, child protection investigator Ralston reported that, when she arrived at Brian's school, he was standing in line to get on the school bus. Child protection investigator Ralston stated that a teacher pointed to Brian and she observed that he appeared clean and healthy. Child protection investigator Ralston stated that she observed Brian, but did not interview him and did not interview any school personnel.[15]

Also, on March 25, 2009, child protection investigator Clair Ralston contacted Brian Jasko's treating ADHD physician, Dr. Baker, in Bay City. Dr. Baker reported that Cheryl Jasko brings Brian Jasko every month as scheduled and, "states being happy with child's progress, and he has no concerns."

Child protection investigator Clair Ralston also contacted Dr. Dana Driscoll's office concerning Jacob. Child protection investigator Clair Ralston documented, "Office reports last well being check was 2-17-09 mom did not make an appointment for follow-up on ear infection the Dr. discussed nutrition with mom child is on low growth curve."

Child protection investigator Ralston reported to OIG investigators that she contacted Brian's medical providers, due to the prior indicated finding of medical neglect. Child protection investigator Ralston stated that Dr. Baker saw Brian on a regular basis and had no concerns about Cheryl abusing Brian's medication.

On the afternoon of March 25, 2009, child protection investigator Ralston contacted Cheryl Jasko by phone and documented:

> CPI spoke to Cheryl Jasko giving her the unfounded finding on 82. Discussed follow up appt on Jacob with Driscoll not made. Cheryl states the phone is always busy, and I explained her prior report 79, and the children appts. need to be kept. She stated she would call and set something up.

The allegation of environmental neglect against Cheryl Jasko was unfounded and the investigation was closed on March 27, 2009, three days after the hotline call was made.

In an interview with OIG investigators, Supervisor Sharon Alexander reported that the investigation was unfounded during the initial stages of the investigation, because they did not think the hotline call had been made in good faith. Supervisor Alexander stated that when child protection investigator Ralston went to the home, the home was clean and there was no indication of environmental neglect as alleged by the reporter. Supervisor Alexander reported that she thought that the parents told child protection investigator Ralston about an altercation between the reporter and the parents, prior to the hotline call. When asked if child protection investigator Ralston interviewed Brian Jasko, supervisor Alexander stated, "I don't know that she questioned him specifically about his house being dirty, but she did observe him. I think she did talk to him, but I don't think she documented that."

According to the Adult Substance Abuse Screen, located in the attachments to the investigation, Dave Ford and Cheryl Jasko denied current drug use. Cheryl Jasko reported being prescribed Loratabs for "DISC" and Xanax for anxiety. Dave Ford reported taking no medications. Child protection investigator Ralston told OIG investigators that Cheryl and Dave Ford agreed to a urinalysis test; but, since the investigation was closed during the initial stage, she did not refer them.

---

[15] OIG investigators subpoenaed Brian Jasko's school records from Woolf Elementary school, where Brian attended early childhood education, for half a day, five days a week. According to Woolf Elementary records, from August 25, 2008, to March 27, 2009, Brian was absent a total of 18 school days and was picked up early on two other days.

**Death of five-year-old Brian Jasko**

Two months later, in June 2009, Brian Jasko was pronounced dead at Chesterton General Hospital. The Chesterton County Autopsy report of Brian Jasko concluded the following:

> This is the case of the death of a 5-year-old male with a day's history of nausea, vomiting and headache. Approximately 24 hours prior to his being found lifeless, Brian reportedly had cried out and was throwing up and was taken downstairs and reported to have a seizure-like activity. At that time, vital signs revealed a temperature of approximately 100 degrees Fahrenheit. These observations were reportedly made in the early morning hours early June 2009. During the day, Brian reportedly had nausea and vomited approximately seven times during the day. When Brian was put to bed that evening, Brian's lips were said to be purple and Brian's level of consciousness was said to be not normal. Brian was subsequently found non-responsive, essentially without vital signs in the early morning hours of early June 2009. The autopsy examination reveals evidence of dehydration with sunken eyes and decrease in skin turgor. The internal autopsy examination reveals a significant degree of cerebral edema to be present. The underlying cause of this cerebral edema is under investigation at this time. The results of toxicology and other laboratory studies are pending at this time. As best can be determined after the autopsy examination, the cause of death appears to be that of cerebral edema with underlying cause of this cerebral edema pending further investigation and histology and laboratory data. The manner of death, therefore, is also pending at this time.

Following the laboratory data, the cause of death was reported as the following:

> Laboratory data reveals supratherapeutic blood levels of both codeine and diphenhydramine. The combined effect of these two drugs is a cause of death in this case. The cause of death is listed as multiple drug toxicity. Other significant conditions include cerebral edema, dehydration, clinical nausea and vomiting, clinical ADHD. Manner of death based on how the cause of death came about, an investigative finding. Based on present information available at this time, the manner of death is best classified as undetermined. Also at issue is potential negligence involved in the caregivers not seeking medical attention for a five-year-old child with repeated episodes of vomiting, purple lips and altered level of consciousness when put to bed the night of his death.

**Sixth Child Protection Investigation (Opened June 2009)**

In June 2009, Brock Peters from the Illinois State Police contacted the hotline to report the death of Brian Jasko. According to the hotline narrative:

> Reporter states at approximately 3:00 am in 6/09 911 was called by neighbors at the request of babysitter Terrence Rivers.[16] Terrence aka T.R. had been requested by OPWI (Cheryl Jasko) to babysit her children while OPWI (Cheryl Jasko) went to the emergency room for treatment of a leg injury. Reporter states ambulance personnel related that when they arrived at the address of the child in Blackstone, they found 5-year-old Brian Ford dead on scene…. Mother found the child unresponsive upon her return from the hospital.

Later this same day, Brock Peters from the Illinois State Police again called the hotline to provide additional information concerning the report. SCR documented the following:

---

[16] According to child protection investigator Mandy Thompkins contact notes, in June 2009, child protection investigator Thompkins contacted Terrence Rivers' probation officer, Delores Glover from Grove County Probation. Delores Glover reported that "Terrence Rivers is currently on probation…Terrence has 3 cases: unlawful possession of controlled substances (medication-Alprazam and Clonapin) in July of 2008, Court ordered 24 months probation; 2nd case was for battery and the third case for DUI-ALCOHOL. Delores stated Terrence is Court ordered to submit to drug screens and she orders him to submit to a drug screen for worker today." On the day of Brian's death, Terrence Rivers tested positive for Amphetamines, Opiates, and methamphetamines.

> …Reporter states there were observations during the four days prior to Brian's death that Brian was very ill and mother (Cheryl) and stepfather (Dave) did not seek medical treatment for him. Reporter states he obtained statements from Terrence and another friend/neighbor (Mr. Golden) that they told Cheryl and Dave to take Brian to the doctor. Reporter states Brian had complained of stomach pain, had seizures, vomiting, diarrhea and appeared to be in a catatonic-like state at times. Reporter states mother put Brian to bed between 10:00-10:30 pm in 06/09 and was the last person to see him alive. Later that night father took mother to the hospital emergency room for a problem with her leg. Father, mother and two siblings went to the hospital and Brian was left at the home with Terrence. When the family returned from the hospital in the early morning hours mother found Brian to be cold to the touch and 911 was called. Reporter states no one remembers Brian eating anything but possibly some potato chips during the prior four to five days. Reporter states Brian was prescribed Adderall, Clonodine and another medication for unknown diagnosis. Brian is described as being a "crank baby" very slow functioning. Reporter states it is believed that mother and step father were selling or using Brian's medication…Cheryl and Dave Ford added to report and added allegations of 51, 79, and 60.

The child protection investigation was assigned to child protection investigator Mandy Thompkins and her supervisor, Sharon Alexander. According to the child protection investigation, the day of Brian's death, the maternal grandparents Maureen and Matthew Jasko agreed to comply with a safety plan that allowed April Jasko and Jacob Ford to stay in the care of the maternal grandparents.

On June 16, 2009, child protection investigator Mandy Thompkins had Cheryl Jasko and Dave Ford complete a urinalysis screen. Cheryl Jasko tested negative and Dave Ford tested positive for Benzodiazepines.

During the course of the child protection investigation, Cheryl Jasko admitted to Illinois State Police Investigators that she gave Brian Jasko 2-3 Benadryl pills the morning before his death and 3-4 Benadryl pills the evening before his death, as well as 2 tablespoons of Codeine syrup. Cheryl admitted that she took the Codeine from Terrence Rivers. Also during the course of the State Police investigation, both Cheryl Jasko and Dave Ford admitted to selling and giving away Brian's prescription Adderall, as well as Dave's prescription Xanax and Cheryl's prescription Loratabs.

The child protection investigation was closed on November 24, 2009. The allegations against Terrence Rivers were unfounded. Both Cheryl Jasko and Dave Ford were indicated for 1-Death, 60-substantial risk of physical injury, 74-inadequate supervision, 79-medical neglect.

According to LEADS results, on December 15, 2009, Cheryl Jasko was convicted of Drug Induced Homicide and both Cheryl Jasko and Dave Ford were convicted of the Manufacture and Delivery of a Controlled Substance. On December 18, 2009, Dave Ford was convicted of the Manufacture and Delivery of a Controlled Substance.

**ANALYSIS**

Over the course of two and a half years, Cheryl Jasko was investigated five times for drug related allegations and neglect of her children. The first two investigations were for the mother's alleged methamphetamine use. The allegations were unfounded two weeks later, when the source of the allegations claimed that she had never alleged that Cheryl was a drug user and vouched for her parenting abilities. The third investigation was indicated in five weeks for medical neglect, after it was determined that Cheryl was failing to follow through with treatment of Brian's chronic ear infections, which his doctor reported could have long term effects on Brian's hearing, if left untreated. During the third

investigation, Cheryl contradicted her early denial and admitted to having been a meth user during the first two investigations. Seven months later, Brian's stepfather reported that Brian only had 30% of his hearing.

The fourth investigation was initiated in October 2008, when the Department received an allegation from school personnel that Brian was pale, thin, sleepy and lethargic. The investigation was taken as Cuts, Bruises and Welts because of a sore on Brian's head. Despite learning of concerns from Brian's doctor, and despite the prior finding of medical neglect, the investigator, Mandy Thompkins, and her supervisor, Sharon Alexander, unfounded the investigation, when the explanation for the sore was determined to be plausible. Given the mother's lack of medical follow-through demonstrated in the prior investigation, and the reporter's concerns about Brian's weight, when Brian's pediatrician requested that all children be seen, the child protection investigator Mandy Thompkins should have ensured that all children were seen before closing the investigation.

Although this was a complicated case, it appears that investigators were operating with a narrow focus throughout this family's history with the Department. When viewed individually, any one of the following events may not appear to be cause for concern; however, if these events had been collectively analyzed, child protection investigator Mandy Thompkins and her supervisor, Sharon Alexander, would have been more concerned about the care being provided to Brian.

- Brian was receiving prescription medications for the treatment of ADHD from a general practitioner and not his pediatrician.
- Brian's pediatrician expressed concerns about possible exploitation of Brian for drug seeking by the mother.
- The sore on Brian's head took almost three months to heal. Given the rate at which wounds in healthy children heal, child protection investigator Thompkins should have ensured that Brian Jasko was seen by his pediatrician at the beginning of the investigation.
- Cheryl provided conflicting information about when she stopped using methamphetamine, and had never been in a treatment program. Quitting methamphetamine use through unassisted abstinence is unlikely.
- Brian's inconsistent school attendance.

The system proved unable to respond to professionals' concerns over Brian's general well-being. Brian was seen as an unusually quiet boy. We know in retrospect that he was probably receiving what would become lethal doses of Benadryl, later combined with cold medication.

*Medicaid Recipient Claim Detail*
In response to a previous OIG investigation (OIG# 989567, dated 5-08) regarding access to Medicaid Benefit Claim information, the Department issued a memo in October 2009 advising investigators where an Administrative Subpoena should be sent when "seeking information related to Medicaid benefits." In addition to instructions on the use of subpoenas, the importance of such data suggests that training on the multiple uses of the information would prompt investigative staff to seek the information.

The memo issued by the Department was shared with child protection staff after Brian's death. Had investigators in this case requested Brian Jasko's Medicaid Recipient Claim Detail, investigators would have noted that Cheryl was taking Brian to multiple service providers, and receiving medications from multiple service providers. With the Medicaid Recipient Claim Detail in hand, the investigators could have consulted with Brian's pediatrician.

**RECOMMENDATIONS**

1. Child protection investigators should be trained on the multiple uses that the Medicaid Recipient Claim Detail can provide.

2. This report should be shared with supervisor Sharon Alexander and child protection investigator Mandy Thompkins and used as a teaching tool on the importance of collectively analyzing information gathered during the course of an investigation.

3. This report should be redacted and incorporated into training child protection staff on investigating substance abusing families.

**APPENDIX**

*Pharmaceutical Records for Brian Jasko*

The following chart includes all the prescriptions filled or attempted to be filled for Brian Jasko from January 29, 2007-June 1, 2009. The chart was compiled from the Medicaid Recipient Claim Detail for Brian Jasko and pharmacy records.

*- Rejected by Medicaid for reasons unknown

**- Rejected by Medicaid for attempting to refill too soon

| Date | Prescription Medication | Prescriber |
|---|---|---|
| 1-29-07 | Albuterol Inhaler<br>Prednisolone (Asthma Medication) | Briar Medical Clinic (Dr. Jared Zena) |
| 2-5-07 | Albuterol Inhaler<br>Hydramine Elixir (Antihistamine)<br>Azithromycin (Antibiotic) | Briar Medical Clinic (Dr. Jared Zena) |
| 2-10-07 | Singulair (Allergy/Asthma medication) | Dr. Paul Logan |
| 2-16-07 | Loratadine (Antihistamine) | American Medical Group (Dr. Ryan) |
| 2-16-07 | Hydramine Elixir (Antihistamine) | Briar Medical Clinic (Dr. Jared Zena) |
| 2-21-07 | Albuterol Inhaler | Briar Medical Clinic (Dr. Jared Zena) |
| 3-8-07 | Albuterol Inhaler**<br>Amoxicillin | American Medical Group (Dr. Ryan) |
| 3-19-07 | Hydramine Elixir (Antihistamine)<br>AerochDoris<br>Nasonex<br>Xopenex Inhaler | Briar Medical Clinic (Dr. Jared Zena) |
| 3-28-07 | Albuterol Inhaler<br>Loratadine (Antihistamine) | American Medical Group (Dr. Driscoll) |
| 3-30-07 | Hydramine Elixir (Antihistamine)** | Unknown |
| 4-4-07 | Hydramine Elixir (Antihistamine)<br>Nasonex**<br>Xopenex Inhaler** | Briar Medical Clinic (Dr. Jared Zena) |
| 4-18-07 | Hydramine Elixir (Antihistamine) | Briar Medical Clinic (Dr. Jared Zena) |
| 4-21-07 | Nasonex<br>Xopenex Inhaler | Briar Medical Clinic (Dr. Jared Zena) |
| 5-8-07 | Patanol Eye Drops<br>Singulair (Asthma/Allergy) | Dr. Carl Supcek |
| 5-21-07 | Hydramine Elixir (Antihistamine)<br>Nasonex Nasal Spray<br>Xopenex Inhaler | Briar Medical Clinic (Dr. Jared Zena) |
| 6-28-07 | Hydramine Elixir (Antihistamine) | Briar Medical Clinic (Dr. Jared Zena) |
| 7-26-07 | Ovide Lotion (Head lice treatment)<br>Cefdinir (Antibiotic)<br>Pediacare Decongestant * | Bay City Health Clinic (Dr. Cho) |
| 7-30-07 | Dextrostat (ADHD medication) * | Unknown |
| 7-30-07 | Hydramine Elixir (Antihistamine) | Ostler Memorial Hospital (Dr. Zena) |
| 7-31-07 | Clonidine (Antihypertensive)<br>Amphetamine Salts (ADHD medication) | Bay City Health Clinic (Dr. Cho) |
| 8-13-07 | Clonidine (Antihypertensive)**<br>Amphetamine Salts (ADHD medication)** | Bay City Health Clinic (Dr. Cho) |

