E-FILED
Friday, 17 December, 2021  06:28:38 AM
Clerk, U.S. District Court, ILCD

# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## JANUARY 2010

**DENISE KANE, PH.D.**
**INSPECTOR GENERAL**

# OFFICE OF THE INSPECTOR GENERAL
## ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES

January 1, 2010

To the Governor and Members of the General Assembly:

The child welfare field has an obligation to examine whether the services it offers are effective. That is, are they doing what they are supposed to and are they doing so in a cost-efficient manner?  During times of economic hardship and scarce resources this evaluation has even greater importance.  If we want to strengthen families, we have to provide strong services.

Families involved in the child welfare system have a right to expect genuine assistance, and to receive specific and tested services that improve safety and well-being outcomes for their children and themselves.   Likewise, the public expects that the money allotted for such services is being well-spent and closely monitored.

Child welfare professionals are in a unique position to model positive and proactive parenting and social skills.   Simply providing information to a parent regarding available services has been shown to be less effective than working directly with the parent to secure the services. For example, the act of providing a parent with a list of community agencies pales in comparison to the benefits of accompanying the parent to the local Head Start or state pre-kindergarten program to help her enroll her child in these proven services.  It is troubling that many of our teen wards' children are not enrolled in these programs.

In her book *Critical Thinking in Clinical Practice*, Dr. Eileen Gambrill posed essential questions we should be able to answer for every family involved in the child welfare system:  Does the particular agency entrusted to help them have a proven track record of providing effective services, and does the assigned staff have the training, skills, and supervision necessary to deliver?  Unless families receive the concerted, proactive efforts of a diligent agency and its dedicated staff, the risks facing our clients will remain.

With Warm Regards,

Denise Kane, Ph.D.
Inspector General

# OFFICE OF THE INSPECTOR GENERAL
# REPORT TO THE GOVERNOR AND THE GENERAL ASSEMBLY

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

Investigation Categories.................................................................................. 1

Investigative Process....................................................................................... 3

Reports ........................................................................................................... 4

Additional Responsibilities ............................................................................. 5

INVESTIGATION ................................................................................................................7

Death and Serious Injury Investigations ......................................................... 7

Child Death Report ...................................................................................... 43

Summary ............................................................................................ 44

Homicide............................................................................................ 50

Suicide ............................................................................................... 57

Undetermined..................................................................................... 58

Accident ............................................................................................. 62

Natural ............................................................................................... 73

Ten-Year Death Retrospective....................................................................... 87

General Investigations ................................................................................... 91

PROJECTS AND INITIATIVES ......................................................................................145

Error Reduction........................................................................................... 145

Ethics   ........................................................................................................ 150

Conflict of Interest: A Practice Guide……………………………………………152

Teen Parent Services.................................................................................... 161

Older Caregivers.......................................................................................... 162

SYSTEMIC RECOMMENDATIONS ..............................................................................163

RECOMMENDATIONS FOR DISCIPLINE……………………………………………171

LAW ENFORCEMENT CASES .....................................................................................175

DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS.....................................179

APPENDICES ................................................................................................................211

A.      DAVID HAYES-MUNRO DEATH INVESTIGATION ................................A-1

B.      REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT ...................B-1

# INTRODUCTION

The Office of the Inspector General of the Department of Children and Family Services was created by unanimous vote of the Illinois General Assembly in June 1993 to reform and strengthen the child welfare system. The mandate of the Office of the Inspector General (OIG) is to investigate misconduct, misfeasance, malfeasance, and violations of rules, procedures, or laws by Department of Children and Family Services employees, foster parents, service providers and contractors with the Department. *See* 20 ILCS 505/35.5 and 35.6. To that end, this Office has undertaken numerous investigations and initiated projects designed to uncover wrongdoing, improve practice, and increase professionalism within the Department.

## INVESTIGATION CATEGORIES

### *Death and Serious Injury Investigations*

The Office of the Inspector General investigates deaths and serious injuries of Illinois children whose families were involved in the child welfare system within the preceding twelve months. The OIG is also a member of Child Death Review Teams around the state. The Inspector General is an *ex officio* member of the Child Death Review Team Executive Council. The OIG receives notification from the Illinois State Central Register (SCR) of all child deaths and serious physical injuries where the child was a ward of DCFS, the family is the subject of an open investigation or service case, or the family was the subject of a previous investigation or closed case within the preceding twelve months. The notification of a child death or serious injury generates a preliminary investigation in which the death report and other reports are reviewed and computer databases are searched. When further investigation is warranted, records are impounded, subpoenaed or requested and a review is completed. When necessary, a full investigation, including interviews, is conducted. The Inspector General's Office created and

maintains a database of child death statistics and critical information related to child deaths in Illinois. The following chart summarizes the death cases reviewed in FY 09:

### FY 09 CHILD DEATH CASES REVIEWED

| | |
|---|---|
| CHILD DEATHS IN FY 09 MEETING THE CRITERIA FOR REVIEW | 89 |
| PRELIMINARY INVESTIGATIONS CONDUCTED | 1 |
| INVESTIGATORY REVIEWS OF RECORDS | 63 |
| FULL INVESTIGATIONS | 7 |
| FULL INVESTIGATIONS PENDING | 18 |

Summaries of death investigations, with a full investigative report submitted to the Director, are included in the Investigations Section of this Report on page 7. Summary of all child deaths reviewed by the OIG in FY 09 can be found on page 50 of this report.

### *General Investigations*

The Office of the Inspector General responds to and investigates complaints filed by the state and local judiciary, foster parents, biological parents and the general public. At the request of the Director, or when the OIG has noted a particularly high level of complaints in a specific segment of the child welfare system, the OIG will conduct a systemic review of that segment. Investigations yield both case-specific recommendations and recommendations for systemic changes within the child welfare system. The Inspector General's Office monitors compliance with all recommendations.

### *Child Welfare Employee Licensure Investigations*

In 2000, the General Assembly mandated that the Department of Children and Family Services institute a system for licensing direct service child welfare employees. The Child Welfare

License permits centralized monitoring of all persons providing direct child welfare services, whether they are employed with the Department or a private agency. The employee licensing system seeks to maintain accountability, integrity and honesty of those entrusted with the care of vulnerable children and families.

A child welfare employee license is required for both Department and private agency investigative, child welfare and licensing workers and supervisors. The Department, through the Office of Employee Licensure, administers and issues Child Welfare Employee Licenses (CWELs).

A committee composed of representatives of the OIG, the Child Welfare Employee Licensure Board and the Department's Office of Employee Licensure screens referrals for CWEL Investigations. The committee reviews complaints to determine whether the allegations meet one or more grounds for licensure action as defined in Department Rule 412.50 (89 Ill. Adm. Code 412.50). The OIG investigates and prosecutes CWEL complaints and hearings.

When a CWEL Investigation is completed, the OIG, as the Department's representative, determines whether the findings of the investigation support possible licensure action. Allegations that could support licensure action include conviction for specified criminal acts, indicated findings of child abuse or neglect, egregious acts that demonstrate incompetence or a pattern of deviation from a minimum standard of child welfare practice. Department Rule 412.50 (89 Ill. Reg. 412.50) specifies the grounds for licensure action. When licensure action is appropriate, the licensee is provided an opportunity for a hearing. An Administrative Law Judge presides over the hearing and reports findings and recommendations to the Child Welfare Employee Licensure Board. The CWEL Board makes the final decision regarding licensure action.

In FY 09, 5 cases were referred to the Inspector General's Office for Child Welfare Employee License investigations. In addition, the Inspector General's Office provided technical assistance to the Office of Employee Licensure in 11 cases, and monitored pending criminal or abuse/neglect charges in 14 cases.

**FY 2009 CWEL Investigation Dispositions**

| | |
|---|---|
| **FY 09** CASES OPENED FOR FULL INVESTIGATION | **5** |
| **INVESTIGATIONS PENDING FROM PRIOR FISCAL YEARS** | **7** |
| LICENSES VOLUNTARILY RELINQUISHED | 2 |
| INVESTIGATIONS COMPLETED/NO CHARGES | 3 |
| CASES PENDING WITH THE ADMINISTRATIVE HEARINGS UNIT (AHU) | 2 |
| DEPARTMENT WITHDREW CHARGES* | 1 |
| FINAL REVOCATION | 4 |

*Charges withdrawn based on newly discovered evidence.

### Criminal Background Investigations and Law Enforcement Liaison

The Inspector General's Office provides technical assistance to the Department and private agencies in performing and assessing criminal history checks. In FY 09, the Inspector General's Office opened 2,569 cases requesting criminal background information from the Law Enforcement Agencies Data System (LEADS). Each case may involve multiple law enforcement database searches. For the 2,569 cases opened in FY 09, the OIG conducted 9,438 searches for criminal background information. In addition, in the course of an investigation, if evidence indicates that a criminal act may have been committed, the Inspector General may notify the Illinois State Police, or it may investigate the alleged act for administrative action only.

The Office of the Inspector General assists enforcement agencies with gathering necessary documents. If law enforcement elects to investigate and requests that the administrative investigation be put on hold, the Office of the Inspector General will retain the case on monitor status. If law enforcement declines to prosecute, the OIG will determine whether further investigation or administrative action is appropriate.

# INVESTIGATIVE PROCESS

The Office of the Inspector General's investigative process begins with a Request for Investigation or notification by the State Central Register of a child's death or serious injury. Investigations may also be initiated when the OIG learns of a pending criminal (or child abuse investigation for referral to CWEL) against a child welfare employee. In FY 09, the OIG received 3,001 Requests for Investigation.[1] Requests for Investigation and notices of deaths or serious injury are screened to determine whether the facts suggest possible misconduct by a foster parent, Department employee, or private agency employee, or whether there is a need for systemic change. If an allegation is accepted for investigation, the Inspector General's Office will review records and interview relevant witnesses. The Inspector General reports to the Director of the Department and to the Governor with recommendations for discipline, systemic change, or sanctions against private agencies. The Office of the Inspector General monitors the implementation of accepted recommendations.

The Office of the Inspector General may work directly with a private agency and its board of directors to ensure implementation when recommendations pertain to a private agency. In rare circumstances, when the allegations are serious enough to present a risk to children, the Inspector General may request that an agency's intake for new cases be put on temporary hold, or that an employee be placed on desk duty, pending the outcome of the investigation.

The Office of the Inspector General is mandated by statute to be separate from the Department. OIG files are not accessible to the Department. The investigations and the Investigative Reports and Recommendations are prepared without editorial input from either the Department or any private agency. Once a Report is completed, the Inspector General will consider comments received and the Report may be revised accordingly.

If a complaint is not appropriate for full investigation by the OIG, the OIG may refer the complaint to law enforcement (if criminal acts appear to have been committed), to the Department's Advocacy Office for Children and Families, or to other state regulatory agencies, such as the Department of Professional Regulations.

### Administrative Rules

Rules of the Office of the Inspector General are published in the Illinois Register at 89 Ill. Admin. Code 430. The Rules govern intake and investigations of complaints from the general public, child deaths or serious injuries and allegations of misconduct. Rules pertaining to employee licensure action are found at 89 Ill. Admin. Code 412.

### Confidentiality

A complainant to the Office of the Inspector General, or anyone providing information, may request that their identity be kept confidential. To protect the confidentiality of the complainant, the OIG will attempt to procure evidence through other means, whenever possible. The OIG and the Department are mandated to ensure that no one will be retaliated against for making a good faith complaint or providing information in good faith to the OIG. At the same time, an accused employee needs to have sufficient information to enable that employee to present a defense.

Office of the Inspector General Reports contain information that is confidential pursuant to both state and federal law. As such, OIG Reports are not subject to the Freedom of Information Act. The OIG has prepared several reports deleting confidential information for use as teaching tools for private agency or Department employees.

---

[1]This includes requests for investigation, notice of child deaths and serious injuries, notification of arrests or pending abuse investigations, and requests for technical assistance and information.

*Impounding*

The Office of the Inspector General is charged with investigating misconduct "in a manner designed to ensure the preservation of evidence for possible use in a criminal prosecution." In order to conduct thorough investigations, while at the same time ensuring the integrity of records, investigators may impound files. Impounding involves the immediate securing and retrieval of original records. When files are impounded, a receipt for impounded files is left with the office or agency from which the files are retrieved. Critical information necessary for ongoing service provision may be copied during the impound in the presence of the OIG investigator. Impounded files are returned as soon as practicable. However, in death investigations, the OIG forwards original files to the Department's Division of Legal Services to ensure that the Department maintains a central file.

# REPORTS

Inspector General Reports are submitted to the Director of DCFS and the Governor. An Inspector General Report contains a summary of the complaint, a historical perspective on the case, including a case history, and detailed information about prior DCFS or private agency contact(s) with the family. Reports also include an analysis of the findings, along with recommendations.

The Office of the Inspector General uses some reports as training tools to provide a venue for an ethical discussion on individual and systemic problems within the practice of child welfare. The reports are redacted to ensure confidentiality and then distributed to private agencies, schools of social work, and DCFS libraries as a resource for child welfare professionals. Redacted OIG reports are available from the Office of the Inspector General by calling (312) 433-3000.

*Recommendations*

In her investigative reports, the Inspector General may recommend systemic reform or case specific interventions. Systemic recommendations are designed to strengthen the child welfare system to better serve children and families.

Ideally, discipline should be constructive in that it serves to educate an employee on matters related to his/her misconduct. However, it must also function to hold employees responsible for their conduct. Discipline should have an accountability component as well as a constructive or didactic one. Without the accountability component, there is little to deter misconduct. Without the didactic component, an employee may conclude that s/he has simply violated an arbitrary rule with no rationale behind it.

The Inspector General presents recommendations for discipline to the Director of the Department and, if applicable, to the Director and Board of the private agency. Recommendations for discipline are subject to due process requirements. In addition, the OIG will determine whether the facts suggest a systemic problem or an isolated instance of misconduct or bad practice. If the facts suggest a systemic problem, the Inspector General's Office may investigate further to determine appropriate recommendations for systemic reform.

When recommendations concern a private agency, appropriate sections of the report are submitted to the agency director and the Board of Directors of that agency. The agency may submit a response to address any factual inaccuracies in the report. In addition, the Board and agency director are given an opportunity to meet with the Inspector General to discuss the report and recommendations.

In this Annual Report, systemic reform recommendations are organized into a format that allows analysis of recommendations according to the function within the child welfare system that the recommendation is

designed to strengthen.  The Inspector General's Office is a small office in relation to the child welfare system.  Rather than address problems in isolation, the OIG views its mandate as strengthening the ability of the Department and private agencies to perform their duties.

The Office of the Inspector General monitors implementation of recommendations made to the Director of DCFS and private agencies. Monitoring may take several forms.  The OIG may monitor to ensure that Department or private agency staff implement the recommendations made or may work directly with the Department or private agency to implement recommendations that call for systemic reform.   The OIG may also develop accepted reform initiatives for future integration into the Department.

# ADDITIONAL RESPONSIBILITIES

### Office of the Inspector General Hotline

Pursuant to statute, the Office of the Inspector General operates a statewide, toll-free telephone number for public access.    Foster parents, guardians *ad litem*, judges and others involved in the child welfare system have called the hotline to request assistance in addressing the following concerns:

- Complaints regarding DCFS caseworkers and/or supervisors ranging from breaches of confidentiality to general incompetence;
- Complaints about private agencies or contractors;
- Child Abuse Hotline information;
- Child support information;
- Foster parent board payments;
- Youth in College Fund payments;
- Problems accessing medical cards;
- Licensing questions;
- Ethics questions; and
- General questions about DCFS and the OIG.

The Office of the Inspector General's Hotline is an effective tool that enables the OIG to communicate with concerned persons, respond to the needs of Illinois children, and address day-to-day problems related to the delivery of child welfare services. The number for the OIG Hotline is **(800) 722-9124**.

The following chart summarizes the Office of the Inspector General's response to calls received in FY 09:

#### CALLS TO THE OIG HOTLINE IN FY 09

| | |
|---|---|
| INFORMATION AND REFERRAL | 1050 |
| REFERRED TO SCR HOTLINE | 74 |
| REFERRED FOR OIG INVESTIGATION | 121 |
| TOTAL CALLS | 1245 |

### Ethics Officer

The Inspector General is the Ethics Officer for the Department of Children and Family Services.  The Inspector General reviews Ethics Statements for possible conflicts of interest of those employees of the Department of Children and Family Services who are required to file Ethics Statements.

For FY 09, 735 Statements of Economic Interest were submitted to the Ethics Officer.  Of the 735 submitted, 73 were further reviewed and addressed for potential conflicts.

#### OIG ACTION ON FY 09 STATEMENTS OF ECONOMIC INTEREST

| | |
|---|---|
| ECONOMIC INTEREST STATEMENTS FILED | 735 |
| STATEMENTS INDICATING POSSIBLE CONFLICTS | 73 |

The OIG Ethics staff also coordinated DCFS compliance with the statewide ethics training mandated under the Illinois State Officials and Employees Ethics Act of 2003.  In 2009, 2,974 DCFS employees were trained. In addition to DCFS employees, DCFS board and commission members were asked to have their members complete off-line training.  In FY 2009, a total

of 392 individuals completed the off-line Ethics training.

### *Consultation*

The Office of the Inspector General staff provided consultation to the child welfare system through review and comment on proposed rule changes and through participation on various ethics and child welfare task forces.

### *Projects and Initiatives*

Informed by the Office of the Inspector General investigations and practice research, the Project Initiatives staff assist the Department's Division on Training and Professional Development in the development of practice training models for caseworkers and supervisors. The model initiatives are interdisciplinary and involve field-testing of strategies. The initiatives are evaluated to ensure the use of evidence-based practice and to determine the effectiveness of the model. See page 145 of this Report for a full discussion of the current projects and initiatives.

# INVESTIGATIONS

This annual report covers the time from July 1, 2008 to June 30, 2009. The Investigations section has three parts. Part I includes summaries of child death and serious injury investigations reported to the Department Director and the Governor. Part II contains aggregate data and case summaries of child deaths in families who were involved with the Department in the preceding 12 months. Part III contains general investigation summaries conducted in response to complaints filed by the state and local judiciary, foster parents, biological parents and the general public.

Investigation summaries contain sections detailing the allegation, investigation, OIG recommendations and Department response. For some recommendations, OIG comments on the Department's responses are included in italics in the "OIG Recommendation/Department Response" section of each case.

## DEATH AND SERIOUS INJURY INVESTIGATIONS

### DEATH AND SERIOUS INJURY INVESTIGATION 1

**ALLEGATION**   A three year-old boy died as a result of inflicted head injuries. An intact family case was open at the time of the child's death and three child protection investigations had been conducted in the previous four months, one of which was pending.

**INVESTIGATION**   The first child protection investigation was initiated after the boy went to daycare with bruises all over his body. (The daycare was a licensed daycare home run by a relative of the mother). The reporter told OIG investigators that the child had never come to daycare with injuries until after the boy and his mother moved in with the mother's boyfriend. The reporter called the hotline after the third incident of bruising occurred. The child's mother told the investigator that the injuries occurred when the child accidentally fell getting out of the bathtub while the boyfriend was giving him a bath. The child was taken for an examination with his long-time pediatrician who sent the child to a regional medical center for further evaluation. The Child Protection Investigator developed a safety plan, placing the child with his maternal grandmother. Staff at the medical center raised concerns but said that the explanation was plausible. The emergency room physician neither spoke with the child's pediatrician nor referred the case to the hospital's child protection team. The pediatrician told the Child Protection Investigator that the child had been a patient for years and the physician had not seen injuries like this on him before. The Child Protection Investigator told OIG investigators that, although she was "alarmed" at the bruises observed on the child, she did not feel she had sufficient evidence to say that the child was abused and indicated the mother and boyfriend for cuts, bruises and welts by neglect. The investigator returned the child to his mother and her boyfriend and referred the family for Intact Family services.

Three weeks later, a second hotline report was made after the child again came to daycare this time with bruises to his legs and his scrotum. The on-call Child Protection Investigator requested that the police conduct a well-being check. The investigator then spoke with the mother who agreed to have the child stay with his maternal grandmother for the night as part of a safety plan. The police officer, after observing injuries to the child's scrotum, felt that the child did not require immediate medical attention and informed the Child Protection Investigator that he would not be writing a report on the well-being check. Because the officer did not document the well-being check his superior was unaware of the extent or seriousness of the injuries.

Family members told OIG investigators that they felt the officer, who was friendly with the boyfriend, did not take the child's injuries seriously.

The assigned Child Protection Investigator, who had also been assigned to the first investigation, took protective custody the next morning after observing the child's injuries and interviewing the daycare provider. The investigator officially placed the child with his maternal grandmother. The child's mother admitted to spanking the child on his butt over his underwear, but both she and her boyfriend contended that the child was injured on "monkey bars" during a family reunion and did not cry. The investigator found it highly unlikely that a child would suffer such injuries and not cry.   At a shelter care hearing, DCFS was granted temporary custody and a GAL was appointed.

The following morning the child was interviewed at the Child Advocacy Center. The child's GAL was not notified of the interview and was not present for the interview. The child told interviewers that he was hit with a belt by his mother's boyfriend, pointing to his penis, stomach, back and hand, repeating the explanation he had given to the daycare provider who had shared it with the investigator prior to her taking protective custody.

At the continued shelter care hearing the Child Protection Investigator was not asked to testify. The grandmother was told that her presence was not necessary because the investigator believed that the case would be continued and the child would remain in the Department's custody.   In an interview with OIG investigators, the child's GAL could not recall what, if anything was presented to the Judge about the child's interview at the Child Advocacy Center. The attorneys presented an order to the Judge which gave custody of the child to his mother. The order also indicated that the mother's boyfriend was to have no contact with the child, that the mother was to continue to reside in the boyfriend's home and he was to vacate the premises. The Child Protection Investigator was surprised and expressed anger that the child was returned to his mother. Upon return the mother immediately pulled the child from the reporting daycare home.  OIG investigators determined that the judge was not aware of the CAC statements, that photos of the child's injuries were not shared with the judge, and that no record of the proceedings was made.  It was a practice in this county to not record child protection hearings.

A Child Welfare Specialist was assigned to the intact case two days after the child was returned to the mother's care. The caseworker, who had a low caseload at the time, was instructed by her supervisor that this was a high risk case requiring weekly visits to the family. The caseworker first saw the child at home within a week of assignment. After two more attempted visits to the home within the next two weeks the mother agreed to bring the child into the DCFS office.

Another two weeks passed before the worker visited the child's daycare.  At that time the daycare director reported that she had seen a bruise on the child's forehead. The mother had already picked the child up so the worker attempted to visit the home but there was no answer. The following week the worker returned to the daycare center, nineteen days after the child was last seen. The worker observed multiple bruises on the child's forehead, rib, and left forearm. The child told the worker that mother's boyfriend gave him a "whooping." The child's mother explained that the bruises came from playing. He also told the worker that the mother's boyfriend lived with him and his mother. The worker did not call the hotline.  The worker also failed to tell her supervisor about the child's outcry.  On the following day, daycare staff called the worker reporting that the child had an additional bruise. The worker instructed the daycare staff to call the hotline. Although daycare staff called the hotline, the worker did not call the hotline with related information that the boy had told her the day before that the boyfriend had hit him. When the worker visited the mother that day the mother told the worker that the child hit his head on the refrigerator door.

A new Child Protection Investigator was assigned to the case. OIG investigators determined that her caseload,

as well as that of the previous investigator, was over BH standards. The new investigator did not speak to the previous investigator.  The investigator told OIG investigators that she read the first investigation but was unable to view photos of the child's previous injuries because of a computer restriction. Although the first investigation had been indicated against the mother and her boyfriend, the second investigation was still pending with few notes because the first investigator was detailed to work in another county. The investigator did not read the intact notes, relying on her interview with the intact worker who did not inform the investigator of the child's statement that the mother's boyfriend had been hitting him.

The investigator and intact family worker jointly visited the child and mother at home. The boyfriend's parents were also present. The boyfriend's parents said they were there because they actually owned the home and informed the investigator that their son did not hurt the child. The child had additional concerning bruising to his eye, cheek and temple.  The mother denied that the boyfriend injured the child, claiming that the child had not seen the boyfriend since the no-contact order was put into place. The mother told the investigator that the new bruises came after the child fell out of bed, hitting his face on the nightstand table. She explained the older bruises as the result of the child hitting his forehead on the refrigerator and bathroom doors. The investigator failed to control the interview setting, interviewing the child within hearing range of the boyfriend's parents and the mother who shouted out comments during the interview. The child told the investigator that he fell out of bed and that he didn't know how the other injuries occurred. The investigator took the child into his bedroom and asked the mother to re-create the scene while the boyfriend's parents and the child watched. The investigator did not ask the child alone to show her how the injuries occurred.

The investigator developed a safety plan with the mother in which she agreed to allow the child to stay with the boyfriend's parents.  The mother objected to the child staying with her relatives, claiming that her family was to blame for DCFS involvement. The investigator did not complete background checks on the boyfriend's parents. The investigator also failed to identify who would care for the child after the parents insisted that their son join the family for an upcoming holiday meal. The investigator approved the safety plan even though the boyfriend's parents stated that they did not believe their son did anything to harm the child. The safety plan was dictated by the preference of the mother, rather than what was in the best interest of the child.

At a court date the following week, the investigator re-interviewed the child in the courtroom waiting area within view of the mother, the boyfriend, and the boyfriend's parents. Despite the no-contact order, the child was observed playing with the mother's boyfriend in the court waiting area.  Both child protection investigators were present.  The second investigator indicated to the attorneys that she believed the child's current injuries were accidental. It was only after she made these statements that the second investigator saw the photos of the earlier injuries. The first investigator was adamant that the child had been abused. Neither investigator was asked to testify in court.  While there appeared to be conflicting information and opinions regarding the child's injuries, this was not brought to the attention of the court and the child was allowed to remain in the custody of his mother. Following the court date, the investigator's supervisor gave permission for the safety plan, in which the child stayed with the boyfriend's parents, to be terminated.

The intact family worker had minimal contact with the child and his mother in the last two months of the child's life. From the time of case assignment until the child was fatally injured four months later, the intact family worker saw the child eleven times. Over the last three months of the case, the worker saw the child eight times, observing injuries 87% of the time. Locations of the injuries varied from bruises to the face, buttocks and ribs. The intact worker failed to take affirmative steps to protect the child even though the mother displayed a pattern of avoidance and the child gave an outcry of abuse by the boyfriend.

In  addition  to failures of the child protection system and court system, law enforcement also failed this child. Although a detective was assigned to investigate the child's scrotum injuries the investigation languished

when the detective, busy with a juvenile murder case, did not ask for assistance, accepting the mother and boyfriend's explanations for the injuries without interviewing other family members or collateral sources of information. It was only through the insistence of an assistant state's attorney that criminal charges were brought against the mother and her boyfriend three months after the injuries.  The mother and the boyfriend were each charged with first-degree murder and are currently incarcerated while awaiting trial.  Both were also indicated by the Department for the child's death.   The mother was pregnant with a child by the boyfriend at the time of their arrest.  She delivered the baby while in jail and the infant was placed in private guardianship with the maternal grandmother.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The intact family services worker should be disciplined, up to and including discharge.**

The intact family services worker was discharged. The worker has appealed the discharge.

**2. The Child Protection Investigator from the C sequence should be disciplined.**

The investigator received a suspension.

**3. This report should be shared with the child protection and intact family managers for a round table discussion on Error Reduction.**

Three round table discussions have been held and an additional discussion session is scheduled.

**4. The DCFS Nurse should be disciplined for failing to obtain full facts before rendering an opinion.**

The nurse received an oral reprimand.

**5. DCFS nurses should undergo the Error Reduction Cuts, Bruises and Welts training.**

The Office of the Inspector General developed and provided the training for DCFS nurses.

**6. The Department's electronic records database (SACWIS) should be changed to ensure that intact family managers have access to investigations linked to cases of their workers.  SACWIS photographs should be viewable by anyone who has access to the investigation.**

Both of the requested changes will be included in the planned release of an updated version of SACWIS, Version 4.1.

**7. Child Protection investigators should consult with the DCFS Office of Legal Services when they are having difficulty coordinating their investigation with police or obtaining information from police in a timely manner.**

DCFS Rules and Procedures have pre-established chain of command. In situations described by this OIG recommendation, the investigator consults with management, who, in turn, assumes the responsibility for resolution. In addition, the Department utilizes the existing legal avenues (e.g., Administrative Subpoena process), to obtain any information necessary for the investigation.

*OIG Response: DCFS Office of Legal Services must, however, proactively ensure that administrative subpoenas for police records are complied with and any failures to comply are forwarded to the Attorney General for enforcement proceedings.*

**8. When a child is scheduled for a Child Advocacy Center (CAC) interview and has an appointed Guardian *ad litem* (GAL), the CAC should notify the GAL of the scheduled interview so that the GAL may observe the interview.**

The Child Advocacy Center of the involved county has agreed to notify GALs who have been appointed to a child's case of a scheduled CAC interview.

**9. The Office of the Inspector General should request that the Administrative Office of Illinois Courts require that Juvenile Courts in substantive matters, such as change of custody or visitations, be required to have such hearings on the record so that a record would be available when necessary.**

The Inspector General has contacted the Administrative Office of the Illinois Courts with regards to this matter. The Inspector General will meet with a representative from the Administrative Office of the Illinois Courts to discuss this issue.

**10. DCFS Office of Legal Services should to the extent permitted by operational needs be present in the involved county's County Juvenile Court a maximum of two (2) days per week over the next six (6) months to focus on cases brought to the DCFS attorney's attention by the State's Attorney, the Judge or DCFS staff. DCFS staff should be instructed to notify DCFS Office of Legal Services of contested or problematic cases. At the conclusion of the six month period, all parties should meet to assess the effect of increased DCFS Office of Legal Services involvement and determine a future plan.**

DCFS is currently in the six month assessment period. Staff has been instructed to notify DCFS Office of Legal Services of contested or problematic cases.

**11. The Office of the Inspector General will facilitate a discussion among the involved State's Attorney's Office, the Court Coordinator, DCFS Field Services Managers and the child protection supervisors serving the involved county directed toward fostering civility and problem resolution in the court process pertaining to juvenile matters.**

The Inspector General will facilitate a discussion among the involved parties.

**DEATH AND SERIOUS INJURY INVESTIGATION 2**

| ALLEGATION | A 12 year-old boy died from injuries inflicted by severe physical abuse. A private agency had closed an intact family services case five months earlier and the family |

**ALLEGATION**  A 12 year-old boy died from injuries inflicted by severe physical abuse. A private agency had closed an intact family services case five months earlier and the family had two child protection investigations prior to his death. An adoption home study was pending at the time of the boy's death.

**INVESTIGATION**  The boy was the youngest of five male siblings who had been adopted nine years earlier. Four of the brothers, including the boy, exhibited significant cognitive developmental issues and the boy had been found to be profoundly delayed. The boy's middle brother had been the subject of an indicated report for risk of injury to the boy, despite the fact he was 14 years-old, developmentally delayed and was not a caretaker for any of the children. The Department requires a minimum age of 16 in order for an allegation of risk of physical harm to be applicable. Ten months after the report was indicated, the children's adoptive father passed away. Following the adoptive father's death, his adult daughter, her husband and their five children moved into the home and assumed responsibility for the boys' care.

Throughout their involvement with the Department, the daughter and her husband presented themselves as having legal custody of the children; however, no guardianship arrangement was ever formalized. Although the case had been referred to an adoption agency to assist the relatives in formalizing their relationship with the boys, efforts were delayed by the couple's failure to provide the adoption agency with the children's Individualized Education Plans (IEP) or a signed agreement to refrain from using corporal punishment. The private agency's home study contained no information direct from school personnel, but relied upon the couple's reports that the children were doing well. Currently, Department procedure does not require contacts with school or secondary care providers for completion of adoption home studies.

Immediately after the couple moved into the home, in-home nursing services for the boy were discontinued at the husband's request. Soon afterward, the hotline received its first call regarding the couple's treatment of the brothers when the middle brother alleged he and the boy were frequently hit by the husband and that he had been prevented from attending his adoptive father's funeral. Over the next six months, the State Central Register (SCR) received eight hotline reports of the brothers being abused and neglected. The allegations were wide-ranging and included first-hand observation of injuries, weight-loss and physical deterioration by school personnel. These reports also relayed the brothers' allegations they were hit with various objects, restrained and confined in the basement, offered insufficient food and subjected to extreme physical demands as a means of discipline.

Two child protection investigations were initiated as a result of the hotline calls. The first, opened less than a month after the adoptive father's death, was in response to the 15-year-old brother's allegations. The assigned child protection investigator interviewed the brother and observed a cut on his face. Another brother told the investigator the children were threatened with a paddle if they misbehaved. The investigator also interviewed the couple, who stated the 15-year-old cut himself by continually scratching at a pimple and that he was simply acting out in response to the death of his adoptive father. The husband acknowledged employing "hard exercise" as a means of discipline and cited his experiences in the military and as a youth minister and desire for order in the home as the impetus for his stern actions. When the investigator spoke with the boy, he stated he was being threatened and was fearful of the situation in the home. The investigator spoke with the family's intact worker who told her the children complained of being subjected to "boot camp" in the home and that the husband had admitted he hit the boys with a paddle. The investigator never questioned the couple about the intact worker's statements or asked to see the paddle. The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) finding the home to be safe, and did not check a specific factor regarding whether any children in the home expressed fear of anyone in the home. The CERAP was

approved by the investigator's supervisor.  In an interview with the OIG, the supervisor stated she interpreted the boy's willingness to talk openly about his fear as being indicative of a level of stability and safety in the home.  The investigator reached a conclusion to unfound the report and her decision was approved by her supervisor.

A second child protection investigation was opened just over four months later in response to complaints by the boy regarding his treatment in "boot camp."  A second child protection investigator was assigned to respond to the report.  Due to a lack of available workers in the area, the second investigator's case load far exceeded the maximum limit established by the Department.  The second investigator interviewed the parents who denied abusing the children and reiterated accusations of misbehavior by the children and bias on the part of others they had made during the first investigation.  The second investigator relied heavily upon information provided by the couple without verification and included scant documentation of her efforts in the case record.  The children described the "boot camp" as being confined to the basement for extended periods of time with minimal sustenance while being forced to perform physically demanding tasks using weights and improvised devices.  The investigator observed the basement but did not ask the brothers to demonstrate the actions they were required to perform.

While the second investigator continued her work on the case, the hotline received a report expressing concern that the 15-year-old brother had been withdrawn from school.  The report was not accepted nor was it added as additional information related to the ongoing investigation of the boy's allegation.  The second investigator spoke to school personnel who reported that on two occasions just prior to making his allegation the youngest boy had begun shaking uncontrollably while in class.  The boy told school personnel he had to stop shaking or he would "get in trouble."  School personnel also related the boy's statements that his brothers were enlisted by the husband to assist him in enforcing discipline during sessions and that the 15 year-old brother had been cut on the nose by a weighted helmet the husband had instructed one of the brothers to put on the boy's head.  The second investigator completed a CERAP finding the home to be safe.

Two weeks later the adult daughter called the adoption agency stating she had fled the home with her children and all the brothers except for the oldest brother in response to the husband's extreme behavior.  The second investigator contacted the daughter who said the husband had tied the boy to his bed.  Neither the investigator nor her supervisor or the temporary supervisor on duty the following day treated the information as urgent.  The temporary supervisor instructed the second investigator to prepare a "discipline plan" to address ongoing concerns regarding corporal punishment in the home.  The second investigator then completed a second CERAP noting reasonable cause to suspect potential or actual abuse in the home; however the document again concluded the children were safe in the home.  The second CERAP had yet to be approved at the time of the boy's death. While these investigations were occurring, the adult daughter and her husband were undergoing an adoption home study. The adoption agency had received no notice of the child protection investigations.

Three weeks later, paramedics were called to the family's home where they found the 12 year-old boy in full cardiac arrest.  Upon examination at the hospital, doctors found multiple hematomas and numerous broken bones and bruises in various stages of healing.  The middle brother was also treated for a broken arm, burns and ligature marks resulting from his hands being bound.  All of the children were removed from the home and placed in foster care.  The boy did not recover from his extensive injuries and died the following day.  In interviews with authorities, the children in the home detailed systematic abuse administered as discipline. Two of the brothers were regularly tied up, beaten and denied food in response to committing household infractions.  Throughout the days leading up to his death, the boy had been subjected to severe beatings with fists and the paddle for repeated offenses such as wetting his pants, and was further punished for being unable to satisfactorily perform the disciplinary exercises required by the husband.

The husband was charged with first-degree murder, aggravated battery of a child and unlawful restraint.  He was indicated for the boy's death and the adult daughter was indicated for substantial risk of physical injury to all of the children in the home because she was aware of the abuse occurring in the home but made no effort to intervene.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The indicated finding for Risk of Physical Harm against the middle brother should be overturned since he was not of legal age to support the finding.** |

The finding was overturned and the investigation was expunged.

**2.  The State Central Register (SCR) administrator should counsel SCR hotline call takers to accept as Related Information calls from mandated reporters on siblings of a child subject in pending investigations.**

The State Central Register Administrator addressed this issue at a supervisors' meeting and supervisors then discussed with staff.

**3.  The first child protection investigator should be disciplined for not documenting and integrating or sharing with her supervisor the information provided by the intact worker that the husband had been using a paddle for corporal punishment of the boys; failing to check the safety factor in the CERAP that the boy had expressed fear of the husband; and for recommending unfounding the investigation after the middle brother disclosed that the marks were caused by the husband with a belt, that both he and the boy were subject to beatings by the husband and the boy disclosed that he was fearful of the husband.  The first investigator's caseload was within B.H. Consent Decree limits.**

The investigator resigned.

**4.   The first investigator's supervisor should receive disciplinary counseling for approving the unfounding of the investigation of Cuts, Welts and Bruises after the middle brother disclosed that the marks were caused by the husband with a belt, that both he and the boy were subject to beatings by the husband and the boy disclosed that he was fearful of the husband.**

The supervisor received a suspension.

**5.  The second child protection investigator should be disciplined for failing to properly assess the risk of harm to the brothers following the information she received from the adoption worker and the adult daughter.   In addition, the second investigator's failure to share critical information hindered supervisory input and appropriate services or oversight through the intact family services referral.  The second investigator's discipline, however, must be mitigated by the fact that she was carrying investigations far in excess of a reasonable investigative caseload and her attempts to alert all relevant supervisory and managerial personnel to the problem and the potential for harm.**

The investigator received a suspension.

**6.  The temporary supervisor should be disciplined for failing to seek more information or review after learning that the boy had been tied and that the adult daughter had fled the home with the children after learning of the harsh disciplinary practices.**

After review of documented facts by the Department, no discipline was imposed.

**7.  The Department must review B.H. investigative caseload levels on a quarterly basis to determine whether there is substantial compliance with the B.H. Consent Decree and whether there are pockets of areas or offices where non-compliance levels put children at risk.**

The review is currently being conducted.

**8.  Pre-adoptive Home Studies of wards or former wards must require children's collaterals and professional collaterals, especially school personnel to objectively ensure the accuracy of information provided.**

Child protection investigators make this determination as they go through the investigative process.

*OIG Response:  The Department response does not address pre-adoptive home studies, which need to inform the courts of direct information from collaterals in the child's life, such as teachers.*

**9.  This report should be shared with the adoption agency to assess its home study policies.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

**10.  The Department should adopt a Rule, similar to what is required for licensed homes, that requires that whenever either the State Central Register or Division of Child Protection learns that a ward or former ward is involved with adoption or post-adoptive services because of a contemplated secondary adoption or guardianship and allegations of abuse or neglect concern the prospective secondary adoptive parents or guardians, SCR or DCP must notify post-adoption of pending allegations and the outcome of the investigation and refer any allegations that are relevant to determining suitability of prospective caretakers.  Post-adoption must notify any involved adoption agency.**

State Central Register (SCR) Call Floor personnel were notified of this process via memorandum.  The Administrator also provided a copy of the memorandum to the Post-Adoption Unit.  In addition, revised Post-Adoption guidelines were provided to SCR personnel.

**11.  With all allegations, indicated or unfounded, the post-adoption unit or the adoption agency must assess the continued suitability of the caretakers.**

The Department agrees that adoptive suitability must be reassessed after a child protection investigation, whether indicated or unfounded. The child protection investigative findings are critical to such a determination.  Management is working to ensure that communication and access to relevant child protection investigations is provided as needed for adoption and guardianship decisions of continued suitability.

**DEATH AND SERIOUS INJURY INVESTIGATION 3**

| ALLEGATION | Five months prior to the death of a developmentally delayed 12 year-old boy, a private agency had closed an intact family service case. The OIG reviewed the agency's history of contact with the family. |
|---|---|

| INVESTIGATION | At the time they were referred for intact family services, the family consisted of an |
|---|---|

80 year-old widower and his five adopted sons, who ranged in age from 11 to 21 years old. Four of the five boys had considerable developmental delays and required a high level of assistance and supervision. The referral for intact family services was made after a report of risk of harm was indicated against the 14 year-old son for aggressive behavior he displayed toward his youngest brother, then 11 years-old. Case opening was delayed by the father's hospitalization and his health continued to deteriorate until his death, seven months after services began. The father's adult daughter, her husband and their five children, ranging in age from 12 to 2, moved into the home and assumed responsibility for the brothers' care. The case was closed three months after the father's death. Five months later the then 12 year-old boy was found dead in the home, the victim of extreme physical abuse.

Throughout its involvement with the family, the private agency failed to develop a comprehensive plan to address the myriad issues facing the household. At the case's inception, an elderly father suffering from serious health issues was charged with providing care to five growing boys, four of whom had special needs. Older caregivers represent a significant demographic and present issues specific to their circumstances. Although individuals over the age of 60 caring for children are eligible for services through the Illinois Department on Aging (IDOA), agency staff never utilized IDOA resources or requested an assessment of the father's ability to care for the boys. In addition, agency staff did not establish a back-up care plan in the event the father could no longer care for his sons, despite his advancing age and worsening physical condition. The Department has recognized the unique challenges faced by child welfare professionals working with older caregivers and has developed statewide initiatives to assist workers. However, professionals working in intact family services, adoption preservation and Department staff who monitor private agencies have not been included in these initiatives. Neither the private agency intact worker nor her supervisor was aware specialized services existed.

After the couple and their children moved into the home at the time of the father's death, agency staff failed to recognize how the loss of a relative, transition to new caretakers and the introduction of five young children into the home would affect the family dynamic. During times of crisis or significant change, increased contact with clients is essential to ensure uninterrupted service and identify potential issues before they escalate. Involved workers must also routinely engage school personnel, physicians and other professionals providing services to clients to generate a complete picture of the family's functioning. Agency staff in this case did not increase contact with the family in the wake of the father's death and the arrival of the couple and their children into the home. Five months after the case was opened, the family's caseworker reduced the frequency of her visits to the home. The caseworker's decision was based in part on her enrollment in advanced education classes. The caseworker's commitment to her academic responsibilities came at the expense of involvement with the family. The caseworker also failed to communicate effectively with an adoption worker from another agency who was working with the family. After a child protection investigation was opened in response to allegations of extreme corporal punishment in the home, the caseworker did not inform the adoption worker that an investigation had been opened, believing the child protection investigator would alert other involved professionals. Provided little oversight or direction by her supervisor, the caseworker operated largely independent from the many other professionals providing services to the family.

| |
|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** |

**Department**

**1. All child welfare agencies that provide multiple services for the Department, such as counseling, intact family, and foster care services, should have supervisory or management level staff, dependent on agency size, receive older caregiver training and serve as internal experts to provide guidance to caseworkers and supervisors across services.**

The Training Unit has trained numerous staff including trainers, direct service placement and permanency staff, intact staff, adoption workers, foster/adopt caregivers, and staff from various offices such as Quality Assurance, the Director's Office, and the Advocacy Office.  Training will continue as funding allows.

**2. All private agency monitors should receive older caregiver training.**

The Older Caregiver Training was completed for Cook County and downstate monitors.

**3. Training for new hires in intact family services should include information on older caregivers and link staff to resources.**

The Department agrees.  The Division of Clinical Services and Professional Development has included material on older caregivers in Foundation Training for new hire intact and placement workers.

**4. Create a resource link in the Department's D-Net to resources, services, and trainings pertinent to older caregivers.**

The Department agrees. For all new staff, intact and placement, a module on older caregivers has been incorporated into Foundation Training for all child welfare staff and their supervisors. For existing staff, a workshop for working with older caregivers has been established and delivered in conjunction with the OIG office. Over the last year a representative from OIG has been coordinating with Training staff to transfer delivery responsibilities to the Department's Office of Training.  The Department has posted a link for resources for staff through the D-Net, titled, "Grandfacts-Resources for Grandparents and Older Caregivers." For family members, we have made resources available through the Training Resource Link to various state fact sheets and other resource links like Generations United, AARP Foundation, Brookdale Foundation Group, Children's Defense Fund, Child Welfare League of America, and Casey Family programs.

**5. The Post Adoption Unit's draft notification form (CFS 1800-M-1a) to adoptive parents regarding minors reaching their 18th or 21st birthday should include language to inform adoptive parents of children with disabilities that the adoption subsidy ends upon the adoptee's 21st birthday, and to instruct the family on how to apply for social security benefits.  The notification form should identify a post adoption staff member who can respond to questions from adoptive parents.**

The Department does not believe using the CFS 1800-M-1a is appropriate.  The Department will provide notice to adoptive parents six months prior to a minor's 18th and 21st birthday.

**Private Agency**

**6. The private agency should identify staff in their management structure who should be trained on older caregiver families to serve as internal expert to provide guidance to caseworkers and supervisors across the agency's services.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The private agency identified 4 staff persons who would serve as internal experts to the agency on older caregiver issues.  These staff persons have completed the Office of the Inspector General Kids and Older Caregivers training.

**7. The private agency's administration should review its child welfare programs and staff allocation, including number of staff and percentage of time allocated to each program to determine whether its staffing pattern is sufficient.  This review should include an evaluation of the efficacy of staff assignment to multiple programs.**

The private agency's Human Resources Department conducted a formal efficacy analysis of staff and supervisors in the Foster Care Division including a review of all supervisors involved in multiple programs and an assessment of their time allocation. The agency has established protocols to help determine staff sufficiency and has hired new staff as needed.  The agency has also developed a Supervision Policy which includes periodic contact with clients for an additional layer of case monitoring.  The agency's management has also established a process for evaluating new cases and assigning them based on the skills, experience, and caseload of the casemanagers.

**8. The private agency should closely monitor full time staff who are also full time students to ensure they are able to carry out their job responsibilities.**

The private agency has revised its Case Manager Supervision Note to include a prompt to inquire about the casemanager's workloads and how school may be affecting their work performance.  In addition, the private agency's Foster Care Division Manager will discuss this issue in supervisory consultations on an ongoing basis.  The agency has also revised its tuition agreement and reimbursement practices to highlight the importance of the students' job responsibilities and allow for increased monitoring of employees who are in school.

**9. The private agency's management should ensure that its child welfare workers, including intact family workers are engaged in appropriate and relevant information sharing with professionals involved with their assigned families.  In this case, involved professionals were school social workers and teachers, post-adoption and adoption workers, home-based therapist, psychiatrist, and home health nurses.**

The private agency has developed protocols to enhance information sharing with professionals involved with their assigned families.  The agency's Case Manger Supervision Note has been revised to include collateral contacts as an area to be covered in supervision and the Documentation Tracking Form and accompanying policy will help supervisors monitor communication with key individuals.  In addition, a policy was issued clarifying the requirement of Child and Family Team Meetings and staff were trained on this policy.

**DEATH AND SERIOUS INJURY INVESTIGATION 4**

| ALLEGATION | A four year-old boy died as a result of severe physical abuse and his twin sister was treated for serious injuries. The children were Department wards who had been returned to the home of their parents in another state three months earlier under an extended visit order. |
|---|---|

| INVESTIGATION | The family's initial involvement with the Department began six years earlier after the hotline received a report that the parents were using methamphetamine in the presence of four children. |
|---|---|

The two oldest were from the mother's previous relationship. The reporter also alleged that the parents did not seek medical attention for their two youngest, who were ill. During the investigation the father acknowledged previously being incarcerated on drug charges in another state where the family used to live. The father stated he had completed drug treatment while in prison and both parents denied any current substance abuse. While the report was still pending the mother gave birth to the twins. The boy was born with medical complexities that necessitated extended hospitalization and significant care following his release. The investigation was ultimately unfounded but the family was referred to receive intact family services through a private agency to assist the family with the boy's care and other issues. Five weeks after the intact family case was opened, both parents were arrested after police officers found components for manufacturing methamphetamine in their home. The couple's four children were present at the time of arrest and taken into custody. One twin and an older sibling tested positive for elevated liver enzyme levels. Physicians theorized the elevated levels were caused by exposure to chemicals used in methamphetamine production. The parents were indicated for environmental neglect and substantial risk of physical injury. The couple's four children were placed in two non-relative foster homes with the twins remaining together after the boy was released from the hospital. The mother's two oldest children were residing in a neighboring state with their maternal grandmother at the time of the arrest. They remained in her home and were not made part of the DCFS case.

Both parents were convicted of manufacture of methamphetamine and received multi-year prison sentences. Initially the parents were both charged with child endangerment, but these charges were later dropped. After 11 months, the mother was released and had her parole transferred to the neighboring state where the maternal grandmother lived and moved into her home. The mother had participated in drug treatment while incarcerated but she did not engage in substance abuse counseling following her release and did not participate in additional services required by the private agency. Eleven months after being released from prison, the mother delivered her seventh child. Private agency staff had suspected the mother was pregnant, which she consistently denied, blaming her weight gain on her sobriety. The mother delivered her child in the other state and continued to deny to private agency staff that she had a new baby until after they were informed directly by child welfare workers from the other state.

Three months later the father was released, and like the mother, had his parole transferred to the neighboring state and moved in with the paternal grandmother. The mother and her new baby left the maternal grandmother's home and moved in with the father, who had no biological connection to the infant. The couple was married soon thereafter.

Two years after the children came into care, the private agency screened the case with the State's Attorney's office in Illinois for termination of parental rights of the couple's four children. The State's Attorney's office deferred filing a petition, citing that the parents needed more time to work towards reunification. While the agency had concerns about the couple's ability to parent, without a petition for termination of parental rights being filed the goal had to remain return home. Over the next year the parents minimally cooperated with services. The parents took no initiative for visiting the children, relying on private agency staff to transport the children to their home in a neighboring state. The parents completed tasks only after being warned by the court that non-compliance would cause the case to move towards termination.

The agency's ability to monitor the couple was greatly compromised by their relocation out-of-state. The

time that elapsed between child visits, assessments and drug screens prevented private agency staff from establishing regular contact with the parents and provided excuses for their failure to comply with tasks (unfamiliarity with local services, transportation issues, etc.) In addition, agency staff had been instructed by the Department's interstate compact staff person that they were prohibited from conducting child welfare work in the other state as they were not licensed there. Following the court's rejection of the petition to terminate parental rights the parents complained of unfair treatment by agency staff. Case management was transferred to other workers who did not possess the same degree of familiarity with the case or the family's history.

The caseworker and case aides administered urine screens to both parents during scheduled visits with their children. While the majority of the father's urine screens tested negative, the mother frequently tested positive. The mother explained her positive screens as resulting from her prescription medications. The agency staff did not regularly ask to see the medication nor did they reconcile the prescriptions with her urine screen results. For several of the positive results the mother had no corresponding prescription medication.
The caseworker did not consult with the mother's doctor to confirm she was prescribed the prescription medications that produced positive results in her drug tests. The caseworker failed to inform the court of positive drug tests.

As the goal for the case remained return home, the court instructed the agency to request an Interstate Compact with the neighboring state so that child welfare services would be provided by the neighboring state, enabling the court to continue monitoring the children's well-being in the home of the parents. Federal law provides for wards in care to be placed in homes across state lines through Interstate Compact Agreements. Interstate Compacts allow for child welfare personnel in the state where families reside to monitor and service children with open cases in juvenile courts in other states. After the neighboring state conducted a review of the parents' home, the neighboring state denied the request, refusing to accept the case for monitoring and services. The state's refusal cited the father's extensive criminal history, including an outstanding arrest warrant, the parents' failure to submit to random drug tests and the lack of adequate beds for children in the home. The compact refusal was sent to the Department's interstate compact staff person who forwarded it to the agency.

Three months after the interstate compact was denied, case management was transferred to a new caseworker who had only been in her position with the agency for one month. Throughout her handling of the family's case, the new caseworker relied on information provided by the parents regarding their progress in services without critical assessment or verification of their reports. The caseworker also accepted the mother's reports that she was participating in counseling services without obtaining consents for release of information from the mother to allow for the assessment of her progress. The caseworker's supervisor did not recognize the deficits in the caseworker's efforts or ascertain more reliable information about the family. Neither the caseworker nor her supervisor utilized the maternal grandmother, who was cooperative throughout and had regular contact with the family, as a potential source of additional information. The unfamiliarity of the caseworker and her supervisor with the family's history and their failure to conduct a comprehensive review of the case file prevented them from identifying inconsistencies and misinformation the mother provided to them as well as to the court.

During a court hearing 3 ½ years after the children came into care the judge determined that there was not enough evidence to proceed with a goal of termination of parental rights. The court ruled that the twins should live with their parents for two months on an extended visit. By ordering an extended visit, instead of a return home, it allowed for the children to be placed in the neighboring state with Illinois court monitoring without Interstate Compact approval. Once in the neighboring state, no provisions were made for services to the twins. Although the twins had been involved in early education programs in Illinois, the parents did not enroll them for similar services in the other state. After the first sixty days the extended visitation order was renewed for another sixty days with a plan to return the two older children once the school year ended. The older siblings continued to visit the parents on weekends. Case aides, who transported the siblings for visitation to and from the parents' home, were not informed of the issues involved in the case or instructed to

observe the family's home for evidence of drug use or other issues.

At the time of the extended visitation order, the agency was ordered to re-submit the case for Interstate Compact approval. Child welfare personnel in the neighboring state again denied the request and additionally asked for the private agency to immediately remove the children from the parents' home. Documentation of the denial was sent to the Department's compact administrator who forwarded it to the private agency. In an interview with the OIG, the interstate compact staff person stated he gave only a cursory review to the documents provided and was therefore unaware that the neighboring state had requested the twins removal from the parents' home. The private agency received notification of the neighboring state's request that the twins be removed three days after the boy's death.

Two months after the extended visit began, the mother gave birth to her eighth child. At that point the family had four children in the home under the age of four, two of whom were less than one year old. Once again she had concealed her pregnancy from private agency staff. The caseworker and her supervisor interpreted the mother's deceptive behavior as an understandable attempt to prevent having another child removed from her custody.

Three months after the twins were returned to their parents' home, paramedics were called to the family's home. They found the boy unresponsive with massive injuries and transported him to the hospital. All children were removed from the home. The boy did not regain consciousness and was taken off life support the following day. A doctor who examined the boy's twin sister found the girl had been "savagely beaten" recently and concluded anyone who had seen her "could not have been unaware of the injuries she had sustained." Although a case aide had transported the older children for a visit one week before the boy's death, the mother told her the twins were sleeping and the aide did not see them. The twin girl returned to her former foster home in Illinois. The twins' younger siblings were placed in foster care in the neighboring state. Both parents were arrested and charged with murder, child battery and child neglect. The mother pleaded guilty and testified against the father. She has been sentenced to thirty years. The father was found guilty and sentenced to one hundred years in prison.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | 1. **The Department's Interstate Compact Procedures should be revised to require:** |

- **when an interstate compact is denied, the Interstate Compact Unit shall notify the Office of Legal Services. The Office of Legal services will then monitor the case to ensure that that interstate compact is neither violated or circumvented in a manner that compromises the safety of children;**

- **if an interstate compact is disputed or violated, the Office of Legal Services will notify DCFS Clinical and DCFS Clinical will convene a staffing with the agency caseworker and supervisor, and the GAL;**

- **notification of the Interstate Compact Unit, by the agency, if an interstate compact placement request is pending and the children are sent to the placement under consideration.**

Revisions are being made to Procedure 328: Interstate Compact, in order to incorporate these requirements. The Interstate Compact Office has been directed to report all such situations immediately to DCFS Office of Legal Services who then monitors the case to ensure that the ICPC is not violated or circumvented in a manner that compromises the safety of children. Copies of that notification are sent to an Associate Deputy Director to verify that direction is being carried out.

**2. DCFS Service Intervention Director of Substance Abuse Services should issue a memo to all private agencies informing them of available consultation services including interpretation of urine screen results involving prescription medication. This report should be shared with DCFS Service**

**Intervention Director of Substance Abuse Services.**

A memo detailing the availability of consultation services has been drafted and is in approval stage prior to distribution. The report has been shared with the Administrator of Substance Abuse Services for the Service Intervention Division.

**3.  The private agency should review its internal procedures for administering and interpreting drug screenings and reporting information from the screens to the Court.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General will meet with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

**4.  In this case, private agency case aides were not given full information regarding the case, putting them at a disadvantage in monitoring the visits.  The private agency should ensure that case aides are educated about the conditions that brought the family to the Department and ongoing issues in the case so that they have a context for their observations of the visits, the home and the behavior of the caregivers.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General will meet with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

**5.  The private agency caseworker and her supervisor should be counseled for:**
   **a) failing to verify information received from the parent, instead accepting their self-report as factual;**
   **b) failing to recognize the secretive behaviors of the parents;**
   **c) failing to verify the prescription medication the mother reported she was taking; and**
   **d) failing to have the parents sign consents for release of information with the counseling center and failing to verify with the counseling center that a counseling session had occurred.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General will meet with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

**6.  The Department's interstate compact staff person should receive disciplinary counseling for not reading the Parent Home Visit report attached to the decision page of the Interstate Compact denial.**

The employee received an oral reprimand.

**7.  The report should be shared with juvenile court personnel in the county where this case was heard.**

The redacted report was shared.

**DEATH AND SERIOUS INJURY INVESTIGATION 5**

| ALLEGATION | A two year-old boy died of internal injuries caused by intentional blunt trauma to the head.  One month prior to his death, the boy's father was the subject of an indicated report for physically abusing him. |
|---|---|

| INVESTIGATION | One month prior to the boy's death, the hotline received a report that the boy had been brought to the hospital with bruises, scratches and human bite marks.  The |
|---|---|

mother observed the injuries after the boy was returned to her home following an overnight visit with his father and his girlfriend.  Local law enforcement was notified of the boy's injuries and a child protection investigation was opened.  A mandate worker performed the initial functions of visiting the boy and interviewing the mother before turning the case over to a child protection investigator for completion.

In her handling of the case, the child protection investigator failed to perform several of the duties required for conducting an adequate investigation.  The mother had related to the mandate investigator the father's assertion that the boy had been injured by other children in the home.  The child protection investigator relied upon this second-hand report without attempting to verify the claim or seek a medical opinion whether the explanation provided by the father was plausible.  The investigator never spoke with the reporter who made the hotline call or the physician who treated the boy at the hospital.  In an interview with the OIG, the investigator stated she left messages for the reporter but her calls were not returned.  In a separate interview, the investigator's supervisor stated she did not instruct the investigator to consult the treating physician because he was not the reporter and in her experience, doctors do not generally return phone calls. Department Procedure requires contact with reporters as well as all medical personnel with knowledge of a child's injury and to access any available medical records.  The boy's medical record contained the treating physician's conclusion the boy's injuries were the result of abuse.

The investigator also neglected to interview the father or observe the children known to be living in his home. Upon accepting the case, the investigator noted the father was a non-custodial parent and no formal visitation arrangement had been established.  Though she went to the father's home on multiple occasions, the investigator either found no one home or was told the father was not present.  The investigator issued an administrative subpoena requesting an interview with the father but, when he did not respond, she did not follow-up with the Department's Legal Division for additional support.  Despite being aware the father had a criminal history, including two assault convictions, the investigator did not obtain the underlying information pertaining to the crimes.  An OIG review of police records found that the father's assault conviction arose from an incident in which he beat the mother severely while she was pregnant with her first child.  During the assault, the father punched the mother repeatedly, struck her with a vodka bottle, burned her with a lighter and bit her on the arm.  The attack only ended after the boy's paternal grandfather pulled the father off of the mother and restrained him as she ran from the home and contacted police.  Individuals interviewed as material witnesses told police they were afraid of the father and reported threats the mother said the father had previously made against her.  The father was sentenced to two years in prison for the assault.  Had the investigator been aware of the severity of the father's attack she could have better evaluated the nature of the boy's injuries.

The investigator did conduct an interview with the mother, who said she would not allow the father to have contact with the boy and that she was planning to move out of state.  The investigator accepted the mother's statement without critical assessment considering she had previously returned to him and had another child. The investigator and her supervisor indicated the allegation against the father but closed the case without making a referral for intact family services.

Two weeks prior to the boy's death, the boy was seen by his pediatrician and was found to have a fractured

sternum.  Despite the pediatrician's knowledge of the family's prior involvement with the Department and the severity of the injury, the pediatrician failed to call the hotline to report suspected abuse.

One month later, after spending the night in the home of the father and his girlfriend, the boy was brought to a hospital emergency room where doctors observed bruises covering his entire body and blisters on the inside of his hands.  He was pronounced dead on arrival.  The coroner ruled the cause of death to be homicide resulting from closed head trauma and determined the boy to be a victim of chronic abuse.  The mother, father and girlfriend were each arrested and charged with murder and are currently awaiting trial.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The child protection investigator should be disciplined for her failure to: obtain relevant police reports; obtain complete medical records; interview the treating physician; and interview/observe all the children in the alleged perpetrator's home.**

The investigator received an oral reprimand.

**2.  The child protection investigator's supervisor should be disciplined for her failure to ensure that the investigator completed required investigative tasks.**

The supervisor received an oral reprimand.

**3.  Pursuant to the Office of the Inspector General's procedures, the Inspector General is sharing a redacted copy of this report with the CEO and the Chief of Medical Staff of the health center where the pediatrician was on staff for quality assurance purposes.**

Pursuant to ANCRA, the Office of the Inspector General referred the physician to the Illinois State Medical Disciplinary Board.

**DEATH AND SERIOUS INJURY INVESTIGATION 6**

| ALLEGATION | A four year-old boy was killed when a fire swept through the home of his maternal grandmother, where he lived.  At the time of the boy's death his family had an open case to receive intact family services through the Department. |
|---|---|

| INVESTIGATION | The boy's parents had been the subjects of five previous child protection investigations, three of which had been indicated against either one or both of |
|---|---|

them.  Both parents had histories of substance abuse and the mother had cirrhosis of the liver as a result of her alcohol consumption.  The mother had been diagnosed with bi-polar disorder and depression and had been prescribed psychotropic medication and powerful narcotics to treat her mental health conditions and chronic back pain.  The family home was well known to neighbors and local police for the frequent explosive physical and verbal altercations that erupted between the parents.  An OIG review of police records found that during the three years prior to the boy's death, police had been called to the parents' residence 61 times.  There was a mutual history of domestic violence between the parents, however police reported that not all calls led to arrests and none of the arrests resulted in convictions, as neither parent would pursue charges against the other.  The maternal grandmother, who lived next door, often provided shelter for the boy and his 13 year-old brother when conditions in the home reached a crisis.

The family's first intact family services case was opened following the second indicated report, which identified "an escalating pattern of violence in the home which places children at potential risk of harm."  The case was referred to a private agency to provide services, including domestic violence counseling.  In her handling of the case, the private agency intact worker relied upon the mother's self-reports she was participating in services but did not independently verify her claims.  The OIG later learned the organizations the mother reported receiving counseling services from either did not perform those functions or had not had any contact with her.

Six months after the first intact family services case was closed, the hotline received another call alleging that the parents' emotional instability placed the children in the home at risk.  The child protection investigator assigned to the report learned the mother had recently been released from a psychiatric hospitalization after checking herself in for depression.  Despite uncertainty regarding the mother's cognitive state, the investigator did not obtain her mental health records in order to develop a better understanding of her ability at that time to care for her children.  Although the investigator did contact police regarding the family's previous involvement with law enforcement, she only inquired about recent events and did not request the full history, which would have illustrated the degree to which substance abuse and domestic violence had persisted, escalating over the years.  Ultimately the investigator indicated the report against both parents for substantial risk of injury and a second case was opened for intact family services, this time through the Department.  An out-of-state Law Enforcement Agency Database System (LEADS) check performed by the OIG also found the mother had been convicted of aggravated assault in a neighboring state after hitting the father over the head with a hard object, believed to be a glass bottle.  This incident occurred while the second intact family services case was open.

At the time the second intact family services case was opened through the Department, the mother and her sons had moved in with the maternal grandmother.  The mother reported she and her husband were getting divorced, however the children frequently shuttled between the two homes.  Although both parents initially stated a desire to participate in services, including marriage counseling, the father soon became non-compliant and would not cooperate.  The mother was referred for a substance abuse evaluation, however she refused to submit to a drug test and staff from the facility reported she appeared to be under the influence of alcohol.  The mother also refused to sign a consent for the release of her mental health information to the Department intact family worker.  As a result, the worker was unaware of the mother's extensive history of mental health issues or that she was not following her treatment program and was psychiatrically hospitalized three times while the second intact family case was open.  The Department intact family services worker did not consider pursuing court intervention to compel the mother to comply with services.

Four months after the second intact family services case was opened, the boy was killed in the fire at his maternal grandmother's home.  The fire was ruled to be accidental and was traced to an electric fan found in the basement.  The Department intact worker had completed a Home Safety Checklist at the family home, but it was unclear whether a Checklist was completed for the grandmother's residence.  The Checklist did not require inclusion of the address of the home being assessed.  The OIG has since ensured that the form has been revised to include this information.  The importance of conscientious fire prevention and preparedness cannot be understated in its relation to ensuring the safety of children.  From 1989 – 1998, fire was the leading cause of death among children under the age of five in Illinois, and children under five were more than three times as likely to die as a result of a fire than the rest of the state's population.  The Department has made many efforts in recent years to promote greater fire safety awareness, including creation of the Home and Fire Safety Training program and entering into a joint effort with the Chicago Fire Department to distribute smoke detectors to workers to provide to clients.  Diligent attention to fire safety issues must be reinforced with all clients caring for children.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  This report should be shared, as a teaching tool, with the private agency intact family services worker, the child protection investigator and the Department intact family services worker.** |

The report was shared with the involved private agency worker and Department investigator and worker.

**2.  The domestic violence training curriculum should be revised to inform workers of the critical importance of obtaining complete police records, including emergency calls to a home, as demonstrated by this case.**

The domestic violence training curriculum has been revised to reflect this recommendation.

**3.  Department Procedures should be revised to require that in cases where domestic violence is present, child protection investigators and intact workers should contact the local police department and request the complete police record involving the family, including 911 contacts at the home.**

A work group of representatives from the Department, the Office of the Inspector General and the police will be convened to address any difficulties in obtaining 911 records.

**4.  This report should be used as a teaching tool for intact family services workers regarding court intervention as a means of enhancing parental compliance with required services and the use of police reports as a measure of drug use and violence in the home. The OIG will also incorporate the use of police reports in upcoming Error Reduction Trainings.**

Department Procedure 302.388 addresses the issue of court intervention in cases of non-compliant clients with safety/protective issues. However, the Department agrees to continue to encourage child protection staff to utilize this option when necessary.  The Department will also use a redacted copy of this report as a teaching tool.

**5.  The Department should post a fire safety and prevention announcement on the D-Net twice a year. The announcement should include statistics of child fire fatalities and reminders to case managers that families should check smoke detector batteries and review fire escape plans.**

A fire prevention brochure was posted on the D-Net.

**DEATH AND SERIOUS INJURY INVESTIGATION 7**

| ALLEGATION | A two-year-old boy died as a result of massive blunt trauma injuries inflicted while in the care of his mother.  At the time of his death, the family was receiving intact |

family services from a private agency and a child protection investigation was opened two days prior to his death.

| INVESTIGATION | The mother, a former ward, had an extensive history with the Department dating back to a child protection investigation of her family when she was five years old. |

At eight, following the sixth indicated report against her own mother, she was removed and taken into Department custody and placed in the home of her maternal grandmother, where she remained until she was 16.  She was removed from the grandmother's home after it was learned she had previously been sexually abused by someone in the home.  The same year the sexual abuse occurred the mother became pregnant with her first child, and by the time she left her grandmother's home she had three children.  At 21, when Department guardianship was terminated, the mother had six children and delivered her seventh child ten days after being emancipated, which she surrendered for adoption.  The mother had a history of suicidal ideation and aggression as well as possible depression, however there was little evidence in her case record to suggest significant engagement with counseling.  At the time she exited state care, the mother had no relatives or other support system available to her.

Ten months after guardianship ended, the mother gave birth to the boy, her eighth child, who presented with a congenital heart defect and remained in the hospital.  The mother failed to pick him up for several days after he was ready to be released, later explaining she had been dealing with being evicted from her home.  When the boy was three months old his mother brought him to the hospital where he was diagnosed with organic failure to thrive.  When the boy was ready to be discharged he could not be released to his mother because she and her other children were living in a homeless shelter and his medical complexity necessitated stable care.  Three of her children remained in her custody while her oldest three were living with paternal relatives.  The hospital instead arranged for the boy to be placed in a nursing facility for follow-up care.  The nursing facility expressed willingness to care for the boy for as long as his mother required.  Six months later, after leaving the maternal grandmother's residence, the mother called the hotline to report she was homeless.  She told the assigned child protection investigator she had experienced a history of domestic violence and was a continuing victim of abuse at the hands of the boy's father.  A referral was made to a private agency to provide intact family services to the family.

For 20 months the private agency maintained an open intact service case with the family.  During that time the numerous issues facing the family persisted without measurable progress.  The mother was unable to stabilize her housing situation, moving between various residences and often staying with the boy's father.  The mother reported domestic abuse by the father and private agency staff and school personnel regularly observed injuries to the mother as well as the children.  The children reported that the father hit their mother in front of them and was abusive towards them and described being afraid of him.  An OIG review of police records found that while police were called to the father's home on several occasions while the mother lived with him, she was often identified as the aggressor.  At times the mother offered other explanations for the injuries to her children, however private agency staff did not attempt to verify the mother's accounts of what had occurred.

The caseworker and her supervisor who were both assigned to the family throughout the majority of the intact case failed to recognize the scope of the problems facing the mother or the likelihood of her ability to parent successfully.  In addition to ongoing domestic violence and transience, the children were often documented inflicting injuries to each other, raising further questions about the diligence of the mother's supervision.  Case notes referred to her as being overwhelmed by the responsibilities of parenting.  At various times, relatives caring for the mother's other children would return them to her or the maternal grandmother would leave her own children in the mother's care.  The children's school reported they were generally absent from classes and educational assessments to establish action plans were not secured.  Four months after the intact case was opened, the mother delivered her ninth child after hiding her pregnancy from agency staff.  She

explained she had not divulged the pregnancy because she had intended to surrender the child for adoption. Shortly after the baby was born the mother decided to retain custody. A public health nurse involved with the family at the time of the birth also held a position with the private agency as an intern. The nurse continued to work with the family in her capacity as a medical provider while also assisting with service requirements of the intact case.

During this time, the boy remained at the nursing facility. Facility staff noted the mother's inconsistent visitation and failure to comply with training on his medical condition necessary for discharge. After the boy had been living at the nursing facility for over a year, staff working with the boy recommended transitioning him to a new placement to allow him to begin bonding with a caretaker in a family home setting. Facility staff was uncertain the mother was an appropriate caretaker for the boy given his medical needs. The mother expressed hesitancy about caring for the boy along with the children already in her care but ultimately decided she was prepared for reunification. In the 18 months the boy lived in the facility his mother visited him 9 times with her last visit occurring 4 months prior to his discharge. Although the boy was believed to be ready for toilet training when he was discharged to his mother agency staff did not consider advising the mother to delay toilet training, a particularly stressful developmental phase, to allow for a period of adjustment.  In interviews with the OIG, the caseworker and her supervisor stated they believed that they were bound to continue working towards the goal of having the boy returned home by virtue of their roles as intact service workers. The caseworker stated that the possibility of screening the case into court for dependency was never discussed. It was their understanding such action could only be taken if the mother stated she no longer wanted to care for the child and, therefore, thought the case was ineligible for screening.

One month after the boy was returned home, his mother delivered her tenth child. Homemaker services were secured for the family. The number of family members in the home fluctuated as children continued to enter and leave the home. Three weeks later a hotline report was made alleging the mother had failed to make her new baby, who was born underweight and with possible sickle-cell anemia, available for follow-up treatment. A child protection investigation was opened for medical neglect. The same day, the mother discontinued homemaker services. Two days later the boy was brought to the hospital with extensive injuries and his breathing was labored. He was pronounced dead later that day. A post-mortem examination found evidence of internal and external injuries to virtually every part of the boy's body. The mother was arrested and charged with murder and is awaiting trial. The children in the home were removed and placed in foster care.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The private agency should counsel the caseworker and her supervisor on the findings of this investigation.** |

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The private agency caseworker and supervisor were counseled.

**2. The private agency should provide training to its child welfare professionals on how to recognize dependency and screening for court filing.**

Private agency staff were trained by an outside expert on dependency issues including jurisdiction of the Juvenile Court, child abuse and neglect, understanding who is a dependent child, and mandated reporting.

**3. The private agency should not assign an employee or intern to a family in which the employee or intern has a continuing professional relationship with the family outside the agency.**

The private agency will ensure that an intern is not assigned a family case where the intern has a continuing professional relationship with the family outside the agency.

**DEATH AND SERIOUS INJURY INVESTIGATION 8**

| ALLEGATION | An eight month-old boy died of undetermined causes.  The baby had previously been the subject of an indicated report of physical abuse by his father and his family was involved with intact family services through the Department at the time of his death. |
|---|---|

| INVESTIGATION | The baby was brought to a hospital emergency room when he was one month-old by his father.  The infant was suffering from continued vomiting and his father said |
|---|---|

he had fallen on the baby after tripping over a cord while carrying him.  The father's 10 year-old daughter who also lived in the home stated she heard the baby crying during the night.  Physicians treating the baby found bruising to both sides of his stomach and a hematoma in his abdomen wall.  Doctors also identified bruises to the baby's eyes and forehead and determined he had anemia related to blood loss.  A call was placed to the hotline and a child protection investigation was opened.  Local law enforcement was also notified of the infant's suspicious injuries.  During the subsequent investigation, the mother stated she believed the father's account that the baby sustained the injuries from an accidental fall, however the father eventually admitted to police he had squeezed the infant's sides.  The father claimed he did so in an attempt to alleviate the infant's discomfort caused by gas.  The father was arrested and charged with aggravated battery of a child, aggravated domestic battery and reckless conduct.  At a court appearance, the father was released on bond but was admonished by the judge not to return to the family home or have any contact with the mother or the baby.  Although the judge's no-contact instruction was included in court transcripts it was not entered into the written bond statement.  The child protection investigation was indicated for risk of harm against the father and unfounded against the mother.  The case was then referred for intact family services.

Prior to handing the case off for intact family services, the child protection investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) showing the home to be safe based on the father's incarceration.  The investigator noted the mother would seek an order of protection against the father.  Upon accepting the case, the assigned intact worker met with the mother, her 10 year-old daughter and the baby in their home and discussed the need for services with the mother, who was resistant.  The mother informed the intact worker the court had ordered no contact between the father and the baby, but had no documentation to support her assertion.  The mother informed the worker she had previously been engaged with a therapist who had treated her with psychotropic medication but she had discontinued attending or taking her prescription drugs.  The intact worker noted the mother as being anxious and depressed and made a referral for in-home counseling and recommended she resume her medication schedule.

Approximately six weeks after the father was released from jail he moved back into the family home.  Following his return, the intact worker's supervisor checked with the county court and found no information restricting the father from having contact with the family or returning to the home.  The intact worker and the supervisor contacted the Department's Office of Legal Services and spoke with a Department attorney for consultation.  According to the intact worker and the supervisor, the Department attorney advised them that if the father had not been convicted of a crime and there was no established order from the court he could not be denied contact with the family or prevented from returning home.  In an interview with the OIG, the Department attorney stated that while she did not recall the conversation, the account provided by the workers corresponded with what she would have advised.  Neither the intact worker or her supervisor nor the Department attorney documented the conversation regarding the father's legal status.

The mother's already inconsistent compliance with services deteriorated following the father's return to the home.  The father refused to participate in services and the mother began canceling counseling appointments and missing scheduled home visits with the intact worker.  The mother maintained her belief the injuries to the baby had been caused accidentally and denied the possibility the father could have intentionally hurt their son.  The intact worker and her supervisor failed to recognize that the father's return to the home significantly

compromised the baby's safety in his mother's custody.  The intact worker also did not make an effort to facilitate the mother's participation in therapy by transporting her to sessions or collaborating with the therapist.  The lack of support available to the mother isolated her in the home and increased the level of risk to the baby.

Six months after the intact case was opened, the baby was transported to the hospital where he was pronounced dead.  An autopsy was unable to establish a conclusive cause of death.  The 10 year-old girl was removed from the home and placed in the custody of her maternal uncle.  Following a child protection investigation, the mother and father were both indicated for death by neglect and risk of harm to the girl.  The father died three months later from a drug overdose.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  When the Department's Office of Legal Services is consulted by the field regarding critical decisions, the conversations and advice must be documented by DCFS Legal and the field.** |
| --- | --- |

When DCFS Legal is consulted by the field regarding a critical decision a Critical Decision Legal Case Update will be completed and maintained in the Office of Legal Services (OLS).  The Legal Case Updates are privileged and confidential.  As such they are not discoverable. Consultation with Legal should not be documented in the case file.

**2.  The Department should designate a Felony Review Designee in the involved county to serve as an informational liaison to the involved county's State's Attorney's Felony Review Board and to provide expertise to the field concerning bond court, orders of protection and ongoing felony criminal proceedings.**

The Department has designated a Felony Review Liaison.  The Office of Legal Services already has a liaison to the involved county's State's Attorney's Office.  This person would serve as the informational liaison.  The Office of the Inspector General provided this redacted report and other similar redacted reports to the Office of Legal Services to assist the liaison in understanding the issues and concerns.

**3.  The Department's legal counsel and the Department's Felony Review Designee should receive legal training concerning bond court, special conditions of bond, felony criminal proceedings and orders of protection, as they relate to protection of children.**

The Department agrees and training has been completed.

**4.   This report should be shared and reviewed with the intact worker, her supervisor and the Department attorney.**

The redacted report was shared and reviewed with all involved staff.

**DEATH AND SERIOUS INJURY INVESTIGATION 9**

| | |
|---|---|
| **ALLEGATION** | A six year-old girl died of a degenerative, congenital disease while her family was receiving intact family services from the Department.   Translation services were not utilized by the Department intact family services workers providing services to the Spanish-speaking family, in violation of the Burgos Consent Decree. |

| | |
|---|---|
| **INVESTIGATION** | The family consisted of a mother and her six children, whose ages ranged from 11 years to 8 months old at the time the case was opened.  The family was faced |

with numerous significant issues.   The mother's six year-old daughter presented serious medical issues stemming from a congenital neurological disorder.   The mother's husband, the father of the four oldest children, was incarcerated for armed robbery.   Department involvement with the family was initiated when the mother left her boyfriend, the father of her two younger children, upon learning he had been sexually abusing her oldest daughter.   After a child protection investigation indicated the boyfriend for the abuse, the family was referred for intact family services.

Due to the absence of any Spanish-speaking staff in the regional office servicing the case, a non-Spanish speaking intact worker was assigned to the family.   From the outset, the intact worker noted the inability she had in developing trust with the family given the language barrier.   The intact worker submitted a request to a private agency contracted by the Department to provide assistance on cases involving Spanish-speaking families.   At the time, the program responded to such requests by assigning Spanish-speaking employees to provide homemaker services to the families, however this arrangement did not ensure the employee and the intact worker would be present in the family's home at the same time.   The intact worker submitted a second request to the private agency for translation assistance noting she, "never got what [she] thought [she] was going to get," in the way of help communicating with the family.   The request was approved but no additional assistance was forthcoming.   The intact worker also asked the private agency to translate vital documents she needed to provide to the family, but this task was never performed.

Both the intact worker and a second worker who later handled the case reported having difficulty coordinating their efforts with the private agency employee.   Since home visits usually were conducted in the employee's absence, the workers utilized the mother's brother and his 13 year-old daughter, who were often present in the home, as translators.   The intact workers were aware that doing so violated Department procedure but felt it was their only option to engage in some meaningful dialogue with the family.   Since they were speaking through individuals who were not directly involved with the case, the workers limited themselves to general questions regarding the family's welfare rather than addressing the significant challenges facing them. Fourteen months after the intact case was opened, the mother delivered her seventh child who was born with a rare form of muscular dystrophy.   The mother had never informed the workers of her pregnancy and they were unaware she was expecting.   No information about the baby's father other than his name was obtained. The boy died at the age of two months from complications of his medical condition.   One month later, the six year-old succumbed to the effects of her disease.   In interviews with the OIG, the intact workers reported feeling overwhelmed by the situation and felt they were doing the family a disservice by providing substandard case management.   A third, bi-lingual intact worker who later assumed responsibility for the case told the OIG the language barrier between the family and previous workers had proved a significant obstacle to providing services and that more substantive communication between parties would have allowed the case to have been closed sooner.

An OIG review of the Department case file found no documentation of any activities performed by the private agency employee in service of the family.   The file maintained by the agency contained a negligible amount of information.   In an interview with the OIG, the administrator of the private agency program acknowledged

a lack of oversight of employees and informed the OIG that since the time the case was serviced the program had been modified to provide only dedicated translation services to Department workers.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1.   The Department should share this report with the Illinois Attorney General's Office to gain insight into the Department's failure to comply with the Burgos Consent Decree.**

A redacted report was shared and reviewed with the Attorney General's Office.

**2.   The Deputy Director of the Division of Affirmative Action should issue a communication to Department staff in the affected regions instructing them of their obligation to comply with the Burgos Decree as detailed in Procedure 302.30(c).   The Department should also educate staff about the availability of the tele-interpreters resource through quarterly announcements on the D-Net and include on the D-Net a list of qualified interpretation/translation providers in each region.**

The interpreter information has been submitted to the Office of Legal Services for review prior to posting on the D-Net.

**3.  The Department should review the contract and program plan for interpretation services with the private agency to determine if contract requirements are being met.**

Corrective plans have been given to the provider and completion is in process.  The Contract Office continues to review and update the program plans.

**DEATH AND SERIOUS INJURY INVESTIGATION 10**

| | |
|---|---|
| **ALLEGATION** | A one year-old boy died of natural causes after being brought to a hospital emergency room unresponsive. Tests later found the presence of cocaine in the boy's system. The family's intact family services case was closed four months prior to the child's death. |

**INVESTIGATION**     The family had an extensive history of involvement with the Department stemming from the mother's substance abuse, diagnosed mental illness as well as multiple arrests and convictions for drug possession and prostitution. At the time of the one year-old's birth, two of the mother's five children had been born substance exposed. The father also had numerous arrests and convictions for drug possession, battery and weapons violations. By the time the one year-old was born, the parents had already been the subjects of two indicated abuse and neglect reports and had a previous intact family case closed for non-compliance with services. The mother's three oldest children had been removed from her care and placed in the custody of their maternal grandmother. The father reported the mother openly engaged in a "drug-lifestyle," coming and going from the home without notice and engaging in high-risk behaviors.

When the one year-old was born, he and his mother tested positive for cocaine. As a result, a child protection investigation was opened. The mother reported receiving little pre-natal care, being on parole for a prostitution conviction, receiving disability payments for clinical depression, and not taking prescribed anti-depressants for at least a year. Mother also stated the infant's father was not her current paramour but a man who was incarcerated; she was uncertain of his whereabouts. The paramour was aware that the child was not his biologically. He initially refused to care for the child, but later expressed willingness to care for the infant along with the two older siblings that he fathered. The mother entered a residential substance abuse program that allowed the infant to accompany her into treatment. The child protection investigation was indicated against the mother and an intact family services case was opened.

Throughout her involvement with the case, the intact worker demonstrated an inability to recognize the severity of the issues facing the family and anticipate the problems that were likely to arise. She also failed to conduct necessary tasks that would have enabled her to gather a fuller picture of the family's situation or the parents' ability to provide adequate care to the children. The intact worker never secured consents for release of information from the substance abuse facility, which prevented her from conferring with professionals on the mother's course of treatment. Additionally, consents were never obtained for mental health services provided to the couple's five year-old son, the oldest child in their care. An OIG review of public aid records found the five year-old never received his prescribed medication or any mental health services while the intact case was open.

Although the intact worker conducted numerous home visits she failed to recognize ongoing problems in the home. On many occasions she found the five year-old at home rather than at school. The father attributed his inability to get the boy to school, which was a five minute walk away, to his lack of access to a car and the unavailability of alternative caregivers for the other two children while he left the home. The intact worker also observed unsanitary conditions in the home and noted the father's complaints of being overwhelmed by his responsibilities. Despite these issues, the intact worker never secured homemaker services or transportation assistance to reduce the pressure on the father, the children's primary caretaker. The intact worker also neglected to ensure that child development evaluations were performed for the youngest two children or that early intervention services were located. The utilization of an Ecomap, a listing of relevant available resources within a one mile radius of the family's home, would have illustrated the many local organizations and institutions that could have provided additional support and respite to the family.

Throughout the case, the intact worker relied on the parents' self-reports without following-up or confirming

their statements.  The intact worker accepted the mother's self-report of being drug free for two months, without confirming her assertion with a urinalysis.  The worker did not realize the mother's two month sobriety was the result of a two month incarceration for prostitution.  Although the father was receiving WIC benefits as financial assistance, those benefits were discontinued after the family moved without providing a new address.  The intact worker took no action to ensure that WIC was notified of the family's move and to prevent interruption of benefits.  Despite the family's continual non-compliance with services, the intact worker updated an integrated assessment marking their progress as "satisfactory."  In separate interviews with the OIG, the intact worker and her supervisor insisted that intact family services are provided on a voluntary basis and that they sought to empower clients by making clients aware of available services and relying on them to perform tasks.  Their approach overly relied upon clients in crisis demonstrating a high level of motivation and failed to take into account the potential risks posed to children in the home if services were not secured.  Given the family's myriad issues and tumultuous history, their case would have been better suited for a referral to the Intact Family Recovery program (IFR), a specialized unit trained to work with high-risk, substance abusing clients.

The intact family case was closed after nine months following the worker's final visit during which she noted the family was "doing well."  Two months later another child protection investigation was opened for risk of physical injury after the father was observed handling the one year-old roughly in a hospital waiting room while the five year-old received treatment for an illness.  Two months later, while that investigation was still pending, and two weeks after the mother had given birth to her seventh child, the one year-old was brought to an emergency room in cardiac arrest and septic shock.  He was pronounced dead the same day.  Cocaine was found in the boy's system and doctors concluded that the level present suggested he had ingested the drug within the previous few hours.  The mother and father both denied using cocaine around the boy and offered multiple accounts of how he might have come into contact with it.  While at the hospital, the mother was arrested on an outstanding warrant for prostitution.  The other two children in the couple's care were removed and placed with their paternal aunt in another state.  The pending child protection investigation was later indicated against the father and the subsequent investigation related to the one year-old's death was indicated against both the mother and father for death by neglect and substantial risk of physical injury.  Two months after the boy's death and shortly after she entered a substance abuse facility, the mother gave birth to her eighth child.  The child was taken into protective custody by the Department and placed in foster care.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.**   The Department's Division of Clinical Services and Professional Development should review and discuss this report with the intact family services worker and her supervisor to |

discuss the inadequacy of the intact worker's initial and updated integrated assessments and provide instruction on conducting thorough integrated assessments.  Instruction should include, but not be limited to, the collection and evaluation of relevant behavioral, emotional, psychiatric, developmental and educational information on the minors and caregivers.

The Regional Clinical Manager met with the worker and supervisor.  Both received copies of the "Overview of the Integrated Assessment Program" and a copy of the "Integrated Assessment Activities on Standard Cases/Case Activity Timeline."  Appropriate use of these documents was discussed with the supervisor and worker and both acknowledged that they understood the necessity of, and proper use of, the Integrated Assessment tool.

**2.   The Department's regional manager should provide non-disciplinary counseling for the intact worker and her supervisor on the use of Ecomaps and strategies to effectively link families to viable community services.**

The redacted report was reviewed and discussed with the employees.

**3.  In keeping with the Strengthening Families model, intact family services workers should receive Ecomap training in order to build protective factors around children and reduce abuse and neglect.**

The complete training is included as a part of the Department's Foundation Training.

**4.  All integrated assessments for intact families should incorporate an Ecomap that identifies resources available to the family within their community.**

The Department's Division of Service Intervention and the Division of Child Protection collaborated in educating intact family services staff on the use of Ecomaps.  Intact family services managers continue to encourage staff to use the D-Net Resources/Ecomap.

**5.  Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families.  Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and state pre-K programs.**

There is no policy or protocol for referring substance exposed infants to the Intact Family Recovery program.  However, the Division of Service Intervention gets a weekly report from Quality Assurance on Cook County substance exposed infant cases.  The Division of Service Intervention then contacts the assigned child protection staff to inform them that the case may be appropriate for the Intact Family Recovery program and how to make the referral.

*OIG Response: Referrals to the Intact Family Recovery program should be required in specific circumstances and incorporated into written policy.*

**DEATH AND SERIOUS INJURY INVESTIGATION 11**

| | |
|---|---|
| **ALLEGATION** | A four year-old boy was mauled to death by three dogs kept as pets by his foster family. |

**INVESTIGATION**    The boy had resided in the foster home, which had a license monitored through a private agency, for just over a year prior to his death.  His foster mother's adult son, who also lived in the home, found the boy unresponsive in the back yard, where the dogs were primarily kept.  The boy had sustained massive wounds to his face, neck, torso and legs. The foster mother, her adult son and two older teenage children were all present in and around the home at the time of the attack, however none were aware of it at the time it occurred.  The family estimated the boy had been out of sight for no more than 15 minutes by the time his body was found.  The dogs had no history of aggressive behavior and animal control officers who responded to the scene reported the dogs were friendly and responded appropriately to human interaction.  Although authorities found a sufficient supply of dog food in the home, a veterinary examination of the dogs found the two larger animals to be underfed with one verging on emaciation.  Following completion of the veterinary examination, all three dogs were euthanized. A post-mortem test for rabies returned negative results.  At the conclusion of a child protection investigation of the boy's death, the foster mother and her adult son were indicated for death by neglect for failing to properly supervise the boy and ensure that he could not enter the dogs' area on his own.  The foster mother later refused to cooperate with a licensing investigation conducted by the private agency and her foster care license was revoked.

Investigators and experts in animal behavior were unable to determine the dogs' motivation for attacking the boy, whose foster family reported he had played with the animals alone in the past.  Research in the field of dog attacks against humans has found that even seemingly docile pets can become overly aggressive. Children are particularly at risk due to their size, high level of unpredictable activity and lack of familiarity with animal behavior.  Children between the ages of five and nine suffer the greatest number of dog bites among youth.  Other factors can increase the potential for a dog attack.  Incidents of dog attacks on humans escalate substantially when more than one dog is present.  Animals that are consistently tethered in a small area or perpetually confined in a tight space can become territorial and hostile.  Those that are left alone for extended periods of time or have little contact with humans often display poor socialization, increasing the potential to lash out.

In interviews with the OIG, both the licensing worker and her supervisor stated they had heard dogs barking when they visited the home, but had never seen the animals.  The caseworker handling the boy's case was unaware dogs were present in the home.  Although Department Rule requires licensing staff to assess any safety issues associated with household pets, it does not provide specific guidelines for implementation.  It is vital that when child welfare professionals assess homes where children reside or might be placed that they identify any and all pets in the home.  Workers must identify any potential hazards caused by these pets, including those related to medical conditions, such as asthma and allergies.  They should observe the animals and their living quarters and inquire as to where and how they are maintained.  By recognizing the possible risks posed by some pets in the home, workers can make better informed decisions when evaluating home environments and reduce the potential dangers to children.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   In order to satisfy Department Rule 402.8, General Requirements for the Foster Home, the Department should incorporate into a licensing safety assessment the guidelines set** |

**forth by the American Humane Society regarding the observation of family pets in their natural environment.  These guidelines, detailed below, should also be incorporated into Part 300, Reports of**

**Child Abuse and Neglect and Part 406, Licensing Standards for Day Care Homes.**

*Guidelines from the American Humane Society*

*In a publication entitled "A Common Bond: Maltreated Children and Animals in the Home" published by the American Humane Society, authors Mary Lou Randour and Howard Davidson propose that a child welfare safety assessment of animals and children should include animal related questions and observation of interactions between family members and family pets. The Humane Society recommends observation of the animal in its daily environment, and that when making a home visit the observer can incorporate the following questions into the interview:*

- *Do you have any family pets or other animals in your home?*
- *May I see them, or can you bring them out?*
- *What can you tell me about your pets?*
- *Who takes care of them?*
- *What happens when one of them is disobedient?*
- *Who disciplines them?  How do they do that?*
- *Have you had any other pets?  What happened to them?*

*When observing interactions between the family members and their pets, the following should especially be considered:*

- *Are there any family pets that might be classified as a breed that is associated with animal fighting or other crimes?  The presence of a high-risk pet could place children and other family members in danger.*
- *Do the animals seem relaxed around all family members, or do they seem to avoid, or appear anxious around, one or two particular family members?*
- *How does the presence of the animals affect the family interactions?*
- *If there is a dog in the home, does the child have access to the area where the dog is kept?*
- *If the child is near the dog, how is s/he supervised?*
- *How much time does the dog spend interacting with family members?*
- *What socialization has the dog had with children?*
- *Has the dog received obedience training?*
- *Does the dog have a history of aggressive behaviors?*

The Office of Child and Family Policy and the Licensing Unit are developing a form to be signed by the foster parent responding to several questions about dangerous pets listed in the American Humane Society guide. Once this language is drafted, similar language will be drafted for Department Procedures 406 and 408. In addition, new legislation requires cross-reporting between child abuse investigators and animal abuse investigators.

**DEATH AND SERIOUS INJURY INVESTIGATION 12**

| ALLEGATION | The autopsy of a one year-old boy who died of undetermined causes found he had high levels of opiates in his system.  At the time of his death, the boy resided in a relative placement and his family was involved with Department intact family services. |

| INVESTIGATION | The family's involvement with the Department began eight months prior to the boy's death following a hotline call reporting possible domestic violence and unsafe treatment of the boy in his home. |

The assigned child protection investigator went to the home of the boy's maternal grandmother, where he and the parents lived.  Although the grandmother asserted the father was physically abusive to the mother, the father denied any history of domestic violence.  The mother, who was 15 years-old, was not present.  The father, who was 22, agreed to move out of the home until the investigator could speak to the mother.  After interviewing the mother, who also denied the father was abusive towards her, the investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) marking the home as safe, based on the grandmother's agreement not to allow the father into the home.  Soon afterwards, however, the investigator learned the grandmother had substance abuse issues and a second CERAP was marked unsafe.  A new safety plan was developed calling for the mother and child to move in with another relative.  The investigator spoke with the relative but did not visit her home or conduct a background check prior to approving the placement.  The report was ultimately indicated against the father and grandmother for risk of physical injury and the case was referred for intact family services.

Upon accepting the case, the intact family services worker learned the 15 year-old mother and child had left the relative's home and moved in with the mother's 21 year-old cousin, herself a single mother.  The intact worker created a new safety plan requiring all of the mother's contact with her son to be supervised by another adult.  Ten days later the intact worker reported the plan had been violated after making an unannounced visit and discovering the mother had unsupervised contact with her child.  A hotline call was made and a second child protection investigation was initiated.  The mother and the cousin told the child protection investigator assigned to the second case that the safety plan had not been fully explained to them and they had not been provided with a copy of the document.  The mother and the cousin also said that the extent to which the cousin was responsible for monitoring the mother and the boy had not been made clear to them.  They believed the supervision requirement only applied if the father was present, and since he had recently been incarcerated, the need for supervision had been eliminated.

The second investigator created a new, more explicit safety plan stating the cousin was to monitor any and all contact between the boy and either parent or the grandmother.  Approximately two weeks later the intact worker and the investigator learned that the mother was not attending school regularly because the 21 year-old cousin did not want to care for the child.  A few days later the intact worker learned that the mother and son had been put out of the cousin's home after mother brought a school friend home to see her son. Protective custody was taken of the child due to the safety plan being violated a second time. At a shelter care hearing the child was placed in the home of mother's half-sister.  The Judge also allowed the mother to move in although she only stayed for one day and then left.  The boy remained in the half-sister's home until the time of his death.  A post-mortem toxicology report found the boy had opiate levels 10 times higher than normal, however the medical examiner was unable to determine how the drugs entered the boy's system.  A law enforcement investigation into the boy's death is still pending.

When creating safety plans, workers are encouraged to remember "The Three Cs."  Plans should be clear, provide for contingencies when problems arise, and delineate consequences for failure to comply.  The child welfare professionals who constructed these plans and their supervisors who approved them failed to recognize the inherent weaknesses in requiring the 21 year-old mother of an infant to provide constant oversight to a 15 year-old and her son.  The plan did not address the parameters of the cousin's involvement

and did not include an end date when the plan would be vacated or altered. Furthermore, the intact worker did not make a concerted effort to engage the mother with services in the area that might have removed some of the burden from the cousin and allowed the mother to continue her educational and personal development. It is unrealistic to assume a 15 year-old in crisis will independently locate potential sources of assistance. Utilization of an Ecomap, a detailed listing of both formal community social services and informal support resources present in a community, could have provided the mother additional options to relying solely upon her cousin for support.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |
|---|---|

**1. The field manager should provide non-disciplinary counseling for the intact family services worker and her supervisor on using more of an ecological approach (including an Ecomap) in linking teen parents to viable community services such as protective daycare.**

The worker was counseled.

**2. This report should be used by the field manager to prompt case discussions with both child protection investigators in exploring alternative and more realistic safety planning in this case.**

The report was shared and discussed with the investigators.

**DEATH AND SERIOUS INJURY INVESTIGATION 13**

| ALLEGATION | A three month-old boy died of Sudden Infant Death Syndrome (SIDS).  The baby had been the subject of a child protection investigation shortly after his birth. |
|---|---|

| INVESTIGATION | Two weeks after the baby was born he was admitted to the hospital in preparation for scheduled surgery.  While at the hospital, the infant's mother dozed off while |
|---|---|

sitting in a chair holding the baby.  The boy fell to the floor and hit his head prompting the opening of a child protection investigation against the mother for cuts, welts and bruises.

The assigned child protection investigator interviewed the mother the following day at the baby's bedside just after he returned from surgery.  The mother stated her son had been sick for several days before entering the hospital and explained she had been fatigued from staying up nights with him.  The investigator presented the mother with a home safety checklist, however the mother declined to review the document with the investigator at that time.  The investigator also spoke to the baby's primary physician and a doctor at the hospital who both confirmed the infant's illness prior to entering the hospital and agreed the mother had dropped the baby accidentally as a result of her being overtired.  The investigator continued her work on the case and ultimately decided to unfound the report without ever conducting a home visit or completing the home safety evaluation.  The investigator's supervisor approved closure of the case but did not authorize waiving the home safety checklist requirement.

Presented with a situation involving a young mother coping with a sick child over several sleepless nights, it would have been prudent of the investigator to examine the sleeping situation in the family's home.  Expecting to complete the home safety checklist with the mother when her child had just returned from surgery was unreasonable.  The OIG reviewed other similar recent cases handled by the investigator and found she demonstrated a pattern of neglecting to complete home safety checklists with parents who were initially resistant.  The home safety checklist is not only an effective tool for assisting both child welfare professionals and parents to identify potential hazards in the home, but its completion is also a requirement of closing investigations.   Ensuring that the checklist is completed is essential to developing an accurate assessment of the home environment and reducing safety risks.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The field manager should review the investigator's cases involving young mothers and the home safety checklist and provide non-disciplinary counseling to the investigator and her** |
|---|---|

**supervisor on the importance of providing anticipatory guidance through the home safety checklist. The field manager should also counsel the investigator and her supervisor on effective practice with recalcitrant clients.**

The field manager reviewed the relevant cases and the investigator and supervisor were counseled.

**DEATH AND SERIOUS INJURY INVESTIGATION 14**

| ALLEGATION | A record review conducted following the death of a 20 year-old ward found the boy's caseworker had recorded only four visits with him over the previous two years. |
|---|---|

| INVESTIGATION | The ward died of a gunshot wound to the neck suffered during an altercation with another individual on the street.  The last several years of the ward's life were |
|---|---|

turbulent as he became involved in gang activity, frequently ran from placements and was incarcerated on three separate occasions.  The caseworker assigned to the ward at the time of his death had been responsible for providing services to him for the previous two years.  Although caseworkers are required to conduct monthly visits with clients, the Department's electronic database (SACWIS) showed only four reported contacts between the caseworker and the ward over that time.

In an interview with the OIG, the caseworker stated he disliked paperwork and acknowledged he had a long-standing habit of failing to use SACWIS to document contact with clients.  Department Procedure requires workers to record visits in SACWIS the same day they occur, however the caseworker routinely did not perform this task.  Other times the caseworker created handwritten notes he kept in his office but rarely transferred the information to SACWIS.  The caseworker demonstrated strong knowledge of the cases he managed and familiarity with the various issues facing his respective clients.  The caseworker stated his supervisor frequently reminded him to enter his information into SACWIS and that his field office had recently embarked on an initiative to increase overall diligence in SACWIS compliance.

In a separate interview with the OIG, the caseworker's supervisor said she was aware the caseworker's failure to note his contacts in SACWIS was a problem but she never had cause to believe he was not performing his duties.  She had spoken to the caseworker repeatedly about the need to perform this task but had never disciplined him for not following through.  The OIG found the supervisor also neglected to utilize SACWIS to document her work on cases, as required by the Department.  During the two years the caseworker managed the ward's case, the supervisor had produced five handwritten quarterly reports, only one of which was recorded in SACWIS.

The SACWIS system was established to allow involved child welfare professionals to immediately access pertinent information regarding wards and the services they are provided.  Failure to ensure entries are made in a diligent and timely manner greatly reduces the system's effectiveness.  Furthermore, SACWIS documentation is a requirement for federal reimbursement for providing services.  Neglecting to comply with these regulations jeopardizes the uninterrupted transfer of vital funds from the federal government to the Department.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.   The caseworker should be disciplined for his failure to comply with SACWIS documentation standards.** |
|---|---|

The caseworker received a suspension.

**2.   The caseworker's supervisor should be disciplined for her failure to implement progressive discipline for the caseworker for his chronic lack of documentation and her failure to use SACWIS to document her quarterly review of cases.**

The supervisor received a suspension.

**3.  The supervisor should schedule one set day a week that the caseworker is required to remain in the office to complete SACWIS documentation on his cases.  The supervisor must continue to monitor that the caseworker is remaining in the office and entering his SACWIS contact notes in a timely manner.**

The supervisor has been monitoring the employee's completion of notes on a weekly basis and ensuring that his SACWIS documentation is up to date.  The supervisor set a specific time each week for the employee to complete the notes.

**DEATH AND SERIOUS INJURY INVESTIGATION 15**

| **ALLEGATION** | Two brothers, ages six and eight, died as a result of a fire in their home.  The boys had been the subjects of a child protection investigation that was unfounded four months prior to their deaths. |
|---|---|

| **INVESTIGATION** | The family's involvement with the Department began with a hotline report alleging both boys had suffered cuts, welts and bruises inflicted by their father.  During the |
|---|---|

subsequent child protection investigation, it was learned that the boys and their nine year-old sister were living with their father while their parents were engaged in a custody dispute.  The father attributed the boys' injuries to a game they played by sliding down a flight of stairs in the house on their backs.  All three children denied any physical abuse by their father.  It was noted that the three siblings had each been diagnosed with autism with the eight year-old boy's case being the most severe.  While the case was still pending, the mother was granted sole custody of the children by the court.  The report against the father was ultimately unfounded.

Four months after the case was closed, firefighters and police responded to a fire at the mother's home.  The mother had responded to cries for help coming from the boys' bedroom and had attempted to combat the blaze along with her boyfriend, who was also present in the home at the time.  Both boys died in the fire and the county coroner determined the children had succumbed to the effects of smoke inhalation.  Police and fire department investigators who examined the scene noted a large amount of cigarette lighters found throughout the house that were easily accessible to children, including one located in the boys' room among the debris from the fire.  The mother told the fire marshal she had caught the boys playing with a lighter earlier during the day of the fire and had spanked them and warned them of the potential dangers.  She also stated she had previously found lighters in the boy's bedroom.  Fire officials also noted that although there were two smoke detectors in the home, neither was operational.

The child protection investigator assigned to the case spoke to the fire marshal who expressed his belief the cause of the fire was most likely accidental.  Although a conclusive determination could not be made, the consensus of involved officials was that the fire was probably caused by the boys playing with a lighter in their bedroom.  The child protection investigator conducted all necessary interviews and completed a Child Endangerment Risk Assessment Protocol (CERAP) that determined the nine year-old girl to be safe in her mother's home.  After reviewing the case with a panel of fellow workers and consulting with and gaining the approval of her supervisor, the investigator unfounded the report of death by neglect against the mother.

In an interview with the OIG, the investigator stated her decision to unfound the report was based on her determination the fire was a tragic accident.  In her case record the investigator noted that children playing with flammable materials was a common occurrence.  The investigator did not consider the totality of factors that led to the fire; the abundance of lighters in the home, the children's cognitive limitations and history of playing with lighters, and the absence of an operational warning system.  The investigator also failed to give adequate consideration to the fact the mother had found the boys playing with a lighter earlier the same day and was present in the home when the fire began.  The supervisor who approved the investigator's finding had only been in her position for 10 days at the time the case was closed and had little familiarity with the details of the case.  Both the investigator and the current supervisor stated they felt a great deal of empathy for the mother because of the loss of her children and conceded their feelings may have influenced their decision to unfound the report.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The Department administrator for the region should review this report and conduct non-disciplinary counseling with the child protection investigator and her current supervisor for** |
|---|---|

**failing to maintain their objectivity when unfounding this case.  The discussion should also focus on the vulnerability of decision makers when confronted with emotionally charged cases.**

Non-disciplinary counseling was conducted with both employees.

## CHILD DEATH REPORT

The Office of the Inspector General (OIG) investigates the deaths of Illinois children whose families were involved in the child welfare system within the preceding twelve months.  The OIG receives notification from the Illinois State Central Register (SCR) when a child dies, when the death is reported to SCR.[2]  The OIG investigates the Department's involvement with the deceased and his or her family when (1) the child was a ward of DCFS; (2) the family is the subject of an open investigation or service case at the time of the child's death; or (3) the family was the subject of an investigation or service case within the preceding twelve months.[3]  If the OIG learns of a child death meeting this criteria that was not reported to the SCR, the office will still investigate the death.

Notification of a child's death initiates a preliminary investigation in which the death report is reviewed, databases are searched and results reviewed, autopsy reports are requested, and a chronology of the child's life, when available, is reviewed.  The next level of investigation is an investigatory review of records in which records may be impounded, subpoenaed, or requested, and reviewed. When warranted, OIG investigators conduct a full investigation, including interviews.  A full investigation usually results in a report to the Director of DCFS.  The majority of cases are investigatory reviews of records, often including social service, medical, police and school records, in addition to records generated by the Department.

Cases, individually, may not rise to a level necessitating a full investigation, but collectively can indicate systemic patterns or problems that require attention.  The OIG continues to address systemic issues through a variety of means, including cluster reports, initiatives, and trainings.  Systemic issues previously addressed include: substance abuse, infant sleep safety, and home safety.  Unfounded or pending cuts, bruises and welts investigations have often preceded child deaths so in this fiscal year, the OIG, in conjunction with the Department and the Juvenile Protective Association, completed Error Reduction Training for child protection investigations of cuts, bruises and welts. **See Error Reduction Training on page 145**.

In Fiscal Year 2009 the OIG investigated **89** child deaths meeting criteria for review, a decrease from 99 deaths in FY 2008, and a further decrease from 111 deaths in FY 2007.  A description of each child's death and DCFS involvement is included in the annual report for the fiscal year in which the child died. This year's annual report includes summary information for children who died between July 1, 2008 and June 30, 2009.  During this fiscal year, a preliminary investigation was conducted in **1** case; investigatory reviews of records were conducted in **63** cases; and full investigations were opened in **25** cases:  **7** investigations have been completed, with reports to the Director; **18** investigations are pending (4 for a

---

[2] SCR relies on coroners, hospitals, and law enforcement in Illinois to report child deaths, even when the deaths are not suspicious for abuse or neglect.  The deaths are not always reported.  Therefore, true statistical analysis of child deaths in Illinois is difficult because the total number of children who die in Illinois each year is unknown.  The Illinois Child Death Review Teams have requested that individual county registrars forward child death certificates to SCR to compile a list of all the children who die in Illinois.  It is not known whether this is regularly occurring; in addition, some death certificates are sent to the Child Death Review Team Coordinator well after the fiscal year in which the death occurred.  The Cook County Medical Examiner's policy is to report the deaths of all children autopsied at the Medical Examiner's office.  The OIG acknowledges all the county coroners and the Cook County Medical Examiner's Office for responding to our requests for autopsy reports.
[3] Since the implementation of SACWIS, some investigations are expunged from the system in less than a year. Therefore, not all child deaths actually meeting the criteria for review are brought to the attention of the OIG.  The OIG and the Department are developing language to submit to the Legislature to amend ANCRA to keep investigations in SACWIS for a minimum of 12 months.

cluster report). Comprehensive summaries of death investigations reported to the Director in FY 09 are included in the Investigation section of this annual report.

**Summary**
Following is a statistical summary of the 89 child deaths investigated by the OIG in FY 09, as well as summaries of the individual cases. The first part of the summary presents child deaths by age and manner of death, case status and manner of death, county and manner of death, and substance exposure status and manner of death. The second part presents a summary of deaths classified in five manners: homicide, suicide, undetermined, accident, and natural. [4]

*Key for Case Status at the time of OIG investigation:*

Ward . . . . . . . . . . . . . . . . . . . . . Deceased was a ward

Unfounded DCP . . . . . . . . . . . Family had an unfounded DCP investigation within a year of child's death

Pending DCP . . . . . . . . . . . . . Family was involved in a pending DCP investigation at time of child's death

Indicated DCP . . . . . . . . . . . . Family had an indicated DCP investigation within a year of child's death

Child of Ward . . . . . . . . . . . . Deceased was a ward's child, but not a ward themselves

Open/Closed Intact . . . . . . . . Family had an open intact family case at time of child's death / or within a year of child's death

Open Placement . . . . . . . . . . . Deceased, who never went home from hospital, had sibling(s) in foster care

Split Custody . . . . . . . . . . . . . Deceased, who was at home with family, had sibling(s) in foster care (or out of home pursuant to a DCFS safety plan)

Preventive Services/
Extended Family . . . . . . . . . . . Intact family case was opened to assist family, but not as a result of an indicated DCP investigation

Return Home . . . . . . . . . . . . . Deceased or sibling(s) was returned home to parent(s) from foster care within a year of child's death

Child Welfare
Services Referral . . . . . . . . . . . A request was made for DCFS to provide services, but no abuse or neglect was alleged

---

[4] The causes and manners of death are determined by hospitals, medical examiners, coroners and coroners' juries.

**Table 1: Child Deaths by Age and Manner of Death**

| | Child Age | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|---|
| Months of Age | At birth | | | | | 1 | 1 |
| | 0 to 3 | 1 | | 4 | 5 | 11 | 21 |
| | 4 to 6 | 1 | | 2 | 4 | 1 | 8 |
| | 7 to 11 | 1 | | | 2 | | 3 |
| | 12 to 24 | 1 | | 1 | 1 | 4 | 7 |
| Year of Age | 2 | | | | 2 | 2 | 4 |
| | 3 | 3 | | | 2 | 2 | 7 |
| | 4 | | | 1 | 3 | | 4 |
| | 5 | | | 1 | | 1 | 2 |
| | 6 | | | | 1 | 1 | 2 |
| | 7 | 1 | | | 2 | 2 | 5 |
| | 8 | | | | | 1 | 1 |
| | 9 | | | | | 1 | 1 |
| | 10 | | 1 | | 1 | | 2 |
| | 11 | | | | | | 0 |
| | 12 | 1 | | | | | 1 |
| | 13 | | 1 | | 1 | | 2 |
| | 14 | | | | 1 | 2 | 3 |
| | 15 | 3 | | | | 1 | 4 |
| | 16 | | | | 1 | 1 | 2 |
| | 17 | 2 | | | 1 | 2 | 5 |
| | 18 or older | 2 | 2 | | | | 4 |
| | TOTAL | 16 | 4 | 9 | 27 | 33 | 89 |

**Table 2: Child Deaths by Case Status and Manner of Death**

| Reason for OIG investigation* | | Homicide | Suicide | Undetermined | Accident | Natural | Total |
|---|---|---|---|---|---|---|---|
| DCP | Pending | 2 | | 2 | 4 | 6 | 14 |
| | Unfounded | 2 | 1 | 2 | 7 | 7 | 19 |
| | Indicated | | | | 3 | 1 | 4 |
| Ward | | 4 | 3 | 1 | 4 | 9 | 21 |
| Return Home | | | | | 1 | | 1 |
| Open Placement | | | | 1 | | | 1 |
| Open Intact | | 2 | | 1 | 4 | 5 | 12 |
| Closed Intact | | 2 | | 1 | 1 | 2 | 6 |
| Split custody | | 1 | | 1 | 2 | 1 | 5 |
| Child of Ward | | 1 | | | 1 | | 2 |
| Preventive Services/Extended Family | | 2 | | | | 1 | 3 |
| Child Welfare Services Referral | | | | | | 1 | 1 |
| TOTAL | | 16 | 4 | 9 | 27 | 33 | 89 |

* This was the primary reason for OIG investigation.

Table 3: Child Deaths by County of Residence and Manner of Death

| County** | Homicide | Suicide | Undetermined | Accident | Natural | TOTAL |
|---|---|---|---|---|---|---|
| Champaign | | | | 2 | 1 | 3 |
| Christian | | | | 1 | | 1 |
| Coles | | | | 1 | | 1 |
| Cook | 10 | 2 | 1 | 8 | 14 | 35 |
| Du Page | 1 | 1 | | | 1 | 3 |
| Edwards | | | 1 | | | 1 |
| Effingham | | | 1 | | | 1 |
| Franklin | | | | 1 | | 1 |
| Fulton | | | | | 1 | 1 |
| Kane | | | | 1 | 2 | 3 |
| Kankakee | | | 1 | | | 1 |
| Lake | | | | 1 | | 1 |
| LaSalle | | | | | 1 | 1 |
| Livingston | | | 1 | | | 1 |
| Logan | | | | | 1 | 1 |
| Macon | | | | | 1 | 1 |
| Macoupin | | | | | 1 | 1 |
| Madison | 2 | | | | | 2 |
| McHenry | | | | 2 | | 2 |
| McLean | | | | 1 | | 1 |
| Peoria | 1 | | | 1 | 1 | 3 |
| Perry | | | | 2 | | 2 |
| Randolph | | | | | 1 | 1 |
| Richland | | | | 1 | | 1 |
| Saline | | | 1 | | 1 | 2 |
| Sangamon | | | 1 | 1 | | 2 |
| Stark | | | | | 1 | 1 |
| Stephenson | | | | | 2 | 2 |
| Will | 1 | 1 | | 1 | 3 | 6 |
| Williamson | 1 | | 1 | 1 | | 3 |
| Winnebago | | | 1 | 2 | 1 | 4 |
| **TOTAL** | 16 | 4 | 9 | 27 | 33 | 89 |

** Some children died in counties outside of their county of residence.

**Table 4: Child Death by Substance Exposure and Manner of Death**

| Substance exposure | Homicide | Undetermined | Accident | Natural | TOTAL |
|---|---|---|---|---|---|
| Child exposed at birth*** | 0 | 3 | 4 | 4 | 11 |
| Mother has history of substance abuse | 0 | 1 | 3 | 0 | 4 |

*** This includes children who tested positive for a substance at birth or whose mother tested positive for a substance at birth.  Others may have been exposed to drugs during their mother's pregnancy, but the drug use was not recent enough to cause the newborn or mother to test positive.

## FY 2009 DEATH CLASSIFICATION BY MANNER OF DEATH

### HOMICIDE
**Sixteen (16)** deaths were classified homicide in manner.

| Cause of death | Number |
|---|---|
| Gunshot wound(s) | 6 |
| Multiple Injuries due to child abuse | 4 |
| Abusive head trauma | 3 |
| Smothering | 1 |
| Inhalation injuries due to fire | 1 |
| Stab Wounds and strangulation | 1 |
| **TOTAL** | **16** |

### PERPETRATOR INFORMATION:

| Perpetrator | Number* |
|---|---|
| Father | 1 |
| Mother | 3 |
| Mother's Boyfriend | 2 |
| Stepmother | 1 |
| Uncle | 1 |
| Brother | 1 |
| Brother-in-law | 1 |
| Unrelated Peer | 4 |
| Unrelated Adult | 1 |
| Unknown/Unsolved | 3 |

\* In two deaths, there was more than one perpetrator.

| Perpetrator sex | Perpetrator age range | Charges |
|---|---|---|
| Males | 9-40 | 7 have been charged and await trial; 2 have been convicted for murder or assault |
| Females | 18-29 | 2 have been charged and await trial; 1 has been convicted |

## SUICIDE
**Four (4)** deaths were ruled suicide.

Three children had a cause of death of hanging.
One child had a cause of death as gunshot wound.

## UNDETERMINED
A death is classified as undetermined in manner when there is insufficient information to classify the death as homicide, suicide, accident, or natural.  This situation usually arises because of deficiencies in investigation, most of which are impossible to overcome.  When a case is classified as undetermined, the decision usually lies between two of the four possible manners of death.  In nearly all cases involving infants and children the decision rests between homicide and two other possible manners: accident and natural.

**Nine (9)** deaths were classified undetermined in manner.

4 children had an undetermined cause (one of the 4 is pending).
2 children had a cause of prematurity (with maternal drug use).
2 children had a cause of drug overdose.
1 child had a cause of Sudden Unexplained Death in Infancy.

## ACCIDENT
**Twenty-seven (27)** deaths were classified accident in manner.

| Cause of death | Number |
|---|---|
| Asphyxia/sleep related deaths | 10 |
| Drowning | 5 |
| Injuries from Fire | 2 |
| Multiple injuries due to dog bites | 2 |
| Motor vehicle accident related injuries | 5 |
| Sudden Unexplained Death in Infancy (SUDI) | 1 |
| Anoxic brain injury due to drug overdose | 1 |
| Heat Stroke | 1 |
| **TOTAL** | **27** |

CHILD DEATH REPORT

## NATURAL

**Thirty-three (33)** deaths were classified natural in manner.

| Cause of death | Number |
|---|:---:|
| Cerebral Palsy | 1 |
| Complications from premature birth | 2 |
| Pneumonia or respiratory illness (including asthma) | 9 |
| Intrauterine Fetal Demise/Stillbirth | 1 |
| Sudden Infant Death Syndrome (SIDS) | 3 |
| Sudden Unexplained Death in Infancy (SUDI) | 1 |
| Cardiac disease or complications from heart problems | 2 |
| Metabolic Disorders | 1 |
| Seizure Disorder | 1 |
| Sepsis/Septic Shock | 4 |
| Complications of Sickle Cell Anemia | 1 |
| Chronic medical syndrome | 2 |
| Dehydration | 1 |
| Mononucleosis | 1 |
| Multiple congenital issues | 1 |
| Bowel problems | 2 |
| **TOTAL** | **33** |

## HOMICIDE

| Child No. 1 | DOB 7/07 | DOD 7/08 | Homicide |
|---|---|---|---|
| Age at death: | Just shy of one year | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to child abuse | | |
| Perpetrator: | Mother's boyfriend | | |
| Reason For Review: | Open preventative services case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

**Narrative:**      Seventeen-year-old mother and her 17-year-old boyfriend reported that they noticed the 11-month-old baby having a seizure and called 911.  At autopsy the baby was found to have massive internal injuries, including lacerated and hemorrhaging organs, multiple rib fractures, and bruising to her chest and abdomen.  The boyfriend confessed to holding the baby against the wall and punching her in the stomach multiple times.  He was with the baby alone in a room with loud music playing.  Neither the infant's mother nor the boyfriend's mother, both of whom were present in the next room, were aware of what the boyfriend did to the child.  The boyfriend was charged with first degree murder.  He was indicated for death by abuse to the child.  The mother gave birth to her second child, the boyfriend's baby, in December 2008.  The hotline was called in April 2009 after the mother and paternal grandmother brought the baby to the hospital with an apparent seizure and hospital staff learned that the mother's first child was murdered.  A report of substantial risk of physical injury to the child was indicated; the mother and infant had been living with the paternal grandparents, but during the course of the investigation, the mother moved out, leaving the child with the paternal grandparents.  The mother completed a short-term guardianship statutory form giving the paternal grandparents temporary guardianship of the child.  The paternal grandparents have since filed for guardianship in probate court.

**Prior History:**    The 17-year-old's mother has a lengthy history with DCFS dating to 1991, primarily for issues of neglect.  The last indicated investigation involving the maternal grandmother's care of her own children was in 2000.  A preventative services case was open for 5 days in December 2007.  No records were available for review from that case, but the worker reported that the family was living in a car because of a house fire and she helped the family obtain housing advocacy and funds.  The maternal grandmother had been the primary caregiver of the deceased, however, four days before the child's death, the mother took her for a weekend visit and did not return her to her grandmother's care.

| Child No. 2 | DOB 9/95 | DOD 7/08 | Homicide |
|---|---|---|---|
| Age at death: | 12½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to blunt trauma due to child abuse | | |
| Perpetrator: | Brother-in-law | | |
| Reason For Review: | Pending DCP investigation at time of child's death; open intact family case at time of child's death | | |
| Action Taken: | Full investigation, Reports to Director 12/8/08 & 2/19/09 | | |

**Narrative:**      Twelve-and-a-half-year-old developmentally disabled boy died in the hospital a day after 911 was called to his home with a report that he was having a seizure.  The boy was severely physically abused.  His 42-year-old brother-in-law was charged with first degree murder, aggravated battery of a child, and unlawful restraint.  He was indicated for the child's death.  His wife was indicated for substantial risk of physical injury to all the children in the home because she was aware of the abuse taking place in the home and did not take action to stop it.  The deceased's siblings and the couple's own children were removed from their care and placed in foster care.

Prior History:    The child was the youngest of five male siblings who had been adopted nine years earlier.  Four of the boys including the deceased were developmentally delayed.  In November 2007, after their adoptive parents died, the adoptive father's adult daughter, her husband, and their five children moved into the home and assumed responsibility for the boys' care.  From December 2007 through June 2008, eight calls were made to the hotline expressing concern about the boys.  Two child protection investigations were initiated.  A December 2007 investigation was unfounded for cuts, bruises and welts.  An April 2008 investigation was pending at the time of the child's death as was an adoption home study.  In June 2008, while the investigation and home study were pending, an intact family case was opened but services had not yet been implemented at the time of the child's death.  See Death and Serious Injury Investigations 2 and 3.

| Child No. 3 | DOB 3/93 | DOD 7/08 | Homicide |
|---|---|---|---|
| Age at death: | 15 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gun shot wound to head | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fifteen-year-old boy and his cousin were sitting on the back porch of their aunt's home where the boy lived.  Shortly after 10:00 p.m. an unknown person opened fire from the alley shooting the boy in the head and his cousin in the leg.  The cousin crawled into the home and a family member called 911.  A police investigation of the boy's murder remains unsolved but open.

Prior History:    Four months before the boy's death, the hotline was called with a report that the boy ran away from home after he was accused of hurting his younger brother; he was afraid to go home because his stepfather had choked him in the past.  He was staying with a maternal aunt.  Following police and child protection investigations, the boy was indicated for abusing his 4-year-old brother and was referred to an offender program.  The stepfather was not indicated.  The mother and stepfather refused to allow the boy to return home.  The aunt was willing to keep the boy.  The investigator worked with the mother to give her sister temporary guardianship of the boy and accept services from the Department.  An intact family case was opened to assist the aunt with obtaining private guardianship of the boy and to facilitate counseling for the boy and his mother, who was trying to find time in her schedule.  Following the boy's death, family members were offered grief counseling; only the aunt participated.  The mother refused services for herself or her younger children and the case was closed in January 2009.

| Child No. 4 | DOB 7/93 | DOD 7/08 | Homicide |
|---|---|---|---|
| Age at death: | Just shy of 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gunshot wound of the pelvis | | |
| Perpetrator: | 19-year-old neighbor charged | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fifteen-year-old child was asked by his mother to open the door for a 19-year-old neighbor.  When he did, he was shot by another man.  The neighbor has been charged with first-degree murder.  Prosecutors allege the shooter asked the neighbor to get someone to answer the door so he could go inside and kill two people and that the neighbor agreed to help because he wanted to gain status in the neighborhood and with the shooter.

Prior History:   In October 2007 the deceased's mother was investigated for lock-out of a 17-year-old cousin for whom she was the guardian.  The investigation was unfounded because the guardian and teenager both reported that the teenager had been living with her adult brother with the permission of the guardian.  That arrangement had recently ended and the teenager was staying with a friend and her parents.  The teenager agreed to move back into her guardian's home and the investigator made an unannounced visit to the home to verify that she had moved back in.

| Child No. 5 | DOB 8/89 | DOD 7/08 | Homicide |
|---|---|---|---|
| Age at death: | 18 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple stab wounds and strangulation | | |
| Perpetrator: | Unrelated 21-year-old male | | |
| Reason For Review: | Teenager was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Eighteen-year-old ward was found by a maintenance worker behind a building.  She was strangled and stabbed by a young man whom she knew.  The man was tried and convicted of first degree murder.

Prior History:       The teenager entered foster care in 1991 when her mother left her with a relative and failed to return.  Her parents' rights were terminated in 1999 and she had a goal of adoption until March 2007 when it was changed to independence because of her age and the availability of services if she were to remain a ward.  Shortly thereafter she was asked to move out of the foster home in which she had been placed for over three years because she was no longer following house rules.  The teenager increasingly tested her independence by not going to school, coming home late, and wanting to go out of town to visit siblings.  She also expressed a desire to be released from guardianship.  In the final month of her life, the ward was being assessed to determine her eligibility for Supplemental Security Income (SSI) and an adult program with the Illinois Department of Human Services.  She also had a permanency review hearing in which the goal of substitute care pending independence was maintained.

| Child No. 6 | DOB 1/91 | DOD 9/08 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gun shot wounds | | |
| Perpetrator: | Unrelated juvenile | | |
| Reason For Review: | Extended Family Support Services referral within one year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Police received an anonymous call about a "man down."  They responded to a vacant lot where they found a 17-year-old boy with multiple gunshot wounds to his body.  The boy was already dead.  An unrelated juvenile has been charged with his murder.

Prior History:   The boy's mother has a long history of substance abuse that resulted in her inadequately caring for her son and his younger sister.  Beginning in 2005, the children lived primarily with their maternal grandmother.  In April 2008, the grandmother called the hotline requesting financial assistance in the care of the children.  DCFS referred the grandmother to Extended Family Support Services.  A worker helped the grandmother apply for a Department of Human Services grant and provided monetary assistance for bedding, clothing and personal care items for her grandchildren.  The worker tried to help the grandmother obtain legal guardianship of her grandchildren, but adult members of the grandmother's household would not provide the personal information necessary to conduct child abuse & neglect and criminal history background checks.  The case was closed in June 2008.  The deceased had involvement with the criminal justice system from May 2006 through October 2007.  In the months leading up to his death, the boy had gotten a mentor, had changed high schools, and was not arrested.

| Child No. 7 | DOB 10/92 | DOD 9/08 | Homicide |
|---|---|---|---|
| Age at death: | Just shy of 16 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Split custody, child had a brother in foster care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    An unknown person called 911 after discovering the teenager, just shy of his sixteenth birthday, lying unresponsive in an alley.  He was a gunshot victim.  A police investigation of the teenager's murder remains unsolved but open.

Prior History:  The deceased was the oldest of four boys.   In November 2007, the maternal grandmother called the hotline stating that she had been taking care of the three oldest boys, but was kicked out of her apartment and could no longer care for the boys because they refused to stay in a shelter with her.  She did not know where their mother was and had no way to contact her.  The children were taken into protective custody.  The deceased was released to the care of his father who lived in a neighboring state.  The second boy was released to the care of his paternal grandmother who wanted no DCFS involvement, but in March 2009 he became a ward of DCFS through a dependency petition.  He has been in multiple placements and is currently on run.  The third boy was placed in foster care.  He has had a number of problems and has been in multiple placements.  He is currently in juvenile detention.  The fourth child was located with his mother with whom he was allowed to remain.  He later went to live with his maternal grandmother and has not been DCFS-involved.  It is unknown when or how the deceased returned to Illinois and where or with whom he was living at the time of his death.

| Child No. 8 | DOB 9/05 | DOD 9/08 | Homicide |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Smothering | | |
| Perpetrator: | Mother | | |
| Reason For Review: | Deceased was the child of a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:    18-year-old ward put her hand over her 3-year-old daughter's mouth and nose until she could not breathe any longer.  The ward has been charged with first degree murder and is in jail awaiting trial.  She was indicated for death by abuse to her daughter.

Prior History:    The family has an extensive history with DCFS dating to 1979 when the ward's father was referred for services at the age of five.  The ward was involved with DCFS most of her life, with two periods of wardship and both of her parents surrendering their parental rights.  The ward struggled with her own issues of abuse and neglect as she tried to parent her daughter.  The deceased was in foster care from March 2006 until July 2007 when she returned to her mother's care.

| Child No. 9 | DOB 3/91 | DOD 10/08 | Homicide |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple gunshot wounds | | |
| Perpetrator: | Unknown | | |
| Reason For Review: | Open intact family case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Seventeen-year-old boy and a 14-year-old friend were standing on the sidewalk in front of the friend's home around 8:00 p.m. when they were approached by another male.  The male fired a gun striking the teen several times and then fled the scene.  A police investigation remains open; no suspects have been identified.

Prior History:    The boy was in the guardianship of his maternal grandmother with whom he lived.  He was the oldest of three boys.  His family came to the attention of DCFS in August 2005 when his youngest brother was born substance-exposed.  The 37-year-old mother was indicated for substance misuse and an intact family case was opened.  The mother and children resided with the maternal grandmother and the mother completed substance abuse treatment.  The intact family case was open for just over two years and closed in November 2007.

| Child No. 10 | DOB 8/08 | DOD 11/08 | Homicide |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to blunt trauma due to child abuse | | |
| Perpetrator: | Mother and Father | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:    Three-month-old infant was brought unresponsive to the hospital by his 27-year-old mother and 27-year-old father.  The infant was found to have head injuries from which he died two days later.  At autopsy he also was discovered to have fractured ribs.  The parents were indicated for death and head injuries by abuse and for substantial risk of physical injury to their two older children from prior relationships.  A police investigation remains open.

Prior History:    The infant's parents brought him to the hospital limp and non-reactive when he was 18 days old.  He was discovered to have a head injury and bilateral fractures in his legs.  Both injuries were ascertained to be from accidents based on limited information.  The infant returned home after being treated in the hospital and an intact family case was opened.

| Child No. 11 | DOB 5/88 | DOD 12/08 | Homicide |
|---|---|---|---|
| Age at death: | 20 years | | |
| Substance exposed: | No | | |
| Cause of death: | Gun shot wound of neck | | |
| Perpetrator: | 27-year-old unrelated male, alleged | | |
| Reason For Review: | Deceased was a ward | | |
| Action Taken: | Full investigation, Report to Director 6/16/09 | | |

Narrative:    Twenty-year-old ward was killed with one gun shot through the neck.  A friend who was shot in the foot and the hip survived.  A 27-year-old suspect, believed to be a rival gang member, was arrested the same night after his home security camera filmed him shooting the victims.  The shooting was allegedly in response to the two victims earlier trying to set his car on fire.

Prior History:    The deceased was in state care from January 1996 until March 1998 when a great-aunt was awarded subsidized guardianship.  In November 2004, he reentered state care on a dependency petition because his aunt could no longer control his behavior.  At the time of his death, the ward was in a self-selected placement and was working.  See Death and Serious Injury Investigation 14.

| Child No. 12 | DOB 7/05 | DOD 1/09 | Homicide |
|---|---|---|---|
| Age at death: | 3½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Closed head injury | | |
| Perpetrator: | Mother and Mother's boyfriend | | |
| Reason For Review: | Open intact family case and pending DCP investigation at time of child's death | | |
| Action Taken: | Full investigation, Report to Director 6/16/09 | | |

Narrative:     Three-and-a-half-year-old child was brought to the hospital with severe head injuries from which he died three days later.  His 27-year-old mother and her 22-year-old boyfriend have been charged with first degree murder and are in jail awaiting trial.  They were also indicated by DCFS for the child's death.  When she was jailed, the mother was pregnant with her and the boyfriend's child.  She subsequently gave birth and the child was placed in the private guardianship of a maternal relative.

Prior History:    In September 2008 the Department investigated the first of three child protection investigations involving bruises to this child which began appearing shortly after he and his mother moved in with her boyfriend.  At the time of the child's death, there was an open intact family case and an ongoing juvenile protection court case.  See Death and Serious Injury Investigation 1.

| Child No. 13 | DOB 5/01 | DOD 1/09 | Homicide |
|---|---|---|---|
| Age at death: | 7 years | | |
| Substance exposed: | No | | |
| Cause of death: | Inhalation injuries due to an apartment fire | | |
| Perpetrator: | 18-year-old unrelated male | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Seven-year-old died in an apartment fire.  Her 23-year-old mother also died after she went back in to look for the child.  The mother was pregnant and had a four-year-old son who lives with his father.  A police investigation determined that the fire in the 3-unit building was intentionally set to kill a rival gang member.  The mother and her child were not the intended targets, but rather innocent victims of gang violence.  An 18-year-old gang member, who acted as the look-out has been charged with two counts of first degree murder and aggravated arson.

Prior History:    In December 2008 the hotline was called alleging that the mother allowed her 7-year-old daughter to walk to and from school alone.  An investigation for inadequate supervision was unfounded.  The single mother was working overtime and was paying a seventeen-year-old relative to pick her daughter up from school.  The relative admitted that he watched the child from the apartment window which was directly across the street from the school.  DCFS suggested a new care plan for the child.

| Child No. 14 | DOB 9/08 | DOD 2/09 | Homicide |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | Yes, marijuana | | |
| Cause of death: | Multiple injuries due to blunt trauma | | |
| Perpetrator: | 9-year-old brother | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Eighteen-year-old maternal aunt was babysitting her 5-month-old and 9-year-old nephews who were wards placed with the 45-year-old maternal grandmother.  The aunt reported that the 9-year-old told her that he left the 5-month-old to go to the bathroom.  He returned when he heard the baby yelling and found that the baby had fallen off the bed onto the floor.  The boy's explanations were inconsistent with the infant's injuries and the boy later admitted that he had been practicing wrestling moves on the bed with his brother and he kept "accidentally" injuring the baby with his moves.  The boys had been in an upstairs bedroom and his aunt was downstairs.  The aunt was indicated for the baby's injuries as well as inadequate supervision of the boys given the 9-year-old's prior behavior problems.  Since March 2009 the boy has been placed with a foster parent who is trained to attend to his special needs.

Prior History:    The children were removed from their 27-year-old mother's care following the birth of the infant.   The mother was exhibiting bizarre behavior that was determined to place the children at substantial risk of physical injury.   The children entered foster care and were placed with their maternal grandmother.   In December 2008 the 9-year-old was taken to the hospital by his mother because he had an abscess on his face.   The child reported being struck by his 18-year-old maternal aunt with a belt. The aunt was unfounded for cuts, bruises, welts, but the grandmother was indicated for inadequate supervision and substantial risk of physical injury to the child for allowing his mother to have unsupervised contact with him.   The agency servicing the case was looking for another foster home for the children at the time of the baby's death.   The mother gave birth to another child in July 2009.   He entered foster care when released from the hospital following his birth; he is placed in a non-relative foster home.

| Child No. 15 | DOB 4/07 | DOD 3/09 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 22 months |
| Substance exposed: | No |
| Cause of death: | Non-accidental head trauma |
| Perpetrator: | Step-mother |
| Reason For Review: | Open intact family case within a year of child's death |
| Action Taken: | Full investigation pending |

Narrative:     Twenty-two-month-old boy was being cared for by his 29-year-old step-mother while his father was working.   The step-mother called the father to tell him the child was injured in a fall.   911 was called and the child was taken to the local hospital and then airlifted to another hospital.   His injuries were inconsistent with the step-mother's explanation and she later confessed to throwing the child against a door with such force it left him unconscious.   She was angry with the child because he did not want to go to bed.   The step-mother pled guilty to first degree murder and is awaiting sentencing. She also was indicated for death by abuse to the boy.   The 33-year-old father had married the step-mother ten days earlier after a four month courtship.   The boy normally lived with his mother but had been staying with his father for several months.   At the time of his death, the child had old bruises on him.   The father explained that whenever his son had an injury, the step-mother would say it was self-inflicted during a temper tantrum.

Prior History:    The deceased and his father had no prior involvement with the Department.   The step-mother had an intact family case open on her and her two younger children (her two older children lived with their father) from November 2007 through November 2008.   The case was initiated after the mother was indicated for substantial risk of physical injury in an October 2007 child protection investigation. Investigations in August and September 2008 were unfounded.

| Child No. 16 | DOB 10/05 | DOD 3/09 | Homicide |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 years |
| Substance exposed: | No |
| Cause of death: | Complications of closed head trauma |
| Perpetrator: | Maternal uncle |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:     Three-year-old ward was found unresponsive in the morning by her foster mother.   The ward was medically complex as a result of head injuries inflicted on her at 4 months of age by her 17-year-old maternal uncle.   The uncle was babysitting while his sister and mother were grocery shopping, and he became frustrated with the infant.   He was sentenced to three years in prison for aggravated domestic battery.   He also was indicated by DCFS for the child's head injuries.

> Prior History:    After she was injured, the child spent two months in the hospital.  Upon her discharge, it was determined that because of their own health problems, neither the mother nor maternal grandmother could adequately care for the child, and she was placed in a foster home where her special needs could be addressed.

## SUICIDE

Three wards committed suicide this year as well as one child whose family had a brief encounter with the Department.  The OIG is investigating these deaths in conjunction with suicides in prior fiscal years for a cluster report and possible recommendations regarding suicide prevention.

## UNDETERMINED

| Child No. 21 | DOB 4/08 | DOD 8/08 | Undetermined |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Pending DCP investigation at time of child's death; unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-month-old infant was found unresponsive lying face down in the evening by family members.  No cause of death could be determined at autopsy.  The infant's manner of death was undetermined because the family gave more than one explanation about the infant's sleeping arrangements, first stating the infant was put to bed in his crib and found face down, and then stating he was placed to sleep face up on a full-sized bed and found face down.

Prior History:   There were two investigations concerning the infant's 11-year-old sister.  The first, in May 2008, was unfounded.  The second was pending at the time of the infant's death.  Both investigations were initiated after the 11-year-old told an adult that her mother had whipped her.  The first investigation was closed with a referral to community services and the parents' agreement to allow the 11-year-old to live with her maternal grandmother until services were under way.  Shortly thereafter, the second investigation was initiated but found to involve the same incident as the first since the child was still living with her grandmother.  The child exhibited troublesome behavior that her parents found difficult to manage.  The second investigation was closed with services in place for the child and parenting education for the mother.

| Child No. 22 | DOB 8/08 | DOD 8/08 | Undetermined |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Prematurity most likely due to cocaine abuse | | |
| Reason For Review: | Open placement case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Infant born at 19 weeks gestation died a couple of hours after birth.  The infant was born with cocaine in her system.  Her 25-year-old mother admitted to using cocaine within 48 hours of delivery.  She did not receive any prenatal care.  The mother was indicated for death by neglect.

Prior History:   The deceased was the mother's fourth child.  Her third child was born substance exposed in July 2007 and placed with his maternal grandmother where his older sisters already were residing by private agreement.  The mother never complied with services and the maternal grandmother planned to adopt the boy.  Sadly, the grandmother was diagnosed with breast cancer and died in November 2008.  The children were transitioned to the home of their maternal aunt in September 2008.  She is in the process of obtaining guardianship of the girls and adopting the boy.

| Child No. 23 | DOB 7/08 | DOD 8/08 | Undetermined |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Undetermined | | |
| Reason For Review: | Split custody, child had siblings in foster care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Six-week-old infant was found unresponsive at around 3:00 a.m. by her 27-year-old mother and 26-year-old father.  She had been sleeping between her parents on an adult mattress.

Prior History:   The mother has a history with DCFS dating to 1998.  The deceased was the mother's eighth child.  Her five oldest children were adopted by the same foster parent.  Her two younger children are placed in a foster home together and have a goal of adoption.  Agency workers, who were managing the younger children's cases, were unaware that the mother was pregnant.  Mother denied being pregnant and did not inform agency workers when she gave birth.  When workers saw the mother a few weeks later, she told them that she was on a diet and had lost weight.

| Child No. 24 | DOB 8/08 | DOD 8/08 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 25 days |
| Substance exposed: | Yes, opiates, morphine, hydromorphone |
| Cause of death: | Undetermined |
| Reason For Review: | Pending DCP investigation at time of child's death; unfounded DCP investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:        Twenty-five-day-old infant was found unresponsive by his 24-year-old mother after she had fallen asleep while feeding him propped up on pillows in an adult bed in the early morning.

Prior History:   In May 2008 the hotline was called with an allegation of cuts, bruises, welts to the deceased's 4½-year-old sibling.  The boy told his day care provider that his dad (mother's boyfriend and father of the unborn infant) hit him on the side of his head and he fell on Legos.  The investigation was unfounded because the child had no injuries, the boyfriend denied hitting the child, and family members reported no concern about the boyfriend's treatment of the boy.  At the time of the infant's death, there was a pending DCP investigation alleging substance misuse by the mother because of various drugs found in the mother and infant's systems at the infant's birth.  The mother had prescriptions for the drugs, but following the infant's death she was indicated for substance misuse by neglect because she admitted to using vicodin without a prescription during her pregnancy.  Services were offered to the family, but they were refused.

| Child No. 25 | DOB 10/07 | DOD 10/08 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 12 months |
| Substance exposed: | No |
| Cause of death: | Overdose of morphine |
| Reason For Review: | Child was a ward |
| Action Taken: | Full investigation, Report to Director 5/13/09 |

Narrative:        Twelve-month-old ward was found unresponsive by his 14-year-old cousin with whom he lived.  Initially, the child was thought to have died from a respiratory infection because he had had cold symptoms.  However, a toxicology test completed at autopsy revealed that he had approximately ten times the amount of morphine in his system that an adult might have if prescribed morphine, and the child had never been prescribed any opiates, including morphine.  The 35-year-old relative foster mother reported giving the child cough medicine, but the medicine removed from the home by police did not contain an opiate.  Thirteen days before he died, the child was diagnosed with an upper respiratory infection and bronchitis and was prescribed nasal drops and an albuterol inhaler and the foster mother never filled the prescriptions.  Police and DCP investigations remain open.

Prior History:        The Department became involved with this family in February 2008 when the hotline was called alleging domestic violence to the child's 15-year-old mother by the 22-year-old father.  The father was indicated for substantial risk of physical injury to the child and an intact family case was opened on the mother and son.  In April 2008, the six-month-old boy entered foster care because the mother violated a safety plan that she was to have no unsupervised contact with him.  The boy was placed in the home of his mother's half-sister where he remained until his death.  See Death and Serious Injury Investigation 12.

| Child No. 26 | DOB 1/09 | DOD 1/09 | Undetermined |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Prematurity | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Baby girl died shortly after birth at almost 23 weeks gestation.  Her 27-year-old mother tested positive for cocaine and admitted to using cocaine within 24 hours of giving birth.  The mother was indicated for substantial risk of physical injury to her surviving 9-month-old infant; he entered foster care and was placed with his maternal grandfather.

Prior History:     The mother was indicated for substantial risk of physical injury to her 7-month-old son in November 2008 when she was pregnant with the deceased.  The mother was using marijuana and cocaine.  An intact family case was opened on the mother and child who resided with the maternal aunt and grandmother.  During the two months the case was open before she gave birth, the mother attended counseling and participated in substance abuse treatment, however, she also continued to use drugs.

| Child No. 27 | DOB 12/08 | DOD 5/09 | Undetermined |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) with other potentially significant conditions of chronic tracheitis (bacterial infection of the trachea), clinical upper respiratory infection and co-sleeping with parent | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Five-month-old infant was found unresponsive in the morning by his 30-year-old father.  The 23-year-old mother reported that she had fed the baby at 7:30 a.m. and put him in bed with the father at 8:00 a.m.  At 8:30 a.m. the father awoke and the baby was unresponsive.  The father did not think that he rolled over on the baby.  The mother had taken the baby to a hospital emergency room the night before complaining that the baby was not feeding well, was congested and had a fever, diarrhea, sore throat and redness in his ears.  A doctor prescribed an antibiotic and a fever reducer/pain reliever and sent the infant home.  The father was unfounded for death by neglect.

Prior History:     The infant was the couple's second child together.  The mother has two additional children from a prior relationship.  In July 2008 the hotline was called with a report that the 23-month-old child had run into a lit cigarette that his step-father was holding.  The reporter was concerned because the child has asthma and the parents continued to smoke in the same room as the child.  A child protection investigation ensued.  The parents admitted that the child had run into the cigarette but stated it was an accident.  The child was not injured by the cigarette; his doctor had seen what appeared to be more of a scratch than a burn above the child's eye and was not concerned about it.  The doctor had told the parents they should not smoke around the child because of his asthma.  The parents reported that they smoke outside and the step-father only went into the home with the cigarette to get his nephew whose father was ready to leave after a visit.  The investigation was unfounded.

| Child No. 28 | DOB 6/03 | DOD 6/09 | Undetermined |
|---|---|---|---|
| Age at death: | 5½ years | | |
| Substance exposed: | Unknown, however, mother reported using methamphetamine during pregnancy | | |
| Cause of death: | Multiple drug toxicity | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Five-and-a-half-year-old child was found dead in his bed by his 24-year-old mother after she returned home from visiting the emergency room because she had a sore leg.  The little boy had been sick for 3 to 4 days with stomach pain, vomiting, diarrhea, and at least one seizure.  The mother did not take the child to the doctor or hospital emergency room despite being advised by several people to seek medical care for the child and going to the emergency room herself the night the child died.  Instead, the mother had been giving the child codeine and Benadryl to help him sleep.  The mother and 22-year-old stepfather were indicated for death by abuse and medical neglect and their two younger children, ages 1 and 2, entered foster care.  The children are placed together in the home of their maternal grandparents.  The mother and stepfather have been charged with drug induced homicide and involuntary manslaughter.

Prior History:   The mother was indicated on a January 2008 report for medical neglect to the child because she had failed to attend numerous medical appointments for the child's chronic ear problems.  The family was referred to community-based services.  An October 2008 report alleging cuts, bruises, welts and a March 2009 report alleging environmental neglect to the three children were unfounded.

| Child No. 29 | DOB 4/05 | DOD 6/09 | Undetermined |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 years |
| Substance exposed: | No |
| Cause of death: | Pending |
| Reason For Review: | Open intact family services case within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Four-year-old was taken to the hospital by her 28-year-old mother and the mother's 33-year-old boyfriend.  They reported finding her unresponsive and having seizures.  A CT scan revealed a large subdural hematoma and other injuries.  She also had large bald patches on her head, head lice, scabies, and rotten teeth.  The mother reported that the child had fallen and hit her head on concrete about 24 hours prior to becoming ill, but her injuries appeared inconsistent with that explanation.  The child underwent brain surgery during which she went into cardiac arrest and was put on life support.  Life support was removed two days later after it was determined that she had no brain function.  The mother had been dating the boyfriend for six months and had lived with him for the last three months.  A child protection investigation remains open; the child's cause and manner of death are pending.

Prior History:    The deceased was the mother's third child and the only one in her care.  Her oldest child was in the guardianship of his paternal grandmother and the other was given up for adoption.  The boyfriend has four children, all of whom live with their mothers.  The Department became involved with the mother in October 2007 when the mother passed out and was taken to the hospital where a drug screen was positive for methamphetamines.  The mother was indicated for substantial risk of physical injury to the deceased and an intact family case was opened.  The case was closed in November 2008 after the mother participated in substance abuse treatment and parenting education.  At the time of case closing, she had had negative drug screens for nine months, she and the deceased were living with the child's maternal great-grandmother, and she was not yet dating the boyfriend.

## ACCIDENT

| Child No. 30 | DOB 7/01 | DOD 7/08 | Accident |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 7 years |
| Substance exposed: | No |
| Cause of death: | Drowning in a swimming pool |
| Reason For Review: | Pending DCP investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Seven-year-old girl died while swimming in an above-ground swimming pool at a friend's house.  Her mother and the friend's mother and her boyfriend were present in the backyard, but not in the pool at the time.  The girl's drowning was determined to be accidental and a DCP investigation of the child's death was unfounded.  Services were offered to the mother for her and her two surviving younger children, but she declined them.

Prior History:  Twelve days prior to the girl's death, she and her 5-year-old brother were taken to the emergency room by their father; the children were sun-burned, the 5-year-old more seriously than the 7-year-old.  A nurse called the hotline alleging neglect.  The mother and daughter both reported that the mother had applied sunscreen to the children while at a friend's swimming pool and the doctor who treated the children in the emergency room stated that he did not consider the sunburn neglectful.  The investigation was unfounded following the death of the child.  There were two additional unfounded reports in the prior six months involving environmental neglect.

| Child No. 31 | DOB 4/08 | DOD 10/08 | Accident |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 5 months |
| Substance exposed: | No |
| Cause of death: | Sudden Unexplained Death in Infancy (SUDI) |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:     Five-month-old infant was found unresponsive in the morning by his 23-year-old aunt.  The infant was placed in foster care with his maternal grandparents and was regularly cared for by his aunt who lived in the home.  She slept with the infant in an adult bed in violation of licensing standards.  Police and DCFS investigation could not determine whether the aunt overlayed the infant, but both concluded that if she had, it was an accident.  By all accounts, the aunt loved the child and took excellent care of him.  The child's older sister was removed from the foster home and now lives with her paternal grandmother.

Prior History:     In February 2008, the 18-year-old mother and 19-year-old father lost custody of their 10-month-old daughter because of domestic violence between them and the mother's failure to attend to the infant's eye, ear, and yeast infections.  The infant was placed with her maternal grandparents.  When her brother, the deceased, was born two months later, he was also placed with the grandparents.  A third child born to the couple in September 2009 also entered foster care.  While no longer together, both parents are working toward the children's return home.

| Child No. 32 | DOB 8/94 | DOD 10/08 | Accident |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 14 years |
| Substance exposed: | No |
| Cause of death: | Craniocerebral injuries due to a fall from a moving vehicle |
| Reason For Review: | Unfounded DCP investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:       Fourteen-year-old girl jumped out of the right passenger door of a vehicle that was traveling in front of a police car around 5:00 p.m.  The girl fell to the ground and police called for help while attempting to stop the car.  A male jumped out of the car while it was still moving and the vehicle hit a light pole.  The male was later arrested for auto theft.  The girl died in the hospital a few hours after arriving there.

Prior History:     In January 2008 the hotline was called after the child alleged to a mandated reporter that a month earlier her 36-year-old mother had punched her in the jaw and the eye because she came home late.  During the child protection investigation the child recanted, stating that she fabricated the story because she was angry with her mother for not buying her a new pair of gym shoes.  The child demonstrated remorse and said that she didn't think her mother would get into so much trouble.  The mother described punishing her daughter for bad behavior by taking away outside activities.  The investigation was unfounded.

| Child No. 33 | DOB 8/08 | DOD 10/08 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Positional asphyxia | | |
| Reason For Review: | Pending DCP investigation and open intact family case | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Two-month-old infant was found deceased by his father at 6 am.  The father fed the baby around 12:30 am and put him in his crib.  The baby was fussy so the mother put him in bed with her and the father, propping him on a pillow.  She reported that at some point she put the baby back in his crib and thought at that time he might be dead because his hands were cold, but she was sleepy and did not really think about it.  She put the baby to sleep on his side in his crib; the father found him face down with a blanket over his head.  A death investigation was unfounded.

Prior History:     Three weeks before the infant's death, the hotline was called alleging inadequate supervision because the 25-year-old mother was too intoxicated to care for her children.  An intact family case was opened while the investigation was pending; both the child protection investigator and the intact family worker discussed safe sleep practices for infants.  The surviving siblings entered foster care in December 2008 following another report of inadequate supervision because of the mother's substance abuse.  The children are placed with relatives and have a permanency goal of return home.

| Child No. 34 & 35 | DOB 7/05<br>1/07 | DOD 10/08<br>10/08 | Accident |
|---|---|---|---|
| Age at death: | 3 years & 21 months | | |
| Substance exposed: | No | | |
| Cause of death: | Drowning | | |
| Reason For Review: | Indicated DCP investigation within a year of children's deaths | | |
| Action Taken: | Full investigation pending | | |

Narrative:       Twenty-one-month-old and 3-year-old brother and sister died after their 36-year-old mother's truck rolled approximately 100 feet into a retention pond.  The mother reported putting the truck into park to retrieve mail from the end of the driveway and one of the children putting the vehicle into gear.  Police and DCP investigations of the children's deaths are pending.

Prior History:     In October 2007 the mother was indicated for substantial risk of physical injury to her 10-month-old daughter because she was in a bar intoxicated with the baby.  The mother refused services.  In April 2008 the mother was indicated for inadequate supervision of the child because the mother was incapacitated by alcohol and multiple prescription medications while caring for her.  The mother again refused services.  DCFS requested that the county State's Attorney's Office file a petition so the mother could be ordered to participate in services, but the Office refused to file.

| Child No. 36 | DOB 6/08 | DOD 11/08 | Accident |
|---|---|---|---|
| Age at death: | 4 months | | |
| Substance exposed: | No | | |
| Cause of death: | Brain injury due to motor vehicle accident | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Four-month-old baby died two days after sustaining severe head injuries in a car accident with his foster mother and a sibling.  The children were properly restrained in car seats.  While on the highway stuck in traffic because of construction, they were involved in a multiple vehicle accident involving two semi-trailers and four cars.  The family's car was hit from behind and forced into a ditch. The foster mother and half-sibling also sustained injuries in the accident which caused them to be hospitalized.  The foster parents had planned to adopt the baby; they had earlier adopted two of the baby's siblings.

Prior History:      The baby was his 30-year-old mother's sixth child.  He entered foster care directly after birth because his mother's parental rights had been terminated on his five siblings.  All of the siblings have been adopted.

| Child No. 37 | DOB 12/08 | DOD 1/09 | Accident |
|---|---|---|---|
| Age at death: | Five days | | |
| Substance exposed: | No | | |
| Cause of death: | Overlaying | | |
| Reason For Review: | Split custody, child had siblings in foster care | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Five-day-old infant was found unresponsive in the morning face down on a couch.  He had been sleeping on the couch with his 34-year-old mother who had been drinking alcohol with relatives prior to going to sleep.  The mother was indicated for death by neglect to the infant and substantial risk of physical injury to her 3, 6, and 8-year-old children who were also in the home.  The children entered foster care where they are placed together and have a goal of return home.

Prior History:      The deceased was the mother's 10th child.  Her first 6 children entered foster care in 1998.  Three children born in 2000 and after remained at home.  In 2006, a report alleging that the mother was allowing her 17-year-old son to smoke marijuana and have sex in her apartment was unfounded.  A child protection investigator noted that the 3 young children living in the home appeared well-cared for, and he reminded the mother that she should not sleep with her 5-month-old child.  After the younger children entered foster care, the older children's permanency goals were changed from independence to return home.

| Child No. 38 | DOB 9/06 | DOD 1/09 | Accident |
|---|---|---|---|
| Age at death: | 28 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to lying on a plastic pillow and tracheobronchitis with mucus obstruction of nose | | |
| Reason For Review: | Split custody, child had a sibling who was removed from father's custody | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Twenty-eight-month-old child was found dead in the morning by his 22-year-old mother and 18-year-old father.  Investigation revealed that the child had been exhibiting cold symptoms.  At autopsy he had mucus plugging both his nostrils related to severe tracheobronchitis (inflammation of the trachea and bronchial airways).  The child had been sleeping with his face in a plastic pillow.  The combination of the mucus and the child's position on the pillow caused the child to gradually asphyxiate.

Prior History:    The deceased's father, who was a minor at the time of the child's birth, was involved with two older women, each of whom gave birth about the same time.  The deceased remained with his mother, but the other baby was removed from the parents at birth.  The mother of the baby removed at birth was indicated for sexual penetration of the father because he was a minor and they lived together.  When the father reached 18 he married the mother of the baby.  The mother of the baby had a history of neglect with her two older children which led her to surrender her parental rights to those children as well as the baby and the father to surrender his parental rights to the baby.

| Child No. 39 | DOB 2/04 | DOD 1/09 | Accident |
|---|---|---|---|
| Age at death: | 4½ years | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Inhalation injuries due to fire | | |
| Reason For Review: | Indicated DCP investigation within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:     Four-and-a-half-year-old boy died one day after suffering smoke inhalation in a house fire at his home.  Firefighters found the boy and his 3-month-old sister unresponsive on a bed together.  The 3-month-old survived.  The children's maternal grandfather died in the fire trying to find the children.  The children's 31-year-old mother, 9-year-old brother, and the infant's 41-year-old father were not home at the time of the fire.  The cause of the fire is undetermined.

Prior History:    The family has a history with DCFS dating to April 2003 with multiple investigations and two intact family cases opened between February 2004 and September 2007.  The mother has had a recurrent problem with substance abuse and repeat involvement in the criminal justice system.  The maternal grandfather provided a significant amount of care for the children.  The two surviving children are now in the private guardianship of a relative.

| Child No. 40 | DOB 8/04 | DOD 1/09 | Accident |
|---|---|---|---|
| Age at death: | 4 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to dog bites | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Full investigation, Report to Director 6/29/09 | | |

Narrative:     Four-year-old ward was found unresponsive in the afternoon in his foster mother's backyard mauled to death by the family's two Rottweilers and one poodle.  The boy had slipped out the back door into the yard while the foster mother's adult son was out shoveling and other family members were upstairs.  The dogs were kept outside during the day and slept in cages on an enclosed back porch at night.  The dogs were not known to be aggressive, but a veterinary report when they were euthanized noted that the female Rottweiler appeared undernourished and the male Rottweiler appeared emaciated.  The foster mother and her adult son were indicated for death by neglect because the child was able to open the back door and enter the backyard unsupervised.  The foster mother's license has been revoked.

Prior History:    The boy entered foster care right after his birth; his two older siblings were in foster care because of abuse by the father.  The mother was living with the father at the time of the boy's birth and neither had made progress in services.  The ward had a goal of adoption.  At the time of his death he was supposed to be on an overnight pre-placement visit with a prospective adoptive parent, but the visit was cancelled because of an ice storm.  The ward's foster mother was first licensed in 1996.  She subsequently adopted a sibling group of five children; four of those children have reached majority, the fifth is a teenager who remains with the foster parent. See Death and Serious Injury Investigation 11.

| Child No. 41 | DOB 8/08 | DOD 1/09 | Accident |
|---|---|---|---|
| Age at death: | 5 months | | |
| Substance exposed: | No, however, mother has a history of marijuana use | | |
| Cause of death: | Asphyxia due to laying face down on plastic bags between an adult bed & a wall | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Five-month-old infant was found unresponsive by his 20-year-old mother when she checked on him at 3:00 a.m.  The infant had been sleeping by himself on an adult bed in the hotel room in which the family was staying since being evicted from their apartment for failure to pay rent.  The infant rolled off the bed onto a plastic trash bag half filled with clothing; the bag was on the floor between the bed and the wall.  The mother was indicated for death by neglect with the rationale that she left plastic bags filled with clothing alongside the bed knowing that the infant could roll over and she tested positive for marijuana.  The father was at work at the time of the infant's death.

Prior History:     The mother is a former ward.  The deceased was the mother's third child and the only one in her care.  Her daughter is in the custody of her father and her son lives with his adoptive mother.  The mother first became involved with DCFS as a parent in June 2006 when she was investigated for substantial risk of physical injury to her son.  The investigation was unfounded, but an intact family case was opened for a month to link the mother to community services.  In March 2008 the mother and the infant's father were unfounded for substantial risk of physical injury to the mother's daughter.  An intact family case was again opened.  Prior to the infant's death, the intact family caseworker linked the mother to services such as medical care, head start, and counseling.  She provided transportation, assistance with job searching, child care resources, a budget coach and a housing advocate.  The worker had previously completed a home safety checklist with the mother.

| Child No. 42 | DOB  11/08 | DOD 1/09 | Accident |
|---|---|---|---|
| Age at death: | 2 months | | |
| Substance exposed: | No | | |
| Cause of death: | Suffocation due to laying face down on mother's chest | | |
| Reason For Review: | Pending DCP investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Two-month-old infant was found unresponsive in the morning by his 16-year-old mother.  The infant had been sleeping on his mother's chest; she was sleeping on a couch in an apartment where numerous family members lived.  The hotline was called with a report of death by neglect and environmental neglect because of the unhealthy and hazardous condition of the home in which they were living.  The mother was indicated for both allegations.  The adults in the home were arrested for child endangerment and the children in the home, including the 16-year-old, entered foster care.  The mother gave birth to her second child in September 2009; the infant is in her care.

Prior History:     In September 2008 the hotline was called with a report of environmental neglect against the sixteen-year-old girl's 33-year-old mother for crowded and unsanitary living conditions.  The investigator found the home to be dirty and unsanitary.  The mother reported that she and her seven children had been living with her sister and her two children, but her sister had recently died and the mother was evicted from the apartment because it had been in her sister's name.  The family was temporarily staying with the maternal grandmother; the mother's brother, his wife, and their two children were also living in the apartment.  The family cleaned up the home during the investigation; sufficient food and clothing was observed; the children did not appear abused or neglected and reported being well-cared for; and their medical care was confirmed.  A service case was not opened.  In December 2008, the hotline was contacted with a report that the 16-year-old mother had dropped her baby and taken him to the hospital to be checked, but had not taken the baby for a follow-up visit.  The reporter did not know the baby's name or the mother's name.  The reporter gave the name, phone number, and address of a paternal relative, but the relative denied knowing the mother's name or where she lived.  The child protection investigator made further attempts to discover the identities and whereabouts of the mother and infant but had not yet located them at the time of the baby's death.

| Child No. 43 | DOB 8/06 | DOD 2/09 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2½ years |
| Substance exposed: | No |
| Cause of death: | Carbon monoxide inhalation |
| Reason For Review: | Unfounded DCP investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Thirty-one-year-old father returned home from working the night shift to smell gas in his home.  The 31-year-old mother was difficult to rouse and the 2½, 6½ and 11-year-old children were unresponsive.  The two-and-a-half-year-old died at the hospital a few hours later; her mother and siblings survived.  It is believed that the family inhaled carbon monoxide because of a faulty flue connection in the home's furnace.

Prior History:    In September 2008 the hotline was called after the deceased, two years old, was found by police wandering in the street.  The mother, while looking for the child, flagged down a police car.  The police had already found the child and she was reunited with her mother.  The mother and child had been sleeping when the father left for work, forgetting to lock the door.  When the child awoke, she wandered out of the home.  The child protection investigation was unfounded.

| Child No. 44 | DOB 12/08 | DOD 2/09 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | Yes, cocaine |
| Cause of death: | Overlaying |
| Reason For Review: | Open intact family case at time of child's death; pending DCP investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:    Two-month-old infant was found unresponsive in the morning by his aunt.  The night before his maternal grandmother had laid him on her chest and went to sleep with him on a love seat.  The 43-year-old grandmother was babysitting the infant for the weekend.  The grandmother, mother, and father of the infant were indicated for death by neglect because they had all been admonished previously that the grandmother was not to care for the infant because of a history of multiple problems.  The infant was the couple's only child.

Prior History:    The mother was indicated for substance misuse by neglect because the infant tested positive for cocaine at birth.  An intact family case was opened and the infant's primary caretaker was to be the 30-year-old father while the 23-year-old mother engaged in substance abuse treatment.  Eleven days before the infant's death, a second report was made to the hotline alleging a burn to the infant.  Investigation revealed that while the maternal grandmother was babysitting, she fell asleep with a lit cigarette while holding the infant and burned the infant's leg.  The investigation was pending at the time of the infant's death; however, the investigator had previously instructed the parents and grandmother that the grandmother was not to care for the infant.

| Child No. 45 | DOB 1/05 | DOD 3/09 | Accident |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 4 years |
| Substance exposed: | No |
| Cause of death: | Anoxic brain injury due to an overdose of oxycodone |
| Reason For Review: | Child returned home from foster care within a year of her death |
| Action Taken: | Full investigation pending |

Narrative:      Four-year-old and her 5-year-old sister spent the day with a cousin.  The cousin took them to a friend's house and then to a restaurant.  The 4-year-old acted tired and fell asleep periodically throughout the day.  She took a nap after arriving back at the cousin's house.  When the cousin later checked on her, she was unable to wake the little girl.  The girl was taken to the hospital where she arrived unresponsive.  A toxicology test revealed oxycodone in the girl's system.  The girl was determined to be brain dead and she was removed from life support two days after arriving at the hospital.  Neither police nor DCFS could determine how or where the girl had ingested the medication, though it is believed that a relative lost the pill at the cousin's home and the girl found it and ate it.  A DCP investigation of the child's death was unfounded.

Prior History:      The girls and their 3-month-old brother entered foster care in January 2007 when the infant boy suffered an abusive head injury.  The injury occurred when the children were in the care of the girls' father and maternal grandmother while their 21-year-old mother was in jail for missing a court date.  The children were returned to their mother's care in April 2008.

| Child No. 46 & 47 | DOB 9/01 1/03 | DOD 4/09 4/09 | Accident |
|---|---|---|---|
| Age at death: | 7½ years &  6 years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to automobile accident | | |
| Reason For Review: | Open intact family case at time of children's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      Thirty-year-old mother was driving down the road with her 7½-year-old and 6-year-old daughters when she sideswiped an oncoming vehicle and then collided with another oncoming vehicle. Weather conditions were not a factor.  The mother was pronounced dead at the scene; the two girls who were restrained in safety belts suffered serious injuries from which they later died.  Morphine and tramadol (to relieve pain) and diazepam (to treat anxiety) were found in the mother's system at autopsy.

Prior History:      The mother has a history of substance abuse and substance abuse treatment dating to August 2003.  She had an intact family case open with DCFS from April 2005 to November 2006.  The intact family case was reopened in September 2008 when a friend called 911 because she thought the mother had injected bad heroin.  There was a safety plan initially in place for the girls until their mother engaged in treatment.  The intact family case was open at the time of the family's deaths.

| Child No. 48 | DOB 7/08 | DOD 4/09 | Accident |
|---|---|---|---|
| Age at death: | 9 months | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxia due to overlay | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Nine-month-old infant was found unresponsive by his 20-year-old mother around 3:00 a.m. lying face up.  Around 11:00 p.m. the infant was fussy so she took him out of his crib and placed him face up between her and the 21-year-old father in their bed.  The parents were indicated for death by neglect because mother had been educated about the dangers of co-sleeping and the parents drank alcohol prior to going to sleep.  A short-term intact family case was opened and both parents underwent substance abuse evaluations which found that neither needed treatment.  The case was closed within a month of opening because the parents were not interested in receiving services.

Prior History:    In June 2008 the hotline was called with a report of substantial risk of physical injury to the mother's 3½-year-old son.  The mother was witnessed at the courthouse, just after she got married, yelling at, grabbing, and hitting her son because he was screaming and running around trying to get on the escalator.  The mother and the boy's step-father reported that the mother had yelled at the boy and grabbed him by his arm so that he wouldn't hurt himself on the escalator.  The child had no injuries and the investigation was unfounded.

| Child No. 49 | DOB 9/95 | DOD 5/09 | Accident |
|---|---|---|---|
| Age at death: | 13½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple injuries due to motor vehicle striking a bicycle | | |
| Reason For Review: | Open intact family case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Thirteen-and-a-half-year-old boy was riding his bicycle when he was struck and killed by a motor vehicle in a hit and run crash shortly after midnight.  The driver was later apprehended and charged with aggravated driving under the influence, reckless homicide, and leaving the scene of an accident with death or injury.  The boy had earlier snuck out of his house and went off on his bicycle.  His mother discovered him missing around 10:00 p.m. and went out to look for him.  She drove around for a couple of hours before returning home.  She was preparing to file a missing persons report when two of her son's friends came to tell her that he had been hit by a car.

Prior History:    In July 2008 the 38-year-old mother gave birth to her sixth child.  The mother and infant tested positive for cocaine.  The infant was born at a healthy weight and did not exhibit any withdrawal symptoms.  Mother maintained that the day before she went into labor she attended a card party and must have drunk a spiked drink.  She denied using drugs, but agreed to attend substance abuse treatment.  Several collaterals described the mother as a good mother who did not use drugs.  She worked full-time and her kids appeared well-cared for and did well in school.  The mother was indicated for substance misuse by neglect.  She participated in substance abuse treatment and was successfully discharged from the program.  Her random urine drops tested negative.  The infant had a developmental assessment at 3 months and was found to be on target for all areas of development.  The intact family case was closed in January 2009.

| Child No. 50 | DOB 1/09 | DOD 6/09 | Accident |
|---|---|---|---|
| Age at death: | 4½ months | | |
| Substance exposed: | No | | |
| Cause of death: | Positional asphyxia | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Four-and-a-half-month-old infant was found unresponsive in his bassinet in the afternoon by his father's 22-year-old girlfriend.  The girlfriend had placed the infant for a nap face down in his bassinet with several blankets.  The infant and his 23-month-old sibling had been staying with their 23-year-old father and his girlfriend since their mother's power had been shut off about a week earlier.  The girlfriend was unfounded for death by neglect, but the 20-year-old mother was indicated for medical neglect.  The child had a history of breathing difficulties and had been prescribed Albuterol, but the mother never filled the prescription or advised the father and his girlfriend of the child's condition.  The father and his girlfriend had a baby together in September 2009 while the death investigation was still pending.  The DCP investigator completed a home safety checklist with the parents, educated them about safe sleep for babies, and left a Back to Sleep brochure with them.

Prior History: Police contacted the hotline in July 2008 with a report of substantial risk of physical injury to the deceased and his brother by their 19-year-old mother. The mother and father got into an argument while she was moving out of the father's home and the father had a mark on his face. According to the mother, she grabbed the back of the father's neck and pushed him while their 11-month-old was sitting in a car seat. According to the father, the mother slapped him about the face several times while he was holding the child. The mother was arrested for misdemeanor domestic battery because she admitted to pushing the father. The father got a temporary order of protection which he did not extend. The DCP investigation was unfounded because of the "he said, she said" nature of the allegations; the couple had broken up; the child was not injured; and the young couple had a support system of extended family helping them to care for the child.

| Child No. 51 | DOB 9/92 | DOD 6/09 | Accident |
|---|---|---|---|
| Age at death: | 16 years | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Anoxic encephalopathy due to drowning | | |
| Reason For Review: | Teenager was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Sixteen-year-old ward was at a lake with friends when he decided to go swimming. There was no lifeguard. When he went under the water his friends initially thought he was kidding. They called for help when they realized he was drowning. The teenager was rescued from the water, but he was later pronounced dead at the hospital.

Prior History: With the exception of a few years, the teenager was a ward his entire life because of neglect by his mother. At the time of his death he had been living in a residential facility for almost 18 months, but he frequently went on run. He had been on run for approximately one month at the time of his death and a missing persons report had been filed pursuant to protocol. The ward recently had his permanency goal changed to independence. He had a one-month-old baby and three siblings.

| Child No. 52 | DOB 5/99 | DOD 6/09 | Accident |
|---|---|---|---|
| Age at death: | 10 years | | |
| Substance exposed: | No | | |
| Cause of death: | Heat stroke due to exposure to environmental heat; cerebral palsy contributed significantly | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Ten-year-old medically complex child was at her 73-year-old caregiver's home when she began having trouble breathing and vomited. The caregiver called 911 and the girl was taken to the hospital where she died. The girl had cerebral palsy and had recently had hip surgery which required her to be in a full body cast. The outdoor temperature was 90 degrees, the caregiver's home was warm, and the full body cast retained a lot of heat. The caregiver was not running the air conditioner because she was worried the child might get pneumonia. A DCP investigation of the child's death was unfounded.

Prior History: The hotline was contacted in September and October 2008 with allegations of neglect to the child by her mother and caregiver. The calls were made by a school nurse who believed the child was not being fed properly. The child's primary care physician saw the child for a check-up while the investigations were pending and disagreed with the school nurse. The doctor informed the investigator that the nurse had called her several times about the child. The doctor believed the child was being fed enough, but that she would always be underweight compared to other children her age. The mother also reported ongoing tension between herself and the school nurse over her daughter's care. Both investigations were unfounded.

CHILD DEATH REPORT

| Child No. 53 | DOB 11/08 | DOD 6/09 | Accident |
|---|---|---|---|
| Age at death: | 7 months | | |
| Substance exposed: | Yes, opiates | | |
| Cause of death: | Asphyxia due to soft bedding over face | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Thirty-seven-year-old mother laid down in bed for a nap with her 7-month-old and 2-year-old children.  They were staying at the maternal grandmother's home because the grandmother was ill.  When the mother awoke she found the 7-month-old unresponsive.  A death by neglect investigation was unfounded.

Prior History:       The deceased was the mother's seventh child.  The mother's first five children are being raised by relatives through guardianship.  The deceased was born substance-exposed, the mother was indicated for substance misuse, and an intact family case was opened.  The mother and her two children were living with and had the support of the children's paternal grandmother.  Initially, the mother went to detox and then was on a waiting list for an inpatient substance abuse treatment program.  Thereafter, the worker tried diligently to get the mother into substance abuse treatment, but the mother missed several appointments.  The intact family case remains open.

| Child No. 54 | DOB 11/05 | DOD 6/09 | Accident |
|---|---|---|---|
| Age at death: | 3½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Exsanguination due to lacerations of jugular and femoral veins due to animal attack | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Three-and-a-half-year-old child was found unresponsive by his mother and his mother's boyfriend outside his family's home about 8:00 p.m. bleeding from multiple dog bites.  The child had been put to sleep for the night.  When his mother went to check on him, she discovered he had climbed out his bedroom window.  The family had three outside dogs who were unrestrained:  a collie mix and two pit bull mixes.  The dogs were described by older siblings as friendly and not having bitten anyone in the past.  The child had previously slipped out of the home and the family had installed locks at the top of the doors.  A DCP investigation for death by neglect was unfounded.

Prior History:       The deceased was the youngest of four siblings.  In April 2009, the hotline was called with a report of lock-out of the oldest child.  The 17-year-old had moved out of the family home a month earlier, but wanted to return and the mother refused to let him.  The mother made arrangements for him to live with family friends and the investigation was unfounded.

| Child No. 55 | DOB 6/09 | DOD 6/09 | Accident |
|---|---|---|---|
| Age at death: | 4 days | | |
| Substance exposed: | Possibly marijuana | | |
| Cause of death: | Asphyxia due to overlay | | |
| Reason For Review: | Child's mother was a ward within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Four-day-old infant died while sleeping in a full-sized bed with her parents.  The 21-year-old mother, 24-year-old father, and infant had laid down in bed to take a nap.  The mother breast-fed the infant and fell asleep.  When she awoke, she found the infant unresponsive.  The infant was found to have been overlayed and the mother and father were indicated for death by neglect of the baby.  While there was a crib in the home, the infant was sleeping with her parents who admitted to smoking marijuana while caring for her.

Prior History:     Both the mother and father were involved with DCFS as children.  The mother was a ward of DCFS for 12 years before aging out of DCFS care three months earlier when she turned 21. When he was a child, the father's family was involved with DCFS for two years as an intact family. Additionally, the father had been indicated in January 2007 for human bites for biting his then girlfriend's 3-year-old son on the cheek in retaliation for the child biting him on the knee.

| Child No. 56 | DOB 8/91 | DOD 6/09 | Accident |
|---|---|---|---|
| Age at death: | 17½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Asphyxiation due to drowning | | |
| Reason For Review: | Unfounded DCP investigation within a year of teenager's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seventeen-and-a-half-year-old boy went swimming in the afternoon with friends in a lake.  The teenager and another boy swam beyond the roped off area at the beach and when the teenager tried swimming back in, he struggled and went under water.  Other swimmers tried to help him but were unsuccessful.  He was pronounced dead at the local hospital.

Prior History:   In March 2009 the Department received a report that the teenager was in a sexual relationship with a 31-year-old woman and that his mother allowed him to move in with the woman. Reports were taken on the woman and the teenager's mother for investigation of sexual penetration to the teenager.  Both investigations were unfounded.  The woman admitted to having a sexual relationship with the teen but said that she had confirmed with police that it was ok before doing so.  The investigator checked with both the police and the State's Attorney's Office; the State's Attorney advised that by law a 17-year-old could consent to sex with an adult.  The teen's mother denied knowing that her son was having sex with an older woman and did not approve.  Both the teen and his mother reported that he still lived at home and the investigator saw his bedroom with his belongings in it.

**NATURAL**

| Child No. 57 | DOB  6/07 | DOD 7/08 | Natural |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 13 months |
| Substance exposed: | No |
| Cause of death: | Pulmonary hypertension due to bronchopulmonary dysplasia due to prematurity |
| Reason For Review: | Child welfare services referral made within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Thirteen-month-old child was found unresponsive in the morning, lying in her crib in her mother's bedroom.  The child had multiple medical problems as a result of being born prematurely.

Prior History:     The child was born prematurely at 25 weeks gestation and spent over five months in the hospital.  In November 2007 a social worker at the hospital called the hotline to report that the parents were overwhelmed trying to work, take care of their 2-year-old, and visit the baby in the hospital.  The parents were supposed to be in the neonatal intensive care unit 3 times a week to learn how to care for the baby, but they had only been going once a week.  The call was taken as a referral for child welfare services.  Shortly thereafter, the mother quit her job and the father took on two jobs so that the mother could consistently visit the baby, which she did.  The baby was discharged home from the hospital and she and her older brother were observed to be doing well in their parents' care.  The parents were considering an in-home caregiver so that the mother could go back to work.  The worker gave the family a referral for child daycare services and in April 2008 the case was closed.

| Child No. 58 | DOB 3/93 | DOD 7/08 | Natural |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 15 years |
| Substance exposed: | No |
| Cause of death: | Cerebral palsy and encephalopathy with seizure disorder a significant contributing factor |
| Reason For Review: | Indicated DCP investigation within a year of child's death |
| Action Taken: | Investigatory review of records |

Narrative:     Fifteen-year-old medically complex child was found unresponsive by her 9½-year-old sister.  The girls had been left home alone and the 9½-year-old went to a neighbor's home for help.  The mother and her partner were indicated for inadequate supervision of the girls; the mother also was indicated for substantial risk of physical injury to her surviving daughter as it came out during the investigation that the mother had a substance abuse problem.  The girl entered foster care and she is placed with relatives.

Prior History:     The mother was investigated in November 2007 for inadequate clothing and substantial risk of physical injury to the deceased.  Both allegations were unfounded.   She was investigated again in February 2008 and indicated for inadequate supervision to the deceased after she failed to meet the child's school bus for the third time and the girl had to be taken back to school.  The mother reported oversleeping.  School personnel reported that the child did not sleep well at night, so they believed the mother tried to catch up on her sleep during the day.  They described the child as well-cared for.

| Child No. 59 | DOB  5/08 | DOD 7/08 | Natural |
|---|---|---|---|

| | |
|---:|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Walker-Warburg syndrome |
| Reason For Review: | Open intact family case at time of child's death |
| Action Taken: | Full Investigation, Report to Director 6/30/09 |

Narrative: Two-month-old infant died from Walker-Warburg syndrome, a congenital muscular dystrophy, which is usually lethal within the first few months of life. The infant spent the first month of life in the hospital and then was discharged home with a feeding tube and breathing machine. He received hospice care. An older sister died from a genetically inherited disorder three months later. See Child No. 67.

Prior History: This family came to the Department's attention in February 2007 when the mother's 10-year-old daughter disclosed that her mother's boyfriend, the father of two of the mother's six children, had sexually abused her. The boyfriend was indicated for sexual abuse of the child and risk of sexual harm to the other children and the mother left him. An intact family case was opened in March 2007 to assist the mother. It was open at the time of the infant's birth and death. This family is Spanish-speaking but in violation of the Burgos Consent decree, the family did not receive services in Spanish throughout most of the case.

| Child No. 60 | DOB 6/08 | DOD 8/08 | Natural |
|---|---|---|---|
| Age at death: | 7 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Pending DCP investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Seven-week-old infant was found unresponsive by his 30-year-old mother early in the morning. The infant had been sleeping in a queen-sized bed with his mother and a one-year-old cousin. He was placed to sleep face up and found in the same position.

Prior History: The infant was born prematurely at 32 weeks gestation and remained hospitalized for 3½ weeks. A child welfare services referral was made ten days after the infant's birth. The mother lived with her parents and her three children, ages 6, 8, and 10. Her parents refused to allow her to come home with another child and had been requesting for some time that she get her own place to live. Three weeks after the infant's birth, a hospital social worker called the hotline to report that the infant was ready for discharge, but the mother had not been to the hospital that week and had not received patient care training. The mother informed the child protection investigator that she had been ill. The mother reported that she and the baby would be living with the mother's sister and her husband and they planned to move into a larger home together so her other children could join them. The child welfare services referral was closed because there was an investigation. The child protection investigator completed a home safety check list with the mother and observed a crib in the home, advised her about safe sleeping practices for infants, and allowed the mother to take the baby home from the hospital. The baby died while the investigation was pending. The investigation was ultimately unfounded but an intact family case was opened.

| Child No. 61 | DOB 6/91 | DOD 8/08 | Natural |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Seizure disorder | | |
| Reason For Review: | Pending DCP investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative: Seventeen-year-old medically complex boy was found unresponsive in the morning by his mother.

Prior History:     The boy was developmentally delayed and autistic.  He suffered from attention deficit hyperactivity disorder and seizure disorder.  His 53-year-old parents and 14-year-old sister are also developmentally delayed.  The family has been involved with DCFS on and off since 1995 as subjects of child protection investigations and recipients of intact family services.  The most recent involvement was a June 2008 investigation for substantial risk of physical injury to the boy.  Two store customers reported that they witnessed the mother choke the boy.  The mother explained and surveillance tapes supported that mother was trying to restrain the boy because he was acting out slapping her and spitting at her.  The boy had no injuries and the children's primary care physician reported that he had no concerns.  The investigation was unfounded following the boy's death.

| Child No. 62 | DOB 8/08 | DOD 8/08 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Stillborn/placenta abruptio | | |
| Reason For Review: | Open intact family case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Twenty-eight-year-old mother delivered her fifth child.  He was stillborn at 32 weeks gestation.  His mother admitted to using cocaine, marijuana, alcohol and tobacco during her pregnancy which likely caused the child's stillbirth.  The mother was indicated for substantial risk of physical injury to her four surviving children and they were placed in foster care.  The children were returned home following an adjudicatory hearing in November 2008.  The family has an open intact family case.

Prior History:     The family came to the attention of DCFS in November 2007 when the mother gave birth to her fourth child.  The infant tested positive for cocaine and marijuana.  The mother was indicated for substance misuse by neglect and an intact family case was open from December 2007 until March 2008.

| Child No. 63 | DOB  9/08 | DOD 9/08 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | Yes, alcohol | | |
| Cause of death: | Prematurity | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Thirty-nine-year-old mother gave birth to an infant at 26 weeks gestation.  The infant died 27 minutes after birth.  At the time of delivery, the mother's blood alcohol level was .19, more than twice the legal limit.

Prior History:     The deceased was the mother's fourth child.  Her two oldest children live with their fathers.  Her third child lived with her and there were two child protection investigations involving him in the year prior to the infant's birth and death.  In December 2007, the mother and her boyfriend got into a physical altercation and her 6-year-old son tried to intervene and cut his fingers.  The mother left the boyfriend, filed for an order of protection, and moved in with her mother and step-father.  The mother was unfounded on the report; the boyfriend was indicated for cuts, bruises, welts by neglect.  In June 2008, the mother was investigated for inadequate supervision of her son for allegedly leaving him home alone while she was at a bar.  The mother reported that the boy had been left with a babysitter and the child protection investigator was able to verify with the teenaged babysitter's mother that the girl had babysat for the boy on the night in question.  Subsequent to the infant's death, the boy entered foster care and is placed with a maternal aunt.

| Child No. 64 | DOB  1/05 | DOD 9/08 | Natural |
|---|---|---|---|
| Age at death: | 3½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple organ failure due to septic shock due to pancreatitis | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Three-and-a-half-year-old medically complex child was taken to the hospital in respiratory distress.   Once stabilized she was transferred to another hospital where she was found to have pancreatitis that led to septic shock and multiple organ failure.   She died two days later; her parents were with her when life support was removed.

Prior History:     The child entered foster care in January 2007 when she was almost two years old.  She was failure to thrive, mentally retarded, and had a severe seizure disorder (up to 50 seizures per day without medication).   Her 26-year-old mother and 31-year-old father were found to have medically neglected her because they were not regularly feeding her or administering her anticonvulsant medication.  While initially placed in a foster home, she was moved in October 2007 to a nursing care facility which could better meet her needs.  She lived in the facility until her death.  Her parents had a second child in February 2008 who is healthy and who is not DCFS-involved.

| Child No. 65 | DOB  5/08 | DOD 10/08 | Natural |
|---|---|---|---|
| Age at death: | 4½ months | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Unexpected Death in Infancy (SUDI) | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Four-and-a-half-month-old infant was found unresponsive by his 20-year-old mother when she checked on him during the night.   He had been sleeping on his back on his mother's bed while she was up playing cards with friends.   The child was taken to the hospital where he was pronounced dead.   X-rays taken of the child at the hospital were thought to show a skull fracture and a DCP investigation ensued.  The DCP investigation of the child's death was unfounded when at autopsy it was determined that the child did not have a skull fracture.   Rather, the growth plates at the back of the child's head were growing at different rates and may have looked like a fracture on the x-rays.

Prior History:     The paternal grandmother of the deceased's half-sister called the hotline in June 2008 stating that her granddaughter was recently seen at an emergency room for a black eye and that the mother's boyfriend was a registered sex offender.  The investigator witnessed the black eye; the mother and child both stated that the 5-year-old hit it on the window sill when she threw herself down on her bed in a fit of anger.   The mother's 27-year-old boyfriend (father of the deceased) was a registered sex offender; he was convicted of sexual abuse when at 19 years old he had sex with a 16-year-old girl.   He and the mother were indicated for substantial risk of sexual injury to the children because he never received treatment or completed an assessment of risk to the children.   An intact family case was opened.   The boyfriend completed a sex offender assessment which found that he was not a risk to young children and was at low risk for reoffending.   The assessment noted that he could benefit from parenting education.  The couple participated in an in-home parenting program and the intact family case was closed in December 2008.

| Child No. 66 | DOB  7/08 | DOD 10/08 | Natural |
|---|---|---|---|
| Age at death: | 3 months | | |
| Substance exposed: | No | | |
| Cause of death: | Anoxic hypoxia due to bronchiolitis & pneumonitis due to lower respiratory infection | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Three-month-old infant was found unresponsive in his crib in the morning.  His 33-year-old mother had placed the child in his crib next to her bed around midnight, heard him stir at 3:00 a.m., and found him unresponsive around 7:30 a.m.

Prior History:     The mother has three surviving children, who were 7, 8, and 10 at the time of their brother's death.  In April 2008, the 7-year-old's school social worker called the hotline to report welt marks to the underside of the girl's arm from a "whooping" from her mother for not bringing her homework home.  The mother admitted to hitting her daughter with her hand because she consistently failed to bring her homework home.  She said she attempted to hit the palm of her daughter's hand, but her daughter moved and she got her arm instead.  The welt marks had disappeared when the investigator saw the girl two days after the social worker saw her.  All of the children in the home, when interviewed separately, agreed that their mother only hit them on their hands or gave them time outs for discipline.  The social worker reported no prior involvement with the family, a note from the child's teacher confirmed homework completion was an ongoing issue, and the maternal grandmother, who was a licensed day care provider, reported that her daughter was not abusive toward her children.   The investigation was unfounded.

| Child No. 67 | DOB  4/02 | DOD  11/08 | Natural |
|---|---|---|---|
| Age at death: | 6½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Leukodystrophy | | |
| Reason For Review: | Open intact family case at time of child's death | | |
| Action Taken: | Full investigation, Report to Director 6/30/09 | | |

Narrative:     Six-and-a-half-year-old girl died from Leukodystrophy, a genetically inherited disorder in which the brain and nervous system progressively deteriorate, the person loses brain and body functions and eventually dies.  A younger brother died three months earlier from a congenital abnormality.  See Child No. 59.

Prior History:     This family came to the Department's attention in February 2007 when the mother's 10-year-old daughter disclosed that her mother's boyfriend, the father of two of the mother's six children, had sexually abused her.  The boyfriend was indicated for sexual abuse of the child and risk of sexual harm to the other children and the mother left him.  An intact family case was opened in March 2007 to assist the mother.  It remained open at the time of the 6½-year-old girl's death.  This family is Spanish-speaking but in violation of the Burgos Consent decree, the family did not receive services in Spanish throughout most of the case.  See Death and Serious Injury Investigation 9.

| Child No. 68 | DOB  4/99 | DOD  11/08 | Natural |
|---|---|---|---|
| Age at death: | 9½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Cerebral edema due to status epilepticus due to probable underlying metabolic disorder | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death; indicated DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Nine-and-a-half-year-old child with special needs died in the hospital.  She had been there for a month after suffering seizures.  Her neurologist had recently taken her off her seizure medication.

Prior History:    The child resided with her mother and 7-year-old sibling.  The children had regular weekend visitation with their 44-year-old father as their parents were divorced.  In November 2007, following a visit with the father, the hotline was called alleging that the father had left marks on the child by using a plastic spoon to discipline her.  An investigation of cuts, bruises and welts was unfounded because no significant marks were observed.  The father was advised to use another form of discipline.  In August 2008 the hotline was contacted again with an allegation of cuts, bruises and welts by the father to his daughter.  The father was indicated on the report.  At the time of the child's death, the mother was attempting to have the father's court-ordered visitation amended.  The child had been in extensive services due to her special needs and all involved professionals had advised against the use of corporal punishment.

| Child No. 69 | DOB  5/92 | DOD 11/08 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 16 years |
| Substance exposed: | No |
| Cause of death: | Respiratory failure |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:      Sixteen-year-old medically complex ward was hospitalized because of difficulty breathing.  His condition deteriorated and he died in the hospital six days later.  A Do Not Resuscitate order had been in place for several years.  The child had no recent contact with his parents; his mother's whereabouts were unknown and his father was incarcerated for the sexual abuse of his sisters.  His brother and a sister visited him in the hospital prior to his death and his caseworker was with him when he died.

Prior History:      The child's family has a history with DCFS dating to 1998 because of neglect.  In 2004 the child and his siblings entered foster care after his sisters disclosed to a child protection investigator that their father had sexually abused them and had fathered the oldest sister's baby.  The deceased was placed in a nursing care facility where he lived until his death.

| Child No. 70 | DOB  9/08 | DOD 11/08 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2 months |
| Substance exposed: | No |
| Cause of death: | Bronchopneumonia with tracheobronchitis (inflammation of the upper respiratory system) with co-sleeping likely a contributing factor |
| Reason For Review: | Pending DCP investigation at time of child's death |
| Action Taken: | Investigatory review of records |

Narrative:      Two-month-old infant was found deceased in the morning by his mother.  The infant had been sleeping with his 23-year-old parents on a mattress on the floor.  The infant was sleeping in a "boppy" (horseshoe pillow) between the wall and the father.  The infant had been sick for a few weeks and had been diagnosed with an upper respiratory infection two weeks earlier.  A death by neglect investigation was unfounded.

Prior History:      The infant was the 23-year-old parents' sixth child.  When the infant died, there was a pending child protection investigation against the father for cuts, bruises, welts to the couple's 6½-year-old daughter.  The girl had a cut and swollen lip and when the reporter asked about it, the girl said her father had gotten angry at her for scaring her little brother and he threw an empty sippy cup at her.  When interviewed, the girl said her father hit her with the cup by accident and that he apologized.  She said that he was a good dad and she wasn't afraid of him.  Both the maternal grandmother and mother said they knew about the incident and believed it was an accident and neither of the school aged children's teachers had concerns about the children's care.  The father was indicated for cuts, bruises, welts but no service case was opened.

| Child No. 71 | DOB  11/08 | DOD 12/08 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 1 month |
| Substance exposed: | No |
| Cause of death: | Sepsis due to prematurity |
| Reason For Review: | Open preventive services case within a year of child's death |
| Action Taken: | Preliminary investigation |

Narrative:     One-month-old infant was found unresponsive by her 29-year-old mother lying face down on the parents' queen-sized bed.  The mother had placed her there face down for a nap.  There was a crib in the home.  The infant had been born prematurely at 33 weeks gestation.   She had two siblings, ages 8 and 12.

Prior History:     The family was the subject of a report called into the hotline in October 2007 for environmental neglect.  When the investigation was unfounded, a preventive services case was opened, but closed within days, presumably because the family changed their mind about accepting services.  Neither the investigation nor case file was still available for review.  The family has had no further DCFS involvement.

| Child No. 72 | DOB  12/07 | DOD 12/08 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 12 months |
| Substance exposed: | No |
| Cause of death: | Bacterial sepsis, with sickle cell anemia trait a significant condition contributing to death |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:     The day after a well-child visit at his doctor's office, the 12-month-old became ill with a fever and vomiting.  His relative foster parent, a paternal aunt, monitored him throughout the day.  When his condition got worse, his aunt brought him to the emergency room; he was immediately treated but died about an hour later.  The child's autopsy revealed that he had no spleen.  Asplenia is a complication of sickle cell disease and it put the child at greater risk for sepsis (blood infection).

Prior History:     The deceased and his 2-year-old brother entered foster care in October 2008 when the 10-month-old was discovered unattended and crying in the grass shortly after 1:00 a.m.  His 21-year-old mother left him there while she argued with the father of the 2-year-old.  The 30-year-old father got into his car to leave with the 2-year-old and the mother ran in front of the car and was struck.  The mother was arrested for child endangerment and indicated for inadequate supervision and substantial risk of physical injury.  The mother participated successfully in services and her surviving child was returned to her care in September 2009.

| Child No. 73 | DOB  11/08 | DOD 12/08 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 5 weeks |
| Substance exposed: | Yes, cocaine |
| Cause of death: | Necrotizing enterocolitis due to sepsis due to prematurity |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:     Five-week-old ward, who was born substance exposed and prematurely at 26 weeks gestation, died in the hospital where she had lived and been cared for since birth.

Prior History:     The deceased was the 35-year-old mother's sixth child; she had her first child in 1987 and came to DCFS's attention at that time.  The mother has a history of substance abuse and none of her children are in her care.  Two children have been adopted; two are in private guardianship with relatives; and one is in foster care following a disrupted private guardianship.

| Child No. 74 | DOB  9/08 | DOD 12/08 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Substance exposed: | No |
| Cause of death: | Congenital heart disease |
| Reason For Review: | Open intact family case at time of child's death |
| Action Taken: | Full investigation pending |

Narrative:        Twenty-year-old mother awoke to find her 3-month-old daughter unresponsive in the early morning.  The baby was sleeping in a bed with the mother despite DCFS having provided a crib for the baby.  At autopsy the baby was noted to be emaciated.  She weighed an ounce less than she did at birth, though a month earlier she was seen by her pediatrician and noted to have gained weight.  The baby also had a severe diaper rash.  The baby was born with a heart condition and was supposed to have seen a pediatric cardiologist within a week of being discharged from the hospital, but had not yet been seen by one at the time of her death.  The mother was indicated for death by neglect, medical neglect, and substantial risk of physical injury.  Her two surviving children, ages one and two, were taken into custody and placed in traditional foster care.  In August 2009 the mother gave birth to twins.  They entered foster care following their births.  The mother is working toward the children's return home and one of the children's fathers is also participating in services.

Prior History:        The Department became involved with the family at the birth of the deceased baby because there was concern that the mother might harm herself.  The baby was released to the care of the 39-year-old maternal grandmother with whom the family lived until the mother was well enough to assume care of the baby.  An intact family case was opened and the worker was linking the family to services at the time of the baby's death.

| Child No. 75 | DOB  6/07 | DOD 1/09 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 18 months |
| Substance exposed: | No |
| Cause of death: | Acute hypoxemic respiratory failure, respiratory syncytial virus (RSV) |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:        Eighteen-month-old medically complex child was hospitalized with a high fever and RSV.  While being treated, he developed pneumonia and died.

Prior History:        The child and his three siblings entered foster care in November 2007 after he was brought to the hospital with difficulty breathing and he and his twin sister were diagnosed with head injuries, broken right arms, and non-organic failure to thrive.  The twins' 19-year-old father confessed to jerking the twins and throwing them on the bed on several occasions while he was the sole caregiver.  He was charged with aggravated battery and is in jail awaiting trial.  The twins had been born at 29 weeks gestation and remained in the hospital for many weeks.  Upon release, the twins were supposed to be seen at a high risk clinic, but their parents did not take them.  The 21-year-old mother is participating in services and the surviving children have a goal of return home.

| Child No. 76 | DOB  2/06 | DOD 1/09 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 2½ years |
| Substance exposed: | No |
| Cause of death: | Cerebral vein thrombosis (blood clot) due to sickle cell disorder |
| Reason For Review: | Child was a ward |
| Action Taken: | Full investigation pending |

CHILD DEATH REPORT

Narrative:    Twenty-nine-year-old foster mother was trying to awaken the 2 ½ year-old ward to get him ready to go to the dentist when he began shaking and had a seizure.  The boy did not have a history of seizures.  His foster mother took him immediately to the hospital.  The boy was transferred to another hospital where he died two days later.  He did not appear to have been diagnosed with sickle cell prior to his death.

Prior History:    The child entered foster care in September 2008 after his 37-year-old mother exhibited bizarre behavior while on a train with the boy and needed to be hospitalized.  The mother could not identify any relatives to care for her son.  The child was in his second foster home; he was placed there in November 2008.  He was in the process of being assessed developmentally and medically.

| Child No. 77 | DOB  1/01 | DOD 1/09 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 8 years |
| Substance exposed: | No |
| Cause of death: | Congenital heart disease |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Eight-year-old ward with congenital heart disease died in the early morning, two days after her eighth birthday.  She had recently told her paternal grandmother, who was her foster mother, that she did not want to die in her sleep.  She often stayed up watching television with her grandmother late at night.  At approximately 2:00 am., the child woke up her grandmother who had dozed off next to her and asked her to please wake up and watch television with her.  Her grandmother stayed up with her until she heard the child fall back on her pillow; she had stopped breathing.

Prior History:    The child entered foster care at 17 months old and was placed with her paternal grandmother.  Following her birth, her younger sister was placed with a paternal aunt.  The sisters saw each other almost daily.  The deceased's grandmother took exceptional care of her.  The worker and supervisor assigned to the child's case provided wonderful support to the child and grandmother.  The child received excellent medical care, went to school with a nurse when she felt up to it, and had hospice care.

| Child No. 78 | DOB  10/08 | DOD 2/09 | Natural |
|---|---|---|---|

| | |
|---|---|
| Age at death: | 3 months |
| Substance exposed: | No |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) |
| Reason For Review: | Child was a ward |
| Action Taken: | Investigatory review of records |

Narrative:    Three-month-old ward was found unresponsive by her babysitter during a nap.  The babysitter called 911 and the foster father who worked nearby.  The foster father performed CPR until paramedics arrived and took the infant to the hospital where she was pronounced dead.  The infant had been placed in the licensed foster home the day before.

Prior History:    The infant was placed in foster care directly after her birth.  Her 26-year-old mother already had 4 children in foster care; their permanency goal had been changed in July 2008 to termination of parental rights and the mother had recently surrendered her parental rights to those children.  The infant had respiratory issues since birth and two foster placements had failed because of the difficulty of caring for her.  She was hospitalized for a week in January 2009 for a viral infection; her primary care physician noted at follow-up that she was "doing very well after hospitalization."

| Child No. 79 | DOB  9/94 | DOD 2/09 | Natural |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Bronchial asthma | | |
| Reason For Review: | Pending DCP investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Fourteen-year-old boy was found unresponsive lying near the door of his home ten minutes after he took the trash out.  He was found by his 13-year-old sister who went outside to find out what was taking so long.  The boy had a history of asthma but had recently been stable, using an inhaler on an as-needed basis.

Prior History:      At the time of the child's death there was a pending child protection investigation. Someone called the hotline alleging that the child was allowed to watch pornography with his 32-year-old mother and her 41-year-old boyfriend.  All parties denied that they watched pornography together. The investigation was unfounded following the child's death with the evidence suggesting that the report was made in retaliation for a call the boyfriend had made about the person to police.

| Child No. 80 | DOB 6/91 | DOD 2/09 | Natural |
|---|---|---|---|
| Age at death: | 17 years | | |
| Substance exposed: | No | | |
| Cause of death: | Streptococcus pyogenes septicemia due to pneumonia | | |
| Reason For Review: | Pending DCP investigation at time of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:      Seventeen-year-old girl was brought in the late afternoon to the emergency room by her 51-year-old father because she was having difficulty breathing.  The girl, who suffered from asthma, had had an asthma attack a few days earlier and also had been experiencing flu-like symptoms.  The girl died in the hospital six hours after being brought there.

Prior History:      The deceased had two younger sisters, ages 5 and 7.  The family's only DCFS involvement was a pending DCP investigation alleging substantial risk of physical injury and inadequate supervision to the girl's 5-year-old sister.  According to the report, the 45-year-old mother called the 5-year-old's school to report that she wasn't feeling well and asked the school secretary to bring her daughter home.  The secretary said she couldn't do that so the mother picked her up.  While walking home with the girl, the mother appeared intoxicated.  The mother reported that she had met several old friends for lunch and had consumed two glasses of wine.  She and her husband were both assessed for substance abuse issues and neither appeared to have a problem with drugs or alcohol.  The investigation was unfounded because the incident did not rise to a level of abuse or neglect.

| Child No. 81 | DOB  2/09 | DOD  3/09 | Natural |
|---|---|---|---|
| Age at death: | 6 weeks | | |
| Substance exposed: | No | | |
| Cause of death: | Sudden Infant Death Syndrome (SIDS) | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death; child's mother was a ward within a year of child's death | | |
| Action Taken: | Full investigation pending | | |

Narrative:      One-month-old infant was found unresponsive by his 21-year-old mother.  The infant was staying with his mother and one-year-old sibling in a shelter.

Prior History:    The mother was a ward of DCFS until June 2008 when she turned 21 and her case was closed.  The 23-year-old father of the two children also was a former ward with his case closing in February 2005.  The mother was minimally participating in a pregnant and parenting teen program prior to her case being closed.  Approximately one week before the case was closed, the hotline was called with allegations of substantial risk of physical injury to her first child.  The investigation was unfounded and expunged and not available for review.  A month after the infant's death, in April 2009, the hotline was contacted with an allegation of substantial risk of physical injury to the surviving child.  The mother and father got into a physical altercation in front of the child and the father beat up the mother.  The father was arrested for battery and both parents were indicated for substantial risk of physical injury to the child.  Services were offered but refused.

| Child No. 82 | DOB  1/06 | DOD 3/09 | Natural |
|---|---|---|---|
| Age at death: | 3 years | | |
| Substance exposed: | No | | |
| Cause of death: | Small bowel infarction | | |
| Reason For Review: | Child was a ward | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Three-year-old child was found deceased in the morning by his 20-year-old mother.  The boy, his 1½-year-old sister and their mother had spent the night at the mother's boyfriend's home.  The boy had been sick for two days with intermittent vomiting and his mother planned to make a doctor appointment.  Bowel twist can occur suddenly and has a high fatality rate.  Because of the child's sudden death, his 1½-year-old sister was examined at the hospital and had a bone scan.  She was found to have an old fractured clavicle and scratches and bruises and was placed in a foster home.  A child protection investigation of the 3-year-old's death and the 1½-year-old's injuries remains open.

Prior History:       This family came to the attention of DCFS in November 2008 when the hotline was called with a report that the 1-year-old sister had unexplained bruises to the backs of her hands and walked with a limp.  An allegation of cuts, bruises, welts was unfounded, but an allegation of non-organic failure to thrive to the girl was added and indicated, and she and her older brother entered foster care in January 2009.  In March 2009 the children were placed with their mother who lived in the maternal grandmother's home, but they remained in the guardianship of DCFS.  Since being placed in a foster home following her brother's death, the girl has gained weight.

| Child No. 83 | DOB  1/95 | DOD 3/09 | Natural |
|---|---|---|---|
| Age at death: | 14 years | | |
| Substance exposed: | No | | |
| Cause of death: | Pneumothorax due to status asthmaticus due to acute asthma attack | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:       Fourteen-year-old child was taken to the hospital emergency room by her mother and step-father in the evening because she was having an asthma attack.  ER staff treated the girl for 2½ hours with breathing treatments, intubation, IV steroids and medication, but she failed to respond to the treatments (status asthmaticus), a lung collapsed (pneumothorax) and her heart slowed and stopped.  The child was born prematurely at 22 weeks gestation and had poor lung compliance since birth.  A child protection investigation for death by neglect against her mother was unfounded; doctors believed the mother responded promptly to the asthma attack and the child's medical records demonstrated good compliance with appointments and medication to treat the child's asthma.

Prior History:     The deceased was the third of four children.  She was born prematurely and required substantial care.  From June 1995 until March 1996 she was in the Department's custody; she was a ward until June 1997.  The mother was indicated in 1998 and 2005 regarding follow-up of her daughter's asthma.  There was ongoing conflict between the mother and school personnel over the child's medical care and asthma management.  A February 2009 investigation was unfounded for medical neglect because the child's medical provider stated that the 34-year-old mother was acting appropriately with regard to her daughter's medical care.

| Child No. 84 | DOB  7/03 | DOD 3/09 | Natural |
|---|---|---|---|
| Age at death: | 5½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Dehydration | | |
| Reason For Review: | Unfounded DCP investigation; child welfare services referral within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Five-and-a-half-year-old boy became unresponsive while being cared for by his 11-year-old sister and 10-year-old brother.  Family members reported that the child had fallen on a toy train two days earlier and suffered a deep bruise to his right groin area.  The child had had little appetite since suffering the injury.  The child died from dehydration; he likely had an underlying infection.  Neither parent was home at the time of the 5½-year-old's death; the mother was at work and the step-father had taken another child somewhere.  The 10 and 11-year-old siblings were left in charge of five of their siblings, ages 1 to 7.  When her brother became unresponsive, the sister called her adult sister who lived nearby.  DCFS investigated the child's death.  The parents were indicated for the child's death by neglect and for substantial risk of physical injury and inadequate supervision to the other children in the home.  The children entered foster care immediately following the child's death until May and June 2009 when they returned home.  A case remains open with DCFS and the parents and children are engaged in counseling and other services.

Prior History:     In April 2008 the Department investigated a report of sexual molestation to the 11-year-old girl (then 10 years old) by her stepfather.  The report was unfounded because of insufficient evidence.  The following month, the reporter of the April hotline report called the Department requesting child welfare services for the family.  The CWS worker met with the mother who reported that she wanted to give guardianship of the 11-year-old to an aunt and uncle.  The CWS worker encouraged the mother to consider family counseling, but also gave the mother short-term guardianship papers and a referral to a community based agency.  The mother declined a referral to the Extended Family Support Services program.

| Child No. 85 | DOB  11/01 | DOD 4/09 | Natural |
|---|---|---|---|
| Age at death: | 7 years | | |
| Substance exposed: | Yes, cocaine | | |
| Cause of death: | Bronchopneumonia with significant contributing factor of diabetes | | |
| Reason For Review: | Split custody, sibling was placed out of the home pursuant to a safety plan | | |
| Action Taken: | Investigatory review of records | | |

Narrative:     Seven-year-old girl was taken to the hospital by her 31-year-old father.  The girl had been exhibiting flu-like symptoms for a few days and her father had taken her to the doctor the day before where she was diagnosed with a viral infection and sent home.  The girl, who had diabetes, decompensated through the night and was brought to the hospital the next day.  The girl was treated in the emergency room without success.  A child protection investigation of the girl's death was unfounded.  According to the girl's doctor, her diabetes was always managed in an appropriate manner.

Prior History:    The deceased was born substance exposed and an intact family case was open on her and her mother for six months.  Thereafter, the girl lived with her father who also had custody of his three other children.  In March 2009 the Department investigated a report that the girl's insulin was not being administered appropriately.  The investigation was unfounded when the girl's doctor said she had no concerns about the manner in which the girl's diabetes was managed.  A few days after the report was made, the hotline was called by police who reported that the father had been arrested for domestic battery for beating up his 11-year-old son when he discovered the boy had stolen money from him.  A criminal case was initiated, the boy was placed in a safety plan with his paternal grandparents, and an intact family services case was opened.

| Child No. 86 | DOB 6/01 | DOD 5/09 | Natural |
|---|---|---|---|
| Age at death: | 7½ years | | |
| Substance exposed: | No | | |
| Cause of death: | Complications from mononucleosis | | |
| Reason For Review: | Open intact family case at time of child's death; indicated and unfounded DCP investigations within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Seven-and-a-half-year-old medically complex child with severe cerebral palsy died from complications from mononucleosis.  He was hospitalized at the time.

Prior History:    In December 2008, a few months after the family moved to Illinois from another state, the hotline was called with a report that the child's 29-year-old mother was not feeding the child appropriately because he had lost weight and she had not followed up on referrals to see a nutritionist.  The mother reported that the child had always been smaller than other same age children.  The child's school reported that the mother wanted to stay at school all day and feed the child, but it would have been disruptive.  The child was fed at school one time per day.  School personnel wanted the mother to get a swallow study completed on the child because he ate so slowly.  The social worker at the child's prior school described the mother as an excellent caregiver, but stated they also wanted the mother to have a swallow study, but she was resistant.  The mother was indicated for malnutrition of the child and an intact family case was opened.  In February 2009 the hotline was called again with an allegation of malnutrition.  Neither the child's primary care physician nor a physician who examined the child at a children's hospital believed the child was malnourished and noted that children with cerebral palsy cannot be compared to healthy children their age.  The investigation was unfounded.  There was ongoing conflict between this family and the child's school over the child's weight and nutrition.  The intact family worker and a DCFS nurse attempted to mediate the differences.   The case was closed following the child's death.

| Child No. 87 | DOB 6/07 | DOD 5/09 | Natural |
|---|---|---|---|
| Age at death: | 23 months | | |
| Substance exposed: | No | | |
| Cause of death: | Complications arising from short bowel syndrome | | |
| Reason For Review: | Unfounded DCP investigation within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Medically complex and developmentally delayed child was released from a pediatric rehabilitation facility following an almost 3-month stay.  Three days after returning home, he began experiencing symptoms of vomiting and diarrhea.  His parents monitored his condition and he was scheduled to be seen by a home health nurse the following day.  In the middle of the night the toddler became unresponsive and the parents called 911.  The toddler was taken by ambulance to the hospital where he arrived in cardiac arrest and died a short while later.  According to the pathologist who conducted the child's autopsy, the toddler could have deteriorated quickly without obvious signs.  A DCP investigation of the toddler's death was unfounded.

Prior History:    The deceased was the subject of two unfounded reports from October 2008 alleging bone fractures and medical neglect.  The toddler was seen at the local emergency department for a fracture to his left arm.  He was also found to have a fracture to his right tibia, of which the parents were unaware.  The emergency department called the hotline and transferred the toddler to a children's hospital because of his many medical issues.  The child had spent his first eight months in the hospital. He had multiple surgeries and hospitalizations related to an improperly developed bowel resulting in a diagnosis of failure to thrive.  He required G-tube feedings and had a history of osteopenia and rickets which caused bone weakness.  Taking into consideration the explanations for the injuries provided by the mother, the type of bone fractures, the child's medical conditions, and the child's history of care, the child protection team opined that the injuries were caused accidentally.

| Child No. 88 | DOB 5/09 | DOD 5/09 | Natural |
|---|---|---|---|
| Age at death: | 0 | | |
| Substance exposed: | No | | |
| Cause of death: | Prematurity | | |
| Reason For Review: | Pending DCP investigation; open intact family case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Infant, born at 26 weeks gestation, died 48 minutes after birth.  The infant's 23-year-old mother had appropriate prenatal care and no substance abuse was suspected.  She had a history of giving birth prematurely.

Prior History:    At the time of the infant's birth and death, there was a pending investigation on the mother for environmental neglect because the apartment she lived in with her two sons, ages 1 and 4, was infested with roaches.  Investigation revealed a clean home with the exception of the roaches.  The mother was working with the public housing complex in which she lived to rid the apartment of the roaches.  The investigation was unfounded.  The mother was offered services, but she declined them. Following an indicated report of inadequate shelter, the mother had an intact family case open from October 2007 to November 2008 during which time the mother obtained housing and engaged in parenting education and her children were enrolled in early intervention services.

| Child No. 89 | DOB 3/07 | DOD 5/09 | Natural |
|---|---|---|---|
| Age at death: | 26 months | | |
| Substance exposed: | No | | |
| Cause of death: | Multiple congenital anomalies | | |
| Reason For Review: | Open intact family case within a year of child's death | | |
| Action Taken: | Investigatory review of records | | |

Narrative:    Twenty-six-month-old medically complex child was visiting a cousin with her 19-year-mother and her 3½-year-old sister.  The child was sitting on the floor when she began wheezing and whining and fell backwards, collapsing to the floor.  The child had DiGeorge Syndrome, a disorder caused by a defect in chromosome 22, which results in the poor development of several body systems. Her long term prognosis was poor.  At autopsy the child's heart was tremendously enlarged which can cause sudden death.

Prior History:    The family came to DCFS's attention in August 2007 when the infant was hospitalized for failure to thrive.  While the infant's condition was likely partly because of her complex medical condition, medical personnel believed there was an environmental component as well and the mother was indicated for failure to thrive.  An intact family case was open from September 2007 until two weeks prior to the child's death when the mother refused further services and requested that her case be closed.  At the time of case closure, the mother was following the child's treatment plan and attending the child's medical appointments which were two to three times a month.

## 10-YEAR DEATH RETROSPECTIVE

**TOTAL DEATHS BY CASE STATUS FY 2000 TO FY 2009**

| FISCAL YEAR | 2000 | | 2001 | | 2002 | | 2003 | | 2004 | | 2005 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % | # | % |
| Ward | 29 | 31% | 42 | 41% | 23 | 24% | 28 | 23% | 31 | 22% | 37 | 27% |
| Unfounded DCP | 7 | 7% | 14 | 13% | 7 | 7% | 21 | 15% | 29 | 21% | 29 | 20% |
| Pending DCP | 10 | 11% | 6 | 6% | 8 | 8% | 15 | 12% | 12 | 8% | 15 | 11% |
| Indicated DCP | 8 | 8% | 14 | 14% | 9 | 9% | 12 | 10% | 6 | 4% | 1 | 1% |
| Child of Ward | 5 | 5% | 4 | 4% | 6 | 6% | 12 | 10% | 2 | 1% | 2 | 1.5% |
| Open Intact | 9 | 9% | 12 | 12% | 20 | 21% | 19 | 15% | 15 | 11% | 31 | 22% |
| Closed Intact | 5 | 5% | 3 | 2% | 7 | 9% | 7 | 5% | 13 | 9% | 0 | 0% |
| Open Placement | 3 | 3% | 4 | 4% | 5 | 5% | 2 | 1.5% | 10 | 7% | 3 | 2% |
| Closed Placement/ Return Home | 3 | 3% | 1 | 1% | 4 | 4% | 2 | 1.5% | 2 | 1% | 0 | 0% |
| Split Custody | 10 | 11% | 0 | 0 | 4 | 3% | 1 | 1% | 7 | 6% | 2 | 1.5% |
| Others | 7 | 7% | 3 | 3% | 4 | 4% | 8 | 6% | 12 | 10% | 19 | 14% |
| **TOTAL** | **96** | **100%** | **103** | **100%** | **97** | **100%** | **127** | **100%** | **139** | **100%** | **139** | **100%** |

| FISCAL YEAR | 2006 | | 2007 | | 2008 | | 2009 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| CASE STATUS | # | % | # | % | # | % | # | % | # | % |
| Ward | 17 | 20% | 24 | 22% | 19 | 22% | 21 | 24% | 271 | 25% |
| Unfounded DCP | 25 | 29% | 35 | 31% | 18 | 31% | 19 | 21% | 204 | 19% |
| Pending DCP | 7 | 8% | 16 | 14% | 13 | 14% | 14 | 16% | 116 | 11% |
| Indicated DCP | 1 | 1% | 6 | 5% | 12 | 5% | 4 | 4% | 73 | 7% |
| Child of Ward | 1 | 1% | 4 | 4% | 3 | 4% | 2 | 2% | 41 | 4% |
| Open Intact | 20 | 23% | 13 | 12% | 18 | 12% | 12 | 14% | 169 | 15% |
| Closed Intact | 1 | 1% | 2 | 2% | 2 | 2% | 6 | 7% | 46 | 4% |
| Open Placement | 2 | 2.5% | 1 | 1% | 3 | 1% | 1 | 1% | 34 | 3% |
| Closed Placement/ Return Home | 0 | 0 | 5 | 4% | 1 | 4% | 1 | 1% | 19 | 2% |
| Split Custody | 2 | 2.5% | 1 | 1% | 1 | 1% | 5 | 6% | 33 | 3% |
| Others | 10 | 12% | 4 | 4% | 9 | 4% | 4 | 4% | 80 | 7% |
| **TOTAL** | **86** | **100%** | **111** | **100%** | **99** | **100%** | **89** | **100%** | **1086** | **100%** |

**CHILD DEATHS BY DCFS CASE STATUS AND MANNER OF DEATH 2000 TO 2009**

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Deaths | 96 | 103 | 97 | 127 | 139 | 139 | 86 | 111 | 99 | 89 |
| **Ward** | **29** | **42** | **23** | **28** | **31** | **37** | **17** | **24** | **19** | **21** |
| Natural | 13 | 20 | 14 | 18 | 16 | 28 | 10 | 13 | 11 | 9 |
| Accident | 6 | 9 | 3 | 3 | 3 | 1 | 2 | 6 | 5 | 4 |
| Homicide | 7 | 9 | 3 | 6 | 8 | 5 | 4 | 3 | 3 | 4 |
| Suicide | 0 | 0 | 3 | 1 | 2 | 3 | 0 | 0 | 0 | 3 |
| Undetermined | 3 | 4 | 0 | 0 | 2 | 0 | 1 | 2 | 0 | 1 |
| **Unfounded Investigation** | **7** | **14** | **7** | **21** | **29** | **29** | **25** | **35** | **18** | **19** |
| Natural | 0 | 5 | 2 | 9 | 16 | 17 | 8 | 9 | 6 | 7 |
| Accident | 2 | 6 | 0 | 6 | 8 | 8 | 8 | 16 | 7 | 7 |
| Homicide | 4 | 2 | 3 | 5 | 2 | 1 | 7 | 5 | 3 | 2 |
| Suicide | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| Undetermined | 1 | 1 | 1 | 1 | 3 | 3 | 2 | 4 | 1 | 1 |
| **Pending Investigation** | **10** | **6** | **8** | **15** | **12** | **15** | **7** | **16** | **13** | **14** |
| Natural | 0 | 1 | 7 | 6 | 6 | 4 | 3 | 8 | 3 | 6 |
| Accident | 5 | 1 | 1 | 3 | 1 | 5 | 2 | 2 | 1 | 4 |
| Homicide | 3 | 3 | 0 | 5 | 3 | 3 | 2 | 4 | 3 | 2 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| Undetermined | 2 | 1 | 0 | 1 | 2 | 3 | 0 | 2 | 4 | 2 |
| **Indicated Investigation** | **8** | **14** | **9** | **12** | **6** | **1** | **1** | **6** | **12** | **4** |
| Natural | 1 | 4 | 7 | 7 | 3 | 1 | 0 | 2 | 4 | 1 |
| Accident | 4 | 7 | 0 | 4 | 3 | 0 | 0 | 4 | 2 | 3 |
| Homicide | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 2 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 2 | 0 |
| **Child of Ward\*** | **5** | **4** | **6** | **12** | **2** | **2** | **1** | **4** | **3** | **2** |
| Natural | 3 | 1 | 1 | 6 | 1 | 2 | 1 | 2 | 1 | 0 |
| Accident | 1 | 1 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 1 |
| Homicide | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 0 |
| **Open Intact** | **9** | **12** | **20** | **19** | **15** | **31** | **20** | **13** | **18** | **12** |
| Natural | 6 | 6 | 6 | 4 | 8 | 23 | 12 | 5 | 6 | 5 |
| Accident | 0 | 5 | 7 | 10 | 1 | 5 | 3 | 4 | 4 | 4 |
| Homicide | 1 | 1 | 5 | 1 | 1 | 2 | 4 | 2 | 4 | 2 |
| Suicide | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| Undetermined | 2 | 0 | 2 | 4 | 4 | 1 | 1 | 2 | 3 | 1 |

| FISCAL YEAR | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Closed Intact** | **5** | **3** | **8** | **7** | **13** | **0** | **1** | **2** | **2** | **6** |
| Natural | 2 | 2 | 2 | 3 | 3 | 0 | 0 | 1 | 2 | 2 |
| Accident | 2 | 0 | 4 | 1 | 5 | 0 | 1 | 1 | 0 | 1 |
| Homicide | 1 | 0 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 2 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| **Open Placement** | **3** | **4** | **5** | **2** | **10** | **3** | **2** | **1** | **3** | **1** |
| Natural | 3 | 4 | 4 | 2 | 9 | 2 | 2 | 1 | 3 | 0 |
| Accident | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Closed Placement** | **3** | **1** | **4** | **2** | **2** | **0** | **0** | **0** | **0** | **0** |
| Natural | 3 | 0 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Accident | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Split Custody** | **10** | **0** | **4** | **1** | **7** | **2** | **2** | **1** | **1** | **5** |
| Natural | 3 | 0 | 2 | 1 | 3 | 1 | 1 | 0 | 1 | 1 |
| Accident | 1 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 2 |
| Homicide | 1 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 1 |
| Suicide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Undetermined | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| **Adopted** | **0** | **2** | **2** | **1** | **1** | **0** | **0** | **0** | **0** | **0** |
| **Former Ward** | **5** | **1** | **0** | **1** | **1** | **0** | **1** | **1** | **1** | **0** |
| **Open Return Home** | **0** | **0** | **0** | **1** | **0** | **3** | **0** | **4** | **1** | **1** |
| **Closed Return Home** | **2** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Homicide by a ward\*\*** | **1** | **0** | **1** | **2** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Interstate compact** | **0** | **1** | **0** | **0** | **1** | **0** | **1** | **0** | **0** | **0** |
| **Preventive services** | **0** | **0** | **1** | **3** | **4** | **13** | **5** | **2** | **3** | **2** |
| **Subsidized Guardianship** | **0** | **0** | **0** | **1** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Child of former ward** | **0** | **0** | **0** | **0** | **3** | **1** | **0** | **0** | **0** | **0** |
| **Extended family support** | **0** | **0** | **0** | **0** | **2** | **2** | **0** | **1** | **0** | **1** |
| **Child Welfare Referral** | **0** | **0** | **0** | **0** | **0** | **0** | **3** | **1** | **5** | **1** |

*In FY 1 a child of a ward was also a ward and was only counted once in the total.
**In FY 00, FY 02 and FY 03 the victims of the homicide by a ward were either not involved with DCFS and therefore not included in the total or the victims were involved with DCFS and had been included in another category.

90

# GENERAL INVESTIGATIONS

**GENERAL INVESTIGATION 1**

| | |
|---|---|
| **ALLEGATION** | In the course of an OIG investigation of a DCFS intact family services worker, the OIG investigator learned that, previously, the police had called the hotline to report that an ill infant was found living in a home described as a "flop house" frequented by substance abusers. |

| | |
|---|---|
| **INVESTIGATION** | The family's involvement with the Department began after the mother delivered a baby girl. Both mother and baby tested positive for cocaine at the time of the birth |

and a child protection investigation was initiated. The assigned child protection investigator visited the mother at the hospital where she told him of her extensive history of substance abuse. The mother stated she had several adult children, however the investigator did not learn their names or determine where they resided. In an interview with the OIG, the investigator stated he completed checks of the mother and father through electronic databases (CYCIS and SACWIS) and found no history of Department involvement. The investigator said he was unconcerned regarding the welfare of the mother's other children because he understood they were all adults. An OIG check of the CYCIS and SACWIS systems found the mother had previously given birth to eight children, two of whom were eleven and thirteen years old. The two children had each been removed from their mother's custody within a week of being born. The mother had also been involved with the Department as a minor. The OIG found that this critical information was not readily accessible through these databases. Although determining the full scope of the family's history with the Department required a detailed, diligent search, had a cursory inquiry been conducted by the investigator it would have returned at least a partial history. The investigator did perform a law enforcement database check (LEADS) which showed both parents had histories of criminal charges related to drugs.

Given the mother's pre-natal drug use and delivery of a substance-exposed baby, the investigator completed an Adult Substance Abuse Screen on both parents. Department Procedure requires screens showing positive results for substance exposed infants or criminal drug histories to be followed by an immediate referral for substance abuse assessments. A call to the assessment provider is to be made in the presence of the client so that an appointment can be scheduled. The investigator did not make referrals for substance abuse screens of the parents and, in his interview with the OIG, was unable to provide an explanation for failing to have done so. In a separate interview, the investigator's supervisor erroneously told the OIG that referrals for assessment are not usually made until a case is opened for intact family services. Investigators are also required to report any substance exposed births to the Department of Public Health, however this task was not performed. While still at the hospital, the investigator had the mother sign a blank Home Safety Checklist, which is intended for use during an inspection of a child's living environment. The investigator never viewed the family's home despite later conducting an interview with a collateral contact in the same apartment building where they lived. The investigator ultimately recommended indicating the report and the decision was approved by his supervisor. The supervisor signed off on the investigator's report even though several required tasks had not been performed.

The case was referred for intact family services to be provided through the Department. During her first meeting with the family at their home, the intact worker observed the baby to be shaking and recorded in her notes she was "severely concerned" about the infant's health. The intact worker recommended to the mother that she take the baby to the pediatrician. At their next meeting two weeks later, the mother told the worker she had not yet taken the baby to the doctor. The intact worker recorded in her notes that the baby appeared

to be healthier than before.  She also noted the high volume of foot traffic entering and exiting the family's home and suggested they might need to secure a larger residence to accommodate all the people coming and going.  In an interview with the OIG, the intact worker stated she had been aware of the family's substance abuse issues and was concerned the baby's shaking was a symptom of withdrawal.  She did not observe the infant again until 12 weeks later after another hotline report had been made against the family.  Following the report, the intact worker created new SACWIS notes documenting three previous unsuccessful attempts to visit the family.  In the interim, the intact worker had made no effort to ensure the baby had been seen by a physician. The caseworker's supervisor was aware the caseworker was chronically delinquent in documenting her work on cases and that required tasks had not been performed.  The supervisor did not take an active role to ensure the caseworker improved her performance and did not make an individual effort to utilize information available to her to rectify obvious problems with service delivery.

The second hotline report was made after local law enforcement responded to complaints about the family's home.  Police identified the residence as a "flop house" and reported finding needles and other drug paraphernalia amongst unsafe and unsanitary conditions.  Officers observed the infant to be ill.  The baby was hospitalized with a high fever and seizures.  Later, the baby was taken into protective custody and placed in a foster home.  The second report was indicated against both parents for risk of harm.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The intact family services worker should be disciplined for failing to follow Department Procedure 302, Services Delivered by the Department of Children and Family Services,  and the Substance Affected Families Policy in failing to: (a) make a referral for drug assessment; (b) ensure medical follow up for a substance exposed infant exhibiting tremors; (c) make a hotline call for medical neglect; (d) follow supervisory directives; and (e) perform basic duties of her job position, specifically weekly home visits during the first 45 days of the case, and bi-monthly visits thereafter.**

The discipline is in process.

**2.  The child protection investigator should be disciplined for failing to: (a) complete the Home Safety Checklist; (b) ensure the safety and well-being of the newborn who was living in an unsafe environment; (c) follow Department Procedure 302, Appendix A, Substance Affected Families Policy, which dictates that a drug assessment referral should have been made; (d) make a referral for intact family services in a timely manner; and (e) complete a safety assessment.**

The investigator received a suspension.

**3.  The child protection supervisor should be disciplined for failing to provide adequate supervision of an investigation that was incomplete and improperly conducted.  The supervisor failed to: ensure that a substance-exposed infant was assessed for safety and that the parent was immediately referred for drug assessment; ensure that the investigator followed the safety assessment protocol; and sign required documents for proper closing of the investigation.**

The child protection supervisor received a suspension.

**4.  The intact family services supervisor should receive disciplinary counseling for failing to ensure that the intact worker completed tasks and contacts and failing to ensure that the worker was following through on supervisory directives.**

The supervisor received a suspension.

**5. The Office of Information Technology Services should explore the feasibility of streamlining the search function of the State Automated Child Welfare Information System (SACWIS) concerning ease of locating prior history with the Department.**

The Department does not have the funding or manpower to undertake this project.

*OIG Response: Given the high caseloads of investigators and caseworkers, efficient search engines are critical to protecting children.*

## GENERAL INVESTIGATION 2

| | |
|---|---|
| **ALLEGATION** | A child protection investigator failed to interview a mandated reporter who contacted the hotline to allege neglect of two brothers, ages 11 and 17. |

| | |
|---|---|
| **INVESTIGATION** | Police responded to the family's home after the 11 year-old made an emergency call to authorities. Officers arrived to find the children's father holding their |

mother at knifepoint. The father was arrested and charged with aggravated assault. The police department's victim advocate called the hotline and a child protection investigation was opened.

The child protection investigator assigned to the case began by visiting the family home, where he interviewed the mother and both brothers. All three cited the father's alcoholism as a significant source of conflict in the home and stated his behavior became erratic and frightening when he drank. The 17 year-old said he had intervened to protect his mother during the fight that led to police being called. The 17 year-old stated that while he did not fear for himself he was concerned about his mother and brother's ability to protect themselves after his planned departure for college the following year. The mother told the investigator that while the father had long been verbally abusive, this was the first time he had become physically aggressive. She stated she was unsure whether she would pursue an order of protection but had no intention of bailing her husband out of jail.

The investigator completed a Child Endangerment Risk Assessment Protocol (CERAP) determining the home to be safe. The investigator based his conclusion on the fact the father was incarcerated at the time and the mother's stated intention not to allow the father back in the home. One week later, the investigator met with his supervisor to discuss the case. In the interim the court had issued an order of protection prohibiting the father from having any contact with the mother. During the meeting, the supervisor approved the CERAP and waived the requirement that the investigator perform weekly visits. In his case notes, the investigator wrote that the "older teen boys" demonstrated, "full capacity to protect [themselves] and [the mother]."

The investigator then met with the father, who had been released from jail after his brother posted bond. The father denied any history of substance abuse or domestic violence, saying the incident was the first of its kind during the couple's 19-year marriage. Although the father reported he was residing in his brother's home, the investigator did not speak with the brother or determine how long the arrangement might last. The investigator also failed to reconsider the CERAP in light of the father's release from jail. The father stated that he had entered a court-ordered substance abuse treatment program, however the investigator did not obtain a consent for release of information from the hospital providing those services. In response to an inquiry from the OIG, the hospital reported it had no record of the father ever participating in substance abuse treatment.

Later the same day, the investigator left a voicemail message informing the victim advocate of his intention to unfound the report. In an interview with the OIG, the investigator stated he had made several unsuccessful attempts to contact the reporter but had not documented his efforts. Had he contacted the reporter, the investigator would have learned additional relevant facts which would have enabled him to refer the family for ongoing services. The investigator also neglected to obtain a copy of the police report related to the incident in the home. The investigator acknowledged he should have spoken to the reporter and reviewed the police report before concluding his work on the case. The investigator's supervisor approved the unfounded finding and closure of the case despite the fact required tasks had not been performed.

Three weeks after the case was unfounded, police and firefighters were called to the family home in response to a fire in progress. Authorities determined that the father had returned to the home at a time he believed the mother and brothers were asleep, poured gasoline around the base of the building and lit it on fire. The family

and all other residents of the building were able to escape unharmed.  The father was arrested and charged with attempted murder and arson.  He died of natural causes while imprisoned awaiting trial.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The child protection investigator's supervisor should be disciplined for approving the closing of an investigation in the initial stage in which the investigator failed to adequately assess the safety of the children and failed to contact the mandated reporter for investigative information.**

The supervisor received a written reprimand.

**2.   The child protection investigator should be disciplined for failing to adequately assess the safety of the children in this investigation and failing to contact the mandated reporter for investigative information.**

The investigator received a suspension.

## GENERAL INVESTIGATION 3

| **ALLEGATION** | Three female wards and the adopted daughter of a licensed foster parent were sexually abused by the foster mother's son-in-law while they resided in her home. |
|---|---|

**INVESTIGATION**   The abuse allegations came to light after one of the wards, a 16 year-old girl, reported to a therapist that her foster mother's son-in-law had repeatedly sexually assaulted her over the previous three years. The girl additionally stated that the foster mother's adopted daughter, a former ward who was also 16, was engaged in a sexual relationship with the son-in-law. Security guards at the adopted daughter's high school notified local police after observing the girl sneak out of school early and get into a car with a man whom she began kissing. Police stopped the car and found the adopted daughter in the company of the son-in-law.

During the subsequent child protection investigation, the Department and law enforcement officials found evidence the son-in-law had engaged in sexual activity with both girls, as well as two other girls who had previously been placed with the foster mother and had since left the home. The three wards related similar accounts of being assaulted by the son-in-law and all stated the incidents frequently occurred in his home after they had been left there in the care of his wife, the foster mother's adult daughter. The son-in-law was ultimately convicted of sexual assault by a person with authority over the victim. The son-in-law and the adult daughter were indicated for risk of sexual abuse to their own two children and the son-in-law was also indicated for sexual penetration of the 16 year-old foster child. The foster mother was indicated for substantial risk of physical injury to the two girls residing in her home at the time and relinquished her foster home license.

An OIG review of the foster mother's licensing file found that although the foster mother had consistently identified her adult daughter as an alternate caregiver, the Department never determined whether care would be provided in the foster mother's home or at another location. Current Department Rule does not require licensing workers to obtain such information. Since the son-in-law was not identified as a person with access to the girls, a background check or criminal history search was never performed for him. An OIG check of the son-in-law found he had an extensive criminal history dating back 30 years, including numerous convictions in four different states. An OIG check of electronic records (SACWIS) found that the son-in-law had been the subject of two previous indicated reports. In both instances the son-in-law had placed his own children at risk through his drug-related behavior. The second case involved the son-in-law smoking crack while driving with his four year-old daughter and resulted in his being sentenced to four years in prison on a number of charges. The OIG learned of the couple's previous involvement with the Department through a SACWIS search of the adult daughter's name.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.   The Department should amend Department Rule and Procedure 402, Licensing Standards for Foster Family Homes, to require that licensing workers identify alternate caregivers, determine where the alternate care will take place and perform background checks in accordance with Rule 385, Background Checks, of all adults and those over 13 years of age residing in the alternate care home when the care will take place other than in the foster parent's home.**

A CFS 109 is being prepared for a revision of Part 402 that would require that licensing staff identify alternative caregivers and perform background checks in accordance with Rule 385 of all adults and those over 13 years old residing in the alternate care home.

*OIG Response: The critical information that needed to be gathered in this case was where the care was being provided. Unless the Department requires information about where the care is being provided, the harm that the children were subjected to in this case could be repeated.*

## GENERAL INVESTIGATION 4

| | |
|---|---|
| **ALLEGATION** | A child protection investigator improperly indicated a report against the adoptive parents of a 13 year-old boy. |

**INVESTIGATION**    The child protection investigation was initiated after the hotline received a report alleging the parents had refused to pick the boy up upon his release from a psychiatric hospital. The report stated the boy was not a risk to his family and had remained at the facility for three days following his anticipated discharge. The assigned child protection investigator interviewed the parents who stated they had become unable to control the boy's escalating behavior, which included extreme outbursts and threats of violence against his family. The parents reported the boy had been hospitalized 12 times over the previous two years and that his psychiatrist told them they had exhausted all potential medications. The parents signed releases allowing the investigator access to the boy's complete mental health history and to speak with the psychiatrist and a therapist who also treated the boy. The parents believed the accounts of mental health professionals who had been involved with the boy over time would contradict the positions of personnel from the boy's school, who felt his behavioral problems were confined to the home, and staff at the psychiatric hospital, who concluded after a few days of observation that the boy was no risk to his family.

The investigator and her supervisor attended a clinical staffing where the boy's history was discussed. The boy's multiple diagnoses, including bipolar disorder, attention deficit-hyperactivity disorder, and intermittent explosive disorder, were detailed, as was his history of erratic behavior. His increasingly threatening words and actions towards family members culminated in his pushing his 14 year-old brother down a flight of stairs after the sibling confronted him following a bizarre outburst. That incident had precipitated the boy's most recent hospitalization and the parents remained fearful of how he would respond once he was back in the home. The boy told another Department employee who visited him at the hospital that he routinely took his anger out on his family and threatened his parents with harm, although he did not believe he would act on his impulses. The parents stated that just prior to his hospitalization the boy had threatened to stab family members. The day after the staffing, the investigator took the boy into protective custody and placed him in a group home.

After consulting with her supervisor, the child protection investigator indicated the report against the parents for lock out while noting their concerns regarding the safety of the other children. Although Department Procedure requires investigators to interview any and all mental health providers in cases where an alleged victim is psychiatrically hospitalized, the investigator did not speak with either the boy's psychiatrist or his therapist. The investigator's supervisor waived the requirement based on her conclusion that having reviewed the boy's mental health history was sufficient for determining his level of functioning. The investigator and her supervisor gave inordinate credence to staff's report that the boy was functioning normally in the psychiatric hospital, without talking to the hospital's own psychiatrist or considering the expert opinions of the psychiatrist and therapist who had been treating him. In an interview with the OIG, the investigator stated she had attempted to contact the boy's psychiatrist, however a review of the case record found no evidence such an effort had been made.

The parents appealed the indicated finding, which was subsequently reversed and a finding of no-fault dependency was entered. The boy was later transferred from the group home to a residential facility where he remains with a goal of returning home in 12 months. Despite the change in status, Department databases and the official case record all still show the boy entered care as a result of neglect rather than no-fault dependency.

In situations where parents and guardians have reached the limits of their abilities to deal with children who exhibit extreme emotional, behavioral, medical or other issues, the option of entering into a voluntary placement agreement should be presented.  Voluntary placement agreements allow children to be moved to a placement while parents or guardians and professionals work towards reunification.  During the course of this investigation, the OIG found the Department currently has no administrator assigned to oversee the voluntary placement agreement process and there is a lack of familiarity among other workers as to its availability or implementation.  As voluntary placement agreements can be entered into to provide stability and prevent involvement with the Juvenile Court, their utilization should be formalized and encouraged throughout the Department.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.    The Department should correct Department electronic records databases (CYCIS and SACWIS) screens to reflect that the family's case is open as a no-fault dependency, not neglect.** |

The databases have been corrected.

**2.  The Department should draft a memo to be attached to the inside front cover of the file entitled "Error Correction" that explains the neglect finding was expunged.  Suggested language: <u>The parents have not been indicated for neglect.  The case is open as a result of a no-fault dependency.  A copy of this Error Correction sheet should be included whenever copies of the file are made.</u>**

A memorandum has been placed in the file.

**3.  The Department's Clinical Division and the Post-Adoption Unit should be provided information on the use of voluntary placement agreements.**

The use of Voluntary Placement Agreements (VPA) was discussed with all clinical managers statewide.  The issue of Voluntary Placement Agreements was also discussed at a Clinical All Team Meeting.  Those in attendance included the regional nurses, clinical managers, clinical coordinators, sexual behavior problem coordinators and clerical staff.

An Information Transmittal regarding the use of Voluntary Placement Agreements was also distributed.

**4.  The Department should pursue non-disciplinary counseling of the child protection investigator for failing to interview the attending psychiatrist at the psychiatric hospital, the boy's treating psychiatrist and his treating therapist.  Counseling should include a review of the factors to be considered in a lock-out investigation as cited in this report.  This report should be reviewed with the investigator's manager.**

The Office of the Inspector General investigation was shared with the child protection manager who then provided counseling to the worker.

**5.  The Department should pursue non-disciplinary counseling of the child protection investigator's supervisor for failing to ensure Department Procedures 300, Reports of Child Abuse and Neglect, Appendix B, Allegation: Lock-Out was followed.**

The supervisor was counseled.

## GENERAL INVESTIGATION 5

**ALLEGATION**   A private agency failed to meet the needs of a sibling group, including failure to achieve permanency and multiple foster home disruptions for two of these siblings. During the course of the investigation, it was learned that the Department's Agencies and Institutions Licensing cited the private agency for multiple licensing violations requiring correction to maintain a licensed status. In addition, the Council on Accreditation (COA) revoked the agency's accreditation during the OIG investigation.

**INVESTIGATION**   The private agency provided services to the three foster children ages three, two and one beginning in June 2002. Over the next six years the agency assigned six case managers to the children. A traditional foster parent adopted the youngest sibling in 2006. However, the two older siblings had not achieved permanency by 2008, six years after becoming wards of the state. While the private agency managed the children's foster care case, the two oldest children experienced eight placement disruptions with seven different foster homes, six of the foster homes were licensed through the private agency for traditional foster care services. Review of the licensing files by OIG staff revealed multiple deficiencies, including lack of documentation, incomplete licensing investigations and lack of communication between licensing staff and case management staff both within the agency and with other private agencies.

The two oldest children were removed from their fourth foster home after reports of corporal punishment. While in their sixth placement, the agency investigated the foster mother after the children's school made multiple complaints regarding the foster parent's ability to meet the needs of her two foster children, who were now school aged. Both children had frequent school absences, lacked school supplies and the five year old reported corporal punishment by the foster mother. Within the first month of the licensing investigation, the foster mother requested removal of the five and six year old. However, the children would remain in the placement for an additional six months until the agency found a new placement. The private agency licensing representative unsubstantiated the allegations against the foster parent seven months after the initiation of the investigation.

While in their seventh foster home the children were referred for therapy to address their multiple placement disruptions, behavior problems and lack of permanency. Both children received weekly individual counseling, family therapy, respite and tutoring services. The outside service provider would later close the service case because the foster parent moved out of the provider's service area. In a closing report to the agency, the therapist noted concerns with the foster parent that included a lack of cooperation with therapy and blaming the five year old for problems in the foster home. While in the same foster home, the children's school expressed concerns with the foster parent's lack of cooperation with school staff and sending the five year old to school with untreated ringworm. The private agency initiated a licensing investigation of the foster home. During the investigation, the foster parent reported behavior problems with the two foster children that included sexual behaviors between the five and six year old siblings along with an unrelated seven year old foster child and the foster parent's four year old son. The agency initiated a safety plan for the children in the home that required separate bedrooms, not allowing the children to be unsupervised and unannounced home visits by the agency case manager. The safety plan was unrealistic and unenforceable, and the agency did not provide support to the single, working foster parent to help ensure the safety plan was followed. The licensing representative substantiated several licensing violations pertaining to smoke detectors, sleeping arrangements and using the basement for sleeping. The licensing representative recommended that the children be removed from the foster home and the agency consider a specialized placement for the five and six year olds. However, the licensing representative's recommendations were never shared with case management staff. Nearly three weeks after the licensing representative completed the investigation, the foster parent issued a 14-day notice for the removal of the five and six year old foster

children citing that their behaviors were more than the foster parent could handle. The agency's failure to share critical information between child welfare professionals not only impeded services delivered to the children, but hindered the agency's ability to find an appropriate, permanent foster home.

The Department began contracting with the agency for foster care services in 1992. As a licensed Child Welfare Agency, the Department's Agencies and Institutions Licensing staff and Agency Performance Team monitored the agency. Since 2004 the Department has noted numerous on-going concerns with the agency and developed corrective action plans to address agency deficiencies. Since 2005 the agency has been operating with two consecutive provisional licenses as the agency was unable to implement and comply with the Department's corrective action plan. Cited problems included the agency's inability to retain child welfare personnel, follow Department policy, deliver services and maintain contact with clients. The Department cited other problems with administration and financial management. In 2007 the Department found that the agency failed to process foster family home licenses for renewal before license expiration even though the licensee had made a timely and sufficient application for license renewal. The agency's failure to monitor foster homes removes a protective measure for foster children and makes permanency difficult to achieve. Further, the agency's independent audits for fiscal years 2007 and 2008 recommended a restructuring of the agency's accounting department and hiring managers with financial skills.

In April 2007 the Council on Accreditation placed the agency's accreditation on probationary status, citing the agency's continued corrective action plans with the Department. The Council on Accreditation conducted a site visit and required the agency to comply with Council on Accreditation standards pertaining to governance, recruitment and selection of personnel and foster and kinship care services. One year later, after the agency failed to comply with Council on Accreditation standards, the agency's accreditation was revoked. The Council on Accreditation's decision was based on the agency's failure to meet standards related to their governing board, supervision of foster care cases, and continuing provisional child welfare license status with the Department. After an eight month appeal process, Council on Accreditation upheld their decision to revoke the agency's accreditation status. The agency appealed the decision. The DCFS contract requires that child welfare agencies are Council on Accreditation accredited. The private agency has defaulted in its obligation under the DCFS contract.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The Department should not contract with the private agency for foster care services for fiscal year 2010.** |
| --- | --- |

The Department agrees. The Department does not have a contract for foster care services with the private agency for FY 2010.

**2. The Department must craft a transition plan for the children and foster homes assigned to the agency. The transition should be based on a plan that minimizes disruption for the children and families, and selects service providers with the capacity to best service the children.**

All cases were transferred.

**GENERAL INVESTIGATION 6**

| ALLEGATION | A private agency caseworker encouraged a relative caregiver to withhold information from a physician during a medical examination of her 2 year-old relative foster child. |
|---|---|

**INVESTIGATION**   The physician, who had no prior relationship with the girl, contacted the caseworker to request she be brought in for examination after hearing a report of suspicious marks on the girl. The caseworker informed the physician she was unable to transport the girl that day but had a home visit scheduled for the following day. The caseworker stated she would observe the girl for injuries at the visit and bring her in for treatment if necessary. Dissatisfied with the response, the physician spoke to the caseworker's supervisor who considered the caseworker's decision to be appropriate. The next day the caseworker went to the home and observed marks on the girl's face. The caseworker did not believe the injuries were the result of abuse, but after consulting with her supervisor, transported the girl to the physician's hospital.

While waiting to be seen, the caseworker was overheard by hospital staff instructing the relative caregiver to withhold information from the doctor. In an interview with the OIG, the caseworker stated her advice was intended to help focus the relative caregiver on the incident in which the injury occurred rather than sharing details of police and DCP involvement. The caseworker said she had never before accompanied a client to an examination of possible abuse and did not believe doctors would be interested in such information. In order for doctors to reach informed conclusions about possible abuse to a child, pertinent information related to how an injury occurred, dynamics in the home and any history of suspected or confirmed abuse must be shared. Furthermore, the caseworker and her supervisor demonstrated an initial unwillingness to cooperate with the physician when the request for an examination was made. In separate interviews with the OIG, the caseworker and her supervisor characterized the physician as demanding, which they perceived to be an intrusion on their authority. Their perception clouded their judgment and prevented them from complying with the request in a timely manner. The result of the examination was a determination the girl's injuries were the result of physical abuse. The relative caregiver was indicated for Cuts, Welts and Bruises. The girl, her four year-old brother and nine year-old sister were all removed from the home and placed with another relative caregiver, but the children were subsequently moved to a licensed non-relative foster home.

During the course of this investigation, the OIG identified concerns regarding the educational needs of the children in the foster home. The children had been removed from the home for two weeks while the Department investigated an allegation of abuse against the foster parent that was ultimately unfounded. After the children were returned, the foster parent kept the four year old home from the school he had been attending, which she believed was responsible for the hotline report. It was also learned that the then 3 year-old girl was not attending any Head Start or pre-kindergarten program. Although the private agency had two educational liaisons on staff, the liaisons had minimal involvement with the case. They did not make any effort to address the foster parent's relationship with the school, identify additional educational options or assess a day-time recreational program operated by a park district the foster parent had portrayed as an educational alternative. In interviews with the OIG, the liaisons expressed their belief the school was responsible for the disruption of education, despite acknowledging minimal familiarity with the case and the fact neither had ever spoken to the foster parent. The liaisons portrayed the schools frequent efforts to reengage the boy as the actions of a " very aggressive" institution motivated by a belief it was the "best school," and that administrators were attempting to "retaliate" against the foster parent and force the agency to "do what [they] say." The adversarial position adopted by the liaisons runs counter to their role as facilitators and prevented them from recognizing the proactive efforts of a school to ensure a child received the education he was entitled to.

Unbeknownst to the private agency staff, the foster parent enrolled the boy in another school. Department Procedure requires foster parents to collaborate with service providers and case management staff on

decisions related to the education of children in their care.  Throughout the time the boy was held out of school, the foster parent canceled scheduled meetings with school personnel arranged by the caseworker, exacerbating the situation and extending the time the boy was out of school.  By the time the boy enrolled in his new school, he had missed one-third of the academic year.  In addition, the foster parent has repeatedly expressed ambivalence towards caring for the children on a long-term basis.  The foster parent's disregard for Department Procedure and the need to establish permanency for the children should be taken into account by private agency staff.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The private agency should caution the caseworker that her behavior could be interpreted as obstructive.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The private agency caseworker was counseled.  As part of the counseling session, the caseworker was required to review the Code of Ethics for Child Welfare Professionals.

**2.  The private agency should counsel the caseworker's supervisor regarding cooperation with medical professionals to best serve children effectively and efficiently.**

The private agency supervisor was counseled.  As part of the counseling session, the supervisor was required to review the Code of Ethics for Child Welfare Professionals.

**3.  The private agency should counsel the education liaisons regarding biased thinking toward school personnel in this case, and their lack of professional and helpful response to their colleagues within the agency.**

To address concerns related to the utilization of educational liaisons, the private agency implemented the following corrective actions:  the educational liaisons will participate in each supervisor's monthly team meetings and will document any educational concerns and follow-up accordingly; respond to any concerns raised during servicing of a case; and discuss and document educational status reports with case management supervisors.

**4.  The private agency should ensure an evaluation of the foster parent and her relationship with the children, with attention to her ambivalence regarding permanency, lack of cooperation, and compromised credibility.  The private agency should consider requesting a clinical staffing with the Department.**

The foster parent participated in a permanency planning meeting and signed permanency commitment forms for all three minors.  Prior to issuing a recommendation for adoption of the minors, the private agency will require the foster parent to participate in an assessment.

**5. A private agency foster home licensing investigation should be conducted regarding the foster parent's noncompliance with foster home licensing standards in her handling of the boy's educational needs.**

The private agency conducted a licensing investigation and substantiated the complaint.  The private agency implemented a corrective action plan for the foster parent that includes a requirement that the foster parent notify the agency of any concerns and participate in staffings.

**GENERAL INVESTIGATION 7**

| | |
|---|---|
| **ALLEGATION** | A private agency caseworker failed to adequately assess an allegation of physical abuse of a six year-old boy placed in a foster home. |

**INVESTIGATION**   The caseworker went to the foster family's home after receiving a report the boy had told personnel at his school he was being physically abused by his foster mother and her adult daughter.  After she arrived at the home, the boy repeated to the caseworker he was being hit with hands and a "whipping stick."  The caseworker observed the boy fully clothed and did not see any bruises or marks.  The boy did not remove any of his clothing and the caseworker did not complete a body chart.  The caseworker spoke to the foster mother about rules regarding corporal punishment and informed her a call would be made to the hotline reporting the allegation.  The State Central Register (SCR) referred the case back to the private agency to conduct a licensing investigation and advised staff to contact the hotline if the boy presented with any injuries.

The next day, an agency employee transported the boy to a hospital emergency room for an examination.  In an interview with the OIG, the employee stated she accompanied the boy into the examination room and did not observe any bruises on him, but realized upon further consideration that she did not have a clear view of his body.  After completion of the examination the employee was given an ER discharge summary which contained only general information regarding the treatment of bruises.  The employee, who had recently been hired by the agency, said she did not closely read the summary before giving it to the caseworker's supervisor upon her return to the agency.  In a separate interview, the caseworker told the OIG she had recently received a similar hospital summary in another case that explicitly stated the child could not be returned to his home.  The caseworker said the absence of such language in the ER discharge summary of the boy's visit led her to believe he was safe in his home.  The caseworker was unaware additional records and notes from the visit were available from the hospital.  The full medical record of the boy's examination plainly stated the boy's injuries and noted the treating physician's suspicion of abuse.

Three months after the ER visit, the caseworker became aware during a clinical staffing that she had not acquired all available ER records from the hospital.  The previous abuse allegation was reported to the hotline.  Additional records obtained from the hospital reported that the boy was found to have bruises on his chest and lower leg and noted cause for concern for his well-being.  The subsequent child protection investigation ultimately unfounded the report against the foster mother.  The boy was removed from the foster mother's home six weeks later in the wake of an issue involving alternate caretakers while the foster mother was hospitalized.  The child protection investigation of that report was also unfounded and the boy was returned to the home.  Although he was originally placed in the foster home on a temporary basis, he has remained there since he was five months old.  The foster mother's adoption of the boy was recently finalized with her adult daughter designated as a back-up caregiver and a family friend identified as an additional source of support.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  Department Procedures should be amended to include that any time a foster child is hospitalized or taken to the emergency room complete medical records should be obtained and placed** |

**in the child's file.  Procedure should also require that the records are shared with the foster child's pediatrician.**

A Department form, CFS 109, is being prepared for a procedural change to amend Procedure 402 in case of a foster child's hospitalization.  The revised procedure will require that complete emergency room medical records be obtained and placed in the child's file and the record shared with the child's pediatrician.

**2.  The boy's hospital emergency room records should be shared with his current pediatrician.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The private agency mailed the child's medical records to his pediatrician.  In addition, the private agency developed a new policy outlining the process for obtaining reports from emergency medical care appointments and foster care staff has been instructed at team meetings and in supervision to obtain complete medical records when a child is seen at a hospital including, but not limited to discharge summaries, doctor's notes and intake records.

**3.  The private agency caseworker should refer the boy's case to a mediation project for a family mediation to address the boy's social and educational development and extended family support for the foster mother and her daughter.**

The family has been referred to a mediation program that will provide assistance to the back-up caregiver. The private agency foster care staff continue to monitor the child's social and educational development.

**4.  An educational liaison should go to the boy's school to confirm that he is receiving the educational supports he needs to reach his full potential.**

The private agency's caseworker, who has a Masters Degree in education, functions as the educational liaison for the private agency.  The caseworker has met with the school social worker and convened a staffing with school personnel and the foster mother.  The caseworker has also discussed the child's case with the DCFS Educational Liaison.

**5.  The private agency should secure a No Child Left Behind or other appropriate tutoring program for the boy.  The boy's continued participation in a summer camp program should be monitored. When school resumes in the fall, the boy should enroll in an after school program.**

The private agency caseworker is exploring options for after-school programs for the child.

**6.  This report should be reviewed with the caseworker and the caseworker's supervisor for learning purposes.**

The private agency management staff has reviewed and discussed this report with the caseworker and the supervisor.  The supervisor will be attending at least three management training courses and additional DCFS training to enhance her case specific skills.  The private agency Division Manager will monitor the status of these additional training requirements.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 8

| ALLEGATION | Following the death of a six week-old girl, a child protection investigator exhibited unprofessional behavior while dealing with the infant's family. |
| --- | --- |

| INVESTIGATION | The child protection investigation was initiated after the unresponsive infant girl was brought to a hospital emergency room by her parents. The parents stated they |
| --- | --- |

had been drinking moderately that evening while at a wedding and that the father had fallen asleep with the baby in his arms after the couple returned home. The infant's death was reported to the hotline and, later the same day, the child protection investigator went to the family home where the parents and family members were present. The situation in the family's home became contentious soon after the investigator's arrival. The coroner's preliminary ruling was that the cause of death was asphyxiation, leading child welfare workers to believe that protective custody was required. In addition, law enforcement personnel had reported to the hotline that the parents were intoxicated.

After initially stating her intention to remove the parent's two remaining children from the home, the investigator spoke with her supervisor and the coroner. The coroner explained that she did not suspect foul play and the preliminary finding was chosen because medical examiners will not sign off on Sudden Infant Death Syndrome (SIDS) when a baby dies outside of their environment (crib, playpen, etc.) The coroner ultimately ruled the final cause of death to be Sudden Unexpected Death in Infancy (SUDI). The coroner told the supervisor she had no concerns with the family. The supervisor directed the investigator to allow the children to remain in the home under a safety plan.

In interviews with the OIG, members of the infant's family stated the investigator refused to provide them with the name or phone number of her supervisor. The family's carbon copies of the completed safety plan provided to the OIG omitted the supervisor's name and contact information as well as the investigator's phone number, all of which are required to be recorded. The OIG also reviewed the official case file which contained only a photocopy of the original safety plan. The photocopy in the case file included the information that had been denied to the family. In her interview with the OIG, the investigator leveled unfeasible accusations at the family of having altered their documents. Some months later, the original of the safety plan appeared in the official case file. The original safety plan had been altered in a similar manner to the earlier photocopy. The investigator was unable to explain the discrepancies between the original and carbon copies of the safety plan. In addition, the investigator provided the family with a Termination of the Safety Plan form which was not approved by the supervisor.

A review of the investigator's case files found evidence the investigator had falsified records on multiple occasions. In one instance, the investigator noted an in-person contact for a health screening with two children who had been taken into custody and placed with their grandparents. The grandparents told the OIG they took the children to a different hospital than the one recorded by the investigator and that she had not been in attendance. A further examination of the investigator's work logs found she had submitted overtime and on-call hours that nearly equaled her average time spent on the job. Some of the hours appeared to have been altered to increase their totals without supervisory approval. A number of the overtime documents also did not include information identifying what case was being serviced when the hours were performed, limiting the Department's ability to verify the veracity of the claims. The investigator's total gross earning from the Department for the fiscal year was $147,877, an amount equal to 2 ¼ times her base salary.

The OIG learned the investigator's driver's license had been suspended on three occasions while she was actively working for the Department and that she had allowed her automobile insurance to lapse. Initially, it appeared the investigator had transported children while her license was suspended. The investigator never informed her supervisor of the change in status of her license, as required by the Department. The

investigator admitted being aware she was unlicensed during one of the suspension periods and failing to inform her supervisor. The Department requires employees in relevant positions to complete Certification of License and Automobile Liability Coverage forms annually to ensure those who transport clients are compliant with the law. Currently, these forms are only required of employees who submit requests for travel reimbursement. The investigator had not submitted a reimbursement request for the previous four years and therefore had not been asked to affirm that her license and insurance were up to date. Language in the Certification suggests employees hold driver's licenses issued by the State of Illinois even though some employees, like this investigator, reside in states contiguous to Illinois and hold licenses issued in those states.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The Department should discipline the child protection investigator, up to and including discharge, for falsification of records, for tampering with and falsification of overtime reports, for failure to inform her supervisor of her driver's license suspension, for failure to carry minimum auto liability insurance, for transporting children for official business while driving on a suspended license, and for making untruthful statements to the Office of the Inspector General.** |

Discipline of the investigator is in progress.

**2. Timekeepers must have initialed supervisor approval for any changes in overtime requests. Overtime request forms must include case identification, such as the State Central Register (SCR) number or case name.**

A standard e-mail is sent to all timekeepers the day prior to each time period closing that timesheets not completed need to be submitted to the employee for completion and the supervisor for approval signature. In addition, timekeepers are reminded that all back up documentation, including case identification, must be attached and signed by the supervisor prior to entry by the close of business on the date payroll closes.

**3. The Department should audit time records of employees who earn twice the amount of their base salary in a given year to determine whether documentation supports reported time or whether it is more economical to hire an additional employee.**

The Department will review its use of existing overtime and earnings reports and modify, as needed, to identify DCFS employees earning more than twice the annual base salary. The identified instances will then be analyzed and reviewed with appropriate Deputies and supervisors. The first review will take place in February 2010 after annual earnings compilations are complete.

**4. The Department's Certification of License and Automotive Liability Coverage form for employee's signature should be amended to state "by the Illinois Secretary of State or other State _____" to address Department employees who live in states contiguous to Illinois.**

The Budget and Finance Division will review the current form, modify the form and require use of the revised form for the next reporting period.

**5. The Department should enforce its policy that _all_ employees who are required to drive as a condition of employment should certify annually that they have a valid driver's license and automotive liability coverage.**

The Department's Office of Employee Services (OES) will develop a report from OES's system in May each year to notify the Division Deputy and Personnel Liaison of every employee that needs a Certification of License and Automotive Liability Coverage form completed for the next fiscal year. The Liaison will notify the employee and their supervisor of the need to complete the form and submit it prior to June 30. The supervisor will be responsible for collecting and sending forms to the Personnel Liaison. The Liaison will provide copies of the forms to the Vouchering Unit and also to OES for the employee's file.

**GENERAL INVESTIGATION 9**

| ALLEGATION | During the course of another investigation, the OIG identified concerns regarding a caseworker's reported contacts with clients. |
|---|---|

| INVESTIGATION | |
|---|---|

While conducting a separate investigation involving required contacts with clients, the OIG reviewed records pertaining to the caseworker's performance on other cases. The review found the caseworker had failed to conduct mandatory monthly visits with a medically complex ward who resided in a residential nursing facility. Four days after the boy died as a result of his illness, the investigator created contact notes covering the prior 22 months. In the notes, the caseworker reported having diligently conducted the required monthly meetings. In an interview with the OIG, the caseworker asserted the meetings had taken place. An OIG review of visitor logs from the facility found that more than two-thirds of his reported contacts with the boy could not be supported by visitor logs or other documentation from the facility. The caseworker's own records demonstrated a consistent pattern of failing to conduct required visits with clients. In several instances, the caseworker either rarely visited wards or failed to see them at all over periods stretching up to two years. In addition, the caseworker routinely entered all his notes into the Department's electronic database system (SACWIS) on a single day, recreating up to two years worth of entries that are intended to be submitted in a timely manner. These entries often repeated the same, nondescript language and included unsubstantiated information that did not correspond to reports gathered from other agencies.

In an interview with the OIG, the caseworker acknowledged failing to regularly enter his SACWIS notes and stated that many of his records were handwritten and kept in his office. The OIG conducted an on-site review of the caseworker's office and found his hard files in disarray. Files lacked current information and some had not been updated since being serviced by a previous worker. Documents for various wards were mixed together in piles and records pertaining to certain minors were found in the case files of others. Information that could be located did not support the caseworker's assertions that he performed required duties. The caseworker stated that his supervisor frequently instructed him to complete his SACWIS entries promptly. In his interview with the OIG, the supervisor stated that after the caseworker went on medical leave, the supervisor spent more than two weeks reconstructing the caseworker's files and putting them in order.

Although the supervisor was aware the caseworker neglected to complete his SACWIS entries promptly, he did not take action to correct the behavior. The supervisor frequently added his own supervisory notes to the caseworker's SACWIS notes but did not report the caseworker's failure to enter the notes. The supervisor never composed a corrective action plan to address the caseworker's deficiencies and told the OIG the caseworker had never provided an explanation as to why he did not perform the tasks. The supervisor stated he sometimes called staff at the facilities the caseworker visited to ensure his compliance, however none of these contacts were documented. The supervisor stated he had received complaints from facility staff that when the caseworker did conduct visits he often did so on weekends when other involved child welfare professionals were unavailable. The caseworker, who did not own a car, did not submit any travel reimbursement forms despite the great distances he was required to cover in order to conduct his visits, creating a void of responsibility and further complicating efforts to verify his actions.

While handling the case of a 15 year-old girl who had been incarcerated, the caseworker was informed of an issue involving the girl's foster home where she would be returning upon her release. The foster mother had married a man who worked for the private agency that held her license which necessitated transferring her license to another agency. The foster mother alerted the caseworker to the situation five months prior to the girl's release, however the caseworker took no action on the matter. The caseworker's supervisor, who also

served as the Department's regional liaison for incarcerated youth, made no effort to prompt the caseworker or to resolve the situation himself.  The supervisor had previously been notified by staff at the correctional facility that the caseworker often failed to appear for scheduled visits with the girl and had not been to see her for six months prior to her release.  The caseworker and supervisor's failure to address the girl's placement issues placed undue strain on a family dealing with a minor's return to her foster home following incarceration and compromised the private agency's ability to act in accordance with Department Rule.  Furthermore, the caseworker and the supervisor provided inaccurate information regarding the caseworker's interaction with the girl to a consulting group that tracks data on incarcerated wards for the Department.  As the consulting group accepted information from the supervisor in his other role as regional liaison for incarcerated youth, he undermined the validity of the data and called the conclusions of the consulting group into question.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES |
| --- |

**1.  The Department should discipline the caseworker, up to and including discharge, for failure to visit assigned wards as required, for failing to enter recordings of case activity or entering recordings on a timely basis, for falsification of records by entering contact dates that were not substantiated, for entering inaccurate dates of contacts and similar text in entered contact notes, and for maintaining minors' case records in an unacceptable condition.**

The employee resigned from the Department and the Child Welfare Employee Licensure Board revoked the employee's child welfare employee license.

**2.  The Department should discipline the caseworker's supervisor for his failure to address the caseworker's performance deficiencies. The supervisor should be instructed to read Rules and Procedures 315, Permanency Planning, specifically regarding requirements pertaining to workers' contacts with children/youth.**

The supervisor resigned from the Department.

**3.  The Department should replace the supervisor in his position as liaison for incarcerated youth from the region.**

The supervisor resigned from the Department.

**4.  The Department should work with the consulting group to make necessary adjustments to better ensure that data collected is verified for accuracy, and to prevent critical or relevant information from being omitted at Quarterly Reviews of incarcerated wards.  Written reports to the Department from the Illinois Department of Corrections (IDOC) and the Illinois Department of Juvenile Justice (IDJJ) should be reviewed and discussed at the quarterly reviews.**

The Department has made revisions to the review process and the information collected.  Information from the Illinois Department of Corrections (IDOC) and the Illinois Department of Juvenile Justice (IDJJ) is forwarded directly to DCFS.  The information from IDOC is forwarded as requested and the information from IDJJ is forwarded on a monthly and quarterly basis.

## GENERAL INVESTIGATION 10

| | |
|---|---|
| **ALLEGATION** | Child welfare professionals failed to secure the extension of Department guardianship for a ward prior to the girl's 19th birthday, preventing her from receiving continued services. |

| | |
|---|---|
| **INVESTIGATION** | The girl had been a ward of the Department since she was 13 years-old and had lived in 39 placements since entering custody. |

Her history of aggressive, combative behavior, diagnosed depression and frequent running away prevented her from achieving stability in either residential or group homes. Repeated arrests for disorderly conduct and assault while in one group home resulted in her serving four months in a juvenile detention center. The girl finally progressed after entering a specialized placement and, as she approached her 18th birthday, her erratic behavior subsided. She completed high school, enrolled in college on her own volition and moved into an apartment through an independent living program administered by the private agency handling her case. The girl's case had been transferred to the private agency after she moved to the region from another part of the state, however her Juvenile Court case remained in its region of origin. The county had attempted to transfer her court case to her county of residence, however the case was never accepted by the court in the new region and was sent back to the area where the girl had previously lived. As a result, the girl's caseworker was unfamiliar with court practices specific to the new county. In the new county, Petitions to Extend Wardship were not filed unless expressly requested by a caseworker. The caseworker was unaware of this practice and never made a request. In the county where the caseworker was based, petitions were automatically filed by the ward's Guardian ad litem (GAL).

The Juvenile Court Act calls for Department guardianship to be terminated upon a ward's 19th birthday unless a petition is filed for an extension. The Department offers assistance to wards up to age 21 through Transitional Living Services while the Youth in College program provides benefits to eligible students until age 23. Both programs require youths to be wards of the Department at the time they apply for services. Although the girl had made great improvements and demonstrated a desire to progress in her life, she was ineligible to receive services through either program because the court had closed her case since a petition to extend guardianship had not been filed. An OIG review of the case file found the caseworker had submitted no case notes and had kept scant records of her work. There was no evidence she had attended court sessions or notified the girl when they occurred. There was high turnover at the agency and three supervisors oversaw the caseworker's efforts, two of whom were in their positions for less than three months. The caseworker acknowledged her poor record keeping but insisted she had maintained regular contact with the girl. The girl confirmed the caseworker had maintained contact with her, often seeing her several times a week.

The OIG interviewed the girl's GAL who stated that neither the caseworker nor anyone else discussed a potential extension with her. The GAL, who was based in the region where the girl had previously lived, said that unlike in other areas, it was standard practice in the region for caseworkers to initiate the process of filing petitions for extension of guardianship. No Department attorney was assigned to the region at the time the girl aged out of Department guardianship, preventing additional guidance being provided to the involved child welfare professionals. An OIG review of court records found the caseworker, her supervisor and the GAL were all present in court when the girl's status as a ward of the Department was terminated. None moved to file a petition or made any attempt to prevent guardianship from being discontinued.

Working in conjunction with another private agency providing assistance to the girl and the Department, an exception was made and the girl was enrolled in the Youth in College program. Her acceptance into the program allowed her to receive additional services as well as medical coverage and a monthly stipend.

0103020020

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  Court records and interviews with the Guardian *ad litem* and representatives of the Department's Office of Legal Services indicate the private agency caseworker failed to attend three of the girl's court hearings in the region where the girl previously lived.  The caseworker also failed to document contact with the girl for nearly eight months she was assigned to the case.  The caseworker should be disciplined for her lack of documentation and failure to attend court hearings.  The caseworker should be closely supervised on these two issues for the next six months.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The private agency caseworker was placed on a Performance Improvement Plan whereby agency management will review weekly and document the caseworker's adherence to agency policy and best practice. During supervision, the caseworker is expected to submit case notes and documentation of court events and discuss upcoming court dates.  Failure to demonstrate improvement in these areas will result in termination of the employee's employment.

**2.  The private agency should prepare a corrective action plan to address the lack of supervision in this case.**

The private agency developed a supervisory plan to address the deficiencies in this case.   A quarterly Quality Improvement Report noting the progress of the plan will be submitted to the Executive Director and will be subsequently included into a semi-annual report to the Board of Directors' Program Committee.

**3. The Department's Office of Legal Services must review cases in which wards are about to turn 19 to ensure that a Petition to Extend Wardship is being considered and filed, if appropriate.**

A tickler system has been set-up to notify the Department's Office of Legal Services prior to a minor turning 19 years of age.

**GENERAL INVESTIGATION 11**

| **ALLEGATION** | Current Department practice of expunging records for certain unfounded child protection investigations from electronic databases in under 12 months does not correspond to legislation requiring review of all child deaths of children with Department involvement within the previous year. |
|---|---|

| **INVESTIGATION** | Both the OIG and the Illinois Child Death Review Teams (CDRT) are mandated to review the deaths of children who individually or through family connections were involved with the Department during the 12 months preceding their death. The aim of these mandates is to identify any potential factors that may have contributed to the circumstances surrounding the death. In many instances, children who have died as a result of abuse or neglect or their caretakers were subjects of previous child protection investigations, both indicated and unfounded. When developing a case history, prior unfounded reports may present facts demonstrating a pattern of behavior or the presence of other factors that contributed to the outcome. While unfounded reports involving death, serious injury and sexual abuse are retained for a period of three years, other unfounded reports are kept for periods of time ranging from thirty days to one year, depending upon the nature of the allegation and the status of the reporter. |
|---|---|

Prior unfounded reports may contain information relevant to child death review. While consideration must be given to allowing individuals who have been the subjects of unfounded reports to move beyond the incidents that precipitated investigation, these reports are highly protected and available to a limited population of involved professionals. Given their potential benefit and the restrictions placed on their availability, extending the retention period for unfounded reports would provide a valuable tool for the OIG and the CDRT when reviewing child deaths.

| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1. The Department should amend Rule 431.30, Maintenance of Records, to maintain unfounded reports that are currently kept for only 30 or 60 days for a period of 12 months following the date of the final finding. The Illinois Child Death Review Team Executive Council concurs with this recommendation.** |
|---|---|

The Department's Office of Legal Services reviewed this issue and concluded that a legislative change is required to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding. The Office of Legal Services has drafted and submitted proposed legislation amending the Abused and Neglected Child Reporting Act that has been approved by the Director.

## GENERAL INVESTIGATION 12

| ALLEGATION | A private agency caseworker failed to adequately address an allegation of abuse made by a nine year-old female ward. |
|---|---|

**INVESTIGATION**    The caseworker was informed by the girl's relative that the girl reported being "whooped" with a belt by her aunt while visiting her home.  The caseworker went to the girl's school the same day and met with the girl, who reiterated the statements she had made to the relative.  The girl said she had been struck with a belt as punishment for wetting the bed.  The caseworker did not ask the girl where on her body she had been hit and did not attempt to observe any injuries.  The caseworker then discussed with the girl the importance of telling the truth and reports she had received from family members that the girl eavesdropped and attempted to insert herself into adult conversations.  The caseworker informed the child she did not want her sharing information between her adult relatives and threatened her that if she, "[brought] discord and misunderstanding between her aunts and grand mother [sic], then she will be placed in a traditional foster home."

In an interview with the OIG, the caseworker stated she had only recently become involved with the family.  The caseworker said her perception of the girl's behavior was based on conversations with the girl's relatives who stated the girl had a penchant for lying and often mimicked adult behavior.  The caseworker stated she did not call the hotline in response to the girl's allegation because she believed striking a child with a belt qualified as corporal punishment, which she counseled the aunt against after speaking with the girl.  One week after the girl made her allegation the caseworker made the decision to place her in the home of the aunt she had accused of abuse.  The girl's two younger brothers, ages four and two, were also placed in the home.  In her interview with the OIG, the caseworker stated alternative placement options were not available because no other relative was able to accept the girl at that time and the caseworker and her supervisor had decided to keep the family together.  Two months after the children were placed with the aunt, the hotline received a report of physical abuse of the four year-old boy.  The subsequent child protection investigation resulted in an indicated finding of abuse against the aunt.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1.    The private agency should discipline the caseworker, in accordance with the agency's personnel policies and procedures, for her mishandling of the girl's allegations of maltreatment, for threatening the child and for placing the girl and her siblings with the alleged perpetrator.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The private agency caseworker has been counseled.  In addition, the caseworker is required to complete additional training.

## GENERAL INVESTIGATION 13

| ALLEGATION | Private agency staff providing services to the mother of a one year-old boy demonstrated a bias in favor of the boy's non-custodial father. |
|---|---|

| INVESTIGATION | The boy was brought to a hospital emergency room by his mother and her boyfriend and found to have a broken right leg. Doctors treating the boy were |
|---|---|

unable to determine the cause of the injury but were concerned about possible abuse given the discrepancies in the accounts provided by the mother and boyfriend as to how the injury occurred. The boy was treated and released, however, two days later following a review by the hospital's child protection team a decision was reached by one of the team's physicians to contact the hotline with an allegation of physical abuse. A child protection investigation was opened and the boy was placed in the home of his maternal grandparents with a safety plan prohibiting unsupervised visitation by the mother or her boyfriend. As the allegation involved a bone fracture to a child under the age of 3, the case was referred for a medical expert opinion on the findings under a Department contract. The case was assigned to the same physician who contacted the hotline. The physician wrote a follow-up report, which reaffirmed the hospital team's previous conclusion. The boy remained in his grandparents' home and a case was opened to provide foster care services.

The hearing to determine whether the mother would retain custody of her son did not begin until almost eight months after he was removed from her home and lasted for a full year after it commenced. Ongoing conflict over assessment of the boy's broken leg proved to be a significant obstacle to establishing definitive objectives for the case as both the mother and the Department sought and obtained medical opinions supporting their positions. The opposing conclusions reached by four doctors, none of whom treated the child, either supporting abuse or an accidental cause of the injury resulted in a long delay before the case was finally adjudicated. The lengthy time the boy's status was in question, a week short of 20 months, created great strain on all those involved and led to an increasingly acrimonious relationship among the family, particularly between the maternal grandparents and private agency staff.

At the inception of the foster care case, the grandparents were under the impression they would be temporary caretakers for the child and that he would soon return to his mother's home. As time passed they became increasingly frustrated at what they perceived to be unnecessary delays and the uncooperative behavior of the private agency. Agency staff, meanwhile, were limited in their efforts by the ongoing uncertainty of the boy's status and whether they were working towards reunification with his mother or alternate care. At the time the boy was injured his biological father became involved and began actively seeking a greater role in the boy's life. Private agency staff viewed the father as a viable potential caregiver and felt it was their responsibility in protecting the child's best interests to engage him in services. The grandparents perceived the private agencies' efforts with the father as favoritism towards him and disrespectful of existing family dynamics. An OIG review of the case record found that as tension grew between the family and agency staff, the tenor of case notes began to reflect divergent interpretations of similar factors in the homes of the grandparents and the father. Conclusions were colored by emotion as the private agency caseworker perceived the grandparents in terms of the hostility she felt they exhibited towards her. The OIG also found that the detail of notes regarding the father was much greater than those pertaining to the family. In an interview with the OIG, the caseworker's supervisor stated she began to monitor the caseworker's notes more closely at the time the father's involvement began and she instructed her to improve her record keeping.

The same month that the hearing began, the mother gave birth to a son by her boyfriend. The next day, the mother called the caseworker and left a message informing her she had delivered the child. Four days later the mother called again and spoke directly to the caseworker. The caseworker did not call the hotline to report the birth until two days after speaking with the mother. In court, however, the caseworker denied

having prior knowledge of the birth.  The OIG verified the mother's earlier calls to the caseworker through a review of phone records.  In addition, the caseworker informed the family that she had made a counseling referral prior to actually having done so.  As the counseling the mother was receiving at the time was determined to be inadequate, the referral for alternative counseling represented a vital element of conscientious case management.

The Department was granted temporary guardianship of the second child pending the outcome of the adjudication hearing and he was also placed in the grandparents' home.  As court proceedings ensued, the two doctors from the treating hospital's findings regarding type of injury and causation became a central issue.  Although the contracted medical expert and orthopedic surgeon were from the same hospital and had collaborated prior to the case, they provided different diagnosis and possible causes in their testimony at the hearing.  The contracted medical expert provided testimony first, and was called back after the surgeon's testimony.  The medical expert changed her testimony to coincide with the findings of the surgeon.  After testimony was presented by a second orthopedic surgeon from a different hospital, the first surgeon was called back to provide rebuttal, but changed his testimony regarding possible causation. The court found that the changing testimony of the treating hospital's doctors undermined the reliability of their conclusions.  Almost twenty months after he was originally injured, the court ruled the boy had not been the victim of physical abuse.  Guardianship of both children was relinquished by the Department and they were returned to their mother's home.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | |

**1.  The contracted medical experts' program plan should require an interdisciplinary discussion with all relevant treating or consulting doctors and specialists before rendering an opinion. If there are areas of disagreement among the consultants and/or specialists, they must be resolved before the report is issued or noted in the final report.**

This will be included in the FY 2011 program plan.

**2.  The hospital's child protection team should review transcripts of the medical expert testimony in the adjudication hearing to inform future practice.**

The Office of the Inspector General forwarded the transcripts of the juvenile court hearings to the child protection team for review.

**3.  The private agency should discipline or counsel the caseworker in accordance with its personnel policies and procedures for misinforming the court about her knowledge of the birth of the mother's second child and for her failure to make a timely referral for therapeutic services for the mother.**

The Office of the Inspector General shared a redacted copy of the report with the private agency and has received a written response from the private agency. The Inspector General will meet with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The caseworker is no longer employed by the private agency.  To address the issue of a lack of consistency in the entry of supervisory notes into SACWIS, the private agency has created an additional management position whose responsibilities include, among other things, reviewing all supervisory notes.

## GENERAL INVESTIGATION 14

| | |
|---|---|
| **ALLEGATION** | A Department employee was the subject of a federal investigation into the distribution of child pornography. |

**INVESTIGATION**

The OIG was informed of the ongoing federal investigation after a search warrant was executed at the home of the Department employee.  Through collaboration with the Department of Homeland Security, the OIG learned federal agents had identified and recovered images and films on the employee's personal computer depicting children engaged in sexually explicit situations.  Agents also determined that the materials contained in the computer had been made available for further distribution over the internet.

Homeland Security provided the OIG with a video recording of an interview with the employee conducted by federal agents on the day of the raid.  In the interview, the employee described himself as a "sick man" and acknowledged his interest in and involvement with child pornography.  The employee admitted he had willfully obtained the materials found on his computer, including searches for several files with titles commonly associated with child pornography.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The Department employee should be discharged for off-duty conduct that makes him unfit for child welfare practice and brings disrepute to the Department.**

The employee was discharged.

## GENERAL INVESTIGATION 15

| | |
|---|---|
| **ALLEGATION** | The executive director of a program providing independent living and foster care services to wards was also a partner in a youth counseling group practice.  The independent living program frequently referred wards to the counseling group for services, presenting a potential conflict of interest. |

| | |
|---|---|
| **INVESTIGATION** | As Ethics Officer for the Department, the case was referred to the OIG to determine whether the executive director's dual roles constituted a conflict of interest. |

The independent living program received Department contracts to provide both transitional and long-term services to wards between the ages of 16 and 21.  Some wards involved in the program required additional psychological support including emergency evaluations, ongoing counseling and therapy.  When, for various reasons, independent living program staff were unable to meet the wards' needs, their cases were referred to outside agencies to provide counseling services.  According to the program, approximately 95% of their clients were engaged in counseling with outside providers.

One of the providers utilized by the program was a counseling group that included the executive director as one of its three partners.  In an interview with the OIG, the executive director stated he recognized the potential conflict of interest posed by his roles with both organizations.  He said he mitigated the conflict by ensuring that all board members of the independent living program were aware of his involvement with the counseling group and also by recusing himself from any decision-making process regarding referrals for counseling.  The executive director reported that he did not treat any wards sent to his counseling group and therefore gained no financial benefit from the referrals, although the partners used 25% of all revenues to cover office expenses.

Despite the fact the executive director was diligent in his efforts to insulate himself from the decision making process, the OIG found that his dual roles constituted a conflict of interest.  Although the executive director did not participate in counseling referral decisions, he directly oversaw the independent living program employees who did.  By virtue of his position of authority, the executive director's subordinates could conceivably be influenced in their decision-making.  In addition, since a portion of the income the counseling group receives to provide services to clients is used to cover communal expenses, the executive director does realize a financial gain from wards being referred to the counseling group.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **To remedy the conflict of interest, the Executive Director should either:** |

(1) **immediately resign from either the independent living program or the counseling group; OR**
(2) **ensure that any/all referrals from the independent living program to the counseling group stop immediately.**

**The Executive Director should notify the Department as to which option he has chosen.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General discussed the findings and recommendations made in the report with agency administrators.

The Executive Director of the private agency dissolved his relationship with the private counseling practice.

**GENERAL INVESTIGATION 16**

| | |
|---|---|
| **ALLEGATION** | A Department intact family services worker failed to perform the duties required of her position. |

| | |
|---|---|
| **INVESTIGATION** | During the course of conducting a separate investigation, the OIG identified concerns regarding the intact worker's performance of essential tasks required for providing adequate services. The OIG reviewed the case files of three families receiving intact family services from the worker and found a pattern of serious deficiencies in all areas of service provision: contact with clients, referrals to other service providers, and assessment and service planning. The intact worker demonstrated an inability to generally comply with procedures for intact family services. |

Although Department Procedure requires in-person contact with clients to be made within 45 days of a new case being opened, in an interview with the OIG, the intact worker acknowledged she routinely failed to meet with clients within that time frame. The intact worker cited the number of cases she was responsible for handling as the reason she did not meet the requirement, however her caseload during the period under review never exceeded the standard established through a federal settlement agreement. The worker also stated she frequently hand-wrote contact notes that were never entered into the Department's electronic database (SACWIS) or neglected to record the visits altogether. The intact worker's handwritten notes did not support her claim and the undocumented visits she said had occurred could not be verified. The intact worker had a history of failing to enter her notes into the SACWIS system as required and had been instructed by her supervisor on numerous occasions to improve her compliance.

In situations where clients were recommended to receive medical attention, counseling or services from outside sources, the intact worker did not take necessary steps to ensure the services were obtained. In one case, a mother who had recently undergone surgery following a complicated birth requested homemaker services. The caseworker did not process the request until eight months after it was made. In another case, school personnel reported to the worker that a child's mother had arrived for a school party under the influence of drugs. The worker never followed up on the claim or referred the mother to be assessed for substance abuse. The intact worker regularly relied upon clients' self-reports of improved behavior or compliance with services without verifying their assertions. Integrated assessments and client service plans, which are also required to be completed within 45 days of case opening, regularly went unfinished until long past the deadline. In one instance the intact worker did not submit an integrated assessment, service plan or home safety checklist until more than a year after assuming case responsibility. Many of the documents that were completed either presented inaccurate information or omitted vital details. Signed consents from clients to obtain medical and mental health records were incomplete and did not include information essential to ensuring clients made fully informed decisions in allowing the documents to be disclosed to the Department. Although the worker's supervisor was aware of her non-compliance with required tasks and regularly directed her to improve her efforts, she did not recognize the lack of improvement over time or take progressive measures to correct the behavior.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  The intact family services worker should be disciplined for failing to perform the duties of an intact worker, including: (a) conducting in-person contacts with assigned families as required** |

**by Procedures 302.388; (b) providing timely services; (c) contacting collaterals and involved service providers; (d) making service referrals; (e) completing service plans, Integrated Assessments; and (f) completing case documentation in a timely manner.**

Discipline of the intact family services worker is in process.

**2.   The intact worker's supervisor should receive disciplinary counseling for failure to ensure that the intact worker completed tasks and contacts, and for failure to ensure that the intact worker was following through on supervisory directives.**

The supervisor received a suspension.

**3.   The Department should issue a memo instructing intact family supervisors in the region to review procedures with their workers on properly filling out Consents for Release of Information forms prior to parent/caretaker signature.  Filling in the address at a later date should be the only acceptable blank on the form prior to the signature.**

The memorandum was issued.

GENERAL INVESTIGATIONS

## GENERAL INVESTIGATION 17

| ALLEGATION | A private agency failed to ensure staff conducted required monthly visits to the foster homes of two sisters, ages three and four. |
|---|---|

**INVESTIGATION**   Both sisters were taken into protective custody by the Department shortly after their births, each having tested positive for cocaine at the time they were delivered. The four year-old was placed with her maternal grandmother while the three year-old went to live in the home of her maternal great aunt. Their cases were referred to a private agency for foster care services. In the year prior to each child's adoption, their cases were assigned to a different team within the agency and experienced three caseworker transfers. The children's first caseworker on the new team was assigned their cases on the day she tendered her resignation from the agency.

Following the caseworker's departure, there was confusion within the agency regarding responsibility for case management. In an interview with the OIG, the new team's supervisor said she believed the former team supervisor assumed oversight of the family's case when the caseworker left. The new team supervisor was assigned to the cases six months after the caseworker's departure and stated she was uncertain as to her role in the family case up to that point. She reported that overall responsibility for case assignment rested with the agency's program director. In a separate interview, the program director told the OIG she had taken over case assignment duties at the agency on an interim basis following the departure of another agency administrator. The program director filled this role while still performing the numerous other tasks required of her position.

The result of this confusion within the agency over case assignment was an absence of services being provided to the family. During a six-month period following the caseworker's resignation, no home visits were conducted to either of the girl's residences and the case was effectively without management as both team supervisors believed the other was responsible for oversight. The children's cases were eventually assigned to their final caseworker, a caseworker new to child welfare. During a court hearing one month after the caseworker took over the case, the caseworker testified she had conducted a required home visit. The caseworker had also documented the visit in the case record and had submitted travel reimbursement forms to the Department. Both the grandmother and great aunt denied this caseworker had visited them on the day in question and recalled it specifically as the day their mother was in the hospital. The caseworker also failed to conduct a home visit to the three year-old's new residence after the great aunt moved, although she told the supervisor the required visit had in fact taken place. Although Department procedure requires a home safety checklist to be completed for any new residence of an unlicensed relative foster home, none was ever prepared. Both the caseworker and the supervisor stated they were unfamiliar with the checklist or the requirement one be completed. Throughout her handling of the case, the final caseworker demonstrated an inability to adequately document her activities. In an interview with the OIG, the caseworker acknowledged discrepancies with her documentation of home visits and attributed the inaccuracies to her inexperience in the position.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The private agency should discipline the third caseworker for falsifying documentation and misleading the team leader.** |
|---|---|

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

Both the caseworker and supervisor resigned from the private agency. The private agency has implemented additional controls to prevent future similar incidents. The private agency supervisors will ensure weekly

supervision and file reviews, increase random phone contacts to foster parents for quality assurance, and staff and reassign cases prior to a caseworker's separation from the agency.   In addition, the electronic records database (SACWIS) case notes must accompany monthly travel vouchers.

**2.   The private agency and its Board should review the agency's current management structure given the number of programs currently under the direction of the Program Director.**

The private agency has reviewed its management structure.  The Executive Director will assist the Director of Programs in managing the programs under her direction.

**3.   Private agency management should review Department Administrative Procedure 25, Home Safety Checklist, with foster care and intact family services staff and incorporate the use of the checklist into practice.**

The private agency has redistributed the Procedure, checklist and brochures to agency staff and provided additional training on home safety.  Supervisors will ensure that the Home Safety Checklist is completed on all required homes and the agency will conduct quarterly reviews to ensure the checklists are a part of the case file.

**GENERAL INVESTIGATION 18**

| | |
|---|---|
| **ALLEGATION** | A child protection investigator compromised the chain of custody by requesting the opening of body bags containing the bodies of two children killed in a house fire before autopsies had been performed. |

**INVESTIGATION**    The two girls, ages four and six, were killed when a fire consumed the home they shared with their mother.  A child protection investigation was initiated and a parallel investigation was opened because the bodies had been transported to a mortuary in another county than where their home was located.  The investigator assigned to the parallel investigation was instructed to view the bodies in accordance with the understanding shared by her and her supervisor that the victims deaths had to be confirmed by Department personnel.  The investigator went to the morgue and asked to view the bodies, which required breaking the coroner's seal.

The OIG found that misunderstanding of the requirement to confirm deaths is widespread within the Department.  Department Procedure allows for investigators to rely upon physicians, medical examiners and/or coroners for verification of a child's death.  The OIG found that the investigator, her supervisor and others involved in the investigator's viewing of the girls to confirm their deaths was conducted in good faith and in the interest of complying with Department Procedure.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1.  Department Procedure 300, Reports of Child Abuse and Neglect, should be amended to explicitly state that death mandates are met by collecting necessary information from coroners or medical examiners in accordance with Allegation 1/51, Death.**

Department Procedure 300 has been amended in accordance with this recommendation.

**2.  A clarification memo should be issued statewide regarding the ability to meet the mandate in death investigations by collecting information from the coroners or medical examiners.**

An Information Transmittal was issued.

**GENERAL INVESTIGATION 19**

| ALLEGATION | A private agency case aide responsible for transporting an 18 month-old girl to a visit with her mother in a correctional facility failed to ensure the visit took place. |
|---|---|

| INVESTIGATION | The mother had been incarcerated while awaiting trial on felony charges that she had caused serious internal injuries to the then 10 month-old girl by punching the |
|---|---|

child in the torso.  Following the incident that caused her injuries, the girl was taken into protective custody by the Department and placed with her maternal great aunt.  The family's case was assigned to a private agency for services.

Eight months later, as part of the agency's duty to facilitate parent/child visits, the girl's caseworker submitted a request for the girl to be transported to the correctional facility for a visit with her mother.  The request was directed to the private agency case aide, who had only begun working for the agency five days earlier.  The case aide went to the maternal great aunt's home, picked up the girl and departed for the jail.  Upon arriving, the case aide realized the transport form he had been provided did not include the mother's name and called the foster home to obtain that information.  Less than 90 minutes after the child was picked up for the visit she was returned to her foster home.  Later the same day, a group of the mother's relatives visited the mother at the jail and brought the child with them.  The mother told the relatives her daughter had never been brought to the jail for their earlier visit.

The great aunt contacted the private agency the following business day and spoke to the caseworker regarding the mother's allegation that the meeting never took place.  The caseworker insisted the meeting had occurred and told the great aunt the child had met with a woman who had braids.  The caseworker additionally stated that the agency performed background checks on its workers and the case aide, "couldn't have taken [the child] anywhere else."  At the great aunt's insistence the caseworker agreed to look into the situation.  After a week passed with no response, the child's grandmother called the agency and spoke with the caseworker who told her the case aide "went and saw somebody" at the jail.  Although numerous conversations were conducted between the caseworker, her supervisor, the case aide and the agency's director regarding the situation, the case aide's direct supervisor was never informed of the allegation.

In an interview with the OIG, the case aide insisted he had taken the child to the jail and conducted the visit.  He also stated he had difficulty navigating the process of gaining entry and was further hampered by the fact he did not know what the mother looked like.  Further, the case aide said he had received basic training from the agency on conducting visits between family members and minors but had not received any instruction on procedures related to accompanying children into correctional facilities.  Prior to his interview with the OIG, the case aide had successfully conducted a visit at the jail, after receiving specific training from the private agency.  In a separate interview, the case aide's supervisor stated that the agency's training program was not formalized but allowed each supervisor to address issues as they saw fit.  The supervisor said there were "core concepts" that were always covered but was unable to delineate what those were or provide any documentation outlining required tasks.

When asked by the OIG to "walk through" the events of the visit in question, the case aide described a process that did not relate to the division of the jail where the mother was held.  Further, the actions the case aide said he was required to perform did not coincide with jail regulations for granting access to that division and there was no record of him ever having been there.  OIG investigators went to the correctional facility and found that the entry process depicted by the case aide corresponded to the steps he would have taken while making his second visit with the other child, whose parent was held in another division of the jail.  During a second interview with the OIG, the case aide maintained he had successfully conducted the first visit but

asked investigators at the conclusion if visiting areas varied among different divisions within the jail.  The case aide would have known this to be true if he had in fact conducted the first visit.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.   The private agency should create a formalized training program to be provided to new case manager aides regarding their uniform job duties.** |

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The private agency has strengthened its training program and created a Case Manager Assistant Orientation Checklist that each supervisor utilizes as a guide to train new case manager assistants.  The private agency has also instituted mandatory weekly supervision to provide uniform and ongoing training for case manager assistants.

**2.   Disciplinary measures should be taken by the private agency in accordance with its personnel policies and procedures with regard to the case aide.**

The case aide is no longer employed by the private agency. The Office of the Inspector General has alerted the Department's Central Office of Licensing of this former employee.  In the event his name is submitted for a background check, the Central Office of Licensing will notify the Office of the Inspector General who will provide information relevant to supervision to his new employer.

**3.   The private agency should ensure that managers receive information regarding complaints as they relate to employees who report directly to them.**

The private agency has reissued its Supervisory Protocols to all supervisors.  The protocol includes the requirement that supervisors are to meet weekly in a structured setting with their staff.  The grievance procedure was also reviewed with all intact and foster care staff.

**GENRERAL INVESTIGATION 20**

| ALLEGATION | A Department employee made statements in the workplace regarding his desire to purchase a gun.  An order of protection had previously been issued against the employee in response to his ongoing harassment of another Department worker. |

| INVESTIGATION | The worker had sought the order of protection against the employee in response to threats directed towards her by him and his attempts to contact her by phone and email, including several emails sent to the worker by the employee through the state email system.  The order of protection was granted and the court instructed the employee to remain at least 200 feet away from the worker at all times.  On one occasion, the worker's direct supervisor, who was also a higher-level member of the employee's chain of command, stated he was with the worker when they saw the employee drive past them while they were in a park nearby their office.  The employee, who had previously been involved in a romantic relationship with the worker, told other Department personnel upon his return that he believed the worker and her supervisor were romantically involved.  One month after that incident, the employee joined in a conversation in his workplace regarding an upcoming gun show and expressed his interest in purchasing a firearm.  Other participants in the conversation were alarmed by his statements, given their awareness of the employee's history with the worker as well as hostile statements he had previously made regarding her supervisor.  The employee's comments about seeking a gun were relayed to the supervisor who did not refer the matter to either Department administrators or law enforcement agencies, despite expressed concern among the employee's co-workers of potential workplace violence.  The OIG referred the investigation of the employee's gun-related comments to the Illinois State Police. |

In an interview with the OIG, the supervisor denied being romantically involved with the worker.  The supervisor stated he had chosen not to alert Department administrators or law enforcement of the employee's gun comments because he wanted to spare the worker embarrassment and keep the issue "in house."  An OIG review of the supervisor's state email disclosed a series of sexually suggestive and explicit emails sent between the worker and the supervisor.  Several lengthy exchanges consumed significant portions of the business day while both were at their jobs.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.    The Department should seek an Independent Medical Evaluation (IME) to determine whether the Department employee is fit for duty and whether he presents any threat of harm to the worker, her family or the supervisor.  The OIG has submitted a draft recommendation for IME with the Office of Employee Services.  As part of the evaluation, management should request that the employee consent to release the court evaluation to the Department.** |

The employee received an independent medical evaluation.

**2.  The employee should be disciplined for using the state e-mail system for personal purposes.  In the event that the employee is found guilty of a violation of the order of protection, the Department should evaluate whether further disciplinary action is warranted.**

The employee received two suspensions.

**3.  The supervisor should be discharged for having an illicit affair with a supervisee, abusing the state e-mail system for personal purposes, for exchanging inappropriate personal e-mails during work hours, for failing to disclose the affair to his supervisor, for failing to discharge his administrative duties concerning potential workplace violence, creating a potential for workplace violence and providing false information to the OIG on three separate occasions.**

The employee was discharged.

## GENERAL INVESTIGATION 21

| | |
|---|---|
| **ALLEGATION** | A Department employee utilized the state email system to perform work for an outside business and to send personal correspondence. |

**INVESTIGATION**    During the course of an investigation into the misuse of state resources, the OIG became aware of the employee's possible misappropriation of the email system. A review of state email records found that over the previous four years the employee had repeatedly used the system for outside professional and personal communications. In an interview with the OIG, the employee acknowledged she had used the state system to send information to a friend of hers who operated a business in another state. The employee saved materials related to the business, as well as orders from clients she had secured, on an external drive, then brought the items to the office and used her work computer to forward them on to her friend. The employee affirmed she had signed documents demonstrating her understanding of Department policy regarding usage of the state email system.

During the course of conducting the investigation, the OIG interviewed the employee's supervisor. The supervisor stated she was aware of the employee's involvement with the out-of-state business and had placed orders through her before. The supervisor denied being aware the employee was utilizing state resources to perform work for the company. The OIG review of email records found the supervisor had corresponded with the employee through the state email system on matters related to the business. The review also found numerous personal emails sent by the supervisor, the majority of which were sent during regular work hours.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Department employee should be disciplined for using the state email system for personal use. Her discipline should be mitigated by her supervisor's behavior that provided permission for using state email for personal business.**

The employee received a suspension.

**2. The Department employee's supervisor should not receive a copy of this report or participate in any pre-disciplinary or disciplinary discussions concerning this report.**

The supervisor did not participate in the disciplinary process.

**3. The supervisor should be disciplined for encouraging the use of state resources for the employee's outside business and should be counseled for using the state email system for personal use.**

The supervisor received a suspension.

**GENERAL INVESTIGATION 22**

| ALLEGATION | A Department employee received gift cards for her participation in a study conducted by a private agency concerning Department wards. |
| --- | --- |

| INVESTIGATION | The Department employee participated in the study during her regular work hours and received the gift cards in appreciation. A ward on the employee's caseload |
| --- | --- |

was involved in the study and the employee's participation in the study was part of her regular employment. As a result of her participation, she received a total of $30 in gift cards that were mailed by the contractual agency to her office.

The OIG found the private agency had mailed a total of 43 gift cards over a period of 13 months to 9 Department caseworkers and 12 caseworkers from private agencies. These gift cards were used as incentives for getting reports from caseworkers about their activities related to the wards in the study. No state employee received an amount greater than a total of $30 in gift cards, the maximum amount allowable under the State Officials and Employees Ethics Act. Research proposals involving children and families served by the Department, including those that offer incentives, must be reviewed by the Department's Research Review Board (RRB). The study had been reviewed by a state university, but it had not been submitted for review by the RRB.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1. The private agency should immediately complete the necessary Research Review Board forms and request a review of the use of incentives by the Research Review Board.** |
| --- | --- |

The incentive portion of this research has been eliminated making a review unnecessary.

**2. The Department should expand information contained in the D-Net related to research to include at least: contact information for the Department's Research Director, the frequency with which the Research Review Board meets, and reference to Rule 432, Research Involving Children and Families, and the requirements set forth therein.**

All Research Review Board research proposal submission forms, examples of consents, and list of committee members have been submitted to the Office of Communications as part of the Governor's Sunshine Project and will be accessible to the general public through the portal being created by Central Management Services.

## GENERAL INVESTIGATION 23

| ALLEGATION | A Department administrator testified as a witness against the Department during a hearing regarding the possible expungement of a sexual molestation charge. |
|---|---|

**INVESTIGATION**   The Department administrator was contacted by a family friend, the mother of a 13 year-old girl, who relayed her daughter's allegation she had been sexually abused by the pastor of their church, a relative of the administrator.  The administrator went to the friend's home and spoke privately with the girl, who told her the pastor had abused her on numerous occasions.  After the girl's mother began making inquiries into securing counseling services for her daughter, a hotline call was made alleging sexual abuse against the pastor.

The child protection investigator assigned to the case ultimately indicated the report against the pastor for sexual molestation.  Although the investigator was aware the pastor was active with his church, he did not inform the church of the allegations made against the pastor or notify the church after the report was indicated.  In addition, the investigator did not make an effort either during or after the investigation to determine whether the pastor's duties brought him in contact with children.  The investigator also neglected to locate children involved with the church to discern whether any of them had ever been subjected to inappropriate behavior by the pastor.  The investigator's supervisor did not recognize the necessity of notifying the church or instruct the investigator to do so.  In a previous investigation, the OIG recognized the difficulty with properly notifying religious institutions of pending child abuse and neglect charges against clergy or administrators.  The OIG recommended the Department develop a protocol to assist workers and provide guidelines for notification of religious entities under these circumstances.

After the report was indicated, the pastor appealed the finding and an administrative hearing was held.  The Department administrator appeared at the hearing and testified on behalf of the pastor.  She acknowledged calling child protection staff but said she did so because her name had been provided to them as a collateral contact and that investigators had never contacted or consulted her.  The OIG concluded that in navigating a difficult position involving both her personal life and professional responsibilities, the Department administrator acted responsibly and did not misuse or abuse her position with the Department to influence the child protection investigation.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  The Department should develop guidelines to assist employees who are confronted with the difficult position of having a personal relationship with a subject of a child protection investigation.   Based on prior OIG investigations, the guidelines should include the following information:**

- ▪ **When a subject of a child protection investigation is known to you in a personal capacity, you may not access SACWIS to view the investigation.**
- ▪ **If the investigation is occurring in your office, or handled by anyone within your chain of command, you must inform your supervisor and the investigator to guard against inadvertent disclosure of confidential information.**
- ▪ **You may always contact the child protection investigator to provide information that is known to you that is relevant to the investigation.  You must clarify that you are calling in a personal capacity only.**
- ▪ **You may make telephone calls concerning the investigation only to the extent that they are permitted within the existing Department policy of permitting reasonable use of the telephone for personal purposes.  It may, however, be more prudent to schedule an**

**interview after work hours or during personal time, such as a lunch hour, providing a clear distinction that you are speaking as a private citizen and not as a Department employee.**

- **When you share information, you should be careful not to suggest that your position with the Department or your knowledge of Department procedures mean that your information is more valuable or reliable than information from other non-professional sources.**

- **You may never use your office or other Department resources to assist the subject with the investigation.**

The Ethics Officer developed a D-Net link that allows employees to access frequently asked questions regarding conflicts of interest issues.

**2.   The child protection investigator and his supervisor should receive non-disciplinary counseling regarding assuring that the safety of children in the church is assessed when the allegations are against a figure in the church.**

Both the investigator and the supervisor were counseled.

## GENERAL INVESTIGATION 24

| ALLEGATION | A Department employee used the state email system to operate a private business. |
|---|---|

**INVESTIGATION**   An OIG review of the employee's state email records found several personal emails, many of which were related to the private business she operated. These included communications related to purchasing equipment, the creation of promotional materials and securing advertising time from local media outlets. One message sent to a fellow worker requested assistance in raising awareness of the business among Department clients the worker serviced. In an interview with the OIG, the employee acknowledged being the sole proprietor of the business and accepting payments through a post office box she maintained. In identifying the numerous phone numbers associated with the business, the employee stated that one of them was the number of another Department worker whose number she had included in promotional materials without the worker's permission. The employee stated she had later enlisted the worker to take down any information she received from interested parties and forward it to her. Another of the phone numbers belonged to a man unknown to the Department whom the employee identified as a friend who had previously assisted her with the business.

The OIG identified four separate personal addresses maintained by the employee. The employee stated that none of the addresses were her primary residence and that she moved freely between the various locations. The OIG found that the employee, a licensed foster parent, had previously voluntarily relinquished her license after the private agency that held her license learned a convicted felon lived in her home. The agency's case closure report stated the employee had chosen to surrender the license rather than remove the felon from her home. The employee had since applied for and been granted a license by another agency. Although no children were placed with the employee at the time of the investigation, she told the OIG that a ward who had been in her custody since she received her new license had moved with her between her multiple residences. Only one residence was identified in the licensing file as being approved for the placement of children.

An OIG review of the employee's licensing file, cross-referenced with state criminal history records, found the man the employee identified as the friend who had helped run her business was the felon that had previously resided in her home. The man had an extensive criminal history, including several convictions for weapons offenses. The employee had previously been granted orders of protection against the man on two occasions and each noted they shared common residences. On the employee's application for her new foster care license she had stated she was single. The man was incarcerated at the time of the investigation and prison records listed the employee as his fiancé and his address as being the same as one used by her. The OIG also identified a second individual with multiple drug-related arrests and convictions who reported another of the employee's addresses as his own. His relationship to the employee is unknown, however his driver's license was also associated with the same address.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1. The Placement Clearance Desk should be directed to place a hold on further placements to the Department employee's foster home until the licensing investigation is resolved.**

The employee's foster home was placed on hold.

**2. The private agency holding the employee's current foster care license should conduct a licensing investigation of the employee's home to determine whether either of the individuals with known criminal histories maintains any presence in the foster home and whether such presence presents a risk of harm to foster children. The licensing investigation should include interviews of foster children**

**previously placed with her to determine whether either man ever resided in any of her homes.   In addition, the licensing investigation should determine whether the employee was housing her prior foster child at addresses other than her licensed address.**

The agency conducted a licensing investigation.

**3.   The employee should be disciplined for use of the state email system to further her private business, for attempting to exploit Department clients to further her business interests and for requesting that a co-worker use state resources in furtherance of her private business.**

Discipline of the employee is in progress.

**4.   The private agency holding the employee's current foster care license should provide information regarding the licensure investigation to the OIG to determine whether further charges of misconduct are warranted.**

The Department agrees.   The agency provided the requested information.   No further charges were warranted.

## GENERAL INVESTIGATION 25

**ALLEGATION**   A child protection investigator was also employed as a counselor at a hospital.  In her role as a counselor, the investigator had contacted a fellow Department employee regarding a pending investigation.  The OIG was asked to investigate the possible conflict of interest.

**INVESTIGATION**   The investigator, an employee of the Department for 15 years, had held her second job at the hospital for four years.  The investigator had not informed her supervisor nor any other Department personnel of her position with the hospital and had not taken steps at her second job to prevent her from working with Department clients in her capacity as a counselor.  However, the secondary job had originally been arranged for the investigator by her former supervisor.  In an interview with the OIG, the investigator stated she had interpreted the Department's conflict of interest rule (Rule 437) to require supervisory notification only when an employee determined a conflict of interest existed and that she had not perceived her secondary employment as a possible conflict.

Utilizing a combination of sick time and medical leave, the investigator was absent from her position with the Department for two months, during which time she continued to perform her part-time duties for the hospital.  The investigator had complied with Department Procedure for being approved for the absence and the medical documents she submitted did not include any restrictions regarding her activity while on leave.

In response to the concerns arising from the investigator's secondary employment, the OIG advised her to seek a consultation from the Department's Conflict of Interest Committee.  In addition to concerns regarding interacting with Department clients and personnel while working as a counselor, the Committee also identified issues with the investigator's hours spent at the hospital.  Two days per week, the investigator's scheduled hours of work for the Department and the hospital required her to be on duty for more than 24 consecutive hours.  Maintaining such a schedule would strain an individual's ability to adequately perform their work for the Department and could create or exacerbate adverse medical conditions.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  If the child protection investigator were to go on medical leave again, she should be required to submit a detailed explanation of her medical condition on Central Management Services (CMS) Form 95 that would clearly explain any limitations.  In addition, prior to approving secondary employment, her supervisor should consider the extent to which the investigator's decision to maintain secondary employment, at times working more than 24 consecutive hours, has contributed to her medical condition.**

The information was shared with the Office of Employee Services and the supervisor.

**2.  Rule 437, Employee Conflict of Interest, should be amended to clarify that secondary employment must always be reported to one's supervisor.  The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict.  The employee must be told to update the supervisor whenever their secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes.**

The conflict of interest workgroup is in the process of finalizing the proposed changes to Rule 437.

## GENERAL INVESTIGATION 26

| | |
|---|---|
| **ALLEGATION** | The Office of the Executive Inspector General received a complaint that a Department supervisor was engaged in a romantic relationship with a Department employee under her direct authority and gave him preferential treatment when issuing case assignments. |

**INVESTIGATION**

The supervisor had been forthright and prompt in contacting the Department's Conflict of Interest Committee seeking guidance in addressing the romantic relationship she saw developing between herself and the employee. The supervisor also notified Department administrators of the issue and copied them on her correspondence to the Committee. The administrators took immediate action, moving the employee to another team under different management, a move that corresponded with the Committee's recommendation. Given the small size of the field office where the supervisor and the employee were located it soon became clear further steps would need to be taken to distance their professional and personal relationships. The administrators offered, and the supervisor accepted, a temporary demotion and reassignment to another field office. The supervisor has since been reinstated to her previous position at the second field office. The OIG found that all parties were forthright in addressing the situation and took full measures to resolve the situation in a timely manner to avoid a conflict of interest from arising.

After initially receiving the complaint, the Office of the Executive Inspector General conducted interviews over a three month period before referring the matter to the OIG for further investigation. Although Department Rule requires possible conflicts of interest to be reported to the Conflict of Interest Committee, the Office of the Executive Inspector General was unaware of the Department's conflict of interest rule and did not make the referral. Had it done so, it would have learned from the Committee that the issue had already been resolved. Entities with overlapping authority should coordinate their efforts to prevent waste of time and resources and better serve the public interest.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. The Director should request that the Office of the Executive Inspector General, when it receives allegations that amount to a violation of the Department's conflict of interest rule, follow Rule 437, Employee Conflict of Interest, and direct the complainant to file the complaint with the Department's Conflict of Interest Committee.**

The Office of the Executive Inspector General sent a response stating that it is not the Office of the Executive Inspector General's duty to be cognizant of individual internal agency policies prior to conducting their investigations to determine if the matter should be fully investigated by the Office of the Executive Inspector General or referred back to the agency.

**2. The Inspector General will consult with Department managers in this region regarding how to define a conflict of interest and, if one exists or is perceived to exist, how to work through the situation and inform staff.**

The Inspector General discussed these issues with the Department managers. To provide additional resources to managers and Department staff in addressing such matters, conflicts of interest scenarios have been posted on the Office of the Inspector General's D-Net web site.

## GENERAL INVESTIGATION 27

**ALLEGATION**    While providing services and training concerning older caregivers, the OIG was asked to determine issues related to client confidentiality and assessment of parents as caregivers pertaining to a private agency.

**INVESTIGATION**    The private agency contracts with the Department to provide both social work and legal services to selected older caregivers and those dealing with illness.  The OIG was asked to clarify whether the agency is obligated to protect the confidences of their clients versus the best interests of the child, and whether there are standards and procedures to provide guidance to courts, families, and professionals in situations where parents whose parental rights were terminated wish to resume parenting their biological children.

The first issue arose in the context of the Department contracting with the agency to provide legal services to a caregiver.  The caregiver, who had become a client of the agency, may have continued accepting subsidies after the child in their care had left their home, unbeknownst to the Department.  As legal counsel for the client, the hired attorney was obligated to adhere to established standards of attorney/client privilege.  The agency, however, administered only social work services until it was determined that no conflict existed between the caregiver, the Department and the best interests of the child.

The second issue involved identification by the agency of individuals whose parental rights had been terminated but who wished to resume parenting their children whose adoptive relationships, for various reasons, would not extend until the children reached the age of majority.  While it is currently legally possible for a parent whose rights have been terminated to resume care and legal custody of their children through a guardianship agreement, these matters should be handled in the Juvenile Court.  The OIG learned it was the agency's standard practice to provide short-term guardianship forms to families while conducting initial home visits.  This practice presents the potential for abuse of the system, as an adoptive parent or guardian receiving subsidy payments could execute a short-term guardianship agreement for a biological parent and provide the parent with the subsidy while permitting the biological parent to care for the child without notifying the Juvenile Court.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**    **1.    The Department should direct the private agency to immediately change its practice of automatically leaving short-term guardianship forms with each new client.  Rather, if a short term guardianship is needed, the agency should assist their clients in completing short-term guardianship forms to ensure that a biological parent is not named as a short-term guardian.**

An Ad Hoc Committee was formed to address this and other identified issues.

**2.   The Department should form an ad hoc committee composed of the General Counsel of the Department, the Executive Director of the private agency, and an attorney from the OIG to resolve these outstanding issues related to the agency's client confidentiality, ethical obligations to the Department, evaluating back up plans, the use of short-term guardianship forms, and rehabilitated birth parents who wish to resume parenting responsibilities.**

The Office of the Inspector General is satisfied with the responses from the agency in regards to the ethical obligations and confidentiality issues. Social workers are the first contact with the families and lawyers only see the families if the social worker's assessment is deemed appropriate. Any suggestion of fraud is referred to the DCFS Post Adoption Unit.

## GENERAL INVESTIGATION 28

| ALLEGATION | A child protection investigator engaged in unprofessional behavior in a hospital emergency room after transporting a mother and her two month-old daughter for a medical evaluation. |
|---|---|

**INVESTIGATION**  A child protection investigation was opened after the mother sought medical attention for the infant who was found to be below her birth weight.  After receiving additional medical treatment, the mother was instructed to take the baby to her pediatrician one week later for a follow-up visit.  When staff from the pediatric clinic were unable to contact the mother, a second hotline report was made.  The child protection investigator was one of several Department workers who had been attempting to locate the mother and her baby for two weeks when she finally found her at the family's home.  The investigator transported the mother to the hospital for a medical evaluation of the infant. While in the waiting room, the investigator engaged in a lengthy and heated verbal altercation with a hospital social worker that culminated in hospital security being called to ensure order was maintained.

In reviewing the chain of events that led to the incident, the OIG found that the confrontation was largely the result of the divergent interests represented by the investigator and the social worker.  In her interview with the OIG, the investigator stated that after she informed her supervisor she had located the mother and baby, she was instructed to take the infant into protective custody and ensure she was examined at the hospital as soon as possible the same day.  The time that had elapsed since the baby was last seen and the acceptance of a second hotline report alleging her condition had deteriorated created a sense of urgency among child protection staff that was conveyed to the investigator.  Upon arriving at the hospital, the investigator perceived the social worker to be condescending and bureaucratic, more concerned with asserting her own credentials and following routine procedure rather than facilitating the baby's medical treatment.

In a separate interview with the OIG, the hospital social worker described the investigator as being abrasive and demanding.  The social worker was familiar with the mother from her previous visits to the hospital and described her as being "terrified" by the investigator's behavior.  The social worker characterized her actions as attempts to alleviate the mother's concerns regarding statements made by the investigator that the baby could be removed from her custody.  The social worker cited her own background in child welfare as proof of her understanding of the mechanisms of the system and told the mother, in the presence of the investigator, that events would not transpire as she had been told.

The result of the conflict between the investigator and the social worker was a volatile exchange between two child welfare professionals in the presence of a client and her infant in a public institution.  As both parties identified separate priorities and sought to protect their positions, they lost sight of the Department's goal of providing the best possible services to the mother and ensuring the safety and welfare of the baby.  Although situations inevitably arise that present developing crises and challenge the emotional limits of those involved, child welfare professionals must maintain their composure and act responsibly in the best interest of clients and children.

| OIG RECOMMENDATIONS / DEPARTMENT RESPONSES | **1.  The Department should develop protocols for mediation of conflicts or disputes between child protection workers and hospital staff with whom child protection investigators regularly interact.** |
|---|---|

Quarterly meetings are held at the Emergency Reception Center with hospital social workers.

## GENERAL INVESTIGATION 29

| | |
|---|---|
| **ALLEGATION** | Two adoption home studies completed on behalf of the executive director of an adoption agency were performed by social workers who were subordinates of the executive director. |

| | |
|---|---|
| **INVESTIGATION** | The executive director of a non-profit, licensed adoption agency sought an international adoption of a child between four and seven years old and required a |

home study. Department Rule states pre-adoption requirements are to be contained in a valid home study, including a factual evaluation of the prospective parent. The first home study of the executive director was completed by an employee of the executive director's agency. When the first home study was rejected because of the appearance of a conflict of interest, the executive director enlisted a second adoption agency to complete the required evaluation. The second home study was completed by a social worker, who as an independent contractor was under the authority and control of the executive director. Neither of the employee's relationships with the executive director were disclosed in the home studies.

The second home study was paid for by a check drawn from the adoption agency's account and signed by the executive director. The executive director claimed the cost of the first home study was taken as a portion of an adoption grant available to employees of the agency. The adoption grant, which is taken out of the agency's earnings, could potentially jeopardize the agency's tax exempt status.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.    The Department's Adoption Coordinator should be commended for her careful attention to detail and immediate disclosure to the OIG about the conflicts of interest contained in** |

**two home studies completed approximately four months apart.**

A commendation letter was sent.

**2.  The Department's Interstate Compact Office should be directed to reject the second home study submitted on behalf of the adoption agency's executive director.**

The Interstate Compact Office rejected the second home study.

**3.  The executive director should reimburse the agency, if not already done, for the funds drawn on the agency's account for the home study conducted for her personally.**

The Office of the Inspector General shared a redacted copy of the report with the private agency. The Inspector General met with agency administrators and a member of the agency's Board of Directors to discuss the findings and recommendations made in the report.

The executive director has reimbursed the private agency for the home study.

**4.  The executive director should be instructed to inform the agency's Board of Directors of her intent to adopt a child, and the Board should ensure that the executive director does not proceed with an adoption in any way that would be prejudicial to the agency and its clients.**

The executive director withholds her decision to adopt. The executive director will inform her agency's Board of Directors when she plans to resume her adoption plans. The Board of Directors will ensure that the executive director's adoption plans will not interfere with the agency or its clients' interests.

**5.   The adoption agency should develop a protocol related to adoption by the agency's employees or independent contractors, approved by its Board of Directors, which avoids conflicts of interest and is consistent with its status as a tax-exempt organization.**

The private agency has established a protocol approved by its Board of Directors that avoids conflicts of interest and is consistent with its status as a tax exempt organization.

**6.   The Office of the Inspector General ethics staff should provide counseling to the executive director on the issue of conflict of interest, especially as it relates to her role as the executive director of a licensed child welfare agency.**

The Office of the Inspector General ethics staff provided conflicts of interest counseling to the executive director.

## GENERAL INVESTIGATION 30

| | |
|---|---|
| **ALLEGATION** | A Department administrator responsible for overseeing child protection investigations held secondary employment with a hospital that was the subject of a pending child protection investigation. |

| | |
|---|---|
| **INVESTIGATION** | The child protection investigation was initiated after the hotline received an allegation that a hospital employee had injured a minor patient. The assigned |

investigator was part of a team whose supervisor reported directly to the Department administrator. As the investigation proceeded, contentiousness between the investigator and hospital staff led to a teleconference between involved parties, including the administrator. It was during this conference call that hospital staff learned the Department administrator was the same individual who worked at the hospital and requested the Department transfer the investigation to another team. The Department honored the hospital's request and forwarded the matter to the OIG in its role as Ethics Officer for the Department.

In an interview with the OIG, the administrator, a long-time Department employee, stated he had worked at the hospital for the previous 15 years on a part-time basis in various capacities. He admitted having encountered child protection investigators in the course of performing their duties while he was working, but said they never consulted with him on cases involving the hospital. The administrator also acknowledged dealing with children at the hospital who he knew to be wards but said he treated them as "just kids on the unit." He stated he had ended his employment with the hospital one month before the investigation, however rather than a formal resignation he simply "stopped going." The administrator said his reason for leaving the hospital was because the program he participated in had "gotten terrible." The administrator told the OIG he assumed hospital staff were aware of his role with the Department but said he had not informed management and was unable to identify anyone who knew of his other responsibilities. He also stated he had received and returned the annual Statements of Economic Interest required to be filed with the OIG by the Department which he believed qualified as proper notification. The administrator's supervisor was unaware of his work for the hospital until he was informed by hospital staff following the conference call.

In his dual roles as a hospital employee and a Department representative responsible for overseeing workers investigating an allegation against the hospital, the administrator created a conflict of interest. Outside observers could easily conclude that the administrator's feelings towards the hospital, whether positive or negative, could influence his judgment regarding investigations. Although the administrator did not routinely participate in such investigations, he had been called in to resolve a dispute over compliance with investigative efforts. Furthermore, investigators were placed in a compromising position in which they could have felt that their treatment by the administrator might be influenced by their conclusions regarding the hospital. In his interview, the administrator stated that, in retrospect, he would not have done anything differently. His inability to recognize how his dual roles could be perceived by those on the outside and his failure to take proactive steps to prevent being placed in such a position demonstrates the difficulty of illustrating and addressing conflicts of interest within the Department.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.    The Department administrator should receive non-disciplinary counseling addressing his lack of introspection into the conflict of interest from his secondary employment.** |

The administrator received non-disciplinary counseling.

**2. The counseling session should emphasize the importance of proactively recognizing and disclosing potential conflicts of interest so that the public can be assured that child protection investigations are not biased by those conflicts.**

The non-disciplinary counseling conducted included this information.

## GENERAL INVESTIGATION 31

| ALLEGATION | A top Department administrator used the state email system to circulate baseless "safety" threats to other Department personnel. |
| --- | --- |

**INVESTIGATION**   The Department administrator sent an email to fellow executive staff reporting a potential safety hazard related to an insect-borne illness transmitted by spiders hiding under toilet seats. In the email, the administrator encouraged recipients to forward the warning on to others. The information cited by the administrator in the email had been debunked as an internet hoax in 2000 following publication of a study on the issue in a leading entomological journal.

The Department has guidelines in place for disseminating pertinent information. Requests for proposed announcements should be directed through the Department's Communications Office to be vetted for inclusion on the D-Net. Health-related alerts possess great potential for causing concern and must be based on sound medical evidence. The Department has several internal and external experts to assist it in notifying staff of possible health risks.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**   **1.  The Department administrator should immediately retract the email and inform staff of the hoax.**

The employee is no longer with the Department. Executive staff understand that it was a hoax.

**2.  Executive Staff should be instructed that Health or Safety Alerts should be vetted through the Department's Communications Office for D-Net Announcements.**

This was completed at the weekly Deputies' Meeting.

## GENERAL INVESTIGATION 32

| | |
|---|---|
| **ALLEGATION** | A Department employee used the state email system to disseminate a message with political connotations. |

**INVESTIGATION**   The Department employee sent the email to a number of fellow workers one week prior to the date of a scheduled election.  The email offered suggestions on how individuals could mitigate their public reactions to the election results while in the presence of others who did not share their views.  In an interview with the OIG, the employee stated she did not perceive the email to be political in nature but rather as a lesson in etiquette that could be beneficial for Department personnel.  The employee did not compose the email but passed along a message she had received from an outside source.  An OIG review of the employee's email records found no pattern of misuse of the state email system.  The employee acknowledged having agreed to the terms of use of the state email system and stated she regretted having sent the message to others in the Department.  Based on recent changes in legislation, future allegations concerning political emails will be referred to the Executive Office of the Inspector General for investigation.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.  The Department employee should be disciplined for sending an email that violates the Department's prohibition against political activity in the workplace.**

The employee received an oral reprimand.

## GENERAL INVESTIGATION 33

**ALLEGATION**

A Department subcontractor with two service contracts overstated the number of hours she worked for the Department.  In addition, the subcontractor was appointed to a task force for which she received travel reimbursement.  In one instance, the subcontractor received reimbursement from one of the contractors and the task force for the same trip.

**INVESTIGATION**

The subcontractor worked for two entities that contracted with the Department.  One of the contracts secured her services as an adoption trainer while the second called for her to perform adoption file reviews.  The adoption training contract included strict limitations on the number of days per week and hours per day the employee could claim.  In separate interviews with the OIG, the employee, her present and past supervisors and a Department administrator all stated that given the variety of her duties, her weekly hours were irregular, sometimes far exceeding the maximum number of hours she could claim.  In response, her supervisors allowed her to submit hours for "compensatory time" on days she did not actually work to more accurately reflect the amount of time she had spent during weeks her tasks required her to work more than her allotted hours.  The administrator informed the OIG that another Department employee held a similar status and was afforded the same opportunity when recording his hours.  Both supervisors and the administrator spoke highly of the employee's performance and characterized her as a diligent, dedicated worker, however none of the supervisors or the administrator kept or reviewed records of her actual time worked.  After being presented with travel reimbursement records, the employee acknowledged mistakenly submitting the same reimbursement request to two entities on one occasion.

The public institution overseeing the employee's contract did not have a policy in place to address the situation.  The OIG found that the lack of accurate record keeping prevented meaningful review of the employee's division of labor.  Given the diversity of the employee's work for the Department, the reporting of her hours and activities should be formalized to ensure better oversight and accuracy.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1.   The Department should develop a system with the public institution to accept billings for actual hours worked.**

The public institution's time keeping system includes daily sign in and sign out sheets to record actual hours worked.  The daily sheets will be used to record monthly time that is reported to the institution for payroll purposes.

**2.  If the Department is unable to reach an agreement with the institution to accept actual hours billed, the Department must ensure the institution tracks compensatory time internally for the Department employee, the other worker of similar status and any other persons under the contract whose billing does not reflect actual time worked.  All internal records must be approved and signed off on by a supervisor and should reflect the activity for which the time was incurred.  Compensatory time should be claimed within a month of earning, if possible.  In addition, when billings are submitted, the nature of the billing (whether actual or compensatory) must be clearly noted on the billing records.**

All daily sign in sheets, monthly time reports, and travel vouchers to contractors are reviewed and approved by the supervisor, administrator, and Deputy Director or designee and now reflect actual or compensatory time worked.

**3.   The Director should review whether the employee's contractual commitments compromise her appointment to the task force.**

This issue is currently under review by the Department.

**4.   The employee should repay the Department for the roundtrip mileage and toll reimbursement she received from the task force.**

The contractor repaid the mileage and toll reimbursement for this trip.

**GENERAL INVESTIGATION 34**

| | |
|---|---|
| **ALLEGATION** | The OIG conducted a review of compliance with a previous recommendation that pre-school age wards returning to their parents participate in early childhood education programs.  The review was performed in order to ensure that children of teen parents were receiving preschool services. |

**INVESTIGATION**    Pursuant to recommendations made by a prior OIG investigation, Department Procedure was amended to require all children for whom the Department is responsible to be enrolled in an early childhood education program, such as Head Start or State Pre-Kindergarten.  Furthermore, the Department recommended that caseworkers involved with children between the ages of three and five receiving intact family services should actively encourage their parents to enroll them in such programs as well.  Through the course of subsequent investigations, the OIG found numerous cases in which parenting teen wards were provided insufficient information regarding early education programs or were not provided adequate encouragement or support to ensure that they connected their children to these services.  In response to these findings, the OIG examined a sample of 110 parenting teen wards' cases in the Cook Region from FY 2008 to assess the level of participation of their eligible children in early childhood education programs.

The OIG found a varying range of compliance with the early childhood education requirement among the cases reviewed.  In a number of cases, educational programs for the children of teen wards were left unexplored.  Oftentimes when potential resources were identified, teen parents were simply provided a phone number with the expectation that they would follow through independently.  The OIG also found that teen parents of children not yet old enough to begin school frequently were not provided anticipatory guidance and information to meet their child's future educational needs.   Given the behavioral histories and skill deficiencies of many parenting teens as well as the obstacles often created by caring for a child, it is unreasonable to expect these clients to succeed in obtaining services on their own.

Participation in preschool education interventions have positive effects on cognitive growth, school readiness, health status, academic achievement, and reduced need for grade retention and special education services. [Reynolds, A.J., Robertson, Temple, J. A., Robertson D. L., & Mann, E. A. (2001) Long- term Effects of an early Childhood Intervention on Educational Achievement and juvenile Arrest: A 15 Year Follow-up of Low-income Children in Public schools. Journal of the American Medical Association, 285 (18), 2339-2346.]  Research studies have also shown that consistently available preschool education is associated with greater maternal educational advancement and higher levels of employment particularly for teenage mothers. Furthermore, participation in early childhood education programs creates protective factors around children, such as social development and teacher intervention that can reduce the likelihood of abuse and neglect. It was noted that caseworkers involved with the Teen Parent Service Network (TPSN) received training on the benefits and advantages of creating Ecomaps with teen parents as well as instruction on how to complete them.  The Ecomap is a hands-on educational assessment tool developed by caseworkers and the teen parent. The Ecomap is designed to identify viable community services within a mile radius of the parent's home. By identifying community resources within a 1-mile radius of a parent's home, Ecomaps provide a concrete basis for engaging parents with available services.

| | |
|---|---|
| **OIG RECOMMENDATIONS / DEPARTMENT RESPONSES** | **1.  In future training, the Teen Parent Services Network (TPSN) should replicate a task-centered community approach that includes caseworkers visiting community resources during the** |

**training.**

The Department agrees. TPSN will revamp eco-map training using a task-centered approach to identifying resources.   The training incorporates a "hands on" case management approach to locating community

services.  The training will include visits to neighborhood agencies to identify resources available to pregnant/parenting teen wards.  TPSN will develop and/or include on the current monitoring instrument documentation which reflects that completed Ecomaps are in all case files.  The Ecomap training for TPSN caseworkers is scheduled for April 2010.

**2.  TPSN should set incremental goals to increase the number of teen parent children enrolled in early childhood programs.**

The Teen Parent Services Network (TPSN) will identify eligible 3+ year olds to determine whether they are enrolled in an early childhood education program.  For those not enrolled, TPSN will identify the obstacles to enrollment.  TPSN will educate all staff on the importance of exploring early childhood education options with each ward.  In January 2010, TPSN will include enrollment in an early childhood education program as part of the Performance Incentive Program for all Regional Service Providers.

**3.  TPSN should set incremental goals to increase the number of teen parent children enrolled in programs accredited by the National Association for the Accreditation of Young Children (NAEYC).**

TPSN will encourage, whenever possible, teen parents to enroll their children in NAEYC accredited early childhood education programs.

## GENERAL INVESTIGATION 35

| ALLEGATION | In her capacity as Ethics Officer for the Department, the Inspector General was asked to determine if permitting Department employees to receive services and reimbursement from the Council on Accreditation (COA) constituted a conflict of interest. |

**INVESTIGATION**

The Illinois Gift Ban Act prohibits state employees from soliciting or accepting remuneration from entities conducting or attempting to enter into business with the state. The Council on Accreditation had a long-standing contract with the Department certifying that facilities met established standards. Department employees were provided opportunities to attend peer reviews conducted by the Council on Accreditation, which covered the cost of travel and lodging and reimbursed participants for food.

The Ethics Officer, after consulting with the Office of the Executive Inspector General and the Executive Ethics Commission, concluded that while the provision of travel expenses and lodging clearly implicated the Gift Ban Act, the participation of Department employees in peer reviews conducted by the Council on Accreditation added to the employees' base of knowledge and benefited the Department. By participating in the peer reviews, employees gained a greater understanding of the accreditation process which they were able to use to enhance their work for the Department. As such, the Council on Accreditation's contribution to covering the cost of attending peer reviews fell under the exception for travel expenses as presented in the administrative rules associated with the Act.

**OIG RECOMMENDATIONS / DEPARTMENT RESPONSES**

**1. Employees must obtain approval from the Ethics Officer for all travel for Council on Accreditation (COA) peer reviews.**

The Department agrees to have employees obtain approval from the Ethics Officer for their first initial peer review request. If the employee changes positions, they need to obtain approval from the Ethics Officer again. Quality Assurance sent updated instructions to all known certified and active Council on Accreditation peer reviewers currently employed by the Department advising them of the new requirement to obtain approval from the Ethics Officer. Quality Assurance will continue to ensure that staff are not approved for participation on state time for Council on Accreditation reviews without having the Ethics Officer's approval.

**2. The Department should have a central source and listing of all DCFS employees that conduct peer reviews.**

Quality Assurance maintained a centralized listing of all DCFS employees who have been certified to participate in Council on Accreditation peer reviews. Quality Assurance also notes whether or not the employee is considered to be on active status with Council on Accreditation as a peer reviewer and implemented quarterly communications with Council on Accreditation in an effort to ensure that any newly trained reviewers working for DCFS are known to both Council on Accreditation and to Quality Assurance.

144

# PROJECTS AND INITIATIVES

## ERROR REDUCTION

The Office of the Inspector General is required by statute to develop Error Reduction Implementation Plans to remedy patterns of errors and problematic practices that compromise or threaten the safety of children as identified in both the Inspector General's death and serious injury investigations and by Child Death Review Teams. 20 ILCS 505/35.7.  The fields of medicine, aviation and engineering have offered classic examples of the benefits of introspective organizations in lowering risk of harm to those they serve. Over the past 18 months the Inspector General has developed a training curriculum and introduced child protection investigators, their supervisors and managers to the concept of error management – i.e., what can be done to prevent the occurrence of tragic error by applying error reduction methods to child protection investigations of allegations of cuts, bruises, and welts, since these allegations are often a precursor to the fatality of young children.

As of December 2009, 96% of child protection investigators, supervisors and managers have been trained on the error reduction management of cuts, bruises, and welts abuse allegations.  Training responsibilities were transitioned to The Juvenile Protection Association[5] and DCFS training staff in the second half of this fiscal year.

### Critical Thinking
The underlying principle of the cuts, bruises and welts Error Reduction Training is the application of critical thinking skills to child protection investigations. Critical thinking skills applied to one set of investigations can be generalized to other investigations. Past investigative errors included investigators' over-reliance on self-reports, failure to seek corroboration of information, and the failure to objectively weigh the credibility of informants. At times, some investigators prematurely became anchored to initial impressions and rejected evidence that contradicted their initial impressions. Others operated under a "Rule of Optimism," misinterpreting and overlooking harmful adult behaviors discovered in the course of an investigation.

The field of child protection is a difficult one. Many times we do not want to believe that a parent would harm a child, so we cling to optimistic views and discredit contradictory facts. To reduce the tendency for these biases, and to lower the reliance on self-reports, investigators must obtain the information necessary to be able to answer questions about who, what, where, when and how, an incident occurred by gathering enough information to provide a fair and accurate account of the events that led to the child's injuries. The Error Reduction training curriculum reviewed these and other key components of investigations, including scene investigations, scene reenactments, timelines and the identification of key informants. The Inspector General also recommended and the Department adopted procedural changes to the investigation of cuts, bruises and welts.  Most significantly, the training introduces the use of the *Referral Form for Medical Evaluation of a Physical Injury to a Child* to increase collaboration with medical professionals and the use of child centered collaterals focusing on persons the child might trust.

---

[5] The Juvenile Protection Association is a private, non-profit, social service agency that contracts with the Department to provide counseling, consultation, professional education and technical assistance services.

*Seeking Collaboration with Medical Professionals*

Child protection needs the assistance of pediatricians and family physicians to lower risk of harm to infants and children. The American Academy of Pediatrics (AAP) promotes the use of evidence–based practices to improve health and prevention practices among child and adolescent health professionals. *Bright Futures,*[6] an AAP publication, reminds health professionals that child maltreatment or abuse can occur in any family and that without identification and intervention, unchecked acute and chronic stressors can lead to child abuse or neglect. The guidelines of *Bright Futures* advise health professionals to look for signposts of child maltreatment factors, including a child who is perceived by parents to be demanding or difficult to satisfy; an infant diagnosed with a chronic illness or disability; a family who is socially isolated, without community support; mental health issues with one or both parents that have not been diagnosed and treated; and a parent with career difficulties who may see the newborn as an impediment or burden. AAP's Evidence Panel for *Bright Futures* referenced evidence that demonstrated in pediatric settings that the use of developmental services among families with children from 0-3 years of age can decrease the odds of families using severe discipline (e.g. slapping the face or hitting with object). If child abuse and neglect are going to be combated, the village providing the safety net has to include the child's physician, other helping professionals and family members who are invested in the well-being of the child.[7]

To help communicate the importance of collaboration with the medical community, trainings included medical research literature involving bruising and child development. For example, the research states that children who do not "cruise" do not bruise themselves. Thus, it is rare for young infants to suffer a bruise compared to children who are crawling or walking. Therefore, any young infant referred to child welfare who presents with a bruise should be seen by a medical professional. However, data from the Inspector General's death investigations and the review of a random sample of statewide child protection investigations involving bruising of infants and children found that in 65% of the investigations, child protection investigators did not record a professional exchange of information with medical providers. Vital information about the abuse, critical to rendering an opinion, was not shared by the child welfare professional with the injured child's pediatrician or family physician. In 31% of investigations of bruising in infants 24 months or younger, the parents/caretakers history of domestic violence was not shared with the child's physician.

Steps taken to correct these errors and increase the reliability of information provided to medical professionals included training the investigators on how to dialogue with a doctor and use of the referral form. Communication with medical providers should focus on exchanging information on relevant facts so the physician can render an opinion of whether the injury is more likely (the standard of evidence for upholding an indicated finding of abuse or neglect on administrative appeal) to be the result of abuse versus an accident. Relevant information provided to a medical professional includes whether there was either domestic violence or substance abuse problems in the home, and the caretaker's explanation for the injury. The training curriculum also corrected the misconceptions that investigators could not exchange

---

[6] Hagan JF, Shaw Js, Duncan PM, eds. 2008. *Bright Futures Guidelines for Health Supervision of Infants, Children, and Adolescents*, 3rd Edition.

[7] Medical professionals are in a unique position to prevent child maltreatment. Dr. Kent Hyme MD, FAAP, a pediatrician who testified on behalf of the American Academy of Pediatrics to a House Ways and Means Subcommittee Hearing on Improving Child Protection Subcommittee (May 23, 2006) reported that pediatricians often are not provided the information vital to the child's follow-up care, especially in substantiated cases of abuse. He found that pediatricians tend to dwell on the periphery of the child protection system. But, after child protection concludes its investigation, it is the child's physician who can monitor the child's well-being in subsequent visits.

information with a doctor because it biased the doctor's opinion or violated confidentiality. To increase the probability of a careful consideration by the physician of the risks associated with an injury to young infants and children, the Department adopted the *Referral Form for Medical Evaluation of a Physical Injury to a Child* to provide written documentation of information from the child protection investigator.

### Child Centered Collaterals

Another key change was requiring child protection investigators to speak with child centered collaterals. Previously, investigators were required to interview persons identified by the parent, but were not required to speak with other persons whom the child might trust and who may have additional relevant information about the abuse allegations. To identify child centered collaterals, older children can be asked, "Who do you feel safe with?" For non-verbal children, investigators can ask older siblings to whom the baby is special. They can also ascertain who in the extended family network seems concerned about the child's well-being. The Inspector General often found that relatives or professionals invested in the child's well-being were not interviewed. Sometimes, investigators minimized the importance of child centered collaterals.[8] Initial reviews of post training investigations seem to indicate that investigators still experience difficulties in understanding that child protection investigators need to interview individuals that the *child* has identified as concerned with his/her well-being.

### Creation of an Error Reduction Web Page and Frequently Asked Questions

In support of the Department's error reduction efforts, the Office of the Inspector General added an Error Reduction web page to the Inspector General and Ethics Officer's DCFS D-Net site. The Error Reduction page provides error reduction training information to both DCFS and private agency child welfare staff.

To help dispel misconceptions and answer relevant questions raised during the trainings, DCFS committed the resources of its Office of Legal Services to the training initiative. A DCFS attorney attended field trainings to clarify statutes and rules. To further inform field staff, the Inspector General's Office, with the assistance of DCFS Legal, created a Frequently Asked Questions section on the Error Reduction web page. Below are several examples of Frequently Asked Questions:

- **What can I tell Mom about her boyfriend's criminal background?**
  *Conviction information is public information and can be shared, but should only be shared for a legitimate case purpose. If her boyfriend was convicted for retail theft 10 years ago, there is no reason to share the information. However, if the boyfriend has convictions that suggest risk of harm to the child, you can share them.*

- **What about arrest information?**
  *According to Administrative Procedure 6, you can and should examine arrest-only information to assess whether the arrests show a pattern of behaviors that suggest substance abuse, violence, conflict resolution difficulties, or other problems that may be relevant to the safety of the child. You can discuss the arrest patterns with the arrestee, to gather additional information. If you believe that the pattern of arrests suggests problems that may affect the child's safety and that the caretaker needs the information to protect the child, you can disclose the pattern of arrests. For instance, it is permissible to say, "Your boyfriend's history suggests he may have a problem with conflict resolution." A single arrest that did not result in a conviction should not be disclosed, because you cannot presume that the event occurred when it did not result in a conviction.*

---

[8] In the Spring and Fall of 2008, Director McEwen and his Acting Deputy Director of Child Protection issued two memoranda to child protection staff, instructing investigators, supervisors and managers to correct errors that were noted in OIG investigations and in the Department's review of 8,000 child protection investigations. The errors identified included investigators' over-reliance on self reports and minimization of family members' concerns for the child's safety.

*Pending arrests (those in which criminal charges are still pending) can be disclosed if relevant to child safety.*

- **I know that I'm supposed to read prior indicated and unfounded reports, but I'm not to *use* the prior unfounded reports. Why am I reading them?**

*You can't indicate a pending investigation based only on a prior unfounded report, but you can document and use relevant information that you find in a prior unfounded report. For instance, if in your pending investigation you would like to talk to the father of the child, and the mother is refusing to provide contact information, if you find contact information in the prior unfounded investigation, you can, and should, use it.*

*If a critical witness in a current investigation provided inconsistent information in a prior investigation, you should note that discrepancy and use it in weighing that individual's credibility or ability to protect. For instance, if mom tells you that this is the first time that her boyfriend has hit her son, but you see in the prior investigation that mom made the same exact statement, you should confront mom about the discrepancy, and note it in the current investigation. The discrepancy should be weighed when considering whether the mother can protect the child from the boyfriend. You can document that you learned the information from a review of the prior investigation. You should also document what you did in response, e.g., I questioned the mother about the discrepancy between what she had just told me and what she had told the prior investigator. Mom denied that she had told the prior investigator that her boyfriend hit her son.*

*In addition, if you have information in the current investigation that leads you to question the prior finding, you should call the hotline with a risk of harm allegation. For instance, if the prior investigation was unfounded because the investigator could not determine between two caretakers who was responsible for the child when he received an injury, and two months later a different child suffers a similar injury while in the sole custody of one of the caretakers, you must call the hotline or add an allegation to your investigation.*

- **If I can't accept a promise not to hit the child as a safety plan, what do I do?**

*When the facts suggest excessive corporal punishment, it means that the parent inflicted excessive harm to the child, not just a spanking. Under these circumstances, a safety plan needs to involve other people. Think about involving other professionals or a relative or other person that the child feels comfortable with. Consider an immediate referral to intact family services.*

- **What if a safety plan is necessary and the non-custodial father is available?**

*If both mother and father agree that he is the dad, and the child will be safe with the father, the father is entitled to care for the child if it is unsafe to keep the child with mother.*

- **If the parent does not want the child placed (after protective custody) with a particular relative, how should I proceed?**

*The governing principle is "best interest of the child." If placement with a particular relative is best for the child, the parent cannot dictate that the child not be placed there. Still, friction between the parent and the relative should be considered.*

- **Why do so many investigations get overturned on appeal?**

*Sometimes it depends on the availability of witnesses when the hearing proceeds; sometimes it depends on whether there was adequate documentation of information learned during the investigation. The Department bears the burden of proof at the hearing. Another problem results from indicating someone for neglect if they were not a primary caretaker.*

PROJECTS AND INITIATIVES

*Safety Planning*

In other high risk situations, investigators have to determine whether the safety of the child and the risk of future harm can be managed, and what investigative information is needed to make this decision. The foundation of a good safety plan is a solid investigation. Investigations conducted by the Office of the Inspector General have found investigative shortcuts occur when investigators are overburdened. High caseloads, such as those caseloads that exceed B.H. standards, [9] increase the potential for the investigator taking shortcuts. Each shortcut has the potential of producing a lethal error, or what the error reduction literature calls a "near miss" of a tragedy. When shortcuts were taken in investigations, they were inevitably also taken in safety planning, leaving children vulnerable to potential harm. There is a response cost when an investigator establishes a formal safety plan, namely, the obligation that the investigator must monitor the child and family every five days. Perhaps this extra burden creates a situation ripe for the "Rule of Optimism," where the investigator over-relies on the family to mitigate the risk so they need not monitor. The error reduction training emphasized the concern that when there is physical abuse to infants and young children, the likelihood that a household will be abuse-free in the future is unpredictable. These dangerous situations call for orders of protection or protective custody.

For a safety plan to be effective, all participants must have a clear understanding of the reason for a plan and the specifics of the plan. The training covered key questions that have to be answered in safety planning. For example: If the alleged perpetrator agrees to move out of the house, where are they going to stay and for how long? Who in the professional community and extended family can monitor the plan and notify DCFS if problems arise? Is the family going to be able to follow through on the agreed upon plan and have they understood the consequences of violating the safety plan? Does a parent's desire for romantic relationships, or companionship, or drugs diminish the parent's ability to protect the child? Does the relative or professional who agrees to help monitor the children understand the safety risks?

Consequences for violating safety plans have to be clear, including explaining that the case could be screened for a court order or even custody. In some cases, where parents continue to be involved with an abusive paramour or drugs, a child protective order or placement with an appropriate non-custodial parent should be pursued.  It is a rare practice within the Department to pursue alternative safety plans with non-custodial fathers, despite federal directives that the Department should involve fathers. During the training, some investigators complained that no matter the risk, some state's attorneys will not screen a case into court. The findings of the Child Death Review Teams (CDRT) concur with this complaint and the CDRTs have recommended that the Department begin to keep data on the number of screenings on a county-wide basis so that DCFS Legal can intervene.

Child Protection problems may differ by region or community, and therefore generalized training may not address all relevant issues. Management, with the assistance of DCFS Legal, must step in post-training to follow-up on particular problem areas. Training alone is not enough - it can only hope to raise awareness of issues that need resolution. Training follow-up includes a feedback loop to the field. With the assistance of the DCFS Office of Legal Services, a *Frequently Asked Questions* training email is issued to each team trained, answering questions raised in the training.

*Quality Assurance Follow-Up to Trainings*
*The Child Death Review Teams*

The Error Reduction Training curriculum on cuts, bruises and welts was shared with the Executive Council of the Child Death Review Teams and a member of the Council attended a training. Prior to this training, the Chair of the Executive Council assisted the Inspector General's Office in developing and delivering an error reduction training on investigations involving mentally ill and substance abusing

---

[9] B.H. references child plaintiffs in a Federal Court settlement agreement.

parents. This training was piloted in the Southern Region and is anticipated to be the subject of the next Error Reduction Plan, following the Department's Quality Assurance field reviews of cuts, bruises and welts investigations. The results of the initial Quality Assurance reviews will be shared with the Executive Council. The Inspector General and the Executive Committee of the Child Death Review Teams are committed to making recommendations that will assist the State in lowering child mortality.

## ETHICS

### Child Welfare Ethics Advisory Board

The Child Welfare Ethics Advisory Board was formed in March 1996 as an advisory body to the DCFS Inspector General.  Its members are an interdisciplinary group appointed by the Inspector General.[10] Though the Board did not meet formally this year, individual Board members provided consultation to the Inspector General as needed.

The Inspector General asked an Advisory Board member to consider the ethical issues raised in an inquiry.  The inquiry involved an executive director of a not-for-profit private agency which provides services to wards through transitional and independent living programs.  The executive director also had a partnership interest in a counseling group to which some of the youth from the not-for-profit agency were referred.  The executive director attempted to avoid any actual, potential, or apparent conflicts of interest by not participating in any agency decision related to referrals for outside services, and advising new agency board members about the relationship with the counseling agency.  In spite of the executive director's intentions and best efforts to avoid client referrals to outside resources and informing agency board members about his interest in the counseling agency, the Advisory Board member was concerned that the executive director had authority and control over decision makers within the agency who may not be aware of any affect on their judgment caused by the executive director's dual roles.  The Advisory Board member believed that the conflict of interest could not be resolved as long as the executive director was involved in both agencies, and recommended either that the executive director resign from one of the two agencies or that the not-for-profit agency discontinue referrals to the counseling agency.

The Inspector General referred another situation that had been received from the Department's Conflict of Interest Committee to an Advisory Board member which involved a Department Administrator's desire to have a relative's children placed with him through the Department.  The children had been in placement and serviced by a private agency for approximately 18 months.  When it became necessary to remove the children from another relative placement, the Department Administrator contacted the private agency and requested the children be placed in his home.  The Administrator had a professional and on-going

---

[10] During this fiscal year, the members of the Child Welfare Ethics Advisory Board were:

Michael Bennett, Ph. D., Department of Sociology, DePaul University
Jennifer Clark, Psy. D., Clinical Director, Child Protection Division, Cook County Juvenile Court Clinic
Michael Davis, Ph.D., Senior Fellow, Center for the Study of Ethics in the Professions and Professor of Philosophy, Illinois Institute of Technology
Armand Gonzales, M.D., Pediatrician
James C. Jones, M.S.W., M.B.A., President and CEO, ChildServ
Jimmy Lago, M.S.W., M.B.A., Chancellor, Archdiocese of Chicago
David Ozar, Ph.D., Department of Philosophy, Loyola University Chicago
David Schwartz, M.D., Interim Chair, Department of Medicine - Division of Infectious Diseases, John H. Stroger Jr. Hospital of Cook County and Associate Professor of Medicine, Rush Medical College
Ada Skyles, Ph.D., J.D., Associate Director and Research Fellow, Chapin Hall Center for Children, University of Chicago (Chair)

relationship with the private agency through his work in the Department and contacted the Department's Conflict of Interest Committee to determine how to avoid any potential conflicts. The Inspector General and the Chair of the Child Welfare Ethics Advisory Board reviewed the ethical issues involved and concluded that it was in the children's best interests for their cases to remain with the private agency, and in order to avoid any potential conflicts of interest or hint of impropriety, any responsibility the Department Administrator had related to the private agency would be transferred to another region. The details of this arrangement were worked out with the Department and communicated to all involved.

The Inspector General asked the Chair of the Child Welfare Ethics Advisory Board to review an inquiry involving a child protection employee's secondary employment. The second job was as a part time mentor to an adolescent youth through a community organization that had several contracts with the Department, none of which were for mentoring. The youth being mentored by the Department employee became the subject of a child protection investigation, which is how the Department employee's secondary employment became known. The employee was not directly involved in the child protection investigation of the youth he was mentoring; the investigation was assigned to a different team within the same office. The Inspector General asked the Chair of the Child Welfare Ethics Advisory Board to review the situation for any ethical issues. Together they determined that there were no ethical problems with the Department employee continuing his mentoring relationship with the youth, and concluded that not continuing the mentoring would present a difficult situation for the youth. They also advised the employee that the situation may not have escalated into a matter requiring review by the Office of the Inspector General if, in accordance with Rule 437, the employee had informed his supervisor about the secondary employment when it began.

### DCFS Ethics Officer
As Ethics Officer for DCFS under the Illinois Governmental Ethics Act, the Inspector General reviewed 735 Statements of Economic Interest that senior DCFS employees are required to file with the Secretary of State by May 1 of each year. Of the 735 statements submitted, 73 were further reviewed and followed up on for potential conflicts. The statements reviewed did not involve violations of the Gift Ban Act.

### Annual Ethics Training
As required by the State Officials and Employees Ethics Act of 2003, state officials and DCFS staff continued ethics training for all new, contractual, seasonal, and temporary employees. The Office of the Inspector General coordinates and monitors the ethics training for the Department, including monitoring new employees' acknowledgements that they have completed the off-line ethics training. The online ethics training for state employees consisted of lessons on various ethical dilemmas. There were two training periods (October 1 – December 30, 2008 for DCFS board and commission members, and May 11 – June 9, 2009 for DCFS employees), for which the OIG ethics staff notified those registered to complete the online training and monitored their completion status. Upon conclusion of each training period, the OIG submitted a report to the Office of the Executive Inspector General for the Agencies of the Illinois Governor. In 2009, 2,974 DCFS employees completed the online ethics training. In addition to DCFS employees, DCFS board and commission members were asked to have their members complete an off-line training. In FY 2009, a total of 392 individuals completed the off-line ethics training.

### Conflicts of Interest
To address some common ethical issues that frequently arise for child welfare professionals, the Office of the Inspector General developed the following practice guide to provide some guidelines and case studies as a means of reinforcing the process of thinking critically about conflicts of interest as we service children and families. This practice guide can also be viewed on the Inspector General's web site on the D-Net.

## CONFLICTS OF INTEREST:  A PRACTICE GUIDE

### I. Introduction

Child welfare professionals regularly encounter ethical issues in the course of their daily activities in providing service to children and families. Of all the ethical issues in child welfare, some of the most vexing and difficult questions concern conflicts of interest. The vast majority of child welfare professionals who find themselves ensnared in a conflict of interest situation do so accidentally, acting before thinking about the ethical issues which may be present. The purpose of this practice guide is to provide some guidelines and case studies as a means of reinforcing the process of thinking critically about conflicts of interest as we service children and families.

### II. Identifying Conflicts of Interest

A conflict of interest arises when a child welfare professional entrusted to exercise objective judgment has an interest that could interfere with the objectivity of that judgment.

Conflicts of interest may be:

- **Actual** – does not require that a person act on his or her interest; it merely requires that the interest exists. **The key question to ask is: does this interest pose a conflict with my role as a child welfare professional?**
- **Potential** – there is no existing conflict, but there is the **likelihood** that the situation will change and a person will have an interest that could reasonably affect decision making in the future. **The key question to ask is: is there a reasonable possibility that this will pose a conflict in the future?**
- **Apparent** – there is no potential or actual conflict, but an individual who is unaware of the facts may reasonably infer that a conflict exists. **The key question to ask is: how does this look to an objective observer?**

What is important is the presence of the interest itself, not how the professional assesses his or her ability to exercise objective judgment.

Conflicts of interest can be:

- **Private Interests** – e.g., secondary employment; selling fundraising candy to clients; DCFS employees using their position to influence agency activities affecting friends or relatives.
- **Multiple Relationships** – e.g., romantic relationships between co-workers; DCFS employees becoming foster parents, guardians, or adoptive parents to DCFS wards; DCFS employees who have both a professional and nonprofessional relationship with a person.

In assessing whether a conflict of interest exists, it is important to assess past interests as well as present and future interests – e.g., member of a committee evaluating proposals for funding worked for one of the bidders in the past.

### III. Ways to Make Conflicts Less Problematic

The key to resolving conflicts of interest before they become problematic is to recognize and address them proactively. Here are some helpful hints:

- **Know** the various Rules, Procedures and Code of Ethics concerning conflicts of interest that affect your work as a DCFS employee.

- **Seek** consultation with your supervisor and, if necessary, with the DCFS Conflict of Interest Committee before making a decision or taking an action which you suspect may involve conflict of interest issues. Reveal the perceived conflict to an objective third party.
- **Provide** full disclosure of your status as a DCFS employee in situations such as secondary employment where conflicts of interest are likely.
- **When in doubt – ask!**

## IV. When Conflicts of Interest Are Not Resolvable

Sometimes, despite our best efforts, conflicts of interest are not resolvable. In these instances, the transparency of the decision making process is paramount. Decisions regarding conflicts of interest should never be made in isolation. Consult your supervisor, the DCFS Conflict of Interest Committee, or The Office of the Inspector General for DCFS who serves as the Department's Ethics Officer.

## V.  Conflict of Interest Case Examples

Following are 14 vignettes which involve "Frequently Asked Questions" regarding conflicts of interest. Since each situation has its own unique fact patterns, each situation must be analyzed independently. Guidance should be sought from the Conflict of Interest Committee whenever there is a question about conflicts of interest.

---

*Scenario Number One*
*Mary, a DCFS manager, is told by close family friends that they are subjects of a child abuse investigation. Although Mary does not have any involvement in the investigation, she accesses SACWIS to learn about the status of the investigation and the name of the investigator. Mary calls the investigator to provide information she has about the family's character. Does Mary have a conflict of interest?*

Mary has an actual conflict of interest because she has allowed her friendship to conflict with her professional responsibilities and duties. Although we don't leave our personal relationships and concerns at home when we come to work, it is unethical for us to use our status as Department employees to affect or access an ongoing investigation. Rule 437.40(u) states: "When an employee or any person with whom the employee has a personal relationship is the subject of an investigation or review…the employee shall not use his or her status as an employee to influence or interfere with the investigation or review. The employee…shall have access to the record(s) of the investigation or review only as authorized by applicable statute." Administrative Procedure 20.6 also states: "The SACWIS search function may not be used to retrieve database information for purposes other than the accomplishment of assigned duties."

Mary's challenge is to resolve this conflict of interest in an ethical and caring manner. At a minimum, Mary should notify her immediate supervisor about her concerns. Although Mary can use her telephone at work to speak with the investigator, it may be more prudent for Mary to schedule an interview after work hours or during personal time, such as a lunch hour. In this way, Mary makes a clear distinction that she is speaking with the investigator as a private citizen and not as a Department employee. Additionally, Mary can tell her friends that she is willing to be interviewed as a collateral source in the investigation. This interview, particularly if conducted after regular work hours, would allow Mary to support her close friends while, at the same time, avoiding a conflict of interest between her personal interest and her professional responsibility as a Department employee.

---

***Scenario Number Two***
*Sam, a child welfare supervisor, plans to rent his lakefront house to Morgan, a case manager whom he supervises. The rent will be at market value. Does Sam have a conflict of interest?*

Both Sam and Morgan have a potential conflict of interest, no matter which of them is landlord or tenant. Sam's and Morgan's private relationship as landlord-tenant can potentially conflict with their professional relationship as supervisor-supervisee. As a supervisor, Sam is in a position to make decisions about Morgan in the workplace which could be influenced by their landlord-tenant relationship. If Morgan fails to pay rent and he is simultaneously disciplined at work, Morgan could allege that Sam is retaliating. Likewise, if Sam grants Morgan's request for time off while denying the requests of others on the team, favoritism could be inferred. Rule 437.40(a) states: "No employee shall use his or her official position for private gain (other than salary), give preferential treatment to any person or entity in the conduct of official duties because of personal interest…or engage in conduct that could adversely affect the confidence of the public in the integrity of the Department of Children and Family Services."

If Sam, as a supervisor, wishes to rent his house to Morgan, Sam should neither supervise Morgan nor be involved with any cases assigned to Morgan. Morgan should be supervised by another supervisor. The situation is the same if Sam were renting from Morgan.

***Scenario Number Three***
*Beth, a child welfare case manager, realizes that she was romantically involved five years ago with a relative of one of the parents in a case she has been assigned. The relationship ended amicably and Beth does not feel working with the family poses a conflict of interest. Is Beth correct? What, if anything, should Beth do?*

Beth has an apparent conflict of interest. Even though Beth's relationship with the parent's relative ended amicably five years ago and even though Beth does not feel there is a conflict of interest in working with this family, it is important to avoid even the appearance of a conflict of interest. Beth should notify her supervisor of the apparent conflict and ask that the case be assigned to another case manager. Department employees should "not engage in conduct that could adversely affect the confidence of the public in the integrity of the Department…." (Rule 437.40(a)).

**Scenario Number Four**
*Andrew and his supervisor Ann find that they are becoming romantically involved. Their relationship is becoming the topic of conversation in the office. Does their relationship pose a conflict of interest? What, if anything, should Andrew and Ann do to resolve any conflict of interest?*

Workplace relationships between co-workers are some of the most common and difficult situations to navigate because they affect not only the two persons involved, but also co-workers and the overall work environment. Ann and Andrew have a conflict of interest. Ann should tell her supervisor about the relationship and request that she be reassigned to another team or office. Ann should have no supervisory oversight of Andrew or any of the cases assigned to him. Ann, the person in the more powerful position, should be given the reassignment.

Oftentimes, for a number of reasons, the reassignment of the supervisor cannot take place immediately. This may be true, particularly in Downstate offices where there are fewer staff. In this situation, the administrator should set up a "wall" to assure that Ann does not supervise Andrew or any of the cases assigned to him.

Office romances are distracting not only for the two persons involved, but also for people around them. Maintaining secrecy about the relationship makes one even more vulnerable to ethical failures. If creating an ethical work environment is a goal, Ann could sit down with other supervisors in the office and tell them why she is choosing to transfer to another office or team. The administrator might also ask Ann for permission to share the reason she is transferring with all who work in the office, thus removing the veil of secrecy and modeling transparency within the work environment.

**Scenario Number Five**
*Zoe, a DCFS clinical administrator, wishes to accept a part-time position as a social worker. She would be the only social worker in the Emergency Room of St. Elsewhere Hospital. Does Zoe have a conflict of interest?*

Zoe's employment as the only social worker in the E.R. poses a potential conflict of interest with her position as a DCFS employee. In situations involving children who are wards of the state, part of a family being serviced by DCFS, or who are brought to the hospital as part of a child protection investigation, it would be very difficult, if not impossible, for Zoe to avoid a conflict of interest between her position as a DCFS employee and her duties as a hospital social worker.

If, however, there was more than one social worker available for patients in the E.R., another social worker could provide services in situations where Zoe would have a conflict of interest. Zoe should inform hospital administration of her primary employment as a DCFS administrator so that the hospital can construct a "wall" between her position as a DCFS employee and her responsibilities as an E.R. social worker. Rule 437.40(s)(t) should be taken into account when assessing conflicts of interest in secondary employment.

Zoe is a mandated reporter in either capacity and is required to report suspected cases of child abuse or neglect. Zoe should also inform her DCFS supervisor of her secondary employment.

*Scenario Number Six*
*Bertha, a DCFS supervisor and licensed foster parent through a private agency, wishes to have a DCFS ward placed in her home. Does Bertha have a conflict of interest?*

Bertha would have a conflict of interest if a DCFS ward were placed in her home and the placement was licensed or monitored by DCFS. In order to avoid a conflict of interest, Bertha's home must be monitored and licensed by a private agency and by private agency staff who have no significant relationship with Bertha.  For example, if Bertha was the manager of the DCFS APT team that monitored the private agency, the private agency would have to be monitored by another APT team. Rule 437.40(o) states: "The employee's or spouse's foster family home or day care home shall be supervised, monitored, licensed and evaluated by an agency other than the Department and by individuals who have no significant working relationship or personal relationship with the employee." Based on Rule 437.70, Bertha must also obtain the permission from her Regional Administrator in order for the placement to occur. If Bertha has to attend a court hearing regarding the DCFS ward residing in her home, consideration may have to be given for a seasoned employee or supervisor from the private agency to be present in court hearings in order to minimize any potential conflict of interest or influence Bertha may have on court proceedings or court personnel.

*Scenario Number Seven*
*Emily and John, DCFS employees, want to open a child care facility. Do Emily and John have a conflict of interest?*

As a safeguard against conflicts of interest, Rule 437.40(n) states: "The employee must resign his or her employment before commencing any operations such as a child care facility." Please note that this Rule does not apply to Department employees who either wish to become foster parents or open a home day care. To avoid potential conflicts of interest, however, the licensing study for a day care home or foster home must be done by an agency other than the Department and by persons who have no significant personal or working relationship with either Emily or John.

*Scenario Number Eight*
*Victor, a DCFS investigator, is asked for advice about an investigation by a close friend. The friend starts talking with Victor about a relative's child neglect investigation. Does Victor have a conflict of interest?*

Victor has a potential conflict of interest. Victor cannot talk about the specific details of an investigation. By doing so, Victor risks not only the integrity of the investigation, he also risks his job. Victor can "back out" of a difficult situation by giving general information about DCFS and the investigative process. He cannot, however, give his opinion or offer suggestions or specific advice about an ongoing investigation.

*Scenario Number Nine*
*Lulu, a DCFS clinician, might have former DCFS clients in her second job as a mediator. She provides mediation services on her own time and not using State resources. Does Lulu have a conflict of interest?*

Lulu has a potential conflict of interest. She can never mediate cases which involve any of her former or current DCFS clients. Mediators are called to be neutral. Despite our best efforts, there is a human tendency to favor one person over another. Even if Lulu thinks she can be impartial in these cases, an important factor to consider is how mediating her former clients' cases would look to an objective observer. Lulu may mediate cases involving past DCFS clients who were not on her caseload if she fully discloses that she is a DCFS employee. The client then has an opportunity to choose another mediator. Ideally, Lulu would not mediate cases of any former DCFS clients in order to avoid even the appearance of impropriety.

*Scenario Number Ten*
*Charles, a Regional Administrator, has been asked to be part of a committee evaluating a proposal for funding submitted by an agency for which he used to work. Charles worked for this agency about ten years ago and left to take a job with DCFS. Charles thinks this is all ancient history, and does not see any reason why he cannot review the proposal. He does not tell anyone on the review committee about his past employment with the agency. Charles gives the agency's proposal a positive review and recommends funding. Does Charles have a conflict of interest?*

Charles has the appearance of a conflict of interest. Even though he views his past employment at the agency as "ancient history," an objective observer could infer that Charles' previous employment has an influence, either positive or negative, on his funding recommendations. What Charles thinks about his ability to be objective is not important.  Charles should have told the proposal review committee about his past employment with the agency as soon as he realized the agency had submitted a proposal. The review committee could than have determined whether Charles should remove himself from the review process. The DCFS Code of Ethics for Child Welfare Professionals states: "Child welfare professionals should avoid professional matters where they have a private or professional interest. If a situation arises where such a conflict may exist, child welfare professionals should consult with an appropriate supervisor and take steps to eliminate any potential or real conflict." (Rule 1.07(b) (1))

*Scenario Number Eleven*
*Lindsey, a DCP investigator, has a part time job as an intake worker at the local women's shelter. She has worked at the shelter for a number of years and assumes that everyone on her DCP team knows about it. Lindsey works at the shelter from 11 pm to 7 am on Monday, Friday, and every other Saturday and Sunday. Her work hours with DCFS are 8:30 am to 5:00 pm, Monday through Friday. Does Lindsey have a conflict of interest?*

Lindsey should not assume that there is no conflict of interest between her two jobs just because she presumes that staff at DCFS know about her second job. In order to determine if Lindsey has a conflict of interest, she needs to review not only the duties of both jobs and the clients she serves in both places of employment, but also whether she can adequately perform the duties of both jobs, given the hours demanded at both. Rule 437.40(a) states: "No employee shall…impede or adversely affect governmental efficiency or economy because of personal interest…." Lindsey should review her secondary employment on an annual basis with her supervisor to discuss changed circumstances in either job which may cause a conflict of interest, particularly concerning job functions, time commitments, and clients served.

*Scenario Number Twelve*
*As a token of appreciation, Harold, a DCFS contract monitor for the Healing Arms Counseling Agency, has been given a $30.00 gift card by the agency's Director. Harold gratefully accepted the gift, but didn't think he should keep it for himself since he is a state employee. He gave the gift card to a homeless person he regularly sees near his house. Did Harold act appropriately?*

Harold should have let the agency's Director know that he cannot accept gifts from the agency and immediately returned the gift card. Although the amount of the gift card was under $100.00 and could have been accepted under the "gift ban" amount of the State Officials and Employee's Ethics Act (5 ILCS 430), DCFS employees are also bound by Department Rule 437 which is more stringent than the Ethics Act. Harold's acceptance of the gift violates Rule 437. While Rule 437 allows acceptance of tokens of appreciation in limited situations, such as participating in a governmental or civic event, a gift from a contractor is prohibited. Even though the Ethics Acts permits the donation of the gift as a remedy, Rule 437 requires any payment, gift or other consideration not authorized for acceptance by Rule 437 shall be returned to the donor immediately. Giving the gift to a deserving individual did not remedy the situation. As child welfare professionals, we have a higher fiduciary duty to perform our jobs with impartiality and in the best interest of the child. Acceptance of gifts or gratuities from clients or contractors can lead others to suspect that we are not acting "with clean hands." Harold should have notified his supervisor of the offer of the gift and returned the gift.

***Scenario Number Thirteen***

*Alicia, the executive director of a licensed adoption agency, plans to adopt a child and wants to utilize a social worker from her agency to complete the required home study. Would this be a conflict of interest?*

A valid home study must contain a factual evaluation of the prospective parent. In this instance, a reasonable person could conclude that there is the potential for influence of the social worker, either positively or negatively, by a relationship with either the agency or its executive director. Also, Alicia's personal interest in adopting a child could interfere with her obligation to exercise objective judgment in the service of the agency, which could escalate into an abuse of power. Abuses of power create a particularly serious ethical problem because they represent a breach of fiduciary duty, which can undermine confidence.

Alicia should inform her Board of Directors of her intent to adopt a child and the board should ensure that Alicia does not proceed with an adoption that would be prejudicial to the agency and its clients. An adoption agency other than Alicia's should handle her adoption.

***Scenario Number Fourteen***

*Lydia, an executive director of a private agency that provides services to wards through transitional and independent living programs, also has a partnership interest in a counseling group. This counseling group provided counseling services to some of the youth. Lydia does not participate in any decisions related to referrals from her private agency for outside services. Lydia also advises new agency board members about her relationship with the counseling agency and the fact that she does not receive any financial benefit from any referral to the counseling agency. Do these efforts resolve the conflicts of interest resulting from Lydia's involvement at the private agency and the counseling group?*

As executive director of a child welfare agency, Lydia is entrusted to exercise objective judgment in the service of the agency and its clients. Although Lydia's staff refer agency clients to the counseling group in which Lydia has a partnership interest, she does not directly refer clients to the counseling group. As executive director of the child welfare agency, Lydia has authority and control over all agency staff, and in making referrals for outside counseling services, the staff may be unaware of any affect on their judgment Lydia's dual roles might have. Nonetheless, potential for influence exists.

In addition, the fact that Lydia does not receive any direct financial benefit from referrals to the counseling agency does not avoid a conflict. As a partner in the counseling group, Lydia is responsible for a portion of the counseling agency's office overhead. Twenty-five percent of all incoming patient revenues at the counseling agency goes to cover office expenses. If incoming client revenue did not cover all of the office expenses, Lydia and her partners would be required to provide funding to cover the outstanding expenses.

In order to avoid even the appearance of a conflict of interest, Lydia should resign from either the child welfare agency or the counseling agency. However, if Lydia wants to retain her involvement in both agencies, then all referrals from her child welfare agency to the counseling agency in which she has a partnership interest must stop immediately.

**VI. Resources Regarding Ethics in Child Welfare**

- DCFS Office of the Inspector General (312/433-3000)
- DCFS Inspector General's Ethics Advisory Board (312/433-3000)
- DCFS Conflict of Interest Committee (conflict.interest@illinois.gov)
- DCFS Code of Ethics for Child Welfare Professionals, Sec. 1.07: Conflicts of Interest
- DCFS Rule and Procedure 437: Employee Conflicts of Interest
- DCFS Employee Handbook
- Leever, Martin et al., Ethical Child Welfare Practice, CWLA, 2002.
- Ethical Child Welfare Practice, Vol. 1: Clinical Issues, Illinois Department of Children and Family Services and University of Chicago, School of Social Service Administration, 1998
- Pastoral Care and Child Welfare: A Handbook for Hospital Chaplains & Child Welfare Professionals, Illinois Department of Children and Family Services Office of the Inspector General and the University of Chicago School of Social Service Administration, 2003
- State Officials and Employees Ethics Act, 5 ILCS 430

## TEEN PARENT SERVICES NETWORK TRAINING

The Teen Parent Services Network (TPSN) noted in their most recent review that 71% of pregnant and parenting wards had not completed high school or obtained a GED.[11]  In response to these findings, the Office of the Inspector General Project Initiatives staff collaborated with the Teen Parent Services Network (TPSN) and Ron Rooney, Ph.D., University of Minnesota, School of Social Work to develop training to address parenting teen wards' lack of educational achievement.

In May 2009, Dr. Rooney trained 71 TPSN case managers, supervisors and clinicians using the Task-Centered education video, *"Developing Educational Goals with the Teen Parent."*  The training, designed to assist workers and TPSN wards to overcome obstacles to their educational attainment, included role plays that modeled engagement, empowerment and appropriate support.  To ease the concerns of teen parents, the training emphasized the importance of enrolling children in quality Head Start/State Pre-K programs. The training was presented at three Chicago TPSN sites for TPSN case managers, supervisors and clinicians.

Dr. Rooney, at no extra cost to the Department, enhanced the video training through a grant from the University of Minnesota, School of Social Work. The web-based education video can be downloaded and is available to all Illinois child welfare workers. The application of the video is not limited to pregnant and parenting teens, but can be used by any case manager attempting to engage a youth in the pursuit of educational achievement. The training can be viewed at https://umconnect.umn.edu/.

During FY 2010, Dr. Rooney will provide off-site consultation with TPSN case managers and supervisors to facilitate client engagement in meaningful goal achievement.  The twice monthly consultations from Minnesota will take place through the use of web-cams and will include role play demonstrations with staff in their own offices. The consultations are scheduled to begin in November 2009.  Dr. Rooney will return to Chicago in May 2010 to provide in-person consultation and additional training to reinforce the educational achievement of teen parents and their children.

---

[11] Teen Parent Service Network Years in Review fiscal years 2007 and 2008.

## OLDER CAREGIVERS

In 2001, the Department recognized the need to develop appropriate practices to assist its older relative and non-relative foster and adoptive/guardian families.  At that time, over 4,000 relative and traditional foster parents 60 years of age and older were caring for almost 8,800 children.  About half of the 8,800 children (52%) were in adoptive or subsidized guardianship placements in 2001. By 2009, the numbers had increased to 5,700 older caregiver families caring for 10,300 children.  The majority (82%) of the children in older caregiver families were in adoptive or subsidized guardianship placements.

In 2004, the Inspector General's Office began developing a specialized training curriculum to enhance caseworkers' abilities to serve older caregiver families.  The Inspector General's Project Initiative staff led a training effort with participation by the Department on Aging and Illinois Area Agencies on Aging.

In 2009, in response to the increased the number of children in adoptive or subsidized guardianship placements with older adults, Project Initiative staff revised the training curriculum to include an expanded section on legal options for back-up caregiver plans including short-term and standby guardianships and standby adoptions.

As a result of a 2009 Inspector General death investigation in which unresolved older caregiver issues contributed to a child's death, the Inspector General's Project Initiative staff trained approximately 300 Department and private agencies' Intact Families Services staff and Adoption Preservation Services staff.  This training will continue into FY 2010. Recently, Project Initiatives staff supported the transfer of Older Caregiver training by providing *train the trainer* events, so that the training can be effectively incorporated into the general DCFS Foundations training.  The Inspector General's Older Caregiver Project Initiative staff will participate in the Department's quarterly Post Adoption program meetings to identify ongoing training needs of staff working with older caregivers.

## SYSTEMIC RECOMMENDATIONS

Inspector General investigative reports contain both systemic and case specific recommendations. The systemic reform recommendations for Fiscal Year 2009 have been categorized below to allow for analysis of the recommendations according to the function that the recommendation is designed to strengthen within the child welfare system.  The Office of the Inspector General is a small office in relation to the child welfare system.  Rather than address problems in isolation, the Office of the Inspector General views its mandate as strengthening the ability of the Department and private agencies to perform their duties. Recommendation categories are as follows:

- CHILD PROTECTION INVESTIGATIONS
- COORDINATION WITH OUTSIDE ENTITIES
- ETHICS
- HOME SAFETY
- INTACT FAMILY SERVICES
- LEGAL ISSUES
- LICENSING
- MEDICAL
- OLDER CAREGIVERS
- PERSONNEL
- POST-ADOPTION
- STATE CENTRAL REGISTER
- USE OF INTERNET AND INTRANET

## CHILD PROTECTION INVESTIGATIONS
### Death Investigations
- *Procedure 300: Reports of Child Abuse and Neglect* should be amended to explicitly state that death mandates are met by collecting necessary information from coroners or medical examiners in accordance with Allegation 1/51, Death by Abuse/Neglect.

- A memo should be issued to child protection staff statewide clarifying that in death investigations the mandate is met by collecting information from coroners or medical examiners.

### Maintenance of Unfounded Reports
- The Department should amend *Rule 431.30: Confidentiality of Personal Information of Persons Served by the Department of Children and Family Services/Maintenance of Records* to maintain unfounded reports that are currently kept for only 30 or 60 days for a period of 12 months following the date of the final finding.  The Illinois Child Death Review Team Executive Council concurs with this recommendation.

## COORDINATION WITH OUTSIDE ENTITIES
- The Director should request that the Executive Inspector General, when it receives allegations that amount to a violation of the Department's Conflict of Interest Rule, direct the complainant to file the complaint with the Department's Conflict of Interest Committee as instructed in *Rule 437: Employee Conflict of Interest*.

- Child protection management should develop protocols for mediation of conflicts or disputes between child protection workers and staff of hospitals with whom child protection investigators regularly interact.

- When a child is scheduled for a Child Advocacy Center (CAC) interview and has an appointed Guardian *ad litem* (GAL), the CAC should notify the GAL of the scheduled interview so that the GAL may observe the interview.

- The Office of the Inspector General will facilitate a discussion among the involved county's State's Attorney's Office, the Court Coordinator, DCFS Field Services Managers and the Child Protection Supervisors serving the involved county to enhance civility and a dialogue on problem solving strategies in matters involving child protection.

**ETHICS**

- The Department should develop guidelines to assist employees who are confronted with the difficult position of having a personal relationship with a subject of a child protection investigation. Based on prior Office of the Inspector General investigations, the guidelines should include the following information:

  - When a subject of a child protection investigation is known to you in a personal capacity, you may not access the State Automated Child Welfare Information Services (SACWIS) to view the investigation.

  - If the investigation is occurring in your office, or handled by anyone within your chain of command, you must inform your supervisor and the investigator to guard against inadvertent disclosure of confidential information.

  - You may always contact the child protection investigator to provide information that is known to you that is relevant to the investigation. You must clarify that you are calling in a personal capacity only.

  - You may make telephone calls concerning the investigation only to the extent that they are permitted within the existing Department policy permitting reasonable use of the telephone for personal purposes. It may, however, be more prudent to schedule an interview after work hours or during personal time, such as a lunch hour, providing a clear distinction that you are speaking as a private citizen and not as a Department employee.

  - When you share information, you should be careful not to suggest that your position with the Department or your knowledge of Department procedures means that your information is more valuable or reliable than information from other non-professional sources.

  - You may never use your office or other Department resources to assist the subject of the investigation.

- The Ethics Officer will review requests for approval for travel expenses of Department employees conducting peer reviews for the Council on Accreditation (COA) on a case by case basis in order to ensure that no one with direct supervision or decision-making authority over the COA contract is a

reviewer and ensure that the potential reviewer's job responsibility has a connection to the tasks required of the reviewer.

- *Rule 437: Employee Conflict of Interest* should be amended to clarify that secondary employment must always be reported to one's supervisor.  The supervisor should determine (if necessary, with consultation from management and/or the Conflict of Interest Committee) whether the secondary employment creates a conflict.  The employee must be instructed to update the supervisor whenever his or her secondary employment duties change and a notation of the secondary employment should be maintained in a supervisory file, which is transferred each time supervision changes.

## HOME SAFETY

- The Department should post a fire safety and prevention announcement on the D-Net twice a year. The announcement should include statistics of child fire fatalities and reminders to case managers that families should check smoke detector batteries and review fire escape plans.

## INTACT FAMILY SERVICES

- In keeping with the Strengthening Families Model, intact family workers should receive Ecomap training in order to build protective factors around children and reduce abuse and neglect.

- All integrated assessments for intact families should incorporate an Ecomap that identifies resources available to the family within their community.

- Intact Family Services Workers should review the Office of the Inspector General report regarding court intervention as a means of enhancing parental compliance with required services and the use of police reports as a measure of drug use and violence in the home. The Office of the Inspector General will also incorporate the use of police reports in upcoming Error Reduction Trainings.

### Burgos Compliance

- The Deputy Director of the Division of Affirmative Action should issue a communication to DCFS staff in the Cook and Aurora regions instructing them of their obligation to comply with the Burgos Decree as detailed in *Procedure 302.30(c) Services Delivered By The Department/Accessibility of Services to All Persons*. The Department should also educate staff about the availability of the tele-interpreters resource through quarterly announcements on the D-Net and include a list of qualified interpretation/translation providers in each region.

### Domestic Violence

- Department procedures should be revised to require that in cases where domestic violence is present, child protection investigators and intact workers should contact the local police department and request the complete police record involving the family, including emergency calls involving the home.

- The domestic violence training curriculum should be revised to inform workers of the critical importance of obtaining complete police records, including emergency calls involving a home.

*Computer Access*
- The Department's electronic records database (SACWIS) should be changed to ensure that intact family supervisors have access to investigations linked to the cases of their workers.  In addition, photos on SACWIS should be viewable by anyone who has access to the investigation.

*Substance Abuse*
- Substance affected and dually diagnosed clients should be referred to child welfare teams with expertise in working with these clients and families. Programs such as the Intact Family Recovery program (IFR) have expertise with both populations and successfully enroll 70% of the eligible children they serve in Head Start and State Pre-K programs.

- The DCFS Service Intervention Director of Substance Abuse Services should issue a memo to all private agencies informing them of available consultation services including interpretation of urine screen results involving prescription medication.

## LEGAL ISSUES
- When the DCFS Office of Legal Services is consulted by the field regarding critical decisions, the conversations and advice will be documented by the DCFS Office of Legal Services.

- The DCFS Office of Legal Services must review cases in which the minor is about to turn 19 and ensure that a Petition to Extend Wardship is being considered and filed, if appropriate.

- The Office of the Inspector General should request that the Administrative Office of Illinois Courts require that Juvenile Courts conduct hearings of substantive matters, such as change of custody or visitation, on the record so that critical information would be available when necessary.

- The DCFS Office of Legal Services should, to the extent permitted by operational needs, be present in the Juvenile Court of the involved county a maximum of two (2) days per week over the next six (6) months to focus on cases brought to the DCFS attorney's attention by the involved county's State's Attorney, the Judge or DCFS staff.  DCFS staff should be instructed to notify the DCFS Office of Legal Services of contested or problematic cases.  At the conclusion of the six-month period, all parties should meet to assess the effect of increased DCFS Office of Legal Services involvement and to determine a future plan.

- The Department's Interstate Compact Procedures should be revised to require:

  - notification to DCFS Office of Legal Services by the Interstate Compact Unit when an interstate compact is denied;

  - if an interstate compact is denied, Office of Legal Services will monitor the case to ensure that the interstate compact is neither violated or circumvented in a manner that compromises the safety of children;

  - if an interstate compact is disputed or violated, Office of Legal Services will notify DCFS Clinical who will convene a staffing with the agency caseworker, supervisor, and the GAL;

  - notification of the Interstate Compact Unit, by the supervising agency, if an interstate compact placement request is pending and the children are sent to the placement under consideration.

*Criminal*

- The Department should designate a Felony Review Designee in Cook County to serve as an informational liaison to the Cook County State's Attorney's Felony Review Board and to provide expertise to the child welfare field concerning bond court, orders of protection and ongoing felony criminal proceedings.

- Cook County DCFS Legal Counsel and the Department's Felony Review Designee should receive legal training concerning bond court, special conditions of bond, felony criminal proceedings and orders of protection, as they relate to protection of children.  The Assistant Cook County State's Attorney, Chief of the Child Protection Division, has agreed to provide such training.

- Division of Child Protection (DCP) investigators should consult with the DCFS Office of Legal Services whenever they are having difficulty coordinating their investigation with police or obtaining information from the police in a timely manner.

*Confidentiality*

- The Department should issue a memo instructing the involved region's intact family supervisors to review procedures with their workers on properly filling out Consent for Release of Information forms prior to parent/caretaker signature.  Filling in the address at a later date should be the only acceptable blank on the form prior to the signature.

## LICENSING

- The Department should amend *Rule and Procedure 402:  Licensing Standards for Foster Family Homes* to require that, when the care will take place at a location other than in the foster parent's home, licensing workers identify alternative caregivers, determine where the alternative care will take place and perform background checks in accordance with *Rule 385: Background Checks*, of all adults and those persons over 13 years of age residing in the alternative care home.

- The Department should incorporate into a licensing safety assessment the guidelines set forth by the American Humane Society regarding the observation of family pets in their natural environment.

## MEDICAL

- The program plan for medical expertise in diagnosing child abuse should require an interdisciplinary discussion with all relevant treating or consulting doctors and specialists before rendering an opinion. If there are areas of disagreement among the consultants and/or specialists, the discrepancies must be resolved before the report is issued or, if they cannot be resolved, the discrepancies should be noted in the final medical report.

- DCFS *Procedure 402.17: Licensing Standards for Foster Family Homes: Health Care of Children* should be amended to include that any time a foster child is hospitalized or taken to the emergency room, complete medical records should be obtained and placed in the child's file.  Procedure should also require that the records be shared with the foster child's pediatrician.

- DCFS nurses should undergo the Error Reduction Training for cuts, bruises and welts.

## OLDER CAREGIVERS

- All child welfare agencies that provide multiple services for the Department, such as counseling, intact family, and foster care services, should have supervisory or management level staff, dependent on agency size, receive older caregiver training and serve as internal experts to provide guidance to caseworkers and supervisors across services.

- Department staff who monitor private agencies that contract with the Department should receive older caregiver training.

- Training for new hires in intact family, adoption preservation, and post-adopt services should include information on older caregivers and link staff to resources.

- The Department should create a resource link in the Department's D-Net to resources, services, and trainings pertinent to older caregivers.

## PERSONNEL

- Timekeepers must have initialed supervisor approval for any changes in overtime requests.  Overtime request forms must include case identification such as the State Central Register (SCR) number or case name.

- The Department should audit time records of employees who earn twice the amount of their base salary in a given year to determine whether documentation supports reported time or whether it is more economical to hire an additional employee.

- The Department's Certification of License and Automotive Liability Coverage form for employee's signature should be amended to state "by the Illinois Secretary of State or other State (fill in state)" to address DCFS employees who live in states contiguous to Illinois.

- The Department should enforce its policy that all employees who are required to drive as a condition of employment should certify annually that they have a valid driver's license and automotive liability coverage.

- The Department must review B.H. investigative caseload levels on a quarterly basis to determine whether there is substantial compliance with the B.H. Consent Decree and whether there are geographic pockets, areas or offices where non-compliance levels put children at risk.

- Executive staff should be instructed that Health or Safety Alerts should be vetted through the DCFS Communications Office for D-Net Announcements.

## POST-ADOPTION

- DCFS Clinical and the Post-Adoption Unit should be provided information on the use of voluntary placement agreements.

- The Department should adopt a Rule, similar to what is required for licensed homes, that requires that whenever either the State Central Register (SCR) or the Division of Child Protection (DCP) learns that a ward or former ward is involved with adoption or post-adoptive services because of a

contemplated secondary adoption or guardianship, and abuse or neglect by the prospective secondary adoptive parents or guardians is alleged, SCR or DCP must notify the Post-Adoption Unit of pending allegations and the outcome of the investigation and refer any allegations that are relevant to determining suitability of prospective caretakers.  The Post-Adoption Unit must notify any involved adoption agency.

- With all allegations of abuse or neglect, indicated or unfounded, the Post-Adoption Unit or the adoption agency must assess the continued suitability of the caretakers.

- The Post-Adoption Unit's draft notification form (CFS 1800-M-1a) to adoptive parents regarding minors reaching their 18th or 21st birthdays should include language to inform adoptive parents of children with disabilities that the adoption subsidy ends upon the adoptee's 21st birthday, and to instruct the family on how to apply for social security benefits.  The notification form should identify a post-adoption staff member who can respond to questions from adoptive parents.

- The Department should direct the appropriate private agency to immediately change its practice of automatically leaving short-term guardianship forms with each new client. Rather, if a short term guardianship is needed, the agency should assist their clients in completing short-term guardianship forms to ensure that a biological parent is not named as a short-term guardian.

- The Department should form an *ad hoc* committee composed of the General Counsel of DCFS, the Executive Director of the involved private agency, and an attorney from the Office of the Inspector General to resolve outstanding issues related to private agency's client confidentiality, ethical obligations to the Department, evaluating back-up plans, the use of short-term guardianship forms, and rehabilitated birth parents who wish to resume parenting responsibilities.

## STATE CENTRAL REGISTER

- The State Central Register administrator should counsel State Central Register hotline call takers to accept calls from mandated reporters on siblings of a child subject in pending investigations as "Related Information."

## USE OF INTERNET AND INTRANET

- The Department should expand information contained in the D-Net related to research to include at least: contact information for the DCFS Research Review Board, the frequency with which the Research Review Board meets, and reference to *Rule 432: Research Involving Children and Families*, and the requirements set forth therein.

- In the interest of transparency, all Department advisory groups and their membership should be accessible on the web, and members who serve on multiple advisory groups should be identified.

- The Office of Information Technology Services should explore the feasibility of streamlining the search function of SACWIS concerning ease of locating prior history with the Department.

# RECOMMENDATIONS FOR DISCIPLINE

In FY 2009, the Office of the Inspector General recommended discipline of Department and private agency employees for the conduct detailed below. Discipline recommendations ranged from counseling to discharge.

***Failure to Properly Assess Risk***

- A child protection investigator failed to ensure that a child victim was seen by a doctor following multiple facial injuries; failed to complete a CANTS/LEADS check on relatives before developing a safety plan; and failed to develop an alternative safety plan or take protective custody when the relatives, who did not believe the alleged perpetrator caused any injury to the child, failed to ensure the alleged perpetrator did not have access to the child. The discipline should be mitigated by the fact that the child protection investigator was carrying a caseload higher than permitted by the B.H. Consent Decree.

- A child protection investigator failed to properly assess the risk of harm to child victims after learning that the caretaker had tied a disabled teen to the bed. In addition, the child protection investigator failed to share this information with the supervisor which hindered supervisory input and appropriate services or oversight through the intact family services referral. The discipline should be mitigated by the fact that the child protection investigator's caseload was higher than permitted by the B.H. Consent Decree.

- A child protection supervisor failed to seek additional information after learning that a disabled child had been tied to a bed all day by a caretaker and that a second caretaker had fled the home with the other children after learning of harsh disciplinary practices by the first caretaker.

- After a child disclosed abuse by his mother's boyfriend to his intact family services worker, the intact worker failed to contact the hotline or inform the child protection investigator, the child's GAL or the Assistant State's Attorney regarding the disclosure. The intact family services worker also failed to make at least weekly attempts to see the child.

- A child protection investigator recommended unfounding an investigation of cuts, welts and bruises despite learning from the intact worker that the alleged perpetrator had been using corporal punishment on the children and the children disclosed that they were fearful and subject to beatings by their caregiver.

- A child protection supervisor approved the unfounding of an investigation in which the child victim disclosed abuse by the alleged perpetrator and admitted fear of the alleged perpetrator.

- A child protection investigator failed to ensure the safety and well-being of a newborn who was living in an unsafe environment; failed to complete a Home Safety Checklist; failed to make a referral for a drug assessment; and failed to complete a safety assessment.

- A child protection supervisor failed to provide adequate supervision of an investigation that was incomplete and improperly conducted. The supervisor failed to ensure that a substance-exposed infant was assessed for safety and that the parent was immediately referred for a drug assessment. The supervisor also failed to ensure that the investigator followed the safety assessment protocol.

- A private agency intact worker and supervisor failed to assess a former DCFS ward's ability to parent before recommending that a special needs child be returned to the former ward's care even though the former ward displayed an inability to parent and failed to cooperate with services.

- A private agency foster care supervisor failed to respond to a doctor's request to examine a child believed to be abused and advised the caseworker not to take the child to the doctor unless the caseworker observed signs of abuse.

- A Department nurse failed to obtain a complete history before rendering an opinion to a child protection investigator.

- After a DCFS ward alleged maltreatment by a relative with whom a sibling of the child had been placed, the foster care caseworker implied that the child was lying and threatened to place the child in traditional foster care away from relatives if the child continued to say such things. The worker then placed the child with the alleged perpetrator without ensuring that the child's allegations were investigated.

- A staff person from the Interstate Compact Office failed to appreciate the urgency of a state's denial of an interstate compact agreement, given that the children had already been placed in that state and that state was requesting that the children be removed.

- A child protection supervisor approved closing an investigation in the initial stage without assessing the safety of children and without ensuring the investigator contacted the mandated reporter for investigative information.

- A child protection specialist failed to adequately assess the safety of children in an investigation and failed to contact the mandated reporter for investigative information.

### *Errors in Service Provision/Investigative Work*

- An intact family services worker failed to refer a client for a drug assessment; ensure medical follow-up for a substance exposed infant exhibiting tremors; make a hotline call for medical neglect; follow supervisory directives; and perform basic duties of the job position, specifically, weekly home visits during the first 45 days of the case, and bi-monthly visits thereafter.

- A child protection investigator falsified case records, tampered with and falsified overtime reports, failed to inform a supervisor of a suspended driver's license, failed to carry minimum auto liability insurance, transported children for official business while driving on a suspended license, and made untruthful statements to the Office of the Inspector General.

- A caseworker's supervisor failed to address the caseworker's chronic performance deficiencies which included failure to visit assigned wards and record case activity.

- A private agency case aide picked up a two-year-old girl at her foster home to transport her to a supervised visit with her mother in prison.  The aide returned the girl to her foster home 2 hours later reporting that he had taken her to the visit when, in fact, he did not.

- An intact worker failed to conduct in-person contact with assigned families; failed to provide timely services; failed to pursue collateral contacts and involved service providers; failed to make service

referrals; failed to complete service plans and Integrated Assessments; and failed to write contact notes at all or in a timely manner.

- A caseworker failed to visit assigned wards; failed to enter case activity or entered case activity on an untimely basis (one to two years late); falsified records by entering contact dates that did not occur; and entered inaccurate dates of contacts and similar text in previously entered contact notes.

- An intact family services supervisor failed to ensure that the intact family services worker completed tasks and contacts and failed to ensure that the intact family services worker was following through on supervisory directives.

- A child protection investigator failed to obtain relevant police reports, obtain complete medical records, interview the treating physician, and interview/observe all the children in the alleged perpetrator's home.

- A child protection supervisor failed to ensure that the child protection investigator completed required investigative tasks, including obtaining police reports and medical records and interviewing all children in the alleged perpetrator's home.

- A private agency caseworker falsified documentation concerning home visits and misled a supervisor to believe that she had observed the foster parents' interaction with the foster children, when she had not.

- Two private agency education specialists displayed biased thinking when they failed to address legitimate concerns of school personnel and failed to provide professional intervention.

- A foster care caseworker failed to enter contact notes into the Department's electronic database (SACWIS).

- A foster care supervisor failed to use SACWIS to document quarterly case reviews and failed to implement progressive discipline for a caseworker who chronically failed to document contact notes in SACWIS.

- A private agency caseworker and supervisor relied on a mother's explanation that the reason her drug screens were positive was from prescription medication without determining whether the mother's prescription medication would have caused the positive drug screen.

- A private agency caseworker misinformed the court about when the caseworker learned of the birth of a child and documented in a contact note that a referral for services was made when, in fact, the referral was not made until a week later.

### *Misuse of State Resources*

- A Department employee sent a political email to several colleagues using the state e-mail system.

- A Department employee used the state email system to further a personal relationship with another Department employee.

- A child protection investigator used the state email system for a private business.

- A child protection supervisor used the state email system for personal use and permitted a supervisee to use state resources for a private business.

- A child protection investigator used the state email system to further a private business and requested that a co-worker refer Department clients to her private business.

### Off-duty Conduct

- A Department employee accessed child pornography on his home computer.

### Misuse of Position

- A Department supervisor maintained a romantic relationship with a supervisee; abused the state e-mail system in furtherance of the relationship; exchanged inappropriate personal e-mails during work hours; failed to disclose the affair to a supervisor; failed to discharge administrative duties concerning potential workplace violence; created a potential for workplace violence; and provided false information to the Office of the Inspector General.

- An executive director of a private agency had a home study of her own family completed by an employee of the same agency, which was then rejected by the interstate compact due to a conflict of interest. The executive director then asked a former employee to complete the home study.

# LAW ENFORCEMENT CASES

**Case 1**
The Office of the Inspector General assisted the State's Attorney's Office and local law enforcement personnel in their investigations of the deaths of two children.  Murder charges were filed in both cases. The criminal cases are pending.

**Case 2**
The Office of the Inspector General referred a fraud case to the State's Attorney's Office in 2007.  In FY 2009, the state indicted a Department employee and her relative for fraud.  The state dropped the charges against the former Department employee in March 2009.  The employee's relative had earlier pled guilty to benefits fraud and received 24 months probation in the same case.

**Case 3**
The Office of the Inspector General referred foster parents to the Illinois State Police for investigation of suspected fraud.  The investigation is ongoing.

**Case 4**
The Office of the Inspector General provided requested assistance to the Illinois State Police regarding a closed child protection investigation and an Office of the Inspector General investigation involving the same parties.

**Case 5**
The Office of the Inspector General referred an allegation of harassment by a Department employee to the Illinois State Police for investigation.  The investigation is ongoing.

**Case 6**
A Department supervisor and worker requested the assistance of the Office of the Inspector General on behalf of a minor with serious alcoholism issues.  The State's Attorney's Office was contacted about filing an "addicted minor" petition.  The youth also had pending delinquency petitions.  He was placed for treatment in a residential facility, but left the facility against staff advice.  In August 2009 the minor was committed to the Juvenile Department of Justice.

**Case 7**
The Office of the Inspector General referred to the Illinois State Police a Department employee with an outstanding order of protection who was heard talking about purchasing a gun.

**Case 8**
The Office of the Inspector General provided background information to the Illinois Department of Financial and Professional Regulations in their investigation of a former Department employee.

**Case 9**
The Office of the Inspector General provided assistance to the Secretary of State Police to help identify an individual in their investigation.

**Case 10**
The Office of the Inspector General referred a fraud case involving foster care payments and housing to both the Attorney General's Office and to the State's Attorney.

**Case 11**
The Office of the Inspector General referred an investigation to the Illinois State Police concerning a Department employee who had claimed extensive travel on travel vouchers but who had not, in fact, conducted the claimed visits with the child that were the bases for the alleged travel expenses.

**Case 12**
The Office of the Inspector General referred to the Illinois State Police an investigation of allegations that a Department employee offered to place a child for adoption in exchange for money.

**Case 13**
The Office of the Inspector General provided assistance to the Inspector General's Office/Social Service Administration investigating a fraud allegation.

**Case 14**
The Office of the Inspector General coordinated with law enforcement and the Department during an investigation of an employee believed to be a threat of harm to others.

**Case 15**
The Office of the Inspector General provided assistance to an out-of-state police department task force seeking information pertaining to a pending criminal investigation.

**Case 16**
The Office of the Inspector General provided assistance to law enforcement after locating information on an individual who was wanted since 2002, and was currently within extradition limits. The Sheriff's Office verified that the warrant was still active and that they would go forward with arrest and extradition.

**Case 17**
The Office of the Inspector General referred for criminal prosecution an allegation of an attempt to sell a child.

**Case 18**
The Office of the Inspector General provided technical assistance to the DCFS Office of Legal Services pertaining to an individual who was allegedly behaving in a threatening manner.

**Case 19**
The Office of the Inspector General investigated an anonymous complaint sent to the State Central Register which alleged that a facility was improperly handling dangerous items confiscated from residents.

**Case 20**
The Office of the Inspector General provided technical assistance to the Office of the Inspector General of the Department of Healthcare and Family Services.

**Case 21**
The Office of the Inspector General provided technical assistance to the DCFS Office of Legal Services pertaining to criminal activity of an individual with access to children.

**Case 22**
The Office of the Inspector General provided assistance to private agency staff when information on a LEADS and warrant implicated an individual whose identity had been stolen by a relative.

**Case 23**
The Office of the Inspector General provided information to the United States Secret Service pertaining to an alleged threat against the then President Elect and his family.

**Case 24**
The Office of the Inspector General provided technical assistance to the Office of Employee Assistance pertaining to questions raised concerning a current Department employee who was the subject of a recent arrest and order of protection.

**Case 25**
The Office of the Inspector General investigated and coordinated with local and federal law enforcement allegations pertaining to a Department employee's involvement with child pornography.

**Case 26**
The Office of the Inspector General provided on-going assistance to law enforcement in Illinois and Indiana to facilitate identification, arrest and prosecution of a Department employee wanted for financial crimes.

**Case 27**
The Office of the Inspector General provided assistance to local and federal law enforcement who were investigating the sexual exploitation of DCFS wards.

**Case 28**
The Office of the Inspector General provided technical assistance to the Office of the Inspector General for the Chicago Board of Education concerning a school employee who was alleged to be a sex offender.

**Case 29**
The Office of the Inspector General provided information to a local law enforcement agency concerning a missing and endangered pregnant person.

**Case 30**
The Office of the Inspector General provided information to out-of-state law enforcement agencies regarding an outstanding warrant for a convicted child sexual offender.

**Case 31**
The Office of the Inspector General provided information to a local law enforcement agency for the apprehension of an individual wanted for aggravated abuse of a child.

**Case 32**
The Office of the Inspector General provided information to an out-of-state law enforcement agency for the apprehension of an individual wanted for assault with a vehicle.

## DEPARTMENT UPDATE ON PRIOR RECOMMENDATIONS

The following Office of the Inspector General recommendations were made in previous Fiscal Years, but were not fully implemented before the Annual Report was issued.  The current implementation status of these recommendations is detailed below in the following categories.

- Child Protection
- Contract Monitoring
- Ethics
- Foster Home Licensing
- General
- Medical
- Personnel
- Services
- Teen Parent Service Network

**CHILD PROTECTION**

**The Department must ensure that notifications of investigation findings to mandated reporters from the State Central Register conform to Rule 300.130, Notices Whether Child Abuse or Neglect Occurred, and include the name of the child victim (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 08 Department Response:* The Department agrees.  Implementation of this recommendation is in progress.

> *FY 09 Department Update:* This requires a change in Statewide Automated Child Welfare Information System (SACWIS), since the letter is generated in SACWIS.  Several notification letters will need to be changed and all changes will be made at the same time.  A meeting will be convened in January 2010 between the Office of Legal Services (OLS), the Division of Child Protection (DCP) and the State Central Register (SCR) to make revisions.

**The Department should notify all parents of children cared for by a caretaker who is under investigation for abuse and/or neglect (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 3).**

> *FY 08 Department Response:* The OIG recently agreed to modify this recommendation and will submit the amended recommendation to the Department.

> *Revised recommendation:* **The Department should train investigators and issue policy to require that when investigating injuries that occurred during babysitting, the investigator should determine the names of all other children that the babysitter provides care for, and interview them when appropriate and add children as additional alleged victims when appropriate.  Parents, including non-custodial involved parents, of all children who are added as additional alleged victims should be notified of pending and completed**

investigations as required by the Abused and Neglected Child Reporting Act (ANCRA) and existing Rule and Procedure.

*FY 09 Department Update:* A policy/information transmittal is being developed to notify staff.

**Child protection managers should be instructed to issue administrative subpoenas to the Acting General Counsel of the Department of Healthcare and Family Services in child protection investigations when they are seeking information related to Medicaid benefit claims (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Department agrees. The instruction will be sent to Child Protection Managers.

*FY 09 Department Update:* An email was sent to Regional Administrators in April 2009 and a memo was sent to child protection staff in October 2009.

**The Department should pursue an interagency agreement with the Department of Healthcare and Family Services (HCFS) allowing DCFS Division of Child Protection staff access to Medicaid Benefit Claim information (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Department of Healthcare and Family Services (HCFS) notified DCFS that the 2004 interagency agreement allows for the necessary access. Representatives from DCP and the Guardianship Administrator's Office will coordinate with the Department of Healthcare and Family Services to implement this recommendation.

*FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from HCFS. While no one has denied access to the Department, access has not been authorized. Efforts to gain access will continue.

*FY 09 OIG Response: The recommendation concerned access by child protection staff. Any access arranged must be available to child protection staff.*

**As previously recommended by the Office of the Inspector General in FY 2007, Department procedures should be amended to require that in child protection investigations in which the plan is for a family member to obtain private guardianship of the child/ren, the family should be referred to the Extended Family Support Program for assistance in securing private guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 11).**

*FY 08 Department Response:* The Service Intervention Deputy has reviewed and approved the draft procedure. The procedure has been sent to the Office of Child and Family Policy for the revision process.

*FY 09 Department Update:* The Department studied the Procedures and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year. Service Intervention is currently determining where the money can be found for this change.

*FY 09 OIG Response: The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region. The projected cost of*

*assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

**Extended Family Support Program Managers should meet with Child Protection Program Managers and Supervisors to assure an efficient referral process.  Training should take place once the Extended Family Support Program Plan is finalized (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 12).**

> *FY 08 Department Response:* The Department has drafted a request for proposal for a statewide Extended Family Support monitoring agency.  One of the responsibilities of the contracted monitoring agency will be to provide training to DCFS staff on the Extended Family Support Program.

> *FY 09 Department Update:* The Department studied the Procedures and determined that the change could increase the Extended Family Support Program budget by as much as $400,000 per year.  Service Intervention is currently determining where the money can be found for this change.

**FY 09 OIG Response:** *The Department should explain the necessity of establishing a contracted monitoring agency in order to provide training to DCFS staff on the Extended Family Support Program. The Department should explain how it arrived at the projected additional cost of $400,000, including a line item breakdown of projected expenses by Region. The projected cost of assisting family members to obtain private guardianship of a child must be weighed against potential savings created by assisting and strengthening families to prevent them from entering the system.*

**The SCR Administrator should issue a policy memo instructing SCR operators that when a mother delivers a stillborn (20 weeks gestation or more) and either the mother or the placenta tests positive for illegal substances, SCR should immediately initiate an investigation for death by abuse.  In addition, SCR should take for investigation an allegation of risk of harm to any children in the home (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 13).**

> *FY 08 Department Response:* The Memo was issued but the DCFS Office of Legal Services requested that the memo be rescinded until the allegation system is amended, which is in progress.

> *FY 09 Department Update:* The Department and the OIG agreed to amend the recommendation. The SCR should accept the hotline call as "Information Only."

**The Division of Service Intervention should meet with management to address targeted training on the Substance Affected Family Policy, Procedure 302, Appendix A (2006) and the use of short-term guardianship (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 14).**

> *FY 08 Department Response:* The Department agrees.  The Division of Service Intervention will meet with the Division of Child Protection Management to develop and implement a training. DCFS Investigative and Intact staff will be trained the Cook Regions beginning in December 2008.

> *FY 09 Department Update:* The Substance Affected Family Policy was incorporated into the Reunification Training, and the Division of Child Protection will conduct a training on short term guardianship.

**The third check box option on the Safety Plan screen of the SACWIS Safety Assessment should be removed because it provides child protection workers with an option that conflicts with Rule and Procedures 300, Reports of Child Abuse and Neglect, (from OIG FY 08 Annual Report, General Investigation 3).**

*FY 08 Department Response:* The Department agrees. Representatives from the Department's Safety Workgroup and representatives from the SACWIS workgroup are reviewing the recommendation for implementation.

*FY 09 Department Update:* The SACWIS change has been made.

**The Department should adapt questions found in the book authored by Teresa Ostler, *Assessment of Parenting Competency in Mothers with Mental Illness* for child protection investigators to utilize when interviewing mental health professionals to determine a parent's ability to adequately care for his/her children.  These questions should be incorporated into child protection investigator training (from OIG FY 08 Annual Report, General Investigation 4).**

*FY 08 Department Response:* The Department agrees. The Department's Safety Workgroup is reviewing the questions to determine how best to incorporate the material into training.

*FY 09 Department Update:* DCFS Training is incorporating the questions into the 2010 training curriculum for all investigative staff.

**The Department should immediately approve and disseminate the information transmittal regarding parallel investigations (from OIG FY 08 Annual Report, General Investigation 10).**

*FY 08 Department Response:* The protocol for parallel investigations was incorporated into revisions to Procedure 300, which is anticipated to be finalized in December 2008.  The protocol for parallel investigations has also been discussed in monthly meetings with Child Protection management and staff.

*FY 09 Department Update:* Policy Guide 2009.02, Parallel Investigations, was distributed in August 2009.

**The Department and the church officials should review and clarify the Joint Protocol to specify under what conditions, if any, the church officials should contact the Hotline when the alleged victim is no longer a minor (from OIG FY 08 Annual Report, General Investigation 25).**

*FY 08 Department Response:* The Department agrees.   The implementation of this recommendation is in progress.

*FY 09 Department Update:* A protocol is now in place in which the Archdiocese sends DCFS Office of Legal Services and the State's Attorney a letter when and if they have an allegation about alleged abuse by a priest for allegations being made by adults stating that they were previously abused.  Legal Services reviews the allegations to determine if the priest is deceased, or if he is still practicing and/or may be in contact with children. If the priest is still practicing and/or may be in contact with children the allegations are forwarded to the State Central Register for a supervisor to review and gather additional information.

**The Department should consider amending the Risk of Sexual Injury Allegation to include situations in which prior sexual abuse of a minor is confirmed through investigation and the perpetrator of the prior abuse has current access to child/ren (from OIG FY 08 Annual Report, General Investigation 25).**

> *FY 08 Department Response:* The Safety Workgroup is reviewing this recommendation.

> *FY 09 Department Update:* The Department and the OIG agreed that the substantial risk allegation does not need to be amended, as initially recommended.

**State Central Register Administrator should revise the SCR Call Floor Manual to reflect lessons learned from an OIG investigation in which a parent had misrepresented himself as a police officer and received confidential information from a call-taker (from OIG FY 08 Annual Report, General Investigation 13).**

> *FY 08 Department Response:* The report was shared with the SCR Administrator and the revisions to the SCR Call Floor Manual are in process.

> *FY 09 Department Update:* The SCR Call Floor Manual revision was implemented in June 2009.

**The Abused and Neglected Child Reporting Act (ANCRA) should be amended to clarify that the Department can share unfounded investigative information during a subsequent child protection or criminal investigation with any persons named in Section 11.1 for purposes consistent with the Abuse and Neglect Child Reporting Act or criminal prosecution (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 07 Department Response:* DCFS Legal has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The targeted date of completion is May 2008.

> *FY 08 Department Update:* DCFS Legal has assigned an attorney to draft amendments to ANCRA, which address the above issue, as well as other proposed changes to ANCRA, and will submit as a single legislative package. The anticipated date of completion is February 2009.

> *FY 09 Department Update:* Draft amendments to the Abused and Neglected Child Reporting Act addressing this issue will be submitted as part of the legislative package for the Fall Session 2010.

**Department Procedures should be amended to include a provision that when someone walks into a Department office with a concern about child abuse or neglect, they should be invited into the office to make a hotline report or to talk to an investigative supervisor if they have questions or concerns about making the report (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 4).**

> *FY 07 Department Update:* The Office of Child and Family Policy has forwarded the final draft of P300 to the Division of Child Protection. The P300 workgroup is reviewing the final draft.

*FY 07 OIG Response: The final draft of Procedure 300 does not contain language that addresses this recommendation.*

> *FY 09 Department Update:* The issue has been addressed in a revised draft of Procedure 300, Reports of Child Abuse and Neglect.

**The Department should ensure that child protection investigations, both unfounded and indicated, are not expunged while a subsequent investigation, involving the same family, is pending (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

> *FY 07 Department Response:* The Department is considering whether to pursue a change in legislation to implement this recommendation.

> *FY 08 Department Update:* The Department is continuing to examine this and other legislative amendments to ANCRA.

> *FY 09 Department Update:* The Department has drafted proposed legislation to be submitted as part of the legislative package for the Fall Session 2010.

**Department Procedure 300.70, "Referrals to the local law enforcement agency and State's Attorney" should be amended to include second-degree burns as injuries requiring referrals to local law enforcement and the State's Attorney (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 5).**

> *FY 07 Department Response:* Language regarding this recommendation is being drafted and will be submitted to the Office of Child & Family Policy for approval.

> *FY 08 Department Update:* The OIG's recommendation was based on a request by the Children's Advocacy Center (CAC). The Department continues to review the feasibility of the recommendation.

> *FY 09 Department Update:* In Procedures 300 (Appendix B, Allegations, Burns 5/55), the Department will add "notification to State's Attorney on 2nd, 3rd, and 4th degree burns" in order to implement the recommendation.

**The procedures for completing a CERAP and the decision tree for mentally ill parents should be amended so that the guidelines note the need to assess risk to the child when a parent incorporates a child into their delusional system, even in the absence of overt negative statements (from OIG FY 06 Annual Report, Death and Serious Injury 2).**

> *FY 06 Department Response:* The committee revising the safety assessment continues to work on the safety framework protocol.  Targeted completion date is June 2007.

> *FY 08 Department Update:* Department procedures require a rule out of dependency. Revised safety enhancement factors have been expanded.

> *FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

**The Department should ensure that available fathers be explored as potential placements.  If a safety plan is likely to last longer than six months, the Department should facilitate a legal relationship between the child and the caretaker (from OIG FY 06 Annual Report, General Investigations 11).**

*FY 06 Department Response:* A committee has been formed to revise the safety assessment process. The Committee continues to work on the safety assessment framework protocol. Targeted completion date is June 2007.

*FY 07 Department Update:* The Child Endangerment Risk Assessment Protocol (CERAP) draft, currently being field tested, directs the attention of the worker to consider available fathers as potential placements.

*FY 08 Department Update:* The CERAP draft provides that non-custodial parents should be identified and assessed first for potential out-of-home placement when a safety plan is needed.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

**FY 09 OIG Response:** *According to the most recent data, just over 100 families have been referred statewide to agencies that the Department contracts with to provide services to fathers. The Department needs to encourage broader participation for fathers of DCFS involved children.*

**The State Central Register should revise the Notice of Indicated Finding sent to parents to ensure that parents know the identity of the indicated perpetrator or whether the allegation was indicated to an unknown perpetrator (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 6).**

*FY 05 Department Response*: This recommendation is under review by the DCFS Legal Division because of the impact it may have on the DuPuy Federal lawsuit.

*FY 06 Department Update*: Revisions are on hold pending implementation of the changes required by the DuPuy Federal lawsuit. Changes will be implemented as soon as possible, but no later than July 17, 2007.

*FY 07 Department Update:* Revisions were placed on hold by DCFS Legal due to changes required by DuPuy Federal Lawsuit. As of November 2007, litigation is ongoing and it appears additional changes to the notice form may be required. DCFS Legal will continue to monitor and will draft an updated form when legal issues have been resolved. The anticipated implementation date is May 2008.

*FY 08 Department Update:* Revisions to the notification letter are in process and will be completed by June 2009.

*FY 09 Department Update:* Recommendation in progress. Estimated completion date: Summer 2010.

**Add a third box to each safety factor, acknowledging that information for that factor may be "unknown" or "uncertain" and add a section at the conclusion of the factors list for identifying information that needs to be gathered in the future to further assess safety (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 07 Department Response:* The current draft CERAP that is being field-tested provides two assessment tools. The first is used at the outset and permits workers to note that more information is needed before the question can be answered.

*FY 08 Department Update:* The current draft of the initial CERAP acknowledges the option that more information is needed to assess safety.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

**Devise a supervisory form to accompany the safety assessment that would allow a supervisor to determine the source of information that formed the basis of the particular safety factor decision and provide a check that basic available objective sources (such as the hotline report, prior child protection investigations, police reports and interviews with police, and criminal history information as required by Administrative Procedure 6) (from OIG FY 06 Annual Report, General Investigations 16).**

*FY 08 Department Update:* The current draft CERAP identifies the source of the information.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

**While developing its protocol for investigations of abuse and neglect in religious facilities the Department should develop a general protocol for ascertaining supervisors and administrators to receive official notification. An appointed designee of the Department's Legal Division or the State Central Register should facilitate notification to the proper religious superiors (from OIG FY 06 Annual Report, General Investigations 9).**

*FY 07 Department Response:* The Department is reviewing this recommendation.

*FY 08 Department Update:* DCFS Legal provided DCP with a draft protocol for review. DCP will utilize this protocol to generate an information transmittal to staff. The anticipated date of implementation is February 2009.

*FY 09 Department Update:* Policy Guide 2009.03 was distributed in October 2009 in response to the recommendation.

**DCFS Procedure 300, Reports of Child Abuse and Neglect, should be amended to provide that the decision to take protective custody of a child whose parent is receiving services from the Department (e.g., intact family, independent living, or residential programs) must include consideration of the degree of the parent's cooperation with services and the extent to which services provided address the allegation (from OIG FY 04 Annual Report, Death and Serious Injury 19).**

*FY 04 Department Response*: The CERAP Advisory Council is currently reviewing the CERAP Protocol. The OIG recommendations will be shared with the group at their next meeting, January 2005.

*FY 05 Department Update*: Procedure 300.80, Delegation of the Investigation, has been revised and the draft includes this consideration. Legal is currently reviewing Procedures 300 and it is projected all related tasks will be complete by Spring 2006.

*FY 06 Department Update*: The Division of Child Protection Committee has not completed its review and final revisions to Procedures 300, Reports of Child Abuse and Neglect. Once completed, these will be returned to the Office of Child and Family Policy to begin the process of

approval from the Joint Commission on Administrative Rules (JCAR). Implementation date: Spring 2007.

*FY 07 Department Update:* The Office of Child and Family Policy has forwarded the final draft of Procedures 300 to the Division of Child Protection. The Procedures 300 workgroup is reviewing the final draft and expects completion by December 2007.

*FY 08 Department Update:* The internal and external review of Procedures 300 has been completed and comments were forwarded to the Associate Deputy for review. The revisions to Procedures 300 are expected to be finalized by January 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

**The Child Endangerment Risk Assessment Protocol (CERAP) should be amended to require that workers note when a risk factor cannot be answered because of insufficient information. Under such circumstances, workers should be required to perform diligent inquiry into relevant facts for assessment within 48 hours. The Department should develop tight procedures to ensure that there is follow-up and resolution of unknown variables (from OIG FY 05 Annual Report, Death and Serious Injury Investigation 9).**

*FY 07 Department Update:* The draft CERAP, currently being piloted, addresses this recommendation.

*FY 08 Department Update:* The recommendations resulting from the pilot were submitted to the Safety Workgroup, which is meeting regularly to incorporate these recommendations. There is a possibility of some additional slight modifications to incorporate the recent Department focus on Trauma-Informed practices. Procedures 300, Appendix G: Safety Assessment Enhancement, has been revised and will be implemented when changes to SACWIS are completed. The anticipated date of implementation is July 2009.

*FY 09 Department Update:* A policy and protocol designed to ensure the safety of children is scheduled to be implemented by July 2010.

**OIG FY 04 Annual Report, Death and Serious Injury Investigation 24 included the following six recommendations (labeled below a-f). The responses and updates follow the six recommendations.**

**a) The Procedure for the allegation of Poisoning (#6/56) should include information from literature:**

- **Common sources of intentional poisoning of children include: ipecac, laxatives, black and red pepper, salt, water (intoxication), acetaminophen and aspirin, insulin, adult prescription drugs (e.g. barbiturates, antidepressants, diuretics), alcohol and illicit drugs, and arsenic;**

- **Common symptoms associated with intentional poisoning include: chronic diarrhea, vomiting, lethargy, dehydration, and seizures;**

- **Intentional poisoning has an extremely high mortality rate and when found, children who are intentionally poisoned should not be left with the perpetrator.**

**b) The Department should establish guidelines for the investigation of abusive poisoning cases and suspected Factitious Disorder by Proxy cases in accordance with the published literature. Allegations should be amended to provide that in cases where intentional poisoning is suspected, the investigator should also suspect and investigate Factitious Disorder by Proxy.**

c) Department Procedures should acquaint workers with the following critical information necessary to investigate Factitious Disorder by Proxy:

- Critical to any investigation of poisoning, and especially Factitious Disorder by Proxy, is a detailed determination of who provides care for the child when;

- Investigators must retrieve all available medical records for the affected child and siblings; an affidavit of history care, completed by the parents, will be a useful first step in attempting to get all available records;

- While not dispositive, the typical perpetrator is a mother who has some medical background;

- Typically, perpetrators of Factitious Disorder by Proxy appear particularly bonded with their children and are particularly adept at convincing professionals of their sincerity and abiding interest in their children;

- Most victims of Factitious Disorder by Proxy are infants and toddlers;

- As much as 98% of the time, the perpetrator continues victimizing the child in the hospital;

- The most common presentation of Factitious Disorder by Proxy is apnea.  Other common presenting conditions include seizures, bleeding, central nervous system depression, diarrhea, vomiting, fever (with or without sepsis or other localized infection), and rash.  Probably the most common cause of death in homicidal Factitious Disorder by Proxy is suffocation, but there are many causes of death, among which are poisoning with various drugs, inflicted bacterial or fungal sepsis, hypoglycemia, and salt or potassium poisoning;

- Factitious Disorder by Proxy is not limited to directly causing conditions (e.g. poisoning and suffocation); it may also include, over and under reporting signs or symptoms (e.g. exaggeration of symptoms), creating a false appearance of signs and symptoms (e.g. tampering of specimens) and/or coaching the victim or others to misrepresent the victim as ill (Ayoub, et al., 2002).  The presence of valid illness does not preclude exaggeration or falsification (Ayoub, et al., 2002).

d) A Factitious Disorder by Proxy investigation should include a thorough review of available medical records for all children in the family.  If a child abuse team is available at the treating hospital, they should conduct the review.  If a child abuse team is not available, this review should be conducted by DCFS nurses and should be subject to the following procedures:

- Interview medical personnel regarding symptoms.  If intentionally caused, how long after administration would symptoms be expected to occur?  How long would symptoms be expected to last per dose?

- Determine context of onset of symptoms.  Who is present prior to onset of symptoms?

- Prepare a medical chronology of symptoms, charting the onset of symptoms and the access of possible perpetrators;

- Do siblings' records contain evidence of false pediatric reporting?

- Interview treating doctor to determine whether appropriate laboratory tests have been ordered to detect the presence of poisons or emetics.

e) Whenever investigators suspect intentional poisoning or Factitious Disorder by Proxy, an immediate referral must be made to law enforcement and the State's Attorney.

f) Whenever investigators suspect intentional poisoning or Factitious Disorder by Proxy, investigators must employ a multi-disciplinary approach that includes sharing of information and frequent contact with law enforcement and any Child Abuse Team at the hospital.  If no child

**abuse team is available, the investigator and DCFS nurse must maintain an open dialogue throughout with treating medical professionals to ensure sharing of all information.**

*FY 04 Department Response*:   A workgroup was convened to revise/update Procedures 300. Reference to allegations 5/56, 15/65 and 10/60 will be included in the draft protocol for conducting investigations when Factitious Disorder by Proxy is suspected.   The workgroup decided not to limit Factitious Disorder by Proxy to the poison allegation.   Completion date: April 2005.

*FY 05 Department Update*:   The draft policy is complete.   It was reviewed with the OIG for final comments and subsequent revisions.   Distribution to staff is expected within the first quarter of 2006.

*FY 06 Department Update*:   The Division of Child Protection Committee has not completed its review and final revisions to Procedures 300.   Once completed, these will be returned to the Office of Child and Family Policy to begin the process of approval from the Joint Committee on Administrative Rules (JCAR).   Implementation date:  Spring 2007.

*FY 09 Department Update*: Rule 300 is currently being reviewed by the JCAR and Procedures 300, Appendix B, Child Abuse and Neglect Allegations, is being revised.


## CONTRACT MONITORING

**Personnel from the Division of Contracts and Grants must be retrained to ensure critical review of budgets and quarterly reports of both grantees and contractors.**

*FY 08 Department Response:* The Department agrees.  Contract Training will be scheduled.

*FY09 Department Update:* Contract training was completed in March 2009.

***FY 09 OIG Response:*** *The curriculum provided appears to assist contract  monitors in preparing necessary forms but additional training will be necessary to ensure critical review of documents submitted.*

**Personnel from the Division of Contracts should assure that contracted agencies submit program plans that meet the service needs of the DCFS client population and that the contracting agency has the resources and ability to meet those needs.**

*FY 08 Department Response:* The Department agrees.  The Department is beginning the review of program plans for FY10.

*FY 09 Department Update:* Contract reviews were completed.

**Contracts should require quarterly reports from mentoring and counseling agencies on progress toward achievement of program plan goals, both in relationship to individual clients and, in the aggregate, for all clients served under the contract.**

*FY 08 Department Response:* The Department agrees.  Revised requirements will be included in FY10 contracts.

*FY 09 Department Update:* The Department continues to include revised requirements in contracts. The estimated completion date of completion is July 2010.

**The new Contract Monitoring Protocol should include toxicology contracts. Toxicology contract monitoring should include a specific provision requiring review of Approval Forms and incorporation of guidelines developed by the Division of Service Interventions (from the OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department agrees.

*FY 08 Department Update:* The new Contract Monitoring Protocol includes toxicology contracts.

*FY 09 Department Update:* A drug testing protocol was developed in November 2008, which addressed the frequency of testing, random testing, drugs to be tested, and custody and control procedures. A list of review criteria identifying potential red flags was developed for DCFS contract monitors reviewing drug testing vouchers. A revised program plan for DCFS toxicology testing contracts was developed. The program plan incorporates the requirements and procedures of the drug testing protocol by reference and also adopts the random testing requirements of the protocol. The new program plan is expected to be implemented for the FY11 contracts.

**The Department should have a written policy, developed by the Service Intervention Division, dictating the requirements for drug and alcohol drops. The policy and subsequent training should specify red flags that the Contract Liaison should look for in reviewing the Billing Summaries (from the OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department has a work group to update the program plan and protocol for all toxicology providers. An inter-division work group, including Office of the Inspector General staff has been convened to address drug testing issues. The work group is developing standards for client drug testing, frequency and duration of testing, drugs to be included in test panels, program plan requirements for drug testing contractors, review of criteria for contract monitors, use of breathalyzers to test for alcohol, and use of confirmation tests on positive urine screens. The group is planning to complete its recommendation in the fourth quarter of FY2008.

*FY 08 Department Update:* The finalization of the program is under review by the Service Intervention Division. The new program will be added to the FY 2010 contracts.

*FY 09 Department Update:* A drug testing protocol was developed in November 2008, which addressed the frequency of testing, random testing, drugs to be tested, and custody and control procedures. A list of review criteria identifying potential red flags was developed for DCFS contract monitors reviewing drug testing vouchers. A revised program plan for DCFS toxicology testing contracts was developed. The program plan incorporates the requirements and procedures of the drug testing protocol by reference and also adopts the random testing requirements of the protocol. The new program plan is expected to be implemented for the FY11 contracts.

**The Department should develop an electronic system for tracking and linking toxicology resource approvals, caseworker sign-offs on service delivery and billing reviews (from the OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department has developed an electronic tracking process for drops and their results. The contract administration unit has not been introduced to this process yet.

*FY 08 Department Update:* The Department is continuing to implement this recommendation.

*FY 09 Department Update:* The Pilot Program was implemented in 2007 and is still in operation. The Department considers this recommendation closed.

**FY 09 OIG Response:** *The Office of the Inspector General will review the Pilot Program.*

**Drug and alcohol toxicology contracts should be competitively bid (from the OIG FY 07 Annual Report, General Investigation 1).**

*FY 07 Department Response:* The Department agrees. This will be implemented with FY 2009 contracts.

*FY 08 Department Update:* Due to the program plan and protocol changes, this service was not bid in FY 2009. It is anticipated that the service will be out for bid in FY 2010.

*FY 09 Department Update:* Due to retirement and staff changes and the new committee that developed recommendations, it is still anticipated that services will be put out for bid for FY2011.

**The Department must immediately ensure that no further advance payments are issued without procurement of a surety bond and without signed verification that the expected billings and proposed budget will support timely repayment of the advance. Contract monitors must ensure that contractors are not incurring needless expenditures, such as the rental payments that the new agency incurred (from OIG FY 06 Annual Report, General Investigations 13).**

*FY 06 Department Response:* The Division of Budget and Finance will work with the Office of Legal Services to develop an appropriate protocol for implementing a surety bond process as it relates to advance payments for non-board contracts.

*FY 07 Department Update:* Protocol development is in process. Anticipated completion date: May 2008

*FY 08 Department Update:* Boilerplate language was modified for FY09 contracts to include language specific to refunding excess revenues with timelines for a) termination of an agreement and b) end of contract year. A surety bond is not required since statutory language removing a conflict between the Child and Family Act and the State Finance Act has not been resolved. It was suggested to try to amend the Child and Family Act to bring it up to date with the law recognized by the comptroller and that has not been accomplished.

**FY O8 OIG Response:** *Absent a legislative change, the Department must comply with current law and procure surety bonds. In addition, contract liaisons need to determine that budget and billings will support payback.*

*FY 09 Department Response:* Proposed revisions to the Children and Family Services Act (20 ILCS 505) were provided to DCFS Legislative Office in November 2009, to begin the legislative process. The Legislative Office submitted the legislative proposal to the Governor's Legislative Office for their approval to move forward.

*FY 09 OIG Response: The Legislative proposal submitted was to eliminate the statutory requirement for surety bonds. The OIG opposes this legislative proposal because it believes that surety bonds are an appropriate safeguard for public funds. The OIG's recommendation concerning surety bonds came from an investigation in which public funds were lost because a surety bond was not procured.*

**The Department must separately track all advance payments and ensure they are repaid in a timely manner (from OIG FY 06 Annual Report, General Investigations 13).**

*FY 06 Department Response:* The Department's Office of Contract Administration and Office of Financial Management will work together to develop a separate tracking mechanism for advances made with non-board contracts.  Estimated date of completion is February 28, 2007.

*FY 07 Department Update:* The tracking mechanism is under development.   Anticipated completion date: May 2008.

*FY 08 Department Update:* The system development project was stopped prior to implementation and has not been completed.  The practice of making advances was changed to provide advances in very few situations, and then only for no more than two months; more of these types of contracts were changed to grants; the program plan was modified to include a reconciliation to recover the advances in the last two months and/or lapse period.   The excess revenue audit process also lowered the threshold for audit review in order to identify and recover advances if not captured in the program plan/reconciliation process.

*FY 08 OIG Response: The Department should track even the few advance payments it currently makes, whether through grants or contracts.*

*FY 09 Department Update:* The Contract Monitors/Liaisons maintain individual tracking of all advance payments for new services or vendors and initiate a reconciliation plan during the last two months of service of the contract period.

*FY 09 OIG Response: The absence of tracking recoupment and reconciliation was found in several OIG investigations. The recommendation is that all advance payments must be centrally tracked to ensure that individual monitors are enforcing requirements.*

**The Department must develop a reliable Contract Monitoring process that would provide checks and balances and separation of functions to prevent the abuses.  The process must include:**

- **Quarterly review of expenditures to ensure that expenditures were related to the Contract**;
- **Quarterly review of services, to ensure that the goods or services were provided;**
- **Contractual and Rule requirement that any contractual spending for services or items not specifically covered under the Contract must be approved, in writing, by the Contract Division;**
- **Lapsed funds and obligation of funds must be approved in writing by the Contract Division.**

**The Department must develop specific guidelines for disbursement when Fiscal Agents are used.  The guidelines must include checks and balances to ensure that Fiscal Agents ascertain that the services or goods for which they issue checks have been provided.  The use of Fiscal Agents must also be monitored by the Contracts division to ensure separation of functions.  Fiscal Agents must**

**understand that their role is not limited to check-writing and that they maintain fiduciary responsibility for expenditure of public funds.**

**The Department needs to systematically track public monies spent by contractors through subcontracts. The Department must be able to track who is ultimately responsible for providing services and who is ultimately receiving DCFS funds, in order to guard against conflicts of interest and double-billing.**

**The Department must develop a conflict of interest protocol, whereby entities are identified that the Department should not be contracting with, because of conflicts of interest, and the Department must purchase anti-conflict software that would identify Department funds expended on prohibited entities, similar to the practice at law firms (from OIG FY 06 Annual Report, General Investigation 12).**

*FY 06 Department Update:* The Department is developing a workgroup that will consist of Contract Administration staff, Budget and Finance staff, and a representative(s) of the Conflict of Interest Committee to analyze the current processes and make recommendations to the Director for changes/enhancements.

*FY 07 Department Update:* A workgroup is being developed. Anticipated completion date: May 2008.

*FY 07 OIG Response: These recommendations were made after the Inspector General's Office discovered that a quarter of a million dollars of Department funds intended to assist children and families was diverted into the private bank account of a Department manager. These recommended changes are critical to ensuring that such abuse of trust does not occur in the future. The Department has had more than two years to institute these basic changes.*

*FY 08 Department Update:* The workgroup is reviewing the monitoring and disbursement processes and will provide recommendations for revisions/changes to Executive Staff by March 2009. It is anticipated that execution of approved recommendations will be prior to finalization of the fiscal year 2010 contracts. The ability to purchase and/or implement software is dependent on available funding.

*FY 09 Department Update:* The review of the monitoring and disbursement processes was completed. Final draft has been submitted to Executive staff for recommendations for revisions/changes. As a part of the contract process for FY2010, Contract Administration established and followed a protocol of using federal web-based sites to research each vendor/provider as a part of processing contracts to identify potentially prohibited vendors and/or look for vendors with potential conflicts of interest and/or a suspended and debarred status. Procedures 436 are currently under revision by a workgroup to address record keeping procedures for Purchase of Service (POS) agencies.

*FY 09 OIG Response: Revisions must include checks and balances when fiscal agents are used. The OIG has not had an opportunity to review the final draft.*

**ETHICS**

**A task group should be assembled to revise Rule 437, Employee Conflict of Interest, and draft related Procedures. Procedural additions should include:**

    **a. If an employee takes secondary employment where there is the potential for contact with DCFS clients, a wall needs to be built between the DCFS employee and any DCFS clients being serviced by the secondary employer.  In this case, the employee's supervisor should call the secondary employer to verify the wall is in place.**

    **b. The supervisor should review secondary employment at the time of the annual review to see if a conflict has developed that was not present when the employee accepted the secondary employment.**

    **c. Instructions on how to contact the Conflict of Interest Committee.**

        **All DCFS employees should receive training on the revised Rule and Procedures 437 (from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 07 Department Response:* A task group was assembled, but is currently in abeyance, and the Director is currently reviewing possible changes to Rule 437.

*FY 08 Department Update:* The conflict of interest workgroup has been reconvened and is in the process of finalizing the proposed changes to Rule 437 and in drafting new procedures that support the revised rule.  The anticipated completion of revised Rule 437 is March 2009.

*FY 09 Department Update:* The workgroup has been reconvened to address outstanding issues, including fire walls and secondary employment.  We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The anticipated completion date for submission of the draft of Rule 437 for internal and external comment is January 2010.

**The task group should consider the extent to which private agencies should be included in Rule 437 (from OIG FY 07 Annual Report, Employee Conflict of Interest).**

*FY 07 Department Response:* The workgroup is currently in abeyance and the Director is considering the extent to which private agencies should be included in Rule 437, Employee Conflict of Interest.  The work group was provided with redacted copies of certain Office of the Inspector General reports.

*FY 08 Department Update:* The conflict of interest workgroup has been reconvened and is in the process of finalizing the proposed changes to Rule 437 and in drafting new procedures that support the revised rule.  The anticipated completion of revised Rule 437 is March 2009.

*FY 09 Department Update:* The Department now requires contracting agencies to have a Conflict of Interest policy that reflects the specifications of Rule 437. It is therefore unnecessary to determine whether Rule 437 applies to private agencies.

**FOSTER HOME LICENSING**

**The Department should pursue an amendment to the Abused and Neglected Child Reporting Act (ANCRA)  extending the 30-day retention period to six months after a final finding is entered for unfounded reports involving licensed foster homes made by non-mandated reporters (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 9).**

*FY 08 Department Response*: The DCFS Office of Legal Services has assigned an attorney to draft amendments to ANCRA which address the above issue as well as other proposed changes to ANCRA, and will submit these amendments as a single legislative package.

*FY 09 Department Update:* DCFS Legal reviewed and concluded that a legislative change is required to extend the maintenance of unfounded reports (not already addressed by statute) to 12 months following the date of the final finding. Legal has drafted and submitted proposed legislation amending ANCRA – 325 ILCS 5 that has been approved by the Director for inclusion in our legislative package for the upcoming Spring Session. We anticipate that the legislative process and subsequent revision to Rule 431.30, Maintenance of Records, can be completed by the beginning of Spring 2011.

**The requirement outlined in Procedures 301, Appendix E: Placement Clearance Process regarding a joint-site-visit between the licensing worker and placing worker should be included in licensing procedures (from OIG FY 08 Annual Report, Death and Serious Injury Investigation 15).**

*FY 08 Department Response:* The Department agrees. Procedures 402, Licensing Standards For Foster Family Homes, has been revised to indicate that a joint on-site visit to the foster home may be required by the licensing worker and placement worker to complete the CFS 2012, Pre-Placement Questionnaire. The revised Procedures 402 has been sent to the Director for approval.

*FY 09 Department Update:* Procedures 402.27, Licensing Supervision, revisions became effective in December 2008.

**Procedure 383, Licensing Enforcement, must be revised to address the deficiencies in notification and completion of licensing investigations of licensed foster homes. In 2004, the Inspector General recommended and the Department agreed to have Quality Assurance conduct a review of Central Office of Licensure's method of identifying CANTS reports on licensed foster homes and establishing a schedule of reliability checks for the system of identifying foster homes with a CANTS report (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 07 Department Response:* Final revision of Rule 383 was submitted for approval. The JCAR process has not been completed and the Director's office wants to review further.

*FY 08 Department Update:* Rule 383, Licensing Enforcement, was adopted effective March 17, 2008. Procedures 383 were released for public comment in August 2008, which included the revised provisions for licensing investigations.

*FY 09 Department Update:* Policy Transmittal 2009.12 - Procedure 383, Licensing Enforcement was issued July 31, 2009.

**The Department's licensing standards should require a reassessment of a foster home license when the licensing agency becomes aware of a major change in the family composition, such as a spouse/paramour moving out of the home. The reassessment should include a review of the foster parent's capability to care for the children in light of the loss of a second caretaker as well as the circumstances surrounding the change and any ensuing custody or other legal disputes (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:* Appropriate revisions have been sent to the Office of Family and Child Policy.

*FY 09 Department Update:* CFS 597FFH has been revised and will be distributed when revisions to P402 are complete.  This information is included in draft P402, Licensing Standards for Foster Family Homes, but additional revisions to the procedure are currently in process.

**The Department should develop guidelines for shared monitoring responsibilities when a single foster home has children monitored by different agencies or when the case monitoring and license monitoring functions are split between agencies. The guidelines should include the following requirements:**

    a.  **a staffing of all involved case and licensing workers;**
    b.  **written agreement of roles and responsibilities of each worker;**
    c.  **written guidelines concerning the responsibility to share information and the process for sharing information (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

**The Department should issue a policy memorandum that states that whenever possible, each foster home should have a single entity that monitors placement of foster children and foster home licensing. POS may grant waivers to the policy based on individual children's needs but must ensure that the guidelines stated above are in place whenever a waiver is granted (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

**Whenever a waiver is granted, and case responsibility is transferred to a single agency, the relinquishing agency should not be penalized, but should be moved up for case rotation assignment of a new case (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 2).**

*FY 08 Department Update:*  The Department is continuing to review this recommendation.

*FY 09 Department Update:* A workgroup is being developed to address the guidelines and policy change.

**The Department should immediately issue a policy clarification for Rule 402.15, Number and Ages of Children Served, regarding the number and ages of children permitted in licensed foster homes. The clarification memo should emphasize that all children receiving full time care in the home - birth, adopted, foster and otherwise - are to be figured in to the total (from OIG FY 06 Annual Report, Death and Serious Injury 8).**

*FY 07 Department Update:* Draft has been revised and will be submitted to licensing for review by November 15, 2007.  Target completion date:  January 2008

*FY 08 Department Update:* The draft policy is being revised. The estimated date of completion is June 2009.

*FY 09 Department Update:* Policy Interpretation 2009.03 was issued April 7, 2009.

**GENERAL**

**The Department's legislative liaison should pursue legislative amendment to Illinois Statute 430 ILCS 65/4-65/10 Public Safety to address the need to revoke firearm registration of parents who demonstrate an inability to keep their firearms from minors under a set of conditions that include: minors, age 16 and under, with a mental condition or behavior that poses clear and present danger to self or other persons (e.g., discharging firearms in the absence of parental supervision, shooting guns at other persons, taking weapons or ammunition to school) (from OIG FY 07 Annual Report, General Investigation 3).**

*FY 07 Department Response:* The Department believes that any legislation to amend Illinois Statute 430 ILCS 66/4-65/10 should be negotiated by the Illinois State Police and the Department of Natural Resources. The Department of Children and Family Services has no involvement in firearms law.

*FY 07 OIG Response:* *The OIG is pursuing the legislative change.*

*FY 08 OIG Update:* *House Bill-5191, which would amend the Firearm Owners Identification Card Act, was introduced to the Illinois General Assembly by State Representative Greg Harris. Through a collaborative effort by the OIG and Representative Harris, the House passed the Bill on April 30, 2008. On May 1, 2008 the Bill arrived in the Senate and is being sponsored by State Senator Heather Steans. The Bill is currently pending in the Senate.*

*FY 09 OIG Update:* *The bill was not passed prior to the end of the last session. The OIG will work to have the bill reintroduced and passed in the next session.*

**The anticipated training for graduated sanctions for child welfare workers should include more detailed court training (how to testify, how to screen, overlapping court involvement, court orders) (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 9).**

*FY 07 Department Response:* The Department agrees. The Office of Training will work with DPO to develop a more detailed court training curriculum. The training will be delivered beginning November 2008 to DCFS and POS child welfare workers.

*FY 08 Department Update:* The Office of Training had problems with the vignettes that were prepared with the assistance of a university. This product will be revised and completed by June 2009 and training will begin in July 2009.

*FY 09 Department Update:* The Office of Legal Services and the Office of Training conducted Court Training in all the Regions.

**The OIG recommended that Rule 412, Licensure of Direct Child Welfare Services Employees and Supervisors, be revised:**

- **To permit the Department to refuse to issue a license with knowledge that the applicant had committed a violation that would warrant revocation or if the applicant had engaged in behavior that would pose a risk to children or state resources;**

- **To expand the list of criminal pending charges or convictions that would warrant a refusal to issue to include any crime of which dishonesty is an essential element;**
- **To permit the Department to refuse to issue a license if the applicant provides false information during the licensing process;**
- **To provide guidelines for assessing criminal convictions and abuse or neglect findings that are not bars to licensure;**
- **To permit the Division of Child Welfare Employee Licensure to refer applications for investigation to verify facts presented (from OIG FY 06 Annual Report, General Investigations 26).**

> *FY 07 Department Update:* The Clinical Division, through the Child Welfare Employee Licensure (CWEL) staff, has drafted proposed changes to Rules 412. The draft of the proposed amendment incorporates input from the OIG, and the appointed Board members of the Child Welfare Employee Licensure (CWEL) program. The text of the proposed amendment will be submitted to the Director for review, approval, and transmittal to the Joint Committee on Administrative Rules (JCAR).

> *FY 08 Department Update:* The revisions to Rule 412 were submitted to the Office of Child and Family Policy on November 21, 2008 and will begin the revision/comment process. The anticipated date of completion is June 2009.

> *FY 09 Department Update:* The amended Rule 412 has been submitted to the Joint Committee on Administrative Rules for review. The anticipated completion date is Fall 2010.

**The Department's Conflict of Interest Committee should establish procedures for building walls between private agencies and DCFS Administrators who have decision-making power over agencies that they previously worked for (from OIG FY 06 Annual Report, General Investigations 28).**

> *FY 06 Department Response:* The procedures have been drafted by the Conflict of Interest Committee.

> *FY 07 Department Update:* The Director is considering the recommended changes.

> *FY 08 Department Update:* A Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437 and is drafting new procedures that support the revised rule. The anticipated date of completion is March 2009.

> *FY 09 Department Update:* The workgroup has been reconvened to address outstanding issues, including fire walls and secondary employment. We have contacted the chair of the Secondary Employment Subcommittee to initiate further deliberations with the subcommittee. The Conflict of Interest workgroup is in the process of finalizing the proposed changes to Rule 437. The anticipated completion date for submission of the draft of Rule 437 for internal and external comment is January 2010.

**The practice of disseminating the actual Law Enforcement Agencies Data System (LEADS) printouts should stop. LEADS Operators should provide a verbal or written assessment of the LEADS printout, as provided in AP6 (from OIG FY 05 Annual Report, General Investigation 34).**

*FY 05 Department Response*:  The LEADS protocol committee is currently meeting to revise AP 6 and incorporate all outstanding practice-related OIG recommendations.  Members of this workgroup have also begun meeting with the OIG on this issue as it relates to accessing underlying arrest and case reports from the Chicago Police Department, specifically, and the state in general.  The workgroup, chaired by the Division of Child Protection, anticipates completion by the first quarter of 2006.

*FY 06 Department Update*:  The committee continues to work on revisions to Administrative Procedure 6.  Issues leading to development of this workgroup have been incorporated into the current draft.  The Illinois State Police reviewed a recent draft and their comments have been included.  The Legal Division representative is reviewing the draft in light of the Adam Walsh Act to ensure appropriate provisions are included in the LEADS protocol.   Anticipated completion of revisions should be by the beginning of 2007.

*FY 09 Department Update*: Administrative Procedure 6, Law Enforcement Agencies Data System (LEADS), was distributed in October 2009. A memorandum for LEADS operators was also distributed in October 2009.

## MEDICAL

**The Department's Guardianship Administrator should identify and review all wards who have a current diagnosis of Reactive Attachment Disorder (RAD) and develop and implement a plan to determine whether these children and youth were properly diagnosed and are receiving appropriate treatment or whether they require an evaluation that follows recommended guidelines of the American Academy of Child and Adolescent Psychiatry, and the American Professional Society on the Abuse of Children.  The OIG will provide the Guardianship Administrator with the two investigations where RAD was misused (OIG FY 07 Annual Report, General Investigations 2).**

*FY 07 Department Response:* The Department's Clinical Division will review all wards with a current diagnosis of Reactive Attachment Disorder.

*FY 08 Department Update:* Using the guidelines and standards proposed by the American Academy of Child and Adolescent Psychiatry, the Department's Chief Consulting Psychologist will identify all children in placement who have a diagnosis of RAD. A random clinical review of at least five children will be completed to ensure proper assessment, diagnosis and treatment. In addition, a letter delineating the American Academy's standards and guidelines for the assessment and treatment of RAD will be drafted and distributed to all therapy and counseling providers. This should be completed by the end of February 2009.

*FY 09 Department Update:* Clinical will complete all parts of this recommendation.

**The OIG and the Department should continue their collaboration in developing a document for medically complex children prior to finalizing proposed Procedures 300, Appendix L, which contains investigation and case management guidelines and procedures for investigating certain allegations (OIG FY 07 Annual Report, Children with Medically Complex Conditions).**

*FY 07 Department Response:* Additional input is being received regarding children with special healthcare needs.  Recommendations from this group will be shared with the Clinical Division of Child & Family Policy.

*FY 08 Department Update:* The workgroup revising Procedures 300, Reports of Child Abuse and Neglect, abandoned the separate Appendix L, and incorporated the content regarding medically complex children in the body of Procedures 300.370 (J), 302.388, and 300.80. The revisions to Procedures 300 were published and are being reviewed by DCP for final publication. An amendment to Rule 300, Allegation 79, Medical Neglect, also addresses children with complex medical needs. The amendment to the rule was posted on the D-net and the Web Resource for review and comment.

*FY 09 Department Update:* Policy transmittal 2008.09 was issued to address these issues. Procedures 300.70(1), Procedures 300.80(g), Procedures 302.388(f)(2) and Procedures 302: Appendix O were amended to address these issues.

**The Guardianship Administrator's Office should regularly obtain information from Medicaid Prescription Use Screens to better service wards who are prescribed multiple medications (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 06 Department Response:* The Department's consulting psychiatrist has been in discussions with staff from DHS, regarding linking the DCFS Psychotropic Medication Consultation Program database and the IDPA Medication Screens to provide more timely access to Medicaid Payment Data.

*FY 07 Department Update:* DHS General Counsel is working to secure approval. After approval is secured, DCFS Legal will work to secure the signatures required to implement the Intergovernmental Agreement. Anticipated completion date: May 2008.

***FY 07 OIG Response:*** *The Intergovernmental Agreement addresses only access to records of psychotropic medication and only for wards that the Department is unable to locate. This does not address the recommendation, which was to monitor multiple medications of all wards. It should not be limited to wards that cannot be found, and it should not be limited to psychotropic medications, since non-psychotropic medications can be counter-indicated for use with psychotropic medications.*

*FY 08 Department Update:* DCFS is working with the Department of Healthcare and Family Services (HCFS) to obtain access to the Medicaid prescription use screens. The anticipated date of completion is January 2009.

*FY 09 Department Update:* Representatives of the Guardianship Administrator's Office have continued to request access from HCFS. While no one has denied access to the Department, access has not been authorized. Efforts to gain access will continue.

**The Department, as recommended in a previous report, should apply a targeted feeding assessment, such as the Nursing Child Assessment Satellite Training, in cases with allegations of inadequate food and/or malnutrition and failure to thrive and where there are chronically ill children whose feeding regimen may require occupational therapy adaptations (from OIG FY 04 Annual Report, Death and Serious Injury Investigation 10).**

*FY 07 Department Update:* Comments are being incorporated into the draft procedures for medically complex, including children with feeding problems.

*FY 08 Department Update:* The draft procedures are comprehensive, but do not specifically address feeding issues. The OIG will share research and targeted feeding assessment information with the DCFS Chief of Nursing Services.

*FY 09 Department Update:* DCFS Nurses were trained in the NCAST Feeding Assessment Tool in 2004. The Chief Nurse is reviewing the training materials to incorporate into written protocol.

## PERSONNEL

**The Department should amend Rule 412, Licensure of Direct Child Welfare Services Employees and Supervisors, to provide specific provisions for voluntary relinquishment of a child welfare employee license (from OIG FY 08 Annual Report, General Investigation 30).**

- **A licensee may voluntarily relinquish his or her license at any time.**

- **The voluntary relinquishment of a CWEL during a pending licensure or disciplinary investigation or proceeding shall be recorded in the CWEL files as "*relinquished during licensure or disciplinary investigation or proceeding.*"**

- **Voluntary relinquishment of a license must be filed with the Child Welfare Employee License Division on a form prescribed by the Division. The form must contain an acknowledgment that reinstatement will be subject to consideration of the facts disclosed in any pending licensure investigations or proceedings. Voluntary relinquishment does not divest the OIG of the jurisdiction to complete a pending investigation.**

- **An Application for License from a licensee who previously relinquished shall be considered a Request for Reinstatement rather than an Application for License.**

*FY 08 Department Response:* The Department agrees. The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 is currently being reviewed by the Joint Committee on Administrative Rules.

**Section 412.100 should be amended as follows: Section 412.100 Restoration of Revoked, Suspended or Relinquished License: A licensee may request the restoration of his or her license by submitting a written request to the Board providing specific reasons to support the request. In considering an application to reinstate or grant a license that was relinquished during a pending licensure investigation or administrative proceeding, the Board shall consider any charges filed along with a report or sworn statement by the Office of the Inspector General regarding the evidence developed in the investigation. For the purpose of considering a Request for Reinstatement, the Board shall presume that the facts developed during the investigation or the pending charges are true, when the license was surrendered during a pending investigation or licensure proceeding; the licensee may rebut the presumption for good cause shown. The Board may not reinstate a license where it has been shown by investigation and administrative hearing that it is not in the best interest of the public to do so. Considerations that will be reviewed when making a finding of "in the best interest of the public" include, but are not limited to: the nature of the offense for which the license was revoked; the period of time that has elapsed since the revocation; evidence of rehabilitation; and character references (from OIG FY 08 Annual Report, General Investigation 30).**

*FY 08 Department Response:* The Department agrees. The Office of Child and Family Policy has begun the revision process.

*FY 09 Department Update:* Rule 412 is currently being reviewed by the Joint Committee on Administrative Rules.

**Rule 412 should be amended to provide for automatic suspension or denial of license application after a licensee or applicant has failed a drug test required by Administrative Procedure 24 (from OIG FY 08 Annual Report, General Investigation 32).**

*FY 08 Department Response:* The Department agrees.  The Department convened a task force that has developed language to amend Rule 412.

*FY 09 Department Update:* Pre-employment drug testing (Administrative Procedure 24) was suspended indefinitely due to budget constraints.

**The Department should develop policy to address suspected substance abuse in the workplace (from OIG Recommendations made in 2005, 2001 and 1999).**

*FY06 Department Response:* The Department developed a definition and procedure for Reasonable Suspicion testing. The Department agrees to amend the Employee Manual and the Employee Licensure Rule to address Reasonable Suspicion of substance abuse and will also engage in discussions with the union.

*FY 07 Department Update:* The Department's workgroup addressing the need for incident-based reasonable suspicion drug or alcohol testing is currently developing protocol for pre-employment drug testing. Reasonable suspicion testing has been put on hold temporarily.

*FY 08 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

*FY 08 OIG Response: The OIG has been continuously recommending this critical change in policy for nine years. The policy change sought by the OIG would have a minimal budgetary impact. The lack of reasonable suspicion policy, which would allow for testing when an employee is reasonably suspected of being under the influence of drugs or alcohol, continues to place our children, families and staff at risk.*

*FY 09 Department Update:* The Department began pre-employment testing in February 2008, but has had to suspend this program due to budgetary cuts. The Department plans to re-implement this program as soon as it is fiscally feasible. Reasonable suspicion testing will be negotiated between management and the Union in the future.

**The Department must implement security safeguards prior to enabling remote access to SACWIS on personal computers.  Office of Information Technology Services (OITS) must obtain direct approval from the private agency's executive director prior to enabling remote access for private agency employees.  Two documents should be developed in connection with remote access:  (1) The agency director should sign a form agreeing to notify OITS within 24 hours of the employee's change in status or departure from the agency, and (2) The employee should sign a document specifically acknowledging the confidential nature of the remote access application and agree to ensure that outside persons do not have access to the application.  The employee should be informed and agree to the requirement that, in order to maintain confidentiality, the Department prohibits transferring or downloading any confidential information onto their personal computer**

or email.  **The OITS should maintain and routinely update a database of remote access to SACWIS users (from OIG FY 08 Annual Report, General Investigation 24).**

> *FY 08 Department Response:* The Director and the Office of Legal Services are reviewing this recommendation.

> *FY 09 Department Update:* The documents have been developed and issued.

**FY 09 OIG Response:** *The Illinois DCFS Virtual Private Network (VPN) usage agreement should also require a signature by the Executive Director to ensure the Executive Director's knowledge and approval of remote access.*


## SERVICES

**The Department should not allow counseling services to be provided by bachelor level professionals with no supervision (from OIG FY 08 Annual Report, General Investigation 24).**

> *FY 08 Department Response:* The Department requires a minimum of a master's degree for professionals providing counseling services. Those agencies that may have been grandfathered in to allow a bachelor's level professional to provide counseling will be reviewed on a more frequent basis to ensure that adequate supervision is provided.

**FY 08 OIG Response:** *This was not a grandfathered agency.  This agency's Executive Director had a master's degree.  However, those providing services, for the most part, only had bachelor's degrees and were not provided supervision.*

> *FY 09 Department Update:* The Department monitors counseling contracts which provide therapeutic services on an annual basis, at a minimum, in order to make sure that all service providers have at least a master's or doctorate degree.

**The Department's Resource Referral Form should be modified to include the service category "therapeutic counseling services" (from OIG FY 08 Annual Report, General Investigation 24).**

> *FY 08 Department Response:* The Department agrees. The Resource Referral Form is being revised.

> *FY 09 Department Update:* The form was revised in January 2009.

**The Department should amend Procedures 302.388 Intact Family Services to provide that parents with developmental disabilities are referred to community resources that specialize in working with the developmentally delayed population for community linkage and additional case management services (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 8).**

> *FY 07 Department Response:* The revisions to 302.388 have been requested.

> *FY 08 Department Update:* The draft Procedure 302.388 was forwarded to the Office of Child and Family Policy on September 25, 2008. The Office of Child and Family Policy is now in the revision and comment process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* Procedures 302.388 were completed and approved by the Director on September 2009.

**The Department's Division of Clinical Practice should assist child protection and case management staff in managing cases involving caregivers with a developmental disability (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 8).**

*FY 07 Department Response:* The content of the training is developed and will be converted into web-based training.  It will be included in the pre-service training for all job specialties and caregivers.  Anticipated completion date: December 2007.

*FY 08 Department Update:* The on-line course was completed and effective February 25, 2008. The on-line course is incorporated in pre-service Foundation training for all new direct service child protection and child welfare staff and supervisors. The on-line course is open for registration to all veteran child protection and child welfare staff for in-service training. The DD Administrator convened a tele-conference meeting with Cook DCP Administrators to discuss the need for a statewide centralized consultation process with DCP investigators and staff.  The discussion identified necessary and practical information regarding developmental disabilities that could be used with staff, advising them of when to seek immediate consultation from the DD Administrator.  The training on this information is scheduled for March 2009.

*FY 09 Department Update:* To meet training needs, 24 training presentations were scheduled with DCP and Intact staff.  As of November 2009, 12 sessions were completed.  The remaining sessions are scheduled for the weeks of November 2009 and December 2009.

**The Department should train Child Protection and Intact Family staff on utilization of the Social Security Administration's consent for release of information to obtain information on a parent or child's qualifying disability (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 8).**

*FY 07 Department Response:* This is included in the on-line orientation training.  Confidentiality and release of information is currently covered in training for all staff and will be included in the revised Foundations, which will be ready for delivery in December 2007.

*FY 07 OIG Response:  The orientation training does not include training on securing consent to access relevant social security disability information. The material is not covered in Foundation training for child protection and child welfare staff.  The OIG will work with the Department to ensure that this material will be included in the Foundations training.*

*FY 09 OIG Response: A response was not provided by the Department.*

**The Department should amend Procedures 302.388 Intact Family Services to provide that when a parent has a condition that may become debilitating, Intact Family Services staff ensure that the parent has a back-up caregiver plan that meets the child's medical, developmental and scholastic needs (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 8).**

*FY 07 Department Response:* The revisions to 302.388 have been requested.

*FY 08 Department Update:* Draft Procedure 302.388 was forwarded to the Office of Child and Family Policy (OCFP) on September 25, 2008.  The OCFP is now in the revision and comment process.  The anticipated date of completion is June 2009.

*FY 09 Department Update:* A policy transmittal was issued to reinforce practice.

**The Subsidized Guardianship Agreement (CFS 1800) should be amended.  At a minimum this agreement should allow for payment suspension and termination of the agreement when custody of a minor is restored to a biological parent.  In the interest of complete and full disclosure however, the possibility of a child returning to his/her biological parent and the steps necessary for that to occur should be clearly identified in the General Provisions Section of the Agreement (from the OIG FY 07 Annual Report, Older Caregivers Addendum).**

*FY 07 Department Response:* The Department agrees.

*FY 08 Department Update:* The Department is continuing to review implementation of the recommendation.

*FY 09 Department Update:* The forms, as well as rule and procedure, do currently provide termination criteria that would cover the return of the youth to a birth parent.   There is no language in a subsidy agreement about return to a birth parent, since it is not expected; and it is inappropriate to provide this type of language in a contractual agreement with the subsidized guardians.

*FY 09 OIG Response: OIG investigations as well as reports from the field support that return to a birth parent does occur and needs to be subject to procedures when it does occur. Recent amendments to the Adoption Act (705, ILCS, 405/12-34) also support the need for the Department to recognize the possibility of return home.*

**In any case in which a change in guardianship essentially represents a return home, DCFS Legal should be involved to ensure that the appropriate petition is filed in the appropriate court and to represent the Department at any subsequent hearing on the matter  (from the OIG FY 07 Annual Report, Older Caregivers Addendum).**

*FY 07 Department Response:* The Department agrees.

*FY 08 Department Update:* The Department is continuing to review implementation of the recommendation.

*FY 09 Department Update:* The Department's Office of Legal Services has reviewed this issue and concluded that the burden is on the moving party to present evidence as to why the minor should be returned to their care.  The Office of Legal Services will be involved to the extent requested or ordered by the court.

*FY 09 OIG Response: If the Department is aware of a Return Home, and is not contesting it, it is the duty of the Department to inform the court.*

**The Department must monitor and enforce contract compliance of POS agencies with Department contracts to acknowledge and include fathers and paternal family members as an integral part of case management services.  Department monitors must ensure that Department Procedures 302: Services Delivered by the Department and its Appendix J: Pregnant and/or Parenting Program is followed (OIG FY 07 Annual Report, General Investigation 22).**

*FY 07 Department Response:* The Department agrees.  A memorandum is being drafted to DCFS and POS staff.  Target completion date:  December 2007.

*FY 08 Department Update:* The newly appointed Deputy for Monitoring is reviewing this recommendation and will address this issue by February 2009.

*FY 09 Department Update:* The Fatherhood Initiative addresses this issue.

**FY 09 OIG Response:** *The Fatherhood Initiative expresses an important goal of the Department but does not provide practical means of monitoring or assessing the adherence to that policy. Moreover, only 104 cases statewide have been referred to the Fatherhood Initiative Programs, according to the most recent data. The Department needs to secure broader participation for father of DCFS involved children.*

**The Department should review and update the Emergency Reception Center (ERC) Manual to include expectations of follow-up workers bringing children to the Emergency Reception Center (from OIG FY 06 Annual Report, General Investigations 4).**

*FY 07 Department Update:* The updated ERC Protocol/Manual (Transmittal) has not been finalized and is on hold with the Office of Child and Family Policy awaiting information resolution regarding shelter transportation issues.  When it is completed the informational transmittals will go out to DCFS, POS, CWS, and DCP staff. Also, training will take place for all staff regarding protocol on how CWS or DCP can make an Emergency Shelter referral and intake guidelines for bringing children and youth into ERC for an emergency temporary shelter care placement.

*FY 08 Department Update:* The ERC Protocol has been drafted and is awaiting approval to be sent out for comment. The anticipated date for distribution/implementation is January 2009.

*FY 09 Department Update:* Referral forms for the Emergency Reception Center (CFS 1900 and CFS 1901) were issued in February 2009. The referral form does not address procedures for admission to the Emergency Reception Center. Emergency Reception Center protocol is on hold at this time.

**The Department's Division of Legal Services should draft a standardized form for the appointment of Short-term Guardianship and provide training on proper use of the form (from OIG FY 07 Annual Report, General Investigations 4).**

*FY 07 Department Response:* DCFS Legal has assigned an attorney to develop training on the appropriate use of the statutory Short-term Guardianship form.

*FY 08 Department Update:* The CFS 444-2: Appointment of Short-Term Guardian Form was added to the Department's website in December 2007, however the form needs to be amended to account for recent statutory changes.

*FY 09 Department Update:* The revised form was completed in July 2009.

**When a child welfare worker has a pregnant mother on his/her caseload who has been previously indicated for abuse or neglect and refuses to give the child welfare worker information as to the due date and expected place of delivery and the worker has concerns about the new baby, the worker should increase visitation within 2 months around the anticipated due date, document attempts to**

get consent to speak with doctors, document contacts with family and support network to seek notification of birth (from OIG FY 07 Annual Report, Death and Serious Injury Investigation 7).

*FY 07 Department Response:* Procedure is currently being revised. Targeted completion date: June 2008.

*FY 08 Department Update:* The revisions are in process and the anticipated date of completion is February 2009.

*FY 09 Department Update:* Policy Transmittal 2009.09 was issued April 29, 2009.

**Procedures 302 should be revised to show that certified copies of vital records will be assessed a fee and that the fee on administrative copies of vital records will be waived by the Department of Public Health, but not necessarily by the local county clerk. This procedure should also address the issue of prepaid postage (from OIG FY 07 Annual Report, Birth Certificates).**

*FY 07 Department Response:* Language is being drafted that will be submitted to the Office of Child & Family Policy by December 2007.

*FY 08 Department Update:* Operations is currently revising Procedures 302. The anticipated date of completion is February 2009.

*FY 09 Department Update:* Revised Procedure 302.390 incorporating needed language is complete and awaiting Director approval prior to being issued.

**Procedures for Child And Youth Investment Teams (CAYIT) should be amended to include situations in which a move is requested for any reason other than a ward's best interest (OIG FY 07 Annual Report, General Investigations 14).**

*FY 07 Department Response:* The CAYIT Policy is currently under review. Target completion date: February 28, 2008.

*FY 08 Department Update:* CAYIT procedures (Policy Guide 2006.04) have been revised to clarify and differentiate the referral process for placement changes through CAYIT, Clinical Placement Staffing Review and Residential Transition Discharge Planning Protocol. The revised procedure will be sent to the Office of Child and Family Policy for review and then sent out for comment.

*FY 09 Department Update:* Draft revisions to the CAYIT policy have been completed and submitted to the Office of Child & Family Policy for review and completion of revision process.

**In split custody cases with a history of substance abuse and relapse, the Department should require random drug drops to assist the Department in securing necessary services for the children and family. In cases of alcoholism, random urine testing is not reliable. Breathalyzers are preferable. The OIG reiterates its prior recommendation that DCFS acquire breathalyzers and train on their use (from OIG FY 04 Annual Report, Death and Serious Injury Investigation 21).**

*FY 07 Department Update:* The Department has implemented new substance affected family policies that include drug testing requirements. Staff are being trained on the procedures as part of the Reunification training. An inter-division work group is developing additional guidelines for drug testing DCFS clients and monitoring DCFS drug testing contracts. The work group is

developing standards for frequency and duration of drug testing, use of breathalyzers, and the panel of drugs for which to test.  Anticipated completion date is the fourth quarter of FY 08.

*FY 08 Department Update:* The recommendation is in progress and the anticipated date of completion is March 2009.

FY 09 Department Update: A drug testing protocol was developed in November 2008 which addressed frequency of testing, random testing, drugs to be tested, and custody and control procedures.  A list of review criteria identifying potential red flags was developed for DCFS contract monitors reviewing drug testing vouchers.

A revised Program Plan for DCFS toxicology testing contracts was developed.  The Program Plan incorporates the requirements and procedures of the drug testing protocol by reference and also adopts the random testing requirements of the protocol.  The new Program Plan is expected to be implemented for the FY11 contracts.

**When a medical report indicates that a caregiver, regardless of age, may not be capable of caring for a child into adulthood, the back-up caregiver should sign a statement that he/she is aware of that fact and is still willing to serve as the back-up caregiver (from OIG FY 05 Annual Report, General Investigation 19).**

*FY 07 Department Update:* Revisions to Rule 309 Adoption Services have been made by the Office of Child and Family Services and it is under review. Target completion date is March 2008.

*FY 08 Department Update:* The CFS 486, Adoption Conversion Assessment, section 16, addresses the back-up caregiver issue.

**FY 08 OIG Response:** *The CFS 486, Adoption Conversion Assessment, provides for discussion with a back-up caregiver, but it does not address the back-up caregiver's awareness of the caregiver's potential incapacity and need for signature reflecting that awareness and willingness to serve as the back-up caregiver.*

*FY 09 Department Update:* The Department has submitted draft amendments to Rule 302.40 to implement this change.

**The Department should revise Procedure 327, Guardianship Services, Appendix F – Immigration/Legalization Services for Children with Undocumented Status to reflect current practices.  Because of the complexity and unfamiliar nature of immigration services to child welfare staff, the Department should develop a resource link on the D-Net to provide workers with a central location for obtaining needed information/instruction.  There should be communication within the Department regarding the development of computerized/satellite training to reflect current practices of the Immigration Services Unit (from OIG FY 07 Annual Report, General Investigation 20).**

*FY 07 Department Response:* Final draft of Procedure 327 Appendix F has been provided to the Inspector General's Office for review.

*FY 08 Department Update:* The final version of Procedures 327, Appendix F was issued on June 20, 2008. The virtual training, which reflects the current practices of the Immigration Services Unit is now available on the D-net.

*FY 08 OIG Response:* Although some revisions to the Guardian & Advocacy Division on-line training were made, current procedural information has not been included. The revised Procedures 327, Appendix F: Immigration/Legalization Services for Foreign Born DCFS Wards has not replaced obsolete information provided through the links "Procedures for acquiring SIJS" and "Click here to review the [Immigration Services] Alert." The "SSN Application Procedures" link to Procedures 327, Appendix G: Application for Social Security Number is not applicable to wards applying for an SSN after acquiring Legal Permanent Resident status. The "SSN Application Procedures" link should direct users to P327, Appendix F, section (c)(7). In addition, links intended to direct users to Policy Guide 2008.02, Mexican Consulate Notification of Mexican or Mexican American Minors in the Custody of the Department, are not functioning.

      *FY 09 Department Update:* Training links have been added to the D-net.

*FY 09 OIG Response:* The hyperlinks to the DCFS resources in the virtual training are not functioning. The OIG will continue to monitor the implementation of this recommendation.

## TEEN PARENT SERVICE NETWORK

**The Department should amend the HealthWorks contract to ensure that at the Initial Health Screenings, if a pregnancy is confirmed, an obstetrical ultrasound is performed to confirm that the pregnancy is in the uterus and to estimate the gestational age of the fetus, and that a health professional advises and counsels the youth regarding pregnancy options (OIG FY 07 Annual Report, General Investigation 22).**

      *FY 07 Department Response:* The Department will notify HealthWorks that a Comprehensive Health Evaluation (CHE) and ultrasound must be completed within 7 days when pregnancy is known or suspected. The Department will notify the HealthWorks Lead Agency for the involved county regarding completing a CHE for pregnant wards within 7 days and performing a pregnancy test during the CHE if pregnancy is suspected. Wards that are pregnant will be referred to an OB/GYN, whose medical judgment will dictate the need for an ultrasound. Notification will be sent by November 2007.

*FY 07 OIG Response:* A pregnant youth who has not received prenatal care must receive an ultrasound within seven days of the confirmation of pregnancy.

      *FY 08 Department Update:* A draft letter to HealthWorks will be sent to the DCFS Medical Director for review no later than December 4th. Once finalized, the letter will be sent to the HealthWorks Lead Agency.

      *FY 09 Department Update:* The letter was sent.

**The Teen Parenting Service Network's phone line should be used during regular business hours for child welfare workers to report a teen pregnancy as soon as it becomes known (OIG FY 07 Annual Report, General Investigation 22).**

      *FY 07 Department Response:* The change to the Unusual Incident Report (UIR) will be added in the Appendix of Rule 331, which is currently being revised.

*FY 08 Department Update:* The revisions are in process. The anticipated date of completion is June 2009.

*FY 09 Department Update:* The UIR was revised and Rule 331 was amended to reflect this information.

**DCFS Rule 315, Appendix A, Child Endangerment Risk Assessment Protocol (CERAP), should be amended to require a CERAP be completed when a parent who has an open DCFS case and whose children have previously been removed from his or her care has another child.  The Teen Parent Service Network Policies and Procedures should be likewise amended (from OIG FY 04 Annual Report, Death and Serious Injury Investigation 19).**

*FY 07 Department Update:* The new CERAP draft currently being field-tested provides that a safety plan must be developed whenever a caregiver has a prior abuse history.

*FY 08 Department Update:* The recommendations resulting from the pilot were submitted to the Safety Workgroup, which has been meeting regularly to incorporate these recommendations. There is a possibility of some additional slight modifications to incorporate the recent Department focus on Trauma Informed Practices.  Procedures 300, Appendix G: Safety Assessment Enhancement has been revised and will be implemented when SACWIS changes are completed. The anticipated implementation date is July 2009.

**FY 08 OIG Response:** *The Department's response does not address the need to amend Teen Parent procedures.*

*FY 09 Department Update:* Both the CERAP and Teen Parent Service Network procedures are currently being amended to include the recommended revisions.

# APPENDICES

**APPENDIX A:**

   **David Hayes-Munro Death Investigation**

**APPENDIX B:**

   **Report to the Steering Committee on Family Assessment**

212

## OFFICE OF THE INSPECTOR GENERAL
## DEPARTMENT OF CHILDREN AND FAMILY SERVICES

**REDACTED REPORT**

*This report is being released by the Office of the Inspector General for teaching/training purposes. To ensure the confidentiality of all persons and service providers involved in the case, identifying information has been changed. All names, except those of professional references, are fictitious.*

**File:** 08-1164

**Minors:**
Hayes-Munro, David, DOB 6/2005, DOD 12/2007
Hayes-Munro, Brian, DOB 11/2007
Munro, Keith, DOB 8/2006
Munro, April, DOB 8/04 (Surrendered for adoption at birth)
Munro, Tiffany, DOB 9/2003
Munro, Stephanie, DOB 9/2002
Thomas, Terrance, DOB 6/2000
Thomas, Teresa, DOB 8/1999
Thomas, Lilia, DOB 10/1998
Munro, Calvin, DOB 3/1997

**Mother:** Munro, Janetta (DOB 8/83); former ward

**Father:** Hayes, Sam, DOB 5/86, father of David, Keith and Brian

## INTRODUCTION

The Office of the Inspector General (OIG) received notification of the death of two-year-old David Hayes-Munro. At 1:30 a.m., in December 2007, David's father, Sam Hayes, discovered the child unresponsive. David's father and mother, Janetta Munro, transported him to Somerset Hospital. About three hours later, David was transferred to Upper Central Hospital with an admitting diagnosis of intracranial bleed, anal trauma, and bruises on his back. David was pronounced dead at 5:05 p.m.

David's biological mother, Janetta Munro, was charged with murder. She remains in custody pending trial. The next court date is in May 2009. At the time of David's death, there was an open intact family services case with The Concord Center, and a pending child protection investigation that was opened in December 2007 for an allegation of medical neglect to David's newborn brother, Brian Hayes-Munro.

The Office of the Inspector General initiated an investigation pursuant to its directive to investigate all child deaths in which there was an open DCFS case or prior DCFS involvement within the past twelve months of the child's death.

## INVESTIGATION

Autopsy Report[12]

In an autopsy of David's body in December 2007, the medical examiner noted considerable evidence of external and internal injury on nearly all parts of the body. The child sustained bruising to the forehead and abrasions to both cheeks. On the torso were bruises on the chest and healing abrasions on the abdomen. Bruises and abrasions were also found on David's elbows, arms, and back. An x-ray of the body revealed a fracture of the right humerus, the bone of the upper arm. Head injuries consisted of subgaleal hemorrhages on the scalp, subdural hemorrhages on the brain, a diffuse subarachnoid hemorrhage over the brain,[13] multiple cerebral contusions, and cerebral edema or swelling. An examination of David's eyes revealed multiple retinal hemorrhages as well as hemorrhaging of the left and right optic nerves.[14] Other internal injuries included hemorrhages in subcutaneous tissue on the back, legs, thighs, and right arm, and beneath both armpits. The medical examiner noted no rectal or anal trauma. David died of multiple injuries due to blunt trauma due to child abuse. Manner of death was homicide.

Family Background

David's mother, Janetta Munro, (DOB 8/83), is a former ward of the state. Janetta Munro was born in Chicago to Minnie Sawyer and Steve Munro. Janetta's family has a lengthy history of involvement with the Department dating back to at least January 1989, when Minnie Sawyer was indicated for 55-Burns/Scalding to Tyrone, Janetta's 4-year-old brother. Janetta's mother was subsequently indicated five times:

> **F** – November 1990 for 74-Inadequate Supervision of Janetta, Tyrone, Angela, Mary, Lucianna and Sabrina
> **G** – May 1991 for 81-Failure to Thrive and 79-Medical Neglect of Sabrina[15]
> **J** – January 1992 for 76-Inadequate Food, 74-Inadequate Supervision, and 22-Subtantial Risk of Harm to Janetta, Tyrone, Angela, Mary, and Lucianna
> **L** – 65-Substance Abuse; Brianna was born substance exposed (cocaine) in February 1992
> **M** – 65-Substance Abuse and 22-Substantial Risk of Harm; Miranda was born substance exposed in January 1994[16]
> **N** – 11-Cuts, Welts, Abrasions to Janetta in December 1996

### Pregnant and Parenting Adolescent

In 1992 Janetta was eight years old when she and her siblings were removed from their mother's care. From May 1992 to December 1999, Janetta lived in three homes of relatives; the last placement was with

---

[12] Office of the Medical Examiner, Report of Postmortem Examination, December 2007.

[13] Subdural and subarachnoid refer to hemorrhages that occur from the rupture of a blood vessel(s) beneath one of the meninges (a protective covering over the brain and spinal cord that consists of three layers: the dura mater – the outermost and toughest layer lining the inner surface of the skull; the pia mater – the innermost layer that adheres to the brain, and the web-like arachnoid membrane that is between the other two linings.) A subgaleal hemorrhage occurs between the skull and scalp.

[14] Surgical Pathology Consultation Report, Final, Department of Pathology, Homer Medical Center, December 2007.

[15] Shania was born in 1/90 with medical complications; she died in a nursing care facility in 1993. Janetta later reported during a psychological evaluation that her mother killed her sister in 1993.

[16] Miranda, now 15 years old, was adopted in September 2001. Mary (19), Lucianna (18), and Brianna (16) are living with subsidized guardians. Tyrone and Angela aged out of the system.

her maternal grandmother Sarah Sawyer (July 1994 - December 1999).  Janetta was removed from her grandmother's care in 1999 after she alleged that some time in 1996, when Janetta was 12 years old, the brother of her maternal grandmother's paramour fondled and penetrated her with his fingers.  DCFS subsequently indicated Marvin K. (unknown last name) for 19-Sexual Penetration and 21- Sexual Molestation.

At the time of the indicated report at the end of 1999, Janetta was a 16-year-old mother of three children (Calvin, 2, Lilia, 1, and Teresa, 4 months)[17] and pregnant.  Her Family Health file shows that Janetta was provided with pregnancy options counseling and anticipatory guidance regarding birth control methods and prenatal care.  The teen mother and her children were placed in ABC Group Home in March 2000, and while there, Janetta gave birth to her fourth child, Terrance [6/00].[18]  In May 2002, when Janetta was 18 years old, she entered an independent living program with her four children.  Four months into the program, Janetta informed the Alpha Services workers she was eight months pregnant and had not told anyone because she had planned to terminate the pregnancy, but waited too long.  Janetta said she was not receiving prenatal care and wanted to look into adoption for the unborn baby.  She received pregnancy options counseling and consulted with Uniting Child & Family Services about adoption. A worker wrote that Janetta appeared unhappy and uncertain about the situation.  Janetta delivered Stephanie [9/02] and brought her baby home.  There was no further mention of adoption.  Janetta was 19 years old and received birth control at a follow-up medical appointment. As she repeatedly refused to participate in random pregnancy testing, Alpha Services workers encouraged her to use birth control.[19]  In August 2003, Janetta informed her worker that she was six months pregnant, and at the age of 20, she gave birth to her sixth child, Tiffany [9/03].  As Janetta was approaching her 21st birthday in 2004, staff from Clinical Services for Teens confirmed that she had not earned a high school diploma or GED certificate, she refused to work or further her education, and had been non compliant with services.

*Evaluations*
Janetta's case records contain a psychological evaluation, a comprehensive assessment, a parenting assessment, and one occupational therapy evaluation.  In January 1997 a psychological evaluation was completed when Janetta was 13 years old. Janetta reported a history of suicidal ideation and attempts. When she was asked about homicidal ideation, Janetta stated, "I think of hurting anyone that is in my way. I'm tempted to hurt people and beat up people that treat me wrong." Janetta reported that she cries every night before she falls asleep. She exhibited a depressed mood.   It was recommended that Janetta be placed with her siblings and begin individual psychotherapy, a psycho-educational evaluation for school, and that she receive a psychiatric consult for medication.

The Clinical Services for Teens (CST) completed a Comprehensive Assessment in June 2001, which noted that Janetta, age 17, had received individual counseling in 1994-95 when she was 11-12 years old for anger, stress and depression.[20]   The CST recommended that Janetta participate in counseling and parenting classes, have contact with the children's biological fathers, and meet the medical and emotional needs of her children.  While the fathers of Janetta's children were identified in the assessment, the

---

[17] Janetta's age at the birth of each child was 13½ (Calvin), 15 (Lilia), and 16 (Teresa).

[18] While in ABC group home, Janetta completed classes for certified nursing assistant, but she never took the certification exam.

[19] A DCP investigation of Janetta was opened in January 2003 and unfounded for risk of harm.  An Alpha Services worker had reported that Janetta left two of her children with a person whose biological children were in temporary custody of the Department pending an investigation.

[20] While the case record indicates that Janetta began counseling at the Kappa Center (KC) in August 1999, and in September 2002, she was accepted for counseling at the KC pending assignment of a counselor, the KC reported having no record for Janetta Munro.

records do not show that any of the fathers were involved in services or providing Janetta financial support:

>    Terrance Thomas, father of Terrance, Teresa, and Lilia
>    Oscar Denton, father of Stephanie
>    Hector Lansen, father of Tiffany
>    Unknown father of Calvin

The CST parenting assessment of Janetta in October 2001 noted that the young mother of four reported she did not have a support system or day care services, and that the children did not have a regular pediatrician; but she was taking them to the Santo County Health Department, when necessary. The CST recommended that Janetta would continue to benefit from parenting classes.

In an Occupational Therapy Initial Evaluation dated October 2003, 20-year-old Janetta was observed as "sad and cries silently during the evaluation. She appears aware of and responsive to the baby's needs…Mother states that she wants her children to have consistency in their lives because she knows what it is like to be in multiple placements since she has been a ward of the state most of her life and has lived in many different placements." It was recommended that Janetta would benefit from psychological or counseling services to discuss her feelings and "possible post-partum depression" with a professional with this expertise. Janetta's sixth child, Tiffany, a premature baby, would benefit from evaluations through an Early Childhood Intervention program. There was no indication in Janetta's case records that she participated in counseling services following the 2003 evaluation, or that Tiffany was referred for a 0-3 evaluation or received early childhood development services.

Post-emancipation

When DCFS guardianship ended in August 2004, 21-year-old Janetta was the mother of six children: Calvin, age 7, Lilia, 5 years/10 months, Teresa 5, Terrance 4, Stephanie 2, and Tiffany age 1. Days following her emancipation, Janetta notified Alpha staff that she gave birth to her seventh child (April Munro) in August 2004.[21] Janetta had also reported that the biological father of 5-year-old Teresa had made an informal childcare arrangement and that the caregiver filed for guardianship of Teresa in Santo County court.[22]

Ten months after leaving state care, Janetta gave birth to her eighth child, David Hayes-Munro, in June 2005. David was diagnosed with Tetralogy of Fallot, a congenital heart disease distinguished by four separate defects which result in the flow of oxygen-deficient blood throughout the body.[23] At 13 days old, David underwent surgery for a shunt placement in the heart as a temporary solution to help supply oxygenated blood through his body; David would require a permanent fixture when he was older. When David was ready for discharge, Janetta failed to pick him up for several days. The hospital contacted DCFS and Janetta reported that she was unable to get David because she had been evicted from her home.

In September 2005, Janetta brought three-month-old David to South Medical Center because he was not gaining weight. David was diagnosed with organic failure to thrive; his heart condition contributed to problems with feeding and weight gain. Janetta and her children were living in a homeless shelter when David was ready for discharge. Because David could not be released to his homeless mother, alternative

---

[21] April was reported to be the result of a rape. Janetta immediately surrendered the newborn for adoption through Uniting Child & Family Services. Alpha workers were unaware Janetta had been pregnant with April.
[22] The DCP investigation of David's death found that Teresa was in the care of godparents.
[23] National Institute of Health Medline, http://www.nlm.nih.gov.

placement arrangements were made through the hospital social worker.  In September 2005, David was discharged from the hospital to Stonehedge Nursing Home, a nursing facility, for follow-up care.[24]

David was admitted to Stonehedge Nursing Home with the diagnoses of Organic Failure to Thrive, Tetralogy of Fallot, asthma, umbilical hernia, poor weight gain, and developmental delay.  David's long-term care would require regular appointments with a cardiologist and possibly long-term medications. The combination of asthma and heart defect would increase the risk of respiratory distress, thus his need for respiratory therapy (nebulizer treatments, oxygen therapy and monitoring).   David lived in the nursing facility for two years, from September 2005 to October 2007, when he was discharged to his mother.

The Concord Center

*Voluntary Foster Care Placement*
In March 2006, Janetta contacted The Concord Center to report that she was homeless and could not keep her children.  As one of her children was previously injured at a homeless shelter, Janetta did not wish to reenter a shelter.  Terrance (age 5), Stephanie (age 3), and Tiffany (age 2) were voluntarily placed in foster care through The Concord Center for two weeks and returned to their mother.  Nine-month-old David was living at Stonehedge Nursing Home.  By this time, Janetta's three oldest children, Calvin, Lilia and Teresa, were not living with their mother.[25]

While the three children were in voluntary placement, Concord staff called the child abuse hotline in March 2006 when five-year-old Terrance reported that his mother punches him in the mouth and pushes his sister in the head. The allegation was unfounded.[26]  In March, Janetta and her three children moved in with Janetta's mother, Minnie Sawyer, but they had an argument regarding the maternal grandmother's discipline methods, and in March Janetta phoned the DCFS hotline from a police station to report that her family was homeless. Her call was taken for investigation of #77-inadequate shelter. The three children re-entered foster care on a voluntary basis through The Concord Center for two weeks.

During the sequence C investigation, 5-year-old Terrance told the child protection investigator (CPI) that he did not want to return to his father's house because his "father whips him with a belt and is mean to him."  Three-year-old Stephanie said that Mr. Sam Hayes (biological father of David Hayes-Munro) was mean and tried to hit her with a belt, but that he was not mean to her mother. Janetta reported that she would receive $800 per month in supplemental security income (SSI) for her son David upon his discharge from the nursing facility.  The head nurse at Stonehedge Nursing Home informed the CPI that "David is only here due to the mother's social issues and they are willing to keep David as long as the mother allows."

The CPI wrote, "Janetta has tried to put her children in a safe environment by going to The Concord Center and requesting temporary voluntary foster care.  She is crying out for help.  This is more of a case seeking assistance to prevent neglect or abuse."  The CPI screened Janetta for domestic violence. Janetta reported incidents of domestic violence between herself and former and current partners.  Janetta reported that police had been to the home to investigate domestic violence, Sam Hayes had hit, slapped, and pushed her, he never gave her money to see her baby in the hospital, he would tell her she can not go anywhere, and he would use the baby when he was in the hospital to track her down. The CPI completed

---

[24] The Stonehedge Nursing Home has since changed ownership and was renamed The Village.
[25] Records show that Calvin, Lilia, and Teresa had been living with [paternal] family members for an unspecified time. Names and addresses of the relatives were not found in Concord's records.
[26] Although the DCP report was expunged, information pertaining to the allegation was found in Concord's Social History dated April 2006, and initial Client Service Plan dated May 2006.

an Adult Substance Abuse Screen for Janetta, which was negative for drug use; but she did report that she had non-drug related criminal charges.

In April 2006 an intact family services case was opened and assigned to The Concord Center for services. A copy of the DCP report was in The Concord Center's intact family file. The CPI recommended referrals for housing assistance, domestic violence counseling, and individual counseling. Janetta agreed to participate in services.

***Intact Family Case Opening***

The Concord Center provided intact family services to Janetta and her family for 20 months, from April 2006 to December 2007. During the open intact case, the family had two workers – Wendy Garza worked with the family for the first four months until the case was transferred to intact worker Nancy Ladd in July 2006. Ms. Ladd worked with the family until the intact case closed. Gladys Patterson was the supervisor of both workers.

When the intact case was opened in April 2006, Janetta and her three children were living with Sam Hayes. The CPI had referred the family to Sanford Housing Services for Section 8 housing. The children needed to be enrolled in kindergarten and Head Start. The CPI had completed a domestic violence screen in which Janetta reported she had an abusive relationship with Sam Hayes.

<u>Domestic Violence</u>

Intact worker Wendy Garza completed a Social History April 30, 2006 in which she noted:

> The family has also lived with one of the children's father, Sam Hayes, who mother reports is abusive[27] to her and her children…Janetta is currently romantically involved with Sam Hayes…Janetta reports that on occasion Mr. Hayes has been physically abusive towards her. At times she describes him as unsupportive of her and her children. She and the children are currently residing with Mr. Hayes. Janetta does not report any concerns about her or the children's safety in Mr. Hayes's presence. [Her two oldest] children have been cared for by relatives since birth…[28] Janetta has not visited David in the nursing facility on a regular basis. She reports that she wants him to return home but she worries about meeting his medical needs…The family resides in a one bedroom apartment…in the home is three mattresses placed on the floor…[Janetta] has no source of income at this time. She receives food stamps. David [her son] receives approximately $900 from Social Security; however, those funds are given to the nursing facility.[29] Recommendations: stable housing, parenting education and support, children's enrollment in educational programs, address concerns of domestic violence in the home, and individual therapy for the mother.

In May 2006, Janetta told intact worker Wendy Garza that her younger children's father, Sam Hayes, was often physically aggressive toward her and was tired of having her and the children in his home. Janetta and her children moved in with a friend who lived in the same building as Mr. Hayes, but the mother and children returned to the father's apartment a week later. On June 1, Janetta reported that Sam Hayes had a short temper of late, but his anger and frustration was directed towards her, not the children. (The same

---

[27] A Leads check was not completed for Sam Hayes during the C-sequence DCP investigation.

[28] The names of the children, their father(s) or caretaking relatives were not noted.

[29] Per the Social Security Administration, Office of Inspector General, Janetta Munro never filed for benefits for herself or her other children. Only David was receiving Supplemental Security Income (SSI) which went to Stonehedge Nursing Home until October 2007.

day Ms. Garza observed Stephanie with a swollen lip. See section of this report: *Children's Unreported Injuries/Inadequate Supervision*).  A day later, Janetta left word for the worker that she and the children were going to stay with her mother.  Two weeks later Janetta and her children returned to Mr. Hayes's apartment.

In August 2007, intact worker Nancy Ladd observed Janetta with a black eye.  Janetta reported that Mr. Hayes hit her. The children, who showed no signs of abuse, witnessed the incident and told Ms. Ladd that Mr. Hayes hurt their mother.  Terrance, age 7, disclosed to the worker that he was afraid of Sam Hayes, but that Mr. Hayes was not around a lot, so it was okay.  Janetta, who was about to move into her own place, said she felt safe staying in Mr. Hayes's apartment for the next few days, as he was frequently out of the home; if they were in danger, she would go to her mother's home.  On August 29, 2007, Janetta informed Ms. Ladd that Mr. Hayes was hospitalized after attempting suicide by taking over-the-counter pain medication. Janetta also introduced her 10-year-old son Calvin to Ms. Ladd.  Calvin was now living with his mother and siblings.[30]  In a supervisory note (8/07), Gladys Patterson wrote, "Refer to domestic violence program."

On November 26, 2007 Janetta informed Ms. Ladd that her 9-year-old daughter Lilia was staying with her, because the child said her father (Terrance Thomas) was hitting her.[31]  Two days later, Ms. Ladd observed Janetta with a laceration on her face that required stitches. Janetta related that Lilia's father came for the child; but when she refused to allow Lilia to leave with him, he hit Janetta.  The landlord called the police and the father was arrested.[32]

On November 28, 2007, Janetta told Ms. Ladd that Mr. Hayes was moving into her new apartment. Also, her brother, Tyrone, a schoolteacher, was available to assist with the children.  According to Ms. Patterson's supervisory note of November 30, Janetta "now has all eight of her children living in the home[33]…and Mother's brother is staying in the home. The worker will do a background check."[34]

During the open intact family case, The Concord Center staff did not make a referral for domestic violence assessment and counseling for either Janetta or Sam Hayes.  The intact file did not contain LEADS information for Sam Hayes, and there was no indication that The Concord Center staff sought information from the Police Department to determine whether calls were received from the Hayes/Munro residence.  From September 2006 to February 2007, Janetta and the children lived in a women's homeless shelter, Helen's Safe Haven,[35] but they also spent time at Mr. Hayes's apartment during this period.

The OIG conducted a LEADS check.[36]  Mr. Hayes has no convictions in his adult record. He was arrested three times (twice in 2005 and once in 2007) for damaging property, battery and fleeing police, and in

---

[30] The intact file does not explain how Calvin came to live with Janetta, only that Janetta said she had been trying to contact "Calvin's guardian."

[31] Ms. Ladd advised Janetta to call the hotline. Janetta later reported that they [SCR] did not take the call. The father's name was not noted in the case note.  The OIG conducted a Leads check on Terrance Thomas. He has no convictions. Mr. Thomas was arrested twice for domestic battery in 2002 and 2007, which were stricken on leave. The 2007 arrest report was related to the incident involving Janetta, the victim.

[32]  The father had custody of Lilia and in December 2007 Lilia returned to her paternal family.

[33] In November 2007 Calvin, Terrance, Stephanie, Tiffany, David, Keith, Brian and Lilia were in Janetta's care.

[34] DCFS records show that Tyrone Munro completed college and was a school teacher. The OIG completed a Leads check on Tyrone Munro; he had a negative history (no arrests or convictions) as of December 2007.

[35]  Helen's Safe Haven operates a shelter for women and children who are victims of domestic violence, homelessness and recovering from substance abuse.  Shelter stay is 90 days.

[36] At the age of 14, Sam Hayes was charged as a juvenile with aggravated criminal sexual assault of his 9-year-old stepsister.

2007 he was given 12 months of supervision for theft. Janetta has one arrest in 2004 for criminal trespass to vehicle, and no convictions.

***Police Reports***

Police records of calls to Sam Hayes and Janetta Munro's residence consisted of four police reports in which Sam Hayes was identified as the victim in three of the four reports (see below). There were two additional calls to the residence (April 2005 and March, 2006) that identified Sam Hayes or Janetta Munro as the complainant for which there were no available reports.

> On November 24, 2005 at 11:40 a.m. an incident of domestic battery was reported in which Sam Hayes was identified as the victim. Mr. Hayes stated that he and Janetta Munro got into a verbal altercation. Mr. Hayes stated that Ms. Munro struck him in the head several times with an open hand. Mr. Hayes grabbed Ms. Munro's arms to stop the hitting. Ms. Munro bit Mr. Hayes four times on the left arm and once on the right arm. Mr. Hayes pushed Ms. Munro out into the hallway of the building and called the police. The police observed bite marks on Mr. Hayes who refused medical attention or sign a complaint. Ms. Munro related that she bit Mr. Hayes because he struck her in the face and threw her to the floor causing bruising to her back. The police observed no marks on Ms. Munro. Both were provided copies of the Illinois Domestic Violence Act.

> On January 25, 2006 at 10 p.m. an incident of domestic battery was reported in which Mr. Hayes was identified as the victim. Mr. Hayes told the police that he and Ms. Munro were involved in a mutually combative fight. They argued about Ms. Munro leaving their children unattended while she went to talk to a neighbor in his apartment in the same building. Police observed a bite mark on Mr. Hayes's right hand. Ms. Munro related that Mr. Hayes struck her in the face. The police did not observe any visible marks. Both parties refused medical attention or sign complaints. Ms. Munro and their three children (Tiffany, Stephanie and Terrance) left the apartment to stay with her brother in the city.

> On April 21, 2006 at 1:30 p.m. an incident of a disturbance and a man with a knife was reported in which Mr. Hayes was identified as the victim. When the police arrived, Mr. Hayes was standing outside his apartment building. He told the officers that Cary Greene approached Mr. Hayes with a knife and ran back into the building. Mr. Greene was found with a small steak knife in his pocket; he denied pulling it out or intent to use it. Further investigation revealed that there was a misunderstanding surrounding a visit that Janetta Munro made, accompanied by her children, to see Mr. Greene's brother in the same building. Mr. Hayes later retracted his statement about the knife being pulled on him.

> On April 30, 2006 at 3:30 p.m. an incident of domestic battery was reported in which Janetta Munro was identified as the victim. Ms. Munro stated that she was involved in a verbal dispute with "her ex-boyfriend Sam Hayes." Ms. Munro related that Mr. Hayes lives in the same building. Mr. Hayes slapped her face as they argued in the hallway outside of Ms. Munro's apartment. Ms. Munro did not want Mr. Hayes arrested, but to stay away from her. Ms. Munro refused medical attention, stating that the slap did not hurt her. The police attempted to contact Mr. Hayes at his residence with no result.

<u>Children's Unreported Injuries/Inadequate Supervision</u>

Less than two months after the intact case was opened, the first intact worker, Wendy Garza, observed "Stephanie had a fat lip" on June 1, 2006. Janetta told Ms. Garza that Tiffany punched Stephanie, and

Ms. Garza wrote, "Both girls confirm the story."[37]  Ms. Garza did not call the hotline.  On June 19, Ms. Garza saw the family and noted that Janetta grabbed Tiffany and Stephanie roughly by the arm when they started fighting. The worker talked with Janetta about parenting services.

On August 28, 2006, Janetta (age 23) informed Ms. Ladd that she delivered a baby boy, Keith Munro, over the weekend.  Janetta said she had not informed Ms. Ladd of the pregnancy because she planned to have an abortion, but did not have enough money.  She stated that she and Mr. Hayes had decided to give the child up for adoption because of their situation.  Janetta said that she felt unsupported by Mr. Hayes, who made it clear that he did not want the child.  Janetta and the worker went to the hospital to bring the newborn home.  Ms. Ladd later returned to the home, accompanied by a case aide and with baby supplies, clothing and a bassinet.  Ms. Ladd wrote that while at the home,

> This worker attempted to talk with Sam about the baby, but he was unwilling to discuss anything with this worker and indicated that he had enough stress without the addition of a new baby.  NM [Janetta Munro] asked this worker what she thought about the new baby coming home and if it was the right decision.  This worker explained that she needs to make that decision and encouraged her to talk with Sam.

After asking the workers to step outside, Janetta attempted to discuss options with Mr. Hayes, who locked himself in the bathroom and refused to talk with her.  Janetta then informed Ms. Ladd that she decided to keep her son. When Ms. Ladd shared her concerns and asked Janetta to thoroughly consider her options, Janetta told her there was nothing to discuss.

Ms. Ladd recorded the following observations at three home visits in September 2006: on September 18 she found one-month-old Keith sleeping on a mattress on the floor on his stomach. The worker explained to Janetta the risk associated with this and Janetta said she usually puts the baby in the bassinet. Stephanie and Tiffany were extremely active and defiant towards their mother. "Several times NM [natural mother] had to physically remove potentially dangerous items from their hands. At one point Tiffany had a broom that she was swinging very close to the baby, and Stephanie has an aluminum can top that NM took away from her." On September 20, Stephanie and Tiffany were "extremely aggressive towards these workers (Ms. Ladd and intern Diane Webb), both physically and verbally." Janetta was unable to control the children.  Also, while driving Janetta and her one-month-old son Keith to the store, Janetta removed the infant from his car seat because he was crying. Ms. Ladd explained the danger to the mother.  On September 21, Keith exhibited "very shaky hands and arms."  Janetta explained how difficult it was for him to sleep because of all of the chaos in the home.[38]  Tiffany was physically aggressive towards the workers.  Janetta attempted to calm Tiffany by grabbing her arm tightly and forcing her to sit in her lap, which was ineffective.  Janetta related that she was having the most difficult time with Tiffany's behavior and that the child was aggressive with baby Keith. "She has slapped her and attempted to bite her hands."[sic]

In October 2006, while living in a shelter, Janetta informed Ms. Ladd that 3-year-old Tiffany sustained a head injury at Helen's Safe Haven when a teenager pushed her into a wall.  Tiffany received staples in her head at an ER and was released.  A week later, on October 30, Ms. Ladd observed the staples in Tiffany's head as well as a bruise to the child's right eye.  Janetta explained that Tiffany had fallen at Head Start and that Helen's Safe Haven completed an incident report.  Ms. Patterson's supervisory note of November 1 stated "Worker observed Tiffany with a black eye, mother stated that she fell at the shelter, the worker will verify this with shelter staff."

---

[37]  Stephanie was 3 years and 9 months old; Tiffany was 2 years and 9 months old.
[38]  Keith's medical records from The Eastside Medical Center indicate he was a healthy baby.

Four months later, in February 2007, Ms. Ladd observed that Tiffany had a bruise on her left eye. Janetta explained that the child was playing with a pay phone when it fell off the receiver and hit her in the eye, and that Helen's Safe Haven completed an incident report. Ms. Ladd wrote, "This bruise appears to be consistent with the story given by both NM [natural mother] and the children."

The Concord Center's intact file did not indicate that Ms. Ladd obtained corroboration from Helen's shelter staff or the Head Start staff regarding Tiffany's injuries, which her mother reported occurred at their facilities. According to Helen's Safe Haven records, one Incident Report was filed pertaining to the injury to Tiffany's head on October 19, 2006. The account collaborated Janetta's explanation. There were no notations regarding bruises to Tiffany's right and left eye. According to the file, shelter staff had no contact with The Concord Center's staff.[39]

The OIG found no incident reports in October 2006 or February 2007 on Tiffany in the Head Start files, but case management notes for Tiffany reflect that on Thursday, March 15, 2007 Janetta called to report that Tiffany was taken to the emergency room after "she ran into a concrete wall and has 3 stitches in her head." Tiffany returned to school Tuesday, March 20. Regarding Stephanie, it was noted in the Head Start staff file that on January 11, 2007 Stephanie arrived with "a busted lip. She had been crying, she said, 'My sister pushed me out the bed.'"

In a supervisory note dated August 29, 2007, Ms. Patterson wrote that Tiffany had begun wetting herself. Two weeks later, Ms. Ladd recorded that during a home visit on September 13, Janetta related an incident in which Janetta's 6-year-old brother, Darius, burned 4-year-old Tiffany with an iron, while Janetta was in the shower. Janetta showed the worker a scar on Tiffany's leg. Janetta then talked about her concern with her own mother's parenting and that she will not allow her mother, Minnie Sawyer, to be around the children unsupervised. In the contact note, Ms. Ladd did not describe the burn mark, its size or note the date of the incident. She did not ask about witnesses, including Minnie Sawyer, or speak with the children about the incident. Ms. Ladd reminded the mother about proper supervision. She did not call the hotline.

On December 12, 2007, Ms. Ladd made her last home visit prior to David's death.[40] David had been home nearly two months. Janetta reported that she was struggling with toilet training David. Ms. Ladd wrote that she observed a bruise on the right side of David's forehead and that Janetta reported she found Tiffany on top of David, hitting him. Janetta tried to get Tiffany (age 4) to talk about the incident with Ms. Ladd, but the child put her head down and refused to answer. Janetta talked again about her children's physical aggression and Ms. Ladd discussed the importance of supervision. Janetta said she was ready for counseling and needed it because of the stress in caring for all the children with little support.

A homemaker had been servicing the family since October 2007. In a supervisory note dated December 13, 2007 Ms. Patterson noted Ms. Ladd's observation of a bruise on David's head and the mother's account that "the kids beat him up, Tiffany pushed him down." Ms. Patterson wrote, "Worker follow-up with homemaker regarding report that the siblings are causing injury to David. No current safety concerns." According to the intact file, Ms. Ladd did not follow up with the homemaker regarding David's bruise or toilet training.

---

[39] The shelter's exit interview of Janetta in February 2007 noted that she was in compliance during her stay. Her room was always neat and clean, her children were always clean and well-dressed, and put to bed in a timely manner. No alcohol or drug issues, past or present, were reported.

[40] A 0-3 team from a child development agency was in the home completing an evaluation of David.

David Hayes-Munro

In July 2006, three months after the intact case was opened, Janetta told Ms. Ladd that she was ready to bring David home and felt prepared as she had attended several trainings at Stonehedge Nursing Home regarding his care needs. She also reported that David's father, Sam Hayes, was unemployed, but receiving money from his parents in Wisconsin. On July 24, 2006, David's case manager at Stonehedge contacted Ms. Ladd to schedule a staffing to discuss discharge planning for one-year-old David, who had been living at the facility for 10 months. The case manager expressed her concerns to Ms. Ladd regarding Janetta's unstable housing, inaccessibility by phone, and needed training, prior to discharge, on David's high level of special needs.

Janetta and Ms. Ladd attended a July 27 staffing,[41] where it was reported that one-year-old David had made great gains developmentally (functioning at eight months old in motor and social skills). He was continuing to have respiratory issues and required regular oxygen treatments. Eating was still a concern; he was taking a bottle, but eating small amounts of solid food.[42] He was receiving various therapies five times a week. It was recommended that he remain at Stonehedge four to six months longer and that Janetta participate in his services as much as possible. She agreed to participate one day a week.

On October 19, 2006, Ms. Ladd received a call from the Stonehedge case manager to report:

> David's doctor had many concerns regarding the appropriateness of David's placement. David is now almost two years old and needs to have a primary caregiver to bond and attach to…[The case manager] will talk with her supervisor…about how to initiate a more permanent living arrangement for David…*NM has not visited since July.* David has made progress since the last staffing in July. He has an increased appetite and is starting to talk. He currently has RSV which is a viral infection. [Italics inserted by OIG]

In the same phone conversation, Ms. Ladd informed the Stonehedge case manager,

> She [Janetta] had another child and is living in a homeless shelter. This worker expressed Concord's concerns regarding NM's ability to care for David due to her limited support system, financial resources and lack of parenting skills.

In a subsequent phone conversation on November 10, 2006, the Stonehedge case manager told Ms. Ladd that she talked with Janetta about her inadequate involvement with David and encouraged her to visit weekly. The case manager informed Ms. Ladd that Janetta had a babysitter and could visit David whenever she wanted.[43] The case manager said she was not planning to call the hotline at that time as she did not want to damage their working relationship. Ms. Ladd suggested a staffing and stated that Janetta continued to live in a homeless shelter and was struggling with caring for her four children.

Janetta and Ms. Ladd attended a staffing at Stonehedge in December 2006. David, 19 months old, was transitioning from bottle feeding to soft foods, but was still at risk for choking. David's most significant

---

[41] Biological father Sam Hayes was not present.

[42] David had received nasogastric feeds (feeding tube is inserted in the nose, toward back of throat and down the esophagus or feeding canal) for a period of time because he was not gaining enough weight through oral feeds. Tube feeding is a way to feed children who are not able to suck or swallow well enough to provide good nutrition. Most children are able to eat normally after medical problems have improved.

[43] Information regarding hours of babysitter availability was not in Stonehedge's records and Concord's file has no babysitting information. Per the intact file, Concord staff had little knowledge of Janetta's extended family members.

delay was his verbal skills and he required close supervision because of weak balance. He had been in isolation in December because of MRSA.[44] He continued to receive occupational, physical, speech and language pathology therapies. His only medication was Zantac for acid reflux. All agreed the child was ready to enter a home setting, but Janetta needed to demonstrate that she could provide an appropriate environment. It was recommended that she attend weekly sessions at Stonehedge to learn how to care for him. When Stonehedge staff inquired about David entering foster care until Janetta was ready for him, Ms. Ladd responded that *the duration of voluntary foster placements was only two weeks and that Janetta needed more than that to obtain housing.* There was no discussion of the option to screen David on dependency with the State's Attorney's Office, and the intact case had been open eight months. [Italics inserted by OIG]

On January 18, 2007, Janetta informed Ms. Ladd that she had been attending trainings at Stonehedge on David's care and was attending a training that afternoon. Four days later, Stonehedge staff notified Ms. Ladd that Janetta had not attended scheduled trainings (January 16 and 17), and did not call to reschedule. Ms. Ladd said she would discuss the issue with Janetta. Ms. Ladd wrote in a subsequent contact note (February 2, 2007) that Janetta said she missed the trainings because she was busy trying to find a place. Ms. Ladd encouraged her to reschedule the trainings, and wrote that Janetta understood that David could not come home until she completed the trainings. Ms. Ladd's contact note did not address Janetta's false reporting.

In February 2007, Ms. Ladd confirmed that Janetta attended a training with David's occupational therapist on February 10, 2007. Ms. Ladd asked the therapist if she had concerns about Janetta's ability to parent David and meet his special needs. The therapist was not comfortable answering the question and asked for Ms. Ladd's concerns which were:

> NM's minimal parenting skills and the fact that she is just barely able to handle the four kids in her care…there are concerns regarding David's lack of attachment to NM and his siblings due to the lack of regular and consistent contact on the part of NM…This worker [Ms. Ladd] related that it is necessary for NM to hear the concerns coming from [Stonehedge] staff and was concerned that these issues were not addressed at the last staffing…

Gladys Patterson wrote in a supervisory note on February 21, 2007,

> Mother has talked to the worker about possibly putting David up for adoption. She feels that she can not care for him with the other children and keep him safe from his siblings.

At a Child and Family Team meeting at The Concord Center on February 26, intact staff[45] and Janetta discussed David's need to be discharged from the nursing facility, Janetta's options for a long term plan for him, and the need for a decision. Ms. Ladd wrote,

> [Janetta] expressed several times that she was unable to take care of David and meet his needs while meeting the needs of the other children. She feels very overwhelmed with current responsibilities and is struggling as a single parent…NF [Sam Hayes] is of no support to her with the children…NM expressed having a very difficult time making this decision and acknowledged how her own history of abuse and neglect was impacting her

---

[44] Methicillan-resistant Staphylococcus Aureus (MRSA) is a virus that has come from the staph infection virus known as Staph Aureus.
[45] Intact family staff present was Nancy Ladd and Gladys Patterson, and intern Diane Webb. Mr. Sam Hayes was not present.

ability to make the decision. Workers praised her for accomplishing what she has accomplished on her own so far…NM to talk with NF and make a decision for a long term plan for David. *At this point Concord will begin assisting NM with either a plan for a private adoption, screening David in juvenile court or supporting her in him returning to her care.* [Italics inserted by OIG]

Ms. Ladd and Ms. Patterson attended a clinical staffing on March 16, 2007 at Stonehedge Nursing Home. Ms. Ladd wrote that 21-month-old David was making steady gains and was at 18 months developmentally, and that "*feeding continues to be biggest issue...potty training beginning.*"  *Janetta had not visited since December 2006.*  No foster family had been identified and the plan was "to continue to concurrent plan with natural mother for David's long term placement needs.  David will continue to reside at Stonehedge Nursing Home." [Italics inserted by OIG]

At a Child and Family Team staffing at The Concord Center[46] on May 14, 2007, Janetta expressed her desire to parent David.  Discussion centered on the need for Janetta to visit David on a regular and consistent basis in order to build a relationship with him, and to participate in trainings on his care.  They "Discussed permanency alternatives for David should he not return to her care," but no details were recorded.

On August 21, 2007, Ms. Ladd notified Stonehedge staff that Janetta was about to move into her own apartment and that she wanted David with her "and feels more capable to have him returned to her now that she has secured her own living arrangement."  It was during this time that 10-year-old Calvin joined his mother and four siblings (Terrance, Stephanie, Tiffany, Keith).

A Child and Family Team meeting was held at Concord on October 3, 2007[47] to discuss a discharge plan for David.  It was noted that David was "ready to be toilet trained…David is beginning to develop physically aggressive behaviors. He bites his hands when mad. He is quick to temper tantrum."

From the time that the intact case was opened on April 17, 2006, and until the beginning of October 2007, Janetta visited David 9 times, and Sam Hayes visited his son twice.[48]  In October 2007, Janetta visited three times in preparing for 2-year-old David's discharge home on October 19.  During an 18-month period that David was in Stonehedge, there were three 3-month intervals in which Janetta did not visit her child (August-October 2006, March-May 2007, and July-September 2007)

**Dates of Parent Visits with David at Stonehedge (April 2006 to October 19, 2007)**

| Janetta Munro | Sam Hayes |
|---|---|
| 05/07/2006 | 03/30/2006 |
| 06/04/2006 | 06/04/2006 |
| 06/28/2006 | |
| 07/27/2006 | |
| 12/25/2006 | |
| 12/29/2006 | |
| 01/10/2007 | |
| 02/10/2007 | |
| 06/04/2007 | |

[46] The meeting was attended by Janetta Munro, Nancy Ladd, Gladys Patterson, Diane Webb (intern), and Jane Dearborn (case aide).

[47] Staffing was attended by Janetta Munro, Nancy Ladd, Gladys Patterson, student intern Yolanda Cruz; and Stonehedge's Activity Director and case manager.  Mr. Sam Hayes was not present.

[48] Per Stonehedge Nursing Home's records including resident's visitor sign-in log.  There was no record of a visit by maternal grandmother, Minnie Sawyer.  Janetta's sister, Angela Munro, visited on June 4, 2006.

*David Returns Home*

In October 2007, Ms. Ladd and Ms. Patterson transported Janetta and three of her children (Stephanie, Tiffany and Keith) to Stonehedge to pick up David, who was being discharged to his mother.  Calvin, age 10, and Terrance, age 7, had been left at home.

David was 28 months old and functioning at 20 months.  According to the Post Discharge Plan of Care, David was "ready for toilet training," he required nebulizer treatments twice a day, and a respiratory therapist was scheduled to visit the home the next day. David was to receive a soft diet with ground or chopped meat, no raw vegetables and no candies. Janetta was provided a list of high risk foods and unsafe toys, and instructions for child proofing her home. She was given the physician's orders and cardiology appointment information, a nebulizer machine, and one month supply of medication, Zyrtec and Zantac. The Plan noted "tantrums" to describe David's behavior, and that he had a speech delay and wore prescription glasses.  The Plan also noted that Janetta did not have a phone in the home and was "provided Trac phone for emergencies."[49]

The Concord Center staff returned the family to their home and upon their arrival they found that maternal grandmother, Minnie Sawyer, had dropped off her two children at Janetta's apartment. Janetta had eight children in the home that day.

In October, Ms. Ladd arranged for Overton Homemaker Services for the family.  The homemaker services consisted of parenting skills development, budgeting, household chores, and some child supervision to allow Janetta to keep appointments and run errands.  The Concord Center approved 20 hours weekly (4 hours a day, 5 days a week).  A limit on length of service was not noted in any of the records.   Overton's homemaker, Cathy Weaver, started October 29, 2007, ten days after David came home.

On October 29, Janetta called Ms. Ladd, following David's medical appointment. Janetta was upset because the cardiologist informed her that he will need more surgery in the future.  Ms. Ladd made an unannounced afternoon visit the next day and observed Calvin, Terrance, Stephanie, Tiffany, David and Keith as doing well. Janetta reported that David was doing well with eating, sleeping and breathing treatments, but she took issue with his older siblings babying him because she wanted David to be as independent as possible. Janetta said she was satisfied with the homemaker.

The homemaker's written progress report for the week of November 5-9, 2007 noted that Janetta and the homemaker were starting "pottie training and off the bottle. It's a little hard right now but where going to each at it."[sic][50]  The homemaker's supervisor wrote a case note stating that on November 7 Janetta requested more hours from the homemaker "because of her 2 year old son is beginning to have more complication with his heart one of his vails [sic] is beginning to leak. They are planning to do surgery again maybe in January."

At the next intact family home visit on November 12, Ms. Ladd noted that David was on time out for urinating on the floor.  The family was having breakfast.  Ms. Ladd checked on David, who was sitting on the bedroom floor watching TV.  Janetta expressed her frustration with toilet training. Ms. Ladd reminded Janetta that David was developing at a slower rate and encouraged patience. Ms. Ladd wrote that Janetta was also upset and displeased with Terrance's poor performance in school and that his teacher reported his difficulty staying on task. Janetta reported that Terrance was now receiving special education

---

[49] Trac phone is a pre-paid cell phone.
[50] While toilet training referred to David it is likely that 15-month-old Keith was being weaned from bottle feeding.

services.[51]  Ms. Patterson's supervisory note of November 16, 2007 reiterated Janetta's frustration with toilet training David and with Terrance's low grades.

In a phone call on November 26, Janetta told Ms. Ladd that her daughter, Lilia, age 9, was staying with her.[52]  Ms. Ladd visited the family two days later, at which time Janetta introduced her new baby, Brian. Janetta said he was a healthy, five-pound baby boy born on November 24 at South Hospital, and that she hid the pregnancy because she wanted to make her own decisions as to what to do with the baby. She reported that Sam Hayes was the baby's father, and though he wanted Janetta to give the baby up for adoption, she did not wish to do so.  Janetta reported that she had been very happy since Brian's birth.[53]

On Wednesday, December 12, Overton's program administrators, Velma Willard and Carmen Sylva, arrived at the Munro home to meet with Janetta and Ms. Ladd to discuss Janetta's request for increased homemaker hours.[54]  Per Overton's record, the administrators did not meet with Ms. Ladd. They were in the home from 2 p.m. to about 3:30 p.m., but Ms. Ladd did not show up for the meeting.  While there, Ms. Willard "noticed a small bruise above David's right eye. When Ms. Munro was asked about it, she stated that he had fallen out of bed." Janetta said she needed more homemaker hours and complained, "Now she [homemaker] just gets in my way because by the time I get the children ready to go anywhere, it's time for her to go. She's just in my way."  Janetta told them that she wanted to get herself together and that no one was going to take her children.

Ms. Ladd wrote in a case note that she arrived at the home at 3:00 p.m. on December 12 for a scheduled home visit, but made no mention of a meeting with Overton or that the administrators had been to the home.[55]  She and Janetta discussed the homemaker services; Janetta said she likes the service, but complained that the homemaker was not providing the hours that were agreed on.  Janetta again reported to Ms. Ladd that she was struggling with toilet training David. Ms. Ladd "observed a bruise on the right side of David's forehead" and asked Janetta about it. Janetta stated that she found Tiffany (age 4) on top of David, hitting him, which resulted in the bruise to his head.  Janetta said she was ready for counseling and felt she needed it because of the stress in caring for all the children with little support or breaks. This was Ms. Ladd's last home visit to the Munro home, as David died three days later.
In a progress report for the week of December 10-14 the homemaker wrote,

> This week was a little different then any other week because Miss Munro did her day to day work only two days…and then the other days she stayed in the room with the kids. They only came out to eat and then they all went back into the room. Miss Munro said that she wasn't feeling to well. [sic]

Overton's administrator Velma Willard completed an Incident Report, dated December 24, 2007, following David's death.  In the report, Ms. Willard wrote that the family's homemaker, Cathy Weaver,

---

[51] A copy of Terrance's Individual Education Plan (IEP) was not in Concord's intact file, even though Janetta had signed consents for release of information from his school to Concord effective 9/07-9/08.
[52] Lilia was returned to her paternal family on December 10, 2007.
[53] The homemaker wrote that in the week of December 3-6 Janetta was back on her feet and helping with meals and housekeeping.
[54] Ms. Willard informed OIG investigators that the homemaker services supervisor, Carmen Sylva, scheduled the meeting with Nancy Ladd. Ms. Willard wrote that the homemaker was in the home as well as a 0-3 team from a child development agency to evaluate David.
[55] Ms. Ladd wrote that a 0-3 team was at the home for David. Ms. Ladd informed OIG investigators that she did not recall scheduling a meeting with Overton in December 2007.  Scheduling a meeting was not recorded in the intact family or homemaker service file.

stated that on Thursday, December 13, Janetta informed the homemaker that she was not to come to the home anymore.[56] Janetta was upset about the amount of hours the homemaker had been assigned.

In an OIG interview, Ms. Willard stated that a decision to increase the homemaker's hours could not be made on December 12 in the absence of Ms. Ladd.  Regarding the bruise on David's face, Ms. Willard said she could not be more specific about its appearance or when the injury occurred. She recalled that the homemaker stated that David did have a bruise on Monday or Tuesday, December 10 or 11.  Ms. Willard stated that Janetta wanted more help, but was not specific. Ms. Willard had the impression that the mother was overwhelmed.  Ms. Willard stated that no adult family members were at the home on December 12, but the homemaker had previously reported that Janetta's brother helped with the children. The homemaker informed Ms. Willard that on the last day she was at the Munro home, Friday December 14, 2007, Janetta told the homemaker that if she was not getting more hours of service, then she did not want the homemaker. After Janetta returned to her room with the children that day, the homemaker waited an hour, but Janetta and the children did not come out, so she left.

Mental Health and Parenting Services

During the 21 months of intact family services, Janetta attended two sessions of parenting classes at The Concord Center on February 22, 2007 and March 15, 2007.  Each session was an hour and a half in length.  Janetta did not participate in mental health services or home-based counseling.

At the start of intact family services, supervisor Gladys Patterson wrote on April 26, 2006 that Janetta was to be referred to Omega for parenting services.[57]  Ms. Patterson observed Janetta on June 27, 2006 and wrote, "Mother seemed to be depressed and overwhelmed with the children. Referred her again to Neighborhood Family Services for individual therapy…"

On July 7, 2006, Gladys Patterson wrote in a supervisory note,

> Mother has been referred several times to Omega for in-home parenting services to help her learn how to appropriately set limits and consequences with the children. Also has been referred to Neighborhood Family Services for therapy to address her apparent depression.

In September 2006, Ms. Ladd referred Janetta to Omega for home-based parenting services. Ms. Ladd informed the agency that "the family's stress level was high and income low; they live in a small one-bedroom apartment with the father of the three youngest children. Terrance must repeat Kindergarten. She is overwhelmed with all she has to deal with, and has a difficult time managing the children's behavior. The Concord Center believes that Mom is teachable as far as parenting skills." Ms. Ladd's immediate concern had to do with Janetta's ability to keep the older children away from the newborn, Keith.  Ms. Ladd and staff from Omega met at Janetta's home on September 21, 2006. Ms. Ladd's case note described the meeting as "extremely chaotic" because of the children's disruptive behavior.

---

[56] The homemaker had not included this information in her weekly progress report.

[57] Omega Agency provides services designed to improve parenting skills, alleviate family isolation, strengthen family relationships and facilitate healthy development of parents and young children.  Omega offers parenting coaching, workshops and classes; parent-child interaction activities, individual and group counseling, childcare, weekly shared evening meals and transportation.

*Omega Parent-Child Center*

According to Omega's record, Janetta never had an active case.  Following an intake meeting on September 21, 2006, Janetta did not keep a subsequent appointment.  The Omega social worker wrote her observations during the initial meeting in the home, as well as a follow-up plan:  "While we were speaking to her, mom rarely made eye contact. She never smiled, and seemed to have a very flat affect. She seemed distracted and unable to focus on the conversation, which was repeatedly disrupted by her yelling at the children. Her yelling did not seem to come with any consequences…"  Tiffany was very active and aggressive. "She climbed all over the workers, pulled on them, and at times kicked and pushed them. She was unaffected by her mother's threats and couldn't be controlled. Janetta said that this is the most difficult part of her parenting." It was difficult to understand the children's language, including 6-year-old Terrance. Staff observed one-month-old Keith's arms "trembled significantly" and wondered if he had a neurological problem.  He calmed down and the tremors stopped when he was held. Janetta and Ms. Ladd attributed his tremors to daily exposure to stress and noise. "The family's stress level is high…" The family has a television, but no toys.  The Omega social worker wrote,

> One of the first things I think we need to address is Janetta's mental health. She seems like she may be experiencing depression, post-partum or otherwise…She needs to be helped first, in my opinion, in order for her to effectively work with her children…The Head Start program will be a positive resource for the younger children. Perhaps our drop-in group can also be a place for them to socialize with other children, learn appropriate behavior, and have an outlet for play…

Children's Unmet Education and Evaluation Needs

Prior to the family's involvement with The Concord Center, the Munro children had not been in educational programs or day care.  Janetta had not enrolled Terrance in kindergarten in September 2005, even though the child was 5 years/3 months old at the time.  When the intact family case was opened, the worker at that time, Wendy Garza, immediately began the process for school enrollment.[58] Terrance started kindergarten at Watson Elementary School in April 2006; however, six months passed before Stephanie and Tiffany were enrolled in a Head Start program in October 2006. Ms. Garza had also talked with Janetta about summer programs for the children, but they did not participate in recreational or educational summer programs in 2006 or 2007.

Stephanie and Tiffany were enrolled in a Head Start program for 4 half days per week, Mondays through Thursdays.  According to school records, neither child attended four days of school in any given week in the 2006-2007 school year.  The school records cited the children's excessive school absences in February 2007, a month in which Stephanie never attended and Tiffany attended one day.  The school provides transportation to and from home.

The table below illustrates Stephanie and Tiffany's attendance from October 23, 2006 to May 7, 2007, their last day in school.  Of 98 school days during this period, Stephanie attended 17 days or 17% and Tiffany attended 19 days or 19%.

---

[58] Ms. Garza took the children (Terrance, Stephanie, and Tiffany) for health examinations for school enrollment. Stephanie and Tiffany required current immunizations. Per the intact file, the Munro children received routine health care services from The Children's Clinic.

| Stephanie | Tiffany |
|---|---|
| **November 2006** ||
| - | Monday, 11/6 |
| Wednesday, 11/8 | - |
| - | Thursday, 11/9 |
| Tuesday, 11/14 | Tuesday, 11/14 |
| Thursday, 11/16 | Thursday, 11/16 |
| **December 2006** ||
| - | Monday, 12/4 |
| Tuesday, 12/5 | - |
| Wednesday, 12/13 | Wednesday, 12/13 |
| Monday, 12/18 | Tuesday, 12/19 |
| **January 2007** ||
| Tuesday, 1/9 | Tuesday 1/9 |
| Thursday, 1/11 | - |
| Tuesday, 1/23 | - |
| - | Wednesday, 1/24 |
| - | Thursday, 1/25 |
| **February 2007** ||
| - | Tuesday, 2/20 |
| **March 2007** ||
| Thursday, 3/1 | - |
| - | Thursday, 3/8 |
| Tuesday, 3/13 | Tuesday, 3/13 |
| Tuesday, 3/20 | Tuesday, 3/20 |
| **April 2007** ||
| Wednesday, 4/4 | Wednesday, 4/4 |
| Tuesday, 4/10 | Tuesday, 4/10 |
| Thursday, 4/19 | - |
| - | Wednesday, 4/25 |
| **May 2007** ||
| Wednesday, 5/2 | Wednesday, 5/2 |
| Monday, 5/7 | Monday, 5/7 |

The intact supervisor, Ms. Patterson, wrote that on March 19, 2007 Head Start staff notified her of the children's absences and Stephanie's need for an evaluation for services.  Also on March 19, Head Start staff requested a special education evaluation of Tiffany for reasons of attention deficit and speech concerns, and a special education evaluation for Stephanie, because of developmental concerns.  There was no record of completed evaluations.

Terrance's school attendance in 2005-2006 was poor. Consequently, he was re-enrolled in kindergarten in August 2006 and continued to have attendance problems.  In September 2006, Janetta told Ms. Ladd, "It is too much of a hassle for her to get the kids up and ready to take him [Terrance] to school and that she has too much to do during the day and waiting for him to get home from school gets in the way of this." On October 3, 2006, school personnel notified Ms. Ladd that they had not seen Terrance in two weeks. The school arranged transportation for Terrance so that he could attend morning and afternoon classes to catch up. A case study was not recommended at that time because Terrance had not attended school on a

regular basis and family factors affected his functioning. In January 2007, the school recommended Terrance be evaluated for speech, but there was no evidence in the file that Terrance was evaluated around that time. Ms. Patterson wrote that on May 25, 2007 the school reported that Terrance had missed several days and that Janetta attributed his absences to Mr. Hayes's incarceration.

After the family relocated in August 2007, the Concord staff helped Janetta to enroll Terrance (age 7) and Calvin (age 10) at Holland School on September 6, 2007. A Head Start program was located for Stephanie and Tiffany.

| | | | | |
|---|---|---|---|---|
| **Terrance** | Recommended school enrollment in April 2006 | Kindergarten enrollment, Watson Elementary in April 2006<br><br>Re-enrolled in kindergarten at Watson in August 2006 | Excessive absences in 2006-2007 school year | June 2007 evaluated as eligible for special education (speech and language services)<br><br>Enrolled in first grade in September 2007 at Holland Elementary |
| **Stephanie** | Recommended enrollment in Head Start in April 2006 | Enrolled in Head Start in week of October 22, 2006 | March 2007: school reports Stephanie is not attending; school refers her for special education evaluation. She missed hearing/vision test. | |
| **Tiffany** | Recommended enrollment in Head Start in April 2006 | Enrolled in Head Start in week of October 22, 2006 | March 2007: school reports Tiffany is not attending. She did not pass a hearing/vision test. Referred for special education evaluation. | |

<u>Housing</u>

Shortly after the intact family case opened, Sanford Housing Services had informed Janetta and the intact staff that the family would not have a housing voucher for possibly a year (Ms. Patterson's Supervisory Note, May 22, 2006). According to the intact file, Janetta's plan was to use David's SSI ($800 monthly) as income when he returned home, which she believed would help her secure housing through Sanford. Janetta reported in July 2006 that she was in the process of applying for TANF assistance,[59] but it was not until April 2007 that the family was approved for TANF cash assistance; approval was reversed in May 2007 because Janetta refused to provide information on the children's fathers for child support purposes.

---

[59] Janetta received assistance through WIC (Women, Infants and Children Supplemental Food Program) and she was issued a Link card through the Department of Human Services to access cash and food benefits.

During the first year of intact family services, Janetta and her children were in and out of Sam Hayes's residence, the family lived in a homeless shelter for four months (September 28, 2006 to February 2, 2007), and they stayed briefly with the children's maternal grandmother and a friend.  As a result of Ms. Ladd's continued efforts, in March 2007, Janetta and her children were accepted into a transitional housing program. The family could live in a furnished apartment while still working on securing permanent housing.  Janetta postponed the move when her father was hospitalized,[60] and subsequently turned down transitional housing, saying she preferred to remain with Mr. Hayes until she received the Section 8 voucher.

In August 2007, Janetta was approved for Section 8 housing through Sanford Housing Services. Janetta and her children moved into a four-bedroom apartment in August 2007.

Client Service Plan and Integrated Assessment

The initial family service plan, dated May 1, 2006, was unsigned. The family's case was identified as short term and service needs were stable housing, parenting education and support, and the children's enrollment in educational programs.  Janetta's assigned tasks addressed the need to visit her son David on a regular basis, and learn about his condition and required care.  The client service plan did not address domestic violence or couples counseling.  The younger children's father, Sam Hayes, did not participate in the development of the service plan, he was not included in the plan, and he was not referred for services.  He did not participate in his son's case staffings at the nursing facility.

The service plan was evaluated one time, on October 31, 2006.  Ms. Ladd rated Janetta's tasks as satisfactorily met with regard to her involvement with housing services, maintaining safe housing for her children, and ensuring that Terrance, Tiffany and Stephanie attended school on a regular basis. At that time, however, Terrance had at least 10 absences since the start of school two months earlier, and the girls had just been enrolled in Head Start (October 22, 2006).   Tasks pertaining to David were rated unsatisfactory, as Janetta was not visiting her son regularly and had not participated in services at the Stonehedge Nursing Home.

Ms. Ladd completed an Integrated Assessment on June 8, 2007.[61] The report omitted Keith Munro (10 months old) and the younger children's father, Sam Hayes, as members of the intact family. The report identified the relationship between mother and father as abusive. Janetta was described as overwhelmed with daily parenting responsibility, having very limited parenting skills and support system, and an unsupportive paramour.  Janetta struggled with setting limits and enforcing consequences for the children's negative behavior. Ms. Ladd wrote that Janetta was not regularly visiting her son David, and the children were not attending education programs regularly – Terrance, Stephanie, and Tiffany had been "absent 20 days for the last completed semester" of school and Head Start. Terrance's school had recommended he repeat kindergarten.  Despite the children's school absences, Ms. Ladd noted that Janetta ensured that the children attended school.  Ms. Ladd wrote that Stephanie (4 years/9months old) and Tiffany (3 years/9 months old) were screened at school and found to be eligible for further early intervention evaluation.

---

[60] Janetta's father passed away in May 2007.
[61] A Social History had been completed within the initial 45 days of intact services.

Summary of Family's Involvement with Intact Family Services

The Concord Center's intact family staff met and exceeded the in-person contact requirements of intact family services.[62] The intact staff monitored housing advocacy efforts, and secured Norman certification for funds to help provide concrete services (cash assistance, payment of overdue utility bill, bus cards, and grocery and discount store gift cards, baby formula/food, infant and children's clothing, bassinet, crib and beds for the children). Staff transported the family to David's case staffings at Stonehedge Nursing Home, and transportation was provided to keep a medical appointment for the children and to grocery shop. The intact family worker arranged for homemaker services that started in October 2007, when David came home.

During 21 months of intact family services, Janetta attended two sessions of parenting classes at Concord on February 22, 2007 and March 15, 2007.  Each session was an hour and a half in length.  In an 8-month period (April through December 2006), Janetta visited her son David 6 times; and in a 9-month period (January to October 1, 2007), she visited her son 3 times.  She participated in training at Stonehedge on David's care in June 2006, February 2007, and on the day of his discharge in October 2007.[63]

SCR Report: Sequence A (Medical Neglect-79)

The State Central Register (SCR) received a hotline call a day after Ms. Ladd's home visit on December 12, 2007.  A physician from Somerset Hospital called the hotline on December 13 to report that Brian (DOB 11/07) was born full-term, but at a low birth weight, and his mother had not received pre-natal care. The hospital had recommended that Janetta bring Brian in to monitor his weight and to check for jaundice, but she had not followed up.  Also, a neo-natal screen had determined that Brian had the hemoglobin C trait [sickle cell anemia].  The hospital instructed the mother to have the infant seen, and had mailed two certified letters to notify her.  As of the hotline call, she had failed to comply.

An investigation of Janetta was opened for #79-Medical Neglect to Brian.  On Friday December 14, 2007, the day before David's death, the DCP investigator was at the family's home to interview Janetta and observe the children.  Janetta reported that she recently moved and had not yet found doctors near her new residence. Janetta said that on Wednesday [December 12] she received a call from Dr. Weiner that Brian might have sickle cell anemia and would be in need of additional medical care. The mother denied having received notification by certified mail. Janetta said that she was planning to make an appointment with the children's pediatrician at The Children's Clinic.[64] When the DCP investigator advised Janetta to inform medical staff at Somerset Hospital of where she planned to take Brian for follow-up care, Janetta "became increasingly agitated" and felt she was being singled out. The DCP investigator explained that Somerset Hospital needed to know so that the baby's medical information can be shared with Janetta's doctor of choice.  Janetta reported her involvement with services from The Concord Center, Overton Homemaker Services, therapists and a nutritionist.  Janetta talked about David's health care needs. She denied she was ever a victim of domestic violence.

The DCP investigator wrote that the children, Calvin (10), Terrance (7), Stephanie (5), Tiffany (4), David (2), Keith (1), and Brian (3 weeks old) appeared adequately cared for and showed no signs of abuse or neglect.  Three of the children, Stephanie, Tiffany, and David, were in their beds asleep.  The investigator

---

[62] Procedures 302.388, Intact Family Services state that within the first 45 days of service delivery, intact family workers should meet with all involved family members weekly. Concluding the initial 45-day assessment period, intact workers are to visit the family, at minimum, twice monthly or monthly with supervisory approval.

[63] According to Stonehedge's records Janetta received training on medication administration on June 28, 2006, and training on suctioning, trach care, and emergency equipment (oxygen) on October 19, 2007.

[64] Janetta was no longer a resident in the area serviced by The Children's Clinic.

made no mention of observing a bruise above David's eye, which was present on December 12.  Janetta reported that two other children, Lilia (age 9) and Teresa (age 8), lived with paternal relatives.

On December 16 and 21, 2007, the DCP investigator interviewed two hospital physicians, one of whom was the Reporter. The doctors confirmed Brian's low birth weight, and that Janetta had reported she smoked cigarettes and ate only two to three times a week during the last month of her pregnancy. The doctor stated that the mother's eating habits might have contributed to the low birth weight.  The results of lab tests on Brian were consistent with a form of mild sickle cell anemia, and that the child's anemia could become more pronounced once he reached six months of age.  For this reason, it was imperative that a hematologist examine Brian.  The Reporter made the call when he became aware of medical personnel's unsuccessful attempts to contact Janetta regarding Brian's condition.

The hospital social worker informed the DCP investigator that one, not two, certified letter had been mailed to Janetta on December 10, but it could not be determined if she received it as there was no record of a return receipt.  The social worker stated that typically a certified letter is sent for notification purposes and no attempt is made to contact a family by phone.

On January 4, 2008, the DCP investigator wrote that the case was closing because of the subsequent oral report and death of David Hayes-Munro. On January 8, 2008, Janetta Munro was indicated for medical neglect of Brian because she had not followed up with the doctor's recommendation to return the infant for monitoring of weight and jaundice.

David's Death

On December 15, 2007, a nurse called the hotline (SCR Report: Sequence B) to report that two-year-old David presented at Somerset Hospital with extensive acute left subdural hematoma, and that he would likely die.  He had multiple bruises on his head, face, chest, abdomen and back in various stages of healing.  He also had scab areas behind his ears and scratch marks on his legs. Two front teeth were missing.  Janetta stated that David had been lethargic and not himself, and that he had jumped from a bunk bed the day before.  David was transferred from Somerset Hospital to Upper Central Hospital, where a doctor called the hotline, also on December 15, 2007, to report that David was pronounced dead at 5:05 p.m.

Sam Hayes told the DCP investigator that he arrived home from work at 1:00 a.m. and, as usual, he checked on all of the children.  When he entered David's bedroom, he noticed that the child was breathing hard. The father said that he told Janetta that they needed to take David to the hospital.  Mr. Hayes refused to believe that Janetta hurt their son.

Mr. Hayes reported that he is the biological father of the four youngest children. He said he was unable to care for his children because of work and he could not identify family members who could care for the children.  The DCP investigator told the father that the children would be taken into protective custody. On December 18, 2007, the court granted temporary custody of Calvin, Terrance, Stephanie, Tiffany, Keith, and Brian to DCFS.  A few days later, Mr. Hayes told the DCP investigator that he wants his children and that he has help from his family.

On the day David died, Terrance disclosed that Sam Hayes had been abusive to the children. Mr. Hayes hit the children with a belt and shoe, and also punched the children. As the Reporter had not observed any injuries, the report was taken as Related Information and no allegations were added to the death investigation.

During the death investigation Mr. Hayes reported that he has known Janetta since he was 16 years old. Regarding Janetta's older children, Mr. Hayes had no contact with Teresa in four years and to his knowledge, Teresa's father was deceased and she was in the care of godparents. Janetta has had no contact with Teresa. Mr. Hayes stated that Calvin's father reportedly is unknown and in jail. Mr. Hayes reported that Terrance Thomas is the father of Terrance and Lilia, but that he claimed only Lilia to be his child. Mr. Hayes talked about the domestic battery incident involving Janetta and Mr. Thomas a year earlier. Mr. Hayes provided Mr. Thomas's last known address and phone number. Mr. Hayes did not know Stephanie's father. He also reported that Janetta was raped during a time that they were separated and she gave birth to April Munro, who was immediately given up for adoption to non- family members.

On December 17, Terrance, Calvin, Tiffany and Stephanie each denied seeing Janetta hit David, and Stephanie stated that David had fallen from the top bunk bed. The CPI documented attempts to interview Janetta, but was unsuccessful as the mother's attorney advised her not to speak with DCFS.

Child protection staff encountered problems determining the whereabouts of Lilia and Teresa Thomas. The investigator made several good faith attempts to contact the family at Terrance Thomas's two last known addresses. On December 18, the CPI spoke with Gladys Patterson at The Concord Center, who related that Calvin had recently returned to Janetta's care from relatives, that Lilia was in her father's custody, and that she had no information regarding Teresa.

As to David, Janetta Munro was indicated for Death by Abuse (Allegation #1), Head Injuries (Allegation #2), and Cuts, Bruises, Welts, Abrasions and Oral Injuries (Allegation #11). The mother was also indicated for Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Abuse (Allegation #10) to Calvin, Terrance, Stephanie, Tiffany, Keith, and Brian.

<u>Current Family Status</u>

After David's death, Brian Hayes-Munro (7 months old), Keith Munro (age 2), Tiffany Munro, (age 4), and Stephanie Munro, (age 5) entered foster care and were placed in The Concord Center foster home of Rita Monson. Terrance Thomas (age 8) and Calvin Munro (age 11) were placed in the Concord foster home of Janice Copeland. In June 2008, Ms. Copeland notified the agency that she was interested in caring for Terrance and Calvin long-term.

In response to a diligent search letter for the older children's father(s), on June 17, 2008, Mr. Jamal Johnson contacted foster care staff stating that he was Calvin's biological father and that he wanted his son with him. Mr. Johnson stated that he had recently returned to the area after receiving a letter from Janetta explaining that she was in jail and needed help raising Calvin. The worker told Mr. Johnson that he would have to undergo a paternity test and should attend court hearings.

According to SACWIS case notes, Calvin and Terrance have been attending individual therapy and Stephanie and Tiffany initially participated in art therapy, but they were referred to another children's therapy program to address more serious concerns. Mr. Hayes was participating in individual therapy, parent coaching, and weekly supervised visits with Tiffany, Brian and Keith.

<u>OIG Interviews of Nancy Ladd and Gladys Patterson</u>

Ms. Ladd stated that the primary focus of intact family services for the Munro family was to assist the mother in finding stable housing, and once this problem was remedied, her son David could return home. Ms. Patterson said the intact case was opened so that Janetta could qualify for Section 8 housing. Ms. Patterson explained that the case came in at Level 3 for short term services, initially six months, but the case was kept open because Janetta needed a housing voucher.

Ms. Ladd told OIG investigators that Janetta presented as being overwhelmed, having limited family and social support. She was 22 years old and raising three children, and had one child in a nursing facility. Ms. Ladd initially assessed that this was not a high risk family, as Janetta cared about her children, was able to meet their basic needs, was willing to participate in services, was open to suggestions as to how to better parent as she understood she had deficiencies in parenting, and she was open to advocating for herself and her children in order for her situation to become more stable. As she became more familiar with the family, she assessed the family as low to moderate risk. There were limitations, as she was not working and had non school-age children in her care. It was difficult for her to look for employment with no day care and "You can't get day care paid for if you are not working." Ms. Ladd stated that the intact family initially was comprised of Janetta, her children Terrance, Stephanie, Tiffany, and David, and Sam Hayes. The mother and children were living with Sam Hayes.

Ms. Patterson stated that parenting concerns reflected in the social history were based on the children's behaviors. The 2 and 3-year-olds were using profanity, they were oppositional, and one child bit a staff member. Their mother was young, overwhelmed, and had been a ward of the state. Intact staff gradually learned about her other children.

### Domestic Violence/Children's Injuries

Ms. Ladd stated that the first intact worker, Wendy Garza, had informed her that there had been incidents of domestic violence in the home. Janetta was referred to Leighton's Place for counseling, but she did not follow through. Helen's Safe Haven's homeless shelter does not provide domestic violence counseling. Ms. Ladd said she believed Leads/Cants checks were done on Sam Hayes when the intact case was opened.[65]

Ms. Ladd believed the mother was not abusive nor presented a risk to her children in terms of parenting style. She accepted Janetta's explanations for the children's injuries and she did not check out the mother's accounts of the incidents. She did not consider that an adult caused black eyes or burn to Tiffany. Ms. Ladd had contact with the Head Start staff, but she could not recall that they talked about Tiffany's injury or that she asked Tiffany about the incident occurring at school. Ms. Ladd could not recall talking with Helen's Safe Haven shelter staff about Tiffany's injuries. She talked privately with the children following her observation of injuries and none reported abuse. Regarding the burn injury to Tiffany, Ms. Ladd said the burn was on the child's leg, she could not remember its size or its appearance, but did recall seeing a scorch line. The burn incident occurred at the maternal grandmother's home, but she did not ask when the incident occurred or whether other adults were around while Janetta was taking a shower during the incident.

Ms. Ladd stated that she talked with her supervisor about the child's injuries and was not instructed to call the hotline. Ms. Ladd believed the issue to be parental supervision as the Munro children were very active and Janetta expressed having difficulty managing their behaviors. Ms. Ladd frequently discussed with Janetta the need to provide structure and supervision to prevent injury to the children.

Ms. Patterson confirmed to OIG investigators that neither parent participated in domestic violence services. She said that intact staff did not observe Janetta hitting her children, "in fact natural mother was a little too passive." Ms. Patterson stated that the family presented a moderate level of risk, but the children were found to be safe. Ms. Patterson recalled that Tiffany was injured at the shelter, but she did not specifically recall a black eye injury occurring at Head Start. Ms. Patterson said she would expect Ms. Ladd to follow up with Head Start if Janetta said that that is where her child was injured. Ms. Patterson attributed the children's aggression towards each other to the mother's passive non-active

---

[65] Leads/Cants checks were not conducted on Sam Hayes during the DCP investigation or open intact case.

DAVID HAYES-MUNRO DEATH INVESTIGATION

parenting, chaos and unstable housing.  She added, "I understand that domestic violence is an element too."

### Alternative Planning

Ms. Ladd stated that when she first became involved with the family, David was not ready for discharge and his mother did not have stable housing. The Concord Center recommended that Janetta have regular contact with David at Stonehedge, and that Janetta learn his care needs.  Ms. Ladd stated that based on Janetta's reporting, she visited David approximately once a month.  Ms. Ladd did not always hear about the visits right away, but she had regular contact with Stonehedge staff and confirmed the mother's visits.  Ms. Ladd said she did not have a reason for not documenting confirmation of Janetta's visits in the intact file.

Ms. Patterson and Ms. Ladd told OIG investigators that David could not be discharged when ready because of his mother's lack of housing.  If Janetta had stable housing by December [2006], David would have gone home.  Ms. Patterson was asked whether she thought the case could have been screened for dependency and she responded, "Yes, we advised Janetta that she could call the hotline and report that she could not take care of David."

Ms. Patterson said she was aware that Janetta had not visited David for months at a time or "as often as we would have liked."  Ms. Ladd said she had ongoing conversations with her supervisor regarding the mother's visits.  Ms. Ladd believed that the goal of weekly visits would be difficult for Janetta to meet.  Ms. Ladd said that Janetta never had David home for overnight or weekend visits, even though this was allowed.  Ms. Ladd stated that staff occasionally offered to watch the Munro children at the agency so that Janetta could visit David, but she never accepted the offer. The Concord Center does not have respite care for intact families; the service is only available for foster care families.  A plan was established for an intern to provide Janetta transportation to Stonehedge for visits, but this was near the time of David's discharge. Ms. Ladd said she provided Janetta with bus cards, but the distance and traveling with four small children would have been difficult for any parent.  Janetta told her she did not have family support to go with her or help with the children while she visited.  Ms. Ladd never met extended family and she did not ask Janetta for permission to speak with them.  Ms. Ladd said there was always something going on with Janetta that prevented her from visiting her son.  Ms. Ladd drove Janetta to Stonehedge for David's case staffings and Janetta visited David while there.  Mr. Hayes visited his son on occasion.

Ms. Ladd said that she and her supervisor discussed the possibility that David may not be able to return home. "We always do concurrent planning, but because this was not a foster care case this was entirely dependent on what natural mother's desires were."  Ms. Patterson and Ms. Ladd stated that at Child and Family Team meetings, they discussed with Janetta David's discharge and The Concord Center's concerns with the mother's reports of being overwhelmed.  They explored options that included foster care and adoption, but Janetta did not want her children in the system.  Ms. Ladd said that with the option of foster care, "We would have needed to call the hotline and mom would have had to say 'I am unable to care for my son and do not want him returned to my care.'"  Ms. Ladd explained that the case did not have to go through the system and David would not have to become a ward.  The Concord Center had identified a family through the foster care program that had experience parenting a child with special needs similar to David's.  When the family resource was presented to Janetta, she said she needed to talk with Mr. Hayes. She was given time to make a plan, but by the next meeting she had changed her mind.

Ms. Patterson informed OIG investigators that staff discussed that Janetta needed services to meet David's needs and that the mother said she might not be able to meet his needs and the needs of all her children.  At a subsequent meeting Janetta felt differently about having David home, but Ms. Patterson could not recall what had changed for Janetta.  Ms. Patterson was asked whether staff provided Janetta with feedback from observations and known information, and Ms. Patterson responded, "It was not all

bad. The positive was her commitment to her children; she wasn't running the streets or using drugs, and she was able to have a relationship with workers."

Ms. Ladd said she could not recall a discussion with her supervisor about screening David into care "because we did not think the case was viable for screening." The case could be screened only if Janetta said she would not take David back. She and her supervisor never discussed the case in terms of dependency. When asked whether she believed there was reason to screen David when he was ready for discharge and could not return to his mother, Ms. Ladd stated she did not think this case would have been accepted on dependency.

Ms. Patterson and Ms. Ladd informed OIG investigators that David would have to be in imminent danger to pass screening. Ms. Ladd added that because David was not home, there was no imminent risk, and at screening, his case would have been rejected. Ms. Patterson said that intact staff had a lot of information about the family, but she was of the opinion that staff could not have gathered enough information for David's case to pass screening. When asked whether intact staff had information to suggest that it was not in David's best interest to return to his mother, Ms. Patterson said that staff "discussed this with Janetta, because this was our concern. We developed a plan and worked with her, but it took a long time."

Ms. Ladd said she did not meet or speak with David's doctor from Stonehedge even after learning in October 2006 of the doctor's concern with attachment development and the child not living with a family. It was at that time that Ms. Ladd also learned that Janetta had not been to Stonehedge in three months. Ms. Ladd said she did not have an answer for not contacting David's doctor. Ms. Ladd talked with other Stonehedge staff about her concern with Janetta's ability to care for David. Ms. Ladd said she informed her supervisor about the doctor's concerns, but she did not think Ms. Patterson called the doctor.

Ms. Patterson said she was aware of the doctor's concerns about David's living arrangement and that The Concord Center shared that concern. Ms. Patterson did not speak with the doctor. She did not know if Ms. Ladd contacted the doctor, but assumed that the worker shared The Concord Center's concerns with the doctor. Ms. Patterson said she did not consider that intact staff could have sought support from David's doctor in preparation to screen the case. Ms. Patterson said that intact staff was concerned with David living in a nursing home, but "The nursing home never came out and said that David had to leave." Ms. Patterson did acknowledge that Stonehedge staff said David was ready for discharge ten months before he actually went home. She stated, "We tried to work things out with the mother." "She had legal custody, this was her child."

Ms. Ladd stated that at case staffings at Stonehedge, "The Concord Center staff was very clear as to what we wanted to see, but Stonehedge staff would not say a word to Janetta, because they did not want to harm their relationship. Stonehedge staff kept saying it's fine if David needed to stay at the facility" and "Stonehedge said they were not in a position to say whether the child should or should not return home." Ms. Ladd said she was frustrated with Stonehedge because they all needed to be, but were not on the same page, which she felt was not fair to Janetta. Ms. Ladd confirmed to OIG investigators that Stonehedge staff asked whether David could enter foster care, and Ms. Ladd explained to them short-term voluntary foster care only. Ms. Ladd said it was difficult to say whether mother and child had a healthy attachment, but Janetta was appropriate with David. His face lit up when she arrived and he played with his siblings. David had also formed attachments with Stonehedge staff.

*Participation in Services*
Ms. Ladd confirmed to OIG investigators that Mr. Hayes was not included in the service plan and there were no tasks for him, because he was not present when the plan was discussed. She attempted to involve the father by requesting he be available when there were meetings with Janetta, but he was at work or had other reasons for not attending. Ms. Ladd said that in looking back, he should have been included in the

service plan.  Her understanding was that client service plans are court documents to show a parent's progress or lack of progress, and are used in screening cases.  Ms. Patterson stated that the children's father [Sam Hayes] was not identified when the intact case was opened, but she thought they could have later added a page in the client service plan for him.  She stated, "We do try to involve the fathers."

Ms. Patterson thought the service plan was reviewed every six months, and that there should have been more tasks in the plan to reflect Concord's referrals.  Ms. Ladd stated that the service plan was not reflective of everything that Concord was doing for the family and Ms. Patterson thought the mother was offered everything possible.  In addition to home visits and concrete services, staff, including Ms. Patterson, had a lot of contact with Janetta, provided ongoing support, and worked on building a trusting relationship. Janetta made use of intact staff for talking about parenting issues and using staff support to get her children in school programs. Janetta felt comfortable with staff. When stressed or in crisis, she called the worker.  Ms. Patterson and Ms. Ladd explained that although the frequency of home visits could have been reduced, weekly visits continued for nearly two years, because Janetta was without family support, needed a lot of help, and frequently asked for assistance.

Ms. Patterson and Ms. Ladd stated that, overall, Janetta was cooperative and made use of services – she enrolled her children in school, attended job training through Public Aid/TANF, worked with housing services and a public health nurse. Ms. Patterson stated that services were put in place, but that use of services is voluntary.  She acknowledged that when Janetta was offered child care at the agency so she could participate in services, the mother refused.  Upon further questioning about the services and the mother's participation, Ms. Ladd stated that Janetta started, but did not complete parenting classes; she attended two of six classes at Concord. Janetta did not participate in home-based counseling or other mental health services.  Ms. Ladd stated, "We never made a referral for a psychological evaluation for Janetta, because we wanted to see if she could make progress in individual therapy first."[66]

Regarding homemaker services, Ms. Patterson and Ms. Ladd recalled that Janetta requested increased homemaker hours.[67] Ms. Patterson stated that the Overton agency did not inform her that Janetta did not want the homemaker to return, and she learned about this after David's death.

When asked what was different with the family at the time that David returned home as compared to the start of intact family services, Ms. Ladd said "housing."  When asked whether there was improvement in Janetta's parenting skills, Ms. Ladd stated that once Janetta obtained permanent housing, her mood was much improved.  Ms. Patterson stated, "I can't say we didn't see any progress." When asked what had changed in the family by the time David returned home, Ms. Patterson said Janetta had her own apartment, that housing was a big and stressful issue – not having a place to live and living in a stressful relationship.  Housing was the reason she first came to Concord. Janetta "wanted to be independent" and with housing she was no longer living in a stressful relationship.  Ms. Patterson acknowledged that intact staff was unaware as to whether the father, Sam Hayes, continued involvement with the family or moved in with Janetta and the children.  Staff learned later that their relationship continued.

---

[66]  The Concord Center's intact family contract with DCFS provides for the Department to reimburse for psychological assessments separate from the intact case rate when the evaluation is DCFS approved and the family's insurance company denies payment.  Services funded per Concord's case rate include general counseling and therapy.

[67] Ms. Ladd said that after her home visit on December 12, 2007, she discussed Janetta's request with her supervisor. Ms. Ladd left town the next day as there was a death in her family. Ms. Ladd and Ms. Patterson said they did not schedule a meeting with Overton Homemaker Services in December.

*Toilet Training*

Both Ms. Patterson and Ms. Ladd confirmed to OIG investigators that they attended Concord's Child and Family Team meeting on October 3, 2007 to discuss David's discharge plan and that David's readiness for toilet training was noted. Ms. Patterson recalled that Stonehedge staff was working on toilet training and she thought he was using the toilet at times. Ms. Ladd said she could not recall if Stonehedge had started working with David to begin training. Ms. Patterson and Ms. Ladd stated that they did not discuss with Janetta the possibility that she delay toilet training once David was home, to allow for a period of adjustment. They discussed with the mother that physically David was ready, but because he was delayed, the training had to be done on his time. Janetta appeared to understand that she needed to have different expectations of David, as it might take longer for him to learn.

Ms. Ladd stated that after David was home, Janetta was frustrated and not sure how to work with him. Janetta was confused because of her experience with her other children. Ms. Patterson felt their concerns were addressed by making weekly visits and adding the homemaker, who was working with Janetta on toilet training. Ms. Ladd recalled that staff talked with Janetta about the potential for regression in David's behavior, and that this is not unusual with a change in environment. Ms. Ladd said she had no evidence that Janetta could or could not successfully toilet train David, and Ms. Patterson said she could not say that staff had a good idea of Janetta's understanding of toilet training a child like David. Ms. Ladd thought Janetta's frustration had to do with the mother's thinking that things would be different when David came home. Ms. Ladd could not recall there being a discussion among staff regarding increased risk for child abuse during toilet training. Regarding her supervisor's note in which she wrote that Tiffany began wetting herself, Ms. Ladd did not recall whether this was an isolated incident or chronic problem or whether this was addressed.

*Meeting Children's Basic Needs*

OIG investigators asked whether the Munro home was a safe environment for David. Ms. Ladd stated that "The Concord Center recognized that there were risks, but with supportive services David could be discharged to his mother." Ms. Ladd did not believe there was a reason that David should not return home. When asked how she would know that the family would do well with supportive services, since Janetta had not made use of services in the past, Ms. Ladd responded that by the time David went home, he had made progress, and was walking and running. Janetta was meeting her children's basic needs, and there were times Janetta could manage the children's behavior appropriately. She recalled that she talked with a worker at Helen's Safe Haven and was told that Janetta did well at the shelter.

Ms. Patterson stated that Terrance had some school absences, but she was not sure how many. Ms. Ladd said she was aware that Terrance was missing school, but she did not remember that he had to repeat kindergarten. She recalled that in early 2007, Watson Elementary evaluated and placed Terrance in special education. Ms. Ladd said she explained to Janetta the negative effect of school absences on academic performance, and she thought Janetta had realistic expectations of Terrance. Ms. Ladd did not remember looking at Terrance's IEP, but she spoke with the school social worker about it. She did not visit Terrance's school or the girls' Head Start program. Ms. Ladd believed Stephanie and Tiffany were attending school regularly, but she did not recall having a conversation with Head Start staff regarding their attendance. She thought Stephanie initially had a difficult time at Head Start in terms of adjustment to structure, and that Tiffany made an easier transition. Ms. Ladd stated that the children did not participate in a summer program. She said that Concord has a summer program, which Terrance could have attended, but the girls were too young to participate.

Ms. Patterson stated that 0 to 3 evaluations were done for the girls through their school district, but she could not recall when. She recalled Ms. Webb taking or attempting to take the children for evaluation. Ms. Patterson said she expected that the intact worker would get a copy of the evaluations for the file.

She stated that intact staff was more concerned about the children's behaviors. Ms. Patterson thought the girls were referred to art therapy to address their behaviors, and that Janetta had started parenting classes.

### Integrated Information

Ms. Ladd informed OIG investigators that she did not write about Janetta's non-involvement with services and her poor parenting skills in the Integrated Assessment, because there is no section in the report for this kind of information; but she could have put it in the narrative section. Ms. Ladd said that the Integrated Assessment fields in the SACWIS system do not lend themselves to clinical assessment of families. SACWIS training addresses how to enter information in response to prompts, rather than entering clinical aspects of a case. Ms. Patterson explained that information about Keith was not in the Integrated Assessment because he was born after the case was opened, and it is difficult to add new children to family groups in the SACWIS system. Ms. Patterson said that Mr. Hayes was not in the Integrated Assessment because he was not involved with the initial allegations, and SACWIS did not allow for adding members to the case. Ms. Ladd said she did not know how to add names to the template and, for this reason, the youngest children and their father, Sam Hayes, were not added to the Integrated Assessment. Ms. Ladd acknowledged that she could have written about these family members in the general narrative portion of the Assessment, or in the summary at the end of the report. Ms. Ladd said she believed she made a typographical error when she wrote that Stephanie and Tiffany were absent 20 days in a semester of Head Start classes, as she thought the girls attended consistently.[68]

Ms. Patterson said she knew Janetta had been a ward, had been in the Clinical Services for Teens program, and that she had four children by the time she aged out of the system. Ms. Ladd said she had no information about Janetta's history as a former ward, and this was not discussed with her supervisor. She has had other cases involving former wards and The Concord Center does not collect prior information. What information she had, came from Janetta. Ms. Ladd learned about Janetta's older children as time passed and the mother's goal was to have all her children with her. Ms. Ladd was unaware of Janetta's pregnancies during the open intact case; and when Keith was born, she was surprised and shocked that Janetta hid her pregnancy. She asked Janetta why she did not disclose it, and the mother said she was considering adoption and did not want to be judged. Ms. Ladd described Janetta's physical appearance as that of a larger woman, who wore large t-shirts, and who did not show significant changes in appearance, mood, behavior or physical capability, such as walking or lifting the children. Ms. Ladd informed OIG investigators that she has no personal conflict supporting a mother's decision to surrender her child for adoption or terminate a pregnancy.

Ms. Ladd informed OIG investigators that, when Janetta reported that her brother Tyrone was going to help her, Ms. Ladd believed he had moved into her home. Ms. Ladd could not remember whether a Cants/Leads check was completed on him. Ms. Patterson stated that after Brian's birth, a maternal uncle was living in the home. Ms. Patterson understood that he was getting back on his feet, looking for housing, and was a school teacher. Ms. Patterson said she believed that Ms. Ladd did a Leads check. Ms. Patterson was aware that Janetta sometimes babysat her younger siblings.

### Diane Webb, Public Health Nurse and The Concord Center Intern

Ms. Ladd stated that following Keith's birth, the family's public health nurse, Diane Webb, discussed family planning with Janetta, and the mother planned to get birth control. Ms. Ladd said she did not know whether Janetta attended family planning counseling. Ms. Ladd stated, "I had regular contact with the public health nurse," but Ms. Ladd did not know why the family had a visiting nurse for Keith.[69] She

---

[68] According to the children's Head Start records their attendance was not consistent.

[69] According to Keith's hospital birth records Public Health record for the Munro family, a public health case was opened because Janetta was a 23-year-old woman who had no prenatal care, delivered 7 children prior to Keith's

recalled that Ms. Webb had confirmed that Keith was born drug-free, had no medical conditions, and was seen regularly at The Children's Clinic.

Ms. Patterson also stated that Diane Webb, "the public health nurse," worked with Janetta on family planning; they discussed birth control. Ms. Webb made appointments for Janetta, but Janetta never got there. Upon further questioning about Ms. Webb, Ms. Patterson stated that Ms. Webb was also an intern at The Concord Center and Ms. Patterson was her supervisor.

Ms. Ladd clarified that Ms. Webb was working with the family in two capacities - public health nurse and Concord's intern in the intact family program. When Ms. Webb started her internship, she already knew the family. Ms. Ladd reported that Ms. Webb stopped seeing the family as a visiting nurse, when she began her internship at Concord. Ms. Ladd later stated that Ms. Webb was going out to the home weekly for Concord, and she did not know how Ms. Webb was working in her nursing visits. As an intern, she sometimes made home visits on a different day than Ms. Ladd in the same week to drop off bus cards, see how the family was doing, and talk about services. Ms. Ladd believed that Ms. Webb, as a public health nurse, could follow up with Janetta to ensure medical appointments were kept. She explained that Ms. Webb made no case entries in SACWIS because she did not have access to the system.

OIG Interview of Diane Webb

Diane Webb is a registered nurse employed at the Public Health Department. She began providing public health nursing services to Janetta in September 2006, following Keith's birth, and until the family moved out of the area in August 2007. Ms. Webb opened a case for Brian in January 2008, when he was placed in Concord's foster home following his brother's death. She closed Brian's case on May 20, 2008, after Brian was moved to another foster home outside the service area.

Ms. Webb returned to school for a Master's degree in human services and counseling, and did an internship at Concord from November 2006 to May 2007. As an intern, Ms. Webb assisted Concord's case managers in working with families. Ms. Webb accompanied workers on home visits, conducted her own home visits, and provided case management services. Ms. Webb assisted Nancy Ladd with the Munro family. From August 2006 to May 2007, Ms. Webb serviced the Munro family as a public health nurse and a Concord intern. Ms. Webb said she informed her public health supervisor of her internship at Concord.

Ms. Webb's public health supervisor informed the OIG investigator that she was aware that Ms. Webb was interning at Concord and did not perceive a problem with this. She stated that given the size of the service area community, she would not have been surprised if Ms. Webb, as an intern, encountered families involved with the local Public Health Department. Ms. Matheson stated that she was unaware that Ms. Webb was working with the Munro family through Concord.

Ms. Webb told OIG investigators that the Munro children were being seen at The Children's Clinic. The Public Health offices are housed at the same site as the Clinic. Ms. Webb handled intake of Janetta's case in September 2006, and continued servicing the family through June 2007, just prior to the family's move in August.

---

birth, was a smoker, and had reported having personal issues that needed to be addressed. Keith was healthy at birth. He was full term and weighed 7 lbs, 5 oz.

**Diane Webb's public health nursing services**

| Date | Type | Notes |
|------|------|-------|
| 09/08/2006 | Office | Keith is alert and active; growth and development appear to be within normal limits. The Children's Clinic for care. |
| 10/12/2006 | Office | Mother is no longer in apartment, but may be returning. Head Start applications completed for 3 and 4 year old daughters to begin Monday. |
| 11/17/2006 | Home | 2-month pediatric assessment of Keith; alert and active. Growth and development appear to be within normal limits. Per checklist, discussed relief of parental stress, maternal contraception, role of father and siblings in care of infant, emotional needs and temperament of infant. |
| 02/08/2007 | Not noted | 4-month pediatric assessment of Keith. Per checklist, discussed infant's diet, cleaning mouth, use of car seat, prevention of burn injuries. |
| 03/30/2007 | Office | 6-month pediatric assessment of Keith. Use of Denver II development screen reveals developmental delays primarily in language and personal/social areas. Mother is working with The Concord Center where they are providing family support for her and children. Per checklist, discussed infant's teething, diet, and introducing the cup. |
| 06/27/2007 | Office | Saw Keith following a Clinic visit; cold sores in mouth and on lips.  Advised Janetta on cleanliness of object and sibling kisses. Follow up at 12 months. |

In The Concord Center's intact file are three handwritten case notes by Diane Webb in November 2006 that reflect a blend of child welfare and health related services (see Table below).

**Diane Webb's case entries in The Concord Center file**

| Date | Case Notes |
|------|-----------|
| 11/21/2006 | Home visit. Bus pass given. Arranged for Janetta to see Dr. Janus at Jefferson clinic on 11/24 for post-partum check-up and arrange for Family Planning method. A cab will pick her up (a service of Jefferson Clinic). Discussed effective discipline, first chapter of "How to Talk So Kids Will Listen" by Faber and Maybish given. Asked her to complete exercise about denying and accepting feelings. Plan to visit 11/28. |
| 11/27/2006 | Phone contact with RN at Jefferson clinic. Cab went to pick up mother; however, no phone call made to her. Did not make appointment. Reschedule for 11/28. RN will call Janetta when cab is on the way. |
| 11/29/2006 | Home visit. Janetta expressed concerns 'No one is helping.' She said she needs a job and full-time day care so she can work. Offered to help her find day care and application for Action for Children; however, she needs to have a job before they will accept an application. Told her free employment services. She went for post-partum check-up on 11/28. Her appointment for internal exam is 12/11/06. She expressed interest in having an IUD inserted. |

In an OIG interview, Ms. Webb stated that she is a public health family case manager for pregnant women and infants up to age 1.  The Children's Clinic referred Janetta and Keith for public health services.  Ms. Webb stated that she knew Concord was involved with the family at that time.  She recalled that Keith was gaining weight. Janetta had a referral for an eye doctor, because his eyes were a little crossed, but she missed three appointments. She reviewed Keith's immunization record and discussed day care needs with Janetta.  Ms. Webb stated that she continued to visit the family as a nurse and intern, but

she saw the family more frequently as an intern.  As a nurse, she needed to see Keith minimally every three months.

Ms. Webb recalled that while at Concord, she initially was working a lot with the Munro family and less later.  She discussed family planning with Janetta and made appointments for her. Janetta told Ms. Webb that she kept the appointments.  During her internship at Concord, Ms. Webb visited the home twice a month and attended two meetings at Stonehedge.  Ms. Webb stated that in her nursing capacity, she cannot transport a family.  As an intern she did not transport the family to Stonehedge.  The mother was told she needed to visit her child, attend training and improve parenting skills.  She recalled telling Nancy Ladd and Gladys Patterson that she could not see how Janetta could meet the children's various needs, physical and developmental, and that they shared her concerns, including David's return home.  She said staff thought this was a safe home environment.  Ms. Webb said she did not ask, nor was she asked, to speak with David's doctor at Stonehedge.  She said Concord's staff could ask her questions about medical issues.

Ms. Webb said that when she made home visits, she would spend time playing with the children and model behavior for Janetta. Ms. Webb's observations of the children were that they appeared needy, lacked stimulation in the home, and were aggressive with each other.  The family required the assistance of two nurses to manage the children when at the public health office.  She recalled Tiffany stating "My daddy does not want me no more," and that the children were afraid of dad.  Ms. Webb observed the father, Sam Hayes, to be cordial. Ms. Webb said she had no contact with Head Start, but Head Start would have had the children evaluated.  She recalled that in 2006 she saw Tiffany at the clinic with a cut above her eye. Tiffany fell down stairs, was taken to an emergency room and received stitches for the cut. Ms. Webb stated that she never observed Tiffany with a black eye and never had reason to believe the children were physically abused.

## ANALYSIS

Janetta Munro was a young, overburdened, high-risk parent. At any given time, while receiving intact family services from The Concord Center, Janetta was caring for four to eight of her children that included four children under the age of 4.  Janetta was not self-sufficient and had little to no support when she was emancipated.  Her parenting skills were less than adequate and she lacked the ability to provide structure and stimulation to her children.  She was a dependent and isolated mother who was frequently homeless and with a possible post-partum depression diagnosis.

### *Dependency*
It was unnecessary that David live in an institutional environment for two years.  At different junctures in his short life, there were lost opportunities to assess Janetta's ability to care for David, screen his case for dependency, and place him with a family that could meet his special needs. When David was ready for discharge, he could not be released because his mother was unable to provide him with the care necessary for his well being.  Ms. Patterson and Ms. Ladd should have consulted with DCFS Legal Services to initiate a petition in court, rather than advise the mother to call the hotline on herself.  Child Protection does not investigate dependency allegations.  Ms. Patterson and Ms. Ladd did not consider a parenting assessment to seek a professional opinion, that despite her desire, Janetta was unable to provide the care that David needed, determine what was required of Janetta to adequately parent David, and how much time was required to achieve readiness. Also, a psychological evaluation might have provided staff with insight to her strengths and deficits and behaviors. Intact staff did not consider the importance of communicating with David's physician, who might have been willing to provide a written statement in support of David's need to be in the care of a family until his mother could care for him. Despite this, The Concord Center staff had information to present David's case for screening:

- David's readiness for discharge
- Mother's inability to care for him and her statements to that effect
- Infrequent visits to see David; refusal of assistance that would have freed the mother to make visits
- Unproven parent capability to meet David's special needs
- Non participation in services
- Domestic violence
- Lack of progress in improving parenting skills
- Prior hotline calls
- Inability to meet siblings' educational and developmental needs
- Unconfirmed accounts of children's injuries
- Chaotic home environment

Engaging in alternative planning allows the intact worker to demonstrate effort to provide parents with the kind of assistance that would help to remove real and/or perceived obstacles to participation in services. Where there is parental refusal of assistance or lack of progress, documented efforts and information gathered provide a basis for intervention, such as screening a child's case. No one challenged, questioned or confronted Janetta with her lack of involvement with services, her children's school absences, inadequate visits to the nursing facility, or her refusal of transitional housing, which would have removed her and the children from an abusive relationship.

Nancy Ladd and Gladys Patterson operated on the assumption that the family's core problem was housing and the sole reason that David could not be discharged to his mother. Consequently, the intact worker and supervisor did not proactively pursue alternative planning. There was no assessment to document that it was not in David's best interest to remain in extended care in a nursing facility or return to less than minimally involved parents. Ms. Patterson did not demonstrate sufficient clinical insight of the family's pervasive problems. Her supervisory direction on this case did not reflect the experience or clinical knowledge that one would expect from a licensed clinical social worker who has worked in the field for 20 years. Ms. Patterson's supervision of an intact worker, who had minimal perception of the family's problems, had serious consequence for the direction of the case.

Ms. Ladd and Ms. Patterson gave the impression in the intact record and during the OIG interviews that they were looking to the nursing home staff to communicate to Janetta that David had to leave the facility, but could not return to her care; thus forcing the issue of his requiring substitute care. The facts are that when David was ready for discharge, Stonehedge staff inquired about foster care for David, but when told this was not a viable option, Stonehedge agreed to care for the child until his mother was ready for him. It was intact staff's responsibility for establishing grounds to recommend an alternative non-institutional living arrangement for David.

### Failure to Call Hotline

While the intact staff did not believe that the children's injuries were the result of child abuse or neglect, and therefore did not call the hotline, staff did not attempt to corroborate the mother's explanations for the injuries, even though both parents reportedly demonstrated a tendency to turn to physical violence to resolve interpersonal problems. While the children were assessed safe throughout the open intact case, staff did not conduct an adequate risk assessment. Problems were minimized, including domestic violence, child development issues, parent's difficulty meeting minimum parenting responsibilities with assistance and support from agency staff, and unconfirmed accounts of injuries to the children. Although staff perceived Janetta as "too passive" with the children, she is identified as the offender and not the victim in most of the police reports involving domestic disputes.

Chronic family problems and crises suggested the parents did not have sufficient strengths and resources to improve their situation, improve parenting skills, and minimally meet their children's developmental and educational needs. Risk and safety issues could not be mitigated through services, as the father was uninvolved and Janetta refused to participate in clinical interventions and declined child care opportunities that would allow her to visit her son more frequently. There were no stepped up efforts to involve the father in services. Change was not evidenced by the family when David was discharged home. Janetta had not demonstrated measurable or observed personal change or improvement in parenting by the time David went home. There was no evidence to support Ms. Patterson's belief that Janetta wanted to be independent and had removed herself from her "stressful" relationship with Sam Hayes when she achieved stable housing. In fact, Sam Hayes moved in with Janetta and the children. It was the inherent chaos of the home that gave plausibility to Janetta's explanations for her children's injuries over time.

The Concord Center staff should have considered respite services or protective day care for the youngest Munro children and homemaker services earlier in the case. There was sufficient argument for DCFS funded protective/family maintenance day care based on the presence of domestic violence and poor parenting skills in the home. Protective day care is provided to children in indicated reports of child abuse or neglect. Protective day care helps to reduce parental stress that may lead to abuse or neglect, foster child development, and provide additional monitoring. According to Concord's intact family services contract, the agency will provide family respite care to intact families. The service may be purchased by The Concord Center through a sub-contract, as needed. While homemaker services were established for the family, the service started 19 months after the case was opened and when David returned home. A much earlier homemaker referral may have mitigated parenting and safety issues in the home and provide intact staff with additional information for assessment, planning and intervention purposes.

### Toilet Training
Most children are ready to tackle the challenge of toilet use somewhere between ages 2 and 3, with boys generally at the latter end of this range. According to the American Academy of Pediatrics (AAP), there is no set age to begin toilet training, but most children start to show an interest between the ages of 18 months and 24 months. Some children are not ready until they are 2½ years old, however, so the child's reactions should be the parent's guide. Toilet training requires a great deal of patience and a willingness to accept setbacks. Parents are ready when they can devote up to three months of daily encouragement to their toddler. It is paramount that, when the child makes a mistake, the adult's response is not an exasperated or a punishing one.

Although a Child and Family Team meeting occurred two weeks prior to David's return home, The Concord staff did not discuss how the issue of toilet training might be approached with Janetta. At the chronological age of 2 years and 4 months, David was in the process of being toilet trained in a new home environment, he was subject to temper tantrums, and was developmentally delayed. These facts provided a volatile mix. When a bruise was observed above David's eye, staff did not consider the possibility of abuse associated with toilet training. Strong consideration should have been given to delay toilet training to allow David time to adjust to his new environment, and to allow his mother to adjust to caring for David.

The AAP warns that toilet training may be more challenging when there are stressors in the home, such as a recent or upcoming move, a new baby, or a death, illness, or other crisis that has a major impact on the family. David was 28 months old when he arrived at a new home environment after living in a nursing facility for most of his life. David's newborn sibling, Brian, arrived less than a month later. Calvin and Terrance, a special education student, were in a new school. Stephanie and Tiffany were home, as they had not started Head Start. Toilet training at the onset of David's return home was inadvisable. David was likely to experience regressive behaviors in response to a significant change in his living arrangement

and to a family with whom he had not formed a strong attachment to help him through the transition. It was likely that David's return home would increase an already highly stressed and chaotic home environment.  Janetta's children were in various phases of child development and exhibiting aggressive behaviors.  It was not surprising that soon after homemaker services started, Janetta asked for expanded hours. Most high-risk parents want help with raising their children, especially at a time when there is a child that is frustrating them.[70]

<u>Case Assignment</u>

Public health nurse Diane Webb should have recused herself from working with the Munro family while interning at The Concord Center.  Ms. Patterson should not have assigned the intact family case to Ms. Webb.  It was difficult to know where Ms. Webb's professional role boundaries began and ended during her dual involvement with the family.  In the future, Concord's management should ensure disclosure of interns' prior involvement with families that are working with the agency to avoid inappropriate case assignment.

---

[70] Schmitt, Barton D., MD, Seven Deadly Sins of Childhood: Advising Parents about difficult Developmental Phases.

# REPORT OF THE INSPECTOR GENERAL
## TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

## I. INTRODUCTION

In reviewing the literature supporting Family Assessment as a differential response, we are struck by the importance of securing meaningful services as critical to the success of Family Assessment. While the Task Force is proceeding to determine which allegations and factors would be best suited for Family Assessment, we believe that, at the same time, the Task Force needs to examine the services available for families with the specific allegations that are being considered. This "bottom-up" approach, to accompany the current work of the Task Force, is urged because of the great opportunity presented by Family Assessment to offer our families genuine assistance to address problems and prevent future involvement with the Department. In addition, the perspective of the Office of the Inspector General, which consistently reviews death and serious injury cases in which ineffective services have been offered to families, requires us to consider the effectiveness of services in conjunction with any plan for Family Assessments.

**Family Conferencing**

We note that a specific service (Family Conferencing) has been shown to have good outcomes, especially with minority populations.[71] Since one of the goals of Family Assessment in Illinois is to reduce racial disparity in placement cases, we strongly encourage that Family Conferencing be incorporated into the Family Assessment model as a primary tool for Family Assessment Workers.

Family Assessment is intended to protect and promote the health, safety and welfare of low and moderate-risk children and youth whose families otherwise would be subject to a child protective investigation. Both the Assessment and Service Provision phases can include Family Group Conferencing. Family Group Conferencing utilizes the resources of extended family to capitalize and draw on the strengths of the larger family unit.

**Services for Medical Neglect Concerns**

A family-strengthening model requires the provision of accessible, relevant and tested services, targeted to specific concerns. We are including guidelines for task-centered problem resolution when dealing with medical neglect allegations. For allegations which the committee decides Family Assessment is appropriate, these guidelines should be included in the service plans. By associating Family Assessment with the delivery of specific and critically evaluated services, we believe that the outcome for maintaining strong families will be greatly enhanced.

We chose the Medical Neglect allegation for an in-depth look at service provision both because the allegation contains a broad spectrum of severity and because it has a particularly low rate of indicated finding (16% for fiscal years 2008 and 2009). Medical Neglect allegations also account for 6% of allegations over the "J" (10th) sequence, suggesting that investigations are not resolving the concerns that brought the family into contact with the child welfare system. The Inspector General's Report to the Steering Committee on Family Assessment is informed by an in-depth review of 150 medical neglect investigations.

---

[71] This information is based on a telephone conversation in August 2009 between Dr. Kane, Inspector General, and Hennepin County Grant Manager Lisa Berry. A broad range of 500 Hennepin cases had been handled through family conferencing. Ms. Berry noted that the outcome was particularly successful (using CFSR data) in working with minority families.

In October 2006, our Ethics Board first noted the advantages of providing a secondary prevention model for some cases of medical neglect.  As a result of the suggestions made by the Ethics Board, OIG staff also began to examine the possibility of moving away from labels of abuse and neglect in some situations involving medically complex children.

Other services that should be considered after Family Assessment may be targeted to the solution of the specific concern(s) that may have resulted in the hotline call.  Some health issues, such as head lice, can be resolved quickly within the 45-day assessment period, provided the Department identifies resources designed to address the concern.  For instance, hiring a lice removal service for two weeks may do more to help a family than several months of generic services for parenting classes or monitoring housekeeping abilities.

More complex health issues will take longer – requiring greater involvement with the families (6-9 months for adequate baseline and management of medical condition).  In the role of case manager-health advocate professional, the Family Worker works with the families and their medical professional team, using a combined set of knowledge and skills necessary to remove obstacles or barriers causing medical neglect issues (e.g., transportation, babysitting, education).  The Family Worker helps communicate to the parents/caregivers the elements of a child's illness, health condition and treatment/management plan through repeated reinforcement of the educational messages, and their benefits and consequences. Service coordination and cooperation with other professionals and service providers, including school personnel, can provide parents with options, support and reinforcement.  From a combined child welfare and medical/mental health perspective, a situational and environmental assessment is more likely to be relevant and on-target, produce action-oriented tasks, and hopefully create an incentive for the family to continue to engage in health care services and prevention for their child.

**Definitions**
Medical Neglect-Allegation #79 [Rule and Procedures 300]

> Lack of medical or dental treatment for a health problem or condition that, if untreated, could become severe enough to constitute a serious or long-term harm to the child; lack of follow-through on a prescribed treatment plan for a condition that could become serious enough to constitute serious or long-term harm to the child if the plan goes unimplemented.

Developmental Disability [Developmental Disabilities Assistance and Bill of Rights Act of 2000]

> Severe chronic mental or physical disabilities that manifest before a person reaches 22 years of age, and are likely to continue indefinitely, and result in substantial functional limitations in three or more of the following areas:  self-care, receptive and expressive language, learning, mobility, self-directions, capacity for independent living, or economic self-sufficiency.

**Common Medical Neglect Allegations Appropriate For Family Assessment**
The following allegations are appropriate for alternative response:
1) Missed medical appointments
2) Mismanaged prescribed medication administration
3) Non compliance with prescribed treatment/management plan
4) Delay or fail to seek medical treatment
5) For children with medically complex conditions – the Family Worker should follow Policy Guide: Case Management Guidelines for Children with Medically Complex Conditions, IX. Intact Family Requirements.

## II.  CASE MANAGEMENT REQUIREMENTS FOR FAMILY ASSESSMENT

**ASSESSMENT**

Having secured consents for release of information, the Family Worker shall establish contact with the medical provider to verify the child's condition and status. Such verification must come from a physician, registered nurse, or dentist. The Family Worker will secure the child's treatment/management plan if:

1.  The child has/had an untreated health problem, or prescribed treatment plan was not implemented

2.  The problem or condition, if untreated, could result in serious or long-term harm to the child

3.  The treatment plan requires implementation or is simply a recommended plan that is left to the parent to decide whether to engage in treatment

4.  The family's compliance history with medical care for the child

5.  Length of time health care provider has been treating the child

6.  Are there other options the health care provider believes are safe for the child, i.e., can the treatment plan be modified, attempt a new medication schedule, have parent call in for updates [e.g., blood glucose monitor results at home] rather than through office appointments, etc. Have these options already been presented to the family?

The Family Worker will identify reason(s) for delay or failure to seek medical treatment, or missed appointments:

1.  Verify the parent/guardian/primary caretaker's explanation for unmet need, i.e., child is on a waiting list, seeing a different practitioner at every appointment (i.e., a group practice) with multiple suggested treatment plans, service is not available, change in insurance and/or coverage, problem with public aid medical card.

2.  Identify barriers to meeting the child's health needs

    a)  Parents who have developmental disabilities (See Appendix for Medical Management Guidelines for Working with Developmentally Disabled Parents)

    b)  Evaluate parents' baseline understanding of the health care need:

        1)  Parent's understanding of the child's current health condition or diagnosis
        2)  Where is the child being taken for treatment or evaluation of the issue? [If the treating physician is other than the child's primary care physician, the primary care doctor may be unaware of other health care providers, i.e., Public Health Department. The parent could be receiving multiple treatment plan options from different health care providers]
        3)  How does the parent describe their relationship with the doctor treating the issue?
        4)  How does the parent describe the treatment plan and goals?
        5)  What barriers does the parent feel are present that make adherence to the treatment plan difficult? [What steps do the parents feel need to be taken to make the treatment plan manageable?]

6) Is the parent using alternative treatments that they feel will be as successful as the recommended treatment plan from their medical provider? [Note: Different cultures have therapies that they feel are just as or possibly more effective than western medicine advice.) If the family is using alternative treatments, is their medical provider aware and how do they feel about the efficacy of the alternative treatment(s) being used by the family?

**INTERVENTION / SERVICES**

Interventions will be completed and the presenting problem(s) will be resolved within six (6) to nine (9) months.

A.    MEDICAL APPOINTMENTS

The Family Worker will transport parent and child, with no special transport needs, to medical appointments and/or assist the family to carry out the prescribed treatment plan until an intervention service plan is established and started.

Along with the parent, the Family Worker will arrange for transportation to and from appointments. Transportation service is provided for purpose of keeping medical appointments when no other means of transportation is available. Any transportation arrangement must be able to accommodate the child's special needs, if any.

1. Have child and parent identify person(s) [child's advocate] to assist with meeting medical appointments. Use of relatives, friend, church member, unpaid volunteer to transport child or provide child care to free parent for medical appointments

2. Meet with parent and child's advocate to establish arrangement

3. Parent/legal guardian will need to complete consents in order for the child's advocate to accompany child to medical appointment and be privileged to the child's health information given at the appointment, **OR**

4. Select and arrange for transportation service provider – Can provider meet specific transport needs of child? What is the service provider's track record for reliability? [*Note:* In some geographic areas older adult caretakers, age 60 and older, who are eligible for transportation services for self and dependent child through the Department on Aging.]

5. Schedule the service

6. Prepare child for pick-up

7. Contact the child's health care provider prior to the visit to confirm that they will see the child with a person other than the parent/guardian, and if any special measures are needed for the child to be seen under these circumstances. [*Note:* Different health providers/facilities interpret "consent" differently.  For instance, some providers may only require a phone call to the parent or be willing to accept written parental consent, while others may require that the parent/guardian be present.

B.    MEDICATION ADMINISTRATION

Support parent(s) through treatment plan (See Appendix for Examples of Guidelines for Task-Centered Problem Management Targeting Specific Illness - diabetes, epilepsy, sickle-cell anemia).

Review the school's medication policies [Chicago Public Schools, Illinois State Board of Education, School District].

1. School-age Children

   a) Individualized Education Plan (IEP) is necessary for all students who require medicine and/or treatment while in school.

   b) Model Section 504 Plan is for children with a chronic illness in school, i.e., diabetes, epilepsy. The plan should be individualized to meet the needs, abilities, and medical condition of the student and should include only those items that are relevant to that student.

2. Self-administration of Medication

   a) Administration of medication by a student must be under the direct supervision of the school nurse, principal or principal's designee.

3. School's Procedures for Changes in Medication

[*Note:* Prescriptions and refills for psychotropic medicine are not called in to the pharmacy; rather the prescription must be picked up in person by child's parent/guardian.]

C.    PRESCRIBED TREATMENT/MANAGEMENT PLAN

1. Arrange training/educate family (and child advocate) on treatment management
2. Arrange for assistance – person and type of help

   • Identify school personnel participating in treatment plan
   • Review IEP or Model Section 504 Plan
   • Arrange conference/mediation meeting

The Family Worker will link the family to the health issue related Support Group, i.e., The Epilepsy Foundation, The American Diabetes Association, Cystic Fibrosis Foundation.

*Mental Health*
When the parent/guardian refuses to consent to *psychiatric* treatment or dispense psychotropic medication, the Family Worker will work with a mental health social worker and the parent/guardian to educate on child's mental health diagnosis, medications, treatment and goals of treatment plan, and linkage to a Support Group.

D.    DELAY OR FAIL TO SEEK MEDICAL TREATMENT

1. The Family Worker will ensure that the treating physician is aware of the parent's explanation for delay/failure to seek treatment.

2. If the treating physician is not the child's primary care physician, the Family Worker will inform the primary care physician of the parent's delay/failure to obtain treatment for the child, the health condition of the child, and contact information of the treating physician.

3. Teen parents will be directly linked to Health Families Illinois (HFI).

4. Only after the child's treatment/management plan is being implemented will the Family Worker limit case management activity to monitor progress regarding medical appointments and/or adherence to the prescribed treatment plan.

5. NOTE: IF THE DELAY IN TREATMENT IS ASSOCIATED WITH OTHER SUSPECTED ABUSE, FOR EXAMPLE, CLINIC SUSPECTS FRACTURE, PARENTS TOLD TO TAKE CHILD TO EMERGENCY ROOM FOR X-RAY, AND PARENTS DO NOT TAKE THE CHILD TO THE EMERGENCY ROOM, THIS SHOULD BE TRANSFERRED TO TRADITIONAL INVESTIGATIVE TRACK AND CHILD SHOULD BE SEEN WITHIN 24 HOURS.

**ADDITIONAL CONSIDERATIONS FOR FAMILY ASSESSMENT CASES**
1. Families with an open Intact Family Services case at the time of case assignment:

   a) A case staffing attended by the Family Worker, intact family worker and their supervisors will occur to identify and discuss presenting issue(s) and develop action steps to be taken by the intact family worker
   b) The Family Worker may need to assist the intact family worker to resolve the problem
   c) The Family Worker will verify that the problem has been resolved

2. The Family Worker will be provided with LEADS and CANTS information for:

   a) Child-related calls
   b) Domestic violence, domestic disputes
   c) Drug-related calls

3. Families requiring further services and monitoring will be directly linked to community-based agencies, i.e., child development evaluation through Early Intervention Program; public health for immunizations; dentist for dental care.

4. Primary caretakers with no legal relationship with the child will be linked with Extended Family Support Services to assist the primary caretaker in securing custodial rights of the child.

5. Arrange for day care services for overburdened parents.

**III. SWITCH TO TRADITIONAL INVESTIGATION**
The Family Worker will initiate a switch to a traditional investigative track when any of the following circumstances are present:

   1. Evidence that child safety is compromised; observe suspicious injury
   2. Child's health condition has worsened
   3. Parent refuses to give consent for release of information on the child
   4. Observe signs of substance abuse
   5. Paramour in the home and the Family Worker observe signs of domestic violence
   6. After a reasonable period of time, initial situation that caused concern has not changed

## IV. THE ROLE OF DCFS REGIONAL NURSES

The Department's Regional Nurses can serve as valuable resources to alternative response workers. While safety decisions and case management remain the responsibility of CWS workers, Regional Nurses shall assist with:

1. Understanding treatments and medications, including how altering treatments, not attending medical appointments, or not following through on medical care plans may be harmful to the child.

2. Identifying specific questions the Family Worker needs to ask medical professionals for assessment and problem solving purposes.

3. Communicating with medical professionals to help obtain needed information.

4. Assessing communication and treatment coordination between the medical provider and parents/guardian.

## V. RESOURCES

Caring for Children with Chronic Health Care Conditions/A Guide for Caseworkers and Caregivers. The Illinois Department of Children and Family Services and Office of the Inspector General, May 2007.

The Illinois Family Conference Project Manual.  The Illinois Department of Children and Family Services and Office of the Inspector General of DCFS, November 1998.

American Academy of Pediatrics (www.aap.org)

Centers for Disease Control and Prevention (www.cdc.gov)

IDCFS Statewide Provider Database (SPD) is a searchable catalogue of community-based resources addressing the needs of children and families. Users may search the system with a child's case ID, or select services within a given area (5 to 100 mile radius), and obtain details about programs and services. The Statewide Provider Database can be accessed through D-Net Links: Resources Links: CANS, RTOS, SPD, UIR or https://illinoisoutcomes.dcfs.illinois.gov/.

Healthy Families Illinois (HFI) works with families with newborns who are at risk of child abuse or neglect. Some programs may target more specific populations, e.g., first-time teen parents. Participants receive information and referrals to improve family functioning through development of improved problem-solving skills; identification and improved access to family support systems; and development of self-sufficiency goals, i.e., completion of high school or its equivalent, and the delay of subsequent births. Services are provided through intensive home visits, commencing bi-weekly during the pregnancy or weekly for at least six months following the child's birth. Home visitation may continue at least quarterly through the first five years of the child's life.

Children and youth with developmental disabilities and or mental illnesses:
- Mood Diaries
- OIG Redacted reports

Eco-Map – Adapted for DCFS use from *Hartman, A. (1995) Diagrammatic Assessment of Family Relationships. Families in Society, 76, 111-122.*

## VI. APPENDICES

- Guidelines for Task-Centered Problem Resolution Targeting Specific Illness – Diabetes

- Guidelines for Task-Centered Problem Resolution Targeting Specific Illness – Epilepsy

- Guidelines for Short-Term Task-Centered Problem Resolution – Head Lice

- Case Example of Medical Management of Sickle-Cell Anemia Using Illinois Family Group Conference

- Medical Management Guidelines for Working with Developmentally Disabled Parents

**GUIDELINES FOR TASK-CENTERED PROBLEM MANAGEMENT TARGETING SPECIFIC ILLNESS**

**HEALTH ISSUE: CHILD WITH UNCONTROLLED DIABETES**

| BARRIER/OBSTACLE | CONCRETE TASK | ACTION |
|---|---|---|
| Parent lacks concrete resources:<br>• Information about Diabetes<br>• Medical Supplies<br>• Transportation | Family worker procures resources at once for parent:<br>• American Diabetes Association literature<br>• Sample model of Section 504 Plan for Student with Diabetes | • Transport family to next appointment<br>• Ensure family has adequate medical supplies<br>• Establish future transportation arrangement |
| Parent lacks support or reinforcement necessary from other persons<br><br>Parent feels unsupported by child's doctor<br><br>Parent is angry with school personnel<br><br>Parent and/or child experience stress, anxiety, depression related to illness | Establish communication, develop relationship between parent, extended family and health/school professionals:<br>• Secure copy of child's IEP<br>• Secure child's medical information<br>• Identify family member and/or friend to be child's advocate<br>• Schedule appointment with child's physician, parent(s) and child<br>• Schedule meeting with appropriate school personnel to discuss the physician's recommendations, treatment plan, to develop or confirm elements of the IEP or Section 504 Plan; and establish communication lines<br>• Schedule follow-up visit with doctor<br>• Family worker provides constructive feedback to parent and child<br>• Explore support group option<br>• Discuss with parent referral to a mental health professional | • Request medical information<br>• Parent, child, child's advocate and Family Worker discuss with doctor – recommendations, child's baseline, treatment plan, and role or school personnel. Clarify Type of Diabetes:<br>  a) Type 1: juvenile or insulin-dependent diabetes<br>  b) Type 2: adult or non-insulin diabetes<br>• Parent, child's advocate, and Family Worker discuss with appropriate school personnel, physician's recommendations, treatment plan, develop or confirm elements of the IEP or Section 504 Plan, and establish communication lines<br>• Follow up with doctor: Parent, child, child's advocate and Family Worker review readings with doctor of child's glucose log or chart<br>• Discuss with health professional – coping with stress, anxiety, depression associated with the illness<br>• Educate parent and child on stress management – physical and mental stress can change the level of blood glucose levels<br>• Educate and reinforce parent's positive support to child<br>• Search and link family with support group |
| Parent lacks skill and/or knowledge<br><br>Parent does not have easy, healthy affordable meal recipes | • Parent keeps log or chart of blood glucose levels and monitors levels<br>• Family Worker instructs or accompanies the parent to the library for cookbooks<br>• Family Worker procures simple, nutritious recipes for family<br>• Family worker links parent to nutritionist | • Check blood glucose (sugar) levels often<br>• Repeat demonstrations by parent and child of blood glucose level checks<br>• Reinforce parent and child's understanding of the signs and symptoms of having too high or too low of blood sugar<br>• Parent learns that monitoring glucose levels helps the child, parent and doctor figure out if the child's diet, medication and |

REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

| | | |
|---|---|---|
| | • Parent prepares grocery list; include healthy snacks<br>• Parent cooks new simple meal<br>• Parent engages child in appropriate physical activities | exercise are right for the child's type of diabetes<br>• Parent and/or child administers insulin, if needed<br>• Parent and child learn to explain child's illness to peers<br>• Special diet at home to help control the right amount of sugar intake; Family Worker observes parent:<br>  a) Avoid junk food<br>  b) Grocery shop<br>  c) Cook |
| Parent has adverse beliefs | • Family worker and parent discuss beliefs, include child advocate; link with health professional<br>• Family worker encourages parent to support child to participate in age-appropriate developmental tasks, activities | • Parent and child gain control of the child's diabetes which helps to dispel adverse beliefs |
| Parent lacks capacity to perform task | • Parent/child identify family member or friend to assist with treatment | • Parent with help from Family Worker secures re-training on charting and monitoring procedures |

**GUIDELINES FOR TASK-CENTERED PROBLEM MANAGEMENT TARGETING SPECIFIC ILLNESS**

**HEALTH ISSUE: CHILD WITH EPILESPY**

| BARRIER/OBSTACLE | CONCRETE TASK | ACTION |
|---|---|---|
| Parent lacks concrete resources:<br>• Information about Epilepsy<br>• Medical Supplies<br>• Transportation | Family worker procures resources at once for parent:<br>• Epilepsy Foundation, American Epilepsy Society (AES), The Charlie Foundation (ketogenic diet)<br>• Sample model of Section 504 Plan for Student with Epilepsy | • Print out information from websites, if parents are unable to obtain by self<br>• Provide family with local institutions (library, community outreach centers, etc.) that will enable them to access information from the web<br>• Transport family to next appointment<br>• Establish future transportation arrangement<br>• Ensure that family has adequate medical supplies |
| Parent lacks support or reinforcement necessary from other persons<br>• Parent lacks family support<br>• Parent feels unsupported by child's doctor<br>• Parent and school are not communicating effectively to establish a seizure plan<br>• Parent and/or child experience stress, anxiety, and/or depression related to illness | Establish communication and develop relationships between all those involved in child's care (parent, extended family, health/school professionals) :<br>• Secure copy of child's IEP/504 Plan<br>• Secure child's medical information<br>• Identify family member(s) and or friend(s) to be child's advocate<br>• Schedule appointments for child and parent to meet with child's primary care physician (PCP), and child's neurologist<br>• Schedule meeting with appropriate school personal to discuss physician's recommendations, treatment plan, to develop or confirm elements of the IEP or Section 504 Plan; establish communication lines<br>• Schedule follow-up visit with doctor<br>• Family worker provides constructive feedback to parent and child<br>• Explore support groups via online and/or in person for child and parent | • Request medical information<br>• Parent, child, child's advocate(s) and Family Worker discuss with doctor – recommendations, child's baseline, treatment plan, what to do if there is a change in the treatment plan, and role of school personnel.<br>• Parent, child, child's advocate(s), and Family worker discuss with appropriate school personnel, physician's recommendations, treatment plan, develop or confirm elements of the IEP or Section 504 Plan, and establish communication lines<br>  ➢ School and parent are aware of the course of action to be taken in order to secure a medication dosage change (refer to CPS policy manual – administration of medication during school hours)<br>  ➢ Parent is to provide school with all possible information concerning child's condition – typical seizures experienced and triggers<br>  ➢ Family worker should encourage school staff to ask questions<br>• Follow up with child's PCP and neurologist: Parent, child, child's advocate and Family worker to review seizure log and management<br>• Educate and praise parent for providing child with positive support<br>• Discuss with family how they cope with stress – may need to link to a mental health professional<br>• Search and link family with support groups; the Epilepsy Foundation is a good source of information and has e-communities with blogs and videos |

REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

| BARRIER/OBSTACLE | CONCRETE TASK | ACTION |
|---|---|---|
| Parent lacks skill and/or knowledge<br><br>Parent is not aware of the importance of fluctuating medication dosages | • Parent has a seizure plan and an action plan<br>• Parent has a medicine schedule<br>• Parent has a seizure observation record<br>• Family worker and parent establish home safety guidelines to prevent injury<br>• Family worker and parent discuss actions to be taken when a seizure occurs<br>• Parent understands that it is crucial to keep appointments and have necessary blood work drawn | • Parent reiterates what to do when child has a seizure<br>  o Parent is aware of the different types of seizures and how to respond accordingly<br>  o Administration of Diastat if prescribed by a doctor for use in an emergency situation<br>▪ Family worker goes through medications with parent and discusses the importance of correct dosage and timely administration<br>  ➢ Parent is able to reiterate why the amount of drug in the child's system is important<br>• Family worker ensures that safety measures are put into place by observing home environment<br>• Parent/Child is able to identify factors that may precipitate a seizure (triggers) such as stress, lack of sleep, flashing lights, etc.<br>• If child is prescribed a specific diet by a doctor such as the "ketogenic diet" parent and/or child are aware of what foods to include and what foods to avoid<br>• Parent and child learn to explain child's illness to peers |
| Parent has adverse beliefs | • Family worker and parent discuss beliefs and treatment, include child advocate; link with health care professional | • Through health literature and physician's input, work to dispel adverse beliefs |
| Parent lacks capacity to perform task | • Parent/child identifies family member or friend to assist with treatment<br>• Family work will link family to an agency that will provide assistance | • Assure parent is assisted through treatment procedures and follow-up |

REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

B-13

**GUIDELINES FOR SHORT-TERM TASK MEDICAL PROBLEM RESOLUTION**

**HEALTH ISSUE: CHILD WITH UNTREATED OR REOCCURRING HEAD LICE**

| BARRIER/OBSTACLE | CONCRETE TASK | ACTION |
|---|---|---|
| Parent lacks concrete resources. | Family worker procures resources at once for parent:<br>• Literature from the American Academy of Pediatrics and the Center for Disease Control<br>• Purchase over the counter treatment or, if indicated, a prescribed medication | • Assure timely treatment to prevent missed days from school [child may attend school after treatment]<br>• Parent starts first line treatment: medicinal Cream Rinse and use of fine-tooth comb. Inspect head every 2 to 3 days. Reapply treatment in 7-10 days as recommended by the Center for Disease Control (CDC) |
| Parent lacks support or reinforcement necessary from other persons | • Family worker reassures parent and child's family that having lice is not a sign of "uncleanliness"<br>• Parent informs school nurse/personnel of completed treatment | • Family Worker confirms appropriate school personnel are aware of issue, treatment and with confidentiality for the child as a priority<br>• If an extensive case of infestation is present with signs that the infestation has been present over a long period of time, such as scabs from the child itching and scratching the lesions, the child should be examined by a health care provider for assurance of no secondary infection or possibly the need for prescription strength treatment |
| Parent lacks skill and/or knowledge | • Family worker walks through treatment instructions with parent<br>• Family worker and parent discuss tasks to complete in home to prevent re-infection | • Assure environmental measures taken by parent at home to prevent re-infection: wash bedding in hot cycle, wash combs in hot water, vacuum carpet |
| Parent has adverse beliefs | • Family worker and parent discuss safety of treatment | • With use of health literature, work to dispel adverse beliefs |
| Parent lacks capacity to perform task | • Parent identifies family member or friend to assist with treatment | • Assure parent is assisted through treatment procedures and follow-up |

REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

**CASE EXAMPLE OF A MEDICAL MANAGEMENT OF SICKLE-CELL ANEMIA USING ILLINOIS FAMILY GROUP CONFERENCE**

The Central Region of the State at the time of this study had a higher reporting and indication rate than any other region. It had a protective rate of 3 per 1000 children. The state wide rate was 2.2 per 1000 children. The majority of families served in the family conference study were African American. Extended family members participated in 93% of study's cases, offered feedback for safe planning and provided care for the children. An orderly set of task-centered and mediation practices brought together fathers, mothers and extended family members This case illustrated that medical professional resources' efforts may be futile without the cooperation of the child's support system.

A three-year-old child had life-threatening sickle-cell anemia. The child was also profoundly deaf and had developmental disabilities. The child had been hospitalized with pneumonia and sickle-cell crisis, and had required transfusions. Her mother had a substantiated neglect report for medical neglect after she had missed her daughter's medical appointments. The medical provider had called the hotline. The mother had four children and was pregnant. The father of her youngest child and the unborn child resided with the mother, but was not listed on the lease because the local public housing rules did not allow co-habitation of unmarried couples. The family was current with their rent at the time. The mother received SSI for the child.

The above family was referred to the family conference agency within a month of the indicated medical neglect report. It was the first substantiated report on the family. The family accepted the services offered by the family conference agency. The family conference coordinator had a monthly average of four face-to-face family contacts and a .4 monthly average of contacts with collateral service providers. The family received services for eleven months, closing a few months after the birth of the fifth child. The family had established a consistent pattern of follow-up medical care for the three-year-old. The family participated in three family care and protection group conferences during this time with participation of the maternal and paternal extended family. Six family members participated in two of three scheduled conferences (See Table 1.)

REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

B-15

**Table 1**



FIGURE 2:  NUMBER OF FLATVILLE PARTICIPANTS AT
MEDIATION SESSION 5



The family conference agency's average lead time for the initial family meetings was 58 days. Information from the child's medical records was shared with the extended family at the initial meeting with progress and follow-up care shared at the subsequent meetings. The meetings took place in the evenings at the family's home. Medical care of a chronically ill child lacks a natural terminal point such as a parent finishing a course of antibiotic treatment for a child. The family demonstrated a commitment to long term support of the child with tasks focused on the care of the child or other children so the mother could attend her child's medical appointments. They also served to remind mother of her appointments and to serve as back-ups and take the child to doctors' appointments if the mother was unable to. The family coordinator took mother and child to her medical appointments when the case was first opened. (See Table 2).

**Table 2**  <u>Baseline of family's compliance with medical follow-up for three-year-old child with sickle cell for 11 months before referral to family project and nine months after referral</u>

| Before Referral to Family Conference | | | After Referral to Family Conference | | |
|---|---|---|---|---|---|
| Date | Rating | Medical appointments & hospitalizations | Date | Rating | Medical appointments & hospitalizations |
| 06/25/97 | + | Appointment kept recommended monthly follow-up appointment. Appointment set with specialist . | 05/28/98 | + | Follow-up appointment.  Child active playing.  Ten day course of medication. Pneumonia stable. |
| 08/13/97 | + | Reschedule appointment and lab work-up. Recommend monthly appointment. | 06/23/98 | + | Follow-up appointment. Possible fever. Chest X-ray, lab work-up, return tomorrow. |
| 10/14/97 | + | Evaluation by geneticist recommends bi-monthly appointment. | 06/24/98 | + | Appetite good, no fever, active without distress, cultures- continue antibiotic |
| 10/15/97 | + | Pediatrician exam notes that development had been on target until the age of 23 months when she had an acute pnuemococcal sepsis - in hospital for ten days.  Doctor's notes:  At her 15-month visit she had been doing well.  At her 18-month visit she had been speaking in 2-word phrases. | 07/98 | - | Missed – appointment not scheduled by family |
| 10/29/97 | + | Mother brought child to pediatrician walk-in because child fell and bumped head. Mother reported that child had recently begun to wheeze, had cold symptoms for about a week.  MD notes no acute distress and child appeared well nourished. | 08/11/98 | + | Follow-up appointment |
| 12/02/97 | - | Scheduled appointment not kept. | 08/31/98 | + | Refill of prescriptions |
| 12/30/97 | - | Three days hospitalization. | 09/02/98 | + | Refill of prescriptions |
| 01/14/98 | + | Follow-up appointment.  Child finished ten-day course of medication.   No fever, appetite and activity normal.  Recommend appointment in two weeks. | 09/98 | 0* | MD notes three-day hospitalization treated for febrile illness, IV antibiotics and blood transfusion.  Released cultures negative. |

REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

| Before Referral to Family Conference | | | After Referral to Family Conference | | |
|---|---|---|---|---|---|
| Date | Rating | Medical appointments & hospitalizations | Date | Rating | Medical appointments & hospitalizations |
| 02/98 | - | Child not seen for follow-up – No appointment made | 10/12/98 | + | Flu vaccine, chest x-ray chem. Panel, resolved respiratory infection continued medications. |
| 03/98 | - | Child not seen for follow-up – No appointment made | 12/09/98 | + | Hematology clinic child doing well next appointment six month follow-up |
| 04/98 | - | Child not seen for follow-up – No appointment made | 02/10/99 | + | Patient appears to show continual recovery, brought in by grandmother who wasn't sure of when mother's follow-up appointment was—MD notes this is "remarkable for the fact that mom just delivered baby yesterday. Infant is in good health.  Follow-up visit scheduled for 05/99" |
| 05/20/98 | + | Five day hospitalization (hotline call) | 03/99-04/99 | 0 | |

Rating Scale:  + = Progress/Improvement   0 = Neutral Condition   - = Worse/Negative Condition
* Rated neutral since even with medical management a sickle cell crisis occurred.

In the 18 months following the case closure there were no subsequent reports. Shortly after the case closing the mother and father married. Fatality prone illnesses require special planning. Practice parameters for the treatment in high risk-cases should include the primary physician, close cooperation with specialists, education of the individual and their support systems, close monitoring and follow-up, focus on potential triggers to the illnesses, and medication (Spector & Nicklas, 1995).  A family worker's role in situations where the family faces medical management problems includes advocacy for efficacious medical resources; otherwise, the family efforts may be futile. Likewise, the medical professional resources' efforts may be in vain without the cooperation of the child's support system

B-18

REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

**MEDICAL MANAGEMENT GUIDELINES FOR WORKING WITH DEVELOPMENTALLY DISABLED PARENTS**

Definition of Developmental Disability:

Defined by the Developmental Disabilities Assistance and Bill of Rights Act of 2000:

Severe chronic mental or physical disabilities that manifest before a person reaches 22 years of age are likely to continue indefinitely, and result in substantial functional limitations in three or more of the following areas: self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, or economic self-sufficiency.

Barriers to working with a Developmentally Disabled (DD) Parent

- Possibility of negative attitudes from health care providers towards developmentally disabled individuals due to limitations in information processing, problem-solving skills, and communication issues
- More time consuming interactions due to communication barriers, memory processing (i.e. skills may have to be re-demonstrated on multiple visits), learned behavior to compensate or conceal learning deficits, making it difficult for the demonstrator to know if the parent has successfully understood a concept
- Most families with a parent with DD have low income
- Parents with DD can have a difficult time maintaining long-term employment, thus leading to difficulties with health care insurance coverage for their dependents.
- Poor time management and keeping track of time, i.e. may miss appointments due to not allotting enough time to get to the appointment or show up one hour after the scheduled time and expect to still keep appointment
- Significant numbers of the parents with developmental disabilities have their own personal history of neglect or abuse, which may lead them to have a difficult time trusting others, can become defensive in certain situations, especially with authoritative figures, and expect relationships in their life to be "unequal."
- Often have a learned behavior since a child of being dependent on another individual to direct their actions and decisions, rewarded for being obedient. "They may even deny or minimize the difficulties in an attempt to please the caseworker." (Green & Cruz, 2000).
- They and their children may feel stigmatized due to their DD and may at times be too embarrassed to ask for help.
- Parents with DD may also be experiencing emotional and psychiatric issues in addition to their cognitive delays

REPORT TO THE STEERING COMMITTEE ON FAMILY ASSESSMENT

B-19

Caseworker's Focus

- Needs to be very individualized due to the varying degree of the DD of the parent and its affect on the family.
- Focused on the family, parent, and the child's needs.
- Allotment of more time for these families needs to be a standard due to communication barriers and need to invest time to build trust.
- Address the parent's top priority first, otherwise you may not move forward with the child's need you are trying to focus on, i.e. if they are more concerned about bills that need to be paid than learning about their son's asthma issues, focus on getting them support to pay their bills first so their attention can then go to their son's needs.
- Think through every step required to achieving a task and explain every step to the parent; i.e. if they have been missing appointments to get to their child's doctor, walk through every step to getting to an appointment from making the appointment, to the mode of transportation to get to the appointment, where to go once at the building, telling the receptionist they are there waiting to be seen, etc.
- Per "Parent to Parent of Georgia":
  - Repetition is very important for task learning – teaching one task may require multiple sessions.
  - Break down tasks into small steps
  - Prepare parent with DD and child for appointments - understanding the expectations of the appointment and writing down questions they want to ask
  - Do not assume the patient is not being cooperative if not following through on a task, they may not understand what to do and not want to admit their limitations
  - Do not assume they can read or tell time
  - Help parent with DD understand with expectation management of their children, i.e. what is an accident versus misbehavior
- Per Green and Cruz (2000):
  - Avoid making assumptions based on the first visit.
  - Be prepared for the DD parent to possibly test their boundaries with missed appointments, not answering questions, etc.
  - Model good boundaries.
  - Avoid criticizing the parent and advice giving such as "you should …"
  - "Validate feelings, offer choices, and explain consequences"
  - Assist with applications
  - Let parent set the pace for learning tasks one at a time
  - Use varied teaching techniques: model with return demonstration, examples of real life situations, guided practice, concrete examples
  - Watch for signs of fatigue and disinterest when teaching tasks

Components of Successful Medical Visit with a Parent Who Has a Developmental Disability

- Short social visits to the office prior to the appointment to desensitize the parent
- Minimize environmental noise
- Tell the parent step by step what is happening during the appointment
- Include the parent in medical decisions as much as possible
- Review with the parent what happened at an appointment for them to understand the outcome of the appointment and the next step

References:

Green, N. & Cruz, V. (2000). Parents with Developmental Disabilities. Excerpt from the training curriculum from the Metropolitan State College of Denver Social Work Program .

Hansen, S. (1999). Parents with a Disability. Through the Looking Glass Website: http://lookingglass.org/id parents/article.php

Parent to Parent of Georgia. Providing Support to Parents who have Developmental Disabilities. http://www.parenttoparentofga.org/roadmap/parentsupport/familymembersparentswithdisabilities.htm

Prater, C. & Zylstra, R. (2006). Medical Care of Adults with Mental Retardation. *American Family Physician*. 73 (12): 2175.

Tracy, J. & Iacono, T. (2008). People with developmental disabilities teaching medical students – does it make a difference? *Journal of Intellectual & Developmental Disability*. 33 (4): 345.

U.S. Department of Health and Human Services: Administration on Developmental Disabilities. (2000). http://www.acf.hhs.gov/programs/add/ddact/DDACT2.