## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| JENNIFER J. MILLER; DARIN E. MILLER; SECOND AMENDMENT FOUNDATION, INC.; ILLINOIS STATE RIFLE ASSOCIATION; and ILLINOIS CARRY, <br><br> Plaintiffs, <br><br> v. <br><br> MARC D. SMITH, in his official capacity as Acting Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 18-cv-3085 |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on the Motion for Summary Judgment (d/e 55) filed by Defendants Marc D. Smith and Kwame Raoul.  For the reasons stated below, Defendants' Motion for Summary Judgment is GRANTED.

# I.  PROCEDURAL BACKGROUND

The five Plaintiffs in this case are Jennifer J. Miller, Darin E. Miller, the Second Amendment Foundation, the Illinois State Rifle Association, and Illinois Carry.  The Millers are a married couple who are licensed foster caregivers.  Jennifer Miller additionally holds a license to operate a for-profit day care out of the Millers' family home.  The three organizational Plaintiffs are non-profit membership organizations devoted to Second Amendment advocacy.  The Millers are members of each of the three organizational Plaintiffs.

Section 7 of the Illinois Child Care Act of 1969 requires the Illinois Department of Children and Family Services (DCFS) to "prescribe and publish minimum standards for licensing" for child care facilities including home day cares and foster family homes. 225 ILCS 10/7.  Under Subsection 7(a), DCFS is required to issue regulations including:

> (13)  Provisions prohibiting handguns on day
>        care home premises except in the
>        possession of peace officers or other
>        adults who must possess a handgun as a
>        condition of employment and who reside

on the premises of a day care home;

    (14)   Provisions requiring that any firearm permitted on day care home premises, except handguns in the possession of peace officers, shall be kept in a disassembled state, without ammunition, in locked storage, inaccessible to children and that ammunition permitted on day care home premises shall be kept in locked storage separate from that of disassembled firearms, inaccessible to children;

    (15)   Provisions requiring notification of parents or guardians enrolling children at a day care home of the presence in the day care home of any firearms and ammunition and of the arrangements for the separate, locked storage of such firearms and ammunition

225 ILCS 10/7(a)(13)–(15).

In order to comply with §§ 7(a)(13)–(15) of the Act, DCFS has promulgated the following rules:

    (17)   Handguns are prohibited on the premises of the day care home except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside in the day care home.  The licensee shall post a "no firearms" sign, as described in Section 65(d) of the Firearm Concealed Carry Act, in a visible location where

parents pick up children.

(18)   Any firearm, other than a handgun in the possession of a peace officer or other person as provided in subsection (a)(17), shall be kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children.

   A)   Ammunition for such firearms shall be kept in locked storage separate from that of the disassembled firearms, inaccessible to children.

   B)   The operator of the home shall notify the parents or guardian of any child accepted for care that firearms and ammunition are stored on the premises.  The operator shall also notify the parents or guardian that such firearms and ammunition are locked in storage inaccessible to children.  The notification need not disclose the location where the firearms and ammunition are stored.

89 Ill. Admin. Code §§ 406.8(a)(17)–(18).  Hereinafter, the regulations codified at 89 Ill. Admin. Code §§ 406.8(a)(17)–(18) and the Illinois statute mandating said regulations are referred to collectively as the "Day Care Home Rule."

DCFS has also promulgated the following rule regarding firearms in foster family homes:

(o)    Any and all firearms and ammunition shall be stored and locked up separately at all times and kept in places inaccessible to children.  No firearms possessed in violation of a State or federal law or a local government ordinance shall be present in the home at any time. Loaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures.

89 Ill. Admin. Code § 402.8(o).  Hereinafter, this regulation is referred to as the "Foster Home Rule."  Together, the Day Care Home Rule and the Foster Home Rule are hereinafter referred to as the "DCFS Rules."

On April 16, 2018, Plaintiffs filed a Complaint (d/e 1) asserting that the Day Care Home Rule was an unconstitutional restriction on the Second Amendment right to keep and bear arms.  On May 29, 2019, Plaintiffs filed their Amended Complaint (d/e 19).  In the Amended Complaint, Plaintiffs assert that both the Day Care Home Rule and the Foster Home Rule are unconstitutional restrictions on the Second Amendment right to keep and bear arms.  The Plaintiffs request a declaration that the DCFS Rules are unconstitutional, as

well as preliminary and permanent injunctions enjoining Illinois from enforcing the DCFS Rules.

Plaintiffs' Amended Complaint names two defendants: Marc D. Smith, Acting Director of DCFS, and Kwame Raoul, Attorney General of the State of Illinois. Both Defendants are sued in their official capacities. On November 12, 2021, Defendants jointly filed a Motion for Summary Judgment (d/e 55), as well as a supporting Memorandum of Law (d/e 56). Defendants' Motion argues that: (1) the Millers waived their Second Amendment rights when they applied for foster home and day care home licenses, and the organizational Plaintiffs lack standing to challenge the DCFS Rules if the Millers are dismissed; (2) the DCFS Rules are consistent with a historical tradition of regulating access to firearms by minors and regulating storage of gunpowder and are, therefore, categorically outside of the scope of the Second Amendment's protection; (3) the Day Care Home Rule is a presumptively valid regulation of a "sensitive place"; (4) the Foster Home Rule "is a regulation in a longstanding tradition permitting the government to exercise control over the work of those with whom it contracts"; and (5) the DCFS

Rules survive constitutional scrutiny because they are substantially related to the Government's important interest in ensuring the safety of children.  D/e 55, ¶¶ 4–10.  Defendants also argue that Defendant Kwame Raoul, the Attorney General of Illinois, is not a proper party because he does not play a role in the enforcement of the DCFS Rules and is therefore entitled to Eleventh Amendment immunity from Plaintiffs' claims.  Id., ¶ 13.

