## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, <br><br> Plaintiffs, <br><br> v. <br><br> HEIDI E. MUELLER, in her official capacity as Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 3:18-CV-3085 |

## PLAINTIFFS' F.R. CIV. P. 56(a) MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs, DARIN E. MILLER, JENNIFER J. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, by and through undersigned counsel, and, pursuant to Rule 56(a) of the Federal Code of Civil Procedure (Fed. R. Civ. P. 56(a)), move this Honorable Court to enter summary judgment in their favor. A Memorandum in Support of this Motion will be filed at or near the time of the filing of this Motion.

Dated: September 6, 2025

Respectfully submitted,

By:  _____/s/ David G. Sigale_____
Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:18-CV-3085 |
| HEIDI E. MUELLER, in her official capacity as Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF
### F.R. CIV. P. 56(a) MOTION FOR SUMMARY JUDGMENT

Plaintiffs, DARIN E. MILLER, JENNIFER J. MILLER, SECOND

AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION,

and ILLINOIS CARRY, by and through undersigned counsel, and, in support of

their F.R. Civ. P. 56(a) Motion for Summary Judgment, states as follows:

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ...................................................................................... 1

UNDISPUTED MATERIAL FACTS ........................................................ 1

ARGUMENT ............................................................................................ 24

STANDING .............................................................................................. 24

SUMMARY JUDGMENT STANDARD .................................................. 25

I. *Bruen* makes clear that the Second Amendment requires a categorical approach based on text and history. ........................................................ 27

II. The Foster Home Ban and Day Care Home Ban are inconsistent with the Second Amendment's text and history. ...................................................... 28

    A. The proper historical analysis focuses on Founding-Era restrictions, and late-nineteenth-century laws cannot be used to contradict the Second Amendment's plain meaning................................................................ 29

    B. Modern firearm restrictions must be closely analogous to historical restrictions, and the inquiry into historical analogues does not give the State a regulatory blank check. ....................................................................... 33

    C. The challenged bans are not justified by any historical tradition of firearm regulation. ................................................................................... 34

        Neither foster homes nor home day cares qualify as "sensitive places." .................................................................................................. 35

CONCLUSION ......................................................................................... 41

## TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                          **<u>Page</u>**

*Bauer v. Shepard*,
620 F.3d 704 (7th Cir. 2010) ............................................................................. 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...........................................................................................25

*Crawford v. Washington*,
541 U.S. 36 (2004) ............................................................................................ 30

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..........................................................26, 27, 28, 32, 35

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .............................................................. 24 ,25, 32,35

*Khan v. State Oil Co.*,
93 F.3d 1358 (7th Cir. 1996) ............................................................................ 31

*King v. Preferred Technical Group*,
166 F.3d 887 (7th Cir. 1999) ...........................................................................25

*Latke v. Cont'l Cas. Co.*,
248 F. Supp. 2d 797 (C.D.Ill. 2003) ...............................................................25

*Lynch v. Donnelly*,
465 U.S. 668 (1984) ......................................................................................... 30

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ..................................................................................... 29, 33

*Malloy v. Hogan*,
378 U.S. 1 (1964) ............................................................................................. 30

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ....................................................................... 32, 33

*Myers v. United States*,
272 U.S. 52 (1926) .......................................................................................... 30

*Nevada Comm'n on Gaming Ethics v. Carrigan*,

iii

564 U.S. 117 (2011) ................................................................. 30

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
142 S. Ct. 2111 (2022) ................................. 27, 28, 30, 31,32, 33, 34, 35, 36, 38, 39, 40

*People v. Buffalo Confectionary Co.,*
401 N.E.2d 546 (Ill. 1980) ....................................................... 5

*Schoenthal v. Raoul,*
2025 U.S. App. LEXIS 22464 (Sept. 2, 2025) ................................36, 37

*State Oil Co. v. Khan,*
522 U.S. 3 (1997) ................................................................. 32

*United States v. Rahimi,*
602 U.S. 680 (2024) .......................................................... 34, 37

*Virginia v. Moore,*
553 U.S. 164 (2008) ............................................................. 30

*Winter v. Minn. Mut. Life Ins. Co.,*
199 F.3d 399 (7th Cir. 1999) ................................................... 25

## Constitutions and Statutes

U.S. CONST.
    amend. II .................................................................. 27

Fed. R. Civ. P. 56(c) ............................................................ 25

15 ILCS 205/4 ................................................................... 5

225 ILCS 10/7 .......................................................... 3, 4, 5, 22, 23

2 Ill. Adm. Code 775.320 ...................................................... 6

2 Ill. Adm. Code 775.330 ......................................................6

89 Ill. Adm. Code 402.8 ...................................................... 24

89 Ill. Adm. Code 406.8 ...................................................... 23

iv

D.C. CODE §§

    7-2501.01(12) ............................................................................. 26

    7-2502.01(a) ............................................................................... 26

    7-2502.02(a)(4) ........................................................................... 26

## <u>Other Authorities</u>

Mark W. Smith, "*Not all History is Created Equal": In the Post-Bruen*
*World, the Critical Period for Historical Analogues is when the*
*Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022)
*available at* https://bit.ly/3CMSKjw ........................................................ 29

## INTRODUCTION

The Foster Home and Day Care Home Rules and statutes at issue in this case, which ban law-abiding adults licensed to foster parent, or provide day care in their own homes, from keeping functional firearms for self-defense, violate the Plaintiffs' Second Amendment rights under *District of Columbia v. Heller* and are therefore unconstitutional.

Using the appropriate historical analysis as required by *New York State Rifle & Pistol Ass'n v. Bruen*, Defendants cannot justify the challenged prohibitions and restrictions. Since firearm possession in one's home is clearly within the plain text of the Second Amendment, the burden falls on the Defendants to show the challenged laws and rules are consistent with the Nation's historical tradition of firearm regulation. But Defendants are unable to do so, because they (1) cannot offer analogues from the appropriate *historical period*, and (2) they cannot offer "well-established and representative" historical restrictions that are closely analogous to the challenged bans.

Therefore, when *Bruen*'s careful instructions for applying its text and history test are followed, it becomes inescapably clear that the challenged rules fail to meet constitutional muster. Summary judgment for Plaintiffs should be entered.

## UNDISPUTED MATERIAL FACTS

1.      Darin and Jennifer Miller are citizens of the United States, and residents and citizens of the State of Illinois, currently residing in Shelbyville. *See* Declaration of Darin E. Miller, attached hereto as Exh. A, at ¶2; *see also* Declaration of Jennifer J. Miller, attached hereto as Exh. B, at ¶2.

2.      Darin and Jennifer are licensed foster parents with the State of Illinois. Though they are not currently fostering at the present time, it is their intent to continue to do so in the future. Exh. A, ¶3; Exh. B, ¶3; *see also* Defs' SJ Exh. 1 at p.20 (DCFS002259).

3.      As a condition to receiving their foster parenting license from the State of Illinois, as part of the application process the Millers were required to complete an Acknowledgment of Compliance of the firearm restrictions (then numbered as Rule 402.8(g)), and a Form CFS 452-2 ("Foster Family Firearms Agreement"). The former required a statement if there are firearms on the premises, while the latter stated the DCFS Rule (then numbered as Rule 402.8(g)), and requires the applicant to disclose where any firearms and/or ammunition are located within their home. *See*, e.g.*,* Defs' SJ Exh. 1 at p.25 (DCFS002365); *see also* Defs' SJ Exh. 1 at p.21 (DCFS002266).

4.      Jennifer is also a licensed home daycare operator in the State of Illinois, and she conducts that activity in the home Darin and she share in Shelbyville. Exh. B, ¶4; Exh. A, ¶4; *see also* Defs' SJ Exh. 1 at p.27 (DCFS003877).

5.      As a condition to receiving her home daycare license from the State of Illinois, as part of the application process Jennifer was required to complete a Firearms Agreement, which recites the applicable DCFS rules, and requires affirmation of compliance. *See* Defs' SJ Exh. 1 at p.19 (DCFS002239).

6.      Neither Darin nor Jennifer is prohibited under state or federal law from acquiring or possessing firearms or ammunition. Exh. A, ¶5; Exh. B, ¶5.

2

7.    Both Darin and Jennifer possess a valid and active FOID cards and are thus currently licensed to possess a firearm pursuant to Illinois law. Exh. A, ¶6; Exh. B, ¶6.

8.    Darin also possesses a valid and active concealed carry license ("CCL") and is thus currently licensed to carry a concealed handgun pursuant to Illinois law. Exh. A, ¶6; Exh. B, ¶7.

9.    It is Darin's desire and intent to exercise his Second Amendment rights to possess a firearm for self-defense both in and outside their home. It is Jennifer's desire and intent to exercise her Second Amendment rights to possess a firearm for self-defense inside their home. Exh. A, ¶7; Exh. B, ¶8.

10.    Despite Darin's and Jennifer's FOID cards and corresponding rights to possess a firearm in their home, under 225 ILCS 10/7(a) and 89 Ill. Adm. Code § 402.8(o), they are prohibited from possessing any functional firearms in their home, even in a safe or on their person – in that all firearms must be unloaded and in a safe with any ammunition in a separate locked location - as long as Jennifer and Darin have a foster parenting license. Exh. A, ¶8; Exh. B, ¶9.

11.    Further, despite Darin's CCL and corresponding right to possess and carry a firearm, including a handgun, under 225 ILCS 10/7(a)(13) and 89 Ill. Adm. Code § 406.8(a)(17), he is prohibited from possessing a handgun in their home, even in a safe or on their persons, during the "operating hours" of Jennifer's home day care. Exh. A, ¶9; Exh. B, ¶10; *See also* Transcript of Deposition of Meghan

3

Jorgensen, attached hereto as Exh. C, at 58:13-63:12. The language of the applicable Rule itself has no such stated time limitations.

12.    Also, despite Darin's and Jennifer's FOID cards and corresponding rights to possess a firearm in their home, under 225 ILCS 10/7(a)(14) and 89 Ill. Adm. Code § 406.8(a)(18), they are prohibited from possessing any functional firearms in their home, even in a safe or on their persons – in that all firearms must be disassembled, unloaded, and in a safe with any ammunition in a separate locked location – at the least during the "operating hours" of Jennifer's home day care. Exh. A, ¶10; Exh. B, ¶11.

13.    Darin would comply with the provisions of 430 ILCS 66/65(a)(2), which provides that "[n]othing in this paragraph shall prevent the operator of a child care facility in a family home from owning or possessing a firearm in the home or license under this Act, if no child under child care at the home is present in the home or the firearm in the home is stored in a locked container when a child under child care at the home is present in the home." Exh. A, ¶11.

14.    Despite their disagreement with the laws and rules regarding both home daycare and foster parenting that are challenged in this lawsuit, Jennifer and Darin comply with those laws. They are fearful of having their foster parenting license revoked or not renewed if they do not comply with the challenged laws and rules. They are also fearful of Jennifer losing her home daycare operator's license if they do not comply with the challenged laws and rules. Exh. A, ¶12; Exh. B, ¶12.

4

15. When Jennifer and Darin comply with the laws and rules prohibiting the possession of functional firearms generally and handguns specifically, they are left without the ability to meaningfully defend themselves or their family in case of confrontation. Exh. A, ¶13; Exh. B, ¶13.

16. Defendant Kwame Raoul is the Attorney General of Illinois and has statutory duties defined in 15 ILCS 205/4, including that he litigate to ensure state laws are followed and respected, including 225 ILCS 10/7. Defendant Attorney General Raoul has therefore enforced the challenged laws, code sections, rules, customs and practices against Plaintiffs and is in fact presently enforcing the challenged laws, code sections, rules, customs and practices against Plaintiffs. He is sued in his official capacity. Defs.' Answer to 2AC ¶ 26 (Dkt. #84); *About Us,* OFF. OF THE ATT'Y GEN., https://bit.ly/3TfHsOB (last visited September 4, 2025), attached hereto as Exh. D.

17. Defendant Raoul possesses "all the powers associated with [the Attorney General's] office at common law," which "include the initiation and prosecution of litigation on behalf of the People[,]" a power that "may be exercised concurrently with the power of the State's Attorney to initiate and prosecute all actions, suits, indictments and prosecutions in his county as conferred by statute." *People v. Buffalo Confectionary Co.*, 401 N.E.2d 546, 549 (Ill. 1980) (internal citation omitted).

5

18.     Defendant Heidi Mueller is the is the Director of the Illinois Department of Children and Family Services. https://dcfs.illinois.gov/about-us/dcfs-director-bio.html (last checked September 4, 2025); attached hereto as Exh. E.

19.     Mueller administers the Department of Children and Family Services. She was appointed by the Governor and confirmed by the Illinois Senate. Among other responsibilities, she oversees and supervises IDCFS's five primary divisions, each headed by a Deputy Director who reports directly to Mueller. The divisions are Program Operations, Management and Budget, Policy and Plans, Youth and Community Services and Child Protection. *See* 2 Ill. Adm. Code 775.320. Direct client services are provided through the Division of Program Operations. *See* 2 Ill. Adm. Code § 775.330.

20.     In Mueller's official capacity, she is responsible for enforcing certain of Illinois's laws, code sections, rules, customs, practices, and policies, specifically those challenged herein. Also, in that capacity, Mueller is presently enforcing the laws, code sections, rules, customs, practices and policies complained of in this action. Specifically, Mueller is the authority charged with processing and administering the day care home licensing system and the foster care system in Illinois. She is sued in her official capacity. Defs.' Answer to 2AC ¶ 25 (Dkt. #84).

21.     The foster care system was created, with the beginnings of regulation, licensure, and federal money for the expansion of a child welfare infrastructure, in the 1930's. *See* Transcript of Deposition of Catherine Rymph, attached hereto as Exh. F, at 19:20-25.

6

22.     Rymph was asked to provide a brief overview of foster care and child placement in the United States from the American founding forward, as well as a brief history of day care. Exh. F at 26:19-22.

23.     The system of child care system was haphazard, *ad hoc*, largely unregulated, and often exploitive until the mid-twentieth century. Exh. F at 29:2-5.

24.     Among the earliest methods of providing for indigent children were indenture and apprentice systems. These were labor systems, brought to the colonies from England, which were widely practiced in colonial America. Exh. F at 31:13-17.

25.     Back in the colonial days and before the Declaration of Independence and Revolutionary War, indigent children were cared for by being sent to work in some form or fashion. Exh. F at 32:11-18.

26.     What it meant to take care of indigent children in the eighteen century would not necessarily mean what we might think of that today. The master, as they were called, typically had responsibilities to house the servant or apprentice, to clothe them, to feed them, and to -- if it was an apprentice situation, to actually teach them the skill that was the subject of the apprenticeship. But other things that we might think of today as caring for a child such as loving the child, talking to the child about their fears and insecurities, being nurturing in that way, teaching them to read and write, provide them an education, those would not have been expected in those relationships. Exh. F at 34:25 – 35:1-13.

27.     To the extent that the master was benefitting from the labor of the child, having the child, you know, injure themselves so severely that they couldn't perform their work anymore would not have been in the interest of the master. And even as the master had an interest in making sure his investment in the child didn't get diminished by having the child eat rat poison and die, or burn his hand off with the poker or something like that, it was in the master's interest to keep the child healthy so he can continue to perform labor. And that doesn't mean that masters always acted in their interest. There was no community authority going around and knocking on doors checking for that. Exh. F at 35:14 - 36:15.

28.     Both apprenticeship and indenture were widely practiced as labor systems in the colonial period. Apprentice leans more towards you're going to teach the person a trade. Indenture leans more towards it is just kind of a physical labor, hard labor kind of situation. Exh. F at 40:24 - 41:4.

29.     In the colonial period young people of all backgrounds, whether they were born in the colonies or not, often ended up in those kinds of labor situations. Over the course of the eighteenth century, indenture faded out as a system used by more affluent people, and indenture became something that was exclusively for poor children and poor families over the course of time. That was a change happening over the eighteenth century and around the time of the Revolutionary War. Exh. F at 41:5-14.

30.     A child could be bound out to indenture by a guardian (parent, relative) or a court. The contracts would spell out the term and type of service, the

8

training and education the child should receive, and any benefits to be conferred at the end of the term such as giving the child tools or training in a useful skill. Boys were get indentured into hard labor, and girls would be indentured for "servant" labor. Exh. F at 43:6 – 44:2. The contracts said the master was to provide basic housing, clothing, and food. Despite those contracts, those relationships could still be quite exploitive. *Id.* at 44:18-24. The contracts did not otherwise have any kind of conditions of how the master otherwise was to treat the child. It was similar whether the binding was done by the guardian or by a court. *Id.* at 47:3-10.

31.    Also, in the eighteenth century, local "overseers of the poor" who were tasked with distributing poor relief (money, food, other charity) had the power to bind out children from poor families as indentured servants instead of supplying relief, and "they did so regularly." This was fulfilling the overseer's duty to give relief to the poor, in that the child gets food, clothes, and a place to sleep, even as he is now a servant. Exh. F at 48:2-21; 49:5-6, 18-24.

32.    Poverty was the most significant reason why a child would be bound out by a court in colonial America. The indentured/apprentice system that was what was used in the colonial era wasn't about the children being abused. It was a labor system, and that was used to address the problem of poverty. Exh. F at 52:3-11.

33.    Courts could remove children from their home and bind them out if the parents were idle, if the children were disobedient, or if they were not being taught a useful trade. This had nothing to do with whether or not the children in their home were at least by modern standards well cared for or loved, it was about

9

whether or not they were useful. Exh. F at 52:13 – 53:1. **The goal of the system was the need for children to become self-sufficient workers who would not become a drain on the community due to their poverty.** Exh. F at 53:10-16.

34.    Doctor Rymph is offering no opinion about firearms in the colonial period or how they may pertain to the child welfare system. Exh. F at 55:20 – 56:9. Doctor Rymph is offering no facts about firearms. *Id.* at 56:10-14.

35.    Following the Revolutionary War, there began to be new understandings of childhood as a separate period of time in the life span that led to different ideas about parenting. It started with a small group of elites, who believed that the survival of the new Republic necessitated that the civic values of the founding be transmitted to the next generation. They adopted more intensive parenting and placed greater emphasis on education. It did not become more widespread across the whole country until the 1930s. Exh. F at 57:1-19; 58:1-16.

36.    Many widows and orphans resulted from the Revolutionary War, who had to turn to poor relief and indenture. Also starting to emerge in this period as a response to this large number of indigent people was the creation of almshouses and workhouses where the poor would actually go and live in those institutions as another form of poor relief. The almshouses themselves could bind the children out for purposes of learning a trade. Exh. F at 58:17 - 59:15.

37.    In 1824, New York passed legislation that kids begging in the street would go to almshouses and they could be bound out. Enslaved children were viewed as property. But also in white rural families, immigrant families, and among

the urban poor, older ideas of children as a source of household labor or income persisted for decades. This was still the mentality a quarter of the way through the nineteenth century. Exh. F at 60:4-9; 60:20 – 61:7. Indenture was the preferred solution for the care of independent children through the 1830s. *Id.* at 62:4-6. Indenture in the 1820s was similar to that in the Colonial era. *Id.* at 62:25 – 63:3.

38.    By the 1880s, there were over 600 orphanages serving tens of thousands of children in the United States. Most children even had living parents, but due to poverty they couldn't feed all the children, so the kids had to go into an orphanage. Exh. F at 63:17-25. However, while orphanages have expanded considerably, there is still indenture, including the similar situation of orphanages placing children on farms to pay for their own care through their labor. Exh. F at 64:4-12.

39.    The early orphanages were initially private, they were often associated with a particular religious faith. The public orphanages emerged in the later nineteenth century, partly because some states banned the placement of children in poorhouses with other adults. And since the option of putting children in the public poorhouses was foreclosed, the State felt like it needed to provide some other publicly-funded means of housing those children. Exh. F at 65:10-25. The orphanage situation didn't have anything to do with whether or not the child was otherwise cared for or loved, it was used as an economic safety net for poor families. *Id.* at 66:11-20. It was not about neglect or abuse like we would think about it today. *Id.* at 67:2-4.

40.    Concern about orphanages as an institution began in the 1850s, and "placing out" (placement of children in a rural household, typically a farm household, where they would perform household labor as part of the household) was a reaction to that concern. Exh. F at 69:7-22. The ideal was that the child would the ideal is that the young person would be absorbed into the family sort of like a member of the family and get the benefits of family life, which they wouldn't get in the orphanage. But the reality was often that these young people were treated as servants and laborers. *Id.* at 71:1-6. There was not a lot of oversight; sometimes there was no oversight. The children often ran away because they were unhappy being there, unhappy with how they were treated. There was an evolution over the decades of the late nineteenth and into the early twentieth century, the realization that there needs to be some oversight. *Id.* at 72:21 - 73:2. "Placing out" was pretty much over by the 1930s. *Id.* at 72:1-3.

41.    **Doctor Rymph has no knowledge one way or another whether or not these colonial people who were taking on these indentured servants or apprentices, as the case may be, possessed firearms, other than her generalized knowledge that there was a war going on and people were armed because they were fighting a war. She does not have specific knowledge of that with respect to indenture.** Exh. F at 74:2-15.

42.    **Doctor Rymph also has no knowledge whether or not regarding all these people on the farms that these orphan trains were running to for the purpose**

12

of "placing out" indenture, whether or not those people had firearms. Exh. F at 74:16-21.

43.    There was a divide over the course of the nineteenth century that stated among the middle classes and which did not filter down to the other classes until around the 1930s, of a shifting view of children's value being because they could work, to their value being because they had inherent worth – the "useful vs. useless" child. Exh. F at 76:7 – 77:12.

44.    Illinois began experimenting with public-paid fostering in the 1880s, 1890s. It was often related to newer concerns about neglect and overwork of the child, and the lack of oversight as to how the child is treated in traditional free placements. Exh. F at 81:8-22. During that time, state boards of child welfare gained more power from legislatures to oversee placement of children in homes as a means of introducing better and more consistent policy. *Id.* at 83:4-10. One hope was that gathering evidence and providing greater supervision would mean that children would not be so "very friendless, isolated, and subjected to abuse and neglect." Also, that they would not be used "as cheap servants." Also, there was a problem that these children are not having the opportunity to attend school. *Id.* at 83:20 – 84:5. Around the 1870s, American reformers also became attuned to the problem of physical abuse on the farms (*Id.* at 85:20 – 86:6), and by parents. *Id.* at 88:16-24.

45.    In 1923, 64 percent of dependent and neglected children were in orphanages ("orphan asylums"), while 23 percent were in free homes ("placed out

farm houses"), and 10 percent in boarding homes. Exh. F at 91:10-17. Boarding homes were one of the attempts to solve the problem of too little oversight. A boarding home would be a home where a child is placed and someone is paying board to the family that is caring for the child. This is in the late nineteenth, into the early twentieth century, into the 1930s where the child welfare experts are coming to prefer boarding homes over any of those other options. This was a precursor to the foster homes scenario. *Id.* at 91:22 – 92:11.

46.     By the end of 1939 every state had a system of county public child welfare services. Doctor Rymph does not know when was the first state that did it. Exh. F at 93:7-20. In the 1930s-1950s, boarding homes began to be called "foster family homes." Exh. F at 95:9-19. Taking hold in the '30s, '40s, and '50s was the idea that foster homes are fulfilling an almost therapeutic function in helping children, that children need to be understood as individuals with individual needs who need to be carefully placed in a trained and monitored vetted home with lots of follow up and casework. That is a completely different idea than the idea that existed in the eighteenth century and the one that still existed through much of the nineteenth century, that poor children can pay for their care through their labor. *Id.* at 96:7-17.

47.     In the 1930s, standards of good practice for foster family homes – according to the non-governmental Child Welfare League which offered its recommendations - included vetting potential foster families for the structural features of the home. One that they were particularly concerned with was the

14

number of bedrooms and to be sure that children were not sharing bedrooms with people they were not related to, that they were not sharing bedrooms with members of the opposite sex. There were concerns about well water. Eventually there were stipulations about indoor plumbing, though that was not yet an expectation. 104:25 - 105:15. There were groups that only wanted married couples taking in children, not single/widowed women. *Id.* at 106:2-6. Nor older couples. *Id.* at 106:13-20. If it's going to be a family home, it needs to look like a more conventional family, and not too large. *Id.* at 106:20-25. And women should not work outside the home. *Id.* at 107:7-8.

48.    In 1959, Doctor Rymph first notes the Child Welfare League standard that the home "should present no hazards to the safety of the foster child." Exh. F at 108:9-19. Doctor Rymph could not name any such hazards, except ones previously mentioned such as the safety of the water and milk supply, and that the community had schools and churches, had a good reputation, and was free of disease. *Id.* at 109:7-10; 107:23 – 108:6.

49.    Day Care services emerged around the turn of the twentieth century as a form of temporary charity for impoverished women. Exh. F at 114:13-20. Child welfare professionals in the early to mid-twentieth century were opposed to the idea because they thought children should be in their own homes with their mothers. *Id.* at 115:4-9.

50.    Because the Child Welfare League opposed day care, it did not issue its standards until the 1960s. Exh. F at 119:13-17; 120:10-15. By 1969, the CWL

recommended that day care homes and foster homes should represent no hazards to the health and safety of a foster child, and into the 80s, it recommended that radiators and other heat sources must be protected to prevent burns. *Id.* at 121:21-25.

51.    In 1984, the CWL standards recommended "high rise apartments should have guards on the windows," and that "household cleaning supplies, chemicals, weapons, and medicines should be stored safely out of reach of children." This was the first time that Doctor Rymph saw a published reference to "weapons." Exh. F at 122:1-11.

52.    Defendants' witness Patrick Charles would not include one's home in his definition of "sensitive places." *See* Transcript of Deposition of Patrick Charles, attached hereto as Exhibit G, at 76:11-18.

53.    None of the colonial laws regarding "sensitive places" cited by Charles involve people's homes. Exh. G at 81:14.

54.    In the mid-late 1800s, location-specific armed carriage laws proliferated widely. This refers to public carry, *i.e.* public buildings and locations. Exh. G. at 81:16 – 82:9; 86:9-22. In his references to 1870 for Missouri and 1889 in Arizona and 1890 in Oklahoma, none of Charles's examples say that firearms are prohibited in people's homes. *Id.* at 87:22 – 88:6.

55.    Charles speculated that a party in someone's home in Texas may fit the definition, but historically speaking, he has no records to know if that was ever the case. Exh. G at 84:10-15; *see also id.* at 88:21 – 89:7. For all the hypotheticals,

16

he does not know either way. Historians do not have enough enforcement records to understand the complete contours other than know the certain places that they recommended: Worship, public gathering, election ground, those are the issues that they were referring to. *Id.* at 87:10-17.

56.     In Charles's example in Columbia, Missouri, it does not say that firearms are prohibited in people's homes. The word "home" is not mentioned. Charles again speculated that it could be instances where a home could apply, but the example does not say that in and Charles does not know, as he does not have examples where the law was enforced at somebody's home. Exh. G at 90:5-15.

57.     Charles then discussed Kansas, and wrote that "Most Kansas localities that enacted restrictions on the carrying of dangerous weapons in, quote/unquote, sensitive places, did so by making their entire commercial and public epicenters off limits." Exh. G at 93:20-25. The entire public and commercial epicenters did not include people's houses, unless there was a home on that property. "But then there may have been an exception for the home. We don't know." *Id.* at 94:2-7.

58.     Throughout the mid to late nineteenth century, state and local governments maintained the authority to restrict the carrying of dangerous weapons in a variety of "sensitive places" where people were regularly known to congregate. Exh. G at 95:1-10. The most common locations to be designated by mid to late nineteenth-century lawmakers as sensitive places were: A, churches and places of worship; B, places where large public assemblies generally took place, *i.e.*, public parks, town squares, and the like; C, polling places and other buildings

17

where political activities generally took place; D, schools and institutions of higher learning; E, places where events of amusement took place, *i.e.*, places where people congregate for large planned events; and, F, bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood-altering drugs were purchased or consumed. Exh. G at 99:20 – 100:11.

59.    And in your categorization, in A through F on that Paragraph 20 [of Charles's Declaration/Report], the word "home" is not used. "[T]here are perhaps instances where a school is someone's home. We don't know. We do not know how it was enforced. Exh. G at 100:18-24. But leaving aside the hypothetical, the word "home" is not used in Charles's categorizations, and the word "home" does not appear in his declaration. *Id.* at 100:25 – 101:4.

60.    From the mid to late nineteenth century, perhaps the most common area of firearm regulation was that of protecting children from firearm-related violence, and protecting the public from the dangers associated with children possessing and handling firearms. Exh. G at 101:14-19. Page 16.

61.    Sensitive place firearm prohibitions where events of amusement took place and at schools and institutions of higher learning are historical examples in this regard. Except for the hypothetical that maybe someone was running a school in their house, those examples do not say people's homes. The word ""home" or "people's homes" is not stated. Exh. G at 101:24 – 102:8.

18

62.    Charles writes about "events of amusement" and uses various examples ranging in time from 1879 to 1903, but none of them use the word "home." Exh. G at 102:9-24.

63.    Charles then discusses regulations at schools and institutions of higher learning, but these are regulations on students and faculty on school/university grounds. Exh. G at 103:13, 104:25 – 105:24. Charles listed a great number of examples of university regulations prohibiting students who he said could be actually be from the age of 13 upward from having firearms. That's what his examples and footnotes were all about. *Id.* at 122:11-17.

64.    Charles then discusses restrictions at public school systems. But outside the hypothetical, the word "home" is not used in those regulations. Exh. G at 116:16 – 116:2. Even an example of a law prohibiting teachers from having firearms at school did not prohibit them from possessing firearms in their home. *Id.* at 117:8-21.

65.    An 1899 law in Dwight, Illinois prohibited firearms and dangerous weapons on school premises; the word "home" is not mentioned. Exh. G at 119:4-13. Mazon, Illinois had the same restriction. *Id.* at 120:4-13.

66.    Charles writes that: "What is historically certain is that 'sensitive place' firearm prohibitions at public and some private schools were widespread by the turn of the twentieth century." Exh. G at 126:20-24. The word "home" does not appear in that sentence. *Id.* at 127:7-8.

19

67.     Charles discussed three ways to protect minors from firearm-related violence. The first was having "sensitive place" laws prohibiting firearms and other dangerous weapons at places of amusement and schools, which were – apart from the hypothetical – public locations. Exh. G at 129:20 - 130:19.

68.     The second method involved regulating the commercial sale or transfer of firearms and dangerous weapons to minors. Exh. G at 130:24 – 131:2; 131:11-13.

69.     The third method involved restricting minors' ability to use and carry firearms on public property. Exh. G at 131:3-4; 131:13-14.

70.     Save perhaps for laws prohibiting the discharging of firearm near occupied buildings and populated areas and laws restricting armed carriage, firearm restrictions on minors were the most widely adopted laws in the country. This was referring to the mid to late 1850s through the close of the twentieth century, and referred to restrictions on minors purchasing and possessing and using firearms. Exh. G at 136:6-22.

71.     In the nineteenth century, there was a spread of mid to late nineteenth-century ordinances restricting minors from purchasing, acquiring, using and carrying firearms. That is the same types of restrictions Charles has been talking about or writing about in this whole section [III of his declaration]. Exh. G at 145:20 – 146:2. **No laws existed restricting parents from owning firearms because they have children.** *Id.* at 146:8-13. He does not know of any laws prior to the mid-to-late nineteenth century where parents were prohibited from having firearms because they had minor children. *Id.* at 146:18-23. Charles's declaration stops at the

20

end of the nineteenth century, and so he does not explore the twentieth century. *Id.* at 146:24 – 147:7.

72.    Saul Cornell testified about Massachusetts (1783) and New York (1793) laws allowing people to have firearms and up to 25 pounds of gunpowder in their homes, but they were not allowed to load the firearms, because of the safety to the neighbors or townspeople during a time of a fire breaking out. *See* Transcript of Deposition of Saul Cornell, attached hereto as Exhibit H, at 178:12 – 179:14; 182:20 – 183:22; 184:19 – 185:11; 185:24 – 186:8; 186:10 – 187:10.

73.    Regulation of firearms was also for fire suppression purposes in Danville, Illinois in 1855. Exh. H at 202:8 – 203:8.

74.    Cornell is not opining that the fact that there were gunpowder storage laws back in the late 1700s, early to mid 1800s, that that gives the state authority to pass whatever firearms regulations that it wants. Exh. H at 244:11-19.

75.    The parties entered into a Stipulation dated August 27, 2025. Plaintiffs incorporate that Stipulation as if fully restated herein (attached hereto as Exhibit I). In particular from that document, "[t]he Second Amendment Foundation, the Illinois State Rifle Association, and Illinois Carry (collectively, the "Organizational Plaintiffs") are member organizations that promote awareness of, and advocacy for, the Second Amendment," and "Jennifer and Darin Miller are members of each of the Organizational Plaintiffs." Exh. I at ¶¶1,2.

Additionally, the challenged Statutes and Rules are as follows:

21

<u>**Day Care:**</u>

Section 10/7 of the Illinois Child Care Act of 1969 (225 ILCS 10/7) states in relevant part:

> (a) The Department must prescribe and publish minimum standards for licensing that apply to the various types of facilities for child care defined in this Act and that are equally applicable to like institutions under the control of the Department and to foster family homes used by and under the direct supervision of the Department.
>
> The Department shall seek the advice and assistance of persons representative of the various types of child care facilities in establishing such standards. The standards prescribed and published under this Act take effect as provided in the Illinois Administrative Procedure Act, and are restricted to regulations pertaining to the following matters and to any rules and regulations required or permitted by any other Section of this Act:
>
> . . .
>
> (13) Provisions prohibiting handguns on day care home premises except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside on the premises of a day care home;
>
> (14) Provisions requiring that any firearm permitted on day care home premises, except handguns in the possession of peace officers, shall be kept in a disassembled state, without ammunition, in locked storage, inaccessible to children and that ammunition permitted on day care home premises shall be kept in locked storage separate from that of disassembled firearms, inaccessible to children;
>
> (15) Provisions requiring notification of parents or guardians enrolling children at a day care home of the presence in the day care home of any firearms and ammunition and of the arrangements for the separate, locked storage of such firearms and ammunition;

22

Section 406.8(a) of Title 89 of the Illinois Administrative Code ("General Requirements for Day Care Homes") states in relevant part:

> 17) Handguns are prohibited on the premises of the day care home except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside in the day care home. The licensee shall post a "no firearms" sign, as described in Section 65(d) of the Firearm Concealed Carry Act [430 ILCS 66/65(d)], in a visible location where parents pick up children.

> 18) Any firearm, other than a handgun in the possession of a peace officer or other person as provided in subsection (a)(17), shall be kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children.

>> A) Ammunition for such firearms shall be kept in locked storage separate from that of the disassembled firearms, inaccessible to children.

## Foster Care

Section 10/7 of the Illinois Child Care Act of 1969 (225 ILCS 10/7) states in relevant part:

> (a) The Department must prescribe and publish minimum standards for licensing that apply to the various types of facilities for child care defined in this Act and that are equally applicable to like institutions under the control of the Department and to foster family homes used by and under the direct supervision of the Department.

> The Department shall seek the advice and assistance of persons representative of the various types of child care facilities in establishing such standards. The standards prescribed and published under this Act take effect as provided in the Illinois Administrative Procedure Act, and are restricted to regulations

23

pertaining to the following matters and to any rules and regulations required or permitted by any other Section of this Act.

Section 402.8(o) of Title 89 of the Illinois Administrative Code ("General Requirements for the Foster Home"), restated as IDCFS Rule 402.8(o) (formerly 402.8(i) states in relevant part:

> Any and all firearms and ammunition shall be locked up at all times and kept in places inaccessible to children. No firearms possessed in violation of a State or Federal law or a local government ordinance shall be present in the home at any time. Loaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures.

The Defendants order those fostering or operating a home daycare through IDCFS to comply with the firearm restrictions. These Rules deny Plaintiffs the ability to defend themselves and their families, in violation of the Second Amendment.

## ARGUMENT

## STANDING

Per SUF 1-15 and Exhibits A and B, Jennifer and Darin have standing to bring and maintain this action. "Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011) (citing *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010).

24

Per SUF 75 and Exhibit I, the Organizational Plaintiffs have standing to bring and maintain this action in that "(1) their members would otherwise have standing to sue in their own right; (2) the interests the associations seek to protect are germane to their organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit." *Ezell*, 651 F.3d at 696.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In evaluating a summary judgment motion, the court focuses on whether any material dispute of fact exists that would require a trial. *Winter v. Minn. Mut. Life Ins. Co.*, 199 F.3d 399, 408 (7th Cir. 1999). In making this determination, the court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, however, the nonmoving party must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial." *Latke v. Cont'l Cas. Co.*, 248 F. Supp. 2d 797 (C.D.Ill. 2003) (citation omitted).

_____

The Foster Home and Day Care Home Rules at issue in this case — which ban law-abiding adults licensed to foster parent, or provide day care in their own homes, from keeping "any lawful firearm in the home operable for the purpose of immediate self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) — violated the Second Amendment under that seminal case, where the Supreme Court - among its other holdings - struck down District of Columbia's "safe storage" requirements, which in that case were "a requirement that all guns be kept "unloaded and either disassembled or secured by a trigger lock, gun safe, locked box, or other secure device" except when located in a place of business or being used for lawful recreational activities." *See* D.C. CODE §§ 7-2501.01(12), 7-2502.01(a), 7-2502.02(a)(4); *see also Heller*, 554 U.S. at 575. The stated reason was that "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Heller*, 570 U.S. at 630.

The District argued the Court should read into the restrictions an exception for self-defense, but the Court rejected that reading, holding it "is precluded by the unequivocal text, and by the presence of certain other enumerated exceptions" of which self-defense is not included. *See Heller*, 570 U.S. at 630. This rejection was also noted in Justice Breyer's dissent. *Id.* at 692 (2008) (Breyer, J., dissenting). That same lack of ability for self-defense is present in this case, and while the penalties for non-compliance differ, the threat of fostering and daycare license revocation is

26

just as - if not more – severe than whatever criminal penalty the District was threatening to impose.

Since this case began, and as the Seventh Circuit noted, the Supreme Court issued its opinion in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), which significantly—and decisively—changed the analysis by abrogating the "two-step" framework previously applied in Second Amendment cases. Under the historical analysis required by *Bruen*, Defendants have no support for the prohibitions and restrictions challenged in this suit. *Bruen* is fatal to them.

When *Bruen*'s careful instructions for applying its text and history test are followed, it becomes inescapably clear that the challenged rules find no justification in "this Nation's historical tradition of firearm regulation." *Id.* at 2135.

I.    *Bruen* **makes clear that the Second Amendment requires a categorical approach based on text and history.**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed" U.S. Const. Amd. II.

In *Bruen*, the Supreme Court reaffirmed, and clarified beyond further dispute, its holding in *Heller*, and clearly states the "the standard for applying the Second Amendment": if "the Second Amendment's plain text covers an individual's conduct," then the government's attempt to restrict that conduct is unconstitutional, unless the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then

27

may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 142 S. Ct. at 2129-30 (cleaned up).

Defendants cannot show that the challenged limits are consistent with the Nation's history, because their historical analysis suffers from two fatal defects: (1) They cannot offer analogues from the appropriate *historical period*, and (2) they cannot offer "well-established and representative" historical restrictions that are closely analogous to the challenged bans, *id.* at 2133. Defendants have only unrelated restrictions and vagaries, purportedly evidencing a historical tradition, but really merely "eviscerat[ing] the general right to [keep] arms for self-defense" in precisely the manner *Bruen* prohibits, 142 S. Ct. 2134.

## II.    The Foster Home Ban and Day Care Home Ban are inconsistent with the Second Amendment's text and history.

Defendants cannot dispute that the conduct burdened by the rules challenged here—keeping "any lawful firearm in the home operable for the purpose of immediate self-defense," *Heller*, 554 U.S. at 635—is covered by the Constitution's plain text and thus "presumptively protect[ed]" by the Second Amendment. *Bruen*, 142 U.S. at 2126. Accordingly, the burden falls to the government to justify its bans under the Second Amendment's history. When applying the relevant era of "historical tradition" to the analysis, and analyzing the purported analogies from restrictions enacted during the relevant era, it becomes clear the Defendants cannot meet that burden. Plaintiff discuss both points below.

28

A.    **The proper historical analysis focuses on Founding-Era restrictions, and late-nineteenth-century laws cannot be used to contradict the Second Amendment's plain meaning.**

The great bulk of the Defendants' historical evidence comes from long after the ratification of the Second Amendment in 1791, *see* Charles and Rymph reports, *see also* SUF 37-51, 54-71 (discussing regulations enacted throughout the nineteenth century and into the twentieth). Because the key period for understanding the Second Amendment is the time of its ratification—1791—all of this later evidence is irrelevant. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), *available at* https://bit.ly/3CMSKjw. Two principles—both established by binding and unequivocal Supreme Court precedent—necessitate the conclusion that 1791 is the critical year, not 1868—and *certainly* not historical evidence from into the twentieth century.

First, incorporated Bill of Rights provisions have the same meaning applied to the States as to the federal government. *See McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) ("incorporated Bill of Rights protections 'are all to be enforced against the States … according to the same standards that protect those personal rights against federal encroachment'" (citation omitted)). It has been a bedrock principle of Bill of Rights jurisprudence *for over five decades* that while it is the Fourteenth Amendment that *incorporates* the Bill of Rights guarantees against the States, once incorporated, those rights have *exactly the same meaning against the*

29

*States* as they do against the federal government. As the Court put the point in *Malloy v. Hogan* in 1964, the protections in the Bill of Rights are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 378 U.S. 1, 10-11 (1964). The Court has repeatedly reiterated that fundamental rule in the ensuing years, most recently *in Bruen itself*: "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137.

Second, as *Bruen* also makes clear, the Supreme Court has always treated the ratification of the Bill of Rights as the key period for understanding the scope of the rights enumerated therein. 142 S. Ct. at 2137 (citing *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168-69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011)). Almost a century ago, the Court explained that the First Congress of 1789, is "a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument," *Myers v. United States*, 272 U.S. 52, 174-75 (1926), and this practice is no less true in the context of the Bill of Rights, *see, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's [reasoning in *Myers*].""). Illinois's amicus argues, instead, that 1868 should be the relevant date for *both*

30

the Second Amendment's application against the States *and the federal government*.

But nothing in *Bruen* hints that the Court meant to usher in such a sea-change in incorporation doctrine. And the fact that Supreme Court precedent makes "the public understanding of [a] right in 1868 … central to whether the right was incorporated against the states" but "irrelevant" to determining the *meaning* of the right, follows directly from those principles. For while the generation that adopted the Fourteenth Amendment engaged in a robust debate about *whether* to apply the Bill-of-Rights guarantees against the States, *no one* thinks they engaged in any kind of meaningful debate over whether to *change the substantive meaning of each of those rights*.

To be sure, *Bruen* "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," and it stated that it did not "need [to] address this issue." 142 S. Ct. at 2138. But the Court's decision not to wade into a "scholarly debate" cannot be read as changing or casting doubt on the longstanding precedent described above. And that precedent dictates that 1791 is the critical date. Indeed, as this Court has recognized, unless and until the Supreme Court overturns one of its precedents it remains binding no matter how "wobbly" or "moth-eaten" its "foundations" have become. *See Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996), *vacated by*

31

*State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling precedent but stating that "[t]he Court of Appeals was correct in applying" it because "it is this Court's prerogative alone to overrule one of its precedents.").

Justice Barrett's concurring opinion in *Bruen* provides further confirmation of the point. Justice Barrett strongly suggested that "Reconstruction-era history" is "simply too late," and she cautioned that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." 142 S. Ct. 2163 (Barrett, J., concurring). Here, however, Defendants' "evidence" offers nothing but such attempts at freewheeling.

The *Bruen* majority opinion—despite its aside about not wading into the "scholarly debate" on the issue—is fully consistent with Justice Barrett's analysis. For the majority, too, treated evidence surrounding 1791 as generally dispositive of the contours of the Second Amendment. "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. That is why courts "must … guard against giving postenactment history more weight than it can rightly bear." *Id.* "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614). In fact, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter

32

that text." *Bruen*, 142 S. Ct. at 2137.

The Seventh Circuit's precedent leads to the same conclusion. While the Court initially suggested in *Ezell* that 1868 was "the relevant historical moment," *Ezell*, 651 F.3d at 701, that Court subsequently departed from that mistaken proposition, holding in *Moore v. Madigan* that "1791" was "the critical year for determining the amendment's historical meaning, according to *McDonald*." 702 F.3d 933, 935 (7th Cir. 2012). And while nineteenth-century history can be considered for the purpose, as *Bruen* described it, of "mere confirmation" of the original meaning established based on evidence contemporaneous with "the ratification of the Second Amendment." 142 S. Ct. at 2137, it cannot serve as a main source. As *Moore* held, the Second Amendment's ratification in 1791 is "the *critical* year for determining the amendment's historical meaning." 702 F.3d at 935 (emphasis added). And as *Bruen* held, "to the extent later history contradicts what the text says, the text controls." 142 S. Ct. at 2137.

**B.    Modern firearm restrictions must be closely analogous to historical restrictions, and the inquiry into historical analogues does not give the State a regulatory blank check.**

*Bruen* also contains clear instructions governing *how closely modern restrictions must match* historical restrictions to pass muster: while "a modern-day regulation" need not be "a dead ringer for historical precursors," the process of analogical reasoning does not give the government "a regulatory blank check," and "courts should not uphold every modern law that remotely resembles a historical

analogue." 142 S. Ct. at 2133 (cleaned up). While this was illuminated further in *United States v. Rahimi*, 602 U.S. 680, 692 (2024), it did not alter this rule.

The Court set forth "two metrics" to guide the inquiry into what types of "regulations [are] relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132-33. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (cleaned up). And the process of reasoning by historical analogy *is not* "an invitation to revise" the "balance struck by the founding generation" "through means-end scrutiny." *Id.* at 2133 n.7.

This case is governed by *Bruen*'s directive that where the government adopts a regulation "that the Founders themselves could have adopted," the historical inquiry is "relatively simple": if no closely analogous regulation is part of our Nation's history, it is unconstitutional. *Id.* at 2131, 2132.

### C.     The challenged bans are not justified by any historical tradition of firearm regulation.

Once *Bruen*'s instructions governing the proper application of its text and history standard are kept in mind, the Defendants cannot conjure any historical justification for the challenged bans, and any such efforts fall apart when the appropriate analysis is applied. "At this step of the *Bruen* analysis, the government bears the burden of demonstrating that the challenged handgun regulations are

34

"consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

The only colonial era firearm restrictions offered by Defendants were regulations aimed at fire suppression. SUF 72-74. On top of that, even Defendants' other opinion witness Dr. Rymph could not opine that the colonial masters of the indigent indentured children were disarmed. In fact, she said, the opposite was probably true, given that there was a war. SUF 41.

**Neither foster homes nor home day cares qualify as "sensitive places."**

Defendants will no doubt attempt to rely on the "sensitive places" exception[1] but Defendants cannot offer any evidence that one's home – the core of the Second Amendment right per *Heller* - was *ever* considered a sensitive place. Defendants' own witnesses have no such information (*See* SUF 41, 52, 53), except when dealing in unsupported hypotheticals.

One set of historical restrictions—mentioned in *dicta* in *Heller* and "assumed" to exist by *Bruen*—is comprised of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Bruen*, 142 S. Ct. 2133 (quoting *Heller*, 554 U.S. at 626). *Bruen* identified a "few 18th- and 19th- century 'sensitive places'"—"legislative assemblies, polling places, and courthouses"—and suggested that "courts can use analogies to those historical regulations of 'sensitive

---

[1] 1 Though this Court declined to reach Plaintiffs' facial challenge in the previous round of litigation in this matter, Plaintiffs specifically reiterate that claim and assert since the restrictions are invalid as applied, the same reasons herein that render the challenged bans unconstitutional as applied to Plaintiffs also render them unconstitutional as applied *to anyone*, thus the appropriate relief in this case is an order declaring them unconstitutional on their face. *See Ezell v. City of Chicago*, 651 F.3d 684, 697-98 (7th Cir. 2011).

places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* The Defendants have seized upon this passage, but it ignores the key limits in *Bruen* that completely foreclose its argument, not to mention the fact that their witnesses do not support the argument, either.

1.     Beginning with *Bruen*'s first metric, the "burden on the right of armed self-defense" posed by the bans challenged here and the "sensitive place" restrictions identified in *Bruen* are not even remotely comparable. *Id.* at 2133. The difference is both spatial and temporal, and it is stark. The spatial difference can be described in terms of the Second Amendment's text: while the restrictions identified in *Bruen* limited "the *carrying* of firearms in sensitive places," *id.* (emphasis added), the bans here bar law-abiding citizens from *keeping* them—in *their own homes*. Even the Seventh Circuit's recent application of the "sensitive places" doctrine to public transportation does not aid Defendants here. *See Schoenthal v. Raoul*, 2025 U.S. App. LEXIS 22464 (Sept. 2, 2025). In *Schoenthal*, the Court held that "a regulation does not offend the Second Amendment because it is consistent with our historical tradition when it: 1) temporarily regulates the manner of carrying firearms; 2) in a crowded and confined space; 3) where that space is defined by a natural tendency to congregate people in greater density than the immediately adjacent areas; 4) that space furthers important societal interests; and 5) the presence of firearms in that space creates a heightened risk to maintaining public safety." *Id.* at *46. Plaintiffs cite that holding to contrast it with the present

situation, and emphasize that *none* of that applies to the home. Even the *Schoenthal* Court admonished that "[w]e stress that lower courts should not employ this summary of today's decision as a test in all Second Amendment challenges. '[C]ommon sense' informs the *Bruen* inquiry." *Schoenthal*, 2025 U.S. App. LEXIS 22464 at *46 (citing *Rahimi*, 602 U.S. at 698). Here, common sense shows that one's home, with or without children in it, is nothing like public transportation, or a polling place, or a courthouse, nor – comparing to the examples cited by the Defendants' witnesses – even a school.

As should be dispositive, Defendants' own opinion witness Patrick Charles would not include one's home in his definition of "sensitive places." SUF 52. Further, none of the colonial laws regarding "sensitive places" cited by Charles involve people's homes. SUF 53. For good reason – if the home became a "sensitive place," the Second Amendment would be nullified.

This distinction entails a further difference as to *when* the restrictions apply. Limits on carrying arms in specific public places, by definition, only apply for as long as an individual is in one of those places—and the individual can avoid the disability by avoiding those places. Because the restrictions here apply to the home, however, they apply whenever the individual is home and cannot be avoided in this way.

Dr. Rymph admits that for her entire detailed history of indigent child care, she knows nothing about whether the caretakers/masters had firearms. SUF 34, 41-42. She assumed they did possess firearms in the colonial era, since there was a war

37

going on. SUF 41. Indeed, the one thing that stands out in Dr. Rymph's testimony is that the colonial and antebellum indigent child care system had very little to do with the child's welfare at all, just whether they could be "useful" and perform labor. SUF 32-33. The idea that the master would have been disarmed for the benefit of the indentured servant is not credible.

As to one of the topics discussed by Patrick Charles, the burden posed by the challenged bans is also unlike any historical restriction on carrying of firearms in schools for an independent reason: while some Founding-Era rules restricted *students* from carrying firearms on school grounds, even Charles could cite to no example which extended such limits to *teachers or other adult school employees* in their homes. SUF 63-64. That is a massive difference in the "burden on the right of armed self-defense" posed by the two types of restrictions. *Bruen*, 142 S. Ct. at 2132. And while *Bruen* did not discuss the nuances of an issue, and only mentioned the issue in passing, that shows the *Bruen* Court did not at all settle all of the details of the permissible scope of firearms restrictions in schools as a matter of binding precedent.

Charles described 'sensitive place' firearm prohibitions at public and some private schools as a turn of the twentieth century phenomenon. SUF 66. While Charles described firearm restrictions on minors as among the most widely adopted laws in the country from the mid to late 1850s through the close of the twentieth century, they referred to restrictions on minors purchasing and possessing and

using firearms. SUF 70. None of that is at issue in this case, and in any event Charles's historical offering is from the wrong era, about 80-100 years too late.

As noted, Defendants attempt to show that teachers *were* prohibited from carrying in schools, but the only evidence they come up with are a few random 1870s-era school rules (Charles Report at p.30). These rules also come far too late to be of any use in interpreting the Second Amendment; indeed, the Supreme Court in *Bruen* held that a similar Texas statute from this period, and case-law upholding it, were "late-in-time outliers" entitled to little weight. 142 S. Ct. at 2156; *see also id.* at 2153. Also, nothing in them prohibits teachers from possessing firearms in their homes. Charles's scattered examples from well after the relevant era do not bear on the scope of the Second Amendment.

The analogy to schools fails for both foster and day-care homes, but the fact that Defendants did not *even claim* the analogy extended to foster homes before *Bruen* was decided demonstrates the weakness of that particular comparison. Defendants also cannot escape the fact that even their own expert on the foster care system cannot say that those charged with the care of indigent children were disarmed – no matter the era, and no matter what form the child care took – and in fact, the opposite was almost certainly true.

2.    The *justifications* of the Foster and Day-Care Home Rules here also differ markedly from Defendants' claimed historical analogues. Again, most of the Founding-Era "sensitive place" restrictions concerned locations where *government officials engaged in lawmaking or other government functions*—"legislative

39

assemblies, polling places, and courthouses," *Bruen*, 142 S. Ct. at 2133—and the justification for those limits were obviously to *safeguard those government functions*. That justification has no application here.

Nor is a claimed justification for Founding-Era restrictions on carrying firearms in schools comparable. That is obvious from the key distinction already discussed: they almost universally applied *only to students*. The justification behind those limits is thus plain to see: the fear that the students attending one of the schools in question would *misuse* firearms if they were allowed to carry them to school. Given that these limits did not apply to teachers, the justification *cannot* have been the supposed risk to public safety posed by *teachers and other adults* having access to firearms (even if safely locked away and inaccessible to any students).

Defendants may attempt to get around this difficulty by describing their interest more abstractly, as protecting the health and safety of children. But if one is allowed to describe a restriction's justification at this abstract a level of generality, then it will be no trick to justify *every conceivable* modern firearm restriction as "analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133. After all, the overarching justification for virtually *every* historical restriction was "protecting the public health and safety." At that level, *Heller*, *McDonald*, and *Bruen* were all wrongly decided, since the restrictions at issue were *all* justified by historical analogues. *Bruen* directly repudiates such an approach. *Id.* at 2133 n.7 ("courts may [not] engage in independent means-end scrutiny under the guise of an

40

analogical inquiry").

## CONCLUSION

The Defendants instituted Rules that forced the Millers, and every person who fosters children through the State or operates a home daycare facility, to choose between fundamental Second Amendment rights, and the ability to foster children or operate the home facility. Besides being terrible policy, it is unconstitutional.

In light of the above, as the Defendants cannot – under *Bruen* - support their unconstitutional prohibitions and restrictions on foster parents and home daycare licensees, and since Plaintiffs have been injured in the stripping away of their Second Amendment rights for nothing more than wanting to take care of children in need, summary judgment in the Plaintiffs' favor is proper.


WHEREFORE, the Plaintiff, DARIN E. MILLER, JENNIFER J. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY respectfully request this Honorable Court to enter summary judgment in their favor and against the Defendants. Plaintiffs also request any and all such further relief as this Court deems just and proper.


Dated: September 6, 2025                        /s/ David G. Sigale
                                                  Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:18-CV-3085 |
| MARC D. SMITH, in his official capacity as Acting Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' LIST OF F.R. CIV. P. 56 EXHIBITS

A.    Declaration of Darin E. Miller;

B.    Declaration of Jennifer J. Miller;

C.    Deposition Transcript of Meghan Jorgensen;

D.    Screenshot from Illinois Attorney General website;

E.    Screenshot from Illinois DCFS website;

F.    Deposition Transcript of Catherine Rymph;

G.    Deposition Transcript of Patrick Charles;

H.    Deposition Transcript of Saul Cornell;

I.    Stipulation dated August 27, 2025

Respectfully submitted,

By:    /s/David G. Sigale
Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, <br><br> Plaintiffs, <br><br> v. <br><br> HEIDI E. MUELLER, in her official capacity as Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, <br><br> Defendants. | Case No. 3:18-CV-3085 |

## DECLARATION OF DARIN E. MILLER

I, Darin E. Miller, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1. I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2. I am a citizen of the United States, and a resident and citizen of the State of Illinois, currently residing in Shelbyville.

3. My wife Jennifer and I are licensed foster parents with the State of Illinois. Though we are not currently fostering at the present time, it is our intent to continue to do so in the future.

4. My wife Jennifer also is a licensed home daycare operator in the State of Illinois, and conducts that activity in the home we share in Shelbyville.

<span style="color:red">Exh. A</span>

5.    I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

6.    I possess a valid and active FOID card and am thus currently licensed to possess a firearm pursuant to Illinois law. I also possess a valid and active concealed carry license ("CCL") and am thus currently licensed to carry a concealed handgun pursuant to Illinois law.

7.    It is my desire and intent to exercise my Second Amendment rights to possess a firearm for self-defense both in and outside our home.

8.    Despite my FOID card and corresponding right to possess a firearm in our home, under 225 ILCS 10/7(a) and 89 Ill. Adm. Code § 402.8(o), I am prohibited from possessing any functional firearms in our home, even in a safe or on my person – in that all firearms must be unloaded and in a safe with any ammunition in a separate locked location - as long as my wife Jennifer and I have a foster parenting license.

9.    Further, despite my CCL and corresponding right to possess and carry a firearm, including a handgun, under 225 ILCS 10/7(a)(13) and 89 Ill. Adm. Code § 406.8(a)(17), I am prohibited from possessing a handgun in our home, even in a safe or on my person, during the "operating hours" of my wife's home day care.

10.    Also, despite my FOID card and corresponding right to possess a firearm in our home, under 225 ILCS 10/7(a)(14) and 89 Ill. Adm. Code § 406.8(a)(18), I am prohibited from possessing any functional firearms in our home, even in a safe or on my person – in that all firearms must be disassembled,

unloaded, and in a safe with any ammunition in a separate locked location - during the "operating hours" of my wife's home day care.

11.     I would comply with the provisions of 430 ILCS 66/65(a)(2), which provides that "[n]othing in this paragraph shall prevent the operator of a child care facility in a family home from owning or possessing a firearm in the home or license under this Act, if no child under child care at the home is present in the home or the firearm in the home is stored in a locked container when a child under child care at the home is present in the home."

12.     Despite my disagreement with the laws and rules regarding both home daycare and foster parenting that are challenged in this lawsuit, I comply with those laws. I am fearful of my wife Jennifer and I having our foster parenting license revoked or not renewed if I do not comply with the challenged laws and rules. I am also fearful of my wife Jennifer losing her home daycare operator's license if I do not comply with the challenged laws and rules.

13.     When I comply with the laws and rules prohibiting the possession of functional firearms generally and handguns specifically, I am left without the ability to meaningfully defend myself or my family in case of confrontation.

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this  4  th day of September, 2025.

_____
Darin E. Miller

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:18-CV-3085 |
| HEIDI E. MUELLER, in her official capacity as Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF JENNIFER J. MILLER

I, Jennifer J. Miller, hereby declare under penalty of perjury, that the following information is true to the best of my knowledge and state the following:

1.    I am over 18 years old. I am competent to give this declaration. I am providing this declaration based on my personal knowledge and experience.

2.    I am a citizen of the United States, and a resident and citizen of the State of Illinois, currently residing in Shelbyville.

3.    My husband Darin and I are licensed foster parents with the State of Illinois. Though we are not currently fostering at the present time, it is our intent to continue to do so in the future.

4.    I am also a licensed home daycare operator in the State of Illinois, and I conduct that activity in the home we share in Shelbyville.

Exh. B

5.    I am not prohibited under state or federal law from acquiring or possessing firearms or ammunition.

6.    I possess a valid and active FOID card and am thus currently licensed to possess a firearm pursuant to Illinois law.

7.    My husband Darin possesses a valid and active concealed carry license ("CCL") and he is thus currently licensed to carry a concealed handgun pursuant to Illinois law.

8.    It is my desire and intent to exercise my Second Amendment rights to possess a firearm for self-defense inside my home.

9.    Despite my FOID card and corresponding right to possess a firearm in my home, under 225 ILCS 10/7(a) and 89 Ill. Adm. Code § 402.8(o), I am prohibited from possessing any functional firearms in my home, even in a safe or on my person – in that all firearms must be unloaded and in a safe with any ammunition in a separate locked location - as long as my husband and I have a foster parenting license.

10.    Further, despite my CCL and corresponding right to possess and carry a firearm, including a handgun, under 225 ILCS 10/7(a)(13) and 89 Ill. Adm. Code § 406.8(a)(17), my husband Darin is prohibited from possessing a handgun in our home, even in a safe or on his person, during the "operating hours" of my home day care.

11.    Also, despite my FOID card and corresponding right to possess a firearm in our home, under 225 ILCS 10/7(a)(14) and 89 Ill. Adm. Code §

406.8(a)(18), I am prohibited from possessing any functional firearms in our home, even in a safe or on my person – in that all firearms must be disassembled, unloaded, and in a safe with any ammunition in a separate locked location - during the "operating hours" of my home day care.

12.    Despite my disagreement with the laws and rules regarding both home daycare and foster parenting that are challenged in this lawsuit, I comply with those laws. I am fearful of my husband Darin and I having our foster parenting license revoked or not renewed if I do not comply with the challenged laws and rules. I am also fearful of losing my home daycare operator's license if I do not comply with the challenged laws and rules.

13.    When I comply with the laws and rules prohibiting the possession of functional firearms generally and handguns specifically, I am left without the ability to meaningfully defend myself or my family in case of confrontation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of September, 2025.

Jennifer J. Miller

Atkinson-Baker, Inc.
www.depo.com

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2
    JENNIFER J. MILLER, DARIN      )
 3  E. MILLER, SECOND AMENDMENT    )
    FOUNDATION, INC., ILLINOIS     )
 4  STATE RIFLE ASSOCIATION, and   )
    ILLINOIS CARRY,                )
 5                                 )
                   Plaintiffs,     )
 6                                 )
                   -vs-            )   Case No.:  3:18-CV-3085
 7                                 )
    MARC D. SMITH, in his          )
 8  official capacity as Acting    )
    Director of the Illinois       )
 9  Department of Children and     )
    Family Services, and KWAME     )
10  RAOUL, in his official         )
    capacity as Attorney General   )
11  of the State of Illinois,      )
                                   )
12                 Defendants.     )

13

14           The discovery deposition of MEAGHAN

15  JORGENSEN, called by the Plaintiffs for examination,

16  taken in the above-entitled cause before Marina

17  Mogilevsky, a Certified Shorthand Reporter, with

18  Meaghan Jorgensen being located separate and apart from

19  the Reporter and participating remotely via Zoom, on

20  Friday, October 16th, 2020, at the hour of 10:00

21  o'clock a.m., pursuant to the Federal Rules of Civil

22  Procedure for the United States District Courts

23  pertaining to the taking of depositions.

24  REPORTED BY:  Marina Mogilevsky, C.S.R.
    LICENSE No.:  084-004103      JOB NO.:  (AE07292)
```

Exh. C

Atkinson-Baker, Inc.
www.depo.com

Page 2

```
 1      There were present at the taking of this deposition
 2  the following counsel:
 3
 4      LAW FIRM OF DAVID G. SIGALE, P.C. by
        MR. DAVID G. SIGALE, Esquire
 5      430 West Roosevelt Road
        Wheaton, Illinois  60187
 6      Phone:  (630) 452-4547
        E-mail:  dsigale@sigalelaw.com
 7
            Appeared via Zoom on behalf of the Plaintiffs;
 8
 9      OFFICE OF THE ILLINOIS ATTORNEY GENERAL by
        MR. MATTHEW CHIMIENTI, Esquire
10      MS. GRETCHEN E. HELFRICH, Esquire
        ASSISTANT ATTORNEY GENERAL
11      100 West Randolph Street, 11th Floor
        Chicago, Illinois  60601
12      Phone:  (312) 814-3000
        E-mail:  m.chimienti@atg.state.il.us
13               g.helfrich@atg.state.il.us
14          Appeared via Zoom on behalf of the Defendants;
15
16      ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY
        SERVICES by
17      MS. BETH SOLOMON, Esquire
        Senior Litigation Counsel
18      100 West Randolph Street
        Chicago, Illinois  60601
19      Phone:  (312) 814-6800
        E-mail:  Beth.Solomon@illinois.gov
20          Appeared via Zoom on behalf of the Illinois
            Department of Children and Family Services.
21
22
23  ALSO PRESENT:
24      Ms. Amanda Wolfman - Illinois DCFS General Counsel.
```

Page 3

```
 1                  ZOOM DEPOSITION OF
                    Meaghan Jorgensen
 2
                    October 16, 2020
 3
 4  EXAMINATION BY:                                    PAGE
 5  Mr. David G. Sigale                            06, 116
    Mr. Matthew Chimienti                              108
 6
 7
 8                  * * * * * *
 9              EXHIBITS PREVIOUSLY MARKED
10                                                   PAGE
11  Jorgensen Deposition Exhibit 1                     14
    (Plaintiffs' Amended Notice of R.R. Civ. P.
12  30(b)(6) Deposition to Defendant Marc Smith)
13  Jorgensen Deposition Exhibit 2                     15
    (Illinois Compiled Statute 225 ILCS 10/7(a)(13),
14  (14), and (15))
15  Jorgensen Deposition Exhibit 3                     25
    (JCAR 402.8 General Requirements for the Foster Home)
16
17  Jorgensen Deposition Exhibit 4                     74
    (Defendant Marc Smith's Answers and Objections to
18  Plaintiffs' Rule 33 Interrogatories)
19  Jorgensen Deposition Exhibit 5                     32
    (Foster Family Firearms Agreement - 402.8(g)/402.8(o)
20  (redacted)
21  Jorgensen Deposition Exhibit 6                     29
    (Acknowledgment of Compliance Part 402 Licensing
22  Standards for Foster Family Homes)
23  Jorgensen Deposition Exhibit 7                     18
    (JCAR Title 89, Section 406.8(a)(17) and (18))
24
```

Page 4

```
 1          - EXHIBIT INDEX CONTINUED -
 2                                                   PAGE
 3  Jorgensen Deposition Exhibit 8                    102
    (430 ILCS 66/65 Firearms Concealed Carry Act)
 4
    Jorgensen Deposition Exhibit 10                    78
 5  (Office of the Inspector General - Report to the
    Governor and General Assembly January 2020)
 6
 7
 8
 9
10
11
12              * * o o o * *
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1      THE COURT REPORTER:  Good morning.  My name
 2  is Marina Mogilevsky.  I am a Certified Stenographic
 3  Reporter.
 4          Today's date is October 16th, 2020,
 5  and the time is approximately 10:03 a.m., as
 6  indicated on my computer screen.
 7          This is the deposition of Meaghan
 8  Jorgensen in the matter of Jennifer J. Miller, et
 9  al., versus Marc D. Smith, et al., in the United
10  States District for the Central District of Illinois.
11  The Case Number is 3:18-cv-3085.
12          At this time, I will ask counsel to
13  identify yourselves and whom you represent, and agree
14  on the record that there is no objection to this
15  deposition officer administering a binding oath to
16  the witness via Zoom.
17          Please state your agreement on the
18  record, starting with the noticing attorney.
19      MR. SIGALE:  Good morning.  My name is
20  David Sigale.  And, as you can see, it's spelled
21  S-I-G-A-L-E.  I represent the Plaintiffs in this
22  case.  And I have no objection to you administering
23  oaths via Zoom.
24      MR. CHIMIENTI:  Good morning.  This is
```

Atkinson-Baker, Inc.
www.depo.com

Page 6

1  Matthew Chimienti, as indicated on my screen.  The
2  last C-H-I-M-I-E-N-T-I.  I'm from the Office of the
3  Illinois Attorney General representing both
4  Defendants in this case.  And on behalf of both
5  Defendants, we have no objection to the court
6  reporter administering oaths via Zoom.
7       MS. HELFRICH:  I'm Gretchen Helfrich.  And
8  that's spelled H-E-L-F-R-I-C-H, as on my screen.  I'm
9  also with the Office of the Illinois Attorney
10  General.  And I agree with what Mr. Chimienti said.
11       MS. SOLOMON:  And my name is Beth Solomon,
12  S-O-L-O-M-O-N.  And I am litigation counsel for the
13  Department of Children and Family Services.
14       (WITNESS SWORN.)
15            MEAGHAN JORGENSEN,
16  called as a witness herein, having been first duly
17  sworn, was examined upon oral interrogatories and
18  testified as follows:
19            EXAMINATION
20       by Mr. Sigale:
21  MR. SIGALE:  Q  All right.  Well, good
22  morning, Ms. Jorgensen.  Can you state your name
23  and -- I know it's on your screen there.  But just
24  for the record, can you state your name and spell

Page 7

1  your last name for the record.
2       A  Yes.  My name is Meaghan Jorgensen.  Last
3  name is J-O-R-G-E-N-S-E-N.
4       MR. SIGALE:  All right.  Let the record
5  reflect this is Federal Rule 30(b)(6) deposition of
6  Marc Smith and the Illinois Department of Children
7  and Family Services, with its designated
8  representative today Meaghan Jorgensen.
9            This deposition is taken pursuant to
10  all applicable rules the Federal Rules of Civil
11  Procedure and any local rules of the Central District
12  of Illinois.
13       Q  Ms. Jorgensen, have you ever given a
14  deposition before?
15       A  I have not.
16       Q  Okay.  Let me give you a couple ground
17  rules to hopefully help this go a little faster and a
18  little smoother.  Okay?
19            Marina is here, sort of, taking down
20  everything everybody says.  She can only take down,
21  especially in this context, she can only take down
22  out loud verbal responses.  She cannot take down any
23  nonverbal responses, such as head shaking and hand
24  gestures, and maybe the biggest culprit uh-huh or

Page 8

1  unh-unh.  So please make all your responses out loud
2  and verbal.  Okay?
3       A  Understood.
4       Q  Thanks.
5            It's also very difficult for Marina to
6  take down more than one person talking at a time,
7  especially in this context, I know that it sometimes
8  happens, but I'm going to ask that you wait until I'm
9  done asking my question before you answer.  I in turn
10  will try to wait until you're done answering before
11  asking my next question.  Okay?
12       A  Understood.
13       Q  All right.  If you answer a question that I
14  ask you here today, it's going to be presumed, for
15  purposes of the record that is being made, that you
16  understood the question that I asked you; and that
17  that is the question you are answering.
18            So if for any reason you do not
19  understand a question that I'm asking you today,
20  please let me know.  And I will rephrase it.  Okay?
21       A  Okay.
22       Q  Okay.  And if you need to take a break, let
23  me know.
24       A  Okay.

Page 9

1       Q  All right.  Ms. Jorgensen, are you
2  currently employed?
3       A  I am.
4       Q  And who would that be by?
5       A  I am employed by the Illinois Department of
6  Children and Family Services.
7       Q  And what is your position at -- Can I call
8  it DCFS?  And we'll know that we're talking about the
9  same thing?
10       A  Yes, you may.
11       Q  Okay.  What is your job title at DCFS?
12       A  I am Deputy Director of Legislative
13  Affairs.
14       Q  How long have you held that position?
15       A  Since July of 2019.
16       Q  And what are your job responsibilities as
17  Deputy Director of Legislative Affairs?
18       A  So I handle all monitoring and tracking of
19  legislation.  I handle all interactions with
20  legislators.  And I also, as of January of this year,
21  oversee the Office of Children and Family Policy, who
22  writes rules and procedures.
23       Q  I'm sorry, I missed that.  As of January
24  you oversee the office of what?

Atkinson-Baker, Inc.
www.depo.com

Page 10

1    A   The Office of Children and Family Policy.

2    Q   And what is that again?

3    A   So they write rule and procedure for the

4  Department.

5    Q   Okay.  I want to ask you just a few

6  background questions here before we kind of get into

7  the meat of this.

8        How long have you worked for DCFS?

9    A   I've worked here since July of 2019.

10   Q   Okay.  And prior to that, where were you

11  working?

12   A   I was with the DuPage County State's

13  Attorney's Office.

14   Q   Okay.  From when to when?  Well, strike

15  that.

16        From when to when?

17   A   I started there in November of 2018, end of

18  November, until I came to DCFS.

19   Q   Okay.  What were you doing over at the

20  DuPage County State's Attorney?

21   A   I worked in the civil division.  So I

22  handled the health department, I handled dog bite

23  cases, and I handled FOID card objections.

24   Q   Just as an aside, Ms. Jorgensen, I know

Page 11

1  that you've got quite the family name in DuPage

2  County.  Have you and I crossed paths before?  Have

3  we met before on one of those FOID cases, or no?  If

4  you remember.

5    A   I believe we briefly did once.

6    Q   Okay.  Prior to DuPage County State's

7  Attorney, where, if anywhere, were you employed?

8    A   Would you like everywhere I was employed,

9  or just immediately before that?

10   Q   If you don't mind just running the list, it

11  would save me the trouble of just asking and then and

12  then and then.  So...

13   A   Okay.  So I did political consulting for a

14  company called Core Strategies.  Before that, I had

15  my own consulting company; and I also was general

16  counsel for Patriot Ambulance Service.  Prior to

17  that, I worked for Superior Ambulance.  And I did

18  legislative affairs for Superior Ambulance.

19   Q   Okay.  Let me just run through the timeline

20  real quick.

21        So Superior Ambulance was from when to

22  when?

23   A   Oh, boy.  So that was --

24   Q   Would it help to go the other way?

Page 12

1    A   No, I can -- I'm just trying to think when

2  I graduated law school.

3        So Superior Ambulance would have been

4  May or June after law school.  So 2011.  I worked

5  there for about two-and-a-half, three years.  Then I

6  left there, and that's when I started my own

7  political consulting and I started working for

8  Patriot.  I did those simultaneously.  And then I

9  went to Core Strategies in 2018.

10   Q   And stayed there until November of 2018,

11  when you joined the State's Attorney's Office?

12   A   Correct.

13   Q   Okay.  When you handled legislative affairs

14  for Superior Ambulance, what sort of job

15  responsibilities did that encompass?

16   A   So, again, dealing with legislators, a lot

17  of Medicaid issues, rate increases, lots more

18  entertaining of legislators, but mostly that.

19        They're the third largest ambulance

20  provider.  So there were lots of issues.

21   Q   Okay.  As Deputy Director of Legislative

22  Affairs for DCFS now, are there specific discreet

23  issues that you generally work on; or is it basically

24  everything that -- anything legislative that might

Page 13

1  affect the agency?

2    A   I'm not sure what you mean by "separate

3  discreet issues," but any legislation that comes that

4  has to do with DCFS.

5    Q   Okay.  You said you graduated law school in

6  2011?

7    A   Correct.

8    Q   Okay.  From where?

9    A   Northern Illinois.

10   Q   And your undergraduate degree you received

11  when?

12   A   2008.

13   Q   Okay.  From where?

14   A   University of Iowa.

15   Q   Go Hawkeyes.

16        And what was your major?

17   A   I was a history major.

18   Q   So that was a BA that you received?

19   A   Correct.

20   Q   Okay.  Ms. Jorgensen, I am going to attempt

21  to share my screen.

22        Does everyone see the page with the

23  caption there?

24   A   Yes.

Page 14

1    Q    Okay.  This is a document that I have
2  marked, you can see there in the bottom right corner,
3  as Jorgensen Deposition Exhibit 1.
4              (Jorgensen Deposition Exhibit 1
5              previously marked and screen shared.)
6        MR. SIGALE:  Q  And, Ms. Jorgensen, I'd
7  like you to take a look at this for a moment.  But if
8  I just show you the title of it, is that a document
9  that you've seen before?
10    A    Yes, I've seen this before.
11    Q    Okay.  So Amended Notice of Federal Rule
12  30(b)(6) Deposition to Defendant Marc Smith for
13  today, right now.  And then if I scroll down, we've
14  got some definitions and the meat that I referred to
15  earlier, the Matters for Examination.  This is page 5
16  of the document.  And on page 5 and 6 are 14 topics.
17  And it is being represented to me that you are the
18  person most knowledgeable in the DCFS to testify
19  about all the matters that are listed on these two
20  pages.
21        MR. CHIMIENTI:  I'm going to object, David.
22  She is the witness that's been provided pursuant to
23  Federal Rule of Civil Procedure 30(b)(6).  She's
24  prepared to testify about all these topics.  The

Page 15

1  rules do not require the person most knowledgeable on
2  each of these topics.
3        So she is the 30(b)(6) representative
4  of the Department.  And she's prepared to testify
5  about these topics.
6        MR. SIGALE:  Q  Ms. Jorgensen, is that
7  your understanding, that you are the designated
8  representative to testify about all these topics here
9  today?
10    A    Correct, that is my understanding.
11    Q    Okay.  Well, let's start with No. 1, which
12  is the bases for the Illinois Compiled Statute 225
13  ILCS 10/7(a) sub (13), (14), and (15).  And I'm going
14  to show you this document.  You can see that it's
15  marked Jorgensen Deposition Exhibit 2.
16              (Jorgensen Deposition Exhibit 2
17              previously marked and screen shared.)
18        MR. SIGALE:  Q  This is off of Lexis.  The
19  statute that is Topic No. 1.
20        Are you familiar with this statute?
21    A    The Child Care Act?  Yes, I'm familiar with
22  it.
23    Q    Okay.  So we're looking at 13, 14, and 15.
24  So let's start with 13.

Page 16

1        In fact, I'm sorry.  Before I even do
2  that, I'm going to go up.  Because I want to read the
3  part before the subparts that says, this is (a), "The
4  Department must prescribe and publish minimum
5  standards for licensing that apply to the various
6  types of facilities for child care defined in this
7  Act and that are equally applicable to like
8  institutions under the control of the Department and
9  to foster family homes used by and under the direct
10  supervision of the Department.  The Department shall
11  seek the advice and assistance of persons
12  representative of the various types of child care
13  facilities in establishing such standards.  The
14  standards prescribed and published under this Act
15  take effect as provided in the Illinois
16  Administrative Procedure Act, and are restricted to
17  regulations pertaining to the following matters and
18  to any rules and regulations required or permitted by
19  any other Section of this Act:"  And then we get to
20  the subparts.
21        So sub 13 says, "Provisions
22  prohibiting handguns on day care home premises except
23  in the possession of peace offices or other adults
24  who must possess a handgun as a condition of

Page 17

1  employment and who reside on the premises of a day
2  care home."
3        First of all, did I read sub 13
4  correctly?
5    A    You did.
6    Q    All right.  So Topic No. 1 asks for the
7  testimony regarding the bases regarding -- the bases
8  for the Act's subparagraphs there.
9        So I'll ask you.  What are the bases
10  for that subparagraph?
11    A    I could not tell you that.  This was
12  something that was passed by the legislature, and I
13  don't have the capability to get inside their head.
14    Q    If I were to ask you the same exact
15  question for sub 14 and sub 15, would your answer be
16  the same?
17    A    It would.
18    Q    Topic No. 2 asks for -- Well, before I get
19  to that, notwithstanding the fact that you are the
20  designated representative, is there someone at DCFS
21  that does know the answer to the question of the
22  bases for 225 ILCS 10/7(a)(13), (14), and (15)?
23        MR. CHIMIENTI:  Objection.  Form.
24        She is the 30(b)(6) witness, David.

Atkinson-Baker, Inc.
www.depo.com

Page 18

1  It's irrelevant.
2         But go ahead, Meaghan.
3         THE WITNESS:  I don't know the answer to
4  that.
5         MR. SIGALE:  Q   Okay.
6         All right.  Topic No. 2 asks for the
7  bases for JCAR, Joint Committee on Administrative
8  Rules, Title 89, Section 406.8(a)(17) and (18).
9         So I'm going to stop sharing my screen
10  for a second, and I'm going to go find that document.
11  Give me a second.
12         All right.  Ms. Jorgensen, I am
13  showing you a document that has been marked as
14  Jorgensen Deposition Exhibit 7.
15         (Jorgensen Deposition Exhibit 7
16         previously marked and screen shared.)
17         MR. SIGALE:  Q   Do you recognize -- You
18  might not recognize this exact printout, which is
19  actually off the Illinois General Assembly web page,
20  but are you familiar with the rule that is on your
21  screen right now?
22     A   I am.
23     Q   Okay.  Now, this is specifically Section
24  406.8 titled General Requirements for Day Care Homes.

Page 19

1  And it states there in (a), "The physical facilities
2  of the home, both indoors and outdoors, shall meet
3  the following requirements for safety to children."
4  And, specifically, I want to refer to 17 and 18,
5  which I can't get all on one screen.  So I'll have to
6  go up and down a little bit.
7         So 17 reads, "Handguns are prohibited
8  on the premises of the day care home except in the
9  possession of peace offices or other adults who must
10  possess a handgun as a condition of employment and
11  who reside in the day care home.  The licensee shall
12  post a "no firearms" sign, as described in Section
13  65(d) of the Firearm Concealed Carry Act, which is at
14  430 ILCS 66/65(d), in a visible location where
15  parents pick up children."
16         Ms. Jorgensen, did I read that
17  correctly?
18     A   You did.
19     Q   All right.  Topic No. 2 that is in the
20  Matters for Examination is the bases for those
21  subparagraphs of this Rule 406.8(a).
22         So I'll ask you, do you know the bases
23  for this subparagraph 17 of Rule 406.8(a)?
24         MR. CHIMIENTI:  Objection.  Vague as to

Page 20

1  bases.
2         Meaghan, if you understand, you may
3  answer.
4         THE WITNESS:  Can you rephrase the
5  question?
6         MR. SIGALE:  Q   Sure.
7         If I go back to Exhibit 1, Definition
8  No. 8 on page 5, "basis or bases shall be considered
9  synonymous with justifications and/or reasons."
10         So I'll rephrase it and ask if you
11  know the reason for the enactment of 406.8(a), sub
12  (17).  I'll stick with this one for right now.
13     A   I do.
14     Q   Okay.  What is it?
15     A   We were ordered to do so by statute.  The
16  Child Care Act directed us to enact rules.
17     Q   Is that it, is that the only reason why
18  this rule is in place, this subparagraph is in place?
19     A   We enacted this rule because we were
20  ordered to do so by statute.
21     Q   Okay.  I just want to make sure I'm -- I
22  just want to clarify it here, because this is my only
23  chance to talk to you, Ms. Jorgensen.
24         Is that the only reason why this rule

Page 21

1  was enacted, because the statute said to do it?
2     A   At the Department, we were supportive of
3  this rule, as it protects children.  But we were
4  ordered by statute to create this rule.
5     Q   How does it protect children?
6         Again, I'm just -- And, Ms. Jorgensen,
7  I'm sorry.  I'm going to even back up half a step.
8         Right now I'm focused here on
9  subparagraph 17.  And I'm only focused on the first
10  sentence, which happens to be the part of the rule
11  that's in italics.  Okay?
12     A   Okay.
13     Q   Okay.  So how does it protect children?
14     A   Reducing access to firearms and ammunition
15  prevents death, serious injury, and suicide.
16     Q   As you sit here today, are you aware of any
17  empirical data to support that?
18     A   I am aware that there is evidence out
19  there.
20     Q   I'm sorry, were you done; or were you in
21  the middle of a sentence?
22     A   Yeah.
23     Q   Okay.  But as you sit here right now, can
24  you name any of it or cite to any of it?

Atkinson-Baker, Inc.
www.depo.com

Page 22

1    MR. CHIMIENTI:  I'm going to object to the
2  extent that this question calls for expert testimony,
3  and expert discovery is forthcoming in this case.
4  And DCFS reserves the right to proffer expert
5  testimony on this subject.
6        But subject to that, Meaghan, you may
7  answer.
8    THE WITNESS:  I am aware that there is
9  evidence that exists.  But I cannot cite to it.
10   MR. SIGALE:  Q   Let's move on to
11  subparagraph 18.  So 406.8(a)18.  And it reads, "Any
12  firearm, other than a handgun in the possession of a
13  peace officer or other person as provided in
14  subsection (a)(17), shall be kept in a disassembled
15  state, without ammunition, in locked storage in a
16  closet, cabinet, or other locked storage facility
17  inaccessible to children."
18        And then it's got a sub-subparagraph,
19  capital A.  "A)  Ammunition for such firearms shall
20  be kept in locked storage separate from that of the
21  disassembled firearms, inaccessible to children.  B)
22  The operator of the home shall notify the parents or
23  guardian of any child accepted for care that firearms
24  and ammunition are stored on the premises.  The

Page 23

1  operator shall also notify the parents or guardian
2  that such firearms and ammunition are locked in
3  storage inaccessible to children.  Section 7 of the
4  Child Care Act of 1969 (225 ILCS 10/7).  The
5  notification need not disclose the location where the
6  firearms and ammunition are stored."
7        So, first of all, Ms. Jorgensen, did I
8  read subparagraph 18 correctly?
9    A   You did.
10   Q   All right.  I want to -- Since it's
11  basically three parts, I just want to go through each
12  one.
13        So sub 18, the first paragraph before
14  the capital letter sub-subparagraphs, are you aware
15  of the basis or bases, which is synonymous for reason
16  or reasons or justification or justifications, for
17  that portion of the rule, sub 18?
18   A   I am.
19   Q   Okay.  And what is it slash them?
20   A   We were ordered by the Child Care Act to
21  implement these rules.
22   Q   Anything else?
23   A   No.
24   Q   Okay.  So then we get to 18(A), the capital

Page 24

1  A underneath it.  "A)  Ammunition for such firearms
2  shall be kept in locked storage separate from that of
3  the disassembled firearms, inaccessible to children."
4        If I were to ask you the same question
5  about bases slash reasons slash justifications, would
6  your answer be the exact same?
7    A   It would.
8    Q   Anything to add beyond that regarding this
9  18 sub (A), capital A?
10   A   No.
11   Q   And, in fact, no one is challenging 18 sub
12  (B).  So I don't need to ask you about that.
13        Okay.  Ms. Jorgensen, I am going back
14  to the Matters for Examination.  And No. 3 lists,
15  "The bases for Rule 402.8(o) (previously 402.8(g)) of
16  the Licensing Standards for Foster Family Homes."
17  And it was established in earlier depositions that
18  that sub (o), that's a recent change.  It was
19  previously a different subparagraph.  I'm sure you're
20  well aware of that, actually.
21        I want to show you a document that
22  I am marking as Jorgensen Deposition Exhibit 3.  You
23  can see that in the bottom right corner there.
24

Page 25

1        (Jorgensen Deposition Exhibit 3
2         previously marked and screen shared.)
3        MR. SIGALE:  Q   And, again, while you
4  might not be familiar with this exact printout from
5  the IllinoisGeneralAssembly.gov, I will ask you if
6  you remember familiar with the rule that is
7  represented there on the screen?
8    A   I am.
9    Q   Okay.  So 402.8 is General Requirements for
10  the Foster Home, which it says twice, and we skip
11  down to letter O.  And I'm skipping past things like
12  working kitchen, working bathroom, water hazard
13  protection, swimming pools and hot tubs, tobacco,
14  alcohol, dangerous household supplies, and then we
15  get down to letter O.  Which states, "Any and all
16  firearms and ammunition shall be stored and locked up
17  separately at all times and kept in places
18  inaccessible to children.  No firearms possessed in
19  violation of a state or federal law or a local
20  government ordinance shall be present in the home at
21  any time.  Loaded guns shall not be kept in a foster
22  home unless required by law enforcement officers and
23  in accordance with their law enforcement agency's
24  safety procedures."

Atkinson-Baker, Inc.
www.depo.com

Page 26

1          Did I read that correctly?

2     A   You did.

3     Q   All right.  So there are three sentences in

4  this subparagraphs O.  And the only ones we're going

5  to talk about are the first and the third.  I don't

6  care about the second one.

7          So the first one, "Any and all

8  firearms and ammunition shall be stored and locked up

9  separately at all times and kept in places

10 inaccessible to children."  If I go back to Exhibit

11 1, the bases slash justifications slash reasons for

12 enacting this part of the rule, are you aware of

13 them?

14    A   I am.

15    Q   Okay.  And what is it slash they or them?

16    A   This rule is consistent with the

17 Department's mandate to protect children.

18 Restricting children's access to firearms and

19 ammunition protects against death, serious injury,

20 and suicide.

21    Q   Is that it?

22    A   Yes.

23    Q   Okay.  Similar to what I asked you before,

24 are you aware of any empirical evidence to support

Page 27

1  that reason that you just gave?

2          MR. CHIMIENTI:  Objection to the extent

3  that it calls for forthcoming expert testimony.

4          But subject to that, Meaghan, you may

5  answer.

6          THE WITNESS:  Can you clarify the question?

7          MR. SIGALE:  Q   You just gave me the

8  reason about -- and I'm going to paraphrase a little

9  bit, but you just said it's consistent with the

10 Department's mandate to protect children against

11 death and serious injury and suicide.  And I'm asking

12 now if you are aware of any empirical evidence to

13 support that conclusion, that bases.

14         MR. CHIMIENTI:  Objection to the extent it

15 misstates her prior testimony, and to the extent it

16 calls for expert testimony.

17         But go ahead, Meaghan.

18         THE WITNESS:  There is well-documented

19 evidence out there that does exist.

20         MR. SIGALE:  Q   As you sit here today, are

21 you able to cite any of it to me?

22         MR. CHIMIENTI:  Same objections with

23 respect to experts.

24         Go ahead, Meaghan.

Page 28

1          THE WITNESS:  I am not able to specifically

2  cite it.

3          MR. SIGALE:  Q   If I were to ask you the

4  same exact questions regarding the third sentence

5  that starts with "Loaded guns shall not be kept,"

6  dot, dot, dot, would your answers be exactly the

7  same; or would you have anything to change or add to

8  that?

9          MR. CHIMIENTI:  And I would again add an

10 objection to the extent that that question calls for

11 potential forthcoming expert testimony.

12         But to the extent you understand the

13 question, Meaghan, you may answer.

14         THE WITNESS:  Yes, it would be the same.

15         MR. SIGALE:  Q   Okay.  All right.  So the

16 next topic or the next Matter for Examination is

17 No. 4, which is "The bases for Section 3 of the Form

18 CFS 402-A" that has that certification.  But I'm

19 going to pause for a second and pull up an exhibit to

20 share.  Okay?

21    A   Okay.

22    Q   All right.  Ms. Jorgensen, I'm showing a

23 document that's been marked as Jorgensen Deposition

24 Exhibit 6.

Page 29

1          (Jorgensen Deposition Exhibit 6

2          previously marked and screen shared.)

3          MR. SIGALE:  Q   Also for purposes of --

4  Since it's right there on the screen, it's also a

5  document provided by DCFS Bates stamped as No. 195.

6  And, as you can see, it's redacted to exclude any

7  personal information from the Millers.

8          So are you familiar, in general, with

9  this form?

10    A   I am.

11    Q   Okay.  Just for -- Are you familiar with

12 the exact form that the Millers have signed, or are

13 you just familiar with this form in general?

14    A   I'm familiar with the form in general.

15    Q   Okay.  So it's titled Acknowledgment of

16 Compliance Part 402 Licensing Standards for Foster

17 Family Homes.  And I'm going to scroll down to --

18 Well, first of all, what's the purpose of this form,

19 in general?

20    A   This is a recordkeeping form for DCFS

21 licensing representatives.

22    Q   I'm sorry, recordkeeping for what?

23    A   So that licensing reps are aware that

24 foster parents understand the rules they must follow.

Atkinson-Baker, Inc.
www.depo.com

Page 30

1    Q   Okay.  Now, this says, "Section III.
2    Firearms."  And it references Rule 402.8(g), which I
3    believe at least counsel and I, and I assume you,
4    Ms. Jorgensen, know is now 402.8(o).  But as of at
5    least a couple weeks ago, this form still is the same
6    and still says 402.8(g).
7         But, at any rate, it states, "Any and
8    all firearms and ammunition shall be locked up at all
9    times and kept in places inaccessible to children.
10   No firearms possessed in violation of a State or
11   Federal law or a local government ordinance shall be
12   present in the home at any time.  Loaded guns shall
13   not be kept in a foster home unless required by law
14   enforcement officers and in accordance with their law
15   enforcement agency's safety procedures."
16        And then it says underneath it, "I
17   certify that there are no firearms on the premises,
18   but will immediately notify the Licensing
19   Representative and complete form CFS 452-2, Foster
20   Family Firearms Arrangement, if I, or any member of
21   the foster family home, acquires a firearm."  And
22   then there's places for initials, presumably the
23   would-be foster parents.
24        Are you aware of the basis or bases,

Page 31

1    synonymous with reason or justification, why this
2    section is on this document?
3        A   You cut out a little bit.  Can you repeat
4    the question for me?
5        Q   Sure.
6             I read that Section III, Firearms,
7    that is on this Exhibit 6, this Acknowledgment of
8    Compliance for foster family homes, correct?  I read
9    it correctly?
10       A   Yes.
11       Q   Okay.  My question to you is, if you are
12   aware of the reason why this Section III is on this
13   form?
14       A   It's on here to ensure that foster parents
15   are aware of the rule.
16       Q   Anything else?
17       A   No.
18       Q   All right.  Moving right along.
19            The next topic, which is Topic
20   No. 6 -- Nope, it is not.  It is No. 5.  "The bases
21   for Form CFS 452-2, entitled Foster Family Firearms
22   Agreement."  Which, as you can see in Matter No. 4,
23   that when I recited what was in that section on the
24   form, it refers to 452-2.  And so now I want to ask

Page 32

1    you about Form CFS 452-2.  And it's cut off a little
2    bit, but I'll represent to you that that's what that
3    states.
4             This is a document that is redacted.
5    It is marked as Jorgensen Deposition Exhibit 5.  And
6    it comes from DCFS in this case, and it is Bates
7    stamped 193.  But I redacted the personal
8    information, as you can see.
9             (Jorgensen Deposition Exhibit 5
10            previously marked and screen shared.)
11            MR. SIGALE:  Q   And so, Ms. Jorgensen, are
12   you familiar with this form, in general?
13       A   I am.
14       Q   Okay.  Did you review specifically the
15   Millers' form in this case, so the unredacted version
16   of this document; or are you just familiar with it in
17   general?
18       A   I am familiar with the form in general.
19       Q   Okay.  And it recites at the top -- Well,
20   it's titled Foster Family Firearms Agreement.  It
21   cites that, in quotes, that Rule 402.8(g) again, now
22   with a slight modification.  It's actually 402.8(o),
23   but the form is still the same.
24            And so let me ask you, what is the

Page 33

1    basis for requiring this document of foster parents?
2    And I'll scroll down a little bit, if you need me to.
3        A   So this is a DCFS recordkeeping form for
4    our licensing reps, to ensure that the foster family
5    understands and is aware of the corresponding rule.
6        Q   Is there anything else regarding this
7    document?
8        A   No.
9        Q   Okay.  So why is it that the foster family
10   has to disclose information on it instead of just
11   saying, here is the rule, be aware of it?
12            MR. CHIMIENTI:  Objection.  Form.  Vague.
13   Calls for speculation.
14            Meaghan, if you understand the
15   question, you may answer.
16            THE WITNESS:  I would ask that you be more
17   specific in your question.
18            MR. SIGALE:  Q   Sure.
19            You said -- and forgive me if I
20   misheard you, so you'll correct me -- that it's a
21   recordkeeping form so that the foster family
22   understands the corresponding rule.  Is that what you
23   said, or am I misunderstanding?
24       A   That's correct.

Atkinson-Baker, Inc.
www.depo.com

Page 34

1    Q    Okay.  But it's not just a form that says,
2  here is the rule, sign here that you understand it.
3  It requires information about firearm location,
4  ammunition location, and I guess that's mostly it.
5          So if it's just to make sure that they
6  understand the rule, why are they asked to provide
7  this information?
8          MR. CHIMIENTI:  Objection.  Compound.  Form
9  of the question.  Counsel is testifying.  Misstates
10  her prior testimony.
11          Go ahead, Meaghan.
12          THE WITNESS:  Licensing representatives are
13  also tasked with monitoring foster homes.  And this
14  outlines if there's a firearm present or not.
15          MR. SIGALE:  Q  So it's not just to make
16  sure the foster family understands the rule?
17          MR. CHIMIENTI:  Objection.  Misstates.
18          Go ahead, Meaghan.
19          THE WITNESS:  You asked me what is the
20  basis.
21          MR. SIGALE:  Q  Correct.
22    A    The basis is, so that the foster family
23  understands and is aware of the rule.
24    Q    Okay.  Then I'm sorry.  Because I'm

Page 35

1  misunderstanding you.
2          If that's the basis, then why require
3  the foster parent to provide information --
4          MR. CHIMIENTI:  Asked and answered.
5          Go ahead, Meaghan.
6          MR. SIGALE:  Q -- instead of just checking
7  the box that, yes, I understand.
8          MR. CHIMIENTI:  Asked and answered multiple
9  times.
10          Go ahead, Meaghan.
11          THE WITNESS:  The Department is also tasked
12  with monitoring foster homes.  So this makes us aware
13  if there is one or not, and we can check for
14  compliance.
15          MR. SIGALE:  Q  Is there anything else
16  that you have to add about this form?
17    A    There is not.
18          MR. CHIMIENTI:  Objection.  Vague.
19          Sorry.  Go ahead, Meaghan.
20          THE WITNESS:  There is not.
21          MR. SIGALE:  Q  All right.  No. 6 of the
22  Matters for Examination.  "The enforcement of the
23  rules and/or policies referenced in Numbers 1 through
24  5 above."  So all the rules and statutes and forms

Page 36

1  that we've been discussing up until now, I want to
2  talk to you about the enforcement of them by DCFS.
3          But before I do that, I see that we've
4  been going for an hour.  So maybe this is a good time
5  to take a brief break?
6    A    Yes, please.
7    Q    Okay.  Do you want to say 10 minutes, come
8  back at 11:12?
9    A    Perfect.
10    Q    Okay.  Very good.  See you then.
11          We'll go off the record now.
12          (short break taken 11:02 a.m.)
13          MR. SIGALE:  Q  All right.  Let's go back
14  on.
15          Ms. Jorgensen, where we left off was
16  Topic No. 5 -- sorry, Topic No. 6, "The enforcement
17  of the rules and/or policies referenced in Numbers 1
18  to 5 above."
19    A    Correct.
20    Q    And let me ask you a more open-ended
21  question first.  Which is, do you have any knowledge
22  regarding the enforcement of the policies we've been
23  discussing?
24    A    I have knowledge of the enforcement of the

Page 37

1  rules we're discussing, and enforcement of rules as a
2  whole in the Department.
3    Q    Well, let's stick to the rules we've been
4  discussing.  And -- Well, generally speaking, how
5  does enforcement of the rules work at DCFS?
6          MR. CHIMIENTI:  I'm going to object as to
7  vague.
8          David, are you just talking about the
9  rules?  Are you talking about the statute and the
10  forms?  Which ones are you talking about?
11          MR. SIGALE:  Q  Well, I can keep it, for
12  the moment, to the rules, which is the Topics 2 and
13  3.  So 406.8(a)(17) and (18) and 402.8(o).
14          So how does DCFS enforce those rules?
15    A    Are you wanting to know the process of
16  enforcement?
17    Q    Yes.
18    A    So the process of enforcing these rules is
19  the same process of enforcing any rule.  It's a very
20  long process.
21          First, we receive some awareness of a
22  rule violation.  There is what we call an intake.
23  Then there is an investigation.  Then there's a
24  corrective action plan or a protective plan.  There's

Atkinson-Baker, Inc.
www.depo.com

Page 38

1  an opportunity to comply and get the rule violation
2  corrected.  Then there is a supervisory review, if it
3  progresses through.  There's an informal review.
4  There's a notice of the intent to revoke.  There's a
5  notice of right to appeal.  Then there's an
6  administrative order of closure.
7      **Q   All right.  So let me stick then with the**
8  **hypothetical that a foster parent has -- DCFS hears**
9  **that a foster parent, a licensed foster parent, has a**
10 **firearm in a safe that's loaded.  That would, under**
11 **the rules that we've been -- the rules and statutes**
12 **and forms that we've been discussing, that would be a**
13 **violation of the rules, correct?**
14     MR. CHIMIENTI: Objection.  Incomplete
15 hypothetical.  Calls for speculation.
16     Go ahead, Meaghan.
17     THE WITNESS: Can you repeat the scenario?
18     MR. SIGALE: Q   A foster parent who is not
19 a law enforcement officer, so who doesn't fall under
20 any exceptions, DCFS hears that that foster parent
21 has a loaded firearm that they keep in a safe in
22 their bedroom.  Would that be a violation of the DCFS
23 rules that we've been discussing up until now?
24     MR. CHIMIENTI: Same objections.

Page 39

1      Go ahead, Meaghan.
2      THE WITNESS: If you're asking me something
3  that specific, we would have to go out and
4  investigate.
5      MR. SIGALE: Q   Well, I think that's what
6  I'm getting at.
7      So what is the intake -- You said the
8  first thing was intake.  So what's the intake portion
9  of this process?  What does that entail?
10     A   Someone notifies us, we find out about it
11 when we're out doing a visit.  It could be varying
12 ways.
13     **Q   Okay.  So then there is an investigation.**
14 **Which, you're the one in the hot seat, so I'll ask**
15 **you what that entails.**
16     A   Our licensing rep would go to the home and
17 see if that is -- whatever we're called about, see if
18 that's an actual rule violation.
19     **Q   I suppose if the licensing rep says that**
20 **there isn't a rule violation, then this all ends**
21 **right there.**
22     **So let's assume, for purposes of this**
23 **talk, that there is a rule violation; or the**
24 **licensing representative concludes there is a rule**

Page 40

1  **violation.  So then you said the next step would be a**
2  **corrective action plan.  Can you describe that?**
3  **Not the specific one, but can you**
4  **describe, in general, what that is?**
5      A   So we would give the individuals the option
6  to correct it on the spot.  If not, there would
7  either be a corrective action plan or a protective
8  plan.
9      A corrective action plan is something
10 that's drawn up between the licensing rep -- and
11 using a foster family, because that's what you posed
12 in your question -- and the foster family put
13 together, in conjunction.  And it's how the foster
14 family plans to correct the rule violation.  And they
15 outline a certain amount of time they have, et
16 cetera.
17     **Q   And the next thing you said was opportunity**
18 **to comply.  And I imagine that that kind of goes hand**
19 **in hand with that corrective action plan you just**
20 **described?**
21     A   Not necessarily.  They could correct before
22 a corrective action plan, and there would be no
23 corrective action plan.  Or they could correct during
24 the time the corrective action plan was being like

Page 41

1  set forth, whatever the time frame was.
2      **Q   Oh, so maybe there's an opportunity to**
3  **comply before a corrective action plan is written up?**
4      A   Correct.  They can correct at any time.
5      **Q   Okay.  Then the next thing you said was, I**
6  **think, and correct me if I'm wrong, please, a**
7  **supervisory review?**
8      A   Correct.
9      **Q   What's that?**
10     A   So that would be a meeting with the
11 licensing rep, the foster family, and the supervisor,
12 the immediate supervisor.
13     **Q   Okay.  I'm sorry if it sounds elementary,**
14 **but what would happen at the supervisory review**
15 **meeting?**
16     A   We would walk them through the rule, ask
17 them if they're going to comply, if there's something
18 that stands in their way of complying, and then try
19 to enter into a corrective action plan.  And also
20 give them an opportunity to correct the violation.
21     **Q   And then I think the next thing you said**
22 **was informal review.  Did I jump steps, or is that**
23 **what happens next?**
24     A   That's correct, that's what happens next.

Atkinson-Baker, Inc.
www.depo.com

Page 42

1    Q   Okay.  So what's in the informal review?
2    A   So that would be the foster family, the
3  licensing rep, the immediate supervisor, and then the
4  area administrator of licensing, we call them.  They
5  would have a meeting, similar to the supervisory
6  review, and explain the importance of compliance; and
7  give them an opportunity to enter into a corrective
8  action plan.
9    Q   And then after that, you said there is a
10  notice -- if there's not compliance, of course, a
11  notice of intent to revoke.  What's that?
12   A   So that's a notice that would be sent in
13  the mail, along with a right to appeal, saying the
14  Department intends to revoke your license.
15   Q   I'm sorry, does that actually serve as a
16  revocation of the license?  Or is it a notice and
17  there's going to be a hearing date, or you have 30
18  days to respond to this and have a hearing; or
19  something of that sort?
20   A   It is not an actual revocation of the
21  license.
22   Q   So if it's not an actual revocation,
23  what -- Does it set out any future dates or anything
24  like that, or is it just -- Well, I'll just ask you.

Page 43

1  What's it do if it's not an actual revocation?
2    A   It notifies that that's our intent, and it
3  notifies of the right to appeal.
4    Q   Okay.  And forgive me.  I'm sorry, perhaps
5  I'm asking badly.  But if it's not an actual
6  revocation, then what are they appealing?
7    A   A rule violation.
8    Q   Okay.  So when you had said earlier when
9  you were giving me kind of the timeline or the
10  chronology, for lack of a better word, and you said
11  notice of right to appeal, that's what you were
12  referring to also?
13   A   Correct.  And then if they say they want to
14  do an appeal as well.
15   Q   Say that one more time.
16   A   I said, yes, correct, it would be in that
17  same information.  And then they can appeal.
18   Q   Okay.  And then the last thing you had said
19  in your list was an administrative order of closure.
20  What's that mean?
21   A   So an appeal would go before an ALJ.  And
22  an ALJ would make a determination if there was a rule
23  violation or not.  And then following that would be a
24  order of closure.

Page 44

1    Q   Is the administrative order of closure the
2  revocation?  Does the ALJ do the revocation?  I'm
3  sorry, I'm getting lost on when actually the person's
4  license would be revoked.
5    A   The license would be revoked with the
6  administrative order of closure.
7    Q   Okay.  So let's apply this, if we can, to
8  the specifics regarding the rules that are the
9  subject of this case.
10       So sticking for a second with foster
11  homes -- Actually, Strike that.  I'm sorry,
12  Ms. Jorgensen.
13       So you've been referencing foster
14  families, right, in this whole procedure that you're
15  talking about from intake all the way to
16  administrative order of closure?  That's the
17  chronology for the violations of rules by a foster
18  home, correct?
19   A   Foster home, and it would be day care home
20  as well.  The enforcement proceedings are the same.
21   Q   Okay.
22   A   We would just switch out foster family with
23  day care.
24   Q   Okay.  Thank you for that.

Page 45

1        So looking at 402.8(o), that says "Any
2  and all firearms and ammunition" -- This is the first
3  sentence.  "Any and all firearms and ammunition shall
4  be stored and locked up separately at all times and
5  kept in places inaccessible to children."  And then
6  the third sentence says, "Loaded guns shall not be
7  kept in a foster family unless required by law
8  enforcement officers in accordance with the law
9  enforcement agency's safety procedures."
10       So I want you to presume that in the
11  scenario I'm going to describe, that in the foster
12  home or day care home, that there is not a law
13  enforcement officer living there.  So that exception
14  in the third sentence does not apply.  Okay?
15   A   Understood.
16   Q   Okay.  So through one mechanism or another,
17  or through one means or another, DCFS gets intake
18  that a foster family has a loaded gun on the
19  premises, which would violate, at least on paper, the
20  language in the third sentence of 402.8(o).  That's
21  something that will cause DCFS to go through these
22  enforcement steps, as you've described them, correct?
23       MR. CHIMIENTI:  Objection.  Incomplete
24  hypothetical.  Compound.  Calls for speculation.  And

Meaghan Jorgensen
October 16, 2020

Atkinson-Baker, Inc.
www.depo.com

Page 46

1   vague.
2           Go ahead, Meaghan.
3           THE WITNESS:  Any intake on a rule
4   violation would cause us to go through enforcement
5   measures.
6           MR. SIGALE:  Q   Including a violation of
7   Rule 402.8(o); is that correct?
8       A   Any violation of a rule.
9       **Q   Okay.  So intake gets word that someone is**
10  **violating Rule 402.8(o), the third sentence**
11  **specifically, that they have a loaded gun on the**
12  **premises.  There's an investigation.  The licensing**
13  **rep would go -- goes and talks to the family.  And**
14  **they say, it's just for protection.  We want to have**
15  **a loaded firearm.  It's in a safe.  No one can get to**
16  **it but me.  I'm the only one with the combination.**
17  **And it's just in case there is a break-in.**
18          **Will DCFS in that scenario say, oh.**
19  **Well, that's a good reason.  We can close the**
20  **investigation on this.  Or would they continue with**
21  **the other enforcement steps, as you've described**
22  **them?**
23          MR. CHIMIENTI:  I'm going to object that
24  it's an incomplete hypothetical.  It calls for

Page 47

1   inspection.  It's vague.  It's compound.  And it
2   calls for a legal conclusion.
3           Meaghan, if you understand the
4   question, you can answer it.
5           THE WITNESS:  Any rule violation that is
6   not corrected, we will proceed with enforcement.
7           MR. SIGALE:  Q   Okay.  So the persons --
8   Strike that.
9           The foster family's reason for
10  violating the rule does not affect that enforcement
11  procedures will proceed; is that correct?
12          MR. CHIMIENTI:  Objection.  Vague.
13  Incomplete hypothetical.  Calls for speculation.
14  Calls for a legal conclusion.
15          Meaghan, if you understand, you may
16  answer.
17          THE WITNESS:  If there is a rule violation
18  and it is not corrected, we will proceed with
19  enforcement.
20          MR. SIGALE:  Q   Regardless of what excuses
21  or justifications they give you for why it's okay
22  that they're breaking the rule?
23          MR. CHIMIENTI:  Objection again.  Vague.
24  Incomplete hypothetical.  Calls for speculation.  And

Page 48

1   calls for a legal conclusion.
2           Go ahead, Meaghan.
3           THE WITNESS:  If someone is not in
4   compliance with a rule, we will proceed with
5   enforcement.
6           MR. SIGALE:  Q   Okay.  But what I'm just
7   really asking for is a yes or a no.
8           Does it matter what their reason is
9   for violating the rule, the 402.8(o) that we're
10  talking about?  Or it's a bright-line rule.  That if
11  they're violating the rule, then the enforcement will
12  proceed?
13          MR. CHIMIENTI:  David, you have asked that
14  question three separate times, and she has answered
15  it each time.  Asked and answered.
16          MR. SIGALE:  Okay.  I hear your objection,
17  but she hasn't answered my question.
18          MR. CHIMIENTI:  She has answered the
19  question.  She told you exactly what the issue is.
20          Go ahead, Meaghan.
21          THE WITNESS:  If someone is not in
22  compliance with a rule, we will proceed to
23  enforcement.
24          MR. SIGALE:  Q   So, yes -- And, I'm sorry,

Page 49

1   I'm really just trying to get this, and then I can
2   move on.  Okay?
3           So yes or no.  Does their reason for
4   the rule violation matter?
5           MR. CHIMIENTI:  Asked and answered for the
6   fourth time.
7           Go ahead, Meaghan.
8           THE WITNESS:  If someone is not in
9   compliance with a rule, we are going to move to
10  enforcement.
11          MR. SIGALE:  Q   Okay.  And if that person
12  says, well, I have this firearm in a safe for
13  protection.  And it has to be loaded, because that's
14  how I need it to be available for protection.  And
15  DCFS continues with the enforcement process anyway,
16  then you're saying they will continue with the
17  enforcement process all the way into the
18  administrative order of closure, correct?
19          MR. CHIMIENTI:  Objection.  Assumes facts
20  not in evidence.  Incomplete hypothetical.  Calls for
21  speculation.  And vague.  And misstates her prior
22  testimony.  She's testified about opportunities to
23  correct on multiple occasions.
24          Go ahead, Meaghan.

Atkinson-Baker, Inc.
www.depo.com

Page 50

1     MR. SIGALE:  Q  So they don't correct.
2  They say, we need this for protection.  We're not
3  changing.  So there is no correction.  DCFS will
4  continue with enforcement all the way through the
5  steps that you've described to administrative order
6  of closure; is that correct?
7     MR. CHIMIENTI:  Same objections.
8        Go ahead, Meaghan.
9     THE WITNESS:  Anyone who does not correct a
10  rule violation, we will move through the enforcement
11  process.
12     MR. SIGALE:  Q  Up to and including the
13  last step that you described, which you said was
14  called an administrative order of closure; is that
15  correct?
16     MR. CHIMIENTI:  Objection.  Asked and
17  answered.
18        Go ahead, Meaghan.
19     THE WITNESS:  Correct.
20     MR. SIGALE:  Q  Okay.  And everything that
21  you said, all the testimony that you just gave, that
22  all applies equally to a home day care facility and
23  to a foster family; is that correct?
24     A  Correct, the enforcement process for both

Page 51

1  is the same.
2     **Q  Okay.  So let's say that a couple starts**
3  **the process of becoming a foster family.  Okay?**
4     A  Okay.
5     **Q  I'm sorry?**
6     A  Okay.
7     MR. CHIMIENTI:  First of all, I know where
8  you're going, David.  And this is unnecessarily going
9  to call for speculation.  So I'll just object.
10        But go ahead.
11     MR. SIGALE:  Q  And this foster family is
12  informed of Rule 402 -- this would-be foster family
13  is informed of Rule 402.8(o); and they're told that
14  they've to sign the Foster Family Firearms Agreement,
15  which is CFS 452-2; the Acknowledgment of Compliance,
16  which is CFS 452-A; and they say, for whatever
17  reason, no, we're not going to do that.  We keep our
18  loaded guns in a safe.  No one will be able to get at
19  them.  Will their application for having a foster
20  license be approved?
21     MR. CHIMIENTI:  Objection.  Incomplete
22  hypothetical.  Calls for speculation.  Vague.
23        Go ahead, Meaghan.
24     THE WITNESS:  In any licensing

Page 52

1  circumstance, if someone is not going to comply with
2  the rule, they would not be issued a license.
3     MR. SIGALE:  Q  And that answer that you
4  just gave, that's true for both foster families and
5  for day care homes?
6     A  It is.
7     **Q  And in the circumstance where the foster**
8  **family or the day care home provider says that they**
9  **are not going to comply with that rule, but they**
10  **offer what they think are very good reasons for not**
11  **doing so, that would not change the general statement**
12  **that you just said earlier, right, that if they're**
13  **not going to comply, they will not get a license?**
14     MR. CHIMIENTI:  Objection.  Vague.
15  Incomplete hypothetical.  Calls for speculation.
16        Go ahead, Meaghan.
17     THE WITNESS:  In order for a license to be
18  issued, there must be compliance with all rules.
19     MR. SIGALE:  Q  So, just to clarify, why
20  the foster family or why the would-be foster family
21  or day care home doesn't want to comply doesn't
22  matter in terms of that ultimate result?  If they
23  don't want to comply, or if they're not going to
24  comply, they're not going to get the license

Page 53

1  regardless of why they're not going to comply; is
2  that correct?
3     MR. CHIMIENTI:  Objection.  It's been asked
4  and answered on multiple occasions.
5        Go ahead, Meaghan.
6     THE WITNESS:  Compliance with any rule is
7  required for a license to be issued.
8     MR. SIGALE:  Q  Ms. Jorgensen, are you
9  familiar with instances in real life where the
10  applicant, maybe it's not about firearms, but it's
11  about other things, where the applicant says, well, I
12  shouldn't have to comply with that; or I can't comply
13  with that requirement?
14     MR. CHIMIENTI:  Objection.  That is so far
15  beyond the scope of her notice.  She wasn't prepared
16  to testify on that particular subject, David.  And
17  that's an incomplete hypothetical.
18        Meaghan, if you understand that
19  question, you can answer.  But that's not something
20  you were prepared to testify about today.  And it
21  wasn't noticed by counsel.
22     MR. SIGALE:  Well, I'm glad that you said
23  at the end of that that she can answer, but I think
24  it's squarely within the topic of enforcement of the

Page 54

1  rules. I'm asking if she's aware of any real-world
2  examples of enforcement of the rules.
3        MR. CHIMIENTI: And your question was about
4  real-world examples of enforcement of the rules that
5  are not at issue here.
6        So if you have questions about
7  real-world enforcement of the rules at issue, go
8  ahead and ask her. But you didn't notice up topics
9  about real-world enforcement of other rules.
10        As you can tell, there's Rules 401
11  through 410. There's a number of different rules
12  that could be enforced. You're talking about two
13  firearm rules in question, not the entire universe of
14  DCFS rules. She's only prepared to testify about
15  what you noticed, David.
16        MR. SIGALE: Q  All right. Are you aware
17  of real-world examples of an applicant for a foster
18  family or a day care home saying they can't comply
19  with the -- they can't or won't comply with the
20  firearm requirements that we've been discussing
21  today?
22     A  I am personally not aware.
23     Q  Okay. Do you read Rule 402.8(o) -- Well,
24  give me a second, because I'll share the screen and

Page 55

1  I'll pull it up.
2        So this is 402.8(o). This is the
3  Exhibit 3. Do you have an understanding of Rule
4  402.8(o), where a foster family that does not have a
5  law enforcement officer in it, would be allowed in
6  any circumstance to keep a loaded firearm in a safe
7  for protection?
8        MR. CHIMIENTI: Objection. Vague. Overly
9  broad. Calls for speculation. Incomplete
10  hypothetical.
11        Meaghan, if you understood the
12  question, you may answer it.
13        THE WITNESS: Can you repeat your question?
14        MR. SIGALE: Q  Let me ask the court
15  reporter to read it back.
16        (From the record above, the reporter
17        read the following:
18        "Q: So this is 402.8(o). This is the
19        Exhibit 3. Do you have an
20        understanding of Rule 402.8(o), where
21        a foster family that does not have a
22        law enforcement officer in it, would
23        be allowed in any circumstance to keep
24        a loaded firearm in a safe for

Page 56

1        protection?")
2        MR. CHIMIENTI: Same objections.
3        Go ahead, Meaghan.
4        THE WITNESS: I am not personally aware of
5  any.
6        MR. SIGALE: Q  I'm going to ask you the
7  same question with regard to the day care rule, which
8  is 406.8(a)(17) and (18). And this is Deposition
9  Exhibit 7 I'm referring back to.
10        Do you read section 17 -- subsection
11  17 here -- subparagraph 17, I should say, when an
12  adult in a day care home who is not a peace officer
13  or who doesn't have to have a handgun as a condition
14  of employment, so those two exceptions don't apply,
15  are you aware of any circumstance where that resident
16  of a day care home would nonetheless be allowed to
17  possess a handgun in the day care home?
18        MR. CHIMIENTI: Same objections as there
19  were to the previous hypothetical.
20        Go ahead, Meaghan.
21        THE WITNESS: I am not aware of any.
22        MR. SIGALE: Q  Okay. And then going down
23  to section (18) and (18)(A), because that's all that
24  is really at issue here, do you read this

Page 57

1  subparagraph and sub-subparagraph to allow, in any
2  circumstance, a day care home provider or resident of
3  the day care home to be allowed to have a loaded
4  firearm, even one that isn't a handgun, in any
5  circumstance?
6        MR. CHIMIENTI: Same objections.
7        Go ahead, Meaghan.
8        THE WITNESS: Can you repeat that question?
9        MR. SIGALE: Q  Looking at subparagraph
10  (18) and (18)(A) that is on the screen there.
11     A  Yes.
12     Q  And assuming, again, that there is not
13  a -- that this isn't about a peace officer or other
14  person who needs a firearm for their employment. So
15  those exceptions don't apply. Do you read this rule
16  where there is any circumstance where a day care home
17  resident is allowed to keep a loaded firearm in the
18  day care home?
19        MR. CHIMIENTI: Same objections.
20        Go ahead, Meaghan.
21        THE WITNESS: No. I mean, yes.
22        MR. SIGALE: Q  I'm sorry, go ahead.
23     A  Loaded handguns or loaded firearms should
24  not be kept in a day care home.

Atkinson-Baker, Inc.
www.depo.com

Page 58

1    Q    Okay.  So even if there are no day care
2  kids in the home at the time, that rule still
3  applies?
4          MR. CHIMIENTI:  Objection.  Calls for a
5  legal conclusion.
6              Meaghan, if you understand, you may
7  answer.
8          THE WITNESS:  We only have authority in day
9  care homes during operating hours.
10         MR. SIGALE:  Q  Are there standard
11  operating hours, or is it just whatever operating
12  hours of the individual day care home owner?
13     A    I am not aware if there are standard
14  operating hours, but day care homes are required to
15  notify us of their operating hours.
16     Q    Okay.  So is it your testimony that outside
17  of those operating hours, these restrictions, this
18  sub (17) and sub (18), do not apply?
19         MR. CHIMIENTI:  Misstates her prior
20  testimony.
21             Go ahead, Meaghan.
22         THE WITNESS:  We have authority to enforce
23  rules in day care homes during operating hours.
24         MR. SIGALE:  Q  Okay.  So what I'm asking

Page 59

1  you specifically then is, this sub (17) and sub (18),
2  do they apply to day care homes outside of those
3  operating hours?
4          MR. CHIMIENTI:  Objection.  Asked and
5  answered.
6              Go ahead, Meaghan.
7          THE WITNESS:  All rules apply during
8  operating hours.
9          MR. SIGALE:  Q  So if the operating hours
10  that were provided by the day care home are, say,
11  8:00 to 4:30, is it your testimony that at 4:31 they
12  could bring handguns into the home?
13         MR. CHIMIENTI:  Objection.  Incomplete
14  hypothetical.  Calls for speculation and a legal
15  conclusion.
16             Go ahead, Meaghan.
17         THE WITNESS:  My testimony is that our
18  rules apply during operating hours.
19         MR. SIGALE:  Q  And, therefore, do not
20  apply outside of operating hours.  Is that fair?
21         MR. CHIMIENTI:  Objection.  Asked and
22  answered.
23             Go ahead, Meaghan.
24         THE WITNESS:  We can only enforce the rules

Page 60

1  during operating hours.
2          MR. SIGALE:  Q  I'm sorry, when you say
3  you can only enforce during operating hours, do you
4  mean like you can only physically go to the home
5  during the operating hours; or are you saying that
6  you can only enforce violations that might occur
7  during those operating hours?
8      A    We can only enforce violations during
9  operating hours.
10     Q    So sticking with these rules here that are
11  on the screen, if you got a call, if DCFS got a call,
12  an intake, and it says, I was at so and so's house
13  last night at 9:00 o'clock p.m., and they showed me a
14  handgun.  And I know they run a day care home, go do
15  something about it.  Is that something DCFS would
16  investigate?
17         MR. CHIMIENTI:  Objection.  Calls for
18  speculation.  Incomplete hypothetical.  Vague.
19  Compound.
20             Meaghan, if you understand it, you may
21  answer.
22         THE WITNESS:  You're asking a very
23  fact-specific question.  If we received a call that
24  there was any rule violation during operating hours,

Page 61

1  we would investigate.
2          MR. SIGALE:  Q  Right.  So what if you get
3  a call that, based on the call, the alleged rule
4  violation happened outside of operating hours?
5          MR. CHIMIENTI:  Objection.  Vague.
6  Incomplete hypothetical.  Asked and answered.  Calls
7  for speculation.
8              Go ahead, Meaghan.
9          THE WITNESS:  There could not be a rule
10  violation outside of hours.
11         MR. SIGALE:  Q  Ms. Jorgensen, I'm sorry,
12  I just want to be sure I understand.
13             So there's a home day care provider.
14  And, for whatever reason, DCFS happens to knock on
15  their door at 10:00 p.m., which is not, in this case,
16  operating hours.  So DCFS knocks on the door, the
17  licensing rep shows up at the door at 10:00 p.m. and
18  sees in the house a handgun.  Maybe the guy is
19  cleaning it or something like that.  Is it your
20  testimony that that licensing rep would not consider
21  that a rule violation, because it's outside of
22  operating hours?
23         MR. CHIMIENTI:  Objection.  Incomplete
24  hypothetical.  Vague.  Calls for speculation.  Calls

Atkinson-Baker, Inc.
www.depo.com

Page 62

1  for a legal conclusion. And misstates her prior
2  testimony.
3      Go ahead, Meaghan. If you understand,
4  you can answer.
5      THE WITNESS: Rule violations can only
6  occur during operating hours.
7      MR. SIGALE: Q  Which means, logically,
8  therefore, something that would be a violation during
9  operating hours -- Strike that.
10     Ms. Jorgensen, I'm sorry. You're the
11  designated representative here. So I'm really just
12  trying to get at this. So let me ask you a yes/no
13  question. Okay?
14     If a day care provider has a handgun
15  on the premises outside of operating hours, are they
16  violating this rule?
17     MR. CHIMIENTI: Objection. Incomplete
18  hypothetical. Calls for speculation. Asked and
19  answered for the fourth time.
20     Go ahead, Meaghan.
21     MR. SIGALE: I'm just asking for a yes or
22  no. And it has not been answered.
23     MR. CHIMIENTI: You've asked this question
24  multiple times, David.

Page 63

1      MR. SIGALE: Oh, I've asked it. Yes, I
2  have asked it.
3  **Q  So, please, Ms. Jorgensen, yes or no.**
4      **If a day care home family has a**
5  **handgun on the premises and it's outside of operating**
6  **hours, is that day care home provider in violation of**
7  **that rule?**
8      MR. CHIMIENTI: Same objections.
9      Go ahead, Meaghan.
10     THE WITNESS: No, they would not be in
11  violation of a rule if it was outside of operating
12  hours.
13     MR. SIGALE: Q  Okay. Thank you.
14     What if it's operating hours, but
15  there's no day care children in the home? You know,
16  like now we have the coronavirus, and no one is
17  bringing their kids over. But it's during operating
18  hours, there just aren't any day care kids there. Do
19  the rules still apply; or do they not, if there's not
20  actually any day care kids present?
21     MR. CHIMIENTI: Objection. Calls for
22  speculation. Incomplete hypothetical.
23     Go ahead, Meaghan.
24     THE WITNESS: Day care rules apply during

Page 64

1  operating hours.
2      MR. SIGALE: Q  Regardless if there's zero
3  kids or 8 kids?
4      MR. CHIMIENTI: Asked and answered.
5      Go ahead, Meaghan.
6      THE WITNESS: Our authority extends during
7  operating hours.
8      MR. SIGALE: Q  And just a yes or no.
9  Does it matter if there's zero kids or 8 kids on the
10  premises at that time?
11     MR. CHIMIENTI: Objection. Asked and
12  answered. Calls for speculation.
13     Go ahead, Meaghan.
14     THE WITNESS: No. It applies during
15  operating hours.
16     MR. SIGALE: Q  Okay. What about with
17  regard to foster families? Is there a time when
18  there's a foster family -- assuming there's a
19  placement -- You know what, Strike that.
20     The rule with regard to foster
21  families, 402.8(o), does that apply to them if
22  there's not actually a foster placement in the home?
23     MR. CHIMIENTI: Objection. Calls for
24  speculation.

Page 65

1      Go ahead, Meaghan.
2      THE WITNESS: Foster license rules apply at
3  all times.
4      MR. SIGALE: Q  What if there's not a
5  foster kid actually placed in the home?
6      MR. CHIMIENTI: Asked and answered.
7      Go ahead, Meaghan.
8      THE WITNESS: If someone has a foster
9  license, the rules apply at all times.
10     MR. SIGALE: Q  What's the reason for
11  that? What's the reason for DCFS's application of
12  the rule in that manner? I mean, why -- Strike that.
13     Why does DCFS enforce that rule even
14  if there's not actually a foster child placed in the
15  home?
16     MR. CHIMIENTI: Objection. Misstates the
17  prior testimony.
18     Go ahead, Meaghan.
19     THE WITNESS: So you're saying enforce. We
20  apply that rule, I guess is a better word, in all
21  circumstances, any time in a foster home, because a
22  foster child could come into care of a foster family
23  at any moment.
24     MR. SIGALE: All right. I need to take a

Page 66

1  5-minute break.  So let's do that.  We'll come
2  back -- Let's just make it even and call it a
3  7-minute break, and we'll come back at 12:15.
4          And, really, I don't know how much
5  longer we'll be going.  So, you know, if somebody
6  needs to break for lunch or something like that.  I
7  mean, I need the break now, but I'm happy to
8  otherwise go straight through.
9          Do you all feel the same, or do you
10 need a different arrangement?
11         MR. CHIMIENTI:  Do you have an estimate,
12 David, of about how much longer you've got?  I mean,
13 it's up to Meaghan.  But I guess that would be
14 helpful.
15         MR. SIGALE:  Well, I've got 14 topics.  And
16 I'm on No. 7, I guess.  So I don't know that that's
17 indicative that we'll be going until 2:30 or -- I
18 mean, I could say that.
19         MR. CHIMIENTI:  Okay.  Meaghan, it's up to
20 you.
21         MR. SIGALE:  Yeah, I say that with no
22 confidence, but it's as good a guess as anything.
23         THE WITNESS:  If the estimate is 2:30, I'm
24 fine with going through.

Page 67

1          MR. SIGALE:  Okay.  So let's break for 5
2  minutes.  Unless someone needs more?
3          MR. CHIMIENTI:  No, 5 sounds good.
4          MR. SIGALE:  All right.  Off the record.
5          (short break taken 12:10 p.m.)
6          MR. SIGALE:  Q  All right.  I guess we're
7  ready to go back on.
8          Ms. Jorgensen, just a couple questions
9  that I meant to ask, or that I should have asked at
10 the beginning and didn't.  What's your office
11 address?  Are you out of downtown or a different
12 address?
13     A   Normally, I'm downtown.  So 100 West
14 Randolph.
15     Q   All right.  Did you review any documents to
16 prepare for today?
17     A   Yes.  I reviewed the statute and the rules
18 as well, 402, 406, and the forms.
19     Q   Pretty much exactly what I showed you?
20     A   Correct.
21     Q   Okay.  Any additional materials that you
22 reviewed that I didn't happen to sort of
23 coincidentally show you?
24     A   Paper documents, no.

Page 68

1          Well, I mean, like I didn't -- did
2  I -- No.  But, I mean, the Concealed Carry Act was on
3  there.
4      Q   Okay.  But like did you read a copy of the
5  complaint?
6      A   Oh, yes.  Yes, yes, yes, yes.  That was
7  referenced in there.
8      Q   Okay.  Anything else that you reviewed to
9  prepare for today?
10     A   No.
11     Q   Okay.  We are on Topic No. 7.  And I'll
12 share the -- Do you a copy of this document, by the
13 way, in front of you?  This document being Exhibit 1,
14 which is the Notice of Deposition with all the topics
15 on it.
16     A   I don't have anything in front of me.
17     Q   Got it.  Okay.  So I will share the screen
18 so that you can see it.
19         So No. 7 of the Matters for
20 Examination.  "The empirical evidence relied upon by
21 you as bases for enacting the challenged rules and/or
22 policies (in Plaintiffs' pending complaint) for day
23 care homes and foster homes, as referenced in Numbers
24 1 through 5 above."  And because it already seems

Page 69

1  like yesterday, two days ago or something, 1 through
2  5 was the Child Care Statute, the JCAR rules, and the
3  two forms.  That's 1 through 5.
4          Now, I asked you some questions
5  regarding if you were aware of empirical evidence for
6  the various things.  And I asked you that question
7  for each individual item as we were going through it,
8  and you answered.  And I'm not going to rehash that,
9  unless you need me to, because it was so long ago
10 that you don't remember what you said, but I'm just
11 going to ask, now that this is the topic, if you have
12 any additional information to add, beyond what you've
13 already testified to, as to anything in numbers 1
14 through 5?
15         MR. CHIMIENTI:  And I'm objecting again to
16 the extent that it calls for expert testimony.
17         But go ahead, Meaghan.
18         THE WITNESS:  I'm not sure if you're asking
19 me if this relates specifically to these rules or
20 empirical evidence in general.
21         MR. SIGALE:  Q  I'm sorry, I missed the
22 last few words you said.
23     A   I guess you need to restate specifically
24 what you're asking me.

Atkinson-Baker, Inc.
www.depo.com

Page 70

1    Q   Okay.  When we went through Topics 1
2    through 5, the statute, the two JCAR rules, the two
3    forms, I asked you after each one if you had any
4    empirical evidence for the basis or bases that you
5    gave me.  And you answered.  You said something to
6    the effect of, and I'm paraphrasing, that you're
7    aware of studies, but you can't cite to them.  Or
8    basically that.
9          So what I'm asking you, now that this
10   is a actual topic, No. 7, "The empirical evidence
11   relied upon by you as bases for enacting the
12   challenged rules and/or policies (in Plaintiffs'
13   pending complaint) for day care homes an foster homes
14   as referenced in Numbers 1 through 5 above," if I
15   asked you that specifically, would your answers be
16   the same as you gave earlier?
17         MR. CHIMIENTI:  Same objection regarding
18   the experts.
19         Go ahead, Meaghan.
20         THE WITNESS:  I would say that DCFS
21   generally relies on evidence.  There is nothing to
22   show we would deviate from that in this situation,
23   but I didn't come across anything specific that we
24   relied on for these challenged rules.

Page 71

1          MR. SIGALE:  Q   Okay.  So much as you
2    testified earlier when we were going line by line,
3    you can't cite to me as you sit here any empirical
4    evidence regarding any of those rules or statutes or
5    forms, correct?
6          MR. CHIMIENTI:  Same objection regarding
7    experts.
8          Go ahead, Meaghan.
9          THE WITNESS:  I can't cite to you
10   specifics, but I know it's all there.  And a simple
11   Google search will return evidence.
12         MR. SIGALE:  Q   Okay.  And just to
13   clarify, you didn't do that Google search before
14   showing up here today, correct?
15   A    I personally did not.
16   Q    Okay.  So let's move on then to No. 8.
17   "The occurrence of firearm-related crime in and
18   around day care homes and foster homes in Illinois."
19   Do you, as you sit here today, or as you sit on the
20   other side of the screen today, have any information
21   regarding that topic?
22   A    That's a broad question.  We don't have a
23   database that will keep track of firearm-related
24   crime.

Page 72

1    Q   Okay.  So let's break that topic down then.
2          The occurrence of firearm-related
3    crime in day care homes in Illinois.  Would you have
4    information regarding that?
5    A    Specific crime, no.
6    Q    I'm sorry, I don't know how to -- I don't
7    know the opposite of -- How about general firearm
8    crime in day care homes, does DCFS have information
9    about that?  Do you, as the representative for DCFS,
10   have information regarding that?
11   A    The only -- We may, in certain files.  But
12   there is no overarching incidence, where I could find
13   crime in and around every day care home and foster
14   home in Illinois.  It would have to be on an
15   individual basis.  Each file could potentially have
16   something.
17   Q    Okay.  You mentioned foster homes.  And in
18   particular with that last question, I was trying to
19   exclude that.  So let me rephrase it.
20         Do you, as you sit here, have any
21   information regarding the occurrence of
22   firearm-related crime in day care homes in Illinois?
23         MR. CHIMIENTI:  Objection.  Vague.
24         Go ahead, Meaghan.

Page 73

1          THE WITNESS:  I do not.
2          MR. SIGALE:  Q   Okay.  Do you have any
3    information, as you sit here, regarding the
4    occurrence of firearm-related crime in foster homes
5    in Illinois?
6          MR. CHIMIENTI:  Objection.  Vague.
7          But go ahead, Meaghan.
8          THE WITNESS:  In regards -- No, I do not.
9          MR. SIGALE:  Q   Do you have any
10   information regarding the occurrence of
11   firearm-related crime around day care homes in
12   Illinois?  And I'm going to define around, and I'm
13   going to defer to whatever definition the Department
14   would find significant enough to take down the
15   information.
16         So, in other words, if DCFS say were
17   to think it's significant enough to notate that
18   something happened two blocks away, that would be
19   around.  If it's -- And, I mean, I think that there's
20   logical limits.  You know, 10 miles away isn't going
21   to count.  But I don't know how DCFS would -- or what
22   vicinity would be enough for DCFS to mark it down.
23   So either you know or you don't.
24         Do you have any information regarding

Atkinson-Baker, Inc.
www.depo.com

Page 74

1  the occurrence of firearm-related crime around day
2  care homes in Illinois?
3      MR. CHIMIENTI: Objection. Form. Vague.
4      Go ahead, Meaghan.
5      THE WITNESS: I don't have any information
6  around the occurrence of firearm-related crime around
7  day care homes that would be specific.
8      MR. SIGALE: Q  Okay. Same question, but
9  substitute foster homes for day care homes.
10      MR. CHIMIENTI: Again, object to form.
11  Vague and confusing as to the format of the question.
12      But go ahead, Meaghan.
13      THE WITNESS: It would be the same answer.
14  I don't have any knowledge of occurrence of
15  firearm-related crime around foster homes that's
16  specific.
17      MR. SIGALE: Q  Okay. Ms. Jorgensen, I am
18  showing you Jorgensen Deposition Exhibit 4.
19      (Jorgensen Deposition Exhibit 4
20          previously marked and screen shared.)
21      THE WITNESS: I see it.
22      MR. SIGALE: Q  Okay. You can see the
23  caption of this case, and it is Defendant Marc
24  Smith's Answers and Objections to Plaintiffs' Rule 33

Page 75

1  Interrogatories.
2      Now, you'll have to forgive me. I
3  don't know how much time you might have spent in
4  federal court with the State's Attorney's Office or
5  with DCFS. So I don't want to presume you know Rule
6  33. But I know that in the civil division of the
7  DuPage State's Attorney, you know interrogatories.
8  So these are Marc Smith's, as acting director,
9  answers to Plaintiffs' interrogatories in this case.
10  And I'm actually going to stop sharing for a second
11  so I can find what I'm looking for. Give me a
12  second.
13      But let me ask you, while I'm going
14  through this on my end, have you seen that document
15  before?
16      A  I have.
17      Q  You have. Okay.
18      So let me ask you again, are there
19  documents that you've looked through that you haven't
20  mentioned?
21      A  I apologize if I left that one out. I
22  looked at that. I looked at the complaint, the
23  notice. But I think that's everything I can recall
24  at this moment.

Page 76

1      Q  Okay. Sure. It's really not a gotcha
2  thing. Just, you know, as long as you said it, I
3  figured I'd ask if there was anything else.
4      So I'm going to go back to sharing.
5  And you've seen this before. And I don't know that
6  I've actually had this happen before, Ms. Jorgensen,
7  what I'm about to tell you. But this is page 3. And
8  when I go to the verification here, and that's not
9  you. You didn't sign this, correct?
10      A  Correct.
11      Q  Okay. And, in fact, the legal counsel in
12  the deposition here, who might very well be putting
13  herself as a witness, quite possibly, signed this.
14      But you did review this before showing
15  up here today, correct?
16      MR. CHIMIENTI: And I'd object to that
17  characterization, whether she's even putting herself
18  in question as a witness. But go ahead, you can ask
19  your question.
20      MR. SIGALE: Q  Question No. 3 here is,
21  "Identify all information in your possession
22  regarding a link (negative or positive) between the
23  existence of firearm possession by foster parents and
24  firearm violence, including self-defense defensive

Page 77

1  gun uses."
2      Okay. Did I read that question
3  correctly?
4      A  You did.
5      Q  All right. And we go through a number of
6  objections and reservations, and then we get here.
7  "The Office of the Inspector General for DCFS
8  provides annual summaries of reports and
9  investigations made during the prior fiscal year,"
10  citing to a statute. "These annual reports include
11  examinations of the deaths or serious injuries of all
12  Illinois children who were involved in the child
13  welfare system in the preceding 12 months, and causes
14  thereof, including firearms. The annual reports are
15  publically available at," and there's a website that
16  it lists. And then it says, "Investigation
17  continues."
18      Do you see that answer there, or that
19  part of the answer?
20      A  I do.
21      Q  Okay. As you sit here today, have you
22  reviewed the information that's available on that
23  website?
24      A  I don't know exactly where that website

Page 78

1  takes you. I've seen the OIG report.
2      Q   You've seen the OIG report. Lots of them,
3  one of them?
4      A   No. I mean, I've only been here when one
5  OIG report has been released.
6      Q   Okay. So you've seen, what, the most
7  recent?
8      A   Yes.
9          (Whereupon, Jorgensen Deposition
10         Exhibit 10 was screen shared.)
11         MR. SIGALE: Q  Okay. Ms. Jorgensen, I'm
12  going to mark this later as -- and you'll see I
13  didn't do it yet -- as Exhibit No. 10. Okay?
14     A   Okay.
15     Q   This document is entitled -- And, by the
16  way, just so you know, I did get it off that website.
17  And this is the report to the Governor and the
18  General Assembly by the Office of the Inspector at
19  IDCFS on January 2020.
20         As you sit here, do you recall if this
21  is the form that you have seen?
22     A   If this is the OIG report from 2020, I've
23  seen this.
24     Q   Okay. I'll stop sharing for one second.

Page 79

1  Can you describe for me what this report is?
2      A   Yes. It's an annual report that's put
3  together by the Office of the Inspector General.
4  Normally, it's issued in January. And they review
5  all deaths where there was involvement with the
6  Department in the previous year.
7      Q   All right. This is page 178 of this
8  report, and you can see it says 178.
9          Now, let me pause for a second here
10  and let me ask counsel, because I'm not -- I can
11  e-mail this over -- If you want me to pause this for
12  a couple minutes, I'll be happy to e-mail you a copy,
13  because I didn't know I was using it. In fact, I
14  didn't know I was using it until she mentioned it.
15         So do you want me to do that?
16         MR. CHIMIENTI: I mean, David, you can do
17  what you've been -- I mean, you can e-mail it to me
18  like on the next break. That's fine.
19         MR. SIGALE: Okay.
20         MR. CHIMIENTI: Yeah, feel free to just
21  continue and you can e-mail me on the next break.
22         MR. SIGALE: Okay. That sounds like a plan
23  to me.
24     Q   This is page 178 of the form. So I want

Page 80

1  to -- Well, it was page 178 of the form. Hold on.
2  I'll get there.
3         This is from that January 2020 report.
4  And let me ask you this question. Do you have any
5  independent recollection, Ms. Jorgensen, of the
6  contents of that report?
7      A   The specifics, no.
8      Q   Okay. So this is -- Again, it's page 178.
9  And hopefully it's not going to just jump to the next
10  page. But this is a Twenty-Year Death Retrospective.
11  So this is data from the OIG from 2000 through 2019.
12         Now, on the very left-hand column, the
13  one that says "Case Status," are you familiar with
14  the various categories of -- Well, are you familiar
15  with the various categories that are listed there?
16     A   Yes.
17     Q   Okay. So where would foster kids, what are
18  colloquially referred to as foster kids, where are
19  they represented on this left-hand column?
20         MR. CHIMIENTI: I'm going to object that
21  this is beyond the scope of her deposition and that
22  she lacks foundation to answer it, because she's not
23  a member of the OIG.
24         But go ahead, Meaghan.

Page 81

1         THE WITNESS: They could be in various
2  places. Children can be in multiple of those
3  categories.
4         MR. SIGALE: Q  Well, I know children
5  could be, but I'm asking about foster children.
6      A   Foster children. My apologies. They could
7  be in multiple categories.
8      Q   Okay. So foster children are not
9  represented in the "Youth in Care" category?
10     A   No, they are.
11         MR. CHIMIENTI: Objection. Misstates.
12         MR. SIGALE: Q  Let me rephrase.
13         Foster children are not solely
14  represented in the Youth in Care category?
15     A   Foster children are represented in the
16  Youth in Care. They could also be represented in
17  other categories, but that would be me speculating as
18  to their individual situations that would put them in
19  a different category.
20     Q   Okay. What does -- If you know, what does
21  DCP mean?
22     A   That means an investigation. Division of
23  Child Protection.
24     Q   Okay. So the total -- These are all the

Atkinson-Baker, Inc.
www.depo.com

Page 82

1  child deaths over -- Well, if you know,
2  Ms. Jorgensen, what does this represent, this table
3  on page 178 here? If you know.
4       MR. CHIMIENTI: Objection. Calls for
5  speculation. Lacks foundation.
6       Go ahead, Meaghan.
7       THE WITNESS: I don't have any information
8  that -- you know, enough that I would say represents
9  the Twenty-Year Death Retrospective. I would assume
10  it's of the cases that the OIG reviewed, since it's
11  in the OIG report, but I don't know.
12       MR. SIGALE: Q Okay. And, basically,
13  what you just said, that you -- I have the same
14  information as you looking at these charts -- would
15  your answer basically be the same regarding the next
16  table on page 179 and 180 -- Well, for all the tables
17  on the Twenty-Year Death Retrospective, would your
18  answer be the same; that you're just looking at it
19  right here, and so you have what I have?
20    A  Correct.
21       MR. CHIMIENTI: And objection to form.
22       MR. SIGALE: Q Okay. So let me move to
23  Topic No. 9, which is similar, only instead of
24  firearm-related crime in and around day care homes

Page 83

1  and foster homes in Illinois, I want to ask you about
2  the firearm-related injuries and/or death in and
3  around day care homes and foster homes in Illinois.
4  So broader than No. 8. But I'll do what I did
5  before. I'll break it down into various little
6  chunks.
7       So as you sit here today, do you have
8  any information regarding the occurrence of
9  firearm-related injuries and/or death in day care
10  homes in Illinois?
11       MR. CHIMIENTI: Objection. Vague. And
12  overbroad.
13       Go ahead, Meaghan.
14       THE WITNESS: I do not have any knowledge
15  of specific occurrences of firearm-related injuries
16  or death.
17       MR. SIGALE: Q Okay. And let me clarify
18  that.
19       In addition to asking if you're
20  familiar with say a specific instance, I would also
21  be asking if you're aware of, you know, specific
22  data. You know, hypothetically speaking, say you
23  read something that said it happened 10 times or 5
24  percent of the time or some other hypothetical

Page 84

1  number. So I'm not just asking if you know of a
2  specific instance, but also if there's any
3  information regarding quantifying it. And so let me
4  ask it again, just so I'm clear about that.
5       Do you have any information regarding
6  the occurrence of firearm-related injuries and/or
7  deaths in day care homes in Illinois?
8       MR. CHIMIENTI: And I'm going to object. I
9  mean, that's a compound question eight different
10  ways, David. I mean, you're just putting eight
11  qualifiers into the same question, and you're asking
12  it very broadly. So I'm going to object that it's
13  compound.
14       Meaghan, if you understand, you can
15  answer it. But there's a lot in there.
16       THE WITNESS: I wouldn't be aware of a
17  number or data or of a specific occurrence of
18  firearm-related injuries or death in a day care home.
19       MR. SIGALE: Q Okay. What if I asked you
20  that same question, but substitute foster homes for
21  day care homes. Do you have any information then?
22       MR. CHIMIENTI: Same objections.
23       THE WITNESS: I do.
24       MR. SIGALE: Q Okay. What information do

Page 85

1  you have?
2    A  I know that in the last six months, there
3  were two deaths in a foster home related to firearms.
4    Q  One incident or two incidents?
5    A  Two incidents that I have knowledge of.
6    Q  Okay. Well, that's all I can ask.
7       So tell me about the first one.
8       MR. CHIMIENTI: And I'm going to just put
9  an objection on the record here.
10       And, Meaghan, I'll advise you not to
11  answer as to confidential investigations that are
12  still ongoing that are protected by statute. Other
13  than that, you can answer.
14       THE WITNESS: There was an occurrence in
15  April of this year in a foster home, where a child of
16  the age of 4, I believe, suffered a single gunshot
17  wound to the head.
18       MR. SIGALE: Q Do you know any details
19  that -- And I'm not looking for any confidential
20  information or anything, although I believe
21  everything that would be disclosed in that regard
22  would be subject to any confidentiality order. But
23  do you have any more details of what happened in that
24  incident?

Atkinson-Baker, Inc.
www.depo.com

Page 86

1    MR. CHIMIENTI: Same admonition and
2 objection as to confidential information, Meaghan.
3 But go ahead.
4    THE WITNESS: I think it was five children
5 all under the age of 6 playing together unsupervised.
6    MR. SIGALE: Q  Are you able to say what
7 city or county this happened in?
8    MR. CHIMIENTI: I think we're encroaching
9 on confidential information here, Meaghan. And so I
10 would advise you to be careful here. But to the
11 extent that you can give information without
12 violating confidentiality, you can.
13    THE WITNESS: I want to be careful on the
14 confidentiality of that.
15    MR. SIGALE: Q  Okay. Do you know where
16 the firearm came from in that case?
17    MR. CHIMIENTI: Same objection.
18    THE WITNESS: I do not.
19    MR. SIGALE: Q  What was the other
20 incident you referred to?
21    A    The other incident was in May of this year,
22 May 2020. It involved an 8-year-old and a 9-year-old
23 in a foster home. And the 8-year-old died of a
24 single gunshot wound to the chest.

Page 87

1    MR. SIGALE: Q  Do you know where the
2 firearm came from in that case?
3    MR. CHIMIENTI: Same objection.
4    THE WITNESS: I do not.
5    MR. SIGALE: Q  Do you happen to know if
6 anyone was charged in either of those two deaths?
7 Because if they were, that should be public.
8    A   I do not. I do not know.
9    Q   Just to be a little bit more specific,
10 Ms. Jorgensen, do you have any information that
11 either of the firearms used in those cases was the
12 foster parent's firearm that had been kept in a safe?
13    MR. CHIMIENTI: Objection. Vague.
14 Incomplete hypothetical.
15    Go ahead, Meaghan.
16    THE WITNESS: I don't have facts on where
17 it was kept.
18    MR. SIGALE: Q  Okay. So no information
19 regarding the firearms at all other than the
20 incidents happened involving a firearm?
21    MR. CHIMIENTI: Objection. Misstates.
22    But you may answer, Meaghan.
23    THE WITNESS: I don't, personally. And
24 it's under investigation. So I don't even know that

Page 88

1 there's a conclusion on our end.
2    MR. SIGALE: Q  Okay. So now let me look
3 at -- I'm sorry, any other information regarding
4 firearm-related injuries and/or death in foster homes
5 in Illinois?
6    MR. CHIMIENTI: Objection. Vague and
7 overbroad.
8    Go ahead, Meaghan.
9    THE WITNESS: Those are the only two that
10 I'm aware of, that I have specific knowledge to.
11    MR. SIGALE: Q  Okay. And then if I
12 broaden it and ask about data, stats, percentages,
13 anything, you don't have any information regarding
14 that, correct?
15    MR. CHIMIENTI: Objection. Vague. Data,
16 stats, percentages as to what?
17    MR. SIGALE: The occurrence of
18 firearm-related injuries and/or death in foster homes
19 in Illinois.
20    MR. CHIMIENTI: It's still vague. Data,
21 percentages of what? It's a vague question.
22    Meaghan, if you understand, go ahead
23 and answer.
24    THE WITNESS: I don't have any info related

Page 89

1 to data put together on those stats.
2    MR. SIGALE: Q  Okay. So let me move to
3 Topic No. 10. "The number and circumstances of
4 Illinois day care home licensees with whom failure to
5 comply with the challenged rules and/or policies
6 negatively affected their day care home licenses."
7    Do you have any information regarding
8 that topic?
9    MR. CHIMIENTI: Objection. Overbroad.
10    Go ahead, Meaghan.
11    THE WITNESS: Yes.
12    MR. SIGALE: Q  Okay. What information do
13 you have?
14    A   I would have information on the number of
15 violations.
16    Q   All right. What -- I guess tell me the
17 number, and then we'll break down what that means.
18    A   Oh, excuse me. I actually wouldn't know
19 how it affected their license.
20    Q   Okay. Well, then let me ask it this way.
21    Are you aware, as you sit here, of
22 Illinois day care home licensees who did not comply
23 with the rules and policies regarding firearms that
24 we have discussed that have lost their day care home

Atkinson-Baker, Inc.
www.depo.com

Page 90

1  licenses?
2    A   I would not have information as to losing a
3  license.
4    Q   Are you familiar with Illinois day care
5  home licensees who did not comply with the firearms
6  rules and policies that we've been talking about that
7  went through the enforcement process, as you
8  described it earlier?
9    A   Yes.  And there's a public database, the
10  Sunshine website, where you can see if there was a
11  violation.  But there would be no way to determine
12  from there how far through the enforcement process it
13  went.
14    Q   I'm sorry, did you say a Sunshine website?
15    A   Yes.
16    Q   What is that website?
17    A   It's the DCFS Sunshine website.  It's the
18  sister website to our main website in that it's for
19  day care providers.
20    Q   Oh, so it's not a public database.  It's --
21    A   No, it is.
22    Q   Oh, it is.  Okay.  So do you happen to know
23  the URL for it?
24    A   Not off the top of my head.

Page 91

1    Q   Is that something that if I go to the DCFS
2  website I should be able to find like right there on
3  the front page?
4    A   I don't know if it's like directly on the
5  front page.  But you can put in DCFS Sunshine, and it
6  will take you to it.
7    Q   Okay.  I'm going to ask you if you could
8  please find that URL, and give it to your attorneys.
9  Okay?
10    A   Okay.
11    Q   Thank you.
12        And this Sunshine website will
13  specifically tell me what?
14    A   You can look up a specific provider, you'd
15  have to look up a specific provider, and determine if
16  they had any rule violations.
17    Q   So this website doesn't have like data
18  compilations or something, like number of day care
19  home providers that violated in a given fiscal year
20  or something like that.  This is just, you can go
21  look up a specific provider to see if -- like if you
22  want to do a check on them before you go hire them,
23  that kind of thing?
24    A   Correct.

Page 92

1    Q   Okay.
2        MR. CHIMIENTI:  And, David, if you would
3  like the URL, I can read it into the record.  I have
4  it.
5        MR. SIGALE:  Okay.  I'll take it.  I don't
6  know that it's as useful as for a second I thought it
7  might be.  But, yeah, what is it?
8        MR. CHIMIENTI:  It's
9  Sunshine.DCFS.Illinois.gov.
10        MR. SIGALE:  Sounds like it delivers what
11  it promises.
12    Q   All right.  And if I went to this website,
13  I would be searching by name, correct?  I would not
14  be searching for day care providers that got
15  disciplined for firearm violations, correct?
16    A   You search for a name.
17    Q   Okay.  How many licensed day care home
18  providers are in the State of Illinois?
19    A   I believe it's around 5,000.
20    Q   Okay.  So looking at No. 10, I just want to
21  make sure I've asked this to make sure the record is
22  complete.
23        Are you aware of any specific
24  instances of Illinois day care home licensees who did

Page 93

1  not comply with the firearm regulations and lost
2  their day care home licenses as a result?
3    A   I'm not familiar with a specific instance
4  or the number that lost their license as a result.
5    Q   Okay.  And if I were to just jump to Topic
6  No. 11 and substitute foster care for day care home
7  licensees, would your answer be the same?
8    A   It would.
9    Q   Is there somewhere within DCFS that that
10  information is kept that could be obtained?
11        MR. CHIMIENTI:  I'm going to object.  Are
12  you talking about lost licenses, David?
13        MR. SIGALE:  Yeah, yeah, lost licenses,
14  foster or day care.
15    Q   Is there something within DCFS that I could
16  go look at where that information could be looked up?
17    A   You would have to go into each individual
18  file.
19    Q   Okay.  That's the same for Topic 10 and
20  Topic 11, day care home and foster kids?
21    A   Correct.
22    Q   All right.  So Topics 12 and 13 are
23  basically the flip side of that coin, where instead
24  of people -- instead of foster parents and day care

Page 94

1  home providers who lost their licenses as a result of
2  failure to comply with the firearm regulations, 12
3  and 13 ask about the number and circumstances of
4  would-be or perspective day care or foster parent
5  licensees who were denied their respective license
6  because of a failure to comply with that -- with the
7  firearm requirements.
8       Do you have any information regarding
9  those topics?
10       MR. CHIMIENTI:  I'm going to object as
11  overbroad and vague.
12       But go ahead, Meaghan.
13       THE WITNESS:  I would think it would be in
14  each individual circumstance.  There's no compilation
15  of where you could find those circumstances.
16       MR. SIGALE:  Q  Okay.  Are you aware as
17  you sit here of any specific circumstances?
18       A  I am not.
19       Q  Okay.  And let me just break the
20  question -- So 12 and 13, day care and foster, unless
21  you tell me that's too unwieldy, I'll just ask you
22  for both.  The number and circumstances of would-be
23  or perspective day care or foster care licensees who
24  didn't fail to comply with the rules, necessarily,

Page 95

1  but said we're not going to comply with this.  We're
2  not going to sign that form, that 452 form.  We're
3  not willing to do this.  Are you aware of specific
4  instances where people like that were denied
5  licenses?
6       MR. CHIMIENTI:  I'm going to object to the
7  form of the question.
8       Go ahead, Meaghan, if you understand.
9       THE WITNESS:  I am not.
10       MR. SIGALE:  Q  Okay.  And if I were to
11  ask you again if that was something that was compiled
12  somewhere, you would tell me that I'd have to look in
13  each individual applicant's file; is that correct?
14       A  Yes, correct.
15       Q  Okay.  And really for 10, 11, 12, and 13, I
16  just want to clarify.  There's no one that compiles
17  that data, not OIG or anyone else?  Whoever was
18  asking the question, it would have to be through the
19  individual files?
20       MR. CHIMIENTI:  That's really overbroad and
21  vague, David.  You just lumped in four different
22  things.  You've talked about lost licenses -- Are you
23  referring strictly to lost licenses and denied
24  applications?

Page 96

1       MR. SIGALE:  Well, yeah, but I'll clarify
2  it with just lost licenses first.  So 10 and 11.
3       Q  Is there anyone, and it might not
4  specifically be DCFS, that compiles that data that I
5  could look to, OIG or any other agency?
6       A  Not that I'm aware of.
7       Q  Same question for 12 and 13.  And that
8  would be for the denied licenses.
9       A  Not that I'm aware of, no.
10       Q  All right.  Well, another hour has gone by.
11  I am getting towards the end, and I want to review
12  things.  So let's take a 10-minute break.
13       It's 1:13.  Let's say be back at 1:23.
14       MR. CHIMIENTI:  Sounds good.
15       MR. SIGALE:  All right.
16       (short break taken 1:13 p.m.)
17       MR. SIGALE:  Q  Okay.  Let's go back on.
18       Ms. Jorgensen, the information that is
19  in the OIG reports, that link that was sent to me and
20  that the reports are on the website, do you have any
21  reason where you would say, oh, those people, their
22  data is off and wrong; or they don't know what
23  they're doing or anything like that?
24       MR. CHIMIENTI:  Object to the form of the

Page 97

1  question.
2       Meaghan, if you understand it, you may
3  answer.
4       THE WITNESS:  I can't answer that, because
5  I don't know what you're relying to; and I don't know
6  the basis on what their data is in there.  Like I
7  don't know specifically what you're referring to.
8       MR. SIGALE:  Q  Well, I showed you briefly
9  that there was a table there.  And if it had a number
10  in there that said, and I'm making it up, but I think
11  one of the numbers in there was Youth in Care was
12  350.  But for whatever information is in those
13  tables, you would defer to those tables, correct, for
14  the information?  You wouldn't be -- You wouldn't
15  have a reason to disagree with OIG's findings?
16       MR. CHIMIENTI:  Object to the form.  And
17  vague.
18       But go ahead, Meaghan, if you
19  understand.
20       THE WITNESS:  I would have no reason to
21  believe that the information in there is inaccurate.
22       MR. SIGALE:  Q  Okay.  The last thing
23  is -- And, Matt, this is going to of course draw an
24  objection, but we'll have to figure out what to do.

Atkinson-Baker, Inc.
www.depo.com

Page 98

1    Ms. Jorgensen, I need to know, and I
2 hope you understand, I need you to know that, you
3 know, I'm not going to wind up with those two in
4 incidents that you mentioned in April and May. You
5 know, the nonlegal term we use is sandbagging. So
6 I'm going to -- Not that I'm accusing anyone of
7 anything or anything, I'm just trying to cover my
8 bases.
9    So how would I find out, in a
10 confidential, you know, protective order sort of
11 manner, and I'm asking you and counsel, to find out
12 what happened in those instances? Whether or not,
13 you know, there's 6 kids playing and someone snuck a
14 gun in from outside, you know, from an older brother
15 or something like that? Because I can tell you that
16 in those OIG reports, that happened a few times. Or
17 something else. Versus the issue in the case, which
18 is a loaded firearm, but locked in a safe that nobody
19 else has the combination to.
20    So how would I find out, in a
21 confidential, protective order type manner, what
22 happened in those incidents? So I know whether they
23 have any relevance to what we're dealing with here.
24    MR. CHIMIENTI: From Counsel's perspective,

Page 99

1 the answer is, you ask Ms. Jorgensen. Certain of
2 that information, to the extent that it's still in
3 process and under investigation, specifics are
4 legally confidential, not subject to discovery, not
5 subject to disclosure. The documents are protected.
6 Ms. Jorgensen is speaking in very, very broad terms,
7 because some of that information is just not
8 discoverable.
9    So you can ask Ms. Jorgensen the
10 questions about what she knows generally about them.
11 But in terms of confidential, protective order, just
12 because you've sued to challenge a rule does not
13 automatically mean you suddenly get this information
14 that's protected by a statute.
15    So that would be my response to that.
16    MR. SIGALE: Q  Ms. Jorgensen, I already
17 asked you generally what you know, correct? We
18 talked about it.
19    Do you know what stage of
20 investigation those instances are in, or even if they
21 are still being investigated?
22    A  I can't say with certainty. I believe one
23 is for certain, but I can't answer as to both of them
24 with certainty.

Page 100

1    Q  Okay. I'm going to ask you then to go --
2 Obviously I don't know these two incidents --
3    MR. CHIMIENTI: Well, David, I'm going to
4 pause you. You don't ask her to do anything. You
5 can ask us. Okay? She's not going to do your
6 homework for you. Ask counsel, don't ask the
7 witness. It's not her responsibility.
8    MR. SIGALE: Well, she might be the only
9 one that knows the -- is able to find out the answer.
10 And I was going to ask her to tell you the
11 information. But that's fine.
12    Counsel, I'm going to ask you to ask
13 the witness here to find out the status of those two
14 incidents. And to the extent that you're not legally
15 prohibited, to let me know the information of the
16 circumstances of those two incidents.
17    MR. CHIMIENTI: Okay.
18    MR. SIGALE: Q  And with that,
19 Ms. Jorgensen, let me just ask you what I generally
20 refer to as my catch-all question.
21    We've talked about a lot of material
22 today. Is there any information that you've
23 remembered over the course this deposition today that
24 you didn't say at the time or whatever, but

Page 101

1 something's triggered your memory and you have any
2 information to add, beyond what you've already
3 testified to, on any of the topics that we've talked
4 about?
5    MR. CHIMIENTI: I object to the form of
6 that question. And it's overbroad and vague.
7    But, Meaghan, go ahead.
8    THE WITNESS: I have nothing further to
9 add.
10    MR. SIGALE: Q  Okay. Well, thanks for
11 appearing. Your counsel might have questions for
12 you.
13    MR. CHIMIENTI: I do. But I need to go
14 through my notes here.
15    Can we take another 10, David, and
16 come back at 1:45? I don't have that much, but I
17 just need to check my notes.
18    MR. SIGALE: Okay. We'll break for 10
19 minutes. Off the record.
20    MR. CHIMIENTI: Thank you.
21    (short break taken 1:35 p.m.)
22    MR. SIGALE: Q  All right. Ms. Jorgensen,
23 sorry to get you all brimmed up with hope that I was
24 done asking questions, and then yank the rug. I

Atkinson-Baker, Inc.
www.depo.com

Page 102

1  didn't mean to do that.  But you did say you looked
2  at this.
3          (Jorgensen Deposition Exhibit 8
4          previously marked and screen shared.)
5      MR. SIGALE:  Q  This is a Lexis printout,
6  and this is Exhibit No. 8.  And there it is,
7  Jorgensen Dep Exhibit No. 8.  This is a Lexis
8  printout of Statute 430 ILCS 66/65.  I will represent
9  to you that it is part of -- or I don't need to, it's
10  right there -- the Firearm Concealed Carry Act.
11         Is this what you referenced earlier
12  that you had reviewed?
13     A  Yes.
14     Q  Okay.  Specifically this section of the
15  act, or a different part of it?
16     A  Only the section that you referenced.  I
17  forget if it was in the complaint or in the -- I
18  forget where it was referenced.
19     Q  Okay.  Then it probably was this.
20         So let me scoot down just a little bit
21  here, and you'll see (a).  "A licensee under this Act
22  shall not knowingly carry a firearm on or into:"  And
23  it lists 23 things.  So it's got 23 different places
24  that are not allowed, and I want to focus on No. 2.

Page 103

1  "Any building, real property, and parking area under
2  the control of a preschool or child care facility,
3  including any room or portion of a building under the
4  control of a preschool or child care facility.
5  Nothing in this paragraph shall prevent the operator
6  of a child care facility in a family home from owning
7  or possessing a firearm in the home or license under
8  this Act, if no child under child care at the home is
9  present in the home or the firearm in the home is
10  stored in a locked container when a child under child
11  care at the home is present in the home."
12         Now, that differs from Rule 406.8;
13  isn't that correct?
14     MR. CHIMIENTI:  Objection.  Form of the
15  question.
16         Go ahead, Meaghan.  And calls for a
17  legal conclusion.
18     THE WITNESS:  We do not get authority from
19  the Concealed Carry Act.  So I don't -- The
20  Department has no real position on specific sections
21  of that Act.
22     MR. SIGALE:  Q  So as far as DCFS is
23  concerned, if there's a contradiction between the
24  Firearm Concealed Carry Act and the JCAR rules for --

Page 104

1  regarding firearms, the DCFS rules control; is that
2  correct?
3      MR. CHIMIENTI:  Objection.  Misstates the
4  testimony.  And calls for a legal conclusion.
5          Meaghan, if you understand, you may
6  answer.
7      THE WITNESS:  So we get our authority from
8  the Child Care Act, for which we write rules.  We
9  don't get authority from the Concealed Carry Act.
10     MR. SIGALE:  Q  Okay.  So let me rephrase
11  my question.
12         If there is a contradiction between
13  the Child Care Act and the Concealed Carry Act, you
14  will follow the Child Care Act; is that correct?
15     MR. CHIMIENTI:  I'm going to object in that
16  it assumes there's a contradiction.
17         But you may answer, Meaghan.
18     THE WITNESS:  We only have authority to
19  enforce what's in our rules that come from the Child
20  Care Act.
21     MR. SIGALE:  Q  Well, I'm not really
22  asking you what you have the authority to enforce.
23  I'm asking you what rules apply, that later you might
24  enforce if say there was a violation.  But I'm trying

Page 105

1  to get at what rule applies.
2          So the Concealed Carry Act says that a
3  licensee -- if someone has a concealed carry license,
4  they can have a firearm in a day care home, if no
5  child under child care at the home is present; or if
6  the firearm is stored in a locked container.
7          Now, that is the polar opposite of the
8  rules regarding day care homes, which say handguns
9  are prohibited on the premises of the day care home.
10         So I'm trying to -- My question to you
11  is not what you have the authority to enforce.  I'm
12  asking you what rules apply.  So if a day care home
13  operator has a concealed carry license, which rule do
14  they have to follow; the day care rule that says
15  handguns are prohibited, or the concealed carry rule
16  that says they can have it, if it's locked up or
17  there's no children present?
18     MR. CHIMIENTI:  So that question is
19  compound.  And I'm objecting to your characterization
20  that the rules are, quote, polar opposites.
21         But, Meaghan, if you understand the
22  question, you can answer it.
23     THE WITNESS:  So licensed day care homes
24  must follow our rules.

Page 106

1      MR. SIGALE: Q   Is there any reason, that
2 you're aware of, why a -- other than they must follow
3 our rules, is there any reason why the day care home
4 operator who has a concealed carry license is not
5 allowed to follow the -- basically the exception here
6 under 430 ILCS 66/65?
7      MR. CHIMIENTI: Object to the form. Calls
8 for a legal conclusion. And calls for speculation.
9      Meaghan, if you understand.
10      THE WITNESS: At the Department, we have no
11 legal opinion or position on this Act.
12      MR. SIGALE: Q   Okay. But if a day care
13 home licensee has a -- Let's say a would-be day care
14 home licensee, so an applicant, says, well, the Rule
15 406 says that I'm not allowed to have a handgun in
16 the home; but it's okay because I have a concealed
17 carry license, and that says I can do it as long as
18 there's no kids present in the home or I keep it
19 locked up. Your answer to that would be, you still
20 have to follow the DCFS rules?
21      MR. CHIMIENTI: Objection. Form. Calls
22 for a legal conclusion. Asked and answered.
23      Go ahead, Meaghan.
24      THE WITNESS: In order to become licensed,

Page 107

1 a day care home must follow our rules.
2      MR. SIGALE: Q   With no exception for
3 concealed carry license holders, correct?
4      MR. CHIMIENTI: Objection. Again, asked
5 and answered. Calls for speculation. Calls for a
6 legal conclusion.
7      Go ahead, Meaghan.
8      THE WITNESS: An applicant for a day care
9 home license must follow our rules.
10      MR. SIGALE: Q   Right. But I'm just
11 looking for a yes or no answer with this.
12      So is there any exception for -- With
13 regard to the requirement that handguns are
14 prohibited on the premises of the day care home,
15 assuming, again, not a peace officer, not someone
16 that needs it for their employment, is there an
17 exception, yes or no, to the requirement that
18 handguns are prohibited on the premises of the day
19 care home, if the would-be applicant has a concealed
20 carry license?
21      MR. CHIMIENTI: Objection. Asked and
22 answered. Form of the question. Calls for
23 speculation. And calls for a legal conclusion.
24      Go ahead, Meaghan.

Page 108

1      THE WITNESS: There is no exception in our
2 rule.
3      MR. SIGALE: Okay. I do not have anything
4 else. Ms. Jorgensen, thank you for your time today.
5 And, again, counsel probably has some questions for
6 you.
7      THE WITNESS: Thank you.
8      MR. CHIMIENTI: You can leave that up for
9 now, David, just for a second.
10      EXAMINATION
11      by Mr. Chimienti:
12      MR. CHIMIENTI: Q   Ms. Jorgensen, we're
13 still looking at the Concealed Carry Act here,
14 Ms. Jorgensen. And I'm not going to ask you for some
15 sort of legal interpretation or DCFS's position. At
16 the very top it says, "A licensee under this Act
17 shall not knowingly carry a firearm on or into."
18      Do you see that?
19   A   I do.
20    Q   And, Ms. Jorgensen, is it your
21 understanding that a handgun is a type of firearm?
22   A   It is.
23    Q   And are there more types of firearms than
24 handguns?

Page 109

1   A   There are.
2    Q   If you look at the section that Mr. Sigale
3 was asking you about, Section 2, nowhere in that
4 section does it mention anything about -- Well,
5 strike that.
6      David, you can take that down.
7      You were asked earlier about Rule 406,
8 the day care home rules. And I'm going to share my
9 screen with you to show you what was previously
10 entered as Exhibit 7 to your deposition.
11      Do you remember looking at this
12 document?
13   A   I do.
14    Q   And if we scroll down here to Rule 406(a),
15 subparagraphs (17) and (18), which are spread across
16 page 3 and 4 of the document, do you remember looking
17 at these earlier in the deposition?
18   A   I do.
19    Q   Earlier in the deposition you testified
20 that the basis or purpose or reasons for these rules
21 that DCFS enacted was because they were mandated to
22 do so by the Child Care Act. Do you remember that
23 testimony?
24   A   I do.

Atkinson-Baker, Inc.
www.depo.com

Page 110

1    Q.   Okay.  Even though DCFS was ordered to
2    implement these rules by the Child Care Act, are
3    these two rules, (17) and (18) and (18) sub (A) and
4    (18) sub (B), are they consistent with DCFS's mandate
5    to protect the health and safety of children?
6        A    They are, as the Department's mandate is to
7    protect the safety and well-being of children.  And
8    we know that restricting access to firearms and
9    ammunition prevents death, serious injury, and
10   suicide.
11       Q    And so is it fair to say then that
12   protecting the health and safety of children is yet
13   another purpose of these rules here?
14       A    It is.
15       Q    Okay.  Earlier you were also asked about a
16   couple of forms that foster parents have to fill out
17   regarding firearms.  Do you remember those forms?
18       A    I do.
19       Q    And you testified earlier that one of the
20   purposes of those forms is to make sure that the
21   foster parents are aware of the rules.  Do you
22   remember that?
23       A    Yes, I do.
24       Q    Is it the Department's position that

Page 111

1    increased awareness of these rules is consistent with
2    the rule's purpose to protect the health and safety
3    of children?
4        A    Yes, of course.  We want everyone to be
5    aware and understand that restricting access to
6    firearms and ammunition does prevent suicide, serious
7    injury, and death.
8        Q    And the one form that Mr. Sigale showed
9    you, where the family, if they have the firearms, is
10   required to list their firearms, I believe that was
11   Exhibit 5, the Foster Family Firearms Arrangement,
12   you had testified that that -- Well, you actually
13   testified that both of the forms that you looked at
14   for Exhibit 5 and Exhibit 6 were also for -- the
15   purpose was also for compliance.  Do you recall that?
16       A    I do.
17       Q    And ensuring compliance with these rules,
18   is that also consistent with the rules' aim to
19   protect the health and safety of children?
20       A    Yes, it's essential.  That's the main
21   mandate of the Department, to protect the safety of
22   children.  And compliance is essential to that.
23       Q    Okay.  You were asked some questions about
24   day care home operating hours and whether violations

Page 112

1    could take place in and around -- inside or outside
2    of operating hours.
3        Can you describe, generally, what the
4    operating hours of a day care home licensed by the
5    Illinois Department of Children and Family Services
6    could be?
7        A    Essentially, anything.  We have day care
8    providers that operate 6:00 a.m. to 5:00 p.m.  We
9    have day care homes that operate at night.  We have
10   day care homes that operate during the day and at
11   night.  It can totally vary depending on the home.
12       Q    And Mr. Sigale used the example earlier of
13   someone at the day care home, you know, after
14   operating hours, at 9:00 o'clock at night, and they
15   notice that there's a firearm in the home.  Is
16   DCFS -- Regardless of the circumstances or the
17   allegation of when the incident took place in that day
18   care home, would DCFS still investigate the alleged
19   violation?
20       A    They would look into what the operating
21   hours were to determine if the investigation needed
22   to proceed.
23       Q    Okay.  And, again, to determine the
24   specific circumstances surrounding each of these

Page 113

1    violations, that is a labor-intensive review of each
2    individual file, correct?
3        A    Correct.
4        Q    You were asked some questions about firearm
5    crime in and around day care and foster homes.  And
6    you testified about not having any information with
7    you today.  Is the Department ever made aware of
8    crime in and around day care and foster homes,
9    generally?
10       A    We could be, yes.  Someone could -- Someone
11   would have to make us aware.  We would have to get
12   some type of reported information.
13       Q    And when a report like that is made to the
14   Department, what ends up happening?
15       A    It is filled out, the information is taken,
16   and it would depend exactly on the circumstance; but,
17   in general, it would be placed in the file.
18       Q    Okay.  And to determine the circumstances
19   surrounding each one of those potential crimes, again
20   is a labor-intensive review of the file, correct?
21       A    Correct.
22       Q    Okay.  You were asked some questions about
23   the 2020 OIG report that Mr. Sigale put up on the
24   screen, and he asked you if you would defer to the

Atkinson-Baker, Inc.
www.depo.com

Page 114

1  table in terms of what numbers were there, if you had
2  any reason to dispute them.  Do you remember that?
3      A   I do.
4      Q   Now, there's a bunch of tables in there.
5  And I can put it up on the screen, just for
6  completeness sake, so we're looking at the same
7  thing.  So I'm going to share my screen, and I'll
8  show you what Mr. Sigale will eventually mark as
9  Exhibit 10, I believe, to your deposition.
10         And we're on -- We're looking at page
11  185 of the PDF.  And that is, if we look at the
12  bottom of the page, 179 of the Twenty-Year Death
13  Retrospective.  But it's 185 of the PDF.  And if you
14  look at some of these numbers here, looking at this
15  first top line, do you see where it says "Total
16  Deaths" and then it says "Youth in Care"?  Do you see
17  that?
18      A   Yes.
19      Q   And then if we scroll down here to the
20  fourth line under that, it says "Suicide."  Do you
21  see that?
22      A   I do.
23      Q   And it tabulates the numbers.  You know, in
24  2014 it looks like there was one suicide.  In '15

Page 115

1  there was one.  In '16 there was two.  In '17 there
2  was three.  But in '18 and '19 there were none.  Do
3  you see that?
4      A   I do.
5      Q   To the extent that these numbers are low or
6  are zero or it shows that in the past there was even
7  one, is even one at any point in time -- even one
8  child death at any point in time significant to the
9  Department?
10      A   Every single death is important to us.  And
11  we want to do everything in our capability to prevent
12  any death of a child from happening.
13      Q   And are these rules regarding foster home
14  and day care home firearm and ammunition storage
15  designed for that purpose?
16      A   They are.  Because we know that restricting
17  access to firearms and ammunition does prevent from
18  death, serious injury, and suicide.
19      Q   Okay.  I'll stop sharing my screen, and I
20  have one more question for you.
21         You talked about the two incidents
22  recently, in recent memory for DCFS.  One which
23  occurred in April of 2020, and one which occurred in
24  May of 2020.  And without getting into specific

Page 116

1  details of each incident, is it fair to say that,
2  broadly, these incidents were cases where children
3  had access to a loaded firearm and harmed one
4  another?
5      A   Yes, that's fair to say.
6      MR. CHIMIENTI:  Okay.  I don't have any
7  more questions for you, Ms. Jorgensen.  Mr. Sigale
8  might have a few more.
9      MR. SIGALE:  Yeah, I do.
10         FURTHER EXAMINATION
11           by Mr. Sigale:
12      MR. SIGALE:  Q   Let me go back to the
13  Exhibit 10.  And, Ms. Jorgensen, I really don't want
14  to belabor this, because I asked you, and correct me
15  if I'm wrong, where foster kids were represented in
16  this information.  I'm going back to this page 178.
17  And I asked you where, in all of this, foster care
18  kids were represented.  And you said it could be in
19  multiple of these categories, correct?
20      A   Correct.
21      Q   Okay.  So in terms of you being able to
22  really speak to this data, you really can't.  Is that
23  fair to say?
24      MR. CHIMIENTI:  Objection.  Form.

Page 117

1         Go ahead, Meaghan.
2      THE WITNESS:  Speak to the data as a whole,
3  no.
4      MR. SIGALE:  Q   Okay.  So when we go down
5  to -- Oh, what page was it?  185, I think.
6         So this is the page, I think, that
7  counsel just showed you a few minutes ago.  And he
8  mentioned to you about the suicides and how from 2000
9  to 2019 there were 24 of them.  I'm just looking at
10  the numbers, again, the same as you would be doing,
11  as you testified earlier.  And it looked like for the
12  first 13 years, there were 17.  And then one, one,
13  two, three, zero, zero.
14         And of course we all share that even
15  one is terrible, is tragic.  But by sitting here
16  looking at this number, you can't tell me how these
17  children committed suicide, correct?
18      A   I cannot, just looking at this page.
19      Q   Right, right.  Which is why I asked you if
20  you would defer to the information in the report.
21         But just by looking at this, of course
22  DCFS takes it all very seriously, as it should, but
23  in terms of how many of these were foster kids and
24  how many of them died by firearm versus hanging or

Page 118

1  overdose or anything else, you can't speak to that by
2  looking at this, correct?
3      A   I cannot speak to that by looking at this
4  specific page.
5      Q   Okay. And for anything -- And if there was
6  a suicide say regarding a firearm, you can't speak
7  to -- Again, the number could be zero, but if there
8  were any suicides by firearm, there's certainly no
9  information here about where the firearm might have
10  come from, correct?
11        MR. CHIMIENTI: Objection. Are you talking
12  about the table, or are you talking about the
13  document as a whole?
14        MR. SIGALE: I'm talking about the table
15  that you showed her.
16        THE WITNESS: On the table, it doesn't
17  appear. But I can't speak to this document as a
18  whole.
19        MR. SIGALE: Q   Okay. Because you
20  didn't -- Obviously you didn't review all 384 pages
21  of it, correct?
22      A   Correct.
23      Q   Okay. Just for curiosity, did you review
24  all 384 pages of it at the time?

Page 119

1      A   I don't believe I reviewed every single
2  page. I probably looked at it at different times
3  throughout the year.
4      Q   Okay.
5      A   Some areas get into specifics, like some
6  deaths are outlined very specifically, some are not.
7  So...
8      Q   So, generally speaking, is it fair that the
9  information that's contained in this report, you
10  personally would have no reason to disagree with the
11  information in the report?
12      A   I would have no reason to disagree.
13      Q   And if you wanted the information regarding
14  what's in here, you would defer to OIG's report and
15  OIG's findings, correct?
16      A   I'm not --
17        MR. CHIMIENTI: Objection as to form.
18        Go ahead, Meaghan.
19        THE WITNESS: I'm not sure what you mean I
20  would defer to it. They might not necessarily
21  include every fact in this.
22        MR. SIGALE: Q   Okay. But the information
23  that is in here, like, for example, I'm just going to
24  go down a couple pages here to this is page 181, and

Page 120

1  it's -- You know what, hold the phone. I'm going to
2  stop sharing for one second and take a second.
3        Ms. Jorgensen, believe me when I tell
4  you that I picked this at random. I just want to
5  move on with this line of questioning, and we can all
6  go home.
7        This is Child No. 108, who has -- This
8  is page 174 of the PDF, and it's page 168 of the
9  document. And it's under the "Undetermined"
10  category. This was a two-month old infant who was
11  found unresponsive and whatnot. I'm just going to
12  use this as an example.
13        There's a bunch of detail regarding
14  what happened to this child, correct? It's a pretty
15  lengthy explanation. Is that fair to say?
16        MR. CHIMIENTI: Object to the form.
17        Meaghan, go ahead.
18        THE WITNESS: I would probably say it's
19  actually not lengthy at all.
20        MR. SIGALE: Q   Okay.
21      A   If you want my honest opinion, I don't
22  think it's lengthy for a circumstance of a child
23  passing away.
24      Q   I only meant in the context of these --

Page 121

1  It's like a summary. I'm sure there's an actual file
2  that's much longer. Is that probably true?
3      A   Yes, of course.
4      Q   Okay. So I'm just saying, these are
5  summaries, basically, for the report. Is that fair?
6      A   Yes.
7      Q   Okay. And some are longer than others?
8      A   And I don't believe that they summarize
9  each death.
10      Q   I'm sorry, can you explain that?
11      A   I don't think in every OIG report they
12  summarize every death in this detail.
13      Q   Okay. But sticking with this 108, my
14  question to you basically is, just picking this one
15  at random, but I'll scroll to any page that you want,
16  do you have any reason, as you sit there, to dispute
17  the information that would be in this summary?
18        MR. CHIMIENTI: Object to the form.
19        Go ahead, Meaghan.
20        THE WITNESS: Anything that's in here, I
21  wouldn't dispute the accuracy of it. I just don't
22  know that it's all inclusive of the circumstance.
23  But I couldn't make that call based on looking at
24  something like this.

Atkinson-Baker, Inc.
www.depo.com

Page 122

1     MR. SIGALE:  Q  Okay.  Okay.

2        So I will leave it there.  And I do

3  not have anything else, unless counsel does.

4     MR. CHIMIENTI:  I don't.

5        We will reserve signature, David.

6     MR. SIGALE:  Okay.  I will order this.

7  Thank you.  And I will send the exhibits to that

8  e-mail address, Marina, that you gave me earlier.

9     THE COURT REPORTER:  Perfect.  Thank you so

10  much.

11        Counsel, did you want a copy?

12     MR. CHIMIENTI:  Yes, we will take a copy.

13  E-tran, please.  And obviously we're going to need it

14  to read and sign.  But, yeah, e-tran is fine.

15     MR. SIGALE:  Yeah, same here.

16     THE COURT REPORTER:  Okay.  Perfect.  Thank

17  you so much, Counsels.

18        (Whereupon, the Zoom deposition of

19        Meaghan Jorgensen concluded at 2:20

20        p.m. on October 16th, 2020.)

21        (Signature reserved.)

22

23        * * o O o * *

24

Page 123

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS

2

3  JENNIFER J. MILLER, DARIN E.     )
   MILLER, SECOND AMENDMENT         )
4  FOUNDATION, INC., ILLINOIS STATE )
   RIFLE ASSOCIATION, and ILLINOIS  )
5  CARRY,                           )
                                    )
6        Plaintiffs,                )
                                    )
7        -vs-                       )  No. 3:18-CV-3085
                                    )
8  MARC D. SMITH, in his official   )
   capacity as Acting Director of   )
9  the Illinois Department of       )
   Children and Family Services, and)
10  KWAME RAOUL, in his official     )
   capacity as Attorney General of  )
11  the State of Illinois,           )
                                    )
12        Defendants.               )

13

14        I, MEAGHAN JORGENSEN, being first duly sworn,

15  on oath say that I am the deponent in the aforesaid

16  deposition taken on October 16th,  2020; that I have

17  read the foregoing transcript of my deposition,

18  consisting of Pages 1 through 123.

19

20        _____
             MEAGHAN JORGENSEN

21

   SUBSCRIBED AND SWORN TO

22  before me this _____ day

   of _____, A.D. 2020.

23

24        _____
             Notary Public

Page 124

1        REPORTER'S CERTIFICATE

2

3        The foregoing deposition of MEAGHAN JORGENSEN

4  was taken via Zoom, with the Deponent being located at

5  her place of employment, before MARINA MOGILEVSKY,

6  Certified Shorthand Reporter, commencing at 10:03 a.m.

7  on the 16th day of October, 2020.

8        Said witness was first duly sworn by me and

9  then examined upon oral interrogatories.  The questions

10  and answers were taken via machine shorthand by the

11  undersigned and reduced to computerized transcription.

12  The foregoing is an accurate and complete record of

13  said deposition.

14        The certificate annexed hereto applies only

15  to the original transcript or copies signed and

16  certified by me.  I assume no responsibility for copies

17  reproduced beyond my direction or control.

18        The signature of the witness was reserved,

19  and the transcript was submitted to the deponent as per

20  copy of the attached letter.

21        Pursuant to Rule 30(e) of the Federal Rules

22  of Civil Procedure, if the Witness does not read and

23  sign the transcript within 30 days or make other

24  arrangements for reading and signing, the transcript

Page 125

1  may be used as fully as though signed, and this

2  certificate will then evidence such failure to appear

3  as the reason for signature being waived.

4        The undersigned is not interested in the case

5  nor is of kin or counsel to any of the parties herein.

6        IN WITNESS WHEREOF, I hereunto affix my hand

7  as Certified Shorthand Reporter in and for the State of

8  Illinois on December 9th, 2020.

9

10

11

12        _____

   MARINA MOGILEVSKY, C.S.R.,
13  CSR No. 084-004103

14

15

16

17

18

19

20

21

22

23

24

**Exhibits**

**Exhibit 1** 3:11 14:3,4 20:7 26:10,11 68:13

**Exhibit 2** 3:13 15:15,16

**Exhibit 3** 3:15 24:22 25:1 55:3, 19

**Exhibit 4** 3:16 74:18,19

**Exhibit 5** 3:18 32:5,9 111:11,14

**Exhibit 6** 3:20 28:24 29:1 31:7 111:14

**Exhibit 7** 3:22 18:14,15 56:9 109:10

**Exhibit 8** 4:3 102:3,6,7

**Exhibit 10** 4:4 78:10,13 114:9 116:13

**(**

**(13)** 15:13

**(14)** 15:13 17:22

**(15)** 15:13 17:22

**(17)** 20:12 58:18 59:1 109:15 110:3

**(18)** 18:8 37:13 56:8,23 57:10 58:18 59:1 109:15 110:3,4

**(18)(A)** 56:23 57:10

**(a)** 16:3 19:1 24:9 102:21 110:3

**(a)(17)** 22:14

**(B)** 24:12 110:4

**(o)** 24:18

**1**

**1** 14:3,4 15:11,19 17:6 20:7 26:11 35:23 36:17 68:13,24 69:1,3, 13 70:1,14

**10** 36:7 73:20 78:10,13 83:23 89:3 92:20 93:19 95:15 96:2 101:15,18 114:9 116:13

**10-minute** 96:12

**10/7** 23:4

**10/7(a)** 15:13

**10/7(a)(13)** 17:22

**100** 67:13

**108** 120:7 121:13

**10:00** 61:15,17

**10:03** 5:5

**11** 93:6,20 95:15 96:2

**11:02** 36:12

**11:12** 36:8

**12** 77:13 93:22 94:2,20 95:15 96:7

**12:10** 67:5

**12:15** 66:3

**13** 15:23,24 16:21 17:3 93:22 94:3, 20 95:15 96:7 117:12

**14** 14:16 15:23 17:15 66:15

**15** 15:23 17:15 114:24

**16** 115:1

**168** 120:8

**16th** 5:4 122:20

**17** 19:4,7,23 21:9 56:10,11 115:1 117:12

**174** 120:8

**178** 79:7,8,24 80:1,8 82:3 116:16

**179** 82:16 114:12

**18** 19:4 22:11 23:8,13,17 24:9, 11 115:2

**18(A)** 23:24

**180** 82:16

**181** 119:24

**185** 114:11,13 117:5

**19** 115:2

**193** 32:7

**195** 29:5

**1969** 23:4

**1:13** 96:13,16

**1:23** 96:13

**1:35** 101:21

**1:45** 101:16

**2**

**2** 15:15,16 17:18 18:6 19:19 37:12 102:24 109:3

**2000** 80:11 117:8

**2008** 13:12

**2011** 12:4 13:6

**2014** 114:24

**2018** 10:17 12:9, 10

**2019** 9:15 10:9 80:11 117:9

**2020** 5:4 78:19,22 80:3 86:22

**113:23** 115:23,24 122:20

**225** 15:12 17:22 23:4

**23** 102:23

**24** 117:9

**2:20** 122:19

**2:30** 66:17,23

**3**

**3** 24:14,22 25:1 28:17 37:13 55:3, 19 76:7,20 109:16

**30** 42:17

**30(b)(6)** 7:5 14:12,23 15:3 17:24

**33** 74:24 75:6

**350** 97:12

**384** 118:20,24

**3:18-cv-3085** 5:11

**4**

**4** 28:17 31:22 74:18,19 85:16 109:16

**401** 54:10

**402** 29:16 51:12 67:18

**402-A** 28:18

**402.8** 25:9

**402.8(g)** 30:2,6 32:21

**402.8(o)** 24:15 30:4 32:22 37:13 45:1,20 46:7,10 48:9 51:13 54:23 55:2,4,18,20 64:21

**406** 67:18 106:15 109:7

**406(a)** 109:14

**406.8** 18:24 103:12

**406.8(a)** 19:21,23 20:11

**406.8(a)(17)** 18:8 37:13 56:8

**406.8(a)18** 22:11

**410** 54:11

**430** 19:14 102:8 106:6

**452** 95:2

**452-2** 30:19 31:21,24 32:1 51:15

**452-A** 51:16

**4:30** 59:11

**4:31** 59:11

**5**

**5** 14:15,16 20:8 31:20 32:5,9 35:24 36:16,18 67:1,3 68:24 69:2,3,14 70:2,14 83:23 111:11,14

**5,000** 92:19

**5-minute** 66:1

**5:00** 112:8

**6**

**6** 14:16 28:24 29:1 31:7,20 35:21 36:16 86:5 98:13 111:14

**65(d)** 19:13

**66/65** 102:8 106:6

**66/65(d)** 19:14

Atkinson-Baker, Inc.
www.depo.com

**6:00** 112:8

**7**

**7** 18:14,15 23:3 56:9 66:16 68:11, 19 70:10 109:10

**7-minute** 66:3

**8**

**8** 20:8 64:3,9 71:16 83:4 102:3, 6,7

**8-year-old** 86:22, 23

**89** 18:8

**8:00** 59:11

**9**

**9** 82:23

**9-year-old** 86:22

**9:00** 60:13 112:14

**A**

**a.m.** 5:5 36:12 112:8

**accepted** 22:23

**access** 21:14 26:18 110:8 111:5 115:17 116:3

**accordance** 25:23 30:14 45:8

**accuracy** 121:21

**accusing** 98:6

**Acknowledgme nt** 29:15 31:7 51:15

**acquires** 30:21

**act** 15:21 16:7,14, 16,19 19:13

20:16 23:4,20 68:2 102:10,15, 21 103:8,19,21, 24 104:8,9,13,14, 20 105:2 106:11 108:13,16 109:22 110:2

**Act's** 17:8

**acting** 75:8

**action** 37:24 40:2,7,9,19,22, 23,24 41:3,19 42:8

**actual** 39:18 42:20,22 43:1,5 70:10 121:1

**add** 24:8 28:7,9 35:16 69:12 101:2,9

**addition** 83:19

**additional** 67:21 69:12

**address** 67:11, 12 122:8

**administering** 5:15,22 6:6

**administrative** 16:16 18:7 38:6 43:19 44:1,6,16 49:18 50:5,14

**administrator** 42:4

**admonition** 86:1

**adult** 56:12

**adults** 16:23 19:9

**advice** 16:11

**advise** 85:10 86:10

**affairs** 9:13,17 11:18 12:13,22

**affect** 13:1 47:10

**affected** 89:6,19

**age** 85:16 86:5

**agency** 13:1 96:5

**agency's** 25:23 30:15 45:9

**agree** 5:13 6:10

**agreement** 5:17 31:22 32:20 51:14

**ahead** 18:2 27:17,24 34:11, 18 35:5,10,19 38:16 39:1 46:2 48:2,20 49:7,24 50:8,18 51:10,23 52:16 53:5 54:8 56:3,20 57:7,20, 22 58:21 59:6,16, 23 61:8 62:3,20 63:9,23 64:5,13 65:1,7,18 69:17 70:19 71:8 72:24 73:7 74:4,12 76:18 80:24 82:6 83:13 86:3 87:15 88:8,22 89:10 94:12 95:8 97:18 101:7 103:16 106:23 107:7,24 117:1 119:18 120:17 121:19

**aim** 111:18

**alcohol** 25:14

**ALJ** 43:21,22 44:2

**allegation** 112:17

**alleged** 61:3 112:18

**allowed** 55:5,23 56:16 57:3,17 102:24 106:5,15

**ambulance** 11:16,17,18,21 12:3,14,19

**Amended** 14:11

**ammunition** 21:14 22:15,19, 24 23:2,6 24:1 25:16 26:8,19

30:8 34:4 45:2,3 110:9 111:6 115:14,17

**amount** 40:15

**and/or** 20:9 35:23 36:17 68:21 70:12 83:2,9 84:6 88:4,18 89:5

**annual** 77:8,10, 14 79:2

**answering** 8:10, 17

**answers** 28:6 70:15 74:24 75:9

**apologies** 81:6

**apologize** 75:21

**appeal** 38:5 42:13 43:3,11,14, 17,21

**appealing** 43:6

**appearing** 101:11

**applicable** 7:10 16:7

**applicant** 53:10, 11 54:17 106:14 107:8,19

**applicant's** 95:13

**application** 51:19 65:11

**applications** 95:24

**applies** 50:22 58:3 64:14 105:1

**apply** 16:5 44:7 45:14 56:14 57:15 58:18 59:2, 7,18,20 63:19,24 64:21 65:2,9,20 104:23 105:12

**approved** 51:20

**approximately** 5:5

**April** 85:15 98:4 115:23

**area** 42:4 103:1

**areas** 119:5

**arrangement** 30:20 66:10 111:11

**asks** 17:6,18 18:6

**Assembly** 18:19 78:18

**assistance** 16:11

**assume** 30:3 39:22 82:9

**assumes** 49:19 104:16

**assuming** 57:12 64:18 107:15

**attempt** 13:20

**attorney** 5:18 6:3,9 10:20 11:7 75:7

**Attorney's** 10:13 12:11 75:4

**attorneys** 91:8

**authority** 58:8,22 64:6 103:18 104:7,9,18,22 105:11

**automatically** 99:13

**aware** 21:16,18 22:8 23:14 24:20 26:12,24 27:12 29:23 30:24 31:12,15 33:5,11 34:23 35:12 54:1, 16,22 56:4,15,21 58:13 69:5 70:7 83:21 84:16 88:10 89:21 92:23 94:16 95:3 96:6,9 106:2 110:21 111:5 113:7,11

**awareness** 37:21 111:1

---

**B**

**BA** 13:18

**back** 20:7 21:7 24:13 26:10 36:8, 13 55:15 56:9 66:2,3 67:7 76:4 96:13,17 101:16 116:12,16

**background** 10:6

**badly** 43:5

**based** 61:3 121:23

**bases** 15:12 17:7,9,22 18:7 19:20,22 20:1,8 23:15 24:5,15 26:11 27:13 28:17 30:24 31:20 68:21 70:4, 11 98:8

**basically** 12:23 23:11 70:8 82:12, 15 93:23 106:5 121:5,14

**basis** 20:8 23:15 30:24 33:1 34:20, 22 35:2 70:4 72:15 97:6 109:20

**Bates** 29:5 32:6

**bathroom** 25:12

**bedroom** 38:22

**beginning** 67:10

**behalf** 6:4

**belabor** 116:14

**Beth** 6:11

**biggest** 7:24

**binding** 5:15

**bit** 19:6 27:9 31:3 32:2 33:2 87:9

**102:20**

**bite** 10:22

**blocks** 73:18

**bottom** 14:2 24:23 114:12

**box** 35:7

**boy** 11:23

**break** 8:22 36:5, 12 66:1,3,6,7 67:1,5 72:1 79:18,21 83:5 89:17 94:19 96:12,16 101:18, 21

**break-in** 46:17

**breaking** 47:22

**briefly** 11:5 97:8

**bright-line** 48:10

**brimmed** 101:23

**bring** 59:12

**bringing** 63:17

**broad** 55:9 71:22 99:6

**broaden** 88:12

**broader** 83:4

**broadly** 84:12 116:2

**brother** 98:14

**building** 103:1,3

**bunch** 114:4 120:13

---

**C**

**C-H-I-M-I-E-N-T-I** 6:2

**cabinet** 22:16

**call** 9:7 37:22 42:4 51:9 60:11, 23 61:3 66:2 121:23

**called** 6:16 11:14 39:17 50:14

**calls** 22:2 27:3,16 28:10 33:13 38:15 45:24 46:24 47:2,13,14, 24 48:1 49:20 51:22 52:15 55:9 58:4 59:14 60:17 61:6,24 62:18 63:21 64:12,23 69:16 82:4 103:16 104:4 106:7,8,21 107:5, 22,23

**capability** 17:13 115:11

**capital** 22:19 23:14,24 24:9

**caption** 13:23 74:23

**card** 10:23

**care** 15:21 16:6, 12,22 17:2 18:24 19:8,11 20:16 22:23 23:4,20 26:6 44:19,23 45:12 50:22 52:5, 8,21 54:18 56:7, 12,16,17 57:2,3, 16,18,24 58:1,9, 12,14,23 59:2,10 60:14 61:13 62:14 63:4,6,15, 18,20,24 65:22 68:23 69:2 70:13 71:18 72:3,8,13, 22 73:11 74:2,7,9 81:9,14,16 82:24 83:3,9 84:7,18,21 89:4,6,22,24 90:4,19 91:18 92:14,17,24 93:2, 6,14,20,24 94:4, 20,23 97:11 103:2,4,6,8,11 104:8,13,14,20 105:4,5,8,9,12, 14,23 106:3,12, 13 107:1,8,14,19 109:8,22 110:2

**111:**24 112:4,7,9, 10,13,18 113:5,8 114:16 115:14 116:17

**careful** 86:10,13

**carry** 19:13 68:2 102:10,22 103:19,24 104:9, 13 105:2,3,13,15 106:4,17 107:3, 20 108:13,17

**case** 5:11,22 6:4 22:3 32:6,15 44:9 46:17 61:15 74:23 75:9 80:13 86:16 87:2 98:17

**cases** 10:23 11:3 82:10 87:11 116:2

**catch-all** 100:20

**categories** 80:14,15 81:3,7, 17 116:19

**category** 81:9, 14,19 120:10

**Central** 5:10 7:11

**certainty** 99:22, 24

**certification** 28:18

**Certified** 5:2

**certify** 30:17

**cetera** 40:16

**CFS** 28:18 30:19 31:21 32:1 51:15, 16

**challenge** 99:12

**challenged** 68:21 70:12,24 89:5

**challenging** 24:11

**chance** 20:23

**change** 24:18

**28:7** 52:11

**changing** 50:3

**characterization** 76:17 105:19

**charged** 87:6

**charts** 82:14

**check** 35:13 91:22 101:17

**checking** 35:6

**chest** 86:24

**child** 15:21 16:6, 12 20:16 22:23 23:4,20 65:14,22 69:2 77:12 81:23 82:1 85:15 103:2, 4,6,8,10 104:8, 13,14,19 105:5 109:22 110:2 115:8,12 120:7, 14,22

**children** 6:13 7:6 9:6,21 10:1 19:3, 15 21:3,5,13 22:17,21 23:3 24:3 25:18 26:10, 17 27:10 30:9 45:5 63:15 77:12 81:2,4,5,6,8,13, 15 86:4 105:17 110:5,7,12 111:3, 19,22 112:5 116:2 117:17

**children's** 26:18

**Chimienti** 5:24 6:1,10 14:21 17:23 19:24 22:1 27:2,14,22 28:9 33:12 34:8,17 35:4,8,18 37:6 38:14,24 45:23 46:23 47:12,23 48:13,18 49:5,19 50:7,16 51:7,21 52:14 53:3,14 54:3 55:8 56:2,18 57:6,19 58:4,19 59:4,13,21 60:17 61:5,23 62:17,23 63:8,21 64:4,11,

Atkinson-Baker, Inc.
www.depo.com

23 65:6,16 66:11, 19 67:3 69:15 70:17 71:6 72:23 73:6 74:3,10 76:16 79:16,20 80:20 81:11 82:4, 21 83:11 84:8,22 85:8 86:1,8,17 87:3,13,21 88:6, 15,20 89:9 92:2,8 93:11 94:10 95:6, 20 96:14,24 97:16 98:24 100:3,17 101:5, 13,20 103:14 104:3,15 105:18 106:7,21 107:4, 21 108:8,11,12 116:6,24 118:11 119:17 120:16 121:18 122:4,12

**chronology** 43:10 44:17

**chunks** 83:6

**circumstance** 52:1,7 55:6,23 56:15 57:2,5,16 94:14 113:16 120:22 121:22

**circumstances** 65:21 89:3 94:3, 15,17,22 100:16 112:16,24 113:18

**cite** 21:24 22:9 27:21 28:2 70:7 71:3,9

**cites** 32:21

**citing** 77:10

**city** 86:7

**civil** 7:10 10:21 14:23 75:6

**clarify** 20:22 27:6 52:19 71:13 83:17 95:16 96:1

**cleaning** 61:19

**clear** 84:4

**close** 46:19

**closet** 22:16

**closure** 38:6 43:19,24 44:1,6, 16 49:18 50:6,14

**coin** 93:23

**coincidentally** 67:23

**colloquially** 80:18

**column** 80:12,19

**combination** 46:16 98:19

**committed** 117:17

**Committee** 18:7

**company** 11:14, 15

**compilation** 94:14

**compilations** 91:18

**compiled** 15:12 95:11

**compiles** 95:16 96:4

**complaint** 68:5, 22 70:13 75:22 102:17

**complete** 30:19 46:24 92:22

**completeness** 114:6

**compliance** 29:16 31:8 35:14 42:6,10 48:4,22 49:9 51:15 52:18 53:6 111:15,17, 22

**comply** 38:1 40:18 41:3,17 52:1,9,13,21,23, 24 53:1,12 54:18, 19 89:5,22 90:5 93:1 94:2,6,24 95:1

**complying** 41:18

**compound** 34:8 45:24 47:1 60:19 84:9,13 105:19

**computer** 5:6

**concealed** 19:13 68:2 102:10 103:19,24 104:9, 13 105:2,3,13,15 106:4,16 107:3, 19 108:13

**concerned** 103:23

**concluded** 122:19

**concludes** 39:24

**conclusion** 27:13 47:2,14 48:1 58:5 59:15 62:1 88:1 103:17 104:4 106:8,22 107:6,23

**condition** 16:24 19:10 56:13

**confidence** 66:22

**confidential** 85:11,19 86:2,9 98:10,21 99:4,11

**confidentiality** 85:22 86:12,14

**confusing** 74:11

**conjunction** 40:13

**considered** 20:8

**consistent** 26:16 27:9 110:4 111:1, 18

**consulting** 11:13,15 12:7

**contained** 119:9

**container** 103:10 105:6

**contents** 80:6

**context** 7:21 8:7 120:24

**continue** 46:20 49:16 50:4 79:21

**continues** 49:15 77:17

**contradiction** 103:23 104:12,16

**control** 16:8 103:2,4 104:1

**copy** 68:4,12 79:12 122:11,12

**Core** 11:14 12:9

**corner** 14:2 24:23

**coronavirus** 63:16

**correct** 12:12 13:7,19 15:10 31:8 33:20,24 34:21 36:19 38:13 40:6,14,21, 23 41:4,6,8,20,24 43:13,16 44:18 45:22 46:7 47:11 49:18,23 50:1,6, 9,15,19,23,24 53:2 67:20 71:5, 14 76:9,10,15 82:20 88:14 91:24 92:13,15 93:21 95:13,14 97:13 99:17 103:13 104:2,14 107:3 113:2,3,20, 21 116:14,19,20 117:17 118:2,10, 21,22 119:15 120:14

**corrected** 38:2 47:6,18

**correction** 50:3

**corrective** 37:24 40:2,7,9,19,22, 23,24 41:3,19 42:7

**correctly** 17:4 19:17 23:8 26:1

31:9 77:3

**counsel** 5:12 6:12 11:16 30:3 34:9 53:21 76:11 79:10 98:11 100:6,12 101:11 108:5 117:7 122:3,11

**Counsel's** 98:24

**Counsels** 122:17

**count** 73:21

**county** 10:12,20 11:2,6 86:7

**couple** 7:16 30:5 51:7 67:8 79:12 110:16 119:24

**court** 5:1 6:5 55:14 75:4 122:9, 16

**cover** 98:7

**create** 21:4

**crime** 71:17,24 72:3,5,8,13,22 73:4,11 74:1,6,15 82:24 113:5,8

**crimes** 113:19

**crossed** 11:2

**culprit** 7:24

**curiosity** 118:23

**cut** 31:3 32:1

---

**D**

**dangerous** 25:14

**data** 21:17 80:11 83:22 84:17 88:12,15,20 89:1 91:17 95:17 96:4, 22 97:6 116:22 117:2

**database** 71:23 90:9,20

**date** 5:4 42:17

Atkinson-Baker, Inc.
www.depo.com

**dates** 42:23

**David** 5:20 14:21 17:24 37:8 48:13 51:8 53:16 54:15 62:24 66:12 79:16 84:10 92:2 93:12 95:21 100:3 101:15 108:9 109:6 122:5

**day** 16:22 17:1 18:24 19:8,11 44:19,23 45:12 50:22 52:5,8,21 54:18 56:7,12,16, 17 57:2,3,16,18, 24 58:1,8,12,14, 23 59:2,10 60:14 61:13 62:14 63:4, 6,15,18,20,24 68:22 70:13 71:18 72:3,8,13, 22 73:11 74:1,7,9 82:24 83:3,9 84:7,18,21 89:4, 6,22,24 90:4,19 91:18 92:14,17, 24 93:2,6,14,20, 24 94:4,20,23 105:4,8,9,12,14, 23 106:3,12,13 107:1,8,14,18 109:8 111:24 112:4,7,9,10,13, 17 113:5,8 115:14

**days** 42:18 69:1

**DCFS** 9:8,11 10:8,18 12:22 13:4 14:18 17:20 22:4 29:5,20 32:6 33:3 36:2 37:5,14 38:8,20,22 45:17, 21 46:18 49:15 50:3 54:14 60:11, 15 61:14,16 65:13 70:20 72:8, 9 73:16,21,22 75:5 77:7 90:17 91:1,5 93:9,15 96:4 103:22 104:1 106:20

109:21 110:1 112:16,18 115:22 117:22

**DCFS's** 65:11 108:15 110:4

**DCP** 81:21

**dealing** 12:16 98:23

**death** 21:15 26:19 27:11 80:10 82:9,17 83:2,9,16 84:18 88:4,18 110:9 111:7 114:12 115:8,10,12,18 121:9,12

**deaths** 77:11 79:5 82:1 84:7 85:3 87:6 114:16 119:6

**Defendant** 14:12 74:23

**Defendants** 6:4, 5

**defensive** 76:24

**defer** 73:13 97:13 113:24 117:20 119:14,20

**define** 73:12

**defined** 16:6

**definition** 20:7 73:13

**definitions** 14:14

**degree** 13:10

**delivers** 92:10

**denied** 94:5 95:4, 23 96:8

**Dep** 102:7

**department** 6:13 7:6 9:5 10:4,22 15:4 16:4,8,10 21:2 35:11 37:2 42:14 73:13 79:6 103:20 106:10 111:21 112:5

113:7,14 115:9

**Department's** 26:17 27:10 110:6,24

**depend** 113:16

**depending** 112:11

**deposition** 5:7, 15 7:5,9,14 14:3, 4,12 15:15,16 18:14,15 24:22 25:1 28:23 29:1 32:5,9 56:8 68:14 74:18,19 76:12 78:9 80:21 100:23 102:3 109:10,17,19 114:9 122:18

**depositions** 24:17

**Deputy** 9:12,17 12:21

**describe** 40:2,4 45:11 79:1 112:3

**designated** 7:7 15:7 17:20 62:11

**designed** 115:15

**detail** 120:13 121:12

**details** 85:18,23 116:1

**determination** 43:22

**determine** 90:11 91:15 112:21,23 113:18

**deviate** 70:22

**died** 86:23 117:24

**differs** 103:12

**difficult** 8:5

**direct** 16:9

**directed** 20:16

**directly** 91:4

**director** 9:12,17 12:21 75:8

**disagree** 97:15 119:10,12

**disassembled** 22:14,21 24:3

**disciplined** 92:15

**disclose** 23:5 33:10

**disclosed** 85:21

**disclosure** 99:5

**discoverable** 99:8

**discovery** 22:3 99:4

**discreet** 12:22 13:3

**discussed** 89:24

**discussing** 36:1, 23 37:1,4 38:12, 23 54:20

**dispute** 114:2 121:16,21

**District** 5:10 7:11

**division** 10:21 75:6 81:22

**document** 14:1, 8,16 15:14 18:10, 13 24:21 28:23 29:5 31:2 32:4,16 33:1,7 68:12,13 75:14 78:15 109:12,16 118:13,17 120:9

**documents** 67:15,24 75:19 99:5

**dog** 10:22

**door** 61:15,16,17

**dot** 28:6

**downtown** 67:11,13

**draw** 97:23

**drawn** 40:10

**duly** 6:16

**Dupage** 10:12,20 11:1,6 75:7

**E**

**e-mail** 79:11,12, 17,21 122:8

**e-tran** 122:13,14

**earlier** 14:15 24:17 43:8 52:12 70:16 71:2 90:8 102:11 109:7,17, 19 110:15,19 112:12 117:11 122:8

**effect** 16:15 70:6

**elementary** 41:13

**empirical** 21:17 26:24 27:12 68:20 69:5,20 70:4,10 71:3

**employed** 9:2,5 11:7,8

**employment** 17:1 19:10 56:14 57:14 107:16

**enact** 20:16

**enacted** 20:19 21:1 109:21

**enacting** 26:12 68:21 70:11

**enactment** 20:11

**encompass** 12:15

**encroaching** 86:8

**end** 10:17 53:23 75:14 88:1 96:11

**ends** 39:20 113:14

Atkinson-Baker, Inc.
www.depo.com

**enforce** 37:14 58:22 59:24 60:3, 6,8 65:13,19 104:19,22,24 105:11

**enforced** 54:12

**enforcement** 25:22,23 30:14, 15 35:22 36:2,16, 22,24 37:1,5,16 38:19 44:20 45:8, 9,13,22 46:4,21 47:6,10,19 48:5, 11,23 49:10,15, 17 50:4,10,24 53:24 54:2,4,7,9 55:5,22 90:7,12

**enforcing** 37:18, 19

**ensure** 31:14 33:4

**ensuring** 111:17

**entail** 39:9

**entails** 39:15

**enter** 41:19 42:7

**entered** 109:10

**entertaining** 12:18

**entire** 54:13

**entitled** 31:21 78:15

**equally** 16:7 50:22

**essential** 111:20, 22

**Essentially** 112:7

**established** 24:17

**establishing** 16:13

**estimate** 66:11, 23

**et al** 5:9

**eventually** 114:8

**evidence** 21:18 22:9 26:24 27:12, 19 49:20 68:20 69:5,20 70:4,10, 21 71:4,11

**exact** 17:14 18:18 24:6 25:4 28:4 29:12

**Examination** 6:19 14:15 19:20 24:14 28:16 35:22 68:20 108:10 116:10

**examinations** 77:11

**examined** 6:17

**examples** 54:2,4, 17

**exception** 45:13 106:5 107:2,12, 17 108:1

**exceptions** 38:20 56:14 57:15

**exclude** 29:6 72:19

**excuse** 89:18

**excuses** 47:20

**exhibit** 14:3,4 15:15,16 18:14, 15 20:7 24:22 25:1 26:10 28:19, 24 29:1 31:7 32:5,9 55:3,19 56:9 68:13 74:18, 19 78:10,13 102:3,6,7 109:10 111:11,14 114:9 116:13

**exhibits** 122:7

**exist** 27:19

**existence** 76:23

**exists** 22:9

**expert** 22:2,3,4 27:3,16 28:11

69:16

**experts** 27:23 70:18 71:7

**explain** 42:6 121:10

**explanation** 120:15

**extends** 64:6

**extent** 22:2 27:2, 14,15 28:10,12 69:16 86:11 99:2 100:14 115:5

**F**

**facilities** 16:6,13 19:1

**facility** 22:16 50:22 103:2,4,6

**fact** 16:1 17:19 24:11 76:11 79:13 119:21

**fact-specific** 60:23

**facts** 49:19 87:16

**fail** 94:24

**failure** 89:4 94:2, 6

**fair** 59:20 110:11 116:1,5,23 119:8 120:15 121:5

**fall** 38:19

**familiar** 15:20,21 18:20 25:4,6 29:8,11,13,14 32:12,16,18 53:9 80:13,14 83:20 90:4 93:3

**families** 44:14 52:4 64:17,21

**family** 6:13 7:7 9:6,21 10:1 11:1 16:9 24:16 29:17 30:20,21 31:8,21 32:20 33:4,9,21

34:16,22 40:11, 12,14 41:11 42:2 44:22 45:7,18 46:13 50:23 51:3, 11,12,14 52:8,20 54:18 55:4,21 63:4 64:18 65:22 103:6 111:9,11 112:5

**family's** 47:9

**faster** 7:17

**federal** 7:5,10 14:11,23 25:19 30:11 75:4

**feel** 66:9 79:20

**figure** 97:24

**figured** 76:3

**file** 72:15 93:18 95:13 113:2,17, 20 121:1

**files** 72:11 95:19

**fill** 110:16

**filled** 113:15

**find** 18:10 39:10 72:12 73:14 75:11 91:2,8 94:15 98:9,11,20 100:9,13

**findings** 97:15 119:15

**fine** 66:24 79:18 100:11 122:14

**firearm** 19:13 22:12 30:21 34:3, 14 38:10,21 46:15 49:12 54:13,20 55:6,24 57:4,14,17 72:7 76:23,24 86:16 87:2,12,20 92:15 93:1 94:2,7 98:18 102:10,22 103:7, 9,24 105:4,6 108:17,21 112:15 113:4 115:14 116:3 117:24 118:6,8,9

**firearm-related** 71:17,23 72:2,22 73:4,11 74:1,6,15 82:24 83:2,9,15 84:6,18 88:4,18

**firearms** 19:12 21:14 22:19,21, 23 23:2,6 24:1,3 25:16,18 26:8,18 30:2,8,10,17,20 31:6,21 32:20 45:2,3 51:14 53:10 57:23 77:14 85:3 87:11, 19 89:23 90:5 104:1 108:23 110:8,17 111:6,9, 10,11 115:17

**fiscal** 77:9 91:19

**flip** 93:23

**focus** 102:24

**focused** 21:8,9

**FOID** 10:23 11:3

**follow** 29:24 104:14 105:14,24 106:2,5,20 107:1, 9

**forget** 102:17,18

**forgive** 33:19 43:4 75:2

**form** 17:23 28:17 29:9,12,13,14,18, 20 30:5,19 31:13, 21,24 32:1,12,15, 18,23 33:3,12,21 34:1,8 35:16 74:3,10 78:21 79:24 80:1 82:21 95:2,7 96:24 97:16 101:5 103:14 106:7,21 107:22 111:8 116:24 119:17 120:16 121:18

**format** 74:11

**forms** 35:24 37:10 38:12 67:18 69:3 70:3

Atkinson-Baker, Inc.
www.depo.com Index: forthcoming..Illinoisgeneralassem

71:5 110:16,17, 20 111:13

**forthcoming** 22:3 27:3 28:11

**foster** 16:9 24:16 25:10,21 29:16, 24 30:13,19,21, 23 31:8,14,21 32:20 33:1,4,9,21 34:13,16,22 35:3, 12 38:8,9,18,20 40:11,12,13 41:11 42:2 44:10, 13,17,19,22 45:7, 11,18 47:9 50:23 51:3,11,12,14,19 52:4,7,20 54:17 55:4,21 64:17,18, 20,22 65:2,5,8, 14,21,22 68:23 70:13 71:18 72:13,17 73:4 74:9,15 76:23 80:17,18 81:5,6, 8,13,15 83:1,3 84:20 85:3,15 86:23 87:12 88:4, 18 93:6,14,20,24 94:4,20,23 110:16,21 111:11 113:5,8 115:13 116:15,17 117:23

**found** 120:11

**foundation** 80:22 82:5

**fourth** 49:6 62:19 114:20

**frame** 41:1

**free** 79:20

**front** 68:13,16 91:3,5

**future** 42:23

---

**G**

**gave** 27:1,7 50:21 52:4 70:5,16 122:8

**general** 6:3,10 11:15 18:19,24 25:9 29:8,13,14, 19 32:12,17,18 40:4 52:11 69:20 72:7 77:7 78:18 79:3 113:17

**generally** 12:23 37:4 70:21 99:10, 17 100:19 112:3 113:9 119:8

**gestures** 7:24

**get all** 19:5

**give** 7:16 18:11 40:5 41:20 42:7 47:21 54:24 75:11 86:11 91:8

**giving** 43:9

**glad** 53:22

**good** 5:1,19,24 6:21 36:4,10 46:19 52:10 66:22 67:3 96:14

**Google** 71:11,13

**gotcha** 76:1

**government** 25:20 30:11

**Governor** 78:17

**graduated** 12:2 13:5

**Gretchen** 6:7

**ground** 7:16

**guardian** 22:23 23:1

**guess** 34:4 65:20 66:13,16,22 67:6 69:23 89:16

**gun** 45:18 46:11 77:1 98:14

**guns** 25:21 28:5 30:12 45:6 51:18

**gunshot** 85:16 86:24

**guy** 61:18

---

**H**

**H-E-L-F-R-I-C-H** 6:8

**half** 21:7

**hand** 7:23 40:18, 19

**handgun** 16:24 19:10 22:12 56:13,17 57:4 60:14 61:18 62:14 63:5 106:15 108:21

**handguns** 16:22 19:7 57:23 59:12 105:8,15 107:13, 18 108:24

**handle** 9:18,19

**handled** 10:22, 23 12:13

**hanging** 117:24

**happen** 41:14 67:22 76:6 87:5 90:22

**happened** 61:4 73:18 83:23 85:23 86:7 87:20 98:12,16,22 120:14

**happening** 113:14 115:12

**happy** 66:7 79:12

**harmed** 116:3

**Hawkeyes** 13:15

**hazard** 25:12

**head** 7:23 17:13 85:17 90:24

**health** 10:22 110:5,12 111:2, 19

**hear** 48:16

**hearing** 42:17,18

**hears** 38:8,20

**held** 9:14

**Helfrich** 6:7

**helpful** 66:14

**hire** 91:22

**history** 13:17

**hold** 80:1 120:1

**holders** 107:3

**home** 16:22 17:2 19:2,8,11 22:22 25:10,20,22 30:12,13,21 39:16 44:18,19 45:12 50:22 52:8, 21 54:18 56:12, 16,17 57:2,3,16, 18,24 58:2,12 59:10,12 60:4,14 61:13 63:4,6,15 64:22 65:5,15,21 72:13,14 84:18 85:3,15 86:23 89:4,6,22,24 90:5 91:19 92:17,24 93:2,6,20 94:1 103:6,7,8,9,11 105:4,5,9,12 106:3,13,14,16, 18 107:1,9,14,19 109:8 111:24 112:4,11,13,15, 18 115:13,14 120:6

**homes** 16:9 18:24 24:16 29:17 31:8 34:13 35:12 44:11 52:5 58:9,14,23 59:2 68:23 70:13 71:18 72:3,8,17, 22 73:4,11 74:2, 7,9,15 82:24 83:1,3,10 84:7, 20,21 88:4,18 105:8,23 112:9, 10 113:5,8

**homework** 100:6

**honest** 120:21

**hope** 98:2 101:23

**hot** 25:13 39:14

**hour** 36:4 96:10

**hours** 58:9,11,12, 14,15,17,23 59:3, 8,9,18,20 60:1,3, 5,7,9,24 61:4,10, 16,22 62:6,9,15 63:6,12,14,18 64:1,7,15 111:24 112:2,4,14,21

**house** 60:12 61:18

**household** 25:14

**hypothetical** 38:8,15 45:24 46:24 47:13,24 49:20 51:22 52:15 53:17 55:10 56:19 59:14 60:18 61:6, 24 62:18 63:22 83:24 87:14

**hypothetically** 83:22

---

**I**

**IDCFS** 78:19

**identify** 5:13 76:21

**III** 30:1 31:6,12

**ILCS** 15:13 17:22 19:14 23:4 102:8 106:6

**Illinois** 5:10 6:3,9 7:6,12 9:5 13:9 15:12 16:15 18:19 71:18 72:3, 14,22 73:5,12 74:2 77:12 83:1, 3,10 84:7 88:5,19 89:4,22 90:4 92:18,24 112:5

**Illinoisgeneralassembly.gov** 25:5

Atkinson-Baker, Inc.
www.depo.com

**imagine** 40:18

**immediately** 11:9 30:18

**implement** 23:21 110:2

**importance** 42:6

**important** 115:10

**inaccessible** 22:17,21 23:3 24:3 25:18 26:10 30:9 45:5

**inaccurate** 97:21

**incidence** 72:12

**incident** 85:4,24 86:20,21 112:17 116:1

**incidents** 85:4,5 87:20 98:4,22 100:2,14,16 115:21 116:2

**include** 77:10 119:21

**including** 46:6 50:12 76:24 77:14 103:3

**inclusive** 121:22

**incomplete** 38:14 45:23 47:13,24 49:20 51:21 52:15 53:17 55:9 59:13 60:18 61:6,23 62:17 63:22 87:14

**increased** 111:1

**increases** 12:17

**independent** 80:5

**indicative** 66:17

**individual** 58:12 69:7 72:15 81:18 93:17 94:14 95:13,19 113:2

**individuals** 40:5

**indoors** 19:2

**infant** 120:10

**info** 88:24

**informal** 38:3 41:22 42:1

**information** 29:7 32:8 33:10 34:3,7 35:3 43:17 69:12 71:20 72:4,8,10, 21 73:3,10,15,24 74:5 76:21 77:22 82:7,14 83:8 84:3,5,21,24 85:20 86:2,9,11 87:10,18 88:3,13 89:7,12,14 90:2 93:10,16 94:8 96:18 97:12,14, 21 99:2,7,13 100:11,15,22 101:2 113:6,12, 15 116:16 117:20 118:9 119:9,11, 13,22 121:17

**informed** 51:12, 13

**initials** 30:22

**injuries** 77:11 83:2,9,15 84:6,18 88:4,18

**injury** 21:15 26:19 27:11 110:9 111:7 115:18

**inside** 17:13 112:1

**inspection** 47:1

**Inspector** 77:7 78:18 79:3

**instance** 83:20 84:2 93:3

**instances** 53:9 92:24 95:4 98:12 99:20

**institutions** 16:8

**intake** 37:22 39:7,8 44:15 45:17 46:3,9 60:12

**intends** 42:14

**intent** 38:4 42:11 43:2

**interactions** 9:19

**interpretation** 108:15

**interrogatories** 6:17 75:1,7,9

**investigate** 39:4 60:16 61:1 112:18

**investigated** 99:21

**investigation** 37:23 39:13 46:12,20 77:16 81:22 87:24 99:3, 20 112:21

**investigations** 77:9 85:11

**involved** 77:12 86:22

**involvement** 79:5

**involving** 87:20

**Iowa** 13:14

**irrelevant** 18:1

**issue** 48:19 54:5, 7 56:24 98:17

**issued** 52:2,18 53:7 79:4

**issues** 12:17,20, 23 13:3

**italics** 21:11

**item** 69:7

**J**

**J-O-R-G-E-N-S- E-N** 7:3

**January** 9:20,23 78:19 79:4 80:3

**JCAR** 18:7 69:2 70:2 103:24

**Jennifer** 5:8

**job** 9:11,16 12:14

**joined** 12:11

**Joint** 18:7

**jorgensen** 5:8 6:15,22 7:2,8,13 9:1 10:24 13:20 14:3,4,6 15:6,15, 16 18:12,14,15 19:16 20:23 21:6 23:7 24:13,22 25:1 28:22,23 29:1 30:4 32:5,9, 11 36:15 44:12 53:8 61:11 62:10 63:3 67:8 74:17, 18,19 76:6 78:9, 11 80:5 82:2 87:10 96:18 98:1 99:1,6,9,16 100:19 101:22 102:3,7 108:4,12, 14,20 116:7,13 120:3 122:19

**July** 9:15 10:9

**jump** 41:22 80:9 93:5

**June** 12:4

**justification** 23:16 31:1

**justifications** 20:9 23:16 24:5 26:11 47:21

**K**

**kid** 65:5

**kids** 58:2 63:17, 18,20 64:3,9 80:17,18 93:20 98:13 106:18 116:15,18 117:23

**kind** 10:6 40:18 43:9 91:23

**kitchen** 25:12

**knock** 61:14

**knocks** 61:16

**knowingly** 102:22 108:17

**knowledge** 36:21,24 74:14 83:14 85:5 88:10

**knowledgeable** 14:18 15:1

**L**

**labor-intensive** 113:1,20

**lack** 43:10

**lacks** 80:22 82:5

**language** 45:20

**largest** 12:19

**law** 12:2,4 13:5 25:19,22,23 30:11,13,14 38:19 45:7,8,12 55:5,22

**leave** 108:8 122:2

**left** 12:6 36:15 75:21

**left-hand** 80:12, 19

**legal** 47:2,14 48:1 58:5 59:14 62:1 76:11 103:17 104:4 106:8,11, 22 107:6,23 108:15

**legally** 99:4 100:14

Atkinson-Baker, Inc.
www.depo.com

**legislation** 9:19 13:3

**legislative** 9:12, 17 11:18 12:13, 21,24

**legislators** 9:20 12:16,18

**legislature** 17:12

**lengthy** 120:15, 19,22

**letter** 23:14 25:11,15

**Lexis** 15:18 102:5,7

**license** 42:14,16, 21 44:4,5 51:20 52:2,13,17,24 53:7 65:2,9 89:19 90:3 93:4 94:5 103:7 105:3,13 106:4,17 107:3,9, 20

**licensed** 38:9 92:17 105:23 106:24 112:4

**licensee** 19:11 102:21 105:3 106:13,14 108:16

**licensees** 89:4, 22 90:5 92:24 93:7 94:5,23

**licenses** 89:6 90:1 93:2,12,13 94:1 95:5,22,23 96:2,8

**licensing** 16:5 24:16 29:16,21, 23 30:18 33:4 34:12 39:16,19, 24 40:10 41:11 42:3,4 46:12 51:24 61:17,20

**life** 53:9

**limits** 73:20

**link** 76:22 96:19

**list** 11:10 43:19

**111**:10

**listed** 14:19 80:15

**lists** 24:14 77:16 102:23

**litigation** 6:12

**living** 45:13

**loaded** 25:21 28:5 30:12 38:10, 21 45:6,18 46:11, 15 49:13 51:18 55:6,24 57:3,17, 23 98:18 116:3

**local** 7:11 25:19 30:11

**location** 19:14 23:5 34:3,4

**locked** 22:15,16, 20 23:2 24:2 25:16 26:8 30:8 45:4 98:18 103:10 105:6,16 106:19

**logical** 73:20

**logically** 62:7

**long** 9:14 10:8 37:20 69:9 76:2 106:17

**longer** 66:5,12 121:2,7

**looked** 75:19,22 93:16 102:1 111:13 117:11 119:2

**losing** 90:2

**lost** 44:3 89:24 93:1,4,12,13 94:1 95:22,23 96:2

**lot** 12:16 84:15 100:21

**lots** 12:17,20 78:2

**loud** 7:22 8:1

**low** 115:5

**lumped** 95:21

**lunch** 66:6

___

**M**

**made** 8:15 77:9 113:7,13

**mail** 42:13

**main** 90:18 111:20

**major** 13:16,17

**make** 7:17 8:1 20:21 34:5,15 43:22 66:2 92:21 110:20 113:11 121:23

**makes** 35:12

**making** 97:10

**mandate** 26:17 27:10 110:4,6 111:21

**mandated** 109:21

**manner** 65:12 98:11,21

**Marc** 5:9 7:6 14:12 74:23 75:8

**Marina** 5:2 7:19 8:5 122:8

**mark** 73:22 78:12 114:8

**marked** 14:2,5 15:15,17 18:13, 16 25:2 28:23 29:2 32:5,10 74:20 102:4

**marking** 24:22

**material** 100:21

**materials** 67:21

**Matt** 97:23

**matter** 5:8 28:16 31:22 48:8 49:4 52:22 64:9

**matters** 14:15,19 16:17 19:20 24:14 35:22 68:19

**Matthew** 6:1

**Meaghan** 5:7 6:15 7:2,8 18:2 20:2 22:6 27:4, 17,24 28:13 33:14 34:11,18 35:5,10,19 38:16 39:1 46:2 47:3,15 48:2,20 49:7,24 50:8,18 51:23 52:16 53:5,18 55:11 56:3,20 57:7,20 58:6,21 59:6,16,23 60:20 61:8 62:3,20 63:9,23 64:5,13 65:1,7,18 66:13, 19 69:17 70:19 71:8 72:24 73:7 74:4,12 80:24 82:6 83:13 84:14 85:10 86:2,9 87:15,22 88:8,22 89:10 94:12 95:8 97:2,18 101:7 103:16 104:5,17 105:21 106:9,23 107:7,24 117:1 119:18 120:17 121:19 122:19

**means** 45:17 62:7 81:22 89:17

**meant** 67:9 120:24

**measures** 46:5

**meat** 10:7 14:14

**mechanism** 45:16

**Medicaid** 12:17

**meet** 19:2

**meeting** 41:10, 15 42:5

**member** 30:20 80:23

**memory** 101:1 115:22

**mention** 109:4

**mentioned** 72:17 75:20 79:14 98:4 117:8

**met** 11:3

**middle** 21:21

**miles** 73:20

**Miller** 5:8

**Millers** 29:7,12

**Millers'** 32:15

**mind** 11:10

**minimum** 16:4

**minutes** 36:7 67:2 79:12 101:19 117:7

**misheard** 33:20

**missed** 9:23 69:21

**misstates** 27:15 34:9,17 49:21 58:19 62:1 65:16 81:11 87:21 104:3

**misunderstanding** 33:23 35:1

**modification** 32:22

**Mogilevsky** 5:2

**moment** 14:7 37:12 65:23 75:24

**monitoring** 9:18 34:13 35:12

**months** 77:13 85:2

**morning** 5:1,19, 24 6:22

**move** 22:10 49:2, 9 50:10 71:16 82:22 89:2 120:5

**Moving** 31:18

**multiple** 35:8
49:23 53:4 62:24
81:2,7 116:19

**N**

**necessarily**
40:21 94:24
119:20

**needed** 112:21

**negative** 76:22

**negatively** 89:6

**night** 60:13
112:9,11,14

**nonetheless**
56:16

**nonlegal** 98:5

**nonverbal** 7:23

**Northern** 13:9

**notate** 73:17

**notes** 101:14,17

**notice** 14:11
38:4,5 42:10,11,
12,16 43:11
53:15 54:8 68:14
75:23 112:15

**noticed** 53:21
54:15

**noticing** 5:18

**notification** 23:5

**notifies** 39:10
43:2,3

**notify** 22:22 23:1
30:18 58:15

**notwithstanding**
17:19

**November**
10:17,18 12:10

**number** 5:11
54:11 77:5 84:1,
17 89:3,14,17
91:18 93:4 94:3,

22 97:9 117:16
118:7

**numbers** 35:23
36:17 68:23
69:13 70:14
97:11 114:1,14,
23 115:5 117:10

**O**

**oath** 5:15

**oaths** 5:23 6:6

**object** 14:21 22:1
37:6 46:23 51:9
74:10 76:16
80:20 84:8,12
93:11 94:10 95:6
96:24 97:16
101:5 104:15
106:7 120:16
121:18

**objecting** 69:15
105:19

**objection** 5:14,
22 6:5 17:23
19:24 27:2,14
28:10 33:12 34:8,
17 35:18 38:14
45:23 47:12,23
48:16 49:19
50:16 51:21
52:14 53:3,14
55:8 58:4 59:4,
13,21 60:17 61:5,
23 62:17 63:21
64:11,23 65:16
70:17 71:6 72:23
73:6 74:3 81:11
82:4,21 83:11
85:9 86:2,17
87:3,13,21 88:6,
15 89:9 97:24
103:14 104:3
106:21 107:4,21
116:24 118:11
119:17

**objections** 10:23
27:22 38:24 50:7
56:2,18 57:6,19
63:8 74:24 77:6
84:22

**obtained** 93:10

**occasions** 49:23
53:4

**occur** 60:6 62:6

**occurred** 115:23

**occurrence**
71:17 72:2,21
73:4,10 74:1,6,14
83:8 84:6,17
85:14 88:17

**occurrences**
83:15

**October** 5:4
122:20

**offer** 52:10

**office** 6:2,9 9:21,
24 10:1,13 12:11
67:10 75:4 77:7
78:18 79:3

**officer** 5:15 22:13
38:19 45:13 55:5,
22 56:12 57:13
107:15

**officers** 25:22
30:14 45:8

**offices** 16:23
19:9

**OIG** 78:1,2,5,22
80:11,23 82:10,
11 95:17 96:5,19
98:16 113:23
121:11

**OIG's** 97:15
119:14,15

**older** 98:14

**ongoing** 85:12

**open-ended**
36:20

**operate** 112:8,9,
10

**operating** 58:9,
11,14,15,17,23
59:3,8,9,18,20
60:1,3,5,7,9,24
61:4,16,22 62:6,

9,15 63:5,11,14,
17 64:1,7,15
111:24 112:2,4,
14,20

**operator** 22:22
23:1 103:5
105:13 106:4

**opinion** 106:11
120:21

**opportunities**
49:22

**opportunity** 38:1
40:17 41:2,20
42:7

**opposite** 72:7
105:7

**opposites**
105:20

**option** 40:5

**oral** 6:17

**order** 38:6 43:19,
24 44:1,6,16
49:18 50:5,14
52:17 85:22
98:10,21 99:11
106:24 122:6

**ordered** 20:15,20
21:4 23:20 110:1

**ordinance** 25:20
30:11

**outdoors** 19:2

**outline** 40:15

**outlined** 119:6

**outlines** 34:14

**overarching**
72:12

**overbroad** 83:12
88:7 89:9 94:11
95:20 101:6

**overdose** 118:1

**Overly** 55:8

**oversee** 9:21,24

**owner** 58:12

**owning** 103:6

**P**

**p.m.** 60:13 61:15,
17 67:5 96:16
101:21 112:8
122:20

**pages** 14:20
118:20,24 119:24

**paper** 45:19
67:24

**paragraph** 23:13
103:5

**paraphrase** 27:8

**paraphrasing**
70:6

**parent** 35:3 38:8,
9,18,20 94:4

**parent's** 87:12

**parents** 19:15
22:22 23:1 29:24
30:23 31:14 33:1
76:23 93:24
110:16,21

**parking** 103:1

**part** 16:3 21:10
26:12 29:16
77:19 102:9,15

**parts** 23:11

**passed** 17:12

**passing** 120:23

**past** 25:11 115:6

**paths** 11:2

**Patriot** 11:16
12:8

**pause** 28:19
79:9,11 100:4

**PDF** 114:11,13
120:8

**peace** 16:23 19:9
22:13 56:12
57:13 107:15

**pending** 68:22 70:13

**people** 93:24 95:4 96:21

**percent** 83:24

**percentages** 88:12,16,21

**Perfect** 36:9 122:9,16

**permitted** 16:18

**person** 8:6 14:18 15:1 22:13 49:11 57:14

**person's** 44:3

**personal** 29:7 32:7

**personally** 54:22 56:4 71:15 87:23 119:10

**persons** 16:11 47:7

**perspective** 94:4,23 98:24

**pertaining** 16:17

**phone** 120:1

**physical** 19:1

**physically** 60:4

**pick** 19:15

**picked** 120:4

**picking** 121:14

**place** 20:18 112:1,17

**placement** 64:19,22

**places** 25:17 26:9 30:9,22 45:5 81:2 102:23

**Plaintiffs** 5:21

**Plaintiffs'** 68:22 70:12 74:24 75:9

**plan** 37:24 40:2,7, 8,9,19,22,23,24

**41:3,19 42:8 79:22**

**plans** 40:14

**playing** 86:5 98:13

**point** 115:7,8

**polar** 105:7,20

**policies** 35:23 36:17,22 68:22 70:12 89:5,23 90:6

**Policy** 9:21 10:1

**political** 11:13 12:7

**pools** 25:13

**portion** 23:17 39:8 103:3

**posed** 40:11

**position** 9:7,14 103:20 106:11 108:15 110:24

**positive** 76:22

**possess** 16:24 19:10 56:17

**possessed** 25:18 30:10

**possessing** 103:7

**possession** 16:23 19:9 22:12 76:21,23

**possibly** 76:13

**post** 19:12

**potential** 28:11 113:19

**potentially** 72:15

**preceding** 77:13

**premises** 16:22 17:1 19:8 22:24 30:17 45:19 46:12 62:15 63:5 64:10 105:9 107:14,18

**prepare** 67:16 68:9

**prepared** 14:24 15:4 53:15,20 54:14

**preschool** 103:2, 4

**prescribe** 16:4

**prescribed** 16:14

**present** 25:20 30:12 34:14 63:20 103:9,11 105:5,17 106:18

**presume** 45:10 75:5

**presumed** 8:14

**pretty** 67:19 120:14

**prevent** 103:5 111:6 115:11,17

**prevents** 21:15 110:9

**previous** 56:19 79:6

**previously** 14:5 15:17 18:16 24:15,19 25:2 29:2 32:10 74:20 102:4 109:9

**printout** 18:18 25:4 102:5,8

**prior** 10:10 11:6, 16 27:15 34:10 49:21 58:19 62:1 65:17 77:9

**procedure** 7:11 10:3 14:23 16:16 44:14

**procedures** 9:22 25:24 30:15 45:9 47:11

**proceed** 47:6,11, 18 48:4,12,22 112:22

**proceedings** 44:20

**process** 37:15, 18,19,20 39:9 49:15,17 50:11, 24 51:3 90:7,12 99:3

**proffer** 22:4

**progresses** 38:3

**prohibited** 19:7 100:15 105:9,15 107:14,18

**prohibiting** 16:22

**promises** 92:11

**property** 103:1

**protect** 21:5,13 26:17 27:10 110:5,7 111:2,19, 21

**protected** 85:12 99:5,14

**protecting** 110:12

**protection** 25:13 46:14 49:13,14 50:2 55:7 56:1 81:23

**protective** 37:24 40:7 98:10,21 99:11

**protects** 21:3 26:19

**provide** 34:6 35:3

**provided** 14:22 16:15 22:13 29:5 59:10

**provider** 12:20 52:8 57:2 61:13 62:14 63:6 91:14, 15,21

**providers** 90:19 91:19 92:14,18 94:1 112:8

**Provisions** 16:21

**public** 87:7 90:9, 20

**publically** 77:15

**publish** 16:4

**published** 16:14

**pull** 28:19 55:1

**purpose** 29:18 109:20 110:13 111:2,15 115:15

**purposes** 8:15 29:3 39:22 110:20

**pursuant** 7:9 14:22

**put** 40:12 79:2 81:18 85:8 89:1 91:5 113:23 114:5

**putting** 76:12,17 84:10

**Q**

**qualifiers** 84:11

**quantifying** 84:3

**question** 8:9,11, 13,16,17,19 17:15,21 20:5 22:2 24:4 27:6 28:10,13 31:4,11 33:15,17 34:9 36:21 40:12 47:4 48:14,17,19 53:19 54:3,13 55:12,13 56:7 57:8 60:23 62:13, 23 69:6 71:22 72:18 74:8,11 76:18,19,20 77:2 80:4 84:9,11,20 88:21 94:20 95:7, 18 96:7 97:1 100:20 101:6 103:15 104:11 105:10,18,22

107:22 115:20
121:14

**questioning**
120:5

**questions** 10:6
28:4 54:6 67:8
69:4 99:10
101:11,24 108:5
111:23 113:4,22
116:7

**quick** 11:20

**quote** 105:20

**quotes** 32:21

**R**

**Randolph** 67:14

**random** 120:4
121:15

**rate** 12:17 30:7

**read** 16:2 17:3
19:16 23:8 26:1
31:6,8 54:23
55:15,17 56:10,
24 57:15 68:4
77:2 83:23 92:3
122:14

**reads** 19:7 22:11

**ready** 67:7

**real** 11:20 53:9
103:1,20

**real-world** 54:1,
4,7,9,17

**reason** 8:18
20:11,17,24
23:15 27:1,8
31:1,12 46:19
47:9 48:8 49:3
51:17 61:14
65:10,11 96:21
97:15,20 106:1,3
114:2 119:10,12
121:16

**reasons** 20:9
23:16 24:5 26:11
52:10 109:20

**recall** 75:23
78:20 111:15

**receive** 37:21

**received** 13:10,
18 60:23

**recent** 24:18 78:7
115:22

**recently** 115:22

**recited** 31:23

**recites** 32:19

**recognize** 18:17,
18

**recollection**
80:5

**record** 5:14,18
6:24 7:1,4 8:15
36:11 55:16 67:4
85:9 92:3,21
101:19

**recordkeeping**
29:20,22 33:3,21

**redacted** 29:6
32:4,7

**Reducing** 21:14

**refer** 19:4 100:20

**referenced**
35:23 36:17 68:7,
23 70:14 102:11,
16,18

**references** 30:2

**referencing**
44:13

**referred** 14:14
80:18 86:20

**referring** 43:12
56:9 95:23 97:7

**refers** 31:24

**reflect** 7:5

**regard** 56:7
64:17,20 85:21
107:13

**regulations**
16:17,18 93:1

94:2

**rehash** 69:8

**related** 85:3
88:24

**relates** 69:19

**released** 78:5

**relevance** 98:23

**relied** 68:20
70:11,24

**relies** 70:21

**relying** 97:5

**remember** 11:4
25:6 69:10
109:11,16,22
110:17,22 114:2

**remembered**
100:23

**rep** 39:16,19
40:10 41:11 42:3
46:13 61:17,20

**repeat** 31:3 38:17
55:13 57:8

**rephrase** 8:20
20:4,10 72:19
81:12 104:10

**report** 78:1,2,5,
17,22 79:1,2,8
80:3,6 82:11
113:13,23 117:20
119:9,11,14
121:5,11

**reported** 113:12

**reporter** 5:1,3
6:6 55:15,16
122:9,16

**reports** 77:8,10,
14 96:19,20
98:16

**represent** 5:13,
21 32:2 82:2
102:8

**representative**
7:8 15:3,8 16:12
17:20 30:19

39:24 62:11 72:9

**representatives**
29:21 34:12

**represented**
14:17 25:7 80:19
81:9,14,15,16
116:15,18

**representing** 6:3

**represents** 82:8

**reps** 29:23 33:4

**require** 15:1 35:2

**required** 16:18
25:22 30:13 45:7
53:7 58:14
111:10

**requirement**
53:13 107:13,17

**requirements**
18:24 19:3 25:9
54:20 94:7

**requires** 34:3

**requiring** 33:1

**reservations**
77:6

**reserve** 122:5

**reserved** 122:21

**reserves** 22:4

**reside** 17:1 19:11

**resident** 56:15
57:2,17

**respect** 27:23

**respective** 94:5

**respond** 42:18

**response** 99:15

**responses** 7:22,
23 8:1

**responsibilities**
9:16 12:15

**responsibility**
100:7

**restate** 69:23

**restricted** 16:16

**restricting** 26:18
110:8 111:5
115:16

**restrictions**
58:17

**result** 52:22 93:2,
4 94:1

**Retrospective**
80:10 82:9,17
114:13

**return** 71:11

**review** 32:14
38:2,3 41:7,14,22
42:1,6 67:15
76:14 79:4 96:11
113:1,20 118:20,
23

**reviewed** 67:17,
22 68:8 77:22
82:10 102:12
119:1

**revocation**
42:16,20,22 43:1,
6 44:2

**revoke** 38:4
42:11,14

**revoked** 44:4,5

**room** 103:3

**rug** 101:24

**rule** 7:5 10:3
14:11,23 18:20
19:21,23 20:18,
19,24 21:3,4,10
23:17 24:15 25:6
26:12,16 30:2
31:15 32:21 33:5,
11,22 34:2,6,16,
23 37:19,22 38:1
39:18,20,23,24
40:14 41:16 43:7,
22 46:3,7,8,10
47:5,10,17,22
48:4,9,10,11,22
49:4,9 50:10
51:12,13 52:2,9
53:6 54:23 55:3,
20 56:7 57:15

58:2 60:24 61:3,
9,21 62:5,16
63:7,11 64:20
65:12,13,20
74:24 75:5 91:16
99:12 103:12
105:1,13,14,15
106:14 108:2
109:7,14

**rule's** 111:2

**rules** 7:10,11,17
9:22 15:1 16:18
18:8 20:16 23:21
29:24 35:23,24
36:17 37:1,3,5,9,
12,14,18 38:11,
13,23 44:8,17
52:18 54:1,2,4,7,
9,10,11,13,14
58:23 59:7,18,24
60:10 63:19,24
65:2,9 67:17
68:21 69:2,19
70:2,12,24 71:4
89:5,23 90:6
94:24 103:24
104:1,8,19,23
105:8,12,20,24
106:3,20 107:1,9
109:8,20 110:2,3,
13,21 111:1,17
115:13

**rules'** 111:18

**run** 11:19 60:14

**running** 11:10

---

**S**

**S-I-G-A-L-E** 5:21

**S-O-L-O-M-O-N**
6:12

**safe** 38:10,21
46:15 49:12
51:18 55:6,24
87:12 98:18

**safety** 19:3 25:24
30:15 45:9 110:5,
7,12 111:2,19,21

**sake** 114:6

**sandbagging**
98:5

**save** 11:11

**scenario** 38:17
45:11 46:18

**school** 12:2,4
13:5

**scoot** 102:20

**scope** 53:15
80:21

**screen** 5:6 6:1,8,
23 13:21 14:5
15:17 18:9,16,21
19:5 25:2,7 29:2,
4 32:10 54:24
57:10 60:11
68:17 71:20
74:20 78:10
102:4 109:9
113:24 114:5,7
115:19

**scroll** 14:13
29:17 33:2
109:14 114:19
121:15

**search** 71:11,13
92:16

**searching** 92:13,
14

**seat** 39:14

**section** 16:19
18:8,23 19:12
23:3 28:17 30:1
31:2,6,12,23
56:10,23 102:14,
16 109:2,3,4

**sections** 103:20

**seek** 16:11

**sees** 61:18

**self-defense**
76:24

**send** 122:7

**sentence** 21:10,
21 28:4 45:3,6,

14,20 46:10

**sentences** 26:3

**separate** 13:2
22:20 24:2 48:14

**separately** 25:17
26:9 45:4

**serve** 42:15

**Service** 11:16

**Services** 6:13
7:7 9:6 112:5

**set** 41:1 42:23

**shaking** 7:23

**share** 13:21
28:20 54:24
68:12,17 109:8
114:7 117:14

**shared** 14:5
15:17 18:16 25:2
29:2 32:10 74:20
78:10 102:4

**sharing** 18:9
75:10 76:4 78:24
115:19 120:2

**short** 36:12 67:5
96:16 101:21

**show** 14:8 15:14
24:21 67:23
70:22 109:9
114:8

**showed** 60:13
67:19 97:8 111:8
117:7 118:15

**showing** 18:13
28:22 71:14
74:18 76:14

**shows** 61:17
115:6

**side** 71:20 93:23

**Sigale** 5:19,20
6:20,21 7:4 14:6
15:6,18 18:5,17
20:6 22:10 25:3
27:7,20 28:3,15
29:3 32:11 33:18
34:15,21 35:6,15,

21 36:13 37:11
38:18 39:5 46:6
47:7,20 48:6,16,
24 49:11 50:1,12,
20 51:11 52:3,19
53:8,22 54:16
55:14 56:6,22
57:9,22 58:10,24
59:9,19 60:2
61:2,11 62:7,21
63:1,13 64:2,8,16
65:4,10,24 66:15,
21 67:1,4,6 69:21
71:1,12 73:2,9
74:8,17,22 76:20
78:11 79:19,22
81:4,12 82:12,22
83:17 84:19,24
85:18 86:6,15,19
87:1,5,18 88:2,
11,17 89:2,12
92:5,10 93:13
94:16 95:10 96:1,
15,17 97:8,22
99:16 100:8,18
101:10,18,22
102:5 103:22
104:10,21 106:1,
12 107:2,10
108:3 109:2
111:8 112:12
113:23 114:8
116:7,9,11,12
117:4 118:14,19
119:22 120:20
122:1,6,15

**sign** 19:12 34:2
51:14 76:9 95:2
122:14

**signature** 122:5,
21

**signed** 29:12
76:13

**significant**
73:14,17 115:8

**similar** 26:23
42:5 82:23

**simple** 71:10

**simultaneously**
12:8

**single** 85:16
86:24 115:10
119:1

**sister** 90:18

**sit** 21:16,23 27:20
71:3,19 72:20
73:3 77:21 78:20
83:7 89:21 94:17
121:16

**sitting** 117:15

**situation** 70:22

**situations** 81:18

**skip** 25:10

**skipping** 25:11

**slash** 23:19 24:5
26:11,15

**slight** 32:22

**Smith** 5:9 7:6
14:12

**Smith's** 74:24
75:8

**smoother** 7:18

**snuck** 98:13

**so's** 60:12

**solely** 81:13

**Solomon** 6:11

**something's**
101:1

**sort** 7:19 12:14
42:19 67:22
98:10 108:15

**sounds** 41:13
67:3 79:22 92:10
96:14

**speak** 116:22
117:2 118:1,3,6,
17

**speaking** 37:4
83:22 99:6 119:8

**specific** 12:22
33:17 39:3 40:3
70:23 72:5 74:7,
16 83:15,20,21

84:2,17 87:9 88:10 91:14,15, 21 92:23 93:3 94:17 95:3 103:20 112:24 115:24 118:4

**specifically** 18:23 19:4 28:1 32:14 46:11 59:1 69:19,23 70:15 91:13 96:4 97:7 102:14 119:6

**specifics** 44:8 71:10 80:7 99:3 119:5

**speculating** 81:17

**speculation** 33:13 38:15 45:24 47:13,24 49:21 51:9,22 52:15 55:9 59:14 60:18 61:7,24 62:18 63:22 64:12,24 82:5 106:8 107:5,23

**spell** 6:24

**spelled** 5:20 6:8

**spent** 75:3

**spot** 40:6

**spread** 109:15

**squarely** 53:24

**stage** 99:19

**stamped** 29:5 32:7

**standard** 58:10, 13

**standards** 16:5, 13,14 24:16 29:16

**stands** 41:18

**start** 15:11,24

**started** 10:17 12:6,7

**starting** 5:18

**starts** 28:5 51:2

**state** 5:17 6:22, 24 22:15 25:19 30:10 92:18

**State's** 10:12,20 11:6 12:11 75:4,7

**statement** 52:11

**states** 5:10 19:1 25:15 30:7 32:3

**stats** 88:12,16 89:1

**status** 80:13 100:13

**statute** 15:12,19, 20 20:15,20 21:1, 4 37:9 67:17 69:2 70:2 77:10 85:12 99:14 102:8

**statutes** 35:24 38:11 71:4

**stayed** 12:10

**Stenographic** 5:2

**step** 21:7 40:1 50:13

**steps** 41:22 45:22 46:21 50:5

**stick** 20:12 37:3 38:7

**sticking** 44:10 60:10 121:13

**stop** 18:9 75:10 78:24 115:19 120:2

**storage** 22:15, 16,20 23:3 24:2 115:14

**stored** 22:24 23:6 25:16 26:8 45:4 103:10 105:6

**straight** 66:8

**Strategies** 11:14 12:9

**strictly** 95:23

**strike** 10:14 44:11 47:8 62:9 64:19 65:12 109:5

**studies** 70:7

**sub-subparagraph** 22:18 57:1

**sub-subparagraphs** 23:14

**subject** 22:5,6 27:4 44:9 53:16 85:22 99:4,5

**subparagraph** 17:10 19:23 20:18 21:9 22:11 23:8 24:19 56:11 57:1,9

**subparagraphs** 17:8 19:21 26:4 109:15

**subparts** 16:3,20

**subsection** 22:14 56:10

**substitute** 74:9 84:20 93:6

**suddenly** 99:13

**sued** 99:12

**suffered** 85:16

**suicide** 21:15 26:20 27:11 110:10 111:6 114:20,24 115:18 117:17 118:6

**suicides** 117:8 118:8

**summaries** 77:8 121:5

**summarize** 121:8,12

**summary** 121:1, 17

**Sunshine** 90:10, 14,17 91:5,12

**Sunshine.dcfs. illinois.gov.** 92:9

**Superior** 11:17, 18,21 12:3,14

**supervision** 16:10

**supervisor** 41:11,12 42:3

**supervisory** 38:2 41:7,14 42:5

**supplies** 25:14

**support** 21:17 26:24 27:13

**supportive** 21:2

**suppose** 39:19

**surrounding** 112:24 113:19

**swimming** 25:13

**switch** 44:22

**sworn** 6:14,17

**synonymous** 20:9 23:15 31:1

**system** 77:13

---

**T**

**table** 82:2,16 97:9 114:1 118:12,14,16

**tables** 82:16 97:13 114:4

**tabulates** 114:23

**takes** 78:1 117:22

**taking** 7:19

**talk** 20:23 26:5 36:2 39:23

**talked** 95:22 99:18 100:21 101:3 115:21

**talking** 8:6 9:8

37:8,9,10 44:15 48:10 54:12 90:6 93:12 118:11,12, 14

**talks** 46:13

**tasked** 34:13 35:11

**term** 98:5

**terms** 52:22 99:6, 11 114:1 116:21 117:23

**terrible** 117:15

**testified** 6:18 49:22 69:13 71:2 101:3 109:19 110:19 111:12,13 113:6 117:11

**testify** 14:18,24 15:4,8 53:16,20 54:14

**testifying** 34:9

**testimony** 17:7 22:2,5 27:3,15,16 28:11 34:10 49:22 50:21 58:16,20 59:11, 17 61:20 62:2 65:17 69:16 104:4 109:23

**thereof** 77:14

**thing** 9:9 39:8 40:17 41:5,21 43:18 76:2 91:23 97:22 114:7

**things** 25:11 53:11 69:6 95:22 96:12 102:23

**thought** 92:6

**time** 5:5,12 8:6 25:21 30:12 36:4 40:15,24 41:1,4 43:15 48:15 49:6 58:2 62:19 64:10, 17 65:21 75:3 83:24 100:24 108:4 115:7,8 118:24

timeline 11:19 43:9

times 25:17 26:9 30:9 35:9 45:4 48:14 62:24 65:3, 9 83:23 98:16 119:2

title 9:11 14:8 18:8

titled 18:24 29:15 32:20

tobacco 25:13

today 7:8 8:14,19 14:13 15:9 21:16 27:20 53:20 54:21 67:16 68:9 71:14,19,20 76:15 77:21 83:7 100:22,23 108:4 113:7

Today's 5:4

told 48:19 51:13

top 32:19 90:24 108:16 114:15

topic 15:19 17:6, 18 18:6 19:19 28:16 31:19 36:16 53:24 68:11 69:11 70:10 71:21 72:1 82:23 89:3,8 93:5,19,20

topics 14:16,24 15:2,5,8 37:12 54:8 66:15 68:14 70:1 93:22 94:9 101:3

total 81:24 114:15

totally 112:11

track 71:23

tracking 9:18

tragic 117:15

triggered 101:1

trouble 11:11

true 52:4 121:2

tubs 25:13

turn 8:9

Twenty-year 80:10 82:9,17 114:12

two-and-a-half 12:5

two-month 120:10

type 98:21 108:21 113:12

types 16:6,12 108:23

U

uh-huh 7:24

ultimate 52:22

undergraduate 13:10

underneath 24:1 30:16

understand 8:19 20:2 28:12 29:24 33:14 34:2,6 35:7 47:3,15 53:18 58:6 60:20 61:12 62:3 84:14 88:22 95:8 97:2,19 98:2 104:5 105:21 106:9 111:5

understanding 15:7,10 55:3,20 108:21

understands 33:5,22 34:16,23

understood 8:3, 12,16 45:15 55:11

Undetermined 120:9

unh-unh 8:1

United 5:9

universe 54:13

University 13:14

unnecessarily 51:8

unredacted 32:15

unresponsive 120:11

unsupervised 86:5

unwieldy 94:21

URL 90:23 91:8 92:3

V

vague 19:24 33:12 35:18 37:7 46:1 47:1,12,23 49:21 51:22 52:14 55:8 60:18 61:5,24 72:23 73:6 74:3,11 83:11 87:13 88:6, 15,20,21 94:11 95:21 97:17 101:6

vary 112:11

varying 39:11

verbal 7:22 8:2

verification 76:8

version 32:15

versus 5:9 98:17 117:24

vicinity 73:22

violate 45:19

violated 91:19

violating 46:10 47:10 48:9,11 62:16 86:12

violation 25:19 30:10 37:22 38:1, 13,22 39:18,20, 23 40:1,14 41:20

43:7,23 46:4,6,8 47:5,17 49:4 50:10 60:24 61:4, 10,21 62:8 63:6, 11 90:11 104:24 112:19

violations 44:17 60:6,8 62:5 89:15 91:16 92:15 111:24 113:1

violence 76:24

visible 19:14

visit 39:11

W

wait 8:8,10

walk 41:16

wanted 119:13

wanting 37:15

water 25:12

ways 39:12 84:10

web 18:19

website 77:15, 23,24 78:16 90:10,14,16,17, 18 91:2,12,17 92:12 96:20

weeks 30:5

welfare 77:13

well-being 110:7

well-documented 27:18

West 67:13

whatnot 120:11

wind 98:3

word 43:10 46:9 65:20

words 69:22 73:16

work 12:23 37:5

worked 10:8,9,21 11:17 12:4

working 10:11 12:7 25:12

would-be 30:23 51:12 52:20 94:4, 22 106:13 107:19

wound 85:17 86:24

write 10:3 104:8

writes 9:22

written 41:3

wrong 41:6 96:22 116:15

Y

yank 101:24

year 9:20 77:9 79:6 85:15 86:21 91:19 119:3

years 12:5 117:12

yes/no 62:12

yesterday 69:1

Youth 81:9,14,16 97:11 114:16

Z

Zoom 5:16,23 6:6 122:18

 Office of the
Illinois Attorney General
**Kwame Raoul**



# About Us

► Home  ► About

Translate Website

Search

## Jump To:

Consumer Protection

Honest and Open Government

Preserving the Environment

Rights of the People

Safer Communities

### File a Complaint

## Quick Links:

► Legal Assistance Referrals

► Milestones Reports

► News Room

Exh. D

1/4

► Publications

## Get Connected:

outreach@ilag.gov

---

## LEARN ABOUT THESE TOPICS:

- ► **Office of the Attorney General Structure**
- ► **Biography of Illinois Attorney General Kwame Raoul**
- ► **Contact the Office of Attorney General Kwame Raoul**
- ► **Community Outreach and Public Engagement**
- ► **Public Meeting Announcements**
- ► **Annual Reports and Disclosures**
- ► **History of the Office of the Illinois Attorney General**
- ► **Office of the Attorney General Website Privacy Policy**

---

The Attorney General is the state's chief legal officer and is responsible for protecting the public interest of the state and its people.

The job of the Attorney General is to:

- Advocate on behalf of all of the people of Illinois;
- Legislate with members of the General Assembly for new laws; and
- Litigate to ensure state laws are followed and respected.
- The Attorney General provides services that cover a broad range of issues, reaching every corner of Illinois.

## Protecting Consumers

Protecting consumers and businesses that have been victimized by fraud, deception or unfair competition is one of the primary functions of the Attorney General. The office receives approximately 25,000 consumer complaints each year, most commonly concerning motor vehicles and home repair.

》》 Learn More About Protecting Consumers

## Advocating for Women

The Attorney General advocates for an end to domestic violence and sexual assault, offers numerous services to victims of violent crime, and awards grants to domestic violence and sexual assault service providers throughout Illinois.

》》 Learn More About Advocating for Women

## Keeping Communities Safe and Fighting Crime

The Attorney General works with law enforcement agencies at the state and local level to keep families and children safe in their communities. He created the first-of-its-kind task force to take down Organized Retail Crime networks. He protects children from online predators as leader of the Illinois Internet Crimes Against Children Taskforce. Attorney General Raoul partners with federal law enforcement to prevent mass shootings in schools and places of worship, fight violent crimes and get crime guns off the streets.

》》 Learn More About Keeping Communities Safe and Fighting Crime

## Advocating for Older Citizens

The Attorney General works to protect the rights and safety of Illinois' older citizens, who are often targeted by scam artists and abusers. The office is equipped to respond to the special needs of older citizens, including those related to consumer fraud, abuse and neglect, financial exploitation, veterans' rights and health care concerns.

〉〉 Learn More About Advocating for Older Citizens

## Safeguarding Children

Keeping children safe and healthy is a priority of the Attorney General. The office works on many fronts to reduce sexual assault, advocate for after school and community safety programs, and educate children and parents on various safety issues, including Internet safety and teen dating violence.

〉〉 Learn More About Safeguarding Children

## Defending Your Rights

Attorney General Raoul is committed to defending the rights of all the people of Illinois. Bureaus within the office are dedicated to specifically protecting civil, labor and employment, disability, and veterans rights.

〉〉 Learn More About Defending Your Rights

## Communications, Community Engagement and Outreach

Through the work of the Communications and Community Engagement Bureau, our staff is available to address audiences on topics ranging from consumer fraud to crime victim's assistance.

〉〉 Learn More About Communications, Community Engagement and Outreach

## Preserving the Environment

One of the Attorney General's principal responsibilities to public health and safety is protecting our environment. In addition to prosecuting violators of the state's environmental protection laws, the Attorney General protects agricultural producers, an essential part of Illinois' economic vitality.

〉〉 Learn More About Preserving the Environment

## Helping Crime Victims

The Office of the Attorney General has made it a priority to provide services that help victims of violent crime meet their challenges and regain some peace of mind.

〉〉 Learn More About Helping Crime Victims

## Ensuring Open and Honest Government

The Office of the Attorney General is committed to a free and open government supported by free and open exchange of information, as set forth in such laws as the Freedom of Information Act (FOIA) and the Open Meetings Act (OMA).

〉〉 Learn More About Ensuring Open and Honest Government

## Building Better Charities

The Attorney General works in close contact with the state's charitable organizations to ensure they have the tools necessary to follow the law and, in turn, help those in need.

〉〉 Learn More About Building Better Charities



    

Contact Us

Privacy Policy

500 S. 2nd St.
Springfield, IL 62701
(217) 782-1090

115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3000

1745 Innovation Drive, Suites C & D
Carbondale, IL 62903
(618) 529-6400

Individuals with hearing or speech disabilities can reach us by using the 7-1-1 relay service.

# DCFS Director Heidi E. Mueller Biography



**Heidi E. Mueller**
**Director, Illinois DCFS**

Heidi E. Mueller was appointed by Governor JB Pritzker to serve as acting director of the Illinois Department of Children and Family Services (DCFS) on February 1, 2024 and she was confirmed unanimously by the Senate on March 22, 2024.

Prior to her appointment, Director Mueller served as director of the Illinois Department of Juvenile Justice (IDJJ) for eight years. In that role she oversaw the care, custody and services provided to youth committed to the department by Illinois courts, including five secure youth centers, eight aftercare offices and five day-reporting centers located throughout Illinois.

As deputy director of programs for IDJJ, Director Mueller served as the principal policy-making official for the department's healthcare, behavioral health, vocational and recreational programs. She also conceptualized and implemented the core IDJJ intervention and behavioral management programs.

A passionate advocate and champion for children and families, Director Mueller considers her role at DCFS to be her calling and is working tirelessly with her team of more than 3,500 employees, empowering them to have a voice as she helps to make reforms and improvements to the agency.

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3    JENNIFER J. MILLER, DARIN E. MILLER,   )
     SECOND AMENDMENT FOUNDATION, INC.,     )
4    ILLINOIS STATE RIFLE ASSOCIATION, and  )
     ILLINOIS CARRY,                        )
5                                           )
                              Plaintiffs,   )
6                                           )
         vs.                                ) No. 3:18-CV-3085
7                                           )
     HEIDI E. MUELLER, in her official      )
8    capacity as Director of the Illinois   )
     Department of Children and Family      )
9    Services, and KWAME RAOUL, in his      )
     official capacity as Attorney          )
10   General of the State of Illinois,      )
                                            )
11                             Defendants.  )

12

13            The deposition of CATHERINE RYMPH, called by

14   the Plaintiffs for examination, taken pursuant to notice

15   and pursuant to the Federal Rules of Civil Procedure for

16   the United States District Courts pertaining to the

17   taking of depositions, taken before Rocio Arias,

18   Certified Shorthand Reporter, at 212 Lowry Hall,

19   Columbia, Missouri, commencing at 10:01 a.m. on the

20   20th day of May, A.D., 2025.

21

22

23

24

25                                                          Exh. F



```
 1    APPEARANCES:

 2         THE LAW FIRM OF DAVID G. SIGALE, P.C.
           MR. DAVID SIGALE (via videoconference)
 3         55 West 22nd Street
           Suite 230
 4         Lombard, Illinois 60148
           Phone:  (630) 452-4547
 5         E-mail:  dsigale@sigalelaw.com

 6              On behalf of the Plaintiffs;

 7         ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES
           MS. BETH SOLOMON (via videoconference)
 8         60 Van Buren Street
           Suite 1339
 9         Chicago, Illinois 60605
           Phone:  (312) 814-2481
10         E-mail:  bsolomon@idcfs.state.il.us

11              On behalf of the Heidi E. Mueller;

12         ASSISTANT ATTORNEY GENERAL
           DEPUTY CHIEF, SPECIAL LITIGATION BUREAU
13         MS. ABIGAIL R. DURKIN (via videoconference)
           MS. GRETCHEN HELFRICH (via videoconference)
14         115 South LaSalle Street
           Floor 28
15         Chicago, Illinois 60603
           Phone:  (872) 276-3621
16         E-mail:  Abigail.Durkin@ilag.gov
                    Gretchen.Helfrich@ilag.gov
17
                On behalf of the Defendants.
18

19

20                   *    *    *    *    *    *

21

22

23

24

25
```



```
1                        I N D E X

2   WITNESS                                        PAGE

3   CATHERINE RYMPH

4        Direct Examination by Mr. Sigale ....... 4

5

6

7

8                      E X H I B I T S

9   PLAINTIFF'S EXHIBIT            I.D.      ADMITTED

10       No. 1 (Amended Notice of .. 7
                 Deposition)
11
         No. 2 (Final Report) ...... 8
12

13

14

15  DEFENDANT'S EXHIBIT               I.D.      ADMITTED

16

17

18

19

20

21

22

23

24

25
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com



1          COURT REPORTER:  The deposition of Catherine Rymph

2    is being conducted remotely via LegalView by agreement of

3    the parties.  Today's date is May 20th, 2025, and the

4    time is 10:01 a.m.

5                The witness is located at 212 Lowry Hall,

6    Columbia, Missouri.  My name is Rocio Arias.

7                At the conclusion of today's deposition, I will

8    ask that counsel place their orders on the record.

9                Thank you.

10                     (Witness sworn.)

11    WHEREUPON:

12                          CATHERINE RYMPH,

13    called as a witness herein, having been first duly sworn,

14    was examined and testified as follows:

15                     DIRECT EXAMINATION

16    BY MR. SIGALE:

17        Q.   Professor Rymph, can you --

18        MR. SIGALE:  I've already forgotten.  She's been

19    given oath, right, so we can --

20        COURT REPORTER:  Yes.

21    BY MR. SIGALE:

22        Q.   Can you state your name spelling your last name

23    for the record?

24        A.   My name is Catherine Rymph, R Y M P H.

25        MR. SIGALE:  Let the record reflect this is the

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com



1   deposition of Catherine -- of Professor -- Dr. Catherine

2   Rymph taken pursuant to notice with a date agreed upon by

3   the parties, it is taken pursuant to all applicable rules

4   of the Federal Code of Civil Procedure and the local

5   rules of the Central District of Illinois.

6   BY MR. SIGALE:

7        Q.   Professor Rymph, what do you prefer to be

8   called?

9        A.   I'm happy if you just call me Catherine, that's

10  fine.  Some people call me professor, doctor, dean.

11  Doctor is fine.

12       Q.   All right.  I'm going to give you the

13  honorific, I'm going to call you Dr. Rymph.

14       A.   That's fine.

15       Q.   And I'm going to ask you if you've ever given a

16  deposition before?

17       A.   I have not.

18       Q.   All right.  Let me give a few ground rules that

19  will hopefully make this go a little faster and a little

20  smoother, hopefully certainly smoother than so far.

21            Rocio is taking down everything everybody says.

22  She can only take down out loud verbal responses.  She

23  cannot take down non-verbal gestures like head shaking,

24  hand gestures, and maybe the biggest culprit of all

25  mm-hmm or uh-uh, so please keep all your answers out loud



1    and verbal, okay?

2         A.    Yes.

3         Q.    All right.  And it is very difficult for Rocio

4    to take down more than one person talking at a time.

5    There will be times when you're probably going to know

6    what my question is even before I'm done asking it, but I

7    ask that in all circumstances you please wait until I'm

8    done asking my question before you answer, and I in turn

9    will try to wait until you're done answering before

10   asking my next question, okay?

11        A.    Okay.

12        Q.    All right.  If for any reason you do not

13   understand a question that I ask you, please let me know,

14   and I will rephrase it.  If you answer a question that I

15   ask you here today, it's going to be presumed for

16   purposes of the record that is being made that you

17   understood the question that I asked and that that is the

18   question you are answering.  So, again, if for any reason

19   you don't understand a question, please let me know, and

20   I will rephrase it, okay?

21        A.    Okay.

22        Q.    All right.  And if you need to take a break at

23   any time, please let me know.

24        A.    Sure.

25        Q.    All right.  Dr. Rymph, you have been retained



1   as an expert opinion witness in this case, correct, by

2   the defendants?

3        A.   Correct.

4        Q.   Okay.  And -- Sorry.  Give me a sec here.  I'm

5   just going to -- Can anyone see that?

6        A.   Yes.

7        Q.   Okay.  Just for the record, not that anyone

8   cares, but it's showing up for me as a thumbnail, so I

9   can't read it, and I have to take your word for it, that

10  I'm showing the document I think I'm showing.  But I

11  think I'm showing a copy of a notice of deposition --

12       MS. HELFRICH:  Amended --

13       MR. SIGALE:  Amended Notice.  Thank you, Gretchen.

14  Sorry.

15  BY MR. SIGALE:

16       Q.   Dr. Rymph, have you seen a document like this

17  or similar?

18       A.   I don't -- I don't believe so.

19       Q.   Okay.  Well, I'm going to just mark this as

20  Exhibit 1, and I'm going to represent to you that this

21  was sent to the counsel for the defendants, an earlier

22  version had a different date for Patrick Charles, but

23  your date was always the same.  And this is just the

24  notice of deposition that asked you to come here today.

25  But you haven't seen this?



1        A.    I don't think so, no.

2        Q.    Okay.  That's fine.

3              Dr. Rymph, let me start by -- Okay.  This is

4    Exhibit 2.  Can you see that?

5        A.    Yes.

6        Q.    Okay.  I cannot, but I'm glad you can.  This is

7    a 49-page document.  It has the caption of the case, and

8    it says Report and Declaration of Catherine Rymph.  I'm

9    going to just scan through it sort of slow not because I

10   want you to read it, but just I want you to say whether

11   or not it appears to be the report and CV that you

12   submitted in this case, okay?

13       A.    Okay.

14       Q.    Section B and C, D.  Section 2, I presume this

15   all looks familiar so far?

16       A.    Yes, it does.

17       Q.    Okay.  Section 3, that's your signature there?

18       A.    That is my signature.

19       Q.    Okay.  And it's dated April 15th of this year?

20       A.    Correct.

21       Q.    Then we get to Exhibit 1, and we get to your

22   CV, yes?

23       A.    Yes, that's my CV.

24       Q.    Okay.  So I would like to talk with you a

25   little bit about the CV.  And do you by any -- I should



1   have asked this.  Do you have any documents in front of

2   you, by any chance?

3       A.   I have a copy of my report here in front of me,

4   but I can move it if I shouldn't have it.

5       Q.   No, no, no, no, no.  That's fine.  That is the

6   same report that I just scrolled through as Exhibit 2?

7       A.   Yes.

8       MR. SIGALE:  By the way, Rocio, that's Exhibit 2.

9   BY MR. SIGALE:

10      Q.   And was that CV attached to the copy you have

11  right there?

12      A.   No.

13      Q.   Okay.  So reports and CV, that's what you've

14  got right in front of you?

15      A.   Correct.

16      Q.   All right.  I am fine with you having it in

17  front of you.  The only thing I would ask is -- spoiler

18  alert -- most of what we're going to be talking about

19  today is going to be about your report and references to

20  your report.  However, if there are times unprompted

21  during this deposition where you refer to your -- you're

22  referring to your report, just say that that is what

23  you're doing, okay?

24      A.   Okay.

25      Q.   Otherwise you --



1      A.   Sorry.  Just to clarify, you mean if I am

2   physically looking at it here on my desk as opposed to

3   referring to it in the abstract, just to be sure I

4   understand?

5      Q.   Yes.  That's exactly what I mean.

6      A.   Okay.

7      Q.   So if you're quoting yourself from page 34,

8   just say that that's was what you're doing.

9      A.   Got it.  Yes.

10      Q.   Okay.  Did you review any documents or

11   materials to prepare for this deposition this morning?

12      A.   Yes.

13      Q.   What was that?

14      A.   I reread the -- You're talking about what I did

15   this morning?

16      Q.   Sure.  But I'm also asking what you reviewed --

17   I'm sorry.  What you did you you did to prepare.  What you

18   reviewed to prepare.  It could have this morning, it

19   could have been yesterday or last week.

20      A.   So I'm sorry to be dense, but are you asking

21   what I reviewed in order to write the report?

22      Q.   No.

23      A.   No.  Okay.

24      Q.   I'm asking what you reviewed to prepare to sit

25   down this morning --



1      A.   Yes.

2      Q.   -- and do this Zoom deposition.

3      A.   I reread my reports.

4      Q.   Okay.  Is that all?

5      A.   That's all.

6      Q.   Okay.  And I'm not going to ask you for

7  content, okay, get that upfront.  Did you speak with

8  counsel for the defendants or counsel for the State or

9  counsel for the Illinois Department of Children and

10  Family Services in preparation for today?

11      A.   I did.

12      Q.   Okay.  And, again, no content, but who did you

13  speak to?

14      A.   I spoke with Gretchen Helfrich and Abigail

15  Durkin.

16      Q.   Okay.  And when was that?

17      A.   I spoke with them yesterday and very briefly

18  this morning.

19      Q.   About how long total would you say you spoke

20  with them?

21      A.   Three hours.

22      Q.   Okay.  So now this is -- I am going to stop the

23  share here, okay?

24      A.   Okay.

25      Q.   I'm going to ask you questions for now about



 1   your CV.  I'm going to ask you about your report, and the

 2   fact is that I'm glad you can see what I'm sharing, but I

 3   can't, and it'll just be easier for me to stop the share

 4   and just refer to the documents.  If at any time you or

 5   counsel need me to put it back up on the screen for some

 6   reason, I can certainly do that, okay?

 7       A.   Okay.

 8       Q.   All right.  I am looking at Exhibit 2.  I am

 9   looking at page 42 of the PDF, which is the first page of

10   your CV.

11       MS. DURKIN:  Hey, David, just to make sure that the

12   record is clear in terms of what we're looking at, would

13   it -- Do you want me -- I know you're having tech issues,

14   do you want me to put that up on the screen so it's clear

15   what we're all looking at?

16       MR. SIGALE:  Yeah.  Sure.  You can share it.  I

17   appreciate the offer.

18       MS. DURKIN:  Now it's on my end.

19       MR. SIGALE:  I thought I was having a moment because

20   I didn't see anything.

21       MS. DURKIN:  Okay.  42 you said?

22       MR. SIGALE:  Yeah, right there.  Perfect.

23       MS. DURKIN:  Okay.  Great.

24   BY MR. SIGALE:

25       Q.   All right.  Dr. Rymph, the question that's been

1   burning on my mind, what years were you at IU?

2       A.   1984 to 1988.

3       Q.   You left just as I got there.

4       A.   Yes.

5       Q.   All right.

6       A.   Great place.

7       Q.   Say again.

8       A.   I said it's a great place.

9       Q.   Yes, it is, Go Hoosiers.

10      A.   Go Hoosiers.

11      Q.   All right.  Page --

12      MR. SIGALE:  Actually stay on that page.

13  BY MR. SIGALE:

14      Q.   Your current position for the last seven years

15  it says is -- that you are a professor in the Department

16  of History.  Also you're the Inaugural Dean of the Honors

17  College, right?  Those are your current positions?

18      A.   Correct.  Although just to be clear, I've been

19  professor of history for seven years, but only the --

20  I've only been the leader of the Honors College since

21  2021.

22      Q.   And let's stick for a second with the professor

23  department of history part.

24      A.   Mm-hmm.

25      Q.   And you've been a professor for 25 years,



1    right?

2         A.    Yes, 25 years.

3         Q.    Because before you were professor, you spent

4    11 years as an associate professor in the history

5    department, and an assistant professor for seven years

6    before that in the history department.

7         A.    Correct.

8         Q.    So let's -- When I say professor, let's start

9    with the full professor first line of the CV under

10   academic positions, okay?

11        A.    Yes.

12        Q.    What are you -- Are you professor in any

13   particular -- I'm sorry.  I don't know the lingo -- so

14   any particular focus or subsection of history?

15        A.    I would define myself as a U.S. historian who

16   focuses on political history and policy history with

17   special attention to women and the family.

18        Q.    Okay.  And are you currently a teaching

19   professor or researching professor or both?

20        A.    My position is research professor, but before I

21   moved into my administrative role, my assignment as a

22   professor was 40 percent research, 40 percent teaching,

23   and 20 percent service.

24        Q.    I'm sorry.  What does the 20 percent service

25   mean?



1    A.    That just means the committee work that one

2    does through the course of being professor, serving on

3    committees in your department and on campus.

4    Q.    Okay.  So when is the last time that you taught

5    a class?

6    A.    Well, I teach classes in the Honors College,

7    but those are honors classes.

8    Q.    I'm sorry.  I asked badly.  In the history

9    department.

10    A.    It was fall of 2020.

11    Q.    Okay.  And what were you teaching in the fall

12    of 2020 or spring of 20- -- You know, at the time that

13    you were teaching, what were you -- what classes were you

14    teaching?

15    A.    So spring of 2020 I taught a large enrollment

16    class called 20th Century America, and in the fall of

17    2020 I taught a smaller upper division class on women's

18    political history.  At the time I was chair of my

19    department, and so I was on a reduced teaching load.

20    Q.    Okay.  And that is represented there Leadership

21    and Service Highlights third from the bottom, yes?

22    A.    Correct.

23    Q.    Okay.  And it appears you've been very active.

24    Okay.  You were the interim director of the Honors

25    College for a year, and then since then you've been the



1    dean, the inaugural dean of the honors college.  Does

2    that mean that the Honors College started at University

3    of Missouri in 2021 or so, or does that mean you're just

4    the first person to get the title of dean?

5         A.   The Honors College started in 1958 at the

6    University of Missouri.  It was led by a director, and in

7    2021 the provost of the university decided she wanted to

8    elevate the profile of the Honors College, and that is

9    when she appointed me interim director, and then the

10   position turned into a dean position.

11        Q.   Same responsibilities, different title?

12        A.   Same responsibilities, different title,

13   different reporting structure, which is probably not of

14   interest to anyone if you're not inside higher end.  But

15   the different reporting structure has elevated the status

16   of the Honors College, and we've made considerable

17   investments in the college since that time.

18        Q.   Okay.  Your roll within the Honors College

19   then, is it purely -- I hate to say administrative like

20   that's a bad thing, but is it purely like a dean role, or

21   do you teach at the Honors College as well?

22        A.   So it's a dean role.  It's an administrative

23   role.  I'm happy to own the term.

24        Q.   Okay.

25        A.   I understand some people consider it a



 1   pejorative, I enjoy my work very much.

 2          Because the Honors College is -- RR is an

 3   undergraduate college, its mission is undergraduate

 4   education, I do teach a little bit, which is unusual for

 5   a dean.  Most colleges, their deans don't teach; but I

 6   teach one small one-credit class per semester.

 7      Q.   Okay.  Does the class change, or do you teach

 8   the same class every time?

 9      A.   It changes.

10      Q.   Okay.  The last time you taught that one-credit

11   course in the Honors College, what was it?

12      A.   The class I taught this semester was a class

13   called -- We have a book festival in Columbia, Missouri,

14   every spring.  We have five to seven small tutorials, and

15   I led one of those tutorials where the students in the

16   tutorial read works by authors who are coming to the book

17   festival, and then they get to meet those authors during

18   the book festival, and I taught one of those sections

19   this spring.

20      Q.   Okay.  And just to get a flavor here, you said

21   the classes are different.  So the class before that that

22   you taught for the one credit, what was it?

23      A.   In the fall I co-taught a class with one of the

24   associate deans in honors.  And that is a class where the

25   Honors College has a Summer One Read where incoming



1    students all read the same book, and we have started

2    choosing that book through a class that Dr. Harper and I

3    teach together where we preselect three books for the

4    students to read and discuss over the course of the

5    semester, and they do a lot of presentations and

6    activities around those books, and at the end of the

7    semester those students help choose the book that will be

8    the Honors College One Read.  That is a different book

9    program than the book festival that I was referring to

10   before.

11        Q.   Okay.  And if you would be so kind to turn to

12   the next page of this.  All right.  You have to forgive

13   me for sounding glib, Dr. Rymph, but I thought I had to

14   ask.  Did you really get a travel grant that is for

15   21 years?

16        A.   No.  Where does it say that?

17        Q.   It says you have a travel grant from 20- --

18        A.   Oh, my goodness.  No, I see that, but no, no,

19   that would be one year, 2024 to 2025.

20        Q.   Okay.

21        A.   That would be --

22        Q.   I guessed, but I thought maybe you had gotten

23   the best grant ever, so I had to ask.

24             Okay.  On the next page that starts with Book

25   Chapters.



1        A.    Mm-hmm.

2        MS. DURKIN:  For the record, it's 44.

3        MR. SIGALE:  Yeah.  Thank you.  On the PDF, yeah.

4    BY MR. SIGALE:

5        Q.    The fourth one down "From 'Economic Want' to

6    'Family Pathology'" Foster Family Care, the New Deal,"

7    et cetera, you see the -- you see that that's a journal

8    article that you wrote?

9        A.    Yes.

10       Q.    And I know that to some extent that's what

11   we're here to talk about today, so I figured as long as

12   we're going through the CV, what was that article about?

13       A.    So that was an article that I published early

14   on in my process of researching for my book on foster

15   care, and it was specifically about the ways in which new

16   deal -- several of the major new deal laws, the way that

17   they helped to shape the emerging foster care system.

18       Q.    And just, I mean, in a nutshell, what was the

19   conclusion?

20       A.    Well, the conclusion is that the 1930s, the

21   period of the new deal, were really significant moment in

22   actually creating what we can call a foster care system

23   where there is the beginnings of regulation, the

24   beginnings of licensure, the beginnings of federal money

25   for the expansion of a child welfare infrastructure, and



1   the article also addresses some of the social and

2   economic needs of the period that are leading to those

3   changes.

4        Q.   You and a couple other history professors or

5   history doctorates -- I'm not sure how to phrase it, I

6   apologize -- help write an amicus brief in the Fulton

7   versus Philadelphia case.

8        A.   Yes.

9        Q.   And I was -- What was the main point of that

10  brief?  And I'm sorry.  Let me strike that question for a

11  second.  Your amicus brief was on the side of the City of

12  Philadelphia, yes?

13       A.   Yes.

14       Q.   Okay.  And that was a case, please correct me

15  if I'm wrong, the Fulton side -- the City of Philadelphia

16  said that you're not going to be able -- like Catholic

17  institutions won't be able to be involved with the foster

18  system if they won't allow same-sex couples to also

19  foster, the Fulton side sued as a violation of religious

20  rights, yes?

21       A.   That's my recollection.  It was -- I worked on

22  that.  It was four or five years ago now, but your

23  description there is my general recollection of what that

24  case was about.

25       Q.   Okay.  And I understand that you wrote this --



1    that it was a few years ago.  But to your recollection,

2    what was the point or the conclusion, I should say, of

3    your amicus brief?

4         A.   So my recollection was that the two other

5    historians and I, that we were demonstrating that -- and

6    demonstrating unsuccessfully, I should say, that -- in

7    the end, that there was actually a history -- Over the

8    course of the history of foster care, there had been

9    issues of racial and religious discrimination in the

10   child welfare system, and that there had been measures to

11   correct that discrimination on the basis of race and

12   religion.

13        Q.   You mean like there was -- there were previous

14   efforts to -- Sorry.  Strike that.

15             You mean that racial and religious groups had

16   been discriminated against in the past, and government in

17   the past had taken steps to alleviate that?

18        A.   Yes.

19        MS. DURKIN:  Object to form.

20   BY MR. SIGALE:

21        Q.   You answered.  That's fine.

22        A.   Yes.  More or less, yes.

23        Q.   Okay.  And if you could go to --

24        MR. SIGALE:  Abigail, again, thank you -- Page 45.

25   BY MR. SIGALE:



1      Q.   Dr. Rymph, second from the bottom on that page.
2  This is your section on book reviews.  And you wrote a
3  review of an article in -- Strike that.
4           You wrote a review in April of 2008 of a book
5  or an article Best Shot -- Her Best Shot:  Women and Guns
6  in America, by Laura Browder.  It looks like it was some
7  sort of journal article.  Do you remember this?
8      A.   Yes.  It was -- So just to clarify how to read
9  that line.  The review appeared in a journal called
10 Gender and History, and it was a review that I wrote of a
11 book, and the title of the book was Her Best Shot.
12     Q.   Understood.  Thank you.  What was the book,
13 and -- Well, I'll start with that.  What was the point of
14 the book?
15     A.   So I, to be honest, don't remember the book
16 very well.  I remember that I did not like the book, and
17 that's more of a disciplinary question.  I'm a historian,
18 the author of the book comes from more of an American
19 studies' approach.  Didn't really care for her
20 methodology, which was essentially -- If I'm recalling
21 correctly, and again, this is a long time since I would
22 have read that book, or read that book review, that she
23 was looking at examples of popular culture in the
24 twentieth century, so a film here, a movie -- or a comic
25 book here, I don't remember exactly what the genres were,



1    and they just pulling out images of women and guns and

2    theorizing about them.  That's not an intellectual

3    approach that I particularly like, so I recall not really

4    giving the book a very positive review from the

5    perspective of a historian.

6         Q.   So your -- Again, I understand this was a

7    number of years ago, and so I'm just asking for your best

8    recollection.  But regarding the review of that book,

9    your recollection is that your critique was more of a

10   methodological dispute as opposed to the issue of

11   firearms and women and firearms itself, is that fair?

12        A.   That's fair to the best of my recollection.

13        Q.   Okay.  All right.  The last entry of your CV --

14   sorry -- is entitled Teaching on page 49, and it

15   states -- I'll just read it.  "Over twenty-five years of

16   experience teaching a range of graduate and undergraduate

17   courses, including graduate seminars, Honors tutorials,

18   large enrollment courses, research capstone courses, and

19   others."  Did I read that correctly?

20        A.   Yes.

21        Q.   That's the IU education.

22             And did any of those courses that are

23   referenced involve history of firearms in any way?

24        A.   No.

25        Q.   Okay.  So let's go back, we'll stay with your



 1    report, we'll stay with this Exhibit 2, and let's go to

 2    the top then.

 3         A.   May I request that Abigail make it a little

 4    bigger?

 5         MS. DURKIN:  Sure.

 6         MR. SIGALE:  Sure.

 7         THE WITNESS:  Thank you.

 8         MS. DURKIN:  And this, for my own sake, the only

 9    thing that you can see on my screen is the report; is

10    that correct?

11         THE WITNESS:  Yes.

12         MS. DURKIN:  Thanks.

13            Catherine, can you see it okay?

14         THE WITNESS:  Yes, yes.

15         MS. DURKIN:  Thanks.

16            Sorry, David.

17         MR. SIGALE:  No, it's all good.

18            So let's actually go to -- You know what, I'm

19    sorry.  Stay with page 1.

20    BY MR. SIGALE:

21         Q.   This report, this page 2, Dr. Rymph, you have a

22    copy of it in front of you and you said you reviewed it

23    either yesterday or this morning to prepare for today,

24    correct?

25         A.   Correct.



1      Q.   Okay.  Is there anything in this report that

2    you read that you wish to correct, or is there

3    anything -- or change?  Is there anything in this report

4    that as you reread it that you would for whatever reason

5    want to change it?

6      A.   No.

7      Q.   Okay.  All and your opinions regarding this

8    case, you know what -- I'm going to ask you about it, but

9    you know what you were asked to do, and this is the

10   report you wrote, and all your opinions regarding this

11   case are contained in this report, is that fair?

12     A.   I'm not sure that you I understand the

13   question.  I don't have an opinion about the case.  I was

14   asked to write a report about the history of foster care,

15   but I don't know anything about the case or have an

16   opinion about the case.

17     Q.   Okay.  All your -- All the facts and

18   conclusions that you wanted to include in your report

19   that you felt answered the question of what you were

20   asked to do are in this report, is that fair?

21     A.   Yes.

22     Q.   Okay.  So on page 1 it says that you wrote a

23   book in 20- -- well, you published a book in 2017 called

24   Raising Government Children: A History of Foster Care and

25   the American Welfare State, correct?  I read that right?



1        A.   Correct.

2        Q.   And to this layman, it seems like that book

3   would -- seems to be very much on the nose with what you

4   were asked to do in this case, is that fair?

5        MS. DURKIN:  I'll object to form.

6   BY THE WITNESS:

7        A.   Yes.  I would -- Yes, it is -- it is -- I

8   forget exactly what your question was, but, yes, I think

9   it's relevant to what I was asked to do.

10        Q.   Okay.  Is there anything that you wrote in your

11   book in 2017 that you now, eight years later, are

12   contradicting in this report?  In other words, you wrote

13   something in 2017, but in the interim eights years you

14   said, Well, that isn't really -- I don't think that

15   anymore, so now I'm writing something different about

16   that in this report?

17        A.   Not with reference to the report, no.

18        Q.   Okay.  Page 2, it says -- the second sentence

19   of that first paragraph, "I have been asked to provide a

20   brief overview of foster care and child placement in the

21   United States from the American founding forward, as well

22   as a brief history of day care."

23        A.   Correct.

24        Q.   Is there -- That obviously is a very succinct

25   sentence.  Is there any further detail about what you



1   were asked to do that is not encapsulated in this one

2   sentence?

3        MS. DURKIN:  Object to form.

4   BY THE WITNESS:

5        A.   It is a general sentence that captures what I

6   did in greater detail in my report.

7        Q.   Did you have an understanding -- Again, I'm

8   really not trying to ask for conversations between you

9   and the counsel that retained you.  So I'm really asking

10  about just your understanding of what brief was.  When it

11  says "a brief overview of foster care and child

12  placement" is -- it's about 30-something pages, is that

13  brief in the history professor realm, or was there much

14  more that you wanted to write for some reason but didn't?

15       MS. DURKIN:  Same objection as to form.

16            Go ahead, Catherine.

17  BY THE WITNESS:

18       A.   Well, my book is around 200 pages long, so

19  compared to my book, it's brief.  And every element of my

20  book is not in the report.

21       Q.   Did you use your book as the resource for

22  writing this report?

23       A.   My book was a major resource, and it is cited

24  throughout the report.

25       Q.   To clarify, I'm at the bottom now, the last



1    sentence of page 2 moving into page 3.  And it says,

2    "Over the centuries, systems for the care of children

3    have transitioned from indenture, apprenticeship,

4    orphanages, farm placements, an informal adoption to

5    "foster family care" in the mid-twentieth century and,

6    finally, to a late twentieth and early twenty-first

7    century model of "provisional maintenance."  I read that

8    correctly?

9         A.    Yes.

10        Q.    Now, I may have noted that because at the time

11   I read it -- but then I read the whole report -- and it

12   seems to me like that sentence is basically a summary of

13   what I'm going to read in the next 20 pages of the

14   report, does that sound about right?

15        A.    More or less, yes.

16        Q.    Okay.  And it says, "This was also a" --  I'm

17   sorry.  I'm reading the next line of page 3.  "This was

18   also a transition from haphazard, ad hoc, largely

19   unregulated, and often exploitive practices."  Let's just

20   start right there.  Sorry.  Strike that.

21             I read that sentence, but then there's a comma

22   and it says, "to a mid-twentieth century vision of foster

23   care as a therapeutic," dot, dot, dot.

24        A.    Yeah.

25        Q.    So I know that we're going to be going through



1  the report, this is kind of the summary intro part, but

2  in general is it your conclusion, your finding, that the

3  system was haphazard, ad hoc, largely unregulated, and

4  often exploitive until the mid-twentieth century?

5       A.   I think that is generally accurate, but as a

6  historian I would always emphasize that change happens in

7  bits and starts, the pace is different at different times

8  in different regions of the country, so you will see

9  residual parts of an old system in a more recent era, and

10 some regions of the country will take longer to make that

11 transmission.  So while that is generally accurate, the

12 process is never completely linear, if that makes sense.

13      Q.   No, it makes sense.  What --

14      MR. SIGALE:  I'm sorry.  Did someone say something?

15      MS. DURKIN:  No.

16      MR. SIGALE:  I thought I heard something.  I'm

17 sorry.

18 BY MR. SIGALE:

19      Q.   No, I understand that.  And again, we'll get

20 into it.  But what regions of the country were you -- are

21 you referring to when -- that would you say were more,

22 let's say, progressive than others?  Which ones were

23 more, which ones were less?

24      MS. DURKIN:  Object to form.

25 BY THE WITNESS:



1      A.   I wouldn't use the word progressive, but I

2    think I understand your question.  As changes are

3    happening over time, and it's going to depend on what

4    time you're looking at, some of the changes that I

5    describe in my book and in my report are happening sooner

6    in urban areas than they are in rural areas.  They're

7    happening sooner in the Northeast and Midwest than they

8    are in the South.  But again, all of that is going to

9    depend on what time -- we're looking in this report at a

10   period from the eighteen century up until the late

11   twentieth century; and so again, I'm speaking very

12   generally there.

13      Q.   Was your understanding just to give a history

14   all the way from -- I think you said in your report, I

15   think you used the phrase, the founding, until present

16   day; or was it your understanding that there were any

17   particular periods in time that you were to emphasize

18   more than others?

19      A.   I did not have that understanding.  I tried to

20   follow the history as I understood it from my own -- from

21   the research I did from my book and emphasize those time

22   periods of significant change.

23      Q.   Okay.  So whatever happened whenever it

24   happened, that was -- you were to document it in the

25   report?



1      A.   Yes.

2      Q.   Okay.  Page 3, Section A, the first sentence,

3  "Among the earliest" -- By the way, I'm sorry.  Strike

4  that for a second.

5      MR. SIGALE:  Just for the record, let me say that

6  the pages of the report and the PDF match up.  So when I

7  say page 3, I'm actually staring at the report -- the

8  number on the bottom of the page of the report, but for

9  anyone who happens to be reading this, the number is the

10  same, they match up.

11  BY MR. SIGALE:

12      Q.   So I'm page 3 and I'm on Section A, and the

13  first sentence says, "Among the earliest methods of

14  providing for indigent children were indenture and

15  apprentice systems.  These were labor systems, brought to

16  the colonies from England, which were widely practiced in

17  colonial America."  I read that correctly?

18      A.   Yes.

19      Q.   Okay.  Now, it says "Amongst the earliest

20  methods," which implies they're not the only methods.

21  Were there -- were there other me- -- I mean, I suppose

22  other than leave them in the street to die, were there

23  other methods?

24      A.   Leave them in the street to die would be one,

25  but --



1      Q.    Okay.

2      A.    But -- But -- But I -- What -- I'm thinking of

3   the work here of some historians of the institution of

4   slavery who've actually made analogies to suggest that

5   for black children one can see slavery as a kind of a

6   child welfare system.  You know, I think that's a

7   separate argument.  Certainly many, many indigent

8   children in the colonial period were enslaved, which was

9   also a labor system, but was not what I was talking about

10   here in that first paragraph.

11      Q.    Okay.  So back then in the colonial days and,

12   in fact, prior, so in the -- Wow, that is colonial days.

13   So presumably then before the Declaration of

14   Independence, Revolutionary War, et cetera, et cetera,

15   when there were -- this is -- what's written in this

16   paragraph is how indigent children were cared for, they

17   were sent to work in some form or fashion?

18      A.    Yes.  Right.

19      Q.    And if there's like a place -- If there's --

20   Again, if there's a place in your report to refer to, by

21   all means, we'll probably get to it, but just briefly,

22   what's the difference between the indenture system and

23   the apprentice system?  I know you described it, but I'm

24   just going to ask you right here.

25      A.    Sure.  I mean, they're both -- they're both



1   labor systems.  I would say indenture is, if you look at

2   a spectrum from slavery to apprentice, indenture would be

3   closer to slavery, the major difference being that

4   indenture contracts terminated, and, you know, there was

5   a path out of it; whereas apprentice systems had more of

6   an emphasis on learning a skill and learning a trade,

7   learning a skill beyond the kind of pure manual labor of

8   being an indentured servant.

9       Q.   For these children that are being referred to

10  here, when they were indentured, was that -- you say the

11  contract eventually would be up, was there a usual when

12  that was up, like when they turned 18 or something --

13  some other age?

14      A.   Yeah, so certainly adults could enter into

15  indentured contracts, and that might have, you know, a

16  set time period that varied; but for a child it would

17  usually be until they reached some marker of adulthood.

18      Q.   Yeah.  And it occurred to me even as I said it

19  that that probably wasn't 18.  So do you know what

20  adulthood means?

21      A.   It could have been 16, could have been 21,

22  could have been 18; but some age that signified

23  adulthood.

24      Q.   Okay.  And this apprentice system that you

25  referred to, was the idea that they would -- the children



1    would learn a trade and then eventually actually work for

2    the person that took the time to teach them the trade?

3        A.   That can certainly happen.  It didn't always

4    work out that way, but that can certainly happen.

5        Q.   Okay.  Could, but that wasn't, like, the idea.

6    That wasn't the point?

7        A.   Yes.  I mean, it would vary from situation to

8    situation, but certainly.

9        Q.   When adults were engaging in -- were taking in

10   children as apprentices, were they called indentured

11   servants, these children?

12       A.   When they were apprentices.

13       Q.   No --

14       A.   They would have been called servants -- Mm-hmm.

15       Q.   Okay.  Was anyone regulating any -- anything --

16   Strike that.

17            When these adults were taking in these children

18   as apprentices or indentured servants, was there anyone

19   looking over their shoulder to make sure that these kids

20   were taken care of?

21       MS. DURKIN:  Object to form.

22   BY THE WITNESS:

23       A.   So I -- I want to clarify the term you used

24   there, taken care of and emphasize that that

25   understanding, what it meant to take care of in the



 1   eighteen century would not necessarily mean what we might

 2   think of that today, right?  The master, as they were

 3   called, had responsibilities to -- sorry, I got a little

 4   something in my throat -- typically had responsibilities

 5   to house the servant or apprentice, to clothe them, to

 6   feed them, and to -- if it was an apprentice situation,

 7   to actually teach them the skill that was the subject of

 8   the apprenticeship.  But other things that we might think

 9   of today as caring for a child such as loving the child,

10   talking to the child about their fears and insecurities,

11   being nurturing in that way, teaching them to read and

12   write, provide them an education, those would not have

13   been expected in those relationships.

14        Q.   And in terms of, just making up a couple

15   examples off the top of my head.  Making sure the child

16   didn't get to the rat poison, making sure the child

17   didn't get too close to the burning hot forge that his

18   blacksmith master was using to make horseshoes or

19   whatever, there was nothing of that sort, correct?

20        A.   Certainly to the extent that the master was

21   benefitting from the labor of the child, having the

22   child, you know, injure themselves so severely that they

23   couldn't perform their work anymore would not have been

24   in the interest of the master.  Having the child misuse

25   the tools in a way that destroyed the tools, that would



1    not have been in the interest of the master.  But that

2    may not have been your question.  If your question was

3    whether there is some community authority going around

4    and knocking on doors checking for that, I would say no.

5         Q.   And even what you just said about making sure

6    that the master had an interest in making sure his

7    investment in the child didn't get -- didn't get

8    diminished, say, by having the child eat rat poison and

9    die, or burn his hand off with the poker or something

10   like that, you're phrasing it in terms of it's in the

11   master's interest to keep the child healthy so he can

12   continue to perform labor?

13        A.   It would certainly be in their interest.  That

14   doesn't mean that masters always acted in their -- in

15   their interest.  I mean, it's interesting, it's one of

16   the arguments that would have made about the -- that, you

17   know, slavery is not so bad because the masters have an

18   interest in caring for their slaves, but the relationship

19   is still exploitive and entirely an economic one with

20   tendencies towards exploitation.

21        Q.   And talking -- you mentioned about you didn't --

22   you weren't including it in your, what you were writing

23   about in the report, but you mentioned it a little bit

24   earlier about little black boys that are black children

25   that would be -- if they were indigent wound up actually



 1  in a situation that either was slavery or resembled it,

 2  right?

 3       A.   This is going to depend on the part of the

 4  country -- I mean, in the parts of the country where

 5  slavery was less common, black children might have been

 6  also indentured, right, but they could also have been

 7  enslaved.

 8       Q.   Okay.  And in those parts of the country where

 9  they were enslaved -- if everything I've seen or read

10  about slavery is correct, and I didn't subscribe to the,

11  Oh, but they were well cared for point of view -- if the

12  master decided that he felt like beating those children

13  or killing those children like any other slave, I

14  suppose, might not be in his economic interest, right,

15  because that's his property, but nothing was stopping him

16  from doing it.  Is that also true of these little black

17  children that you're describing?

18       MS. DURKIN:  I'll just object to form and scope.

19            But go ahead, Catherine.

20  BY THE WITNESS:

21       A.   Yeah, I might losing track of the question.  I

22  need a little more, like, geographic specificity and

23  maybe time specificity to fully understood your question.

24       Q.   Okay.  You referenced that in certain -- It

25  seems like you're saying that in certain parts of the



 1   country little black indigent children were put in a
 2   situation either that was slavery or akin to slavery.
 3        A.   Yes, that could happen, yes.
 4        Q.   And when that --
 5        A.   If you're talking about the eighteen century,
 6   yes?
 7        Q.   I think so, yeah.  We're still on this among
 8   the earliest methods of providing.
 9        A.   I just wanted to be sure.
10        Q.   Okay.  And what I'm asking is, were those
11   little black children, and I understand -- Strike that.
12            Were those little black children treated like
13   slaves were treated then?  If the master wanted to beat
14   them or kill them or sell them to someone else, nothing
15   was stopping the master from doing that.  Is that how it
16   worked with these children as well?
17        A.   I mean, if they were killed by their master,
18   there could certainly be legal consequences for that.
19        Q.   Why?  What would separate that from any other
20   salve that the master owned?
21        MS. DURKIN:  Object to form and scope.
22   BY THE WITNESS:
23        A.   Yeah.  I was not asked to -- I realize I'm the
24   person who brought up slavery as an analogy.
25        Q.   Right.



1    A.    But my report is not about slavery.  I

2  mentioned it as another labor system at the time, so ...

3    Q.    I'm asking because little black children go

4  into foster care nowadays, so I'm curious -- you know,

5  there were references in the report and we're talking now

6  how little black children who were indigent and had to go

7  into some sort of non-living at home with their parent

8  care were treated.  And so the extent that you're saying

9  they were sometimes treated differently, I'm just trying

10  to explore that a little more.

11    A.    Yeah.  I guess -- I guess where I'm -- This is

12  just going to really -- This is going to really vary

13  depending on the part of the country that you're -- that

14  you're talking about.  But indentured servants, whatever

15  their race, were indentured servants; and it was a labor

16  system that could be quite exploitive regardless of who

17  those children were.

18    Q.    Okay.  And as you're talking about it -- I'm

19  asking, slavery would have been worse, or the two,

20  indenture and slavery actually resembled each other?

21    A.    Indenture had a time limit, so that's an

22  absolute -- to me a very significant difference.

23    Q.    Other than that, in terms of the day-to-day

24  lives, pretty much the same?

25    A.    I guess I can't speak to that, the day-to-day.



1        Q.    Okay.   Okay.   You're not suggesting that they

2    would have actually been better off as slaves, if for no

3    other reason, that an indenture had an end point?

4        A.    No, absolutely not.

5        Q.    In fact, we talk of -- We -- You reference this

6    racial divide, or at least national-origin divide right

7    there next in the report.   You say "Around half of white

8    migrants to the colonies" -- I mean, they wouldn't have

9    been -- If they were in their 20s, they really wouldn't

10   be relevant to this discussion anyway, but if they were

11   teenagers, they were indentured, and white American-born

12   children who were impoverished, orphaned, illegitimate,

13   or just in need of a livelihood, it says, were commonly

14   apprenticed to learn a trade.

15            So I'm using, I guess, the extreme example of

16   black kids and slavery and whatnot, but I don't even have

17   to look that far.   If you were American-born, you got to

18   be an apprentice.   If you were a migrant, you were

19   indentured.   Is that --

20       A.    No.   Sorry.   I'll let you finish your question.

21   Sorry.

22       Q.    No, I can put a question mark on it right

23   there.

24       A.    Okay.   You have both of these systems,

25   apprenticeship and indenture that are widely practiced as



1  labor systems in the colonial period.  As I said before,

2  apprentice leans more towards you're going to teach the

3  person a trade.  Indenture leans more towards it is just

4  kind of a physical labor, hard labor kind of situation.

5       In the colonial period young people of all

6  backgrounds, whether they were born in the colonies or

7  not, often ended up in those kinds of labor situations.

8  What happens over the course of the eighteenth century is

9  that indenture becomes -- indenture really fades out as a

10 system that is used by more affluent people, and

11 indenture becomes something that is exclusively for poor

12 children and poor families over the course of time.  That

13 is a change that is happening over the eighteen century

14 and around the time of the war.

15      Q.   Okay.  I don't understand then these two

16 sentences then in the middle, that sounds different from

17 what you're saying.  "Around half of white migrants to

18 the colonies (most of them who were teenagers or in their

19 twenties) were indentured.  Meanwhile, again in keeping

20 with English practice white American-born children who

21 were impoverished, orphaned, illegitimate, or in need of

22 a livelihood were commonly apprenticed to learn a trade."

23 And the word -- I guess what's throwing me, so this is my

24 question, is that word impoverished in the middle.  It

25 sounds like the poor children you were just referring to



1  as being indentured.  So, I'm sorry, can you explain to

2  me these two sentences a little bit more?

3       A.   So some of those -- some impoverished children

4  might have had the opportunity to be apprenticed.  More

5  of them are going to be indentured.  I think one of the

6  things that's confusing here is that those two words are

7  really -- they can be used -- they are often used

8  interchangeably even though we can kind of line them up

9  and say they -- they theoretically have different

10 meanings.  People use the terms kind of interchangeably.

11      Q.   I'm sorry.  Just to clarify, Doctor, which two

12 words are you talking about?

13      A.   Apprentice and indenture.

14      Q.   Thank you.  Okay.  And I'm sorry, did I cut you

15 off?  Were you still answering?

16      A.   No, that's fine.

17      MR. SIGALE:  Okay.  If you could go to the next

18 page.

19 BY MR. SIGALE:

20      Q.   First full paragraph.  So it says, "A child

21 could be bound out privately (by a guardian) or by a

22 court."  Who was the guardian you're referring to?

23      A.   It could be a parent, it could be a relative.

24 You know, if the parents had died, it could be a sibling,

25 an uncle.



1      Q.   Okay.  So you mean like a -- I understand.

2  Thank you.  Strike that.

3          And are you referring -- When you say bound

4  out, are you referring to indenture right there?

5      A.   Yes.

6      Q.   Okay.  And the guardian would indenture the

7  child, and it says the contracts would spell out the term

8  and type of service, the training and education the child

9  should receive, and any benefits to be conferred at the

10 end of the term such as giving the child tools or

11 training him or her perhaps, right, in a useful skill.

12 Actually, you know, when you're talking about hard labor,

13 I guess I'm just assuming boys, but is that accurate?

14     A.   It's not only boys.  No, it's not only boys.

15     Q.   So girls got indentured out for labor as well?

16     A.   Absolutely, as servants which -- Yeah.

17     Q.   Okay.  So while -- So while boys might have to

18 work in the yard and bale hay or whatever, girls would be

19 house servants or maids or whatever?

20     A.   They -- They might be doing -- Yeah, the

21 household -- The household -- I mean household labor in

22 this period, there's very strong understandings of what

23 kind of labor is done by men and boys, what kind of labor

24 is done by women and girls.  So for girls that would be

25 things you might think of like spinning, things related



1  to producing food, but also caring for domesticated

2  animals like cows.

3      Q.   Okay.

4      A.   And probably occasional field work as well, but

5  maybe the main tasks would be around the household.

6      Q.   Understood.  But while the type of labor might

7  differ, the fact is girls were -- in this time period

8  girls were indentured or apprenticed under the same

9  terms, let's say, that you've been describing for boys?

10     A.   Yes.

11     Q.   Okay.  So back to this second sentence there of

12 this first full paragraph where it said "binding out

13 arrangements involved contracts that spelled out the term

14 and type of service, the training and education the child

15 should receive, and any benefits to be conferred."  Was

16 there typically anything in the contract regarding

17 responsibility for the welfare of the child?

18     A.   Was there anything in the contract about the

19 welfare of the child?  I mean, again, they were to

20 provide basic housing, clothing, and food.  As you can

21 see -- If you read a little farther down in that

22 paragraph, it talks a little bit about how those --

23 those -- despite those contracts, those relationships

24 could still be quite exploitive, if you read below the

25 complaint from the indentured servant complaining about



1  the inadequate food that she was receiving.  So while her

2  master was required to feed her, it was pretty minimal,

3  at least in the case that she's describing.

4      Q.   This is the -- later in the paragraph about the

5  girl who was tied up and whipped and given only corn and

6  salt to eat?

7      A.   Yep.

8      Q.   Okay.  These binding out -- I'm sorry.  Going

9  back up to the beginning of this paragraph.  The

10 contracts that you're referring to for indentured

11 servants.

12     A.   Mm-hmm -- Yes.

13     Q.   Were these just whatever the -- Strike that.

14          It says that the -- The first sentence says, "A

15 child could be bound out privately (by a guardian) or by

16 a court."  Was there a difference in terms of what it

17 meant for the child?

18     A.   In terms of --

19     Q.   I didn't finish the sentence because I haven't

20 figured out to phrase it.  I'm sorry.

21          In terms of what that life was going to be like

22 for the child, was there any difference if the child was

23 bound out by the guardian or the court?

24     A.   So again I think this is going to depend a lot

25 on the situation.  A guardian might be binding out a

1   relative to someone that they know.  And so maybe there

2   is a little bit more about a connection there that might

3   in some cases make a difference.  But I think these

4   arrangements, they're just going to really differ from

5   arrangement to arrangement, how children are treated and

6   what their work is like, and what their provision is.

7        Q.   So there were no legal standards.  It was just

8   whatever the guardian and the master agreed to?

9        A.   I mean, there were general expectations of what

10  would be in a contract like that.  But -- But -- I mean,

11  there would be something in there about when the contract

12  is over, but it wasn't hard and fast that all contracts

13  ended at the same point, if you understand what I mean.

14  Like there might be some general types of things that

15  would be in the contract, but the details could be

16  different.

17       Q.   Well, that's, I guess, what I'm trying to get

18  at.  And leaving apart the spelling out the term, because

19  that's -- I mean, I get that, but in terms of the rest of

20  it, when you say that the contract might have some of the

21  details, are these the things that are referenced in this

22  sentence, this second sentence of this paragraph,

23  determine type of service, training and education, any

24  benefits to be conferred?

25       A.   Yeah.  Those would be the kinds of things that



1  might appear on those contracts.

2       Q.   Okay.  So what I'm not seeing, and what I'm

3  asking you about is, did these types of contracts have

4  any kind of conditions of how the master otherwise was to

5  treat the child?

6       A.   Beyond those terms, no.

7       Q.   Okay.  And is your answer for that the same

8  regardless of whether the binding is done by the guardian

9  or by a court?

10       A.   It's going to be similar.  Again, similar --

11  similar terms.  And I -- I have to be vague about that

12  because these are just not all going to look the same.

13  There's always going to be differences.  But in general

14  binding out was a labor system through which an indigent

15  child that needed to be supported to adulthood would work

16  for that care.

17       Q.   Okay.  In fact, you probably can't see my

18  cursor, but you have in the middle of the page this

19  footnote 4, you see it?

20       A.   Mm-hmm.  I think --

21       Q.   And then the next --

22       MR. SIGALE:  Don't -- don't -- I wasn't trying to

23  read the footnote.

24       MS. DURKIN:  Okay.  My apologies.

25       MR. SIGALE:  I was just using it as a landmark.



1    BY MR. SIGALE:

2        Q.    The next sentence says, "In the eighteen

3    century, local "overseers of the poor" who were tasked

4    with distributing poor relief had the power to bind out

5    children from poor families instead of supplying relief,

6    and "they did so regularly."  So they had these

7    overseers, we'll get more into detail about that in a

8    second, and their job is to give the poor -- what's

9    relief?  Like food?

10       A.    Yeah.  Relief would be, yeah, food, other kinds

11   of, you know -- Relief is a general term.  It can involve

12   money, it can up involve food; but the just sort of basic

13   charity -- we might think of a as charity, basic relief

14   to the poor.

15       Q.    And so they had the option instead of giving

16   that relief to just make the children from those families

17   indentured servants?

18       A.    Yeah.

19       Q.    And they did so regularly, that is what you

20   wrote?

21       A.    Yes.

22       Q.    Add this was -- Again forgive me if I'm asking

23   the same question, but I feel like I'm asking it

24   different.  This was supposed to be for the benefit of

25   the child, or the benefit of the person that they were



1   binding the child to?

2       A.   So, you mean when the overseers of the poor are

3   binding out the child?

4       Q.   Yeah.

5       A.   So the overseer of the poor is fulfilling his

6   duty to provide relief to the poor.  So you've got -- Say

7   the poor family, the widow and her six children, and the

8   overseer of the poor is meant to provide relief to that

9   family; and so maybe some relief in the form of food or

10  something else is being provided to the family, but the

11  children that are of an age where they can be really good

12  laborers, we can bind them out to someone else.  And that

13  will substitute for -- that the provision that will be --

14  the provision that the child will have as an indentured

15  servant, a place to sleep at night, food, minimal

16  clothing, the master is providing that instead of the

17  overseer of the poor, and the master is getting the labor

18  of the child in exchange.  So it's -- One could describe

19  it as intended to be a mutually beneficial relationship,

20  right, if you take out all of the exploitation and the

21  power relations from it, the child is given a home, the

22  master is given a servant --

23      Q.   Okay.

24      A.   -- for a period of time.

25      Q.   And who were these overseers of the poor?



1        A.    They would be local community members who were

2    appointed to that role.

3        Q.    That's what I'm asking.  By whom?

4        A.    I don't -- I don't know exactly.

5        Q.    Okay.

6        MR. SIGALE:  If you could go to page 5, Abigail.

7        MS. DURKIN:  Sure.

8        MR. SIGALE:  I'm also going to just point out real

9    quick, it's been -- We have been going 90 minutes, I'm

10   having fun, but if -- I'm just pointing that out for

11   anyone in case anyone needs to use the bathroom or take a

12   break, whatever, so just --

13       MS. HELFRICH:  Can we just have five minutes?

14       MR. SIGALE:  Yeah.  Okay.  Let's go off the record

15   for five minutes.  It's 11:31, and we'll come back on at

16   11:36.

17       MS. HELFRICH:  All right.  Thank you.

18       MR. SIGALE:  I'm going to stop my video, and

19   hopefully I'll come back on.

20                      (A short break was had.)

21       MS. DURKIN:  Are we back on the record, Rocio?

22       MR. SIGALE:  I don't think so.

23       COURT REPORTER:  Yes.

24       MS. DURKIN:  Okay.  David, I just wanted to clarify

25   one thing.  We also met with Dr. Rymph last Friday, so if



1  you'd like to ask Dr. Rymph about that, you're welcome

2  to.  I believe her testimony was assuming this week, but

3  we also met last Friday.  I just wanted to clarify that.

4  Again, if you want to question her about that, you're

5  welcome to.

6       MR. SIGALE:  Okay.  Thanks.  I'll just --

7  BY MR. SIGALE:

8       Q.  Dr. Rymph, when you were talking about you met

9  with counsel for the State in this case for about three

10 hours, does that include last Friday?

11      A.  Oh, no, sorry.  It includes only our meeting

12 this week.  So yes, it was additional time on Friday.

13      COURT REPORTER:  I'm sorry.  Do you know how long

14 the whole deposition is going to go so that I can let

15 scheduling know?  Just an idea.

16      MR. SIGALE:  Yeah.  Give me a minute.  I don't want

17 to overpromise and under deliver.

18      COURT REPORTER:  Yeah.

19      MR. SIGALE:  If we're taking a break I would say

20 2:00/2:30.

21      COURT REPORTER:  Thank you.  I'm ready.

22 BY MR. SIGALE:

23      Q.  So we're in the middle of page 5 of the report.

24 Again, just using it as a landmark, there's that Footnote

25 No. 8 in the middle.  Do you see that, Dr. Rymph?



1      A.   Yes.

2      Q.   Okay.  The next sentence after that footnote

3    says that "poverty was the most significant reason why a

4    child would be bound out by a court in colonial America."

5    So it had nothing -- it wasn't -- I guess going up to the

6    sentence right before that, this was -- this whole

7    indentured/apprentice system that was what was used in

8    the colonial era wasn't about the children being abused,

9    correct?

10     A.   Correct.  It was a labor system, and that was

11   used to address the problem of -- of poverty.

12     Q.   And moving down, again, that sentence after

13   Footnote 8, courts could remove children from their home

14   and bind them out if the parents were idle, if the

15   child -- children were disobedient, or if they were not

16   being taught a useful trade.  So this had nothing to do

17   with whether or not the children in their home were at

18   least by modern standards well cared for or loved or

19   anything, it was about whether or not they were useful;

20   is that right?

21     A.   I think useful is actually a really good word,

22   and it's a word that other historians have used to

23   describe understandings of children in this period.  It

24   doesn't mean that parents didn't love their children, but

25   that their usefulness was a chief way in which they were



1    understood.

2        Q.    And this seems to track with what we were

3    talking about on the previous page with these overseers

4    where you wrote that they could instead of giving relief,

5    bind them out as indentured servants, but really it seems

6    like the mentality back then was that that was a form of

7    relief.

8        A.    Yeah.  Yes.  I would agree with that.

9        Q.    And when you write here kind of towards the

10   bottom of what we can see on the screen on page 5, "the

11   heart of the matter was the need for children to become

12   self-sufficient workers who would not become a drain on

13   the community due to their poverty."  And when you say

14   the heart of the matter, you mean like the goal of this

15   whole system?

16       A.    Yes.

17       COURT REPORTER:  I'm sorry, Abigail, did you object?

18       MS. DURKIN:  I said object to form.

19       COURT REPORTER:  Thank you.

20   BY MR. SIGALE:

21       Q.    And when you say --

22       MR. SIGALE:  Just keep the screen where it is, the

23   bottom lines of it, I'm afraid I don't --

24   BY MR. SIGALE:

25       Q.    My apologies to Mr. Hacsi -- or Professor Hacsi



1    who noted, "the "standards of care by which today's

2    foster children are deemed neglected, quote marks, would

3    have seemed "very strange" to colonial parents?"

4              What -- What standards of care are you -- Let's

5    start with the first in-quotes phrase in this sentence,

6    what standards of care are you referring to?

7         A.   Well, Tim Hacsi would be referring to the

8    standards of care, you know, at the time in which he

9    wrote that essay which I believe is in the late 1990s,

10   but I don't have the date in front of me unless you

11   scroll down; but we can think of that as a modern

12   understanding of care and the reasons why children are

13   deemed neglected and put into foster care in a more

14   modern period as we're living in now.

15        Q.   So as you sit here the phrase in quote marks,

16   deemed neglected, do you have any examples of that?

17        A.   So examples of where -- of understandings --

18   like modern -- today's understandings of neglect that

19   would have seemed strange to colonial parents, is that

20   what you're asking?

21        Q.   It is.

22        A.   Yeah.  So keeping your kids out of school, not

23   sending your kids to school.  I think you gave an example

24   earlier -- a hypothetical about say a child who is using

25   some dangerous blacksmithing equipment, maybe, you know,



1  unsupervised in ways that they could harm themselves, say

2  an infant being cared for -- being left alone and cared

3  for by a child who is maybe only 4 or 5 years old, things

4  like that that would today look to us like, Oh, my

5  goodness, this child is not being properly cared for,

6  they're being neglected, we need some kind of

7  intervention there.  Tim Hacsi's point is that those

8  kinds of things -- that those would have seemed very

9  strange as colonial era Americans would not have seen

10  those as problematic or warranting some kind of

11  intervention.

12       Q.   I did one of the, you know, quick search, you

13  know, functions on the -- I was reading the report, and

14  the word firearm appears in this report zero times, and

15  the word gun appears once in your CV about your review of

16  that book that we were talking about earlier.  Is it fair

17  to say with regard to this colonial and

18  revolutionary-period kids being -- being indentured out,

19  being apprenticed out that you have no opinions or --

20  well, let me leave it as that.  You have no opinions

21  regarding this labor system that we've been talking about

22  and how firearms have any impact on that whatsoever, is

23  that fair?

24       MS. DURKIN:  Object to form.

25  BY TH WITNESS:



1       A.    If you're asking what do I know about firearms

2   in this period, that's not in the scope of my report, I

3   don't -- it's not something that has come up in the

4   literature that I have read.

5       Q.    So you are not offering any facts regarding

6   firearms in the colonial period as they pertain to this

7   child welfare system?

8       A.    Correct.  I am not offering any opinions about

9   the firearms.

10      Q.    Well, not -- Thank you.  That was going to be

11  my next question, but this question was, you're not

12  offering any facts?

13      A.    No, right.  I'm sorry.  Yes, there are no facts

14  about firearms, yes.

15      Q.    Okay.  On page 6.

16      MR. SIGALE:  6.  Perfect.  Okay.

17  BY MR. SIGALE:

18      Q.    So when you say -- You know, the thing is,

19  Doctor, you actually wrote a really good report.  You

20  wrote a very clear report, so I'm going to ask a question

21  about this, but you answer it in the next sentence.  So

22  you write the child -- "after the American Revolutionary

23  War, childhood "for the first time in American history,

24  became the object of political discourse."  And I was

25  going to ask, Well, what do you mean by that?  But you



 1   move it -- you answer it in the next sentence.  "The
 2   belief that the survival of the Republic" -- this new
 3   Republic, right?  "necessitated that the civic values of
 4   the founding be transmitted to the next generation meant
 5   that post-Revolutionary generations adopted more
 6   intensive parenting and greater emphasis on education."
 7   As you sit here, is that what you were refer- -- is that
 8   had a you meant by childhood becoming political
 9   discourse, or were you referring also or instead to
10   something else?
11        A.   I'm referring specifically to the role that the
12   revolution played in creating new understandings of
13   childhood as a separate period of time in the life span
14   that led to different ideas about parenting.  It's a
15   development that starts with a small group of elites in
16   this period, and then it doesn't -- but then becomes more
17   widespread across the whole country not really until the
18   1930s, but this is the beginning of that development of
19   new understandings of childhood.
20        Q.   I'm sorry.  I know that you said it started
21   with some of elites, but what started it?
22        A.   Yeah.  So if you -- If you think about people
23   who, you know, we sometimes we refer to as the founding
24   fathers, the founding generation, who are economic and
25   political elites who are very invested in the political



1    philosophy of the revolution and of the new republic,

2    they're very committed to this new political experiment

3    that they are helping to lead.  And the great fear is

4    that this experiment in republican government will

5    disappear with the health of the founding generation

6    because they are the people who are committed to these

7    ideas.  So it leads to this new understanding about

8    childhood, that if we're going to -- that if we're going

9    to -- if this political project and this political

10   experiment is going to be successful and last beyond the

11   founding generation, then we have to, as a generation,

12   instill those values and ideals in the next generation.

13   So for that small group of elites, there's this

14   beginnings of this commitment to educating young people

15   and educating women so that they can educate young

16   people.

17        Q.   But it moves on, you say, "the war also led to

18   poverty and displacement of widows and their children"

19   because a lot of men went to war and a lot of men died in

20   the revolution leaving a lot of widows and children and

21   orphans behind.

22        A.   Correct.

23        Q.   So you say in the middle of this page 6, "who

24   often had to turn to poor relief and indenture."  Now we

25   know what is indenture, but you said a page or two before



1  that poor relief -- one of the forms of poor relief was

2  indenture.  Is that the same here?

3      A.    Indenture is a form of poor relief.  Other

4  kinds of poor relief would have been, as you described

5  before, donations of food and other kinds of sustenance,

6  and then what will start to emerge in this period as a

7  response to this large number of indigent people is the

8  creation of almshouses and workhouses where the poor can

9  actually -- what was called indoor relief where the poor

10 would actually go and live in those institutions as

11 another form of poor relief.

12     Q.    Okay.  And then it says at the bottom of that

13 paragraph that the almshouses themselves could bind the

14 children out for purposes of learning a trade.

15     A.    Yes.

16     Q.    And going back to what Professor Hacsi said on

17 the first page about -- or the last page about things --

18 modern mentality seeming very foreign to back then,

19 again, where we talk -- where it seems to us about

20 selling children practically into slavery, this is --

21 well, the children -- It's the labor system we've been

22 talking about up until now, correct?

23     A.    Yes.

24     Q.    The masters need labor, and the kids need to

25 learn a skill and they need somewhere to sleep and



 1  someone to feed them?

 2      A.   Yep.

 3      Q.   Okay.  And the same thing, before I move on,

 4  you say "In 1824, New York passed legislation" about kids

 5  begging in the street would go to almshouses and they

 6  could be bound out.  So into -- a quarter of the way

 7  through the nineteenth century this is still the

 8  mentality?

 9      A.   Yes.

10      Q.   Okay.  On page 7 you were talking about the

11  elites, but -- and the start with picking up in the

12  middle of the sentence here, "small minority of children

13  grew up under these newer understandings."  That's the

14  whole elites with the education and passing the ideals on

15  to the next generation, right?

16      A.   Yes.  I don't actually see exactly where you

17  are, but --

18      Q.   Top line.

19      A.   It's the very top line, yes.  Yes, got it.

20      Q.   But then we move on to the next one.  "Enslaved

21  children, of course, were viewed as property.  But also

22  in white rural families, immigrant families, and among

23  the urban poor, older ideas of children as a source of

24  household labor or income persisted for decades."  I read

25  that correctly?



1       A.   Yes.

2       Q.   And that ties in with what I just asked you,

3   that a quarter of a century into -- I'm sorry.  A quarter

4   into the nineteenth century, New York is still passing

5   laws about putting kids -- street kids into almshouses to

6   bind them out?

7       A.   Yes.  Was there a question that I missed?

8       Q.   No, I just put a question mark at the end of

9   that sentence, yeah.

10       All right.  So let's scoot down a little bit to

11   this Subsection B, and you write, "In the eighteenth

12   century, poor dependent children" -- sorry -- "poor and

13   dependent children had been absorbed into rural and urban

14   households as indentured servants, farm workers, or

15   apprentices.  By the early nineteenth century, however,

16   households could no longer take in all children in need.

17   Local communities began placing poor children in

18   almshouses (also known as "poor houses")," so they were

19   the same thing?

20       A.   They're pretty much the same thing.  There's a

21   little bit of a distinction between what is kind of a

22   publically founded workhouse versus a privately funded

23   almshouse, but they're definitely in the same universe.

24       Q.   Okay.  "Indenture continued to be the most

25   common way of supporting dependent children," yes?



1      A.    Yes.

2      Q.    And then again going back to that 1824,

3  whatever, New York with the almshouses you write here,

4  indenture was the preferred solution for the care of

5  independent children through the 1830s, yes?

6      A.    Yes.

7      Q.    Now in terms of now --

8      A.    Sorry.  Sorry.  If I can clarify there.  The

9  point of that system is actually the contrast with the

10  first part of the sentence, that as I was talking about

11  these new ideas of childhood as a separate stage of life

12  where children are to be protected, that is this new idea

13  that's developing among more affluent people, but it's

14  not developing among all people, and that's the contrast

15  that's set up in that sentence that you just read the

16  second half of.

17      Q.    Okay.

18      A.    Of the role of indenture.

19      Q.    Leaving aside the affluent to/or taking this

20  new enlightened way of thinking about children, for all

21  the others who were still using indenture as the

22  preferred solution, by the time of the 1830s, was the --

23  was there anything different about the indenture, be it

24  the conditions, the term lengths?  Was there anything

25  that hadn't changed about that, or was indenture in the,



```
 1   let's say, 1820s pretty much the same as indenture in the

 2   colonial era?

 3        A.   It's going to be generally similar.  I would

 4   add the caveat that types of labor that people would --

 5   had been doing may have a changed because the economy is

 6   changing, if you understand what I mean.  There will be

 7   new kinds of tasks that perhaps didn't exist 100 years

 8   earlier.

 9        Q.   Okay.  Okay.  Basically still manual labor for

10   boys and house labor for girls?

11        A.   Yes.

12        Q.   Going to page 8 towards the bottom third.  On

13   your screen, not counting that half line, 1 2, 3, 4, 5,

14   6 -- I'm sorry.  We're on 1, 2, 3, 4, 5, 7th line down

15   that starts "By the 1880s."

16        A.   Got it.

17        Q.   "By the 1880s, there were over 600 orphanages

18   serving tens of thousands of children in the United

19   States."  It says that most children even had living

20   parents, they were just -- either -- they were

21   basically -- they couldn't feed -- it was poverty, they

22   couldn't feed all the children, so someone had to -- one

23   or more, I guess, of the kids had to go into an

24   orphanage?

25        A.   Yes.
```



1      Q.    By the 1880 then, is it fair to say that the

2   orphanages now are the predominant means of caring for

3   indigent children?

4      A.    By the late nineteenth century, the 1880s as

5   you say, orphanages have obviously expanded considerably.

6   You read that sentence.   Indenture has not gone away.

7   And as I detail in subsequent sections of the report,

8   orphanages will be placing children on farms to work for

9   their support and to this placing out system, which they

10  are not indentured arrangements, but they have a lot of

11  things in common with them, particularly the notion that

12  children pay for their own care through their own labor.

13  So indenture hasn't gone away yet, but it's falling out

14  of favor, in favor of orphanages.

15     Q.    Well, I'm sorry, now I'm a little confused.   If

16  the orphanages -- If the kids are in orphanages and

17  they're still being sent out to farms to work to pay for

18  their keep, which sounds an awful lot like the

19  indentured, what exactly did they do at the -- When you

20  write, "By the 1880s, there were over 600 orphanages

21  serving tens of thousands of children," how were they

22  serving them other than finding them farms to go house

23  play indentured servant at?

24     A.    So it's about the age.   So young children are

25  going to be in the institution, younger children will be



1   in the institution, older children will be, you know,

2   farmed out as they would say, but not until they're older

3   usually.

4        Q.   The orphanages -- I'm sorry, maybe it's like a

5   paragraph up on the screen or something, but --

6        MS. DURKIN:  Do you want me to move it?

7        MR. SIGALE:  No, it's fine.  I'm sure Dr. Rymph will

8   just be able to answer it.

9   BY MR. SIGALE:

10       Q.   The orphanages, were they government run,

11  private run, private run but government oversight, what

12  was it?

13       A.   So it's all of that.  Initially the early

14  orphanages were private, they were often sectarian, you

15  know, associated with a particular religious faith.  The

16  public orphanages really emerged in the later nineteenth

17  century, and it's partly because some states are banning

18  the placement of children in poorhouses with other

19  adults.  And so if you're going to foreclose that option

20  of putting children in the public poorhouses, then the

21  State will feel like it needs to provide some other

22  publically funded means of housing those children.  So

23  the States do get involved later in the century.

24       Q.   Later in the century, is that --

25       A.   Later in the nineteenth century, yeah.



1       Q.    I'm sorry.  I didn't hear what you said.

2       A.    Later in the nineteenth century, but I didn't

3  let you finish your question, so that might not have been

4  what you were asking.  I apologize.

5       Q.    That's fine.  I was going to ask is this by the

6  1880s reference you were making?

7       A.    Right.  Yes, yes.

8       Q.    What's the difference between the orphanages

9  that are being referenced here and the almshouses that

10  they -- these orphanages apparently succeed in?

11      A.    The almshouses didn't have age restrictions.

12  Orphanages were only for children, and almshouses were

13  for adults or families, there was no segregation of ages.

14      Q.    I see.  Again, it appears that this orphanage

15  situation didn't have anything to do with whether or not

16  the child was otherwise cared for or loved or anything,

17  it was simply an economic -- it was an economic thing; is

18  that right?

19      A.    It's an economic thing to the extent that it's

20  used as a safety net for poor families, right?  They'll

21  place their children there maybe for -- with the

22  intention of placing them for a short period of time

23  until the family is able to bring the children, you know,

24  back home again.  It is a kind of economic safety net for

25  poor families.  In that sense it is an economic



1    institution.

2         Q.    But it wasn't about like neglect or abuse, the

3    way that we would think about it today.

4         A.    Yeah.  Correct.  Correct.

5         Q.    And you write about that at the very bottom of

6    page 8 when you write, "When government officials,

7    courts, or charities brought a child to an orphanage it

8    was often as a middleman, connecting the parents to the

9    orphanage, rather than as "independent actors seeking to

10   remove children from their parents."

11        A.    Correct.

12        Q.    I read that right?

13        A.    Correct.

14        Q.    So I'll obviously leave it at that.

15              Okay.  And then the next thing of note I wanted

16   to ask you about was on page 10 where it looks like -- So

17   the bottom of page 9, I'm sorry, you're talking about

18   some nineteenth century reformers who said -- who saw

19   orphanages as no better than -- for children than adult

20   institutions because they were still institutions, and

21   then you list some of the bad things that they found

22   about them, right?  You see that at the bottom of

23   page 9?

24        A.    Yes.

25        Q.    Okay.  Who are these nineteenth century



1  reformers that you're referring to?

2      A.   Yeah.  These would be middle class reformers,

3  both men and women, who might have identified themselves

4  as child savers.  They have -- They're reformers who have

5  a particular interest in children.

6      Q.   Okay.  Was this like a religious thing, or some

7  sort of government, some sort of political -- What's the

8  word I'm looking for?  I'm sorry.  Platform?  Who was it

9  generally?

10      A.   So they tend to be urban educated native-born

11  part of the new middle class who -- you know, this is --

12  and they are not -- although they are -- they're likely

13  religious themselves in that they are members of a church

14  and their religious values animate their reform, they're

15  not necessarily reforms that are connected to a

16  particular church.  And they're not part of the

17  government, although some of them will be like moving

18  towards -- local and state government should take more

19  responsibility for these problems that right now only

20  private philanthropy is taking care of.  When I say right

21  now, this is sort of an evolution that is happening in

22  the late nineteenth or early twentieth century in a

23  period that historians sometimes refer to as the era of

24  progressive reform, the progressive movement, when

25  there's kind of outpouring of reform movement of all



```
 1   kinds and child welfare reformers are just one subset of
 2   a larger reform movement of the period.
 3        Q.   Okay.  And I'm sorry.  You're saying this is
 4   like the late nineteenth century?
 5        A.   Late nineteenth, yeah.
 6        Q.   Okay.
 7        A.   In what I just said there.  I mean, the concern
 8   about orphanages starts earlier than that.
 9        Q.   When you say earlier than that, when are you
10   talking about?
11        A.   1850s.
12        Q.   Okay.  And then you write about how, quote,
13   unquote, placing out becomes the -- develops what -- as a
14   reaction to people who didn't think orphanages were good?
15        A.   Yes.
16        Q.   Okay.  So placing out is what -- You describe
17   it, rather than read from the report.
18        A.   Okay.
19        Q.   What is placing out?
20        A.   So placing out is placement of children in a
21   rural household, typically a farm household, where they
22   will perform household labor as part of the household.
23   And as we've already discussed, orphanages did develop
24   these placing out programs themselves for some of the
25   older children that were in their care, but there was
```



```
 1   also a placing out movement that developed in reaction to

 2   orphanages that said children should never be in

 3   orphanages to begin with, they should be placed into farm

 4   families from the beginning.

 5        Q.   Okay.  And you write here about -- I'm sorry.

 6   Here is the last full paragraph on page 10 where placing

 7   out is known as free placement, or also known as free

 8   placement because it wasn't -- there wasn't an indenture

 9   contract, and the family didn't get any money from anyone

10   to board the child, right?

11        A.   Right.

12        Q.   And then you write that it's -- And this,

13   correct me if I'm wrong, this placing out the way you

14   write it in this last paragraph on page 10 seems a lot

15   like the apprentice situation where they go there and

16   they work, and in turn they're fed and given a place to

17   sleep, and -- Well, am I right, or no?

18        A.   Well, Megan Birk, who's a historian who has

19   studied farm placements in the Midwest very closely, I

20   think she puts it very well when she says that these

21   placing out was often more akin to indenture.  You know,

22   they were indenture relationships without a contract, so

23   that the child would be -- or the young person who be a

24   servant in the household.  The ideal, and why reformers

25   thought this was a better -- a better system than an
```



1   orphanage -- the ideal is that the young person would be

2   absorbed into the family sort of like a member of the

3   family and get the benefits of family life, which they

4   wouldn't get in the orphanage.  But the reality was often

5   that these young people were treated as servants and

6   laborers.

7        Q.   Okay.  And this -- this placing out was in the

8   second half of the nineteenth century.  Did it end in

9   1900, or did it continue on after that?

10       A.   It continues a little bit after that.  It's

11  pretty much over by the first world war, but it continues

12  just a little bit into the twentieth century.

13       Q.   Okay.  This farm system placing out

14  arrangement, did it come with anyone overseering this

15  farm family to make sure that they were treating the

16  orphan child well or taking good care of him or her, or

17  how -- that they were -- were there -- Strike that.  I'm

18  sorry.  Let me start over.

19            This placing out arrangement --

20       A.   If I can clarify something that I said before.

21       Q.   Yeah.  Of course.

22       A.   When you asked when placing out ends, it

23  actually goes a little bit longer than that.  When I

24  answered the question, I was thinking specifically about

25  the orphan trains, which are maybe the most famous form



1  of placing out, but that system of children being placed

2  in another home without any board being paid to that

3  family continues a little bit longer into the 1930s.

4        Q.    Okay.  And during all -- so for 80 years

5  basically there's this placing out system that's going

6  on?

7        A.    Yeah -- Yep.

8        Q.    And during that time of -- During this placing

9  out system, was there any government oversight of these

10  farm families to make sure they were properly providing

11  for the welfare of the child?

12        A.    Well, that's one of the biggest problems with

13  these.  The idea that this is a better system than

14  orphanages is that the families were typically not vetted

15  in any way, and there was very little follow up.  So

16  children might -- If you think about the orphan train

17  example, they're taken from urban areas in the Northeast

18  to the Midwest or even the West, the train stops at the

19  train platform, people from the area come and they choose

20  their orphan to take home with them.  Those families

21  weren't necessarily vetted ahead of time.  There wasn't a

22  lot of oversight.  Sometimes there was no oversight.  The

23  children often ran away because they were unhappy being

24  there, unhappy with how they were treated.  And so that's

25  an evolution that we start to see over the decades of the



 1  late nineteenth and into the early twentieth century, is

 2  the realization that there needs to be some oversight,

 3  and I discuss this in the report, trying to figure out

 4  how to do that.

 5      Q.   And that's what you refer to on the beginning

 6  of the next page where you write "There was initially

 7  very little oversight or even follow up of these

 8  placements"?

 9      A.   Right.

10      Q.   Then you go on to say, in other cases "placing

11  out" was more in common with indenture -- "indentures

12  without the paperwork."  So that's what you were talking

13  about earlier as well, yes?

14      A.   Yes.

15      Q.   Okay.

16      MS. DURKIN:  I don't want to cut you off, but if you

17  are -- and I'm not suggesting that you are, switching

18  subjects or switching time periods, I just know that it's

19  very close to 12:30, if you want to call it here or if

20  you want to continue.

21      THE WITNESS:  I'm not dying as I thought I would be.

22      MR. SIGALE:  Well, you tell me when you would like

23  to break.

24      THE WITNESS:  I'm good.  I can keep going.

25  BY MR. SIGALE:



1      Q.   Dr. Rymph, just a follow up on a question I

2   asked you beforehand.  You have no knowledge one way or

3   another whether or not these colonial people who were

4   taking on these indentured servants or apprentices, as

5   the case may be, possessed firearms, correct?

6      A.   I don't have any specific knowledge of that.

7      Q.   Other than there was basically a war going on,

8   right?

9      A.   So you're going back to the eighteenth century?

10  I just want to make sure that I'm following you.

11     Q.   Yeah.  Right.  Colonial days.

12     A.   Right.  I mean, other than my generalized

13  knowledge that, yes, there was a war going on and people

14  were armed because they were fighting a war, I don't have

15  specific knowledge of that with respect to indenture.

16     Q.   Okay.  And if I asked you the same question

17  regarding all these people on the farms that these orphan

18  trains were running to, whether or not those people had

19  firearms, you have no knowledge or opinion of that with

20  regard to the subject of indenture placing out, correct?

21     A.   Correct.

22     Q.   Okay.  So we were talking about the little --

23  what you wrote obviously.  "Initially very little

24  oversight or even follow up of these placements."  And

25  then we scoot down to the bottom of the page and you say,



 1   "Indeed, in the late nineteenth century older views

 2   persisted in working class, immigrant, and rural

 3   communities."  So even in the late nineteenth century, so

 4   what 1880s perhaps?

 5        A.   Yes.

 6        Q.   Is that what you're referring to?

 7        A.   Yes.

 8        Q.   There's still this divide in terms of what to

 9   do with all these poor children, between these upper

10   class or middle class elites, and as you write it here,

11   working class, immigrant, rural communities, is that fair

12   to say?

13        A.   Yes.  And I would just add a little additional

14   nuance to that.  This is not just about what to do with

15   dependent children from the working classes, immigrant

16   backgrounds, or rural communities, the expectation that

17   in tact working class families and immigrant families and

18   in rural households, the expectation was that children

19   would work, either work on the family farm or as it's

20   becoming increasingly common in this period, work for

21   wages and factories or mines.

22        Q.   Is this part of -- this divide that we're

23   talking about, I have heard, you know, a number of times

24   over the years that the mentality was that children were

25   just little adults.  Is that kind of the question that



 1   you're discussing here, the divide of thinking about

 2   these children?

 3        A.   Yes --

 4        MS. DURKIN:  Object to form.

 5             Go ahead, Catherine.

 6   BY THE WITNESS:

 7        A.   You know, this is a subject of great interest

 8   to many historians, is understanding the way that

 9   childhood has been understood over time and how a

10   definition of childhood -- what is childhood, how those

11   have changed over time.  And that idea of children as

12   just sort of short adults, if you want to think about it

13   in that way, is an older idea, certainly around the

14   eighteen century.  And one of the things that I've been

15   talking about today, and you have been asking about

16   today, and is in the report, is this history of the

17   beginnings of that new idea, that childhood is a

18   different stage of life.  They're not just little adults,

19   but childhood is a stage of life in and of itself where

20   the child is to be attended to as an individual who has

21   specific needs because they are a child, and that -- One

22   historian has described it as the transmission from the

23   understanding of the useful child, which is a term you

24   used earlier, the child is useful to the household

25   because they can work, that's where their value comes



1    from, to a growing idea over the course of this

2    nineteenth century that starts in middle classes and

3    isn't really fully filtered down to other classes until

4    the 1930s or so, the idea of the child as a useless

5    child, right?  That instead of being a source of income

6    for my family, is going to cost me a lot of money to

7    raise a child, but I want to raise a child because of the

8    kind of joy that that brings me, and the inherent worth

9    of the child.  So it's a transition that's happening over

10   many, many decades, and it happens first among these

11   urban middle classes and is not fully complete for really

12   all Americans until the 1930s.

13           That was a long answer.  I apologize.

14   BY MR. SIGALE:

15       Q.   No, not at all, I appreciate it.  So bottom of

16   page 12, last full paragraph -- I'm sorry.  The start of

17   the last paragraph there leads into the next page.  You

18   write, "When Midwestern states began experimenting with

19   public paid fostering in the later nineteenth century,

20   when in the later -- Sorry.  Strike that -- when are you

21   referring to in the later nineteenth century in that

22   sentence?

23       A.   1880s, 1890s.  Is that your question?

24       Q.   It is.  And --

25       A.   Go ahead.



1      Q.   No, I'm sorry.  Were you answering?

2      A.   No, I was just going to again reiterate the

3   point that these transmissions are not happening at the

4   same pace in all parts of the country; hence, the kind of

5   general term '80s and '90s.  But in some places it's

6   going to be a little bit earlier, in some places it's

7   going to be a little bit later.

8      Q.   Well, sure.  But you start the sentence by

9   talking about the midwestern states?

10     A.   Yep.

11     Q.   So what was it about the -- Sorry strike that.

12          Were the midwestern states the first to start

13  experimenting with public paid fostering?

14     A.   No, no.

15     Q.   Okay.  So who -- Where and when was the first

16  experimenting with public paid fostering?

17     A.   So I understand your question, and I don't

18  think I can give a satisfactory answer to it because the

19  most thorough account of this -- of the shift from free

20  placements to public paid fostering is this work by Megan

21  Birk in which she is looking at rural placements in the

22  Midwest, and that's what I'm referencing there.  I don't

23  know of anyone that's done as thorough a study of farm

24  placements as she has, and her work is concentrated on

25  the Midwestern farm states.



1    Q.    Okay.  So you don't know then if other regions

2    of the country began experimenting with public paid

3    fostering earlier than that?

4    A.    I could not say that for certain, no.

5    Q.    Okay.  So sticking with the Midwestern states,

6    are these the same Midwestern states that the orphan

7    trains were running to?

8    A.    So orphan trains ran to Midwestern states, they

9    also went farther west; and, of course, Midwest is a term

10   that no one really agrees on what it means.  But there

11   were orphan trains that went as far out as Arizona and

12   Colorado, you know, states that I think we can all agree

13   are Western; but they also went to Midwestern states,

14   which is typically closer to those urban areas that

15   they're sending children from.

16   Q.    Well, I mean, let's -- I was just using the

17   orphan train, but I understand that children were placed

18   out by other means other than this orphan train, right?

19   A.    Right.

20   Q.    Okay.  So maybe -- Let me be more general and

21   say are these the same Midwestern states, however that

22   term is defined, where placing out had been the system?

23   A.    Yes.

24   Q.    Okay.  And when you reference in the end of

25   that sentence -- "Lack of over-" -- I'm just referring to



 1   this clause right here.  "Lack of oversight in

 2   traditional free placements."  Free placements, if I

 3   recall from the earlier pages, that's a synonym for this

 4   placing out, right?

 5        A.   Yes.  And I don't see the part you're quoting,

 6   but that free placements and placing out are synonyms,

 7   yes.

 8        Q.   Bottom of page 12, two lines from the bottom.

 9        MS. DURKIN:  I apologize.  The Zoom kicked me out.

10   I apologize for that.

11        THE WITNESS:  So we briefly lost the screen share.

12        MS. DURKIN:  David, just for my sake, do you mind

13   repeating the question, or if the court reporter would?

14        MR. SIGALE:  Yeah.  I'll ask the court reporter, I

15   couldn't possibly repeat any of my questions.

16        MS. DURKIN:  Let me go ahead and share the screen.

17   Sorry, everybody.

18             Can you see it, Catherine, David?

19   BY MR. SIGALE:

20        Q.   Dr. Rymph, two lines from the bottom, "lack of

21   oversight in traditional free placements."  Free

22   placements is a synonym for this placing out, yes,

23   correct?

24        A.   Correct.

25        Q.   Okay.  So staying with this sentence here, so



1  are you able to define what you meant by midwestern

2  states in this sentence, or is it just what you said

3  before?

4      A.   It's -- It's -- The states that Megan Birk

5  studied, which I couldn't produce a list off the top of

6  my head of all of them, but it's Ohio, Illinois, Indiana,

7  that region of the country.

8      Q.   Okay.  So Illinois began experimenting with

9  public-paid fostering in the 1880s, 1890s?

10     A.   Around that time, yes.

11     Q.   Okay.  And then you write, "It was often

12 related to newer concerns about neglect, overwork, and

13 lack of oversight in traditional free placements."  So

14 this is -- you're referring to neglect and overwork of

15 the child, correct?

16     A.   Correct.

17     Q.   And lack of oversight, you're referring to how

18 the child is treated, correct?

19     A.   Correct.

20     Q.   Okay.  And you're saying that was a newer

21 concern also in the 1880s, 1890s?

22     A.   Yes.  Correct.

23     Q.   Okay.

24     MR. SIGALE:  Now I really was going to go, as

25 Abigail said, page 13.  Stop.  And now we're at



1   Section C.

2            So because I literally am at a new section and

3   a new era, thus the title of the section, would anyone --

4   Dr. Rymph, like to take that 10 minutes?  And this seems

5   like a logical spot to do it.  Is there anyone that wants

6   to?

7       MS. DURKIN:  Yeah.  Let's do it.

8       THE WITNESS:  10 minutes will be enough for me.  I

9   don't know what others need.

10      MR. SIGALE:  Is that good for all of you?

11      MS. DURKIN:  10 minutes is fine.  Sure.

12      MR. SIGALE:  Okay.  It's 12:41 -- 12:42 now, let's

13  come back at 12:52.

14      MS. DURKIN:  Great.  Thanks.

15              (A short break was had.)

16      MR. SIGALE:  I need three more minutes.  I'm going

17  to beg your indulgence.

18      MS. DURKIN:  No problem.

19              (A short break was had.)

20      MR. SIGALE:  Let us go back on the record.

21  BY MR. SIGALE:

22      Q.   All right.  Dr. Rymph.

23      A.   Yes.

24      Q.   We were on page 13 and Section C.  Now we're in

25  the twentieth century according to your report.



1        A.    Yes.

2        Q.    And now moving a little bit past obviously what

3    we were talking about before the break, where we were

4    talking about the 1880s and 1890s, now we are talking

5    about the early 1890s and early 1900s, and you write that

6    during that time "state boards of child welfare "gained

7    more power from legislatures" to oversee placement of

8    children in homes as a means of introducing better and

9    more consistent policy."  I read that correctly?

10       A.    Yes.

11       Q.    Okay.  And this shift, was this based on what

12   you were -- we were talking about before the break, this

13   kind of divide about the useful child versus the useless

14   child?

15       A.    This is a development that is happening in that

16   larger context for sure.  I mean, in the sense that these

17   reformers who are going to be asking for more oversight

18   of children in these placements, they're coming from

19   these more like middle class urban educated households

20   who have already absorbed the new understandings of

21   childhood as its separate and precious stage of life

22   needing individualized care, and so as reformers

23   they're -- that's what they want for their own children,

24   and now those who identify as child welfare reformers are

25   wanting that kind of life for other people's children's



1  as well, so they're becoming more concerned about the

2  welfare of children in these farm placements and in other

3  potentially exploitive parts of society.

4       Q.   Okay.  And I think as we read on in this

5  paragraph -- Strike that.

6            The end of the sentence that I just read talks

7  about better and more consistent policy.  And I was going

8  to ask you what that means, but does it mean what you

9  write in the remainder of this paragraph, in the next few

10 sentences?  Is that what you're talking about when you

11 say better and more consistent policy?

12      A.   Just as I review the paragraph, I mean, yes.

13 What's in the rest of the paragraph would be examples of

14 better and more consistent policy.

15      Q.   Okay.  So it talks about their state visiting

16 agent, so and state boards can have better oversight, and

17 state visiting agents make -- gather evidence from their

18 visits, and then the Boards use that evidence to make

19 additional legislation about supervision and care -- I'm

20 paraphrasing a little bit -- but then it says, "One hope

21 was that gathering evidence and providing greater

22 supervision would mean that children would not be so

23 "very friendless, isolated, and subjected to abuse and

24 neglect."  Also, that they would not be used "as cheap

25 servants."  Are these, for look of a better word, the



1    problems that this oversight is meant to correct?

2         A.   It's meant to correct those problems, and I

3    would say one problem that is not embedded in those two

4    sentences is the problem that these children are not

5    having the opportunity to attend school.

6         Q.   Okay.  And do you know what the abuse and

7    neglect that is in that quote is referencing?

8         A.   I don't know what that particular quote -- what

9    particular form of abuse that particular quote is

10   referencing, but it reflects the concern that children

11   placed on an isolated farm where they are not -- you

12   know, they are alone and there is no one watching out to

13   make sure that they're being cared for and not abused.

14   It just reflects that general concern.

15        Q.   Okay.  And is it your understanding that at

16   least in the general sense, that that abuse was physical

17   abuse?

18        A.   So it very well might have included that

19   because we are now in -- I don't know if this is earlier

20   or later in the report, but there is a period in the

21   1870s where American reformers become attuned to the

22   problem of physical abuse, which they had not been

23   before.  So this reflects that quite new concern, that

24   children are not just being required to work and not

25   being educated, but that children might also be subjected



1   to physical abuse.

2       Q.   And you said this was a very new concern, and

3   by that you mean in the 1890s and early 1900s?

4       A.   1870s is when historians date that, you know,

5   emergence of concern about physical abuse, it's dated to

6   the 1870s.

7       Q.   Okay.  Let me compliment your report because

8   now I'm going to move to the top of 14, and we're going

9   to talk about exactly what I just asked you.

10      A.   Oh, yeah, there it is.

11      Q.   So in the later nineteenth century critics of

12  farm placements began expressing concern about possible

13  abuse, poor treatment, and exploitation.  And reformers

14  were having a new awareness of child abuse and neglect as

15  concerns distinct from a child's poverty.  So it was

16  becoming, you're saying, in the later nineteenth century,

17  that it wasn't just about are they fed, but are they

18  otherwise also not being abused, those are two different

19  things.

20      A.   Yes.

21      Q.   Right?

22      A.   Yes.  Correct.

23      Q.   Okay.  But then you write, "Beginning in the

24  1820s, some states had crafted laws prohibiting cruelty

25  and neglect toward children, but these laws had not been



1   systematically enforced."  So -- And did you mean in the

2   sentence above it when you said, In the later nineteenth

3   century, when critics of farm placements began expressing

4   concern about abuse, that they were expressing concern

5   that there were laws that were not enforced, or is that

6   two different things?

7        A.    Certainly there were -- there were these laws

8   that appear quite early in some states, but they hadn't

9   really been consistently enforced.  So that --

10  deconstructing the paragraph, I think along the lines of

11  how you were deconstructing it to ask about it, but that

12  first sentence in the later nineteenth century, that new

13  concern there is reflecting the concern that's emerging

14  in the 1870s, which is sort of discovery of child abuse.

15  And then that intervening sentence, again, just unpacking

16  it systematically is simply pointing out that there were

17  laws that existed in the past, but that those law -- I

18  mean, we all know this, you can have a law in the books,

19  and it doesn't actually mean that the problem goes away

20  or that anyone enforces the law.  That we can see

21  evidence of some attention to the problem by the act of

22  passing a law, but not one that was enforced, that

23  interest in enforcing the law and paying attention to the

24  problem and seeing that problem as a critical part -- a

25  critical concern about child placement isn't emerging



1  until later in the 19th century.

2       Q.   Do you know what states had crafted those laws

3  beginning in the 1820s?

4       A.   I want to say -- It's states like

5  Massachusetts, Pennsylvania, and New York.  I can't say

6  exactly which ones, but it certainly is not states in the

7  south, it's not states in the West, it's states in kind

8  of New England, east/northeast.

9       Q.   Okay.  I noticed you left out midwest.

10      A.   Right.

11      Q.   Would that have been one of those areas that

12 would have, or wouldn't have?

13      A.   Not in the 1820s because a lot of the

14 midwestern states aren't even states yet in the 1820s.

15      Q.   Okay.  Okay.  Then you write really what you

16 just talked about.  "Historians of family violence have

17 pointed to the 1870s as the period when child abuse was

18 truly discovered."  Does that mean by parents or anybody?

19      A.   By reformers.

20      Q.   Oh, I'm sorry.  I'm asking badly.  Abused by

21 parents or by --

22      A.   Oh, yes.  Now I understand the question.

23 Right.  That's the particular awareness of abuse, by

24 parents.

25      Q.   Okay.  Thus the next sentence about this law



 1   enforcement approach that would allow the states to

 2   remove a child from the home?

 3        A.    Correct.

 4        Q.    "And prosecute the parents in cases of neglect

 5   and abuse."  Now, in this sentence, and forgive me for

 6   sounding like the obvious, but you're the expert, what is

 7   the difference in this sentence between neglect and

 8   abuse?

 9        A.    That is such an important question.

10        Q.    Thank you.

11        A.    In this whole history, and I think also in the

12   way that child welfare has continued to be understood

13   throughout the twentieth century and into the

14   twenty-first century, and this is something that I very

15   much noticed in my research, is that there's a tendency

16   to talk about the problems of neglect and abuse, always

17   connected with that and when through most of the

18   twentieth century certainly the primary concern remains

19   neglect.  And neglect continues to be closely related to

20   poverty.  And so there can be the assumption that when

21   that phrase neglect and abuse is used even today, the

22   children are in foster care because they've been

23   physically abused.  Some of them have, but they haven't

24   all been physically abused.  Many of them are in foster

25   care because of charges of neglect.  But because those



 1  two words are so often linked together, it's very

 2  difficult to kind of disaggregate in the historic

 3  records, but also in the present, I would say.

 4      Q.   Okay.  But when you use those words, are you

 5  using them the way that -- like a layman would commonly

 6  think of them?  Abuse is some provacative hurting,

 7  whereas neglect is I'm not taking care of the kid?

 8  That's when DC- --

 9      A.   Yes.

10      Q.   Yes.  Okay.  Yes.

11      A.   That's a simpler answer to your question.

12      Q.   Okay.  So when DCFS goes into the home and

13  there's a kid in a saggy diaper that's full of whatever,

14  full of waste and everyone's wandering around in their

15  own filth and there's pizza boxes all over the floor and

16  the kid has to eat dog food because mom is not giving

17  them any other food, that would be neglect?

18      A.   Yes.

19      Q.   Okay.  That's an example of neglect, and maybe

20  an extreme one, but my sad thought is that it probably

21  does happen.

22      A.   Yes.

23      Q.   Okay.  But you're not putting any special

24  historian gloss on those phrases, neglect and abuse are

25  how I would think of it.



1      A.    Yes.  I would agree with how you are describing

2   it, yes.

3      Q.    Okay.

4      MR. SIGALE:  All right.  The next page, 15.

5   Perfect.

6   BY MR. SIGALE:

7      Q.    Where the cursor is, if you can see the cursor?

8   Perfect.  Right there.  "By 1930, the percentage in

9   orphanages declined to 59 percent."  Well actually

10   right -- "In 1923, 64 percent of dependent and neglected

11   children are in" orphanages.  I assume that's what

12   "orphan asylums" means?

13      A.    Yes, yes.

14      Q.    While "23 percent were in free homes," that's

15   those placed out farm houses?

16      A.    Yes.

17      Q.    "Ten percent in boarding homes."  Now, boarding

18   homes, can you just clarify for me -- sorry if it was in

19   a page I skipped, even though I don't think I skipped any

20   pages, but I might have missed that paragraph -- what are

21   boarding homes?

22      A.    So boarding homes were one of the attempts to

23   solve the problem of too little oversight.  The idea -- A

24   boarding home would be a home where a child is placed and

25   someone is paying board to the family that is caring for



1    the child.  So paying some amount of money that is meant

2    to cover, say, the cost of food.

3        Q.    Okay.

4        A.    And this is a transmission that is happening in

5    this period that we're looking at, late nineteenth, into

6    the early twentieth century, into the 1930s where the

7    child welfare experts are coming to prefer boarding homes

8    over any of those other options.

9        Q.    And this sounds like, and you probably wrote

10   about it, a precursor to the foster homes scenario?

11       A.    Correct.

12       Q.    All right.  So in 1920s only 10 percent are in

13   boarding homes, by 1930 the orphanages had population

14   dropped 5 percent, by 1933 the number of children in

15   boarding homes was more than double the number in free

16   homes.  So it sounds like -- Well, it sounds like the

17   boarding home and the free home percentage flipped?

18       A.    Yeah.  They're starting to flip, yeah.

19       Q.    So orphanages at this point, and I'm sure the

20   Great Depression didn't help any of this stuff, but the

21   number of kids in orphanages is roughly the same.  It's

22   only declined a little bit, but now more kids are being

23   placed in these boarding homes?

24       A.    Yes.  Yes.

25       Q.    And these boarding homes that were the



1   precursor to what we know of as the foster-home scenario,

2   that started to become preferred by the 1930s?

3        A.   Had started to be preferred by child welfare

4   experts, yes.

5        Q.   It talks about the Great Depression.  And then

6   we go to the middle of page 16 and the Section D,

7   Development of the Modern System.  And you write "In 1935

8   only 25 percent of states had a system of county public

9   child welfare services; eleven states had no public -- no

10  statewide public child welfare agency.  By the end of

11  1939 every state did."

12       A.   Correct.

13       Q.   So in that couple years, a pretty rapid

14  increase?

15       A.   Yes.

16       Q.   When -- I'm sorry.  When did it start?  So you

17  write, "In 1935, only 25 percent of states," when was the

18  first state that did it?

19       A.   I don't recall if I ever knew.  I don't know

20  for certain.

21       Q.   Okay.  Would you say that, as you sort of write

22  in the middle of 17 that -- last full paragraph it starts

23  with "in the end, neither child refugee program was fully

24  realized," that was the Jewish children from Europe in

25  '39 and the British children in '40.  "But the need for



1   foster homes grew, nonetheless.  Wartime mobility, unwed

2   pregnancy, desertion, economic mobilization and the

3   movement of mothers into the workforce led to a growing

4   need for -- and declining availability of-foster homes."

5   Was this the movement in time when foster homes became

6   prevalent for lack of a better word?

7         MS. DURKIN:  Object to form.

8              But go ahead, Catherine.

9   BY THE WITNESS:

10        A.   By foster homes do you mean boarding, what

11  I've -- what we were talking about with boarding homes, a

12  home where the family is paid?

13        Q.   Well, no.  You used the phrase foster homes in

14  that paragraph, in 17.

15        A.   Yeah.  Okay.  I mean, it was -- the need grows

16  in the 1940s, but it was also quite large in the 1930s.

17  And the reason I asked that earlier clarifying question

18  is that child welfare experts in the 20s and the 30s

19  would have called both the free homes and the boarding

20  homes, they would have called them foster homes.  There's

21  just a difference in -- they would have called both of

22  those systems foster homes.  They have a preference for

23  boarding homes.  And as you pointed out, the percentage

24  is starting to flip and we're seeing fewer free homes and

25  more boarding homes.  But there's a great need for foster



1  homes during the '30s as well.

2      Q.   Okay.  So if we're only -- If we're only

3  talking about sympathics, is there a time in history

4  specific -- sorry.  I'm not catching this from the

5  report -- Is there a time in history when the phrase

6  foster home came into vogue and now that's what

7  everything is called instead of boarding home or placed

8  out or whatever else?

9      A.   Yeah.  So I'm going to be annoyingly symantec

10  about this.  The preferred term for what we today think

11  about as foster care, the preferred period -- sorry --

12  the preferred term in the '30s and '40s and '50s, the

13  foster family care.  And that's when that term came to be

14  used, foster family care to refer more specifically to

15  the -- the system that -- that we're discussing here in

16  the report.

17      Q.   So in the '30s, '40s, and '50s boarding homes

18  became referred to as foster family homes?

19      A.   Yes.

20      Q.   And was that just purely a semantical shift, or

21  was there a shift in how -- with the name change, was

22  there a change in how they were administered or how they

23  were run?

24      A.   Yeah.  There's an absolute sea change in the

25  understanding of what the service was that these homes



 1  were providing, and that sea change is related to the
 2  kind of wholesale adoption of the idea of childhood as a
 3  special time of life when children need to be protected,
 4  and there is this understanding that's emerging out of
 5  this community of child welfare experts beginning even
 6  earlier, like in the earlier part of the twentieth
 7  century, but really taking hold in the '30s, '40s, and
 8  '50s that foster homes need -- are fulfilling an almost
 9  therapeutic function in helping children, that children
10  need to be understood as individuals with individual
11  needs who need to be carefully placed in a trained and
12  monitored vetted home with lots of follow up and
13  casework.  And that is a completely different idea than
14  the idea that we saw in the eighteenth century and the
15  one that still exists through much of the nineteenth
16  century, that poor children can pay for their care
17  through their labor.  By the period we're looking at now
18  in this section, it's a very different understanding of
19  childhood and it's a very different understanding of the
20  purpose of foster care.
21      Q.   Okay.  On page 21 -- No, sorry, 22.  You see
22  where it says Section II in bold font?
23      A.   Yes.
24      Q.   I want to look about six lines above that --
25  Wait.  1, 2, 3, 4, 5, 6, 7, 8, 9 lines above that, and



1    actually, Dr. Rymph, if you look at the screen, the

2    fourth line down.

3         A.   The line that begins "children."

4         Q.   That's it.  Right in the middle there, "by the

5    mid-twentieth century the idea that any home would do was

6    replaced with a push toward licensed, regulation,

7    monitored home as the only safe way to fulfill a

8    community's obligations to dependent children."

9         A.   Yes.

10        Q.   Is the mid-twentieth century that you're

11   referring to, the '30s, '40s, '50s that you were talking

12   about earlier, or is there a more specific time that you

13   are referring to here?

14        A.   '30s, '40s, '50s, and little bit into the '60s;

15   but '30s, '40s, '50s.

16        Q.   And the -- Again, you know, the '30s, '40s,

17   '50s, you say that it was regulated and monitored, what

18   kinds of things was it regulated and monitored for?

19        A.   So through -- through licensure foster

20   families -- Well, to the system of licensed foster family

21   care, which I'm going to -- I'm saying that specifically

22   because there was an unregulated rogue unlicensed system

23   that was going on at the same time, which I can say more

24   about if you want, but the idea within the licensed

25   foster care system was that there would be very careful



1  vetting of foster parents according to standards of best

2  practice, particular requirements for the makeup of the

3  family, particular recommendations and requirements for

4  the safety of the home, the size of the home, features of

5  the neighborhood and community.  And child welfare

6  reformers, which I go on to talk about in the next

7  section, devote a lot of time to debating, writing, and

8  revising these standards for best practice that are then

9  reflected in licensure.

10      Q.   I'm going to -- So then we move down to the

11  Section II, "Establishing Standards for Care."  And you

12  write how the very first White House Conference on the

13  Care of Dependent Children was in 1909, it was convened

14  by Teddy Roosevelt?

15      A.   Yep.

16      Q.   Correct?

17      A.   Yes.

18      Q.   And you write from the -- I'm sorry.  Bottom of

19  the page, going into the next one, "The majority of

20  delegates supported, among other reforms, campaigns

21  against child labor and efforts to establish state

22  financial support for widowed mothers to enable them to

23  keep their children at home."  What are, if you know, the

24  other reforms that these two specific examples were

25  among?



 1        A.    So, I mean, those were the -- those were the
 2   really big ones.  And the recommendations about foster
 3   care flowed from that second one.  The idea that children
 4   are best cared for by their own parents in their own
 5   home, and that children should never be removed from
 6   their family of origin for reasons of poverty alone.
 7   They say this in this report, although it would continue
 8   to happen for decades after that.  And so the idea of the
 9   mothers' pensions, what I refer to in that sentence as
10   "state financial support for widowed mothers," was that
11   if a woman was raising her children alone, she should be
12   paid a public stipend by the State so that she could care
13   for her children in the home because if she couldn't do
14   that, her children were going to end up in an orphanage,
15   in foster care, or begging on the streets --
16        Q.    And then -- Go ahead.  Sorry.
17        A.    So the first goal is to have state support to
18   keep children in the home cared for by their mother.  If
19   they must live outside the home, they should be in a
20   family setting rather than in an institutional setting,
21   so it's all kind of connected, these reforms.
22        Q.    But not in an institutional setting where they
23   are going to be just child labor?
24        A.    Certainly not where they're just going to be
25   child labor, right, yes.



1    Q.    And I would imagine from what you were talking

2    about before, that the people at this conference decided

3    that if the State was going to be giving money to

4    orphanages or to foster families to take care of kids,

5    better to give the money to the kid's actual mother so

6    the kid could stay at home.  Was that kind of the idea?

7    A.    That's the premise, yes.

8    Q.    On page 24 going about what you are -- what you

9    were talking about, about the commission saying that kids

10   shouldn't be labor, you write here "In the 1870s it would

11   have "bothered almost no one," to see substantial labor

12   assigned to a placed-out child."  That was those -- the

13   kids sent out to the farm, right?

14   A.    Yes.

15   Q.    And then you said that changed over the next

16   decades, and then you give some examples of what the kids

17   had to go through.  A couple lines down you write, "Ideas

18   about "acceptable childhoods were changing by 1900, and

19   increased investigations into conditions for children

20   added to the growing worry that children placed on farms

21   too often worked long hours instead of attending school."

22   A.    Yeah.

23   Q.    Was that the focus of the investigations into

24   these conditions, how they were working, how long they

25   were working, were they going to school?  Was that the



1   focus?

2       A.   That's primarily the -- primarily the focus,

3   yes.

4       Q.   Okay.  Give me just a second here,

5   Dr. Rymph.

6       A.   No worries.

7       Q.   Bottom of 25, the bottom -- the last paragraph

8   of it, or last paragraph that goes into the next page.

9   It's talking about this Child Welfare League," and I

10  don't know what the A is.  Is that supposed to be

11  America, or Association?

12      A.   Yeah.  Child Welfare League of America.

13      Q.   And it talks about their standards that you

14  write in the footnote that they started writing beginning

15  in the late 1950s?

16      A.   No.  Sorry.  Okay.  The Standards volumes start

17  appearing earlier, but that standard preamble --

18      Q.   Oh, began in the late 1950s?

19      A.   Yeah.

20      Q.   Got it.  When did the volume start coming out?

21      A.   So the earliest one that I found -- And I think

22  it is the earliest one -- was a typed script from 1933,

23  so not published, but I found the typed script in

24  archive, and then after that they were -- they were --

25  the Child Welfare League published them, I think



1  beginning in -- I think the first one is 19- -- the first

2  one that's published is either 1938 or 1940, but I would

3  have to check my bibliography to see that.

4       Q.    Okay.  What is this Child Welfare League?

5  What's the relationship to -- I'm sorry.  I'm asking

6  badly, so strike it.

7             What is this Child Welfare League, and how does

8  it relate to these kind of government agencies that you

9  wrote earlier seemed to be popping up, the state agencies

10  for child welfare?

11       A.    Right.  So --

12       MS. DURKIN:  I object to form.

13             But go ahead.

14  BY THE WITNESS:

15       A.    After the child welfare conference from 1909,

16  in 1912 Roosevelt establishes -- Teddy Roosevelt

17  establishes the Children's Bureau, which is a federal

18  agency that's part of the Department of Labor, and then --

19  And so that is a federal government organization focused

20  on child welfare issues in particular.  The Child Welfare

21  League of America is a non-governmental organization.  It

22  is a -- it is an umbrella organization, that members of

23  the organization were individual child welfare agencies.

24  So that might be a private orphanage, it might be a state

25  child welfare agency, it might a private child welfare

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com



 1    agency.   There were a couple in Canada, but they're

 2    overwhelmingly in the United States.   And it's the

 3    agencies themselves that are part of the Child Welfare

 4    League of America, and the idea is that they spend a lot

 5    of -- they do -- a lot of their work directed towards

 6    establishing standards and best practices for the

 7    profession.   So it's agencies where people are working in

 8    this kind of newish field called Child Welfare, and they

 9    are working on establishing the norms and best practices

10    for their profession through the Child Welfare League.

11         Q.   Okay.   So let me jump down to page 26, the

12    bottom paragraph.   So you write that by the end of the

13    1930s, it was "accepted that "primary responsibility for

14    care of all children in need of such care," which I

15    assume means that they need placement in a foster family

16    home?

17         A.   Yes.

18         Q.   "Rests with the public agency"?

19         A.   Yes.

20         Q.   And it looks like these -- I said foster family

21    homes, but in the next sentence, "By 1938, 23 states

22    required boarding homes be licensed and nine other states

23    required a boarding license."   So in 1938 they're still

24    using the phrase boarding home?

25         A.   Yeah.   And they're going to continue to be



1  using lots of different terms.  And I couldn't say

2  exactly when boarding home completely goes away, but the

3  shift is happening.

4       Q.   Okay.  And the shift that it was the public

5  agency, i.e., the government that was responsible for

6  taking -- for caring for the children in need of that

7  kind of care -- I'm sorry.  I lost my train of thought.

8            You're saying that the -- that it wasn't until

9  the end of the 1930s that it became wildly accepted that

10  the government had the primary responsibility for the

11  care of such children; is that correct?

12      A.   Right.  It's very much a mixed public, private,

13  you know, loose ad hoc.  There's different arrangements

14  in different states.  So some states have stronger public

15  systems than others.  In some states the private agencies

16  are always more ubiquitous than the public ones.  But

17  probably in the early twentieth century there would have

18  more private Child Welfare agencies than public child

19  welfare agencies, and that shift is happening in the

20  early part of the century, and the growing conviction

21  among child welfare experts that while the private

22  agencies still had a place and still had value, that the

23  primary responsibility should rest with the public

24  agency.

25      Q.   Okay.  And the lapse sentence says, "Standards



1  of good practice included "vetting potential foster

2  families for the structural features of the home."  Why

3  don't we just take that step by step.  What does that

4  mean?  I mean, besides the obvious, that the home wasn't

5  falling down, what were -- What structural features were

6  they concerned with?

7       A.   One that they were particularly concerned with

8  was the number of bedrooms and to be sure that children

9  were not sharing bedrooms with people they were not

10 related to, that they were not sharing bedrooms with

11 members of the opposite sex.  There were concerns about

12 well water, if you consider a well a structural feature

13 of the home.  Eventually there'll be stipulations about

14 indoor plumbing, though in the 1930s that was not yet an

15 expectation, that all foster homes would have indoor

16 plumbing, but those kinds of features.

17      Q.   Okay.  "Certification of the parents' good

18 health, and letters of reference."  Those seem

19 self-explanatory, "as well as what were considered to be

20 critical matters of family makeup."  Is that

21 mother/father, or something else?

22      A.   So mother/father is certainly a big part of it,

23 and it might sound obvious, but, you know, boarding homes

24 in the nineteenth century might very often be like a

25 widow.  It would be a way for a widowed woman with her



1    own children, she could earn a little income for herself

2    by being paid to board someone else's children.  By the

3    best practices that are being established by the Child

4    Welfare League, they don't want that anymore, they don't

5    want a single woman or even a widowed woman serving as a

6    foster parent.  It needs to be a married couple.  Some of

7    those rural placements where children were placed in the

8    late nineteenth or early twentieth century might have

9    been like a brother and sister who live together.  I

10   think that's the scenario in Anne of Green Gables that's

11   very famous to some people.  It's a brother and sister

12   operating a farm.  That would not have been okay under

13   these new standards.  Also it might have been in the past

14   an older couple, an older couple who's getting on in age

15   and they're in their 60s and their 70s and they really

16   can't manage all the work on the farm anymore, but their

17   own children have left.  They might take in one of those

18   placed out children.  Under these emerging standards in

19   the mid-twentieth century, that's not what child welfare

20   experts thought a foster family home was.  If it's going

21   to be a family home, it needs to look like a family -- a

22   more conventional family.  The parents need to be a

23   married couple, they need to be of a plausible age that

24   they could have been the parents of the foster child and

25   also importantly, they couldn't have too large a family.



 1   They were very reluctant to place children in a home that

 2   had seven or eight other children living there even if

 3   they were all the biological children of the family

 4   because they wanted the foster child to be able to get

 5   the individualized care and attention of the parents.

 6        Q.    Okay.   Thank you.

 7        A.    And women shouldn't work outside the home.

 8   That's another critical part of family makeup, yeah.

 9        Q.    Okay.   Thank you.   Yeah.

10             So on page 29, the first full paragraph, you

11   reference the 1941 standards.   And you say, "That a child

12   "should receive good physical care and shelter" was only

13   a "minimum requirement" for the child's well-being."   And

14   forgive me if it's just in the next sentences, tell me,

15   but what are -- if good physical care and shelter is only

16   a minimum requirement, what are the other requirements

17   according to the standards?

18        A.    Well, certainly the evolving standards of

19   family makeup that I described, but other things like --

20   there's a lot of attention to the safety of the home, to

21   make sure that it was a safe place for children; and

22   that, you know, that definition is going to change over

23   time.   One example of that would be, there's a lot of

24   concern in the '30s about testing the water supply, and

25   making sur that the milk supply is free of disease, that



1    becomes less of a concern going on later as fewer homes

2    are using well water, right?  Also recommendations or

3    standards that there needs to be a church or school --

4    churches and schools, you know, within a certain radius,

5    that the community have a good reputation, that the

6    community be generally free of disease, things like that.

7    So not just about the home, but about the community as

8    well.

9        Q.   Okay.  Now you write in your report "that the

10   home "should present no hazards to the safety of the

11   foster child," and you say that that's in the 1959

12   standards.  To your knowledge, is that the first time

13   that that phrase that you have in quotes was used in the

14   standards?

15       A.   The no hazards phrase, I can't say for certain

16   that it wasn't used before, but certainly was used by

17   1959.  There would have been an earlier -- In earlier

18   versions of this there would be other kinds of language

19   that would have talked about the safety of the home, but

20   the hazards -- the hazards term I believe comes a little

21   bit later as in this 1959 example.

22       Q.   Okay.  And you write about -- the next thing is

23   about the opposite sex bedrooms.  And, I guess, that's

24   the only -- only example.

25            Did the standards in 1959 specifically state



 1   what hazards it was referring to?

 2       A.   There would be -- I don't have the copy of that

 3   standards in front of me, although I actually have it in

 4   my office, and I could pull it out if you wanted me to,

 5   but it would -- usually in that part of the standards

 6   volume it would list some examples.

 7       Q.   Okay.  But as you sit here, you don't know what

 8   they are?

 9       A.   Not specifically to 1959.  The general -- the

10   general topics that we've discussed so far.

11       Q.   Okay.  Okay.  Then you go on in page 30 when

12   you write, "solidifying standards came by mid-twentieth

13   century to recommend not only that homes be sanitary and

14   large enough for children to have their own rooms," but

15   then you say that they start talking about recommending

16   the dynamics.  You mentioned earlier foster mothers

17   aren't supposed to work, so foster fathers need to make

18   enough money to support everyone.  They want more

19   African-Americans.  Apparently back then, because

20   African-American men made less, African-American women

21   had to work, so they had to get rid of the requirement

22   about foster mothers not working.  So are these -- These

23   examples that you write in here about the internal

24   dynamics of foster families, is this what you're

25   referring to, or were there other things as well?



1      A.    There were other things as well that I wrote at

2   great length about in my book that is a lot of

3   psychoanalyzing of foster parents.  You know, why do they

4   want to be foster parents, are they doing it for the

5   right reasons or the wrong reasons?  There's a lot of

6   literature from the '40s and '50s that investigate those

7   questions.

8      Q.    Okay.  The next sentence -- or I'm sorry -- the

9   next paragraph that starts with "Payment of board."

10     A.    Yes.

11     Q.    And -- Well, it says that the agencies had

12  oversight over the families, that foster families had

13  their performance evaluated, and they could be -- the

14  foster parent could be discontinued if they failed to

15  meet certain requirements and standards.  What period of

16  time are you referring to this in this paragraph?

17     A.    '40s, '50s, '60s.

18     Q.    1940s, '50s, and '60s, yes?

19     A.    Yes.

20     Q.    And do you know offhand what the certain

21  requirements and standards were referring to?  Were they

22  just the things that you referenced earlier in the

23  report?

24     A.    Right.  And so here, you know, this is going to

25  vary from jurisdiction to jurisdiction, what the



```
 1   particular licensing requirements of a community might
 2   be.  The standards themselves are not legally binding,
 3   but the understanding and hope was that those standards
 4   would be given more regulatory teeth through the
 5   licensure process, but it's not going to look
 6   everywhere -- it's not going to look everywhere exactly
 7   the same.  But this point about -- Well, I guess that
 8   wasn't what you were asking, so I'll let you ask the next
 9   question.
10        Q.   Okay.  Bottom of 31, I think springboarding off
11   of what you were talking about, you say, "By the 1950s, a
12   consensus had developed that almost all children in
13   foster care were damaged to some extent" -- I'll just
14   read -- "requiring specialized attention to placement in
15   appropriate homes.  In the postwar period" -- So '40s and
16   '50s?
17        A.   Yes.
18        Q.   "The idea became wildly understood among
19   professionals that foster care was an institution now
20   caring for "problem children" rather than orphaned or
21   children suffering only from poverty."  And then it says,
22   "In this context, foster care increasingly took on
23   therapeutic functions" -- you used that phrase earlier
24   "which meant a significant change in the purpose in
25   foster care from earlier in the century."  What brought
```



 1    this consensus on, that now all of a sudden in the '50s
 2    all the children there are damaged?
 3         A.   Well, there are a lot of factors.  I'll name a
 4    couple of them that I think are particularly significant.
 5    One is, maybe you can say the rise of a certain branch of
 6    child psychology that emerges from the Second World War,
 7    and the idea known as attachment theory, which people
 8    write -- the experts writing about attachment theory
 9    based a lot of their understanding on studies they did of
10    children during the Second World War in London where the
11    children were moved out -- moved away from their families
12    out to the countryside allegedly for their safety to
13    escape the bombing of London.  And so there were studies
14    done of those children and the damage that it did to them
15    psychologically and emotionally to have been separated
16    from their parents.  So that -- Those ideas coming from
17    Britain are really influencing child psychology and
18    social work and child welfare in the United States.  So
19    that's one that I think is quite important.
20                     (Exit Ms. Solomon.)
21          A second one that's quite different, but I see
22    as also quite important, was that with the creation of
23    the new deal welfare state, the idea that -- it was just
24    so widespread among child welfare reformers that programs
25    that the new deal welfare state such as aid to dependent



 1   children, minimum wage law, Fair Labor Standards Act, the
 2   right of workers to join a union, that all -- that that
 3   infrastructure was creating -- was establishing the
 4   ability for families to have economic security so that
 5   children would not have to be put into foster care
 6   because their family was so poor.  And so because child
 7   welfare experts believed so strongly that this had, in
 8   fact, happened, that these reforms of the new deal era
 9   had eliminated poverty as a reason to -- that children
10   would be placed in foster care, they really -- they
11   believed that, they'd say it over and over again.  In the
12   1950s when they look out and say, yeah, but there's still
13   so many children coming into foster care, we know they're
14   not coming into foster care for reasons of poverty
15   anymore because the new deal solved all of that, so it
16   must be for other kinds of reasons like they are just
17   really, really damaged, and their families are really
18   damaged.
19          Now I want to be clear, poverty never went away
20   as a reason why children were going into foster care, and
21   research will later show that, but there's this window of
22   time in the late '40s up until the late 1950s where child
23   welfare experts really believed that.  So that also
24   contributes to the idea that the children coming into
25   care are more damaged.



1      Q.   Okay.  Thank you.

2      A.   Sorry.  That was so long again.

3      Q.   No, no, no.  That was the answer, so I

4  appreciate that.

5           Sorry.  Give me a second here.

6           Okay.  We jump down to page 34, Section III,

7  and it appears, other than perhaps the conclusion, that

8  your report has left the realm of foster family care and

9  moved on to Day Care --

10     A.   Yes.

11     Q.   -- right?

12     A.   Yes.

13     Q.   Okay.  And you write on 34 "the histories of

14 foster care and day care were entwined, especially during

15 the Second World War."  And you write next, "Day Care

16 services emerged around the turn of the twentieth century

17 as a form of temporary charity for impoverished women."

18     A.   Yes.

19     Q.   So does this mean like paid daycare services

20 emerged around the turn of the twentieth century, or do

21 you mean that nobody watched anybody else's kids until

22 the turn of the twentieth century?

23     A.   I mean the former.  Obviously there were things

24 like babysitting or leaving your child in the care of an

25 older child or another relative or a neighbor, if we



 1   think of that as kind of babysitting.  What I'm referring

 2   to there is a kind of organized childcare as a service to

 3   women.

 4        Q.   Okay.  And you say it "emerged around the turn

 5   of the twentieth century," but child welfare

 6   professionals in the early to mid-twentieth century were

 7   opposed to the idea because they thought children should

 8   be in their own homes with their mothers.

 9        A.   Correct.

10        Q.   And this also goes along with your statement

11   earlier that women didn't work?

12        A.   Well, women did work.  I said that foster

13   mothers were not supposed to work outside --

14        Q.   Were not supposed to work, right?

15        A.   But certainly immigrant women, working-class

16   women, they are almost always working outside the home

17   because working-class men don't make high enough wage to

18   support wives and children without sending them to work.

19   And then single mothers are in a really terrible bind as

20   to how to care for their children, they have to work.

21        Q.   So --

22        A.   That was the idea behind the mothers' pensions,

23   is so they wouldn't have to work.  That was the theory

24   behind it, but women are still working outside the home

25   for wages.



1     Q.    Okay.   Yeah.   Of course.   But like is a common

2  problem today, if the mother is going to be working, say,

3  as a scullery maid for, you know, a few pennies, which,

4  you know, meant something different back in the turn of

5  the century, they can't afford to be paying someone to

6  watch the kids, right?

7     A.    Right.

8     Q.    That defeats the purpose?

9     A.    Correct.

10    Q.    So what were they doing with the children?

11    A.    So there would have been a number of options.

12  They might leave the child in the care of a neighbor,

13  they might leave the child in the care of an older -- one

14  of their other children.   They might leave the children

15  totally to fend for themselves, which created all kinds

16  of problems.   They might place the child in an orphanage

17  or in foster care, all of those things.

18         The creation of these day care services that I

19  referred to in the twentieth century, that was -- this

20  is -- I think it's 1898 that the association of day

21  nurseries is created.   And that is a philanthropic

22  organization, you know, run by, you know, more affluent

23  women who set up day care centers -- with what we might

24  today call day care centers, they called them day

25  nurseries, where mothers could temporarily place their



1   children, but it was always meant to be temporary because

2   those women running the day nurseries did not think women

3   should be working outside the home, they thought children

4   should be at home with their mothers.  So they don't

5   really like day care any more than anyone else does, but

6   they see this kind of temporary need that some women have

7   just to kind of right some things in their lives.  So the

8   day care services that I'm referring to there would be

9   that kind of -- It's a charity.  It's not a service where

10  the mother is going and paying for the day care, it's a

11  charity that's offered to them.

12      Q.   No problem.  You write on the next page right

13  before the 75 footnote, that child welfare experts were

14  skeptical about -- I'm paraphrasing -- day care of any

15  kind because children should be cared for by their

16  mothers, and now I'm going to quote -- "their suspicious

17  about the motives of women who said they needed childcare

18  to work, end quotes.  What did that mean?

19      A.   That they're suspicious that women who say they

20  need childcare to work, either don't actually need to

21  work, right?  I mean, that's part of the suspicion,

22  like -- you know, a married couple with children, why

23  would the woman need childcare to work, she has a husband

24  who's supporting her, right?  So there must be some other

25  reason why she wants to get away from her children.



1    That's the kind of flavor of those suspicions.

2        Q.    Yeah, but I'm -- I'm sorry.  What reasons?

3    Like she was having an affair?  What reasons?

4        A.    No, not suspicion that they were having an

5    affair, but suspicion that that they had their priorities

6    wrong, all right?  You know, like your family can get by

7    without you working.  Your job is to stay home and care

8    for your children, you don't need -- you know, you must

9    want to purchase some kind of luxuries, and that's why

10   you say that you need child care so that you can work.

11       Q.    Okay.  Bottom of --

12       A.    Suspicion about mothers in the mid-twentieth

13   century.  There's a long, long literature on it.

14       Q.    Okay.  Bottom of 35 you write, "The CWLA argued

15   that group day care facilitated the spread of disease and

16   that children did not receive individualized attention."

17   When generally was the CWLA arguing this?

18       A.    This is particularly about the debate around

19   child care during the Second World War when large numbers

20   of mothers of young children were working outside the

21   home and in need of day care in order to do so.  And the

22   federal government for the first time began subsidizing

23   day care for working mothers so that they could work in

24   war industries.

25       Q.    Page 38, so you write in that paragraph -- that



1    first full paragraph on that page, "In 1960, the Child

2    Welfare League issued its first Standards for Day Care."

3    Was there anything informal before that or literally in

4    1960, that's when someone got the idea to make Standards

5    for Day Care?

6        A.   I would -- I see -- You're asking why this

7    comes so much later than some of these other standards

8    for something like foster care?

9        Q.   No, I'm really just asking, I mean, why in --

10   whether or not this was -- just first came up with it in

11   1960, or they just -- they had it, but they just decided

12   to write it down in 1960?

13       A.   So, the Child Welfare League was not a fan of

14   day care.  They did not think that children should be in

15   day care.  They -- So to that extent, they're not writing

16   standards for day care because they would like the system

17   to not really exist.  And I think what you see, you know,

18   the Second World War creates this huge need, and the

19   Child Welfare League starts kind of grudgingly weighing

20   in on the subject to the extent that they're talking

21   about standards for day care during the Second World War,

22   it's in their efficacy for what they called foster family

23   day care as opposed to what they called institutional day

24   care.  They thought if day care has to -- if we have to

25   have day care, it should be day care in a home not in an



1    institution, and that those homes should be licensed like

2    foster homes are licensed.  But I think that many of

3    those child Welfare professionals are really hoping that

4    this is a need that emerges during the Second World War

5    that will then dissipate after the end of the war; but,

6    of course, it doesn't, and women continue to be -- the

7    number of women -- the percentage of women in the work

8    force continues to go up, goes up not only among working

9    class women, but also professional women, middle class

10   women, and so I think the 1960 is when the Child Welfare

11   League just finally says, Okay.  This is the reality.

12   There is a need for child care and as the Child Welfare

13   League we he need to, you know, formalize some

14   recommendations for what will make that day care best for

15   the needs of the children.

16        Q.   Okay.  And to ask your -- the question you

17   thought I was asking before, the reason why they did --

18   the Child Welfare League made standards for day care so

19   much later than foster care is it what you just said,

20   they didn't approve of day care, hoped it would go away,

21   and that they didn't want to bother with it?

22        A.   Yeah.  I think that's fair.

23        Q.   You write after that footnote 82.

24        MR. SIGALE:  I don't need footnote 82, I'm just

25   using it as a landmark.



1   BY MR. SIGALE:

2        Q.    "Day care homes (like foster homes) were to be

3   inspected and reviewed for health and safety measures

4   such as adherence to "state and local health, fire and

5   sanitary regulations," including proper heat,

6   ventilation, light, sanitary water supply, screens on the

7   windows, of proper provision for care of perishable

8   food."  Was this the -- Were there others that for

9   whatever reason you didn't include, or was that -- were

10  those the examples that are in the source?

11       A.    There is a longer list of examples in the

12  source, and I provided some examples that I thought

13  covered several of the categories of what would

14  constitute health and safety measures.

15       Q.    Okay.  Are these repetitive, or is there

16  anything -- can you think of anything that you left out

17  that's different from this?

18       A.    I think that that is representative.

19       Q.    Okay.  And going down a couple lines, you

20  mention that the day care standards are revised, and you

21  say by 1969 the guidelines said that the physical

22  facility of homes should represent no hazards to the

23  health and safety of a foster child.  So that got added

24  in 1969, and then you go into the 80s, "radiators and

25  other heat sources must be protected to prevent burns."



1  And then moving into the next page "high rise apartments
2  should have guards on the windows, and that "household
3  cleaning supplies, chemicals, weapons, and medicines
4  should be stored safely out of reach of children."  Now
5  that is the first reference -- first and only reference
6  to weapons, I guess, of any kind.  And first question
7  about that, is 1984 the first time that it's mentioned?
8      A.   It is the first time that I saw it.  I couldn't
9  state unequivocally that it isn't anywhere else, but that
10  is the first time that I saw it in the published
11  standards that I looked at.
12      Q.   I'm sorry.  I missed that last sentence.  What
13  was it that you said?
14      A.   It was the first time that I saw it in the
15  published standards that I looked at.
16      Q.   Okay.  And were you actually going year by year
17  in order to see the first time that it showed up and '84
18  was it, or --
19      A.   No, I did not go -- I did not go year by year.
20      Q.   Okay.  So you didn't check '83, '82, '81?
21      A.   I don't think they are.  So the Child Welfare
22  League would publish one of these volumes, and then they
23  would reissue it every year for a little while, and then
24  they would publish another one that they would revise and
25  issue it.  They weren't publishing a new one every year,



1    but there was usually like two a decade once they started

2    publishing them.

3        Q.    Okay.  So if '84 was the first time you saw it,

4    do you know if '84 was a new edition, or a -- or if that

5    was a reprint of a previous edition?

6        A.    So I believe it is a new edition, but without

7    looking at the volume in front of me, I could not state

8    that unequivocally.

9        Q.    Okay.  Do you know if '84 was a new edition,

10    when the previous new edition would have come out?

11        MS. DURKIN:  Object to form.

12    BY THE WITNESS:

13        A.    I don't know with certainty, no.

14        Q.    Okay.  If it was twice a decade, then it stands

15    to reason that the latest that the previous new edition

16    could have come out was 1979?

17        A.    That's reasonable.  Again, I can't state that

18    unequivocally.

19        Q.    Okay.  Okay.  Do you have any knowledge or

20    opinion as you sit here what this -- what this quote

21    means, this last sentence before the conclusion?  I'm

22    sorry.  In the quote marks.

23        A.    What it --

24        Q.    Sorry.  Let me rephrase it.  Do you have any

25    knowledge or opinion as you sit here as to any of the



1    details of what this quoted part at the beginning of

2    page 39 that starts with "household cleaning supplies,"

3    what that actually means in practice?

4        A.    What it actually means in practice, so I'm

5    not -- So I will try to answer your question.  I may not

6    be understanding it correctly, so just let me know.  The

7    purpose of these standards were then to feed into

8    licensure requirements, and so just reading the standards

9    at face value would say the purpose of the standards was

10   to encourage states that were licensing day care homes to

11   require as a condition of licensure that those items

12   listed there be stored safely out of reach of children.

13   Does that get to what your question was, or did I

14   misunderstand it?

15       Q.    No, and I'm sure I asked it poorly.  I'll ask

16   it again.

17            Do you have any knowledge or opinion how in

18   practice the standards were saying that such items should

19   be stored safely out of the reach of children, how that

20   was supposed to be achieved?  Did the standards have

21   details of how to accomplish that?

22       A.    Okay.  So you're asking literally what does it

23   mean to store these safely out of the reach of children?

24       Q.    Well, not like from a lay person's standpoint,

25   from the standards --



1     A.   All right.  I'll take another stab at it.  The

2  standards are an attempt, you know, to create standards

3  of best practice.  There's input from child welfare

4  professionals at state agencies, public agencies, private

5  agencies, schools of social work that are feeding into

6  these standards, they're circulating drafts of them,

7  they're giving their revisions and often it's, you know,

8  well, this state is doing this thing that no other state

9  is doing yet, maybe the rest of us should start thinking

10  about doing it as the standards are changing.  And this

11  is a recommendation that's published in 1984 that

12  reflects that conversation of where the Child Welfare

13  League thinks those standards should to be going, and

14  that the hope is that states will reflect those standards

15  in their licensure requirements.  But then those

16  licensure requirements themselves are probably going to

17  contain some more specific language about what it means

18  to -- whatever the verbiage is that's in that sentence --

19  to ensure that they are stored safely out of reach of

20  children.

21     Q.   Because these CWLA standards are not official

22  policy of anything, they're recommendations or proposals?

23     A.   Correct.  They're recommendations for best

24  practice, yes.

25     Q.   Okay.



1          A.    Professional standards --

2          Q.    So you're not -- Sorry.  I missed what you

3    said.

4          A.    Professional standards.  Standards of the

5    profession.

6          Q.    And the first time that the professional

7    standards of this group -- that while it had been around

8    for --

9          A.    1920.  Since --

10              (Inaudible due to multiple speakers.)

11   BY MR. SIGALE:

12         Q.    And had been putting day care standards out

13   since 1960?  The first time that they even made a

14   recommendation regarding storing these items was 1984 to

15   your research, yes?

16         A.    Yes.  As far as I had seen, yes.

17         Q.    I think this is the very last thing I have to

18   ask you.  Those are famous last words.

19              Your conclusion, your second sentence.

20   "Significant changes to both foster care and day care

21   occurred in the late twentieth and early twenty-first

22   centuries."

23         A.    Yes.

24         Q.    Now we have been talking so far as I know, 1984

25   was the latest date we've been talking about anything; so



1    as far as I know, we have only been talking about at best

2    the mid twenties -- the twentieth century with maybe a

3    little dabbling into the late twentieth century.  I

4    haven't seen, unless I missed it in the report, which is

5    possible, I haven't seen anything about the twenty-first

6    century.  So I notice that you make a reference in the

7    next sentence or so to a late twentieth and early

8    twenty-first century model of provisional maintenance.

9    Is that what you're referring to when you talk about the

10   twenty-first century, or is there something else?

11         A.    There are some -- There's some other -- There's

12   some other changes that I would say distinguish the early

13   twenty-first century from the late twentieth century that

14   you're right, I did not get into -- into the report

15   except may only tegmentally.  One is the rise of the

16   permanency movement which is -- it starts in the 1970s,

17   but really solidified in the 1990s.  And a major

18   component of that shift is the Adoption and Safe Families

19   Act, which I believe is 1997, which -- and again, this is

20   outside the scope of this report.  I didn't write about

21   it here, although I wrote about it in my book.  Adoption

22   and Safe Families Act made it easier to terminate

23   parental rights of parents whose children were in foster

24   care, and to move them more rapidly into adoptive homes.

25   That's a really huge change.  That happens, you know,



1   from the late twentieth into the twenty-first century,

2   but I did not write about it in my report for the most

3   part.

4        Q.   Okay.  And that's the main change in the

5   twenty-first century?

6        A.   There are other changes in terms of -- there's

7   a greater emphasis in the twenty-first -- you know, all

8   those things that I was talking about before mid-century

9   about the specific makeup of the family, there's a shift

10  in the rhetoric around that, in the twenty-first century

11  towards looking at what are the needs of the child and

12  can this home meet the needs of that child, and so less

13  attention to whether -- so maybe it's a single mother who

14  is working outside the home.  In the 1950s child welfare

15  professionals would have said, No, she can't be a foster

16  parent.  But under newer understandings, you look at the

17  needs of the child and say, Well, in this particular case

18  that particular home can meet the needs of the specific

19  child.  So there's less attention to the emphasis on like

20  a heteronormative family than the ones earlier.

21       Q.   And my guess is where -- we're looping our way

22  back around to that amicus brief in Fulton versus City of

23  Philadelphia.  Let me see if I have anything else.

24            Dr. Rymph, I'm going to ask you a catch-all

25  question here.  I know you said very, very early on that



 1  every -- all your facts, all your opinions that you

 2  wanted to convey are in your report.  I appreciate you

 3  indulging me today while I ask you about that; but is

 4  there anything that is -- that you feel is very important

 5  in this report that I didn't ask you about?

 6      A.   I don't think so, no.

 7      Q.   Okay.  All right.  Dr. Rymph, counsel might

 8  have some questions for you, but -- and I might have some

 9  followups if that's the case, but otherwise I don't have

10  any other questions for you today.  Thank you.

11      MS. DURKIN:  Thanks.  David, I just ask that we take

12  a quick five-minute break.

13      MR. SIGALE:  Yeah.

14      MS. DURKIN:  Great.  We'll come back on the record

15  at 2:35.  Thanks.

16              (A short break was had.)

17      MS. DURKIN:  So we're back on the record at 2:35.

18          Dr. Rymph, I have no further questions for you,

19  so you're officially done for the day.  Thank you so much

20  for your time.

21          We'll go ahead and order a copy, but we'll

22  reserve signature.

23      MR. SIGALE:  I'll take a copy as well.

24          And, Dr. Rymph, thank you for your time today.

25      COURT REPORTER:  So who's ordering the original?

312.236.6936
877.653.6736
Fax 312.236.6968
www.lexitaslegal.com



     1        MS. DURKIN:  We'll go ahead and order the original

     2   and reserve signature on it.

     3        COURT REPORTER:  And who's going to handle

     4   signature?  Should I send the letter to you or to

     5   Dr. Rymph?

     6        MS. DURKIN:  Go ahead and send that to me -- myself

     7   and Gretchen.  Can you e-mail it?

     8        COURT REPORTER:  Sure.  I'll make sure they e-mail

     9   it.

    10             We're of the record at 2:38 p.m.

    11                       (Witness excused.)

    12

    13

    14

    15

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25



```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
    JENNIFER J. MILLER, DARIN E. MILLER, )
 4  SECOND AMENDMENT FOUNDATION, INC.,    )
    ILLINOIS STATE RIFLE ASSOCIATION, and)
 5  ILLINOIS CARRY,                       )
                                          )
 6                     Plaintiffs,        )
                                          )
 7           vs.                          ) No. 3:18-CV-3085
                                          )
 8  HEIDI E. MUELLER, in her official     )
    capacity as Director of the Illinois  )
 9  Department of Children and Family     )
    Services, and KWAME RAOUL, in his     )
10  official capacity as Attorney         )
    General of the State of Illinois,     )
11                                        )
                       Defendants.        )
12

13

14          I, CATHERINE RYMPH, state that I have read the
    foregoing transcript of the testimony given by me at my
15  videoconferenced deposition on the 20th day of May, 2025,
    and that said transcript constitutes a true and correct
16  record of the testimony given by me at the said
    deposition except as I have so indicated on the errata
17  sheets provided herein.

18

19
                              _____
20                                 CATHERINE RYMPH

21  SUBSCRIBED AND SWORN to
    before me this _____ day
22  of _____, 2025.

23
    _____
24       NOTARY PUBLIC

25
```



1   UNITED STATES OF AMERICA          )
    NORTHERN DISTRICT OF ILLINOIS     )
2   EASTERN DIVISION                  ) SS.
    STATE OF ILLINOIS                 )
3   COUNTY OF COOK                    )

4

5          I, Rocio Arias, Certified Shorthand Reporter,

6   do hereby certify that CATHERINE RYMPH was first duly

7   sworn by me to testify to the whole truth and that the

8   above videoconferenced deposition was reported

9   stenographically by me and reduced to typewriting under

10  my personal direction.

11         I further certify that the said deposition was

12  taken at the time and place specified and that the taking

13  of said deposition commenced on the 20th day of May,

14  A.D., 2025, at 10:01 a.m.

15         I further certify that I am not a relative or

16  employee or attorney or counsel of any of the parties,

17  nor a relative or employee of such attorney or counsel,

18  nor financially interested directly or indirectly in this

19  action.

20

21

22

23

24

25



1          Witness my official signature on this 16th day

2     of June, A.D., 2025.

3

4

5

6

7                    _Rocio Arias_

8                    _____
                     ROCIO ARIAS, CSR
9                    180 North LaSalle Street
                     Suite 2800
                     Chicago, Illinois  60601
10                   Phone:  (312) 236-6936

11
      CSR No.  084-004525
12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    Errata Sheet

2

3    NAME OF CASE: Miller vs Mueller

4    DATE OF DEPOSITION: 05/20/2025

5    NAME OF WITNESS: Catherine Rymph

6

7    Page _____ Line _____ Reason _____

8    From _____ to _____

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23

24   _____
     SIGNATURE OF DEPONENT



Miller vs Mueller
Catherine Rymph - 05/20/2025                                    1

---

**Exhibits**

**985578_Catherine_
Rymph_052025_Exhibits**

---

**1**

**1**  7:20 8:21 24:19 25:22
63:13,14 96:25

**10**  67:16 70:6,14 82:4,8,11
92:12

**100**  63:7

**10:01**  4:4

**11**  14:4

**11:31**  50:15

**11:36**  50:16

**12**  77:16 80:8

**12:30**  73:19

**12:41**  82:12

**12:42**  82:12

**12:52**  82:13

**13**  81:25 82:24

**14**  86:8

**15**  91:4

**15th**  8:19

**16**  33:21 93:6

**17**  93:22 94:14

**18**  33:12,19,22

**1820s**  63:1 86:24 88:3,13,
14

**1824**  60:4 62:2

**1830s**  62:5,22

**1850s**  69:11

**1870s**  85:21 86:4,6 87:14
88:17 100:10

**1880**  64:1

**1880s**  63:15,17 64:4,20
66:6 75:4 77:23 81:9,21
83:4

**1890s**  77:23 81:9,21 83:4,
5 86:3

**1898**  116:20

**19-**  102:1

**1900**  71:9 100:18

**1900s**  83:5 86:3

**1909**  98:13 102:15

**1912**  102:16

**1920**  126:9

**1920s**  92:12

**1923**  91:10

**1930**  91:8 92:13

**1930s**  19:20 57:18 72:3
77:4,12 92:6 93:2 94:16
103:13 104:9 105:14

**1933**  92:14 101:22

**1935**  93:7,17

**1938**  102:2 103:21,23

**1939**  93:11

**1940**  102:2

**1940s**  94:16 110:18

**1941**  107:11

**1950s**  101:15,18 111:11
113:12,22 128:14

**1958**  16:5

**1959**  108:11,17,21,25
109:9

**1960**  119:1,4,11,12 120:10

126:13

**1969**  121:21,24

**1970s**  127:16

**1979**  123:16

**1984**  13:2 122:7 125:11
126:14,24

**1988**  13:2

**1990s**  54:9 127:17

**1997**  127:19

**19th**  88:1

---

**2**

**2**  8:4,14 9:6,8 12:8 24:1,21
26:18 28:1 63:13,14 96:25

**20**  14:23,24 28:13

**20-**  15:12 18:17 25:23

**200**  27:18

**2008**  22:4

**2017**  25:23 26:11,13

**2020**  15:10,12,15,17

**2021**  13:21 16:3,7

**2024**  18:19

**2025**  4:3 18:19

**20s**  40:9 94:18

**20th**  4:3 15:16

**21**  18:15 33:21 96:21

**212**  4:5

**22**  96:21

**23**  91:14 103:21

**24**  100:8

**25**  13:25 14:2 93:8,17
101:7

---



Miller vs Mueller
Catherine Rymph - 05/20/2025

2

**26** 103:11

**29** 107:10

**2:00/2:30** 51:20

**2:35** 129:15,17

**2:38** 130:10

---

**3**

**3** 8:17 28:1,17 31:2,7,12 63:13,14 96:25

**30** 109:11

**30-something** 27:12

**30s** 94:18 95:1,12,17 96:7 97:11,14,15,16 107:24

**31** 111:10

**34** 10:7 114:6,13

**35** 118:14

**38** 118:25

**39** 93:25 124:2

---

**4**

**4** 47:19 55:3 63:13,14 96:25

**40** 14:22 93:25

**40s** 95:12,17 96:7 97:11, 14,15,16 110:6,17 111:15 113:22

**42** 12:9,21

**44** 19:2

**45** 21:24

**49** 23:14

**49-page** 8:7

---

**5**

**5** 50:6 51:23 53:10 55:3 63:13,14 92:14 96:25

**50s** 95:12,17 96:8 97:11, 14,15,17 110:6,17,18 111:16 112:1

**59** 91:9

---

**6**

**6** 56:15,16 58:23 63:14 96:25

**600** 63:17 64:20

**60s** 97:14 106:15 110:17, 18

**64** 91:10

---

**7**

**7** 60:10 96:25

**70s** 106:15

**75** 117:13

**7th** 63:14

---

**8**

**8** 51:25 52:13 63:12 67:6 96:25

**80** 72:4

**80s** 78:5 121:24

**81** 122:20

**82** 120:23,24 122:20

**83** 122:20

**84** 122:17 123:3,4,9

---

**9**

**9** 67:17,23 96:25

**90** 50:9

**90s** 78:5

---

**A**

**a.m.** 4:4

**Abigail** 11:14 21:24 24:3 50:6 53:17 81:25

**ability** 113:4

**absolute** 39:22 95:24

**absolutely** 40:4 43:16

**absorbed** 61:13 71:2 83:20

**abstract** 10:3

**abuse** 67:2 84:23 85:6,9, 16,17,22 86:1,5,13,14 87:4,14 88:17,23 89:5,8, 16,21 90:6,24

**abused** 52:8 85:13 86:18 88:20 89:23,24

**academic** 14:10

**acceptable** 100:18

**accepted** 103:13 104:9

**accomplish** 124:21

**account** 78:19

**accurate** 29:5,11 43:13

**achieved** 124:20

**act** 87:21 113:1 127:19,22

**acted** 36:14

**active** 15:23

**activities** 18:6



Miller vs Mueller
Catherine Rymph - 05/20/2025

3

**actors** 67:9

**actual** 100:5

**ad** 28:18 29:3 104:13

**add** 48:22 63:4 75:13

**added** 100:20 121:23

**additional** 51:12 75:13 84:19

**address** 52:11

**addresses** 20:1

**adherence** 121:4

**administered** 95:22

**administrative** 14:21 16:19,22

**adopted** 57:5

**adoption** 28:4 96:2 127:18,21

**adoptive** 127:24

**adult** 67:19

**adulthood** 33:17,20,23 47:15

**adults** 33:14 34:9,17 65:19 66:13 75:25 76:12, 18

**affair** 118:3,5

**affluent** 41:10 62:13,19 116:22

**afford** 116:5

**afraid** 53:23

**African-american** 109:20

**African-americans** 109:19

**age** 33:13,22 49:11 64:24 66:11 106:14,23

**agencies** 102:8,9,23

103:3,7 104:15,18,19,22 110:11 125:4,5

**agency** 93:10 102:18,25 103:1,18 104:5,24

**agent** 84:16

**agents** 84:17

**ages** 66:13

**agree** 53:8 79:12 91:1

**agreed** 5:2 46:8

**agreement** 4:2

**agrees** 79:10

**ahead** 27:16 37:19 72:21 76:5 77:25 80:16 94:8 99:16 102:13 129:21 130:1,6

**aid** 112:25

**akin** 38:2 70:21

**alert** 9:18

**allegedly** 112:12

**alleviate** 21:17

**almshouse** 61:23

**almshouses** 59:8,13 60:5 61:5,18 62:3 66:9,11,12

**Amended** 7:12,13

**America** 15:16 22:6 31:17 52:4 101:11,12 102:21 103:4

**American** 22:18 25:25 26:21 56:22,23 85:21

**American-born** 40:11,17 41:20

**Americans** 55:9 77:12

**amicus** 20:6,11 21:3 128:22

**amount** 92:1

**analogies** 32:4

**analogy** 38:24

**animals** 44:2

**animate** 68:14

**Anne** 106:10

**annoyingly** 95:9

**answering** 6:9,18 42:15 78:1

**answers** 5:25

**anymore** 26:15 35:23 106:4,16 113:15

**apartments** 122:1

**apologies** 47:24 53:25

**apologize** 20:6 66:4 77:13 80:9,10

**apparently** 66:10 109:19

**appeared** 22:9

**appearing** 101:17

**appears** 8:11 15:23 55:14, 15 66:14 114:7

**applicable** 5:3

**appointed** 16:9 50:2

**apprentice** 31:15 32:23 33:2,5,24 35:5,6 40:18 41:2 42:13 70:15

**apprenticed** 40:14 41:22 42:4 44:8 55:19

**apprentices** 34:10,12,18 61:15 74:4

**apprenticeship** 28:3 35:8 40:25

**approach** 22:19 23:3 89:1

**approve** 120:20



**April** 8:19 22:4

**archive** 101:24

**area** 72:19

**areas** 30:6 72:17 79:14 88:11

**argued** 118:14

**arguing** 118:17

**argument** 32:7

**arguments** 36:16

**Arias** 4:6

**Arizona** 79:11

**armed** 74:14

**arrangement** 46:5 71:14, 19

**arrangements** 44:13 46:4 64:10 104:13

**article** 19:8,12,13 20:1 22:3,5,7

**assigned** 100:12

**assignment** 14:21

**assistant** 14:5

**associate** 14:4 17:24

**association** 101:11 116:20

**assume** 91:11 103:15

**assuming** 43:13 51:2

**assumption** 89:20

**asylums** 91:12

**attached** 9:10

**attachment** 112:7,8

**attempt** 125:2

**attempts** 91:22

**attend** 85:5

**attended** 76:20

**attending** 100:21

**attention** 14:17 87:21,23 107:5,20 111:14 118:16 128:13,19

**attuned** 85:21

**author** 22:18

**authority** 36:3

**authors** 17:16,17

**availability** 94:4

**awareness** 86:14 88:23

**awful** 64:18

---

**B**

**babysitting** 114:24 115:1

**back** 12:5 23:25 32:11 44:11 45:9 50:15,19,21 53:6 59:16,18 62:2 66:24 74:9 82:13,20 109:19 116:4 128:22 129:14,17

**backgrounds** 41:6 75:16

**bad** 16:20 36:17 67:21

**badly** 15:8 88:20 102:6

**bale** 43:18

**banning** 65:17

**based** 83:11 112:9

**basic** 44:20 48:12,13

**basically** 28:12 63:9,21 72:5 74:7

**basis** 21:11

**bathroom** 50:11

**beat** 38:13

**beating** 37:12

**bedrooms** 105:8,9,10 108:23

**beg** 82:17

**began** 61:17 77:18 79:2 81:8 86:12 87:3 101:18 118:22

**begging** 60:5 99:15

**begin** 70:3

**beginning** 45:9 57:18 70:4 73:5 86:23 88:3 96:5 101:14 102:1 124:1

**beginnings** 19:23,24 58:14 76:17

**begins** 97:3

**belief** 57:2

**believed** 113:7,11,23

**beneficial** 49:19

**benefit** 48:24,25

**benefits** 43:9 44:15 46:24 71:3

**benefitting** 35:21

**bibliography** 102:3

**big** 99:2 105:22

**bigger** 24:4

**biggest** 5:24 72:12

**bind** 48:4 49:12 52:14 53:5 59:13 61:6 115:19

**binding** 44:12 45:8,25 47:8,14 49:1,3 111:2

**biological** 107:3

**Birk** 70:18 78:21 81:4

**bit** 8:25 17:4 36:23 42:2 44:22 46:2 61:10,21 71:10,12,23 72:3 78:6,7 83:2 84:20 92:22 97:14



108:21

**bits**  29:7

**black**  32:5 36:24 37:5,16
38:1,11,12 39:3,6 40:16

**blacksmith**  35:18

**blacksmithing**  54:25

**board**  70:10 72:2 91:25
106:2 110:9

**boarding**  91:17,21,22,24
92:7,13,15,17,23,25
94:10,11,19,23,25 95:7,17
103:22,23,24 104:2
105:23

**boards**  83:6 84:16,18

**bold**  96:22

**bombing**  112:13

**book**  17:13,16,18 18:1,2,
7,8,9,24 19:14 22:2,4,11,
12,14,15,16,18,22,25
23:4,8 25:23 26:2,11
27:18,19,20,21,23 30:5,21
55:16 110:2 127:21

**books**  18:3,6 87:18

**born**  41:6

**bother**  120:21

**bothered**  100:11

**bottom**  15:21 22:1 27:25
31:8 53:10,23 59:12 63:12
67:5,17,22 74:25 77:15
80:8,20 98:18 101:7
103:12 111:10 118:11,14

**bound**  42:21 43:3 45:15,
23 52:4 60:6

**boxes**  90:15

**boys**  36:24 43:13,14,17,
23 44:9 63:10

**branch**  112:5

**break**  6:22 50:12,20 51:19
73:23 82:15,19 83:3,12
129:12,16

**briefly**  11:17 32:21 80:11

**bring**  66:23

**brings**  77:8

**Britain**  112:17

**British**  93:25

**brother**  106:9,11

**brought**  31:15 38:24 67:7
111:25

**Browder**  22:6

**Bureau**  102:17

**burn**  36:9

**burning**  13:1 35:17

**burns**  121:25

---

## C

**call**  5:9,10,13 19:22 73:19
116:24

**called**  4:13 5:8 15:16
17:13 22:9 25:23 34:10,14
35:3 59:9 94:19,20,21
95:7 103:8 116:24 119:22,
23

**campaigns**  98:20

**campus**  15:3

**Canada**  103:1

**capstone**  23:18

**caption**  8:7

**captures**  27:5

**care**  19:6,15,17,22 21:8
22:19 25:14,24 26:20,22

27:11 28:2,5,23 34:20,24,
25 39:4,8 47:16 54:1,4,6,
8,12,13 62:4 64:12 68:20
69:25 71:16 83:22 84:19
89:22,25 90:7 95:11,13,14
96:16,20 97:21,25 98:11,
13 99:3,12,15 100:4
103:14 104:7,11 107:5,12,
15 111:13,19,22,25 113:5,
10,13,14,20,25 114:8,9,
14,15,24 115:20 116:12,
13,17,18,23,24 117:5,8,
10,14 118:7,10,15,19,21,
23 119:2,5,8,14,15,16,21,
23,24,25 120:12,14,18,19,
20 121:2,7,20 124:10
126:12,20 127:24

**cared**  32:16 37:11 52:18
55:2,5 66:16 85:13 99:4,
18 117:15

**careful**  97:25

**carefully**  96:11

**cares**  7:8

**caring**  35:9 36:18 44:1
64:2 91:25 104:6 111:20

**case**  7:1 8:7,12 20:7,14,24
25:8,11,13,15,16 26:4
45:3 50:11 51:9 74:5
128:17 129:9

**cases**  46:3 73:10 89:4

**casework**  96:13

**catch-all**  128:24

**catching**  95:4

**categories**  121:13

**Catherine**  4:1,12,24 5:1,9
8:8 24:13 27:16 37:19
76:5 80:18 94:8

**Catholic**  20:16



**caveat** 63:4

**centers** 116:23,24

**Central** 5:5

**centuries** 28:2 126:22

**century** 15:16 22:24 28:5,
7,22 29:4 30:10,11 35:1
38:5 41:8,13 48:3 60:7
61:3,4,12,15 64:4 65:17,
23,24,25 66:2 67:18,25
68:22 69:4 71:8,12 73:1
74:9 75:1,3 76:14 77:2,19,
21 82:25 86:11,16 87:3,12
88:1 89:13,14,18 92:6
96:7,14,16 97:5,10
104:17,20 105:24 106:8,
19 109:13 111:25 114:16,
20,22 115:5,6 116:5,19
118:13 127:2,3,6,8,10,13
128:1,5,10

**certainty** 123:13

**Certification** 105:17

**cetera** 19:7 32:14

**chair** 15:18

**chance** 9:2

**change** 17:7 25:3,5 29:6
30:22 41:13 95:21,22,24
96:1 107:22 111:24
127:25 128:4

**changed** 62:25 63:5 76:11
100:15

**changing** 63:6 100:18
125:10

**Chapters** 18:25

**charges** 89:25

**charities** 67:7

**charity** 48:13 114:17
117:9,11

**Charles** 7:22

**cheap** 84:24

**check** 102:3 122:20

**checking** 36:4

**chemicals** 122:3

**chief** 52:25

**child** 19:25 21:10 26:20
27:11 32:6 33:16 35:9,10,
15,16,21,22,24 36:7,8,11
42:20 43:7,8,10 44:14,17,
19 45:15,17,22 47:5,15
48:25 49:1,3,14,18,21
52:4,15 54:24 55:3,5 56:7,
22 66:16 67:7 68:4 69:1
70:10,23 71:16 72:11
76:20,21,23,24 77:4,5,7,9
81:15,18 83:6,13,14,24
86:14 87:14,25 88:17
89:2,12 91:24 92:1,7 93:3,
9,10,23 94:18 96:5 98:5,
21 99:23,25 100:12 101:9,
12,25 102:4,7,10,15,20,
23,25 103:3,8,10 104:18,
21 106:3,19,24 107:4,11
108:11 112:6,17,18,24
113:6,22 114:24,25 115:5
116:12,13,16 117:13
118:10,19 119:1,13,19
120:3,10,12,18 121:23
122:21 125:3,12 128:11,
12,14,17,19

**child's** 86:15 107:13

**childcare** 115:2 117:17,
20,23

**childhood** 56:23 57:8,13,
19 58:8 62:11 76:9,10,17,
19 83:21 96:2,19

**childhoods** 100:18

**children** 11:9 25:24 28:2
31:14 32:5,8,16 33:9,25

34:10,11,17 36:24 37:5,
12,13,17 38:1,11,12,16
39:3,6,17 40:12 41:12,20,
25 42:3 46:5 48:5,16 49:7,
11 52:8,13,15,17,23,24
53:11 54:2,12 58:18,20
59:14,20,21 60:12,21,23
61:12,13,16,17,25 62:5,
12,20 63:18,19,22 64:3,8,
12,21,24,25 65:1,18,20,22
66:12,21,23 67:10,19 68:5
69:20,25 70:2 72:1,16,23
75:9,15,18,24 76:2,11
79:15,17 83:8,18,23 84:2,
22 85:4,10,24,25 86:25
89:22 91:11 92:14 93:24,
25 96:3,9,16 97:3,8 98:13,
23 99:3,5,11,13,14,18
100:19,20 103:14 104:6,
11 105:8 106:1,2,7,17,18
107:1,2,3,21 109:14
111:12,20,21 112:2,10,11,
14 113:1,5,9,13,20,24
115:7,18,20 116:10,14
117:1,3,15,22,25 118:8,
16,20 119:14 120:15
122:4 124:12,19,23
125:20 127:23

**children's** 83:25 102:17

**choose** 18:7 72:19

**choosing** 18:2

**church** 68:13,16 108:3

**churches** 108:4

**circulating** 125:6

**circumstances** 6:7

**cited** 27:23

**City** 20:11,15 128:22

**civic** 57:3

**Civil** 5:4



Miller vs Mueller
Catherine Rymph - 05/20/2025

7

**clarify** 10:1 22:8 27:25 34:23 42:11 50:24 51:3 62:8 71:20 91:18

**clarifying** 94:17

**class** 15:5,16,17 17:6,7,8, 12,21,23,24 18:2 68:2,11 75:2,10,11,17 83:19 120:9

**classes** 15:6,7,13 17:21 75:15 77:2,3,11

**clause** 80:1

**cleaning** 122:3 124:2

**clear** 12:12,14 13:18 56:20 113:19

**close** 35:17 73:19

**closely** 70:19 89:19

**closer** 33:3 79:14

**clothe** 35:5

**clothing** 44:20 49:16

**co-taught** 17:23

**Code** 5:4

**college** 13:17,20 15:6,25 16:1,2,5,8,16,17,18,21 17:2,3,11,25 18:8

**colleges** 17:5

**colonial** 31:17 32:8,11,12 41:1,5 52:4,8 54:3,19 55:9,17 56:6 63:2 74:3,11

**colonies** 31:16 40:8 41:6, 18

**Colorado** 79:12

**Columbia** 4:6 17:13

**comic** 22:24

**comma** 28:21

**commission** 100:9

**commitment** 58:14

**committed** 58:2,6

**committee** 15:1

**committees** 15:3

**common** 37:5 61:25 64:11 73:11 75:20 116:1

**commonly** 40:13 41:22 90:5

**communities** 61:17 75:3, 11,16

**community** 36:3 50:1 53:13 96:5 98:5 108:5,6,7 111:1

**community's** 97:8

**compared** 27:19

**complaining** 44:25

**complaint** 44:25

**complete** 77:11

**completely** 29:12 96:13 104:2

**compliment** 86:7

**component** 127:18

**concentrated** 78:24

**concern** 69:7 81:21 85:10, 14,23 86:2,5,12 87:4,13, 25 89:18 107:24 108:1

**concerned** 84:1 105:6,7

**concerns** 81:12 86:15 105:11

**conclusion** 4:7 19:19,20 21:2 29:2 114:7 123:21 126:19

**conclusions** 25:18

**condition** 124:11

**conditions** 47:4 62:24 100:19,24

**conducted** 4:2

**conference** 98:12 100:2 102:15

**conferred** 43:9 44:15 46:24

**confused** 64:15

**confusing** 42:6

**connected** 68:15 89:17 99:21

**connecting** 67:8

**connection** 46:2

**consensus** 111:12 112:1

**consequences** 38:18

**considerable** 16:16

**considerably** 64:5

**considered** 105:19

**consistent** 83:9 84:7,11, 14

**consistently** 87:9

**constitute** 121:14

**contained** 25:11

**content** 11:7,12

**context** 83:16 111:22

**continue** 36:12 71:9 73:20 99:7 103:25 120:6

**continued** 61:24 89:12

**continues** 71:10,11 72:3 89:19 120:8

**contract** 33:11 44:16,18 46:10,11,15,20 70:9,22

**contracts** 33:4,15 43:7 44:13,23 45:10 46:12



47:1,3

**contradicting** 26:12

**contrast** 62:9,14

**contributes** 113:24

**convened** 98:13

**conventional** 106:22

**conversation** 125:12

**conversations** 27:8

**convey** 129:2

**conviction** 104:20

**copy** 7:11 9:3,10 24:22
109:2 129:21,23

**corn** 45:5

**correct** 7:1,3 8:20 9:15
13:18 14:7 15:22 20:14
21:11 24:10,24,25 25:2,25
26:1,23 35:19 37:10 52:9,
10 56:8 58:22 59:22 67:4,
11,13 70:13 74:5,20,21
80:23,24 81:15,16,18,19,
22 85:1,2 86:22 89:3
92:11 93:12 98:16 104:11
115:9 116:9 125:23

**correctly** 22:21 23:19 28:8
31:17 60:25 83:9 124:6

**cost** 77:6 92:2

**counsel** 4:8 7:21 11:8,9
12:5 27:9 51:9 129:7

**counting** 63:13

**country** 29:8,10,20 37:4,8
38:1 39:13 57:17 78:4
79:2 81:7

**countryside** 112:12

**county** 93:8

**couple** 20:4 35:14 93:13
100:17 103:1 106:6,14,23

112:4 117:22 121:19

**couples** 20:18

**courses** 23:17,18,22

**court** 4:1,20 42:22 45:16,
23 47:9 50:23 51:13,18,21
52:4 53:17,19 80:13,14
129:25 130:3,8

**courts** 52:13 67:7

**cover** 92:2

**covered** 121:13

**cows** 44:2

**crafted** 86:24 88:2

**create** 125:2

**created** 116:15,21

**creates** 119:18

**creating** 19:22 57:12
113:3

**creation** 59:8 112:22
116:18

**credit** 17:22

**critical** 87:24,25 105:20
107:8

**critics** 86:11 87:3

**critique** 23:9

**cruelty** 86:24

**culprit** 5:24

**culture** 22:23

**curious** 39:4

**current** 13:14,17

**cursor** 47:18 91:7

**cut** 42:14 73:16

**CV** 8:11,22,23,25 9:10,13
12:1,10 14:9 19:12 23:13
55:15

**CWLA** 118:14,17 125:21

---

**D**

**dabbling** 127:3

**damage** 112:14

**damaged** 111:13 112:2
113:17,18,25

**dangerous** 54:25

**date** 4:3 5:2 7:22,23 54:10
86:4 126:25

**dated** 8:19 86:5

**David** 12:11 24:16 50:24
80:12,18 129:11

**day** 26:22 30:16 114:9,14,
15 116:18,20,23,24 117:2,
5,8,10,14 118:15,21,23
119:2,5,14,15,16,21,23,
24,25 120:14,18,20 121:2,
20 124:10 126:12,20
129:19

**day-to-day** 39:23,25

**daycare** 114:19

**days** 32:11,12 74:11

**DC-** 90:8

**DCFS** 90:12

**deal** 19:6,16,21 112:23,25
113:8,15

**dean** 5:10 13:16 16:1,4,
10,20,22 17:5

**deans** 17:5,24

**debate** 118:18

**debating** 98:7

**decade** 123:1,14

**decades** 60:24 72:25
77:10 99:8 100:16



**decided** 16:7 37:12 100:2 119:11

**Declaration** 8:8 32:13

**declined** 91:9 92:22

**declining** 94:4

**deconstructing** 87:10,11

**deemed** 54:2,13,16

**defeats** 116:8

**defendants** 7:2,21 11:8

**define** 14:15 81:1

**defined** 79:22

**definition** 76:10 107:22

**delegates** 98:20

**deliver** 51:17

**demonstrating** 21:5,6

**dense** 10:20

**department** 11:9 13:15,23 14:5,6 15:3,9,19 102:18

**depend** 30:3,9 37:3 45:24

**dependent** 61:12,13,25 75:15 91:10 97:8 98:13 112:25

**depending** 39:13

**deposition** 4:1,7 5:1,16 7:11,24 9:21 10:11 11:2 51:14

**Depression** 92:20 93:5

**describe** 30:5 49:18 52:23 69:16

**describing** 37:17 44:9 45:3 91:1

**description** 20:23

**desertion** 94:2

**desk** 10:2

**destroyed** 35:25

**detail** 26:25 27:6 48:7 64:7

**details** 46:15,21 124:1,21

**determine** 46:23

**develop** 69:23

**developed** 70:1 111:12

**developing** 62:13,14

**development** 57:15,18 83:15 93:7

**develops** 69:13

**devote** 98:7

**diaper** 90:13

**die** 31:22,24 36:9

**died** 42:24 58:19

**differ** 44:7 46:4

**difference** 32:22 33:3 39:22 45:16,22 46:3 66:8 89:7 94:21

**differences** 47:13

**differently** 39:9

**difficult** 6:3 90:2

**diminished** 36:8

**DIRECT** 4:15

**directed** 103:5

**director** 15:24 16:6,9

**disaggregate** 90:2

**disappear** 58:5

**disciplinary** 22:17

**discontinued** 110:14

**discourse** 56:24 57:9

**discovered** 88:18

**discovery** 87:14

**discriminated** 21:16

**discrimination** 21:9,11

**discuss** 18:4 73:3

**discussed** 69:23 109:10

**discussing** 76:1 95:15

**discussion** 40:10

**disease** 107:25 108:6 118:15

**disobedient** 52:15

**displacement** 58:18

**dispute** 23:10

**dissipate** 120:5

**distinct** 86:15

**distinction** 61:21

**distinguish** 127:12

**distributing** 48:4

**District** 5:5

**divide** 40:6 75:8,22 76:1 83:13

**division** 15:17

**doctor** 5:10,11 42:11 56:19

**doctorates** 20:5

**document** 7:10,16 8:7 30:24

**documents** 9:1 10:10 12:4

**dog** 90:16

**domesticated** 44:1

**donations** 59:5

**doors** 36:4

**dot** 28:23



**double** 92:15

**drafts** 125:6

**drain** 53:12

**dropped** 92:14

**due** 53:13 126:10

**duly** 4:13

**Durkin** 11:15 12:11,18,21,
23 19:2 21:19 24:5,8,12,
15 26:5 27:3,15 29:15,24
34:21 37:18 38:21 47:24
50:7,21,24 53:18 55:24
65:6 73:16 76:4 80:9,12,
16 82:7,11,14,18 94:7
102:12 123:11 129:11,14,
17 130:1,6

**duty** 49:6

**dying** 73:21

**dynamics** 109:16,24

---

**E**

---

**e-mail** 130:7,8

**earlier** 7:21 36:24 54:24
55:16 63:8 69:8,9 73:13
76:24 78:6 79:3 80:3
85:19 94:17 96:6 97:12
101:17 102:9 108:17
109:16 110:22 111:23,25
115:11 128:20

**earliest** 31:3,13,19 38:8
101:21,22

**early** 19:13 28:6 61:15
65:13 68:22 73:1 83:5
86:3 87:8 92:6 104:17,20
106:8 115:6 126:21 127:7,
12 128:25

**earn** 106:1

**easier** 12:3 127:22

**east/northeast** 88:8

**eat** 36:8 45:6 90:16

**economic** 19:5 20:2 36:19
37:14 57:24 66:17,19,24,
25 94:2 113:4

**economy** 63:5

**edition** 123:4,5,6,9,10,15

**educate** 58:15

**educated** 68:10 83:19
85:25

**educating** 58:14,15

**education** 17:4 23:21
35:12 43:8 44:14 46:23
57:6 60:14

**efficacy** 119:22

**efforts** 21:14 98:21

**eighteen** 30:10 35:1 38:5
41:13 48:2 76:14

**eighteenth** 41:8 61:11
74:9 96:14

**eights** 26:13

**element** 27:19

**elevate** 16:8

**elevated** 16:15

**eleven** 93:9

**eliminated** 113:9

**elites** 57:15,21,25 58:13
60:11,14 75:10

**else's** 106:2 114:21

**embedded** 85:3

**emerge** 59:6

**emerged** 65:16 114:16,20
115:4

**emergence** 86:5

**emerges** 112:6 120:4

**emerging** 19:17 87:13,25
96:4 106:18

**emotionally** 112:15

**emphasis** 33:6 57:6
128:7,19

**emphasize** 29:6 30:17,21
34:24

**enable** 98:22

**encapsulated** 27:1

**encourage** 124:10

**end** 12:18 16:14 18:6 21:7
40:3 43:10 61:8 71:8
79:24 84:6 93:10,23 99:14
103:12 104:9 117:18
120:5

**ended** 41:7 46:13

**ends** 71:22

**enforced** 87:1,5,9,22

**enforcement** 89:1

**enforces** 87:20

**enforcing** 87:23

**engaging** 34:9

**England** 31:16 88:8

**English** 41:20

**enjoy** 17:1

**enlightened** 62:20

**enrollment** 15:15 23:18

**enslaved** 32:8 37:7,9
60:20

**ensure** 125:19

**enter** 33:14

**entitled** 23:14

**entry** 23:13



**entwined** 114:14

**equipment** 54:25

**era** 29:9 52:8 55:9 63:2 68:23 82:3 113:8

**escape** 112:13

**essay** 54:9

**essentially** 22:20

**establish** 98:21

**established** 106:3

**establishes** 102:16,17

**establishing** 98:11 103:6, 9 113:3

**Europe** 93:24

**evaluated** 110:13

**eventually** 33:11 34:1 105:13

**everyone's** 90:14

**evidence** 84:17,18,21 87:21

**evolution** 68:21 72:25

**evolving** 107:18

**EXAMINATION** 4:15

**examined** 4:14

**examples** 22:23 35:15 54:16,17 84:13 98:24 100:16 109:6,23 121:10, 11,12

**exchange** 49:18

**exclusively** 41:11

**excused** 130:11

**Exhibit** 7:20 8:4,21 9:6,8 12:8 24:1

**exist** 63:7 119:17

**existed** 87:17

**exists** 96:15

**exit** 112:20

**expanded** 64:5

**expansion** 19:25

**expectation** 75:16,18 105:15

**expectations** 46:9

**expected** 35:13

**experience** 23:16

**experiment** 58:2,4,10

**experimenting** 77:18 78:13,16 79:2 81:8

**expert** 7:1 89:6

**experts** 92:7 93:4 94:18 96:5 104:21 106:20 112:8 113:7,23 117:13

**explain** 42:1

**exploitation** 36:20 49:20 86:13

**exploitive** 28:19 29:4 36:19 39:16 44:24 84:3

**explore** 39:10

**expressing** 86:12 87:3,4

**extent** 19:10 35:20 39:8 66:19 111:13 119:15,20

**extreme** 40:15 90:20

---

## F

**face** 124:9

**facilitated** 118:15

**facility** 121:22

**fact** 12:2 32:12 40:5 44:7 47:17 113:8

**factories** 75:21

**factors** 112:3

**facts** 25:17 56:5,12,13 129:1

**fades** 41:9

**failed** 110:14

**fair** 23:11,12 25:11,20 26:4 55:16,23 64:1 75:11 113:1 120:22

**faith** 65:15

**fall** 15:10,11,16 17:23

**falling** 64:13 105:5

**familiar** 8:15

**families** 41:12 48:5,16 60:22 66:13,20,25 70:4 72:10,14,20 75:17 97:20 100:4 105:2 109:24 110:12 112:11 113:4,17 127:18,22

**family** 11:10 14:17 19:6 28:5 49:7,9,10 66:23 70:9 71:2,3,15 72:3 75:19 77:6 88:16 91:25 94:12 95:13, 14,18 97:20 98:3 99:6,20 103:15,20 105:20 106:20, 21,22,25 107:3,8,19 113:6 114:8 118:6 119:22 128:9, 20

**famous** 71:25 106:11 126:18

**fan** 119:13

**farm** 28:4 61:14 69:21 70:3,19 71:13,15 72:10 75:19 78:23,25 84:2 85:11 86:12 87:3 91:15 100:13 106:12,16

**farmed** 65:2

**farms** 64:8,17,22 74:17 100:20



**farther** 44:21 79:9

**fashion** 32:17

**fast** 46:12

**faster** 5:19

**fathers** 57:24 109:17

**favor** 64:14

**fear** 58:3

**fears** 35:10

**feature** 105:12

**features** 98:4 105:2,5,16

**fed** 70:16 86:17

**federal** 5:4 19:24 102:17, 19 118:22

**feed** 35:6 45:2 60:1 63:21, 22 124:7

**feeding** 125:5

**feel** 48:23 65:21 129:4

**felt** 25:19 37:12

**fend** 116:15

**festival** 17:13,17,18 18:9

**fewer** 94:24 108:1

**field** 44:4 103:8

**fighting** 74:14

**figure** 73:3

**figured** 19:11 45:20

**film** 22:24

**filtered** 77:3

**filth** 90:15

**finally** 28:6 120:11

**financial** 98:22 99:10

**finding** 29:2 64:22

**fine** 5:10,11,14 8:2 9:5,16

21:21 42:16 65:7 66:5 82:11

**finish** 40:20 45:19 66:3

**fire** 121:4

**firearm** 55:14

**firearms** 23:11,23 55:22 56:1,6,9,14 74:5,19

**five-minute** 129:12

**flavor** 17:20 118:1

**flip** 92:18 94:24

**flipped** 92:17

**floor** 90:15

**flowed** 99:3

**focus** 14:14 100:23 101:1, 2

**focused** 102:19

**focuses** 14:16

**follow** 30:20 72:15 73:7 74:1,24 96:12

**followups** 129:9

**font** 96:22

**food** 44:1,20 45:1 48:9,10, 12 49:9,15 59:5 90:16,17 92:2 121:8

**footnote** 47:19,23 51:24 52:2,13 101:14 117:13 120:23,24

**force** 120:8

**foreclose** 65:19

**foreign** 59:18

**forge** 35:17

**forget** 26:8

**forgive** 18:12 48:22 89:5 107:14

**forgotten** 4:18

**form** 21:19 26:5 27:3,15 29:24 32:17 34:21 37:18 38:21 49:9 53:6,18 55:24 59:3,11 71:25 76:4 85:9 94:7 102:12 114:17 123:11

**formalize** 120:13

**forms** 59:1

**forward** 26:21

**foster** 19:6,14,17,22 20:17,19 21:8 25:14,24 26:20 27:11 28:5,22 39:4 54:2,13 89:22,24 92:10 94:1,5,10,13,20,22,25 95:6,11,13,14,18 96:8,20 97:19,20,25 98:1 99:2,15 100:4 103:15,20 105:1,15 106:6,20,24 107:4 108:11 109:16,17,22,24 110:3,4, 12,14 111:13,19,22,25 113:5,10,13,14,20 114:8, 14 115:12 116:17 119:8, 22 120:2,19 121:2,23 126:20 127:23 128:15

**foster-home** 93:1

**fostering** 77:19 78:13,16, 20 79:3 81:9

**found** 67:21 101:21,23

**founded** 61:22

**founding** 26:21 30:15 57:4,23,24 58:5,11

**fourth** 19:5 97:2

**free** 70:7 78:19 80:2,6,21 81:13 91:14 92:15,17 94:19,24 107:25 108:6

**Friday** 50:25 51:3,10,12

**friendless** 84:23



**front** 9:1,3,14,17 24:22
54:10 109:3 123:7

**fulfill** 97:7

**fulfilling** 49:5 96:8

**full** 14:9 42:20 44:12 70:6
77:16 90:13,14 93:22
107:10 119:1

**fully** 37:23 77:3,11 93:23

**Fulton** 20:6,15,19 128:22

**fun** 50:10

**function** 96:9

**functions** 55:13 111:23

**funded** 61:22 65:22

---

**G**

**Gables** 106:10

**gained** 83:6

**gather** 84:17

**gathering** 84:21

**gave** 54:23

**Gender** 22:10

**general** 20:23 27:5 29:2
46:9,14 47:13 48:11 78:5
79:20 85:14,16 109:9,10

**generalized** 74:12

**generally** 29:5,11 30:12
63:3 68:9 108:6 118:17

**generation** 57:4,24 58:5,
11,12 60:15

**generations** 57:5

**genres** 22:25

**geographic** 37:22

**gestures** 5:23,24

**girl** 45:5

**girls** 43:15,18,24 44:7,8
63:10

**give** 5:12,18 7:4 30:13
48:8 51:16 78:18 100:5,16
101:4 114:5

**giving** 23:4 43:10 48:15
53:4 90:16 100:3 125:7

**glad** 8:6 12:2

**glib** 18:13

**gloss** 90:24

**goal** 53:14 99:17

**good** 24:17 49:11 52:21
56:19 69:14 71:16 73:24
82:10 105:1,17 107:12,15
108:5

**goodness** 18:18 55:5

**government** 21:16 25:24
58:4 65:10,11 67:6 68:7,
17,18 72:9 102:8,19
104:5,10 118:22

**graduate** 23:16,17

**grant** 18:14,17,23

**great** 12:23 13:6,8 58:3
76:7 82:14 92:20 93:5
94:25 110:2 129:14

**greater** 27:6 57:6 84:21
128:7

**Green** 106:10

**Gretchen** 7:13 11:14
130:7

**grew** 60:13 94:1

**ground** 5:18

**group** 57:15 58:13 118:15
126:7

**groups** 21:15

**growing** 77:1 94:3 100:20
104:20

**grows** 94:15

**grudgingly** 119:19

**guardian** 42:21,22 43:6
45:15,23,25 46:8 47:8

**guards** 122:2

**guess** 39:11,25 40:15
41:23 43:13 46:17 52:5
63:23 108:23 111:7 122:6
128:21

**guessed** 18:22

**guidelines** 121:21

**gun** 55:15

**guns** 22:5 23:1

---

**H**

**Hacsi** 53:25 54:7 59:16

**Hacsi's** 55:7

**half** 40:7 41:17 62:16
63:13 71:8

**Hall** 4:5

**hand** 5:24 36:9

**handle** 130:3

**haphazard** 28:18 29:3

**happen** 34:3,4 38:3 90:21
99:8

**happened** 30:23,24 113:8

**happening** 30:3,5,7 41:13
68:21 77:9 78:3 83:15
92:4 104:3,19

**happy** 5:9 16:23

**hard** 41:4 43:12 46:12

**harm** 55:1



**Harper** 18:2

**hate** 16:19

**hay** 43:18

**hazards** 108:10,15,20
  109:1 121:22

**head** 5:23 35:15 81:6

**health** 58:5 105:18 121:3,
  4,14,23

**healthy** 36:11

**hear** 66:1

**heard** 29:16 75:23

**heart** 53:11,14

**heat** 121:5,25

**Helfrich** 7:12 11:14 50:13,
  17

**helped** 19:17

**helping** 58:3 96:9

**heteronormative** 128:20

**Hey** 12:11

**high** 115:17 122:1

**higher** 16:14

**Highlights** 15:21

**historian** 14:15 22:17 23:5
  29:6 70:18 76:22 90:24

**historians** 21:5 32:3 52:22
  68:23 76:8 86:4 88:16

**historic** 90:2

**histories** 114:13

**history** 13:16,19,23 14:4,
  6,14,16 15:8,18 20:4,5
  21:7,8 22:10 23:23 25:14,
  24 26:22 27:13 30:13,20
  56:23 76:16 89:11 95:3,5

**hoc** 28:18 29:3 104:13

**hold** 96:7

**home** 39:7 49:21 52:13,17
  66:24 72:2,20 89:2 90:12
  91:24 92:17 94:12 95:6,7
  96:12 97:5,7 98:4,23 99:5,
  13,18,19 100:6 103:16,24
  104:2 105:2,4,13 106:20,
  21 107:1,7,20 108:7,10,19
  115:16,24 117:3,4 118:7,
  21 119:25 128:12,14,18

**homes** 83:8 91:14,17,18,
  21,22 92:7,10,13,15,16,
  23,25 94:1,4,5,10,11,13,
  19,20,22,23,24,25 95:1,
  17,18,25 96:8 103:21,22
  105:15,23 108:1 109:13
  111:15 115:8 120:1,2
  121:2,22 124:10 127:24

**honest** 22:15

**honorific** 5:13

**honors** 13:16,20 15:6,7,24
  16:1,2,5,8,16,18,21 17:2,
  11,24,25 18:8 23:17

**Hoosiers** 13:9,10

**hope** 84:20 111:3 125:14

**hoped** 120:20

**hoping** 120:3

**horseshoes** 35:18

**hot** 35:17

**hours** 11:21 51:10 100:21

**house** 35:5 43:19 63:10
  64:22 98:12

**household** 43:21 44:5
  60:24 69:21,22 70:24
  76:24 122:2 124:2

**households** 61:14,16
  75:18 83:19

**houses** 91:15

**houses"** 61:18

**housing** 44:20 65:22

**huge** 119:18 127:25

**hurting** 90:6

**husband** 117:23

**hypothetical** 54:24

---

**I**

**i.e.** 104:5

**idea** 33:25 34:5 51:15
  62:12 72:13 76:11,13,17
  77:1,4 91:23 96:2,13,14
  97:5,24 99:3,8 100:6
  103:4 111:18 112:7,23
  113:24 115:7,22 119:4

**ideal** 70:24 71:1

**ideals** 58:12 60:14

**ideas** 57:14 58:7 60:23
  62:11 100:17 112:16

**identified** 68:3

**identify** 83:24

**idle** 52:14

**II** 96:22 98:11

**III** 114:6

**illegitimate** 40:12 41:21

**Illinois** 5:5 11:9 81:6,8

**images** 23:1

**imagine** 100:1

**immigrant** 60:22 75:2,11,
  15,17 115:15

**impact** 55:22

**implies** 31:20

LEXITAS

**important** 89:9 112:19,22 129:4

**importantly** 106:25

**impoverished** 40:12 41:21,24 42:3 114:17

**in-quotes** 54:5

**inadequate** 45:1

**inaudible** 126:10

**inaugural** 13:16 16:1

**include** 25:18 51:10 121:9

**included** 85:18 105:1

**includes** 51:11

**including** 23:17 36:22 121:5

**income** 60:24 77:5 106:1

**incoming** 17:25

**increase** 93:14

**increased** 100:19

**increasingly** 75:20 111:22

**indenture** 28:3 31:14 32:22 33:1,2,4 39:20,21 40:3,25 41:3,9,11 42:13 43:4,6 58:24,25 59:2,3 61:24 62:4,18,21,23,25 63:1 64:6,13 70:8,21,22 73:11 74:15,20

**indentured** 33:8,10,15 34:10,18 37:6 39:14,15 40:11,19 41:19 42:1,5 43:15 44:8,25 45:10 48:17 49:14 53:5 55:18 61:14 64:10,19,23 74:4

**indentured/apprentice** 52:7

**indentures** 73:11

**Independence** 32:14

**independent** 62:5 67:9

**Indiana** 81:6

**indigent** 31:14 32:7,16 36:25 38:1 39:6 47:14 59:7 64:3

**individual** 76:20 96:10 102:23

**individualized** 83:22 107:5 118:16

**individuals** 96:10

**indoor** 59:9 105:14,15

**indulgence** 82:17

**indulging** 129:3

**industries** 118:24

**infant** 55:2

**influencing** 112:17

**informal** 28:4 119:3

**infrastructure** 19:25 113:3

**inherent** 77:8

**initially** 65:13 73:6 74:23

**injure** 35:22

**input** 125:3

**insecurities** 35:10

**inside** 16:14

**inspected** 121:3

**instill** 58:12

**institution** 32:3 64:25 65:1 67:1 111:19 120:1

**institutional** 99:20,22 119:23

**institutions** 20:17 59:10 67:20

**intellectual** 23:2

**intended** 49:19

**intensive** 57:6

**intention** 66:22

**interchangeably** 42:8,10

**interest** 16:14 35:24 36:1, 6,11,13,15,18 37:14 68:5 76:7 87:23

**interesting** 36:15

**interim** 15:24 16:9 26:13

**internal** 109:23

**intervening** 87:15

**intervention** 55:7,11

**intro** 29:1

**introducing** 83:8

**invested** 57:25

**investigate** 110:6

**investigations** 100:19,23

**investment** 36:7

**investments** 16:17

**involve** 23:23 48:11,12

**involved** 20:17 44:13 65:23

**isolated** 84:23 85:11

**issue** 23:10 122:25

**issued** 119:2

**issues** 12:13 21:9 102:20

**items** 124:11,18 126:14

**IU** 13:1 23:21

## J

**Jewish** 93:24

**job** 48:8 118:7



join 113:2

journal 19:7 22:7,9

joy 77:8

jump 103:11 114:6

jurisdiction 110:25

### K

keeping 41:19 54:22

kicked 80:9

kid 90:7,13,16 100:6

kid's 100:5

kids 34:19 40:16 54:22,23
55:18 59:24 60:4 61:5
63:23 64:16 92:21,22
100:4,9,13,16 114:21
116:6

kill 38:14

killed 38:17

killing 37:13

kind 18:11 29:1 32:5 33:7
41:4 42:8,10 43:23 47:4
53:9 55:6,10 61:21 66:24
68:25 75:25 77:8 78:4
83:13,25 88:7 90:2 96:2
99:21 100:6 102:8 103:8
104:7 115:1,2 117:6,7,9,
15 118:1,9 119:19 122:6

kinds 41:7 46:25 48:10
55:8 59:4,5 63:7 69:1
97:18 105:16 108:18
113:16 116:15

knew 93:19

knocking 36:4

knowledge 74:2,6,13,15,
19 108:12 123:19,25
124:17

### L

labor 31:15 32:9 33:1,7
35:21 36:12 39:2,15 41:1,
4,7 43:12,15,21,23 44:6
47:14 49:17 52:10 55:21
59:21,24 60:24 63:4,9,10
64:12 69:22 96:17 98:21
99:23,25 100:10,11
102:18 113:1

laborers 49:12 71:6

lack 79:25 80:1,20 81:13,
17 94:6

landmark 47:25 51:24
120:25

language 108:18 125:17

lapse 104:25

large 15:15 23:18 59:7
94:16 106:25 109:14
118:19

largely 28:18 29:3

larger 69:2 83:16

late 28:6 30:10 54:9 64:4
68:22 69:4,5 73:1 75:1,3
92:5 101:15,18 106:8
113:22 126:21 127:3,7,13
128:1

latest 123:15 126:25

Laura 22:6

law 87:17,18,20,22,23
88:25 113:1

laws 19:16 61:5 86:24,25
87:5,7,17 88:2

lay 124:24

layman 26:2 90:5

lead 58:3

leader 13:20

Leadership 15:20

leading 20:2

leads 58:7 77:17

League 101:9,12,25
102:4,7,21 103:4,10 106:4
119:2,13,19 120:11,13,18
122:22 125:13

leans 41:2,3

learn 34:1 40:14 41:22
59:25

learning 33:6,7 59:14

leave 31:22,24 55:20
67:14 116:12,13,14

leaving 46:18 58:20 62:19
114:24

led 16:6 17:15 57:14 58:17
94:3

left 13:3 55:2 88:9 106:17
114:8 121:16

legal 38:18 46:7

legally 111:2

Legalview 4:2

legislation 60:4 84:19

legislatures 83:7

length 110:2

lengths 62:24

letter 130:4

letters 105:18

license 103:23

licensed 97:6,20,24
103:22 120:1,2

licensing 111:1 124:10

licensure 19:24 97:19



98:9 111:5 124:8,11
125:15,16

**life** 45:21 57:13 62:11 71:3
76:18,19 83:21,25 96:3

**light** 121:6

**limit** 39:21

**linear** 29:12

**lines** 53:23 80:8,20 87:10
96:24,25 100:17 121:19

**lingo** 14:13

**linked** 90:1

**list** 67:21 81:5 109:6
121:11

**listed** 124:12

**literally** 82:2 119:3 124:22

**literature** 56:4 110:6
118:13

**live** 59:10 99:19 106:9

**livelihood** 40:13 41:22

**lives** 39:24 117:7

**living** 54:14 63:19 107:2

**load** 15:19

**local** 5:4 48:3 50:1 61:17
68:18 121:4

**located** 4:5

**logical** 82:5

**London** 112:10,13

**long** 11:19 19:11 22:21
27:18 51:13 77:13 100:21,
24 114:2 118:13

**longer** 29:10 61:16 71:23
72:3 121:11

**looked** 122:11,15

**looping** 128:21

**loose** 104:13

**losing** 37:21

**lost** 80:11 104:7

**lot** 18:5 45:24 58:19,20
64:10,18 70:14 72:22 77:6
88:13 98:7 103:4,5
107:20,23 110:2,5 112:3,9

**lots** 96:12 104:1

**loud** 5:22,25

**love** 52:24

**loved** 52:18 66:16

**loving** 35:9

**Lowry** 4:5

**luxuries** 118:9

---

## M

**made** 6:16 16:16 32:4
36:16 109:20 120:18
126:13 127:22

**maid** 116:3

**maids** 43:19

**main** 20:9 44:5 128:4

**maintenance** 28:7 127:8

**major** 19:16 27:23 33:3
127:17

**majority** 98:19

**make** 5:19 12:11 24:3
29:10 34:19 35:18 46:3
48:16 71:15 72:10 74:10
84:17,18 85:13 107:21
109:17 115:17 119:4
120:14 127:6 130:8

**makes** 29:12,13

**makeup** 98:2 105:20
107:8,19 128:9

**making** 35:14,15,16 36:5,
6 66:6 107:25

**manage** 106:16

**manual** 33:7 63:9

**mark** 7:19 40:22 61:8

**marker** 33:17

**marks** 54:2,15 123:22

**married** 106:6,23 117:22

**Massachusetts** 88:5

**master** 35:2,18,20,24
36:1,6 37:12 38:13,15,17,
20 45:2 46:8 47:4 49:16,
17,22

**master's** 36:11

**masters** 36:14,17 59:24

**match** 31:6,10

**materials** 10:11

**matter** 53:11,14

**matters** 105:20

**me-** 31:21

**meanings** 42:10

**means** 15:1 32:21 33:20
64:2 65:22 79:10,18 83:8
84:8 91:12 103:15 123:21
124:3,4 125:17

**meant** 34:25 45:17 49:8
57:4,8 81:1 85:1,2 92:1
111:24 116:4 117:1

**measures** 21:10 121:3,14

**medicines** 122:3

**meet** 17:17 110:15
128:12,18

**meeting** 51:11

**Megan** 70:18 78:20 81:4



**member** 71:2

**members** 50:1 68:13
102:22 105:11

**men** 43:23 58:19 68:3
109:20 115:17

**mentality** 53:6 59:18 60:8
75:24

**mention** 121:20

**mentioned** 36:21,23 39:2
109:16 122:7

**met** 50:25 51:3,8

**methodological** 23:10

**methodology** 22:20

**methods** 31:13,20,23 38:8

**mid** 127:2

**mid-century** 128:8

**mid-twentieth** 28:5,22
29:4 97:5,10 106:19
109:12 115:6 118:12

**middle** 41:16,24 47:18
51:23,25 58:23 60:12
68:2,11 75:10 77:2,11
83:19 93:6,22 97:4 120:9

**middleman** 67:8

**midwest** 30:7 70:19 72:18
78:22 79:9 88:9

**midwestern** 77:18 78:9,
12,25 79:5,6,8,13,21 81:1
88:14

**migrant** 40:18

**migrants** 40:8 41:17

**milk** 107:25

**mind** 13:1 80:12

**mines** 75:21

**minimal** 45:2 49:15

**minimum** 107:13,16 113:1

**minority** 60:12

**minute** 51:16

**minutes** 50:9,13,15 82:4,
8,11,16

**missed** 61:7 91:20 122:12
126:2 127:4

**mission** 17:3

**Missouri** 4:6 16:3,6 17:13

**misunderstand** 124:14

**misuse** 35:24

**mixed** 104:12

**mm-hmm** 5:25 13:24 19:1
34:14 45:12 47:20

**mobility** 94:1

**mobilization** 94:2

**model** 28:7 127:8

**modern** 52:18 54:11,14,18
59:18 93:7

**mom** 90:16

**moment** 12:19 19:21

**money** 19:24 48:12 70:9
77:6 92:1 100:3,5 109:18

**monitored** 96:12 97:7,17,
18

**morning** 10:11,15,18,25
11:18 24:23

**mother** 99:18 100:5 116:2
117:10 128:13

**mother/father** 105:21,22

**mothers** 94:3 98:22 99:10
109:16,22 115:8,13,19
116:25 117:4,16 118:12,
20,23

**mothers'** 99:9 115:22

**motives** 117:17

**move** 9:4 57:1 60:3,20
65:6 86:8 98:10 127:24

**moved** 14:21 112:11
114:9

**movement** 68:24,25 69:2
70:1 94:3,5 127:16

**moves** 58:17

**movie** 22:24

**moving** 28:1 52:12 68:17
83:2 122:1

**multiple** 126:10

**mutually** 49:19

---

## N

**national-origin** 40:6

**native-born** 68:10

**necessarily** 35:1 68:15
72:21

**necessitated** 57:3

**needed** 47:15 117:17

**needing** 83:22

**neglect** 54:18 67:2 81:12,
14 84:24 85:7 86:14,25
89:4,7,16,19,21,25 90:7,
17,19,24

**neglected** 54:2,13,16 55:6
91:10

**neighbor** 114:25 116:12

**neighborhood** 98:5

**net** 66:20,24

**newer** 60:13 81:12,20
128:16



**newish** 103:8

**night** 49:15

**nineteenth** 60:7 61:4,15 64:4 65:16,25 66:2 67:18, 25 68:22 69:4,5 71:8 73:1 75:1,3 77:2,19,21 86:11, 16 87:2,12 92:5 96:15 105:24 106:8

**non-governmental** 102:21

**non-living** 39:7

**non-verbal** 5:23

**nonetheless** 94:1

**norms** 103:9

**Northeast** 30:7 72:17

**nose** 26:3

**note** 67:15

**noted** 28:10 54:1

**notice** 5:2 7:11,13,24 127:6

**noticed** 88:9 89:15

**notion** 64:11

**nowadays** 39:4

**nuance** 75:14

**number** 23:7 31:8,9 59:7 75:23 92:14,15,21 105:8 116:11 120:7

**numbers** 118:19

**nurseries** 116:21,25 117:2

**nurturing** 35:11

**nutshell** 19:18

---

**O**

**oath** 4:19

**object** 21:19 26:5 27:3 29:24 34:21 37:18 38:21 53:17,18 55:24 56:24 76:4 94:7 102:12 123:11

**objection** 27:15

**obligations** 97:8

**obvious** 89:6 105:4,23

**occasional** 44:4

**occurred** 33:18 126:21

**of-foster** 94:4

**offer** 12:17

**offered** 117:11

**offering** 56:5,8,12

**offhand** 110:20

**office** 109:4

**official** 125:21

**officially** 129:19

**officials** 67:6

**Ohio** 81:6

**older** 60:23 65:1,2 69:25 75:1 76:13 106:14 114:25 116:13

**one-credit** 17:6,10

**operating** 106:12

**opinion** 7:1 25:13,16 74:19 123:20,25 124:17

**opinions** 25:7,10 55:19,20 56:8 129:1

**opportunity** 42:4 85:5

**opposed** 10:2 23:10 115:7 119:23

**opposite** 105:11 108:23

**option** 48:15 65:19

**options** 92:8 116:11

**order** 10:21 118:21 122:17 129:21 130:1

**ordering** 129:25

**orders** 4:8

**organization** 102:19,21 22,23 116:22

**organized** 115:2

**origin** 99:6

**original** 129:25 130:1

**orphan** 71:16,25 72:16,20 74:17 79:6,8,11,17,18 91:12

**orphanage** 63:24 66:14 67:7,9 71:1,4 99:14 102:24 116:16

**orphanages** 28:4 63:17 64:2,5,8,14,16,20 65:4,10, 14,16 66:8,10,12 67:19 69:8,14,23 70:2,3 72:14 91:9,11 92:13,19,21 100:4

**orphaned** 40:12 41:21 111:20

**orphans** 58:21

**outpouring** 68:25

**over-** 79:25

**overpromise** 51:17

**oversee** 83:7

**overseer** 49:5,8,17

**overseeing** 71:14

**overseers** 48:3,7 49:2,25 53:3

**oversight** 65:11 72:9,22 73:2,7 74:24 80:1,21 81:13,17 83:17 84:16 85:1 91:23 110:12

**overview** 26:20 27:11



**overwhelmingly** 103:2

**overwork** 81:12,14

**owned** 38:20

---

**P**

---

**p.m.** 130:10

**pace** 29:7 78:4

**pages** 27:12,18 28:13
31:6 80:3 91:20

**paid** 72:2 77:19 78:13,16,
20 79:2 94:12 99:12 106:2
114:19

**paperwork** 73:12

**paragraph** 26:19 32:10,16
42:20 44:12,22 45:4,9
46:22 59:13 65:5 70:6,14
77:16,17 84:5,9,12,13
87:10 91:20 93:22 94:14
101:7,8 103:12 107:10
110:9,16 118:25 119:1

**paraphrasing** 84:20
117:14

**parent** 39:7 42:23 106:6
110:14 128:16

**parental** 127:23

**parenting** 57:6,14

**parents** 42:24 52:14,24
54:3,19 63:20 67:8,10
88:18,21,24 89:4 98:1
99:4 106:22,24 107:5
110:3,4 112:16 127:23

**parents'** 105:17

**part** 13:23 29:1 37:3 39:13
62:10 68:11,16 69:22
75:22 80:5 87:24 96:6
102:18 103:3 104:20
105:22 107:8 109:5

117:21 124:1 128:3

**parties** 4:3 5:3

**partly** 65:17

**parts** 29:9 37:4,8,25 78:4
84:3

**passed** 60:4

**passing** 60:14 61:4 87:22

**past** 21:16,17 83:2 87:17
106:13

**path** 33:5

**Pathology'** 19:6

**Patrick** 7:22

**pay** 64:12,17 96:16

**paying** 87:23 91:25 92:1
116:5 117:10

**Payment** 110:9

**PDF** 12:9 19:3 31:6

**pejorative** 17:1

**pennies** 116:3

**Pennsylvania** 88:5

**pensions** 99:9 115:22

**people** 5:10 16:25 41:5,10
42:10 57:22 58:6,14,16
59:7 62:13,14 63:4 69:14
71:5 72:19 74:3,13,17,18
100:2 103:7 105:9 106:11
112:7

**people's** 83:25

**percent** 14:22,23,24 91:9,
10,14,17 92:12,14 93:8,17

**percentage** 91:8 92:17
94:23 120:7

**Perfect** 12:22 56:16 91:5,8

**perform** 35:23 36:12
69:22

**performance** 110:13

**period** 19:21 20:2 30:10
32:8 33:16 41:1,5 43:22
44:7 49:24 52:23 54:14
56:2,6 57:13,16 59:6
66:22 68:23 69:2 75:20
85:20 88:17 92:5 95:11
96:17 110:15 111:15

**periods** 30:17,22 73:18

**perishable** 121:7

**permanency** 127:16

**persisted** 60:24 75:2

**person** 6:4 16:4 34:2
38:24 41:3 48:25 70:23
71:1

**person's** 124:24

**perspective** 23:5

**pertain** 56:6

**Philadelphia** 20:7,12,15
128:23

**philanthropic** 116:21

**philanthropy** 68:20

**philosophy** 58:1

**phrase** 20:5 30:15 45:20
54:5,15 89:21 94:13 95:5
103:24 108:13,15 111:23

**phrases** 90:24

**phrasing** 36:10

**physical** 41:4 85:16,22
86:1,5 107:12,15 121:21

**physically** 10:2 89:23,24

**picking** 60:11

**pizza** 90:15

**place** 4:8 13:6,8 32:19,20
49:15 66:21 70:16 104:22
107:1,21 116:16,25



Miller vs Mueller
Catherine Rymph - 05/20/2025                                                21

placed-out 100:12

placement 26:20 27:12
65:18 69:20 70:7,8 83:7
87:25 103:15 111:14

placements 28:4 70:19
73:8 74:24 78:20,21,24
80:2,6,21,22 81:13 83:18
84:2 86:12 87:3 106:7

places 78:5,6

placing 61:17 64:8,9
66:22 69:13,16,19,20,24
70:1,6,13,21 71:7,13,19,
22 72:1,5,8 73:10 74:20
79:22 80:4,6,22

platform 68:8 72:19

plausible 106:23

play 64:23

played 57:12

plumbing 105:14,16

point 20:9 21:2 22:13 34:6
37:11 40:3 46:13 50:8
55:7 62:9 78:3 92:19
111:7

pointed 88:17 94:23

pointing 50:10 87:16

poison 35:16 36:8

poker 36:9

policy 14:16 83:9 84:7,11,
14 125:22

political 14:16 15:18
56:24 57:8,25 58:2,9 68:7

poor 41:11,12,25 48:3,4,5,
8,14 49:2,5,6,7,8,17,25
58:24 59:1,3,4,8,9,11
60:23 61:12,17,18 66:20,
25 75:9 86:13 96:16 113:6

poorhouses 65:18,20

poorly 124:15

popping 102:9

popular 22:23

population 92:13

position 13:14 14:20
16:10

positions 13:17 14:10

positive 23:4

possessed 74:5

possibly 80:15

post-revolutionary 57:5

postwar 111:15

potential 105:1

potentially 84:3

poverty 52:3,11 53:13
58:18 63:21 86:15 89:20
99:6 111:21 113:9,14,19

power 48:4 49:21 83:7

practically 59:20

practice 41:20 98:2,8
105:1 124:3,4,18 125:3,24

practiced 31:16 40:25

practices 28:19 103:6,9
106:3

preamble 101:17

precious 83:21

precursor 92:10 93:1

predominant 64:2

prefer 5:7 92:7

preference 94:22

preferred 62:4,22 93:2,3
95:10,11,12

pregnancy 94:2

premise 100:7

preparation 11:10

prepare 10:11,17,18,24
24:23

preselect 18:3

present 30:15 90:3 108:10

presentations 18:5

presume 8:14

presumed 6:15

pretty 39:24 45:2 61:20
63:1 71:11 93:13

prevalent 94:6

prevent 121:25

previous 21:13 53:3
123:5,10,15

primarily 101:2

primary 89:18 103:13
104:10,23

prior 32:12

priorities 118:5

private 65:11,14 68:20
102:24,25 104:12,15,18,
21 125:4

privately 42:21 45:15
61:22

problem 52:11 82:18 85:3,
4,22 87:19,21,24 91:23
111:20 116:2 117:12

problematic 55:10

problems 68:19 72:12
85:1,2 89:16 116:16

Procedure 5:4

process 19:14 29:12
111:5



**produce** 81:5

**producing** 44:1

**profession** 103:7,10 126:5

**professional** 120:9 126:1, 4,6

**professionals** 111:19 115:6 120:3 125:4 128:15

**professor** 4:17 5:1,7,10 13:15,19,22,25 14:3,4,5,8, 9,12,19,20,22 15:2 27:13 53:25 59:16

**professors** 20:4

**profile** 16:8

**program** 18:9 93:23

**programs** 69:24 112:24

**progressive** 29:22 30:1 68:24

**prohibiting** 86:24

**project** 58:9

**proper** 121:5,7

**properly** 55:5 72:10

**property** 37:15 60:21

**proposals** 125:22

**prosecute** 89:4

**protected** 62:12 96:3 121:25

**provacative** 90:6

**provide** 26:19 35:12 44:20 49:6,8 65:21

**provided** 49:10 121:12

**providing** 31:14 38:8 49:16 72:10 84:21 96:1

**provision** 46:6 49:13,14 121:7

**provisional** 28:7 127:8

**provost** 16:7

**psychoanalyzing** 110:3

**psychologically** 112:15

**psychology** 112:6,17

**public** 65:16,20 77:19 78:13,16,20 79:2 93:8,9, 10 99:12 103:18 104:4,12, 14,16,18,23 125:4

**public-paid** 81:9

**publically** 61:22 65:22

**publish** 122:22,24

**published** 19:13 25:23 101:23,25 102:2 122:10, 15 125:11

**publishing** 122:25 123:2

**pull** 109:4

**pulling** 23:1

**purchase** 118:9

**pure** 33:7

**purely** 16:19,20 95:20

**purpose** 96:20 111:24 116:8 124:7,9

**purposes** 6:16 59:14

**pursuant** 5:2,3

**push** 97:6

**put** 12:5,14 38:1 40:22 54:13 61:8 113:5

**puts** 70:20

**putting** 61:5 65:20 90:23 126:12

---

### Q

**quarter** 60:6 61:3

**question** 6:6,8,10,13,14, 17,18,19 12:25 20:10 22:17 25:13,19 26:8 30:2 36:2 37:21,23 40:20,22 41:24 48:23 51:4 56:11,20 61:7,8 66:3 71:24 74:1,16 75:25 77:23 78:17 80:13 88:22 89:9 90:11 94:17 111:9 120:16 122:6 124:5, 13 128:25

**questions** 11:25 80:15 110:7 129:8,10,18

**quick** 50:9 55:12 129:12

**quote** 54:2,15 69:12 85:7, 8,9 117:16 123:20,22

**quoted** 124:1

**quotes** 108:13 117:18

**quoting** 10:7 80:5

---

### R

**race** 21:11 39:15

**racial** 21:9,15 40:6

**radiators** 121:24

**radius** 108:4

**raise** 77:7

**raising** 25:24 99:11

**ran** 72:23 79:8

**range** 23:16

**rapid** 93:13

**rapidly** 127:24

**rat** 35:16 36:8

**reach** 122:4 124:12,19,23 125:19

**reached** 33:17

**reaction** 69:14 70:1



**read** 7:9 8:10 17:16,25
18:1,4,8 22:8,22 23:15,19
25:2,25 28:7,11,13,21
31:17 35:11 37:9 44:21,24
47:23 56:4 60:24 62:15
64:6 67:12 69:17 83:9
84:4,6 111:14

**reading** 28:17 31:9 55:13
124:8

**ready** 51:21

**real** 50:8

**reality** 71:4 120:11

**realization** 73:2

**realize** 38:23

**realized** 93:24

**realm** 27:13 114:8

**reason** 6:12,18 12:6 25:4
27:14 40:3 52:3 94:17
113:9,20 117:25 120:17
121:9 123:15

**reasonable** 123:17

**reasons** 54:12 99:6 110:5
113:14,16 118:2,3

**recall** 23:3 80:3 93:19

**recalling** 22:20

**receive** 43:9 44:15 107:12
118:16

**receiving** 45:1

**recent** 29:9

**recollection** 20:21,23
21:1,4 23:8,9,12

**recommend** 109:13

**recommendation** 125:11
126:14

**recommendations** 98:3
99:2 108:2 120:14 125:22,
23

**recommending** 109:15

**record** 4:8,23,25 6:16 7:7
12:12 19:2 31:5 50:14,21
82:20 129:14,17 130:10

**records** 90:3

**reduced** 15:19

**refer** 9:21 12:4 32:20
57:23 68:23 73:5 95:14
99:9

**refer-** 57:7

**reference** 26:17 40:5 66:6
79:24 105:18 107:11
122:5 127:6

**referenced** 23:23 37:24
46:21 66:9 110:22

**references** 9:19 39:5

**referencing** 78:22 85:7,10

**referred** 33:9,25 95:18
116:19

**referring** 9:22 10:3 18:9
29:21 41:25 42:22 43:3,4
45:10 54:6,7 57:9,11 68:1
75:6 77:21 79:25 81:14,17
97:11,13 109:1,25 110:16,
21 115:1 117:8 127:9

**reflect** 4:25 125:14

**reflected** 98:9

**reflecting** 87:13

**reflects** 85:10,14,23
125:12

**reform** 68:14,24,25 69:2

**reformers** 67:18 68:1,2,4
69:1 70:24 83:17,22,24
85:21 86:13 88:19 98:6
112:24

**reforms** 68:15 98:20,24
99:21 113:8

**refugee** 93:23

**regard** 55:17 74:20

**region** 81:7

**regions** 29:8,10,20 79:1

**regularly** 48:6,19

**regulated** 97:17,18

**regulating** 34:15

**regulation** 19:23 97:6

**regulations** 121:5

**regulatory** 111:4

**reissue** 122:23

**reiterate** 78:2

**relate** 102:8

**related** 43:25 81:12 89:19
96:1 105:10

**relations** 49:21

**relationship** 36:18 49:19
102:5

**relationships** 35:13 44:23
70:22

**relative** 42:23 46:1 114:25

**relevant** 26:9 40:10

**relief** 48:4,5,9,10,11,13,16
49:6,8,9 53:4,7 58:24
59:1,3,4,9,11

**religion** 21:12

**religious** 20:19 21:9,15
65:15 68:6,13,14

**reluctant** 107:1

**remainder** 84:9

**remains** 89:18



Miller vs Mueller
Catherine Rymph - 05/20/2025

24

**remember** 22:7,15,16,25

**remotely** 4:2

**remove** 52:13 67:10 89:2

**removed** 99:5

**repeat** 80:15

**repeating** 80:13

**repetitive** 121:15

**rephrase** 6:14,20 123:24

**replaced** 97:6

**report** 8:8,11 9:3,6,19,20, 22 10:21 12:1 24:1,9,21 25:1,3,10,11,14,18,20 26:12,16,17 27:6,20,22,24 28:11,14 29:1 30:5,9,14, 25 31:6,7,8 32:20 36:23 39:1,5 40:7 51:23 55:13, 14 56:2,19,20 64:7 69:17 73:3 76:16 82:25 85:20 86:7 95:5,16 99:7 108:9 110:23 114:8 127:4,14,20 128:2 129:2,5

**reporter** 4:1,20 50:23 51:13,18,21 53:17,19 80:13,14 129:25 130:3,8

**reporting** 16:13,15

**reports** 9:13 11:3

**represent** 7:20 121:22

**representative** 121:18

**represented** 15:20

**reprint** 123:5

**republic** 57:2,3 58:1

**republican** 58:4

**reputation** 108:5

**request** 24:3

**require** 124:11

**required** 45:2 85:24 103:22,23

**requirement** 107:13,16 109:21

**requirements** 98:2,3 107:16 110:15,21 111:1 124:8 125:15,16

**requiring** 111:14

**reread** 10:14 11:3 25:4

**research** 14:20,22 23:18 30:21 89:15 113:21 126:15

**researching** 14:19 19:14

**resembled** 37:1 39:20

**reserve** 129:22 130:2

**residual** 29:9

**resource** 27:21,23

**respect** 74:15

**response** 59:7

**responses** 5:22

**responsibilities** 16:11,12 35:3,4

**responsibility** 44:17 68:19 103:13 104:10,23

**responsible** 104:5

**rest** 46:19 84:13 104:23 125:9

**restrictions** 66:11

**Rests** 103:18

**retained** 6:25 27:9

**review** 10:10 22:3,4,9,10, 22 23:4,8 55:15 84:12

**reviewed** 10:16,18,21,24 24:22 121:3

**reviews** 22:2

**revise** 122:24

**revised** 121:20

**revising** 98:8

**revisions** 125:7

**revolution** 57:12 58:1,20

**Revolutionary** 32:14 56:22

**revolutionary-period** 55:18

**rhetoric** 128:10

**rid** 109:21

**rights** 20:20 127:23

**rise** 112:5 122:1 127:15

**Rocio** 4:6 5:21 6:3 9:8 50:21

**rogue** 97:22

**role** 14:21 16:20,22,23 50:2 57:11 62:18

**roll** 16:18

**rooms** 109:14

**Roosevelt** 98:14 102:16

**roughly** 92:21

**RR** 17:2

**rules** 5:3,5,18

**run** 65:10,11 95:23 116:22

**running** 74:18 79:7 117:2

**rural** 30:6 60:22 61:13 69:21 75:2,11,16,18 78:21 106:7

**Rymph** 4:1,12,17,24 5:2,7, 13 6:25 7:16 8:3,8 12:25 18:13 22:1 24:21 50:25 51:1,8,25 65:7 74:1 80:20



82:4,22 97:1 101:5 128:24 129:7,18,24 130:5

## S

**sad** 90:20

**safe** 97:7 107:21 127:18, 22

**safely** 122:4 124:12,19,23 125:19

**safety** 66:20,24 98:4 107:20 108:10,19 112:12 121:3,14,23

**saggy** 90:13

**sake** 24:8 80:12

**salt** 45:6

**salve** 38:20

**same-sex** 20:18

**sanitary** 109:13 121:5,6

**satisfactory** 78:18

**savers** 68:4

**scan** 8:9

**scenario** 92:10 93:1 106:10

**scheduling** 51:15

**school** 54:22,23 85:5 100:21,25 108:3

**schools** 108:4 125:5

**scoot** 61:10 74:25

**scope** 37:18 38:21 56:2 127:20

**screen** 12:5,14 24:9 53:10,22 63:13 65:5 80:11,16 97:1

**screens** 121:6

**script** 101:22,23

**scroll** 54:11

**scrolled** 9:6

**scullery** 116:3

**sea** 95:24 96:1

**search** 55:12

**sec** 7:4

**sectarian** 65:14

**section** 8:14,17 22:2 31:2, 12 82:1,2,3,24 93:6 96:18, 22 98:7,11 114:6

**sections** 17:18 64:7

**security** 113:4

**seeking** 67:9

**segregation** 66:13

**self-explanatory** 105:19

**self-sufficient** 53:12

**sell** 38:14

**selling** 59:20

**semantical** 95:20

**semester** 17:6,12 18:5,7

**seminars** 23:17

**send** 130:4,6

**sending** 54:23 79:15 115:18

**sense** 29:12,13 66:25 83:16 85:16

**sentence** 26:18,25 27:2,5 28:1,12,21 31:2,13 44:11 45:14,19 46:22 48:2 52:2, 6,12 54:5 56:21 57:1 60:12 61:9 62:10,15 64:6 77:22 78:8 79:25 80:25 81:2 84:6 87:2,12,15 88:25 89:5,7 99:9 103:21

104:25 110:8 122:12 123:21 125:18 126:19 127:7

**sentences** 41:16 42:2 84:10 85:4 107:14

**separate** 32:7 38:19 57:13 62:11 83:21

**separated** 112:15

**servant** 33:8 35:5 44:25 49:15,22 64:23 70:24

**servants** 34:11,14,18 39:14,15 43:16,19 45:11 48:17 53:5 61:14 71:5 74:4 84:25

**service** 14:23,24 15:21 43:8 44:14 46:23 95:25 115:2 117:9

**services** 11:10 93:9 114:16,19 116:18 117:8

**serving** 15:2 63:18 64:21, 22 106:5

**set** 33:16 62:15 116:23

**setting** 99:20,22

**severely** 35:22

**sex** 105:11 108:23

**shaking** 5:23

**shape** 19:17

**share** 11:23 12:3,16 80:11,16

**sharing** 12:2 105:9,10

**shelter** 107:12,15

**shift** 78:19 83:11 95:20,21 104:3,4,19 127:18 128:9

**short** 50:20 66:22 76:12 82:15,19 129:16

**Shot** 22:5,11



**shoulder** 34:19

**show** 113:21

**showed** 122:17

**showing** 7:8,10,11

**sibling** 42:24

**side** 20:11,15,19

**SIGALE** 4:16,18,21,25 5:6
7:13,15 9:8,9 12:16,19,22,
24 13:12,13 19:3,4 21:20,
24,25 24:6,17,20 29:14,
16,18 31:5,11 42:17,19
47:22,25 48:1 50:6,8,14,
18,22 51:6,7,16,19,22
53:20,22,24 56:16,17
65:7,9 73:22,25 77:14
80:14,19 81:24 82:10,12,
16,20,21 91:4,6 120:24
121:1 126:11 129:13,23

**signature** 8:17,18 129:22
130:2,4

**significant** 19:21 30:22
39:22 52:3 111:24 112:4
126:20

**signified** 33:22

**similar** 7:17 47:10,11 63:3

**simpler** 90:11

**simply** 66:17 87:16

**single** 106:5 115:19
128:13

**sister** 106:9,11

**sit** 10:24 54:15 57:7 109:7
123:20,25

**situation** 34:7,8 35:6 37:1
38:2 41:4 45:25 66:15
70:15

**situations** 41:7

**size** 98:4

**skeptical** 117:14

**skill** 33:6,7 35:7 43:11
59:25

**skipped** 91:19

**slave** 37:13

**slavery** 32:4,5 33:2,3
36:17 37:1,5,10 38:2,24
39:1,19,20 40:16 59:20

**slaves** 36:18 38:13 40:2

**sleep** 49:15 59:25 70:17

**slow** 8:9

**small** 17:6,14 57:15 58:13
60:12

**smaller** 15:17

**smoother** 5:20

**social** 20:1 112:18 125:5

**society** 84:3

**solidified** 127:17

**solidifying** 109:12

**Solomon** 112:20

**solution** 62:4,22

**solve** 91:23

**solved** 113:15

**sooner** 30:5,7

**sort** 8:9 22:7 35:19 39:7
48:12 68:7,21 71:2 76:12
87:14 93:21

**sound** 28:14 105:23

**sounding** 18:13 89:6

**sounds** 41:16,25 64:18
92:9,16

**source** 60:23 77:5 121:10,
12

**sources** 121:25

**south** 30:8 88:7

**span** 57:13

**speak** 11:7,13 39:25

**speakers** 126:10

**speaking** 30:11

**special** 14:17 90:23 96:3

**specialized** 111:14

**specific** 74:6,15 76:21
95:4 97:12 98:24 125:17
128:9,18

**specifically** 19:15 57:11
71:24 95:14 97:21 108:25
109:9

**specificity** 37:22,23

**spectrum** 33:2

**spell** 43:7

**spelled** 44:13

**spelling** 4:22 46:18

**spend** 103:4

**spent** 14:3

**spinning** 43:25

**spoiler** 9:17

**spoke** 11:14,17,19

**spot** 82:5

**spread** 118:15

**spring** 15:12,15 17:14,19

**springboarding** 111:10

**stab** 125:1

**stage** 62:11 76:18,19
83:21

**standard** 101:17

**standards** 46:7 52:18



Miller vs Mueller
Catherine Rymph - 05/20/2025                                                    27

54:1,4,6,8 98:1,8,11
101:13,16 103:6 104:25
106:13,18 107:11,17,18
108:3,12,14,25 109:3,5,12
110:15,21 111:2,3 113:1
119:2,4,7,16,21 120:18
121:20 122:11,15 124:7,8,
9,18,20,25 125:2,6,10,13,
14,21 126:1,4,7,12

**standpoint** 124:24

**stands** 123:14

**staring** 31:7

**start** 8:3 14:8 22:13 28:20
54:5 59:6 60:11 71:18
72:25 77:16 78:8,12 93:16
101:16,20 109:15 125:9

**started** 16:2,5 18:1 57:20,
21 93:2,3 101:14 123:1

**starting** 92:18 94:24

**starts** 18:24 29:7 57:15
63:15 69:8 77:2 93:22
110:9 119:19 124:2
127:16

**state** 4:22 11:8 25:25 51:9
65:21 68:18 83:6 84:15,
16,17 93:11,18 98:21
99:10,12,17 100:3 102:9,
24 108:25 112:23,25
121:4 122:9 123:7,17
125:4,8

**statement** 115:10

**states** 23:15 26:21 63:19
65:17,23 77:18 78:9,12,25
79:5,6,8,12,13,21 81:2,4
86:24 87:8 88:2,4,6,7,14
89:1 93:8,9,17 103:2,21,
22 104:14,15 112:18
124:10 125:14

**statewide** 93:10

**status** 16:15

**stay** 13:12 23:25 24:1,19
100:6 118:7

**staying** 80:25

**step** 105:3

**steps** 21:17

**stick** 13:22

**sticking** 79:5

**stipend** 99:12

**stipulations** 105:13

**stop** 11:22 12:3 50:18
81:25

**stopping** 37:15 38:15

**stops** 72:18

**store** 124:23

**stored** 122:4 124:12,19
125:19

**storing** 126:14

**strange** 54:3,19 55:9

**street** 31:22,24 60:5 61:5

**streets** 99:15

**strike** 20:10 21:14 22:3
28:20 31:3 34:16 38:11
43:2 45:13 71:17 77:20
78:11 84:5 102:6

**strong** 43:22

**stronger** 104:14

**strongly** 113:7

**structural** 105:2,5,12

**structure** 16:13,15

**students** 17:15 18:1,4,7

**studied** 70:19 81:5

**studies** 112:9,13

**studies'** 22:19

**study** 78:23

**stuff** 92:20

**subject** 35:7 74:20 76:7
119:20

**subjected** 84:23 85:25

**subjects** 73:18

**submitted** 8:12

**subscribe** 37:10

**subsection** 14:14 61:11

**subsequent** 64:7

**subset** 69:1

**subsidizing** 118:22

**substantial** 100:11

**substitute** 49:13

**succeed** 66:10

**successful** 58:10

**succinct** 26:24

**sudden** 112:1

**sued** 20:19

**suffering** 111:21

**suggest** 32:4

**suggesting** 40:1 73:17

**summary** 28:12 29:1

**Summer** 17:25

**supervision** 84:19,22

**supplies** 122:3 124:2

**supply** 107:24,25 121:6

**supplying** 48:5

**support** 64:9 98:22 99:10,
17 109:18 115:18

**supported** 47:15 98:20



**supporting** 61:25 117:24

**suppose** 31:21 37:14

**supposed** 48:24 101:10 109:17 115:13,14 124:20

**sur** 107:25

**survival** 57:2

**suspicion** 117:21 118:4,5, 12

**suspicions** 118:1

**suspicious** 117:16,19

**sustenance** 59:5

**switching** 73:17,18

**sworn** 4:10,13

**symantec** 95:9

**sympathics** 95:3

**synonym** 80:3,22

**synonyms** 80:6

**system** 19:17,22 20:18 21:10 29:3,9 32:6,9,22,23 33:24 39:2,16 41:10 47:14 52:7,10 53:15 55:21 56:7 59:21 62:9 64:9 70:25 71:13 72:1,5,9,13 79:22 93:7,8 95:15 97:20,22,25 119:16

**systematically** 87:1,16

**systems** 28:2 31:15 33:1, 5 40:24 41:1 94:22 104:15

---

**T**

---

**tact** 75:17

**taking** 5:21 34:9,17 51:19 62:19 68:20 71:16 74:4 90:7 96:7 104:6

**talk** 8:24 19:11 40:5 59:19

**talked** 88:16 108:19

**talking** 6:4 9:18 10:14 32:9 35:10 36:21 38:5 39:5,14,18 42:12 43:12 51:8 53:3 55:16,21 59:22 60:10 62:10 67:17 69:10 73:12 74:22 75:23 76:15 78:9 83:3,4,12 84:10 94:11 95:3 97:11 100:1,9 101:9 109:15 111:11 119:20 126:24,25 127:1 128:8

**talks** 44:22 84:6,15 93:5 101:13

**tasked** 48:3

**tasks** 44:5 63:7

**taught** 15:4,15,17 17:10, 12,18,22 52:16

**teach** 15:6 16:21 17:4,5,6, 7 18:3 34:2 35:7 41:2

**teaching** 14:18,22 15:11, 13,14,19 23:14,16 35:11

**tech** 12:13

**Teddy** 98:14 102:16

**teenagers** 40:11 41:18

**teeth** 111:4

**tegmentally** 127:15

**temporarily** 116:25

**temporary** 114:17 117:1,6

**Ten** 91:17

**tend** 68:10

**tendencies** 36:20

**tendency** 89:15

**tens** 63:18 64:21

**term** 16:23 34:23 43:7,10 44:13 46:18 48:11 62:24 76:23 78:5 79:9,22 95:10, 12,13 108:20

**terminate** 127:22

**terminated** 33:4

**terms** 12:12 35:14 36:10 39:23 42:10 44:9 45:16, 18,21 46:19 47:6,11 62:7 75:8 104:1 128:6

**terrible** 115:19

**testified** 4:14

**testimony** 51:2

**testing** 107:24

**theoretically** 42:9

**theorizing** 23:2

**theory** 112:7,8 115:23

**therapeutic** 28:23 96:9 111:23

**there'll** 105:13

**thing** 9:17 16:20 24:9 50:25 56:18 60:3 61:19,20 66:17,19 67:15 68:6 108:22 125:8 126:17

**things** 35:8 42:6 43:25 46:14,21,25 55:3,8 59:17 64:11 67:21 76:14 86:19 87:6 97:18 107:19 108:6 109:25 110:1,22 114:23 116:17 117:7 128:8

**thinking** 32:2 62:20 71:24 76:1 125:9

**thinks** 125:13

**thought** 12:19 18:13,22 29:16 70:25 73:21 90:20 104:7 106:20 115:7 117:3 119:24 120:17 121:12



thousands 63:18 64:21

throat 35:4

throwing 41:23

thumbnail 7:8

tied 45:5

ties 61:2

Tim 54:7 55:7

time 4:4 6:4,23 12:4 15:4, 12,18 16:17 17:8,10 22:21 28:10 30:3,4,9,17,21 33:16 34:2 37:23 39:2,21 41:12,14 44:7 49:24 51:12 54:8 56:23 57:13 62:22 66:22 72:8,21 73:18 76:9, 11 81:10 83:6 94:5 95:3,5 96:3 97:12,23 98:7 107:23 108:12 110:16 113:22 118:22 122:7,8,10,14,17 123:3 126:6,13 129:20,24

times 6:5 9:20 29:7 55:14 75:23

title 16:4,11,12 22:11 82:3

to/or 62:19

today 6:15 7:24 9:19 11:10 19:11 24:23 35:2,9 55:4 67:3 76:15,16 89:21 95:10 116:2,24 129:3,10, 24

today's 4:3,7 54:1,18

tools 35:25 43:10

top 24:2 35:15 60:18,19 81:5 86:8

topics 109:10

total 11:19

totally 116:15

track 37:21 53:2

trade 33:6 34:1,2 40:14 41:3,22 52:16 59:14

traditional 80:2,21 81:13

train 72:16,18,19 79:17,18 104:7

trained 96:11

training 43:8,11 44:14 46:23

trains 71:25 74:18 79:7,8, 11

transition 28:18 77:9

transitioned 28:3

transmission 29:11 76:22 92:4

transmissions 78:3

transmitted 57:4

travel 18:14,17

treat 47:5

treated 38:12,13 39:8,9 46:5 71:5 72:24 81:18

treating 71:15

treatment 86:13

true 37:16

turn 6:8 18:11 58:24 70:16 114:16,20,22 115:4 116:4

turned 16:10 33:12

tutorial 17:16

tutorials 17:14,15 23:17

twenties 41:19 127:2

twentieth 22:24 28:6 30:11 68:22 71:12 73:1 82:25 89:13,18 92:6 96:6 104:17 106:8 114:16,20, 22 115:5 116:19 126:21 127:2,3,7,13 128:1

twenty-first 28:6 89:14 126:21 127:5,8,10,13 128:1,5,7,10

twenty-five 23:15

type 43:8 44:6,14 46:23

typed 101:22,23

types 46:14 47:3 63:4

typically 35:4 44:16 69:21 72:14 79:14

## U

U.S. 14:15

ubiquitous 104:16

uh-uh 5:25

umbrella 102:22

uncle 42:25

undergraduate 17:3 23:16

understand 6:13,19 10:4 16:25 20:25 23:6 25:12 29:19 30:2 38:11 41:15 43:1 46:13 63:6 78:17 79:17 88:22

understanding 27:7,10 30:13,16,19 34:25 54:12 58:7 76:8,23 85:15 95:25 96:4,18,19 111:3 112:9 124:6

understandings 43:22 52:23 54:17,18 57:12,19 60:13 83:20 128:16

understood 6:17 22:12 30:20 37:23 44:6 53:1 76:9 89:12 96:10 111:18

unequivocally 122:9 123:8,18

unhappy 72:23,24



Miller vs Mueller
Catherine Rymph - 05/20/2025

30

**union** 113:2

**United** 26:21 63:18 103:2
112:18

**universe** 61:23

**university** 16:2,6,7

**unlicensed** 97:22

**unpacking** 87:15

**unprompted** 9:20

**unquote** 69:13

**unregulated** 28:19 29:3
97:22

**unsuccessfully** 21:6

**unsupervised** 55:1

**unusual** 17:4

**unwed** 94:1

**upfront** 11:7

**upper** 15:17 75:9

**urban** 30:6 60:23 61:13
68:10 72:17 77:11 79:14
83:19

**usefulness** 52:25

**useless** 77:4 83:13

**usual** 33:11

---

**V**

---

**vague** 47:11

**values** 57:3 58:12 68:14

**varied** 33:16

**vary** 34:7 39:12 110:25

**ventilation** 121:6

**verbal** 5:22 6:1

**verbiage** 125:18

**version** 7:22

**versions** 108:18

**versus** 20:7 61:22 83:13
128:22

**vetted** 72:14,21 96:12

**vetting** 98:1 105:1

**video** 50:18

**view** 37:11

**viewed** 60:21

**views** 75:1

**violation** 20:19

**violence** 88:16

**vision** 28:22

**visiting** 84:15,17

**visits** 84:18

**vogue** 95:6

**volume** 101:20 109:6
123:7

**volumes** 101:16 122:22

---

**W**

---

**wage** 113:1 115:17

**wages** 75:21 115:25

**wait** 6:7,9 96:25

**wandering** 90:14

**wanted** 16:7 25:18 27:14
38:9,13 50:24 51:3 67:15
107:4 109:4 129:2

**wanting** 83:25

**war** 32:14 41:14 56:23
58:17,19 71:11 74:7,13,14
112:6,10 114:15 118:19,
24 119:18,21 120:4,5

**warranting** 55:10

**Wartime** 94:1

**waste** 90:14

**watch** 116:6

**watched** 114:21

**watching** 85:12

**water** 105:12 107:24
108:2 121:6

**ways** 19:15 55:1

**weapons** 122:3,6

**week** 10:19 51:2,12

**weighing** 119:19

**welfare** 19:25 21:10 25:25
32:6 44:17,19 56:7 69:1
72:11 83:6,24 84:2 89:12
92:7 93:3,9,10 94:18 96:5
98:5 101:9,12,25 102:4,7,
10,15,20,23,25 103:3,8,10
104:18,19,21 106:4,19
112:18,23,24,25 113:7,23
115:5 117:13 119:2,13,19
120:3,10,12,18 122:21
125:3,12 128:14

**well-being** 107:13

**west** 72:18 79:9 88:7

**Western** 79:13

**whatnot** 40:16

**whatsoever** 55:22

**whipped** 45:5

**white** 40:7,11 41:17,20
60:22 98:12

**who've** 32:4

**wholesale** 96:2

**widely** 31:16 40:25

**widespread** 57:17 112:24



**widow** 49:7 105:25

**widowed** 98:22 99:10
105:25 106:5

**widows** 58:18,20

**wildly** 104:9 111:18

**window** 113:21

**windows** 121:7 122:2

**wives** 115:18

**woman** 99:11 105:25
106:5 117:23

**women** 14:17 22:5 23:1,
11 43:24 58:15 68:3 107:7
109:20 114:17 115:3,11,
12,15,16,24 116:23 117:2,
6,17,19 120:6,7,9,10

**women's** 15:17

**word** 7:9 30:1 41:23,24
52:21,22 55:14,15 68:8
84:25 94:6

**words** 26:12 42:6,12 90:1,
4 126:18

**work** 15:1 17:1 32:3,17
34:1,4 35:23 43:18 44:4
46:6 47:15 64:8,17 70:16
75:19,20 76:25 78:20,24
85:24 103:5 106:16 107:7
109:17,21 112:18 115:11,
12,13,14,18,20,23 117:18,
20,21,23 118:10,23 120:7
125:5

**worked** 20:21 38:16
100:21

**workers** 53:12 61:14
113:2

**workforce** 94:3

**workhouse** 61:22

**workhouses** 59:8

**working** 75:2,11,15,17
100:24,25 103:7,9 109:22
115:16,24 116:2 117:3
118:7,20,23 120:8 128:14

**working-class** 115:15,17

**works** 17:16

**world** 71:11 112:6,10
114:15 118:19 119:18,21
120:4

**worries** 101:6

**worry** 100:20

**worse** 39:19

**worth** 77:8

**wound** 36:25

**Wow** 32:12

**write** 10:21 20:6 25:14
27:14 35:12 53:9 56:22
61:11 62:3 64:20 67:5,6
69:12 70:5,12,14 73:6
75:10 77:18 81:11 83:5
84:9 86:23 88:15 93:7,17,
21 98:12,18 100:10,17
101:14 103:12 108:9,22
109:12,23 112:8 114:13,
15 117:12 118:14,25
119:12 120:23 127:20
128:2

**writing** 26:15 27:22 36:22
98:7 101:14 112:8 119:15

**written** 32:15

**wrong** 20:15 70:13 110:5
118:6

**wrote** 19:8 20:25 22:2,4,
10 25:10,22 26:10,12
48:20 53:4 54:9 56:19,20
74:23 92:9 102:9 110:1
127:21

### Y

**yard** 43:18

**year** 8:19 15:25 18:19
122:16,19,23,25

**years** 13:1,14,19,25 14:2,
4,5 18:15 20:22 21:1 23:7,
15 26:11,13 55:3 63:7
72:4 75:24 93:13

**yesterday** 10:19 11:17
24:23

**York** 60:4 61:4 62:3 88:5

**young** 41:5 58:14,15
64:24 70:23 71:1,5 118:20

**younger** 64:25

### Z

**Zoom** 11:2 80:9



DEPOSITION INSIGHTS™
by LEXITAS

3:18-cv-03085-SEM-DJQ    # 94    Filed: 09/08/25    Page 276 of 535    SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

888-893-3767 | lexitaslegal.com

1

1           IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS

2

3  JENNIFER J. MILLER, DARIN E. )
MILLER, SECOND AMENDMENT     )

4  FOUNDATION, INC., ILLINOIS   )
STATE RIFLE ASSOCIATION,     )

5  and ILLINOIS CARRY,          )
                             )

6           Plaintiff,         )
                             )

7    vs.                      ) Case No. 3:17-CV-3085
                             )

8  HEIDI E. MUELLER, in her    )
official capacity as Director)

9  of the Illinois Department of)
Children and Family Services,)

10  and KWAME RAOUL, in his     )
official capacity as Attorney)

11  General of the State of     )
Illinois,                    )

12                            )
        Defendants.          )

13

14     The deposition of PATRICK CHARLES, called by

15  the Plaintiffs, for examination, taken pursuant to

16  notice and pursuant to the Federal Rules of Civil

17  Procedure for the United States District Courts

18  pertaining to the taking of depositions, taken

19  before Joan M. Burke, Certified Shorthand Reporter

20  and Registered Professional Reporter appearing

21  remotely via videoconference, at Annapolis,

22  Maryland, commencing at 10:01 a.m., on the 22nd

23  day of May, A.D. 2025.                    Exh. G

24

25

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

2

```
 1   APPEARANCES:

 2       LAW FIRM OF DAVID G. SIGALE, P.C.
     MR. DAVID G. SIGALE

 3       55 West 22nd Street
     Suite 230

 4       Lombard, Illinois 60148
     Phone: (630) 452-4547

 5       E-mail:  dsigale@sigalelaw.com

 6           Via videoconference on behalf of the
         Plaintiff;

 7

     DCFS OFFICE OF LEGAL SERVICES

 8       SENIOR LITIGATION COUNSEL
     MS. BETH I. SOLOMON

 9       60 East Van Buren Street
     Suite 1339

10       Chicago, Illinois 60612
     Phone: (312) 814-6800

11       E-mail:  bsolomon@idcfs.state.il.us

12           Via videoconference on behalf of the
         Defendant Heidi E. Mueller;

13

14       OFFICE OF THE ILLINOIS ATTORNEY GENERAL
     SPECIAL LITIGATION BUREAU

15       MS. GRETCHEN HELFRICH
     MS. ABIGAIL R. DURKIN

16       115 South LaSalle Street

         35th Floor

17       Chicago, Illinois 60603
     Phone: (312) 243-5900

18       E-mail: gretchen.helfrich@ilag.gov
             abigail.durkin@ilag.gov

19
         Via videoconference on behalf of the

20           Defendants;

21

22

23

24

25
```

3

```
1                    I N D E X

2  WITNESS                               PAGE

3  PATRICK CHARLES

4        Direct Examination by Mr. Sigale .......  4

5

6

7                    EXHIBITS

8  CHARLES DEPOSITION EXHIBITPAGE
```

```
9        No. 1 (Amended Notice of Deposition) ..  16

10       No. 2 (Curriculum vitae) ..............  16

11       No. 3 ("The Fugazi Second Amendment:
            Bruen's Text, History, and

12            Tradition Problem and How to
            Fix It.") ......................  54

13   No. 4 (Declaration) ...................  66
```

```
14

15               *    *    *    *    *

16

17

18

19

20

21

22

23

24

25
```

1    COURT REPORTER:  The deposition of Patrick

2    Charles is being conducted remotely via LegalView.

3    Today's date is May 22nd, 2025, and the time is

4    10:01 a.m.

5            The witness is located at Annapolis,

6    Maryland.

7            My name is Joan Burke.  At the conclusion

8    of today's deposition, I will ask that counsel

9    place their orders on the record.  Thank you.

10           Will you raise your right hand, please.

11                   (Witness sworn.)

12   WHEREUPON:

13                   PATRICK CHARLES,

14   called as a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16                   DIRECT EXAMINATION

17   BY MR. SIGALE:

18       Q.   Good morning.  Can you state your name

19   and spell your last name for the record?

20       A.   Full name is Patrick Joseph Charles.

21   Charles is spelled C H A R L E S.

22       MR. SIGALE:  All right.  Let the record

23   reflect this is the deposition of Patrick Charles.

24   It is taken pursuant to notice with the date

25   agreed upon by the parties.  It is taken pursuant

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

5

1  to all applicable rules of the Federal Code of

2  Civil Procedure, and the local rules of the

3  Central District of Illinois.

4  BY MR. SIGALE:

5      Q.  First order of business, I don't want to

6  accidentally degrade or demote you.  Is it

7  Mr. Charles or professor or doctor?

8      A.  Just Mr. Charles.

9      Q.  Mr. Charles.  Got it.

10          Have you ever given a deposition

11  before?

12      A.  Yes.

13      Q.  Okay.  About how many times?

14      A.  Once.

15      Q.  Oh.  Okay.  Well, that's easy enough.

16  What case was that in?

17      A.  Mintz v. Nigrelli.  It's in New York

18  District Court.

19      Q.  Okay.  If you'll give me a second here.

20  I am going to at some point ask about your CV, and

21  when I do, will that case be listed in there?

22      A.  It's not listed in the CV, but it is

23  listed in my declaration.

24      Q.  Okay.  All right.  And how long ago did

25  you give deposition?

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    # 99-1 FINGERS DAGGER PARK 2B OF SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

6

```
1    A.   April 20th of this year.

2    Q.   Oh.  Okay.  And what's -- what's that

3  case about?

4    A.   The case was originally about whether or

5  not a religious assembly or place of worship

6  constitutes a sensitive place in Second Amendment

7  doctrine.  The complaint was amended and later

8  changed to whether or not you could prohibit

9  firearms in summer camps and whether summer camps

10  in themselves could constitute a sensitive place

11  of regulation consistent with Second Amendment

12  jurisprudence.

13    Q.   Okay.  And you were deposed in that, you

14  said -- I'm sorry -- like, last month or a year

15  ago?

16    A.   It would be exactly 32 days ago.

17    Q.   Got it.

18         All right.  Well, I usually say I'm

19  going to repeat the ground rules so they're fresh

20  in your mind, although in this case they really

21  are fresh in your mind.  But I'm going to do it

22  anyway.

23         Joan here is taking down everything

24  everybody says.  She can only take down out loud

25  verbal responses.  She cannot take down nonverbal
```

DEPOSITION INSIGHTS ™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #89-10 Filed 09/06/25 Page 282 of 535 SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

7

1   responses such as head shaking, hand gestures,

2   maybe the biggest culprit, mm-hmm, uh-huh.  So,

3   just please keep all of your answers out loud and

4   verbal.  Okay?

5       A.  Understood.

6       Q.  It's also very difficult for Joan to take

7   down more than one person talking at a time.

8   There will be times, I'm sure, when you're going

9   to know what my question is even before I'm done

10  asking it, but I'm going to ask in all

11  circumstances please wait until I'm done asking my

12  question before you answer.  And I, in turn, will

13  try to wait until you're done answering before

14  asking my next question.  Okay?

15      A.  Understood.

16      Q.  If there is a question I ask you that you

17  do not understand, please let me know and I will

18  rephrase it.  If you answer a question that I ask

19  you here today, it's going to be presumed for

20  purposes of the record that's being made that you

21  understood the question that I asked you and that

22  that is the question you are answering.  So,

23  again, if you do not understand a question that I

24  ask you, please let me know and I will rephrase

25  it.  Okay?

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

8

1     A.   Understood.

2     Q.   And if you need to take a break, let me

3  know.

4     A.   Will do.

5     Q.   The only thing I would ask is that if

6  there is a question pending, please answer the

7  question and then we can take a break as you -- as

8  you see fit, as you need to.

9          So, okay, with that said -- well,

10  let me ask you a little bit more about this Mintz

11  versus Nigrelli case.  You said the issue started

12  with sensitive places in -- I'm sorry.  What did

13  you say, in schools?  You said that the case

14  started out as something different than it ended

15  up as.  So sensitive places, in what did it start?

16     A.   Yes.  If I recall correctly, it started

17  off as a complaint on prohibiting firearms at

18  places of worship and religious assembly.

19     Q.   Right.

20     A.   And then it was amended to file the --

21  same plaintiffs filed the same -- basically the

22  same suit, amended their complaint to apply to

23  summer camps.

24     Q.   Okay.  And was your -- who retained you

25  in that case, the government or the plaintiffs?

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #89-10 Filed 05/06/25 Page 4 of 535 SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

9

1      A.   The government.  The New York Attorney

2  General's Office.

3      Q.   And was your opinion -- strike that.

4           Was your testimony sought before or

5  after the complaint got amended?

6      A.   Can you explain what you mean by

7  "testimony"?

8      Q.   Well, your written -- you said you were

9  deposed, right?  You submitted a declaration, much

10  like you did in this case?

11      A.   Yes.

12      Q.   Did your declaration cover the issue of

13  religious places and houses of worship or summer

14  camps or both?

15      A.   So when the case was first filed, I

16  did -- I issued a declaration that asked to

17  explore the history and tradition of sensitive

18  place at a macro level and any particular history

19  that related to places of worship or religious

20  assembly.  So that was the focus of the

21  declaration.

22           When the case was amended, they

23  again reached out to me and said can you please --

24  would you please be interested in writing another

25  X report that discusses the issue as it affects to

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

10

1  children.  A summer camp is attended by children.

2  What areas, sensitive places where children were

3  present were firearms historically, traditionally

4  prohibited.

5      Q.   Thank you.  Is that case still pending?

6      A.   Yes.

7      Q.   And to be more specific, to your

8  knowledge, is it still pending in the district

9  court or is it in the Second Circuit Court of

10  Appeals right now?

11      A.   If I am -- if I may look at my -- I have

12  my declaration, a copy just in case technology

13  prohibits.

14      Q.   Sure.  But hold on.  Let me ask what

15  declaration are you looking at?  I'm sorry.

16      A.   The declaration I filed in this case.

17      Q.   This case.  Sure.  Yeah, go ahead.

18      A.   Yes.  So just in case something went

19  wrong, but it's on Page 2 of that declaration and

20  I believe it's in the Northern District of New

21  York.  Yes, the Northern District of New York.

22      Q.   Sure.  But I didn't know when -- where

23  you wrote that.  I didn't know if you were writing

24  that's where it was filed or where you gave your

25  deposition in.  I was -- is the case on appeal now

DEPOSITION INSIGHTS ™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ   #36   Filed: 09/04/25   Page 286 of 535

Deponent: Patrick Charles
Date: 2025-05-22

11

1   or is it still pending in the district court is

2   what I was asking, if you know?

3       A.   Oh.   It's still pending in the district

4   court.

5       Q.   Got it.   Thank you.

6            You mentioned that you have your

7   declaration there in front of you.   Do you have

8   any other documents in front of you or around you?

9   I assume you're in front of a computer screen.

10      A.   No.

11      Q.   Okay.   Obviously I have no problem with

12  you referring to your declaration.   You wrote it.

13  I'm going to be marking it as an exhibit and I'm

14  going to be asking you questions about it.   The

15  only thing I ask you is kind of like you just did,

16  if, in fact, during one of your answers you need

17  to refer to that report, just please say that's

18  what you're doing and where in the report you're

19  referring to.   Okay?

20      A.   Understood.

21      Q.   Okay.   So --

22      MS. HELFRICH:   May I interrupt, David, for a

23  second?

24      MR. SIGALE:   Yeah.

25      MS. HELFRICH:   To the extent possible, given,

DEPOSITION INSIGHTS ™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ
Deponent: Patrick Charles
Date: 2025-05-22

12

1   you know, technological snafus, I would be

2   grateful if we could have the report up when

3   you're asking him about specific sections so we

4   can be sure we're all talking about the same

5   place.

6       MR. SIGALE:  And -- yeah, and I intend to do

7   that subject to any technological snafus on my

8   end, which, not to use a pun, but history suggests

9   there might be.  So if I -- that happens again,

10  we'll figure it out.

11      MS. HELFRICH:  Okay.  Thanks.

12      MR. SIGALE:  But, yes, I have no problem with

13  when we get into the -- talking about the

14  declaration itself, putting it up on the screen.

15      MS. DURKIN:  David, I'm happy to -- if you run

16  into that same issue, I can toss it up again.

17      MR. SIGALE:  Thank you.  Appreciate that.

18  BY MR. SIGALE:

19      Q.   Mr. Charles, did you review any documents

20  to prepare for this deposition today?

21      A.   Just my declaration.

22      Q.   Now, your declaration, at least to me,

23  came with a great number of exhibits.  Spoiler

24  alert, Exhibit 1 was the CV I'm going to be

25  putting up on the screen in a second, or trying

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

13

1   to.  And then 2 through 70-something were a number

2   of old-timey statutes that were reprinted.  Did

3   you review all of those exhibits or just the

4   actual typed declaration that you wrote?

5       A.  I just reviewed the declaration and the

6   parentheticals and the footnotes I used.  I didn't

7   repull all the documents.  The documents should

8   speak for themselves.

9       Q.  Okay.  I'm sorry.  What do you mean "the

10  parentheticals and the footnotes"?

11      A.  So, generally when I cite a -- if you

12  look at the declaration, when I cite a law, I

13  generally help make it easier for you, the reader,

14  to see what I'm referring to in the text that's

15  relevant.  So I put parentheticals virtually in

16  all of my footnotes that I do not cite expressly

17  in the text of the -- the body of the text.

18      Q.  Okay.  But is that -- I'm sorry.  You --

19  is that just another way of saying you reviewed

20  the declaration including the footnotes or do you

21  mean you went and when you cited a source in

22  the -- in preparation for today, when your

23  deposition cited to a source, you went and looked

24  at the source?

25      A.  No.  I -- when I -- I've only referred to

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ
Deponent: Patrick Charles
Date: 2025-05-22

14

1   what's actually in the declaration.  Everything

2   that's in the declaration was prepared by looking

3   at the original source though, so I did not go

4   back to the original sources in preparation for

5   this declaration.

6       Q.   Okay.

7       A.   I just looked at the declaration itself.

8   I hope that makes this clear.

9       Q.   Yes.  Yes.  Just -- you reviewed just the

10  36 -- the 35 pages of the report, of the

11  declaration?

12      A.   That's correct.  35 pages.

13      Q.   Okay.  And did you speak with -- up

14  front, make it clear, I'm not asking you about

15  content.  Did you speak with anyone to prepare for

16  today's deposition?

17      A.   Yes.

18      Q.   And who was that?

19      A.   Ms. Gretchen Helfrich and Ms. Abigail

20  Durkin.

21      Q.   And when did you speak to them?

22  Separate, together, when did you speak to them?

23      A.   I spoke to them together.  And we spoke

24  on two occasions.

25      Q.   And when were those two occasions?

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ   #34   Filed: 09/04/25   Page 290 of 535

Deponent: Patrick Charles
Date: 2025-05-22

15

1      A.   Tuesday, May 20th, and the previous

2    Thursday.  I believe that would be the 15th?

3      Q.   Sounds right.  If you're saying -- if

4    you're asking if last Thursday was the 15th, yes.

5      A.   Yes.

6      Q.   And approximately in total how long did

7    you talk?

8      A.   Two hours.

9      Q.   Okay.  Thank you.  All right.  Let's --

10   let's try this.

11                        (Document shared.)

12   BY MR. SIGALE:

13     Q.   Okay.  Mr. Charles, can you see my -- can

14   you see the document I'm trying to share on the

15   screen?

16     A.   It says Amended Notice of Deposition.

17     Q.   Yeah.  And let's maybe -- I'm sorry,

18   Mr. Charles.  I'm trying to do a -- I'm trying to

19   sort out the --

20     MR. SIGALE: Abigail, I'm going to wind up

21   asking you again because all I've got -- off the

22   record.

23                        (Discussion held off

24                         the record.)

25     MR. SIGALE:  Let's go back on.

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

16

1  BY MR. SIGALE:

2      Q.   All right.  Mr. Charles, you acknowledge

3  that this is an Amended Notice of Deposition.

4  This, if I scroll down -- hopefully you can see

5  I'm scrolling down.  Am I?

6      A.   Yes.

7      Q.   Excellent.  It's got you listed here

8  today.  Is this a document you've seen before?

9      A.   No.

10     Q.   Okay.  I'll just represent to you then

11  that this is a document that I sent to the

12  defendant's counsel in this case that asked you to

13  come here this morning, but if you -- if you've

14  never seen it before, then I'll just thank you for

15  being here anyway.  All right.  Let me stop the

16  share on this.

17     MR. SIGALE:  I'll mark that -- Joan, I'll send

18  that to you as Exhibit 1, though.

19                              (Charles Deposition

20                               Exhibit No. 1

21                               marked.)

22     MR. SIGALE:  Okay.  Abigail, if you are able

23  to put the CV up, I will mark that as Exhibit 2.

24                              (Charles Deposition

25                               Exhibit No. 2

DEPOSITION INSIGHTS ™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

JENNIFER ZAMBER, PATRICK CHARLES SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

17

```
 1                    marked.)

 2                    (Document shared.)

 3       MR. SIGALE:  Yeah.  This -- on my end, this

 4  looks perfect and -- can I ask a question,

 5  Abigail?

 6       MS. DURKIN:  (No audible response.)

 7       MR. SIGALE:  You're on mute though, but

 8  does -- does this look like a full screen document

 9  to you or a little tiny window?

10       MS. DURKIN:  Yeah.  No, it's full.  I think

11  when -- listen, I'm not a tech expert, but when I

12  hit "share," there is a lot of different options

13  and I just go with the option that is just the

14  Adobe PDF.  I don't click on, like, a desktop

15  screen or anything like that.  I just click the

16  PDF.

17       MR. SIGALE:  I didn't even see any options

18  like that.  All right.  Well, I will have to sort

19  that out on my own time.  I'm sorry to -- any of

20  them inconveniencing you.  I've never had this

21  happen before the other day.

22  BY MR. SIGALE:

23       Q.   All right.  So we're still on the record

24  or back on the record.  And, Mr. Charles, this

25  document, actually my copy has an almost-blank
```

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

18

1   page at the beginning that says Exhibit 1, and

2   that was Exhibit 1 to your declaration, you

3   understand?

4       A.   Yes.

5       MR. SIGALE:  Okay.  And Abigail, if you could

6   slowly scroll down.  Little faster.

7   BY MR. SIGALE:

8       Q.   Do you recognize this document,

9   Mr. Charles?

10      A.   Yes.

11      Q.   Okay.  And what is this document?

12      A.   It's my CV.  It's not completely updated.

13  You know, things change all the time, but it's my

14  CV.  This is a version of it, yes.

15      Q.   What is it -- I'm sorry.  Strike that.

16           This CV is current as of when?

17      A.   I couldn't tell you because it doesn't

18  have a date stamp on it, but I can just tell you

19  that, you know, my current job is the -- as a

20  senior historian for the Air Force Historical

21  Support Division, so my -- the first line of the

22  Air Force Historical Research Agency as the

23  studies and interviews division chief, that was my

24  last employment.  I switched jobs in late January

25  or early February of this year, so I've been in

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

19

1  seat of my new position for almost four months.

2      Q.   Okay.

3      A.   So that's how I know it's older.

4      Q.   Okay.  So this document is at least four

5  or five months out of date.  Was there any other

6  additions to be made to this document besides

7  your -- in the Experience section?

8      A.   Perhaps a few more courts have cited my

9  writings.  And perhaps it does not include my most

10  recent two law review articles, "But For a Free

11  Press," that was published by William and Mary

12  Bill of Rights Journal, and I forget the exact

13  title, but it was published by University of

14  Illinois Chicago on sensitive places.  That just

15  came out about a week ago.

16      Q.   I could have sworn I saw, "But For a Free

17  Press," but maybe I saw it on Google.  Okay.

18  Thank you.

19              So you, clearly from reviewing this

20  document, are involved in Second Amendment issues

21  from a historical perspective, of course, yes?

22      A.   Yes.

23      Q.   Are you involved in any other

24  constitutional-type issues from a historical

25  perspective, you -- I'll just put a question mark

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ
Deponent: Patrick Charles
Date: 2025-05-22

20

1  right there.

2      MS. HELFRICH:  I'm going to object to the

3  form.

4  BY MR. SIGALE:

5      Q.   You can answer --

6      A.   May I --

7      Q.   -- if you understood the question.

8      A.   Can you clarify what you mean by

9  "involved"?

10     Q.   Do you research and write about other

11 constitutional amendments besides the Second?

12     A.   If you're focusing on the amendments

13 only, it would be the First Amendment,

14 particularly the Free Press Clause, the Fourteenth

15 Amendment, that would cover Apportionment Clause,

16 and the Citizenship Clause.  I have also --

17     Q.   I'm sorry, Mr. Charles.  I missed what

18 you said.  What was the first clause you said of

19 the Fourteenth?

20     A.   The Apportionment Clause.

21     Q.   Apportionment.  Thank you.  I didn't hear

22 that.

23     A.   Yeah, it's actually Section 2, I believe.

24 I should have started with Section 1, which is

25 I've done writings on privileges and immunities

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

21

1   and on birthright citizenship.  And I believe in

2   terms of the amendments, those are the only areas

3   I've really focused on.

4       Q.   Okay.  And these First Amendment,

5   Fourteenth Amendment issues, are these issues you

6   were researching and writing about before, oh, say

7   November of 2024, or is this something that you --

8   you were researching and writing about before

9   that?

10      A.   Privileges and immunities at least goes

11  back to 2010.  So --

12      Q.   Okay.

13      A.   -- Section 1.  Citizenship Clause goes

14  back to at least 2012.  The Apportionment Clause

15  goes back to at least 2011.  And the First

16  Amendment Press Clause goes back to 2012.

17  Obviously those are the publication dates, but I

18  was researching them, you know, roughly months or

19  a year before that.  So I'm going off those dates

20  I gave you are for the final publication year.

21      Q.   Understood.

22           And just starting here with the

23  education, the B.A. from GW.  Is

24  Cleveland-Marshall School of Law, is that in

25  Cleveland or is that just the name and it's

DEPOSITION INSIGHTS ™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #884   JENNIFER ...   Page ...
Deponent: Patrick Charles
Date: 2025-05-22

22

1  somewhere else?

2      A.   Great question.  I get that a lot.  It is

3  actually in Cleveland.

4      Q.   Okay.  And was -- what was legal theory

5  and history, if you can just describe that briefly

6  in terms of your LLM study?

7      A.   So legal theory and history focus for the

8  LLM at the Queen Mary University School of London

9  is actually one of the few programs where they

10  provide a full -- you have to apply to get a full

11  scholarship.  I believe I was one of two full

12  scholarship recipients.  That focuses on largely

13  history --

14           Well, you can do one of two ways,

15  right?  It's a little bit broader.  You can focus

16  on legal theory with a dabble in history or focus

17  on history and its applicability to legal theory.

18  So I focused on the latter.  And it's not focused

19  on what just happens in London or the UK, it's

20  actually the bringing together of students from

21  across the world where you have this international

22  kind of collaboration to learn about each other's

23  systems and how they invoke theory or use history

24  to adjudicate legal questions.  So, yeah, it's a

25  great collaboration to see the different

DEPOSITION INSIGHTS™
by **LEXITAS**

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

23

1 viewpoints. So hope that answers your question.

2      Q.   Okay.  Thank you.

3           And, I'm sorry, maybe this was said

4 even before I got on the screen or I just didn't

5 catch it.  Where are you right now?

6      A.   I am in Annapolis, Maryland.

7      Q.   Are you at home or are you in an office

8 somewhere?  Like at the Navy --

9      A.   I'm in my personal office.

10      Q.   Say again?

11      A.   My personal office at my residence.

12      Q.   Got it.

13           All right.  Well, let's -- let me --

14 I'm going to scroll down a little bit here to the

15 experience.  Don't really have to scroll, but we

16 did.  Thank you.

17           You said your current position of

18 the last four, five months isn't actually on this

19 CV yet.  So let me start with that.  Is it

20 still -- are you still with the Air Force

21 Historical Research Agency?

22      A.   No.  Although under the organizational

23 structure of my agency, they are part of my

24 current workforces.  You have to see the -- what

25 we call the org chart to understand.  But, yeah, I

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ   #841   Filed: 09/03/25   Page 299 of 535

Deponent: Patrick Charles
Date: 2025-05-22

24

1   mean, it's a different level of -- within what we

2   call Air Force History Office, which is a --

3                I apologize.  That's my dogs that --

4        Q.   Wow.

5        A.   And they're eight pounds each, so,

6   that's -- yeah.

7        Q.   Yeah, my little guy is pretty darn loud

8   when he wants to be, too.

9                The -- are you still employed by the

10   United States Air Force?

11       A.   Yes.  I've been employed by them since

12   December of 2010.

13       Q.   And the first line of your -- right there

14   that we can see on the screen, it says, "Air Force

15   Historical Research Agency, comma, USAF."  You see

16   that there, right?

17       A.   Yes.

18       Q.   Okay.  And you're saying you don't

19   actually work for the Air Force Historical

20   Research Agency, so if we were to write that

21   first -- that new paragraph, what would it say?

22   What would come before the "comma, USAF"?

23       A.   Okay.  So for the record, it is in my

24   declaration.  It's Senior Historian of the Air

25   Force Historical Support Division.  The position

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

25

1 is located at Joint Base Anacostia-Bolling in

2 Washington, D.C.  And that position falls directly

3 under the Air Force History Office which oversees

4 the entire department of the Air Force History

5 Museums program that consists of roughly 400

6 history museum personnel for the Air Force.

7     Q.   And what are your job responsibilities

8 for them?

9     A.   As the senior historian, I am responsible

10 principally for the generation of the air staff

11 history report, which is an annual report that

12 covers all doings and events, operations,

13 memorandum, policy changes, issues within the

14 Headquarters Air Force in the Pentagon.

15          Additionally, I am -- I am the head

16 for any special studies that come the way of

17 Headquarters Air Force, so anybody at Headquarters

18 Air Force or within the Air Force and a wider

19 spectrum says we need a special study, a

20 memorandum, a background paper, a white paper on a

21 particular historical subject, that comes to me

22 and I lead the project and direct and the staff as

23 need be to complete.

24     Q.   Do all branches of the military have this

25 agency, this department?

DEPOSITION INSIGHTS ™
by **LEXITAS**

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

26

1      A.   All -- so every military component has

2  their own history office.  They're all structured

3  differently.  The Air Force's is by far and away

4  the most expansive.

5      Q.   Okay.  So, and I don't want to -- I mean,

6  you'll tell me, I suppose, if we get into

7  something classified by accident, but --

8      A.   Mm-hmm.

9      Q.   Your working -- you're employed by the

10  US Air Force?

11      A.   Yes.

12      Q.   You're currently testifying on behalf of

13  the government in favor -- well, you're testifying

14  on behalf of the government, which is defending a

15  firearm restriction, which is -- seems, at least

16  in public, pretty counter to this government's

17  position -- this administration's position, I

18  should say, regarding the Second Amendment.  Is --

19  is that any -- is there any sort of conflict with

20  regard to that?  Have you been -- like, are you

21  doing this and you were told not to or is there

22  any restriction on your Second Amendment work

23  outside of the Air Force given this

24  administration's stance on that issue?

25      MS. HELFRICH:  Objection to form.

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    #384    Filed: 09/05/25    Page 2 of 535 ... SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

27

1          Go ahead.  You can answer, Patrick, if

2    you understand the question.

3    BY THE WITNESS:

4        A.    Yes.  So I'm not -- I cannot speak for

5    what this administration's policies are completely

6    on the Second Amendment as I am not privy to those

7    conversations, so I cannot speak to that.  What I

8    can say in terms of -- if you're saying there is a

9    conflict of interest.

10       Q.    I'm just asking.

11       A.    Yes.  I'm going to get to that.  When I

12   took this position in the Air Force, we discussed

13   these issues with Air Force JAG, as I do write on

14   matters pertaining to the law and things that

15   involve the executive branch of government.  The

16   general rule of thumb is that I -- it is not --

17   it's not necessarily forbidden because there's

18   still First Amendment freedoms that are given to

19   personnel within the civilian federal service.

20   However, anything that is highly critical of the

21   Department of Defense, Department of the Air

22   Force, and the executive branch that I work for,

23   we have -- we have agreed that that is off-limits.

24   However, anything else is within limits so long as

25   it's not, again, you know, not to violate free

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

28

1  press readings of it, but to my knowledge, I have

2  not written anything critical of this current

3  administration or their policies regarding the

4  Second Amendment that I am aware of, unless you

5  can correct me on that.  But I hope that answers

6  the question.

7      Q.   Yeah.

8      A.   And if I can add I -- I did work for the

9  government, but I'm here on my individual

10  capacity.  So I have to take leave and I do all my

11  work on legal jurisprudence and historical

12  writings that do not involve Air Force, airpower,

13  military history on my own time, whether it's

14  weekends, nights, or I have to take personal

15  leave.  So in this instance, I have to take

16  personal leave from work to be here today.

17     Q.   Okay.

18     A.   And if I may add, my declaration

19  specifically states this as well, that I'm not

20  speaking on the behest of the DOD, Air Force, or

21  other federal government, so definitely not this

22  current administration.

23     Q.   Okay.  And I saw that.  So that's

24  understood.

25          So your -- the research that you --

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

#3841 JENNIFER J. MILLER, IN RE: SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

29

1   the research and writing, presumably, that you do

2   for the USAF, there -- you get assignments from

3   various military personnel, you research what they

4   ask you to research about?

5       A.   Yes and no.

6       Q.   Can you explain?

7       A.   Yes.  Yes in the sense if a study or

8   issue is directed from my chain of command, that

9   is the assignment I will take to -- to go about.

10  However, at the same time I'm given leeway to

11  conduct my own historical inquiries so long ago

12  it's in the best interest of the Air Force and

13  preserving what is currently taking place in the

14  Air Force for historical posterity.

15           The office that I currently work

16  for, which stand -- stood up originally in 1942 at

17  the behest of Franklin D. Roosevelt, and all

18  federal agencies during the World War had this --

19  had something similar in order to basically give

20  an objective account of the government's dealings

21  for a variety of reasons, so that they could make

22  good decisions, but also for transparency purposes

23  to the public.  Because after World War I, they

24  didn't have the information that they needed and

25  nobody -- particularly all the war documents those

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

30

1   got -- many of those got destroyed.  So when they

2   went into World War II, they were very poorly

3   equipped and prepared to know which direction to

4   take the military or which to position the

5   government to fight -- to fight the Axis Powers,

6   so this was why we were stood up and this has been

7   our core mission, which is to help preserve any

8   and all Air Force activities so that future

9   commanders and current commanders can make

10  informed decisions to improve combat capability

11  and systems.

12      Q.   Okay.  Are you a civilian employee of the

13  Air Force or are you actually enlisted?  Are you

14  part of the military?

15      A.   I am a federal civilian, although I'm

16  also a veteran.

17      Q.   And I thought I saw that in the CV.

18  Correct?  You were -- you were in the Marines?

19      A.   Yes.  1997 to 2002.  Joined --

20      Q.   Okay.

21      COURT REPORTER:  I'm sorry.  Joined when?  You

22  talked over each other.

23      THE WITNESS:  When I was 17, I joined.

24      COURT REPORTER:  Thank you.

25

DEPOSITION INSIGHTS™
by LEXITAS

3:18-cv-03085-SEM-DJQ  # 41 ... DEPOSITION OF ... SECOND A...

**Deponent:** Patrick Charles
**Date:** 2025-05-22

888-893-3767 | lexitaslegal.com

31

1  BY MR. SIGALE:

2      Q.   Your responsibilities for -- your current

3  job responsibilities, have you fully explained

4  them or are there others that you haven't

5  mentioned yet?

6      A.   I'd say the only really additional thing

7  is I help our key leaders devise and develop

8  policies that better aid the Department of Air

9  Force History Museums program in carrying out

10  their mission.  Basically the left and right

11  parameters of what we should and should not do in

12  order to best serve as historians for the Air

13  Force to make sure that the taxpayers are getting

14  the best bang for their buck and we are not

15  wasting valuable tax dollars.

16      Q.   And it looks like you've been a historian

17  for the Air Force in some capacity since April of

18  '22; is that right?

19      A.   No.  Back to it's December of 2010.  I

20  served as the historian for 352nd Special

21  Operations Wing located at Mildenhall, United

22  Kingdom.

23      Q.   All right.  So you spent four years

24  there.  And then, I'm sorry, so you --

25              So, I'm sorry.  I'm looking -- from

DEPOSITION INSIGHTS ™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

32

1  this, it looks like you worked for the USAF in

2  some capacity, but you left for a year or two,

3  that 2019 to 2021 period?  Or, no --

4      A.   No.

5      Q.   -- was that then as part of the Air Force

6  fellowship?  So were you working for the Air Force

7  then or --

8      A.   Yes.  So the Air Force legislative

9  fellowship is an annual program that takes the

10  best and brightest of the Air Force from the

11  active duty, particularly officers and civilians,

12  mainly about four civilians to go every year, and

13  what that fellowship involves is a three-year tour

14  in which they take people from the best of their

15  career field -- so I was still a historian working

16  for the historian career field on Capital Hill in

17  several capacities.

18           And they do three -- it's a

19  three-parter.  The first part is you work for an

20  executive branch that is not the DOD, and in my

21  case it was the State Department to learn about

22  the legislative processes and the different --

23  different executive branch.

24           The second part is you get

25  assigned -- you don't get -- you don't pick, you

1  get assigned by the Air Force a office whether, in

2  the House or on the Senate, and you spend an

3  entire year working as their legislative fellow

4  focused on defense matters and any other matters

5  that they are willing to give you and you feel

6  comfortable taking on.  You have a right to refuse

7  any issue that you do not want to take because

8  you're primarily there to learn about defense and

9  appropriations.

10             Following that year, you are then

11  sent out to one of the many legislative liaison

12  offices that exist throughout the entire DOD

13  enterprise.  In my case, given my Special

14  Operations background, Air Force Special

15  Operations and working as the US Air Force

16  historian for special Operations Command from 2016

17  to 2019, they felt it was a good idea if I

18  embedded with the US Special Operations Command

19  Legislative Affairs, also located in Washington,

20  DC.  And from there I was outplaced, which is part

21  of the program, back to my -- back into a

22  historian billet.  And I will say while there, I

23  was given several historian tasks to whether aid

24  Senator Heinrich or basically serve as a liaison

25  for the history office.

DEPOSITION INSIGHTS ™
by LEXITAS
3:18-cv-03085-SEM-DJQ
888-893-3767 | lexitaslegal.com
Deponent: Patrick Charles
Date: 2025-05-22

34

1    Q.   Okay.  Thank you.

2              So it appears from the CV that

3    pretty much everything has to do with history,

4    which would make sense given your education,

5    except the five years in the Marine Corps; am I

6    right?

7    A.   Yes.  When I was in the Marines, I did

8    not have my BA.  I was right out of high school

9    and I did correspondence courses at colleges when

10   I was there.

11   Q.   Okay.  Let's go down a couple sections to

12   Fellowships and Grants.  What is the

13   Bordin-Gillette research fellowship that you

14   received sometime last year?

15   A.   This is a fellowship that is sponsored by

16   University of Michigan, Bentley Historical

17   Library.  The fellowship requires that you spend

18   at least a week, preferably two, at Ann Arbor

19   going through their archive daily to research a

20   particular subject matter that you have a thesis

21   statement for.  And then they base that funding

22   solely on the cost of the trip and food and

23   lodging.  There's no extra stipend there like, you

24   know -- you know, even 500 bucks.  It's all based

25   on just travel expenses.  They're willing to pay

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    #384   Page 310 of 535

Deponent: Patrick Charles
Date: 2025-05-22

35

1   that on your behalf and they've done that for me

2   twice in 2024 and then once in 2018.

3       Q.   And -- I see that.  And so you took leave

4   from the Air Force for a couple weeks last year to

5   do the Michigan fellowship?

6       A.   Yes.  Whenever I do any of these

7   fellowships, excluding the last one, the

8   Clark-Yudkin, which was in connection with the

9   US Air Force Air Force Academy, I have to take

10  leave and then do this on my own accord.

11      Q.   And what subjects were you researching, I

12  guess, if -- I'm sorry if that's not the right

13  word -- last year at Michigan?

14      A.   Last year I was given the fellowship

15  because when I wrote my book in 2018, 2019, called

16  "Armed in America", the John Dingell papers at

17  that time were not made available to public

18  researchers and they are awaiting the signature of

19  Dingell or Debbie Dingell, who was in the House of

20  Representatives, so that wasn't made available to

21  me.

22           And when they were made available,

23  the -- the library reached out and said would you

24  be interested in applying because now that they're

25  available, we would love to have you again.  So

DEPOSITION INSIGHTS™
by LEXITAS
888-893-7767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

36

1    that's what I did.  That was my principal reason

2    there was to look at all the Dingell papers which

3    are arguably one of the, if not the, most

4    expansive collection of one Congressman's

5    materials in there to review.  So I reviewed his

6    materials and, while there, although the Air Force

7    they didn't pay me, I reviewed many materials

8    related to the Air Force, which I'm happy to do to

9    expand my job's horizon.

10              So I found some very interesting

11   papers about what was called the Freeman Mutiny,

12   which was a World War II mutiny by -- it Wasn't

13   really a mutiny.  It's what the white officers

14   called it.  But that by black officers that did

15   not like being segregated in the officer's club.

16   So they -- they protested and they called it a

17   mutiny and then they tried to put them all on

18   trial for -- not treason, but kind of

19   insubordination.  And, yeah, it's a very important

20   historical event in terms of black history during

21   World War II.

22              And the University of Michigan had

23   no idea that they had the Freeman Mutiny papers

24   there.  So I brought that to their attention and

25   they wrote an article highlighting them in, I

DEPOSITION INSIGHTS ™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    #841  Filed: 09/04/25    Page 312 of 535

Deponent: Patrick Charles
Date: 2025-05-22

37

1   think, three to six months later after my visit.

2       Q.   Very nice.  Okay.

3            Your -- is there a -- in your book,

4   "Armed in America: A History of Gun Rights from

5   Colonial Militias to Concealed Carry," in --

6   published in 2018, is -- is there a -- a theme or

7   a conclusion to that book?  And I don't mean it --

8   of course it ended and has a back cover, but what

9   I mean is, is it purely, okay, here's -- here was

10  the -- what -- here's what Ben Franklin said and

11  here's what Jefferson said, and here's what the

12  sheriff of this -- of Georgia county said in

13  18-whatever and just like that?  Or is there a

14  theme or a point to be made in that book?  I don't

15  mean that to sound pejorative, so hopefully you

16  know what I'm asking.

17      MS. HELFRICH:  Object to the form.

18  BY THE WITNESS:

19      A.   I think there's a couple of things in

20  there, and I -- whenever somebody -- or somebody

21  writes, I'm always interested in their thoughts.

22  The intention of the book is to provide

23  historians, legal scholars, and just the general

24  public with a history of how or understanding of

25  what we today refer to as gun rights has evolved,

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

38

1  why it evolved, when it evolved, and why.  And

2  then hopefully generate an honest conversation

3  about that so that we can talk within the

4  parameters of history and facts and not hyperbole

5  and conjecture.  I got into writing that because

6  there is a lot of hyperbole, conjecture, and

7  inference that's made that, I think, steps out of

8  the bounds of the evidence, so we need to stay

9  within the evidence as much as we can and try to

10  make as little inferences as possible.  So that's

11  the point of the book.  If that answers your

12  question.

13      Q.   I think it does.

14           The second from the top, "The

15  'Reasonable Regulation' Right to Arms:  The Gun

16  Rights Second Amendment Before the Standard

17  Model," that was the title of a chapter you wrote

18  in the book that's italicized after; is that

19  right, or am I misreading this?

20      A.   Yes, that I was invited to participate in

21  that book published by the Smithsonian, and that

22  chapter highlighted how our -- how gun rights

23  advocates had changed the goalpost and what the

24  Second Amendment protects to be far more expansive

25  following the advancement of what academics

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

39

1    commonly refer to at the behest of Glenn Harlan

2    and -- at the behest of Glenn Harlan Reynolds,

3    the, quote/unquote, standard model.  And that

4    it's -- it just basically tests the politics and

5    why that changes and how, and how the two are so

6    -- are pretty far removed from each other.  And

7    that's basically it.

8               You know, to say there's not -- I

9    mean, there is a misconception that the narrative

10   on what the Second Amendment protects has been

11   consistent throughout history and as Armed In

12   America discusses, and that discusses, that's not

13   true even on behalf of what we call advocates of

14   gun rights.

15      Q.   And, I'm sorry, if you could expand a

16   little bit.  What is the, quote/unquote, standard

17   model that is referred to in that chapter title?

18      A.   The "standard model" is a phrase that

19   Glenn Harlan Reynolds, he is a constitutional

20   scholar, I believe, out of Tennessee.  He wrote

21   back in the 1990s that -- that basically that the

22   new -- he called it the new -- the new standard

23   model.  That there was a -- a wide consensus on

24   what the Second Amendment history was, what it

25   protects, and so forth, and that phrase kind of

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ   #34   Filed: 09/04/25   Page 315 of 535

Deponent: Patrick Charles
Date: 2025-05-22

40

1   took off, so the standard model, and that's why I

2   used that language, is because it's very specific

3   model with very certain parameters devised by very

4   certain individuals that helped form the pillars

5   of it.  And it still, I guess, informs thinking

6   today in certain circles.

7       Q.   And, in brief, what is "Vote Gun," the

8   top line?  Is that -- that's a book you published

9   a couple years ago or that's a chapter in

10  something?

11      A.   That's a book that was published by

12  Columbia University Press two years ago.

13      Q.   And what is -- I mean, obviously I can

14  read the title and I can surmise, but I'd rather

15  hear it from the source.  What's this book about?

16      A.   The book centers on the 1968 Gun Control

17  Act and how the 1968 Gun Control Act was important

18  in understanding the political shift that we have

19  seen today and the divide over gun rights and gun

20  control between conservatives and liberals.

21           Now, I mean, there used to be

22  conservative Democrats and, you know, liberal

23  Republicans.  It's all kind of blended today.  I

24  think just conservative Republicans, not

25  completely, but it's, you know, gone that way.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

41

1  But it kind of discuss -- this is the origin of

2  that.  Discusses the political players involved,

3  what their goals were, how they sought to

4  accomplish it.  And what the -- the difference

5  between what they're saying was true and what was

6  really true, what the evidence speaks to, and how

7  they were using hyperbole or, you know, the bully

8  pulpit to inform and rise or, I guess, motivate

9  supporters to lean one way or the other on

10  politics.  I hope that answers the question.

11      Q.   If I scroll down to the next section --

12      MR. SIGALE:  Or more to the point, ask Abigail

13  to please scroll down to the next section.  Thank

14  you.

15  BY MR. SIGALE:

16      Q.   You have a forthcoming article entitled,

17  "The Second Amendment and Heller's 'Sensitive

18  Places' Carve-Out Post-Rahimi:  A Historiography,

19  Analysis, and Basic Framework," coming out in

20  the -- what is that, is that University of

21  Illinois-Chicago?

22      A.   Yes.

23      Q.   Okay.  And so anyway, did I read the

24  title of this forthcoming article correctly?

25      A.   Yes.

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ   #384   Filed: 06/04/25   Page 720 of 535

Deponent: Patrick Charles
Date: 2025-05-22

42

1    Q.   And what is that article going to be

2  about?

3    A.   As I mentioned earlier in this

4  deposition, that -- regarding my CV and any

5  corrections, this is one of those corrections.

6  That article was published --

7    Q.   Oh.

8    A.   -- a week, ten days ago.  So it's up,

9  available on the UIC Law Review website and it

10  basically discusses the history of the sensitive

11  places, how Heller appears to have come out with

12  the phrase "sensitive places," where it came from,

13  and historically what were sensitive places

14  according -- you know, this is what the Court

15  calls it, and how they evolved and why they

16  evolved.  And I would say it sets a framework for

17  maybe the courts to consider.  It doesn't tell

18  anybody they have to; it just says here's

19  something to think about as we move forward.

20    Q.   And does that article contain information

21  that you believe is relevant to this discussion

22  that for whatever reason didn't make it into your

23  declaration?

24    MS. HELFRICH:  Objection.  Vague as to "this

25  discussion."

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

43

1       MR. SIGALE:  I'll rephrase.

2   BY MR. SIGALE:

3       Q.   Does that article, "The Second Amendment

4   in Heller's Sensitive Places," dot dot dot, does

5   that, in your view, contain information about the

6   sensitive places discussion that you believe is

7   relevant to the issues in this case?

8       MS. HELFRICH:  I'm going to object, again,

9   David, because I think it calls for a legal

10  conclusion.

11      MR. SIGALE:  Well, he -- he is an attorney.

12      MS. HELFRICH:  He's not here as an attorney

13  though.  He's here as a legal historian.

14      MR. SIGALE:  Okay.  Your objection's -- the

15  objection is noted.

16  BY MR. SIGALE:

17      Q.   All right.  As a historian, does that

18  article in the -- that we're talking about, does

19  it contain information regarding the sensitive

20  places issue that, as a historian, you believe

21  pertains to the issues in this case that for

22  whatever reason did not make -- did not appear in

23  your declaration?

24      MS. HELFRICH:  I'm going to object to the

25  form.

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #38-10 Filed: 09/09/2025 Page: 44 of 535
Deponent: Patrick Charles
Date: 2025-05-22

44

```
1              You can answer if you understand,

2    Patrick.

3    BY THE WITNESS:

4         A.   Honestly, I do not know.  That is not for

5    me to decide.  But I will say that a lot of the

6    sources that are contained in my declaration are

7    also contained there and there are a lot of

8    sensitive places provisions that are in there as

9    well.  What each reader wants to determine from

10   the content of the article is up to their own, so

11   I have not thought about -- I didn't write that

12   for this case or nor did I, you know, think of it

13   in that way, so --

14        Q.   From your historical perspective, what's

15   the relevance, not as a legal term, but as a --

16   from a historical view, of the Rahimi decision to

17   this sensitive places discussion?

18        MS. HELFRICH:  Object that it calls for legal

19   conclusion.

20        MR. SIGALE:  All right.

21        MS. HELFRICH:  You can answer as a historian.

22   BY MR. SIGALE:

23        Q.   But actually what I mean is what is

24   Rahimi's relevance as historian to the sensitive

25   places issue?
```

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

JENNIFER J. MILLER, DARING 2025 USER... SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

45

1    A.   Can you clarify whether -- do you mean

2    its relevance to the historical issue as matter of

3    history or do you mean its relevance as to legal

4    jurisprudence?  Because all -- you know, what

5    we're doing now is history, so I don't want to

6    misconstrue what you're saying.

7    Q.   Well, I guess I'm asking the way that you

8    meant it in that article because clearly the

9    Second Amendment is a -- I mean, it's historical,

10   but it's a legal doctrine.  Heller was history,

11   but it's a law case.  It's a legal opinion.

12   Rahimi was a legal opinion.  And your writing,

13   according to this article -- this article, a

14   historiography and analysis of them.  So I guess

15   I'm asking the question in the sense of how you

16   approached it to write this article?  What is the

17   connection between the sensitive places issue and

18   the Rahimi decision?

19   A.   If I understand the question correctly,

20   the article is not predicated on Rahimi.  The

21   article mentions Rahimi because that's the most

22   recent Second Amendment opinion.  And it discusses

23   how Rahimi more or less clarified some of the

24   muddy waters on Bruen.  It discusses that, but

25   that in itself does not impact the historiography

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

46

1  of sensitive places, how they came about, and how

2  they evolved and expanded and why they expanded,

3  depending on a variety of factors, by the close of

4  the nineteenth century.  So I hope that answers

5  the question.

6      Q.   That -- okay.  That's fine.  Thank you.

7           And then I see the next line is that

8  "But For a Free Press," that I knew I had seen

9  somewhere and now I know where.

10          Well, let me jump down one -- to the

11  sixth line.  The, I assume, meant to be

12  provocative, "The Fugazi Second Amendment:

13  Bruen's Test, History, and Tradition Problem and

14  How to Fix It."  I read some of it, but again I

15  want to go to the source.  What is the theme, what

16  is the intent of this article, what are you trying

17  to say?

18          Let me rephrase that.  What are you

19  saying?  You're not trying to.  You did it.  What

20  are you saying in this article?

21      A.   The central thesis of -- I pronounce it

22  Fugazi.

23      Q.   Fugazi, Fugazi, (indiscernible).

24      A.   It's actually premised, Fugazi, after --

25  well, one it has a meaning.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    #3841 FILED 09/04/2025  Page 247 of 535
Deponent: Patrick Charles
Date: 2025-05-22

47

1    Q.   Okay.

2    A.   I'm a punk rock -- I'm a punk rock guy.

3  So there is a band called Fugazi, so that's why --

4    Q.   All right.

5    A.   I'm a big fan of Fugazi.  But -- yeah,

6  but the central premise of that is that Bruen

7  presents itself as being steeped in history and a

8  certain kind of objectivity about history.

9  However, its own methodology, they undercut it at

10  several points.

11          So, for instance, I believe the

12  article draws this out is, with virtually no

13  evidence, just Justice Thomas stipulates that two

14  gun -- two gun laws were racist in origin or they

15  had racist impetus, but he has no evidence to

16  support that other than the claims of amici.

17  Conversely, he has amicus, myself, showing him,

18  you know, roughly 40 laws that had licensed armed

19  carriage and why it developed and how it developed

20  and he claims that never existed.  At the same

21  times, he has laws that stipulate something else

22  and he says, well, those are too few and far

23  between.

24          So the point is, is that in Bruen,

25  it was kind of a cherry-pick approach, is that not

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

48

1   only is that the evidence chosen, but also how to

2   use that evidence, it was inconsistent.  So that's

3   the point of the article is that I am urging the

4   Court to be a little bit more careful, methodical,

5   transparent in how it approaches the Second

6   Amendment moving forward.  I hope that answers the

7   question.

8        Q.   And you submitted your own amicus brief

9   in the Bruen case, yes?

10       A.   Yes, in support of neither party.

11       Q.   And you didn't do it -- strike that.  Let

12  me segment -- or tangent for a second.

13            Obviously you have a law degree, you

14  have an LLM.  Are you licensed to practice

15  anywhere?

16       A.   No, I'm -- I've never been licensed.

17       Q.   Okay.  And you, obviously as not a

18  practicing attorney, you didn't have a client that

19  asked you to submit that amicus brief in Bruen.

20  You -- you just did it; you felt your voice should

21  be heard, yes?

22       A.   Yes.  All briefs I submit are purely at

23  my behest. That have just my name on it, if that

24  makes sense.  I did a brief with historians early

25  on collectively, but, yeah.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

JENNIFER MILLER, PERRY DISTRICT SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

49

 1     Q.   And what was it -- what made you write

 2  that amicus brief?  What made you want to

 3  participate in that amicus process in the Bruen

 4  case?

 5     A.   In that case, nobody actually knew the

 6  history of those laws, particularly the licensing

 7  provisions.  And there was many things percolating

 8  at the lower court that were, in my opinion,

 9  patently untrue.  So my thing was to give the

10  evidence that we know to be factually true, submit

11  that to the Court, and say this is what you should

12  base your opinion off of and to -- I think I

13  highlighted two examples where the parties were

14  putting forth very questionable inferences that

15  did not withstand serious historical scrutiny and

16  to warn the Court to do a little bit more due

17  diligence before adopting those claims.

18     Q.   And your interest in the Bruen case,

19  would you say that that started in the lower

20  courts or only when the Supreme Court granted

21  certiorari in the case?

22     A.   I believe at that time I was, you know,

23  still -- I was, you know, writing several Second

24  Amendment pieces.  I think even writing "Vote

25  Gun," but, yeah, I wasn't following it.  Like, I

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

50

1    don't follow the cases per se.  I just -- you

2    know, it came up and I had -- I had knowledge, I

3    think, that was relevant and I submitted it.

4        Q.   Okay.  Are there other writings in

5    here -- and let's -- and this Exhibit 1, your CV,

6    and I'm looking -- I'm going to limit my question

7    to this Book Publication and Chapter section, and

8    then the following Articles and Other Print

9    Publications section.  Okay?

10               Other than at least from the title,

11   that UIC article that just came out, are there any

12   other articles that -- or books that you wrote --

13   or chapters that you wrote that discuss the issues

14   that are in your declaration, which seems to me

15   the sensitive places issue and the firearms and

16   minors issue?

17       A.   Not that have been published.

18       Q.   Are there any that are imminently

19   forthcoming?

20       A.   No.

21       Q.   Okay.  So just to clarify, if I want to

22   know prior to this declaration what have you

23   written about sensitive places, that article from

24   UIC last week or so, that's the only one?

25       A.   That focuses squarely on it.  Sensitive

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

51

1  places is also discussed in the Fugazi article,

2  albeit probably at a macro level.

3      Q.   Okay.  Just very briefly, what's your --

4  what's the discussion on a macro level in that

5  Fugazi Second Amendment article about sensitive

6  places?

7      A.   It's consistent with my declaration, and

8  basically it talks about how they evolved,

9  expanded, why.  And perhaps I think it discusses

10  its relevance to Bruen at that time.  I don't

11  recall what its relevance to Bruen was, but I use

12  it as an example.

13      Q.   Okay.  And same question with regard --

14  Same question with regard to the minors -- that's

15  minors with an O -- issue.  Are there writings

16  that are listed in this -- those two parts of your

17  CV where that issue is discussed?

18      A.   Yes.  It's discussed in "Armed in

19  America".

20      Q.   And that, again, is the book that was

21  published in 2018?

22      A.   Yes.

23      Q.   Okay.

24      MS. HELFRICH:  David, would you mind if we

25  took a five-minute break?

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

52

1      MR. SIGALE:  Not at all.

2      MS. HELFRICH:  Okay.

3      MR. SIGALE:  11:15.  We'll come back on at

4   11:20.

5      MS. HELFRICH:  Thanks.

6      THE WITNESS:  Thanks.

7                          (Whereupon a short

8                           break was taken.)

9   BY MR. SIGALE:

10     Q.   All right.  Mr. Charles, you good to keep

11   going?

12     A.   Yes.

13     Q.   What was your opinion -- strike that.

14          Is it -- did you disagree with the

15   conclusion in Bruen, excuse me, regarding the

16   right to public carry?

17     MS. HELFRICH:  Objection.  This is beyond the

18   scope.  He's not here as a legal analyst.

19     MR. SIGALE:  Noted.

20   BY MR. SIGALE:

21     Q.   You can answer though.

22     A.   I believe I'm on, in the Fugazi Second

23   Amendment, stipulating that the outcome of the

24   case is understandable and there are ways to reach

25   that decision, however, again I was -- the point

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

53

1 of the article is I'm highly critical of the means

2 and the methods the Court used to get there.  I

3 thought those were highly questionable and

4 inconsistent, in some ways, hypocritical when

5 compared to other opinions the Court had issued in

6 actually that same term.

7    Q.   So when you say that you believe that the

8 result was understandable and that there were ways

9 to reach it, it sounds -- it sounds like you're

10 being kind of agnostic about what the actual end

11 result was, your beef is in how it was done.  Is

12 that right?

13    MS. HELFRICH:  Same objection.  Beyond the

14 scope.

15            Go ahead.

16 BY THE WITNESS:

17    A.   That's one way to characterize it.  If

18 you look at my broader writings, and as I

19 stipulated earlier, my position is that if we're

20 going to make decisions based upon history, we

21 need to do it in an informed and educated and

22 factual manner and that's -- that's -- that's

23 basically my chief area of interest and all of

24 legal scholarship is basically that one question.

25 If you wanted to break it down to just one thing.

DEPOSITION INSIGHTS™
by LEXITAS

888-893-7767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

54

1  So but, yeah, that's not why I was brought on here

2  as an expert is to -- what's the history of

3  sensitive places and its applicability to minors.

4      MS. DURKIN: David, I don't mean to chime in,

5  but do you still need this exhibit up?

6      MR. SIGALE:  I was actually just thinking

7  that.  No, go ahead and take it down.

8      MS. DURKIN:  Okay.

9                     (Exit Ms. Solomon.)

10     COURT REPORTER:  We just lost Ms. Solomon.

11     MS. DURKIN:  Beth will be back later.  She had

12  to hop off for a minute, but she'll be back later.

13     MR. SIGALE:  All right.  I'm going to try --

14  I'm going to try sharing again.  I won't be able

15  to see it, I think, but hopefully you can.

16                     (Document shared.)

17     MR. SIGALE:  I'll mark this as Exhibit 2 and

18  then I'll --

19     COURT REPORTER:  I think this is 3.  The CV

20  was 2.  Sorry.

21     MR. SIGALE:  Oh, yeah.  The notice of dep was

22  1, the CV was 2.  This is 3.  Thank you.

23                     (Charles Deposition

24                     Exhibit No. 3

25                     marked.)

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

#3341 JENNIFER MILLER, PATRICK CHARLES SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

55

1  BY MR. SIGALE:

2      Q.   Can you see, Mr. Charles, what I put up

3  on the screen hopefully?

4      A.   I see Page 629 of my article titled, "The

5  Fugazi Second Amendment."

6      Q.   Yes.  So first full paragraph there in

7  the middle of the page, "Herein lies the problem

8  with Bruen.  History was not invoked honestly or

9  honorably and therefore the jurisprudence that

10  will flow from it will be arguably illegitimate."

11  Let me put a pin right there and just ask you what

12  you meant when you wrote that?

13      A.   It's actually quite simple.  So if I base

14  my opinion upon a fallacy, incorrect statement, a

15  lie, whatever may have you, and future courts

16  continue to base their future jurisprudential

17  decisions on that same inaccurate history, lie,

18  fallacy, should a later court fix -- should a

19  later court correct just that one historical fact,

20  then everything, all the opinions that were based

21  upon that incorrect fact, are wrong if -- I mean,

22  legally theoretically speaking, right?

23          So holdings -- that is not to say

24  anything about a holding, right?  What I'm saying

25  is, so in my example I often use is the privilege

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

56

1  and the unique clause of the Fourteenth Amendment

2  that we know that it protected far more than what

3  the Supreme Court said it did in the late

4  nineteenth century.  I think we're pretty much in

5  a pretty strong consensus now historically

6  speaking.

7              So but the court has never gone back

8  and said and fixed that.  So if any future court

9  says -- that relies on that history and says

10  that's right -- that's the right history, you're

11  kind of basing your opinion on a fallacy, right?

12  And then it's tainted in a way.  So that's my

13  point, right?

14              You know, if you start -- if a

15  war -- here's another good example.  If a war

16  starts based upon a lie, right, is that war

17  legitimate?  Arguably no.  I mean, I guess you

18  could say it's still a war, but, I mean, it's all

19  premised on a lie.  So that's my point.

20      Q.   And that is what you believe happened in

21  Bruen, correct?  That's the point of this Fugazi

22  article?

23      MS. HELFRICH:  Objection to the form.

24  BY MR. SIGALE:

25      Q.   Is that correct?

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

57

1     A.   As I stated earlier, the methodologies

2  they employed were widely inconsistent.  They made

3  inferences and used minimal data to draw broad

4  conclusions, then took larger swaths of data and

5  dismissed it as insufficient.  So in that

6  instance, that's my point, is that when you apply

7  the law and you do a theory with constitutional

8  law, it should be consistent throughout, and in

9  Bruen, as my article outlines, that did not

10  happen.

11     Q.   Okay.  And at the bottom here you

12  write -- sorry, the bottom of this page, the main

13  text, "This criticism of Bruen is not to suggest

14  that this author does not support recognizing any

15  Second Amendment rights outside the home.  This

16  author does and has stated as much several times."

17  And then I go to paragraph -- I'm sorry,

18  Footnote 43, the right to -- "Second Amendment and

19  the Basic Right to Transport Firearms for Lawful

20  Purposes."  And then I go to the next page, to

21  finish the footnote, that you cite an article

22  saying, "It was accepted in the nineteenth and

23  early twentieth century that armed carriage laws

24  could not completely extinguish individuals from

25  exercising their right to self-defense in extreme

DEPOSITION INSIGHTS™
by LEXITAS
888-893-7767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

58

1    cases."

2              Do you know, as you sit here, what

3    "extreme cases" means in the context of this

4    footnote?  What was it refer -- what was that

5    referring to?

6        A.   In that instance, it was referring to a

7    line of jurisprudence that starts to matriculate

8    in courts in the mid to late nineteenth century

9    that states that a law that would prohibit someone

10   from -- so let's say you had to -- an armed

11   carriage prohibition in a location.  And that

12   person was in a certain fact pattern in which they

13   had no alternative but to arm themselves in

14   defense for an imminent threat.  It has to be

15   imminent, not, you know, I think I may be

16   threatened here.  So in those instances, there was

17   a good line of jurisprudence that suggested that,

18   that there could be an exception to the rule, but

19   it was on the plaintiff -- excuse me, the

20   defendants to show -- that were being prosecuted

21   to show that body of law.  Or to show the fact

22   pattern that would meet that, if that makes sense.

23       Q.   Okay.  So I'm sorry.  Let me just ask you

24   to rephrase that a little bit.  So the phrase

25   "extreme cases" meant what exactly?

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #34 JENNIFER JOHNSON, ET AL., PAGE 334 of 535 SECOND A...

**Deponent:** Patrick Charles
**Date:** 2025-05-22

59

1    A.   That's my language.  It's an imminence,

2    right?  It is the threat to oneself is about to

3    happen.  That the fact pattern would dictate that

4    they were in danger of their life and they had to

5    violate the law in that instance to carry.  They

6    had no other alternative.

7    Q.   Okay.  And then I go down a few lines and

8    you cite an article that, "The Statute of

9    Northampton could not prohibit the transfer of

10   arms for lawful purposes, nor the transporting of

11   firearms to the shooting range, to one's home or

12   business, for government militia service, and

13   purchase or sale." I guess the lawful -- what

14   was -- from your historical perspective, what was

15   the definition or meaning of, quote/unquote,

16   lawful purposes as you use it in this footnote?

17       MS. HELFRICH:  Objection.  I believe that's a

18   quote.

19            You can answer if you understand,

20   Patrick.

21   BY MR. SIGALE:

22   Q.   It says, Prohibiting the transport of

23   arms, dot, dot, dot, for lawful purposes.  So I'm

24   asking if he knows what lawful purposes meant.

25   A.   If I may, can I contextualize that

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #364 JENNIFER MILLER, ET AL. V. BRENDAN KELLY SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

60

1  footnote?

2      Q.   Yeah.

3      A.   Yes.  The purpose of the footnote was

4  there were certain writers, particularly Steven

5  Holbrook, who were misrepresenting my work as

6  supporting an outright ban on carrying of arms,

7  and that -- that the Second Amendment did not

8  extend beyond the home.  They had misstated my

9  position not only in legal briefs, but in law

10 review articles and symposia.  So that footnote

11 was quoting myself to show that I had never stated

12 that position.  So that's what that footnote's

13 about.

14     Q.   Okay.  So this is, like, you -- this

15 footnote is you reiterating your views to refute

16 what was -- what could be deemed as criticism of

17 you?

18     A.   Yes.  False criticism.

19     Q.   Okay.  So -- so when you make this

20 citation to the -- this article talking about the

21 Statute of Northampton that says it should not be

22 construed as prohibiting the transport of arms for

23 lawful purposes, I'm just asking what do you mean

24 by lawful purposes in this footnote?

25     A.   As you -- if you look in -- so you'd have

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

61

1   to scroll up to the first one, the right to

2   transport.  The point there is to state is that

3   there is nothing -- so, again, people are

4   misconstruing on my -- my critics are

5   misconstruing my interpretation of State of

6   Northamptom.  And I find no evidence to suggest

7   that the Statute of Northampton's text nor its

8   enforcement or its restatement in any legal

9   treatises or by any monarch or whatever may have

10  you was an outright prohibition on all forms of

11  armed carriage.  That's how they misinterpreted my

12  position and have said that if Patrick is correct,

13  for instance, then how can the hue and cry

14  assemble or how can the militia assemble with

15  arms?  Under Patrick's interpretation, then all

16  that's illegal.  And I never said that.

17            So lawful purposes can mean many

18  things.  It can be assembling of the hue and cry

19  at the behest of the government official.  It can

20  mean the assembling of the militia.  I mean, in

21  the transport of one arms, so long as it wasn't

22  done in contraveyance of the local ordinance or

23  provision, it was okay.  Come the mid to late

24  nineteenth century, many laws offered an exception

25  for lawful transport and defined the parameters of

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

62

1   when that lawful transport occurred.

2              So that's kind of defining that.

3   It's setting the parameters terms to say, again,

4   that my critics are completely misstating my

5   position in doing so for a political purpose to

6   make me -- to discredit me, not because they want

7   to engage in an honest and accurate debate about

8   what the history does and does not show.

9       Q.   In your mind, what you're referring to

10  there, does that lawful transport involve, like,

11  having it on -- having the arm on their person or,

12  just to use an example of what Illinois considers

13  lawful transport if you don't have a concealed

14  carry license, it's unloaded, locked up in a --

15  inaccessible, in a case such as in the trunk.  Is

16  that the kind of lawful transport that you're

17  referring to?

18      MS. HELFRICH:  Objection.  Are you talking

19  about the Statute of Northampton or some other

20  statute?

21  BY MR. SIGALE:

22      Q.   I'm refer -- there's two references to it

23  in that footnote.  The one in the -- talking about

24  the Statute of Northampton and the one in the

25  first part of the footnote, the Second Amendment

DEPOSITION INSIGHTS ™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

JENNIFER J. MILLER, PATRICK CHARLES SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

63

1   and the basic right to transport.

2       A.   Can you -- I'm sorry if I misunderstood

3   the question.  It sounds like you're asking me to

4   draw an inference between the Statute of

5   Northampton or a historical law to the

6   applicability of what's going on today and

7   that's --

8       Q.   No, I'm not.  I'm not.  I'm -- I'm asking

9   as you reference it two times in that footnote,

10  one in your own article from 2019 and one in that

11  article talking about the Statute of Northampton.

12  You reference that you think history supports the

13  lawful transport of firearms, and what I'm asking

14  is, is if that lawful transport of firearms that

15  you're referring to in those footnotes, whether

16  that involved the person actually carrying the

17  firearm on their person for self-defense or if it

18  meant transporting it, like, say, in the trunk or

19  the carriage?

20      MS. HELFRICH:  I'm going to object to the

21  form.

22          You can answer if you understand,

23  Patrick.

24  BY THE WITNESS:

25      A.   I can only guess what you're trying to

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

JENNIFER MILLER, et al. v. BOB JONES SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

64

1  get at.  But it really depends on -- so I'm not

2  finding any -- I think you're kind of making the

3  inference that these laws had -- that permitted

4  transport that I have located in that first

5  article or that -- you know, again, the point

6  is -- I'm making is that I never saw any law that

7  outright prohibited a transport of the arm, right?

8          Carrying for self-defense has been

9  prohibited.  There are several examples of that.

10  I have never seen a law that outright prohibited

11  your ability to move anything, particularly if you

12  own it from one home to another.  That article

13  discusses the NRA's position on transporting

14  weapons and how that evolved, and how that was the

15  consensus with the evolution of the automobile and

16  that, you know, you'd have to break it completely

17  down and disassemble it and stuff like that.

18          But, you know, I -- and it's really

19  hard to answer your question.  I -- the articles

20  themself will kind of give you those -- maybe you

21  can infer from what you want.  Again, my writings

22  are you can infer what you want.  They discuss the

23  history.  So it's hard to -- to put it into a

24  modern context.

25      Q.  I'm not asking the modern context.  I'm

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

65

1  asking as you were referring to, you say, "History

2  supports the lawful transport of firearms."  I'm

3  asking if from what the historical reference is

4  that you're referring to in that footnote.  Did

5  the lawful transport mean they could carry it on

6  their person while they were transporting it, or

7  did it mean that they had to break it down, put it

8  in a case, they could transport it in the trunk?

9       A.   It could mean many things depending upon

10  the local jurisdiction.  I have several laws cited

11  there that you'd have to read.  Then again there's

12  a lot that we don't know about the enforcement to

13  make too many inferences, so most local

14  enforcement of these laws have been completely

15  lost to time and we'll have no way to put them

16  back together except to look to the text of the

17  laws themselves.  So what I would refer you to is

18  the text of the laws themselves for you to

19  (indiscernible).  I do not have the text of those

20  laws in front of me to offer an opinion as to how

21  it would have historically applied.

22       Q.   Okay.  So let's -- let me look.  I'm --

23  make sure there wasn't something else I wanted to

24  ask you about on this CV before moving on.

25            So going back to something I asked

DEPOSITION INSIGHTS™
by LEXITAS

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

888-893-3767 | lexitaslegal.com

66

1  you before about the CV about whether or not there

2  were any -- you know what, strike the question.

3  Never mind.

4        Let's -- Abigail, if you'd be so

5  kind as to put up the -- the report, which I will

6  mark as Exhibit 4.

7                        (Charles Deposition

8                         Exhibit No. 4

9                         marked.)

10                       (Document shared.)

11    MS. DURKIN:  Can you see it?  Is it big enough

12  for everybody?

13    THE WITNESS:  Yes, I can see it.

14    MR. SIGALE:  That's better.

15    MS. HELFRICH:  Can you make it a little

16  bigger, Abigail?

17    MS. DURKIN:  Does that work?

18    MR. SIGALE:  Okay.  This Exhibit 4 we went --

19  no, I went through your -- it was your CV.

20        So, Abigail, if you could scroll

21  down through this document at a moderate pace

22  here.

23  BY MR. SIGALE:

24    Q.  And professor -- I'm sorry, Mr. Charles,

25  do you recognize this document that is being

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

67

1  scrolled through here?

2      A.   Yes, it looks like my exhibit as I have

3  submitted it.

4      MR. SIGALE:   Okay.   And, Abigail, if you could

5  jump all the way to the end.

6  BY MR. SIGALE:

7      Q.   That's -- is that your signature at the

8  bottom?

9      A.   That is my signature.

10     Q.   Okay.   And you wrote this a month ago --

11 or you signed it a month ago, not -- right around

12 the same time actually as you were being deposed

13 in that New York case, yes?

14     A.   Six days before I was deposed in the

15 New York case.

16     Q.   Okay.   Let's jump back up to the top.

17 Number 3, Paragraph 3, says "DCFS, Department of

18 Children and Family Services, is defending its

19 restrictions on firearms in daycare homes and

20 foster homes."   So do you understand that this

21 case entirely is about firearms restrictions in

22 people's homes?

23     MS. HELFRICH:   Object to the form.

24          Go ahead and answer, Patrick.

25

DEPOSITION INSIGHTS™
by **LEXITAS**

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #364 JENNIFER MILLER, PATRICK CHARLES SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

68

1  BY THE WITNESS:

2      A.   I presume a daycare home is a home and a

3  foster home is a home, yes.

4      Q.   Okay.  So there isn't anything about this

5  case that -- that impacts the right to public

6  carry.  Is that your understanding of this case?

7      MS. HELFRICH:  Objection.  Calls for a legal

8  conclusion.  And it's beyond the scope.

9              Patrick, you can answer.

10  BY THE WITNESS:

11      A.   Can you -- was the question as it

12  involved public carry?

13      Q.   Yes.  Is it your understanding this case

14  does not involve pub- -- the issue of public

15  carry?

16      A.   If it's -- if the case is limited to

17  one's private residence, then the answer would be

18  yes.

19      Q.   Okay.  So Paragraph 4 says, "I have read

20  the plaintiff's complaint, see generally

21  plaintiff's second amended complaint for

22  declaratory and injunctive relief."  In your own

23  words, what are the plaintiff's claims in that

24  second amended complaint?

25      MS. HELFRICH:  Objection.  Beyond the scope.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ  #34-1 ... Page 344 of 535 ... SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

69

1   Calls for a legal conclusion.

2           Go ahead, Patrick.

3   BY THE WITNESS:

4       A.   I did not read the complaint again before

5   appearing here today, so I cannot restate with any

6   accuracy or honesty as to what the complaint has.

7   I apologize.

8                       (Enter Ms. Solomon.)

9   BY MR. SIGALE:

10      Q.   Okay.  And when you of read the Rahimi,

11  Bruen, McDonald and Heller decisions, what was the

12  purpose of reading them as pertains to this

13  declaration?

14      MS. HELFRICH:  Objection.  Vague.

15          Go ahead, Patrick.

16  BY THE WITNESS:

17      A.   You must read the jurisprudence of any

18  issue before you.  I mean, that's required so that

19  you understand the history that they have talked

20  about.  In this case, that's kind of all what is

21  relevant is what is the history that they have

22  said.  I don't think they've said anything in

23  their opinions that are -- in my personal opinion

24  that are 100 percent dispositive or either way.

25  So it's not -- I mean, I think that's all I'm

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

#341 JENNIFER J. MILLER, DURING HIS SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

70

1    getting at.  But I've read them, yes.

2       Q.   Well, presumably you've read all four of

3    those decisions prior to being retained for this

4    case.  I mean, right?  I mean, if nothing else,

5    you wrote that Fugazi article about Bruen, so you

6    had to have read Bruen for that, as an example.

7    So all four of these cases, presumably you read

8    before being retained in this case, yes?

9       A.   Yes, at one point or another.

10       Q.   Okay.  So other than refamiliarizing

11    yourself to prepare for this, was there any other

12    reason why you reviewed those four cases?

13       MS. HELFRICH:  Objection to the form.

14            Go ahead, Patrick.

15    BY THE WITNESS:

16       A.   I did not reread them prior to this

17    deposition.  I have --

18       Q.   The declaration, I'm sorry.

19       A.   Or the dec- -- I am familiar with all

20    four opinions.  I did not reread each of them in

21    their entirety prior to preparing the declaration,

22    if that answers your question, if that's what

23    you're getting at.

24       Q.   Sure.  And the last sentence -- yeah, the

25    last sentence on the page, Paragraph 4, "DCFS has

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

71

1  asked me to expound on the history and the

2  tradition of the law restricting armed carriage in

3  locations, jurisprudentially referred to as

4  sensitive places, particularly as it pertains to

5  protecting children from firearms violence."

6  That's one of the things you were asked to do,

7  yes?

8      A.   Yes.

9      Q.   "As well as the history and tradition of

10 the law restricting access by minors to firearms

11 and other dangerous weapons."  That's the other

12 things you were asked to do, correct?

13     A.   Yes.

14     Q.   Okay.  So within that sentence, that

15 encapsulates the two tasks you were asked to

16 perform for this declaration; is that correct?

17     A.   Yes.

18     Q.   And all your findings -- strike that.

19          Are all your findings contained

20 within this declaration?

21     A.   For this case, yes.

22     Q.   Are there findings on this issue that you

23 included in some other case?

24     MS. HELFRICH:  Objection.  Vague.

25          Go ahead, Patrick.

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

72

1  BY THE WITNESS:

2      A.   Not that I'm aware of off the top of my

3  head.

4      Q.   Like, for example, in that -- what was

5  it, Mintz?  Hintz?  What was the New York case?

6      A.   Mintz v. Nigrelli.

7      Q.   Mintz.  That's it.  Are there issue --

8  are there findings regarding sensitive places that

9  for some reason are not in this declaration?

10     MS. HELFRICH:  Object to the form.

11          Go ahead, Patrick.

12  BY THE WITNESS:

13     A.   Not that I'm aware of.

14     Q.   Okay.  Any opinions that you have

15  regarding those findings that you had -- that you

16  had during -- regarding those two tasks that are

17  there in Paragraph 4, are all your opinions

18  regarding those findings contained within this

19  declaration?

20     A.   Yes.

21     MS. HELFRICH:  Object to the form.

22          Go ahead.

23  BY THE WITNESS:

24     A.   Yes.

25     MS. HELFRICH:  David, can I just interject for

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

JOHN DOE, A FICTITIOUS NAME, ET AL. VS. PRINCE, IN HIS OFFICIAL SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

73

```
 1   a second?  Because it's coming up on 12:00 o'clock

 2   and I just wanted to remind you that Patrick is on

 3   Eastern time, and I wanted to remind him that if

 4   you feel you need a lunch break, please say so.

 5        THE WITNESS:  I'm okay.  I may need a bathroom

 6   break at one point, but I'm not there yet.

 7   Bladder's holding firm.

 8        MR. SIGALE:  Okay.

 9        MS. HELFRICH:  TMI.

10   BY MR. SIGALE:

11        Q.   On Paragraph 9 of your declaration, what

12   is it Page 3 --

13        MR. SIGALE:  Abigail, I need you. Page 3.

14        MS. HELFRICH:  Page 3.

15                         (Document shared.)

16        MR. SIGALE:  Thank you.  Yes.  Perfect.

17   BY MR. SIGALE:

18        Q.   All right.  The second sentence of that

19   paragraph says, "The bulk of the historical

20   research utilized within this declaration was

21   completed prior to being retained by DCFS in this

22   case."  Is that because of the books and the

23   Mintz case and the -- the other articles and

24   whatnot that are listed in your CV, or was there

25   another reason why you had already done the bulk
```

DEPOSITION INSIGHTS ™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

74

1  of the historical research prior to being

2  retained?

3      MS. HELFRICH:  Object to the form.

4              Go ahead and answer.

5  BY THE WITNESS:

6      A.   All the above.  I have 15 years of

7  experience on researching laws and I have a wide

8  array of information in my archive -- personal

9  archives and I was also -- you know, I had just

10  published that sensitive place article so I had

11  been working on that for probably well over a year

12  in my spare time.  So, yeah, I -- that's all I'm

13  getting at is that, you know, I do historical --

14  I'm constantly doing historical research on this

15  issue, so I -- you know, I learn new things all

16  the time.

17      Q.   All right.  So at the bottom of Page 3 we

18  start with this -- sorry -- Section 1, "A Macro

19  History of Sensitive Places Through the Nineteenth

20  Century."  Is it -- what is your understanding

21  from a historical perspective --

22              And, Mr. Charles, I don't say "from

23  a historical perspective" in a question, will you

24  just presume that I mean from a historical

25  perspective?  I know you're a historian and that's

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

JENNIFER MILLER, DARRIN FULLER SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

75

1  why you're here.  I'll try to say it to make it

2  clear, but if I don't, I'm always asking you from

3  your context as a historian, okay?

4      A.   Yes, that's why I'm -- was retained as a

5  historical expert, so that's how I'm going to

6  answer the question.

7      Q.   Sure.  Okay.

8           But from a historical perspective of

9  someone who writes amicus briefs to the Supreme

10 Court, what is your understanding of what period

11 of history is most relevant to analyzing Second

12 Amendment cases?

13     MS. HELFRICH:  Object to the form.

14 BY THE WITNESS:

15     A.   I don't have any opinion on that.  That's

16 for the courts to determine.  You can make an

17 argument for anything, but that's why the lawyers

18 are there, right?

19     Q.   Someone's got to be, right?

20          So let's -- you write in this

21 Paragraph 11, "For nearly five centuries in

22 England from the late thirteenth through the late

23 eighteenth century, what constituted a so-called

24 sensitive place in which" -- I'll just read the

25 whole thing -- "in which arms-bearing could be

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

76

1   regulated or altogether prohibited was rather

2   broad.  It encompassed densely populated areas as

3   well as areas where people regularly congregated

4   for lawful purposes or conducted commerce."  Did I

5   read that correctly?

6        A.   Yes.

7        Q.   Okay.  Did it encompass people's homes?

8        A.    Well, the term sensitive places is a

9   modern term, right?  So this definition -- I've

10   got to clarify what I mean by sensitive place.

11   It's a modern term.  Sensitive -- what I'm calling

12   a sensitive place restriction, which they were not

13   referred to at the time, is laws that designate a

14   specific location off limits for anyone --

15   sometimes except the government officials to -- to

16   have or carry arms.  So in those -- if we're

17   talking about a location, and in that definition

18   home was not in the definition.  However, there

19   were laws in England that prohibited certain

20   people from having certain weapons in their home

21   depending upon their socioeconomical status.  So

22   but I wouldn't call those sensitive places laws.

23        Q.   Okay.  And, in fact, then you go into

24   detail with some of these 500 -- no,

25   700-roughly-year-old laws about fairs and markets

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

77

1  and the Statute of Northampton and going armed in

2  the city of London or its suburbs.  So those

3  are -- those examples, that's what you're

4  referring to in that previous sentence that I

5  read, correct?  That's why you wrote those

6  examples?

7      A.   Yes, those -- those examples are to

8  stipulate, as sensitive places laws do, locations

9  in which law -- and arms were generally prohibited

10  and they started identifying particular and

11  specific locations.

12      Q.   Okay.  And then Paragraph 12, "The extent

13  to which this broad English understanding of what

14  constituted a sensitive place, quote/unquote, that

15  is where arms-bearing could be outright

16  prohibited, traveled across the Atlantic is

17  unknown."  I read that correctly?

18      A.   I believe that's exactly what it says

19  verbatim.

20      MS. HELFRICH:  We can't see it, David.

21          Abigail, could you scroll?

22      MR. SIGALE:  Oh.  Sorry.  Yeah.  Right there.

23      MS. HELFRICH:  Thank you.

24  BY THE WITNESS:

25      A.   It's Paragraph 12, first sentence.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ   ...   SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

78

1     Q.   "Local law enforcement records did not

2   survive for posterity, and therefore it is

3   impossible for historians or anyone to reconstruct

4   exactly how often, when, and where armed carriage

5   restrictions were enforced."  Again, I read that

6   verbatim?

7     A.   Yes.

8     Q.   And that armed carriage restriction that

9   you're referring to, that armed carriage refers to

10   being armed out in public?  It means -- it's

11   another way to say public carry, correct?

12     A.   Generally, yes.  I mean, it could

13   potentially also mean on one's private lands

14   depending upon the context, but, yes, that's

15   generally speaking, yes.

16     Q.   Okay.  So but then you give some examples

17   in Paragraph 13 where there are sensitive place

18   firearm restrictions from the mid-seventeenth

19   century through the early nineteenth century.  So

20   the mid 1600s through the early 1800s, correct?

21     A.   Yes, those are examples that we have been

22   able, as historians, to locate as to show that

23   there are indeed historical examples where

24   locations could be identified as prohibiting armed

25   carriage and therefore to understand the doctrine

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ   #364   Filed: 09/04/25   Page 354 of 535
Deponent: Patrick Charles
Date: 2025-05-22

79

1   of sensitive places did survive and transfer over

2   to America.

3       Q.   Okay.

4       A.   In different -- yes.

5       Q.   Not that it was called sensitive places,

6   if I'm correctly recalling your earlier testimony,

7   yes?

8       A.   In 2008, Heller coined the term.

9       Q.   So, okay.  So any references to the

10  phrase in talking about earlier times like, say,

11  Colonial times, that's your phrase of it?

12      A.   Yes.  That's why I say so-called

13  sensitive places at the beginning because, again,

14  that -- that's a phrase that Heller used to

15  describe the history and tradition of prohibiting

16  firearms and certain location-based things.  But

17  that term does not come into existence in any

18  public discourse or anything until Heller coins

19  the term.  It does not even appear in any of the

20  briefs.  It is something that the majority coined,

21  originated from them.

22      Q.   Okay.  And I'm sorry.  Just let me -- let

23  me make clear.  Besides your CV, there's

24  70-something other exhibits, I referred to it

25  earlier in the deposition, which looks like to be

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

#341 JENNIFER 90601228, PAINCESCOUZER SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

80

1    the original sources of the various ordinances and

2    statutes that you cite in here, correct?

3        A.    Yes.  Those should all correspond to the

4    exhibit in the original source document or scan on

5    the original source -- well, obviously, it can't

6    be the original.  They're the scans of originals.

7        Q.    Understood.  I do not see any reason why

8    I would need to go to the actual document and pull

9    up all these original -- these scans of these

10   original documents as opposed to just asking you

11   about it when it's referenced in your declaration.

12   Do you see any reason why you would be unable to

13   answer a question about a various -- I'm sorry,

14   about a particular ordinance or statute without

15   looking at the orig- -- that scan of the original?

16       MS. HELFRICH:  Object to the form.

17              Go ahead, Patrick.

18   BY THE WITNESS:

19       A.    I may, depending upon the question you

20   ask in terms of particularly fines or punishments.

21   Larger context of the law, things you ask like

22   that, you know, some of those laws are adopted

23   with different aforethought, but with a similar

24   purpose, so it really depends.

25       Q.    Okay.  If you need to look at the actual

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    #34-10  Filed 09/04/25   Page 356 of 535
Deponent: Patrick Charles
Date: 2025-05-22

81

1   exhibit, please let me know.  Okay?

2       A.   Okay.

3       Q.   All right.  So before I did that tangent,

4   we were talking about these Colonial laws that you

5   reference here in Paragraph 13.  And what I see in

6   the so-called sensitive place category, as you

7   write it, legislative assemblies in Maryland,

8   going armed before elections in Delaware and

9   New York, prohibiting by force of arms or malice

10  menacing, to disturb or hinder voting.  Correct?

11      A.   Yes.  Those are the examples I provided.

12      Q.   Okay.  And fair to say none of those

13  examples are in people's homes?

14      A.   No, those are not in people's homes.

15      Q.   Paragraph 14 -- actually just read the

16  bottom and then move to the next page.  "It was

17  during the mid to late nineteenth century," so

18  mid-to-late 1800s, "with the advent and commercial

19  proliferation of revolvers and repeating firearms,

20  the first firearms capable of carrying out mass

21  shootings at the hands of a single individual,

22  that location-specific armed carriage restrictions

23  proliferated widely."  I know that you're going

24  to -- that you went into more detail in the rest

25  of the paragraph, but generally speaking,

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

82

```
 1  location-specific armed carriage restrictions,

 2  armed carriage again refers, generally speaking,

 3  to public carry, yes?

 4      A.   Yes.

 5      Q.   So these location-specific public carry

 6  restrictions are -- you're referring to public

 7  buildings, public locations, where the public

 8  carry of firearms is restricted, correct?

 9      A.   Yes.  That's generally.

10      Q.   Okay.  And you used the examples, 1869 in

11  Tennessee, elections, fares, race courses, or

12  other public assembly of the people, correct?

13      A.   Yes.

14      Q.   And 1870 Texas, church or religious

15  assembly, the issue of your Mintz case.  Any

16  schoolrooms or other place where persons assembled

17  for educational lib- -- literary or scientific

18  purposes, or into a ballroom, social party or

19  other social gathering.  Or to any election

20  precinct, or to any other place where people may

21  be assembled to muster or perform any other public

22  duty or any other public assembly.

23  I don't mean to sound glib, but all of those Texas

24  restrictions of the carrying of dangerous weapons

25  involve public forums; am I correct?
```

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #341 FILED 09/04/25 Page 358 of 535

Deponent: Patrick Charles
Date: 2025-05-22

83

1    A.   Not necessarily.

2    Q.   Which ones?

3    A.   So if I had, for instance, a social party

4  at my estate, that would be my home.  If I had

5  another social gathering that was, you know,

6  invited the neighborhood or so forth, that could

7  be my home.  There are instances or what if you're

8  a priest that lives on the church property, do you

9  have a separate residence or is it connected to

10  the church itself?  Same with the maybe a

11  schoolmaster, is it connected to the schoolroom,

12  is it not.

13          I mean, these are hypotheticals, but

14  again I don't -- it's difficult for me to

15  foreclose any instance where it could be

16  somebody's home or their place where they reside.

17  So I refer to the text of the law and the issue we

18  have in limiting it to just public in all

19  instances is that most cases involving these

20  things would have been adjudicated at the local

21  level, not at the Supreme Court, which we -- you

22  know, usually survives.  So those issues have not

23  survived for historical posterity.

24          So just like I said in the early

25  eighteenth century -- or the late eighteenth

DEPOSITION INSIGHTS ™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

84

1  century and the early nineteenth century, like, a

2  lot of local enforcement records and the

3  discretion that local enforcement officials used

4  to enforce these revisions, we are missing that

5  context.  The best that you have is the text of

6  the law, and based on text of the law, I can make,

7  you know -- I don't want to foreclose that there's

8  only one interpretation here.  There can be more

9  than one historically speaking.

10      Q.  But historically speaking, you don't

11  know?

12      A.  We don't know without the local

13  enforcement records as to who -- whether a social

14  party was applied at someone's residence as well

15  as to a -- a public venue.

16      Q.  From a historical standpoint, did a --

17  did a private landowner have the right to allow or

18  exclude firearms from their own private property?

19      MS. HELFRICH:  Objection.  Vague as to

20  jurisdiction, time.

21  BY THE WITNESS:

22      A.  Is the question did any of these statutes

23  allow that?  I don't understand.

24      Q.  No, I'm ask- -- I guess what I'm asking

25  is, if you know, if Texas in 1870 or Tennessee in

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

85

1  1869 allowed private land owners to allow or

2  forbid the carriage of firearms on their own

3  properties?

4      MS. HELFRICH:  Object to the form.

5          Go ahead, Patrick, if you

6  understand.

7  BY THE WITNESS:

8      A.  In the state of Texas, I don't know

9  anything off the top of my head.  I do have

10  examples of landowners prohibiting weapons on

11  their particular properties.  Again, as my -- my

12  declaration notes that firearms local

13  (indiscernible) rampant, so what may have been

14  true in one jurisdiction may have been different

15  in another.

16      Q.  But even the example that you just gave,

17  that's the fire -- that was the private

18  landowner's choice?

19      A.  I don't know --

20      MS. HELFRICH:  Objection.

21      THE WITNESS:  Go ahead.  Sorry.

22      MS. HELFRICH:  Just object to the form.

23          Go ahead, Patrick.

24  BY THE WITNESS:

25      A.  I don't know.  I just know that there are

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

86

1 examples.  To answer, I don't know.  I just know

2 that there are examples in which landowners would

3 advertise that -- and this was a practice that

4 they would do to let people know that firearms

5 were prohibited on their property, to give fair

6 warning to someone who did and that they would be

7 either sued, prosecuted, or may be in danger from

8 retaliation.

9     Q.   Okay.  The very next line of -- I'm

10 sorry.  The very last line of that page, going

11 into the next page.  "Georgia enacted a law saying

12 no person in said state of Georgia be permitted or

13 allowed to carry about his or her person any dot,

14 dot, dot, pistol or revolver or any kind of deadly

15 weapon to any court of justice or any election

16 ground or precinct or any place of public worship

17 or any other public gathering in the state."  We

18 agree all of that is public -- public buildings or

19 public gatherings?

20     A.   It would be -- well, place of public

21 worship could be -- well, I mean -- they all say

22 public, let's put it that way.

23     Q.   Okay.

24     A.   And I mean unless -- if that's what

25 you're getting at.  I mean, I can see an instance

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

87

1  in which a place of public worship is technically

2  one's own home or it's owned privately, but they

3  call it public worship because the public goes

4  there.  So it depends on how we're going to define

5  public.  Or a --

6      Q.  Do you --

7      A.  What if a public gathering in the state

8  took place on someone's private land at their

9  behest.

10      Q.  Okay.  But for all hypotheticals, you

11  don't know either way?

12      A.  No, we don't have enough enforcement

13  records to understand the complete contours other

14  than know the certain places that they

15  recommended:  Worship, public gathering, election

16  ground, those are the issues that they were

17  referring to.  And we are (indiscernible)

18  legislative debates as well in virtually all laws

19  at the state and local level up through the close

20  of the nineteenth century because those records

21  were not maintained.

22      Q.  Okay.  And you reference 1870 for

23  Missouri and 1889 in Arizona and 1890 in Oklahoma.

24  And can we agree that these examples, none of them

25  say that firearms are prohibited in people's

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    #384 JENNIFER MILLER, DERINGER-NESS SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

88

```
1   homes?

2       MS. HELFRICH:  Object to the form.

3             Go ahead, Patrick.

4   BY THE WITNESS:

5       A.   I'm reading them all.  The word "home" is

6   not used, but again, as I said before, it depends

7   on, you know, is the place of public worship

8   somebody's home?  You know, so it goes back to

9   that original answer is that we do need to learn

10  more about the enforcement records and whether

11  that ever applied.  But there could be a situation

12  where that arose.  I just don't know of any.  But

13  the word "home" itself does not appear in the

14  statutes.

15      Q.   Okay.  And at the bottom of Page 8, your

16  Footnote 5, you make a couple references here.

17  Your Exhibit 2 and 3, 1879 New Orleans, 1891

18  Texas.  Can -- does the word "home" appear in

19  either of those examples?

20      A.   The word "house" does.

21      Q.   Well, house or other place of public

22  entertainment or amusement.  It's -- right, the

23  context of the word house right there is not

24  people's -- a person's home?  Is that correct?

25      A.   I'm reading.
```

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    #364  Page 364 of 535
**Deponent:** Patrick Charles
**Date:** 2025-05-22

89

1    Q.   Okay.

2    A.   In these examples, I mean, other than the

3  word "house," I would say that these examples do

4  not -- maybe except for again the church or

5  religious assembly or someone had the schoolroom

6  as their house, but that's just a -- you know,

7  restating what I stated to you before.

8    MR. SIGALE:  Okay.  You guys, is it possible

9  to take a five-minute break?

10    MS. HELFRICH:  Patrick, are you interested in

11  having a lunch break?

12    THE WITNESS:  No, I don't need a lunch break.

13  I'm good.

14    MS. HELFRICH:  Okay.  Then five minutes is

15  fine.

16    MR. SIGALE:  Great.

17                    (Whereupon a short

18                     break was taken.)

19  BY MR. SIGALE:

20    Q.   So, Mr. Charles, we were on -- it looks

21  like Paragraph 17.  And that paragraph talks about

22  how that -- well, what it says here, "In addition

23  to the" -- if the first line, "In addition to the

24  above state and territorial laws, there was an

25  abundance of local ordinances restricting the

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ   #34   Filed: 07/04/25   Page 365 of 535

Deponent: Patrick Charles
Date: 2025-05-22

90

```
 1   carrying of dangerous weapons in so-called

 2   sensitive places," end quote.  Correct?

 3       A.   Yes.

 4       Q.   Okay.  And then you give some examples.

 5   And I -- I just want to clarify that again in this

 6   example in Columbia, Missouri, it does not

 7   reference -- does not say that firearms are

 8   prohibited in people's homes.  That the word

 9   "home" is not mentioned, correct?

10       A.   The word "home" is not.  But it could be

11   instances where a home could apply.

12       Q.   But, it doesn't say that in and the fact

13   is you don't know one way or the other?

14       A.   I do not have the examples where the law

15   was enforced at somebody's home, no.

16       Q.   Okay.  If I go to Page 11 -- I'm sorry.

17   Let me go to the very bottom of Page 10.

18   "Meanwhile, other than Missouri localities

19   including Collins, 1887; Craig, 1880; Cuba, 1881;

20   and Granby, 1873, just to name a few, enacted

21   ordinances restricting the carrying of dangerous

22   weapons."  And again, carrying within these

23   ordinances generally means public carry?

24       A.   It means, yes, carry and -- I mean the

25   corporate and corporate limits would have been
```

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

91

1   mostly the downtown areas.

2       Q.   Okay.  And that's what you wrote in that

3   next sentence.  "This meant that the carrying of

4   dangerous weapons within these localities'

5   commercial and public epicenters, i.e. downtown,

6   high-traffic shopping areas, and government

7   buildings, was legally off limits," correct?  So

8   those are the examples -- well, strike that.  I

9   read that sentence correctly, correct?

10      A.   You read the sentence correctly, yes.

11      Q.   Okay.  And then the next sentence says,

12  "The carrying of weapons immediately outside these

13  commercial and public epicenters, however, could

14  be lawful."  Is there a historical meaning outside

15  of the common of what "immediately outside these

16  places" meant?

17      A.   That's just my verbiage, not any

18  historical verbiage.  The point of the sentence is

19  to stipulate that there could be a state

20  regulation that -- or another local regulation

21  that governed carried depending upon concealed or

22  open or it could regulate minor carrying or a

23  variety of things.  They -- there were sometimes a

24  myriad of laws, or sometimes there was no myriad

25  of laws, depending upon the location.  So it's --

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

**Deponent:** Patrick Charles
**Date:** 2025-05-22

92

1  it leaves open the possibility that, yes, it may

2  only apply in some jurisdictions to the corporate

3  and corporate limits, while in other jurisdictions

4  there may have been a separate penalty for the

5  corporate and corporate versus the other areas,

6  and there may be a state law that regulated

7  concealed carry, but allowed open carry.  It --

8  there's -- there's any number of combinations.  So

9  that's how firearms laws worked all the way up

10  through the mid twentieth century is that it was

11  not one standard, but many.

12      Q.   But is that what -- is all that what you

13  meant with that sentence, the carrying of weapons

14  immediately outside these commercial and public

15  epicenters, however, could be lawful?

16      A.   Yes.  I just elaborated on that, that --

17  that was not the question I was asked.  You asked

18  the question to -- as to the purpose of the

19  declaration is merely to discuss the -- well, this

20  section is to talk about the macro level of

21  sensitive places and how they developed.

22  The purpose of the declaration is not to answer

23  each and every instance in which an armed carriage

24  restrictions or a law that could restrict somebody

25  from having, using, or operating weapons worked in

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

93

1   a particular jurisdiction.  This declaration is

2   solely limited in this section to the macro level

3   of sensitive places.  So if you dig deeper,

4   there's more I would have to provide you to -- to

5   answer that.  But, yes there -- that's

6   intentionally left broadly to leave open and to

7   not foreclose certain other regulations.

8        Q.   Okay.  So the point is is that in these

9   Missouri localities, that it could be that once

10  you leave the downtown, the high-traffic shopping

11  area, the government building, it could be that

12  you are allowed to carry weapons?

13       A.   Yes.

14       Q.   Okay.  Then you talk about -- basically

15  it's the same discussion that we just had, but in

16  using the example of Stockton, Kansas, yes?

17       A.   Yes.  It goes into Kansas as a whole, but

18  Stockton would be the first, right.

19       Q.   And then you say after the Exhibit 12,

20  which I'm just using as a landmark, "Most Kansas

21  localities that enacted restrictions on the

22  carrying of dangerous weapons in, quote/unquote,

23  sensitive places, did so by making their entire

24  commercial and public epicenters off limits."  I

25  read that right?

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

#841 [ENTER COVER TITLE, PAGE COUNT SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

94

1    A.   Yes.

2    Q.   And can we agree that entire public and

3  commercial epicenters did not include people's

4  houses?

5    A.   It would not have unless there was a home

6  on that property.  But then there may have been an

7  exception for the home.  We don't know.

8    Q.   Okay.

9    A.   We don't have the enforcement records.

10  But there -- technically a home could be in that

11  epicenter, correct?  But was there an exception to

12  the policy?  I don't know.  Or was it enforced to

13  everything in there?  I don't know.

14    Q.   Yeah, and I guess you might be better

15  equipped to talk about municipal zoning laws in

16  the 1800s in the Midwest and so on.  I -- I don't

17  know certainly.

18        So let -- let me jump ahead to

19  Paragraph 20, which is on Page 14.

20                 (Document shared.)

21    MR. SIGALE:  Thank you, Abigail.

22  BY MR. SIGALE:

23    Q.   You write in that paragraph, "The two

24  things are historically certain.  First" -- and

25  I'm starting in the middle of the second line.

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ

Deponent: Patrick Charles
Date: 2025-05-22

95

1   "First, throughout the mid to late nineteenth

2   century," so mid to late 1800s, "state and local

3   governments maintained the authority to restrict

4   the carrying of dangerous weapons in a variety of,

5   quote/unquote, sensitive places."  Again, in

6   quotes, because the term didn't exist until 2008.

7   "Where people were regularly known to congregate."

8   I read that correctly?

9       MS. HELFRICH:  Objection.

10      THE WITNESS:  Yes.

11      MS. HELFRICH:  You read in other stuff that

12  wasn't in there.  I just want that to be clear on

13  the record.

14      MR. SIGALE:  Okay.  Sorry.  I did.

15      MS. HELFRICH:  Okay.

16  BY MR. SIGALE:

17      Q.   Other than my -- other than my insertion

18  about 2008 and sensitive places, did I read this

19  sentence correctly?

20      A.   Yes.

21      Q.   Okay.  And under that, there's the --

22  there's the continuation of Footnote 31, and in

23  the middle of that remainder of Footnote 31, you

24  write, "It is utterly impossible for historians to

25  locate and collect" -- I'm sorry -- "locate and

1  collate all the varying firearm regulations of any

2  given type or category."  Now, you address that

3  issue earlier in the declaration about things

4  being lost to time and whatnot.  I'll just —— you

5  know what, you wrote what you wrote.  But is that

6  basically the reason why it's utterly impossible

7  because of what you had written previously in the

8  declaration or some other reason that —— that

9  heretofore has gone unexplained?

10     MS. HELFRICH:  Object to the form.

11             Patrick, go ahead if you understand.

12  BY THE WITNESS:

13     A.   My point throughout this thing, so

14  each —— each era has its limitations in terms of

15  compiling any historical information and then even

16  extends to today.  So my point is, is that if

17  you're trying to do a simple number count and say

18  we have X number of laws and Y number of laws said

19  this and Z numbers of law said this, so let's make

20  a determination based upon numerical, that would

21  be not historically accurate.  A lot of laws, as I

22  point out here, they would be published in

23  newspapers, but also local ordinances could be

24  published like, you know, in the town center or

25  they may have kept them there and they didn't keep

1   the book.

2              I have found examples where a local

3   story says they're enforcing an ordinance on a

4   firearms law and how it's being enforced, but I

5   can't find the law itself.  So we know the law

6   existed, but I don't have the text of the law and

7   I don't know the outcome of that enforcement

8   because we have no judicial opinion.

9              So this is kind of the problem

10  historians have with reconstructing anything.

11  What I can say, and it's the point of the

12  paragraph there, is that we know the laws existed,

13  we have examples of the different types of forms

14  they have, and then based upon that we can make

15  certain determinations as to what was permissible

16  and what was unpermissible.  And that's the best

17  we can go off.

18              And that's been the standard I've

19  stated throughout is what -- you know, why I get

20  involved -- you know, you mentioned earlier, you

21  said, you know, what -- what was the point of the

22  article.  And I said the one theme of all my

23  articles is that if we're goingto  make

24  conclusions, we need to make conclusions on what

25  we know.  The same time we should acknowledge what

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

#3841 JENNIFER VANDERSTAR, PAING SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

98

1  we don't know and then discuss the limitations of

2  that as well.  That we should not be so keen to

3  jump to conclusions on what does and what does not

4  say and rely on what we have.  So that's my point.

5  I hope that explains everything.

6       Q.   Sure.  Sure.  Then let's move on to

7  Page 16.  It's the -- actually, hold on.  Maybe I

8  want to -- no.

9            Okay.  So I asked you -- before we

10  talked about that footnote, I asked you about that

11  phrase about "sensitive places," quote/unquote,

12  "where people were regularly known to congregate."

13  And then you write, "Historical examples abound

14  that illustrate this point from Oregon to

15  Tennessee, Nebraska to Utah," and so forth and so

16  forth.

17            And then you say, "Second," comma,

18  and then we jump a couple pages of footnotes and

19  wind up at Page 16 to the continuation of

20  Paragraph 20 where you write, "What generally

21  constituted a, quote/unquote, sensitive place by

22  the close of the nineteenth century varied

23  depending upon local customs and practices.

24  However, the most common locations to be

25  designated by mid to late nineteenth-century

99

 1    lawmakers as, quote/unquote, sensitive places --"

 2              Let me stop right there before I go

 3    to the examples you use and just clarify.  We've

 4    established that, quote/unquote, sensitive places

 5    is in quote/unquote because it wasn't really a

 6    phrase then.  What did they call it?  Anything?

 7         A.   No.  There was no common term to describe

 8    the doctrine.

 9         Q.   They just said firearms are prohibited in

10    and then list the loc- -- whatever the locations

11    were, yes?

12         A.   Yes.  So my -- my definition of sensitive

13    place is to say -- what kind of how Heller

14    described it.  So if we define sensitive place,

15    historical restrictions is any law that named a

16    specific location where -- usually carrying,

17    because if you can't carry it, you can't use it,

18    but they would prohibit the carrying or use of

19    firearms at those locations.

20         Q.   Okay.  And so you write, "The most common

21    locations to be designated by mid to late

22    nineteenth-century lawmakers," so mid to late

23    1800s, "as, quote/unquote, sensitive places were:

24    A, churches and places of worship; B, places where

25    large public assemblies generally took place,

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:22-cv-03805-SEM-DJQ   #34-0   JENNIFER OSKER, Page 375 of 535

#34-0   Page 375 of 535   SECOND A...

**Deponent:** Patrick Charles
**Date:** 2025-05-22

100

1  i.e., public parks, town squares, and the like; C,

2  polling places and other buildings where political

3  activities generally took place; D, schools and

4  institutions of higher learning; E, places where

5  events of amusement took place, i.e., places where

6  people congregate for large planned events; and,

7  F, bars, clubs, social venues, or anywhere in

8  which alcohol or psychoactive or mood-altering

9  drugs were purchased or consumed."  Correct?  The

10  locations, I read them correctly?

11      A.   Yes.

12      Q.   Okay.  And this is your -- your

13  categorization, right, this A through F?

14      A.   Yes.  Upon reading, you know, the perusal

15  of all the laws that I have read and the ones that

16  I used to illustrate in this declaration, those

17  are the most common ones listed.

18      Q.   And in your categorization, in A through

19  F on that Paragraph 20, the word "home" is not

20  used, correct?

21      A.   The word "home" is not used, but, as I

22  stated before, you know, there are perhaps

23  instances where a school is someone's home.  We

24  don't know.  We do not know how it was enforced.

25      Q.   Okay.  But leaving aside the

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03388-SEM-DJQ #94-0 JENNIFER CORKRE, PART 3, VOL 1 SECOND A...

**Deponent:** Patrick Charles
**Date:** 2025-05-22

101

1    hypothetical, the word "home" is not used in your

2    categorizations here, correct?

3        A.    The word "home" does not appear in my

4    declaration, no.

5        Q.    Okay.  And -- actually, strike that

6    question -- strike that word.

7                okay.  So then we get to Section 2

8    of your declaration, which I was thinking of as

9    kind of a segue section.  Section 1 is about --

10   says about sensitive places, Section 3 seems to be

11   focused on children or minors, and then you've got

12   this middle Section 2 that the title has both.

13               So you write in this Paragraph 21,

14   "From the mid to late nineteenth century" -- again

15   mid-to-late 1800s -- "perhaps the most common area

16   of firearm regulation was that of protecting

17   children from firearm-related violence, and

18   protecting the public from the dangers associated

19   with children possessing and handling firearms."

20   Correct?  Those two things?

21       A.    Yes.

22       Q.    Okay.  Sensitive place firearm pro- --

23   I'm sorry, I'm reading the last sentence of

24   Page 16.  "Sensitive place firearm prohibitions

25   where events of amusement took place and at

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com
**Deponent:** Patrick Charles
**Date:** 2025-05-22

102

1  schools and institutions of higher learning are

2  historical examples in this regard."  Again,

3  except for the hypothetical that maybe someone was

4  running a school in their house, those examples

5  that you list on the bottom of Page 16 do not say

6  people's homes, correct?

7      A.   The word "home" or "people's homes" is

8  not stated there, no.

9      Q.   Okay.  And then Paragraph 22, is examples

10  of events of amusement -- firearm prohibitions

11  where events of amusement took place.  And then

12  you go into historical analogs.  So you mention in

13  this paragraph 1879 New Orleans, places of public

14  entertainment or amusement; a Waco, Texas,

15  reference in 1891 where places where persons are

16  assembled for amusement; same thing in 1871,

17  Texas; 1889 Arizona; 1890 Oklahoma; and they

18  all -- they're all -- Montana 1903.  So they all

19  use this phrase in your examples where persons are

20  assembled for amusement, correct?

21      A.   Yes.

22      Q.   And outside of the hypothetical, those

23  examples do not say the word "home," correct?

24      A.   No.  They don't say "home".

25      Q.   All right.  And then in Paragraph 23, you

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:16-cv-00055-FDW-DQQ    #9340 JENNIFER CURRER, ... SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

103

1   use -- you go to the other example about

2   prohibitions at schools and institutions of higher

3   learning.  And you say that, "It can be traced

4   back to" -- "those types of prohibitions," I

5   should say, I'm sorry, "can be traced back as far

6   back as the late eighteenth century," yes?  And --

7   I'm sorry.  I should let you answer.  Yes, that's

8   what you wrote here?

9       A.   Yes.  Regulations pertaining to schools

10  and colleges can date back to the eighteenth

11  century, yes.

12      Q.   Okay.  And you used a couple -- you used

13  some examples.  University of North Carolina

14  prohibiting students from keeping firearms without

15  permission from someone of the faculty, so

16  apparently there were some times students could

17  keep fire -- or use firearms.  Do you know what

18  those example -- some of those examples were

19  when -- why a faculty would give permission to a

20  student to keep or use a firearm?

21      A.   In that instance, no, but the later

22  instances help inform the instances pro- --

23  perhaps when it would be suitable, mostly military

24  training if they are there for some kind of

25  military officer course, which wasn't uncommon.

DEPOSITION INSIGHTS ™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:24-cv-03053-SEM-DJQ    #34-10    JENNIFER OOMBER, DAVID SNULLEB, SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

104

1      Q.   Okay.  Okay.  Any others that you can

2   think of?

3      A.   Not off the top of my head, no.

4      Q.   All right.  And then you move to the next

5   page.  Oh, Yale.  Forbidding students from keeping

6   any gun or pistol.  These are all students --

7   actually, I -- now that I'm thinking of it, I

8   don't even know.  College students in this -- that

9   day and age, were they generally, like, 18 to 22

10   or did people go to college earlier or later back

11   then?  If you know?

12      A.   Based on studies of that era, the average

13   age for people attending university or college was

14   the ages between 13 and 16.  However, you could go

15   as late as you wanted.  So, for instance,

16   John Adams graduated from Harvard at the age of

17   20.  But typically 13 to 16.

18      Q.   Okay.

19      A.   So a middle schooler or to a freshman,

20   you're talking about today.

21      Q.   Okay.  Wow.

22           And then on the -- we're still on

23   the top of -- actually, I want to go to the bottom

24   of 18.  You -- in the footnotes you list a number

25   of other examples.  Alabama, no student could keep

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ    #340    JENNIFER HOOKER, et al. v. ... SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

105

1  firearms, dirk -- dirks or dirk knives.  Columbia

2  College, 1824, no student shall keep firearms.

3  All of these examples -- and you can read the

4  footnotes.  You've got Illinois, Augusta in

5  Kentucky, Waterville in Maine, Williams College,

6  and all of them are prohibitions on students

7  keeping firearms, correct?

8       A.   All these regulations, yes, were --

9  particularly part of the student Code of Conduct

10  or the student rules and regulations, yes.

11       Q.   My favorite, by the way is Page 19,

12  Number 45.  University of North Carolina, no

13  student shall keep a dog or firearms or gunpowder.

14  I didn't -- couldn't really figure the -- why they

15  lumped those two -- those things together, but --

16       A.   It's hunting.  They were protecting

17  people -- them from doing unlawful hunting.

18       Q.   Ah.  Thank you.  I just thought they were

19  maybe cat lovers at Chapel Hill back then.

20            So then -- so all of -- so all of

21  these -- it looks like these -- the footnotes on

22  Page 20, all -- they're all restrictions on

23  students having firearms, correct?

24       A.   Yes.  Typically those laws were

25  pertaining to students and the laws governing the

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03302-MGL-TER-RMG #23-40 JENNIFER PINCKNEY, ET AL. SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

106

1  faculty would have maybe been separate.  I don't

2  think there was any regula- -- whatever rules

3  applied to the faculty probably were kept separate

4  and we don't know if they survived.

5      Q.   Okay.  I know that it's been a year or

6  so, according to your earlier testimony, since you

7  read the complaint in this -- the second amended

8  complaint in this case.  But to your knowledge,

9  are the plaintiffs asking for minors to be given

10  access to firearms in this lawsuit?

11      MS. HELFRICH:  Objection.  Calls for a legal

12  conclusion.

13  BY THE WITNESS:

14      A.   Yes, I don't recall what's in the

15  complaint at this point.

16      Q.   If I were to represent to you that this

17  lawsuit is not at all about giving firearms to

18  minors or allowing minors to possess firearms --

19      MS. HELFRICH:  David, you disappeared.

20      MR. SIGALE:  I know I did.  All right.  Shoot.

21      MS. HELFRICH:  Do you want to go out and back

22  in?

23      MR. SIGALE:  I'm going to have to.

24  Mr. Charles, as you can see I've performed a magic

25  trick.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:24-cv-03385-SEM-DJQ    #984-10    JENNIFER ORNGER, et al. v. PRITZKER, ... SECOND A...    Page 382 of 535
Deponent: Patrick Charles
Date: 2025-05-22

107

```
 1        THE WITNESS:  Your background took over your

 2   face.

 3        MR. SIGALE:  Yeah.  Yeah, I'm going to have to

 4   ask my Zoom program what it's trying to imply.

 5              In the meantime, I'm -- we're going

 6   to have to take a break for two minutes.  You can

 7   strike the question I was in the middle of asking.

 8   And I will -- Joan, I will be logging back in in a

 9   second.

10                        (Whereupon a short

11                         break was taken.)

12   BY MR. SIGALE:

13        Q.  So, Mr. Charles, if I were to represent

14   to you that nothing in the lawsuit is regarding --

15   and nowhere do the plaintiffs request that minors

16   have access to firearms or be allowed to possess

17   firearms or purchase firearms -- do you have in

18   your mind --

19        COURT REPORTER:  I'm sorry.  The feed stopped

20   for just a second.  I don't want to lose your

21   question.

22                        (Record read.)

23   BY MR. SIGALE:

24        Q.  From a historical perspective, does that

25   alter your opinion on the relevance of all these
```

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

**Deponent:** Patrick Charles
**Date:** 2025-05-22

108

1  examples?

2     MS. HELFRICH:  Objection.  It calls for a

3  legal conclusion and we don't agree with your

4  characterization of the lawsuit in the first

5  place, so we dispute that representation.

6     MR. SIGALE:  Okay.  Understood.

7  BY MR. SIGALE:

8     Q.   You can answer.

9     A.   I got -- I really don't understand the

10 question.  I'm sorry.

11    Q.   You have listed a great number of

12 examples of university regulations prohibiting

13 students who you've said could be actually be from

14 the age of 13 upward from having firearms, right?

15 That's what the past three, four pages of examples

16 and footnotes, et cetera, all are about, correct?

17    A.   Yes.  And they can be expelled, which

18 would be the biggest form of punishment, yes.

19    Q.   Okay.  If the plaintiffs in this case are

20 not asking for minors to have access to firearms,

21 what is the importance then of all these pages of

22 examples of university regulations?

23    MS. HELFRICH:  I object.  This is -- this is a

24 hypothetical that we don't think accurately

25 characterizes the lawsuit.  And it's not his --

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:16-cv-03085-SEM-DJQ    #38-40 JENNIFER YOUNGER, PATRICK CHARLES SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

109

1    he's not here to say what the relevance of these

2    statutes are to our suit.

3    BY MR. SIGALE:

4        Q.   With that said if you understand the

5    question, Mr. Charles, you can answer it.

6        A.   These examples are examples in which the

7    law is trying to restrict minors' access to

8    firearms through any means in order to prevent the

9    negative consequences that may result, right?

10   Which would be violence, death.  You know, they're

11   13 and 16.  They're concerned about their

12   maturity, more or less here.  And so, I mean,

13   that's kind of just what these -- these laws are

14   about and then, you know, as the law -- as more

15   laws become relevant as the law evolves, then we

16   start to talk about laws restricting minors'

17   access and it includes regulating parental and

18   guardians' ability to, you know, have firearms or

19   loan or -- minors to use firearms on certain

20   things.

21               So, I mean, that's just the history.

22   That's all I can speak to.  That the history is

23   what it is.  However you or Ms. Helfrich want to

24   characterize it in the case of this lawsuit,

25   that's not my area of expertise in this case, so I

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMDJQQ  #9840JENNIFERJOMGER, PATRIBECMLEBS SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

110

1   don't know what else to say except to tell you I

2   can gladly tell you that's why that law existed,

3   due to the dangers that minors pose with firearms

4   and, you know, they're immature at that time.  You

5   know, just --

6        Q.   Okay. Paragraph 24 on Page 22.  I'm going

7   to read through the footnote number there.  "And

8   given the wide prevalence of these college and

9   university firearm prohibitions, when the dangers

10  associated with minors accessing, acquiring, and

11  misusing firearms precipitously increased during

12  the mid to late nineteenth century."  Why did

13  those dangers precipitously increase during the

14  mid-to-late nineteenth century?

15       A.   Based upon what I can tell, I mean,

16  there's really -- to understand the time, right?

17  Minors are not -- and this comes to the rise of

18  public schools, right?  We are trying to get

19  children in the school.  The youth at that time

20  were causing a lot of problems.  There's no laws

21  or regulations requiring them to attend school.

22  So there's that problem is that they're causing

23  havoc in local communities without anyplace to go.

24            In addition to that, you have the

25  wide proliferation and sale and production of toy

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03825EMDDQQ    #9:40 JENNIFER ROWGER, PRIN 386 of 535
Deponent: Patrick Charles
Date: 2025-05-22

111

1    pistols, regular pistols, or -- you know, you

2    don't have locked safes back then, either, that

3    people are putting their weapons in.  So, you

4    know, if you're a young person and your parents

5    are out in the field, are out at work, you can

6    take their firearm if it's accessible and go out

7    and cause damage or problems.  So these laws are

8    more or less to prevent that and to held parents

9    accountable as well as the children accountable

10   for what may happen as a result of these violence,

11   dealers accountable.

12            I mean, there's all kinds of

13   different purposes depending upon the locality.

14   What I can tell you, and this is what my book

15   covers, "Armed in America", is that the complaints

16   in newspapers and public letters explode that this

17   is the problem, and that it has to be dealt with

18   really fast and really quickly because it's

19   getting out of hand with young people losing their

20   eyes, young people dying every week, it's in the

21   newspapers.  So they're just trying to prevent the

22   needless death and -- of minors and also the

23   public that are being at the hands of this -- the

24   youth are shooting at things in the public scene

25   or even on private land.  There's tons every sad

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03085-SEM-DJQ #34-0 JENNIFER ANKEL, DELBERT MILES SECOND A... Page 387 of 535
**Deponent:** Patrick Charles
**Date:** 2025-05-22

112

1  stories that are put, and this is where the whole

2  push for it begins.

3           And then, yeah, the public school.

4  Obviously when they start going to public school,

5  regulations started to require that, they -- as

6  minors would do, you know, the firearms they start

7  bringing them to schools and they start passing

8  those regulations to prohibit that.

9    Q.  Okay.  I appreciate all of that and I

10  obviously want to let you talk, but I don't think

11  that's what I was asking.

12    A.  Oh.  I'm sorry.  What was the question?

13    Q.  I was asking about this part about the --

14  you write, "The dangers associated with minors

15  accessing, acquiring, and misusing firearms," so

16  let me take that part out.  "The dangers

17  precipitously increased during the mid to late

18  nineteenth century."  What happened during the

19  mid-to-late nineteenth century such that the

20  dangers precipitously increased?

21    A.  Yes.  So as I -- I answered this in the

22  beginning of the answer to my last question.  So

23  you have -- in the mid -- early-to-mid nineteenth

24  century, you're talking about firearm production

25  was largely -- I would say most was long rifles

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

**Deponent:** Patrick Charles
**Date:** 2025-05-22

113

1   and muskets and they had to be individually

2   produced.  Yes, you had Eli Whitneys and the

3   interchangeable parts system, but that wasn't the

4   standard across the board.  But by the mid to late

5   nineteenth century, firearm production increases

6   precipitously and, you know, the whole standard

7   production line goes in and tthey're making a lot

8   of toy pistols or things that are more accessible,

9   concealable for kids to use, whether they're

10  knives or pistols or stuff.  Things that they can

11  hide.

12          So, yes, that's kind of what's

13  happening at that time.  You're seeing also --

14  you're also seeing a change in demographics.

15  You're seeing less, you know -- at the founding

16  you're talking about, 90 to 93 percent of people

17  lived in -- you know, out in the rural areas, the

18  farm areas, and then it wasn't until the late

19  nineteenth century that you had, like, 30 percent

20  start to be inside the town areas.  So that's also

21  increased.  You're talking about a lot more people

22  and a lot more town areas for a lot more potential

23  for altercations, dangers, deaths, because more

24  people are, you know, interchanging every day.

25      Q.   Okay.  The obvious thing that I want to

3:21-cv-03385-SEM-DJQ   #38-40   Page 114 of 535

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

JENNIFER DONKER, DARBIE MILLER SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

114

1    ask you about here is the -- the Civil War was

2    during the mid to late nineteenth century.  So

3    does your answer have anything to do with that or

4    is your answer totally independent of the Civil

5    War?

6         MS. HELFRICH:  Object to the form.

7              Go ahead.

8    BY THE WITNESS:

9         A.   I don't think the Civil War has any

10   bearing on this to my knowledge.  I do know -- or

11   I think I also cite that there's laws going back

12   to the 1850s, even prior to the Civil War, where

13   you have public schools restricting that.  I don't

14   know what the earliest I cite for -- and we

15   haven't got to this yet, that's the -- you know,

16   the loaning, bartering or selling.  But I think

17   those go back to the 1860s as well.  I'm not sure

18   off the top of my head the earliest I have cited,

19   but, I mean, those exist as well.

20        Q.   Okay.

21        A.   I also think, if I may, the Civil War

22   kind of upended a lot of state and local

23   regulation for some time, so you're not going to

24   find as many laws coming into the foray at that

25   time unless it was related to the war effort.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMC #34 JENNIFER BONKER, DEFENDANTS SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

115

1    Q.   Okay.  Is that just on the firearm issue

2   that we're talking about or in general?

3    A.   I believe generally there was kind of

4   a -- you know, that's the focus is the war effort.

5   So if you're talking about regulation, it's all

6   related to that.  Also lawmakers at that time

7   don't meet year-round like they do now.  They only

8   met, you know, at very small, short sessions.

9    Q.   Okay.  Now, in the next page, Page 23,

10  there's not much text.  So the first full

11  sentence, "The state of -- states, plural, of

12  Maryland, Missouri, Texas, Vermont, and Washington

13  as well as the territories of Arizona and Oklahoma

14  are examples in this regard.  Each prohibited

15  firearms and other deadly weapons in and around

16  their public school systems."  Now, we -- we've

17  talked for pages about regulations at

18  universities, yes?

19   A.   Yes.

20   Q.   And now you're talking about states

21  prohibiting weapons and firearms around public

22  school systems, right?

23   A.   Yes.  The public school system starts to

24  develop at that time.

25   Q.   And again, outside of the hypothetical,

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03088-SEM-DJQ    #93-40    JENNIFER BROOKER, et al. v. JAMES MILLER SECOND A...
Page 391 of 535
**Deponent:** Patrick Charles
**Date:** 2025-05-22

116

1   the word "home" isn't used here, correct?

2       A.   No, these are all school regulations.

3       Q.   Okay.

4       A.   Now, there may be a regulation that says

5   on their way from home to school, if that helps,

6   but, yeah.  Some say school --

7       Q.   About --

8       A.   Yeah, some say on their way to -- yeah,

9   so it would be traversing or some would say on

10  school grounds.

11      Q.   Okay.  But even that traversing is the

12  minor student cannot traverse with a firearm,

13  correct?

14      A.   In most instances it said minor.  There

15  were some instances in which these laws applied to

16  adults as well as minors, yes.

17      Q.   Okay.  Are there -- are you able to point

18  me to an example of that, the adult part?

19      A.   Well, the adult part would have

20  applied -- not traversing.  At the school

21  regulations as we touched -- we discussed

22  beforehand, what the states of the territories of

23  Oklahoma, Arizona, so forth, that applied to both,

24  right?

25      Q.   That's the --

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-00805-SEM-DJQ   #34   JENNIFER SCHOBER, ET AL. v. THE SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

117

1    A.    That law was not restricted to minors,

2   it's to all persons, minors included.  As far as

3   the local laws that discuss that, I believe on

4   Page 30, the top line -- actually the bottom of

5   29, early 30, discusses that some local laws

6   prohibited teachers and pupils alike from having

7   firearms.

8    Q.    On the school grounds, correct?  That's

9   your Exhibit 68, for example, and Tahlequah,

10  Oklahoma?

11   A.    Yes.  Hold on.  I'm trying to make sure

12  none of them say traverse or -- yeah, none of

13  these examples it's traversing.  It's on the

14  school grounds for the adults.

15   Q.    Okay.  And, again, nothing prohib- --

16  nothing in that law that you're referring to or

17  that ordinance, whatever it happens to be,

18  prohibits the teacher from possessing a firearm in

19  their home?

20   A.    Presuming their home was not the

21  schoolhouse.

22   Q.    Okay.  Then on Page 25 in the footnotes,

23  I made a -- sorry, a whole bunch of notes here.

24  You -- San Jose, California, 1900, that's got to

25  be a public -- that's got to be a public school

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

Deponent: Patrick Charles
Date: 2025-05-22

118

1   student regulation, right, because carrying a

2   deadly weapons is -- could cause suspension or

3   expulsion, right?

4       A.   Well, it says, yes, "The carrying of

5   deadly weapons shall constitute good cause for

6   suspension or expulsion from school."

7       Q.   So clearly that's referring to -- that's

8   a regulation on students, right?

9       A.   Yes, that's referring to the students.

10      Q.   Same thing for Fresno in 1898, Oakland in

11  1897, San Diego in 1892, LA, 1882, Alameda.  So it

12  looks like it's spread throughout California.

13  There's San Francisco.  So all of -- they all copy

14  the same language basically and they all prohibit

15  students from carrying at the public schools,

16  correct?

17      MS. HELFRICH:  Objection --

18  BY THE WITNESS:

19      A.   Yes.  Cal- -- go ahead.

20      MS. HELFRICH:  No, that's fine.

21              Objection to the form.

22  BY THE WITNESS:

23      A.   Yes, Footnote 65 they all use similar

24  language and there was no state law, but

25  localities enacted their own restrictions on

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

Deponent: Patrick Charles
Date: 2025-05-22

119

1  students.

2      Q.   Okay.  And then in Footnote 66, you cite

3  a few Illinois examples.  So why not make mention

4  of it?  So 1899, no fire- -- in Dwight, Illinois,

5  no firearms or dangerous weapons shall -- of any

6  kinds shall be brought on the premises, right?  It

7  doesn't say you can't have firearms or dangerous

8  weapons at home; it just says do not bring them on

9  the premises, correct?

10     A.   The word premises is there, yes.

11     Q.   Okay.  And the word "home" is not?

12     A.   The word "home" does not appear in that

13  language, no.

14     Q.   Okay.  And Dixon, Illinois, in 1899, is

15  it your understanding that any pupil carrying

16  firearms or other deadly weapons, that that refers

17  also to on school grounds or don't you know?

18     A.   I would have to read the -- so that's

19  going to be an entire section on student rules and

20  it may have previously stated in a previous

21  position as to the grounds or so forth, but I did

22  not include that here, clearly, so I cannot say

23  anything except to say that it did apply to the

24  pupils.

25     Q.   And same thing for Decatur and

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03303-SEM-DJQ #34 JENNIFER OCONNER, ... Page 520-635 SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

120

1  Springfield, looks like the same -- roughly the

2  same language?

3      A.   Yes, it's referring to the students.

4      Q.   Okay.  And Mazon, Illinois, the first

5  place that we've mentioned that I confess I don't

6  know where it is, that -- that prohibits bringing

7  firearms onto the school grounds or on the

8  premises, correct?

9      A.   We're referring to Mazon?

10     Q.   Mazon, sure.

11     A.   Yes, it says to the school grounds or

12  about the premises, so that would be in and around

13  the school grounds.

14     Q.   Okay.  And Harvey says you can't -- the

15  pupils can't carry firearms or other weapons

16  without the written -- well, if you disregard any

17  of the foregoing, the pupil must have the written

18  consent of the school's superintendent before

19  being admitted to the school. So at the very

20  least, this applies to the pupil, correct?

21     A.   Yes, that regulation applies to the

22  pupils.

23     Q.   And it seems to imply that your -- the

24  pupil isn't allowed to carry firearms or other

25  weapons onto the school grounds.  Do you --

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03085-SEM-DJQ    #84    JENNIFER BUDDE, ... SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

121

1      MS. HELFRICH:  Object to the form.

2   BY MR. SIGALE:

3      Q.   Do you see it that way or do you not

4   know?

5      A.   Are you talking about Harvey?

6      Q.   I'm talking about Harvey.

7      A.   I'd have to read the entire section.  I

8   apologize for admitting that, but, yeah, you'd

9   have to read that to see if they're referring to

10   just the school grounds, the premises, or maybe

11   even traversing to and from, which some of them

12   would have covered both, so --

13      Q.   Okay.  And the same thing for -- let --

14   would you agree that Joliet, Fairfield, and at

15   least Jacksonville, the last -- three of the last

16   four examples, all apply to the pupil?

17      MS. HELFRICH:  David, can you -- I'm sorry.

18   Can you point out where Jacksonville is?

19      MR. SIGALE:  It's --

20      THE WITNESS:  Page 26.

21      MR. SIGALE:  Yeah, Jacksonville bleeds into

22   the top of Page 26.

23      MS. HELFRICH:  Got you.

24   BY THE WITNESS:

25      A.   Yeah, those three are definitely

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03302-BHH-SVH-JDQ   #240   JENNIFER POUGEET, DARNELL MILLER, SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

122

1  referring to the pupils in the text.  I would have

2  to again look at the Hillsboro on -- but I'm going

3  to presume that it applies to the pupils.

4      Q.   Okay.

5      A.   Because that refers to toy pistols, which

6  I would assume was something that adults did not

7  do.

8      Q.   Okay.  And I don't want to -- I don't

9  want to dig through all the other footnotes --

10 Kansas, Michigan -- but is it your understanding

11 that it's basically all the same thing as we just

12 talked about, the Illinois sta- -- regulations?

13     MS. HELFRICH:  Objection.  Vague.

14 BY MR. SIGALE:

15     Q.   That their prohibition-- that these

16 footnotes all have examples of different states

17 prohibiting pupils from having firearms?

18     A.   Well, these are actually locality

19 regulations.  The state regulations are -- precede

20 all this, so that's --

21     Q.   All right.  I -- I asked badly.  Each

22 footnote is, like -- gathers regulations of

23 localities within that state.  So 67 looks like

24 Kansas, 68, Michigan.  And the localities

25 referenced within those footnotes, are they also

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:16-cv-03385-SEM-DJQ #9340-JENNIFER00UNGER, DEFINSE2UNDER, SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

123

1   all regulations on pupils or restrictions on

2   pupils carrying firearms?

3       A.   The examples here are generally, but not

4   all, applicable to the pupil as the school

5   regulation.  However, as stated earlier, let's say

6   a school was in a locality that also had a

7   regulation saying that everything in the town

8   epicenter was off limits and the school fell in

9   with that -- typically, you know, schools

10  typically fell in the epicenters of towns where

11  people would go.  The schools could itself be

12  covered by that, which would apply to adults and

13  the students.  But the students' restriction is to

14  apply the -- expel them from school while the

15  local ordinance would be to apply a criminal

16  penalty, right?  So there could be an instance of

17  that.  But the purpose of these regulations, so we

18  understand that there -- their limitation, is

19  these are the school regulations as applied to

20  students and maybe the teachers under them, but

21  there could also be regulations that overlap or

22  work in conjunction with it that could prohibit

23  someone from teachers also carrying at this

24  school, too, depending upon the locality or

25  jurisdiction.  So it's difficult just to say that

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

Deponent: Patrick Charles
Date: 2025-05-22

124

1   it -- only students were prohibited here.

2      Q.   Okay.  But as we talked about earlier,

3   all your findings regarding these issues -- this

4   issue is included in your declaration, correct?

5      A.   Yes.  Everything to -- all my findings

6   are illustrated by the examples within the

7   declaration or cited as, you know, secondary

8   sources.

9      Q.   Okay.  And as a professional historian,

10  your goal when writing this declaration or any

11  other historical writing in your professional

12  capacity is to be as thorough as possible,

13  correct?

14     A.   Yes, and it's not the total -- let's put

15  it this way.  The map is not the territory.  And

16  what I mean by that is that the illustrations and

17  examples I provide are there to -- to inform

18  what's in my declaration, but it's not the

19  totality of all the evidence.  There are other

20  things.  But, yes, everything in here, I stand by

21  as supporting my findings as stated in the

22  declaration.

23     Q.   Okay.  But if there was another -- if

24  there was another example that you felt was

25  important that informed your conclusions that

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMDDQQ  #93-40JENNIFERBOONGERFER, DEPINAEPNULSES5SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

125

1  supported your finding, you would have included it

2  here, correct?

3      MS. HELFRICH:  Objection.  Hypothetical.

4  BY THE WITNESS:

5      A.   I included -- all the examples I included

6  are to illustrate the point.  And under the

7  professional historical standard, the amount of

8  evidence I provided is more than substantial to

9  prove the points that I make.  Again, it's not my

10  understanding or when you write a historical thing

11  to provide every -- each and every source that you

12  have that informs that outcome or that decision,

13  but instead to provide everything that you think

14  is necessary to help aid the reader in

15  understanding your interpretation.  So, yeah, I

16  mean, I hope that answers the question because

17  it -- I don't want to give the assumption that

18  every piece of evidence that I have or have found

19  is in this declaration.  But, again, I'm not

20  stating anything that is not.  In this

21  declaration, I stand by the findings and the

22  examples I provide illustrate my points.

23      Q.   Okay.  Then you give other examples in

24  other states on Page 28.

25          Okay.  And then let's -- talking

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

**Deponent:** Patrick Charles
**Date:** 2025-05-22

126

1   about Page 29 -- we're looking on Page 29, and you

2   write, "Exactly how many" -- and this ties in what

3   we were just talking about, I guess.  "Exactly how

4   many local public school boards and administrators

5   enacted these prohibitions is unknown.  As with

6   most local government records up through the close

7   of the nineteenth century, many, if not most, mid

8   to late 19 -- mid to late nineteenth-century

9   public school rules and regulations have been lost

10  to time."  You were -- and then it says you were

11  "able to locate many examples through popular

12  online databases and search engines, but those

13  historical sources from the databases and search

14  engines only provide us with a fragment of the

15  regulatory whole," correct?  You stand by those --

16  it's only a month later, so you still stand by

17  that paragraph that you wrote right there?

18       A.   Yes.

19       Q.   All right.  Let me on, and let me quote,

20  "What is historically certain is that,

21  quote/unquote, sensitive place firearm

22  prohibitions at public and some private schools

23  were widespread by the by the" -- a little typo

24  there -- "turn of the twentieth century."  So did

25  I read that correctly?

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:24-cv-00355-SLD-JEH # 93-40 JENNIFER YOUNKER, PATRICK CHARLES, SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

127

```
 1      A.    Yes.

 2      Q.    All right.  What I don't -- strike that.

 3            Would you agree that that sentence

 4   that you just wrote about what is historically

 5   certain does not say the word "home"; is that

 6   correct?

 7      A.    The word "home" does not appear in that

 8   sentence, no.

 9      Q.    Okay.  And you give a few examples on

10   Page 30 of -- and this ties in with what you were

11   saying -- "in Louisiana, 1886, carrying dangerous

12   weapons on the school grounds by pupils or

13   teachers positively prohibited."  Do you see that

14   example?  It's your Exhibit 67?

15      A.    Yes.

16      Q.    Okay.  Now, this Tahlequah, Oklahoma, in

17   the Cherokee Advocate, 1884, "Drunkenness,

18   profanity, gambling and carrying unlawful weapons

19   are prohibited and if practiced by a teacher will

20   lead to the cancellation of his certificate or by

21   a pupil to his expulsion from the school."  Do you

22   know, as you sit here, whether or not the

23   prohibition on drunkenness, profanity, gambling

24   and carrying unlawful weapons was only on school

25   grounds or if teachers and pupils were required to
```

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03885-SEMD-DQQ    # 340 JENNIFER DONKER, PATRICK CHARLES SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

128

1  forego those things everywhere?

2      A.   I do not have the regulation in its

3  entirety in front of me, but because it does state

4  school regulations, my presumption would be that

5  that was the regulation to the school.  There

6  were, however, different Oklahoma restrictions on

7  the carrying of weapons that were pretty broad

8  based in town centers and localities.  I think

9  they had an exception for long guns in some

10  instance, but Oklahoma had a pretty restrictive

11  public carry restriction at that time.

12      Q.   Okay.  And public carry restriction in

13  what -- in the example that you're thinking of

14  right now did not involve the home, correct?

15      A.   Off the top of my head, no.  I don't -- I

16  can't state with certainty without the -- the law

17  in my hand, but I don't recall, no.

18      Q.   Okay.  And then there's a few examples

19  that -- the next example talks about school

20  premises.  The others don't say either way.  Then

21  the bottom of the footnote, Chippewa Falls,

22  Wisconsin -- bottom of the page is, like, the

23  continuation of a footnote, Chippewa Falls,

24  Wisconsin, 1903, pupils shall not bring to school

25  any fireworks, gun powder, firearms, or percussion

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMC #3:40-JENNIFER DONNGER, PATRICK CHARLES SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

129

1    caps unless directed by a teacher.  I am going to

2    go with your military training example, because

3    otherwise I could not figure out any other reason

4    why a teacher would instruct a pupil to bring any

5    of that stuff to class, but -- okay.

6              So all these examples -- all these

7    examples involve at the least pupils, correct,

8    that we've been talking about?

9        A.    The most recent ones, yes. Except for,

10   obviously, above that you'd have the -- the

11   teachers, too.  So Exhibit 67 through 69.

12       Q.    So it's either pupils or it's pupils -- a

13   couple of them are pupils and teachers, but they

14   all include pupils?

15       A.    They all include pupils, yes.

16       Q.    So then we get to Section 3 of your

17   report and now it's just about minor access to

18   firearm and other dangerous weapons?

19       A.    Yes.

20       Q.    And you write here that there are --

21   there were three ways to, as you write, protect

22   minors from firearm-related violence.  That's from

23   Line 3 of Paragraph 26.  So let's -- let's go

24   through them.

25              Starting with the beginning of that

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03080-SEM-DJQ    #93-10    JENNIFER OURCEF, PATRICK CHARLES SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

130

1    paragraph, sensitive place, again in quotes, laws

2    prohibiting firearms and other dangerous weapons

3    at places of amusement and schools, again public

4    locations, correct?

5        MS. HELFRICH:  Objection.  Misstates his

6    testimony.

7    BY THE WITNESS:

8        A.    Yes --

9        Q.    Except for the hypothetical, those are

10    public locations?  Correct?

11        MS. HELFRICH:  Object -- go ahead.

12    BY THE WITNESS:

13        A.    Except -- you know, where a school could

14    be someone's residence as well.

15        Q.    Right.  But except for that hypothetical,

16    generally speaking, amusements and places of

17    amusement and schools were public locations,

18    correct?

19        A.    By and large, yes.

20        Q.    Was just one method by which mid to late

21    nineteenth-century lawmakers protected minors from

22    firearm-related violence.  That's what we've been

23    talking about up to now.

24            The other method involved regulating

25    the commercial sale or transfer of firearms and

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

Deponent: Patrick Charles
Date: 2025-05-22

131

1  dangerous weapons to minors, so I see that as the

2  second way.

3              As well as minors' ability to use

4  and carry firearms on public property.  I see that

5  as the third way.  Do you disagree with me?  Am I

6  breaking it up too far?

7      A.   Let me read.

8      Q.   Yeah, go ahead.

9      A.   Yes, so it's three -- there's three

10  parts, right?  There is the -- there's the --

11  there's the sensitive place, right?  And then

12  there's the commercial side transfer, it's access

13  to them, and then the ability for them to use

14  their carry.  So those are the three ways that

15  different localities handled the problem.  Some of

16  them did multiple, but, you know, those were the

17  three different ways I would categorize the loss.

18      MR. SIGALE:  Okay.  So let's -- we've talked

19  about one, the first one, so we'll talk about the

20  other two.  But I'm sorry to do this.  I need to

21  ask to take, let's say, two minutes.  I've got

22  something popped about a court hearing tomorrow

23  morning and I have to send a message out.  So two

24  minutes?

25      THE WITNESS:  Yep.  That's fine.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

Deponent: Patrick Charles
Date: 2025-05-22

132

1    MS. HELFRICH:  Yes.

2    MR. SIGALE:  All right.  1:40.

3                        (Whereupon a short

4                         break was taken.)

5  BY MR. SIGALE:

6    Q.   So let's go back on.  And kind of the

7  middle there of 31, up two lines -- no.  No.

8  That's the line right there.  You -- where you

9  write at the end, you see where the cursor is to

10  the right of "child"?

11    A.   Yes.

12    Q.   All right.  Go two lines up.

13    A.   For historically certain.

14    Q.   That's the one.  That's the one.  The

15  first is that, "Laws restricting minors from

16  purchasing, acquiring, using, and carrying

17  firearms were endorsed by some of this country's

18  earliest child protection organizations."   And

19  then you cite an 1877 article or pamphlet or

20  something, report maybe, and then an 187- -- 1889

21  report.  I don't know if that's a national

22  organization or what.  But the Association for

23  Prevention of Cruelty to Children and Animals.

24  And probably best they put children first in

25  that -- in their title.

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

**Deponent:** Patrick Charles
**Date:** 2025-05-22

133

1              My question for you is are those --

2     is that around the time, 1887, 1889, is that when

3     this -- these endorsements first happened or had

4     they -- are these just the most ready examples

5     that you found?  Do you understand what I'm

6     asking?

7          A.   I think you're asking when did they first

8     endorse the laws?

9          Q.   Yeah, was it 1877 or 189- -- 1889 forward

10    or no?

11         A.   I cannot speak to when they first

12    endorsed, but you can say the second organization

13    was around for 30 years.  And these organizations

14    were also -- this is all around the time of the

15    child rights reform movement where they're trying

16    to get children out of working, you know, whether

17    indentured servitude situations to, you know,

18    perilous jobs that killed children, to get them

19    into public schools.  All this is happening around

20    that time and, you know, 18- -- I think that's --

21    you know, all this stuff is not digitized, so --

22    but that's -- it shows -- the point here is to

23    show that these organizations are pushing it and

24    they are actually are advocating for these local

25    ordinances and they're endorsing them.  So you --

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

Deponent: Patrick Charles
Date: 2025-05-22

134

1  when you see the mass proliferation that's taking

2  place in the mid to late nineteenth century, it's

3  somewhat at the behest of these organizations but

4  it's also due to the problem.

5           So, like, the -- I mean, I think I

6  bring it up later how the ABA was founded in what,

7  in -- I don't know, where is the ABA founded?  I

8  forget -- 1870 -- well, yeah --

9      Q.   Yes.

10     A.   1878 ABA.  So you start to see these

11  national organizations arguing for larger national

12  issues because everything was localized.  So you

13  start to see that developing in American society

14  before then.  It's really about word of mouth and

15  dealing with local problems.

16     Q.   Okay.  And going off of something you

17  said earlier, were these really post-Civil

18  War-type issues?

19     MS. HELFRICH:  Objection.  Form.

20     MR. SIGALE:  I'm sorry.  I asked badly.

21  BY MR. SIGALE:

22     Q.   This whole let's have a national -- let's

23  have some national movement on these issues, is

24  that a post-Civil War philosophy?

25     A.   I don't know if I would characterize it

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03825-SEM-DJQ    # 34    JENNIFER OGORZEK, ... SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

135

1  that way or I can really speak to that.  But as I

2  said earlier about the Civil War, I mean, that's

3  where everybody's minds were focused

4  legislatively, public discourse.  I mean, people

5  worry about their loved ones and family and

6  resolving the war.  It's not until after the war

7  that the nation really gets back to legislating.

8  And prior to the war, I mean, the biggest issue

9  was -- or one of the, was slavery, right?  So

10  that's what a lot of the discourse is talking

11  about and the justice of that, so -- I don't know

12  if that answers the question, but --

13      Q.  Well, that's kind of what I'm getting at.

14  Is that an explanation for why you're citing an

15  article from 1877 and another one from 1889

16  because prior to 1861, the focus was slavery and

17  from 1861 to 1865, the focus was the war?

18      MS. HELFRICH:  Object --

19  BY THE WITNESS:

20      A.  Perhaps.  Yes.  I mean, I have to do some

21  more digging, but my -- my point there is simply

22  that these laws were endorsed.  Just what I say

23  there.  I'm not trying to infer something else

24  here.  This is a very straightforward citation

25  that these organizations backed it and they're

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMD-DQQ   #340 JENNIFER BOOKER, DANIEL MULLER SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

136

1  part of the reason that they proliferated as they

2  did and the interest of, you know, child safety

3  and children's rights.

4      Q.   All right.  At the bottom of 31, when you

5  write, "Firearm restrict-" -- well, say three

6  lines up or four lines up.  Sorry.  "Safe perhaps

7  for laws prohibiting the discharging of firearm

8  near occupied buildings and populated areas and

9  laws restricting armed carriage, firearm

10  restrictions on minors were the most widely

11  adopted laws in the country."

12          Two questions.  What time frame are

13  you referring to when you write that sentence?

14      A.   I'm referring to the mid to late 1850s,

15  through the close of the twentieth century.

16  Again, the turn of the -- wait, no.  The

17  nineteenth century, excuse me.  Nineteenth.

18      Q.   Got it.  And when you say, "firearms

19  restrictions on minors," you're talking about

20  restrictions on minors purchasing and possessing

21  and using firearms?

22      A.   Yes.  So again there's a -- I categorize

23  that as a large -- I categorize all the

24  regulations, but there was not -- I think as you

25  go into some of the laws, they're not all the

DEPOSITION INSIGHTS ™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03825-SEM-DJQ    #93-40 JENNIFER OBORNE, PATRICK NUMBER SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

137

1  same, right?  There is a variance.  Depending upon

2  local customs and norms, depending upon the ages

3  to the type of regulation.  I believe New York was

4  really restrictive in terms of how they regulated

5  this and they had a plethora of regulations

6  relating to minors that kind of overlaid on top of

7  each other.

8      Q.   Do you have a few examples?

9      A.   Off the top of my head, no.  But I can

10  say they had a different carry versus, like, a

11  loan and access and sale and then they had a

12  regulation that would apply to anybody, including

13  minors.  Yeah, I mean, really depended.  I mean,

14  the locality would determine how they wanted to

15  prosecute that.  But those records are also lost

16  to time, so, you know, you just kind of -- all you

17  can do is look at the statue, say, okay, well, you

18  have these various ones that are regulating very

19  similar things and how would they -- how would you

20  have prosecuted a violator in these different

21  scenarios, so I can't speak to that without actual

22  cases (indiscernible).

23      Q.   Okay.  But, generally speaking, the

24  restrictions that you're referring to at the --

25  towards the bottom thereof Page 31, are

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03655-SEM-DJQ   #93-40   JENNIFER GUNTER, PATRICK CHARLES SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

138

1  restrictions on selling guns to minors or allowing

2  min- -- or giving guns to minors to use or

3  possess, correct?

4      MS. HELFRICH:  Objection.  Asked and answered.

5  Misstates his prior testimony.

6  BY MR. SIGALE:

7      Q.   You can answer.  I think it's --

8      A.   Yeah, I -- I don't see -- I don't see how

9  the question is all that different.  It seems like

10  a different way of trying to get at the same

11  premise.  But, yeah, I mean, it's just -- you

12  know, they have, again, different ways of this.

13  If I recall correctly, again, some were about

14  loaning, some were about access.  I think there

15  was a negligent one as well.  Like, the minor got

16  access to it.  It's not, you know, on par with how

17  we regulate it today, the wording we would use,

18  but you could interpret it as that.  As, you know,

19  the adult was negligent in the minor getting

20  access to the firearm and trying to prevent that

21  in any way that they can.

22      Q.   Okay.  And then we go to Paragraph 27,

23  yeah, on Page 32.  And you write, "This is not to

24  say, of course, that every jurisdiction maintained

25  restrictions on minors purchasing, acquiring,

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:16-cv-03685-SEM-DJQ   #93-40   JENNIFER DOUGLAS, ET AL. V. SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

139

1   using and carrying firearms."  That is, of course,

2   a carryover from the previous paragraph of the

3   types of restrictions you were referring to.

4            And you say, "Historically speaking,

5   this is not unusual.  The movement for legal

6   uniformity in the country did not commence until

7   1878 with the establishment of the ABA, and the

8   movement would not begin to address the subjects

9   of firearms law until 19- -- the 1920s."

10            So between 1878 and the 1920s, if

11   I'm inferring correctly, the movement for legal

12   uniformity, whatever subjects that encompassed

13   until the 1920s, did not involve firearms; is that

14   correct?

15       A.   There may have been individuals that

16   would push for it.  What I'm getting at there, you

17   would have to go into "Armed In America," which I

18   cite here and it's 20 pages, and that discusses

19   that the movement is in response to the

20   reformation of the NRA as a -- more of a gun

21   rights lobby and they are for the first time,

22   starting in 1911 -- actually, it's the Revolver

23   Association first and then the NRA piggybacks.

24   And they start arguing against what they call

25   anti-firearms laws and they start arguing for

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMC #93-40 JENNIFER BONKER, DANIEL MILLER SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

140

1  uniformity to stop the ensnaring of sportsmen,

2  hunters, and firearms owners and local regulations

3  because, again, every jurisdiction differed.  So

4  what you may be getting in the way to carry in

5  your local jurisdiction or maybe you use a firearm

6  in a certain area, you go to the next town over,

7  you were in deep trouble.

8          So that's what that's referring to.

9  That doesn't mean that I can't say for certain

10  that there's been nobody that talks about

11  uniformity of firearms regulation before that.  In

12  fact, I believe there was a op ed in LA Times in

13  the early 1890s, which was talking about, you

14  know, we need to make the jurisprudence all the

15  same.  So whatever the first is, I can't say.

16          But the point to be made is that,

17  yeah, I mean, when we're looking at these firearm

18  regulations, it's difficult to jump to a

19  conclusion that everybody and anybody's supporting

20  one view of it.  That you're going to find a

21  plethora of views, and that the -- the best is if

22  you're going to look at this historically is to

23  take the principal, the principal here is

24  protecting minors, and we know that is a -- we see

25  that in the public discourse.

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMC #3-40 JENNIFER RODGERS, Page 416 of 535 SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

141

1

2              So that was the end goal.  They all

3  just had different means and different ways to go

4  about that depending upon their local

5  circumstances and the events that they face in

6  their community.  Because that's how laws are

7  enacted, right?  We enact laws based upon the

8  circumstances that affect us.  So that's just kind

9  of what I'm trying to get out there.

10      Q.   Okay.  And then you say, "The movement

11  to -- of uniformity and firearms law didn't start

12  until the 1920s and --

13      A.   That's the ABA's movement for it.  The --

14      Q.   Oh.

15      A.   Like I said before, the gun rights

16  movement begins in the 1910s by the Revolver

17  Association, but it wasn't really taken seriously

18  until the 1920s.  And that's when the NRA gets

19  involved and the ABA also gets involved, and

20  that's where it lifts off.   But the Revolver

21  Association was the -- Fred -- his name was Carl

22  Fredrick.  He was with them and he was the

23  architect of what would become the Uniform

24  Firearms Act.

25      Q.   Okay.  And then you write, "Uniformity in

1  firearms regulation across the country, however,

2  remained elusive through the 1960s."  Is that

3  supposed to -- does that culminate with the 1968

4  Gun Control Act or is that -- is there something

5  else you're referring to there?

6      A.   So what I'm referring to there is that,

7  yes, the 1960s following the assassination of

8  President Kennedy.  And 1963, led to, you know,

9  another push for, I guess, uniform model laws.

10  But by then the NRA was a very powerful force that

11  was preventing that uniformity from taking place

12  unless it was a law that they supported.  But they

13  didn't have any uniform laws, so they started

14  working the National Sports -- the NSS -- I forget

15  the first initial -- the National Shooting Sports

16  Foundation.

17          And then they -- so, I mean, my

18  point here is that when often people talk about,

19  you know, we heed -- you know, I hear it often in

20  conversations that we need to talk about laws that

21  every state or any jurisdiction they all enacted.

22  The reality of that is, is that was just not true.

23  I mean, you really don't see the -- the uniformity

24  even through the 1960s.  And Gun Control Act is

25  really the first federal-wide attempt to be really

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMDIQQ    #3:40 JENNIFER DONKEE, DANIEL MILLER, SECOND A...
Page 418 of 535
Deponent: Patrick Charles
Date: 2025-05-22

143

1  restrictive on firearms laws.  Then in the 1934

2  and the 1938 acts were largely gutted at the

3  behest of the NRA so they didn't have any

4  enforcement provisions in there that could

5  actually be enforced by the federal government.

6            So this is kind of the -- what I'm

7  trying to get at.  There is a larger history here

8  and I'm just kind of -- I'm just trying to make

9  the point that, you know, there is no such thing

10  as uniformity in firearms regulation throughout

11  much of our history.  There were -- you know, with

12  the exception of a category, so we could say

13  shooting restrictions, we can say armed carriage,

14  we can say minor restrictions.  Those would be the

15  three most prevalent, and there are other

16  categories that are not as prevalent, but

17  protecting minors is the -- one of the top three

18  most prevalent by the close of the nineteenth

19  century.

20      Q.   Okay.  Paragraph 28, you reference that,

21  "At least 20 states and territories ban the sale

22  or the giving and loaning of handguns and other

23  deadly weapons to 18- to-20-year-olds by the turn

24  of the twentieth century."  Have you been retained

25  by the government in any -- and I'm using "the

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:16-cv-03885-SEM-DJQ #94-10 JENNIFER HOOPER, PATRICK CHARLES, SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

144

1  government" broadly, in any locale to be an expert

2  witness in any lawsuit involving firearm rights

3  and 18 to-20-year-olds?

4      A.  No.

5      MS. HELFRICH:  Objects to the form.

6          Go ahead.

7  BY THE WITNESS:

8      A.  Yeah, no.

9      Q.  No?  Okay.

10          And then you write, "To my

11  knowledge, throughout the mid to late nineteenth

12  century, the state -- these state and territorial

13  firearm restrictions on minors were widely

14  understood to be constitutionally permissible

15  because they enhance public safety," and you cite

16  a Tennessee case from 1878.  Now, this goes to

17  what you were talking about before where you

18  believe that the examples that you've been giving

19  are representative to show your point and you

20  don't need to -- or I'm not going to say need,

21  you're not citing every example that you know.

22  But here you write why the restrictions were

23  widely understood and then you cite one case.  So

24  are you aware of others?

25      A.  Cases at the top of my head, no.  But if

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:18-cv-03385-SEM-DJQ   #340   JENNIFER BOOKER, Patrick Charles SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

145

1   you go to "Armed in America", which I cite in 156,

2   and the supporting notes that accompany it, there

3   is a number of examples that I provide.  Again, we

4   as historians don't provide every -- and list

5   every example, because also the publishers don't

6   like that because they don't get -- you know,

7   nobody buys books for the footnotes.  So I've had

8   my footnotes cut, like, by 40 -- by 60 percent in

9   a lot of books that proved my points.

10              But the point there is that, yeah, I

11  mean, they -- I don't know of any instance -- and

12  I'm sure there's got to be one, right?  There

13  always is one.  There's always outliers.  But the

14  overall majority of the public discourse agreed

15  that limiting minor access to firearms and the

16  things that resulted were, you know -- were

17  proper.  They were in the best interest of the

18  public safe community, and I don't know of anybody

19  that they were unconstitutional.

20      Q.   Okay.  And you say that, "Nineteenth

21  century, there was a spread of mid to late

22  nineteenth-century ordinances restricting minors

23  from purchasing, acquiring, using and carrying

24  firearms."  That is the same types of restrictions

25  that you've been talking about or writing about in

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03825-SEM-DJQ   #32-40   JENNIFER JOHNSON, et al. Page 421 of 535
Deponent: Patrick Charles
Date: 2025-05-22

146

1   this whole section, correct?

2       A.   Yes.

3       Q.   Okay.

4       A.   That's the point I just made, right?

5   That you've got to go to the previous to find

6   support for what I just put there.  It's leading

7   up to that point.

8       Q.   Okay.  What I don't see referenced

9   anywhere is any restrictions on parents owning

10  firearms because they have kids.  That's not

11  referenced anywhere in your report, correct?

12      A.   To my knowledge that -- yeah, that law --

13  those laws don't exist.

14      Q.   Okay.

15      A.   At least at that time there was no such

16  law.  Let me paraphrase.

17      Q.   Well, at this time that you're talking

18  about, is that mid to late nineteenth century?

19      A.   Yes.

20      Q.   Is there any time prior to that where

21  parents were prohibited from having firearms

22  because they had minor children?

23      A.   Not to my knowledge.

24      Q.   Are you aware of any law after the mid to

25  late nineteenth century that prohibited parents

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com
3:21-cv-03080-SEM-DJQ   #9-40   JENNIFER GOUKER, PATRICK CHARLES SECOND A...
**Deponent:** Patrick Charles
**Date:** 2025-05-22

147

1  from possessing firearms if they had minor

2  children?

3     MS. HELFRICH:  Objection.  Outside the scope.

4  BY THE WITNESS:

5     A.   Yeah, I didn't explore the twentieth

6  century for the purpose of this declaration.  I

7  stopped at the twentieth century.

8     Q.   Oh, you did?  I don't know that I

9  realized that.  Thank you.

10    A.   Yes.

11    Q.   So you -- your -- this report, the

12 historical range ends at 1899?

13    A.   I believe I -- let me go back through.  I

14 believe I state that somewhere.  Hold on.  Four

15 parts.  Macro history up through the close of the

16 nineteenth century, I'm talking about Page 3.

17 Examines history, tradition of making this -- it

18 sets the place, which is sticking to the same

19 thing.  Part 3, yeah, so it's sticking through the

20 close of the nineteenth century.

21    Q.   Okay.  And I saw that, obviously, for

22 Part 1.  I didn't realize that Part 2, Part 3,

23 Part 4 were doing the same thing.

24    A.   Yeah.  That was just my intent to stop

25 at -- I mean, I believe I may have cited to -- in

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com

3:23-cv-03885-SEM-DJQ    #93-40 JENNIFER DOUGLAS, et al. v. JENNIFER DOUGLAS, et al. PAUL J. MILLER, SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

148

1    some examples like, hey, that law continued to the

2    early twentieth century.  If I did, I knew I would

3    do that in other writings.  I don't -- I'm not

4    sure if I did that here.  But, yeah, my intent

5    here is to stop at the turn or close of the --

6    turn of the twentieth, close of the nineteenth.

7        Q.   Okay.  So that reference about -- in

8    Paragraph -- I'm sorry, I hadn't caught that.  But

9    that reference in Paragraph 27 to the uniformity

10   that talks about the 1920s and the 1960s, that

11   actually would be the only reference in this

12   report to the twentieth century?

13       A.   There may be another reference.  I don't

14   want to say it's the only.  But in terms of the

15   only -- the point of that paragraph is to, again,

16   explain the prevalence of firearm localism and

17   that it extended even into the twentieth century

18   as terms of a concept, that we don't have firearms

19   nationalism even after the adoption or the push

20   for Uniform Firearms Act.  It's only a minority of

21   the states enact that -- rather in most states

22   enact laws that were different.

23            And it wasn't until -- this is in

24   the report, but, you know, localism isn't really

25   undone until the push for preemption, firearm

DEPOSITION INSIGHTS™
by LEXITAS
888-893-3767 | lexitaslegal.com
3:21-cv-03085-SEM-DJQ   #93-40JENNIFER OOMKEER, PATRICK WILSER, SECOND A...   Page 240 of 535
Deponent: Patrick Charles
Date: 2025-05-22

149

```
 1   preemption laws in the mid to late 1960s by the

 2   National Shooting Sports Foundation.  So even if

 3   you were to count, we would have to still go

 4   through the local laws --

 5      Q.   All right.

 6      A.   -- from --

 7      Q.   My point is, is that other than that one

 8   reference to the twentieth century, your

 9   historical analysis only runs basically through

10   1899?

11      A.   In terms of laws providing examples of

12   laws, yes.

13      MR. SIGALE:  Okay.  You know what, I'm sorry.

14   Let me just sit here in silence for a minute.  I

15   might be about done, so --

16      THE WITNESS:  I'm going to go on mute real

17   quick.  I didn't see my daughter come home.  I'll

18   ask my wife if she came home.

19      MR. SIGALE:  Do you want to take five,

20   everyone?

21      MS. HELFRICH:  Sure.

22      THE WITNESS:  Thank you.

23      MR. SIGALE:  All right.   2:10; back at 2:15.

24                      (Whereupon a short

25                       break was taken.)
```

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:16-cv-03083-SEM-DJQ   #940   JENNIFER OAKLEY, PATRICK CHARLES SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

150

1  BY MR. SIGALE:

2     Q.   Mr. Charles, you good to go?

3     A.   Yep.

4     Q.   All right.  Let's turn to the last page

5  of the report, Page 35.  I'm going to ask you this

6  on the very, very off chance that somehow

7  historical summary means something different than

8  regular summary.  You write in Paragraph 30, "Laws

9  restricting minors' access and use of firearms as

10 well as laws restricting adult access and use of

11 firearm at, quote/unquote, sensitive places

12 wherein children are regularly present."  Are

13 those -- the laws that you're referring to in that

14 Paragraph 30, are those the laws that we have been

15 discussing for the past four hours that are in

16 Paragraphs 1 through 29 or does it mean something

17 else?

18    A.   No, it refers to that.  Like I said,

19 everything for this case is contained in this

20 report, so --

21    MR. SIGALE:  Okay.  Then with that said, I

22 don't have any further questions for you,

23 Mr. Charles.  Counsel might have some questions

24 for you, and if they do, I might have some

25 follow-up questions.  But otherwise, I am done,

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

3:21-cv-03825-EMC #340 JENNIFER FONTER, ET AL. V. NULL SECOND A...
Deponent: Patrick Charles
Date: 2025-05-22

151

1  so --

2      MS. HELFRICH:  Okay.  I'd like to take five

3  minutes and then -- I'd like to take five minutes

4  to collect my thoughts.

5      MR. SIGALE:  Of course.  So it's 2:17.  We'll

6  come back at 2:22?

7      MS. HELFRICH:  Fine.

8      THE WITNESS:  All right.  Just shout.  I'm

9  right here looking at something.

10      MR. SIGALE:  All right.

11                          (Whereupon a short

12                          break was taken.)

13      MS. HELFRICH:  We can go back on.  I don't

14  have any questions for Mr. Charles.  So we are

15  done with the questioning.  And we will reserve

16  signature.

17      COURT REPORTER:  All right.  Mr. Sigale, did

18  you need a transcript prepared at this time?  Oh,

19  I mean, did Ms. Solomon have questions?

20                          (No audible response.)

21      COURT REPORTER:  Mr. Sigale, did you need a

22  transcript prepared at this time?

23      MR. SIGALE:  Yeah, I'll take it at this time.

24      MS. HELFRICH:  We'll take a copy.

25      COURT REPORTER:  And did you want your

1   exhibits attached?

2       MR. SIGALE:  Yes.  But that means I need to

3   upload them to your something.  Do you want me to

4   upload them using that link that I could have done

5   before the deposition?

6       COURT REPORTER:  If it's easier, you can just

7   send them to me because I will be uploading them

8   when I'm finished marking them and referring to

9   them also.

10                          (Discussion held off

11                           the record.)

12                          (WITNESS EXCUSED.)

13

14

15

16

17

18

19

20

21

22

23

24

25

153

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS

 2

 3  JENNIFER J. MILLER, DARIN E. )
MILLER, SECOND AMENDMENT     )

 4  FOUNDATION, INC., ILLINOIS   )
STATE RIFLE ASSOCIATION,     )

 5  and ILLINOIS CARRY,          )
                             )

 6            Plaintiff,      )
                             )

 7    vs.                      ) Case No. 3:17-CV-3085
                             )

 8  HEIDI E. MUELLER, in her   )
official capacity as Director)

 9  of the Illinois Department of)
Children and Family Services,)

10  and KWAME RAOUL, in his    )
official capacity as Attorney)

11  General of the State of    )
Illinois,                    )

12                             )
          Defendants.    )

13
          I, PATRICK CHARLES, state that I have

14  read the foregoing transcript of the testimony
given by me at my deposition on the 22nd day of

15  May, 2025, and that said transcript constitutes a
true and correct record of the testimony given by

16  me at the said deposition except as I have so
indicated on the errata sheets provided herein.

17

18         _____
          PATRICK CHARLES

19
No corrections (Please initial)  _____

20  Number of errata sheets submitted_____(pgs.)

21  SUBSCRIBED AND SWORN to
before me this _____ day

22
of _____ 2025.

23
_____

24        NOTARY PUBLIC

25
```

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

**Deponent:** Patrick Charles
**Date:** 2025-05-22

154

```
 1  UNITED STATES OF AMERICA        )
    NORTHERN DISTRICT OF ILLINOIS )

 2  EASTERN DIVISION               ) SS.
    STATE OF ILLINOIS              )

 3  COUNTY OF COOK                 )

 4

 5

 6          I, Joan M. Burke,  Certified Shorthand

 7  Reporter and Registered Professional Reporter, do

 8  hereby certify that PATRICK CHARLES was first duly

 9  sworn by me to testify to the whole truth and that

10  the above deposition was reported stenographically

11  by me and reduced to typewriting under my personal

12  direction.

13          I further certify that the said

14  deposition was taken at the time and place

15  specified and that the taking of said deposition

16  commenced on the 22nd of May, A.D., 2025, at 10:01

17  a.m.

18          I further certify that I am not a

19  relative or employee or attorney or counsel of any

20  of the parties, nor a relative or employee of such

21  attorney or counsel, nor financially interested

22  directly or indirectly in this action.

23

24

25
```

DEPOSITION INSIGHTS™
by LEXITAS

888-893-3767 | lexitaslegal.com

Deponent: Patrick Charles
Date: 2025-05-22

155

```
 1          In witness whereof, I have hereunto set

 2   my hand at Chicago, Illinois, this 31st day of

 3   May, A.D. 2025.

 4

 5                    ------------------------------

 6                         JOAN M. BURKE, CSR, RPR
                      180 North LaSalle Street

 7                         Suite 2800
                      Chicago, Illinois 60601

 8                         Phone: (312) 236-6936

 9
     CSR NO. 084-002259

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

Page 1

2           IN THE UNITED STATES DISTRICT COURT FOR THE
3                  CENTRAL DISTRICT OF ILLINOIS
4    ------------------------------------------------X

5    JENNIFER J. MILLER, DARIN E. MILLER, SECOND

6    AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE

7    ASSOCIATION, and ILLINOIS CARRY,

8                         Plaintiffs,

9                         Case No.: 3:18-CV-3085

10            -against-

11

12   MARC D. SMITH, in his official capacity as Acting

13   Director of the Illinois Department of Children and

14   Family Services, and KWAME RAOUL, in his official

15   capacity as Attorney General of the State of

16   Illinois,

17                         Defendants.

18   ------------------------------------------------X

19                         DEPOSITION OF

20                         Saul Cornell

21                    NEW YORK, NEW YORK

22                       April 12, 2021

23

ATKINSON-BAKER – a VERITEXT COMPANY
24   (800)288-3376
     www.Depo.com
25   REPORTED BY:  KIARA MILLER
     FILE NO.:  AF022C2

Exh. H

Atkinson Baker, a Veritext Company
www.depo.com

Page 2

2    IN THE UNITED STATES DISTRICT COURT FOR THE
3         CENTRAL DISTRICT OF ILLINOIS
4    -----------------------------------------------X
5    JENNIFER J. MILLER, DARIN E. MILLER, SECOND
6    AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE
7    ASSOCIATION, and ILLINOIS CARRY,
8              Plaintiffs,
9              Case No.: 3:18-CV-3085
10        -against-
11
12   MARC D. SMITH, in his official capacity as Acting
13   Director of the Illinois Department of Children and
14   Family Services, and KWAME RAOUL, in his official
15   capacity as Attorney General of the State of
16   Illinois,
17             Defendants.
18   -----------------------------------------------X
19
20        Deposition of SAUL CORNELL, taken on behalf of
21        Plaintiff's, at Remote Location, New York,
22        New York, commencing at 10:03 a.m., Monday,
23        April 12, 2021, before Kiara Miller.
24
25

Page 3

2    A P P E A R A N C E S :
3
4
5              LAW FIRM OF DAVID G. SIGALE
               Attorneys for Plaintiff
6              430 West Roosevelt Road
               Wheaton, Illinois 60187
7
               BY: DAVID G. SIGALE, ESQ.
8
9
10
               OFFICE OF THE ILLINOIS ATTORNEY GENERAL
11             Attorneys for Defendants
               100 West Randolph Street, 11th Floor
12             Chicago, Illinois 60601
13             BY: AARON P. WENZLOFF, ESQ.
14
15
16   ALSO PRESENT:
17   MATTHEW CHIMIENTI
18   GRETCHEN HELFRICH
19
20
21
22
23
24
25

Page 4

1                   S. CORNELL
2    F E D E R A L   S T I P U L A T I O N
3
4         IT IS HEREBY STIPULATED AND AGREED by
5    and between the counsel for the respective
6    parties hereto, that the filing, sealing, and
7    certification of the within deposition shall be
8    and the same are hereby waived.
9         IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form of
11   the question shall be reserved to the time of
12   trial.
13        IT IS FURTHER STIPULATED AND AGREED
14   that the within deposition may be signed before
15   any notary public with the same force and
16   effect as if signed and sworn to before this
17   court.
18
19
20
21
22
23
24
25

Page 5

1                   S. CORNELL
2    S A U L   C O R N E L L, after having first been duly
3    sworn by a Notary Public of the State of New York,
4    was examined and testified as follows:
5         COURT REPORTER:  Please state
6    your name for the record.
7         THE WITNESS:  Saul A. Cornell.
8         COURT REPORTER:  Please state
9    your address for the record.
10        THE WITNESS:  28 Wood Road,
11   Redding, Connecticut 06896.
12   EXAMINATION BY
13   MR. SIGALE:
14        Q    We'll start by asking, I guess --
15   I know you just said it, but I'll just --
16   force of habit, state your name and spell
17   your last name for the record.
18        A    Sure.  Saul A. Cornell,
19   C-O-R-N-E-L-L.
20        Q    Let the record reflect this is the
21   deposition of Saul Cornell.  It is taken
22   pursuant to notice with date agreed upon by
23   the parties.  It is taken pursuant to all
24   applicable rules of the federal rules of
25   civil procedure and the local rules of the

Atkinson Baker, a Veritext Company
www.depo.com

Page 6

S. CORNELL

1
2  Central District of Illinois.
3      Dr. Cornell, you have give
4  deposition before?
5      A   Yes.  I have.
6      Q   Okay.  The last one I believe was
7  last November, am I incorrect, was there one
8  more recent?
9      A   Zeleny.  Oh, hold on.  I'm sorry.
10  Let me check to make sure -- yes, Zeleny
11  would have been the last one, yes.
12      Q   Now, that was in November, right?
13      A   Yes.
14      Q   Of last year?
15      A   Yeah.
16      Q   So it's been a few months.  Let me
17  give you a few ground rules, hopefully make
18  this go a little faster.  Is that okay?
19      A   Yeah.
20      Q   Kiara is here.  She's taking down
21  everything everybody says.  She can only
22  take out loud verbal responses.  She cannot
23  take down nonverbal responses, such as hand
24  gestures, head shaking.  Maybe the biggest
25  culprit, um-hmm or uh-uh.  So please keep

Page 7

S. CORNELL

1
2  all your answers out loud and verbal.  Okay?
3      A   Absolutely.
4      Q   All right.  It is very difficult
5  for Kiara to take down more than one person
6  talking at a time.  There will probably be
7  times when you're going to know what my
8  question is even before I'm done asking it.
9  But I'm going to ask that in all
10  circumstances, you please wait until I'm
11  done asking my question before you answer,
12  and I, in turn, will try to wait until
13  you're done answering before asking another
14  question.  Okay?
15      A   Absolutely fine.
16      Q   All right.  And just as a little
17  caveat with the nature of Zoom, we'll
18  probably break that rule about a hundred
19  times today.  If we do, it's fine.  We'll
20  just stop.  We'll just catch up with each
21  other and move on.  Okay?
22          If you answer a question that I
23  ask you here today, it's going to be
24  presumed for purposes of the record that you
25  understood the question that I asked, and

Page 8

S. CORNELL

1
2  that that is the question that you are
3  answering.  So if for any reason you do not
4  understand a question that I ask you, please
5  let me know, and I will rephrase it.  Okay?
6      A   All right.
7      Q   I don't know if your microphone or
8  your volume is turned down.  Can you just
9  make sure it's up so that everyone can hear
10  you?
11      A   Let me just go to the
12  appropriate --
13      Q   If you continue like that, you're
14  perfectly fine.
15      A   Okay.  Yeah.
16      Q   Yeah.  That's good.
17          And finally, if you need to take a
18  break for any reason, please let me know.
19  Okay?
20      A   Sure.
21      Q   All right.  So just to clarify,
22  right now you're talking to us from your
23  home in Connecticut; is that right?
24      A   That is correct.
25      Q   And what city -- I'm sorry, what

Page 9

S. CORNELL

1
2  city did you say you live in?
3      A   It's a New England town, Redding,
4  Connecticut.
5      Q   Redding.  Okay.  And that's the
6  D's, right?
7      A   Yes.
8      Q   But you said you work somewhere in
9  New York; is that right?
10      A   Yes.  I teach at Fordham
11  University.  My primary appointment is as at
12  a college at Rose Hill, but I also teach at
13  the law school, which is at Lincoln Center.
14      Q   Okay.  What city?
15      A   New York City.
16      Q   Oh, that's in New York City.
17  Okay.  All right.
18          Dr. Cornell, I'm going to -- a
19  number of documents were supplied to me, and
20  so I'm going to get a couple of little
21  preliminaries out of the way here about how
22  I'm going to do things.  I'm going to share
23  my screen with you really quick.  I'm going
24  to do this as a preliminary thing.  Okay?
25      A   Okay.

Atkinson Baker, a Veritext Company
www.depo.com

Page 10

S. CORNELL

1
2  Q  I'm going to share my screen with
3  you.  This is a document that I'm going to
4  mark as Exhibit A, and you can see it's got
5  the caption of the lawsuit that we're all
6  here for.  And then it says Expert Report of
7  Saul Cornell.
8      (Whereupon, Expert Report of
9      Saul Cornell was marked as
10     Defendant's Exhibit A for
11     identification as of this date.)
12 BY MR. SIGALE:
13     Q  I'm going to skip ahead to
14 page 20.  Is that your signature?
15     A  Yes.
16     Q  And I'll zoom out a little bit for
17 hopefully ease of reading, and this would
18 appear to be the expert report that you
19 submitted in this case, correct?
20     A  That is correct.
21     Q  This is going to be marked as
22 Exhibit A.  Like I said, this is preliminary
23 stuff.  I'm going to stop the share, and
24 then I'm going to show you what I'll mark,
25 or what will be marked as Exhibit B, and

Page 11

S. CORNELL

1
2  this would appear that's your information at
3  the top, correct?
4      A  Correct.
5      Q  This was also submitted to me as
6  your most current CV?
7      A  Correct.
8      Q  It's 16 pages.
9      A  Yes.
10     Q  I'm not going to ask you at this
11 moment.  We'll go into it, but this would
12 appear to be that document, correct?
13     A  That is correct.
14     Q  This is going to be Exhibit B.
15     (Whereupon, 2021 CV was marked
16     as Defendant's Exhibit B for
17     identification as of this date.)
18 BY MR. SIGALE:
19     Q  Now, as far as why I'm bringing
20 this up at all is, it was also submitted to
21 a number of appendixes and exhibits
22 numbering 1 through 126.  We're going to be
23 referring to some of those documents
24 throughout, but the ones that I do, I want
25 to keep the number that you gave to them.

Page 12

S. CORNELL

1
2  For example, if I were to use number 17,
3  I'll mark that as A17.  And I use one of
4  the appendixes, I'll probably just mark that
5  as -- you've got four appendixes, if I use
6  them, I'm going to keep them C, D, E, and F.  So I'm
7  going to keep the number -- because you gave
8  a chronological list and numbered all the
9  exhibits in that list, I'm going to keep
10 those numbers.  So that's how we're going to
11 operate today.  So I'm going to go out of
12 order already, and I'm going to --
13     MR. SIGALE:  Let's go off the
14     record for a second.
15     (Whereupon, a recess was taken
16     between 11:14 a.m. and 11:16 a.m.)
17     MR. SIGALE:  Let's go back on
18     the record.
19 BY MR. SIGALE:
20     Q  All right.  I am going to go out
21 of order already, which is not my intent,
22 but whatever.  This is Exhibit B.  This is
23 the CV.
24     A  Correct.
25     Q  I want to briefly run through this

Page 13

S. CORNELL

1
2  with you, Dr. Cornell.  There might be some
3  question.  There might be some of the
4  contents that merit a little more digging, a
5  little more questioning, but to the extent I
6  can briefly go through it, I will.  So the
7  Paul and Diane Guenther Chair, is that a
8  Chair that is for any -- like, is there any
9  particular charge to having to holding that
10 chair?
11     A  Yes.  The Paul and Diane Guenther
12 Chair was established by Paul and Diane
13 Guenther who are prominent Fordham alumni
14 and philanthropists in the New York area.
15 And the chair was designed to be in
16 constitutional history and was designed for
17 someone who was working in the field of
18 constitutional history, but who would speak
19 as a public intellectual on important
20 constitutional questions of the day.
21     Q  And as to what constitutes, excuse
22 the pun, an important constitutional issue
23 is that within the chair holder's discretion
24 or was there a description, for example,
25 matters say in the bill of rights or

Page 14

S. CORNELL

1
2  something with the first eight amendments or
3  something of that short?
4      A    No.  It was wide open, but of
5  course, most constitutional historians do
6  find themselves at some point in their
7  career encountering some aspect of the bill
8  of rights.
9      Q    And all this in education is
10  accurate, correct?
11     A    Correct.
12     Q    University of Sussex for a year?
13     A    Yes.
14     Q    Amherst for a year then --
15     A    Well, Amherst, I graduated.
16     Q    You graduated from Amherst with a
17  BA?
18     A    Yes.
19     Q    Then you went to Penn and got your
20  master's.  Then you stayed at Penn for an
21  additional four years, got your Ph.D.?
22     A    Correct.
23     Q    Then you went to William and Mary
24  where you were assistant professor for a
25  couple of few years.  Any particular topic

Page 15

S. CORNELL

1
2  that you were teaching at -- assistant
3  teaching in the Department of History at
4  William and Mary?
5      A    So I was in residence at the
6  Omohundro Institute of Early American
7  History and Culture, and I was free to teach
8  anywhere within the broad chronological
9  period of early American history.  I did
10  teach a seminar on the debate of the
11  constitution.
12     Q    You mean the founding fathers, the
13  drafting period, that debate, correct?
14     A    Yeah.  I think when we use the
15  phrase "founding period," we generally,
16  although again, some people might quibble
17  over the way you define it, but most people
18  would accept that it starts with the
19  American Revolution and it ends somewhere in
20  the federalist era.  Sometimes made with the
21  alien and sedition -- some people would say
22  it's Jefferson's election to the presidency.
23  But most people include both the period of
24  the first day of constitution writing and
25  the first decade of life under the new

Page 16

S. CORNELL

1
2  constitution.  Some other people might
3  include the marshal court area, but now
4  we're getting into academic turf arguments.
5      Q    Okay.  I was just trying to make
6  sure I'm differentiating say from the debate
7  over the constitution that, for example,
8  that rages today in some quarters, but
9  you're talking historically.
10     Okay.  Then you went to --
11     A    It's not uncommon in a course like
12  that to do a week on, what does this all
13  mean for today now that we've spent a whole
14  term talking about federalists and
15  antifederalists.  But it's not a course in
16  constitutional theory or the interpretation
17  of the constitution.  That's correct.
18     Q    Okay.  And then you were at -- I
19  know that it's very important that I say the
20  Ohio State University for six years, and
21  what did you teach there from '91 to '97?
22     A    So I taught a variety of courses,
23  including the American history survey, which
24  I taught the first half.  So it basically
25  goes from paleolithic America through to

Page 17

S. CORNELL

1
2  reconstruction.
3      Q    Paleolithic, I'm sorry, when does
4  that period start?
5      A    So essentially most American
6  history courses now actually begin with the
7  first inhabitants of America, many of whom
8  came over the land bridge that connected
9  Alaska to the Asian continent.  Although
10  there's some debate about whether some came
11  by boats, and 10,000, 14,000, 18,000,
12  there's a little bit of scholarly debate
13  about exactly how many thousands of years,
14  but it's quite ancient.
15     Q    Okay.
16     A    This is the period where there's
17  still wooly mammoths to hunt.
18     Q    Okay.  And I see that you taught
19  at Ohio State from '91 to 2005, there was
20  just a small break in there when you went to
21  the Netherlands; is that correct?
22     A    That's right.  I was --
23     Q    2008, '91 to 2008?
24     A    Yes.  Except for the time I was a
25  Fulbright distinguished lecturer in the

Atkinson Baker, a Veritext Company
www.depo.com

Page 18

S. CORNELL

2  Netherlands.
3      **Q   So what you said about teaching a**
4  **wide variety of subjects, and I want to make**
5  **sure that I get the full picture.  So if I**
6  **skipped over some of those topics.  Please**
7  **let me know.**
8          **But that would be descriptive of**
9  **the whole '91 through 2008 period, correct?**
10     A   Correct.  So in addition to
11  teaching the survey course, which is
12  typically the course that's required, I
13  taught the early republic, which used to be
14  defined as Jefferson and Jackson, but as
15  history has moved more towards social
16  history, naming it after white Anglo-Saxon
17  Protestant presidents, that nomenclature has
18  been replaced by the more inclusive
19  chronological periodizations, so the early
20  republic.
21          I also taught American
22  constitutional history, and that typically
23  goes from the roots of American
24  constitutional thought in the British empire
25  all the way up to, depending on how the term

Page 19

S. CORNELL

2  goes, to the current Supreme Court term in
3  any given year.  And then I also taught
4  seminars on historical methodology and
5  graduate seminars on early American history
6  and historical interpretation and
7  constitutional history.
8      **Q   And you have been at Fordham from**
9  **2009 through the present?**
10     A   Correct.
11     **Q   Why'd you leave OSU to go to**
12  **Fordham?**
13     A   Well, I am a lifelong New Yorker,
14  so there was certainly an appeal to return
15  back east where my family was and my wife's
16  family, but I would have to admit the idea
17  of having my salary doubled and my teaching
18  load halved also may have been a motivating
19  factor.
20     **Q   Yeah.  I can see that.  Okay.**
21          **So we go down to your fellowships.**
22          **In general, what were you doing**
23  **during these fellowships, you received**
24  **basically a grant to do a specific topic --**
25  **to research a specific topic?**

Page 20

S. CORNELL

2      A   So each of -- with the exception
3  of the Gilder Lehrman fellowship at Yale,
4  which was focused on a new book project on
5  race and guns in the antebellum period,
6  which is to say the pre civil war period,
7  the Yale and the Connecticut research
8  scholar residencies were part of the
9  sabbatical leave.  So when you have a
10  sabbatical, you have several options about
11  what you can do, and since my work for the
12  last 20 years has grown increasingly focused
13  on issues to where law is essential to what
14  I write about, I felt like spending some
15  more time at a top law school participating
16  in seminars and discussing projects with
17  various members of the faculties would be
18  advantageous.
19     **Q   How many of these fellowships**
20  **involved firearm issues?**
21     A   So when I was at Yale, I was
22  focusing on the popular constitutionalism,
23  and that resulted in a long review article
24  in the Yale Journal of Law and the
25  Humanities on popular constitutionalism the

Page 21

S. CORNELL

2  debate between federalists and
3  antifederalists.
4      **Q   Can I interrupt you?  Yale is**
5  **listed here at least twice, so --**
6      A   Right.  So the one at the law
7  school, that was focused on my research for
8  this -- what I thought was going to be a
9  full-scale project on popular
10  constitutionalism, it turned out to be a
11  lengthy article in the Yale Law Journal of
12  the Humanities.  Do you need me to explain
13  the debate around popular constitutionalism?
14     **Q   Sure.**
15     A   So traditionally, constitutional
16  history focuses primarily on courts and
17  gives the lion's share attention to federal
18  courts and indeed the Supreme Court.
19  Beginning, really, the key text is Larry
20  Kramer's book, The People Themselves, where
21  Kramer argued that we needed to get beyond a
22  court-centered narrative if we're going to
23  understand how constitutionalism impacted
24  American development more broadly, and that
25  the people acting outside of traditional

Atkinson Baker, a Veritext Company
www.depo.com

Page 22

S. CORNELL

2 venues, whether it's -- any sort of, you
3 know, the whiskey rebellion to more
4 localized court actions and cases to
5 assembling in the streets and protesting
6 peacefully, all of these different modes of
7 expressing ideas were generally laid with a
8 lot of constitutional meaning.
9        People are, when they're holding
10 these rallies, they're talking about whether
11 alien and sedition acts are constitutional,
12 for instance, and why they are or why they
13 are not.
14        So nobody had really -- Kramer's
15 book was sort of this clarion call for more
16 research, but nobody was actually doing it.
17 A lot of people were talking about how
18 important it was, and he was even featured
19 in the New York Times magazine, but very few
20 people had actually asked the question, at
21 the time that the constitution was proposed
22 and ratified, what were ordinary Americans
23 saying about the constitution.  And that was
24 the focus of that piece in the Yale Journal
25 of Law and the Humanities.

Page 23

S. CORNELL

2    Q   It's the 2011?
3    A   Yeah.  And the research -- sorry.
4 The scholar residents at the University of
5 Connecticut was largely focused on a book
6 that I just published that came out in 2019.
7 It was coauthored with a law professor and
8 former justice steward clerk Gerald Leonard,
9 and that is a book that Cambridge Press
10 published in a new series called New
11 Histories of American Law.  It grew out of
12 the three-volume Cambridge History of Law in
13 America, which is sort of now the standard
14 reference work on the history of American
15 law and constitutional history.
16        And Gerry was an expert on
17 Jacksonian constitutionalism and the
18 particular way that the party system fit
19 within American constitutional thought.
20 Because, of course, the founders were very
21 antiparty, so it's quite remarkable that
22 within a generation or generation and a
23 half, we find the beginnings of modern-style
24 parties.
25        Of course, I was interested in

Page 24

S. CORNELL

2 popular constitutionalism, and so our book,
3 which is called The Partisan Republic:
4 Democracy, Exclusion and the Fall of the
5 Federalist Constitution 1780s to 1830s,
6 charts how the federalists, who, of course,
7 wrote the constitution and essentially wrote
8 the bill of rights, tried to use law to
9 stave off the most radical strains of
10 American democracy, but they ultimately are
11 defeated by the Jacksonians, and the reason
12 it takes so long, why Jefferson, for
13 instance, was unable to achieve what Jackson
14 was, is Jefferson was still enough of a
15 member of this founding generation and
16 enough of an opponent party.  He famously
17 says, if I can only go to heaven -- of
18 course, I'm paraphrasing now -- if I could
19 only go to heaven as a federalist or an
20 antifederalist as a member of a party, I
21 would rather not go.
22        So Jefferson is sort of really
23 strongly against parties, but he, himself,
24 slowly increases the partisanship of
25 American constitutional law.  So our study

Page 25

S. CORNELL

2 is about this change and really how ironic
3 it is that a constitution is really designed
4 to avoid political parties only succeeds
5 because it embraces rank political
6 partisanship.
7    Q   Okay.
8    A   So neither of those projects have
9 a lot of firearm, Second Amendment stuff in
10 them.
11    Q   Okay.
12    A   They are a great read, though.  I
13 highly recommend them.
14    Q   Just asking basically for a year,
15 when did you start your research, your
16 writing into firearm law into Second
17 Amendment law?
18    A   So I had been working on this
19 topic now since 1999.
20    Q   Okay.  I'm going to go down your
21 writings.  It's one of the later pages of
22 this document.  You're going to be able to
23 pinpoint for me the first foray into
24 firearms?
25    A   Sure.

Atkinson Baker, a Veritext Company
www.depo.com

Page 26

S. CORNELL

1
2    Q    What's OAH?
3    A    Oh, I'm sorry.  That's the
4 Organization of American Historians.  That's
5 the main scholarly organization, umbrella
6 group for American historians.
7    Q    And do I understand that you won
8 that award 14 years in a row?
9    A    So it's a kind of, I guess it's a
10 bit like being knighted by the queen, which
11 is to say once you are anointed, you are now
12 an OAH distinguished lecturer and very few
13 people, although I suppose it's possible,
14 manage to do something that would involve
15 that title being revoked.  Although I think
16 it's possible.
17    Q    So you were given the award in
18 2006 and you managed to hold onto it --
19    A    Right.
20    Q    -- through the present.
21    A    Yes.
22    Q    I see.
23    A    It's more of a status, I suppose
24 would be the way to analogize it.
25    Q    No, I understand.  The Langum

Page 27

S. CORNELL

1
2 Prize, what writing won you that award?
3    A    That was my book on the Second
4 Amendment, A Well Regulated Militia.
5    Q    How many of the other awards here
6 involve firearms or the Second Amendment?
7    A    The rest are -- the other awards
8 are for my first book, The Other Founders,
9 which is a book about the antifederalists,
10 and I think among historians that book,
11 which is pretty standard on graduate reading
12 lists, is probably still the book I'm best
13 known for.
14    Q    What was the name of it?
15    A    The Other Founders:
16 Anti-Federalism and the Dissenting Tradition
17 in America.
18    Q    And here we get to your books
19 where we find, among other things, A Well
20 Regulated Militia, which you referred to
21 earlier, and The Other Founders, which you
22 referred to much more recently, as in the
23 previous question.
24    A    Right.
25    Q    And then a number of other

Page 28

S. CORNELL

1
2 publications there, seven.  And how many of
3 these seven involve the Second Amendment?  I
4 see that at least three of them do.
5    A    Yes.
6    Q    Is that right, just three?
7    A    Yeah.
8    Q    Let's talk about those three
9 briefly.  Back in 2000, you mentioned that
10 your first foray into firearm rights or the
11 firearm topic, however you care to phrase
12 it, was in 1999.  Did it involve this book,
13 Whose Right to Bear Arms in the Second
14 Amendment Protect, publish in 2000?
15    A    No.  The first thing I published
16 on this was an essay's part of a symposium I
17 organized in the Journal of Constitutional
18 Commentary.
19    Q    Was there anything in particular
20 that, and I would apologize in advance if I
21 wind up that this is a, that the answer
22 brings up a sore subject, so I'll apologize
23 in advance potentially.  But was there
24 something in particular that sparked your
25 interest in this in 1999?

Page 29

S. CORNELL

1
2    A    So it's an interesting story.  I
3 was teaching at William and Mary at the
4 time, and I just published this -- or, yes,
5 I suppose I literally just published my
6 first book, the antifederalist book, and of
7 course as I was finishing the book which
8 primarily focuses on how this antifederalist
9 tradition influenced early American
10 constitutional thought and development, in
11 particular descent.  You know, everything
12 from Jeffersonianism, Jacksonianism, certain
13 strains of John C. Calhoun's political and
14 constitutional theory.  I did notice that
15 there was a lot more antifederalism
16 percolating American legal thought, and I
17 would start seeing references to
18 antifederalists in law reviews, and I lived
19 around the corner from the William and Mary
20 law school, spent a lot of time in the law
21 library.
22        And in addition to this sort of
23 general revival, if you will, of
24 antifederalism, and actually I published an
25 article in the Northwestern Law Review on

Atkinson Baker, a Veritext Company
www.depo.com

Page 30

S. CORNELL

1
2 this sort of antifederalist revival charting
3 something I call The Changing Historical
4 Fortunes of the Anti-Federalists, which
5 talks about how they start out as sort of
6 states' rights people.  They become small D
7 democrats, and suddenly they became
8 libertarians, or were starting to become
9 libertarians.  And one of the areas where
10 the sort of new antifederalism emerged was
11 in writing about the Second Amendment, with
12 the antifederalists, particularly the
13 Pennsylvania antifederalists were
14 represented as these avatars of kind of a
15 libertarian challenge to constitutional
16 government and a fairly robust
17 individualistic view of the right to bear
18 arms, and I thought this is interesting.
19 There's something going on here.
20        So quite frankly, I decided as
21 important and sexy as the antifederalists
22 were, somehow firearms and the Second
23 Amendment would likely get me a little more
24 notice.  So in order to kind of draw people
25 to my earlier work, I wrote about

Page 31

S. CORNELL

1
2 antifederalism and the Second Amendment and
3 the way that their ideas have been
4 interpreted, hoping this would sort of boost
5 the sales of my book.  And I was actually
6 all set to start a new project on Jefferson
7 and the enlightenment, and then the Emerson
8 case emerged, and suddenly the fact that I
9 had just written an article, everyone wanted
10 to ask me what I thought about the Second
11 Amendment.
**12      Q   I wish I had this off the tip of**
**13 my tongue.  I don't.  Emerson was around,**
**14 what, 2000?**
15      A   That's approximately.  I think
16 Emerson might have actually been litigated
17 in 1999.  I don't remember what year the
18 decision was rendered.  But it, of course,
19 was the first of the new Second Amendment
20 jurisprudence, predating Heller.
**21      Q   Sure.  And you're referring, were**
**22 you following it from its inception, or are**
**23 you just referring to the fifth circuit**
**24 opinion?**
25      A   So just as my article in

Page 32

S. CORNELL

1
2 Constitutional Commentary appeared, that
3 case was moving to trial, and I'm trying to
4 remember did it ever make it beyond the
5 district court to the appellate court.  I
6 think it did, but I'd have to check my notes
7 to be sure.
**8      Q   Okay.**
9      A   But I was in the right place at
10 the right time for people to be much more
11 interested in my work.
**12      Q   Sure.  If you're asking if it made**
**13 it to the circuit court, it did.  The fifth**
**14 circuit ruling was what was --**
15      A   Oh that's right.  Right, right,
16 right.
**17      Q   Anyways, okay.  So it was a topic**
**18 that sparked your interest, and it happened**
**19 to be in a moment that it was starting to**
**20 spark a lot of people's interest?**
21      A   Correct.
**22      Q   So Whose Right to Bear Arms Did**
**23 the Second Amendment Protect, what was that**
**24 about?**
25      A   So that is a teaching text.  To

Page 33

S. CORNELL

1
2 call it a textbook is perhaps something of a
3 misnomer.  But there was, before the
4 internet when you could download everything
5 for free, many of the textbook companies
6 produced these edited volumes of scholarly
7 articles with teaching apparatus to make
8 them more teachable.  Because as I'm sure
9 you may recall from your undergraduate
10 career, picking up a law review article and
11 handing it to an 18-year-old is not always
12 the most sound pedagogic strategic.
13        So what this article did was to
14 take the debate, which I wouldn't say it was
15 raging at the time, but which there were two
16 clearly identified positions, which of
17 course from the point of view of a
18 pedagogically driven text is great.  And so
19 I took what I felt to be the best
20 representation of what was then called the
21 individual rights argument, and the most
22 persuasive view what was then called the
23 collective rights argument, and then some
24 other debates around that fundamental issue
25 and brought them together for

Page 34

S. CORNELL

1
2  undergraduates.
3      Q   The one about the the, the listing
4  above it, A Well Regulated Militia, you
5  referenced that as a -- you won awards for
6  that book, yes?
7      A   Correct.
8      Q   I guess beyond the title, what is
9  that book about?
10     A   So that is I think is the first
11  effort to dig deeply into the Second
12  Amendment and both go backwards and go
13  forward in time from its enactment history
14  and to try and understand how it was
15  interpreted across the broad arm of American
16  history.
17     Q   Is it just as the title states,
18  the founding fathers' viewpoints or did it
19  incorporate more of that popular
20  constitutionalism as you described it
21  earlier?
22     A   So it also goes back in time into
23  English history, although mostly talks about
24  how English history was understood by the
25  revolutionary generation, and it does make a

Page 35

S. CORNELL

1
2  very pointed effort to get beyond what the
3  elites thought about the Second Amendment to
4  try and tease out what non-elites thought
5  about the meaning and scope of the right to
6  bear arms.
7      Q   What, ultimately, is the
8  conclusion of that book?
9      A   So the conclusion of that book is
10  the history of the right to bear arms in
11  American life is much more complicated than
12  either proponents of gun rights or modern
13  proponents of gun control had realized.
14  That there was quite a bit more disagreement
15  at crucial times in American history and
16  that many of the debate -- and that both of
17  the positions that had defined the modern
18  debate at the time that I entered this
19  debate were in some ways rooted in, not in
20  the original debate over the constitution,
21  but were rooted in a different moment so
22  that the modern gun rights tradition is --
23  actually emerges in the Jacksonian era, and
24  the modern collective rights view emerges in
25  a backlash against reconstruction.

Page 36

S. CORNELL

1
2      So I think the fairest way to
3  describe my book is that I, I believed,
4  argued that both the prevailing individual
5  rights' view and the prevailing collective
6  rights' view were equally anachronistic in
7  important ways.
8      Q   Let me just ask you briefly, and I
9  guess I'll work backwards from what you just
10  said.  That you said that modern gun control
11  is that -- that for a lack of a better word,
12  school of thought or that belief, that
13  effort, I'll go with that word, that effort.
14  You called it a backlash against
15  reconstructionism.  I hear that and I think,
16  okay, reconstruction, all the freedman, the
17  former slaves are now given the right to
18  bear arms, the same as white folk, and a lot
19  of people don't like that.  Is that, in
20  essence, what you mean by that?
21     A   So actually what I mean by that is
22  slightly more complicated.  So if you look
23  at the history of reconstruction, what tends
24  to happen is people who look at
25  reconstruction, much like people who look at

Page 37

S. CORNELL

1
2  the founding ear, tend to pick out those
3  parts of the story that best fit their
4  narrative and their policy objectives in the
5  present, and so there are stories you can
6  tell about the founding stories.  You can
7  tell about reconstruction that are conducive
8  to both gun control and gun rights.  Each
9  side tends to favor the story that supports
10  their underlying focus.
11      My view is that reconstruction is
12  really both tragic and fascinating because
13  what happens in reconstruction is first you
14  have the black coats, which do exactly what
15  you just said, which is enact racially
16  discriminatory legislation aimed at
17  disarming freedman, but very quickly what
18  the republicans who are in charge of the
19  reconstruction realize is that there needs
20  to be fairly robust gun regulation.  That
21  that gun regulation needs to be racially
22  neutral, and it needs to be designed to
23  demilitarize and to neutralize the
24  proliferation of weapons in the
25  reconstruction south, which are producing

Atkinson Baker, a Veritext Company
www.depo.com

Page 38

S. CORNELL

1  S. CORNELL
2  really quite high levels of violence and are
3  making it very difficult to sustain the
4  republican project of reconstruction.
5       So when one looks at
6  reconstruction in its entirety, it tells a
7  much more complicated and interesting story,
8  one that certainly vindicates robust view of
9  the Second Amendment, but vindicates a
10  robust view of the right of gun regulation.
11  And I suppose what -- another takeaway from
12  that book project is that gun ownership and
13  the defense of gun ownership is deeply
14  rooted in American tradition, but so is gun
15  regulation.
16  **Q   So let me try and get down to the**
17  **nub of this -- this part of it, and that's**
18  **still only half of it.**
19  **So the gun control being a**
20  **backlash against reconstructionism, two**
21  **aspects, the black coats were disarming the**
22  **freedman, thus leaving them helpless against**
23  **the white marauders, the Klan, for example,**
24  **the country bumpkin sheriffs who were**
25  **aligned with the Klan or maybe even members.**

Page 39

1  **S. CORNELL**
2  **And then you had the other aspect, which was**
3  **those like the Klan who had lots and lots of**
4  **weapon and weren't afraid to use them to**
5  **achieve their aim of stopping reconstruction**
6  **from happening.  Is that -- so they were**
7  **trying to disarm, they were trying to stop**
8  **the disarming of the -- they were trying to**
9  **stop the arming of the black folks, and they**
10  **were trying to take away the firearms from**
11  **the marauding white folks.  Are those**
12  **basically the two aspects?**
13      A   Well, those two aspects are
14  important.  The third aspect is a general
15  view that what I would call permissive
16  carrier firearms in public poses a serious
17  threat to public safety, and what you see in
18  this period are some of the most robust
19  regulations of firearms across a wide swath
20  of areas of conduct.  So regulation of
21  firearms in a variety of ways increases
22  during the reconstruction era.  But the net
23  effect of reconstruction is to increase
24  levels of gun regulation.
25      **Q   And it's during this permissive**

Page 40

1           **S. CORNELL**
2  **carry period that you're referring to or**
3  **this effort against permissive carry that**
4  **you see court cases like Bliss and Nunn.**
5  **They were the -- those court cases were --**
6  **well, they were basically court challenges**
7  **to that third aspect that you just**
8  **described?**
9      A   Actually Bliss and Nunn are
10  antebellum cases, and they really fit more
11  into the early shockers of my story in the
12  book.
13  **Q   Okay.**
14      A   Where you see the first
15  regulations of concealable weapons, which
16  have become cheep, more reliable, and more
17  plentiful, and that creates a wave of
18  regulations which are then challenged in
19  court.  There are no Second Amendment or
20  state analog-like cases from the founding
21  era.  Jurisprudence on the right to bear
22  arms really starts in the 19th century.
23  **Q   Is that basically because of cases**
24  **like Slaughterhouse and Cruikshank, that the**
25  **right to bear arms wasn't basically a**

Page 41

1           **S. CORNELL**
2  **protectable right under the bill of rights?**
3      A   Sorry.  So now you're asking, just
4  so that I'm clear, what was the effect of
5  Supreme Court decisions during the
6  reconstruction era vis-a-vis the Second
7  Amendment, is that what you're asking?
8      **Q   Yeah.  I guess so, and if it's not**
9  **really your thing, that's fine.  It's just**
10  **kind of a natural followup to what you had**
11  **just said.**
12      A   So to the extent that the only
13  constitutional mechanism to reach into a
14  state of via the Second Amendment would
15  require an incorporation argument.  The
16  incorporation jurisprudence of this late
17  reconstruction or post reconstruction,
18  depending, again, how you define these
19  chronological distinctions, was key to
20  narrowing the potential scope of Second
21  Amendment claims via an argument in federal
22  court.
23      **Q   All right.  So -- oh I'm sorry.**
24  **That was only half the category.  You**
25  **mentioned that your Well Regulated Militia**

Atkinson Baker, a Veritext Company
www.depo.com

Page 42

1          S. CORNELL
2  book also talked about how modern gun rights
3  movement emerged during the Jacksonian
4  period.  I was hoping you could expand upon
5  that a little bit?
6     A    Right.  So there are a couple of
7  things to say, and that I do say in the
8  book.  So first of all, if you look at the
9  language in state constitutions, there's a
10  profound change in the Jacksonian period.
11  So the typical Jacksonian state constitution
12  reads, the right of each citizen to bear
13  arms in defense of himself and the state
14  shall not be questioned.  Whereas the 18th
15  century constitutions tend to say the right
16  of the people to bear arms in defense of
17  themselves and the state shall not be
18  questioned.
19          So there's clearly a profound
20  change in the language of constitutional
21  arms bearing clauses, and my book I think
22  was the first work to point out that this
23  was a meaningful change, and that we had to
24  understand why this change was occurring,
25  and my argument is that a more libertarian

Page 43

1  conception of the right to bear arms emerges
2  in the antebellum Jacksonian period and is
3  not fully in evidence in the founding era.
4          There are certainly some voices in
5  the founding era that are starting to think
6  about the right to bear arms in a more
7  expansive way, but the flourishing of that
8  point of view really occurs in southern
9  antebellum jurisprudence.
10
11     Q    The change from himself to
12  themselves, what's the significance?
13     A    So the 18th century formulation,
14  the right of the people to bear arms in
15  defense of themselves and the state changes
16  into the right of each citizen to bear arms
17  in defense of himself and the state.  So
18  himself and the state clearly evidences a
19  more individualistic conception, and I
20  illustrate this to my students by, for
21  instance, counterposing the image, famous
22  image of George Washington at Cincinnatus,
23  where Washington is portrayed as the modern
24  version of this great Roman figure, and he's
25  portrayed next to a plow.  He doesn't have a

Page 44

1          S. CORNELL
2  firearm.  He's got a ceremonial sword, but
3  the sword rests on the Roman facie, which is
4  the symbol of Roman law, which was, of
5  course, co-opted by Mussolini into fascism
6  in the 20th century, but that's a very civic
7  republican understanding of the citizen
8  soldier.
9          Whereas if you look at the Daniel
10  Boone sculpture from the Jacksonian period,
11  he's involved in hand-to-hand combat with an
12  Indian in which he's brandishing a Kentucky
13  rifle.  And so my argument is that the 18th
14  century formulation speaks more to public
15  defense, and the 19th century formulation
16  begins to speak more to individual defense.
17  And it's not just the language of state
18  constitutions.  It's literally, if you will,
19  written in stone because you see sculptures
20  changing to reflect those two conceptions of
21  arms bearing.
22          And, of course, that's another
23  example of how you study constitutional
24  thought without just focusing on cases.
25     Q    Well, when did that -- strike

Page 45

1          S. CORNELL
2  that.
3          This Jacksonian principle, as
4  you're describing it, the Daniel Boone with
5  the rifle, did that just pop up overnight
6  that or was this a school of thought that
7  had been festering, say that the himself and
8  the state was saying perhaps never really in
9  terms of say popular constitutionalism.  Was
10  never really the accurate thought of the
11  people.  That it was always themselves, and
12  it just took until the Jacksonian period to
13  codify it.  Do you understand what I'm
14  asking?
15     A    I did.  The way you just
16  formulated it, though, you just formulated
17  that the shift is towards themselves from
18  himself.  But the -- it's actually the other
19  way around.
20     Q    No.  I'm sorry.  Then I misspoke.
21  The wording said themselves, but the people
22  believed himself in quotes, and it just took
23  until the Jacksonian period to codify that
24  change -- almost like the themselves thing
25  was not really an accurate representation of

Page 46

S. CORNELL

1
2  what the people thought.
3     A    Right.  Well, like any historical
4  inquiry, we need evidence, and we need to
5  document that, and the question becomes what
6  are the best indicators of what people
7  believe outside of the legal elite.  And
8  then the other related question is if you
9  are approaching constitutional history from
10  the point of constitutionalism, at some
11  level you don't really care what the Supreme
12  Court thinks.  I mean, if there's a popular
13  belief from the point of view of a study of
14  popular constitutionalism, that would be the
15  focus of the inquiry.
16        But my understanding, and
17  remember, you know, I do teach in a law
18  school, but I'm not licensed to practice law
19  because I'm not a lawyer.  My understanding
20  is there's a traditional hierarchy of
21  authority in law, and something like a
22  Supreme Court decision or a court decision
23  is generally afforded more weight than let's
24  say a letter to the editor.
25     Q    Well, sure, of course.  I guess

Page 47

S. CORNELL

1
2  depending on what question you're trying to
3  answer, whether the question is what law do
4  I have to follow versus what did the
5  townspeople think.  But you had mentioned
6  that there really wasn't any jurisprudence
7  on the right to bear arms back during that
8  period, correct?
9     A    Okay.  So I don't really --
10     Q    And I'm just asking the questions.
11  You're the one that studied this.
12     A    Right.
13     Q    So I'm just asking.  I don't know,
14  other than the writings like, for example,
15  say the federalist papers or something of
16  that sort or the letters to the editor, I
17  don't know what else I could really have to
18  go on.  So in terms of just going back to my
19  question, and if you don't know because no
20  one's done the research on it or whatever,
21  that's fine.  But going back to that
22  question of whether or not he himself
23  almost might have been like an inaccurate
24  representation of the beliefs of the people
25  at the time and themselves -- I'm sorry.

Page 48

S. CORNELL

1
2  The themselves was a misprint, an inaccurate
3  statement of the people's belief, and it
4  just took until the Jacksonian period for it
5  to start getting changed to himself, the
6  more individual.  That's what I'm asking,
7  and if it doesn't make sense or if you don't
8  know, no one's thought about it before,
9  whatever.
10     A    Well, my view of the matter is,
11  and I think there's some evidence to support
12  this view is you tend to find the more
13  individualistic conception of arms bearing
14  among more radical antifederalists.  So, for
15  instance, if you look at a text that figures
16  prominently in a lot of the modern debate,
17  it's written by the dissenting members of
18  the Pennsylvania antifederalists.  So the
19  Pennsylvania ratification convention had,
20  you know, I'd have to check my notes, but
21  it's something on the order of maybe 60
22  people in it.  And you had about a third of
23  them who are antifederalists, and they
24  opposed the constitution in particular among
25  many reasons for lack of a bill of rights,

Page 49

S. CORNELL

1
2  and they do offer the first suggestion for a
3  detailed bill of rights.  They're also the
4  second state to ratify it -- have
5  ratification conventions, so they get there
6  first or second, I should say.
7        And it's a document that's very
8  hastily assembled because they're actually
9  three provisions that they include on the
10  right to bear arms.  Two of which are almost
11  the same, which suggests a kind of lack of
12  deliberation in composing the document, but
13  one of them which gains a lot of attention
14  is that famous provision about hunting and
15  uses, you know, the right to bear arms, but
16  links it also to hunting.
17        So the question then becomes what
18  do you do with the views of 20
19  antifederalists in Pennsylvania, how much
20  weight as a historian would you accord that.
21  I mean, I certainly believe it's a very good
22  representation of what the more radical that
23  country of antifederalists in Pennsylvania
24  thought, and perhaps antifederalists in
25  similar parts of the country that resemble

Atkinson Baker, a Veritext Company
www.depo.com

S. CORNELL

1
2 the Pennsylvania back country.
3        But it's important to note that
4 those same antifederalists, when they run
5 for election to be members of the first
6 congress, they are soundly defeated.  So as
7 you can see, that raises this interesting
8 question, well, if they were so
9 representative, and if their views were so
10 insightful as to what people were
11 motivated -- were motivated people, why did
12 they lose the election.  Because they sort
13 of ran on a -- we have the voice of people
14 asking for a bill of rights.
15     **Q    Do we know that they were defeated**
16 **in their elections because of any particular**
17 **provision of their proposed bill of rights?**
18     A    Well, we really can't say with any
19 certainty because we don't have polling for
20 that period.  All we can say is that they
21 were the ones who articulated the most kind
22 of individualistic version of the right to
23 bear arms.  They were very ardent for their
24 general support for a bill of rights, and
25 they took a shellacking in the first

S. CORNELL

1
2 congressional election.
3     **Q    Well, you probably agree that**
4 **history is replete with examples of voters**
5 **voting against their own interests and**
6 **representatives not necessarily being in it**
7 **for the people, but different story another**
8 **day, I suppose.**
9     A    History is interesting.
10     **Q    That it is, that it is.  I will**
11 **certainly give you that.**
12 **        The top line of the document of**
13 **your CV that we've been on screen share the**
14 **whole time, The Second Amendment On Trial:**
15 **Critical Essays on District of Columbia v**
16 **versus Heller, which, by the way, would be**
17 **at least one of two Supreme Court decisions**
18 **that you were alluding to before.  That if**
19 **you want to know what the law is, go look at**
20 **the court decisions versus letters to the**
21 **editor.  But here critical essays, are these**
22 **essays that were written before the**
23 **decision, are they post-mortems on what does**
24 **the decision mean, or what -- just go ahead**
25 **and explain.**

**S. CORNELL**

1
2     A    Sure.  It's an interesting story
3 behind this because leading up to Heller, I
4 thought that there had been enough new
5 scholarships since I published my 2000 book
6 that I was in discussions with the
7 University of Massachusetts Press to pull
8 together some of the best new scholarship
9 that appeared let's say from 1999 to about,
10 you know, Heller was 2008.
11        So, you know, usually you get a
12 book together, you get it together about
13 12 months before, and then cert was granted
14 on Heller, and I told my editor, I think
15 reality has lacked us because there's no
16 point in publishing a book of the best
17 scholarship -- the best new scholarship on
18 the Second Amendment if the Supreme Court is
19 about to weigh in and redefine the landscape
20 of the Second Amendment.  And he says, okay,
21 Saul, so I guess we now have to wait until
22 Heller is decided, and we did.  But then
23 everyone was saying, well, there's bound to
24 be a cert on the incorporation issue.
25        Because I'm sure you, of all

S. CORNELL

1
2 people, realize there was a grant of cert
3 with the Chicago case.  And so I had to call
4 my editor again.  So now there's this other
5 case, and it's going to deal with the Second
6 Amendment and the Fourteenth Amendment.  So
7 if we publish a case that's just on Heller
8 and something quite significant happens in
9 this new case, which we learned was
10 McDonald, well, the book is going to be
11 obsolete by the time it goes to press.
12        So we have to at least wait and
13 see, A, what McDonald says, and then
14 probably wait to see is there a new blip of
15 scholarship post McDonald.  And so what we
16 realized since this book went to press, I'm
17 assuming in 2012, I believe, is that what
18 was so interesting is that the major
19 scholarship was still mostly focused on
20 Heller.  There had been a couple of articles
21 on McDonald, but to this day, you hear much
22 more about the Heller decision in terms of
23 jurisprudential debate about what the Second
24 Amendment means than you do about McDonald.
25        So we were satisfied that we could

Atkinson Baker, a Veritext Company
www.depo.com

Page 54

S. CORNELL

1
2 finally publish something because the debate
3 had kind of stabilized. And essentially,
4 what I did was I took the two -- the Joyce
5 Lee Malcolm amicus brief and the Jack Rakoff
6 amicus brief, each which took two opposing
7 historical interpretations, put them at the
8 front -- no, I'm sorry. That's in the
9 appendix in the book.
10        And then I picked the best
11 scholarship on Heller, and I don't remember
12 everything I picked, but I do remember the
13 idea was to have a very balanced account.
14 So, for instance, Nelson Lund's article on
15 Heller is in there. Cass Sunstein's article
16 on Heller is in there. Reva Siegel's
17 article on Heller is in there. And to
18 actually give you the full table of
19 contents, I'd have to pull it up. You know,
20 those are my three favorite that I remember.
21    **Q   Those three, those would come down**
22 **on the collective rights side; is that right**
23 **or did they not?**
24    A   Well, Nelson Lund, who had the
25 Patrick Henry chair in Second Amendment

Page 55

S. CORNELL

1
2 studies that was funded by the NRA, I think
3 would --
4    **Q   Right, right. Unlikely.**
5    A   -- would be alarmed to find that
6 he was characterized in that way. Now,
7 that's a -- that to me was one of the most
8 interesting articles, of course, he takes
9 Justice Scalia to task for being
10 half-hearted originals, for not really
11 taking the originals argument as far as he
12 should have in Heller. Cass Sunstein's
13 argument is Heller Griswold ,which argues.
14 In fact, Heller is about recognizing that
15 most Americans have a fairly robust
16 individualistic view of the Second
17 Amendment, and it was time for the courts to
18 catch up.
19        And in her own way, Reva Siegel
20 makes a kind of similar argument, but she's
21 much more focused on constitutional
22 movements and popular constitutionalism. So
23 her argument is people like you are much
24 more important than Justice Scalia in
25 understanding Heller.

Page 56

S. CORNELL

1
2    **Q   All right. Well, I will take that**
3 **as a compliment, I suppose.**
4        **Just to clear up some things. I**
5 **don't want to spend a -- I really don't want**
6 **to spend a ton of time on it, but you are --**
7 **you have spoken quite clearly that you**
8 **believe from a historical standpoint Justice**
9 **Scalia got Heller wrong; is that correct?**
10 **Is that fair to say?**
11    A   Yup. That's correct.
12    **Q   And I've also read that you --**
13 **read you -- read statements of yours that**
14 **from a living -- I believe -- you're going**
15 **to tell me when I misquote you, and I**
16 **certainly am not trying to do that. From a**
17 **living constitutional standpoint, you think**
18 **that Scalia got it right.**
19    A   Yup. Absolutely.
20    **Q   Can you explain that?**
21    A   I mean, I think I said something
22 like if Justice Scalia had -- if the case
23 had been given to Justice Kennedy, for
24 instance, he would have written an opinion
25 analogous to his jurisprudence on the

Page 57

S. CORNELL

1
2 expansion of gay rights. And it would have
3 been a very short opinion. It would have
4 probably been 30 pages, and interestingly,
5 the question I find most fascinating is
6 would it have not been a 54 decision, if it
7 had been assigned to Justice Kennedy.
8    **Q   So you think Kennedy would have**
9 **approached it from a -- I don't -- I sound**
10 **like a broken record, but from a living**
11 **document type of viewpoint and said in a**
12 **nutshell times have changed, this is how --**
13 **this is what the people think now.**
14 **Therefore, there should be this individual**
15 **right, and you believe that from that**
16 **standpoint the four dissenting justices**
17 **would have been more likely to go along with**
18 **that?**
19    A   Yes. You know, one of the most
20 interesting things about Heller that is
21 really not well appreciated is the brief
22 that Paul Clement filed where he accepted
23 that the Second Amendment was an individual
24 right, 'cause the justice department had
25 obviously, after the Ashcroft memo, had

Page 58

S. CORNELL

1    S. CORNELL
2    taken that as its standard viewpoint, and
3    Clement's brief, which I heard, for
4    instance, Sandy Levinson, who's a
5    fascinating constitutional figure saying was
6    the best brief written in Heller, argued
7    that the proper disposition of Heller should
8    have been to say it's an individual right,
9    the case should be remanded for the
10   application of, you know, some form of
11   scrutiny, and the specific regulations
12   should be evaluated with that in mind.  And
13   that was Clement's argument.  And, you know,
14   I wonder if the court had adopted the
15   Clement's argument, whether he wouldn't have
16   had a six to three or seven to two.
17       Q   But, ultimately, the point of that
18   though is that -- or the end result of that
19   is that the Supreme Court in Heller did not
20   embrace a levels of scrutiny type argument,
21   correct?  They, in fact, said that it is not
22   subject to a freestanding interest balancing
23   type test, correct?  So that viewpoint of
24   what Clement's said didn't actually win over
25   the court.

Page 59

1        S. CORNELL
2        MR. WENZLOFF:  I'm going to
3    object here that this is a compound
4    question.  You can answer,
5    Dr. Cornell.
6        A   So since it's a compound question,
7    I'll answer in two parts.
8    BY MR. SIGALE:
9        Q   Sure.
10       A   So the first part is if the court
11   had adopted Clement's viewpoint, we would
12   see a different kind of scrutiny analysis
13   applied.  Again, I'm being speculative, and
14   one can never know for sure.  And, again,
15   the second part of your question, which
16   requires a sophisticated jurisprudential
17   analysis, and I have to acknowledge that
18   that's not something that I have expertise
19   to testify on.  As far as I read the
20   literature, there is -- there seems to be
21   some disagreement over what Justice Scalia
22   meant by freestanding interest balancing and
23   what that means, whether that's a blanket
24   prohibition on all forms of interest
25   balancing or simply a prohibition on the

Page 60

1        S. CORNELL
2    thing that he was pointing to, which is a
3    freestanding interest balancing.
4        Q   I guess your question is kind of
5    shared by many, I suppose, because the
6    Supreme Court has yet to answer that
7    question.  Although --
8        MR. WENZLOFF:  David, we're at
9    like 11:25.  Do you think maybe we
10   could take a break for a bit?
11       MR. SIGALE:  Yeah.  If that's
12   fine with Dr. Cornell.  I just --
13       THE WITNESS:  That's great.
14       MR. SIGALE:  Okay.  How long
15   do you want to take then?
16       MR. WENZLOFF:  Would ten
17   minutes be too long, or eight
18   minutes to get us to 11:30,
19   something like that?
20       MR. SIGALE:  I just want to
21   say this before we go off the
22   record.  I know counsel said it, so
23   that's -- that's fine, but remember
24   I said to you at the beginning, if
25   you need to, say so.  We can take a

Page 61

1        S. CORNELL
2    break whenever you want.  Off the
3    record.
4        (Whereupon, a recess was taken
5    from 11:22 p.m. to 11:32 p.m.)
6    BY MR. SIGALE:
7        Q   Dr. Cornell, you good to go back
8    on?
9        A   I'm good to go back on.
10       Q   Let's continue with the -- we're
11   on your CV, where you were, just on page 2.
12   I'm on the section Interviews, Editorials
13   Essays, Podcasts.  That looks like that goes
14   through part of page 4.
15       A   Correct.
16       Q   So let me just ask you this:  What
17   percentage would you say of these documents,
18   and I'll zoom out a little bit, if that
19   helps, would you say involve firearms?
20       A   Well, we could probably count
21   them, couldn't we?  Since I never
22   actually -- I've never counted them up, I
23   would say that is certainly one of that
24   that I do write about quite a lot.
25       Q   Is that a majority of your

Atkinson Baker, a Veritext Company
www.depo.com

Page 62

S. CORNELL

2 scholarship now, Dr. Cornell?

3    A    Sorry.  Now, we switched.  Are we

4 talking about popular essays or are we

5 talking about scholarship, because they are

6 very different worlds?  As I've already

7 suggested, they're sort of an inherent

8 appetite for things about Second Amendment

9 guns.  There seems to be less of an appetite

10 about founding your conceptions of

11 federalism.

12    **Q    Okay.  Sure.  I guess I was**

13 **referring in whatever capacity to the topic**

14 **of firearms in the Second Amendment.  I**

15 **understand there's many different angles**

16 **from which to approach that topic, but in**

17 **one form or another, is that the majority of**

18 **what you do now?**

19    A    No.  I wouldn't say it is.  So I

20 teach, obviously, which is a huge portion,

21 ad there isn't much Second Amendment

22 firearms in that.  Maybe one week out of a

23 15-week semester.

24        If it's this semester because I'm

25 teaching a kind of interdisciplinary common

Page 63

S. CORNELL

2 law seminar, we're probably going to do

3 three weeks out of 15.  Also because there

4 are two cases in the cert pool, and I like

5 to have my students do moot court.

6        So whenever there is a case that

7 actually you know something about, you don't

8 have to read all the materials again.  It's

9 kind of useful to assign those.  And then of

10 course on the coauthor of this textbook,

11 which I drew the first 15,000 years of

12 American history, and my two other authors

13 had to divide up the last 125 years.  So

14 keeping up with that tends to take up some

15 time.

16        I do publish on other aspects of

17 constitutional history, like the Cambridge

18 book.  I do publish on constitutional

19 theories, such as regionalism and popular

20 constitutionalism, and every once in a while

21 I do get press increase like what do you

22 think about Thomas Jefferson, or why is

23 Rhode Island taking plantation out of its

24 official name.

25        So there are -- I would say the

Page 64

S. CORNELL

2 Second Amendment and firearm arms is one

3 important part of my professional identity,

4 but I don't quite yet think it's the

5 majority.  Although for people who work in

6 this field, obviously, they would -- this is

7 where they would see me because they tend

8 not to be as interested in popular

9 constitutionalism in the Jacksonian era.

10    **Q    Okay.  So just off the -- if you**

11 **know, there's 29 listings under the**

12 **Interviews, Editorials, dot, dot, dot**

13 **category.  How many of them or what**

14 **percentage of them would you figure are**

15 **Second Amendment or firearm related?**

16    A    Again, to give you a precise

17 answer, I would just have to take some time,

18 count them up, and calculate the number.

19 But again, as I've said, the thing that

20 seems to prompt the attention of journalists

21 most are my writing about guns and Second

22 Amendment.

23    **Q    Okay.**

24    A    I would love if they'd ask me on

25 antifederalism more, but they seem not to

Page 65

S. CORNELL

2 knock on my door about that one.

3    **Q    Let's take the most recent.  Well,**

4 **Could America's Founders Have Imagined This?**

5 **is that a firearm-related article?**

6    A    God, I don't remember whether that

7 one does.  Actually, you know, that might be

8 about, and again, I would have to reread it

9 to give you a definite.  But I seem to

10 recall that that one is actually not about

11 Second Amendment issues.  That one is about

12 a statement that Nancy Pelosi made that she

13 could not -- she didn't believe that the

14 founders would have imagined that both the

15 house and the senate would fail to defend

16 their prerogatives vis-a-vis the presidency.

17 And I said that the federalists and James

18 Madison in his classic argument, you know,

19 in both federalists 10 and 51 where he

20 outlines this idea that ambition must be

21 made to counteract ambition, would have

22 expected that, for instance, senators would

23 have been more jealous of their power

24 prerogatives vis-a-vis if the executive had

25 been eager to limit executive expansion.

Page 66

S. CORNELL

1
2      The antifederalists, however, had
3  so little faith in human nature, that it
4  wouldn't have surprised them at all.  Once
5  again, when we try and lump the founders
6  together, it fails to distinguish between
7  the federalists and antifederalists, we sort
8  of miss an important nuance there.  So
9  actually, I don't think it had anything to
10  do -- if that's -- I mean, that is my
11  recollection of what that one is about, but
12  I need to reread it.
13      Q   Sure.  Okay.  Well, I'll tell you
14  what, let's -- I'm going to do my best here
15  to focus on the Second Amendment aspect of
16  your work; otherwise, I fear I'll -- I will
17  run out of time just talking about the
18  articles.
19      So very briefly, the Second
20  Amendment case for gun control, what was
21  that -- what was article?
22      A   So, again, these articles are
23  for -- you know, I use the word "popular"
24  advisably because the new republic is not
25  popular the way that Jimmy Kimmel is

Page 67

S. CORNELL

1
2  popular.  So, you know, I think it's
3  important to note that this is a select
4  readership I'm writing for.
5      So that takes up the issue of what
6  kinds of regulations did the founding
7  generation and subsequent generations think
8  were consistent with the Second Amendment?
9  To be any more specific, I'd have to reread
10  it.
11      Q   Well, why don't you go ahead and
12  answer your question without reference to
13  the article itself.  What types of
14  regulations did -- I'm going to wind up
15  paraphrasing your statement, so you'll
16  correct me.
17      But what types of regulations did
18  the founding fathers and those in the
19  popular at the time contemplate?
20      A   So I think if we look at some of
21  the appendices, there'd be some examples of
22  those kinds of regulations.
23      Q   If can I interpret for a second,
24  is that like the Exhibits 1 through 127 or
25  something like that that were submitted to

Page 68

S. CORNELL

1
2  me?
3      A   Yeah.  So that's not -- that is a
4  broad survey, but obviously it's not a
5  comprehensive survey, which would go on for
6  probably another several hundred pages.
7      Q   Sure.
8      I'm looking at the rest of the
9  essays here and whatnot, and they all seem
10  to -- as far as the Second Amendment goes,
11  at least from the titles, they seem to
12  revolve around two themes.  The meeting of
13  the Second Amendment, looks like from the
14  founding fathers' time and firearm
15  regulations.  Are those basically the two
16  big umbrellas under which all these articles
17  and so far as they involve the Second
18  Amendment fall under?
19      A   So I would just amend what you
20  said by saying that the meeting of the
21  Second Amendment key moments in American
22  constitutional history.  It's not just a
23  founding period.  We look at the Jacksonian
24  America, construction America, the early
25  20th century.  I do tend to -- I tend not to

Page 69

S. CORNELL

1
2  do recent American history, although I
3  suppose that as the older I get, more of
4  recent American history will become ancient
5  American history.  So, yes, it's a history
6  of firearms regulation, and the debates and
7  understandings over the meaning of the
8  Second Amendment and comparable state
9  constitutional provisions.
10      Q   Okay.  Any of these articles, if
11  you remember, take the position regarding
12  any particular firearm regulations say this
13  is a bridge too far?
14      MR. WENZLOFF:  Objection as to
15      form.  I mean, bridge too far, I'm
16      not sure what you mean by that.
17      MR. SIGALE:  Well, that's
18      fine.  Dr. Cornell can answer it, if
19      he understands.
20      A   I'd have to say the metaphor's
21  throwing me.  Is there a way that you can
22  take the metaphor out and frame the question
23  more less metaphorically?
24  BY MR. SIGALE:
25      Q   Are there any of these interviews,

Atkinson Baker, a Veritext Company
www.depo.com

Page 70

S. CORNELL

1 and I count 29 of them. I don't know how
2 many of the 29 involve the Second Amendment
3 or firearm regulations specifically, but is
4 there anywhere in these interviews,
5 editorials, essays, podcasts where you
6 discuss a firearm regulation and conclude
7 that it would not be a permissible
8 regulation under the Second Amendment?
9        MR. WENZLOFF: Objection to
10    the extent you're asking for a legal
11    conclusion. But you can also
12    answer, Dr. Cornell.
13    A   So I guess the problem with the
14 way you phrased that question is -- how do I
15 describe this. So the problem with the way
16 that you phrased that question is, there
17 are -- you can frame a question like what
18 gun laws were considered to be
19 constitutional at X point in American
20 history? You could also ask a question
21 based on what the current state of American
22 jurisprudence is, what do most courts in the
23 post Heller era seem to think the limits of
24 constitutional regulation are? And then you

Page 71

S. CORNELL

1 can also ask a question, what do Americans,
2 based on what we know about polling data
3 think the limits of constitutional
4 regulation are?
5        So which of those questions are
6 you asking?
7 BY MR. SIGALE:
8    Q   I guess I'm asking all of them.
9 I'm looking at the third entry here, The
10 Second-Amendment Case for Gun Control. Is
11 there anywhere in that article, as an
12 example, where you say that a particular
13 measure or proposal for gun control would
14 not be allowed under the Second Amendment
15 presumably, in your opinion or whatever hat
16 you're wearing, when you authored the piece?
17        MR. WENZLOFF: Same objection.
18    You can answer.
19    A   So, again, the problem is, I need
20 to know which hat, if you will, you want me
21 to wear. Am I wearing a historian's hat?
22 Am I wearing a constitutional commentator's
23 hat, mindful -- state laws? Am I making a
24 statement what about I believe to be the

Page 72

S. CORNELL

1 current culture around the Second Amendment
2 in America? I mean, they all are slightly
3 different questions with slightly different
4 evidentiary foundations.
5 BY MR. SIGALE:
6    Q   So let me ask it this way. Okay?
7 This article in The New Republic in 2019
8 entitled, The Second Amendment Case for Gun
9 Control, what were you wearing when you
10 wrote that?
11    A   So good question. I don't have
12 the article in the front of me, so I could
13 only give you a very vague recollection.
14 That would be the best I could do without
15 actually looking at it again.
16    Q   What do you remember?
17    A   So I think the core argument of
18 that essay was no right is absolute.
19 Throughout American history our most
20 esteemed rights have all been subject to
21 certain kinds of regulations, and in
22 particular, guns have always fallen within
23 state police power authority. So the issue
24 is not whether or not guns can or should be

Page 73

S. CORNELL

1 regulated, the question really is what are
2 the best gun laws that promote the goals of
3 public safety at the same time while
4 respecting the liberty interest of gun
5 owners.
6    Q   Well, that sounds, if you don't
7 mind my saying, that sounds like a very
8 political statement as opposed to a
9 historical statement. So let me go back to
10 the question then. Based on what you just
11 said, what hat were you wearing when you
12 wrote that?
13    A   So I think the hat that I was
14 wearing is a kind of unique hat that not too
15 many people wear, so I would call that the
16 applied legal history hat.
17    Q   So in that applied legal history
18 hat, have you written about any proposed gun
19 regulation that you would, that you
20 concluded was not permissible or appropriate
21 under the Second Amendment?
22    A   So I can't remember in which of
23 these essays I made the argument, but I have
24 made the argument in several forums that

Atkinson Baker, a Veritext Company
www.depo.com

S. CORNELL

1
2  taxation and sort of a combination of
3  carrots and incentive-based gun regulation
4  would be more effective, better received by
5  gun owners and more likely to achieve the
6  desired outcome.
7         So in one instance, I said rather,
8  you know, we know that from public polling
9  data -- well, first of all, certain kinds of
10  bans are obviously precluded by Heller.  We
11  know that from Heller.  We also know that
12  bans of any kind produce the most pushback
13  in terms when you survey gun owners about
14  ideas that they are comfortable with, you
15  know.  So I can remember which article I
16  said that rather than thinking about banning
17  assault weapons, it might be more effective
18  to think about incentivizing gun owners to
19  store them safely and incentivizing gun
20  other to engage in a whole host of safe gun
21  practices, from proper gun safes to advanced
22  training in firearm safety, et cetera, et
23  cetera.
24         So that programmatic vision of the
25  future of gun regulation is somewhat

S. CORNELL

1
2  different and unique.  I don't know that
3  many people who have staked out that
4  territory the way I have.
5      Q    What sort of incentives would you
6  be proposing?
7      A    Well, tax incentives.
8      Q    Oh, I see.
9      A    So you buy a gun safe, it's tax
10  deductible.
11      Q    Okay.  So I guess I'm going to ask
12  you a question and you're going to, I
13  suspect, say, well, what hat am I wearing?
14  And I'm going say that you tell me in what
15  hat you would be answering.  So you
16  referenced that gun bans or at least handgun
17  bans are prohibited under Heller.  Are there
18  any other gun regulations that you believe
19  are prohibited?
20         MR. WENZLOFF:  Objection.
21         Misstates the testimony.  Also calls
22         for some legal conclusions that are
23         outside the scope of the excerpt
24         report and really outside the scope
25         of his expertise for which he was

S. CORNELL

1
2         offered.
3  BY MR. SIGALE:
4      Q    Okay.  You can answer.
5      A    You know, I haven't really
6  investigated that or written about it.  So
7  I -- as much as it is possible to try and
8  stay in my history lane, of course, the
9  inherent interest in history is always
10  somewhat less robust than the interest about
11  contemporary policy and contemporary
12  politics, and I don't know that history
13  answers every contemporary issue.  At least
14  without involving a step to a level of
15  generality or an analogical process that
16  isn't essentially legal in nature and not
17  really historical.
18      Q    Okay.
19         Let me just ask this one other way
20  and then I'll move on.  Okay?
21      A    Sure.
22      Q    At the screen on the very, very
23  top, Five Types of Gun Laws the Founding
24  Fathers Loved, October 22, 2017.  Do you see
25  it?

S. CORNELL

1
2      A    Yeah.
3      Q    If I were to ask you, give me five
4  types of gun laws the founding fathers
5  hated, would you be able to answer that?
6      A    Clever question.  I don't know how
7  many I can come up with, but can I certainly
8  imagine a number of laws that the founding
9  fathers would have objected to, sure.
10      Q    Well, I've got about five hours
11  and four minutes, plus whatever time we took
12  for breaks.  So why don't you go ahead and
13  tell me some, what types of gun laws would
14  the founding fathers have hated?
15      A    So the founding fathers would have
16  hated a law, any law, that you crippled the
17  ability of a well-regulated militia to
18  function, and that would include any number
19  of different types of laws.
20      Q    Were you waiting for me to ask you
21  what those were?
22      A    Yeah.  So that would be like one
23  obvious category of law.
24      Q    Okay.  So as a couple of examples,
25  I can think of laws that would impede a

Atkinson Baker, a Veritext Company
www.depo.com

1      **S. CORNELL**
2   **well-regulated militia.  Not being allowed**
3   **to have a firearm in your home, that would**
4   **impede someone's ability to serve in the**
5   **militia.  Is that a fair example?**
6        MR. WENZLOFF:  Objection.
7      These are calling for hypotheticals
8      that are incomplete.  Calls for
9      speculation.  Beyond the scope of
10     the report and his expertise for
11     which he's been offered.  If you're
12     able to understand the question and
13     answer it, you can good ahead,
14     Dr. Cornell.
15     A    Thank you.  So your question, like
16   so many historical hypotheticals is
17   incomplete, right.  So one could conjure up
18   the following scenario.  Because of concern
19   over the lack of proper maintenance of
20   weapons, one could imagine a local militia
21   officer or perhaps the just in general to
22   the state militia saying we have given you
23   the opportunity to keep these arms at home
24   and store them properly and keep them in
25   good working order.  Since you have failed

1        S. CORNELL
2      to do that and thereby put the militia in
3      jeopardy, if it needs to be mustered, we are
4      going to now require you to do something
5      else.  What that something else might be
6      could be storage in a magazine.  Perhaps
7      storage in a member of the militia unit, who
8      had shown better practices.  So that person
9      would become the armor for that unit.
10       I mean, one could -- I mean, the
11     problem with the question is it assumes that
12     if you say you can't have a firearm in your
13     home, that there's no other efforts to
14     ensure that the militia is regulated.  So if
15     the question is, in the absence of any other
16     adaptations to address this problem, you
17     prohibited people from having weapons in
18     their homes and did nothing else, that might
19     produce the effect that the effect would be
20     to, in effect, violate the Second Amendment.
21       But there are also scenarios where
22     you could do that and still maintain the
23     goal of a regulated militia.
24   BY MR. SIGALE:
25     Q    Does one of the requirements of

1      **S. CORNELL**
2   **the militia decides that all-able bodied men**
3   **were part of it, right, was that they had to**
4   **keep a working, functional firearm in case**
5   **it was needed, right?  That's what you were**
6   **talking about with, if you don't do that,**
7   **then punitive measures might be taken**
8   **against that person?**
9      A    So the problem with the way you
10   framed it is you're taking a public policy
11   choice made by the founding generation, and
12   you're arguing that it was not a public
13   policy choice, that it was a constitutional
14   mandate.
15       In fact, if you look at the
16   language of the Second Amendment, it leaves
17   the federal government with enormous
18   latitude to decide how it's going to arm and
19   regulate the militia, and if you look at
20   militia laws over the broad arch of early
21   American history, you find that sometimes
22   there's requirement for universal armament.
23       And sometimes that requirement is
24   lessened.  So, for instance, and there are
25   moments in early American history where

1        S. CORNELL
2   everyone, minors between the ages of 18 and
3   not yet past the age of majority, 21, are
4   required to outfit themselves with a militia
5   weapon, but there are also statutes that
6   exempt them at times where the perception is
7   that requiring that it supposes too heavy a
8   burden on poor families, and it's not
9   necessary for public defense.
10       So, essentially, the idea that the
11   militia is the people themselves is a
12   rhetorical construct that is pervasive in
13   this period.  But if one actually looks at
14   militia statutes and you get into the
15   specifics, there are all kinds of exemptions
16   and all kinds of exclusions, and the
17   rhetoric and the reality are often at
18   variance.
19   **Q    So the founding fathers would have**
20   **opposed gun laws that would have impeded the**
21   **militia.  What other types of gun laws would**
22   **the founding fathers have opposed?**
23       MR. WENZLOFF:  Objection as to
24     the form of the question.  Calls for
25     speculation.  Incomplete

Atkinson Baker, a Veritext Company
www.depo.com

Page 82

S. CORNELL

1   hypothetical.  You can answer, if
2   you're able to.
3       A    So I think the founding fathers
4   would have, although I think the founding
5   generation would have seen this as an
6   vindication of a common law right, not a
7   constitutional right.  But, for instance,
8   the individual right of self-defense, which
9   is well-established under common law, it is
10  conceivable to imagine that a law that made
11  individual self-defense unavailable without
12  some countervailing, pressing justification
13  could be problematic.
14  BY MR. SIGALE:
15      **Q   Okay.  Anything else?**
16      A    Presumably, a law that prevented
17  anyone from manufacturing gun powder or
18  firearms could also present problems.
19      **Q   What about laws preventing people
20  from training with them?**
21          MR. WENZLOFF:  Objection to
22  the form of the question.  Calls for
23  speculation.  Incomplete
24  hypothetical.  You can answer, if

Page 83

S. CORNELL

1   you're able.
2       A    So the problem with the way you
3   framed that question, again, is the
4   definition of training in the founding year
5   is quite capacious.  So the state, a law
6   that made it absolutely impossible for
7   anyone to train under any circumstance,
8   clearly would run afoul of the right to bear
9   arms, but there could be all kinds of, you
10  know, regulation of training that would not.
11          So, for instance -- example of
12  laws that say you can't have -- travel to
13  muster with a loaded musket.  You can't
14  discharge your musket on muster day.  You
15  can't discharge a musket within X distance
16  of a road or within the limits of a town.
17  So there are tons of regulations that define
18  what is acceptable training.  And any
19  regular that made training impossible would
20  certainly run afoul, but there would be
21  ample room for lots of regulation of
22  training.
23  BY MR. SIGALE:
24      **Q   Any other types of gun laws the**

Page 84

**S. CORNELL**

1   **founding fathers would not have loved?**
2           MR. WENZLOFF:  Same objection
3   as before.
4       A    Since I only came up with five
5   categories that they loved, I just gave you
6   three.  That means that I'm over 50 percent.
7   So if you gave me like an hour to think it
8   over, I might get you up to 80 percent or
9   even, you know, another full five
10  categories.  But those are the three that
11  come most readily to mind.  I might be able
12  to come up with more, but I'd have to think
13  about it.
14  BY MR. SIGALE:
15      **Q   I'm almost tempted to take you up
16  on that offer, Dr. Cornell, but I'll move
17  on.**
18      A    Okay.
19      **Q   Now, moving on to this article --
20  I'm sorry.  Give me a second here.**
21          **The scholarly articles and essays,
22  you clearly have written quite a lot.  Let
23  me ask you just about a couple of them.**
24      A    Sure.

Page 85

S. CORNELL

1       **Q   Okay.  Bottom of four, Half
2   Cocked:  the Persistence of Anachronism and
3   Presentism in the Academic Debate over the
4   Second Amendment.  This was written in 2017,
5   so it's post Heller, post McDonald, here in
6   the Seventh Circuit, post Ezell, post Moore
7   versus Madison cases, maybe you've heard of?**
8       A    Yup.
9       **Q   What is this article about?**
10      A    So this article discusses the
11  continuing problem in Second Amendment
12  scholarship of people making claims that
13  they purport to be historical, which are
14  not, in fact, historical.
15      **Q   These would be people on the, for
16  lack of a better phrase, the gun rights side
17  of the debate?**
18          MR. WENZLOFF:  Objection as to
19  form.  Vague.  If you understand the
20  question, you can answer it.
21      A    So the great thing about something
22  I call law office history is, it's an equal
23  opportunity employer, and there are people
24  across a wide swath of fields and subjects

Atkinson Baker, a Veritext Company
www.depo.com

Page 86

S. CORNELL

1
2  who fall into the trap of law office
3  history, including historians, and there's
4  certainly some Second Amendment scholarship
5  that is supportive of either a collective
6  right or a robust gun control position that
7  I don't think is solid. I've certainly
8  encountered some scholarship over my time.
9  BY MR. SIGALE:
10     **Q    Okay. Let me ask you this. I've**
11  **seen that phrase, but I want to ask your**
12  **definition of it.**
13     **What is law office history?**
14     A   So law office history, you know,
15  the phrase comes from a famous article by
16  Alfred Kelly, Clio and the Court, which I
17  believe it was published in the Supreme
18  Court review, although I'd have to check
19  that citation. So Kelly identified a
20  problem where you work backwards from a
21  contemporary issue, and you very selectively
22  look at evidence to support a modern
23  litigation position, and both by framing the
24  past in terms of modern categories and
25  selectively looking at evidence through that

Page 87

S. CORNELL

1
2  framework, you distort the past.
3     And, you know, there has been, I
4  think, also kind of additional flaws
5  associated with law office history, which
6  is, for instance, a tendency to not survey
7  the relevant primary and secondary sources
8  fully. I referred to this problem as, if
9  it's not on Westlaw, it doesn't exist. So
10  there are also some methodology and
11  evidentiary problems with law office history
12  that exists on top of the framing issues
13  that Kelly made essential to his discussion.
14     **Q    So the office history as you**
15  **describe it with regard to the Second**
16  **Amendment, is there law office history that**
17  **you write about from the gun control side?**
18     A   So I would frame my -- what I do
19  is not so much writing of the history of gun
20  control. I would frame what I do is my
21  first commitment is neither to gun control
22  nor gun rights, or to any contemporary
23  policy position.
24     My first commitment is to a set of
25  historical methodological precepts, which I

Page 88

S. CORNELL

1
2  believe ought to guide any sound historical
3  inquiry, and that is really -- I oftentimes
4  say to people that my interest in this
5  debate was not driven by any tie to the
6  contemporary policy, but my concern over the
7  way history gets used in legal discourse,
8  legal decision-making, legal scholarship.
9  So I'm in this to defend the honor of Clio.
10     **Q    All right. But you have**
11  **criticized scholars, historians, however**
12  **they categorize themselves, on the gun**
13  **rights side of the debate. Again, for lack**
14  **of a better phrase, or engaging in what**
15  **you're referring to as law office history,**
16  **correct?**
17     MR. WENZLOFF: Objection as to
18  the form of the question. It's
19  vague, but if you understand what's
20  being asked, you can answer.
21     A   So, again, I would frame things
22  somewhat differently. I would say that
23  there's a ton of writing in favor of gun
24  rights. There's much less scholarship of
25  any kind, historians, political scientists,

Page 89

S. CORNELL

1
2  legal scholars, writing about Second
3  Amendment and gun issues from a non-gun
4  rights perspective.
5     So simply if one looks at the
6  amount of material out there, it stands to
7  reason that there's going to be more law
8  office history on the side of gun rights
9  because there's so much more writing about
10  gun rights than either gun control or just
11  purely historical scholarship on the Second
12  Amendment.
13  BY MR. SIGALE:
14     **Q    But, Dr. Cornell, it's not simply**
15  **a matter of percentages and odds, right? I**
16  **mean, you wrote an amicus brief in support**
17  **of the city of Chicago in the -- I'm sorry.**
18  **Wrote an amicus brief in favor of the**
19  **District of Columbia in the Heller case,**
20  **correct?**
21     A   Yeah.
22     **Q    You --**
23     A   Well, I was part of an amicus
24  brief, would be more the correct.
25     **Q    Okay.**

Atkinson Baker, a Veritext Company
www.depo.com

Page 90

**S. CORNELL**

1
2     A    Jack Rakoff from Stanford was the
3   lead author of that brief.
4     Q    Okay.  You write that gun
5   regulation, looks like you've written quite
6   a bit that gun regulation, robust gun
7   regulation is permitted under the Second
8   Amendment, correct?
9     A    Correct.
10    Q    Okay.  You were -- you had a grant
11  from the Joyce Foundation in roughly 2002,
12  which has done quite a bit of work, I think
13  you phrased it, in reducing in gun violence,
14  but others would put it on the gun control
15  side of the debate, correct?
16          MR. WENZLOFF:  Objection.
17       States facts not yet in evidence.
18          MR. SIGALE:  I was asking him
19       the question.
20          MR. WENZLOFF:  And it's a
21       compound question as well.  If you
22       understand the question in its
23       multiple parts, you can answer.
24    A    It's easier for me to answer a
25  specific question without the compound.

Page 91

S. CORNELL

1
2   BY MR. SIGALE:
3     Q    You received a grant from the
4   Joyce Foundation in roughly 2002; is that
5   accurate?
6     A    So Ohio State University received
7   a grant from the Joyce Foundation, and I was
8   the chief investigator on that grant.
9     Q    Okay.  So regardless of what hat
10  you're wearing, you conclude that gun
11  regulation, robust gun regulation, is
12  permitted under the Second Amendment,
13  correct?
14          MR. WENZLOFF:  Objection as to
15       the form of the question.  It's
16       vague and uses terms that haven't
17       been defined, but if you understand
18       the question, you can answer.
19    A    So if you -- for instance, you
20  mentioned the Joyce Foundation.  So the
21  purpose of that center was to study the
22  history of gun regulation and to study the
23  history of gun regulation with the
24  understanding that both the right to have
25  guns and the right to regulate them both

Page 92

S. CORNELL

1
2   have deep roots in the American past.
3          So I think that's probably the
4   fairest and most accurate way of describing
5   what I did with that grant and what has been
6   a fairly persistent theme in my writing,
7   which I don't think it's controversial that
8   I think most people when they look at
9   American history would say rights and
10  regulation both are deeply rooted in our
11  traditions as a people, to use Justice
12  Cardoza's formulation.
13  BY MR. SIGALE:
14    Q    Okay.  Do you believe that as you
15  used the phrase "law office history," is an
16  inaccurate way of -- strike that.
17          When you talk about this -- strike
18  that.
19          This Half Cocked article at the
20  bottom of page 4 that's on the screen there.
21    A    Yes.
22    Q    Is that an article that is in
23  favor of, as you've described it, law office
24  history?
25    A    Sorry.  The question is a bit

Page 93

S. CORNELL

1
2   confusing.  Are you asking is it
3   recommending the use of law office history
4   or the people engaged in it, or is it
5   offering a critique of law office history,
6   which of those questions are you asking?
7     Q    They're two sides of the same
8   coin, but I was asking is it in favor of the
9   use of law office history?
10    A    No.  It's a critique of law office
11  history.
12    Q    And it's a critique of law office
13  history specifically in regards to the
14  Second Amendment, correct?
15    A    Yes.
16    Q    Okay.  So is it fair to that there
17  are people who would describe themselves as
18  legal scholars or historians that write
19  specifically geared towards the gun rights
20  side of the debate?
21          MR. WENZLOFF:  Objection as to
22       the form of the question.  Calls for
23       speculation.  Is vague.  If you
24       understand the question, you can
25       answer it.

Atkinson Baker, a Veritext Company
www.depo.com

Page 94

S. CORNELL

1
2    A    So just to be precise, what
3    criteria are we going to use here to define
4    who gets to call themselves a historian?  Is
5    it an appointment?  Is it
6    self-identification?  Is it membership in --
7    organization?  Do you have in mind which
8    criteria or set of criteria you want to
9    employ?
10   BY MR. SIGALE:
11       Q    No.  I would go with the
12   self-identification.  Maybe it's based on
13   certain objective criterias, and maybe it's
14   just because it's how they fancy themselves,
15   but there are people that label themselves,
16   for whatever reason, a historian or a legal
17   scholar that write on in favor of the gun
18   rights side of the debate; is that fair?
19       A    Sure.  There's a significant body
20   of scholars who identify with the gun rights
21   cause and publish regularly on it.
22       Q    Okay.  Are there -- same question,
23   but now just substitute gun control instead
24   of gun rights?
25           MR. WENZLOFF:  Objection as to

Page 95

S. CORNELL

1
2    the form of the question.  Same
3    objection as before.  It's vague.
4    Calls for speculation.  If you can
5    answer, go ahead.
6        A    I think I need you to formulate
7    the question fully, not substitute in
8    another word 'cause --
9    BY MR. SIGALE:
10       Q    Are there people who identify --
11   self-identify with whatever criteria they
12   choose as legal scholars or historians, that
13   their writing focuses in favor of what would
14   be referred to as the gun control side of
15   the debate?
16           MR. WENZLOFF:  Objection as to
17   form.  Same objection as before.  If
18   you understand, you can answer.
19       A    So most of the historians that I
20   know who work on the issue of the Second
21   Amendment would not describe themselves as
22   writing in favor of gun control, they would
23   describe themselves as interested in the
24   history of the Second Amendment or the
25   militia or the police power or federalism,

Page 96

S. CORNELL

1
2    and would see their writing about the Second
3    Amendment or popular constitutionalism,
4    would see their writing about the Second
5    Amendment as an outgrowth of a more
6    broad-based historical set of inquiries.
7            I don't really know anyone who's a
8    historian that sees themselves as a Second
9    Amendment historian.  I never described
10   myself in that way, and I don't know -- I
11   know there are people who write in favor of
12   gun rights who do that, but I don't know
13   anyone I know who does that.  I mean, there
14   are certainly people who work for some of
15   the gun control organizations who've
16   branched out into scholarship who are
17   clearly doing a kind of gun control history.
18   BY MR. SIGALE:
19       Q    Okay.  So any of the
20   self-identified legal scholars and
21   historians that are not on the gun rights
22   side of the debate, as you've described it,
23   do you criticize of them in Half Cocked, the
24   persistence of dot, dot, dot?
25           MR. WENZLOFF:  Objection to

Page 97

S. CORNELL

1
2    the form of the question.  I think
3    it misstates his prior testimony.
4    But if you understand what's being
5    asked, you can go ahead and answer.
6        A    Yes.  Sure.  I mean, I discuss the
7    Michael Bellesiles scandal very briefly,
8    point out some serious problems with his
9    work.  That's the one that comes most
10   readily to mind.
11   BY MR. SIGALE:
12       Q    What was that Michael Bellesiles
13   scandal, if you don't mind briefly?
14       A    So Bellesiles was a historian who
15   argued that Americans were not well armed,
16   and not particularly good with firearms, and
17   that is an important context for
18   understanding the Second Amendment.  His
19   work, you know, was severely criticized and
20   subjected to really an unprecedented amount
21   of scrutiny and did not fair well under that
22   scrutiny, and, in fact, his book was
23   withdrawn from publication.  He had a major
24   prize taken away from him that he had won
25   for the book, and he left the academy.  So

Atkinson Baker, a Veritext Company
www.depo.com

S. CORNELL

2  it was quite a remarkable story.
3      Q    Did he falsify data or something
4  or did he --
5      A    Well, I mean, the problem was the
6  commission -- he taught at Emory.  Emory
7  convened the commission of eminent scholars
8  to review the allegations, and they
9  concluded that they could not discern a
10  conscious intent to commit fraud, but there
11  were so many errors and such a violation of
12  good historical practice and standard
13  methodology for quantitative analysis of any
14  kind, that they faulted him in quite severe
15  terms for pretty much everything short of
16  claiming that he deliberately falsified
17  evidence, which they felt that they just
18  could not prove.
19      Q    So short of the very most
20  egregious example you can think of where
21  someone literally, it sounds like, got ran
22  out of the profession, do you, in any of
23  your writings, criticize those
24  self-identified scholars or historians who
25  are not on the gun rights side of the debate

1      S. CORNELL
2  for engaging in law office history?
3      MR. WENZLOFF:  Objection as to
4  the form of the question.  You can
5  answer.
6      A    So I have definitely gone after a
7  variety of scholars, some of whom are
8  historians of law office history in various,
9  in some degree, articles.  I think that my
10  book, A Well Regulated Militia essentially
11  undercuts the classic collective rights
12  argument and is the best critique of the
13  collective rights argument, which was
14  traditionally the core argument of gun
15  control advocates.  So I think that I have
16  been quite critical of, if anything, I think
17  my reputation is that I am super critical of
18  many, many, many problematic forms of
19  scholarship and that I apply a pretty high
20  bar, and, you know, the bar that I -- and
21  the metrics that apply, don't always flatter
22  even some quite eminent scholars.
23  BY MR. SIGALE:
24      Q    Let me ask it this way, and I'll
25  move on.  Okay?

1      S. CORNELL
2      A    Okay.
3      Q    It feels to me like law office
4  history is like a -- is almost a derogatory
5  term.  It's -- you have an agenda, you're
6  cherry picking bit and pieces of historical
7  data to fit your agenda, to fit your
8  conclusion, which seems to me different than
9  so-and-so is just wrong.  That Jefferson
10  didn't really -- when he said this, he
11  didn't mean this, he meant that, so-and-so
12  is mistaken.  It seems to me that those are
13  two different things.  So am I right about
14  that in your -- and these are your -- I'm
15  asking your understanding.  So law office
16  history and being incorrect, two different
17  things?
18      MR. WENZLOFF:  Objection as to
19  the form of the question.
20      A    So law office history is a quite
21  profound critique of a flawed methodology.
22  There are certainly a range of historical
23  problems where reasonable people disagree.
24  There's certainly a range of historical
25  problems where people applying sound

1      S. CORNELL
2  historical methodologies can come to
3  different conclusions.
4      There are certainly historical
5  problems where people using legitimate
6  historical methods, you know, you might
7  think that the person's conclusions are
8  weak, unpersuasive, and those kinds of
9  critiques are quite different than critiques
10  of scholarship in the model of law office
11  history because scholarship of modern law
12  office history doesn't meet the minimum
13  standards of historical inquiry.
14  BY MR. SIGALE:
15      Q    Okay.  So you mentioned that in
16  your book, I believe, A Well Regulated
17  Militia, that you disagree and shoot down,
18  excuse the pun, the collective rights
19  theory.
20      A    Yes.
21      Q    The people that you're disagreeing
22  with, are you saying in that book that
23  they're wrong or are you saying that they're
24  engaging in law office history, that they're
25  cherry picking it to fit in an agenda and

Atkinson Baker, a Veritext Company
www.depo.com

Page 102

**S. CORNELL**

1       **S. CORNELL**
2 **presupposing a conclusion and looking for**
3 **data to support it?**
4    A  So in my book, one of the things
5 that I was quite curious about was how do we
6 arrive at these two terms, individual
7 rights, collective rights. You don't see
8 those terms in the 18th century. Those are
9 both analytical terms that were layered over
10 this debate at some point after the 18th
11 century. So the question for me was when do
12 those terms and the underlying conceptions
13 behind those terms gain a strong foothold in
14 American law.
15      And when I looked at the
16 collective rights side of the equation, I
17 was somewhat surprised to find that it's
18 the -- the collective rights conception
19 actually merges in the backlash against
20 reconstruction, not the sort of first
21 backlash, but the sort of quick shank era
22 bank backlash and is actually the product of
23 democratic party lawyers including Reverdy
24 Johnson who is perhaps better known as the
25 lawyer who argued in the Dred Scott case,

Page 103

1        S. CORNELL
2 not the abolitionist side.
3      And Scott makes this is argument
4 that sounds essentially like the modern
5 collective rights argument. That all the
6 Second Amendment was intended to do was to
7 protect the right of the state militias to
8 arm themselves, and that argument, which
9 gets picked up and placed in some of this
10 Supreme Court jurisprudence, leading up to
11 Cruikshank, Presser, and then the case,
12 which somehow gets dropped from the
13 discussion, which is part of the South
14 Carolina KKK trials, and I don't have the
15 case reference readily at hand, but
16 eventually becomes the foundation for the
17 argument that gets made in this famous
18 turn-of-the-twentieth-century Harvard Law
19 Review article by Lucillius Emery where he
20 expressly describes the Second Amendment as
21 a collective right.
22      And so what I argue is that that
23 article emerges out of this strain of Second
24 Amendment thought that originates with the
25 democratic party response to an expansive

Page 104

1        S. CORNELL
2 Fourteenth Amendment, and then through an
3 ironic series of events, or maybe not
4 ironic, depending on your narrative view of
5 what happens next, becomes the standard gun
6 control argument.
7      And what I found is this argument
8 is completely tainted, and there's no good
9 reason to defend it because it's actually
10 rooted in -- it has nothing to do with the
11 original Second Amendment. It's all product
12 of these developments, the end of the 19th
13 century, beginning of the 20th century. So
14 I don't think I get enough credit of killing
15 the collective rights argument.
16    **Q**  **Well, I'll give it to you. But**
17 **what I really want to know is the people,**
18 **the self-described scholars and historians**
19 **that you're discrediting with your research**
20 **on the roots of the collective right theory,**
21 **when you wrote about them, did you write**
22 **that they were incorrect or did you write**
23 **that they were engaging in law office**
24 **history or something akin to that?**
25      MR. WENZLOFF: Objection as to

Page 105

1        S. CORNELL
2 the form of the question. It also I
3 believe misstates his prior
4 testimony. If you understand what's
5 being asked, you can answer,
6 Dr. Cornell.
7    A  So that particular argument that
8 we've just been talking about, which appears
9 in my Second Amendment book, doesn't deal
10 with the modern academic debate. My book
11 actually sort of stops with Miller.
12 BY MR. SIGALE:
13    **Q**  **Is there anywhere in your writings**
14 **that, and you've got a lot of them. There's**
15 **like 14 or 16 pages or something like that.**
16    A  Yeah.
17    **Q**  **Is there anything in your writings**
18 **where you accuse the self-described scholars**
19 **or historians on the collective rights side**
20 **of the debate of engaging in law office**
21 **history or agenda-driven history or however**
22 **you want to phrase it or do you just say**
23 **they're wrong?**
24      MR. WENZLOFF: Objection to
25 the form of the question. Vague.

Atkinson Baker, a Veritext Company
www.depo.com

Page 106

S. CORNELL

1
2     You can answer.
3     A    So the problem is that when I
4  jumped into this debate, the debate was
5  essentially dead.  And so jumping in with
6  this, what I call a new paradigm, pretty
7  much everyone -- there had been no one
8  writing about the Second Amendment, for all
9  intents and purposes.  The one person who
10  actually took a strong collective rights
11  view passed way before I started writing
12  about this, and there was kind of a vacuum.
13  So I was in the somewhat unusual position
14  of, as of somewhat junior scholar, of kind
15  of helping to shape the debate.  So pretty
16  much once I kind of jumped in, the terms of
17  the debate changed, so there was nobody --
18  nobody was really defending the collective
19  rights view anymore.  So there was no one to
20  critique.
21  BY MR. SIGALE:
22     Q    Is there anywhere in your writings
23  where you are accusing anyone who is a
24  self-described scholar, not the guy who got
25  run out of town.  Bellesiles, I think you

Page 107

S. CORNELL

1
2  said his name was.  Is there anywhere in
3  your writing where you are -- where you
4  state, where you write that a self-described
5  scholar or historian, other than that
6  Bellesiles guy, who is writing on the Second
7  Amendment, not on the gun rights side of the
8  debate, is engaging in law office history?
9     MR. WENZLOFF:  Objection to
10  the form of the question.  You can
11  answer.
12     A    Well, as I just stated, the
13  problem was, people stopped writing about
14  the Second Amendment.
15  BY MR. SIGALE:
16     Q    Mr. Cornell, this is -- I'm sorry.
17  I want to move on.  So this kind of one of
18  those questions where I want just a yes or
19  no, if you can give me one.
20     MR. WENZLOFF:  Same objection.
21     A    I guess my answer is the premise
22  of the question is flawed, so it is
23  impossible to give you a yes or a no.
24  BY MR. SIGALE:
25     Q    Okay.  That's fine.

Page 108

S. CORNELL

1
2     So we go through the -- a lot of
3  writings, and then you've spoken on the
4  Second Amendment quite a bit.
5     MR. WENZLOFF:  So, David,
6  we've been going for a little over
7  an hour now.  I don't know.  I'm
8  just curious in terms of how this is
9  going play out timing-wise.  Are we
10  going to break for lunch or are you
11  going push on through.  When would
12  you think a break would make sense?
13     MR. SIGALE:  We can take a
14  break right know, if you'd like, if
15  Dr. Cornell wants?
16     THE WITNESS:  Sure.  Lunch
17  might not be a bad thing.
18     MR. SIGALE:  All right.  Lunch
19  is not a bad thing.  Let's come back
20  at 1:30.  It's 12:40.
21     THE WITNESS:  So that would be
22  2:30 my time?
23     MR. SIGALE:  Yes.  Sorry.
24  Yes.
25     (Whereupon, a recess was taken

Page 109

S. CORNELL

1
2     from 12:41 p.m. to 1:33 p.m.)
3     MR. SIGALE:  Let's go on then.
4     MR. WENZLOFF:  Back on.
5  BY MR. SIGALE:
6     Q    I'm going to share the screen with
7  you, and you will be relieved to see that we
8  are talking about something other than your
9  CV.  So this is Exhibit A.  And this is, as
10  we've established, your expert report in
11  this case.  I guess we'll start at the
12  beginning, which is what you were asked to
13  do.  First of all, did you do anything to
14  prepare for this deposition today?
15     A    Besides reading my report, you
16  mean?
17     Q    Well, that would be -- no.  That
18  would be actually part of the answer.  So
19  did you review any -- so your report, you
20  reviewed that.  Did you review any other
21  materials?
22     A    I did look over the historical
23  evidence produced for the appendices, or I
24  guess in this case, exhibits.  Although I
25  haven't memorized them, so if you quiz me on

Atkinson Baker, a Veritext Company
www.depo.com

Page 110

S. CORNELL

1
2  anything, we may have to actually go to the
3  text.
4      Q   Okay.  All right.  So I will not
5  just blindly say, so, number 72, what's that
6  about.  I won't do that to you.
7          Did you discuss your deposition
8  with anyone prior to coming here today?
9      A   I assume that talking with the
10  attorneys about the -- the attorneys from
11  the attorney general's office about today is
12  part of attorney-client privilege, I would
13  think.
14      Q   Well, there's various rules
15  regarding that, but one of the things that's
16  not attorney-client is whether or not you
17  spoke to them.  So did you do that?
18      A   So, yes, we did have a
19  conversation about this deposition.
20      Q   Okay.  And, I'm sorry, is "they"
21  Mr. Wenzloff, Ms. Helfrich, and
22  Mr. Chimienti?
23      A   Correct.
24      Q   Okay.  And when did you have that
25  conversation?

Page 111

S. CORNELL

1
2      A   I'd have to check my diary, as
3  they say in the UK, or we say calendar,
4  right.  So I think we spoke on Friday.  We
5  also spoke one other time.
6      Q   So for about how long total?
7      A   I'd have to check my records.  I
8  sort of cleared my desk for the deposition,
9  so I couldn't really -- it was not a quick
10  conversation.  It was not an all-day long
11  conversation.
12      Q   Okay.  So in the report, the
13  screen is being shared here, assignments,
14  and you were asked to provide, and it says
15  here, I'm just reading.  I, meaning you,
16  have been asked to provide an expert opinion
17  on the history of firearms regulation in the
18  Anglo-American legal tradition, with a
19  particular emphasis on the regulation of
20  firearms relating to the safety and welfare
21  of minors, including regulation of places
22  such as schools and the other places where
23  minors might gather.  I've further been
24  asked to evaluate the statute and
25  regulations at issue in this litigation to

Page 112

S. CORNELL

1
2  assess whether they fall within the scope of
3  firearms regulation revealed by that
4  history.
5          Did I read that accurately?
6  A   Yes.  You did.
7      Q   Okay.  Was there anything more to
8  your assignment than what is written in this
9  paragraph?
10      A   This charge, for lack of a better
11  word --
12      Q   Sure.
13      A   -- was what I perceived to be my
14  remit in this case, and in the process of
15  presenting them with various historical
16  materials, we certainly kept in touch, but
17  this was the general direction I was given.
18      Q   Okay.
19          So your assignment did not involve
20  and your expertise does not involve anything
21  regarding the ability or nuts and bolts of
22  self-defense in any given situation,
23  including the best way to achieve it, if
24  need be, or various methods of doing so.
25  That's got nothing to do with what you do,

Page 113

S. CORNELL

1
2  correct?
3      A   Yes.  That's correct.  I did not
4  investigate series of self-defense or change
5  in theories of self-defense or anything of
6  that sort.
7      Q   And for that matter, crime rates
8  in Illinois, immortality rates in Illinois,
9  any particulars of children that might be
10  under the jurisdiction, for lack of a better
11  word, of the Illinois Department of Children
12  and Family Services, you have no opinions
13  regarding that, and that is not your area of
14  expertise, correct?
15      A   Yes.  Correct.  I am not a public
16  policy expert.
17      Q   Okay.
18          So we talked about your CV, and it
19  looks like you've got a little summary of it
20  here in the -- that section of your report.
21  And that says you provided expert witness
22  testimony in Rocky Mountain Gun Owners
23  versus Hickenlooper.  What was that case
24  about, if you recall?
25      A   So that case was not about the

Atkinson Baker, a Veritext Company
www.depo.com

Page 114

S. CORNELL

1
2  Second Amendment.  That was a case about
3  the -- the meaning and scope of Colorado's
4  constitutional arms bearing provision.
5      **Q    Okay.  It was -- what ultimately,**
6  **what type of case was it?  I don't mean like**
7  **a firearms case.  I mean what were the**
8  **plaintiffs asking for, if you know?**
9      A   So without looking through the
10  complaint materials again or the resolution
11  of the complaint in the final case, I
12  couldn't give you an exact answer, but I do
13  believe that one of the issues in contention
14  was the side -- the assault, sorry -- large
15  capacity magazine limit in the state of
16  Colorado.
17      **Q    Okay.  Chambers versus City of**
18  **Boulder?**
19      A   So also, on a Second Amendment
20  case, that case dealt with the city of the
21  Boulder's assault weapons ban, but the issue
22  there was preemption law and the -- I won't
23  say unique because it's not unique to
24  Colorado, but it is predominantly a western
25  phenomenon.  Something called the home rule

Page 115

S. CORNELL

1
2  doctrine, which emerged fairly soon after
3  the founding of states like Colorado and
4  California, and according to home rule
5  doctrine, there are certain areas of
6  government authority that are exempt from a
7  preemption argument because certain
8  localities, typically large cities are
9  acknowledged to have certain home rule
10  features, which allow them additional scope
11  for regulation.
12          And so the key issues in that case
13  were there was a body of jurisprudence in
14  Colorado defining what the appropriate test
15  was, whether or not an area of regulation
16  fell within the home rule exception to
17  preemption.
18          And although, again, I'd have to
19  consult the complaint to give you a more
20  precise answer, one of the prongs of this
21  multipronged test that the Colorado Supreme
22  Court articulated had a historical
23  component.  I think it was three, and one
24  component had to do whether or not the
25  subject of regulation was something that had

Page 116

S. CORNELL

1
2  to be done at the state level or could
3  plausibly have a local component.
4          And I didn't opine on that because
5  that's a -- that's not a historical
6  question.  The question I was asked to focus
7  on was, what is the history of local gun
8  regulation in Colorado.
9      **Q    Okay.  So in the -- going back to**
10  **the Hickenlooper case, which side did you**
11  **serve as an expert witness for?**
12      A   So I was retained by the attorney
13  general's office in California.
14      **Q    And in Chambers versus the City of**
15  **Boulder?**
16      A   It was the city attorney's office.
17  I think that's the technical way, that legal
18  body.  Some cities it's the solicitor
19  general, some cities it's the corporate
20  counsel, but if memory serves me well, I
21  think it was just called the city attorney's
22  office.
23      **Q    Okay.  Zeleny versus Newsom next.**
24      A   So Zeleny is a public carrier
25  case, but it's a somewhat unusual public

Page 117

S. CORNELL

1
2  carrier case in that it also implicates
3  certain First Amendment claims.  That
4  carrying a firearm is not just a firearm,
5  but it's an expressive symbol, and also I
6  was retained by the attorney general's
7  office of California.
8      **Q    Okay.  Zeleny -- Zeleny, I'm**
9  **sorry.  That's still going on?**
10      A   Yes.  That's hasn't been resolved.
11      **Q    The other two cases, are either of**
12  **them still ongoing?**
13      A   No.  They both were -- had
14  decisions.  I assume there's no appeal from
15  Chambers.  Chambers is recently -- the
16  Boulder assault weapon was struck down, but
17  I don't know if there's any further appeal
18  of that.
19      **Q    Okay.  And you're obviously being**
20  **compensated for your time.**
21          **Okay.  Section four is the basis**
22  **for opinions and materials considered, and**
23  **you base your opinion and you list the**
24  **bullet points, the amended complaint in this**
25  **suit.  The Illinois regulations and statutes**

Page 118

1           S. CORNELL
2 at issue in this lawsuit; education,
3 expertise, and research in the field of
4 legal history; and then review analysis of
5 the primary, secondary sources and other
6 materials that are cited in the footnote and
7 listed in the appendices.
8           I noticed that there are materials
9 cited in the footnotes, and you'll correct
10 me if I'm wrong.  But I notice that there
11 were materials cited in the footnotes that
12 are actually not in the appendices.  Is
13 there --
14     A   Anything in particular in mind?
15     Q   I thought something in Illinois
16 was something like a 1911 or something like
17 that.  I thought -- is it your
18 understanding -- am I wrong, is it your
19 understanding that whatever is cited in the
20 footnotes should be attached as part of the
21 appendices?
22     A   So I think the criteria that we
23 agreed upon -- in consultation with the
24 attorney general's office, that we would try
25 to provide PDF copies of anything that would

Page 119

1 be difficult to find and anything that we
2 could readily get in PDF form.  And that we
3 didn't -- we didn't assume that this was
4 going to be an exhaustive inclusion of
5 everything because there are obviously
6 things that I've encountered in my scholarly
7 career that inform my opinion, you know,
8 from just studying American history for many
9 years that we haven't included.  And we
10 haven't included things that are obviously
11 on Westlaw or HeinOnline, unless it's a
12 somewhat more difficult to find HeinOnline.
13 Like, we wouldn't include a copy of -- I
14 can't recall if we included the relevant
15 arms provision of the state constitution or
16 not, but that's readily available.
17
18     Q   Okay.  But when you're citing to
19 some state law or municipal ordnance from
20 the turn of the 20th century or something,
21 it appears that it was your intent to
22 include it as a PDF.
23     A   Yeah.  We tried to include as much
24 as possible.  I mean, it is possible because
25 we're dealing with quite a lot of the

Page 120

1           S. CORNELL
2 material.  That if something fell through
3 the cracks, if there's anything that you're
4 eager to get your hands on, I will certainly
5 make every effort to try and find a copy for
6 you.
7     Q   Okay.  I'll let you know that.
8 Thank you.
9           I understand that the first two of
10 these bullet points are pretty specific, and
11 the second two are very broad, but is there
12 anything between the time of writing in this
13 report -- let me do this.
14           Is there anything that you
15 reviewed between the writing of this report
16 and now that you're relying upon that are
17 not listed in this report?
18     A   So there's not, but of course, the
19 en banc decision in California of Young
20 versus Hawaii, I read, so I suppose my
21 thinking is somehow now, whether I want it
22 to or not, I've read the decision and
23 thought about it.  So whether it will
24 influence how I answer any of your
25 questions, I can't quite say.

Page 121

1           S. CORNELL
2     Q   Sure.  Well, if something you
3 answer is based on that recent Ninth Circuit
4 en banc opinion, just please say that that's
5 what you're referring to.  I mean, I guess
6 in general, tell me what you're referring to
7 regardless, but I just understand that if
8 you refer to the Ninth Circuit's en banc on
9 Young, that it's not in here.
10           When you were asked to take on
11 this assignment, were any assumptions, were
12 you asked to make any assumptions in
13 formulating your opinion?
14     A   No.  Just that they were familiar
15 with my work and my reputation, and that
16 they needed someone who was familiar with
17 the history of firearms regulation, familiar
18 with the constitutional history of the
19 Second Amendment and analogous state arms
20 provisions.
21     Q   Okay.  Well, I get that that's why
22 they contacted you, but in terms -- I say
23 assumptions, I mean in terms of, you know,
24 formulating your opinions, was there
25 anything -- were you given any instructions

Page 122

1          S. CORNELL
2    with regards to assume that the law does
3    this or assume that DCFS would do this in a
4    certain situation or assume that the
5    plaintiffs in this case are dot, dot, dot.
6    Anything along those lines is what I'm
7    asking?
8          MR. WENZLOFF:  I'm going to
9       interject here just for a moment.
10      Just to remind, Dr. Cornell, you're
11      free to testify about any
12      assumptions that we provided and
13      that you relied in forming your
14      opinions, but all other
15      communications between counsel and
16      you are privileged under rule --
17      federal rule of civil procedure 26.
18      So just with that cautionary note,
19      you can answer the question.
20   A   Sure.  Thank you.
21         Yes.  As I said, the substance of
22   our conversations were --
23         MR. SIGALE:  Before you answer
24      that.  Counsel, I guess we don't
25      know what he's going to say was the

Page 123

1          S. CORNELL
2    substance of it, but.
3          MR. WENZLOFF:  I believe your
4       question was, did we identify any
5       assumptions that you relied on in
6       forming your opinion.  You can
7       answer that question.  After that,
8       let's let counsel ask additional
9       questions, and if there's additional
10      objections that need to be made,
11      I'll make them.
12   A   Sure.
13   BY MR. SIGALE:
14   Q   I guess, Dr. Cornell, there's two
15   proper answers, which is yes, I was told to
16   assume X or no.
17   A   So the answer to that would be no.
18   Q   Okay.  What's you understanding of
19   what this lawsuit is about?
20   A   So my understanding of what this
21   lawsuit is about -- sorry, I'm getting a
22   little more tired.
23   Q   And I'm sorry, Doctor, if you --
24   it's really not a memory test.  If this is
25   one of those things where you're pulling up

Page 124

1          S. CORNELL
2    your copy of the amended complaint, say on
3    your computer or something, would say
4    refresh your recollection or something, like
5    that.  I could care less if you're referring
6    through the course of these questions today,
7    if you need to refer to something, I have no
8    problem with that, just so long as you
9    please identify what it is you're referring
10   to.  So I just want to get that out.
11         Okay.  Back to your answer of your
12   understanding of what this lawsuit is about?
13   A   My understanding is whether or not
14   these regulations that impact day care --
15   in-home day care and foster parents pose a
16   constitutional problem under current Second
17   Amendment jurisprudence, and whether or not
18   the laws are consistent with a history of
19   regulation as defined by Heller.  And,
20   sorry, just to clarify, I want to say that
21   Heller jurisprudence, I'm talking about
22   Heller's direction to take history into
23   account when seeking to evaluate the
24   constitutionality of regulations.
25   Q   Okay.  And what is your

Page 125

1          S. CORNELL
2    understanding of what the Illinois
3    regulations and statutes at issue in this
4    lawsuit do?
5    A   So these, again, I would have to
6    have the regulations in front me because
7    they are sort of a multipart regulation, but
8    in general, these regulations deal with
9    access to firearms in these facilities.
10   Q   Can you define "facilities"?
11   A   So day care, in-home day care, and
12   foster care.
13   Q   So when you say these facilities,
14   you're referring to people's houses?
15   A   I think -- yes, I think that's
16   right, yes.
17   Q   Okay.  I just want to make sure
18   I'm clarifying.  Is there some other
19   facility that you believe -- is there some
20   other type of building that you believe this
21   lawsuit involves?
22   A   So when you say this lawsuit, are
23   you talking about the specific plaintiffs or
24   the scope of the challenge to the law?
25   Q   Well, the scope of plaintiff's

Atkinson Baker, a Veritext Company
www.depo.com

Page 126

S. CORNELL

1       S. CORNELL
2   challenge to the law, which is what the
3   lawsuit is about.
4       A   So I'm assuming that -- it is
5   theoretically possible for -- I don't know
6   enough about the history.  I don't know
7   about the scope of, for instance, of
8   fostering.  I don't know whether or not if
9   you were living in a hippie commune, and you
10  chose to foster children, whether that
11  would, you know, occur in a barn or a home
12  or how that would -- so, I mean, there
13  are -- playing the law processor game, you
14  know, I don't know every conceivable
15  domestic structure in which people could
16  foster children.  I mean, I assume they all
17  fit the definition of "home," but I don't
18  know that for a fact, right.
19      Q   Okay.  I want you to assume for
20  purposes of our talk today that we're
21  talking about people's houses.  That
22  we're -- we're not talking about, you now,
23  the Motel 6.  We're not talking about the
24  barn or any of the hippie communes or
25  anything like that.  Okay?

Page 127

S. CORNELL

1       S. CORNELL
2       A   So that certainly helps things.
3       Q   Well, short of the first year of
4   law school hypotheticals, you understand
5   that this case only involves people's
6   houses.
7       A   Yeah.  I accept your
8   characterization that that currently
9   involves, and is the most likely fact
10  pattern to define this principle.
11      Q   Okay.
12          So then we get to the summary of
13  your opinion.  I'm just going to run through
14  it here, I guess, part by part.  You write,
15  "It is my opinion that the regulations and
16  statute at issue in this case--namely,
17  Illinois Department of Children and Family
18  Services Rule 402.8(o), Rule 406.8(17) and
19  (18), and Section 10/7 of the Illinois Child
20  Care Act (225 ILCS 10/7) are consistent with
21  the historical power and tradition of state
22  regulation and firearms and gun powder."
23          Did I accurately read what you
24  wrote there?
25      A   You did.

Page 128

S. CORNELL

1       S. CORNELL
2       Q   All right.  So I'm going to --
3   that's obviously a summary, so I'm going to
4   stop there with that and kind of move down.
5           You reviewed state law regulating
6   the storage of gun powder; laws regulating
7   storing loaded weapons in homes; laws
8   prohibiting arm in sensitive places.
9           Then you good down, bans on public
10  carry; bans banning the discharge of weapons
11  in populous areas; ban on weapons in schools
12  and other places in which children are
13  likely to gather; prohibition on the sale or
14  possession of arms by minors; legal
15  decisions on the scope of the police power;
16  legal treatises on the scope of the police
17  power.  So -- I'm sorry.  Before I move
18  down, I read like an entire thing there.
19          Is all the historical evidence
20  that you relied upon listed here in the, was
21  it nine bullet points that are in report or
22  since writing the report, have you relied on
23  any other, as you write it here, as
24  historical evidence?
25      A   No.  These bullet points are the

Page 129

S. CORNELL

1       S. CORNELL
2   broad categories of types of laws and
3   ordnances.
4       Q   Okay.
5       A   And other sources.
6       Q   Okay.  So you started out by
7   addressing the District of the Columbia
8   versus Heller case and how Justice Scalia
9   directed courts to look for history -- or to
10  history for guideposts in evaluating the
11  scope of permissible regulation under the
12  Second Amendment, correct?
13      A   That is correct.
14      Q   All right.  You write that "The
15  Heller decision directs judges to consider
16  history as one part of the analysis
17  necessary to evaluate the constitutional
18  scope of permissible gun regulation."
19          Did I read that accurately?
20      A   Yes.
21      Q   Okay.  And then you stated that
22  Heller didn't actually do the research
23  itself.  The Heller court didn't do that
24  research itself, but as you write it, rather
25  left this project to lower courts, correct,

Atkinson Baker, a Veritext Company
www.depo.com

Page 130

S. CORNELL

1
2  you still would assert that?
3      A   Yes.
4      Q    And then you quote the now famous
5  passage of the Heller decision, and I'll
6  just read it.  "Although we do not undertake
7  an exhaustive historical analysis today of
8  the full scope of the Second Amendment,
9  nothing in our opinion should be taken to
10  cast doubt on longstanding prohibitions on
11  the possession of firearms by felons and the
12  mentally ill, or laws forbidding the
13  carrying of firearms in sensitive places
14  such as schools and government buildings, or
15  laws imposing conditions and qualifications
16  on the commercial sale of arms."
17      Yes, I read that correctly?
18      A   You did.
19      Q    All right.  Does this case, as you
20  understand it, involve the possession of
21  firearms by felons or mental ill people?
22      A   No.
23      Q    Does it involve the carrying of
24  firearms in sensitive places or anywhere
25  else?

Page 131

S. CORNELL

1
2      A   Potentially, yes.
3      Q   Okay.  Potentially how?
4      A   So this part of Heller expressly
5  mentions schools, and so the question I
6  think in terms of understanding this is how
7  much like a school is day care center, how
8  much like a school is a foster care setting,
9  and as a secondary matter, if guns were not
10  carried in either of these places, it seems
11  doubtful that this would be an issue of
12  public concern.  Like if it was a right to
13  have a gun locked up, which is one of the
14  requirements, at least one of the statutes,
15  there would be no issue.  So that would
16  imply that there has to be a carrying issue
17  in terms of the person requesting to be able
18  to have firearms and is still operate a day
19  care center or serve as a foster parent.
20      Q    The carry argument involves in
21  public, correct, that is, is that your
22  understanding of what traditionally the word
23  "carry" is referred to -- is referring to?
24          MR. WENZLOFF:  I'm just going
25      to object to the form of the

Page 132

S. CORNELL

1
2      question.  You can answer, if you
3      understand.
4      A   Right.
5          And after I answer this question,
6      can I take a quick bio break, if that's
7      okay?
8  BY MR. SIGALE:
9      Q   Yeah.  Of course.
10      A   So if one looks into the history
11  of carry, it turns out, and I'm just sort
12  of, it was a new discovery for me that there
13  is a body of case law that talks about
14  carrying firearms from one room to another
15  and whether that sort of carry is implicated
16  in legislation, and apparently, it was in
17  several cases from the 19th century.
18      Q   Okay.  Are you aware of whether or
19  not that's what Justice Scalia was referring
20  to when he talks about the carrying of
21  firearms?
22          MR. WENZLOFF:  Objection.
23      Sorry.  Go ahead.  Did you finish
24      the question?
25          MR. SIGALE:  I don't know

Page 133

S. CORNELL

1
2  anymore.
3          MR. WENZLOFF:  Sorry.  I was
4      just going to object to the form.
5          MR. SIGALE:  Okay.  I'm sure
6      you'll still keep it a standing
7      objection.  I'm sure when I rephrase
8      it or restate it, you'll do the same
9      thing.
10  BY MR. SIGALE:
11      Q    So are you aware whether or not
12  Justice Scalia was referring to that
13  room-to-room type carrying in this paragraph
14  from Heller that you quoted in your report?
15          MR. WENZLOFF:  Same objection.
16          THE WITNESS:  Does that mean I
17      should answer?
18          MR. WENZLOFF:  You should
19      answer.
20      A   Oh, thank you.
21          If we take a kind of standard
22  plain meaning, public meaning, textual
23  modality, so Justice Scalia says laws
24  forbidding the carrying of firearms in
25  sensitive places such as schools and

Page 134

S. CORNELL

1
2  government buildings, well, those are
3  internal structures.  Those are not, you
4  know, carrying it down the lane or carrying
5  it in a park.  Those are carrying it in a
6  building.  So clearly based on just the
7  plain meaning of the text, it certainly
8  seems to indicate that.  That, in fact, when
9  he says carrying firearms, he isn't
10  including carrying them inside a building.
11  BY MR. SIGALE:
12      Q   I have some more questions on this
13  topic, but you already referenced you need
14  to take a break, so --
15      A   Yes.  A very quick bathroom break
16  would be great.
17          MR. SIGALE:  Let's just take
18      five.  So 2:15.  Off the record.
19          (Whereupon, a recess was taken
20          from 2:10 p.m. until 2:15 p.m.)
21  BY MR. SIGALE:
22      Q   You would agree that the holding
23  in Heller is that there was an individual
24  right to possess a firearm unconnected to
25  service in a militia?

Page 135

S. CORNELL

1
2          MR. WENZLOFF:  Objection as to
3      the form of the question.  Also
4      calls for a legal conclusion.  You
5      can answer.
6      A   Yes.  I think the -- I think
7  there's pretty broad scholars' consensus
8  that that's an apt characterization of
9  Heller decisions central holding.
10  BY MR. SIGALE:
11      Q   And, again, this is all to the
12  extent you know.  Did that right apply per
13  the Heller decision?
14          MR. WENZLOFF:  Objection to
15      the form.  I'm sorry.  I apologize.
16      I thought you were done.
17  BY MR. SIGALE:
18      Q   Did that right apply in one's
19  home?
20      A   I think that the general consensus
21  is that Heller asserts that its rights claim
22  was strongest in the home.
23      Q   And strongest in the home implies
24  that it applies elsewhere; is that what
25  you're saying?

Page 136

S. CORNELL

1
2          MR. WENZLOFF:  Objection --
3      objection as to form.  You can
4      answer.
5  BY MR. SIGALE:
6      Q   I'll rephrase.  When you say
7  strongest, are you saying that the opinion
8  also applies -- strike that.
9          When you say strongest are you
10  saying that the holding of color is that
11  that individual unconnected to a militia
12  also applies outside of the home?
13          MR. WENZLOFF:  Objection as to
14      form.  You can answer.
15      A   So this is the most contested and
16  interesting question about Heller.  I'm
17  paraphrasing Justice Scalia.  I'd have to
18  look through to find the passage, but I
19  believe the passage says something like
20  something very similar to the strongest in
21  the home, but it doesn't really flush that
22  out very far and certainly doesn't flush out
23  what the contours of that right are, and my
24  understanding of the jurisprudence since
25  Heller is there has been very different

Page 137

S. CORNELL

1
2  takes by different courts about how to make
3  sense of what that means.
4          So there's everything from
5  Posner's decision in Moore V. Madison is to
6  Young versus Hawaii, and I think there's
7  pretty general agreement that those
8  decisions are not exactly the same.  How
9  different they are hasn't really been
10  determined, but I think everyone would agree
11  that those decisions are definitely not
12  exactly the same.
13          Whether that's a meaningful
14  difference of opinion or whether that's a
15  circuit split or a no circuit split, I think
16  people are all over the map on their
17  assessment of what to make of post Heller
18  jurisprudence.
19  BY MR. SIGALE:
20      Q   Okay.  But we can agree that this
21  individual right regardless of where outside
22  the home or how outside the home it applies,
23  that it does apply inside the home?
24      A   Yeah.  I think that's a
25  conventional reading of Heller, yeah.

Atkinson Baker, a Veritext Company
www.depo.com

Page 138

1          S. CORNELL
2      Q   Okay. Is there anything about
3  this lawsuit that involves the issue of
4  firearms outside of the home?
5          MR. WENZLOFF: Objection as to
6      form. I also don't know what you
7      mean by this lawsuit. Are you
8      talking about Heller or what are
9      you?
10 BY MR. SIGALE:
11     Q   Well, okay, fair enough. Although
12  this lawsuit is the one that has all brought
13  us here gathered today, Heller is Heller.
14  But, Dr. Cornell, to your understanding, is
15  there anything about this lawsuit, Miller
16  versus Smith, that has brought us all here
17  today that involves the issue of firearms
18  outside the home?
19         MR. WENZLOFF: Objection as to
20     form. Also, if you're asking about
21     allegations in the complaint, I
22     think it's more appropriate to
23     direct Dr. Cornell to a part of the
24     complaint and ask him questions
25     related to the specific document

Page 139

1          S. CORNELL
2      rather than speculate about what
3      this the case might involve.
4          You can answer, if you
5      understand.
6      A   So, again, the way the question is
7  formulated, it's a bit difficult to offer an
8  answer because, for instance, it's hard to
9  image how the guns get into the home unless
10  at some point they've been outside the home.
11  Unless the guns -- the ore was mined in the
12  home, the metal was smelt in the home, and
13  things were assembled in the home. So in
14  some sense, the guns had to have been out of
15  the home at some point in order to get in
16  the home, unless all steps of gun production
17  were done in the home, which would be
18  impressive, but difficult, I'd imagine.
19 BY MR. SIGALE:
20     Q   So, Dr. Cornell, just to clarify
21  here, are you equating transport with the
22  carrying of firearms?
23         MR. WENZLOFF: Objection to
24     the form of the question. You can
25     answer.

Page 140

1          S. CORNELL
2      A   Again, you know, you're asking
3  sort of these very wide open questions. I
4  don't really know what we're talking about.
5  I don't really know how it could be
6  transported or it could be carried. It
7  depends on how you got them from point A to
8  point B, I suppose.
9  BY MR. SIGALE:
10     Q   Well, sure, but they are two
11  different things, right?
12         Let me ask it this way: If I take
13  that firearm and put it in a case, put it in
14  the trunk of my car and drive it to a firing
15  range, did I carry it to the firing range or
16  did I transport it to the firing range, if
17  you know, if you have an understanding of
18  it?
19         MR. WENZLOFF: Objection to
20     the form of the question.
21     Objection. It seems to call for a
22     legal conclusion and is speculation
23     about opposing's counsel
24     hypothetical, I don't know. If you
25     understand the question, you can

Page 141

1          S. CORNELL
2      answer.
3      A   So I don't know under the current
4  state of federal Illinois law how that fact
5  pattern would be interpreted. The only
6  thing I can tell you is that looking into
7  the history of firearms regulations, it is
8  fascinating how much debate there is over if
9  it's carried in a saddle, is it carried
10  under the laws regulating the carry of
11  firearms, and in many jurisdictions, I
12  haven't studied this so I can say in all
13  jurisdictions or I couldn't even offer a
14  quantitative assessment whether most
15  jurisdictions, but there is a remarkable
16  consistent theme about having firearms, even
17  if they are not on your person, is
18  considered to be carrying under the law, but
19  I don't know where we are with current state
20  of law. I can only say that at various
21  historical moments that would have not been
22  an unreasonable conclusion in many
23  jurisdictions.
24 BY MR. SIGALE:
25     Q   To the extent you're familiar with

Atkinson Baker, a Veritext Company
www.depo.com

Page 142

**S. CORNELL**

1
2 **the Moore versus Madison opinion, Judge**
3 **Posner's opinion --**
4    A   Yeah.
5    **Q   -- did it involve the right of the**
6 **plaintiffs to throw -- put their firearm in**
7 **a case and put it in the back of their car**
8 **and drive it -- in the trunk of their car**
9 **and drive it to a firing range or did it**
10 **involve the right to carry it on their**
11 **person and conceal it for self-defense?**
12    A   So it's been a while since I read
13 Moore, and the only thing that I feel
14 comfortable, without rereading the decision,
15 I think I read when it came out but I don't
16 think I've read it since then, was that it
17 clearly it was a decision that struck down
18 Illinois's total prohibition on carry, but I
19 don't remember the decision well enough to
20 know what the fact pattern was.
21    **Q   So you don't know as you sit here**
22 **if there is a difference between**
23 **transporting a firearm, like in your**
24 **vehicle, versus carrying on your person for**
25 **say self-defense purposes?**

Page 143

**S. CORNELL**

1
2    MR. WENZLOFF:  Objection to
3 the form of the question.  Calls for
4 a legal conclusion.  Incomplete
5 hypothetical.  You can answer, if
6 you understand.
7    A   So to underscore the point I made
8 before, I have looked at some of the
9 historical evidence on this question, but I
10 have not looked at any of the contemporary
11 jurisprudence on this question in any
12 detail.
13 BY MR. SIGALE:
14    **Q   Okay.**
15    A   So I suppose if you say that
16 that's what the state of the law is, that
17 that sounds to me possible, but it also
18 sounds to me equally possible that that's
19 not the state of law, and I couldn't really
20 commit to either view without further
21 scrutiny.
22    **Q   Okay.**
23    A   But it's not unreasonable that
24 that would be one way of framing the law,
25 but for all I know, that could be wrong.

Page 144

S. CORNELL

1
2    **Q   Okay.  To your understanding, does**
3 **this law -- I'm sorry, does this Miller**
4 **lawsuit involve any issues regarding the**
5 **commercial sale of arms?**
6    MR. WENZLOFF:  Objection as to
7 the form of the question.  You can
8 answer.
9    A   Well, again, it doesn't seem that
10 this is a case that involves the sale of
11 arms directly.
12 BY MR. SIGALE:
13    **Q   Okay.**
14    A   But that, you know.
15    **Q   Sir, Doctor, I'm not talking about**
16 **the law school hypothetical.  Are the**
17 **plaintiff's alleging that they wish to be**
18 **able to sell guns?**
19    MR. WENZLOFF:  Objection as to
20 the form of the question.  Again, if
21 you're going to ask about specific
22 allegations in the complaint, I
23 think it makes sense to put the
24 complaint up for specific questions
25 on paragraphs.

Page 145

S. CORNELL

1
2    But again, Dr. Cornell, if
3 you're able to recall and answer the
4 question, feel free to go ahead and
5 do so.
6    A   So I can think of two scenarios.
7 So one scenario, someone who is forbidden to
8 have a firearm unlocked in a day care
9 setting goes to purchase a firearm and then
10 stores it at their brother-in-law's house.
11 That would seem not at all to implicate this
12 situation, but if you buy the gun and bring
13 it home and store it on the premises, then
14 the commercial sale of arms is indirectly
15 the implicated, right.
16 BY MR. SIGALE:
17    **Q   Personally, I guess I would**
18 **disagree, but are the, if you know, are the**
19 **plaintiffs in this lawsuit suing over the**
20 **issue -- over the hypothetical that you just**
21 **described; is that in the complaint that you**
22 **reviewed?**
23    MR. WENZLOFF:  Same objection
24 as earlier.  Go ahead and answer.
25    A   To the best of my recollection,

Page 146

S. CORNELL

1           S. CORNELL
2    no.
3   BY MR. SIGALE:
4        Q    Okay.
5        A    But to offer you a definite
6    answer, I'd have to look at the complaint
7    again.
8        Q    Well, okay.  So those are kind of
9    the magic words.  Counsel's been saying it,
10   but that's just counsel.
11           Would you like me to put the
12   complaint up, you can review it?
13       A    Sure.  If you want to dig into
14   this, that's fine with me.
15       Q    Well, I don't know how far I want
16   to dig, but I'll at least put it up.  I'll
17   let you read it for whatever.  Let you read
18   it, and that way if I ask you questions
19   about it, at least you have it.
20       A    That's fine with me.
21       Q    So, all right.  I'm going to stop
22   this for a second.  And 'cause you can
23   teach an old dog new tricks.  There it is.
24   I'll mark that as Exhibit C.  You're able to
25   just click on that and pull it up on your

Page 147

1           S. CORNELL
2    screen, right, Doctor?
3        A    I think I have to download it and
4    then pull it up.
5           (Whereupon, Amended Complaint
6            was marked as Defendant's
7            Exhibit C for identification as
8            of this date.)
9   BY MR. SIGALE:
10       Q    Which is easier for you, I can put
11   it up on the screen and scroll to your
12   leisure or you can download it and read it
13   on your own?
14       A    I'm completely agnostic, whichever
15   you prefer.  Well, you know the complaint.
16   Having filed it, so I would assume it would
17   be more efficacious if you put it on the
18   screen and you pointed me to the appropriate
19   passage.
20       Q    Okay.  Well, I don't know what
21   appropriate would be, I guess, but we'll --
22       A    I'm just saying more efficient,
23   perhaps, but --
24       Q    No.  It's fine.  We'll go with
25   that.  Let me share the screen.  Exhibit C,

Page 148

1           S. CORNELL
2    amended complaint for declaratory and
3    injunctive relief filed on May 29, 2019 in
4    the Miller versus Smith case, AKA this
5    lawsuits, and it is the amended complaint.
6           And let's see if I scroll down,
7    paragraph 4, the policy of IDCFS
8    substantially prohibits day care home
9    licensees in Illinois from the possession
10   and carry of firearms for the purpose of
11   self-defense.  Paragraph 5, the IDCFS policy
12   also substantially prohibits licensed foster
13   parents in Illinois from the possession and
14   carry of firearms for the purpose of
15   self-defense which violates plaintiffs'
16   constitutional rights under the Second
17   Amendment.
18       A    All right.  So having read that, I
19   now feel quite confident saying that this
20   issue does involve carrying.
21       Q    Do you know carrying how?
22       A    Well, the complaint that you just
23   read to me talks about the violation of the
24   right to carry.
25       Q    Okay.  So here let's go down to --

Page 149

1           S. CORNELL
2    and we can refer to -- if you need to refer
3    to this to back to it at some point, I will
4    tell you that here on page 8 is the citation
5    of the quote of the section 10/7 in the
6    child care act, and page 9 talks about that
7    JCAR, Joint Committee Administrative Rules,
8    here in Illinois, 406.8(a) 17 and 18.
9           And then I cite a section of the
10   Illinois Firearm Concealed Carry Act, and
11   then there's the foster care section where I
12   cite the statute and the rules.
13          So, okay.  This is one of those
14   things where maybe it's easier to let you
15   download it and pull it up if you need to,
16   but if you know a section or a paragraph or
17   you say oh, go to that part again or
18   something like that, I'd be happy to do it.
19          So to your understanding then, the
20   carrying that's referenced in this lawsuit,
21   what is the nature of the carrying that is
22   the subject of this lawsuit?
23          MR. WENZLOFF:  Objection as to
24   the form of the question.  It's
25   vague.  If you understand, you can

Atkinson Baker, a Veritext Company
www.depo.com

Page 150

S. CORNELL

1  answer.
2      A    Well, by the terms of the
3  complaint you filed, you allege a violation
4  of your client's right to carry.  So that is
5  what's at issue here, right?  So I'm not
6  sure what you're asking me to do, except to
7  say you are alleging that these regulations
8  infringe the right of your clients to carry.
9  BY MR. SIGALE:
10      Q    Okay.  So is that carrying, do you
11  know whether that carrying involves like in
12  the home on one's person in a holster or say
13  from the home say to the grocery store or
14  both; do you know?
15      MR. WENZLOFF:  Objection as to
16  the form of the question.  I mean,
17  the complaint speaks for it.  I
18  don't know that there are any
19  allegations about that level of
20  specificity, and for Dr. Cornell to
21  go beyond the complaint is pure
22  speculation.  If you're able to
23  answer, please answer, Dr. Cornell.
24      A    I guess I'm limited by the

Page 151

S. CORNELL

1  evidence before me.  The only thing I can
2  say with any certainty is you allege that
3  these regulations violate your client's
4  right to carry, and I have absolutely no way
5  of knowing what they or you think that
6  means.
7  BY MR. SIGALE:
8      Q    Okay.  Sorry.  Hold on one second.
9      Okay.  So you write in the -- you
10  write in the report here on page 5 about how
11  the right wasn't unlimited and it -- the
12  Heller -- you write out that there wasn't
13  the right to keep any weapon whatsoever in
14  any manner, for whatever purpose, which was
15  a quote from Heller; you see that part,
16  correct?
17      A    Yes.
18      Q    Okay.  Are you aware, one way or
19  the other, whether the plaintiffs are
20  arguing that no gun regulation, what is
21  required, are they -- in other words, are
22  the plaintiffs suing that there should be no
23  gun regulation?
24      MR. WENZLOFF:  Objection as to

Page 152

S. CORNELL

1  form.  Calls for speculation.  To
2  the extent you're asking for
3  Dr. Cornell to testify about
4  something that's beyond the face of
5  the complaint is pure speculation.
6      Dr. Cornell, if you understand
7  and can answer, please do so.
8      A    Well, the entire structure of our
9  legal system requires that in order to have
10  a case that's judicable, there has to be an
11  injury, and it has to be specific.  So I
12  don't know that -- I don't know that the
13  question you asked sort of exists in the
14  legal world, as I know it.  I can't, in my
15  mind, frame a lawsuit in which you seek to
16  prove that you don't think there are no gun
17  laws that are constitutional.  That seems to
18  be what you're asking, and I don't know how
19  I could frame a legal complaint to
20  operationalize that question.  Unless I'm
21  misunderstanding your question.
22  BY MR. SIGALE:
23      Q    No.  That's okay.

Page 153

S. CORNELL

1      This is the top paragraph of
2  page 6.  Can you just, if you can read
3  through it real quick.  I believe you read
4  through it when you were preparing for
5  today, but can you just expand on what
6  you're saying in this paragraph?
7      A    You mean better than I did in
8  writing?
9      Q    Is there -- is everything that you
10  wanted to say here or is there anything to
11  expand upon?
12      A    No.  I think I did a pretty good
13  job.  I'm happy with this formulation.
14      Q    Okay.  Now, in terms of -- going
15  to the next paragraph then, the corollary of
16  these principles that you listed above is
17  the permissible regulations would
18  necessarily change in response to changes in
19  society that prompted legislatures to
20  exercise their police power to develop novel
21  solutions to new problems.
22      That is very much, it sounds like,
23  a living document type of viewpoint; is that
24  what you subscribed to?

Atkinson Baker, a Veritext Company
www.depo.com

Page 154

1          S. CORNELL
2          MR. WENZLOFF:  Objection.
3    It's vague.  I don't think anyone
4    know what living type viewpoint
5    means.  If you understand,
6    Dr. Cornell, you can answer.
7          A    No.  I wouldn't describe it as
8    that.  I would describe this as a fairly
9    conventional restatement of what the police
10   power involves.
11   BY MR. SIGALE:
12        **Q    Well, what's the difference**
13   **between this and the living document view of**
14   **the -- or the living constitution viewpoint?**
15         MR. WENZLOFF:  Objection.
16         THE WITNESS:  Okay.  I'm
17   sorry.
18         MR. SIGALE:  He objected.  You
19   can answer.
20         THE WITNESS:  Sorry, Aaron.
21   Is that your --
22         MR. WENZLOFF:  Yes,
23   Dr. Cornell.  Same objection as
24   before.  And you can go ahead and
25   answer.

Page 155

1          S. CORNELL
2          A    Okay.  Thank you.
3          So I don't think they're even
4    remotely similar and to give an example,
5    let's take -- let's take the issue of
6    capital punishment in the Eighth Amendment.
7    If you are an originalist, you would say
8    since the constitution itself acknowledges
9    capital crimes, you can't argue under an
10   originalist argument that capital punishment
11   is inherently unconstitutional.  If you're a
12   different kind of originalist, you might
13   want to say since capital punishment was a
14   well-established practice at the time of the
15   founding, you couldn't argue that it was
16   unconstitutional under originalists'
17   interpretation.
18         If you are a living
19   constitutionalist, you can easily say that,
20   you know, in Scandinavia, they don't do it.
21   We now know more about the human capacity
22   for pain and suffering; and therefore, what
23   would have been seen as perfectly normal in
24   the 18th century would now be seen as
25   inherently cruel and unusual.  So that's

Page 156

1          S. CORNELL
2    like a classic illustration of the different
3    between a so-called originalist and a
4    so-call living constitution.
5          What I'm talking about here is
6    really rather different.  So if you recall,
7    Justice Scalia in Heller made the point that
8    I think is uncontroversial, there are some
9    people in the gun control movement who were
10   happy to make the following kind of
11   argument, which Scalia mocked with -- for
12   good reason, I suppose.  Well, you can have
13   all the muskets you want, you just can't
14   have an AR15, to which Scalia said, well,
15   that is not how we interpret the
16   constitution.
17         Because, for instance, we wouldn't
18   limit a freedom of the press to hand print
19   printing presses and wouldn't exclude the
20   internet from any First Amendment
21   protection.  So we don't take that type of
22   antiquarian approach to constitutional
23   meaning.
24         What Justice Roberts and Justice
25   Cavanaugh -- then Judge Cavanaugh, now

Page 157

1          S. CORNELL
2    Justice Cavanaugh, observed is that just as
3    we might think about arms available to the
4    founders as having either lineal descendents
5    or analogical equivalents, so to the
6    founding year regulations might have or
7    early American regulations, 'cause, of
8    course, Scalia also looked to early 19th
9    century, and indeed he even looked into
10   reconstruction.
11         So if we find a law that is either
12   lineal -- it wouldn't be a lineal
13   descendent.  It'd be a lineal progenitor of
14   a modern law, or we find a law that is
15   analogous to a modern law, we would treat
16   that the same way we would treat firearms
17   technology.  Does that make sense?
18   BY MR. SIGALE:
19        **Q    Well, I guess I'm going to turn it**
20   **around on you, I suppose.  I'm not sure**
21   **which part you're asking if it makes sense,**
22   **but I get the basic idea that you're coming**
23   **from, but the -- so this paragraph here,**
24   **this is talking about the police power and**
25   **what do we do about -- what do we do about**

Atkinson Baker, a Veritext Company
www.depo.com

Page 158

S. CORNELL

1
2  the internet because the internet wasn't
3  around at the time of the founding; is that
4  basically what this paragraph is?
5         MR. WENZLOFF:  Objection.
6  Misstates his prior testimony.
7         MR. SIGALE:  Well, I'm not
8  misstating.  I'm asking.
9         MR. WENZLOFF:  You can answer,
10  Dr. Cornell.
11         MR. SIGALE:  You can answer.
12     A    So I think what this paragraph
13  does is it talks about the nature of the
14  police power.  And moreover, talks about
15  Heller as recognizing that when we turn to
16  history for guidance, we turn to history to
17  guidance on both the right side and the
18  regulation side, and we don't look at
19  history in a kind antiquarian way.  We look
20  for -- look at history in a genealogical
21  fashion, if you will, and in an analogical
22  fashion.  Does that make sense?
23  BY MR. SIGALE:
24     Q    Yeah.  I think that basically the
25  last line of this paragraph then basically

Page 159

S. CORNELL

1
2  is what you're saying then, yes?
3  Understanding regulations many not be
4  literally rooted founding era practice?
5     A    That's certainly part of the
6  story.
7     Q    Okay.
8         Is there any requirement to how
9  close the regulation has to be to the modern
10  situation?
11         MR. WENZLOFF:  Objection as to
12  form of the question.
13  BY MR. SIGALE:
14     Q    For example, I think it was Jones
15  versus U.S.  The Supreme Court going on
16  about the constable hiding in the back of
17  the carriage as some sort of founding era
18  corollary to GPS trackers under the rear
19  bumper.  Is there from -- from a historical
20  standpoint, is there any degree of
21  similarity that has to be adhered to?
22         MR. WENZLOFF:  Objection as to
23  the form of the question.  It's
24  vague.  You can answer, if you
25  understood.

Page 160

S. CORNELL

1
2     A    So I think pointing to the Jones'
3  case, which is of course a fascinating case,
4  is helpful because Justice Alito I think
5  correctly pointed out the -- and I think it
6  was a constable in a trunk, and Justice
7  Alito said the constable would have to be
8  pretty small to fit in the trunk.
9  BY MR. SIGALE:
10     Q    Right.
11     A    And Justice Alito said it's just
12  silly to frame this in an originalist
13  modality.  And particularly, he singled out
14  that there was an extensive discussion of
15  the of curtilage, which is an 18th century
16  property term referring to sort of
17  outbuildings and area included within the
18  domicile and is sort of antiquated property
19  term, and to think that we were fashioning
20  surveillance criminal procedure in the 21st
21  century based on the concept of curtilage
22  and whether or not the car parked on the
23  street would have fallen inside or outside
24  the curtilage in the 18th century was just a
25  kind of odd, perhaps even silly, legal

Page 161

S. CORNELL

1
2  enterprise.
3         Because you seem to be, in fact,
4  asking which side of the fence was the horse
5  parked on, which again is sort of an odd way
6  to try and fashion a new body of law to deal
7  with this potentially important area of our
8  expectations of privacy and criminal
9  procedure and due process and all this other
10  stuff.
11     Q    So I guess let me direct you to
12  two things, two things that you wrong in
13  this report, and they're both on the screen,
14  actually, at this the moment.  And let me
15  ask you how those two work with each other,
16  or if they do at all?
17     A    Okay.
18     Q    One is what we've been talking
19  about.  It's -- see my cursor, the first
20  full paragraph here?
21     A    Yeah.
22     Q    About permissible regulations
23  changing in response to changes in society.
24     A    Yes.
25     Q    Then I scroll down, you footnote

Atkinson Baker, a Veritext Company
www.depo.com

Page 162

1        S. CORNELL
2   John Roberts, Chief Justice Roberts'
3   statement in Heller about lineal descendents
4   of arms and also lineal descendents of the
5   restrictions.
6        So my question to you is, from a
7   historical standpoint, since that is your
8   expertise, when you're talking about
9   constitutional rights and the permissible
10  restrictions upon them, and I'm not even
11  going to limit you to the Second Amendment,
12  whatever you happen to know.  How lineal do
13  the regulations have to be in order that
14  it's permissible to change them in response
15  to changes in society and still be
16  permissible?
17       MR. WENZLOFF:  I'm going to
18  object to the form of the question.
19  You can answer.
20       THE WITNESS:  So, okay.  By
21  the way, after we answer this
22  question, can I take another little
23  break?  Because we've been at it for
24  about an hour and a half.
25       MR. SIGALE:  If you need to

Page 163

1        S. CORNELL
2   take a break, we can take a break.
3   So go ahead and answer the question,
4   and we'll take five minutes.
5       THE WITNESS:  Well, okay.  So
6   I have to ask your indulgence.  I
7   need to scan something and send
8   something; otherwise, my daughter is
9   going to lose an apartment in
10  Manhattan, which is I'm sure you
11  realize, time is of the essence.  So
12  if I can have just the amount of
13  time it takes me to scan and send --
14       MR. SIGALE:  I'll tell you
15  what, let's break the normal rule.
16  I'm going to go on faith on that.
17  Okay?  I'm going to break the normal
18  rule.  Go ahead and do what you have
19  to do to help your daughter out.
20  How long do you need, five minutes,
21  ten minutes?
22       THE WITNESS:  Probably just
23  ten minutes.  I think I can -- if I
24  set it up, if you don't mind my --
25  well, I'm just trying to think.

Page 164

1        S. CORNELL
2   Unfortunately, I'm the only one
3   who's got a scanner in this office.
4   And, again, I apologize.  And I
5   understand if you think this is
6   completely an inappropriate request,
7   but it's --
8       MR. SIGALE:  I'll come back in
9   ten minutes.  Go help your family
10  out.  And I'm going to trust you not
11  to go communicating with counsel
12  about the answer to this question.
13       THE WITNESS:  Oh absolutely.
14  Let's answer this question, for
15  sure.
16       MR. SIGALE:  Oh, then we could
17  have just taken the break.
18       THE WITNESS:  I'm sorry.  I
19  didn't mean to do that.  But,
20  yeah --
21       MR. SIGALE:  Let's answer the
22  question and we'll take a ten-minute
23  break.
24       THE WITNESS:  No.  I'm happy
25  to answer the question now.  So

Page 165

1        S. CORNELL
2   sorry for the confusion.
3   A    So my understanding is that there
4   are two principles, and one is articulated
5   by Justice Roberts about lineal descent, and
6   the other is articulated by now Justice
7   Cavanaugh about analogical connection.  And
8   my understanding, and I was intrigued by
9   Justice Cavanaugh's descent in Heller too,
10  so I did some reading about what was
11  decided, and there is a vast and fascinating
12  legal literature going back to, I think it
13  was Nixon's attorney general Edward Levy who
14  wrote a classic book on legal reasoning, and
15  Cass Sunstein who's written about
16  everything, really an influential Harvard
17  law article on analogical reasoning of the
18  law, and because I teach law to both law
19  students and undergraduates, this issue of
20  how you construct a proper legal analogy and
21  how you distinguish cases, which is itself
22  kind of a form of analogical reasoning, is
23  fascinating to me, and obviously, perhaps
24  one of the three most important skills that
25  lawyers learn in law school.  So I tip my

Atkinson Baker, a Veritext Company
www.depo.com

Page 166

1           S. CORNELL
2   hat to you folks, and it is an extremely
3   complicated cognitive process, and I don't
4   know that you can actually boil it down to a
5   simple rubric or simple set of rules.
6           But that's my understanding based
7   on both my teaching experience and reading
8   people as smart as Edward Levy, of course is
9   a very prominent conservative legal scholar,
10  and Cass Sunstein was a very prominent
11  literal legal scholar, that the task of
12  framing proper legal analogies is both core
13  and complicated.
14          MR. SIGALE:  Why don't we
15      go -- why don't we pick that up, and
16      we'll take a 13-minute break.  We'll
17      come back at 3:10, and, Kiara, when
18      we come back at 3:10, I'm going to
19      ask you for some sort of accounting
20      of how much time we've been actually
21      on the record during today.
22          Off the record.
23   (A discussion was held off the record.)
24          (Whereupon, a recess was taken
25          from 2:58 p.m. to 3:20 p.m.)

Page 167

1           S. CORNELL
2   BY MR. SIGALE:
3       Q   Well, at any rate, we're back on,
4   and I know that we were talking about the
5   Chief Justice Roberts' comment about lineal
6   descendents of the restrictions and how that
7   jived with the permissible regulations
8   changing in response to changes in society,
9   and then you started -- well, you ended
10  towards the break, you were talking about
11  competing academic or historical historians'
12  viewpoints about the topic, and so is -- and
13  hopefully I summarized that colloquy
14  correctly.  So my question to follow up on
15  that subject is, is there any agreement as
16  to how lineal -- strike that.
17          Or is there any agreement as to
18  how lineal a restriction -- a new
19  restriction has to be to an old --
20      A   So --
21      Q   -- permissible restriction?
22      A   Got it.  So just to clarify, I
23  wasn't actually talking about historians.  I
24  was talking about legal scholars.
25      Q   Oh, okay.

Page 168

1           **S. CORNELL**
2       A   So I mentioned Edward Levy who was
3   a very distinguished conservative, a legal
4   scholar at the University of Chicago, and he
5   was, I think, either solicitor general or
6   attorney general under Nixon.  And then I
7   mentioned Cass Sunstein, of course a
8   well-known liberal constitution scholar at
9   the Harvard law school.
10          And based also on my several years
11  now teaching at Fordham law school and
12  talking with my colleagues, the most
13  complicated and some ways elusive skill to
14  impart to young lawyers is the ability to
15  distinguish cases, which is essentially an
16  analogical exercise.
17          So I don't know that anyone has
18  figured out how to define that process and,
19  you know, frame it out in a step-by-step
20  process.  I think we still even in law
21  schools, mostly teach by example.  We throw
22  enough cases at students so that they see
23  many examples of how cases are
24  distinguished, how legal analogies are
25  drawn, and then they hopefully learn or they

Page 169

1           S. CORNELL
2   don't learn.
3           So I think you've hit the nail on
4   the head that this is among most the
5   critical but yet complicated, in some ways,
6   ineffable task that we ask of lawyers and
7   judges.
8       Q   Okay.  And it sounds like then it
9   winds up, what is -- what is lineal and thus
10  permissible, winds up being decided on a
11  case-by-case basis when, and of course that
12  vary depending on what court and what judge
13  and what part of the country you're in.
14  Does that sound about right?
15      A   I mean, I agree.  I think that
16  without trying to predict the future, I
17  think what we will see in the next phase is
18  a lot of this case-by-case decision-making,
19  where, you know, obviously with some
20  situations, they'll be clear analogies, but
21  more often than not, they'll be cloudy
22  analogies.
23      Q   This bottom of six, the main text,
24  investigating the history of gun regulation,
25  it says "reveals a dynamic and pragmatic

Atkinson Baker, a Veritext Company
www.depo.com

Page 170

S. CORNELL

2 process of adapting gun regulation to the
3 needs of a changing society."
4        And then you cite various factors
5 that go into that.  And just to clarify, is
6 all that what you refer to as the police
7 power, as you write in the last sentence of
8 that paragraph?
9    A   Yeah.  Those are all done in
10 conformity with state police power.
11    Q   Okay.  And I know I asked you
12 about gun regulations that founding fathers
13 wouldn't approve of, kind of a little
14 bookend to the article you had previously
15 written, but my question is, is from a
16 historical standpoint, or I'll ask it from a
17 historical standpoint.  Short of what Heller
18 talked about, short of Heller's lingo of the
19 fact pattern of handgun -- functional
20 handguns in one's home, were there any other
21 regulations regarding firearms that were not
22 historically permissible using the police
23 power?
24        MR. WENZLOFF:  Objection as to
25    the form of the question.  You can

Page 171

S. CORNELL

2    answer.
3    A   So, again, there are two possible
4 ways of understanding the question you
5 asked.  So one way of understanding it is,
6 have courts in the past adjudicated firearms
7 laws to exceed state police power.  And
8 there the answer is yes, particularly in the
9 antebellum south.  The second way of doing
10 that is looking at the range of commentaries
11 on firearms regulation and police power over
12 the course of American history.  Did
13 commentators who are recognized to be
14 authoritative figures in American legal
15 history, did they outline any boundaries.
16 So those are two slightly different 'cause
17 they rely on different bodies of evidence.
18 But to me as a historian, those would be the
19 most relevant and useful answers to your
20 question.
21 BY MR. SIGALE:
22    Q   All right.  Well, the first one
23    that you described seems to fall under the
24    category of legal research and --
25    A   Right.

Page 172

S. CORNELL

2    Q   -- while if you had a case that
3 was handy, as an example, that's fine, but I
4 guess I'm asking you for the materials I'm
5 not going to find say in the Westlaw search.
6 I use Lexus, but that's not --
7    A   Sure.  I mean, you've already
8 mentioned some of them when I think you
9 mentioned Bliss and Nunn as two examples of
10 antebellum statutes that struck down laws as
11 an excessive state police power regulation.
12    Q   Okay.
13    A   So in my survey of the kinds of
14 materials I've described in this report,
15 it's very clear that laws that effectively
16 provide no, for instance, a regulatory
17 regime that essentially did not have a good
18 cause condition for issuing a permit would
19 probably not pass constitute -- almost
20 certainly would not pass constitutional
21 muster based on this.
22        That at least since the 1830s,
23 there's been recognition of the necessity of
24 a good cause justification for public carry.
25    Q   I'm sorry.  I actually think I

Page 173

S. CORNELL

2 lost you there on that last sentence.  I
3 guess I could have it read back, but it
4 might just be easier to ask you to repeat
5 what you just said.
6    A   Sure.  So based upon my research,
7 and most of this research is done since
8 Heller, that any regulation of public carry
9 that does not have within it a reasonable
10 cause exception to a broad prohibition would
11 not pass constitutional muster.
12    Q   Oh, okay.  I see what you're
13 saying.  Okay.
14        I'm going to scoot down -- you
15 write at the -- what is this, page 9, where
16 my cursor is -- the middle of the first
17 paragraph, the continuing paragraph right
18 after footnote 44.  "The power to regulate
19 firearms and gunpowder is therefore at the
20 very core of the police power and inheres in
21 both states and local municipalities."
22        I just want to clarify, as we've
23 been discussing, however, that as Heller
24 showed and as, in fact, as McDonald showed,
25 to use a couple examples, that power to

Atkinson Baker, a Veritext Company
www.depo.com

Page 174

1          S. CORNELL
2    regulate is not absolute; fair to say?
3        A    I think it's fair to say that it's
4    a fundamental principle of Anglo-American
5    law that no right is absolute and neither is
6    the authority of government to regulate
7    without limit.
8        Q    Okay.  So you write, bottom of
9    nine, "The scope of state power to regulate,
10   prohibit, and inspect gunpowder has been
11   among the most far reaching of any exercise
12   of the police power throughout American
13   history."  Going to ten.  "The many state
14   laws and local ordinances authorizing
15   government official to search for gunpowder
16   illustrates the scope of this authority."
17          Now, the next -- I read that
18   correctly, yes?
19       A    Yup.
20       Q    All right.  Then I want to go to
21   the next paragraph and stop there at the
22   next line.  "The exercise of state police
23   power in the era of the Second Amendment,
24   particularly when the issue was safe storage
25   of guns or gunpowder, sanctioned a variety

Page 175

1          S. CORNELL
2    of laws."
3          So can you expand on what you mean
4    by the phrase "safe storage of guns or gun
5    powder"?  Where, in this first full
6    paragraph on ten, where my cursor is.
7        A    Sure.  So there are variety of
8    laws dating back to the colonial period and
9    including laws enacted contemporaneously
10   with the Second Amendment that deal with the
11   poor police power issues of health, public
12   safety, and laws that regulate how gun
13   powder must be stored, how much gun powder
14   can be stored in any one particular place,
15   what the scope of state authority to inspect
16   gunpowder, regulate the transport of
17   gunpowder, regulate the quality of gunpowder
18   manufacture, and regulate the way whether or
19   not guns can be stored, loaded or not.  All
20   of those have examples from either the
21   colonial period or the era of the Second
22   Amendment.
23       Q    I'm going, at some point before we
24   all part ways today, we're going to go over
25   some of those, because some of those are in

Page 176

1          S. CORNELL
2    the exhibits that --
3        A    Yes.
4        Q    -- 1 through 127.  We're going to
5    go through some of them.
6        A    Good.
7        Q    But generally speak, the gunpowder
8    storage, those were basically fire safety
9    rules, correct?
10       A    Well, I think -- well, a couple of
11   things.  First of all, some of them were
12   certainly fire safety laws, but not all of
13   them.  Some of them, depending on the level
14   of generality that you understand the legal
15   principle that they enact, are either
16   speaking to the danger that a loaded gun can
17   have because a loaded gun in the 18th
18   century has the potential to go off and harm
19   someone.  Some of them are dealing with the
20   fact that if the gunpowder is not properly
21   manufactured, that when one uses the
22   gunpowder, the guns will not function
23   properly.  So there are multiple aspects of
24   this that are driving.  So it would be an
25   overstatement in the simplification to say

Page 177

1          S. CORNELL
2    it's just about fire safety.
3        Q    Okay.  When you talk about --
4    well, let's use one of them.  Okay.  I'm
5    going to stop the share in a second.  The
6    commonwealth passage.  I'm going to share
7    the screen, but chat, file, file.  Okay.
8    I'll have my Exhibit D, which is Appendix 1
9    to your report.
10          MR. SIGALE:  I just want to
11       enter this in record, and by the end
12       of this, just so we're all -- it's
13       all clear, I'm going to enter all
14       the appendices, maybe not all
15       exhibits, 1 through 127, but at
16       least the Appendices 1 through 4, I
17       think it was.  So what I want to do
18       very quickly so that we're -- laws
19       of the commonwealth of
20       Massachusetts, Exhibit 9.  Look at
21       that.
22          Well, I'm sorry here because
23       there's a whole lot of documents,
24       and every time I want to open one
25       and send it through the chat and so

Atkinson Baker, a Veritext Company
www.depo.com

Page 178

1          S. CORNELL
2     on, I've got to jump through some
3     hoops.
4          But there's what I've marked
5     as Exhibit A9.
6          (Whereupon, MA - 1783 Mass Gun
7          Powder Laws of the Commonwealth
8          was marked as Defendant's
9          Exhibit A9 for identification as
10         of this date.)
11    BY MR. SIGALE:
12        Q    On the screen your Exhibit 9, my
13    Exhibit A9.  This is the laws of the
14    commonwealth of Massachusetts from
15    November 28, 1780, dot, dot, dot.  Then it
16    looks like some boilerplate from the law
17    school.  The red marks, I assume, are yours,
18    Doctor?
19        A    I believe they are.
20        Q    Okay.  Whereas, and I'm reading
21    here at the red here, where my cursor is,
22    bottom of the, what, page 3 of 6 on the PDF.
23    "Whereas the depositing of loaded arms in
24    the houses of the town of Boston, is
25    dangerous to the lives of those who are

Page 179

1          S. CORNELL
2     disposed to exert themselves when a fire
3     happens to the break out in the said town."
4          So fair enough that that's the
5     purpose to protect firearm or the bucket
6     brigade or whoever was doing fire protection
7     in those days?
8         A    So a couple of comments.  So
9     this -- this is clearly about the dangers of
10    firearms discharging in a house.
11        Q    During a fire.
12        A    And it's clearly a particular
13    danger in the case of the people have to go
14    in and then extinguish the fire.  And as a
15    secondary note, you'll notice it's in the
16    preamble, which of course Heller articulates
17    a principle that preambles cannot be
18    construed to narrow the scope of the
19    operative clause.  So the next question
20    becomes, are we applying Heller's preamble
21    rule to reading this or not.
22        Q    Well, in so far as the preamble is
23    stating one of the purposes, is there -- I
24    mean, we can just read through it, but are
25    there other -- are there other purposes?

Page 180

1          S. CORNELL
2     It's -- I mean, you back that in the -- when
3     was this, 17?
4         A    I believe it's first enacted in --
5         Q    1801?
6         A    So I think 1783 might be the first
7     time it is enacted in this form.  Then it's
8     reenacted I think like in 1792.  Then again
9     maybe in 1803.  So it's a law that stays on
10    the books for a while in the founding era,
11    passed in March 1783.
12        Q    Your understanding in terms of a
13    firearm that was loaded with gunpowder, that
14    it wasn't like how exposed was the gunpowder
15    when to say the fire, if a fire broke out in
16    a house and a firearm had gunpowder in it,
17    it wasn't protected from the fire by
18    anything, correct?
19        A    Correct.
20        Q    Okay.  So reading this, "That if
21    any person shall take into any
22    dwelling-house, stable, barn, out-house,
23    ware-house, store, shop or other building,
24    within the town of Boston, any cannon,
25    swivel, mortar, howitzer, co-horn, or

Page 181

1          S. CORNELL
2     fire-arm, loaded with, or having gun-powder
3     in the same, or shall receive into any
4     dwelling-house, stable, barn, out-house,
5     store, ware-house, shop or other building,
6     within the said town, any bomb, grenade, or
7     other iron shell, charged with, or having
8     gun-powder in the same, such person shall
9     forfeit and pay the sum of ten pounds" dot,
10    dot, dot.  Oh, except for the dot, dot, dot,
11    it's "to be recovered at the suit of the
12    Firewards in an action of debt."
13         The firewards, is that a colonial
14    word for fire department?
15        A    So I'd have to double check, but
16    it's -- I think it is a reference to fire
17    wardens or the fire -- so you have fire
18    wardens, which are the person, and you have
19    firewards, which are the districts of the
20    city, which are the divisions to inspect and
21    protect against fires.
22        Q    Okay.  There's a part in here.
23    Well, it says here any person within the
24    town Boston or other building, any powder
25    above, what is by law allowed.

Page 182

S. CORNELL

1      S. CORNELL
2        What was by law allowed?
3      A   So that varied from town to town
4  and state to state.
5      Q   But do you know in this case in
6  Boston and this --
7      A   I don't remember how much powder
8  was allowed to be stored in the city of
9  Boston.
10     Q   Okay.  Give me a second.  I
11  thought I -- okay.  So I'm looking at this
12  page above your red marks, the paragraph
13  above.  "An Act to provide for the Storing
14  and safe Keeping of Gun-Powder in the Town
15  of Boston, and prevent Damage from the
16  same."
17     A   Yes.
18     Q   You see what I'm reading?
19     A   Yeah, yeah.
20     Q   And it says, "Be in enacted by the
21  Senate and House of Representatives, in
22  General Court assembled, and by the
23  authority of the same, That all gun-powder
24  imported and landed brought at the port of
25  Boston, shall be brought to and lodged in

Page 183

1      S. CORNELL
2  the Powder-House or Magazine in said town,
3  and not elsewhere on pain of confiscation of
4  all powder put or kept any other house or
5  place."  And I'll skip the next thing, as
6  the important part is here, I think.
7  "Provided nevertheless, That it shall and
8  may be lawful for any person to keep in his
9  house or shop for sale, by retail, the
10  quantity of twenty-five pounds of gun-powder
11  at one time, which quantity shall be kept in
12  brass, copper or tin tunnels, and no
13  otherwise, under the penalty of forfeiting
14  all such gun-powder."
15        If I'm reading this right, and
16  please tell me, sounds like notwithstanding
17  this fire prevention or fire -- or
18  protection of the firemen act that you cited
19  in red, it sounds like a person is allowed
20  to keep 25 pounds of gunpowder in their
21  house; is that right?
22     A   So if it's properly stored, yes.
23     Q   Okay.  In the brass, copper, or
24  tin tunnels, right?
25     A   Right.

Page 184

1      S. CORNELL
2      Q   Okay.
3        Did Boston at the time of the
4  writing of this, or Massachusetts maybe is
5  more of Massachusetts generally.  Did
6  Massachusetts recognize a right to arm
7  self-defense say if someone broke into your
8  house?
9      A   Yes.  In fact, one of the most
10  famous articulations of that right comes in
11  John Adams's defense of British troops
12  during the Boston massacre trial.
13     Q   Okay.  So just to clarify,
14  sticking with this statute for, I guess it
15  isn't a statute, right, it's a Massachusetts
16  law or Boston ordnance?
17     A   I think it's a Massachusetts
18  statute passed for the town of Boston.
19     Q   Okay.  So every person is, clearly
20  they are allowed to have firearms.  Every --
21  I understand that not everyone would have
22  been allowed, but all persons who were
23  allowed to possess firearms were allowed to
24  have them in their home.  And they were
25  allowed to have 25 pounds of gunpowder in

Page 185

1      S. CORNELL
2  their home, properly stored, but because of
3  protection of the firemen, they were not
4  allowed to keep that firearm loaded; is that
5  accurate?
6      A   I mean, that's mostly accurate.
7  But it is important, there is no
8  professional firemen.  You're talking about
9  guns shooting your neighbors.
10     Q   There was like what bucket
11  brigades or something of that sort?
12     A   Yeah.  If you were quite wealthy,
13  you might be able to have -- you would have
14  one of these tokens nailed to your house,
15  which meant that you were wealthy enough to
16  hire a private fire brigade; otherwise, you
17  were pretty much stuck with your neighbors.
18     Q   Well, ports in a storm, I suppose.
19  So the lives of those who are disposed to
20  exert themselves if a fire happens to break
21  out in the said town, that's the
22  townspeople?
23     A   Yeah.
24     Q   Okay.  So people were allowed to
25  have firearms in their home.  They were

Atkinson Baker, a Veritext Company
www.depo.com

Page 186

S. CORNELL

1    allowed to have 25 pounds of gunpowder
2    properly stored.  But because of the safety
3    to the neighbors during the -- or
4    townspeople during a time of a fire breaking
5    out, they were not allowed to load the
6    firearms in their home; is that accurate?
7    A   Yes.
8    Q   Okay.
9    Is the New York City statue that
10   you are quoting here, is that basically the
11   same as the Massachusetts statute to protect
12   the -- here, I'll go to 48.  New York
13   ordinance ordained and established by the
14   mayor, alderman and commonality of the city
15   of New York 1793.
16   Basically the same as the Boston
17   or the Massachusetts statute that we just
18   went through?
19   A   It's similar.  I'd have to look at
20   the two statutes side by side.
21   Q   Okay.  Fair enough.  Hold on.  Let
22   me go to your Appendix D.  Nope.
23   You wouldn't happen to know off
24   the top of your head what exhibit?

Page 187

S. CORNELL

1    A   No.  I mean, they are both
2    examples of early American gunpowder storage
3    statutes.
4    Q   For protection of the fire people?
5    A   And also protection of people
6    living in the home, as well.
7    Q   You mean if a fire breaks out in
8    the home?
9    A   Yeah.
10   Q   Okay.  This is an example of what
11   I was talking about.  So I'm back at your
12   Exhibit D here.  Okay?  I'm on page 2 of 15.
13   A   Right.
14   Q   There's no exhibit for this.  This
15   is the reference to the New York Times --
16   A   Oh, okay.
17   Q   And there's no exhibit here.  So
18   is there a reason for -- so I can't pull it
19   up, I can't show it to you, that kind of
20   thing.  Is there a reason for that or is
21   that -- it's the one above it also doesn't
22   have an exhibit.  So you couldn't find it
23   or?
24   A   I'd have to check to see whether

Page 188

S. CORNELL

1    or not it's an oversight or there's a
2    secondary reference, but no easily available
3    copy of the primary.  I could certainly
4    track that down.
5    Q   Okay.  Well, for purposes --
6    A   Most likely explanations.
7    Q   For purposes of right now, if you
8    needed to look at it to compare side by side
9    and talk about how it compares to the
10   Massachusetts statute, the fact is that at
11   this moment in time, you can't do that
12   'cause I don't have it pull up, right?
13   A   Right.
14   Q   And then you go into a discussion
15   regarding State versus Buzzard.  I can't
16   remember if that was already brought up.
17   But you gave a few paragraphs here about
18   prohibiting concealed carry.  Open carry was
19   generally allowed; is that fair to say?
20   A   So that is an extremely
21   complicated issue.  The southern law --
22   sorry, the southern jurisdictions, some of
23   them took the view that you can ban conceal
24   carry, but you had to allow open carry, and

Page 189

S. CORNELL

1    then outside of the south, there's a more
2    broad ranging prohibition that you can't
3    travel armed in public without a good cause.
4    Q   So just like today it seems the
5    state of the law sometimes depends on the
6    jurisdiction that you're looking at?
7    A   I think that is an important
8    insight in one that is quite applicable to
9    virtually every aspect of American criminal
10   law, but in particular laws dealing with
11   firearms.
12   Q   Okay.  And when we petition the
13   Supreme Court about it, we call that circuit
14   splits.  So, okay.
15   A   Right.  But of course, remember
16   the incorporation of the Second Amendment,
17   most of these are jurisdictional splits into
18   state courts, so there is no --
19   Q   Sure, sure.  When it comes to at
20   least the Second Amendment, yeah.  These
21   questions remain -- a lot of these questions
22   remained unanswered where the differences
23   remained for a very long time.
24   I guess I want to go back to that

S. CORNELL

**complicated discussion about lineal restrictions and to novel solutions to novel problems. Bottom of page 10, you start talking about concealed weapons in public. Now, as it turns out, now every state to some degree allows concealed weapons in public, yes?**

A So the way I would phrase that is currently in America we have two models, may-issue states and shall-issue states. There are no states with across-the-board prohibitions or total prohibitions.

**Q Okay.**

**So were there -- let me see if I understand what you said earlier. So the south permitted open carry and generally prohibited conceal carry, and the north you're saying generally prohibited carry at all without a good reason?**

A Yes.

**Q Okay. And is that like Mason-Dixon line, north-south, or is there some other --**

A So it's not quite a Mason-Dixon



S. CORNELL

line. There is -- so in the 1830s Massachusetts enacts a more restrictive public carry regime and states both in New England, the Midwest, and the far west adopt at least one of the pair of statutes that Massachusetts adopted. So there are number of states in both the north, the Midwest, and the far west that adopt this -- I wouldn't say it's universally adopted.

**Q I'm sorry. This is what?**

A This new more restrictive -- sorry, this Massachusetts-based restrictive regime.

**Q Okay. Now, I read you talking about a case, and if you don't remember which one I'm talking about, that's fine. Although I suspect it's the Buzzard case that is here on the first main paragraph of paragraph 11. Where you talked about -- forgive me, maybe it's even later in the report and I just don't remember it. But State versus Buzzard where the Supreme Court justice there for Arkansas said something to the effect of these dirt pistol stored of**



S. CORNELL

**course can't be carried and concealed, and I can't understand how anybody would think otherwise. Does that ring a bell?**

A Certainly, State V. Buzzard is a case that doesn't take a broad libertarian view of the right to carry in public. And because all those statutes generally were conceal carry statutes, the main issue for the court is conceal carry.

**Q Okay. But the court in Buzzard differentiated between dirks, pistols, swords, sword in a cane, or other dangerous weapons, which I think you called something like an abomination or something like that.**

A Right.

**Q Or an affront of human decency or something of that sort.**

A Right.

**Q With other pistols that were like commonly used for like militia. Am I misremembering here?**

A So there is an interesting legal tradition, and again, I have to look at the Buzzard opinion just to verify that that



S. CORNELL

language is in Buzzard as well, but there is a tradition running through a number of 19th century cases where they distinguish between militia suitable weapon and weapons that are only or primarily used for confrontation and are not suitable for civilized warfare.

**Q So back then in the time of State V. Buzzard, which was 1842?**

A Yeah. It's 18 --

**Q It's in the footnotes. I read it. 1842. A differentiation between the pistol that was prohibited in Buzzard -- or I'm sorry, that's referenced saying the Indiana that you cite that's footnote 53 here about dirks, pistols, swords in a cane. There's a differentiation between the kind of pistols that are prohibited in laws such as that and the kinds of pistols, or what we would refer to say as a handgun, that was suitable for the militia service, yes?**

A Yes. That distinction comes up in a number of jurisdictions.

**Q Okay.**

MR. SIGALE: You know what,

Atkinson Baker, a Veritext Company
www.depo.com

Page 194

S. CORNELL

1
2 now I'm going to take a break.  So
3 it's 4:10.  I don't even know when
4 we last went on the record, but it
5 feels like it's been a couple days.
6 So I'm going to take a break.  We'll
7 call it ten minutes.  We'll come
8 back at 4:20.
9          (Whereupon, a recess was taken
10         from 4:10 p.m. to 4:20 p.m.)
11 BY MR. SIGALE:
12     Q   I stand by what I said, family.
13 So if you need to take care of something,
14 say so, and you can take care of it.
15     A   No worries.  I think they were
16 able to -- unfortunately, I am both the tech
17 support and IT guy in the house.  On top of
18 which is the insane requirement for
19 apartments in New York, including a
20 reference from your rabbi, your mullah, your
21 priest, and everyone you dated since junior
22 high school, and it's just ugly -- is what
23 New York apartment hunting is.  Anyway, I do
24 apologize.
25     Q   That's all right.

Page 195

S. CORNELL

1
2     I'm back on this page -- I'm
3 sorry, this Exhibit A, your report on
4 page 12.  You're talking here about the
5 licensed cases in the United States Supreme
6 Court.  Off the top of your head -- strike
7 that.
8     But Justice McClean here was
9 talking about state police power.  Actually,
10 I do want off the top of your head, if you
11 remember.  What was the police power being
12 discussed in the license cases, if you know.
13 If you don't remember --
14     A   No, no, no.  I do know.  I was
15 going to ask you to sing the Jeopardy theme
16 'cause it helps me to remember these things.
17     I think the case is -- it's one of
18 these remarkable cases from the antebellum
19 period of temperates were formed where the
20 question was whether or not some kind of
21 licensing scheme for alcohol implicated
22 interstate commerce or was wholly within the
23 state, and therefore, subject to its police
24 power authority.
25     Q   I see.  So it's in that context

Page 196

S. CORNELL

1
2 that Justice McClean was writing the
3 paragraph that you see under --
4     A   Yes.  That's correct.
5     Q   -- that you see underneath.
6     So the evil to be remedied in that
7 case was alcohol use?
8     A   Yeah.
9     Q   If you remember, did -- was
10 there -- Justice McClean might have wrote
11 that it wasn't susceptible of an exact
12 limitation, but was there a limitation?
13     A   So now I'm trying to remember.
14     Q   And I'm sorry.  I'm asking that in
15 more generic terms.  I'm not asking about
16 alcohol on Sunday type that.  I'm asking
17 about the limitations of the state police
18 power in general in the case.  Did Justice
19 McClean talk about that?
20     A   I don't -- and it's also classic
21 Taney court decision, so they're about five
22 different opinions in the case.
23     Q   I see.
24     A   If you recall, Dred Scott had
25 like, you know, every justice wrote an

Page 197

S. CORNELL

1
2 opinion in that case.  So I just -- it's one
3 of those complicated Taney court decisions.
4     Q   So was Justice McClean, was he --
5 I mean, I can go look it up, I guess, if we
6 need to, but I'm just asking if you know.
7 Was Justice McClean even the lead author?
8     A   I think it's in concurrence with
9 Justice Taney.
10     Q   Okay.  So then your next paragraph
11 actually hits home literally.  You talk
12 about regulations of gunpowder and
13 prohibitions on discharge of firearms, and
14 you talk about two ordinances, and I just
15 want to run through them.  So I want to go
16 back to your Appendix 1, Exhibit D.
17     And there were two.  There's a
18 town of Danville and a town of Quincy.  Town
19 of Danville, I think you put it in your --
20 to leave the error in the original.  And
21 then the town of Quincy.  So 1841.  Okay.
22 So that's Exhibit 22.
23     Sorry.  But I do know -- I do know
24 I saw it in here in your -- oh, here it is,
25 Exhibit 30.  So I said 22 and 30.

Atkinson Baker, a Veritext Company
www.depo.com

S. CORNELL

2  Now to share them with you.

3  (Whereupon, The Revised

4  Ordinances of the City of Quincy

5  was marked as Defendant's

6  Exhibit A22 for identification

7  as of this date.)

8  BY MR. SIGALE:

9  Q   All right.  This is Exhibit A22.

10  This is your Exhibit 22, and this is -- I

11  guess I went a little bit out of order, but

12  it doesn't matter.  City of Quincy, and this

13  is the document that you were referring to,

14  if I can go to page -- here, page 12, the

15  quote here, that's footnote 64.  That's what

16  you were referencing there.

17  A   Right.

18  Q   And I confess to you, Doctor, I

19  read a whole bunch about hogs and pigs

20  wondering why on earth am I reading this,

21  and why did you give me this, before I

22  realized that I just had to keep reading.

23  A   So it is interesting about how

24  prevalent hog and pig issues were.

25  Q   Well, I'll go with you on that,

S. CORNELL

2  but I kind of forgot about it when I started

3  reading about how I was not allowed to

4  halloo in Quincy, and that kind of took my

5  mind off the pork laws.

6  A   Fair enough.

7  Q   So I get to section five here.

8  This is page 4 of the PDF, and discharge of

9  firearms is prohibited.  Yeah.  Page 4, and

10  it's section five.  "That no person shall,

11  within the limits of said city, fire or

12  discharge any cannon, musket, rifle, fowling

13  piece, or other fire arms, or air-gun,

14  except in cases of necessity, or in the

15  performance of the public or lawful act of

16  duty, or discharge or set off any cracker,

17  rocket, torpedo, squib, or other fire works,

18  within the limits of said city, without

19  permission first obtained from the Mayor or

20  one of the Aldermen, or Marshal of said

21  city."  There's a penalty if you break that

22  rule.  What is this?  Is this a -- if I'm

23  reading it with the other sections about

24  halloing and shouting, it appears to be some

25  sort of noise, don't disturb the peace kind

S. CORNELL

2  of ordnance.  And so I'm asking you if it's

3  that or is it some sort of fire suppression,

4  something or other, like the Boston one we

5  talked about earlier, if you know?

6  A   Sure.  I mean, I think it's laws

7  of this nature generally fall under offenses

8  against the public peace, which is a fairly

9  broad category dating back to Blackstone.

10  Blackstone has a whole section on various

11  kinds -- the offenses against the king's

12  peace, against the public peace, offenses

13  against individuals, and I think these

14  public discharge laws are about noise, fire,

15  and possible harm that can come if you are

16  discharging a firearm in a crowded place.

17  Q   Well, it doesn't say crowded

18  place, does it?  It just says within the

19  city limits.

20  A   Right.  So I think what this is a

21  good example of is that the level of

22  regulation in public where people gather has

23  always been considerably greater than it

24  would be, for instance, if you were walking

25  on your estate or traveling far from any

S. CORNELL

2  city or town.  That there's always been a

3  recognition in Anglo-American law that

4  whatever rights you have with weapons,

5  particularly firearms, are subject to

6  different kinds of regulations, depending on

7  where you are.  So it's kind of a time,

8  place, and manner restriction, I suppose.

9  Q   Well, okay.  I'm sorry.  I hear

10  what you're saying in general, but this is

11  just, you're not permitted to do it within

12  the city limits.  So that includes your

13  backyard.  It includes the public market.

14  It includes the orchard, the deserted

15  orchard on the outskirts of town, five miles

16  away.  So it encompasses all of that,

17  correct?

18  A   Correct, yeah.

19  Q   Okay.  So the third line of it

20  says, "except in cases of necessity."

21  Do you have a understanding what

22  cases of necessity meant?

23  A   I think the locus classicus of

24  that would be a legitimate self-defense

25  claim.

Atkinson Baker, a Veritext Company
www.depo.com

Page 202

S. CORNELL

2  Q   Okay.  So then we go to A30.
3      (Whereupon, Danville Ordinances
4      1855 was marked as Defendant's
5      Exhibit A30 for identification
6      as of this date.)
7  BY MR. SIGALE:
8      Q   Which is an act to incorporate the
9  town of Danville, right down in the 217.  It
10 looks like this is the initial creation of
11 the town ordnance.
12     A   Correct.
13     Q   And you -- well, you were kind
14 enough to underline the parts I guess you
15 thought pertinent.  So kind of like a
16 little -- some guideposts there, so I
17 appreciate that.
18     So we're talking about the
19 creation of the police, what is it, the
20 police justice, and it says that "The
21 Legislative Powers of the Council"
22 presumably the town council.  We get down to
23 paragraph 16, which I think is the part that
24 you quoted in the report.
25     "To regulate the storage of tar,

Page 203

S. CORNELL

2  pitch, rosin, gun-powder and other
3  combustible materials."
4      The combustible materials part at
5  the end leads me to believe that this is a
6  fire suppression or a fire prevention
7  regulation; is that what this is?
8      A   Fire and explosion, of course.
9      Q   Okay.  I don't think there was
10 anything else in there that you...
11     Okay.  I'm going to stop the share
12 for one second.
13     You write about the police power
14 during reconstruction, and you talked
15 earlier in the day about that a lot of the
16 gun control, the school of thought, I guess,
17 originated the during the collective rights
18 theory, originated from reconstruction, and
19 we talked about a number of reasons to
20 remedy the black coats, to try to stem the
21 violence and whatnot from white marauders.
22 And you write here that "Reconstruction era
23 republicans used government power
24 aggressively to protect the rights of the
25 recently freed slaves and promote their

Page 204

S. CORNELL

2  vision of ordered liberty."
3      A   Right.
4      Q   That included, as you note a
5  couple of sentences later, their right to
6  bear arms.
7      A   Correct.
8      Q   Okay.  So reading this sentence
9  here about protecting the right of
10 African-Americans to bear arms but being
11 equally insistent on an acting strong,
12 racially neutral regulations aimed at public
13 safety.  What was the public safety that
14 they were concerned about, if not the
15 violence against African-Americans and
16 violence against reconstructionists, who
17 they almost certainly resented mightily.  Is
18 that what you meant by public safety there
19 at the end of that sentence, right before
20 footnote 67, or were you referring to
21 something else?
22     A   So the paramilitary terrorist
23 violence is a part of what's of concern, but
24 also just interpersonal violence is also of
25 concern.

Page 205

S. CORNELL

2      Q   What specifically was a concern?
3      A   Well, you had high levels of
4  homicide, high levels of intimidation.  So
5  there were sort of collective efforts by
6  organizations like the Klan, there were
7  individuals who, for perhaps less overtly
8  political but more interpersonal reasons,
9  were engaged in acts of violence or
10 intimidation.
11     So this period of American
12 history, particularly in the south, was
13 extremely violent and has incredibly high
14 levels of interpersonal violence, and some
15 of it is collective in the nature like the
16 Coalfax massacre, and some of it is highly
17 individualistic.  People often with a racial
18 animist, sometimes political animist, or
19 sometimes just animist.
20     Q   So the Coalfax massacre, just to
21 use the example you gave, was -- that was
22 basically an effort to terrorize black
23 people and retaliate, for lack of a better
24 word, for wanting to have the right to bear
25 arms and to assemble?

Atkinson Baker, a Veritext Company
www.depo.com

S. CORNELL

2    A   Those are two important parts of
3  the dynamic at Coalfax.  The other part of
4  it was a disputed election over who would be
5  sheriff.
6    Q   Okay.  So, right, voting.  So
7  voting rights.
8    A   Yeah.
9    Q   And then you talk -- and so there
10  was -- obviously that -- so that falls under
11  the category I think of protecting the
12  freedman from violence, and then there was
13  individual -- individual violence towards --
14    A   Right.  So you have violence
15  against republicans because of their support
16  for African-American rights.  And you have
17  violence against African-Americans.  And
18  then you just have interpersonal violence
19  for, you know, revenge, you know, financial
20  gain, all this sort of law-and-order
21  motivation, so to speak.
22    Q   Okay.  So how did the republicans
23  in this reconstruction era, how did they go
24  about protecting the rights of
25  African-Americans to bear arms but somehow

S. CORNELL

2  still enact strong regulations?
3    A   So, the, -- excuse me, a variety of
4  tactics.  So one of the things that they do
5  is, of course, they recreate militias in the
6  south, but allow African-Americans to join,
7  which of course means that sort of
8  proconfederate racist whites will no longer
9  participate in the militia, so these
10  militias become known at the time as
11  quote/unquote Negro militias, and they
12  become vital for protecting
13  African-Americans, protecting republicans,
14  and ensuring public safety.  So there's that
15  part of the story.  There's also neutral
16  laws against public carry that are passed
17  and targeted par prosecutions of
18  paramilitary organizations like the Klan and
19  Klan-like organizations.  So republicans
20  take a very kind of activist approach to
21  dealing with the unprecedented levels of
22  violence in the reconstruction south.
23    Q   Okay.  You quote the Texas
24  statutes, looks like somewhere around 1873
25  would be the statute -- where the statute is

S. CORNELL

2  from?
3    A   Yup.
4    Q   First of all, "Any person carrying
5  on or about his person, saddle, or in his
6  saddle-bags, any pistol, dirk, dagger,
7  slung-shot" -- is that supposed to be
8  slingshot?
9    A   It's just the way -- describe
10  slingshots.
11    Q   Say again?
12    A   It's just a sort of colloquial
13  description of a slingshot.
14    Q   Oh, okay.  "Sword-canes, spear,
15  brass-knuckles, bowie-knife, or any other
16  kind of knife."
17        First of all, is this the same as
18  that discussion in Buzzard where these are
19  like lowbrow weapons that are and Nasa would
20  have had to civil society, but not referring
21  to the kinds of militia type weapons that
22  say civilized honorable people would have
23  carried?
24    A   So I think this law is a little
25  bit more robust and sweeping because the

S. CORNELL

2  perception is the danger of widespread
3  armament and violence in the reconstruction
4  south has caused so much mayhem, that the
5  level of regulation is actually more intense
6  than it was in the antebellum period.
7    Q   Okay.  And, Professor, I'm not
8  trying to be glib here, or Professor,
9  Doctor, I'll use them both --
10    A   Or in Germany, we'd say Herr
11  Dr. Professor.
12    Q   All right.  The statute says,
13  "Unless he has reasonable grounds for
14  fearing an unlawful attack on his person,
15  and that such ground of attack shall be
16  immediate and pressing."
17        It seems to me that being anything
18  other than a white confederate would give
19  you a reasonable ground for fearing an
20  unlawful attack on your person during that
21  time period; is that fair to say?
22    A   Well, not in a sense which those
23  terms are used in this statute.  There's a
24  long tradition in self-defense law, which
25  hasn't figured as prominently in the Second

Atkinson Baker, a Veritext Company
www.depo.com

Page 210

1    S. CORNELL
2  Amendment clause perhaps as it should,
3  although there was a wonderful article in
4  the California law review not too long ago
5  on the relationship between the history of
6  self-defense law and Second Amendment law,
7  and it points out at that, for quite a long
8  time, the definition of this reasonable fear
9  has always required a very precise and
10  imminence kind of test.  So a generalized
11  fear would not meet the standard.  The legal
12  standard required an immediate and concrete
13  threat, not a generalized threat.
14    Q    So are you saying that the
15  freedmen in Texas wasn't enough for the
16  white confederates to say we're coming to
17  get you, boy.  They actually had to be at
18  your front -- they had to be like out on
19  your property with a rope before you could
20  actually arm yourself to defend yourself; is
21  that a --
22    A    No.  That's not what I'm saying at
23  all.  First of all, there are two things.
24  So this is about carry, not about possession
25  in the home.  So that's a separate question.

Page 211

1    S. CORNELL
2  And if you thought that someone was coming
3  to get you, that is an imminent and specific
4  threat.  So, for instance, there's a
5  difference between saying so-and-so made a
6  threat against me, so-and-so has harassed
7  me, so-and-so has shown concrete evidence
8  that they are threatening me, and saying the
9  world's a dangerous place, there are threats
10  out there.  The law has typically treated
11  those two things as very different claims.
12    Q    It feels like the lines would have
13  been blurred a lot more back then in that
14  part of the country, no?
15    A    Well, I think it depends on the
16  facts on the ground, which varied
17  enormously.
18    Q    Sure.  Okay.  And I don't want get
19  into -- I'm sure we could come up with
20  hypotheticals for both okay and not okay,
21  and I don't want to do that.
22    So this was -- so like today,
23  reasonable grounds was a fact-specific
24  inquiry that might have been in the hands of
25  a judge or a jury?

Page 212

1    S. CORNELL
2    A    Right.  Well, the -- it's worth
3  clarifying.  So this model that we're
4  talking about is an affirmative defense
5  model.  So you make a decision, I am indeed
6  facing a discernible and imminent threat.  I
7  decide to arm, as is my right, and then if
8  you are prosecuted, which you may or not
9  meet, depending on the jurisdiction and the
10  circumstances, you are able to make an
11  affirmative defense that my decision to arm
12  on this occasion was entirely consistent
13  with my right to arm in the case of an
14  imminent and specific threat.
15    Q    All right.  The last line there on
16  this paragraph -- last sentence on this
17  page, "Restrictions were also adopted
18  prohibiting guns in locations deemed to be
19  essential to public or civic life."
20    That sentence does not include the
21  home; is that fair to say?
22    A    So the places that are listed
23  specifically are places like schools,
24  churches, places where education or
25  socializing occur.  So I suppose it's an

Page 213

1    S. CORNELL
2  interpretive question whether the home in
3  some situations would fit that bill or would
4  not fit that bill.
5    Q    Okay.  Was this -- that sentence,
6  is it referring to the carrying that is
7  listed in the previous paragraphs?
8    A    I think that's an introduction to
9  the next statute, but I can check my copy
10  here.  So, yes.  Yeah.
11    Q    So I'm right.  It's unlawful for
12  any person to carry a gun or sword or
13  bowie-knife or other dangerous weapon on
14  election day, within a half mile of polling
15  places -- oh, that's the whole statute.
16    If you know, what happened if you
17  lived within a half mile of the place of
18  election?
19    A    I don't know.
20    Q    Okay.  Did carry mean on ones --
21  on the statute on the top of 14, where it
22  says, "Unlawful for any person to carry any
23  gun, pistol" et cetera.  And then it says,
24  "Concealed or unconcealed."
25    Is it -- do you understand that

Atkinson Baker, a Veritext Company
www.depo.com

Page 214

1       **S. CORNELL**
2   **carry there to mean like loaded on one's**
3   **person?**
4       A   You know, the fascinating thing
5   again about this period, jurisprudentially,
6   is you have numerous cases, and some them
7   take the view that even if it's unloaded, it
8   still violates the statute.  There's one
9   famous case where the pistol is
10  disassembled, and it clearly was ruled not
11  to violate the statute.  So there is some
12  range of views of these courts on -- and
13  there are some slightly differences between
14  state statutes.  So I don't think you could.
15  I haven't tried to figure out which of those
16  models was most prevalent, but my reading of
17  the material seems to suggest there are a
18  range of different constructions of what
19  that would mean.
20      Q   Okay.
21          MR. WENZLOFF:  David, just so
22      we can maybe adjust our
23      expectations.  It's a little after
24      5:00 now.  Do you have a sense as to
25      how much more, how much longer you'd

Page 215

1       S. CORNELL
2   expect this to go?
3           MR. SIGALE:  Sure.  Give me a
4   minute.
5           MR. WENZLOFF:  Thanks.
6           MR. SIGALE:  Off the record.
7           (Whereupon, a recess was taken
8           from 5:03 p.m. to 5:08 p.m.)
9   BY MR. SIGALE:
10      **Q   And I understand, again, Doctor,**
11  **that this whole thing brings up that linear**
12  **discussion that we were having earlier, but**
13  **you talk here on section C that's on the**
14  **screen, page 15.  You mention about Tommy**
15  **guns being banned when they became too**
16  **popular, and you used by gangsters during**
17  **movies such as The Untouchables and any**
18  **machine gun or firearm that can be fired,**
19  **also banning mufflers and silencers.  That's**
20  **a Michigan law from 1929, and then Minnesota**
21  **banned silencers in 1913.**
22      **Is it your understanding, Doctor,**
23  **that this case in no way involves silencers**
24  **or Tommy guns or machine guns?**
25      A   Yes.  To the best of my

Page 216

1       S. CORNELL
2   understanding, there are no Tommy guns
3   involved in this case.
4       **Q   Okay.  And I'm going to stop the**
5   **share for a second.  I'm going to find that**
6   **exhibit.  I don't know if it's --**
7   **Exhibit 81, the Chicago municipal code of,**
8   **what is it, 1922 I think.**
9       A   Is it referenced in the report?
10      **Q   Yeah.  I mean, that's the only**
11  **reason I would have noticed it.**
12      **It's not included.  It's not an**
13  **exhibit.**
14      A   So are we talking about footnote
15  87 or are we talking about footnote 94?
16      **Q   No.  You're being overly**
17  **ambitious.  I'm talking about footnote 81.**
18      A   Oh, okay.  Sorry.  I'm a little
19  ahead of you.
20      **Q   All right.  Well, I looked, and**
21  **it's referenced in your -- the Appendix 1,**
22  **but you didn't attach a copy, you couldn't**
23  **find it, for whatever reason.**
24      **Do you recall off the top of your**
25  **head what this comprehensive permitting**

Page 217

1       **S. CORNELL**
2   **scheme for the sale of purchase and pistols**
3   **and other easily concealed weapons said?**
4       A   Not off the top of my head, I'm
5   afraid.
6       **Q   Okay.  I will stop the share.**
7   **I'll take a second, and I'll see if I can**
8   **find your Salt Lake City that you say is**
9   **similar.  That's Exhibit 119.  Give me a**
10  **second.  I'll pull it up.  I'm going to the**
11  **chat, and I will add Exhibit 119 that you**
12  **all have now.  And I will put it up on the**
13  **screen.**
14      **All right.  If I can refer back**
15  **though for a second.  This is, you write**
16  **about Chicago's 1922 municipal code, and**
17  **then you say Salt Lake City enacted a**
18  **similar law, and that's that 1920 revised**
19  **ordinance of Salt Lake City, which is**
20  **Exhibit 119.**
21          (Whereupon, Revised Ordinances
22          Salt Lake City was marked as
23          Defendant's Exhibit A119 for
24          identification as of this date.)
25

Atkinson Baker, a Veritext Company
www.depo.com

Page 218

S. CORNELL

1   S. CORNELL
2   BY MR. SIGALE:
3       Q   Okay.  So these are -- oh, wow.  I
4   just noticed the first couple of lines of
5   that.  Okay.  Section 1156, unlawful for
6   parents to permit a minor to possess a
7   firearm arm, air gun, or instrument designed
8   to throw missiles.  Is that like a bow and
9   arrow?
10      A   Interesting.  There are so many
11  discarded technologies, you know, from
12  slingshots, and I would have to do some
13  digging to figure out what -- whether they
14  are talking about a technology that we still
15  use that has a different name or whether
16  this is some, you know, fad that was causing
17  some problems in Salt Lake City at this
18  particular moment and has never been heard
19  from again.
20      Q   Okay.  Anyway, so there's part of
21  the law that parents or guardians are not
22  allowed of to have minors allowed to possess
23  or use firearms, air guns, or the missile
24  throwers.  Persons shall not give or furnish
25  any minor any firearm, air gun, or other

Page 219

S. CORNELL

1   instrument designed to throw missiles.  And
2   if you sell a firearm or explosive, you need
3   to keep a record of it.
4
5       A   Right.
6       Q   Okay.  And that's the main page of
7   this document.  So, again, using the -- you
8   know, going back to that linear discussion,
9   if this case doesn't involve selling
10  firearms to minors or necessarily allowing
11  them to possess or use a firearm, I think
12  there might be a distinction between taking
13  a foster child say hunting or something or
14  one to a firing range for training or
15  something like that, but short of that,
16  certainly you wouldn't give them any,
17  unsupervised, any firearm ever, but going
18  back to that linear discussion, does this
19  have any specific applicability to this
20  case, does this Utah -- let me rephrase
21  that.
22          Does this Utah, Salt Lake City
23  ordnance, I should say, have any -- what's
24  the relevance to this case?
25      A   So this is a quite wide ranging

Page 220

S. CORNELL

1
2   and strong limit on access of firearms to
3   minors, and as you point out, section 1156
4   makes it unlawful for a parent or guardian
5   having charge or control of any minor to
6   allow such a minor to possess or use in any
7   place, either private or public, within the
8   city limits with a firearm.  So this kind of
9   law seems to me to be fairly on point for
10  this particular litigation because requiring
11  firearms to be locked up or made unavailable
12  or maybe, even in some cases disassembled,
13  could be or is one way to effectuate the
14  principle here that you can't have a working
15  firearm that can be obtained by a minor in a
16  home.
17      Q   So if there was no challenge in
18  this lawsuit regarding the ability to let a
19  minor possess a firearm, assume for purposes
20  of this question that that is the case,
21  there is no -- there's no issue in this
22  lawsuit, no legal claim to allowing minors
23  to possess firearms; does that change your
24  answer at all?
25          MR. WENZLOFF:  Objection as to

Page 221

S. CORNELL

1
2   the form of the question.  Calls for
3   Incomplete hypothetical.  Calls for
4   speculation.  You can answer the
5   question.
6       A   I guess I'll have to ask you to
7   rephrase that.  I'm not sure what you're
8   asking me.
9   BY MR. SIGALE:
10      Q   Okay.  You mentioned that you
11  thought this case had some relevance because
12  it prohibits minors from, in Salt Lake City,
13  from possessing firearms?
14      A   Or having access to.
15      Q   Or having access to.  So if
16  there's no claim to the contrary in this
17  case, does that change your answer?
18          MR. WENZLOFF:  Same objection.
19  You can answer.
20      A   I'm not sure what the claim to the
21  contrary means in this context.
22  BY MR. SIGALE:
23      Q   There's nobody -- there's no legal
24  claim that the plaintiff should have the
25  right to allow their minor foster children

Atkinson Baker, a Veritext Company
www.depo.com

1           S. CORNELL
2  or day care children to have access to
3  firearm arms, no one's arguing for that?
4           MR. WENZLOFF:  Same objection.
5      You can answer.
6      A   So it seems to me that the
7  principle, or to go back to a common
8  principle of statutory construction familiar
9  to the founding generation, and I think
10  still one quite familiar to this generation,
11  in reading a statute, one of the ways to
12  understand what the statute means is to
13  inquire to the mischief to be remedied.
14          So the mischief to be remedied in
15  this case is the danger posed by having easy
16  access to firearms in a home.  And it seems
17  to me that the issue in the case before us
18  is whether or not in a foster home, which is
19  a less stable environment in some ways than
20  a natural home, assuming the natural parents
21  are properly parenting, that having easy
22  access to firearms in that situation is also
23  perilous, and the state has an even greater
24  interest in ensuring that those children are
25  safe.

1           S. CORNELL
2      So it seems to me, again, that
3  this is, to go to your phrase, a lineal
4  antecedent.  This is a very clear example of
5  a lineal antecedent of the kind of laws at
6  issue in this case.
7  BY MR. SIGALE:
8      Q   So are you able from your
9  historian hat, are you able to define what
10  easy access means?  You use the phrase about
11  easy access to firearms.  Can you define
12  what easy access means?
13     A   So this statute actually is more
14  prohibitive than the turn of the phrase I
15  used.  It says that it's unlawful for a
16  parent to allow any minor to control --
17  sorry, having the charge or control of any
18  minor, to allow or permit such minor to
19  have, possess, or use a firearm.  So this
20  statute suggests that if you do not take
21  appropriate steps to prevent your minor in
22  your charge from having access to that
23  firearm, you are in violation of this
24  statute.  That would be my reading.
25     Q   Okay.  Not that anyone's arguing

1           S. CORNELL
2  for it in this case either, but in your
3  reading, in the historical sense, did allow
4  or permit quote/unquote as used in this
5  section 1156, did that include say
6  negligence, or did it have to be -- or did
7  it include, I did everything I could, but
8  somehow the kids still got at it, or does it
9  have to be, here Johnny, Merry Christmas; is
10  that what allow or permit means?
11          MR. WENZLOFF:  Objection as to
12      the form of the question.  You can
13      answer, if you understood.
14     A   Right.  I'm thinking about Merry
15  Christmas, Johnny, for a moment.  So my
16  sense is, and now we're getting into some
17  interesting questions about both tort law,
18  criminal law, that are a little bit beyond
19  my area of expertise about --
20  BY MR. SIGALE:
21     Q   Okay.  If that's the case, then go
22  ahead and say so.  I mean --
23     A   Okay.  So if you want me to try
24  and flush out how this statute would have
25  been applied at the time, I'd have to say I

1           S. CORNELL
2  have not thought about that yet, and I am
3  not sure that my expertise would allow me to
4  opine on that without a lot more research.
5      Q   Okay.  Well, it seems that allow
6  or permit requires some sort of affirmative
7  act or affirmative assent.  I'm allowing or
8  permitting this to happen.
9          MR. WENZLOFF:  Objection.
10     Asked and answered.
11  BY MR. SIGALE:
12     Q   Would you agree with that?
13          MR. WENZLOFF:  Oh, I'm sorry.
14     Calls for speculation.  You can
15     answer the question.
16     A   I don't know if I would agree that
17  allow or permit necessarily, either an
18  ordinary English usage or in its legal
19  usage, would only cover deliberate and
20  intentional act.
21  BY MR. SIGALE:
22     Q   Okay.  And probably we could agree
23  that if this same -- first of all, that a
24  judge in Salt Lake City, I know this is a
25  Salt Lake City ordnance, but a judge in Salt

Atkinson Baker, a Veritext Company
www.depo.com

Page 226

1      S. CORNELL
2  Lake City might interpret it differently
3  than the same ordnance as a judge in Provo,
4  right?  And that'd be -- and possibly
5  different from the same ordnance in Colorado
6  or in New Mexico or in Massachusetts?
7      A   That's certainly possible, but
8  without some case law and some comparisons,
9  it would be hard to offer an opinion.
10     Q   Okay.
11     A   But it's theoretically possibly,
12  certainly.
13     Q   Sure.  As we sit here, we don't
14  know how this section 1156 was enforced in
15  Salt Lake City, and we don't know how it
16  might have been interrupted, how that
17  prohibition year might have been interpreted
18  in similar situations in other
19  jurisdictions; fair to say?
20     A   Yeah.  I think that is fair to
21  say.
22     Q   Okay.  So then we get to the last
23  few pages of your report, and then I want to
24  go through that, and then I'm going go
25  through some of those ordnances with you, a

Page 227

1      S. CORNELL
2  few more that we discussed.  And maybe if at
3  all, save a little bit of time.  Maybe I'll
4  just throw them up on the screen, and maybe
5  I can forward them to Kiara after.  In that
6  way, I can do the typing and emailing after
7  this is over.  Save a few minutes on the
8  front end.
9          So we get to this section here,
10  section D, page 16, about children, minors,
11  and schools.  And so you talk about how
12  there's a period here where the well-being
13  of the child became the guiding principle in
14  the law, and Joseph Story saying that the
15  authority of parents and guardians, far from
16  being some sacrosanct fundamental right,
17  actually depends on the rules of the state,
18  and the state can change those rules and
19  enlarge them and limiting.
20          And you quote Jeffrey Shulman
21  there.  Is that basically correct?
22     A   So I think probably the best way
23  to summarize that would be, as we start with
24  the Blackstonian common law vision.  That is
25  an exceedingly patriarchal vision, and it's

Page 228

1      S. CORNELL
2  a vision that is sort of modeled on the
3  English idea of monarchian authority, and
4  one of the consequences to the American
5  revolution is that family law and domestic
6  law are republicanized so that rather than
7  mirroring autocratic densely theoretical and
8  patriarchal authority, parents now are also
9  subject to the law and their power over
10  their children is diminished, and the law
11  provides a means of protecting children by
12  insisting that parental authority must be
13  exercised in a humane way consistent with
14  the well-being of the child.
15     Q   Okay.  And that really isn't all
16  that controversial, right?  I mean, here in
17  America, in modern American, you beat your
18  kid, you're probably going to go to jail,
19  and they are going to get taken away from
20  you.
21     A   Yeah.  But it is important to
22  recognize that that was a major historical
23  change and great step forward in terms of
24  children's rights and generally a more
25  humane vision of family in domestic law.

Page 229

1      S. CORNELL
2     Q   Okay.  The second sentence of this
3  paragraph, "By mid century" -- and by that,
4  I assume you mean the mid 19th century?
5     A   Yeah.
6     Q   "The problems posed by minors
7  prompted an expansion of government limits
8  on access to firearms."
9          I'm channeling Bye Bye Birdie, I
10  suppose, but what were the problems posed by
11  minors?
12     A   You're not going to burst into
13  song for us?
14     Q   There's another way to phrase that
15  right there that I'm not going to do.
16          What were the problems posted by
17  minors?
18     A   So sorry.  Just a parenthetical,
19  my beloved late mother was a junior high
20  school music teacher, and directed Bye Bye
21  Birdie, so you touched an emotive chord in
22  me when you referenced that.
23          So to get back to your question,
24  this period between, just prior to the civil
25  war to just after the civil war, was a

Atkinson Baker, a Veritext Company
www.depo.com

Page 230

S. CORNELL

2 period of intense economic and social
3 transformation in America, including a
4 significant expansion in the urbanization
5 and the expansion of industrialization.  So
6 that young people, particularly young men,
7 were much more likely to be able to free
8 themselves from the authority of their
9 parents by going to work in a factory or by
10 leaving the small town and seeking
11 employment in the city like Chicago.
12        And one of the consequences of
13 that is you had many more unsupervised young
14 people in crowded conditions in urban areas,
15 and that of course, lead to the increase of
16 crime, disease, a whole series of
17 undesirable social effects.  So with that
18 social transformation, there came a need for
19 greater regulation.
20    Q    So when you write in the middle of
21 this paragraph right after the 85 footnote,
22 "By the end of the nineteenth century, a
23 number of states and localities had enacted
24 laws aimed at prohibiting minors from
25 obtaining access to guns or ammunition."

Page 231

S. CORNELL

2        Are these the minors that are
3 living at home with mom and dad, or are
4 these the minors that were out on their own
5 living in factories -- or working in
6 factories and living the urchin-style while
7 pickpocketing the local folk, the high-born,
8 at the fair?
9    A    So there's both a kind of a
10 Dickensian side of the story, and a less
11 Dickensian side of the story.  Some of the
12 statutes do not single out that possession
13 or purchase of firearms or use of firearms
14 are allowed if they are done with consent
15 and knowledge of parents.  And some statues
16 are more categorical.
17    Q    But the impetus for these laws
18 that you are referencing were out of the
19 emancipated working in factories and
20 pickpocketing the gentry in the public
21 square type people, right, minors, that was
22 the impetus?
23    A    Well, it's a little bit hard to
24 say because there are also -- there is also
25 some evidence of -- anecdotal evidence where

Page 232

S. CORNELL

2 a young person will end up shooting someone
3 at school.  Obviously, if they are attending
4 school, they are not completely on their
5 own.  They're very likely in some
6 supervised, probably in a parental-headed
7 household.  So I wouldn't -- it certainly
8 will have a lot more inquiry say
9 definitively what was driving this -- both
10 of those scenarios exist, and I haven't --
11 and I'm not even sure one could identify
12 which was the driving force behind the
13 statute.
14    Q    Okay.  So the South Dakota law
15 that you reference there, it's footnote 86,
16 that made it unlawful for any person under
17 the age of 15 years to carry, use, or
18 discharge any rifle, shotgun, revolver, or
19 other firearms, except with the consent and
20 knowledge of their parents or guardians.
21        Would you say that was more
22 typical of the minor prohibition statutes or
23 ordnances?
24    A    I wouldn't say it's more typical.
25 I would say that in rural jurisdictions, and

Page 233

S. CORNELL

2 again, I haven't had time to try and nail
3 this down.  My intuition would be in rural
4 jurisdictions there's probably more of an
5 acknowledgment of the likelihood that minors
6 will use firearms with some parental
7 consent, and that in urban areas, it's
8 probably -- the laws are less -- the laws
9 are stricter, but I haven't -- that's just
10 an intuition.  I couldn't really quantify
11 that.
12    Q    So I want to take a look at -- I'm
13 sorry.  I want to take a look at this 87, if
14 it even is there.  Proceedings of the common
15 council.  Okay.  Exhibit 46.  I will stop
16 the share for a second.
17        (Whereupon, Proceedings of the
18        Common Council of the City of
19        Chicago was marked as
20        Defendant's Exhibit A46 for
21        identification as of this date.)
22 BY MR. SIGALE:
23    Q    All right.  Doctor, A46.  Let
24 just -- this is the procedures of the common
25 council for the city of Chicago for 1872 to

Atkinson Baker, a Veritext Company
www.depo.com

Page 234

**S. CORNELL**

1 **1873.  That is a neat font.  I don't think**
2 **we see that anymore.**
3     A   No.  I'm quite sure that's true.
4 There we go.  I think you just --
5 prohibiting the sale or furnishing minors
6 with firearms.  Sorry.  I didn't --
7     **Q   No.  You got it.  You got it.**
8        **"That no person within said city**
9 **shall sell to or in any manner furnish any**
10 **minor with any gun, pistol, revolver, or**
11 **other firearms with a twenty-five to one**
12 **hundred dollar fine."**
13        **So this one doesn't have a -- so**
14 **was this -- what was this, was this a**
15 **blanket you are not allowed to, even if**
16 **you're a parent and you want to teach your**
17 **kid to hunt, not allowed.  That that's**
18 **prohibited, or is this if you're a gun**
19 **dealer, you are not allowed to sell or**
20 **otherwise give a minor a firearm?**
21     A   I think this is a pretty broad
22 prohibition.  You obviously could do what my
23 step-dad did, which was take me hunting in
24 upstate New York 'cause that's not in the

Page 235

S. CORNELL

1 city of Chicago.
2     **Q   Okay, sure.  And well, I don't**
3 **know if in 1872 there was any place in**
4 **Chicago to hunt.  My suspicion is not many**
5 **places, but I guess I don't know.  Do you?**
6     A   I think it's fair to say by the
7 1870s, you wouldn't be hunting for much of
8 anything in Chicago, maybe bargains, but
9 that's about it.
10     **Q   Touche.  Is this an example then**
11 **of what you were describing, urban areas**
12 **that really didn't have parental consent,**
13 **whereas in more rural areas, it was more**
14 **recognized that parents were going to teach**
15 **kids how to use firearms for hunting or for**
16 **whatever purpose?**
17     A   So like I said, I didn't try to
18 correlate that or tally 'cause that would be
19 a quite arduous historical project, but
20 based on my reading of the materials, I find
21 I formed an intuition that it might, if one
22 did that sort of inquiry, what one might
23 find.  So it's a very hypothetical
24 speculative intuition, but not something

Page 236

S. CORNELL

1 that I could assert with historical
2 certainty.
3     **Q   Was Chicago from 1872 to 1873 an**
4 **example of what you are describing with**
5 **urban areas, with emancipated street urchins**
6 **working in the factories by day and**
7 **terrorizing the public at night?**
8     A   So Chicago is probably the fastest
9 growing city in America in that time period,
10 and in addition to having lots of stable
11 happy households, there was certainly a
12 growing population of young boys, and young
13 men in some cases, and that it was suffering
14 growing pains, to be sure, and it was --
15 crime was an issue of some -- crime and
16 violence in general was an issue of some
17 concern to officials in Chicago.
18     **Q   Okay.  Sorry.  88 is Texas.**
19        **Okay.  So Texas looks like, what**
20 **roughly 1873, prohibited firearms -- well,**
21 **again, let's start with what was prohibited**
22 **and then talk about where it was prohibited.**
23 **So bowie knife, butcher knife, or firearms,**
24 **whether known as sixth shooter gun, pistol**

Page 237

**S. CORNELL**

1 **of any kind.  Was that a -- did that cover**
2 **all firearms including the kind of militia**
3 **that would use or did that just cover the**
4 **sneaky, concealable, lowdown type of**
5 **firearms that only varmints and rascals**
6 **would use?**
7     A   I do love those two words,
8 varmints and rascals.  So I'm glad we worked
9 them into the deposition.  So I believe this
10 statute is interesting because sometimes
11 statutes do reference, as you've already
12 mentioned, army and navy pistols being
13 exempt.  This one doesn't exempt those.  Six
14 shooters are revolver, and are not sort of
15 the derringer-like sneaky guns.  They're --
16 I'm trying to now visualize what Colts, a
17 sixth shooter looked like in 1873, what its
18 barrel length would be.  That, I don't
19 think, I'd have to give it some more thought
20 I'd have to refresh my memory about the
21 material culture and technology of firearms.
22        But my first instinct wouldn't be
23 that that's a sneaky weapon.  This needs to
24 be a broader ban on these kinds of weapons.

Atkinson Baker, a Veritext Company
www.depo.com

Page 238

S. CORNELL

2  Q   Okay.  So this statute that you're
3  quoting here is more about the place rather
4  than the type of firearms.  So churches or
5  religious assemblies, schoolrooms where
6  people are assembled for educational,
7  literary, scientific purposes, a ballroom, a
8  social part of your gathering, election
9  days, anywhere where people may have
10  assembled a muster.  That's a militia
11  phrase, right?
12  A   Yeah.
13  Q   Or to perform any other public
14  duty or other public assembly, shall be
15  fined if they are carrying a weapon.
16      So this statute, I know you say in
17  the sentence above, individuals including
18  minors, but by and large, this wasn't just
19  by any means about minors.  I mean, this was
20  about religious gatherings, voting,
21  ballrooms.  It was more about places where
22  people gather; is that right?
23  A   Well, no.  I don't think so 'cause
24  of course it singles out schoolrooms and
25  places for educational activities occur.  A

Page 239

S. CORNELL

2  ballroom is where people go to dance.  Other
3  kinds of social gatherings.  It's a pretty
4  broad swath of -- it's basically places
5  people gather, socialize, pray or learn.
6  Q   Okay.
7  A   Which covers a fair number of
8  public activities.  It doesn't cover
9  swimming, but it certainly does cover a
10  fairly broad range of activities.
11  Q   Well, I suppose or other social
12  gathering composed of ladies and gentlemen
13  can be as broad as somebody wants to make
14  it.
15  A   Yeah.
16  Q   But none of this -- explicitly in
17  this statute, it does not prohibit firearm
18  ownership in the home.
19  A   Correct.  This is not targeting
20  home -- firearms arm in the home explicitly.
21  Q   Okay.
22  A   Although, you know, I don't know
23  enough about history of education to know
24  whether or not how much education would have
25  taken place in homes in a place like Texas.

Page 240

S. CORNELL

2  Q   Okay.
3  A   But I'd have to leave that part
4  open.
5  Q   Okay.  Well, sure.  But if we
6  don't know, then we can't really talk about
7  it.  Social party, if somebody decides to
8  host a party at their house, are you saying
9  that this statutes requires them to empty
10  their -- that they are not allowed to have a
11  firearm in their home if they are having a
12  party in their house, or is this in a public
13  place where there might be a social party?
14  A   That's an interesting question,
15  which I don't know the answer to.
16  Q   Okay.
17      You referenced -- if we go back to
18  one of these laws that in the early 1900s,
19  that allowed a parent or guardian -- that
20  prohibited a parent or guardian to knowingly
21  permit the child to have possession or
22  custody of a gun or pistol.
23      So that kind of law, that
24  knowingly permit does imply some sort of
25  intent; is that fair?

Page 241

S. CORNELL

2  A   Yeah.  That law is structured
3  differently than the other law we talked
4  about.
5  Q   Okay.  And South Dakota law
6  prohibited firearm possession by a minor
7  except with the consent or knowledge -- and
8  knowledge of their parents and guardians.
9  That's in 1903?
10  A   Correct.
11  Q   Is that the same -- I feel like
12  that's the same statute?
13  A   I wonder if that's reenactment of
14  the early statute.  We can check that.
15  Q   And then even New York set the
16  same law, according to you.  New York made
17  the same law, but just changed 15 to 16; is
18  that right?
19  A   Yes.
20  Q   Okay.  Then you talk about
21  category about the sale of toy weapons that
22  could injure or maim children.  I'm
23  chuckling because in disbelief that -- it's
24  like that Saturday Night Live about the guy
25  who owned the toy company that sold bag of

Atkinson Baker, a Veritext Company
www.depo.com

1          S. CORNELL
2  glass and other such things.
3      A   Yes.  That was a surprising find
4  about there was this category, clearly very
5  dangerous toys that were using real gun
6  powder and were made of -- and I read
7  several editorials about how horrible it was
8  that these toy guns were exploding, and in
9  effect became little hand grenades.
10     Q   So then we get to the conclusion
11  here.  I want to see if there's anything in
12  here that I want to actually ask you about.
13  So give me a moment.
14     A   Sure.
15     Q   You're not expressing any opinions
16  regarding the history of foster children,
17  correct?
18     A   That's correct.  The history of
19  foster care is not near I can claim
20  expertise in nor did I do any extensive
21  research on.
22     Q   And home day care where, by the
23  way, we're not talking about education, but
24  I guess every day you learn something.  I
25  know I do.  But did you -- are you

1          S. CORNELL
2  expressing any opinions on the history of
3  home day care?
4      A   No.  That's also nary, that's
5  beyond my expertise.
6      Q   And with regard to foster care,
7  you said it's not your area of expertise.
8  Is that true whether you're talking about
9  foster care generally or but also foster
10  care and firearms?
11     A   I would say that the history of
12  foster care is not area that I have any
13  scholar or expertise in.
14     Q   Okay.  And the same thing for day
15  care, if I -- home day care, if I say home
16  day care and firearm possession, you don't
17  have any opinion regarding that either?
18     A   I mean, yeah.  Again say that I
19  don't have any expertise in the history of
20  home day care.
21     Q   I'm going to make sure, so I'm
22  clear about something here.  'Cause you
23  referenced it in the last paragraph, and we
24  talked about it quite a bit.  You talked
25  about states and localities including

1          S. CORNELL
2  Illinois and its towns and cities have
3  regulated gunpowder and arms since the
4  earliest days of the American republic.
5          And just talking about gunpowder,
6  you cited a number of statutes that -- an
7  ordinances that appear to be about storage,
8  fire suppression, prevening explosions,
9  things like that.  Are you saying that --
10  strike that.
11         Are you making the opinion that
12  the fact that there were gunpowder storage
13  laws back in the late 1700s, early to mid
14  1800s, that that means that the state --
15  that that fact gives the state authority to
16  pass whatever firearms regulations that it
17  wants?
18     A   Well, no.  I don't think I'm
19  saying that.  I think I'm just saying that
20  if we're looking at the history of firearms
21  regulation, the regulation of gunpowder is
22  one area of that, and it has a long history,
23  and it has been expensively regulated.  The
24  question of whether that -- how that history
25  should be analogized to modern gun laws

1          S. CORNELL
2  is -- brings us back to that point we talked
3  about, how to construct proper legal
4  analogies and how to identify lineal
5  descendents of particular laws, and those
6  are complicated jurisprudential questions.
7      Q   Well, talking about complicated
8  jurisprudential questions, are you familiar
9  with the two-prong analysis of Second
10  Amendment challenges that you see in
11  cases -- well, say Ezell versus the City of
12  Chicago or some of the others that I believe
13  you've written the amicus briefs in?
14         MR. WENZLOFF:  Objection as to
15      the form of the question.  It's
16      vague.  But if you understand
17      precisely the question that's being
18      asked, you can answer.
19     A   There's something called a
20  two-step framework that has become quite
21  common among federal courts applying Heller
22  is extensively discussed in the scholar
23  literature that I'm familiar with.
24  BY MR. SIGALE:
25     Q   Okay.  So you would agree that as

Atkinson Baker, a Veritext Company
www.depo.com

Page 246

1          S. CORNELL
2    far as that two-step, that per Heller,
3    firearm possession in the home is clearly
4    within the scope of the Second Amendment
5    right?
6          MR. WENZLOFF:  Objection as to
7       the form of the question.  Calls for
8       a legal conclusion.  Vague.
9       Incomplete hypothetical.  You can
10      answer.
11      A   So my understanding of the
12   two-step framework is to first determine
13   whether the regulation of statute impinges
14   on a Second Amendment right.
15   BY MR. SIGALE:
16      Q   Right.
17      A   And then the second part of the
18   test determines whether or not the law
19   exceeds the state's authority to regulate
20   firearms, and there's quite a bit of
21   discussion and debate about how that second
22   part of the test should be formulated.
23         There's also disagreement about
24   the first part of the test so that, for
25   instance, a case in which you said I have a

Page 247

1    right to a TOW antitank missile, even though
2    it's an arm that can be born among let's say
3    a cruise missile, would not pass the first
4    test because it would be considered, A, a
5    lineal descendent, B, analogous, C, a
6    weapon.  Any of the relevant language from
7    Heller wouldn't apply to it.
8       Q   Okay.  So if the right being
9    claimed is the right to possess a functional
10   handgun in the home for self-defense
11   purposes, we can agree that Heller states
12   that that is within the scope of the right.
13         MR. WENZLOFF:  Objection to
14      the form of the question.  Calls for
15      a legal conclusion.  You can answer.
16      A   So -- sorry, 'cause it's late in
17   the day.  I'm trying to get -- I'm sorry.
18   Could you just repeat the question?
19   BY MR. SIGALE:
20      Q   Sure.  Did the holding in Heller,
21   among other things, was that an individual
22   had an individual right to possess a handgun
23   in their home for lawful purposes, most
24   notably for self-defense?

Page 248

1          S. CORNELL
2          MR. WENZLOFF:  Objection as to
3       the form of the question, but you
4       can answer.
5       A   Yes.  I think that's the -- that
6    is the way Heller's central holding has been
7    characterized by many representable sources,
8    both courts and scholars.
9    BY MR. SIGALE:
10      Q   And are you aware, and if you're
11   not, you're not.  I'm just asking.  Are you
12   aware that the Seventh Circuit in Moore
13   versus Madison stated that that fundamental
14   right is equally applicable outside the home
15   as inside?
16         MR. WENZLOFF:  Objection as to
17      the form of the question, but you
18      can answer.
19      A   My understanding, although I don't
20   have Moore in front of me, was that it
21   didn't state that principle.  It stated that
22   the right must apply in some form outside
23   the home, but it didn't apply equally or
24   give a lot of specific guidance about how
25   one would evaluate claims beyond the home,

Page 249

1          S. CORNELL
2    except to say that to categorically deny
3    that there was a right outside the home was
4    not consistent with Heller.
5    BY MR. SIGALE:
6       Q   Sorry.  You dropped off the last
7    part of your sentence.
8       A   My understanding of Moore, the
9    holding in Moore, although, again it's been
10   a while since I've read it, was that the
11   conclusion was, it is not consistent with
12   Heller to say there is no right beyond the
13   home categorically, but it did not lay out
14   what the scope of that right was.
15      Q   No.  But it did say that the right
16   to self-defense was just as important
17   outside the home as inside the home; do you
18   remember reading that?
19      A   So like I said, it's been a long
20   time since I've read that, but --
21      Q   That's fine.  If you don't
22   remember, you don't remember.
23         You don't remember?
24   A   No.  I mean --
25      Q   Okay.  Fair enough.

Page 250

S. CORNELL

1
2    A  -- but not the specific language.
3    Q  Okay.  Fair enough.
4         And in terms of, I think I asked
5    this, but again, it was a long time ago.  So
6    I'm just going to clarify.  You have no
7    information or data regarding any injury or
8    mortality data statistics with firearms as
9    it pertains to Illinois foster children or
10    day care home children, correct?
11    A  I have no expertise in
12    contemporary epidemiological matters
13    relating to firearms injury.
14         MR. SIGALE:  Let me take -- I
15    know we're getting on.  Let me take
16    five minutes until 6:13.  Let me
17    look through my notes, and I'm about
18    done.
19         MR. WENZLOFF:  Sounds good.
20         (Whereupon, a recess was taken
21         from 6:08 p.m. to 6:15 p.m.)
22    BY MR. SIGALE:
23    Q  I sent over three more exhibits,
24    E, F, and G, and they are -- hold on.  Let
25    me share.  That's not as ominous as it

Page 251

S. CORNELL

1
2    sounds.
3         This is Appendix 2, 3, and 4 to
4    your report.  Appendix 1, we've already been
5    going -- been using the whole day.  But
6    Appendix 2 or Exhibit E, additional state
7    and local laws and regulations to gunpowder.
8    F is your Appendix 3, additional state and
9    local laws and ordinances related to
10    concealed carry.  And then Exhibit G, your
11    Appendix 4, state local laws and regulations
12    related to minors.
13         I just want to understand really
14    briefly the relation of those three exhibits
15    when you -- your Appendix 1 is titled
16    "Chronological list of materials cited or
17    relied upon."  So what are these additional
18    three appendices?
19    A  So it's really just kind of a
20    courtesy to you to try to organize them in a
21    way that will be more useful for you to --
22    and the court obviously, to see the
23    categorizations of laws that might or might
24    not be relevant.
25    Q  Oh, I see.  So E, F, and G is the

Page 252

S. CORNELL

1
2    same material as in Exhibit D, just broken
3    down by category?
4    A  So I don't have the appendices.
5    I'm trying to remember whether there is some
6    overlap or --
7    Q  I guess what I'm asking if you
8    remember, are there materials referenced in
9    Exhibits E, F, and G that are not in your
10    master list Appendix 1?
11    A  God, I -- I don't remember.  I --
12    'cause in pulling these together, we sent
13    separate ones, then we created a master
14    list, and I don't remember when we deleted
15    duplicates or left duplicates in.
16         MR. WENZLOFF:  So, David, I
17    think my recollection -- we'll
18    confirm, and we can let you know.
19    So this is not -- we're not trying
20    to hide the ball here.  I'm fairly
21    certain that it's the same material
22    as in the master list, just broken
23    up by category.  They're subsets
24    of -- basically, there's additional
25    appendices or subsets of the master

Page 253

S. CORNELL

1
2    chronological list.  I don't think
3    there's anything new on the other
4    appendices, just so you're aware.
5         MR. SIGALE:  Okay.
6    A  I mean, that's my recollection,
7    but I have haven't looked at it because they
8    are so massive, and I've had some
9    downloading issues.  So I think I have like
10    most of them now downloaded, but not all of
11    them.  But I have the originals, but they
12    are in a different form, different
13    paginated.  So I haven't done a systemic
14    comparison.  But that is -- Aaron, has best
15    stated my recollection, jogged my
16    recollection.
17    BY MR. SIGALE:
18    Q  Okay.
19    A  Here's our 1873 Texas law.  And
20    here's our common council from Chicago.
21    Q  Oh, yeah.
22         This will be about one of the last
23    things I ask you, I think, Doctor.  And that
24    is, the added bonus is that counsel might
25    have questions for you, and then if he does,

Atkinson Baker, a Veritext Company
www.depo.com

Page 254

1    S. CORNELL
2    I might have some followups.
3        So are you aware of historically
4    of any law that prohibited an individual
5    from possessing firearms in their home, if
6    they had children in the home, and I don't
7    mean -- just so we're clear, I don't mean
8    allowing the child in the home to get
9    access, to have access to the firearm or
10    anything. I'm talking about -- I'm asking
11    you if you're familiar with a statute or
12    ordnance that just out-and-out prohibits
13    someone from possessing a firearm, if that
14    person also has children in the home?
15    A    I'm thinking about that. So to
16    the best of my recollection, the Utah
17    statute which focused on preventing child
18    access would be the type of law that comes
19    closest to that. I am not aware of law, for
20    instance, that said if you store your
21    firearms safely and you have children in the
22    house, you still can't have firearms.
23    Q    And you're not aware of any law
24    that says if there be minors residing in
25    your house, you are prohibited from

Page 255

1    S. CORNELL
2    possessing firearms?
3        MR. WENZLOFF: Objection.
4        Asked and answered.
5    BY MR. SIGALE:
6    Q    Just making a -- you can answer.
7    A    So, again, my sense, and again,
8    it's my sense at the end of the day, and
9    based on my recollection is that the way
10    that the government interest in protecting
11    minors was expressed would have been in, not
12    categorical prohibition, but requirements to
13    prevent minors from having access.
14    Q    And back then, what were those
15    methods?
16        MR. WENZLOFF: Objection.
17        Vague. I don't know what back then
18        means. I also think this is
19        probably the same question as
20        before, but go ahead.
21    BY MR. SIGALE:
22    Q    Do you need me to rephrase it?
23    A    I don't know enough about firearm
24    storage technology to be able to give you a
25    specific answer.

Page 256

1    S. CORNELL
2    Q    Okay. That's fair. All right.
3    Well, Doctor, subject to any followup
4    questions, I am done. So I want to thank
5    you for your time today.
6    A    Well, thank you. In particular,
7    thank you for understanding about my
8    daughter's situation.
9    Q    Oh, sure. I hope that works out
10    just fine. Counsel might have questions for
11    you.
12        MR. WENZLOFF: I don't have
13        any questions.
14        MR. SIGALE: Oh, well, then, I
15        have no followups. Do you want to
16        explain signature?
17        MR. WENZLOFF: So, Professor
18        Cornell, I'm sure you've dealt with
19        this in previous depositions. You
20        have the right to review the
21        transcript after it's prepared,
22        which might take a few weeks. We
23        don't know exactly when we'll get a
24        copy, but once we do get a copy,
25        you'll have an opportunity to review

Page 257

1    S. CORNELL
2    that transcript to see if there are
3    any errors in transcription. So not
4    substantive errors, but
5    typographical errors, errors related
6    to pronunciation of words, or
7    misspellings, you know, the wrong
8    write when it should be homophone of
9    right, things like that. It's your
10    choice. If you'd like, you can
11    reserve the right to review and sign
12    the transcript until after you've
13    reviewed it for those types of
14    errors and submitted an errata
15    sheet. If that's something you'd
16    like to do, you should make that
17    known on the record.
18    THE WITNESS: Yes. In the
19    past I've found, through no fault of
20    the court reporter, mostly through
21    the fault of me not completely
22    shedding my Brooklyn accent, that
23    there are a few times where my
24    pronunciation is less than the
25    queen's English. So it's probably a

Atkinson Baker, a Veritext Company
www.depo.com

Page 258

1        S. CORNELL
2  good idea for me to review it.
3        MR. SIGALE:  Before we go off
4  the record a hundred percent, I'm
5  looking at this Appendix 1, and
6  there's all these exhibits to the
7  Appendix 1.  And we've talked
8  about -- this is not for
9  Dr. Cornell, this is for counsel.
10  And we talked about few of them, of
11  course during this, and I've mark
12  them, but I did not bother and I did
13  not bother to mark Exhibits A1
14  through 172.  I don't know
15  ultimately that it matters.  Because
16  if I want to cite a statute or an
17  ordnance, I'm just going to cite it.
18       Do you have an objection if I
19  just -- you have the same documents
20  I do.  If I consider it
21  incorporated, the ones that I didn't
22  specifically mark, that I just take
23  1 through 172 or whatever it is and
24  incorporate them as they are cited
25  to in D?

Page 259

1        S. CORNELL
2       MR. WENZLOFF:  I don't think
3  we have any objection to that.  I
4  think that is -- so as long as it's
5  clear what you're talking about.
6  Yeah.  That seems fine.
7       MR. SIGALE:  All right.  Well,
8  you guys have a good evening then.
9  Again, Dr. Cornell, thank you.
10       So, Kiara, we're going to do
11  that.  I'm just incorporating my
12  reference, the Exhibits 1 through
13  126 that doctor -- that counsel and
14  Dr. Cornell furnished to me, and
15  they have the same ones.  And I'm
16  just going to incorporate them by
17  reference as part of that Exhibit D.
18  And that's it.  So, everyone, have a
19  good day, a good evening.
20       MR. WENZLOFF:  For the court
21  reporter, do you need anything else
22  from us at this point?
23       COURT REPORTER:  Are you
24  ordering a copy of the transcript?
25       MR. WENZLOFF:  Yes.  We'll

Page 260

1        S. CORNELL
2  take a copy.
3       (Whereupon, this examination was
         concluded at 6:28 p.m.)

Page 261

1        S. CORNELL
2
3
4
5
6
7
8  _____
9  SAUL CORNELL
10
11
12  Subscribed and sworn to
   before me on this _____ day
13  of _____, _____.
14
15  _____
   Notary Public

Saul Cornell
April 12, 2021

Atkinson Baker, a Veritext Company
www.depo.com

Page 262

1
2                 I N D E X
3   WITNESS: SAUL CORNELL
4   EXAMINATION BY                      PAGE
5         MR. SIGALE                      5
6
7              E X H I B I T S
8   DEFENDANT'S        DESCRIPTION        PAGE
9   A           Expert Report of Saul    10
                Cornell
10
    B           2021 CV                  11
11
    C           Amended Complaint        147
12
    A9          MA - 1783 Mass Gun       178
13              Powder Laws of the
                Commonwealth
14
    A22         The Revised Ordinances   198
15              of the City of Quincy
16  A30         Danville Ordinances      202
                1855
17
    A119        Revised Ordinances Salt  217
18              Lake City
19  A46         Proceedings of the       233
                Common Council of the
20              City of Chicago
21
22
23
24
25

Page 263

1
2              C E R T I F I C A T E
3
4   I, KIARA MILLER,
5   A Shorthand Reporter and Notary Public of the
6   State of New York, do hereby certify:
7
8   That the witness whose examination is
9   hereinbefore set forth, was duly sworn or
10  affirmed by me, and the foregoing transcript is
11  a true record of the testimony given by such
12  witness.
13
14  I further certify that I am not related to any
15  of the parties to this action by blood or
16  marriage, and that I am in no way interested in
17  the outcome of this matter.
18
19
20  _____
21            KIARA MILLER
22
23
24
25

**Exhibits**

**Exhibit A** 10:4, 10,22 109:9 195:3 262:9

**Exhibit A9** 178:5,9,13 262:12

**Exhibit A22** 198:6,9 262:14

**Exhibit A30** 202:5 262:16

**Exhibit A46** 233:20 262:19

**Exhibit A119** 217:23 262:17

**Exhibit B** 10:25 11:14,16 12:22 262:10

**Exhibit C** 146:24 147:7,25 262:11

**(**

**(18)** 127:19

**0**

**06896** 5:11

**1**

**1** 11:22 67:24 176:4 177:8,15, 16 197:16 216:21 251:4,15 252:10 258:5,7,23 259:12

**10** 65:19 190:4

**10,000** 17:11

**10/7** 127:19,20 149:5

**11** 191:20

**1156** 218:5 220:3 224:5 226:14

**119** 217:9,11,20

**11:14** 12:16

**11:16** 12:16

**11:22** 61:5

**11:25** 60:9

**11:30** 60:18

**11:32** 61:5

**12** 52:13 195:4 198:14

**125** 63:13

**126** 11:22 259:13

**127** 67:24 176:4 177:15

**12:40** 108:20

**12:41** 109:2

**13-minute** 166:16

**14** 26:8 105:15 213:21

**14,000** 17:11

**15** 63:3 187:13 215:14 232:17 241:17

**15,000** 63:11

**15-week** 62:23

**16** 11:8 105:15 202:23 227:10 241:17

**17** 12:2 149:8 180:3

**1700s** 244:13

**172** 258:14,23

**1780** 178:15

**1780s** 24:5

**1783** 178:6 180:6, 11

**1792** 180:8

**1793** 186:16

**18** 81:2 149:8 193:10

**18,000** 17:11

**18-year-old** 33:11

**1800s** 244:14

**1801** 180:5

**1803** 180:9

**1830s** 24:5 172:22 191:2

**1841** 197:21

**1842** 193:9,12

**1855** 202:4

**1870s** 235:8

**1872** 233:25 235:4 236:4

**1873** 207:24 234:2 236:4,21 237:18 253:19

**18th** 42:14 43:13 44:13 102:8,10 155:24 160:15,24 176:17

**1900s** 240:18

**1903** 241:9

**1911** 118:16

**1913** 215:21

**1920** 217:18

**1922** 216:8 217:16

**1929** 215:20

**1999** 25:19 28:12, 25 31:17 52:9

**19th** 40:22 44:15 104:12 132:17 157:8 193:3 229:4

**1:30** 108:20

**1:33** 109:2

**2**

**2** 61:11 187:13 251:3,6

**20** 10:14 20:12 49:18

**2000** 28:9,14 31:14 52:5

**2002** 90:11 91:4

**2005** 17:19

**2006** 26:18

**2008** 17:23 18:9 52:10

**2009** 19:9

**2011** 23:2

**2012** 53:17

**2017** 76:24 85:5

**2019** 23:6 72:8 148:3

**2021** 11:15

**20th** 44:6 68:25 104:13 119:20

**21** 81:3

**217** 202:9

**21st** 160:20

**22** 76:24 197:22, 25 198:10

**225** 127:20

**25** 183:20 184:25 186:2

**26** 122:17

**28** 5:10 178:15

**29** 64:11 70:2,3 148:3

**2:10** 134:20

**2:15** 134:18,20

**2:30** 108:22

**2:58** 166:25

**3**

**3** 178:22 251:3,8

**30** 57:4 197:25

**3:10** 166:17,18

**3:20** 166:25

**4**

**4** 61:14 92:20 148:7 177:16 199:8,9 251:3,11

**402.8(o)** 127:18

**406.8(17)** 127:18

**406.8(a)** 149:8

**44** 173:18

**46** 233:15

**48** 186:13

**4:10** 194:3,10

**4:20** 194:8,10

**5**

**5** 148:11 151:11

**50** 84:7

**51** 65:19

**53** 193:15

**54** 57:6

**5:00** 214:24

**5:03** 215:8

**5:08** 215:8

**6**

**6** 126:23 153:3 178:22

**60** 48:21

**64** 198:15

**67** 204:20

**6:08** 250:21

**6:13** 250:16

**6:15** 250:21

**7**

**72** 110:5

**8**

**8** 149:4

**80** 84:9

**81** 216:7,17

**85** 230:21

**86** 232:15

**87** 216:15 233:13

**88** 236:19

**9**

**9** 149:6 173:15 177:20 178:12

**91** 16:21 17:19,23 18:9

**94** 216:15

**97** 16:21

**A**

**a.m.** 12:16

**A1** 258:13

**A119** 217:23

**A17** 12:3

**A22** 198:6,9

**A30** 202:2,5

**A46** 233:20,23

**A9** 178:5,9,13

**Aaron** 154:20 253:14

**ability** 77:17 78:4 112:21 168:14 220:18

**abolitionist** 103:2

**abomination** 192:15

**absence** 79:15

**absolute** 72:19 174:2,5

**absolutely** 7:3, 15 56:19 83:7 151:5 164:13

**academic** 16:4 85:4 105:10 167:11

**academy** 97:25

**accent** 257:22

**accept** 15:18 127:7

**acceptable** 83:19

**accepted** 57:22

**access** 125:9 220:2 221:14,15 222:2,16,22 223:10,11,12,22 229:8 230:25 254:9,18 255:13

**accord** 49:20

**account** 54:13 124:23

**accounting** 166:19

**accurate** 14:10 45:10,25 91:5 92:4 185:5,6 186:7

**accurately** 112:5 127:23 129:19

**accuse** 105:18

**accusing** 106:23

**achieve** 24:13 39:5 74:5 112:23

**acknowledge** 59:17

**acknowledged** 115:9

**acknowledges** 155:8

**acknowledgment** 233:5

**across-the-board** 190:12

**act** 127:20 149:6, 10 182:13 183:18 199:15 202:8 225:7,20

**acting** 21:25 204:11

**action** 181:12

**actions** 22:4

**activist** 207:20

**activities** 238:25 239:8,10

**acts** 22:11 205:9

**ad** 62:21

**Adams's** 184:11

**adaptations** 79:16

**adapting** 170:2

**add** 217:11

**added** 253:24

**addition** 18:10 29:22 236:11

**additional** 14:21 87:4 115:10 123:8,9 251:6,8, 17 252:24

**address** 5:9 79:16

**addressing** 129:7

**adhered** 159:21

**adjudicated** 171:6

**adjust** 214:22

**Administrative** 149:7

**admit** 19:16

**adopt** 191:5,9

**adopted** 58:14 59:11 191:7,10 212:17

**advance** 28:20, 23

**advanced** 74:21

**advantageous** 20:18

**advisably** 66:24

**advocates** 99:15

**affirmative** 212:4,11 225:6,7

**afforded** 46:23

**affront** 192:17

**afoul** 83:9,21

**afraid** 39:4 217:5

**African-american** 206:16

**African-americans** 204:10,15 206:17,25 207:6, 13

**age** 81:3 232:17

**agenda** 100:5,7 101:25

**agenda-driven** 105:21

**ages** 81:2

**aggressively** 203:24

**agnostic** 147:14

**agree** 51:3 134:22 137:10,20 169:15 225:12, 16,22 245:25 247:12

**agreed** 5:22 118:23

**agreement** 137:7

**167:15,17**

**ahead** 10:13 51:24 67:11 77:12 78:13 95:5 97:5 132:23 145:4,24 154:24 163:3,18 216:19 224:22 255:20

**aim** 39:5

**aimed** 37:16 204:12 230:24

**air** 218:7,23,25

**air-gun** 199:13

**AKA** 148:4

**akin** 104:24

**alarmed** 55:5

**Alaska** 17:9

**alcohol** 195:21 196:7,16

**alderman** 186:15

**Aldermen** 199:20

**Alfred** 86:16

**alien** 15:21 22:11

**aligned** 38:25

**Alito** 160:4,7,11

**all-able** 80:2

**all-day** 111:10

**allegations** 98:8 138:21 144:22 150:20

**allege** 150:4 151:3

**alleging** 144:17 150:8

**allowed** 71:15 78:2 181:25 182:2,8 183:19 184:20,22,23,25 185:4,24 186:2,6 188:20 199:3 218:22 231:14 234:16,18,20

**240**:10,19

**allowing** 219:10
220:22 225:7
254:8

**alluding** 51:18

**alumni** 13:13

**ambition** 65:20,
21

**ambitious**
216:17

**amend** 68:19

**amended** 117:24
124:2 147:5
148:2,5

**Amendment**
25:9,17 27:4,6
28:3,14 30:11,23
31:2,11,19 32:23
34:12 35:3 38:9
40:19 41:7,14,21
51:14 52:18,20
53:6,24 54:25
55:17 57:23 62:8,
14,21 64:2,15,22
65:11 66:15,20
67:8 68:10,13,18,
21 69:8 70:3,9
71:15 72:2,9
73:22 79:20
80:16 85:5,12
86:4 87:16 89:3,
12 90:8 91:12
93:14 95:21,24
96:3,5,9 97:18
103:6,20,24
104:2,11 105:9
106:8 107:7,14
108:4 114:2,19
117:3 121:19
124:17 129:12
130:8 148:17
155:6 156:20
162:11 174:23
175:10,22
189:17,21 210:2,
6 245:10 246:4,
14

**amendments**
14:2

**America** 16:25
17:7 23:13 27:17
68:24 72:3
190:10 228:17
230:3 236:10

**America's** 65:4

**American** 15:6,9,
19 16:23 17:5
18:21,23 19:5
21:24 23:11,14,
19 24:10,25 26:4,
6 29:9,16 34:15
35:11,15 38:14
63:12 68:21 69:2,
4,5 70:20,22
72:20 80:21,25
92:2,9 102:14
119:9 157:7
171:12,14 174:12
187:3 189:10
205:11 228:4,17
244:4

**Americans**
22:22 55:15 71:2
97:15

**Amherst** 14:14,
15,16

**amicus** 54:5,6
89:16,18,23
245:13

**ammunition**
230:25

**amount** 89:6
97:20 163:12

**ample** 83:22

**Anachronism**
85:3

**anachronistic**
36:6

**analog-like**
40:20

**analogical** 76:15
157:5 158:21
165:7,17,22
168:16

**analogies**
166:12 168:24
169:20,22 245:4

**analogize** 26:24

**analogized**
244:25

**analogous** 56:25
121:19 157:15
247:6

**analogy** 165:20

**analysis** 59:12,
17 98:13 118:4
129:16 130:7
245:9

**analytical** 102:9

**ancient** 17:14
69:4

**anecdotal**
231:25

**angles** 62:15

**Anglo-american**
111:18 174:4
201:3

**Anglo-saxon**
18:16

**animist** 205:18,
19

**anointed** 26:11

**answering** 7:13
8:3 75:15

**answers** 7:2
76:13 123:15
171:19

**antebellum** 20:5
40:10 43:3,10
171:9 172:10
195:18 209:6

**antecedent**
223:4,5

**Anti-federalism**
27:16

**Anti-federalists**
30:4

**antifederalism**
29:15,24 30:10
31:2 64:25

**antifederalist**
24:20 29:6,8 30:2

**antifederalists**
16:15 21:3 27:9
29:18 30:12,13,
21 48:14,18,23
49:19,23,24 50:4
66:2,7

**antiparty** 23:21

**antiquarian**
156:22 158:19

**antiquated**
160:18

**antitank** 247:2

**anymore** 106:19
133:2 234:3

**anyone's** 223:25

**apartment** 163:9
194:23

**apartments**
194:19

**apologize** 28:20,
22 135:15 164:4
194:24

**apparatus** 33:7

**apparently**
132:16

**appeal** 19:14
117:14,17

**appeared** 32:2
52:9

**appears** 105:8
119:21 199:24

**appellate** 32:5

**appendices**
67:21 109:23
118:7,12,21
177:14,16 251:18
252:4,25 253:4

**appendix** 54:9
177:8 186:23
197:16 216:21
251:3,4,6,8,11,15
252:10 258:5,7

**appendixes**
11:21 12:4,5

**appetite** 62:8,9

**applicability**
219:19

**applicable** 5:24
189:9 248:14

**application**
58:10

**applied** 59:13
73:17,18 224:25

**applies** 135:24
136:8,12 137:22

**apply** 99:19,21
135:12,18 137:23
247:8 248:22,23

**applying** 100:25
179:20 245:21

**appointment**
9:11 94:5

**appreciated**
57:21

**approach** 62:16
156:22 207:20

**approached**
57:9

**approaching**
46:9

**approve** 170:13

**approximately**
31:15

**apt** 135:8

**AR15** 156:14

**arch** 80:20

**ardent** 50:23

**arduous** 235:20

**area** 13:14 16:3
113:13 115:15
160:17 161:7
224:19 243:7,12
244:22

**areas** 30:9 39:20
115:5 128:11

230:14 233:7 235:12,14 236:6

**argue** 103:22 155:9,15

**argued** 21:21 36:4 58:6 97:15 102:25

**argues** 55:13

**arguing** 80:12 151:21 222:3 223:25

**argument** 33:21, 23 41:15,21 42:25 44:13 55:11,13,20,23 58:13,15,20 65:18 72:18 73:24,25 99:12, 13,14 103:3,5,8, 17 104:6,7,15 105:7 115:7 131:20 155:10 156:11

**arguments** 16:4

**Arkansas** 191:24

**arm** 34:15 80:18 103:8 128:8 184:6 210:20 212:7,11,13 218:7 239:20 247:3

**armament** 80:22 209:3

**armed** 97:15 189:4

**arming** 39:9

**armor** 79:9

**arms** 28:13 30:18 32:22 35:6,10 36:18 40:22,25 42:13,16,21 43:2, 7,14,16 44:21 47:7 48:13 49:10, 15 50:23 64:2 78:23 83:10 114:4 119:16 121:19 128:14 130:16 144:5,11

145:14 157:3 162:4 178:23 199:13 204:6,10 205:25 206:25 222:3 244:3

**army** 237:13

**arrive** 102:6

**arrow** 218:9

**article** 20:23 21:11 29:25 31:9, 25 33:10,13 54:14,15,17 65:5 66:21 67:13 71:12 72:8,13 74:15 84:20 85:10,11 86:15 92:19,22 103:19, 23 165:17 170:14 210:3

**articles** 33:7 53:20 55:8 66:18, 22 68:16 69:10 84:22 99:9

**articulated** 50:21 115:22 165:4,6

**articulates** 179:16

**articulations** 184:10

**Ashcroft** 57:25

**Asian** 17:9

**aspect** 14:7 39:2, 14 40:7 66:15 189:10

**aspects** 38:21 39:12,13 63:16 176:23

**assault** 74:17 114:14,21 117:16

**assemble** 205:25

**assembled** 49:8 139:13 182:22 238:6,10

**assemblies** 238:5

**assembling** 22:5

**assembly** 238:14

**assent** 225:7

**assert** 130:2 236:2

**asserts** 135:21

**assess** 112:2

**assessment** 137:17 141:14

**assign** 63:9

**assigned** 57:7

**assignment** 112:8,19 121:11

**assignments** 111:13

**assistant** 14:24 15:2

**assume** 110:9 117:14 119:4 122:2,3,4 123:16 126:16,19 147:16 178:17 220:19 229:4

**assumes** 79:11

**assuming** 53:17 126:4 222:20

**assumptions** 121:11,12,23 122:12 123:5

**attach** 216:22

**attached** 118:20

**attack** 209:14,15, 20

**attending** 232:3

**attention** 21:17 49:13 64:20

**attorney** 110:11 116:12 117:6 118:24 165:13 168:6

**attorney's** 116:16,21

**attorney-client** 110:12,16

**attorneys** 110:10

**author** 90:3 197:7

**authored** 71:17

**authoritative** 171:14

**authority** 46:21 72:24 115:6 174:6,16 175:15 182:23 195:24 227:15 228:3,8, 12 230:8 244:15 246:19

**authorizing** 174:14

**authors** 63:12

**autocratic** 228:7

**avatars** 30:14

**avoid** 25:4

**award** 26:8,17 27:2

**awards** 27:5,7 34:5

**aware** 132:18 133:11 151:19 248:10,12 253:4 254:3,19,23

---

**B**

**BA** 14:17

**back** 12:17 19:15 28:9 34:22 47:7, 18,21 50:2 61:7,9 73:10 108:19 109:4 116:9 124:11 142:7 149:3 159:16 164:8 165:12 166:17,18 167:3 173:3 175:8 180:2 187:12 189:25 193:8 194:8 195:2

197:16 200:9 211:13 217:14 219:8,18 222:7 229:23 240:17 244:13 245:2 255:14,17

**backlash** 35:25 36:14 38:20 102:19,21,22

**backwards** 34:12 36:9 86:20

**backyard** 201:13

**bad** 108:17,19

**bag** 241:25

**balanced** 54:13

**balancing** 58:22 59:22,25 60:3

**ball** 252:20

**ballroom** 238:7 239:2

**ballrooms** 238:21

**ban** 114:21 128:11 188:24 237:25

**banc** 120:19 121:4,8

**bank** 102:22

**banned** 215:15, 21

**banning** 74:16 128:10 215:19

**bans** 74:10,12 75:16,17 128:9, 10

**bar** 99:20

**bargains** 235:9

**barn** 126:11,24 180:22 181:4

**barrel** 237:19

**base** 117:23

**based** 70:22 71:3 73:11 94:12

Atkinson Baker, a Veritext Company
www.depo.com

121:3 134:6
160:21 166:6
168:10 172:21
173:6 235:21
255:9

**basic** 157:22

**basically** 16:24
19:24 25:14
39:12 40:6,23,25
68:15 158:4,24,
25 176:8 186:11,
17 205:22 227:21
239:4 252:24

**basis** 117:21
169:11

**bathroom**
134:15

**bear** 28:13 30:17
32:22 35:6,10
36:18 40:21,25
42:12,16 43:2,7,
14,16 47:7 49:10,
15 50:23 83:9
204:6,10 205:24
206:25

**bearing** 42:21
44:21 48:13
114:4

**beat** 228:17

**begin** 17:6

**beginning** 21:19
60:24 104:13
109:12

**beginnings**
23:23

**begins** 44:16

**belief** 36:12
46:13 48:3

**beliefs** 47:24

**believed** 36:3
45:22

**bell** 192:4

**Bellesiles** 97:7,
12,14 106:25
107:6

**beloved** 229:19

**big** 68:16

**biggest** 6:24

**bill** 13:25 14:7
24:8 41:2 48:25
49:3 50:14,17,24
213:3,4

**bio** 132:6

**Birdie** 229:9,21

**bit** 10:16 17:12
26:10 35:14 42:5
60:10 61:18 90:6,
12 92:25 100:6
108:4 139:7
198:11 208:25
224:18 227:3
231:23 243:24
246:20

**black** 37:14 38:21
39:9 203:20
205:22

**Blackstone**
200:9,10

**Blackstonian**
227:24

**blanket** 59:23
234:16

**blindly** 110:5

**blip** 53:14

**Bliss** 40:4,9
172:9

**blurred** 211:13

**boats** 17:11

**bodied** 80:2

**bodies** 171:17

**body** 94:19
115:13 116:18
132:13 161:6

**boil** 166:4

**boilerplate**
178:16

**bolts** 112:21

**bomb** 181:6

**bonus** 253:24

**book** 20:4 21:20
22:15 23:5,9 24:2
27:3,8,9,10,12
28:12 29:6,7 31:5
34:6,9 35:8,9
36:3 38:12 40:12
42:2,8,21 52:5,
12,16 53:10,16
54:9 63:18 97:22,
25 99:10 101:16,
22 102:4 105:9,
10 165:14

**bookend** 170:14

**books** 27:18
180:10

**Boone** 44:10
45:4

**boost** 31:4

**born** 247:3

**Boston** 178:24
180:24 181:24
182:6,9,15,25
184:3,12,16,18
186:17 200:4

**bother** 258:12,13

**bottom** 85:2
92:20 169:23
174:8 178:22
190:4

**Boulder** 114:18
116:15 117:16

**Boulder's**
114:21

**bound** 52:23

**boundaries**
171:15

**bow** 218:8

**bowie** 236:24

**bowie-knife**
208:15 213:13

**boy** 210:17

**boys** 236:13

**branched** 96:16

**brandishing**
44:12

**brass** 183:12,23

**brass-knuckles**
208:15

**break** 7:18 8:18
17:20 60:10 61:2
108:10,12,14
132:6 134:14,15
162:23 163:2,15,
17 164:17,23
166:16 167:10
179:3 185:20
194:2,6 199:21

**breaking** 186:5

**breaks** 77:12
187:8

**bridge** 17:8
69:13,15

**briefly** 12:25 13:6
28:9 36:8 66:19
97:7,13 251:14

**briefs** 245:13

**brigade** 179:6
185:16

**brigades** 185:11

**bring** 145:12

**bringing** 11:19

**brings** 28:22
215:11 245:2

**British** 18:24
184:11

**broad** 15:8 34:15
68:4 80:20
120:11 129:2
135:7 173:10
189:3 192:6
200:9 234:22
239:4,10,13

**broad-based**
96:6

**broader** 237:25

**broadly** 21:24

**broke** 180:15
184:7

**broken** 57:10
252:2,22

**Brooklyn** 257:22

**brother-in-law's**
145:10

**brought** 33:25
138:12,16
182:24,25 188:17

**bucket** 179:5
185:10

**building** 125:20
134:6,10 180:23
181:5,24

**buildings** 130:14
134:2

**bullet** 117:24
120:10 128:21,25

**bumper** 159:19

**bumpkin** 38:24

**bunch** 198:19

**burden** 81:8

**burst** 229:12

**butcher** 236:24

**buy** 75:9 145:12

**Buzzard** 188:16
191:18,23 192:5,
11,25 193:2,9,13
208:18

**Bye** 229:9,20

**C**

**C-O-R-N-E-L-L**
5:19

**calculate** 64:18

**calendar** 111:3

**Calhoun's** 29:13

**California** 115:4
116:13 117:7
120:19 210:4

**call** 22:15 30:3 33:2 39:15 53:3 73:16 85:23 94:4 106:6 140:21 189:14 194:7

**called** 23:10 24:3 33:20,22 36:14 114:25 116:21 192:14 245:19

**calling** 78:7

**calls** 75:21 78:8 81:24 82:23 93:22 95:4 135:4 143:3 152:2 221:3 225:14 246:7 247:15

**Cambridge** 23:9, 12 63:17

**cane** 192:13 193:16

**cannon** 180:24 199:12

**capacious** 83:6

**capacity** 62:13 114:15 155:21

**capital** 155:6,9, 10,13

**caption** 10:5

**car** 140:14 142:7, 8 160:22

**Cardoza's** 92:12

**care** 28:11 46:11 124:5,14,15 125:11,12 127:20 131:7,8,19 145:8 148:8 149:6,11 194:13,14 222:2 242:19,22 243:3, 6,9,10,12,15,16, 20 250:10

**career** 14:7 33:10 119:8

**Carolina** 103:14

**carriage** 159:17

**carried** 131:10 140:6 141:9

192:2 208:23

**carrier** 39:16 116:24 117:2

**carrots** 74:3

**carry** 40:2,3 128:10 131:20,23 132:11,15 140:15 141:10 142:10,18 148:10,14,24 149:10 150:5,9 151:5 172:24 173:8 188:19,25 190:17,18,19 191:4 192:7,9,10 207:16 210:24 213:12,20,22 214:2 232:17 251:10

**carrying** 117:4 130:13,23 131:16 132:14,20 133:13,24 134:4, 5,9,10 139:22 141:18 142:24 148:20,21 149:20,21 150:11,12 208:4 213:6 238:15

**case** 10:19 31:8 32:3 53:3,5,7,9 56:22 58:9 63:6 66:20 71:11 72:9 80:4 89:19 102:25 103:11,15 109:11,24 112:14 113:23,25 114:2, 6,7,11,20 115:12 116:10,25 117:2 122:5 127:5 129:8 130:19 132:13 139:3 140:13 142:7 144:10 148:4 152:12 160:3 172:2 179:13 182:5 191:16,18 192:6 195:17 196:7,18,22 197:2 212:13 214:9 215:23 216:3 219:9,20, 24 220:20

221:11,17 222:15,17 223:6 224:2,21 226:8 246:25

**case--namely** 127:16

**case-by-case** 169:11,18

**cases** 22:4 40:4, 5,10,20,23 44:24 63:4 85:8 117:11 132:17 165:21 168:15,22,23 193:4 195:5,12, 18 199:14 201:20,22 214:6 220:12 236:14 245:11

**Cass** 54:15 55:12 165:15 166:10 168:7

**cast** 130:10

**catch** 7:20 55:18

**categorical** 231:16 255:12

**categorically** 249:2,13

**categories** 84:6, 11 86:24 129:2

**categorizations** 251:23

**categorize** 88:12

**category** 41:24 64:13 77:23 171:24 200:9 206:11 241:21 242:4 252:3,23

**caused** 209:4

**causing** 218:16

**cautionary** 122:18

**Cavanaugh** 156:25 157:2 165:7

**Cavanaugh's** 165:9

**caveat** 7:17

**center** 9:13 91:21 131:7,19

**central** 6:2 135:9 248:6

**century** 40:22 42:15 43:13 44:6, 14,15 68:25 102:8,11 104:13 119:20 132:17 155:24 157:9 160:15,21,24 176:18 193:4 229:3,4 230:22

**ceremonial** 44:2

**cert** 52:13,24 53:2 63:4

**certainty** 50:19 151:3 236:3

**cetera** 74:22,23 213:23

**chair** 13:7,8,10, 12,15,23 54:25

**challenge** 30:15 125:24 126:2 220:17

**challenged** 40:18

**challenges** 40:6 245:10

**Chambers** 114:17 116:14 117:15

**change** 25:2 42:10,20,23,24 43:11 45:24 113:4 153:19 162:14 220:23 221:17 227:18 228:23

**changed** 48:5 57:12 106:17 241:17

**changing** 30:3 44:20 161:23 167:8 170:3

**channeling** 229:9

**characterization** 127:8 135:8

**characterized** 55:6 248:7

**charge** 13:9 37:18 112:10 220:5 223:17,22

**charged** 181:7

**charting** 30:2

**charts** 24:6

**chat** 177:7,25 217:11

**check** 6:10 32:6 48:20 86:18 111:2,7 181:15 187:25 213:9 241:14

**cheep** 40:16

**cherry** 100:6 101:25

**Chicago** 53:3 89:17 168:4 216:7 230:11 233:19,25 235:2, 5,9 236:4,9,18 245:12 253:20

**Chicago's** 217:16

**chief** 91:8 162:2 167:5

**child** 127:19 149:6 219:13 227:13 228:14 240:21 254:8,17

**children** 113:9, 11 126:10,16 127:17 128:12 221:25 222:2,24 227:10 228:10,11 241:22 242:16 250:9,10 254:6, 14,21

**children's** 228:24

**Chimienti** 110:22

**choice** 80:11,13 257:10

**choose** 95:12

**chord** 229:21

**chose** 126:10

**Christmas** 224:9,15

**chronological** 12:8 15:8 18:19 41:19 251:16 253:2

**chuckling** 241:23

**churches** 212:24 238:4

**Cincinnatus** 43:22

**circuit** 31:23 32:13,14 85:7 121:3 137:15 189:14 248:12

**Circuit's** 121:8

**circumstance** 83:8

**circumstances** 7:10 212:10

**citation** 86:19 149:4

**cite** 149:9,12 170:4 193:15 258:16,17

**cited** 118:6,9,11, 19 183:18 244:6 251:16 258:24

**cities** 115:8 116:18,19 244:2

**citing** 119:18

**citizen** 42:12 43:16 44:7

**city** 8:25 9:2,14, 15,16 89:17 114:17,20 116:14,16,21

**cleared** 111:8

**Clement** 57:22

**Clement's** 58:3, 13,15,24 59:11

**clerk** 23:8

**Clever** 77:6

**click** 146:25

**client's** 150:5 151:4

**clients** 150:9

**Clio** 86:16 88:9

**close** 159:9

**closest** 254:19

**cloudy** 169:21

**co-horn** 180:25

**co-opted** 44:5

**Coalfax** 205:16, 20 206:3

**coats** 37:14 38:21 203:20

**coauthor** 63:10

**coauthored** 23:7

**Cocked** 85:3 92:19 96:23

**code** 216:7 217:16

**codify** 45:13,23

**cognitive** 166:3

**coin** 93:8

**colleagues** 168:12

**collective** 33:23 35:24 36:5 54:22 86:5 99:11,13 101:18 102:7,16, 18 103:5,21 104:15,20 105:19 106:10,18 203:17 205:5,15

**college** 9:12

**colloquial** 208:12

**colloquy** 167:13

**colonial** 175:8,21 181:13

**color** 136:10

**Colorado** 114:16,24 115:3, 14,21 116:8 226:5

**Colorado's** 114:3

**Colts** 237:17

**Columbia** 51:15 89:19 129:7

**combat** 44:11

**combination** 74:2

**combustible** 203:3,4

**comfortable** 74:14 142:14

**comment** 167:5

**commentaries** 171:10

**Commentary** 28:18 32:2

**commentator's** 71:23

**commentators** 171:13

**comments** 179:8

**commerce** 195:22

**commercial** 130:16 144:5 145:14

**commission** 98:6,7

**commit** 98:10 143:20

**commitment** 87:21,24

**Committee** 149:7

**common** 62:25 82:7,10 222:7 227:24 233:14, 18,24 245:21 253:20

**commonality** 186:15

**commonly** 192:21

**commonwealth** 177:6,19 178:7, 14

**commune** 126:9

**communes** 126:24

**communicating** 164:11

**communications** 122:15

**companies** 33:5

**company** 241:25

**comparable** 69:8

**compare** 188:9

**compares** 188:10

**comparison** 253:14

**comparisons** 226:8

**compensated** 117:20

**competing** 167:11

**complaint** 114:10,11 115:19 117:24 124:2 138:21,24 144:22,24 145:21 146:6,12 147:5, 15 148:2,5,22 150:4,18,22 152:7,21

**completely**
104:8 147:14
164:6 232:4
257:21

**complicated**
35:11 36:22 38:7
166:3,13 168:13
169:5 188:22
190:2 197:3
245:6,7

**compliment**
56:3

**component**
115:23,24 116:3

**composed**
239:12

**composing**
49:12

**compound** 59:3,
6 90:21,25

**comprehensive**
68:5 216:25

**computer** 124:3

**conceal** 142:11
188:24 190:18
192:9,10

**concealable**
40:15 237:5

**concealed**
149:10 188:19
190:5,7 192:2
213:24 217:3
251:10

**conceivable**
82:11 126:14

**concept** 160:21

**conception**
43:2,19 48:13
102:18

**conceptions**
44:20 62:10
102:12

**concern** 78:18
88:6 131:12
204:23,25 205:2
236:18

**concerned**
204:14

**conclude** 70:7
91:10

**concluded** 73:21
98:9

**conclusion** 35:8,
9 70:12 100:8
102:2 135:4
140:22 141:22
143:4 242:10
246:8 247:16
249:11

**conclusions**
75:22 101:3,7

**concrete** 210:12
211:7

**concurrence**
197:8

**condition** 172:18

**conditions**
130:15 230:14

**conducive** 37:7

**conduct** 39:20

**confederate**
209:18

**confederates**
210:16

**confess** 198:18

**confident** 148:19

**confirm** 252:18

**confiscation**
183:3

**conformity**
170:10

**confrontation**
193:6

**confusing** 93:2

**confusion** 165:2

**congress** 50:6

**congressional**
51:2

**conjure** 78:17

**connected** 17:8

**Connecticut**
5:11 8:23 9:4
20:7 23:5

**connection**
165:7

**conscious** 98:10

**consensus**
135:7,20

**consent** 231:14
232:19 233:7
235:13 241:7

**consequences**
228:4 230:12

**conservative**
166:9 168:3

**considerably**
200:23

**considered**
70:19 117:22
141:18 247:5

**consistent** 67:8
124:18 127:20
141:16 212:12
228:13 249:4,11

**constable**
159:16 160:6,7

**constitute**
172:19

**constitutes**
13:21

**constitution**
15:11,24 16:2,7,
17 22:21,23 24:5,
7 25:3 35:20
42:11 48:24
119:16 154:14
155:8 156:4,16
168:8

**constitutional**
13:16,18,20,22
14:5 16:16 18:22,
24 19:7 21:15
22:8,11 23:15,19
24:25 28:17

29:10,14 30:15
32:2 41:13 42:20
44:23 46:9 55:21
56:17 58:5 63:17,
18 68:22 69:9
70:20,25 71:4,23
80:13 82:8 114:4
121:18 124:16
129:17 148:16
152:19 156:22
162:9 172:20
173:11

**constitutionalis
m** 20:22,25 21:10,
13,23 23:17 24:2
34:20 45:9 46:10,
14 55:22 63:20
64:9 96:3

**constitutionalist**
155:19

**constitutionality**
124:24

**constitutions**
42:9,15 44:18

**construct** 81:12
165:20 245:3

**construction**
68:24 222:8

**constructions**
214:18

**construed**
179:18

**consult** 115:19

**consultation**
118:23

**contacted**
121:22

**contemplate**
67:19

**contemporaneo
usly** 175:9

**contemporary**
76:11,13 86:21
87:22 88:6
143:10 250:12

**contention**

114:13

**contents** 13:4
54:19

**contested**
136:15

**context** 97:17
195:25 221:21

**continent** 17:9

**continue** 8:13
61:10

**continuing**
85:12 173:17

**contours** 136:23

**contrary** 221:16,
21

**control** 35:13
36:10 37:8 38:19
66:20 71:11,14
72:10 86:6 87:17,
20,21 89:10
90:14 94:23
95:14,22 96:15,
17 99:15 104:6
156:9 203:16
220:5 223:16,17

**controversial**
92:7 228:16

**convened** 98:7

**convention**
48:19

**conventional**
137:25 154:9

**conventions**
49:5

**conversation**
110:19,25
111:10,11

**conversations**
122:22

**copies** 118:25

**copper** 183:12,
23

**copy** 119:14
120:5 124:2

188:4 213:9
216:22 256:24
259:24

**core** 72:18 99:14
166:12 173:20

**Cornell** 5:1,7,18,
21 6:1,3 7:1 8:1
9:1,18 10:1,7,9
11:1 12:1 13:1,2
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1,5 60:1,12
61:1,7 62:1,2
63:1 64:1 65:1
66:1 67:1 68:1
69:1,18 70:1,13
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1,14 79:1
80:1 81:1 82:1
83:1 84:1,17 85:1
86:1 87:1 88:1
89:1,14 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1
103:1 104:1
105:1,6 106:1
107:1,16 108:1,
15 109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1,10
123:1,14 124:1
125:1 126:1
127:1 128:1

129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1,14,
23 139:1,20
140:1 141:1
142:1 143:1
144:1 145:1,2
146:1 147:1
148:1 149:1
150:1,21,24
151:1 152:1,4,8
153:1 154:1,6,23
155:1 156:1
157:1 158:1,10
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
203:1 204:1
205:1 206:1
207:1 208:1
209:1 210:1
211:1 212:1
213:1 214:1
215:1 216:1
217:1 218:1
219:1 220:1
221:1 222:1
223:1 224:1
225:1 226:1
227:1 228:1
229:1 230:1
231:1 232:1
233:1 234:1

235:1 236:1
237:1 238:1
239:1 240:1
241:1 242:1
243:1 244:1
245:1 246:1
247:1 248:1
249:1 250:1
251:1 252:1
253:1 254:1
255:1 256:1,18
257:1 258:1,9
259:1,9,14

**corner** 29:19

**corollary** 153:16
159:18

**corporate**
116:19

**correct** 8:24
10:19,20 11:3,4,
7,12,13 12:24
14:10,11,22
15:13 16:17
17:21 18:9,10
19:10 32:21 34:7
47:8 56:9,11
58:21,23 61:15
67:16 88:16
89:20,24 90:8,9,
15 91:13 93:14
110:23 113:2,3,
14,15 118:9
129:12,13,25
131:21 151:17
176:9 180:18,19
196:4 201:17,18
202:12 204:7
227:21 239:19
241:10 242:17,18
250:10

**correctly** 130:17
160:5 167:14
174:18

**correlate** 235:19

**council** 202:21,
22 233:15,18,25
253:20

**counsel** 60:22
116:20 122:15,24
123:8 140:23

146:10 164:11
253:24 256:10
258:9 259:13

**Counsel's** 146:9

**count** 61:20
64:18 70:2

**counted** 61:22

**counteract**
65:21

**counterposing**
43:21

**countervailing**
82:13

**country** 38:24
49:23,25 50:2
169:13 211:14

**couple** 9:20
14:25 42:6 53:20
77:24 84:24
173:25 176:10
179:8 194:5
204:5 218:4

**courses** 16:22
17:6

**court** 5:5,8 16:3
19:2 21:18 22:4
32:5,13 40:4,5,6,
19 41:5,22 46:12,
22 51:17,20
52:18 58:14,19,
25 59:10 60:6
63:5 86:16,18
103:10 115:22
129:23 159:15
169:12 182:22
189:14 191:23
192:10,11 195:6
196:21 197:3
251:22 257:20
259:20,23

**court-centered**
21:22

**courtesy** 251:20

**courts** 21:16,18
55:17 70:23
129:9,25 137:2
171:6 189:19
214:12 245:21

248:8

**cover** 225:19
237:2,4 239:8,9

**covers** 239:7

**cracker** 199:16

**cracks** 120:3

**created** 252:13

**creates** 40:17

**creation** 202:10,
19

**credit** 104:14

**crime** 113:7
230:16 236:16

**crimes** 155:9

**criminal** 160:20
161:8 189:10
224:18

**crippled** 77:16

**criteria** 94:3,8
95:11 118:22

**criterias** 94:13

**critical** 51:15,21
99:16,17 169:5

**criticize** 96:23
98:23

**criticized** 88:11
97:19

**critique** 93:5,10,
12 99:12 100:21
106:20

**critiques** 101:9

**crowded** 200:16,
17 230:14

**crucial** 35:15

**cruel** 155:25

**Cruikshank**
40:24 103:11

**cruise** 247:4

**culprit** 6:25

**culture** 15:7 72:2
237:22

curious 102:5 108:8

current 11:6 19:2 70:22 72:2 124:16 141:3,19

cursor 161:19 173:16 175:6 178:21

curtilage 160:15, 21,24

custody 240:22

CV 11:6,15 12:23 51:13 61:11 109:9 113:18

**D**

D's 9:6

dad 231:3

dagger 208:6

Dakota 232:14 241:5

Damage 182:15

dance 239:2

danger 176:16 179:13 209:2 222:15

dangerous 178:25 192:13 211:9 213:13 242:5

dangers 179:9

Daniel 44:9 45:4

Danville 197:18, 19 202:3,9

data 71:3 74:9 98:3 100:7 102:3 250:7,8

date 5:22 10:11 11:17 147:8 178:10 198:7 202:6 217:24 233:21

dated 194:21

dating 175:8 200:9

decade 15:25

decency 192:17

daughter 163:8, 19

daughter's 256:8

David 60:8 108:5 214:21 252:16

day 13:20 15:24 51:8 53:21 83:15 124:14,15 125:11 131:7,18 145:8 148:8 203:15 213:14 222:2 236:7 242:22,24 243:3,14,15,16, 20 247:18 250:10 251:5 255:8 259:19

days 179:7 194:5 238:9 244:4

DCFS 122:3

dead 106:5

deal 53:5 105:9 125:8 161:6 175:10

dealer 234:20

dealing 119:25 176:19 189:11 207:21

dealt 114:20 256:18

debate 15:10,13 16:6 17:10,12 21:2,13 33:14 35:16,18,19,20 48:16 53:23 54:2 85:4,18 88:5,13 90:15 93:20 94:18 95:15 96:22 98:25 102:10 105:10,20 106:4,15,17 107:8 141:8 246:21

debates 33:24 69:6

debt 181:12

decide 80:18 212:7

decided 30:20 52:22 165:11 169:10

decides 80:2 240:7

decision 31:18 46:22 51:23,24 53:22 57:6 120:19,22 129:15 130:5 135:13 137:5 142:14,17, 19 196:21 212:5, 11

decision- making 88:8 169:18

decisions 41:5 51:17,20 117:14 128:15 135:9 137:8,11 197:3

declaratory 148:2

deductible 75:10

deemed 212:18

deep 92:2

deeply 34:11 38:13 92:10

defeated 24:11 50:6,15

defend 65:15 88:9 104:9 210:20

Defendant's 10:10 11:16 147:6 178:8 198:5 202:4 217:23 233:20

defending 106:18

defense 38:13 42:13,16 43:15, 17 44:15,16 81:9 184:11 212:4,11

define 15:17 41:18 83:18 94:3 125:10 127:10 168:18 223:9,11

defined 18:14 35:17 91:17 124:19

defining 115:14

definite 65:9 146:5

definition 83:5 86:12 126:17 210:8

definitively 232:9

degree 99:9 159:20 190:7

deleted 252:14

deliberate 225:19

deliberately 98:16

deliberation 49:12

demilitarize 37:23

democracy 24:4, 10

democratic 102:23 103:25

democrats 30:7

densely 228:7

deny 249:2

department 15:3 57:24 113:11 127:17 181:14

depending 18:25 41:18 47:2 104:4 169:12 176:13 201:6 212:9

depends 140:7 189:6 211:15 227:17

depositing 178:23

deposition 5:21 6:4 109:14 110:7, 19 111:8 237:10

depositions 256:19

derogatory 100:4

derringer-like 237:16

descendent 157:13 247:6

descendents 157:4 162:3,4 167:6 245:5

descent 29:11 165:5,9

describe 36:3 70:16 87:15 93:17 95:21,23 154:7,8 208:9

describes 103:20

describing 45:4 92:4 235:12 236:5

description 13:24 208:13

descriptive 18:8

deserted 201:14

designed 13:15, 16 25:3 37:22 218:7 219:2

desired 74:6

desk 111:8

detail 143:12

detailed 49:3

determine 246:12

**determined** 137:10

**determines** 246:18

**develop** 153:21

**development** 21:24 29:10

**developments** 104:12

**Diane** 13:7,11,12

**diary** 111:2

**Dickensian** 231:10,11

**difference** 137:14 142:22 154:12 211:5

**differences** 189:23 214:13

**differentiated** 192:12

**differentiating** 16:6

**differentiation** 193:12,17

**differently** 88:22 226:2 241:3

**difficult** 7:4 38:3 119:2,13 139:7, 18

**dig** 34:11 146:13, 16

**digging** 13:4 218:13

**diminished** 228:10

**direct** 138:23 161:11

**directed** 129:9 229:20

**direction** 112:17 124:22

**directly** 144:11

**directs** 129:15

**dirk** 208:6

**dirks** 192:12 193:16

**dirt** 191:25

**disagree** 100:23 101:17 145:18

**disagreeing** 101:21

**disagreement** 35:14 59:21 246:23

**disarm** 39:7

**disarming** 37:17 38:21 39:8

**disassembled** 214:10 220:12

**disbelief** 241:23

**discarded** 218:11

**discern** 98:9

**discernible** 212:6

**discharge** 83:15, 16 128:10 197:13 199:8,12,16 200:14 232:18

**discharging** 179:10 200:16

**discourse** 88:7

**discovery** 132:12

**discrediting** 104:19

**discretion** 13:23

**discriminatory** 37:16

**discuss** 70:7 97:6 110:7

**discussed** 195:12 227:2 245:22

**discusses** 85:11

**discussing** 20:16 173:23

**discussion** 87:13 103:13 160:14 166:23 188:15 190:2 208:18 215:12 219:8,18 246:21

**discussions** 52:6

**disease** 230:16

**disposed** 179:2 185:19

**disposition** 58:7

**disputed** 206:4

**dissenting** 27:16 48:17 57:16

**distance** 83:16

**distinction** 193:22 219:12

**distinctions** 41:19

**distinguish** 66:6 165:21 168:15 193:4

**distinguished** 17:25 26:12 168:3,24

**distort** 87:2

**district** 6:2 32:5 51:15 89:19 129:7

**districts** 181:19

**disturb** 199:25

**divide** 63:13

**divisions** 181:20

**doctor** 123:23 144:15 147:2 178:18 198:18 209:9 215:10,22 233:23 253:23 256:3 259:13

**doctrine** 115:2,5

**document** 10:3 11:12 25:22 46:5 49:7,12 51:12 57:11 138:25 153:24 154:13 198:13 219:7

**documents** 9:19 11:23 61:17 177:23 258:19

**dog** 146:23

**dollar** 234:13

**domestic** 126:15 228:5,25

**domicile** 160:18

**door** 65:2

**dot** 64:12 96:24 122:5 178:15 181:9,10

**double** 181:15

**doubled** 19:17

**doubt** 130:10

**doubtful** 131:11

**download** 33:4 147:3,12 149:15

**downloaded** 253:10

**downloading** 253:9

**drafting** 15:13

**draw** 30:24

**drawn** 168:25

**Dred** 102:25 196:24

**drew** 63:11

**drive** 140:14 142:8,9

**driven** 33:18 88:5

**driving** 176:24 232:9,12

**dropped** 103:12 249:6

**due** 161:9

**duly** 5:2

**duplicates** 252:15

**duty** 199:16 238:14

**dwelling-house** 180:22 181:4

**dynamic** 169:25 206:3

---

**E**

**eager** 65:25 120:4

**ear** 37:2

**earlier** 27:21 30:25 34:21 145:24 190:16 200:5 203:15 215:12

**earliest** 244:4

**early** 15:6,9 18:13,19 19:5 29:9 40:11 68:24 80:20,25 157:7,8 187:3 240:18 241:14 244:13

**earth** 198:20

**ease** 10:17

**easier** 90:24 147:10 149:14 173:4

**easily** 155:19 188:3 217:3

**east** 19:15

**easy** 222:15,21 223:10,11,12

**economic** 230:2

**edited** 33:6

**editor** 46:24 47:16 51:21 52:14 53:4

**editorials** 61:12 64:12 70:6 242:7

**education** 14:9 118:2 212:24 239:23,24 242:23

**educational** 238:6,25

**Edward** 165:13 166:8 168:2

**effect** 39:23 41:4 79:19,20 191:25 242:9

**effective** 74:4,17

**effectively** 172:15

**effects** 230:17

**effectuate** 220:13

**efficacious** 147:17

**efficient** 147:22

**effort** 34:11 35:2 36:13 40:3 120:5 205:22

**efforts** 79:13 205:5

**egregious** 98:20

**Eighth** 155:6

**election** 15:22 50:5,12 51:2 206:4 213:14,18 238:8

**elections** 50:16

**elite** 46:7

**elites** 35:3

**elusive** 168:13

**emailing** 227:6

**emancipated** 231:19 236:6

**embrace** 58:20

**embraces** 25:5

**emerged** 30:10 31:8 42:3 115:2

**emerges** 35:23, 24 43:2 103:23

**Emerson** 31:7, 13,16

**Emery** 103:19

**eminent** 98:7 99:22

**Emory** 98:6

**emotive** 229:21

**emphasis** 111:19

**empire** 18:24

**employ** 94:9

**employer** 85:24

**employment** 230:11

**empty** 240:9

**en** 120:19 121:4,8

**enact** 37:15 176:15 207:2

**enacted** 175:9 180:4,7 182:20 217:17 230:23

**enactment** 34:13

**enacts** 191:3

**encompasses** 201:16

**encountered** 86:8 119:7

**encountering** 14:7

**end** 58:18 104:12 177:11 203:5 204:19 227:8 230:22 232:2 255:8

**ended** 167:9

**ends** 15:19

**enforced** 226:14

**engage** 74:20

**engaged** 93:4 205:9

**engaging** 88:14 99:2 101:24 104:23 105:20 107:8

**England** 9:3 191:5

**English** 34:23,24 225:18 228:3 257:25

**enlarge** 227:19

**enlightenment** 31:7

**enormous** 80:17

**enormously** 211:17

**ensure** 79:14

**ensuring** 207:14 222:24

**enter** 177:11,13

**entered** 35:18

**enterprise** 161:2

**entire** 128:18 152:10

**entirety** 38:6

**entitled** 72:9

**entry** 71:10

**environment** 222:19

**epidemiological** 250:12

**equal** 85:23

**equally** 36:6 143:18 204:11 248:14,23

**equating** 139:21

**equation** 102:16

**equivalents** 157:5

**era** 15:20 35:23 39:22 40:21 41:6 43:4,6 64:9 70:24 102:21 159:4,17 174:23 175:21 180:10 203:22 206:23

**errata** 257:14

**error** 197:20

**errors** 98:11 257:3,4,5,14

**essay** 72:19

**essay's** 28:16

**essays** 51:15,21, 22 61:13 62:4 68:9 70:6 73:24 84:22

**essence** 36:20 163:11

**essential** 20:13 87:13 212:19

**essentially** 17:5 24:7 54:3 76:16 81:10 99:10 103:4 106:5 168:15 172:17

**established** 13:12 109:10 186:14

**estate** 200:25

**esteemed** 72:21

**evaluate** 111:24 124:23 129:17 248:25

**evaluated** 58:12

**evaluating** 129:10

**evening** 259:8,19

**events** 104:3

**eventually** 103:16

**evidence** 43:4 46:4 48:11 86:22, 25 90:17 98:17

**109**:23 128:19,24 143:9 151:2 171:17 211:7 231:25

**evidences** 43:18

**evidentiary** 72:5 87:11

**evil** 196:6

**exact** 114:12 196:11

**EXAMINATION** 5:12

**examined** 5:4

**examples** 51:4 67:21 77:24 168:23 172:9 173:25 175:20 187:3

**exceed** 171:7

**exceedingly** 227:25

**exceeds** 246:19

**exception** 20:2 115:16 173:10

**excerpt** 75:23

**excessive** 172:11

**exclude** 156:19

**Exclusion** 24:4

**exclusions** 81:16

**excuse** 13:21 101:18 207:3

**executive** 65:24, 25

**exempt** 81:6 115:6 237:14

**exemptions** 81:15

**exercise** 153:21 168:16 174:11,22

**exercised** 228:13

**exert** 179:2 185:20

**exhaustive** 119:5 130:7

**exhibit** 10:4,10, 22,25 11:14,16 12:22 109:9 146:24 147:7,25 177:8,20 178:5,9, 12,13 186:25 187:13,15,18,23 195:3 197:16,22, 25 198:6,9,10 202:5 216:6,7,13 217:9,11,20,23 233:15,20 251:6, 10 252:2 259:17

**exhibits** 11:21 12:9 67:24 109:24 176:2 177:15 250:23 251:14 252:9 258:6,13 259:12

**exist** 87:9 232:10

**exists** 87:12 152:15

**expand** 42:4 153:6,12 175:3

**expansion** 57:2 65:25 229:7 230:4,5

**expansive** 43:8 103:25

**expect** 215:2

**expectations** 161:8 214:23

**expected** 65:22

**expensively** 244:23

**experience** 166:7

**expert** 10:6,8,18 23:16 109:10 111:16 113:16,21 116:11

**expertise** 59:18 75:25 78:10

112:20 113:14 118:3 162:8 224:19 225:3 242:20 243:5,7, 13,19 250:11

**explain** 21:12 51:25 56:20 256:16

**explanations** 188:7

**explicitly** 239:16, 20

**exploding** 242:8

**explosion** 203:8

**explosions** 244:8

**explosive** 219:3

**exposed** 180:14

**expressed** 255:11

**expressing** 22:7 242:15 243:2

**expressive** 117:5

**expressly** 103:20 131:4

**extensive** 160:14 242:20

**extensively** 245:22

**extent** 13:5 41:12 70:11 135:12 141:25 152:3

**extinguish** 179:14

**extremely** 166:2 188:21 205:13

**Ezell** 85:7 245:11

**F**

**face** 152:6

**facie** 44:3

**facilities** 125:9, 10,13

**facility** 125:19

**facing** 212:6

**fact** 31:8 55:14 58:21 80:15 85:15 97:22 126:18 127:9 134:8 141:4 142:20 161:3 170:19 173:24 176:20 184:9 188:11 244:12,15

**fact-specific** 211:23

**factor** 19:19

**factories** 231:5, 6,19 236:7

**factors** 170:4

**factory** 230:9

**facts** 90:17 211:16

**faculties** 20:17

**fad** 218:16

**fail** 65:15

**failed** 78:25

**fails** 66:6

**fair** 56:10 78:5 93:16 94:18 97:21 138:11 174:2,3 179:4 186:22 188:20 199:6 209:21 212:21 226:19,20 231:8 235:7 239:7 240:25 249:25 250:3 256:2

**fairest** 36:2 92:4

**fairly** 30:16 37:20 55:15 92:6 115:2 154:8 200:8 220:9 239:10 252:20

**faith** 66:3 163:16

**fall** 24:4 68:18 86:2 112:2 171:23 200:7

**fallen** 72:23 160:23

**falls** 206:10

**falsified** 98:16

**falsify** 98:3

**familiar** 121:14, 16,17 141:25 222:8,10 245:8, 23 254:11

**families** 81:8

**family** 19:15,16 113:12 127:17 164:9 194:12 228:5,25

**famous** 43:21 49:14 86:15 103:17 130:4 184:10 214:9

**famously** 24:16

**fancy** 94:14

**fascinating** 37:12 57:5 58:5 141:8 160:3 165:11,23 214:4

**fascism** 44:5

**fashion** 158:21, 22 161:6

**fashioning** 160:19

**faster** 6:18

**fastest** 236:9

**fathers** 15:12 67:18 76:24 77:4, 9,14,15 81:19,22 82:4 84:2 170:12

**fathers'** 34:18 68:14

**fault** 257:19,21

**faulted** 98:14

**favor** 37:9 88:23

89:18 92:23 93:8 94:17 95:13,22 96:11

**favorite** 54:20

**fear** 66:16 210:8, 11

**fearing** 209:14, 19

**featured** 22:18

**features** 115:10

**federal** 5:24 21:17 41:21 80:17 122:17 141:4 245:21

**federalism** 62:11 95:25

**federalist** 15:20 24:5,19 47:15

**federalists** 16:14 21:2 24:6 65:17, 19 66:7

**feel** 142:13 145:4 148:19 241:11

**feels** 100:3 194:5 211:12

**fell** 115:16 120:2

**fellowship** 20:3

**fellowships** 19:21,23 20:19

**felons** 130:11,21

**felt** 20:14 33:19 98:17

**fence** 161:4

**festering** 45:7

**field** 13:17 64:6 118:3

**fields** 85:25

**figure** 43:24 58:5 64:14 214:15 218:13

**figured** 168:18 209:25

**figures** 48:15
171:14

**file** 177:7

**filed** 57:22 147:16
148:3 150:4

**final** 114:11

**finally** 8:17 54:2

**financial** 206:19

**find** 14:6 23:23
27:19 48:12 55:5
57:5 80:21
102:17 119:2,13
120:5 136:18
157:11,14 172:5
187:23 216:5,23
217:8 235:21,24
242:3

**fine** 7:15,19 8:14
41:9 47:21 60:12,
23 69:18 107:25
146:14,20 147:24
172:3 191:17
234:13 249:21
256:10 259:6

**fined** 238:15

**finish** 132:23

**finishing** 29:7

**fire** 176:8,12
177:2 179:2,6,11,
14 180:15,17
181:14,16,17
183:17 185:16,20
186:5 187:5,8
199:11,13,17
200:3,14 203:6,8
244:8

**fire-arm** 181:2

**firearm** 20:20
25:9,16 28:10,11
44:2 64:2,15
68:14 69:12 70:4,
7 74:22 78:3
79:12 80:4 117:4
134:24 140:13
142:6,23 145:8,9
149:10 179:5
180:13,16 185:4
200:16 215:18

**figures** 218:7,25 219:3,
11,17 220:8,15,
19 222:3 223:19,
23 234:21 239:17
240:11 241:6
243:16 246:3
254:9,13 255:23

**firearm-related**
65:5

**firearms** 25:24
27:6 30:22 39:10,
16,19,21 61:19
62:14,22 69:6
82:19 97:16
111:17,20 112:3
114:7 121:17
125:9 127:22
130:11,13,21,24
131:18 132:14,21
133:24 134:9
138:4,17 139:22
141:7,11,16
148:10,14 157:16
170:21 171:6,11
173:19 179:10
184:20,23 185:25
186:7 189:12
197:13 199:9
201:5 218:23
219:10 220:2,11,
23 221:13
222:16,22 223:11
229:8 231:13
232:19 233:6
234:7,12 235:16
236:21,24 237:3,
6,22 238:4
239:20 243:10
244:16,20 246:20
250:8,13 254:5,
21,22 255:2

**fired** 215:18

**firemen** 183:18
185:3,8

**fires** 181:21

**firewards**
181:12,13,19

**firing** 140:14,15,
16 142:9 219:14

**fit** 23:18 37:3

**figures** 40:10 100:7
101:25 126:17
160:8 213:3,4

**flatter** 99:21

**flawed** 100:21
107:22

**flaws** 87:4

**flourishing** 43:8

**flush** 136:21,22
224:24

**focus** 22:24
46:15 66:15
116:6

**focused** 20:4,12
21:7 23:5 53:19
55:21 254:17

**focuses** 21:16
29:8 95:13

**focusing** 20:22
44:24

**folk** 36:18 231:7

**folks** 39:9,11
166:2

**follow** 47:4
167:14

**followup** 41:10
256:3

**followups** 254:2
256:15

**font** 234:2

**foothold** 102:13

**footnote** 118:6
161:25 173:18
193:15 198:15
204:20 216:14,
15,17 230:21
232:15

**footnotes** 118:9,
11,20 193:11

**foray** 25:23 28:10

**forbidden** 145:7

**forbidding**
130:12 133:24

**figures** force 5:16 232:12

**Fordham** 9:10
13:13 19:8,12
168:11

**forfeit** 181:9

**forfeiting** 183:13

**forgive** 191:21

**forgot** 199:2

**form** 58:10 62:17
69:15 81:24
82:23 85:20
88:18 91:15
93:22 95:2,17
97:2 99:4 100:19
105:2,25 107:10
119:3 131:25
133:4 135:3,15
136:3,14 138:6,
20 139:24 140:20
143:3 144:7,20
149:24 150:17
152:2 159:12,23
162:18 165:22
170:25 180:7
221:2 224:12
245:15 246:7
247:15 248:3,17,
22 253:12

**formed** 195:19
235:22

**forming** 122:13
123:6

**forms** 59:24
99:18

**formulate** 95:6

**formulated**
45:16 139:7
246:22

**formulating**
121:13,24

**formulation**
43:13 44:14,15
92:12 153:14

**Fortunes** 30:4

**forums** 73:25

**forward** 34:13

**figures** 227:5 228:23

**foster** 124:15
125:12 126:10,16
131:8,19 148:12
149:11 219:13
221:25 222:18
242:16,19 243:6,
9,12 250:9

**fostering** 126:8

**found** 104:7
257:19

**foundation**
90:11 91:4,7,20
103:16

**foundations**
72:5

**founders** 23:20
27:8,15,21 65:4,
14 66:5 157:4

**founding** 15:12,
15 24:15 34:18
37:2,6 40:20
43:4,6 62:10
67:6,18 68:14,23
76:23 77:4,8,14,
15 80:11 81:19,
22 82:4,5 83:5
84:2 115:3
155:15 157:6
158:3 159:4,17
170:12 180:10
222:9

**Fourteenth** 53:6
104:2

**fowling** 199:12

**frame** 69:22
70:18 87:18,20
88:21 152:17,21
160:12 168:19

**framed** 80:10
83:4

**framework** 87:2
245:20 246:12

**framing** 86:23
87:12 143:24
166:12

**frankly** 30:20

**fraud** 98:10

**free** 15:7 33:5 122:11 145:4 230:7

**freed** 203:25

**freedman** 36:16 37:17 38:22 206:12

**freedmen** 210:15

**freedom** 156:18

**freestanding** 58:22 59:22 60:3

**Friday** 111:4

**front** 54:8 72:13 125:6 210:18 227:8 248:20

**Fulbright** 17:25

**full** 18:5 54:18 84:10 130:8 161:20 175:5

**full-scale** 21:9

**fully** 43:4 87:8 95:7

**function** 77:18 176:22

**functional** 80:4 170:19 247:10

**fundamental** 33:24 174:4 227:16 248:13

**funded** 55:2

**furnish** 218:24 234:10

**furnished** 259:14

**furnishing** 234:6

**future** 74:25 169:16

———————

**G**

**gain** 102:13 206:20

**gains** 49:13

**game** 126:13

**gangsters** 215:16

**gather** 111:23 128:13 200:22 238:22 239:5

**gathered** 138:13

**gathering** 238:8 239:12

**gatherings** 238:20 239:3

**gave** 11:25 12:7 84:6,8 188:18 205:21

**gay** 57:2

**geared** 93:19

**genealogical** 158:20

**general** 19:22 29:23 39:14 50:24 78:21 112:17 116:19 121:6 125:8 135:20 137:7 165:13 168:5,6 182:22 196:18 201:10 236:17

**general's** 110:11 116:13 117:6 118:24

**generality** 76:15 176:14

**generalized** 210:10,13

**generally** 15:15 22:7 46:23 176:7 184:5 188:20 190:17,19 192:8 200:7 228:24 243:9

**generation** 23:22 24:15 34:25 67:7 80:11 82:6 222:9,10

**generations** 67:7

**generic** 196:15

**gentlemen** 239:12

**gentry** 231:20

**George** 43:22

**Gerald** 23:8

**Germany** 209:10

**Gerry** 23:16

**gestures** 6:24

**Gilder** 20:3

**give** 6:3,17 51:11 54:18 64:16 65:9 72:14 77:3 84:21 104:16 107:19,23 114:12 115:19 155:4 182:10 198:21 209:18 215:3 217:9 218:24 219:16 234:21 237:20 242:13 248:24 255:24

**glad** 237:9

**glass** 242:2

**glib** 209:8

**goal** 79:23

**goals** 73:3

**God** 65:6 252:11

**good** 8:16 49:21 61:7,9 72:12 78:13,25 97:16 98:12 104:8 128:9 153:13 156:12 172:17,24 176:6 189:4 190:20 200:21 250:19 258:2 259:8,19

**government** 30:16 80:17 115:6 130:14 134:2 174:6,15 203:23 229:7

**255:10**

**GPS** 159:18

**graduate** 19:5 27:11

**graduated** 14:15,16

**grant** 19:24 53:2 90:10 91:3,7,8 92:5

**granted** 52:13

**great** 25:12 33:18 43:24 60:13 85:22 134:16 228:23

**greater** 200:23 222:23 230:19

**grenade** 181:6

**grenades** 242:9

**grew** 23:11

**Griswold** 55:13

**grocery** 150:14

**ground** 6:17 209:15,19 211:16

**grounds** 209:13 211:23

**group** 26:6

**growing** 236:10, 13,15

**grown** 20:12

**guardian** 220:4 240:19,20

**guardians** 218:21 227:15 232:20 241:8

**Guenther** 13:7, 11,13

**guess** 5:14 26:9 34:8 36:9 41:8 46:25 52:21 60:4 62:12 70:14 71:9 75:11 107:21 109:11,24 121:5 122:24 123:14

**127:14 145:17 147:21 150:25 157:19 161:11 172:4 173:3 184:14 189:25 197:5 198:11 202:14 203:16 221:6 235:6 242:24 252:7**

**guidance** 158:16,17 248:24

**guide** 88:2

**guideposts** 129:10 202:16

**guiding** 227:13

**gun** 35:12,13,22 36:10 37:8,20,21 38:10,12,13,14, 19 39:24 42:2 66:20 70:19 71:11,14 72:9 73:3,5,19 74:3,5, 13,18,19,20,21, 25 75:9,16,18 76:23 77:4,13 81:20,21 82:18 83:25 85:17 86:6 87:17,19,21,22 88:12,23 89:3,8, 10 90:4,6,13,14 91:10,11,22,23 93:19 94:17,20, 23,24 95:14,22 96:12,15,17,21 98:25 99:14 104:5 107:7 113:22 116:7 127:22 128:6 129:18 131:13 139:16 145:12 151:21,24 152:18 156:9 169:24 170:2,12 175:4, 12,13 176:16,17 178:6 203:16 213:12,23 215:18 218:7,25 234:11, 19 236:25 240:22 242:5 244:25

**gun-powder** 181:2,8 182:14,

23 183:10,14
203:2

**gunpowder**
173:19 174:10,
15,25 175:16,17
176:7,20,22
180:13,14,16
183:20 184:25
186:2 187:3
197:12 244:3,5,
12,21 251:7

**guns** 20:5 62:9
64:21 72:23,25
91:25 131:9
139:9,11,14
144:18 174:25
175:4,19 176:22
185:9 212:18
215:15,24 216:2
218:23 230:25
237:16 242:8

**guy** 106:24 107:6
194:17 241:24

**guys** 259:8

---

**H**

**habit** 5:16

**half** 16:24 23:23
38:18 41:24 85:2
92:19 96:23
162:24 213:14,17

**half-hearted**
55:10

**halloing** 199:24

**halloo** 199:4

**halved** 19:18

**hand** 6:23 103:15
156:18 242:9

**hand-to-hand**
44:11

**handgun** 75:16
170:19 193:20
247:11,23

**handguns**
170:20

**handing** 33:11

**hands** 120:4
211:24

**handy** 172:3

**happen** 36:24
162:12 186:24
225:8

**happened** 32:18
213:16

**happening** 39:6

**happy** 149:18
153:14 156:10
164:24 236:12

**harassed** 211:6

**hard** 139:8 226:9
231:23

**harm** 176:18
200:15

**Harvard** 103:18
165:16 168:9

**hastily** 49:8

**hat** 71:16,21,22,
24 72:10 73:12,
14,15,17,19
75:13,15 91:9
166:2 223:9

**hated** 77:5,14,16

**Hawaii** 120:20
137:6

**head** 6:24 169:4
186:25 195:6,10
216:25 217:4

**health** 175:11

**hear** 8:9 36:15
53:21 201:9

**heard** 58:3 85:8
218:18

**heaven** 24:17,19

**heavy** 81:7

**Heinonline**
119:12,13

**held** 166:23

**Helfrich** 110:21

**Heller** 31:20
51:16 52:3,10,14,
22 53:7,20,22
54:11,15,16,17
55:12,13,14,25
56:9 57:20 58:6,
7,19 70:24 74:10,
11 75:17 85:6
89:19 124:19,21
129:8,15,22,23
130:5 131:4
133:14 134:23
135:9,13,21
136:16,25
137:17,25 138:8,
13 151:13,16
156:7 158:15
162:3 165:9
170:17 173:8,23
179:16 245:21
246:2 247:8,12,
21 249:4,12

**Heller's** 124:22
170:18 179:20
248:6

**helpful** 160:4

**helping** 106:15

**helpless** 38:22

**helps** 61:19
127:2 195:16

**Henry** 54:25

**Herr** 209:10

**Hickenlooper**
113:23 116:10

**hide** 252:20

**hiding** 159:16

**hierarchy** 46:20

**high** 38:2 99:19
194:22 205:3,4,
13 229:19

**high-born** 231:7

**highly** 25:13
205:16

**Hill** 9:12

**hippie** 126:9,24

**hire** 185:16

**historian** 49:20
94:4,16 96:8,9
97:14 107:5
171:18 223:9

**historian's** 71:22

**historians** 14:5
26:4,6 27:10 86:3
88:11,25 93:18
95:12,19 96:21
98:24 99:8
104:18 105:19
167:23

**historians'**
167:11

**historical** 19:4,6
30:3 46:3 54:7
56:8 73:10 76:17
78:16 85:14,15
87:25 88:2 89:11
96:6 98:12 100:6,
22,24 101:2,4,6,
13 109:22 112:15
115:22 116:5
127:21 128:19,24
130:7 141:21
143:9 159:19
162:7 167:11
170:16,17 224:3
228:22 235:20
236:2

**historically** 16:9
170:22 254:3

**Histories** 23:11

**history** 13:16,18
15:3,7,9 16:23
17:6 18:15,16,22
19:5,7 21:16
23:12,14,15
34:13,16,23,24
35:10,15 36:23
46:9 51:4,9
63:12,17 68:22
69:2,4,5 70:21
72:20 73:17,18
76:8,9,12 80:21,
25 85:23 86:3,13,
14 87:5,11,14,16,
19 88:7,15 89:8

91:22,23 92:9,15,
24 93:3,5,9,11,13
95:24 96:17 99:2,
8 100:4,16,20
101:11,12,24
104:24 105:21
107:8 111:17
112:4 116:7
118:4 119:9
121:17,18
124:18,22 126:6
129:9,10,16
132:10 141:7
158:16,19,20
169:24 171:12,15
174:13 205:12
210:5 239:23
242:16,18 243:2,
11,19 244:20,22,
24

**hit** 169:3

**hits** 197:11

**hog** 198:24

**hogs** 198:19

**hold** 6:9 26:18
151:9 186:22
250:24

**holder's** 13:23

**holding** 13:9
22:9 134:22
135:9 136:10
247:21 248:6
249:9

**holster** 150:13

**home** 8:23 78:3,
23 79:13 114:25
115:4,9,16
126:11,17
135:19,22,23
136:12,21
137:22,23 138:4,
18 139:9,10,12,
13,15,16,17
145:13 148:8
150:13,14 170:20
184:24 185:2,25
186:7 187:7,9
197:11 210:25
212:21 213:2
220:16 222:16,

18,20 231:3
239:18,20 240:11
242:22 243:3,15,
20 246:3 247:11,
24 248:14,23,25
249:3,13,17
250:10 254:5,6,8,
14

**homes** 79:18
128:7 239:25

**homicide** 205:4

**homophone**
257:8

**honor** 88:9

**honorable**
208:22

**hoops** 178:3

**hope** 256:9

**hoping** 31:4 42:4

**horrible** 242:7

**horse** 161:4

**host** 74:20 240:8

**hour** 84:8 108:7
162:24

**hours** 77:10

**house** 65:15
145:10 179:10
180:16 182:21
183:4,9,21 184:8
185:14 194:17
240:8,12 254:22,
25

**household** 232:7

**households**
236:12

**houses** 125:14
126:21 127:6
178:24

**howitzer** 180:25

**huge** 62:20

**human** 66:3
155:21 192:17

**humane** 228:13,

25

**Humanities**
20:25 21:12
22:25

**hundred** 7:18
68:6 234:13
258:4

**hunt** 17:17
234:18 235:5

**hunting** 49:14,16
194:23 219:13
234:24 235:8,16

**hypothetical**
82:2,25 140:24
143:5 144:16
145:20 221:3
235:24 246:9

**hypotheticals**
78:7,16 127:4
211:20

_____

**I**

**IDCFS** 148:7,11

**idea** 19:16 54:13
65:20 81:10
157:22 228:3
258:2

**ideas** 22:7 31:3
74:14

**identification**
10:11 11:17
147:7 178:9
198:6 202:5
217:24 233:21

**identified** 33:16
86:19

**identify** 94:20
95:10 123:4
124:9 232:11
245:4

**identity** 64:3

**ILCS** 127:20

**ill** 130:12,21

**Illinois** 6:2 113:8,
11 117:25 118:15

125:2 127:17,19
141:4 148:9,13
149:8,10 244:2
250:9

**Illinois's** 142:18

**illustrate** 43:20

**illustrates**
174:16

**illustration**
156:2

**image** 43:21,22
139:9

**imagine** 77:8
78:20 82:11
139:18

**imagined** 65:4,
14

**imminence**
210:10

**imminent** 211:3
212:6,14

**immortality**
113:8

**impact** 124:14

**impacted** 21:23

**impart** 168:14

**impede** 77:25
78:4

**impeded** 81:20

**impetus** 231:17,
22

**impinges** 246:13

**implicate** 145:11

**implicated**
132:15 145:15
195:21

**implicates** 117:2

**implies** 135:23

**imply** 131:16
240:24

**important** 13:19,
22 16:19 22:18

30:21 36:7 39:14
50:3 55:24 64:3
66:8 67:3 97:17
161:7 165:24
183:6 185:7
189:8 206:2
228:21 249:16

**imported** 182:24

**imposing** 130:15

**impossible** 83:7,
20 107:23

**impressive**
139:18

**in-home** 124:15
125:11

**inaccurate** 47:23
48:2 92:16

**inappropriate**
164:6

**incentive-based**
74:3

**incentives** 75:5,
7

**incentivizing**
74:18,19

**inception** 31:22

**include** 15:23
16:3 49:9 77:18
119:14,22,23
212:20 224:5,7

**included** 119:10,
11,15 160:17
204:4 216:12

**includes** 201:12,
13,14

**including** 16:23
86:3 102:23
111:21 112:23
134:10 175:9
194:19 230:3
237:3 238:17
243:25

**inclusion** 119:5

**inclusive** 18:18

**incomplete** 78:8,

17 81:25 82:24
143:4 221:3
246:9

**incorporate**
34:19 202:8
258:24 259:16

**incorporated**
258:21

**incorporating**
259:11

**incorporation**
41:15,16 52:24
189:17

**incorrect** 6:7
100:16 104:22

**increase** 39:23
63:21 230:15

**increases** 24:24
39:21

**increasingly**
20:12

**incredibly**
205:13

**Indian** 44:12

**Indiana** 193:14

**indicators** 46:6

**indirectly** 145:14

**individual** 33:21
36:4 44:16 48:6
57:14,23 58:8
82:9,12 102:6
134:23 136:11
137:21 206:13
247:22,23 254:4

**individualistic**
30:17 43:19
48:13 50:22
55:16 205:17

**individuals**
200:13 205:7
238:17

**indulgence**
163:6

**industrialization**
230:5

Atkinson Baker, a Veritext Company
www.depo.com

ineffable 169:6

influence 120:24

influenced 29:9

influential 165:16

inform 119:8

information 11:2 250:7

infringe 150:9

inhabitants 17:7

inherent 62:7 76:9

inherently 155:11,25

inheres 173:20

initial 202:10

injunctive 148:3

injure 241:22

injury 152:13 250:7,13

inquire 222:13

inquiries 96:6

inquiry 46:4,15 88:3 101:13 211:24 232:8 235:23

insane 194:18

inside 134:10 137:23 160:23 248:15 249:17

insight 189:9

insightful 50:10

insistent 204:11

insisting 228:12

inspect 174:10 175:15 181:20

instance 22:12 24:13 43:21 48:15 54:14 56:24 58:4 65:22 74:7 80:24 82:8

83:12 87:6 91:19 126:7 139:8 156:17 172:16 200:24 211:4 246:25 254:20

instinct 237:23

Institute 15:6

instructions 121:25

instrument 218:7 219:2

intellectual 13:19

intended 103:6

intense 209:5 230:2

intent 12:21 98:10 119:21 240:25

intentional 225:20

intents 106:9

interdisciplinary 62:25

interest 28:25 32:18,20 58:22 59:22,24 60:3 73:5 76:9,10 88:4 222:24 255:10

interested 23:25 32:11 64:8 95:23

interesting 29:2 30:18 38:7 50:7 51:9 52:2 53:18 55:8 57:20 136:16 192:23 198:23 218:10 224:17 237:11 240:14

interestingly 57:4

interests 51:5

interject 122:9

internal 134:3

internet 33:4 156:20 158:2

interpersonal 204:24 205:8,14 206:18

interpret 67:23 156:15 226:2

interpretation 16:16 19:6 155:17

interpretations 54:7

interpreted 31:4 34:15 141:5 226:17

interpretive 213:2

interrupt 21:4

interrupted 226:16

interstate 195:22

interviews 61:12 64:12 69:25 70:5

intimidation 205:4,10

intrigued 165:8

introduction 213:8

intuition 233:3, 10 235:22,25

investigate 113:4

investigated 76:6

investigating 169:24

investigator 91:8

involve 26:14 27:6 28:3,12 61:19 68:17 70:3 112:19,20 130:20,23 139:3 142:5,10 144:4

148:20 219:9

involved 20:20 44:11 216:3

involves 125:21 127:5,9 131:20 138:3,17 144:10 150:12 154:10 215:23

involving 76:14

iron 181:7

ironic 25:2 104:3, 4

Island 63:23

issue 13:22 33:24 52:24 67:5 72:24 76:13 86:21 95:20 111:25 114:21 118:2 125:3 127:16 131:11,15,16 138:3,17 145:20 148:20 150:6 155:5 165:19 174:24 188:22 192:9 220:21 222:17 223:6 236:16,17

issues 20:13,20 65:11 87:12 89:3 114:13 115:12 144:4 175:11 198:24 253:9

issuing 172:18

J

Jack 54:5 90:2

Jackson 18:14 24:13

Jacksonian 23:17 35:23 42:3, 10,11 43:3 44:10 45:3,12,23 48:4 64:9 68:23

Jacksonianism 29:12

Jacksonians 24:11

jail 228:18

James 65:17

JCAR 149:7

jealous 65:23

Jefferson 18:14 24:12,14,22 31:6 63:22 100:9

Jefferson's 15:22

Jeffersonianism 29:12

Jeffrey 227:20

jeopardy 79:3 195:15

Jimmy 66:25

jived 167:7

job 153:14

jogged 253:15

John 29:13 162:2 184:11

Johnny 224:9,15

Johnson 102:24

join 207:6

Joint 149:7

Jones 159:14

Jones' 160:2

Joseph 227:14

Journal 20:24 21:11 22:24 28:17

journalists 64:20

Joyce 54:4 90:11 91:4,7,20

judge 142:2 156:25 169:12 211:25 225:24,25 226:3

judges 129:15 169:7

**judicable** 152:12

**jump** 178:2

**jumped** 106:4,16

**jumping** 106:5

**junior** 106:14
194:21 229:19

**jurisdiction**
113:10 189:7
212:9

**jurisdictional**
189:18

**jurisdictions**
141:11,13,15,23
188:23 193:23
226:19 232:25
233:4

**jurisprudence**
31:20 40:21
41:16 43:10 47:6
56:25 70:23
103:10 115:13
124:17,21 136:24
137:18 143:11

**jurisprudential**
53:23 59:16
245:6,8

**jurisprudentially**
214:5

**jury** 211:25

**justice** 23:8 55:9,
24 56:8,22,23
57:7,24 59:21
92:11 129:8
132:19 133:12,23
136:17 156:7,24
157:2 160:4,6,11
162:2 165:5,6,9
167:5 191:24
195:8 196:2,10,
18,25 197:4,7,9
202:20

**justices** 57:16

**justification**
82:13 172:24

---

**K**

**keeping** 63:14
182:14

**Kelly** 86:16,19
87:13

**Kennedy** 56:23
57:7,8

**Kentucky** 44:12

**key** 21:19 41:19
68:21 115:12

**Kiara** 6:20 7:5
166:17 227:5
259:10

**kid** 228:18 234:18

**kids** 224:8 235:16

**killing** 104:14

**Kimmel** 66:25

**kind** 26:9 30:14,
24 41:10 49:11
50:21 54:3 55:20
59:12 60:4 62:25
63:9 73:15 74:12
87:4 88:25 96:17
98:14 106:12,14,
16 107:17 128:4
133:21 146:8
155:12 156:10
158:19 160:25
165:22 170:13
187:20 193:17
195:20 199:2,4,
25 201:7 202:13,
15 207:20 208:16
210:10 220:8
223:5 231:9
237:2,3 240:23
251:19

**kinds** 67:6,22
72:22 74:9 81:15,
16 83:10 101:8
172:13 193:19
200:11 201:6
208:21 237:25
239:3

**king's** 200:11

---

**KKK** 103:14

**Klan** 38:23,25
39:3 205:6
207:18

**Klan-like** 207:19

**knife** 208:16
236:24

**knighted** 26:10

**knock** 65:2

**knowing** 151:6

**knowingly**
240:20,24

**knowledge**
152:6 231:15
232:20 241:7,8

**Kramer** 21:21

**Kramer's** 21:20
22:14

---

**L**

**label** 94:15

**lack** 36:11 48:25
49:11 78:19
85:17 88:13
112:10 113:10
205:23

**lacked** 52:15

**ladies** 239:12

**laid** 22:7

**Lake** 217:8,17,19,
22 218:17 219:22
221:12 225:24,25
226:2,15

**land** 17:8

**landed** 182:24

**landscape** 52:19

**lane** 76:8 134:4

**language** 42:9,
20 44:17 80:16
193:2 247:7
250:2

---

**Langum** 26:25

**large** 114:14
115:8 238:18

**largely** 23:5

**Larry** 21:19

**late** 41:16 229:19
244:13 247:17

**latitude** 80:18

**law** 9:13 20:13,
15,24 21:6,11
22:25 23:7,11,12,
15 24:8,25 25:16,
17 29:18,20,25
33:10 44:4 46:17,
18,21 47:3 51:19
63:2 77:16,23
82:7,10,11,17
83:6 85:23 86:2,
13,14 87:5,11,16
88:15 89:7 92:15,
23 93:3,5,9,10,12
99:2,8 100:3,15,
20 101:10,11,24
102:14 103:18
104:23 105:20
107:8 114:22
119:19 122:2
125:24 126:2,13
127:4 128:5
132:13 141:4,18,
20 143:16,19,24
144:3,16 157:11,
14,15 161:6
165:17,18,25
168:9,11,20
174:5 178:16
180:9 181:25
182:2 184:16
188:22 189:6,11
201:3 208:24
209:24 210:4,6
211:10 215:20
217:18 218:21
220:9 224:17,18
226:8 227:14,24
228:5,6,9,10,25
232:14 240:23
241:2,3,5,16,17
246:18 253:19
254:4,18,19,23

---

**law-and-order**
206:20

**lawful** 183:8
199:15 247:24

**laws** 70:19 71:24
73:3 76:23 77:4,
8,13,19,25 80:20
81:20,21 82:20
83:13,25 124:18
128:6,7 129:2
130:12,15 133:23
141:10 152:19
171:7 172:10,15
174:14 175:2,8,9,
12 176:12 177:18
178:7,13 189:11
193:18 199:5
200:6,14 207:16
223:5 230:24
231:17 233:8
241:8 244:13,25
245:5 251:7,9,11,
23

**lawsuit** 10:5
118:2 123:19,21
124:12 125:4,21,
22 126:3 138:3,7,
12,15 144:4
145:19 149:20,22
152:17 220:18,22

**lawsuits** 148:5

**lawyer** 46:19
102:25

**lawyers** 102:23
165:25 168:14
169:6

**lay** 249:13

**layered** 102:9

**lead** 90:3 197:7
230:15

**leading** 52:3
103:10

**leads** 203:5

**learn** 165:25
168:25 169:2
239:5 242:24

**learned** 53:9

**leave** 19:11 20:9 197:20 240:3

**leaves** 80:16

**leaving** 38:22 230:10

**lecturer** 17:25 26:12

**Lee** 54:5

**left** 97:25 129:25 252:15

**legal** 29:16 46:7 70:11 73:17,18 75:22 76:16 88:7, 8 89:2 93:18 94:16 95:12 96:20 111:18 116:17 118:4 128:14,16 135:4 140:22 143:4 152:11,16,21 160:25 165:12, 14,20 166:9,11, 12 167:24 168:3, 24 171:14,24 176:14 192:23 210:11 220:22 221:23 225:18 245:3 246:8 247:16

**legislation** 37:16 132:16

**Legislative** 202:21

**legislatures** 153:20

**legitimate** 101:5 201:24

**Lehrman** 20:3

**leisure** 147:12

**length** 237:19

**lengthy** 21:11

**Leonard** 23:8

**lessened** 80:24

**letter** 46:24

**letters** 47:16

51:20

**level** 46:11 76:14 116:2 150:20 176:13 200:21 209:5

**levels** 38:2 39:24 58:20 205:3,4,14 207:21

**Levinson** 58:4

**Levy** 165:13 166:8 168:2

**Lexus** 172:6

**liberal** 168:8

**libertarian** 30:15 42:25 192:6

**libertarians** 30:8,9

**liberty** 73:5 204:2

**library** 29:21

**license** 195:12

**licensed** 46:18 148:12 195:5

**licensees** 148:9

**licensing** 195:21

**life** 15:25 35:11 212:19

**lifelong** 19:13

**likelihood** 233:5

**limit** 65:25 114:15 156:18 162:11 174:7 220:2

**limitation** 196:12

**limitations** 196:17

**limited** 150:25

**limiting** 227:19

**limits** 70:24 71:4 83:17 199:11,18 200:19 201:12 220:8 229:7

**Lincoln** 9:13

**lineal** 157:4,12,13 162:3,4,12 165:5 167:5,16,18 169:9 190:2 223:3,5 245:4 247:6

**linear** 215:11 219:8,18

**lines** 122:6 211:12 218:4

**lingo** 170:18

**links** 49:16

**lion's** 21:17

**list** 12:8,9 117:23 251:16 252:10, 14,22 253:2

**listed** 21:5 118:7 120:17 128:20 153:17 212:22 213:7

**listing** 34:3

**listings** 64:11

**lists** 27:12

**literal** 166:11

**literally** 29:5 44:18 98:21 159:4 197:11

**literary** 238:7

**literature** 59:20 165:12 245:23

**litigated** 31:16

**litigation** 86:23 111:25 220:10

**live** 9:2 241:24

**lived** 29:18 213:17

**lives** 178:25 185:19

**living** 56:14,17 57:10 126:9 153:24 154:4,13, 14 155:18 156:4 187:7 231:3,5,6

**load** 19:18 186:6

**loaded** 83:14 128:7 175:19 176:16,17 178:23 180:13 181:2 185:4 214:2

**local** 5:25 78:20 116:3,7 173:21 174:14 231:7 251:7,9,11

**localities** 115:8 230:23 243:25

**localized** 22:4

**locations** 212:18

**locked** 131:13 220:11

**locus** 201:23

**lodged** 182:25

**long** 20:23 24:12 60:14,17 111:6, 10 124:8 163:20 189:24 209:24 210:4,7 244:22 249:19 250:5 259:4

**longer** 207:8 214:25

**longstanding** 130:10

**looked** 102:15 143:8,10 157:8,9 216:20 237:18 253:7

**lose** 50:12 163:9

**lost** 173:2

**lot** 22:8,17 25:9 29:15,20 32:20 36:18 48:16 49:13 61:24 84:23 105:14 108:2 119:25 169:18 177:23 189:22 203:15 211:13 225:4 232:8 248:24

**lots** 39:3 83:22

236:11

**loud** 6:22 7:2

**love** 64:24 237:8

**loved** 76:24 84:2, 6

**lowbrow** 208:19

**lowdown** 237:5

**lower** 129:25

**Lucillius** 103:19

**lump** 66:5

**lunch** 108:10,16, 18

**Lund** 54:24

**Lund's** 54:14

---

**M**

**MA** 178:6

**machine** 215:18, 24

**made** 15:20 32:12 65:12,21 73:24,25 80:11 82:11 83:7,20 87:13 103:17 123:10 143:7 156:7 211:5 220:11 232:16 241:16 242:6

**Madison** 65:18 85:8 137:5 142:2 248:13

**magazine** 22:19 79:6 114:15 183:2

**magic** 146:9

**maim** 241:22

**main** 26:5 169:23 191:19 192:9 219:6

**maintain** 79:22

**maintenance** 78:19

Atkinson Baker, a Veritext Company
www.depo.com
Index: major..minutes

**major** 53:18
97:23 228:22

**majority** 61:25
62:17 64:5 81:3

**make** 6:10,17 8:9
16:5 18:4 32:4
33:7 34:25 48:7
108:12 120:5
121:12 123:11
125:17 137:2,17
156:10 157:17
158:22 212:5,10
239:13 243:21
257:16

**makes** 55:20
103:3 144:23
157:21 220:4

**making** 38:3
71:24 85:13
244:11 255:6

**Malcolm** 54:5

**mammoths**
17:17

**manage** 26:14

**managed** 26:18

**mandate** 80:14

**Manhattan**
163:10

**manner** 151:15
201:8 234:10

**manufacture**
175:18

**manufactured**
176:21

**manufacturing**
82:18

**map** 137:16

**marauders**
38:23 203:21

**marauding**
39:11

**March** 180:11

**mark** 10:4,24
12:3,4 146:24

258:11,13,22

**marked** 10:9,21,
25 11:15 147:6
178:4,8 198:5
202:4 217:22
233:19

**market** 201:13

**marks** 178:17
182:12

**Mary** 14:23 15:4
29:3,19

**Mason-dixon**
190:23,25

**Mass** 178:6

**Massachusetts**
52:7 177:20
178:14 184:4,5,6,
15,17 186:12,18
188:11 191:3,7
226:6

**Massachusetts-
based** 191:13

**massacre**
184:12 205:16,20

**massive** 253:8

**master** 252:10,
13,22,25

**master's** 14:20

**material** 89:6
120:2 214:17
237:22 252:2,21

**materials** 63:8
109:21 112:16
114:10 117:22
118:6,8,11 172:4,
14 203:3,4
235:21 251:16
252:8

**matter** 48:10
89:15 113:7
131:9 198:12

**matters** 13:25
250:12 258:15

**may-issue**
190:11

**mayhem** 209:4

**mayor** 186:15
199:19

**Mcclean** 195:8
196:2,10,19
197:4,7

**Mcdonald** 53:10,
13,15,21,24 85:6
173:24

**meaning** 22:8
35:5 69:7 111:15
114:3 133:22
134:7 156:23

**meaningful**
42:23 137:13

**means** 46:12
53:24 59:23 84:7
137:3 151:7
154:5 207:7
221:21 222:12
223:10,12 224:10
228:11 238:19
244:14 255:18

**meant** 59:22
100:11 185:15
201:22 204:18

**measure** 71:14

**measures** 80:7

**mechanism**
41:13

**meet** 101:12
210:11 212:9

**meeting** 68:12,
20

**member** 24:15,
20 79:7

**members** 20:17
38:25 48:17 50:5

**membership**
94:6

**memo** 57:25

**memorized**
109:25

**memory** 116:20
123:24 237:21

**men** 80:2 230:6
236:14

**mental** 130:21

**mentally** 130:12

**mention** 215:14

**mentioned** 28:9
41:25 47:5 91:20
101:15 168:2,7
172:8,9 221:10
237:13

**mentions** 131:5

**merges** 102:19

**merit** 13:4

**Merry** 224:9,14

**metal** 139:12

**metaphor** 69:22

**metaphor's**
69:20

**metaphorically**
69:23

**methodological**
87:25

**methodologies**
101:2

**methodology**
19:4 87:10 98:13
100:21

**methods** 101:6
112:24 255:15

**metrics** 99:21

**Mexico** 226:6

**Michael** 97:7,12

**Michigan** 215:20

**microphone** 8:7

**mid** 229:3,4
244:13

**middle** 173:16
230:20

**Midwest** 191:5,8

**mightily** 204:17

**mile** 213:14,17

**miles** 201:15

**militia** 27:4,20
34:4 41:25 77:17
78:2,5,20,22
79:2,7,14,23
80:2,19,20 81:4,
11,14,21 95:25
99:10 101:17
134:25 136:11
192:21 193:5,21
207:9 208:21
237:3 238:10

**militias** 103:7
207:5,10,11

**Miller** 105:11
138:15 144:3
148:4

**mind** 58:12 73:8
84:12 94:7 97:10,
13 118:14 152:17
163:24 199:5

**mindful** 71:24

**mined** 139:11

**minimum** 101:12

**Minnesota**
215:20

**minor** 218:6,25
220:5,6,15,19
221:25 223:16,
18,21 232:22
234:11,21 241:6

**minors** 81:2
111:21,23 128:14
218:22 219:10
220:3,22 221:12
227:10 229:6,11,
17 230:24 231:2,
4,21 233:5 234:6
238:18,19 251:12
254:24 255:11,13

**minute** 215:4

**minutes** 60:17,
18 77:11 163:4,
20,21,23 164:9
194:7 227:7

Atkinson Baker, a Veritext Company
www.depo.com

250:16

**mirroring** 228:7

**mischief** 222:13, 14

**misnomer** 33:3

**misprint** 48:2

**misquote** 56:15

**misremembering** 192:22

**missile** 218:23 247:2,4

**missiles** 218:8 219:2

**misspellings** 257:7

**misspoke** 45:20

**misstates** 75:21 97:3 105:3 158:6

**misstating** 158:8

**mistaken** 100:12

**misunderstanding** 152:23

**mocked** 156:11

**modality** 133:23 160:13

**model** 101:10 212:3,5

**modeled** 228:2

**models** 190:10 214:16

**modern** 35:12, 17,22,24 36:10 42:2 43:23 48:16 86:22,24 101:11 103:4 105:10 157:14,15 159:9 228:17 244:25

**modern-style** 23:23

**modes** 22:6

**mom** 231:3

**moment** 11:11 32:19 35:21 122:9 161:14 188:12 218:18 224:15 242:13

**moments** 68:21 80:25 141:21

**monarchian** 228:3

**months** 6:16 52:13

**Moore** 85:7 137:5 142:2,13 248:12, 20 249:8,9

**moot** 63:5

**mortality** 250:8

**mortar** 180:25

**Motel** 126:23

**mother** 229:19

**motivated** 50:11

**motivating** 19:18

**motivation** 206:21

**Mountain** 113:22

**move** 7:21 76:20 84:17 99:25 107:17 128:4,17

**moved** 18:15

**movement** 42:3 156:9

**movements** 55:22

**movies** 215:17

**moving** 32:3 84:20

**mufflers** 215:19

**mullah** 194:20

**multipart** 125:7

**multiple** 90:23 176:23

**multipronged** 115:21

**municipal** 119:19 216:7 217:16

**municipalities** 173:21

**music** 229:20

**musket** 83:14,15, 16 199:12

**muskets** 156:13

**Mussolini** 44:5

**muster** 83:14,15 172:21 173:11 238:10

**mustered** 79:3

**N**

**nail** 169:3 233:2

**nailed** 185:14

**naming** 18:16

**Nancy** 65:12

**narrative** 21:22 37:4 104:4

**narrow** 179:18

**narrowing** 41:20

**nary** 243:4

**Nasa** 208:19

**natural** 41:10 222:20

**nature** 7:17 66:3 76:16 149:21 158:13 200:7 205:15

**navy** 237:13

**neat** 234:2

**necessarily** 51:6 153:19 219:10 225:17

**necessity** 172:23 199:14 201:20,22

**needed** 21:21 80:5 121:16

188:9

**negligence** 224:6

**Negro** 207:11

**neighbors** 185:9,17 186:4

**Nelson** 54:14,24

**net** 39:22

**Netherlands** 17:21 18:2

**neutral** 37:22 204:12 207:15

**neutralize** 37:23

**Newsom** 116:23

**night** 236:8 241:24

**nineteenth** 230:22

**Ninth** 121:3,8

**Nixon** 168:6

**Nixon's** 165:13

**noise** 199:25 200:14

**nomenclature** 18:17

**non-elites** 35:4

**non-gun** 89:3

**nonverbal** 6:23

**normal** 155:23 163:15,17

**north** 190:18 191:8

**north-south** 190:23

**Northwestern** 29:25

**notably** 247:25

**Notary** 5:3

**note** 50:3 67:3 122:18 179:15 204:4

**notes** 32:6 48:20 250:17

**notice** 5:22 29:14 30:24 118:10 179:15

**noticed** 118:8 216:11 218:4

**notwithstanding** 183:16

**November** 6:7, 12 178:15

**NRA** 55:2

**nuance** 66:8

**nub** 38:17

**number** 9:19 11:21,25 12:2,7 27:25 64:18 77:8, 18 110:5 191:7 193:3,23 203:19 230:23 239:7 244:6

**numbered** 12:8

**numbering** 11:22

**numbers** 12:10

**numerous** 214:6

**Nunn** 40:4,9 172:9

**nuts** 112:21

**nutshell** 57:12

**O**

**OAH** 26:2,12

**object** 59:3 131:25 133:4 162:18

**objected** 77:9 154:18

**objection** 69:14 70:10 71:18 75:20 78:6 81:23 82:22 84:3 85:19 88:17 90:16

91:14 93:21
94:25 95:3,16,17
96:25 99:3
100:18 104:25
105:24 107:9,20
132:22 133:7,15
135:2,14 136:2,3,
13 138:5,19
139:23 140:19,21
143:2 144:6,19
145:23 149:23
150:16 151:25
154:2,15,23
158:5 159:11,22
170:24 220:25
221:18 222:4
224:11 225:9
245:14 246:6
247:14 248:2,16
255:3,16 258:18
259:3

**objections** 123:10

**objective** 94:13

**objectives** 37:4

**observed** 157:2

**obsolete** 53:11

**obtained** 199:19 220:15

**obtaining** 230:25

**obvious** 77:23

**occasion** 212:12

**occur** 126:11 212:25 238:25

**occurring** 42:24

**occurs** 43:9

**October** 76:24

**odd** 160:25 161:5

**odds** 89:15

**offenses** 200:7, 11,12

**offer** 49:2 84:17 139:7 141:13 146:5 226:9

**offered** 76:2 78:11

**offering** 93:5

**office** 85:23 86:2, 13,14 87:5,11,14, 16 88:15 89:8 92:15,23 93:3,5, 9,10,12 99:2,8 100:3,15,20 101:10,12,24 104:23 105:20 107:8 110:11 116:13,16,22 117:7 118:24 164:3

**officer** 78:21

**official** 63:24 174:15

**officials** 236:18

**oftentimes** 88:3

**Ohio** 16:20 17:19 91:6

**older** 69:3

**ominous** 250:25

**Omohundro** 15:6

**one's** 47:20 48:8 135:18 150:13 170:20 214:2 222:3

**ongoing** 117:12

**open** 14:4 140:3 177:24 188:19,25 190:17 240:4

**operate** 12:11 131:18

**operationalize** 152:22

**operative** 179:19

**opine** 116:4 225:4

**opinion** 31:24 56:24 57:3 71:16 111:16 117:23 119:8 121:4,13

123:6 127:13,15 130:9 136:7 137:14 142:2,3 192:25 197:2 226:9 243:17 244:11

**opinions** 113:12 117:22 121:24 122:14 196:22 242:15 243:2

**opponent** 24:16

**opportunity** 78:23 85:24 256:25

**opposed** 48:24 73:9 81:20,22

**opposing** 54:6

**opposing's** 140:23

**options** 20:10

**orchard** 201:14, 15

**ordained** 186:14

**order** 12:12,21 30:24 48:21 78:25 139:15 152:11 162:13 198:11

**ordered** 204:2

**ordering** 259:24

**ordinance** 186:14 217:19

**ordinances** 174:14 197:14 198:4 202:3 217:21 226:25 244:7 251:9

**ordinary** 22:22 225:18

**ordnance** 119:19 184:16 200:2 202:11 219:23 225:25 226:3,5 254:12 258:17

**ordnances** 129:3 232:23

**ore** 139:11

**organization** 26:4,5 94:7

**organizations** 96:15 205:6 207:18,19

**organize** 251:20

**organized** 28:17

**original** 35:20 104:11 197:20

**originalist** 155:7, 10,12 156:3 160:12

**originalists'** 155:16

**originals** 55:10, 11 253:11

**originated** 203:17,18

**originates** 103:24

**OSU** 19:11

**out-and-out** 254:12

**out-house** 180:22 181:4

**outbuildings** 160:17

**outcome** 74:6

**outfit** 81:4

**outgrowth** 96:5

**outline** 171:15

**outlines** 65:20

**outskirts** 201:15

**overlap** 252:6

**overly** 216:16

**overnight** 45:5

**oversight** 188:2

**overstatement** 176:25

**overtly** 205:7

**owned** 241:25

**owners** 73:6 74:5,13,18 113:22

**ownership** 38:12,13 239:18

---

**P**

**p.m.** 61:5 109:2 134:20 166:25 194:10 215:8 250:21

**pages** 11:8 25:21 57:4 68:6 105:15 226:23

**paginated** 253:13

**pain** 155:22 183:3

**pains** 236:15

**pair** 191:6

**paleolithic** 16:25 17:3

**papers** 47:15

**par** 207:17

**paradigm** 106:6

**paragraph** 112:9 133:13 148:7,11 149:16 153:2,7, 16 157:23 158:4, 12,25 161:20 170:8 173:17 174:21 175:6 182:12 191:19,20 196:3 197:10 202:23 212:16 229:3 230:21 243:23

**paragraphs** 144:25 188:18 213:7

**paramilitary** 204:22 207:18

**paraphrasing**

24:18 67:15
136:17

**parent** 131:19
220:4 223:16
234:17 240:19,20

**parental** 228:12
233:6 235:13

**parental-headed**
232:6

**parenthetical**
229:18

**parenting** 222:21

**parents** 124:15
148:13 218:6,21
222:20 227:15
228:8 230:9
231:15 232:20
235:15 241:8

**park** 134:5

**parked** 160:22
161:5

**part** 20:8 28:16
38:17 59:10,15
61:14 64:3 80:3
89:23 103:13
109:18 110:12
118:20 127:14
129:16 131:4
138:23 149:17
151:16 157:21
159:5 169:13
175:24 181:22
183:6 202:23
203:4 204:23
206:3 207:15
211:14 218:20
238:8 240:3
246:17,22,24
249:7 259:17

**participate** 207:9

**participating**
20:15

**particulars**
113:9

**parties** 5:23
23:24 24:23 25:4

**Partisan** 24:3

**partisanship**
24:24 25:6

**parts** 37:3 49:25
59:7 90:23
202:14 206:2

**party** 23:18
24:16,20 102:23
103:25 240:7,8,
12,13

**pass** 172:19,20
173:11 244:16
247:4

**passage** 130:5
136:18,19 147:19
177:6

**passed** 106:11
180:11 184:18
207:16

**past** 81:3 86:24
87:2 92:2 171:6
257:19

**patriarchal**
227:25 228:8

**Patrick** 54:25

**pattern** 127:10
141:5 142:20
170:19

**Paul** 13:7,11,12
57:22

**pay** 181:9

**PDF** 118:25
119:3,22 178:22
199:8

**peace** 199:25
200:8,12

**peacefully** 22:6

**pedagogic** 33:12

**pedagogically**
33:18

**Pelosi** 65:12

**penalty** 183:13
199:21

**Penn** 14:19,20

**Pennsylvania**
30:13 48:18,19
49:19,23 50:2

**people** 15:16,17,
21,23 16:2 21:20,
25 22:9,17,20
26:13 30:6,24
32:10 36:19,24,
25 42:16 43:14
45:11,21 46:2,6
47:24 48:22
50:10,11,13 51:7
53:2 55:23 57:13
64:5 73:16 75:3
79:17 81:11
82:20 85:13,16,
24 88:4 92:8,11
93:4,17 94:15
95:10 96:11,14
100:23,25 101:5,
21 104:17 107:13
126:15 130:21
137:16 156:9
166:8 179:13
185:24 187:5,6
200:22 205:17,23
208:22 230:6,14
231:21 238:6,9,
22 239:2,5

**people's** 32:20
48:3 125:14
126:21 127:5

**perceived**
112:13

**percent** 84:7,9
258:4

**percentage**
61:17 64:14

**percentages**
89:15

**perception** 81:6
209:2

**percolating**
29:16

**perfectly** 8:14
155:23

**perform** 238:13

**performance**
199:15

**perilous** 222:23

**period** 15:9,13,
15,23 17:4,16
18:9 20:5,6 39:18
40:2 42:4,10 43:3
44:10 45:12,23
47:8 48:4 50:20
68:23 81:13
175:8,21 195:19
205:11 209:6,21
214:5 227:12
229:24 230:2
236:10

**periodizations**
18:19

**permissible** 70:8
73:21 129:11,18
153:18 161:22
162:9,14,16
167:7,21 169:10
170:22

**permission**
199:19

**permissive**
39:15,25 40:3

**permit** 172:18
218:6 223:18
224:4,10 225:6,
17 240:21,24

**permitted** 90:7
91:12 190:17
201:11

**permitting**
216:25 225:8

**persistence** 85:3
96:24

**persistent** 92:6

**person** 7:5 79:8
80:8 106:9
131:17 141:17
142:11,24 150:13
180:21 181:8,18,
23 183:8,19
184:19 199:10
208:4,5 209:14,
20 213:12,22
214:3 232:2,16
234:9 254:14

**person's** 101:7

**Personally**
145:17

**persons** 184:22
218:24

**perspective** 89:4

**persuasive**
33:22

**pertains** 250:9

**pertinent** 202:15

**pervasive** 81:12

**petition** 189:13

**Ph.d.** 14:21

**phase** 169:17

**phenomenon**
114:25

**philanthropists**
13:14

**phrase** 15:15
28:11 85:17
86:11,15 88:14
92:15 105:22
175:4 190:9
223:3,10,14
229:14 238:11

**phrased** 70:15,
17 90:13

**pick** 37:2 166:15

**picked** 54:10,12
103:9

**picking** 33:10
100:6 101:25

**pickpocketing**
231:7,20

**picture** 18:5

**piece** 22:24 71:17
199:13

**pieces** 100:6

**pig** 198:24

**pigs** 198:19

**pinpoint** 25:23

**pistol** 191:25 193:12 208:6 213:23 214:9 234:11 236:25 240:22

**pistols** 192:12,20 193:16,17,19 217:2 237:13

**pitch** 203:2

**place** 32:9 175:14 183:5 200:16,18 201:8 211:9 213:17 220:7 235:4 238:3 239:25 240:13

**places** 111:21,22 128:8,12 130:13, 24 131:10 133:25 212:22,23,24 213:15 235:6 238:21,25 239:4

**plain** 133:22 134:7

**plaintiff** 221:24

**plaintiff's** 125:25 144:17 152:5

**plaintiffs** 114:8 122:5 125:23 142:6 145:19 151:20,23

**plaintiffs'** 148:15

**plantation** 63:23

**plausibly** 116:3

**play** 108:9

**playing** 126:13

**plentiful** 40:17

**plow** 43:25

**podcasts** 61:13 70:6

**point** 14:6 33:17 42:22 43:9 46:10, 13 52:16 58:17 70:20 97:8 102:10 139:10,15 140:7,8 143:7 149:3 156:7

175:23 220:3,9 245:2 259:22

**pointed** 35:2 147:18 160:5

**pointing** 60:2 160:2

**points** 117:24 120:10 128:21,25 210:7

**police** 72:24 95:25 128:15,16 153:21 154:9 157:24 158:14 170:6,10,22 171:7,11 172:11 173:20 174:12,22 175:11 195:9,11, 23 196:17 202:19,20 203:13

**policy** 37:4 76:11 80:10,13 87:23 88:6 113:16 148:7,11

**political** 25:4,5 29:13 73:9 88:25 205:8,18

**politics** 76:12

**polling** 50:19 71:3 74:8 213:14

**pool** 63:4

**poor** 81:8 175:11

**pop** 45:5

**popular** 20:22,25 21:9,13 24:2 34:19 45:9 46:12, 14 55:22 62:4 63:19 64:8 66:23, 25 67:2,19 96:3 215:16

**population** 236:13

**populous** 128:11

**pork** 199:5

**port** 182:24

**portion** 62:20

**portrayed** 43:23, 25

**ports** 185:18

**pose** 124:15

**posed** 222:15 229:6,10

**poses** 39:16

**position** 37:10 69:11 86:6,23 87:23 106:13

**positions** 33:16 35:17

**Posner's** 137:5 142:3

**possess** 134:24 184:23 218:6,22 219:11 220:6,19, 23 223:19 247:10,23

**possessing** 221:13 254:5,13 255:2

**possession** 128:14 130:11,20 148:9,13 210:24 231:12 240:21 241:6 243:16 246:3

**possibly** 226:4, 11

**post** 41:17 53:15 70:24 85:6,7 137:17

**post-mortems** 51:23

**posted** 229:16

**potential** 41:20 176:18

**potentially** 28:23 131:2,3 161:7

**pounds** 181:9 183:10,20 184:25 186:2

**powder** 82:18 127:22 128:6

175:5,13 178:7 181:24 182:7 183:4 242:6

**Powder-house** 183:2

**power** 65:23 72:24 95:25 127:21 128:15,17 153:21 154:10 157:24 158:14 170:7,10,23 171:7,11 172:11 173:18,20,25 174:9,12,23 175:11 195:9,11, 24 196:18 203:13,23 228:9

**Powers** 202:21

**practice** 46:18 98:12 155:14 159:4

**practices** 74:21 79:8

**pragmatic** 169:25

**pray** 239:5

**pre** 20:6

**preamble** 179:16,20,22

**preambles** 179:17

**precepts** 87:25

**precise** 64:16 94:2 115:20 210:9

**precisely** 245:17

**precluded** 74:10

**predating** 31:20

**predict** 169:16

**predominantly** 114:24

**preemption** 114:22 115:7,17

**prefer** 147:15

**preliminaries** 9:21

**preliminary** 9:24 10:22

**premise** 107:21

**premises** 145:13

**prepare** 109:14

**prepared** 256:21

**preparing** 153:5

**prerogatives** 65:16,24

**present** 19:9 26:20 37:5 82:19

**presenting** 112:15

**Presentism** 85:4

**presidency** 15:22 65:16

**presidents** 18:17

**press** 23:9 52:7 53:11,16 63:21 156:18

**Presser** 103:11

**presses** 156:19

**pressing** 82:13 209:16

**presumed** 7:24

**presupposing** 102:2

**pretty** 27:11 98:15 99:19 106:6,15 120:10 135:7 137:7 153:13 160:8 185:17 234:22 239:3

**prevailing** 36:4,5

**prevalent** 198:24 214:16

**prevening** 244:8

**prevent** 182:15 223:21 255:13

**prevented** 82:17

**preventing** 82:20 254:17

**prevention** 183:17 203:6

**previous** 27:23 213:7 256:19

**previously** 170:14

**priest** 194:21

**primarily** 21:16 29:8 193:6

**primary** 9:11 87:7 118:5 188:4

**principle** 45:3 127:10 174:4 176:15 179:17 220:14 222:7,8 227:13 248:21

**principles** 153:17 165:4

**print** 156:18

**printing** 156:19

**prior** 97:3 105:3 110:8 158:6 229:24

**privacy** 161:8

**private** 185:16 220:7

**privilege** 110:12

**privileged** 122:16

**prize** 27:2 97:24

**problem** 70:14, 16 71:20 79:11, 16 80:9 83:3 85:12 86:20 87:8 98:5 106:3 107:13 124:8,16

**problematic** 82:14 99:18

**problems** 82:19 87:11 97:8 100:23,25 101:5

153:22 190:4 218:17 229:6,10, 16

**procedure** 5:25 122:17 160:20 161:9

**procedures** 233:24

**Proceedings** 233:14,17

**process** 76:15 112:14 161:9 166:3 168:18,20 170:2

**processor** 126:13

**proconfederate** 207:8

**produce** 74:12 79:19

**produced** 33:6 109:23

**producing** 37:25

**product** 102:22 104:11

**production** 139:16

**profession** 98:22

**professional** 64:3 185:8

**professor** 14:24 23:7 209:7,8,11 256:17

**profound** 42:10, 19 100:21

**progenitor** 157:13

**programmatic** 74:24

**prohibit** 174:10 239:17

**prohibited** 75:17,19 79:17

190:18,19 193:13,18 199:9 234:19 236:21, 22,23 240:20 241:6 254:4,25

**prohibiting** 128:8 188:19 212:18 230:24 234:6

**prohibition** 59:24,25 128:13 142:18 173:10 189:3 226:17 232:22 234:23 255:12

**prohibitions** 130:10 190:13 197:13

**prohibitive** 223:14

**prohibits** 148:8, 12 221:12 254:12

**project** 20:4 21:9 31:6 38:4,12 129:25 235:20

**projects** 20:16 25:8

**proliferation** 37:24

**prominent** 13:13 166:9,10

**prominently** 48:16 209:25

**promote** 73:3 203:25

**prompt** 64:20

**prompted** 153:20 229:7

**prongs** 115:20

**pronunciation** 257:6,24

**proper** 58:7 74:21 78:19 123:15 165:20 166:12 245:3

**properly** 78:24 176:20,23 183:22 185:2 186:3 222:21

**property** 160:16, 18 210:19

**proponents** 35:12,13

**proposal** 71:14

**proposed** 22:21 50:17 73:19

**proposing** 75:6

**prosecuted** 212:8

**prosecutions** 207:17

**protect** 28:14 32:23 103:7 179:5 181:21 186:12 203:24

**protectable** 41:2

**protected** 180:17

**protecting** 204:9 206:11,24 207:12,13 228:11 255:10

**protection** 156:21 179:6 183:18 185:3 187:5,6

**Protestant** 18:17

**protesting** 22:5

**prove** 98:18 152:18

**provide** 111:14, 16 118:25 172:16 182:13

**provided** 113:21 122:12 183:7

**provision** 49:23 50:17 114:4 119:16

**provisions** 49:9 69:9 121:20

**Provo** 226:3

**public** 5:3 13:19 39:16,17 44:14 73:4 74:8 80:10, 12 81:9 113:15 116:24,25 128:9 131:12,21 133:22 172:24 173:8 175:11 189:4 190:5,8 191:4 192:7 199:15 200:8,12,14,22 201:13 204:12, 13,18 207:14,16 212:19 220:7 231:20 236:8 238:13,14 239:8 240:12

**publication** 97:23

**publications** 28:2

**publish** 28:14 53:7 54:2 63:16, 18 94:21

**published** 23:6, 10 28:15 29:4,5, 24 52:5 86:17

**publishing** 52:16

**pull** 52:7 54:19 146:25 147:4 149:15 187:19 188:13 217:10

**pulling** 123:25 252:12

**pun** 13:22 101:18

**punishment** 155:6,10,13

**punitive** 80:7

**purchase** 145:9 217:2 231:13

**pure** 150:22 152:7

**purely** 89:11

**purport** 85:14

**purpose** 91:21

148:10,14 151:15 179:5 235:17

**purposes** 7:24 106:9 126:20 142:25 179:23,25 188:6,8 220:19 238:7 247:12,24

**pursuant** 5:22,23

**push** 108:11

**pushback** 74:12

**put** 54:7 79:2 90:14 140:13 142:6,7 144:23 146:11,16 147:10,17 183:4 197:19 217:12

**Q**

**qualifications** 130:15

**quality** 175:17

**quantify** 233:10

**quantitative** 98:13 141:14

**quantity** 183:10, 11

**quarters** 16:8

**queen** 26:10

**queen's** 257:25

**question** 7:8,11, 14,22,25 8:2,4 13:3 22:20 27:23 46:5,8 47:2,3,19, 22 49:17 50:8 57:5 59:4,6,15 60:4,7 67:12 69:22 70:15,17, 18,21 71:2 72:12 73:2,11 75:12 77:6 78:12,15 79:11,15 81:24 82:23 83:4 85:21 88:18 90:19,21, 22,25 91:15,18 92:25 93:22,24 94:22 95:2,7 97:2

99:4 100:19 102:11 105:2,25 107:10,22 116:6 122:19 123:4,7 131:5 132:2,5,24 135:3 136:16 139:6,24 140:20, 25 143:3,9,11 144:7,20 145:4 149:24 150:17 152:15,22,23 159:12,23 162:6, 18,22 163:3 164:12,14,22,25 167:14 170:15,25 171:4,20 179:19 195:20 210:25 213:2 220:20 221:2,5 224:12 225:15 229:23 240:14 244:24 245:15,17 246:7 247:15,19 248:3, 17 255:19

**questioned** 42:14,18

**questioning** 13:5

**questions** 13:20 47:10 71:6 72:4 93:6 107:18 120:25 123:9 124:6 134:12 138:24 140:3 144:24 146:18 189:22 224:17 245:6,8 253:25 256:4,10,13

**quibble** 15:16

**quick** 9:23 102:21 111:9 132:6 134:15 153:4

**quickly** 37:17 177:18

**Quincy** 197:18, 21 198:4,12 199:4

**quiz** 109:25

**quote** 130:4 149:5 151:16 198:15 207:23 227:20

**quote/unquote** 207:11 224:4

**quoted** 133:14 202:24

**quotes** 45:22

**quoting** 186:11 238:3

**R**

**rabbi** 194:20

**race** 20:5

**racial** 205:17

**racially** 37:15,21 204:12

**racist** 207:8

**radical** 24:9 48:14 49:22

**rages** 16:8

**raging** 33:15

**raises** 50:7

**Rakoff** 54:5 90:2

**rallies** 22:10

**ran** 50:13 98:21

**range** 100:22,24 140:15,16 142:9 171:10 214:12,18 219:14 239:10

**ranging** 189:3 219:25

**rank** 25:5

**rascals** 237:6,9

**rate** 167:3

**rates** 113:7,8

**ratification** 48:19 49:5

**ratified** 22:22

**ratify** 49:4

**reach** 41:13

**reaching** 174:11

**read** 25:12 56:12, 13 59:19 63:8 112:5 120:20,22 127:23 128:18 129:19 130:6,17 142:12,15,16 146:17 147:12 148:18,23 153:3, 4 173:3 174:17 179:24 191:15 193:11 198:19 242:6 249:10,20

**readership** 67:4

**readily** 84:12 97:10 103:15 119:3,17

**reading** 10:17 27:11 109:15 111:15 137:25 165:10 166:7 178:20 179:21 180:20 182:18 183:15 198:20,22 199:3,23 204:8 214:16 222:11 223:24 224:3 235:21 249:18

**reads** 42:12

**real** 153:4 242:5

**reality** 52:15 81:17

**realize** 37:19 53:2 163:11

**realized** 35:13 53:16 198:22

**rear** 159:18

**reason** 8:3,18 24:11 89:7 94:16 104:9 156:12 187:19,21 190:20 216:11,23

**reasonable** 100:23 173:9 209:13,19 210:8

211:23

**reasoning** 165:14,17,22

**reasons** 48:25 203:19 205:8

**rebellion** 22:3

**recall** 33:9 65:10 113:24 119:15 145:3 156:6 196:24 216:24

**receive** 181:3

**received** 19:23 74:4 91:3,6

**recent** 6:8 65:3 69:2,4 121:3

**recently** 27:22 117:15 203:25

**recess** 12:15 61:4 108:25 134:19 166:24 194:9 215:7 250:20

**recognition** 172:23 201:3

**recognize** 184:6 228:22

**recognized** 171:13 235:15

**recognizing** 55:14 158:15

**recollection** 66:11 72:14 124:4 145:25 252:17 253:6,15, 16 254:16 255:9

**recommend** 25:13

**recommending** 93:3

**reconstruction** 17:2 35:25 36:16, 23,25 37:7,11,13, 19,25 38:4,6 39:5,22,23 41:6, 17 102:20 157:10 203:14,18,22

206:23 207:22 209:3

**reconstructionism** 36:15 38:20

**reconstructionists** 204:16

**record** 5:6,9,17, 20 7:24 12:14,18 57:10 60:22 61:3 134:18 166:21, 22,23 177:11 194:4 215:6 219:4 257:17 258:4

**records** 111:7

**recovered** 181:11

**recreate** 207:5

**red** 178:17,21 182:12 183:19

**Redding** 5:11 9:3,5

**redefine** 52:19

**reducing** 90:13

**reenacted** 180:8

**reenactment** 241:13

**refer** 121:8 124:7 149:2 170:6 193:19 217:14

**reference** 23:14 67:12 103:15 181:16 187:16 188:3 194:20 232:15 237:12 259:12,17

**referenced** 34:5 75:16 134:13 149:20 193:14 216:9,21 229:22 240:17 243:23 252:8

**references** 29:17

**referencing** 198:16 231:18

**referred** 27:20,22 87:8 95:14 131:23

**referring** 11:23 31:21,23 40:2 62:13 88:15 121:5,6 124:5,9 125:14 131:23 132:19 133:12 160:16 198:13 204:20 208:20 213:6

**reflect** 5:20 44:20

**refresh** 124:4 237:21

**regard** 87:15 243:6

**regime** 172:17 191:4,14

**regionalism** 63:19

**regular** 83:20

**regularly** 94:21

**regulate** 80:19 91:25 173:18 174:2,6,9 175:12, 16,17,18 202:25 246:19

**regulated** 27:4, 20 34:4 41:25 73:2 79:14,23 99:10 101:16 244:3,23

**regulating** 128:5,6 141:10

**regulation** 37:20,21 38:10, 15 39:20,24 69:6 70:7,9,25 71:5 73:20 74:3,25 83:11,22 90:5,6,7 91:11,22,23 92:10 111:17,19, 21 112:3 115:11, 15,25 116:8 121:17 124:19 125:7 127:22 129:11,18

151:21,24 158:18 159:9 169:24 170:2 171:11 172:11 173:8 200:22 203:7 209:5 230:19 244:21 246:13

**regulations** 39:19 40:15,18 58:11 67:6,14,17, 22 68:15 69:12 70:4 72:22 75:18 83:18 111:25 117:25 124:14,24 125:3,6,8 127:15 141:7 150:8 151:4 153:18 157:6,7 159:3 161:22 162:13 167:7 170:12,21 197:12 201:6 204:12 207:2 244:16 251:7,11

**regulatory** 172:16

**related** 46:8 64:15 138:25 251:9,12 257:5

**relating** 111:20 250:13

**relation** 251:14

**relationship** 210:5

**relevance** 219:24 221:11

**relevant** 87:7 119:15 171:19 247:7 251:24

**reliable** 40:16

**relied** 122:13 123:5 128:20,22 251:17

**relief** 148:3

**relieved** 109:7

**religious** 238:5, 20

**rely** 171:17

**relying** 120:16

**remain** 189:22

**remained** 189:23,24

**remanded** 58:9

**remarkable** 23:21 98:2 141:15 195:18

**remedied** 196:6 222:13,14

**remedy** 203:20

**remember** 31:17 32:4 46:17 54:11, 12,20 60:23 65:6 69:11 72:17 73:23 74:15 142:19 182:7 188:17 189:16 191:16,22 195:11,13,16 196:9,13 249:18, 22,23 252:5,8,11, 14

**remind** 122:10

**remit** 112:14

**remotely** 155:4

**rendered** 31:18

**repeat** 173:4 247:19

**rephrase** 8:5 133:7 136:6 219:20 221:7 255:22

**replaced** 18:18

**replete** 51:4

**report** 10:6,8,18 75:24 78:10 109:10,15,19 111:12 113:20 120:13,15,17 128:21,22 133:14 151:11 161:13 172:14 177:9 191:22 195:3 202:24 216:9 226:23 251:4

**reporter** 5:5,8 257:20 259:21,23

**representable** 248:7

**representation** 33:20 45:25 47:24 49:22

**representative** 50:9

**representatives** 51:6 182:21

**represented** 30:14

**republic** 18:13, 20 24:3 66:24 72:8 244:4

**republican** 38:4 44:7

**republicanized** 228:6

**republicans** 37:18 203:23 206:15,22 207:13,19

**reputation** 99:17 121:15

**request** 164:6

**requesting** 131:17

**require** 41:15 79:4

**required** 18:12 81:4 151:22 210:9,12

**requirement** 80:22,23 159:8 194:18

**requirements** 79:25 131:14 255:12

**requires** 59:16 152:11 225:6 240:9

**requiring** 81:7 220:10

Atkinson Baker, a Veritext Company
www.depo.com

Index: reread..scholarly

**reread** 65:8 66:12 67:9

**rereading** 142:14

**research** 19:25 20:7 21:7 22:16 23:3 25:15 47:20 104:19 118:3 129:22,24 171:24 173:6,7 225:4 242:21

**resemble** 49:25

**resented** 204:17

**reserve** 257:11

**residence** 15:5

**residencies** 20:8

**residents** 23:4

**residing** 254:24

**resolution** 114:10

**resolved** 117:10

**respecting** 73:5

**response** 103:25 153:19 161:23 162:14 167:8

**responses** 6:22, 23

**rest** 27:7 68:8

**restate** 133:8

**restatement** 154:9

**restriction** 167:18,19,21 201:8

**restrictions** 162:5,10 167:6 190:3 212:17

**restrictive** 191:3, 12,13

**rests** 44:3

**result** 58:18

**resulted** 20:23

**retail** 183:9

**retained** 116:12 117:6

**retaliate** 205:23

**return** 19:14

**Reva** 54:16 55:19

**revealed** 112:3

**reveals** 169:25

**revenge** 206:19

**Reverdy** 102:23

**review** 20:23 29:25 33:10 86:18 98:8 103:19 109:19,20 118:4 146:12 210:4 256:20,25 257:11 258:2

**reviewed** 109:20 120:15 128:5 145:22 257:13

**reviews** 29:18

**revised** 198:3 217:18,21

**revival** 29:23 30:2

**revoked** 26:15

**revolution** 15:19 228:5

**revolutionary** 34:25

**revolve** 68:12

**revolver** 232:18 234:11 237:15

**rhetoric** 81:17

**rhetorical** 81:12

**Rhode** 63:23

**rifle** 44:13 45:5 199:12 232:18

**rights** 13:25 14:8 24:8 28:10 30:6 33:21,23 35:12, 22,24 37:8 41:2

42:2 48:25 49:3 50:14,17,24 54:22 57:2 72:21 85:17 87:22 88:13,24 89:4,8, 10 92:9 93:19 94:18,20,24 96:12,21 98:25 99:11,13 101:18 102:7,16,18 103:5 104:15 105:19 106:10,19 107:7 135:21 148:16 162:9 201:4 203:17,24 206:7,16,24 228:24

**rights'** 36:5,6

**ring** 192:4

**road** 5:10 83:17

**Roberts** 156:24 162:2 165:5

**Roberts'** 162:2 167:5

**robust** 30:16 37:20 38:8,10 39:18 55:15 76:10 86:6 90:6 91:11 208:25

**rocket** 199:17

**Rocky** 113:22

**Roman** 43:24 44:3,4

**room** 83:22 132:14

**room-to-room** 133:13

**rooted** 35:19,21 38:14 92:10 104:10 159:4

**roots** 18:23 92:2 104:20

**rope** 210:19

**Rose** 9:12

**rosin** 203:2

**roughly** 90:11 91:4 236:21

**row** 26:8

**rubric** 166:5

**rule** 7:18 114:25 115:4,9,16 122:16,17 127:18 163:15,18 179:21 199:22

**ruled** 214:10

**rules** 5:24,25 6:17 110:14 149:7,12 166:5 176:9 227:17,18

**ruling** 32:14

**run** 12:25 50:4 66:17 83:9,21 106:25 127:13 197:15

**running** 193:3

**rural** 232:25 233:3 235:14

**S**

**sabbatical** 20:9, 10

**sacrosanct** 227:16

**saddle** 141:9 208:5

**saddle-bags** 208:6

**safe** 74:20 75:9 174:24 175:4 182:14 222:25

**safely** 74:19 254:21

**safes** 74:21

**safety** 39:17 73:4 74:22 111:20 175:12 176:8,12 177:2 186:3 204:13,18 207:14

**salary** 19:17

**sale** 128:13 130:16 144:5,10 145:14 183:9 217:2 234:6 241:21

**sales** 31:5

**Salt** 217:8,17,19, 22 218:17 219:22 221:12 225:24,25 226:15

**sanctioned** 174:25

**Sandy** 58:4

**satisfied** 53:25

**Saturday** 241:24

**Saul** 5:7,18,21 10:7,9 52:21

**save** 227:3,7

**Scalia** 55:9,24 56:9,18,22 59:21 129:8 132:19 133:12,23 136:17 156:7,11,14 157:8

**scan** 163:7,13

**scandal** 97:7,13

**Scandinavia** 155:20

**scanner** 164:3

**scenario** 78:18 145:7

**scenarios** 79:21 145:6 232:10

**scheme** 195:21 217:2

**scholar** 20:8 23:4 94:17 106:14,24 107:5 166:9,11 168:4,8 243:13 245:22

**scholarly** 17:12 26:5 33:6 84:22 119:7

scholars 88:11
89:2 93:18 94:20
95:12 96:20 98:7,
24 99:7,22
104:18 105:18
167:24 248:8

scholars' 135:7

scholarship
52:8,17 53:15,19
54:11 62:2,5
85:13 86:4,8
88:8,24 89:11
96:16 99:19
101:10,11

scholarships
52:5

school 9:13
20:15 21:7 29:20
36:12 45:6 46:18
127:4 131:7,8
144:16 165:25
168:9,11 178:17
194:22 203:16
229:20 232:3,4

schoolrooms
238:5,24

schools 111:22
128:11 130:14
131:5 133:25
168:21 212:23
227:11

scientific 238:7

scientists 88:25

scoot 173:14

scope 35:5 41:20
75:23,24 78:9
112:2 114:3
115:10 125:24,25
126:7 128:15,16
129:11,18 130:8
174:9,16 175:15
179:18 246:4
247:13 249:14

Scott 102:25
103:3 196:24

screen 9:23 10:2
51:13 76:22
92:20 109:6

111:13 147:2,11,
18,25 161:13
177:7 178:12
215:14 217:13
227:4

scroll 147:11
148:6 161:25

scrutiny 58:11,
20 59:12 97:21,
22 143:21

sculpture 44:10

sculptures 44:19

search 172:5
174:15

Second-
amendment
71:11

secondary 87:7
118:5 131:9
179:15 188:3

section 61:12
113:20 117:21
127:19 149:5,9,
11,16 199:7,10
200:10 215:13
218:5 220:3
224:5 226:14
227:9,10

sections 199:23

sedition 15:21
22:11

seek 152:17

seeking 124:23
230:10

sees 96:8

select 67:3

selectively
86:21,25

self-defense
82:9,12 112:22
113:4,5 142:11,
25 148:11,15
184:7 201:24
209:24 210:6
247:11,25 249:16

self-described
104:18 105:18
106:24 107:4

self-
identification
94:6,12

self-identified
96:20 98:24

self-identify
95:11

sell 144:18 219:3
234:10,20

selling 219:9

semester 62:23,
24

seminar 15:10
63:2

seminars 19:4,5
20:16

senate 65:15
182:21

senators 65:22

send 163:7,13
177:25

sense 48:7
108:12 137:3
139:14 144:23
157:17,21 158:22
209:22 214:24
224:3,16 255:7,8

sensitive 128:8
130:13,24 133:25

sentence 170:7
173:2 204:8,19
212:16,20 213:5
229:2 238:17
249:7

sentences 204:5

separate 210:25
252:13

series 23:10
104:3 113:4
230:16

serve 78:4
116:11 131:19

serves 116:20

service 134:25
193:21

Services 113:12
127:18

set 31:6 87:24
94:8 96:6 163:24
166:5 199:16
241:15

setting 131:8
145:9

Seventh 85:7
248:12

severe 98:14

severely 97:19

sexy 30:21

shaking 6:24

shall-issue
190:11

shank 102:21

shape 106:15

share 9:22 10:2,
23 21:17 51:13
109:6 146:22
147:25 177:5,6
198:2 203:11
216:5 217:6
233:16 250:25

shared 60:5
111:13

shedding 257:22

sheet 257:15

shell 181:7

shellacking
50:25

sheriff 206:5

sheriffs 38:24

shift 45:17

shockers 40:11

shoot 101:17

shooter 236:25
237:18

shooters 237:15

shooting 185:9
232:2

shop 180:23
181:5 183:9

short 14:3 57:3
98:15,19 127:3
170:17,18 219:15

shotgun 232:18

shouting 199:24

show 10:24
187:20

showed 173:24

shown 79:8
211:7

Shulman 227:20

side 37:9 54:22
85:17 87:17
88:13 89:8 90:15
93:20 94:18
95:14 96:22
98:25 102:16
103:2 105:19
107:7 114:14
116:10 158:17,18
161:4 186:21
188:9 231:10,11

sides 93:7

Siegel 55:19

Siegel's 54:16

SIGALE 5:13
10:12 11:18
12:13,17,19 59:8
60:11,14,20 61:6
69:17,24 71:8
72:6 76:3 79:24
82:15 83:24
84:15 86:9 89:13
90:18 91:2 92:13
94:10 95:9 96:18
97:11 99:23
101:14 105:12
106:21 107:15,24
108:13,18,23
109:3,5 122:23
123:13 132:8,25
133:5,10 134:11,

Atkinson Baker, a Veritext Company
www.depo.com

17,21 135:10,17
136:5 137:19
138:10 139:19
140:9 141:24
143:13 144:12
145:16 146:3
147:9 150:10
151:8 152:24
154:11,18 157:18
158:7,11,23
159:13 160:9
162:25 163:14
164:8,16,21
166:14 167:2
171:21 177:10
178:11 193:25
194:11 198:8
202:7 215:3,6,9
218:2 221:9,22
223:7 224:20
225:11,21 233:22
245:24 246:15
247:20 248:9
249:5 250:14,22
253:5,17 255:5,
21 256:14 258:3
259:7

**sign** 257:11

**signature** 10:14
256:16

**significance**
43:12

**significant** 53:8
94:19 230:4

**silencers**
215:19,21,23

**silly** 160:12,25

**similar** 49:25
55:20 136:20
155:4 186:20
217:9,18 226:18

**similarity** 159:21

**simple** 166:5

**simplification**
176:25

**simply** 59:25
89:5,14

**sing** 195:15

**single** 231:12

**singled** 160:13

**singles** 238:24

**Sir** 144:15

**sit** 142:21 226:13

**situation** 112:22
122:4 145:12
159:10 222:22
256:8

**situations**
169:20 213:3
226:18

**sixth** 236:25
237:18

**skill** 168:13

**skills** 165:24

**skip** 10:13 183:5

**skipped** 18:6

**Slaughterhouse**
40:24

**slaves** 36:17
203:25

**slightly** 36:22
72:3,4 171:16
214:13

**slingshot** 208:8,
13

**slingshots**
208:10 218:12

**slowly** 24:24

**slung-shot**
208:7

**small** 17:20 30:6
160:8 230:10

**smart** 166:8

**smelt** 139:12

**Smith** 138:16
148:4

**sneaky** 237:5,16,
24

**so-and-so** 100:9,
11 211:5,6,7

**so-call** 156:4

**so-called** 156:3

**social** 18:15
230:2,17,18
238:8 239:3,11
240:7,13

**socialize** 239:5

**socializing**
212:25

**society** 153:20
161:23 162:15
167:8 170:3
208:20

**sold** 241:25

**soldier** 44:8

**solicitor** 116:18
168:5

**solid** 86:7

**solutions** 153:22
190:3

**someone's** 78:4

**song** 229:13

**sophisticated**
59:16

**sore** 28:22

**sort** 22:2,15
23:13 24:22
29:22 30:2,5,10
31:4 47:16 50:12
62:7 66:7 74:2
75:5 102:20,21
105:11 111:8
113:6 125:7
132:11,15 140:3
152:15 159:17
160:16,18 161:5
166:19 185:11
192:18 199:25
200:3 205:5
206:20 207:7
208:12 225:6
228:2 235:23
237:15 240:24

**sound** 33:12 57:9
88:2 100:25
169:14

**soundly** 50:6

**sounds** 73:7,8
98:21 103:4
143:17,18 153:23
169:8 183:16,19
250:19 251:2

**sources** 87:7
118:5 129:5
248:7

**south** 37:25
103:13 171:9
189:2 190:17
205:12 207:6,22
209:4 232:14
241:5

**southern** 43:9
188:22,23

**spark** 32:20

**sparked** 28:24
32:18

**speak** 13:18
44:16 176:7
206:21

**speaking** 176:16

**speaks** 44:14
150:18

**spear** 208:14

**specific** 19:24,25
58:11 67:9 90:25
120:10 125:23
138:25 144:21,24
152:13 211:3
212:14 219:19
248:24 250:2
255:25

**specifically** 70:4
93:13,19 205:2
212:23 258:22

**specificity**
150:21

**specifics** 81:15

**speculate** 139:2

**speculation** 78:9
81:25 82:24
93:23 95:4
140:22 150:23

152:2,7 221:4
225:14

**speculative**
59:13 235:25

**spell** 5:16

**spend** 56:5,6

**spending** 20:14

**spent** 16:13
29:20

**split** 137:15

**splits** 189:15,18

**spoke** 110:17
111:4,5

**spoken** 56:7
108:3

**square** 231:21

**squib** 199:17

**stabilized** 54:3

**stable** 180:22
181:4 222:19
236:11

**staked** 75:3

**stand** 194:12

**standard** 23:13
27:11 58:2 98:12
104:5 133:21
210:11,12

**standards**
101:13

**standing** 133:6

**standpoint** 56:8,
17 57:16 159:20
162:7 170:16,17

**stands** 89:6

**Stanford** 90:2

**start** 5:14 17:4
25:15 29:17 30:5
31:6 48:5 109:11
190:4 227:23
236:22

**started** 106:11
129:6 167:9

199:2

**starting** 30:8
32:19 43:6

**starts** 15:18
40:22

**state** 5:3,5,8,16
16:20 17:19
40:20 41:14 42:9,
11,13,17 43:15,
17,18 44:17 45:8
49:4 69:8 70:22
71:24 72:24
78:22 83:6 91:6
103:7 107:4
114:15 116:2
119:16,19 121:19
127:21 128:5
141:4,19 143:16,
19 170:10 171:7
172:11 174:9,13,
22 175:15 182:4
188:16 189:6,19
190:6 191:23
192:5 193:8
195:9,23 196:17
214:14 222:23
227:17,18
244:14,15 248:21
251:6,8,11

**state's** 246:19

**stated** 107:12
129:24 248:13,21
253:15

**statement** 48:3
65:12 67:15
71:25 73:9,10
162:3

**statements**
56:13

**states** 34:17
90:17 115:3
173:21 190:11,12
191:4,8 195:5
230:23 243:25
247:12

**states'** 30:6

**stating** 179:23

**statistics** 250:8

**statue** 186:10

**statues** 231:15

**status** 26:23

**statute** 111:24
127:16 149:12
184:14,15,18
186:12,18 188:11
207:25 209:12,23
213:9,15,21
214:8,11 222:11,
12 223:13,20,24
224:24 232:13
237:11 238:2,16
239:17 241:12,14
246:13 254:11,17
258:16

**statutes** 81:5,14
117:25 125:3
131:14 172:10
186:21 187:4
191:6 192:8,9
207:24 214:14
231:12 232:22
237:12 240:9
244:6

**statutory** 222:8

**stave** 24:9

**stay** 76:8

**stayed** 14:20

**stays** 180:9

**stem** 203:20

**step** 76:14 228:23

**step-by-step**
168:19

**step-dad** 234:24

**steps** 139:16
223:21

**steward** 23:8

**sticking** 184:14

**stone** 44:19

**stop** 7:20 10:23
39:7,9 128:4
146:21 174:21
177:5 203:11
216:4 217:6

233:15

**stopped** 107:13

**stopping** 39:5

**stops** 105:11

**storage** 79:6,7
128:6 174:24
175:4 176:8
187:3 202:25
244:7,12 255:24

**store** 74:19 78:24
145:13 150:14
180:23 181:5
254:20

**stored** 175:13,14,
19 182:8 183:22
185:2 186:3
191:25

**stores** 145:10

**stories** 37:5,6

**storing** 128:7
182:13

**storm** 185:18

**story** 29:2 37:3,9
38:7 40:11 51:7
52:2 98:2 159:6
207:15 227:14
231:10,11

**strain** 103:23

**strains** 24:9
29:13

**strategic** 33:12

**street** 160:23
236:6

**streets** 22:5

**stricter** 233:9

**strike** 44:25
92:16,17 136:8
167:16 195:6
244:10

**strong** 102:13
106:10 204:11
207:2 220:2

**strongest**
135:22,23 136:7,

9,20

**strongly** 24:23

**struck** 117:16
142:17 172:10

**structure** 126:15
152:10

**structured** 241:2

**structures** 134:3

**stuck** 185:17

**students** 43:20
63:5 165:19
168:22

**studied** 47:11
141:12

**studies** 55:2

**study** 24:25
44:23 46:13
91:21,22

**studying** 119:9

**stuff** 10:23 25:9
161:10

**subject** 28:22
58:22 72:21
115:25 149:22
167:15 195:23
201:5 228:9
256:3

**subjected** 97:20

**subjects** 18:4
85:25

**submitted** 10:19
11:5,20 67:25
257:14

**subscribed**
153:25

**subsequent**
67:7

**subsets** 252:23,
25

**substance**
122:21 123:2

**substantially**
148:8,12

**substantive**
257:4

**substitute** 94:23
95:7

**succeeds** 25:4

**suddenly** 30:7
31:8

**suffering** 155:22
236:14

**suggest** 214:17

**suggested** 62:7

**suggestion** 49:2

**suggests** 49:11
223:20

**suing** 145:19
151:23

**suit** 117:25
181:11

**suitable** 193:5,7,
20

**sum** 181:9

**summarize**
227:23

**summarized**
167:13

**summary** 113:19
127:12 128:3

**Sunday** 196:16

**Sunstein** 165:15
166:10 168:7

**Sunstein's** 54:15
55:12

**super** 99:17

**supervised**
232:6

**supplied** 9:19

**support** 48:11
50:24 86:22
89:16 102:3
194:17 206:15

**supportive** 86:5

Atkinson Baker, a Veritext Company
www.depo.com

supports 37:9

suppose 26:13, 23 29:5 38:11 51:8 56:3 60:5 69:3 120:20 140:8 143:15 156:12 157:20 185:18 201:8 212:25 229:10 239:11

supposed 208:7

supposes 81:7

suppression 200:3 203:6 244:8

Supreme 19:2 21:18 41:5 46:11, 22 51:17 52:18 58:19 60:6 86:17 103:10 115:21 159:15 189:14 191:23 195:5

surprised 66:4 102:17

surprising 242:3

surveillance 160:20

survey 16:23 18:11 68:4,5 74:13 87:6 172:13

susceptible 196:11

suspect 75:13 191:18

suspicion 235:5

Sussex 14:12

sustain 38:3

swath 39:19 85:25 239:4

sweeping 208:25

swimming 239:9

switched 62:3

swivel 180:25

sword 44:2,3 192:13 213:12

Sword-canes 208:14

swords 192:13 193:16

sworn 5:3

symbol 44:4 117:5

symposium 28:16

system 23:18 152:11

systemic 253:13

T

table 54:18

tactics 207:4

tainted 104:8

takeaway 38:11

takes 24:12 55:8 67:5 137:2 163:13

taking 6:20 55:11 63:23 80:10 219:12

talk 28:8 92:17 126:20 177:3 188:10 196:19 197:11,14 206:9 215:13 227:11 236:23 240:6 241:20

talked 42:2 113:18 170:18 191:20 200:5 203:14,19 241:3 243:24 245:2 258:7,10

talking 7:6 8:22 16:9,14 22:10,17 62:4,5 66:17 80:6 105:8 109:8 110:9 124:21 125:23 126:21,

22,23 138:8 140:4 144:15 156:5 157:24 161:18 162:8 167:4,10,23,24 168:12 185:8 187:12 190:5 191:15,17 195:4, 9 202:18 212:4 216:14,15,17 218:14 242:23 243:8 244:5 245:7 254:10 259:5

talks 30:5 34:23 132:13,20 148:23 149:6 158:13,14

tally 235:19

Taney 196:21 197:3,9

tar 202:25

targeted 207:17

targeting 239:19

task 55:9 166:11 169:6

taught 16:22,24 17:18 18:13,21 19:3 98:6

tax 75:7,9

taxation 74:2

teach 9:10,12 15:7,10 16:21 46:17 62:20 146:23 165:18 168:21 234:17 235:15

teachable 33:8

teacher 229:20

teaching 15:2,3 18:3,11 19:17 29:3 32:25 33:7 62:25 166:7 168:11

tease 35:4

tech 194:16

technical 116:17

technologies 218:11

technology 157:17 218:14 237:22 255:24

tells 38:6

temperates 195:19

tempted 84:16

ten 60:16 163:21, 23 164:9 174:13 175:6 181:9 194:7

ten-minute 164:22

tend 37:2 42:15 48:12 64:7 68:25

tendency 87:6

term 16:14 18:25 19:2 100:5 160:16,19

terms 45:9 47:18 53:22 74:13 86:24 91:16 98:15 102:6,8,9, 12,13 106:16 108:8 121:22,23 131:6,17 150:3 153:15 180:12 196:15 209:23 228:23 250:4

territory 75:4

terrorist 204:22

terrorize 205:22

terrorizing 236:8

test 58:23 115:14, 21 123:24 210:10 246:18,22,24 247:5

testified 5:4

testify 59:19 122:11 152:4

testimony 75:21

97:3 105:4 113:22 158:6

Texas 207:23 210:15 236:19,20 239:25 253:19

text 21:19 32:25 33:18 48:15 110:3 134:7 169:23

textbook 33:2,5 63:10

textual 133:22

that'd 226:4

theme 92:6 141:16 195:15

themes 68:12

theoretical 228:7

theoretically 126:5 226:11

theories 63:19 113:5

theory 16:16 29:14 101:19 104:20 203:18

there'd 67:21

thing 9:24 28:15 41:9 45:24 60:2 64:19 85:22 108:17,19 128:18 133:9 141:6 142:13 151:2 183:5 187:21 214:4 215:11 243:14

things 9:22 27:19 42:7 56:4 57:20 61:23 62:8 88:21 100:13,17 102:4 110:15 119:7,11 123:25 127:2 139:13 140:11 149:14 161:12 176:11 195:16 207:4 210:23 211:11 242:2 244:9 247:22 253:23 257:9

**thinking** 74:16 120:21 224:14 254:15

**thinks** 46:12

**Thomas** 63:22

**thought** 18:24 21:8 23:19 29:10, 16 30:18 31:10 35:3,4 36:12 44:24 45:6,10 46:2 48:8 49:24 52:4 103:24 118:15,17 120:23 135:16 182:11 202:15 203:16 211:2 221:11 225:2 237:20

**thousands** 17:13

**threat** 39:17 210:13 211:4,6 212:6,14

**threatening** 211:8

**threats** 211:9

**three-volume** 23:12

**throw** 142:6 168:21 218:8 219:2 227:4

**throwers** 218:24

**throwing** 69:21

**tie** 88:5

**time** 7:6 17:24 20:15 22:21 29:4, 20 32:10 33:15 34:13,22 35:18 47:25 51:14 53:11 55:17 56:6 63:15 64:17 66:17 67:19 68:14 73:4 77:11 86:8 108:22 111:5 117:20 120:12 155:14 158:3 163:11,13 166:20 177:24 180:7 183:11 184:3 186:5

**188:12 189:24** 193:8 201:7 207:10 209:21 210:8 224:25 227:3 233:2 236:10 249:20 250:5 256:5

**times** 7:7,19 22:19 35:15 57:12 81:6 187:16 257:23

**timing-wise** 108:9

**tin** 183:12,24

**tip** 31:12 165:25

**tired** 123:22

**title** 26:15 34:8,17

**titled** 251:15

**titles** 68:11

**today** 7:19,23 12:11 16:8,13 109:14 110:8,11 124:6 126:20 130:7 138:13,17 153:6 166:21 175:24 189:5 211:22 256:5

**tokens** 185:14

**told** 52:14 123:15

**Tommy** 215:14, 24 216:2

**ton** 56:6 88:23

**tongue** 31:13

**tons** 83:18

**top** 11:3 20:15 51:12 76:23 87:12 153:2 186:25 194:17 195:6,10 213:21 216:24 217:4

**topic** 14:25 19:24,25 25:19 28:11 32:17 62:13,16 134:13 167:12

**topics** 18:6

**torpedo** 199:17

**tort** 224:17

**total** 111:6 142:18 190:13

**touch** 112:16

**Touche** 235:11

**touched** 229:21

**TOW** 247:2

**town** 9:3 83:17 106:25 178:24 179:3 180:24 181:6,24 182:3, 14 183:2 184:18 185:21 197:18,21 201:2,15 202:9, 11,22 230:10

**towns** 244:2

**townspeople** 47:5 185:22 186:5

**toy** 241:21,25 242:8

**toys** 242:5

**track** 188:5

**trackers** 159:18

**tradition** 27:16 29:9 35:22 38:14 111:18 127:21 192:24 193:3 209:24

**traditional** 21:25 46:20

**traditionally** 21:15 99:14 131:22

**traditions** 92:11

**tragic** 37:12

**train** 83:8

**training** 74:22 82:21 83:5,11,19, 20,23 219:14

**transcript** 256:21 257:2,12 259:24

**transcription** 257:3

**transformation** 230:3,18

**transport** 139:21 140:16 175:16

**transported** 140:6

**transporting** 142:23

**trap** 86:2

**travel** 83:13 189:4

**traveling** 200:25

**treat** 157:15,16

**treated** 211:10

**treatises** 128:16

**trial** 32:3 51:14 184:12

**trials** 103:14

**tricks** 146:23

**troops** 184:11

**true** 234:4 243:8

**trunk** 140:14 142:8 160:6,8

**trust** 164:10

**tunnels** 183:12, 24

**turf** 16:4

**turn** 7:12 119:20 157:19 158:15,16 223:14

**turn-of-the-twentieth-century** 103:18

**turned** 8:8 21:10

**turns** 132:11 190:6

**twenty-five** 183:10 234:12

**two-prong** 245:9

**two-step** 245:20 246:2,12

**type** 57:11 58:20, 23 114:6 125:20 133:13 153:24 154:4 156:21 196:16 208:21 231:21 237:5 238:4 254:18

**types** 67:13,17 76:23 77:4,13,19 81:21 83:25 129:2 257:13

**typical** 42:11 232:22,24

**typically** 18:12, 22 115:8 211:10

**typing** 227:6

**typographical** 257:5

**U**

**U.S.** 159:15

**ugly** 194:22

**uh-uh** 6:25

**UK** 111:3

**ultimately** 24:10 35:7 58:17 114:5 258:15

**um-hmm** 6:25

**umbrella** 26:5

**umbrellas** 68:16

**unable** 24:13

**unanswered** 189:23

**unavailable** 82:12 220:11

**uncommon** 16:11

**unconcealed**
213:24

**unconnected**
134:24 136:11

**unconstitutional**
155:11,16

**uncontroversial**
156:8

**undercuts** 99:11

**undergraduate**
33:9

**undergraduates**
34:2 165:19

**underline** 202:14

**underlying**
37:10 102:12

**underneath**
196:5

**underscore**
143:7

**understand** 8:4
21:23 26:7,25
34:14 42:24
45:13 62:15
78:12 85:20
88:19 90:22
91:17 93:24
95:18 97:4 105:4
120:9 121:7
127:4 130:20
132:3 139:5
140:25 143:6
149:25 152:8
154:5 164:5
176:14 184:21
190:16 192:3
213:25 215:10
222:12 245:16
251:13

**understanding**
44:7 46:16,19
55:25 91:24
97:18 100:15
118:18,19
123:18,20
124:12,13 125:2
131:6,22 136:24
138:14 140:17

144:2 149:19
159:3 165:3,8
166:6 171:4,5
180:12 201:21
215:22 216:2
246:11 248:19
249:8 256:7

**understandings**
69:7

**understands**
69:19

**understood** 7:25
34:24 159:25
224:13

**undertake** 130:6

**undesirable**
230:17

**unique** 73:15
75:2 114:23

**unit** 79:7,9

**United** 195:5

**universal** 80:22

**universally**
191:10

**University** 9:11
14:12 16:20 23:4
52:7 91:6 168:4

**unlawful** 209:14,
20 213:11,22
218:5 220:4
223:15 232:16

**unlimited** 151:12

**unloaded** 214:7

**unlocked** 145:8

**unpersuasive**
101:8

**unprecedented**
97:20 207:21

**unreasonable**
141:22 143:23

**unsupervised**
219:17 230:13

**Untouchables**
215:17

**unusual** 106:13
116:25 155:25

**upstate** 234:25

**urban** 230:14
233:7 235:12
236:6

**urbanization**
230:4

**urchin-style**
231:6

**urchins** 236:6

**usage** 225:18,19

**Utah** 219:20,22
254:16

_____

**V**

_____

**vacuum** 106:12

**vague** 72:14
85:20 88:19
91:16 93:23 95:3
105:25 149:25
154:3 159:24
245:16 246:8
255:17

**variance** 81:18

**varied** 182:3
211:16

**variety** 16:22
18:4 39:21 99:7
174:25 175:7
207:3

**varmints** 237:6,9

**vary** 169:12

**vast** 165:11

**vehicle** 142:24

**venues** 22:2

**verbal** 6:22 7:2

**verify** 192:25

**version** 43:24
50:22

**versus** 47:4
51:16,20 85:8

113:23 114:17
116:14,23 120:20
129:8 137:6
138:16 142:2,24
148:4 159:15
188:16 191:23
245:11 248:13

**view** 30:17 33:17,
22 35:24 36:5,6
37:11 38:8,10
39:15 43:9 46:13
48:10,12 55:16
104:4 106:11,19
143:20 154:13
188:24 192:7
214:7

**viewpoint** 57:11
58:2,23 59:11
153:24 154:4,14

**viewpoints**
34:18 167:12

**views** 49:18 50:9
214:12

**vindicates** 38:8,
9

**vindication** 82:7

**violate** 79:20
151:4 214:11

**violates** 148:15
214:8

**violation** 98:11
148:23 150:4
223:23

**violence** 38:2
90:13 203:21
204:15,16,23,24
205:9,14 206:12,
13,14,17,18
207:22 209:3
236:17

**violent** 205:13

**virtually** 189:10

**vis-a-vis** 41:6
65:16,24

**vision** 74:24
204:2 227:24,25
228:2,25

**visualize** 237:17

**vital** 207:12

**voice** 50:13

**voices** 43:5

**volume** 8:8

**volumes** 33:6

**voters** 51:4

**voting** 51:5
206:6,7 238:20

_____

**W**

_____

**wait** 7:10,12
52:21 53:12,14

**waiting** 77:20

**walking** 200:24

**wanted** 31:9
153:11

**wanting** 205:24

**war** 20:6 229:25

**wardens** 181:17,
18

**ware-house**
180:23 181:5

**warfare** 193:7

**Washington**
43:22,23

**wave** 40:17

**ways** 35:19 36:7
39:21 168:13
169:5 171:4
175:24 222:11,19

**weak** 101:8

**wealthy** 185:12,
15

**weapon** 39:4
81:5 117:16
151:14 193:5
213:13 237:24
238:15 247:7

**weapons** 37:24
40:15 74:17

78:20 79:17
114:21 128:7,10,
11 190:5,7
192:14 193:5
201:4 208:19,21
217:3 237:25
241:21

**wear** 71:22 73:16

**wearing** 71:17,
22,23 72:10
73:12,15 75:13
91:10

**week** 16:12 62:22

**weeks** 63:3
256:22

**weigh** 52:19

**weight** 46:23
49:20

**welfare** 111:20

**well-being**
227:12 228:14

**well-established**
82:10 155:14

**well-known**
168:8

**well-regulated**
77:17 78:2

**Wenzloff** 59:2
60:8,16 69:14
70:10 71:18
75:20 78:6 81:23
82:22 84:3 85:19
88:17 90:16,20
91:14 93:21
94:25 95:16
96:25 99:3
100:18 104:25
105:24 107:9,20
108:5 109:4
110:21 122:8
123:3 131:24
132:22 133:3,15,
18 135:2,14
136:2,13 138:5,
19 139:23 140:19
143:2 144:6,19
145:23 149:23
150:16 151:25

154:2,15,22
158:5,9 159:11,
22 162:17 170:24
214:21 215:5
220:25 221:18
222:4 224:11
225:9,13 245:14
246:6 247:14
248:2,16 250:19
252:16 255:3,16
256:12,17 259:2,
20,25

**west** 191:5,9

**western** 114:24

**Westlaw** 87:9
119:12 172:5

**whatnot** 68:9
203:21

**whatsoever**
151:14

**whichever**
147:14

**whiskey** 22:3

**white** 18:16 36:18
38:23 39:11
203:21 209:18
210:16

**whites** 207:8

**who've** 96:15

**wholly** 195:22

**Why'd** 19:11

**wide** 14:4 18:4
39:19 85:25
140:3 219:25

**widespread**
209:2

**wife's** 19:15

**William** 14:23
15:4 29:3,19

**win** 58:24

**wind** 28:21 67:14

**winds** 169:9,10

**withdrawn** 97:23

**won** 26:7 27:2
34:5 97:24

**wonderful** 210:3

**wondering**
198:20

**Wood** 5:10

**wooly** 17:17

**word** 36:11,13
66:23 95:8
112:11 113:11
131:22 181:14
205:24

**wording** 45:21

**words** 146:9
151:22 237:8
257:6

**work** 9:8 20:11
23:14 30:25
32:11 36:9 42:22
64:5 66:16 86:20
90:12 95:20
96:14 97:9,19
121:15 161:15
230:9

**worked** 237:9

**working** 13:17
25:18 78:25 80:4
220:14 231:5,19
236:7

**works** 199:17
256:9

**world** 152:16

**world's** 211:9

**worlds** 62:6

**worries** 194:15

**worth** 212:2

**wow** 218:3

**write** 20:14 61:24
87:17 90:4 93:18
94:17 96:11
104:21,22 107:4
127:14 128:23
129:14,24
151:10,11,13
170:7 173:15

174:8 203:13,22
217:15 230:20
257:8

**writing** 15:24
25:16 27:2 30:11
64:21 67:4 87:19
88:23 89:2,9 92:6
95:13,22 96:2,4
106:8,11 107:3,6,
13 120:12,15
128:22 153:9
184:4 196:2

**writings** 25:21
47:14 98:23
105:13,17 106:22
108:3

**written** 31:9
44:19 48:17
51:22 56:24 58:6
73:19 76:6 84:23
85:5 90:5 112:8
165:15 170:15
245:13

**wrong** 56:9 100:9
101:23 105:23
118:10,18 143:25
161:12 257:7

**wrote** 24:7 30:25
72:11 73:13
89:16,18 104:21
127:24 165:14
196:10,25

---

**Y**

**Yale** 20:3,7,21,24
21:4,11 22:24

**year** 6:14 14:12,
14 19:3 25:14
31:17 83:5 127:3
157:6 226:17

**years** 14:21,25
16:20 17:13
20:12 26:8 63:11,
13 119:10 168:10
232:17

**York** 5:3 9:9,15,
16 13:14 22:19
186:10,13,16

187:16 194:19,23
234:25 241:15,16

**Yorker** 19:13

**young** 120:19
121:9 137:6
168:14 230:6,13
232:2 236:13

**Yup** 56:11,19
85:9 174:19
208:3

---

**Z**

**Zeleny** 6:9,10
116:23,24 117:8

**zoom** 7:17 10:16
61:18

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

JENNIFER J. MILLER, *et al*.,

        Plaintiffs,

v.

HEIDI E. MUELLER, *et al*.,

        Defendants.

Case No. 18 cv 3085

Hon. Sue E. Myerscough

Magistrate Judge Karen L. McNaught

**JOINT STIPULATION FOR PURPOSES OF SUMMARY JUDGMENT**

For purpose of summary judgment, Plaintiffs JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY (collectively "Plaintiffs"), and Defendants HEIDI E. MEULLER, in her official capacity as Acting Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois (collectively "Defendants," and together with Plaintiffs, "the Parties"), by their undersigned counsel, agree and stipulate as follows:

**FACTUAL STIPULATIONS**

1.    The Second Amendment Foundation, the Illinois State Rifle Association, and Illinois Carry (collectively, the "Organizational Plaintiffs") are member organizations that promote awareness of, and advocacy for, the Second Amendment.

2.    Jennifer and Darin Miller are members of each of the Organizational Plaintiffs.

3.    In the plaintiffs' Second Amended Complaint (DKT 83), none of the Organizational Plaintiffs allege any direct injury to itself as a result of the enactment or implementation of the statute or the DCFS Rules that are challenged in this litigation (i.e., 225 I.L.C.S. 10/7(a)(13)–(14), 89 Ill. Admin. Code §§ 402.8(o) and 406.8(a)(17)–(18)).

4.    None of the Organizational Plaintiffs have identified any members other than the Millers who are licensed foster caregivers or licensed day care home operators.

5.    None of the Organizational Plaintiffs have a license to be a foster caregiver.

<span style="color:red">Exh. I</span>

6.　　None of the Organizational Plaintiff have a license to operate a day care home.

7.　　None of the Organizational Plaintiffs have identified any members other than the Millers who are licensed foster caregivers or day care home licensees.

## PROCEDURAL STIPULATIONS

8.　　The Parties incorporate by reference and renew their Joint Stipulation Regarding Certain Documents, Writings, and Records Produced in Discovery, dated November 10, 2021 (DKT 56-18).

9.　　The Parties incorporate by reference and renew their Stipulation Regarding Defendants' Expert Dr. Deboarh Azrael, dated March 31, 2021 (DKT 56-16).

10.　　In paragraph 41 of the Second Amended Complaint, Plaintiffs refer to "Form 402-A," entitled "Acknowledgement of Compliance/Part 402 Licensing Standards for Foster Family Homes." The Parties stipulate that the document to which Plaintiffs refer is the document filed as DKT 19, and is in fact Form 452-A.

11.　　In Paragraph 42 of the Second Amended Complaint, Plaintiffs refer to Form 452-2, entitled "Foster Family Firearms Agreement." The Parties stipulate that the document filed as DKT 19-2 is a blank version of Form 452-2.

Agreed to and executed this 27th day of August, 2025.


/s/ David G. Sigale　　　　　　　　　　　/s/ Gretchen E. Helfrich

David G. Sigale　　　　　　　　　　　　Gretchen E. Helfrich
Law Firm of David G. Sigale, P.C.　　　　Deputy Chief, Special Litigation Bureau
55 West 22nd Street, Suite 230　　　　　Abigail R. Durkin
Lombard, IL 60148　　　　　　　　　　Assistant Attorney General
(630) 452-4547　　　　　　　　　　　　115 South LaSalle Street, 35th Floor
E-mail: dsigale@sigalelaw.com　　　　　Chicago, IL 60603
　　　　　　　　　　　　　　　　　　(312) 814-3000
*Counsel for Plaintiffs*　　　　　　　　E-mail: Gretchen.Helfrich@ilag.gov
　　　　　　　　　　　　　　　　　　E-mail: Abigail.Durkin@ilag.gov

　　　　　　　　　　　　　　　　　　*Counsel for Defendants*