## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNIFER J. MILLER, DARIN E. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:18-CV-3085 |
| HEIDI E. MUELLER, in her official capacity as Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' F.R. CIV. P. 56(a) MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs, DARIN E. MILLER, JENNIFER J. MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, by and through undersigned counsel, and for their Reply to Defendants' Response to Plaintiffs' F.R. Civ. P. 56(a) Motion for Summary Judgment (Dkt. #94), states as follows:

### RESPONSE TO DEFENDANTS' ADDITIONAL MATERIAL FACTS

1.      Defendants incorporate their Statement of Undisputed Material Facts set forth in the Motion for Summary Judgment under Fed. R. Civ. P. 56 and Memorandum in Support. DKT 89 at 4–31.

**RESPONSE:**      *See* Plaintiffs' Responses thereto.

1

2.      Patrick Charles explained that the absence of historical records (namely, state and local records) relating to the enforcement of sensitive place restrictions (as that term was coined in Heller) makes it impossible to rule out that these regulations were applied to individuals' homes. See, e.g., DKT 89-11 ¶ 12; see also, Pls.' Exh. G, e.g., at 79:5–8, 83:3–84:15, 87:12–21, 88:5–14, 94:2–13.

**RESPONSE:**      Admit, but other than speculation, he is unaware of any. *See* Dkt. # 94, Exh. G at 100:25 – 101:4; 102:1-8; 102:9-22; 115:20 – 116:2; 129:16 - 130:19.


3.      Because of these gaps in the record, Mr. Charles could not say definitively that a clergyman whose home was on the premises of a place of worship or a school teacher who lived on school grounds would be subject to sensitive place restrictions in those locations. Pls.' Exh. G at 86:25–87:5, 90:10–11, 100:21–24.

**RESPONSE:**      Admit that when Charles was asked – on this subject of a certain Georgia statute – "But for all hypotheticals, you don't know either way?" he answered no.   *See* Dkt. # 94, Exh. G at 86:20 - 87:17.


4.      Mr. Charles clearly testified that locational restrictions that covered town centers applied on their face to any homes located there, and that, again, a lack of enforcement records obscures whether any exception existed for such homes in practice. Pls.' Exh. G at 94:2–13.

**RESPONSE:**         Deny. Charles did not know either way whether a home that happened to be in a commercial or public epicenter in Kansas with a firearm restriction would fall under the prohibition or not, and he certainly was not clear on the subject. *See* Dkt. # 94, Exh. G at 94:2-13.

Plaintiffs also incorporate their <u>Undisputed Material Facts</u> from their cross-Motion for Summary Judgment (Dkt. #94) as their F.R. Civ. P. 56(c)(1) <u>Statement of Additional Undisputed Facts</u>, as if fully repeated herein (cited to herein as "SUF xx").

Plaintiffs further incorporate their Summary Judgment Exhibits and Defendants' Summary Judgment Exhibits.

## <u>ARGUMENT</u>[1]

### I.    PLAINTIFFS DID NOT IGNORE THE ERRONEOUS ARGUMENT ABOUT GOVERNMENT CONTRACTORS.

The challenged laws and Rules are unconstitutional conditions on foster parents and home daycare operators. Since -as discussed previously and reiterated below - the Defendants cannot show that the challenged restrictions and prohibitions are consistent with the Second Amendment's text or history, Defendants contend that its Second Amendment restrictions "are not subject to the analysis set forth in [*Bruen*], but are instead "constitutional conditions on the

---

[1] Plaintiffs incorporate their Statement of Undisputed Material Facts into this document (listed as SUF), as well as their Summary Judgment Exhibits and Defendants' Summary Judgment Exhibits.

receipt of state largesse." See Dkt. 95 at 7. But whatever authority the Defendants have over "contractors who carry out governmental functions" – even if foster parents and home daycare operators fall into such a category – does *not* extinguish their constitutional rights in their own homes. Defendants argue that their firearm restrictions fall outside the Second Amendment and the *Bruen* analysis. But fundamental Second Amendment rights in one's home are completely distinguishable from requiring background checks and drug tests to gain contractor employment at NASA. *See Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 159 (2011), as is the enforcement of pre-publication book review rules for CIA employees. *See Snepp v. United States*, 444 U.S. 507, 510-511 (1980). A "freer" hand, *see NASA*, 562 U.S. at 148, does not equal free reign. In this case, Defendants' claimed "justification" is without merit.

