

ALAN WILSON
ATTORNEY GENERAL

October 28, 2025

The Honorable Leon D. Gilliam, Member
South Carolina House of Representatives
420C Blatt Building
Columbia, SC 29201

Dear Representative Gilliam:

    You seek our opinion "on a matter important to all South Carolinians, especially those among us who are serving as foster parents to the over 4,500 South Carolina youths in foster care." Specifically, your letter states:

> . . .[o]ur concerns and answers to our questions [require resolution] so that these dedicated volunteers retain their Second Amendment right to keep and bear arms - uninfringed -- while they provide their generous and valuable help to children in need.
>
> It is my understanding that caseworkers and other officials with the South Carolina Department of Social Services [SCDSS] are prohibiting foster parents from adopting a foster child so long as any firearms are present in their home.
>
> Our research has not found any state code requiring a complete deaccession of household firearms by foster parents who are considering adoption of a foster child. As part of preparing this letter, we have reviewed SCDSS Regulation 114-550(N). It provides the following:
>
> 114-550(N) Additional Health and Safety Standards.
>
> (1) The applicants' home must meet the following standards concerning weapons:
> (a) The following weapons must be stored in an inoperative condition in a locked area inaccessible to children:
>
>     (i) Firearms;
>     (ii) Air guns;
>     (iii) BB guns;
>     (iv) Hunting slingshots; and

Exhibit "A"

The Honorable Leon D. Gilliam, Member
Page 2
October 28, 2025

>   (v) Any other projectile weapon.
> (b) All ammunition, arrows or projectiles for such weapons must be stored in a locked space separate from the weapons.
> (c) Applicants who are also law enforcement officials and can document that their jurisdiction requires them to have ready and immediate access to their weapons may be exempt from these weapon requirements provided the applicants adopt and follow a safety plan approved by the agency.
>
> https://www.scstatehouse.gov/query.php?search=DOC &search text= 114%205S0&category=CODEOFREGS&conid=72970748&result_pos=0&k eyval= 107151 &numrows=1 0#OCC1

In addition to this regulation, we are also aware that SCDSS developed a Policies and Procedures Manual in 2009. This manual contains additional inquiries to potential foster parents, which appear to restrict applications by firearm-owning foster parent applicants:

> 911.01 Evaluation of the Foster Family Applicant/Family Assessment
>   6. Obtains a list of all firearms in the home whether or not they are owned/licensed to the applicant and ensures they are kept in a locked storage container.
>
> 918.01 Standards of Care
>   17. Firearms and any ammunition shall be kept in a locked storage container except when being legally carried upon the foster parent's person; being used for educational, recreational, or defense of self or property purposes by the foster parent; or being cleaned by the foster parent.
>
> SCDSS Human Services Policy and Procedure Manual 9 (Foster Care Licensing); foster care licensing hs.!2Qf

Specifically, we seek your review of these SCDSS demands from potential and currently serving foster parents in light of 1895 S.C. Const. art. I, Sec. 20; U.S. Const. Amend. II; your prior opinion to Aiken County Council Chairman Gary Bunker dated August 3, 2021 https://www.scag.gov/media/5y3jhxdy/bunkerg-os-l0675-:final☐opinion-8-3-2021-02661976xd2c78.pdf; the 2008 US Supreme Court Opinions in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L. Ed.637; City of Chicago v. McDonald, 561 U.S. 742, 130 S.Ct. 3020, 177 L. Ed. 2d 894( 2010); and the issues discussed by Joseph G. DuChane in his law review article In Defense of Hearth and Home: Determining the Constitutionally of State Regulation of Firearm Storage in Foster Homes 75 Wash. & Lee L. Rev.1639; and any other related resources to provide your opinion about, and answers to, my questions as follows:

First:
Do these firearm ownership bans and/or restrictions by SCDSS constitute an infringement of our citizens' right to keep and bear arms?