| | | |
|---|---|---|
| 8-14-07 | Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Cho) |
| 8-14-07 | Albuterol (Inhaler) | Ostler Memorial Hospital (Dr. Zena) |
| 8-27-07 | Amphetamine Salts (ADHD medication)<br>Diphenhist (Antihistamine) | Bay City Health Clinic (Dr. Cho) |
| 9-3-07 | Cefdinir (Antibiotic) | Bay City Health Clinic (Dr. Cho) |
| 9-5-07 | Clonidine (Antihypertensive)*<br>Singulair (Allergy/Asthma medication) | Bay City Health Clinic (Dr. Cho) |
| 9-12-07 | Amox TR-K (Penicillin) | Lakeland Memorial Hospital (Dr. Logan) |
| 9-24-07 | Clonidine (Antihypertensive)<br>Cefdinir (Antibiotic)<br>Ciprodex (Anti-inflammatory-Antibiotic) | Bay City Health Clinic (Dr. Cho) |
| 10-15-07 | Cephalexin (Antibiotic)<br>Diphenhist (Antihistamine)<br>Benedryl Allergy (Antihistamine)* | Ostler Memorial Hospital (Dr. Zena) |
| 10-24-07 | Diphenhist (Antihistamine)** | Ostler Memorial Hospital (Dr. Zena) |
| 10-26-07 | Diphenhist (Antihistamine)** | Ostler Memorial Hospital (Dr. Zena) |
| 10-28-07 | Diphenhist (Antihistamine) | Ostler Memorial Hospital (Dr. Zena) |
| 10-29-07 | Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Cho) |
| 11-8-07 | Diphenhist (Antihistamine)** | Ostler Memorial Hospital (Dr. Zena) |
| 11-12-07 | Diphenhist (Antihistamine) | Ostler Memorial Hospital (Dr. Zena) |
| 11-15-07 | Albuterol (Inhaler)<br>Azithromycin (Antibiotic)<br>AerochDoris with Mask<br>Singulair (Allergy/Asthma medication) | American Medical Group (Dr. Barth) |
| 11-19-07 | Amox TR-K (Penicillin) | American Medical Group (Dr. Solomon) |
| 11-26-07 | Clonidine (Antihypertensive)<br>Risperdal (Antipsychotics) | Bay City Health Clinic (Dr. Cho) |
| 11-30-07 | Amox TR-K (Penicillin) | American Medical Group (Dr. Driscoll) |
| 12-7-07 | Diphenhist (Antihistamine)<br>Risperdal (Antipsychotics)<br>Cefdinir (Antibiotic) | Bay City Health Clinic (Dr. Cho) |
| 12-14-07 | A/B Otic Ear Drops<br>Cefdinir (Antibiotic)** | American Medical Group (Dr. Driscoll) |
| 1-21-08 | Clonidine (Antihypertensive)<br>Amoxicillin<br>Ibuprofen 100MG<br>Diphenhist (Antihistamine)<br>Risperdal (Antipsychotics) | Bay City Health Clinic (Dr. Cho) |
| 2-6-08 | Andehist (Antihistamine) | Lakeland Memorial Hospital (Dr. Driscoll) |
| 2-29-08 | Clonidine (Antihypertensive)<br>Risperdal (Antipsychotics) | Bay City Health Clinic (Dr. Cho) |
| 6-16-08 | Amphetamine Salts (ADHD Medication) | Bay City Health Clinic (Dr. Baker) |
| 6-30-08 | Amphetamine Salts (ADHD Medication) | Bay City Health Clinic (Dr. Baker) |
| 8-4-08 | Amphetamine Salts (ADHD Medication)<br>Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Baker) |
| 9-1-08 | Amphetamine Salts (ADHD Medication)<br>Clonidine (Antihypertensive)<br>Albuterol Inhaler | Bay City Health Clinic (Dr. Baker) |
| 10-1-08 | Amphetamine Salts (ADHD Medication)<br>Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Baker) |

| | | |
|---|---|---|
| 10-30-08 | Amphetamine Salts (ADHD Medication)<br>Clonidine (Antihypertensive)<br>Diphenhist (Antihistamine) | Bay City Health Clinic (Dr. Baker) |
| 11-27-08 | Amphetamine Salts (ADHD Medication)<br>Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Baker) |
| 12-26-08 | Amphetamine Salts (ADHD Medication)<br>Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Baker) |
| 1-23-09 | Amphetamine Salts (ADHD Medication)<br>Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Baker) |
| 2-20-09 | Amphetamine Salts (ADHD Medication)<br>Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Baker) |
| 3-17-09 | Amphetamine Salts (ADHD Medication)*<br>Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Baker) |
| 3-18-09 | Amphetamine Salts (ADHD Medication) | Bay City Health Clinic (Dr. Baker) |
| 5-14-09 | Amphetamine Salts (ADHD Medication)*<br>Clonidine (Antihypertensive) | Bay City Health Clinic (Dr. Baker) |
| 5-15-09 | Amphetamine Salts (ADHD Medication)* | Bay City Health Clinic (Dr. Baker) |
| 5-23-09 | Amphetamine Salts (ADHD Medication) | Goldberg Hospital (Dr. Edgar Lunasa) |
| 6-1-09 | Amphetamine Salts (ADHD Medication)* | Bay City Health Clinic (Dr. Baker) |

**OFFICE OF THE INSPECTOR GENERAL**
**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**

**REDACTED REPORT**

***This report is being released by the Office of the Inspector General for training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.***

**File:** **09-2275**

**Subject:** Caroline Hanes (DOB 9/01; DOD 4/09)
Mackenzie Hanes (DOB 1/03; DOD 4/09)

## INTRODUCTION

In April 2009, at approximately 9:20 a.m., Allie Hanes (DOB 6/1978) was driving eastbound on Route 92 in Covington, Illinois; her daughters, seven year-old Caroline, and six year-old Mackenzie Hanes, were in the back seat.[1] Ms. Hanes' automobile veered into oncoming westbound traffic, sideswiping a westbound vehicle, and continued traveling eastbound colliding head-on with a second westbound vehicle.[2] Ms. Hanes was pronounced dead at the scene; Caroline and Mackenzie sustained serious injuries. The Covington Fire Department transported Caroline to Harrington Hospital, where she was pronounced dead shortly after arrival. Mackenzie was air lifted to Glascott Hospital; she died from her injuries a few days later. The police report described: "The weather as clear, the road condition was clear of construction, there are no concrete median barriers and the posted speed limit is 55 mph. The children in the subject's vehicle were restrained."

A Covington Police Sergeant spoke with the Assistant Medical Examiner about the deaths of Allie and Caroline Hanes. The Sergeant and the Assistant Medical Examiner discussed concerns that Ms. Hanes' history of drug use and medical problems may have been contributing factors in the accident and deaths. Blood toxicology taken at autopsy indicated that Ms. Hanes tested positive for Morphine, Valium, and Tramadol.[3]

At the time of Ms. Hanes and her daughters' deaths, the family had an open intact family services case with the Department of Children and Family Services (DCFS). The Office of the Inspector General (OIG) investigated Caroline's and Mackenzie's deaths pursuant to its directive to investigate the death of children whose family has had involvement with the Department of Children and Family Services (DCFS) within twelve months prior to the death.

---

[1] Route 92 is a two-lane road.
[2] Passengers in both of the westbound vehicles sustained serious non-fatal injuries.
[3] Morphine is narcotic opiate used to relieve severe or agonizing pain; Valium is an anti-anxiety medication that is contraindicated for individuals with a history of alcohol or drug dependence, and Tramadol a centrally acting synthetic opioid analgesic indicated for the management of moderate to moderately severe chronic pain.

**INVESTIGATION**

## Background

Allie Hanes' first involvement with the child welfare system occurred in August 2003, while she and her daughters, Caroline and Mackenzie lived in Alabama. Ms. Hanes was arrested during a traffic stop for possession of cocaine and her daughters were in the car at the time of her arrest. Alabama child protection referred Ms. Hanes to an intensive outpatient treatment program, which diagnosed and treated her for Cocaine dependence, Opioid abuse, and depression. Ms. Hanes was successfully discharged in March 2004, after completing 63 days of treatment. As a result of her involvement with Alabama child welfare, Caroline and Mackenzie were placed in foster care for approximately three months.

### First Child Protection Investigation ("A" Sequence) [4]

Ms. Hanes' involvement with the Illinois child welfare system commenced in April 2005, when the State Central Register (SCR) received a report that Ms. Hanes had appeared depressed, and on one occasion indicated that she might be suicidal, fearing she might hurt her daughters, Caroline (age three) and Mackenzie (age two). The assigned Child Protection Investigator's (CPI) investigation did not reveal abuse or neglect, and the investigation was unfounded; however, it did suggest a need for services. Ms. Hanes admitted to being Bipolar, and taking Depakote, Lithium, and Valium. The case records contained no documentation indicating that the CPI attempted to identify or contact the psychiatrist/physician, who was treating and prescribing medications to treat Ms. Hanes' Bipolar disorder. Ms. Hanes reported being stressed out and in the process of establishing psychiatric services at Gibbons Family Services. She acknowledged receiving SSI, being unemployed, not using illicit drug, and she welcomed assistance with day care for the girls. No safety plan was noted. An Intact Family Services case was opened in April 2005.

### Intact Family Services Case

The Intact Family Services case was open from April 2005 to November 2006. During the nineteen months the case was opened, the family received services from three caseworkers. In May 2005, Ms. Hanes stopped taking her psychotropic medication because she was no longer covered by her ex-husband's insurance. In response, her caseworker, George Gray developed a crisis plan that called for Ms. Hanes' parents to stay with her and the girls until she got back on medication and the children were enrolled in daycare. Ms. Hanes established mental health and medication services at Gibbons Family Services, and enrolled the girls in daycare. The case records contained no documentation indicating that Mr. Gray attempted to contact Gibbons Family Services to verify that Ms. Hanes had established mental health and medication services.

In June 2005, George Gray completed the Integrated Assessment (IA). Mr. Gray noted no concerns about the girl's health or safety. At the time, Ms. Hanes reported: no support system except her church; her financial situation was difficult; and her mortgage and car payments exceeded her monthly SSI benefit of $688.00. Ms. Hanes appeared to have adequate parenting skills, good insight into her problems, and an ability to reach out to community resources. Mr. Gray evaluated Allie's prognosis as good for following up with services and addressing her needs. "Allie needs to follow up with mental health services for herself. Day care services are needed to give Allie some free time, and reduce some stress on a temporary

[4] The investigation was expunged; however, information about the hotline call and the investigation was gathered from a Case Summary, and an Integrated Assessment (IA) completed by George Gray and Rita Vargas.

basis. It is estimated the case will be open very short term, probably less than six months. Allie will be referred to the community for other resources."

In July 2005, the family's case was transferred to Brent Daniels. Mr. Daniels' supervisor directed him to refer Ms. Hanes to Unlimited Services For Kids (USFK) for in-home counseling, and hands-on assistance with obtaining needed support for the girls. At that time, the girls were receiving protective day care services through the Department. Ms. Hanes was also attempting to secure employment. In August, Mr. Daniels noted that Ms. Hanes began seeing a staff psychiatrist at Gibbons Family Service who prescribed Ms. Hanes: Seroquel, Depakote, and Lithium. Ms. Hanes reported ups and downs, but appeared to be functioning fairly well. Ms. Hanes continued to need child care support from DCFS, and was offered Norman assistance, which she declined. Mr. Daniels visited the family once in September 2005, noting that the children appeared healthy and safe; Ms. Hanes reported taking her medication and following through with treatment. The case record contained no documentation, indicating that Mr. Daniels verified Ms. Hanes' medication and treatment compliance. The Department continued to provide daycare support.

In October 2005, Mr. Daniels' supervisor noted; "the plan is to close the case in December if there is no further issues reported. This woman declined Norman Funds when she found a job. Involved due to mother being overwhelmed due to financial issues and treatment needs the situation has since stabilized. Worker to follow up with developing a plan with this family to explore child care … No new needs identified. The child appeared well; Ms. Hanes continues to take psychotropic medication i.e.; Paxil, Topamax, Seroquel."[5] The case record contained no documented communication between Mr. Daniels and the treating psychiatrist relative to Ms. Hanes' change from medication noted August 2005 (Seroquel, Depakote, and Lithium). Mr. Daniels agreed to extend day care services until Ms. Hanes could arrange alternative day care for the girls. No major concerns were noted.

In November, the family's case was transferred to Makayla Bynum. Ms. Bynum noted that protective day care would continue until February 2006. The intact supervisor, who remained the same, entered a Supervisory Note indicating a Family Meeting had occurred; Ms. Hanes was working, and child support had been cut off, and they planned to take the case to the child support unit in Grady. "Once the child support stabilized and the stress reduced will be able to close the case." The Intact Supervisor assessed the risks as low. The case file contained no documented contact with the family in December 2005 or any attempts to contact Ms. Hanes' mental health providers to verify her progress or assess her compliance with mental health services.

**<u>Second Child Protection Investigation ("B" Sequence)</u>**

On December 30, 2005, SCR received a report that Allie disclosed having thoughts of killing her three-year-old daughter, Mackenzie, and fantasized about life without her. Ms. Hanes also expressed a desire to run away with Caroline, her four-year-old. The hotline report was accepted for investigation of Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare, and assigned to CPI Erin Moran. Also, the Gibbons County Sheriff's Department conducted a child safety check and found the family asleep, the children appeared safe. The officers offered to take Ms. Hanes for an assessment and evaluation, she refused.

The next day, CPI Moran spoke to CPI from the first investigation ("A" sequence), who reported investigating "mother some months back, mental health concerns, mother urged to get involved in counseling, case was opened up with DCFS services, that there should be consideration of safety plan if no mental health involvement by mother." That same day, CPI Moran interviewed and observed the

[5] Paxil is an antidepressant; Topamax is prescribed for prophylaxis of migraine headaches and epilepsy; Seroquel is an antipsychotic.

children and noted no signs of abuse or neglect; she also met with Ms. Hanes, who admitted calling the Crisis Line after the girls fell asleep; "both girls had been riled up because of the holiday." Allie reported being tired, lonely, feeling sorry for herself, and needing extra attention, so she called the Crisis Line to vent. Ms. Hanes denied reporting that she was going to kill her children, and accused the crisis worker of taking her statements out of context. Ms. Hanes complained about her ex-husband, accusing him of not paying child support and rape.[6] Ms. Hanes informed CPI Moran that she had attempted to contact her Gibbons Family Service psychiatrist and her therapist to vent. Her Psychiatrist had been prescribing: Paxil for depression, Ambien for sleep and Clonidine for anxiety. CPI Moran reviewed Ms. Hanes' prior unfounded report and Alabama Child Protection documentation.

CPI Moran interviewed three family collaterals. All three friends of Ms. Hanes' reported that she was a good mother, posed no threat to her daughters, and, to their knowledge, was not an alcohol or drug user. The CPI noted neither Mackenzie nor Caroline exhibited signs of abuse or neglect. On January 1, 2006, intact caseworker Bynum noted becoming aware of the second child protection investigation ("B" sequence). Ms. Bynum spoke to the reporter who stated that Ms. Hanes sounded very depressed, and "…had thoughts of killing Mackenzie, her three-year-old, and that she had been raped and did not want the child."