Plaintiffs have filed a Response (d/e 63) to Defendants' summary judgment motion.  Plaintiffs argue that the Millers have not waived their Second Amendment rights, that the rights infringed by the challenged prohibitions and restrictions are within the historical scope of the Second Amendment, that day care homes are not "sensitive places" where restrictions on firearms are presumptively lawful, and that Illinois has not carried its burden of demonstrating that the DCFS Rules are "narrowly tailored" or substantially related to the Government's compelling interest in protecting children.  D/e 63, pp. 5–7, 10–13, 30.  Plaintiffs also argue that Defendant Raoul is a proper party because he is authorized by statute to enforce the DCFS Rules and may therefore

be sued under <u>Ex parte Young</u>.  <u>Id.</u>, p. 33. On January 14, 2022,
Defendants filed a Reply (d/e 64) to Plaintiffs' Response, arguing
that Plaintiffs have not established a genuine factual dispute and
that Defendants are entitled to summary judgment.

## II.   FACTS

DCFS is an Illinois state agency that provides social services to
children and their families.  D/e 56, ¶ 1.  Children can be placed in
DCFS's custody and care in a number of ways.  <u>Id.</u>, ¶ 2.  For
example, a child's parents may consent to DCFS's temporary
custody.  <u>Id.</u>  Additionally, DCFS may assume the temporary
custody of a child found within the state whose parent or guardian
cannot be located.   <u>Id.</u>  Alternatively, a court may order a child
placed in DCFS's custody and care if the child is adjudicated
abused, neglected, or dependent.  <u>Id.</u>  When DCFS is awarded
guardianship of a child, DCFS is given the rights and
responsibilities of legal custody and is required to act in the child's
best interests.  <u>Id.</u>, ¶ 3.  DCFS sometimes places children in its care
in a licensed child care facility such as a foster home.  <u>Id.</u>, ¶ 5.
Foster homes and foster parents must be licensed by DCFS.  <u>Id.</u>,

¶ 8.  DCFS provides foster parents with subsidies for the expenses incurred in caring for a foster child.  Id., ¶ 7.

DCFS is authorized to promulgate minimum licensing standards for foster homes under Section 7 of the Illinois Child Care Act of 1969.  Id., ¶ 9.  DCFS has promulgated licensing standards for foster homes in Section 402 of Title 89 of the Illinois Administrative Code.  89 Ill. Admin. Code § 402.  Section 402 describes how an individual must apply for a foster care license and the minimum standards with which licensees must comply.  D/e 56, ¶ 11.  Among other requirements, foster care licensees must agree to store tools and other dangerous household supplies away from children, must agree to refrain from smoking, and must agree that their home will be subject to inspection by DCFS to ensure compliance with all of the licensing requirements.  Id., ¶ 12.

The Foster Home Rule, 89 Ill. Admin. Code § 402.8(o), was promulgated by DCFS pursuant to DCFS's authority to create licensing standards for foster homes. The Foster Home Rule provides in relevant part that "[a]ny and all firearms and ammunition shall be stored and locked up separately at all times

and kept in places inaccessible to children" and that "[l]oaded guns shall not be kept in a foster home," subject to certain exceptions not at issue here.  Id., ¶ 15.

Jennifer and Darin Miller are DCFS-licensed foster caregivers who have cared for two foster children in the past.  Id., ¶¶ 35, 41. The Millers voluntarily chose to become foster caregivers.  Id., ¶ 44. The Millers applied for and were granted a foster caregivers' license in 2016.  Id., ¶ 36.  When the Millers cared for foster children, DCFS provided them with funds to offset expenses incurred for the care of the foster children.  Id., ¶ 51.  This financial compensation was one reason why the Millers became licensed foster parents.  Id., ¶ 52.  While applying for their foster caregivers' license, the Millers signed a "Foster Family Firearms Agreement" form provided by DCFS, which contained a restatement of the rule regarding firearms and ammunition in foster homes that was in place at the time.  Id., ¶ 43.  In 2016, the DCFS Rule regarding firearms and ammunition in foster homes stated that "[a]ny and all firearms and ammunition shall be locked up at all times and kept in places inaccessible to children" and that "[l]oaded guns shall not be kept in a foster home

unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures." D/e 56, exh. 3, pp. 3–4. However, the 2016 foster home firearm rule, unlike the current Foster Home Rule, did not require that firearms and ammunition in foster homes be stored and locked up separately. Id., pp. 4–5. The Millers are currently in compliance with the Foster Home Rule. D/e 56, ¶ 53.

In Illinois, day care homes are also child care facilities licensed by DCFS. Id., ¶ 22. Day care homes are "businesses, run out of the licensee's home, where parents of other children pay the day care licensee for child care services." Id., ¶ 23. Section 7(a) of the Illinois Child Care Act of 1969 requires DCFS to create minimum licensing standards for day care homes and requires that the standards include certain restrictions on firearms. See 225 ILCS 10/7(a)(13)–(15). In order to comply with § 7(a), DCFS has promulgated the Day Care Home Rule, which provides in relevant part that: (1) "[h]andguns are prohibited on the premises of the day care home"; (2) licensees are required to "post a 'no firearms' sign . . . in a visible location where parents pick up children"; (3)

"[a]ny firearm" on day care home premises "shall be kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children"; (4) "ammunition for such firearms shall be kept in locked storage separate from that of the disassembled firearms, inaccessible to children"; and (5) "[t]he operator of the home shall notify the parents or guardian of any child accepted for care that firearms and ammunition are stored on the premises" and "shall also notify the parents or guardian that such firearms and ammunition are locked in storage inaccessible to children."  D/e 56, ¶ 31; see 89 Ill. Admin. Code § 406.8(a)(17)–(18).  The Day Care Home Rule is subject to exceptions not at issue in this case.  D/e 56, ¶ 31.  The Day Care Home Rule applies only during the operating hours of the day care home.  Id., ¶ 32.