A.      First, this argument fails because it has no support in the Second Amendment's text or history. *Bruen* explicitly states that "the standard for applying the Second Amendment" is that where the Constitution's "plain text covers an individual's conduct, … [t]he government *must* then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130 (emphasis added). The Court did not announce a "government contractor exception" to that rule, and this Court should not create one. Defendants make no attempt to show, on the basis of "the Nation's historical tradition of firearm regulation," *id.*, that it enjoys "broad powers" to limit the

Second Amendment rights of government contractors, Defs' SJ Motion at p.37, and so that assertion must be rejected under *Bruen*'s square holding.

Instead, Defendants argue that the *Bruen* test does not apply to its argument, because its "wide latitude" over government contractors is apparently some sort of super-constitutional rule—a "general principle" that applies to *every* constitutional right. *Id.* None of the cases they cite clearly establishes that proposition—as opposed to the more mundane conclusions that as a matter of the substance of First Amendment free speech law, *see Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006), procedural due process, *Coyne-Delany Co., Inc. v. Capital Dev. Bd.*, 616 F.2d 341, 343 (7th Cir. 1980), or the purported "constitutional right to informational privacy," *NASA v. Nelson*, 562 U.S. 134, 146 (2011), the analysis is different in certain ways if the plaintiff is a government employee or contractor. In *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 607 (2008), the Supreme Court rejected class-of-one Equal Protection employment discrimination claims against a public employer. In reaching that conclusion, the Court considered "whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer." *Id.* at 600. Here, per *Heller*, the Defendants' restrictions and prohibitions – in Plaintiffs' home – strike right at the most basic and fundamental concern of the Second Amendment.

Further, Defendants' argument is belied by *K.H. v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990), where the Court stated "[w]e may assume, without having to decide,

5

. . . that the foster parents, even if paid by the state, are not state agents for constitutional purposes. Certainly if the state decides to return a child whom it has taken custody of to the child's natural parents, those parents do not become state agents." This rationale – by the Seventh Circuit - completely destroys the Defendants' argument.

Defendants cite to *Tyson-Phipps v. Sec'y Antony Blinken*, 2024 U.S. Dist. LEXIS 184356 (S.D. NY, October 8, 2024), but that case specifically did not address the plaintiff's Second Amendment claim (*Id.* at *5). And the plaintiff's extensive claims of racial discrimination and harassment at the State Department make that case wholly distinguishable and irrelevant from this matter. *See also Tyson-Phipps v. Rubio*, 779 F. Supp. 3d 440 (S.D. NY, April 24, 2025).

Likewise, *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 275 (2024) does not assist Defendants. In *Sheetz*, the Court addressed whether certain governmental permitting conditions for land use violated the Takings Clause of the Fifth Amendment. The Court noted that "[a] permit condition that requires a landowner to give up more than is necessary to mitigate harms resulting from new development has the same potential for abuse as a condition that is unrelated to that purpose." *Id.* at 276. However, such a consideration was specifically eliminated from Second Amendment analysis in *Bruen*. This is also why Drs. Miller and Azrael's testimony is irrelevant.

Further, *Camelot Banquet Rooms, Inc. v. United States SBA*, 24 F.4th 640 (7th Cir. 2022), involving PPP payments during the COVID-19 pandemic, is simply

6

irrelevant. No one is asking the Defendants to fund the exercise of Second Amendment rights; but even in that case the Court noted that "the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit.'" *Camelot*, 24 F.4th at 650 (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006)). What has become clear in Second Amendment jurisprudence is that the right is entitled to no less protection than those of the First Amendment.