The Honorable Leon D. Gilliam, Member
Page 3
October 28, 2025

> Second:
> Can SCDSS legally implement and enforce these firearms ownership and possession restrictions, whether via existing state law, agency regulations or any 'policy and procedures'?
>
> Third:
> If SCDSS cannot so enforce, or require, foster parents to deaccess or lock away firearms, can they undertake a definition of what constitutes 'safe' ownership and handling of firearms in foster homes?
>
> Fourth:
> Given your prior opinion that the " . . . wholesale reservation of regulatory authority to the Legislature concerning the subject matter of 'transfer, ownership, possession, carrying, or transportation of firearms, ammunition, components of firearms, or any combinations of the things' " [2014 WL 5073495 (S.C.A.G. Sept. 30, 2014)] is SCDSS by generating and attempting to apply their regulations, policies, and procedures on foster parents and foster parent applicants, acting outside the scope of their agency authority?
>
> Fifth:
> Is the Legislature the entity to review and determine how foster parents can best keep and bear arms in their households?

It is our opinion that a court would most probably conclude that such a limitation by DSS violates the Second Amendment. Such a Regulation would likely be deemed by a court to infringe upon the foster parents' fundamental right to defend themselves in their home.

## Law/Analysis

Two fundamental constitutional principles – one based upon the state Constitution and one the federal – underpin your questions. First, as the South Carolina Supreme Court recently stated:

> . . . the General Assembly's authority to legislate is plenary: the South Carolina Constitution grants power to the legislature to "enact any act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this State, or the Constitution of the United States." Heslep v. State Highway Dep't., 171 S.C. 186, 193, 171 S.E. 913, 915 (1933); see also Hampton v. Haley, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013) ("[T]he General Assembly has plenary power over all legislative matters unless limited by some constitutional provision."）0; Fripp v. Coburn, 101 S.C. 312, 317, 85 S.E. 774, 775 (1915) ("[T]he legislature may enact any law not prohibited by the Constitution."). . . .

Planned Parenthood South Atlantic v. State, 440 S.C. 465, 475, 892 S.E.2d 121, 127 (2023). In accordance with this basic tenet,

The Honorable Leon D. Gilliam, Member
Page 4
October 28, 2025

> [a]n administrative regulation is valid as long as it is reasonably related to the purpose of the enabling legislation. McNickel's Inc. v. S.C. dept. of Revenue, 331 S.C. 629, 634, 503 S.E.2d 723, 725 (1998). Although a regulation has the force of law, it must fall when it alters or adds to a statute. Id.

S.C. Coastal Conservation League v. S.C. Dep't. of Health & Env't. Control, 390 S.C. 418, 429, 702 S.E.2d 246, 252 (2010). See also S.C. Tax Com'n. v. S.C. Tax Bd. Of Review, 305 S.C. 183, 186, 407 S.E.2d 627, 629 (1991) ["Consequently, we conclude that the Tax Commission has not exceeded its authority by promulgating Regulation 117-110, as it is within statutory and constitutional bounds."]. We find no statutory support for such a Regulation as DSS has promulgated.

The second fundamental constitutional principle involved here is the Second Amendment to the federal Constitution. The United States Supreme Court recently explained in New York State Rifle and Pistol Association, Inc. v. Bruen, 597 U.S. 1, 8-10 (2022), its Second Amendment jurisprudence, as follows:

> [i]n District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L. Ed.2d 637 (2008) and McDonald v. Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L. Ed.2d 894 (2010), we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with Heller and McDonald, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.
>
> The parties nevertheless dispute whether New York's licensing regime respects the constitutional right to carry handguns publicly for self-defense. In 43 States, the government issues licenses to carry based on objective criteria. But in six states, including New York, the government further conditions issuance of a license to carry on a citizen's showing of some additional special need. Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing scheme violates the Constitution.