The next day, CPI Moran discussed the investigation with Ms. Bynum, the intact family services caseworker. CPI Moran encouraged Ms. Bynum to inform Allie's therapist about the allegation under investigation. On January 3, 2006, CPI Moran faxed releases of information to Allie's therapist and prescribing psychiatrist. CPI Moran also left voice messages for both professionals informing them of Allie's alleged threat to harm or kill Mackenzie, and inquiring if they believed she posed a safety risk to children. That same day, CPI Moran's supervisor reviewed Ms. Bynum's safety assessment, which determined the girls to be at minimal risk for significant danger. CPI Moran also spoke to the director of the girls' daycare program. The daycare director reported that the girls had been attending daily for the last couple of months and that Ms. Hanes treats the children well, and she had not observed Allie favoring the older child over the younger child. The children's maternal step-grandfather confirmed that Allie loved both children equally, favoring neither; furthermore, he never heard Allie speak of harming either girl. The step-grandfather admitted that Allie could be an attention seeker, "such as when mother says she was in an accident first of December, pulling car out of her driveway, mother would come in with a boot-cast on foot saying it was injured, yet next two days, mother would have no cast on, then she would put it back on and say having problems with walking, mother going overboard at times for getting attention for herself, not for the children."

On January 4, 2006, CPI Moran spoke to Allie's psychiatrist who had not seen Ms. Hanes for three weeks.[7] The psychiatrist reported:

> Mother was being told to go to five day a week out-patient treatment program at Gibbons Family Services and mother gives excuses she cannot, mother says no one would watch her children, that mother admits to misusing Opiates, Vicodin, mother said this only a month ago to psychiatrist, that she has no family support at all, that mother calls Gibbons Family Services a lot, always in need of medication change or someone to talk to, that mother has told psychiatrist she has had thoughts of taking her anger out on her kids but never would, that mother feels angry with children at times, because they take up her time when she wants to other things, that mother has borderline and Bi-polar diagnosis with opiate dependency, that mother came only one time to substance abuse program, on a weekend, that mother presents as unstable, would consider any threats she made to kill or harm her children to be taken seriously."

[6] Ms. Hanes alleged that her youngest daughter Mackenzie was the product of rape by her ex-husband.
[7] Ms. Hanes reportedly fired Dr. Curtin and wanted another psychiatrist.

CPI Moran interviewed Ms. Hanes' maternal uncle; he reported speaking to his niece several times a week. He described Allie as a great mother, whose biggest problem was not receiving financial support from her ex-husband, and she "…always has had a poor me, trying to get sympathy attitude, she likes to exaggerate and make up things to make her special, like her mouth is flapping but her brain is off, various family members have found her in various lies which she does not remember telling from one week to the other, that when she says it originally it is very serious, but when you think about it, it is nothing but pure nonsense, she likes to get a rise out of people." CPI Moran shared the conversation she had with Allie's psychiatrist with Ms. Bynum and the intact family supervisor. CPI Moran urged Ms. Bynum to contact Allie's grandfather or other family member and inquire if anyone could move into Allie's home until her psychiatrist stated that she posed no risk to the children.

On January 9, 2006, Ms. Hanes informed CPI Moran that she would sign a release of information for her new therapist at Gibbons Family Services, and she would tell her of her DCFS involvement.[8] Allie also reported taking the children to therapy with her, and that her therapist was willing to talk to DCFS. CPI Moran inquired if a family member could move into her home. Allie stated no; however, her therapist would contact her to say that she is not a threat to her children.

CPI Moran contacted the therapist who was unable to talk to her because she needed an original release of information, rather than the faxed copy she received, and Allie needed to come to her office to sign the release. CPI Moran spoke to Allie's mother, who characterized her daughter as stable and involved with several relatives who live minutes away. She further stated that Allie had lots of health problems, but she did not abuse substances or pills. CPI Moran contacted children's pediatrician; his nurse reported that the girls are regularly seen, and there are no concerns.

On January 11, 2006, SCR received a call reporting that Ms. Hanes stated that she was hiding from the police because they were trying to take her children. Ms. Hanes claimed that her sister was hiding Caroline, and she had taken Mackenzie to the hospital with a 103 degrees fever. Following Mackenzie's discharge from the hospital, Ms. Hanes reported driving around fearing the police were at her home waiting for her. The reporter stated the police had been contacted. The hotline call was accepted as related information. That same day, the Intact Family Supervisor entered a Supervisory note documenting Ms. Hanes' threat against Mackenzie, and the psychiatrist's statement that he would take Ms. Hanes' threats seriously. CPI Moran planned to initiate a safety plan prohibiting Ms. Hanes from having unsupervised contact with the children; however, CPI Moran later told intact caseworker Ms. Bynum "…there was nothing to worry about, the children's support network was strong and she felt strongly the children were safe." CPI Moran also planned to send the case to court.

The next day, CPI Moran contacted Allie's therapist and informed her of the mother's threats, and her safety concerns. The therapist agreed to discuss those concerns with Allie at their next scheduled session. The next day, the case was staffed with CPI Moran, the DCP supervisor, intact worker Bynum, and the intact supervisor. After reviewing the case, Allie's call to her church's crisis line, her firing of her psychiatrist, and refusal to follow his recommendation that she participate in a five day a week treatment program, the intact supervisor recommended that Ms. Bynum forward the case to the State's Attorney's Office. CPI Moran and Ms. Bynum planned to meet with mother to establish a safety plan.

On January 13, 2006, CPI Moran, DCP supervisor, intact worker Bynum, and the intact supervisor discussed the most recent Hotline call. All parties agreed that Ms. Hanes needed to come to sign a safety plan, prohibiting her from having unsupervised contact with the girls, pending a mental health evaluation. Later that day, Ms. Hanes and a friend spoke to CPI Moran about the need for a safety plan.

[8] Allie had been meeting with her new therapist for the past three Saturdays.

CPI Moran questioned Allie about the Hotline call; Ms. Hanes stated that she and her friend went to the emergency room because she had a migraine and Mackenzie had a fever. At the emergency room it was determined that Mackenzie had no fever, neither Ms. Hanes nor Mackenzie received medication. The friend then drove Ms. Hanes and the girls to her house, leaving the girls in the care of her husband while she drove Ms. Hanes home. Ms. Hanes denied driving around with a sick child, and could not imagine who would have called the Hotline, and complained of being harassed by DCFS. CPI Moran repeated her request that mother sign the safety plan; however, Ms. Hanes refused.

On January 18, 2006, CPI Moran informed the DCP supervisor of Ms. Hanes' refusal to sign the safety plan. The DCP supervisor noted: "Due to the concerns of mental health stability of mother, allegation of risk of significant harm, neglect, will be indicated. Recommend continued engagement and further services assessment by CWS Bynum is recommended. Appropriate waivers were approved. Risk and safety assessments determined that the involved minors are at minimum risk of significant danger at this time." That same day, intact supervisor documented staffing the case with Ms. Bynum, the DCP supervisor. The DCP supervisor directed CPI Moran to take the safety plan back to Ms. Hanes, and to talk to reporter of the hotline call. The State's Attorney was also contacted.

On January 20, 2006, CPI Moran again contacted Ms. Hanes about signing the safety plan; she eventually relented and signed the safety plan, agreeing to reside with the girls in the home of her friend. On January 23, 2006, Ms. Hanes contacted Ms. Bynum to protest the indicated finding of Substantial Risk of Physical Injury, denying the allegations. The next day, Ms. Hanes informed CPI Moran that she met with Dr. Bartolome, a psychiatrist at Optima Behavioral Health; she had signed a release of information for DCFS. According to Ms. Hanes, Dr. Bartolome told her that DCFS needed to return her children immediately and he would fax a letter to DCFS stating that she was neither homicidal nor a threat to her children. CPI Moran stated that the forthcoming letter would be reviewed by her supervisor, and the safety plan would remain in force. The next day, CPI Moran received Dr. Bartolome's psychiatric assessment dated January 23, 2006:

> Mother is a 27 year old disabled white female, chief complaint, needs a psychiatric evaluation. Mother seen on 2/18/05 where she did not follow up after initial appointment, she was trying to get new psychiatrist and get off pain medication, which were prescribed for a variety of reasons including carpal tunnel and fibromyalgia. Mother says seeing previous psychiatrist and had been seeing him until about a month before, her time and the previous psychiatrist's time were not coinciding, that three week before mother feeling overwhelmed and seemed to have called crisis center, made comments feeling overwhelmed and was feeling like she could kill her children, crisis worker reported this to police and DCFS, within last week DCFS telling mother to get evaluation.
>
> Mother says previous psychiatrist treating mother for Bi-polar disorder, gave her Abilify. Mother feeling sedated and did not want to stop to take Abilify. Mother taking also Paxil, Clonidine, and Abilify. Mother says getting all pain medication two months before, experiencing cravings for that and Clonidine helping. ~Gives history of seeing therapist at Gibbons Family Services, denies mood change on daily basis denies rapid thoughts or impulsivity, denies thoughts of harming self or others, denies previous history of such, denies intent of harming children, denies being depressed or negative cognition, no evidence of anxiety during evaluation.
>
> Mother says seen by psychiatrist at naval base, one hospitalization in 1992. Trials of lithium, Depakote, and Valium through Naval base, struggles with pain medication dependence, has been able to secure pain medication after seeing psychiatrist last year but says no medication past two months. Says using no cocaine since 2002.

> Treatment plan, patient appears mildly manic, will start on Risperdol at bedtime to counter possibility of Bi-polar. At this point do not see evidence of patient being a threat to children or being unable to care for children, recommend to DCFS to provide custody of children to parent, she can return home and care for own children, will need to re-evaluate in 10 days to assess Risperdol response and change medication as needed.

Dr. Bartolome's Axis 1 diagnosis included: Bipolar Disorder, Type1, mild manic versus mixed; Opiate Dependence, physiologic, in early remission; rule out PTSD; cocaine dependence, in sustained full remission. The Axis II diagnosis was deferred. Between March and June 2006, the Pharmacy records indicated that Allie filled prescriptions written by the new psychiatrist for: Suboxone, Paxil, Ambien, Risperdol, Darvocet, Abilify, Geodon (anti-psychotic), and Lorazepam. Also during this time frame, the Pharmacy records indicated that she had multiple prescriptions for Hydrocodone, written by Drs. Turner, Crumb, Dexter, Greeley, and Jester; prescriptions for Darvocet, Tylenol #3 and Methocarbamol (muscle relaxer) written by Dr. Barone; prescriptions for Vicodin and Darvocet written by Dr. Coburn; Ativan by Dr. Dexter; Vicodin and Canpazine by Dr.Turner; Vicodin by Universal Medical Center Emergency Department. Allie's pattern of visiting multiple doctors who prescribed multiple medications continued until her death in April 2009.

On January 25, 2006, the DCP supervisor reviewed Dr. Bartolome's psychiatric assessment, and wrote:

> Supervisor urges safety plan to be terminated today, that allegation against mother should also be unfounded based on positive mental health assessment she secured recently. DCFS supervisor very concerned about mother not maintaining mental health involvement and her reported statements to crisis that DCFS services provider Makayla Bynum needs to continue case involvement to ensure mother's psychiatric stability. Worker and supervisor meet with DCFS service worker Makayla Bynum to advise of such and give copy of mothers recent psychiatric evaluation.

Later that day, CPI Moran met with Ms. Hanes and her friend to terminate safety plan; Ms. Hanes was informed that they were considering unfounding the allegation in light of Dr. Bartolome's recent assessment. The case file contained no documentation indicating a reversal of the indicated finding; subsequently, Ms. Hanes requested an Administrative Hearing to appeal the indicated finding. On February 4, 2006, CPI Moran informed Ms. Hanes that the allegation had been indicated.

Ms. Bynum's next documented family contacts occurred in March 2006; the two contacts were failed unannounced home visits. Following the second failed attempt, Ms. Bynum contacted Ms. Hanes by phone, requesting to see the girls; Ms. Hanes refused, stating that she would see Ms. Bynum at the Administrative hearing.

On April 5, 2006, the intact supervisor noted that Ms. Bynum had attempted to see the family; the family was in the process of appealing the indicated finding; "a psych eval was completed and they found to not to be a risk to the children [letter from Dr. Bartolome]. The safety plan was then on this mother on medication---worker to follow up to determine if the mother is cooperating with outpt care and request medication level to insure she is following up with outpt care."

On April 25, Ms. Bynum went to Mackenzie and Caroline's day care program; she learned "that a hotline call was being made to DCFS due to Mackenzie's eye.[9] This was the second time that Mackenzie had told the teacher that her mommy hit her in the face and on her eye. The first time mother was taking her to the doctor, due to her falling out of bed and the day care did not call the hotline, although Mackenzie

[9] There are no records or documentation to indicate that a hotline call was made by the care provider.

claimed that her mother hit her." Ms. Bynum interviewed Mackenzie, whose eye was slightly bruised; Mackenzie, looking afraid stated "mommy hit me." In another room, Ms. Bynum asked Caroline if her mother hit Mackenzie. Caroline answered yes. Ms. Bynum spoke to Mackenzie's teacher, who believes Caroline is favored by the mother. Ms. Bynum directed the daycare program director to call her if there are any more marks on Mackenzie. This was Ms. Bynum's last contact with the family until October 2006, six months later.

On April 26, 2006, the intact supervisor noted that Allie had a history of homicidal ideation related to Mackenzie, who came to day care with a bruise under her eye. The little girl reported that her mother hit her. A call was made to the hotline. The supervisor noted that the worker will follow up to determine the safety of the girls. The case file contained no further documentation indicating a hotline call was made. The next day the intact supervisor noted that an Administrative Hearing related to the indicated second child protection investigation ("B" sequence) was scheduled for May 5, 2006.

On May 5, 2006, The Department concluded an Administrative Hearing requested by Ms. Hanes to overturn the indicated finding of Environment Injurious to Health and Welfare. After reviewing the DCFS investigative file, and hearing testimony from CPI Erin Moran, Gibbons Crisis Program, the reporter, DCFS intact worker Makayla Bynum, the maternal grandmother, a family friend who monitored the safety plan, and Allie Hanes. On May 18, 2006, the Administrative Law Judge (ALJ) denied Ms. Hanes' request.[10] The ALJ noted that Dr. Bartolome completed his assessment of Ms. Hanes on January 23, 2006; however, his previous contact with her occurred on January 18, 2005 (one year prior). Ms. Hanes failed to follow up that appointment until her January 23, 2006, when he reassessed her. The ALJ further noted:

> The mental health assessment by the psychiatrist has limited weight and relevance. It was completed almost a month after the hotline report was received and is not a valid indication of the appellant's mental state on December 30, 2005. In addition, the report is based upon a single point in time (one meeting with the mother, and the mother's Bipolar and Borderline Personality Disorder make her prone to mood swings). Furthermore it appears to be based solely upon appellants self report. The appellant is not a creditable witness/reporter as she has made repeated conflicting and/or inaccurate statements to various persons, and more than one person interviewed by the Investigator described her as untruthful.

In her recommendations, opinions and findings, the ALJ noted:

> If taken at face value, these reports indicate that the Appellant and/or her children are at imminent risk of harm, and, in fact the hotline reporter stated believing the Appellant's children were at imminent risk of harm. The Appellant's psychiatrist contemporaneous to the events and stressors leading up to the hotline calls, told DCP that: "Mother presents as unstable, would consider any threats she made to kill or harm her children seriously.
>
> Thus, while it is clear the Appellant has a psychological need for attention; it is unclear how far she will go to get it when unstable. So far the Appellant has made statements about wanting to kill her three year-old and run off with her four-year–old while both children were in the house. Even if the Appellant's statements are not taken at face value, and assumed to be evidence of stress and a need for attention, the comments demonstrate the Appellants instability.
>
> It is troubling that despite the risks, the intact case manager [Ms. Bynum] testified that she did not know that the appellant had a history of substance abuse and mental illness prior to the

[10] On June 19, 2006, Ms. Hanes was sent a certified letter and the findings of Administrative Law Judge. The letter had a cc: Wayne Davidson.

> December 2005 hotline report. Nor did the intact worker take the time to address these issues after the hotline report as, even at the hearing, she was unfamiliar with what services the appellant needed or was receiving, and did not know her diagnosis or the contents of the safety plan.
>
> The DCP Investigator testified that she thought the case should be indicated and the Appellant posed a risk, but the intact worker would be monitoring the case and providing services. Instead, the intact worker testified that her caseload is too high for her to go out to the home once a month, she is not providing any services beside day care, and she does not know what the Appellant's mental health/substance abuse issues are. It is hoped that DCFS/DCP administration will further staff this case, upon receipt of this recommendation.
>
> Despite this recommendation, it is clear that the Appellant has strengths. She exhibits good parenting skills when stable, is intelligent and resourceful, has continued to pursue vocational goals, loves her children and is able access community-based services as a means of support. It is hoped that she will continue to build on these strengths, including engaging in individual counseling as a means of helping her achieve her goals, and ensure the wellbeing of herself and her children.