Jennifer Miller applied for and received a DCFS Day Care Home License in 2017 and renewed her license in 2019.  Id., ¶ 54.  Darin Miller helps his wife with the day care, but he is not the licensee.  Id., ¶ 55.  Jennifer voluntarily chose to apply for a Day Care Home License.  Id., ¶ 65.  Jennifer's day care is a business,

and the parents of the children in Jennifer's day care pay Jennifer for child care services. Id., ¶ 66.  While applying for her Day Care Home License, Jennifer signed a certification stating that she had read and was familiar with the "appellate licensing standards" and would "comply with all requirements for licensure."  Id., ¶¶ 57–58. In 2019, when Jennifer applied to renew her license, she signed a form that restated the Day Care Home Rule in full and certified that she had read and was in compliance with the Day Care Home Rule. Id., ¶¶ 61–63.

Darin Miller testified that, in the absence of the DCFS Rules, he would carry a concealed, loaded handgun in his home during day care hours and would store multiple loaded firearms in a locked safe in the Miller house.  Id., ¶¶ 83–84.  Jennifer Miller testified that, in the absence of the DCFS Rules, she would store a loaded handgun locked in a safe in the Miller house.  Id., ¶ 82.

### III.  LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party.  Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc., 986 F.3d 711, 718 (7th Cir. 2021).  When ruling on a motion for summary judgment, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  King v. Hendricks Cty. Commissioners, 954 F.3d 981, 984 (7th Cir. 2020).

## IV.   ANALYSIS

### A.    The Illinois Attorney General Is Not Entitled to Eleventh Amendment Immunity from Plaintiffs' Claims.

Defendants argue that Defendant Raoul is not a proper defendant because the Eleventh Amendment to the U.S. Constitution immunizes him against Plaintiffs' claims.  The Court disagrees.

The Eleventh Amendment limits a federal court's jurisdiction over suits against a state by a foreign state, citizens of another state, and the state's own citizens. <u>MCI Telecommunications Corp. v. Illinois Bell Tel. Co.</u>, 222 F.3d 323, 336 (7th Cir. 2000).  As such, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." <u>Bd. Of Regents of Univ. of Wis. Sys. V. Phx. Int'l Software, Inc.</u>, 653 F.3d 448, 457 (7th Cir. 2011).  The Eleventh Amendment "also bars federal jurisdiction over suits against state officials acting in their official capacities when the state is the real party in interest."  <u>MCI Telecommunications</u>, 222 F.3d at 337.  Under <u>Ex parte Young</u>, 209 U.S. 123 (1908), however, the Eleventh Amendment does not bar private parties from suing individual state officials who have "'some connection with the enforcement' of an allegedly unconstitutional state statute for the purpose of enjoining that enforcement." <u>Doe v. Holcomb</u>, 883 F.3d 971, 975 (7th Cir. 2018) (quoting <u>Ex parte Young</u>, 209 U.S. 123, 157 (1908)).

Defendant Raoul argues that he does not play a role in enforcing the DCFS Rules because he has never enforced the DCFS

Rules before.  Mr. David Buysse, the Rule 30(b)(6) designee who

testified in this matter on behalf of the Office of the Attorney

General, indicated that he was not aware of any past instance in

which the Attorney General had taken action to enforce the DCFS

Rules.  See d/e 56, exh. 18, p. 71.

      Past enforcement, however, is not required under Ex parte

Young.  All that is required is that the defendant official have "some

connection with the enforcement" of the challenged rule or statute.

Ent. Software Ass'n v. Blagojevich, 469 F.3d 641, 645 (7th Cir.

2006).  In Entertainment Software Association v. Blagojevich, 469

F.3d 641 (7th Cir. 2006), the Seventh Circuit found that the "some

connection" requirement was satisfied where the Attorney General

had the power to enforce the challenged statute, even though the

Attorney General had never prosecuted anyone for violating the

statute and shared the power to enforce the statute with the State's

Attorney.  Id. at 645.  Here, enforcement of the DCFS Rules is

governed by Section 11.1 of the Child Care Act of 1969, which

states that violations of the Act or of any rule adopted under the

authority of the Act can be referred to either the Attorney General or

the State's Attorney, who "may initiate the appropriate civil or
criminal proceedings."  225 ILCS 10/11.1; <u>see also</u> d/e 56, exh. 18,
pp. 23, 66–68 (Buysse stating that Section 11.1 "addresses
enforcement of" the Child Care Act of 1969 and conceding that the
Attorney General has the authority to enforce the DCFS Rules
under Section 11.1).  As in <u>Entertainment Software Association</u>,
Defendant Raoul and the State's Attorney have concurrent power to
enforce the DCFS Rules.  As in <u>Entertainment Software Association</u>,
this power satisfies the "some connection" requirement of <u>Ex parte
Young</u>.  Accordingly, Defendant Raoul is a proper party.

## B. Defendants Have Not Shown that the Millers Knowingly Waived Their Second Amendment Rights.

Before reaching the merits of Plaintiffs' constitutional
argument, the Court must determine whether the Millers
contractually waived their right to challenge the constitutionality of
the DCFS Rules.  When applying to be foster caregivers, the Millers
filled out and signed two forms that stated the then-current
requirements for firearm storage in their home.  When Jennifer
Miller applied for a Day Care Home License in 2017, she signed a
form that required her to declare that she had received a copy of the

DCFS Day Care Home Licensing Standards and that she had read them and was familiar with them.  Defendants argue that, by signing these forms, the Millers waived their right to challenge the DCFS Rules.