Therefore, the Defendants have not carried their burden of establishing any similar rule under the "the standard for applying the Second Amendment": whether such a rule "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Further, even under the Supreme Court's subsequent ruling in *United States v. Rahimi,* 602 U.S. 680 (2024), the Defendants cannot show that any of their purported analogues that existed at the founding regulated firearm use to address the particular problem claimed by Defendants, thus there is not a strong indicator that the Defendants' restrictions were imposed for similar reasons, and therefore they are not "relevantly similar" permissible regulations. *See Rahimi* at 692. In short, invoking *Bruen*, the "how" and the "why" between Defendants' restrictions and its claimed analogues do not match at all. The Defendants' restrictions are not for fire suppression, nor are they concerned with public places. The only way Defendants' analogues have any applicability to Plaintiffs' home is through speculation.

7

It is a red herring for the Defendants to argue that since they potentially infringe on other rights (such as inspecting foster homes which may or may not raise Fourth Amendment concerns) that they have *carte blanche* to infringe whatever they want. Plaintiffs' acquiescence to other conditions is no more a waiver of this unconstitutional condition any more than the forms the Defendants have required them to sign.

And Defendants argue that Plaintiffs need to explain why the Second Amendment extends to the "modern conditions" of foster homes and daycare homes, as if children being cared for by other persons than their parents is a new invention. It is not. The methods and attitudes may have changed, but the basic facts have not: (1.) people have been providing care for other people's children for centuries, and (2) there is no evidence any of those care providers – whether they were doing so for money, altruism, free labor, or a combination thereof – were ever disarmed. If the "why" were to match, then there would have been historical firearm restrictions as to the homes of all persons with children, whether foster, natural, adopted, or visiting. There were not. This is why under *Heller* and *Bruen* it is constitutionally irrelevant that one's home is used to care for foster or daycare children. Defendants argue this is a critical distinction, but it is not.

Further, the comparison between foster parents one the one hand, and "felons and the mentally ill" on the other, is offensive and irrelevant. The latter are prohibited from possessing firearms anywhere, anytime, and probably would not be given foster licenses, either. The fact there are many illegal acts that one cannot do,

8

even in their homes, is irrelevant to this discussion as well, and is just another false equivalency the Defendants are offering to confuse the issue, as is the attempt to equate fostering children to the "commercial sale of arms." Dkt. #95 at 10-11.

## II. THE REGULATED CONDUCT IS COVERED BY THE FIRST STEP OF *BRUEN*.

Throughout these summary judgment pleadings, the Defendants have continually attempted to divorce the right of home self-defense from the Second Amendment, as if somehow *Bruen* overruled *Heller*. But self-defense of ones "home and hearth" is still at the core of the Second Amendment right, and there is nothing that *Bruen* said to change that; indeed, that right was only strengthened by *Bruen.*

Defendants argue that Plaintiffs do not have an "ordinary, private home." But in comparing Plaintiff's homes to child care homes in the Framing Era as *Bruen* mandates, there is nothing remarkable about Plaintiffs' home, or any foster or daycare home for that matter. Defendants cannot cite to a single historical instance of a homeowner being disarmed - or their Second Amendment rights being extinguished - because there were children in it. Defendants wish the Court to interpret their non-existent historical analogues as "undiscovered but nonetheless there," but that is not how evidence works.

Defendants cite to *Fulton*, but Plaintiffs have already shown in previous briefings why that case does not support Defendants.

In short, Plaintiffs are seeking to possess functional firearms in their home for self-defense purposes – the core Second Amendment right under *Heller*. The

Defendants are wrong in arguing this does not fall under the plain text of the

Second Amendment. Plaintiffs have met Step One of the *Bruen* analysis.

## III.    PLAINTIFFS' ANALYSIS OF HISTORY AND TRADITION IS CORRECT – PARTICULARLY THAT DEFENDANTS HAVE NO HISTORY OR TRADITION ON WHICH TO BASE THEIR DEFENSE.

First, Defendants completely discount Dr. Rymph's testimony, arguing that

her deposition testimony does not matter (Dkt. #95 at 13), and that her lack of

opinions or knowledge regarding firearms ownership by child care providers does

not matter because that is not why she was retained. Of course her testimony is

relevant since she was the expert offered by the Defendants, but this also displays

the Defendants' attempts to reframe the issue: according to the Defendants the

issue is no longer restrictions on law-abiding persons in their own home who are

providing child care, but "protecting children from firearm dangers," Dkt. #95 at 14,

as if *Bruen*'s mandate to look at the "how" and the "why" does not exist. *See Bruen*,

142 S. Ct. at 2133.

Defendants argue that "whether masters were permitted to possess firearms

sheds no light on whether the DCFS Rules are consistent with the Nation's history

and tradition of protecting children from firearms dangers." Dkt. #95 at 14. But it

*certainly* shed light if one is complying with *Bruen*'s analytical requirements.