The Bruen Court further elaborated upon its analysis of the Second Amendment inquiry by noting that:

> [t]he test that we set forth in Heller and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. . . . Heller itself exemplifies this kind of straightforward historical inquiry. One of the District's regulations challenged in Heller "totally ban[ned] handgun possession in the home." . . . . Accordingly, after considering "founding-era historical precedent," including "various restrictive laws in the

The Honorable Leon D. Gilliam, Member
Page 5
October 28, 2025

> colonial period," and finding that none was analogous to the District's ban, <u>Heller</u> concluded that the handgun ban was unconstitutional. . . .

597 U.S. at 26, 27.

Continuing, <u>Bruen</u> further stated that the required historical analysis for whether the Second Amendment is implicated is, as follows:

> [m]uch like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy – a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

597 U.S. at 28-29.

<u>Bruen</u> also commented at some length on the so-called "sensitive places" exception which implicates the State's right to prohibit firearms:

> [c]onsider, for example, Heller's discussion of "longstanding" laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626, 128 S.Ct. 2783. Although the historical record yields relatively few 18th and 19th-century "sensitive places" where weapons were altogether prohibited – e.g. legislative assemblies, polling places, and courthouses – we are also aware of no disputes regarding the lawfulness of such prohibitions. . . . We therefore can assume it settled that these locations were "sensitive places" where arms could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places to determine that modern regulations prohibiting the carry of firearms in <u>new</u> and analogous sensitive places are constitutionally permissible.
>
> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety personnel are presumptively available. . . ." It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-

> defense that we discuss in detail below. . . . Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" because it is crowded and protected generally by the New York City Police Department.
>
> Like Heller, we "do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." 554 U.S. at 626, 128 S.Ct. 2783. And we acknowledge that "applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins." Heller v. District of Columbia, 670 F.3d 1244, 1275 (C.A.D.C. 2011) (Kavanaugh, J., dissenting).
>
> "But that is hardly unique to the Second Amendment. It is an essential component of judicial decisionmaking under our enduring Constitution." Ibid. We see no reason why judges frequently tasked with answering these kinds of historical, analogical questions cannot do the same for Second Amendment claims.

597 U.S. at 30-31.

    The Bruen Court summarized the importance of the Second Amendment thusly:

> [t]he constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." McDonald, 561 U.S. at 780, 130 S.Ct. 3020 (plurality opinion). We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense. 597 U.S., 70-71. As the Supreme Court emphasized in McDonald, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in Heller, we held that individual self-defense is "the central component of the Second Amendment right."

McDonald, 561 U.S. 742, 767-68 (2010), quoting Heller, 554 U.S. at 599.

    We turn now to consideration of the particular DSS regulation referenced in your letter.

    The Department of Social Services (DSS) is the regulatory body for foster homes in South Carolina. According to the DSS website,

> [a] child enters foster care when they can no longer live safely at home and there is no relative or kin to care for them. Foster care is a temporary family or group home, licensed by DSS, where children can live safely and peacefully while parents work with DSS to solve issues that prevent the child from living at home.

The Honorable Leon D. Gilliam, Member
Page 7
October 28, 2025

> These children are in the legal custody of DSS and are placed with a family or group home that can best meet their individual needs. DSS first works closely with the parents during this time of separation toward returning the child to a safe home environment. However, if reuniting with their biological family isn't possible, then permanency is sought through termination of parental rights and adoption youth remaining in foster care receive assistance and support to help them make a successful transition into adulthood.

DSS, as the legal custodian of the foster care child, has chosen to promulgate regulations regarding the maintaining of firearms in the foster home. These regulations, in essence, require that firearms of any kind be stored to render them inoperable. Such regulations are similar to those in the majority of states, as we understand it. As well-intended as such regulations may be, seeking the protection of a child, they must comply with the law – certainly the Second Amendment. As we have emphasized on numerous occasions, this Office strongly supports the constitutional right to bear arms under the Second Amendment, as well as Art. I, § 20 of the South Carolina Constitution. In light of the decisions by the United States Supreme Court in Heller, McDonald and Bruen, the right to self-defense, as protected by the Second Amendment, is fundamental to the rights of every law-abiding citizen.