On June 5, 2006, Ms. Bynum noted that Allie had appealed the indicated finding, and the decision had yet to be rendered. On July 6, 2006, the intact supervisor noted that a face to face meeting had been attempted the day before. Allie's appeal had not been decided. Ms. Bynum was to assess the current safety of the children. "There have been no new reports; mother is resistive to DCFS involvement."

On June 26, 2006 a copy of the ALJ's recommendations, opinions and findings was sent to the DCP supervisor, and included in the investigative file. OIG investigators asked Ms. Bynum and her supervisor if they received or read the findings of the Administrative Hearing; both stated no. Both reported hearing that the appeal had been denied. A Review of the intact case file revealed that the recommendations, opinions, and findings from the Administrative Hearing were not in the case file.[11]

On October 15, 2006, Ms. Bynum made her final unannounced visit; Ms. Hanes appeared distant. The girls came to the door; they were quiet, appeared guarded, but there were no visible marks on them. Ms. Hanes refused to allow the worker into the house. "Worker informed her that the case was being closed and thanked her for her cooperation. DCFS had paid for her day care. Allie is now paying for her own daycare and claims to be on medication. There have been no unusual incidents or hotline calls made in the past year."

A November 9, 2006, the intact supervisor entered the following Supervisory Note:

> Review for Case Closure/Critical Decision- manger reviewed case and file with worker. Case came in for family preservation services there was no indicated reports in Illinois. Family was reported in Alabama. Case has been opened since 4/05. Worker reports that mother states she is receiving mental health services; however, she refuses to sign consents. There have been no safety or risk concerns since case opening, despite the mother not wanting DCFS involved. There are two children who are in daycare. Worker is going to request a general report regarding any concerns they have with the children. Case is being closed NA, mother has not cooperated with services however worker reports the children appear to have their basic and emotional needs met by this mother.

[11] The OIG provided copies of the of the Administrative Hearing findings to the Intact Family staff.

**Sequences "C", "D", and "E" Expunged.**

**Sixth Child Protection Investigation - Inadequate supervision ("F" Sequence)**

In August 2008, SCR received a report that Allie Hanes was not breathing. According to the reporter:

> I observed Allie Hanes laying on the upstairs bathroom. Allie was semi-conscious, in that she was awake, but was unable to answer any questions. I attempted to ask Allie what was going on, to which she would just look up and stated she was fine. AFD Medic #1 [Atkins Fire Department] responded to the scene and transported her to the hospital. Prior to them transporting Allie to the hospital she advised them that she had "shot up heroin and was feeling high from that". Allie had needle marks on her arm, which was consistent with injecting heroin."

The Hotline accepted the call and opened an investigation for allegations of Inadequate Supervision.

At the scene, an Atkins Police Officer spoke with Beth Hoskins, who stated that Ms. Hanes visited her whenever she wanted to get "high." Ms. Hoskins called 911 because she feared Allie may have injected bad heroin and appeared not to be breathing. Ms. Hanes was transported to the Hospital; Caroline and Mackenzie were transported to the Atkins Police Department to await pick-up by their step-grandfather. When he arrived and took the girls to his home. Upon discharge from the hospital, Ms. Hanes was taken to the Atkins Police Department and held in lieu of bond.[12]

The following day, the temporarily assigned supervisor documented Supervisory Consultation with the assigned investigator, Diane Berger; he outlined investigative task for her to complete, such as: ensuring the safety of the minor, referring for substances abuse and treatment services as needed, creating a safety plan as needed, assessing if family had adequate support systems, contacting police for report and obtain any previous contacts, speak to current caseworker and any previous CPI's involved with the family. CPI Berger's initial attempts to contact Ms. Hanes, the girls, and the Atkins Police Officer failed. Later that day, CPI Berger spoke to a social worker at May Correctional Center, where Allie was being held. The social worker reported that Allie would be on suicide watch for a minimum of 24 hours, as she was angry and distraught. On August 25, 2008, CPI Berger's supervisor directed her to continue efforts to locate the family; CPI Berger made several attempts to contact the family and speak to the Atkins Police Officer. On September 5, 2008, CPI Berger left a message for the May Correctional Center social worker inquiring about the status and whereabouts of Ms. Hanes.

On September 9, 2008, CPI Berger interviewed Ms. Hanes at her home. Ms. Hanes reported being stressed the day of the incidence, and that she had used heroin six times between July 2, 2008 and August 18, 2008. She was held at the May County Correctional Center for 24 hours; upon release, she voluntarily entered a four-day detox program for opiate detoxification on August 20. Allie reported being allergic to Tramadol, Tylenol #3, Restoril, and Amoxicillin. She reported taking Vicodin (4 X daily as needed) for pain, Topral for hypertension, Ambien nightly for sleep, Levothyroxine daily for Addison's disease, lithium for a Bipolar Disorder, Ativan for anxiety, Acetazolamide for kidney Disease, Klonapin as needed for anxiety/sleep, and Valium as needed for anxiety/sleep.

While undergoing detox, Ms. Hanes was treated by Dr. James Coffee who noted:

> Allie describes a lengthy history of drug related problems that go back to her high school years when she was abusing cocaine and at one point, was arrested during that time at about age 20. She states that about four years ago, she was introduced to prescription opioid due to a surgical

[12] Ms. Hanes was discharged from the hospital on August 18, 2008.

> procedure she had and has continued to use them ever since. She states that her psychiatrist, Dr. Bradley Cummings, actually prescribes Vicodin for her at a dose of four to six tablets at 7.5 mg hydrocodone daily for "chronic pain." She has also been prescribed Valium to take up to 40mg daily by Dr. Cummings, but she says she generally uses 10 mg at bedtime and may not even use it every day. About a month ago, she told her doctor that she was having cravings for heroin, a drug she had not used before and he then placed her on Ativan 3 mg per day, but she began using heroin on six occasions in the last month.

Ms. Hanes denied abusing other substances and reluctantly admitted being addicted to opiates; she felt it was okay to take them as long as they were being prescribed. Ms. Hanes was detoxified, using a Suboxone withdrawal protocol and appeared to respond well to the regime. Dr. Coffee further noted:

> Dr. Cummings had been treating her with lithium apparently 900mg at bedtime and when I asked her why she was taking Lithium, she said for a seizure disorder. I told her it is given for bipolar symptoms and she said she was not aware that she was bipolar. Allie has had an extensive exposure to other psychotropics in the past… She does have insomnia. I suggested I could give her a low dose of Doxepin at bedtime as she should not take a controlled substance. She said she had Doxepin at home. She has Neurontin at home, so I must assume that she has quite a war chest of medications in her possession. …Right now, her blood pressure is very low as well as she is experiencing a low pulse rate I have informed her that she will need to come off the lithium due to her renal insufficiency. She denies seeing multiple physicians or buying drugs on the internet. She is obtaining the heroin from a friend.

At discharge, Ms. Hanes was directed to contact Gibbons Family Services on September 10, 2008, for a substance abuse assessment.

Ms. Hanes informed CPI Berger that she was Bi-polar, and under the care of Dr. Bradley Cummings, a psychiatrist. Dr. Cummings had prescribed: Lithium, Effexor, Ativan, Ambien, and a thyroid medication. During a phone interview with OIG investigators, Dr. Cummings described Allie as a "very ill woman;" it was his opinion that she suffered from Addison's disease or Cushing Syndrome, endocrine system conditions. He further reported that he was treating her endocrine condition because Allie had been unable to find an endocrinologist willing to accept her Medicare coverage. Ms. Hanes stated that she did not need a caseworker because she had initiated all her own services. CPI Berger instituted a safety plan; Ms. Hanes did not understand the need for the plan in light of initiating her own services; however, she did provide the names of the maternal step-parents as caregivers for the girls. Ms. Hanes stated that the father of the girls was in arrears for child support; he resided out of state, and had four supervised visits a year with the girls, as he had sexually molested Caroline.

CPI Berger spoke to seven year-old Caroline, who was in the first grade and in a dual language program. Caroline reported "not being scared of the place or the people in the house where her mother got sick, she stated she "kinda knew" the people in the house and was safe as long as mom was there." She reported feeling very safe with mom. CPI also questioned five year-old kindergartner, Mackenzie. Mackenzie stated that no one comes to her house that she does not know, and her mother's friends do not scare her. Both minors appeared well groomed, with no signs of abuse or neglect. CPI Berger informed the maternal step-parents that Ms. Hanes could not have unsupervised contact with the girls.

On September 10, 2008, the step-grandfather informed CPI Berger that Allie had been addicted to Vicodin 4½ years earlier, and stopped using when it became too expensive. The step-grandfather reported speaking to Allie's biological mother who stated that Allie told her she was having a hard time keeping herself from hurting the girls after her detox. That day Allie kept her assessment appointment at Gibbons Family Services, and informing CPI Berger that she would either be referred to individual or group counseling. Ms. Hanes denied thoughts of hurting the girls or being unable to handle her parenting

responsibilities. Allie inquired when her girls could come home; CPI Berger reiterated that the safety plan would remain in place at least through September 16, 2008.

On September 11, 2008, CPI Berger noted speaking to Dr. Cummings, who reported first seeing Allie when she was 15 years-old, and diagnosing her with depression. He had seen her steadily for the past 2 years. He reported "…her depression was her major issue, with bazaar mood swings; however, controlled with medication: Lithium, Ambien, Thyroid medication, Ativan, Vicodin for right foot fracture that didn't heal. He doesn't think Allie was addicted to any of those medications." Dr. Cummings further stated "he sees her every 90 days, probably needs to see her more; however, Allie phones 2-3 times per week, issues are direct to the point and resolved.[13] Last seen within 90 days. Stated suicide has never been an issue; she has been mentally stable, held jobs, and has pushed herself to care for her kids. Stated she would not hurt her kids, actually the opposite: Do anything for them, has good influences in her life: friends, church."

Dr. Cummings was startled to hear that Allie had recently used heroin. When asked if he was aware of her having a prior addiction or treatment for cocaine or other drugs, Dr. Cummings was unsure. In a November 2004 case note, Dr. Cummings wrote that Allie had an "…old history, until age 20, of using cannabis, cocaine and alcohol, toward feeling "normal"; currently, she does not use alcohol, nicotine or caffeine." Furthermore, Allie's family had complex medical and psychological issues and Allie was the most stable and cleanest in the family. When asked by CPI if there were any reasons why minors would not be safe with Allie, he stated no, "kids are front and center of her mind." When asked if her mental health affects her ability to care for her children, Dr. Cummings responded: "…Cortisol affects sleep, non healing such as her foot, blood pressure variations, water retention, [have] an affect on mental health, almost like people has [with] constant PMS." When asked by OIG investigators if he was aware that Allie had described her heroin overdose as a suicide, Dr. Cummings stated no.

On September 15, 2008, CPI Berger contacted the hospital where Ms. Hanes went through detoxification at to request records; CPI was referred to Dr. Coffee's office.[14] CPI Berger also contacted LPD Laboratories for clarification of what drug(s) were identified in Allie's September 10 positive opiate test. To answer that question, the technician recommended conducting an expanded test to identify the specific opiate in Allie's urine.[15] CPI Berger also faxed release of information to a treatment center in Alabama.[16] CPI Berger contacted Allie's therapist at Gibbons Family Services. The therapist described Allie as somewhat uncooperative, and she ended Allie's assessment before she completely stopped providing information. She assessed Allie as opiate dependent and secured a urine sample. Because Allie was prescribed Vicodin and Ativan, she was ineligible for Family Services intensive drug-free outpatient program; however, she could participate in individual counseling.

The next day, the CPI followed up with LPD Laboratory to learn if Suboxone could produce a positive urine screen; the lab technician stated no. Later that day, Allie informed CPI Berger that she had seen Dr. Coffee and he prescribed the opiate blocker Seboxone. CPI spoke to Allie's therapist at Gibbons Family Services, who reported that Allie's urine tested positive for opiates. She reported staffing Allie's case with her supervisor and setting up another appointment to complete Allie's assessment. The therapist

[13] Dr. Cummings reported speaking to her during his 9-9:45 pm "calling hour".

[14] CPI Berger was asked by OIG investigators if she ever spoke to Dr. Coffee. CPI Berger reported leaving him phone message but never communicating with him.

[15] The Forensic Technician stated the opiate could potentially be vicodin, morphine, or codeine.

[16] CPI received the Alabama Treatment Center Transfer/Discharge summary: Allie was admitted to the program on January 15, 2004, "…as the result of an abuse/neglect call to Department of Children and families when she was arrested while attempting to buy cocaine with her children in the car. She was on probation for attempting to buy cocaine with children in the vehicle. History of cocaine and crack abuse resulted in arrest in August 2003. Was seeing doctor for mental health issues and history of attending AA meetings. When admitted, she was confrontational and in denial of addiction. Urine tested positive for opiates on March 1, 2004, however determined she was given opiates at ER following accident resulting in back injury. Was successfully discharged in March 2004."

pointed out that Suboxone was an opiate blocker, thus blocking the analgesic benefit of the Vicodin (an opiate) prescribed by Dr. Cummings. The therapist also had concerns with Allie taking Ativan; if she was willing to come off the medications, she could fully participate in outpatient treatment. CPI Berger met with Allie and reviewed the safety plan, making alterations to it that established clean urine tests and treatment participation as prerequisites for terminating the safety plan.

On September 17, 2008, CPI Berger again contacted LPD Laboratories, and learned that the expanded test identified the opiate as morphine and Oxycotin; neither Suboxone nor heroin was detected. The next day CPI Berger shared the test results with Allie, who denied ever taking those medications. Allie reasoned the positive test result could have been a consequence of an Emergency Room visit two days prior to her overdose. She went to the ER for bad menstrual cramps and a migraine and was unsure if she was given morphine or Oxycotin; she also suggested that the Suboxone might be responsible for the positive result. CPI informed her that the test specifically identified morphine and Oxycotin, ruling out Suboxone. Allie denied using either substance.

On September 19, 2008, CPI Berger asked Allie when she last took Vicodin, Allie reported two days ago; "generally I take one pill daily for back pain." Allie complained that the step-grandparents would not let her see the girls and they cry all the time. When asked if she had anyone else to care for the girls, she said no. Allie also reported having two psychiatrists, attending individual counseling, going to AA, and taking her Suboxone. On September 22, 2008, the step-grandmother shared with the CPI her suspicion that Allie was still using drugs. She reported that Allie screams at the girls, who are happy in her care and only cry when mom shows up. The step-grandmother complained about the commute from her home to the girls' school and requested that the girls be moved to a school closer to her home. The CPI did not recommend uprooting the girls from their school to only have to return to it if and when they return home.

On September 23, 2008, CPI Berger spoke to Allie about the safety plan. Allie thought the safety plan was ending because she had made a treatment appointment on October 1, 2008 and took a urine test. CPI reiterated that completion of those tasks alone would not end the plan; furthermore, she had yet to keep the treatment appointment. Ms. Hanes identified a friend to replace the step-grandparents as safety plan caregiver. Allie learned that the friend had negative CANTS and LEADS and had agreed to stay with Allie and the girls during the week. Also, the step-grandparents would keep the girls over the weekends. The CPI discussed the safety plan with the friend along with the provision that prohibited Allie from having unsupervised contact with the girls. CPI also reviewed the safety plan with Allie and the step-grandparents.