Constitutional rights, including the Second Amendment right to keep and bear arms, may be contractually waived.  See D. H. Overmyer Co. Inc., of Ohio v. Frick Co., 405 U.S. 174, 185 (1972).  However, in both civil and criminal contexts, "courts indulge every reasonable presumption against waiver" of a fundamental constitutional right.  Fuentes v. Shevin, 407 U.S. 67, 95 n.31 (1972).  Overcoming the presumption against waiver requires a showing that the waiver was knowing and voluntary.  See Bayo v. Napolitano, 593 F.3d 495, 505 (7th Cir. 2010).  Whether or not a purported waiver was given knowingly and voluntarily is "an issue which must be resolved by examining the factual circumstances of each individual case."  Scott v. Danaher, 343 F. Supp. 1272, 1278 (N.D. Ill. 1972).  If the parties to a contract including a waiver of constitutional rights (1) have bargaining equality; (2) have negotiated the terms of the contract; and (3) are represented by

competent counsel, the waiver is deemed to be knowing and voluntary as a matter of law.[1]  See Kole v. Vill. of Norridge, No. 11-CV-3871, 2017 WL 5128989, at *14 (N.D. Ill. Nov. 6, 2017). Courts need not reach the knowing-and-voluntary issue if "the contractual language relied upon does not, on its face, even amount to a waiver."  Fuentes, 407 U.S. at 95.

With respect to the Day Care Home Rule, the contractual language relied upon by Defendants appears in the "Application for a Day Care/Group Day Care Home License" that Ms. Miller filled out and signed in 2017.  The document states that Ms. Miller certifies that she is familiar with the relevant licensing standards and agrees to "comply with all requirements for licensure after the permit and/or license is issued."  D/e 56, ¶ 58.  However, the Application does not specifically mention any of the firearms restrictions imposed by the Day Care Home Rule.  See id.  "[A] waiver of constitutional rights in any context must, at the very

---

[1] Plaintiffs' Response (d/e 63) to Defendants' Motion for Summary Judgment incorrectly asserts that bargaining equality, negotiated terms, and representation by competent counsel are all necessary conditions for a knowing and voluntary waiver.  In fact, the presence of all three together is sufficient, but not necessary, to demonstrate that a waiver was knowing and voluntary.  See Allen v. Ohio Civ. Serv. Emps. Ass'n AFSCME, Loc. 11, No. 19-CV-3709, 2020 WL 1322051, at *11 (S.D. Ohio Mar. 20, 2020) (distinguishing Fuentes in part because the waiver language was simple and explicit rather than indirectly stated hidden in "fine print").

least, be clear." <u>Fuentes</u>, 407 U.S. at 95.  Due to the absence of any clear and specific contractual waiver language, the Court finds that the Millers did not waive their Second Amendment Rights by applying for a Day Care Home License in 2017.  In the alternative, the Court finds that a genuine factual dispute exists regarding whether any waiver of the Millers' Second Amendment rights with respect to the Day Care Home Rule was knowing.  According to the Millers' uncontradicted deposition testimony, the Millers did not understand that the Day Care Home Rule did not allow them to store handguns in their home during day care hours until roughly a year after they received their Day Care Home License, when a DCFS employee informed them that they were in violation of the Rule. D/e 56, exh. 4, pp. 223–25.

The Day Care Home License renewal application that Ms. Miller filled out and signed in 2019 included a "Firearms Agreement," which restated in full the day care home licensing requirements related to firearms and required Ms. Miller to affirm that she had "no handguns on the premises" and that her non-handgun firearms were stored in compliance with the Day Care

Home Rule.  D/e 58, p. 16.  Ms. Miller filled out and signed the Firearms Agreement.  The instant action, however, was filed in April 2018, and Plaintiffs' original Complaint challenged the constitutionality of the Day Care Home Rule.  <u>See</u> d/e 1.  Moreover, nothing in the Firearms Agreement indicates that, by signing the agreement, Ms. Miller agreed to abandon her ongoing lawsuit challenging the constitutionality of the Day Care Home Rule.  In context, the most reasonable interpretation of the Firearms Agreement is that Ms. Miller agreed to abide by DCFS's firearms regulations so long as they remained in effect but did not waive the Second Amendment rights implicated in her ongoing lawsuit against DCFS.  <u>See</u> <u>Lewis X. Cohen Ins. Tr. v. Stern</u>, 696 N.E.2d 743, 751 (Ill. App. 1998) ("The primary objective in contract construction is to give effect to the intention of the parties and that intention is to be ascertained from the language of the contract.").

With respect to the Foster Care Home Rule, a genuine dispute exists regarding whether the Millers understood themselves to be waiving their rights under the Second Amendment when they applied to be foster parents in 2016.  The evidence presented by

Defendants to show that the Millers' purported waiver was knowing consists of two documents, an "Acknowledgement of Compliance" and a "Foster Family Firearms Agreement," which were signed by the Millers in 2016.  See d/e 56, ¶¶ 38–43.  The Millers were not represented by counsel when they signed the relevant documents, and the documents were offered to them on a take-it-or-leave-it basis, without any negotiation of terms.  Nor was there bargaining equality between the parties; DCFS is a large and sophisticated government agency that can draw on decades of legal and bureaucratic expertise, while the Millers are individuals with no legal education or training.  Furthermore, Defendants have not presented any testimony of the Millers indicating that they knew themselves to be waiving their rights to later challenge the Foster Home Rule when they applied to be foster caregivers.  Under these circumstances, the issue of whether the Millers' waiver was knowing and voluntary is genuinely disputed and, therefore, inappropriate for resolution at the summary judgment stage.  See Scott, 343 F. Supp. At 1278 (holding that the issue of whether a contractual waiver of constitutional rights was knowing and

voluntary depends on "the factual circumstances of each individual case"); <u>Fuentes</u>, 407 U.S. at 95 (finding no waiver of due process rights by individual plaintiffs who entered into conditional purchase agreements for household goods where there "was no bargaining over contractual terms," parties were "far from equal in bargaining power," and "appellees made no showing whatever that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights").