Because even if protecting children from firearm dangers was a tradition in the

Framing Era (which really did not seem to be the case, based on Defendants' expert

testimony), then one would think that the laws (or lack thereof) governing firearm

10

ownership and use by child care providers would be particularly relevant. But not only does Defendant have no such authority beyond generic fire suppression ordinances and public place restrictions, they are now arguing that does not even matter.

Defendants compound this error by attempting to analogize firearms restrictions in schools to the current restrictions, arguing they are both to protect children. Dkt. # 95 at 13. But even if that "why" matched up, which it does not (Mr. Charles made clear such restrictions were to protect adults from children's mischief), the "how" is completely different. The school restrictions which Defendants cite are akin to the public place restrictions that makes up the bulk of Mr. Charles's testimony. Mr. Charles made clear he was aware of nothing (outside his speculation) that any restrictions disarmed people in their homes.

Defendants wish to discount this lack of a historical record, but this situation is exactly as contemplated in *Bruen*:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

*Bruen*, 142 S. Ct. at 2131. Whichever option is selected, the challenged restrictions do not meet the *Bruen* standard. If protecting children from firearms was a societal problem at the Founding, then the fact there is no similar historical regulation to

11

the foster and day care home restrictions shows that the restrictions violate the Second Amendment. If there were regulations protecting children from that era, then the lack of regulations disarming people in their homes shows the unconstitutionality of the current restrictions. Even according to the Defendants' arguments, this was not a situation "implicating unprecedented societal concerns." *Bruen*, 142 S. Ct. at 2132. In other words, the Founders themselves *could* have adopted the challenged restrictions to address the asserted societal problem, but they did not and/or Defendants have not presented any such examples. *See id.* at 2131. And if it was a problem the Framing Era chose not to address, then that proves Plaintiffs' argument as well.

So since the Defendants do not have relevant historical analogues (while at the same time claiming the record lacks evidence either way as if they did not have the burden of proof on the issue), they are arguing once again that "protecting children" is the only consideration, and offering Drs. Miller and Azrael as if means-end scrutiny was still permissible in Second Amendment analysis.

This is why Plaintiffs are not relying on Marty Hayes in these briefings; nothing in his prior testimony involved the relevant *Bruen* issues. To the extent the Court wishes to consider Mr. Hayes' prior testimony in this matter, Plaintiffs respond to Defendants' pending Motion to Exclude (Dkt. #92) regarding Mr. Hayes with their prior Response thereto (Dkt. #46; ##47-49 (Exhibits)).

IV.  **PEOPLE'S HOMES DO NOT BECOME "SENSITIVE PLACES" BECAUSE OF FOSTERING OR RUNNING A HOME DAYCARE.**

On this issue as well, Defendants conveniently ignore that they have the burden of proof as to the second *Bruen* factor. Instead, they argue that because their expert Mr. Charles offered no actual examples of homes being "sensitive places," and instead guessing and speculating that "maybe" there were such examples, even though he did not know them, somehow that is still sufficient evidence. Charles said it was "unknown" and "impossible to know" whether the public place/sensitive place restrictions he cited would apply in one's home (Dkt. #95 at 16). In every other context of law where a party has the burden of proof, testifying that the required evidence was "unknown" and "impossible to know" means the party did not meet its burden. Flying in the face of this logic, the Defendants insist "the record does not support an inference that homes were always excluded from these restrictions." Dkt. #95 at 16. In Defendants' world, imagining what the evidence might say, if the evidence existed, is sufficient. Plaintiffs assert this Court should require more.

Defendants cite to *Mintz v. Chiumento*, 724 F. Supp. 3d 40 (N.D.N.Y. 2024), but comparing a summer campground to "schools, government buildings, legislative assemblies, polling places, and courthouses" *Id.* at 58, is a far cry from comparing it to one's home, even if it is a home where – for whatever reason – all the neighborhood children congregate. Whether in their own argument or through their expert Mr. Charles, there are no historical analogues disarming adults in their home because there are children sometimes present. *Mintz* does not change that.