Based upon the Supreme Court's decisions, a court could well conclude that the DSS regulations regarding the requirement of gun storage in foster homes violate the Second Amendment. We note that even before Bruen, in Heller, the Supreme Court struck down, "the District's requirement (as applied to respondent's handgun) that firearms in the home be rendered and kept inoperable at all times." In the words of the Heller Court,

> [t]his [requirement] makes it impossible for citizens to use [firearms] . . . for the core lawful purpose of self-defense and is hence unconstitutional. The District argues that we should interpret this element of the statute to contain an element for self-defense. . . . . But we think that is precluded by the unequivocal text, and by the presence of certain other enumerated exceptions. . . .  The nonexistence of a self-defense exception is also suggested by the D.C. Court of Appeals' statement that the statute forbids residents to use firearms to stop intruders, see McIntosh v. Washington, 395 A.2d 744, 755-756 (1978).

554 U.S. at 630. Thus, the Supreme Court, even before Bruen, had held that the requirement of dismantling firearms in the home violated the Second Amendment.

Bruen strongly reinforces Heller in this regard. As the Court holds in Bruen,

> [i]n keeping with Heller, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent wit this Nation's historical tradition may a

> court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Bruen, 597 U.S. at 17. Moreover, as one commentator has concluded, "[f]oster care safe-storage statutes significantly burden foster parents' ability to possess firearm within the home for the core purpose of self-defense and cannot withstand strict scrutiny." Murphy, "Foster Second Amendment Rights: An Evaluation of Foster Parents' Right To Bear Arms," 96 U.Det. Mercy L. Rev. 397, 428 (2019).

Following Bruen, the Supreme Court decided U.S. v. Rahimi, 602 U.S. 680 (2024). In that case, the Court reviewed the facial constitutionality of the federal statute prohibiting possession of a firearm while subject to a domestic violence restraining order. Applying the Bruen test, the Court found that § 922(g)(8) was facially valid. According to the Court,

> [w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed. Section 922(g)(8) is by no means identical to these founding era regimes [surety and going armed laws], but it does not need be. See Bruen, 597 U.S. at 30, 142 S.Ct. 2111. Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent. . . . Unlike the regulation struck down in Bruen, Section 922(g)(8) does not broadly restrict arms by the public generally. . .
>
> The burden Section 922(g)(8) imposes on the right to bear arms also fits within our regulatory tradition. While we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse, see Heller, 554 U.S. at 626, 128 S.Ct. 2783, we note that Section 922(g)(8) applies only once a court has found that the defendant "represents a credible threat to the physical safety of another." § 922(g)(8)(c)(i). That matches the surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon.

602 U.S. at 698-99.

We are unaware of any historical analogue whereby firearms may not be used for self-defense in the home of a foster parent and thereby must remain dismantled, such as the DSS regulation requires. In our view, a foster parent possesses the same constitutional right to self-protection as any other law-abiding citizen. Absent a court concluding that a foster parent poses a danger to others, (which, if so, would likely disqualify that person as a candidate to be a foster parent anyway), Rahimi is inapplicable. Moreover, history has not created a special exception in the case of foster parents, to our knowledge. As Heller makes clear, a requirement that a firearm must be stored and disabled is the equivalent of no-self-defense at all. This requirement is inconsistent with the Second Amendment.

We have located a federal court decision which supports our analysis. In <u>Johnson v. Lyon</u>, 406 F.Supp.3d 651 (W.D. Mich., Northern Div. 2018), foster parents filed an action pursuant to § 1983, alleging that the Michigan rule mandating storage of firearms in an inoperable condition violated the Second Amendment. The director of the Michigan Department of Health and Human Services filed a motion to dismiss for failure to state a claim. However, the Court denied the motion, concluding that the Second Amendment was clearly implicated by the Rule. According to the Court, the Heller decision is controlling (<u>Bruen</u> had not yet been decided when the Michan District Court opinion was issued). According to the Court's detailed analysis,