On September 25, 2008, CPI Berger and intact worker Letty Campbell conducted a transition meeting with Allie, Caroline, Mackenzie, and the friend monitoring the safety plan. Ms. Campbell explained her role as the family's case worker and gave Allie paperwork for urine test to be completed within 24 hours.[17] Allie asked numerous times about when the safety plan would end. Both CPI and Ms. Campbell explained that termination of the safety plan was contingent upon her attending counseling sessions, her progress in treatment, and clean urine tests. Allie reported her last urine test was clean, meaning not positive for the drug (heroin) that brought her to the attention of the Department. CPI informed Allie that her urine tests must be clean for all drugs, not just the drug that opened her case. Allie tested positive for Oxycotin and morphine on September 10, 2008. Allie countered that her psychiatrist could verify that the positive result was due to medication he prescribed. CPI explained to Allie that they had been down that road several times, and it has been explained to her what she needed to do to have the safety plan lifted. Allie wanted to work again, but complained that her involvement with DCFS interfered with that. Ms. Campbell encouraged her to seek employment and agreed to work around Allie's schedule. Ms. Campbell noted that the safety plan would remain in place after the investigation closed.

[17] That day Allie tested positive for opiates.

On September 26, 2008, the intact supervisor noted that the case was being referred to Juvenile Court; however, there was no documentation in the file that a court referral was made. On October 1, 2008, Allie called CPI Berger informing her that she had attended her first counseling appointment and completed a urine test. Ms. Campbell also made a home visit. "Allie was again being difficult today and repeatedly asking worker when the safety plan would end despite worker and investigator explaining it to her." Ms. Campbell reviewed the continuation of the safety plan and gathered information for the Integrated Assessment, completed the Domestic Violence (DV) and Adult Substance Abuse Screens. All questions on the DV screen were marked no. Ms. Campbell noted the following medical and mental health information on the Adult Substance Abuse Screen:

**II. Medical and Mental Health History**

| Yes | No | |
|---|---|---|
| ☒ | ☐ | Are you currently on any medication prescribed for a medical condition? If "Yes", complete below. |

| Diagnosis/Condition | Medication | Dosage | Duration |
|---|---|---|---|
| Ruptured disks | Vicodin | 1 tablet | 2 x a day |
| Foot pain | Vicodin | 1 tablet | 2 x a day |
| Sleep | Ambien | 10 mg. | 1 x a day |

| Yes | No | |
|---|---|---|
| ☒ | ☐ | Do you have or have you ever had a mental health diagnosis? |
| ☒ | ☐ | Are you currently on any medication prescribed for a mental health diagnosis? If "Yes" Complete below. |

| Diagnosis/Condition | Medication | Dosage | Duration |
|---|---|---|---|
| Mood disorder | Lithium | 900 mg. | 1 x a day |
| Anxiety | Ativan | 1 mg. | 1 x a day |
| Suboxone | Opiate blocker | 2 mg. | 2 x a day |

| Yes | No | |
|---|---|---|
| ☒ | ☐ | Has a doctor ever prescribed medication to "calm you down," "help you sleep," or to "help lift depression"? If "YES", what medications? ____________________ ____________________ |
| ☐ | ☒ | **Have you taken prescription drugs (such as vicodin, valium, oxycotin, others) that have not been prescribed for you? List below.** ____________________ ____________________ ____________________ ____________________ |
| ☒ | ☐ | Do you receive disability benefits? |

Ms. Campbell also included information that Allie had been treated for cocaine addiction in Alabama, she reported using heroin recently to commit suicide, and had been referred to Gibbons Family Services for a substance abuse assessment.

On October 6, 2008, Ms. Campbell spoke to Allie's Family Services counselor who reported that Allie was receiving individual counseling, rather than group counseling, because she was taking medication that prohibited her from participating in the regular outpatient program.[18] The counselor suspected that Allie may have a personality disorder and planned to talk to her about getting a second opinion from their staff psychiatrist. Ms. Campbell agreed to talk to Allie about getting a second opinion. That same day, CPI Berger contacted Ms. Campbell to inform her that Allie's September 25 urine test was positive for

[18] Allie reported having a ruptured disk in her back and her psychiatrist was prescribing vicodin. Allie also had another doctor who was prescribing an opiate blocker (Seboxone) to treat her opiate addiction. The treatment program would not allow her to participate in group treatment session until she stopped taking opiates; hence, she began individual sessions.

opiates. When Ms. Campbell questioned Allie about the result, she stated the opiate was vicodin. Ms. Campbell encouraged Allie to find an alternate medication because the clean drops required to terminate the safety plan also meant no prescription opiates. Allie reported being unaware of that provision. CPI reminded her that it had been discussed on several occasions.

The next day, Ms. Campbell again discussed the safety plan with Allie and her friend. Allie was angry, feeling the safety plan traumatized the girls. Ms. Campbell mentioned that the safety plan was in place to avoid taking the girls into custody. Allie's friend, who was staying in the home, reported that she could no longer participate in the safety plan; her participation would end in a few days, and other arrangements needed to be made. She stated that they had been misled by CPI Berger into believing the safety plan would last only a week or two. Ms. Campbell reiterated that the safety plan was reviewed weekly, and Allie needed to produce six weeks of clear urine tests before termination would be considered. Ms. Campbell updated the safety plan and directed Allie to think of another person. Later that day, Allie left a message for Ms. Campbell's supervisor requesting a new caseworker.

On October 8, 2008, the intact supervisor noted:

> The mother is seeing a psychiatrist and he is prescribing much medication, including Vicodin. The mother has been seeing the psychiatrist for years. The mother has a ruptured disk in her back which the reason is given for the Vicodin prescription. The mother is also taking a medication that blocks the effects of opiates. Therefore, the worker has advised the mother to discontinue taking Vicodin. The mother's therapist is recommending that the mother transfer to the psychiatrist at family Services due to concerns about the current psychiatrist and symptoms of personality disorder.

That same day, Allie picked up paperwork for a urine test. Ms. Campbell spoke to Allie about her clean urine test a week earlier, despite her reported Vicodin use. Allie reported taking the Vicodin only as needed. Ms. Campbell also discussed with Allie the cancelling effect the opiate blocker (Suboxone) had on the opiate Vicodin; Allie stated she was aware of this. Ms. Campbell expressed concern that Allie was not taking the Suboxone when she is taking Vicodin. Ms. Campbell attempted to contact Dr. Coffee, the psychiatrist prescribing the Suboxone, and Dr. Cummings, the psychiatrist prescribing Allie the Vicodin and other medication. Ms. Campbell also received a call from the step-grandparents who were willing to take the girls under the safety plan.

On October 9, 2008, the intact supervisor and Ms. Campbell conducted a family meeting. The intact supervisor discussed revisions to the safety plan that placed the girls back with the Grandparents. The safety plan would terminate when Allie's counselor or Dr. Cummings stated support for terminating the plan, in addition to participation in counseling and producing drug-free urine tests. Allie signed the revised safety plan and stated that she would talk to Dr. Cummings about writing a letter in support of terminating the safety plan. Allie also reported having a new primary care physician, Dr. Fenlon, though Dr. Cummings would continue to prescribe medication for her. Allie became upset when the discussion turned to her Vicodin use and her drug overdose. Allie insisted she did not have a substance abuse problem and only used heroin to try to kill herself and not because she was addicted to it. The intact supervisor advised Allie that her explanation did not reassure her that the girls would be safe in her care. Allie became angry when asked to stop taking the Vicodin in combination with the Suboxone, insisting that she saw no problem in taking the medications together, and, despite what might seem inconsistent, she received pain relief from the Vicodin without getting high. The intact supervisor told OIG investigators that despite concerted efforts to explain to Allie that Suboxone blocked the pain relieving effect of Vicodin, Allie remained unconvinced.[19] Both the intact supervisor and intact worker agreed to

[19] Suboxone in combination with Vicodin, Oxycodone, Codeine, Morphine or Heroin, either produces no effect (due to the opiate receptors in the brain already being occupied by the Suboxone), or induces sickness with signs of a strong withdrawal.

get more information on the issue, but continued to recommend discontinuing the Vicodin in order to comply with the substance abuse treatment provider's recommendations.

October 10, 2008, CPI Berger completed a nationwide sex offender search for the father of the girls, in response to Allie repeatedly stating that he was a sex offender. The search revealed no listing for their father. The investigation was indicated on October 8, 2008 for Inadequate Supervision. That same day, Ms. Campbell spoke to Dr. Coffee, who reported prescribing Allie the opiate blocker (Suboxone), and that it would not show up on a drug screen. Furthermore, Allie had signed a contract that she would not take Vicodin or any other opiate while on Suboxone; he would terminate her as a patient if she violated the contract. Ms. Campbell informed him that her other psychiatrist, Dr Cummings, was prescribing her Vicodin, and Allie was testing positive for opiates. Dr. Coffee stated it was very peculiar that a psychiatrist would prescribe her Vicodin. Dr. Coffee reiterated that opinion to OIG investigators.

On October 10, 2008, Dr. Cummings sent the following letter to Ms. Campbell:

> Ms. Hanes has been a patient of mine off and on for years-more steadily over perhaps the last 2-3 years. She is not perfect. Who is? But I have been impressed with (a) her motherly instincts and (b) her work ethic. She has suffered from multiple medical problems in recent years-and I am still not convinced that her medical problems are completely understood - but she has the whole time managed to take care of her two daughters and to keep herself employed. I've seen her hobbling along with a painful, swollen foot- still going to work every day despite the difficulty. She has an easy, caring interaction with her daughters, who always appear happy and well behaved. I recent years, her psychiatric issues have very much taken a back seat to her complicated medical - most likely primarily hormonal and neurological – issues. It has not been easy for her to find specialist medical care.
>
> I consider her to be an excellent guardian of her children. They are safe around her. She has had some horrible times of physical pain, but I consider Mrs. Hanes to be at low risk for relapse in regard to using substances other than those prescribed. Her current pharmacist and I touch base about every 2 weeks- and have done so for over a year.

When OIG investigators questioned the intact supervisor and intact worker about the significance of Dr. Cummings' letter, they stated that his letter was "significant" and "very instrumental in lifting the safety plan." The OIG subpoenaed Dr. Cummings' treatment records for Ms. Hanes. Dr. Cummings attached the following cover letter dated February 5, 2010, to the subpoenaed records:

> …She [Allie] spoke to me during my 9-9:45pm "calling hour" far more frequently than she ever came to the office. Generally her questions were more medical than psychological, as she continually was trying to find various medical specialists who would accept Medicaid or provide charity care, and she had numerous not-clearly-understood medical problems. During the last year or so of her life the Intermediate Care Center at Century Medical Center appears to have become her de facto "doctor".
>
> …During the last year or so of her life two pharmacists also appear to have become an integral part of her medical care. Many efforts were made to try to find an endocrinologist for her. None of this was an ideal situation, but it was the best that she and those trying to help her were able to cobble together. That she continued to work whenever possible inspired those around her to keep trying to help.
>
> While I had occasion across the years visually seen her two young daughters-who always seemed clean, healthy, and well mannered- I can not say that I really knew first-hand anything about her two young daughters or their well-being. Letters to the editor of a local newspaper soon after the mother's death and her children's deaths uniformly commented on how well-parented the children seemed to be.

On October 15, 2008, the DCP Manager documented supervision with Ms. Campbell. The Manager discussed receiving a call from the DCFS Legislative Office; Allie had written a letter complaining about the safety plan, the medication she was taking, and DCFS not allowing her to see her children.[20] The DCP Manager also discussed termination of the safety plan based on Dr. Cummings' letter, the girls attending school, Allie's signed consents for school information and Allie's report of seeing her psychiatrist.

> Per doctor she is dealing with her psychiatric issues and her medical issues (cervical issues and swollen feet). Worker has talked with psychiatrist who prescribes her medication, psychiatrist [Dr. Coffee] who prescribes her [opiate] blockers and signed contract to not take vicodin as a result. She is also seeing a therapist for ind [individual] treatment for substance abuse. She is also on lithium, ativan, ambien, being prescribed by dr [Dr. Cummings] who is prescribing the vicodin… Kids relate well to mom, do a lot of helping out around the house, they have been staying with step-grandparents who may not continue their relationship as mom was bugging them. Mom does have supportive friend who has assisted with supervision of girls and will provide after school care while mom works. Terminate safety plan tomorrow when meet[ing], kids will be home full time. Dad is not in the picture per mom she said he is out of state and offended against the girls but recently went to court and got visitation and it is supervised.
>
> Investigation has indicated will refer to court, mother has long history of substance misuse per prior investigation as well as mental health issues. Based on this risk is moderate and mitigated by the fact that kids are in school, mother has support system at this time and doctor has indicated no risk to children. Goal is to remain intact with mother addressing her substance abuse and mental health issues, addressing kids' needs and assuring their well being. Worker will follow up with dad to get information from him as he is now visiting girls, will also talk with girls about visits with dad as well.

The intact supervisor was asked by OIG investigators if the Hanes case was ever referred to court. The intact supervisor was unsure, but reported having problems with the Gibbons County Assistant State Attorney filling cases when parents have signed or are cooperating with a safety plan. The intact supervisor surmised that the Assistant State's Attorney thought those cases lacked urgent and immediate necessity for removal.

The safety plan was terminated on October 16, 2008.[21] That day, and October 22, Ms. Campbell attempted unannounced home visits. She contacted Allie on October 23 and scheduled a meeting with her and girls for October 28.

On October 21, 2008, Ms. Campbell completed an Integrated Assessment, noting that Allie denied having a substance abuse problem, despite the reason the case came to the attention of the Department. "Allie states that she only recently used heroin in an attempt to commit suicide. She reports only using heroin a total of five to six times." Allie reported being diagnosed with a mood disorder; receiving Social Security Disability benefits as a result of an anxiety disorder; having a ruptured disk, foot pain and thyroid problems. She was being prescribed vicodin, a thyroid medication, Lithium, Ambien, and Adavan by her psychiatrist, Dr. Cummings; and was prescribed Suboxone, an opiate blocker by her other psychiatrist, Dr. Coffee. "Allie is a single parent with obvious mental health and substance abuse issues. She appears to also have issues with lying and manipulation. Allie struggles with handling stress and lacks appropriate

---

[20] On October 24, 2008 the intact supervisor noted that Ms. Campbell responded to the Legislative inquiry, explaining that there had been a safety plan in place, which did allow for visitation but the plan had since been terminated and the children were back in Allie's care.

[21] A Safety Plan Termination letter dated October 16, 2008, was signed by Allie and the intact supervisor.

coping skills. She frequently plays the victim role and has lack of insight into how her mental health and substance abuse issues impact her daughters and place them at risk of harm."

A safety plan prohibiting Allie from having unsupervised contact with the girls was lifted after her psychiatrist provided a letter stating the girls were safe in her care and Allie was at a low risk for relapse. Ms. Campbell described Allie's prognosis as somewhat poor. "…Allie is currently being prescribed vicodin by her psychiatrist, despite it being an opiate and her having problems with heroin, another form of an opiate. Allie's psychiatrist does not appear to see anything wrong with prescribing her vicodin, even though he is not a medical doctor. Due to the medication she is on, she is unable to attend intensive outpatient treatment. She is currently attending individual substance abuse sessions as a result."