Because Defendants have not carried their burden of overcoming every reasonable presumption against waiver, the Court finds that the Millers have not waived their Second Amendment challenge to the Day Care Home Rule and that a genuine factual dispute exists as to whether the Millers waived their challenge to the Foster Home Rule.  But, while Defendants have not shown that any waivers executed by the Millers were knowingly and voluntarily executed, the Millers' decision to become foster caregivers and Jennifer Miller's decision to apply for a Day Care Home license were undisputedly voluntary.  D/e 56, ¶¶ 44, 65.  Both decisions were motivated in part by the promise of valuable consideration from

DCFS, in the form of direct money payments or licensure.  See id.,
¶¶ 52, 66.  Moreover, the Millers could, at any time, have recovered
the full measure of their Second Amendment rights had they been
willing to give up their DCFS licenses and cease serving as foster
caregivers and operating a Day Care Home.  There is, therefore, an
element of voluntariness in the Millers' assumption of the burdens
associated with DCFS licensure.  The Court will consider this
element of voluntariness in the Court's analysis of the
constitutionality of the DCFS Rules as applied to the Millers.

## C.   The Court Will Analyze Plaintiffs' As-Applied Challenges to the DCFS Rules Before Considering Whether to Address Plaintiffs' Facial Challenges.

Plaintiffs assert both as-applied and facial challenges to each
of the challenged DCFS Rules.  An as-applied challenge asserts that
a law or regulation "is unconstitutional as applied to a plaintiff's
specific activities even though it may be capable of valid application
to others."  Surita v. Hyde, 665 F.3d 860, 875 (7th Cir. 2011).  A
facial challenge, by contrast, asserts that the challenged law or
regulation "is wholly invalid," in all of its applications, and "cannot
be applied to anyone."  Ezell v. City of Chicago, 651 F.3d 684, 698

(7th Cir. 2011).  For reasons of judicial efficiency, as well as considerations relating "to the proper functioning of the courts," the appropriate response to a dual challenge like Plaintiffs' is to consider the as-applied challenge first, and then, if the as-applied challenge succeeds, to address the facial challenge if doing so is appropriate.  Bd. of Trustees of State Univ. of New York v. Fox, 492 U.S. 469, 485 (1989); see also Berron v. Illinois Concealed Carry Licensing Rev. Bd., 825 F.3d 843, 846 (7th Cir. 2016) ("[T]he Supreme Court insists that, with few exceptions, statutes and regulations be evaluated in operation ('as applied') rather than peremptorily.").  Because the DCFS Rules, as applied to the Millers, do not violate the Second Amendment, the Court rejects the Millers' as-applied challenge.  As Plaintiffs have not offered any reason why the DCFS Rules are unconstitutional as applied to any broad swath of affected persons other than the Millers, the Court also rejects Plaintiffs' facial challenge.

**D.    The Day Care Home Rule Survives Constitutional Scrutiny.**

Plaintiffs request a declaration that the Day Care Home Rule imposes an unconstitutional restraint on the Millers' Second

Amendment right to keep and bear arms.  Plaintiffs additionally request the issuance of an injunction prohibiting Defendants from enforcing the Day Care Home Rule against the Millers and any other day care home licensees in the state of Illinois.

The Second Amendment to the U.S. Constitution states: "a well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court ruled that a District of Columbia law that amounted to an "absolute prohibition of handguns held and used for self-defense in the home" violated the Second Amendment.  Id. at 636.  Subsequently, in McDonald v. City of Chicago, 561 U.S. 742 (2010), the Supreme Court struck down a Chicago law "effectively banning handgun possession by almost all private citizens" and held that the right recognized in Heller is incorporated against the states through the Due Process Clause of the Fourteenth Amendment.  Id. at 750.

Shortly after McDonald, the Seventh Circuit set forth in Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011) ("Ezell I"), a two-

step inquiry used to determine the constitutionality of state and local laws and regulations challenged on Second Amendment grounds.  At the first step, the Court undertakes a "textual and historical inquiry into original meaning" to determine whether the restricted activity is "categorically unprotected" by the Second Amendment.  Id. at 701, 703.  At the second step, the Court applies "some level of 'means-ends' scrutiny to establish whether the regulation passes constitutional muster."  Williams, 616 F.3d at 691.

Ezell I's two-step inquiry is sometimes complicated by what has come to be known as the "sensitive places" doctrine.  See United States v. Masciandaro, 638 F.3d 458, 472 (4th Cir. 2011). In dicta which several Circuit courts have treated as binding, see, e.g., Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1125 (10th Cir. 2015), the Supreme Court in Heller announced that

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Heller, 554 U.S. at 626–27.  This passage was accompanied by a footnote stating "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  Id. at 627 n.26.  Subsequently, in McDonald, the Supreme Court repeated its "assurances" regarding the presumptive lawfulness of prohibitions on firearms in sensitive places and noted that "incorporation does not imperil every law regulating firearms." Id. at 786.