13

Further, Mr. Charles was also an expert in *Mintz*, and apparently offered the same testimony regarding "sensitive places" that he does in this case. The word "home" does not appear in his testimony in *Mintz*, either. Instead, Charles testifies that "sensitive places" include: "1) churches and places of worship; 2) places where large public assemblies generally took place, *i.e.*, parks, town squares, and the like; 3) polling places and other buildings where political activity generally took place; 4) schools and institutions of higher learning; 5) places where events of amusement took place, *i.e.*, places where people congregate for large planned events; and 6) bars, clubs, social venues, or anywhere in which alcohol or psychoactive or mood altering drugs were purchased or consumed." *Id.* at 63. Though the Court also analogized schools to locations "where children congregate, such as daycares, preschools, playgrounds, community centers, and other places where they congregate for educational purposes" *Id.* at 64-65, placing one's home into all these categories, even if children are present, would be offering Defendants the "regulatory blank check" that is prohibited under *Bruen*. 142 S. Ct. at 2133. Defendants even go so far as to compare foster homes to government buildings (Dkt. #95 at 19) which is outrageous and shows the liberties Defendants are attempting to take with the "sensitive places" doctrine.

Even if the fact that modern foster homes originated in the mid-20th century is accepted, Defendants have not provided any evidence that foster parents in the last 70 years were disarmed. The evidence showed that even the *recommendation*

14

that firearms be kept away from foster children (which is not the same as prohibiting firearms in foster homes) first appeared in 1984. SJ SUF 51.

Day care services have existed for approximately 125 years. SJ SUF 49. They are not "new and analogous" places. There has been a century for Defendants to mine for historical evidence that firearms were prohibited in such locations. They have not done so. Mr. Charles did not present any, and Dr. Rymph did not know of any. And while no Plaintiff is arguing for giving children access to firearms, whether in a foster setting or daycare setting, Defendants simply have not presented evidence that adults in those settings were historically disarmed, directly or through analogy. Defendants' discussion about schools in *Schoenthal* are inapt, because foster homes are not "overwhelmingly dominated by the presence of children" any more than any other home. *See Schoenthal v. Raoul,* 2025 U.S. App. LEXIS 22464 at *26 (7th Cir. 2025). There is likewise no historical evidence presented that home daycares are either, just assumptions.

As noted, the only evidence Defendants offer that teachers were prohibited from carrying in schools is a few random 1870s-era school rules (Charles Report at p.30). These rules are too late to inform the meaning of the Second Amendment, *see Bruen,* 142 S. Ct. at 2156; see also *id.* at 2153. Further, Defendants do not contradict that nothing in them prohibits teachers from possessing firearms in their homes.

The *Schoenthal* Court held that "the search for a "relevantly similar" regulation burdens the government to make comparisons between the "particular

15

problems" that motivated historical firearm restrictions in certain places and the problems that spur restrictions today." *Id* at **26-27 (citing *Rahimi*, 602 U.S. at 692). That has not been done. Holding that the Defendants get to impose restrictions they want *because* they have no historical evidence essentially nullifies *Bruen*.

Finally, contrary to Defendants' assertions, the foster home restrictions apply so long as the Plaintiffs have a foster care license; it does not matter whether a foster child is actually placed in the home. *See* Jorgensen Dep. Trans. at 65:2-23. And though Jorgensen of DCFS testified the daycare rules only apply during "operating hours," the governing statute and Rules have no such limitation. So it is a 24/7 restriction; terminated only when one gives up their licenses. As discussed above, such unconstitutional conditions should not be allowed.

<u>CONCLUSION</u>

In light of the above, Plaintiffs respectfully request this Honorable Court to enter summary judgment in their favor and against the Defendants. Plaintiffs also request any and all such further relief as this Court deems just and proper.

Dated: October 8, 2025                         Respectfully submitted,


By: _____ /s/ David G. Sigale _____
                        Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

*Attorney for Plaintiffs*