> In <u>Heller</u>, the Court confronted a District of Columbia ordinance that, among other things, required residents to keep their lawfully-owned firearms "unloaded and dissembled or bound by a trigger lock or similar device" unless located in a place of business or in use for lawful recreational activity. 554 U.S. at 574- 75, 128 S.Ct. 2783. The Court explained that the Second Amendment right to "keep and bear arms" safeguards the ability of "law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 634-35, 128 S.Ct. 2783. And therefore, the District of Columbia ran afoul of the Second Amendment by its "prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." <u>Id.</u> at 635, 128 S.Ct. 2783.
>
> To be sure, Rule 415 is silent as to the use of firearms. It does not prohibit foster parents from carrying them, nor does it require foster parents to handle them in a particular manner. But like the <u>Heller</u> ordinance, it regulates how firearms are stored. Compare Rule 415(3)(a}-(c) with <u>Heller</u>, 554 U.S. at 574, 128 S.Ct. 2783 (District of Columbia law required lawfully owned firearms in the home to be kept "unloaded and dissembled or bound by a trigger lock or similar device.").
>
> Storing firearms in an inoperable condition makes them useless for the defense of hearth and home, which implicates the Second Amendment. See <u>Heller</u>, 554 U.S. at 630, 128 S.Ct. 2783. The need for self-defense rarely comes with advance notice; it occurs spontaneously, often at times specifically chosen for the expected vulnerability of the intended victim.
>
> For example, a foster parent cannot "use" a firearm while asleep. Thus, Rule 415 mandates that the gun be stored in a locked gun safe or trigger locked, and the ammunition must be stored in a separate locked location. If, during the night, the need arises for the foster parent to use the gun for self-defense, he or she must now retrieve the weapon from the gun safe, proceed to a "separate locked location" to retrieve the ammunition, and load the gun. Only then would it be a functional firearm capable of defending hearth and home. Like the <u>Heller</u> ordinance, these significant constraints on self-defense within the home clearly implicate the Second Amendment; the Department's argument to the contrary must fail.
>
> The Department also argues that Rule 415 falls outside the historical understanding of the Second Amendment for other reasons.

The Honorable Leon D. Gilliam, Member
Page 10
October 28, 2025

In <u>Heller</u>, the Supreme Court held the Second Amendment secures "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." But the Court was clear that the right, like other constitutional rights, is "not unlimited" and "include[s] exceptions." <u>Id.</u> at 595, 128 S.Ct. 2783. While declining to delineate the full scope of the Second Amendment, the Court did articulate an illustrative list of presumptively lawful regulations:

> [N]othing in [this] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

<u>Id.</u> at 626--27, 627 n. 26, 128 S.Ct. 2783.

The Department argues that Rule 415 fits within two of the presumptively lawful categories of government regulation: (1) possession of firearms in a sensitive area, and (2) the "longstanding tradition of targeting select groups' ability to access and use arms in the interests of public safety, including restrictions based on age." Thus, the Department believes Rule 415 falls outside the scope of traditional understanding of the Second Amendment, which would end the inquiry. The Court does not find either argument persuasive.

First, The Department argues that foster homes are analogous to schools because "both have temporary control over others' children." (ECF No. 9 at PageID.203.) Public areas fall within the "sensitive place" exception because they are important to the function of government or because the "possessing firearms in such places risks harm to great numbers of defenseless people .... " <u>Nordyke v. King</u>, 563 F.3d 439, 459 (9th Cir. 2009).

Foster homes are obviously not such a place. They are homes. And considering one's home a "sensitive area" would eviscerate <u>Heller's</u> clarification that "the need for defense of self, family, and property is most acute" in the home. 554 U.S. at 628, 128 S.Ct. 2783. Certainly, a foster home-like any other home--is not a place where "great numbers of defenseless people" are found. <u>Nordyke</u>, 563 F.3d at 459.