**SAFETY PLANS HISTORY***

| Date | Protective Action Taken | What Must Happen to Terminate Plan | Time Frames Imposed by Plan | Urine Test Results |
|---|---|---|---|---|
| 09/9/2008 | Minors to reside in the home of family friends. Allie cannot have unsupervised contact with the minors. The family friends will supervise all contact between Allie and the minors. | 1. Allie must complete a substance abuse assessment on 9/10/08, and participate in recommended services.<br><br>2. CPI will verify past treatment & past/current mental health care/needs.<br><br>3. Family will be opened for intact services. | 1. Assessment: 9/10/08.<br><br>2. Participate in recommended services by: 9/16/08.<br><br>3. Verify treatment by: 9/16/08.<br><br>4. Open for intact services by: 9/16/08. | 9/10/08: Positive: Morphine & Oxycodone |
| 09/16/08 | Minors to reside in the home of family friends. Allie cannot have unsupervised contact with the minors. The family friends will supervise all contact between Allie and the minors. | 1. LPD Labs will provide urine test results to CPI<br><br>2. Allie will attend and participate in individual treatment<br><br>3. Case will be opened with intact services | 1. Lab results by: 9/18/08<br><br>2. Attend treatment by: 10/1/08<br><br>3. Open for intact services by: 9/23/08 | |
| 09/23/08 | Minors will reside at Allie's home from Monday 2:00pm through Friday 2:30pm in the supervision of a family friend during these times. Minors will be picked up from school on Fridays by the couple the children had been living with, and taken back to school on Monday mornings. All three family friends will supervise all contact between Allie and the minors. | 1. Allie will attend and participate in individual treatment.<br><br>2. Allie will have clean urine test: 6 weeks of clean random urine test.<br><br>3. Transition meeting with case worker. | 1. Attend treatment by: 10/1/08.<br><br>2. Random testing.<br><br>3. Transition meeting by: 9/25/08. | 9/25/08: Positive: Opiates |
| 09/30/08 | Minors will reside at Allie's home from Monday 2:00pm through Friday 2:30pm in the supervision of her friend during these times. Minors will be picked up from school on | 1. Allie will attend and participate in individual treatment at Family Services.<br><br>2. Allie will have clean urine test: 6 weeks of clean random | 1. Attend treatment by: 10/1/08.<br><br>2. Results of random urine tests before 10/1/08 to 6:30pm. | |

| | | | | |
|---|---|---|---|---|
| | Fridays by the couple the children had been living with and taken back to school on Monday mornings. All three family friends will supervise all contact between Allie and the minors | urine test. | | |
| 10/1/2008 | Safety Plan terminated following receipt of letter from Dr. Cummings, stating that Allie presented no risk to the children | | | 10/01/2008 Negative: All Substances |
| 10/16/20088 | Safety Plan Terminated | | | |

* CPI Berger implemented and updated the Safety Plans weekly from September 9, 2009 through September 30, 2009. All safety Plans prohibited Allie from having unsupervised contact with the Caroline and Mackenzie. The Safety Plans further stated that if Allie failed to adhere to, or altered the Plans without DCFS approval, that protective custody would be taken. The persons responsible for implementing the Safety Plan were amended when Allie found another party willing to assist in the Safety Plan.

**DOCUMENTED CONTACTS WITH PSYCHIATRIST/THERAPISTS/PHYSICIANS**

| Date | Event | Investigator(CPI)/Caseworker | Comment |
|---|---|---|---|
| 04/11/2005 through 04/22/2005 | "A" sequence investigation. | CPI Delilah Tucker | The case records contained no documentation indicating that CPI Tucker attempted to identify or contact the psychiatrist/physician who were treating Ms. Hanes and prescribing medications to treat her Bipolar Disorder. |
| 04/22/2005 through 07/18/2005 | Open Intact Family Services case. | 1.Caseworker George Gray | Mr. Gray noted that Ms. Hanes reported establishing mental health and medication service at Gibbons Family Services; however, the case record contained no documentation indicating that Mr. Gray attempted to contact Ms. Hanes' psychiatrist or Gibbons Family Services to verify her self report. |
| 07/18/2005 through 11/28/2005 | Open Intact Family Services case. | 2. Caseworker Brent Daniels | Mr. Daniels noted that Ms. Hanes reported seeing her psychiatrist, Dr. Curtin, and being compliant with psychotropic medications he prescribed. The case file contained no documentation indicating that Mr. Daniels attempted to verify Ms. Hanes' self report. |
| 11/28/2005 through 12/30/2005 | Open Intact Family Services case. | 3. Caseworker Makayla Bynum | Ms. Bynum noted no attempts to contact Ms. Hanes' treating psychiatrist, Dr. Cummings, to asses her treatment and medication compliance. |
| 12/30/2005 | "B" sequence investigation | CPI Erin Moran | CPI faxed releases of information to Gibbons Family Services (GFS) therapist and Dr. Curtin, psychiatrist that Ms. Hanes last saw. |
| 01/04/2006 | | CPI Erin Moran | On 1/4/2006, CPI Moran spoke to Dr. Curtin, who reported that "…mother presents unstable, would consider any threat she made to kill or harm her children to be taken seriously." CPI Moran shared the conversation with Ms. Bynum. |
| 01/09/2006 | | CPI Erin Moran | CPI contacted Ms. Hanes' GFS therapist, who was unable to talk to her because she needed an original release of information, rather than the faxed copy she received, and Allie needed to come to her office to sign the release. |

| Date | Event | Investigator(CPI)/Caseworker | Comment |
|---|---|---|---|
| 01/12/2006 | | CPI Erin Moran | CPI contacted the therapist and informed her of Allie's threats involving Mackenzie and her safety concerns. The therapist agreed to discuss those concerns with Allie at their next session. |
| 01/24/2006 | | CPI Erin Moran | CPI received Dr Bartolome's psychiatric assessment dated January 23, 2006, recommending "… At this point do not see evidence of patient being a threat to children or being unable to care for children, recommend to DCFS to provide custody of children to parent, she can return home and care for own children, will need to re-evaluate in 10 days to assess Risperdol response and change medication as needed." |
| 09/11/2008 | "F" sequence investigation | CPI Diane Berger | CPI noted speaking to psychiatrist Dr. Cummings, who reported first seeing Allie at 15 years-old, diagnosing her with depression. He had seen her steadily for the past 2 years. "…her depression was her major issue, with bazaar mood swings; however, controlled with medication: Lithium, Ambien, Thyroid medication, Ativan, Vicodin for right foot fracture that didn't heal. He doesn't think Allie was addicted to any of those medications." |
| 09/15/2008 | | CPI Diane Berger | CPI requested Ms. Hanes' medical and detox records; CPI was referred to Dr. Coffee. CPI also faxed release of information to the treatment center in Alabama, and contacted Allie's therapist at Gibbons Family Services. |
| 10/06/2008 | | Caseworker Letty Campbell | Ms. Campbell spoke to Allie's GFS counselor. Ms. Langston reported that Allie was receiving individual counseling rather than group counseling because she was taking medication that prohibited her from participating in the regular outpatient program. |
| 10/08/2008 | | Caseworker Letty Campbell | Ms. Campbell attempted to contact Dr. Coffee, the psychiatrist who was prescribing the Suboxone, and Dr. Cummings, the psychiatrist prescribing Allie the Vicodin and other medication. Ms. Campbell was concerned about the interaction of Vicodin and Suboxone. |
| 10/10/2008 | Intact Family Case | Caseworker Letty Campbell | Ms. Campbell spoke to Dr. Coffee, who reported prescribing Allie the opiate blocker (Suboxone) and that it would not show up on a drug screen. Furthermore, Allie had signed a contract that she would not take Vicodin or any other opiate while on Suboxone; he would terminate her as a patient if she violated the contract. Ms. Campbell informed him that her other psychiatrist, Dr Cummings, was prescribing her Vicodin, and Allie was testing positive for opiates. |
| | | | Ms. Campbell received a letter from Dr. Cummings stating"…I consider her to be an excellent guardian of her children. They are safe around her. She has had some horrible times of physical pain, but I consider Ms. Hanes to be at low risk for relapse in regard to using substances other than those prescribed. Her current pharmacist and I touch base about every 2 weeks- and have done so for over a year. |

| 10/27/2008 | | Caseworker Letty Campbell | Ms. Campbell contacted Allie's therapist regarding Allie's participation and progress in drug treatment. |
|---|---|---|---|

**URINE TESTS ***

| Date | Urine Test Results | Date results received by DCFS | Comments |
|---|---|---|---|
| 9/10/2008 | Positive for Opiates | Date stamped 9/15/2008 | DCP tested |
| 9/10/2008 | Positive for Opiates | No date stamp on test results | Gibbons Family Services*** |
| 9/25/2008 | Positive for Opiates | Date stamped 10/01/2008 | DCP tested |
| 10/01/2008 | Negative for all substances | Date stamped 10/06/2008 | DCP tested |
| 10/08/2008 | Negative for all substances | Date stamped 10/17/2008 | DCFS Intact tested |
| 10/17/2008 | Negative for all substances | No date stamp on test results | DCFS Intact tested |
| 10/29/2008 | Negative for all substances | No date stamp on test results | DCFS Intact tested Dilute Specimen** |
| 10/29/2008 | Negative for all substance | No date stamp on test results | Gibbons Family Services test*** |
| 10/30/2008 | Negative for all substances | No date stamp on test results | Gibbons Family Services*** |
| 12/01/2008 | Negative for all substances | No date stamp on test results | Gibbons Family Services*** |
| 12/17/2008 | Positive for Benzodiazepines | No date stamp on test results | DCFS Intact tested |
| 02/09/2009 | Positive for Benzodiazepines | No date stamp on test results | DCFS Intact tested Dilute Specimen** |
| 03/06/2009 | Positive for Benzodiazepines | No date stamp on test results | DCFS Intact tested Dilute Specimen** |
| 03/26/2009 | Positive for Benzodiazepines | No date stamp on test results | DCFS Intact tested Dilute Specimen** |

*Urine tested using a 9-10 panel drug screen: Marijuana, Cocaine Metabolites, Amphetamines, Opiates, Pencyclidine, Barbiturates, Benzodiazepines, Methadone, Methaqualone, and Propoxyphene.
** A Dilute Specimen can suggest that the patient has intentionally hydrated her/himself to thwart a positive test result
***Urine test conducted by Gibbons Family Services, Allie's substance abuse treatment provider.

On October 27th, Ms. Campbell attempted to contact Allie's counselor regarding Allie's participation and progress in drug treatment. The counselor returned the call and reported that Allie was being transferred to another counselor. Both professionals had met and discussed Allie's case, and again commented that she suspected Allie to have borderline personality disorder and still wanted her to see a psychiatrist.[22]

The family's October 28, 2008, Service Plan outlined the following tasks: Allie was to continue seeing her psychiatrist, take her medication as prescribed, follow substance abuse treatment recommendations, submit to random urine test within 24 hours of a request, ensure Mackenzie's and Caroline's medical, education, and emotion health needs were met, get a referral for parenting classes, sign releases of information for her treatment providers, and sign releases of information to facilitate communication with the girls' schools and service providers. The service plan remained virtually unchanged during the intact case.

That same day, Ms. Campbell visited Allie and the girls. The girls appeared well. Ms. Campbell told Allie that she made the referral for transportation to counseling.[23] Ms. Campbell inquired about her psychiatric appointment with Dr. Coffee; Allie stated that he was out of town and he needed to increase her Suboxone because she was experiencing cravings. Ms. Campbell asked Allie what medication she was currently taking; Allie replied not Vicodin, due to DCFS not allowing it; however, she reported taking lithium, Ambien, Ativan, Suboxone, and Topral for high blood pressure from the stress of DCFS. Ms. Campbell gave Allie paperwork for a urine test.

During a November 10, 2008, home visit, Allie told Ms. Campbell that Dr. Coffee had increased her Suboxone to ease her cravings, the increase was working, and she was not taking Vicodin. Allie

22 Allie's counselor reported basing her suspicion of a borderline personality disorder on Allie's general presentation and her ability to cry and then turn it off and back on right away.
23 Allie reported that her driver's license was suspended until November as the result of a traffic violation and failing to go to court because she was in detox.

complained that her new counselor was rude and insensitive. Ms. Campbell noted no safety or well being concerns with the girls. Ms. Campbell and Allie reviewed the service plan; Allie agreed to take parenting classes.

On December 5, 2008, Ms. Campbell visited the family, the girls appeared well, and no concerns were noted. Allie reported getting her license back, and taking only Suboxone and Lithium. Allie felt that the Suboxone was working, but she still had cravings. In addition to the Suboxone and Lithium Allie reported, the Pharmacy records subpoenaed by the OIG indicated that between November 11, 2008 and December 5, 2008, she also filled prescriptions for Ambien, Tramadol, Flexeril, Lorazepam, Acetazolamide, Levothyroxine, Cyanocobalamin, and syringes. Allie also complained about not being able to take the medications that were working for her prior to being involved with DCFS. Ms. Campbell reminded her that the only medication she was asked to stop was Vicodin. Allie reported that Dr. Coffee called Dr. Cummings stating: "it was unethical to be prescribing her Vicodin, when she is addicted to opiates. Allie stated that after that, Dr. Cummings called her yelling at her about the conversation Dr. Coffee had with him." When Dr. Coffee was asked by OIG investigators if he ever discussed his and Dr. Cummings' conflicting medication regimes, his response was no. When OIG investigators questioned Dr. Cummings about the alleged conversation with Dr. Coffee and his admonishment of Allie, he emphatically denied that neither event occurred. Allie also reported clean urine screens, and that her counseling sessions had been reduced from weekly to bi-monthly.

On December 17, Ms. Campbell made an unannounced visit; the girls appeared well, no concerns were noted. Allie felt that she was not getting anywhere with her counselor and felt her case with DCFS would never close. Ms. Campbell gave Allie paperwork for a urine screen and reassured her that her case would only remain open until Allie completed recommended services.[24] A week later, the intact supervisor noted that Allie's current services included tasks that addressed her mental health needs and substance abuse issues, and maintaining minimum parenting standards. Allie continued to deny having a substance abuse problem, minimized her mental health issues, and was resistant to treatment recommendations.

On January 6, 2009, Ms. Campbell made an unannounced visit. Upon entering the home, Ms. Campbell observed a male in his fifties and a teenage girl. Allie informed Ms. Campbell that she was renting the room downstairs to the eighteen-year-old girl, who brought her father to view it.[25] The girl's father, a police officer, signed the lease and paid the security deposit. Allie commented that she would move in on January 15. Ms. Campbell confronted Allie about her last urine screen testing positive for Benzodiazepines; Allie reported being prescribed Valium. Ms. Campbell inquired why it showed up on that screen and not others; Allie stated that it is prescribed daily, but she only takes it when anxious. She also reported no longer seeing Dr. Coffee and had stopped taking the Suboxone because neither benefited her; however, she continued to see Dr. Cummings, who was prescribing Ambien, Valium, Lexapro, Acetazolamide, Lithium, Ultram and Synthroid. Ms. Campbell noted no safety or well being concerns.

On January 13, 2009, maternal step-grandmother contacted Ms. Campbell to express concern for the girls, and fears that Allie was using street drugs. Additionally, Allie's biological mother had called the step-grandmother to tell her that Allie had contacted her, sounding incoherent. On January 15, Allie contacted Ms. Campbell, informing her that she had gone to the hospital and was diagnosed with bladder, kidney and ear infections. The doctor prescribed Meclizine, Ciprofloxacin, and two other medications. Allie alerted Ms. Campbell in the event those medications caused her urine to test positive. On January 21, Ms. Campbell visited the family, noting no safety or well being concerns. Allie reported that her renter, was working out; she attended school, worked two jobs, and was never home. Allie had been transferred back

[24] Allie completed a urine test that day and was positive for Benzodiazepines.

[25] Ms. Campbell noted being unaware that Allie was trying to rent the downstairs room, and learned that Allie had been actively trying to rent it for a while. The teenager was a high school student.

to her former counselor and counseling was going well. The girls were doing well in school, and Caroline was being considered for a gifted program. On January 28, 2009 Allie had her first meeting with the parent educator.

On February 5, 2009, Ms. Campbell visited the family; Allie reported speaking to her counselor about getting into an inpatient treatment program. Allie stated that she needs help, knowing that she would benefit from an inpatient program. Ideally, she wanted to take the girls with her, but she was also willing to go into treatment alone. Allie reported being depressed and having urges to use drugs. She denied any ideations of harming herself or others, and she had made an appointment to see her psychiatrist that evening. Ms. Campbell gave Allie paperwork for a urine screen, and told her she would be making an unannounced visit within two weeks.