Some federal appeals courts have treated areas that are like the "sensitive places" mentioned in Heller as categorically outside the scope of the Second Amendment.  See United States v. Marzzarella, 614 F.3d 85, 92 (3d Cir. 2010) ("[T]he Second Amendment affords no protection for . . . the carrying of weapons in certain sensitive places."); Bonidy, 790 F.3d at 1125 (finding Heller's sensitive places dicta binding and holding that "the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices").  The Seventh Circuit, however, has expressed uncertainty as to whether laws regulating firearms in "sensitive places" are entirely immune from Second Amendment

scrutiny.  See Ezell v. City of Chicago, 846 F.3d 888, 894–95 (7th Cir. 2017) ("Ezell II") ("We're not sure that's the correct way to understand the Court's 'sensitive places' passage"); see also United States v. Williams, 616 F.3d 685, 692 (7th Cir. 2010) ("Heller referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge."); United States v. Skoien, 614 F.3d 638, 639 (7th Cir. 2010) (cautioning against reading Heller as a "comprehensive code" and treating the passage on presumptively lawful regulatory measures as "informative" but not "dispositive").  Therefore, the Court will not substitute "sensitive places" analysis for the two-step inquiry prescribed by the Seventh Circuit in Ezell I.

However, a determination as to whether day care homes are "sensitive places" will inform the Court's means-ends analysis under step two of the Ezell I framework.  This approach is consistent with that taken by other district courts in the Seventh Circuit in recent years.  See Solomon v. Cook Cty. Bd. of Commissioners, No. 17-CV-6144, 2021 WL 4147167, at *16 (N.D.

Ill. Sept. 13, 2021); <u>United States v. Redwood</u>, No. 16-CR-80, 2016
WL 4398082, at *4 (N.D. Ill. Aug. 18, 2016).

A number of courts have held or implied that the presence of
children militates in favor of a given place being "sensitive." <u>See</u>
<u>Masciandaro</u>, 638 F.3d at 473 (upholding conviction for carrying a
loaded gun in a vehicle in a national park area "where large
numbers of people, including children, congregate for recreation");
<u>Ezell II</u>, 846 F.3d at 905–07 (Rovner, J., concurring in part)
(suggesting that states have a "wide latitude" to restrict firearms to
protect the safety of children and may even "interfere fairly
significantly" with the rights of parents and employ resources "to
protect children from harm even where the risk of harm is slight or
negligible"); <u>Solomon</u>, 2021 WL 4147167, at *21 (striking down
overbroad regulation that banned firearms in all Forest Preserve
District sites, rather than only in those sites at which children were
frequently present); <u>Redwood</u>, 2016 WL 4398082, at *4 (upholding
ban on firearms in school zones and observing that "[i]t is evident
beyond need for elaboration" that protecting children is an

important government interest) (quoting <u>New York v. Ferber</u>, 458 U.S. 747, 756 (1982)).

The fact that day cares are designated spaces for the care of young children is a powerful indicator that they may be "sensitive places." Moreover, a ban on firearms in day cares is closely analogous to a ban on firearms in schools, which is one of the core "presumptively lawful" measures referenced in <u>Heller</u>. For these reasons, the Court finds that licensed day cares are "sensitive places" in which unusually restrictive firearms prohibitions may be permissible. As discussed above, however, this finding does not eliminate the need to analyze the Day Care Home Rule under the two-step <u>Ezell I</u> framework.

The Court begins with step two, because step one's historical analysis is unnecessary if the challenged law or regulation survives step two's "means-ends" scrutiny. <u>See</u> <u>Redwood</u>, 2016 WL 4398092, at *3 ("Here, the Court need not address whether the prohibition of guns in school zones falls outside of the historical ambit of the Second Amendment, as § 922(q)(2)(A) passes constitutional muster under the appropriate standard of

review."); <u>Williams</u>, 616 F.3d at 692 (skipping step one where challenged statute survived step two scrutiny).  At step two, the Government bears the burden of "justifying its action[s] under <u>some</u> heightened standard of judicial review."  <u>Ezell I</u>, 651 F.3d at 706. The applicable standard of review is "akin to intermediate scrutiny" but can be more or less strict depending on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."  <u>Kanter v. Barr</u>, 919 F.3d 437, 441 (7th Cir. 2019).  Severe burdens that affect the core of the Second Amendment's guarantee "require a very strong public-interest justification and a close means-end fit," while "lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified."  <u>Id.</u> at 441–42 (quoting <u>Ezell II</u>, 846 F.3d at 892).

The Day Care Home Rule affects day care facilities, which are among the "sensitive places" in which restrictions on firearms are presumptively lawful.  However, the affected day cares are also homes, and <u>Heller's</u> central holding is that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates

above all other interests the right of law-abiding, responsible
citizens to use arms in defense of hearth and home." Heller, 544
U.S. at 635.  Possession of a handgun in the home for self-defense
is "the core Second Amendment right." Ezell II, 846 F.3d at 895.
Plaintiffs' challenge to the Day Care Home Rule, therefore, pits the
core Second Amendment right against the core exception to that
right.

An absolute prohibition on keeping handguns in the home
during day care hours is a relatively severe burden on the core
Second Amendment right.  However, relatively few people are
affected by the Day Care Home Rule.  In fact, the institutional
Plaintiffs have not been able to name any members other than the
Millers who would be affected.  See d/e 63, exh. 1, ¶¶ 93–95.
Moreover, the only households affected are those that have chosen
to apply for a Day Care Home License and accept the various
burdens and requirements associated with licensure.  See id.,
¶¶ 65–72 (listing various burdens placed on day care home
licensees, including installation of cabinet locks and outlet covers,

CPR and first aid certifications for the licensee, and presence of age-appropriate toys).

In Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012), the Seventh Circuit observed that "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places." Id. at 940. The Moore court called such a restriction a "lesser burden" and stated that the state "doesn't need to prove so strong a need" as it would in the case of a more general prohibition. Id.; see also Illinois Ass'n of Firearms Retailers v. City of Chicago, 961 F. Supp. 2d 928, 936 ("Moore ultimately looked to two factors on the sliding scale to fashion the level of scrutiny: how much activity was regulated . . . and who was regulated . . . ."). Here, the Millers can preserve their undiminished Second Amendment rights simply by ceasing to operate a day care. Because the Day Care Home Rule restricts the Second Amendment rights of relatively few individuals, and because affected individuals can preserve their Second Amendment rights by ceasing to operate a home day care, the Court finds that intermediate scrutiny is appropriate. See Williams, 616

F.3d at 692 (applying intermediate scrutiny to an as-applied challenge to a "presumptively lawful" regulation banning felons from possessing firearms, including in the home for self defense).

"To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." Id.  It is "evident beyond the need for elaboration" that Illinois' objective of protecting children from injury and death is extremely important.  New York v. Ferber, 458 U.S. 747, 756 (1982).  The Supreme Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." Id. at 757.  The determinative question, therefore, is whether the State has presented sufficient evidence to demonstrate that the Day Care Home Rule bears a substantial relation to the advancement of that objective.

The Court finds that the State has carried its burden. According to the report of Defendants' experts, Drs. Miller and

Azrael (the "Miller-Azrael Report"), the Day Care Home Rule likely reduces the risk to children in Day Care Homes of death or injury from gunfire.  D/e 56, exh. 16, p. 13.  Admittedly, Defendants have not produced direct evidence specifically addressing the issue of whether children in day care homes benefit from the removal of handguns or the storage of other firearms disassembled in locked containers separate from ammunition.  The Miller-Azrael Report concedes that "studies have focused on the risk posed by household firearm ownership," rather than the risk posed by firearms stored in Day Care facilities.  Id.  But any regulation aimed at reducing the risk of an already unlikely event will be difficult to support with hard data, given the difficulty of producing a large enough sample size to support a given conclusion.  And the more narrowly tailored the regulation, the more difficult this sample size problem is to overcome.  Furthermore, since firearms have already been prohibited in day cares in Illinois and many other states for several decades, there is very little recent data available addressing the issue of what would happen if such a prohibition were removed.  See d/e 56, exh. 3 (reviewing the history of precursors to the Day

Care Home Rule in Illinois).  Nevertheless, some unlikely events, such as accidental death or injury to a young child from gunfire in a day care setting, are so devastating on the rare occasions when they do occur that regulations aimed at reducing their likelihood may be justified with data from suitably analogous situations.

Accordingly, the Court accepts the Miller-Azrael Report's finding that there exists "strong link between children's exposure to firearms and the risk of injury and mortality from firearms" and that "the findings of the studies [Miller and Azrael] cite apply equally to households in which children live and households in which children spend time."  D/e 56, exh. 16, p. 13.  More specifically, the Court accepts that removing handguns from day care premises during day care hours and requiring firearms other than handguns to be stored disassembled and unloaded in a locked container with ammunition stored in a separate locked container will reduce the risk of accidental injury or death from gunfire to young children in day care homes.  See id., pp. 10–11, 13–14.

Additionally, the Day Care Home Rule is narrowly tailored to serve the government's compelling interest in protecting children.

As applied to the Millers, the Day Care Home Rule applies only during the daytime hours when their home most closely resembles a school or other "sensitive place" where restrictions on firearms are presumptively lawful.  The Rule places no restrictions on the Millers' Second Amendment rights at night, when the need to defend the home may be greatest.  Having considered the evidence presented, the Court concludes that Illinois has carried its burden of demonstrating that the Day Care Home Rule is substantially related to an important governmental interest.

**E.    The Foster Home Rule Survives Constitutional Scrutiny.**

The Foster Home Rule provides in relevant part that "[a]ny and all firearms and ammunition shall be stored and locked up separately at all times and kept in places inaccessible to children" and that "[l]oaded guns shall not be kept in a foster home," subject to certain exceptions not at issue in this case.  D/e 56, ¶ 15.

Foster homes, like day cares and schools, are characterized by the presence of children.  However, Defendants do not argue that foster homes are "sensitive places" like schools and day cares.  Moreover, a foster home does not have defined hours in which

children are present, but rather functions simultaneously as a home and a child care service at all times when a foster child is present.  Accordingly, while the Court does not find that foster care homes are among <u>Heller</u>'s "sensitive places," the Court will consider the unique and sensitive domestic nature of the foster home when the Court analyzes the Foster Home Rule under the two-step <u>Ezell I</u> framework.  Like the Day Care Home Rule, the Foster Home Rule survives means-ends scrutiny, so it is not necessary to analyze whether the Foster Home Rule lies outside the historical scope of the Second Amendment.

Like the Day Care Home Rule, the Foster Home Rule burdens the core Second Amendment right, the right to use a handgun in self-defense in the home.  Additionally, the Foster Home Rule is significantly broader in its application than the Day Care Home Rule.  Where the Day Care Home Rule applies only to day care businesses that operate out of homes and applies only during day care hours, the Foster Home Rule applies twenty-four hours a day, seven days a week, to every foster caregiver who is not a law enforcement officer.

However, the Foster Home Rule imposes a much less substantial burden on the Second Amendment rights of affected individuals than the Day Care Home Rule.  While the Day Care Home Rule prohibits handguns entirely and requires that all firearms besides handguns be stored disassembled and in a locked storage facility separate from the locked storage facility in which ammunition is kept, the Foster Home Rule, as applied to the Millers, requires only that firearms and ammunition be "stored and locked up separately at all times and kept in places inaccessible to children."  89 Ill. Admin. Code § 402.8(o).  Given the relatively light burden placed on the Second Amendment rights of foster caregivers, the Court finds that intermediate scrutiny is the appropriate standard of review.