Second, the Department asserts that, "caselaw allows a complete prohibition of firearms ... from children." (ECF No. 9 at PageID.204.) The Department relies on a single Fifth Circuit opinion to support its argument. <u>National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, and Explosives</u>. 700 F.3d 185 (5th Cir. 2012). There, the Fifth Circuit reviewed a federal law prohibiting federal firearms licensees (FFLs) from selling handguns to 18-to-20-year-olds. Id. at 192. The law did not prohibit the use or possession of handguns by that group. Id. at 191 ("The government is correct that the challenged federal laws do not bar 18-to-20-year-olds from possessing or using handguns. The laws also do not bar 18-to-20-year-olds from receiving handguns from parents or guardians.") After an extensive review of

The Honorable Leon D. Gilliam, Member
Page 11
October 28, 2025

> tradition and historical legislation surrounding age-related restrictions on firearms, the court concluded that the conduct at issue-the ability of 18-to-20-year olds to purchase handguns from FFLs-fell outside the Second Amendment's protection. Id. at 193-204.
>
> For obvious reasons, the Court does not find this case helpful. Rule 415 directly burdens people outside of a vulnerable demographic to reach children, and it allegedly prevents them from using firearms in their homes. Such a restriction clearly falls within the Second Amendment's protection.[ ] If Rule 415 only prohibited foster children from possessing or using firearms in foster homes, there may not be any constitutional issue. But Rule 415 is not structured like that. Plaintiffs have pleaded that it prevents them-as law-abiding, responsible citizens-from bearing arms to protect their home.
>
> In short, the Court does not find that the Department has met its burden by showing that Rule 415 is outside the scope of the historical understanding of the Second Amendment.

406 F.Supp.3d at 665-667.

    The decision in <u>Bruen</u> strongly reinforces this decision. <u>Bruen</u> found <u>Heller</u> to be correctly decided and reaffirmed that decision (as well as the decision in <u>McDonald</u>). Moreover, the <u>Bruen</u> Court concluded not only that the text of the Second Amendment was controlling, but that there must be a "historical tradition" for a particular firearms regulation in order for such regulation to be upheld. We are unaware of any such tradition with respect to the home of foster parents. As the Court noted in <u>Johnson v. Lyon,</u> the home of foster parents is a "home" like any other. Thus, such a location is not a "sensitive area" justifying such regulation. Further, <u>Rahimi</u> is not to the contrary, as there is no judicial finding of a threat to another.

### Conclusion

    While we greatly respect the purpose and objective underlying the DSS Regulation – the protection of foster children – we are of the opinion that a court would likely conclude that the Second Amendment's right to bear arms is here controlling and supersedes such Regulation. The Supreme Court's decisions in <u>Bruen</u>, as well as <u>Heller</u>, make it clear that the Second Amendment protects the right to have a firearm in one's home with no limitations placed upon its storage. The right to the firearm, protected by the Second Amendment, serves the purpose of self-defense. The restraints placed upon the possession of a firearm by requiring that a foster parent household must dismantle that firearm and keep it stored would likely be deemed by a court to be an infringement upon the homeowner's Second Amendment right to defend hearth and home. Such a requirement provides no self-defense at all.

    Indeed, in <u>Heller,</u> the Supreme Court struck down the District of Columbia's requirement that a firearm be stored to render it inoperable, concluding that such storage requirement "makes it impossible for citizens to use [firearms] for the core purpose of self-defense and is hence

The Honorable Leon D. Gilliam, Member
Page 12
October 28, 2025

unconstitutional." The Michigan decision in Johnson directly addresses this issue in the context of foster parents. As the Court there noted, "[s]toring firearms in an inoperable condition makes them useless for defense...." While we appreciate the policy considerations of DSS which are involved, such considerations cannot violate a fundamental constitutional right to bear arms, as the Supreme Court has construed the Second Amendment. The Rahimi decision is not to the contrary as there has been no judicial determination of a threat to another. We are of the view that the Second Amendment supersedes the Regulation. Of course, only a court may invalidate the DSS Regulation and such agency action remains valid until a court rules otherwise.

Sincerely,

Robert D. Cook
Solicitor General Emeritus