Two weeks later, Ms. Campbell visited the family; the girls were not in school because they were sick. Allie reported recently getting a second psychiatric evaluation; however, she was unwilling to release the information to DCFS. "She stated that the psychiatrist reported that she does not need an inpatient treatment and she would benefit from a dual diagnosis outpatient program. Allie reported that the psychiatrist diagnosed her with depression and referred her to Beck House in Norville."[26] Allie stated that she was going to call Beck House and set it up. Ms. Campbell inquired if Allie was still on the same medications she last reported, she said yes. Allie stated that she was going to speak to the staff at Beck House about linking her to a psychiatrist who would prescribe her antidepressants, because Dr. Cummings (her current psychiatrist) did not feel she needed antidepressants, and was unwilling to prescribe them. Allie was still seeing her counselor, but would only continue seeing her until she was admitted to Beck House. Allie reported meeting with the in-home parenting coach on three occasions. Reportedly, the parenting coach told Allie that she did not feel Allie needed parenting classes and her case would be closed.[27]

On March 2, 2009, Allie called Ms. Campbell to inform her that she had an appointment at Beck House for their dual diagnosis program. Allie also reported experiencing anxiety, and feeling that her current treatment was not working. "She rambled on and on about how no treatment out there is going to help her and that she has done seven months of treatment and should be done." Allie was depressed and felt nothing was going to help. Ms. Campbell encouraged Allie to contact her psychiatrist; Allie stated that Dr. Cummings said "there was no way with the amount of medication she is taking that none of it is helping her." Allie reported that she had completed treatment with her counselor and had gone above and beyond what DCFS had asked of her. Ms. Campbell stated that her counselor would be the person to assess if Allie had completed treatment. Allie commented "she would rather go to Atkins, IL and shoot up than have to deal with this." Ms. Campbell asked Allie if she had been having urges to use; she reported yes, everyday, but she was not going to use and risk losing the girls. Allie also talked about life being better if she was not here, but denied having a plan to commit suicide.

The next day, Allie reported speaking to staff at Beck House and not liking what she heard about the dual diagnosis program. The program required her to go off her medication and see their psychiatrist. The program sounded dreadful, and she feared that with her anxiety issues, participation in group, and not being on medication, would be too much for her to handle. Allie talked to her counselor about her

---

[26] Beck House is formally known as Center for Good Health.

[27] On March 16, 2008,the parenting coach sent a letter to Ms. Campbell indicating that she had met with Allie on two occasions and that Allie had attended parenting classes in 2004; Allie showed her the class material, which was the same material they planned to use. The parenting coach noted that Allie spoke positively about her relationship with the girls, individualize them, and discuss their emotional needs in detail. The parenting coach had no concerns with girls' well being or safety. She recommended that Allie continue individual therapy, and if any parenting issues were identified in therapy, let her know and the case would be reopened.

concerns; the counselor suggested that Allie increase her sessions. Allie reported that she would follow her suggestion.

On March 6, 2009, an irate Allie called Ms. Campbell stating that she had been calling her all week and had not heard from her. Ms. Campbell reminded Allie that she had spoken to her twice that week, and had received no messages from her. Allie stated that she had been waiting all week for the worker to visit. Ms. Campbell apologized to Allie for thinking that she had to wait around all week for an unannounced visit. Ms. Campbell expressed concern about "seeing a continual pattern with Allie calling to try and figure out when workers are coming out during the week of unannounced visits."  Ms. Campbell again told Allie that if she is not at home for an unannounced, she will either attempt another unannounced visit or call her. Later that day, Ms. Campbell attempted an unannounced visit, no one was home; she left paperwork for a urine test in Allie's mailbox.

On March 12, 2009, Ms. Campbell visited Allie and the girls, no child well-being concerns were noted. Allie reported being clean for seven months, feeling happier and able to get out of bed in the morning since Dr. Cummings added a thyroid medication (Cytomel) to her medication regime. Allie stated that she was proud of herself and could never have imagined functioning without daily doses of Vicodin. "She stated that this is a huge step for her that she is no longer taking it and able to function without it. Allie reported that she informed all her doctors to put in her chart never to prescribe her Vicodin."

On March 16, 2009, the intact supervisor completed a quarterly case review and noted that Allie had been participating in mental health and substance abuse services; however, she had been "struggling emotionally with suicidal ideation. She has denied any intent or plan, but has been extremely unhappy with her current circumstances and struggles to maintain sobriety. The mother got a second opinion from a different psychiatrist and he advised her to consider taking an antidepressant and to consider a dual diagnosis program. The mother's primary psychiatrist would not prescribe an antidepressant because of the side effects. The mother also explored a dual diagnosis program, but stated she did not want to go to this program because they require clients to go off of all medication when entering the program. The worker questions the mother's motivation to actually enter the program. The mother has a history of not following through with recommended programs.

On March 24, 2009, Ms. Campbell conducted her last unannounced visit with Allie and the girls; no concerns were noted. Allie appeared tired and stated that her grandmother was in intensive care and she had been traveling back and forth to see her. Allie also cancelled an appointment with her counselor the previous week and had yet to reschedule.  Ms. Campbell encouraged Allie to reschedule the appointment. Allie reported seeing Dr. Cummings, and having no medication issues. Ms. Campbell gave Allie paperwork for a urine screen to be completed within 24 hours and scheduled her next home visit for April 8, 2008.

An Integrated Assessment completed by Ms. Campbell on March 26, 2009 indicated that "Allie denied having had a relapse since last assessment, though she admits to cravings. She has not tested positive on her drug screens, other than what she is on for prescription medication. Allie continues to be involved in individual counseling to address her substance abuse and mental health issues." The Assessment further noted that "Allie has numerous medical conditions. She was previously prescribed vicodin by her psychiatrist, Dr. Cummings, to help with the pain of ruptured disks in her back. Dr. Cummings is no longer prescribing her vicodin, as there was concern by DCFS and a second psychiatrist Allie was seeing that this was unethical based on Allie having an addiction to opiate."  The Pharmacy record indicated that Dr. Cummings changed Allie's pain medication from Vicodin to Tramadol (a Synthetic Analgesic Opioid) in October 2008. At the time the Assessment was being completed, Allie reported Dr. Cummings prescribing Ambien, Lexapro, Valium and Lithium; however, the Pharmacy records indicated that a month prior to the completion of the Assessment, Allie also filled prescriptions for: Tramadol, Topamax,

Cytomel, and Effexor (an anti-depressant) written by Dr. Cummings; Methocarbamol (a muscle relaxer) Cyanocobalamin (an intramuscular vitamin B supplement), syringes, and Fluticasone (an allergy nasal spray) written by Dr. Fenlon ( See attachment for detailed medication listings).

A March 31, 2009 service plan review indicated that Allie was making satisfactory progress in seeing her psychiatrist, signing releases of information, engaging in individual substance abuse counseling, submitting to random urine tests, and not testing positive other than those prescribed by her psychiatrist. Tasks associated with ensuring the girls' medical, educational, and emotional well being were also being satisfactorily met. The referral for in-home parenting training was discontinued after the educator met with Allie and determined that she did not need classes. [28]

On April 4, 2009, an Investigation Supervisor notified the Intact Supervisor that Allie had been involved in a car accident; both girls were with her. Allie and Caroline were killed in the accident; Mackenzie had been airlifted to Glascott Hospital for emergency treatment. On April 8th, medical staff from Glascott Hospital informed Ms. Campbell that results from Mackenzie's MRI confirmed paralysis from the neck down and she would require a permanent feeding tube. After learning of her prognosis and her inability to rebuild her life without her mother and sister, Mackenzie's relatives decided to remove her from life support. Mackenzie died from multiple injuries sustained in the automobile accident.

**ANALYSIS**

Allie Hanes' co–occurring mental illness and substance abuse, coupled with her lack of insight into these problems, presented a myriad of complicated clinical issues that would confound any child welfare professional. Further complicating effective clinical intervention were Ms. Hanes' use of multiple service providers, conflicting treatment regimes, and periodic instability that often is a feature of mental illness exacerbated by substance misuse.

During the time that Ms. Hanes was involved with the Department, she saw at least three different psychiatrists, Dr. Bartolome, Dr. Cummings and Dr. Coffee. In addition, she had previously seen Dr. Curtin through Gibbons Family Services, though she seemed to switch to Dr. Bartolome after Dr. Curtin told a CPI in the second child protection investigation (B Sequence) that Ms. Hanes' threats should be taken seriously. None of her treating psychiatrists or physicians knew the breadth of her diagnoses, the length to which Ms. Hanes went to obtain drugs, nor the multiple medications they and other medical professionals had prescribed. Pharmacy records show that Ms. Hanes received prescriptions from ten physicians and one physician's assistant, in addition to prescriptions from Drs. Cummings and Coffee and her most recent primary care physician, Dr. Fenlon. In the absence of facilitated communication between Ms. Hanes' treatment providers, she effectively created firewalls by switching providers, and reporting various ailments and symptoms to obtain opiate pain relievers, benzodiazepines, muscle relaxers and other psychotropic medication. In doing so, she had the ability to amass a potentially lethal cocktail of drugs. Dr. Cummings noted that Ms. Hanes had thyroid issues and problems seeing an endocrinologist because of insurance, as he was under the impression that Ms. Hanes only had Medicaid. In fact, Ms. Hanes had Medicare, which is accepted by six endocrinologists at Centennial Health Systems. In addition, a January 23, 2006 letter from Dr. Bartolome, and an October 10, 2008 letter from Dr. Cummings painted glowing pictures about the safety of the girls in mother's care and effectively prevented the workers from being able to involve the court.

---

[28] The parenting educator reported that Allie had attended parenting classes in 2004 and showed her material, which was the same material she would be using. The parenting educator reported that Allie spoke positively about her relationship with the girls, and was able to individualize them and discuss their emotional needs in detail. At the time of that meeting the parenting educator noted no concerns for the girls' wellbeing or safety.

Effective treatment of Ms. Hanes' mental illness could not occur in the presence of her persistent denial of and resistance to substance abuse treatment. Ms. Hanes resisted the diagnosis of substance misuse throughout the 27 months that her two Intact Family Services cases were open. Ms. Hanes reported that she was not addicted to opiates, characterizing her heroin overdose as a suicide attempt. Through minimization of her heroin use, Ms. Hanes attempted to also minimize her use of both prescription and illicit opiates. During her hospitalization and detoxification for the overdose, Ms. Hanes was treated by psychiatrist Dr. Coffee. Dr. Coffee prescribed and Ms. Hanes agreed to take the opiate blocker Suboxone, but continued to request and receive Vicodin, an opiate pain medication from Dr. Cummings, another psychiatrist. Ms. Hanes did not share with Dr. Cummings her self reported overdose or that it had been a suicide attempt, perhaps because Dr. Cummings knew of her substance abuse history as early as November 2004.[29] Dr. Cummings did stop prescribing Vicodin in October 2008, after the intact case worker informed him that Ms. Hanes had been prescribed Suboxone. Despite mother's protest that she did not have a substance abuse problem, Ms. Hanes reported asking Dr. Coffee in October 2008 to increase her Suboxone, because she was experiencing opiate cravings. At autopsy Allie Hanes tested positive for Tramadol, morphine and valium. While it cannot be definitely proven that the drugs in her system were a cause of the accident, it is not unreasonable to consider that they had an effect on her ability to safely operate a vehicle for herself and her children. Likewise, her lack of insight about substance abuse issues and its amplifying effect on mental illness would reasonably cause someone to believe that the mother had little insight into how her children were affected by her problems.

In May 2010, The US Food and Drug Administration notified healthcare professionals of changes to the Warnings section of the prescribing information for Tramadol, a centrally acting synthetic opioid analgesic indicated for the management of moderate to moderately severe chronic pain. The strengthened Warnings information emphasizes the risk of suicide for patients who are addiction-prone, taking tranquilizers or antidepressant drugs and also warns of the risk of overdosage. Tramadol-related deaths have occurred in patients with previous histories of emotional disturbances or suicidal ideation or attempts, as well as histories of misuse of tranquilizers, alcohol, and other CNS-active drugs. Tramadol may be expected to have additive effects when used in conjunction with alcohol, other opioids or illicit drugs that cause central nervous system depression. Serious potential consequences of overdosage with Tramadol are central nervous system depression, respiratory depression and death.

In the absence of clinical consultation, the treatment issues and road blocks erected by Ms. Hanes created insurmountable challenges for the workers servicing the family. In this case, assistance from the Clinical Division and DCFS Service Intervention may have been able to assist the workers in navigating the intricate maze of prescription medications, illicit drugs, substance misuse, mental illness, and multiple providers, which thwarted their efforts to provide effective assessment and service provision.

[29] In a November 4, 2004, psychiatric case note Dr. Cummings wrote: "Substance abuse history includes an old history, until age 20, of using cannabis, cocaine, and alcohol, toward feeling "normal"; currently she does not use alcohol, nicotine, or caffeine."

**RECOMMENDATIONS**

1. This case reinforces the recommendation made in the Brower case (OIG# 09-1028):

> Division of Child Protection, intact and placement staff should obtain consultation from DCFS nurse through Sam Gillespie, Administrator for Substance Abuse Services, in child protection investigations where there is a concern about misuse of prescription medication and/or mixing of alcohol and narcotic medications.  Illinois Department of Healthcare and Family Services has requested a point person for referrals to the Recipient Restriction Unit.  Mr. Gillespie should serve as the DHFS Recipient Restriction Unit to report the potential misuse of prescription medications.

2. In cases involving mental illness, especially complicated by substance use disorder, DCFS Clinical Division should be consulted.

3. This case should be shared with DCFS Clinical Division to develop strategies to support the field in these difficult cases.

| *Date* | *Medication* | *Dosage* | *Qty.* | *Medication Classification* | *Reason* | *Prescribing Physician* |
|---|---|---|---|---|---|---|
| **01/01/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **80** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| 01/02/2008 | Zofran | 4 MG 1 tablet 2 X daily | 15 | Antiemetic | Nausea | R. Cummings |
| 01/03/2008 | Tegretol | 200 MG ½ Tablet 3 X Daily | 45 | Anticonvulsant & Mood Stabilizer | | R. Cummings |
| 01/03/2008 | Dilantin | 50 MG 1 Tablet As Needed | | Antiepileptic | | R. Cummings |
| **01/15 /2008** | **Valium** | **10 MG 1 Tablet 4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **01/19/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **80** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| **01/19/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **01/20/2008** | **Flexeril** | **5 MG 1 tablet 3 X Daily as Needed** | **90** | **Muscle Relaxer** | | **S. Holmes** |
| **01/24/2008** | **Darvocet** | **100 MG 1 Tablet 6 X Daily** | **24** | **Opiate Analgesic** | **Pain** | **G. Ford** |
| 01/24/2008 | Acetazolamide | 250 MG ½ Tablet 2 X Daily | 30 | Diuretic | | R. Cummings |
| **01/24/2008** | **Lithium** | **450 MG ½ Tablets 2 X Daily** | **30** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| 01/29/2008 | Metoprolol | 50 MG 1 Tablet 2 X Daily | 60 | Beta-Blocker | Angina/Hypertension | R. Cummings |

| Date | Medication | Dosage | Qty. | Medication Classification | Reason | Prescribing Physician |
|---|---|---|---|---|---|---|
| **02/04/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **80** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| **02/07/2008** | **Flexeril** | **10 MG 1 Tablet 3 X daily (PRN)** | **90** | **Muscle Relaxer** | | **J. Nardulli** |
| **02/14/2008** | **Valium** | **10 MG 1 Tablet 4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **02/19/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **120** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| **02/19/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **02/29/2008** | **Lithium** | **450 MG ½ Tablets 2 X Daily** | **30** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **02/28/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **80** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| 02/29/2008 | Acetazolamide | 250 MG ½ Tablet 2 X Daily | 30 | Diuretic | 5 | R. Cummings |
| **03/05/2008** | **Klonapin** | **1 MG 1 Tablet 3 X Daily** | **90** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **03/10/2008** | **Valium** | **10 MG 1 Tablet 4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| 03/14/2008 | Zofran | 4 MG 1 tablet 2 X Daily | 4 | Antiemetic | Nausea | R. Cummings |
| **03/17/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **03/17/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **80** | **Opiate Analgesic** | **Pain** | **R. Cummings** |

| Date | Medication | Dosage | Qty. | Medication Classification | Reason | Prescribing Physician |
|---|---|---|---|---|---|---|
| 03/18/2008 | Levothyroxine | .05 MG<br>1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| 03/21/2008 | Cytomel | 5 MCG<br>1 Tablet<br>3 X Daily | 90 | Synthetic Thyroid Hormone | Hypothyroidism | R. Cummings |
| **03/27/2008** | **Lithium** | **450 MG<br>1 Tablets<br>2 X Daily** | **60** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **04/04/2008** | **Depakote** | **250 MG<br>1 Tablet<br>3 X Daily** | **90** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **04/07/2008** | **Tylenol w/ Codeine** | **2 Tablets<br>4 X Daily as Needed** | **15** | **Analgesic** | **Pain** | **M. Hardy** |
| **04/07/2008** | **Vicodin** | **5/500 MG<br>1 tablet<br>4 x daily** | **15** | **Opiate Analgesic** | **Pain** | **J. Jorsch** |
| **04/07/2008** | **Valium** | **10 MG<br>1 Tablet<br>4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **04/10/2008** | **Vicodin** | **7.5/750 MG<br>1 tablet<br>4 x daily** | **120** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| 04/14/2008 | Acetazolamide | 250 MG<br>1 Tablet<br>2 X Daily | 60 | Diuretic | | R. Cummings |
| **04/16/2008** | **Klonapin** | **1 MG<br>1 Tablet<br>3 X Daily** | **90** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **04/16/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| 04/19/2008 | Metoprolol | 50 MG<br>1 Tablet<br>2 X Daily | 60 | Beta-Blocker | Angina/Hypertension | R. Cummings |
| 04/26/2008 | Levothyroxine | .05 MG<br>1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |

CAROLINE & MACKENZIE HANES DEATH INVESTIGATION

| Date | Medication | Dosage | Qty. | Medication Classification | Reason | Prescribing Physician |
|---|---|---|---|---|---|---|
| **05/05/2008** | **Valium** | **10 MG<br>1 Tablet<br>4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **05/10/2008** | **Vicodin** | **7.5/750 MG<br>1 tablet every<br>4-6 hr as Needed** | **20** | **Opiate Analgesic** | **Pain** | **S. Swanson** |
| **05/11/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **05/13/2008** | **Lithium** | **450 MG<br>1 Tablets<br>2 X Daily** | **30** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **05/13/2008** | Metoprolol | 50 MG<br>1 Tablet<br>2 X Daily | 60 | Beta-Blocker | Angina/Hypertension | R. Cummings |
| **05/13/2008** | **Vicodin** | **7.5/750 MG<br>1 tablet<br>4 x daily** | **120** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| **05/23/2008** | **Depakote** | **250 MG<br>1 Tablet<br>3 X Daily** | **90** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| 05/23/2008 | Acetazolamide | 250 MG<br>1 Tablet<br>2 X Daily | 60 | Diuretic | | R. Cummings |
| **06/01/2008** | **Valium** | **10 MG<br>1 Tablet<br>4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **06/03/2008** | **Klonapin** | **1 MG<br>1 Tablet<br>3 X Daily** | **90** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| 06/05/2008 | Levothyroxine | .05 MG<br>1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| **06/09/2008** | **Vicodin** | **7.5/750 MG<br>1 tablet<br>4 x daily** | **120** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| **06/12/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |

| Date | Medication | Dosage | Qty. | Medication Classification | Reason | Prescribing Physician |
|---|---|---|---|---|---|---|
| **06/21/2008** | **Lithium** | **450 MG 2 Tablets Daily** | **60** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| 06/22/2008 | Levothyroxine | .05 MG 1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| 06/25/2008 | Metoprolol | 50 MG 1 Tablet 2 X Daily | 60 | Beta-Blocker | Angina/Hypertension | R. Cummings |
| 06/25/2008 | Acetazolamide | 250 MG 1 Tablet 2 X Daily | 60 | Diuretic | | R. Cummings |
| **6/28/2008** | **Paxil** | **12.5 MG 1 Tablet Daily** | **30** | **SSRI** | **Antidepressant** | **S. Fenlon** |
| **07/06/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **120** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| **07/06/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **07/13/2008** | **Lorazepam** | **1 MG 3 X Daily** | **90** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **07/24/2008** | **Lithium** | **450 MG ½ Tablets 2 X Daily** | **30** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **07/21/12008** | **Vicodin** | **5/500 MG PRN** | **12** | **Opiate Analgesic** | **Pain** | **S. Stone** |
| **07/26/2008** | **Lithium** | **450 MG 2 Tablets Daily** | **60** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **07/26/2008** | **Methocarbamol** | **750 MG 1 Tablet Every 6 hours** | **50** | | **Muscle Relaxer** | **J. Barone** |
| **08/01/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **120** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| **08/12/2008** | **Zoloft** | **50 MG 1 X Daily** | **30** | **Anti-Depressant** | **Depression** | |

| *Date* | *Medication* | *Dosage* | *Qty.* | *Medication Classification* | *Reason* | *Prescribing Physician* |
|---|---|---|---|---|---|---|
| **08/12/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **08/11/2008** | **Lorazepam** | **1 MG 3 X Daily** | **90** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **08/23/2008** | **Effexor** | **37.5 MG ½ Tablet 4 X Daily** | **120** | **Anti-Depressant** | **Depression** | **R. Cummings** |
| **08/25/2008** | **Suboxone** | **2 MG/.5 MG ½ Tablet 2 X Daily** | **30** | **Opiate Blocker** | **Opioid Dependence** | **G. Coffee** |
| **08/26/2008** | **Lithium** | **450 MG 2 Tablets Daily** | **60** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **08/28/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **120** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| 08/28/2008 | Naproxen | 500 Mg 1 Tablet 2 X Daily | 20 | Analgesic | | K. Crumb, PAC |
| **08/28/2008** | **Methocarbamol** | **750 MG 1 Tablet Every 6 hours** | **20** | | **Muscle Relaxer** | **K. Crumb, PA** |
| **09/07/2008** | **Darvocet** | **100 MG 1 X Nightly/or PRN** | **40** | **Opiate Analgesic** | **Pain** | **J. Barone** |
| 09/10/2008 | Levothyroxine | .05 MG 1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| **09/11/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **09/14/2008** | **Suboxone** | **2 MG/.5 MG 1 Tablet Daily** | **7** | **Opiate Blocker** | **Opioid Dependence** | **G. Coffee** |
| **09/23/2008** | **Vicodin** | **7.5/750 MG 1 tablet 4 x daily** | **120** | **Opiate Analgesic** | **Pain** | **R. Cummings** |
| **09/26/2008** | **Flexeril** | **10 MG ½ tablet 3 X daily (PRN)** | **30** | **Muscle Relaxer** | | **A. Fenlon** |

| *Date* | *Medication* | *Dosage* | *Qty.* | *Medication Classification* | *Reason* | *Prescribing Physician* |
|---|---|---|---|---|---|---|
| **10/03/2008** | **Lithium** | **450 MG 2 Tablets Daily** | **60** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **10/07/2008** | **Flexeril** | **10 MG ½ tablet 3 X daily (PRN)** | **30** | **Muscle Relaxer** | | **A. Fenlon** |
| **10/08/2008** | **Suboxone** | **2 MG/.5 MG 1 Tablet 2 X Daily** | **20** | **Opiate Blocker** | **Opioid Dependence** | **G. Coffee** |
| **10/10/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **10/18/2008** | **Suboxone** | **2 MG/.5 MG 1 Tablet 2 X Daily** | **60** | **Opiate Blocker** | **Opioid Dependence** | **G. Coffee** |
| **10/18/2008** | **Tramadol** | **50 MG 1 Tablets 4 X Daily** | **120** | **Synthetic Opiate Analgesic** | **Pain Relief** | **R. Cummings** |
| 10/19/2008 | Acetazolamide | 250 MG 2 X Daily | 60 | Diuretic | | R. Cummings |
| 10 /21/2008 | Levothyroxine | .05 MG 1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| **10/23/2008** | **Lorazepam** | **1 MG 3 X Daily** | **90** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **10/25/2008*** | **Doxepin** | | | **Tricyclic Anti-Depressant** | **Depression** | **R. Cummings** |
| **10/29/2008** | **Flexeril** | **10 MG ½ tablet 3 X daily (PRN)** | **30** | **Muscle Relaxer** | | **A. Fenlon** |
| **11/03/2008** | **Lithium** | **450 MG 2 Tablets Daily** | **60** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| 11/04/2008 | Cyanocobalamin | 1000 mcg Intramuscular Injection | 10 | Vitamin B12 Supplement | Pernicious Anemia | A. Fenlon |
| 11/04/2008 | Syringes | | 20 | | | A. Fenlon |
| **11/07/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **11/10/2008** | **Suboxone** | **8 MG/2 MG ½ Tablet 2 X Daily** | **30** | **Opiate Blocker** | **Opioid Dependence** | **G. Coffee** |

CAROLINE & MACKENZIE HANES DEATH INVESTIGATION

| Date | Medication | Dosage | Qty. | Medication Classification | Reason | Prescribing Physician |
|---|---|---|---|---|---|---|
| **11/11/2008** | **Tramadol** | **50 MG 2 Tablets 4 X Daily** | **240** | **Synthetic Opiate Analgesic** | **Pain Relief** | **R. Cummings** |
| **11/17/2008** | **Flexeril** | **10 MG ½ tablet 2 X daily** | **20** | **Muscle Relaxer** | | **A. Fenlon** |
| 11/21/2008 | Acetazolamide | 250 MG 2 X Daily | 60 | Diuretic | | R. Cummings |
| 11/21/2008 | Levothyroxine | .05 MG 1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| **11/21/2008** | **Lorazepam** | **1 MG 3 X Daily** | **90** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| 11/21/2008 | Levothyroxine | .05 MG 1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| **12/03/2008** | **Lithium** | **450 MG 2 Tablets Daily** | **60** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **12/04/2008** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| 12/04/2008 | Pentoxiflline | 400 MG 3 X Daily | 90 | | Intermittent Claudication | R. Cummings |
| **12/04/2008** | **Suboxone** | **8 MG/2 MG ½ Tablet 3 X Daily** | **45** | **Opiate Blocker** | **Opioid Dependence** | **G. Coffee** |
| **12/05/2008** | **Lexapro** | **20 MG 1 X Daily** | **30** | **SSRI** | **Depression** | **R. Cummings** |
| **12/09/2008** | **Valium** | **10 MG 1 Tablet 4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **12/15/2008** | **Tramadol** | **50 MG 2 Tablets 4 X Daily** | **240** | **Synthetic Opiate Analgesic** | **Pain Relief** | **R. Cummings** |
| **12/15/2008** | **Flexeril** | **10 MG ½ tablet 3 X daily** | **30** | **Muscle Relaxer** | **Pain Relief** | **A. Fenlon** |

| Date | Medication | Dosage | Qty. | Medication Classification | Reason | Prescribing Physician |
|---|---|---|---|---|---|---|
| **12/23/2008** | **Darvocet** | 1 Tablet<br>4 X Daily | 20 | **Opiate Analgesic** | **Pain Relief** | **P. Fenlon** |
| 12/26/2008 | Acetazolamide | 250 MG<br>1 X Daily | 60 | Diuretic | | R. Cummings |
| 12/26/2008 | Levothyroxine | .05 MG<br>1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| **01/03/2009** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **01/03/2008** | **Lithium** | **450 MG<br>2 ½ Tablets Daily** | **75** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **01/03/2009** | **Methocarbamol** | **500 MG<br>1 Tablet<br>3 X Daily** | **30** | | **Muscle Relaxer** | **N. Dunne** |
| 01/10/2009 | Meclizine | 25 MG<br>1Tablet<br>3 X Daily<br>PRN | 3 | Antihistamine | Dizziness<br>Nausea | T. Reddy |
| **01/11/2009** | **Valium** | **10 MG<br>1 Tablet<br>4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| 01/15/2009 | Phenazopyridine | 200 MG<br>1 Tablet<br>3 X Daily | 15 | Analgesic | Urinary Tract Pain Relief | A. Fenlon |
| 01/15/2009 | Meclizine | 25 MG<br>3 X Daily<br>PRN | 20 | Antihistamine | Dizziness<br>Nausea Inhibitor | A. Fenlon |
| **01/19/2009** | **Tramadol** | **50 MG<br>1 Tablets<br>4 X Daily** | **120** | **Synthetic Opiate Analgesic** | **Pain Relief** | **R. Cummings** |
| 02/01/2009 | Levothyroxine | .05 MG<br>1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| **02/01/2009** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |

| Date | Medication | Dosage | Qty. | Medication Classification | Reason | Prescribing Physician |
|---|---|---|---|---|---|---|
| 02/8/2009 | Cytomel | 5 MCG<br>1 Tablet<br>3 X Daily | 90 | Synthetic Thyroid Hormone | Hypothyroidism | R. Cummings |
| 02/8/2009 | Topamax | 200 MG<br>1 X Daily | 30 | | Epilepsy | R. Cummings |
| **02/14/2009** | **Flexeril** | **10 MG<br>½ tablet<br>3 X daily<br>PRN** | **20** | **Muscle Relaxer** | | **A. Fenlon** |
| **02/14/2009** | **Valium** | **10 MG<br>1 Tablet<br>4 X Daily** | **120** | **Benzodiazepine** | **Anxiety** | **R. Cummings** |
| **02/14/2009** | **Lithium** | **450 MG<br>2 ½ Tablets X Daily** | **75** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| 02/14/2009 | Acetazolamide | 250 MG<br>1 X Daily | 60 | Diuretic | | R. Cummings |
| **02/17/2009** | **Tramadol** | **50 MG<br>1 Tablets<br>4 X Daily** | **120** | **Synthetic Opiate Analgesic** | **Pain Relief** | **R. Cummings** |
| 03/01/2009 | Syringes | | 30 | | | A. Fenlon |
| 03/01/2009 | Cyanocobalamin | 1000 mcg<br>Intramuscular Injection | 10 | Vitamin B12 Supplement | Pernicious Anemia | A. Fenlon |
| **03/01/2009** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |
| **03/06/2009** | **Methocarbamol** | **500 MG<br>1 Tablet<br>3 X Daily** | **30** | | **Muscle Relaxer** | **A. Fenlon** |
| 03/06/2009 | Fluticasone Nasal Spray | 1 Spray<br>Daily | | Corticosteroid | Allergies | A. Fenlon |
| 03/06/2009 | Levothyroxine | .05 MG<br>1 X Daily | 30 | Synthetic Thyroid Hormone | Hormone Replacement | R. Cummings |
| 03/21/2009 | Cytomel | 5 MCG<br>1 Tablet<br>3 X Daily | 90 | Synthetic Thyroid Hormone | Hypothyroidism | R. Cummings |

| Date | Medication | Dosage | Qty. | Medication Classification | Reason | Prescribing Physician |
|---|---|---|---|---|---|---|
| **03/17/2009** | **Tramadol** | **50 MG 1 Tablets 4 X Daily** | **120** | **Synthetic Opiate Analgesic** | **Pain Relief** | **R. Cummings** |
| 03/17/2009 | Topamax | 200 MG ½ Tablet Daily | 15 | | Epilepsy | R. Cummings |
| **03/20/2009** | **Effexor** | **37.5 MG ½ Tablet 4 X Daily** | **120** | **Anti-Depressant** | **Depression** | **R. Cummings** |
| **03/27/2009** | **Lithium** | **450 MG 2 ½ Tablets Daily** | **75** | **Mood Stabilizer** | **Bi-Polar Disorder** | **R. Cummings** |
| **03/29/2009** | **Ambien** | **10 MG Nightly** | **30** | **Sedative/Hypnotic** | **Insomnia** | **R. Cummings** |

*Table entries in bold reflect a controlled substance.*

**Prescriptions were paid through**:
Well Care/Medicare/Part B
IL. Public Aid
Pharmacy Health Initiative/ Medicare Part B
Cash