The Foster Home Rule, like the Day Care Home Rule, restricts the rights of persons who can regain their undiminished Second Amendment rights by ceasing to provide the child care services for which licensure is required.  But while a Day Care Home License allows private individuals to provide child care services for other private individuals, a foster caregiver license allows private

individuals to provide child care services for the State of Illinois
itself.  DCFS, not the foster parent, is typically the legal guardian of
children placed into foster homes, and DCFS has a continuing
obligation to act in the best interests of foster children.  See 705
ILCS 405/1-3(8); 89 Ill. Admin. Code § 327.2–327.4.  The State's
interest in ensuring the safety of foster children, therefore, is still
more compelling than the State's interest in ensuring the safety of
children generally.

Moreover, the Millers, as foster caregivers, are government
contractors.  See Fulton v. City of Philadelphia, Pennsylvania, 141
S. Ct. 1868, 1878 (2021) (recognizing foster care agency as
government contractor and, nevertheless, holding licensing
requirement for foster care agency unconstitutional under the Free
Exercise Clause of the First Amendment because requirement
discriminated on the basis of religion and did not survive strict
scrutiny).  DCFS's existing licensing standards place a number of
fairly onerous burdens designed to ensure the safety of foster
children on foster parents, including storing tools and other
dangerous household supplies away from children, refraining from

smoking, and agreeing that the foster home will be subject to inspection by DCFS to ensure compliance with all of the licensing requirements. 89 Ill. Admin. Code §§ 402.8(i), (m), 402.27. Licensed foster caregivers also agree to partially relinquish their Fourth Amendment right to be free from unreasonable searches and seizures in exchange for licensure. See Van Dyke v. Fultz, No. 13-CV-5971, 2018 WL 1535141, at *4 (N.D. Ill. Mar. 29, 2018) (finding that social worker could reasonably have believed that foster parent had consented to allow social workers to enter the home without warning and without a warrant to retrieve the foster child). The Millers accepted these burdens and restrictions in exchange for the benefits of licensure, including the payments DCFS provides to defray the expenses associated with caring for the foster child. See d/e 56, ¶¶ 44, 52. While the question of whether the Millers voluntarily waived their Second Amendment rights by applying for a Foster Home License is disputed, Plaintiffs concede that the Millers became foster caregivers "voluntarily" and in part because of the financial assistance offered to foster caregivers by DCFS. Id.; see d/e 63, exh. 1, ¶¶ 44, 52. Furthermore, the Millers can, at any

time, escape the application of the Foster Home Rule by giving up their foster caregivers' license.

Few courts have considered the question of when government contractors can be contractually required to relinquish their Second Amendment rights.  Accordingly, the Court looks to analogous precedents in the more developed area of First Amendment law. See Ezell I, 651 F.3d at 697, 702–03 (modeling framework for analyzing Second Amendment claims on analogous framework used for First Amendment claims); see also Marzzarella, 614 F.3d at 89 n.4 (relying on First Amendment precedents for guidance while interpreting the Second Amendment and reasoning that "Heller itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment").  Supreme Court precedents establish that statements made by government employees pursuant to their professional duties are categorically unprotected by the First Amendment.  Garcetti v. Ceballos, 547 U.S. 410, 426 (2006).  Government contractors also "accept certain restrictions on their freedom as part of the deal." Fulton, 141 S. Ct. at 1878.  Considerations of managerial efficiency

require that governments be allowed considerable freedom in the management of their contractual relationships.  See Comsys, Inc. v. Pacetti, 893 F.3d 468, 471 (7th Cir. 2018) (holding, in part because of the need to allow governments to flexibly manage their internal affairs, that the First Amendment does not protect public contractors from retaliation for job-related speech).  The principle behind these First Amendment decisions applies with equal force in this case.  Like any other parent or guardian, Illinois must be afforded considerable latitude to make its own reasonable decisions regarding how best to ensure the physical safety of the children in its custody.

Based on its consideration of analogous First Amendment precedents, as well as the evidence presented by Defendants, the Court concludes that the safe storage requirements imposed by the Foster Home Rule survive intermediate scrutiny.  The Miller-Azrael Report uses reliable data to demonstrate that "risk of firearm injury and mortality is significantly reduced, but not eliminated, by storing guns and ammunition in a way that makes them less accessible to children (that is, locking, unloading, storing separately from

ammunition)." D/e 56, exh. 16, p. 12.  This is sufficient to establish that the Foster Home Rule is substantially related to Illinois's compelling interest in safeguarding foster children from injury and death.  This conclusion is bolstered by precedents from outside of the Seventh Circuit.  The Ninth Circuit, for example, found in 2014 that a law imposing comparable safe storage requirements on an entire city survived intermediate scrutiny, in part because "a modern gun safe may be opened quickly."  <u>Jackson v. City & Cty. of San Francisco</u>, 746 F.3d 953, 964 (9th Cir. 2014).

Because the Court's conclusion that both of the DCFS Rules survive intermediate scrutiny would be the same regardless of whether or not the Court considered Plaintiffs' challenged evidence, the Court does not reach the issue of the admissibility of the testimony and expert report of Mr. Marty Hayes or the other sources referenced in Plaintiffs' Response.  <u>See</u> d/e 43, 62–64.

## V.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (d/e 55) is GRANTED.  The Clerk is DIRECTED to enter final judgment in favor of Defendants Marc D. Smith and

Kwame Raoul and against the Plaintiffs.  Any pending motions are

DENIED as MOOT, any pending deadlines are TERMINATED, and

any scheduled settings are VACATED.  This case is CLOSED.

**ENTERED:  March 14, 2022**

**FOR THE COURT:**

*/s/Sue E. Myerscough*
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**