E-FILED
Monday, 03 August, 2026  12:38:21 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JENNIFER MILLER, DARIN MILLER, SECOND AMENDMENT FOUNDATION, INC., ILLINOIS STATE RIFLE ASSOCIATION, and ILLINOIS CARRY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 18-cv-3085 |
| HEIDI MUELLER, in her official capacity as Acting Director of the Illinois Department of Children and Family Services, and KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge:**

Now before the Court are Defendants Heidi Mueller's and Kwame Raoul's ("Defendants") Motion for Summary Judgment (d/e 89) and Plaintiffs Jennifer Miller's, Darin Miller's, Second Amendment Foundation, Inc.'s, Illinois State Rifle Association's, and Illinois Carry's ("Plaintiffs") Motion for Summary Judgment (d/e

94). For the reasons set forth, Defendants' Motion for Summary Judgment (d/e 89) is GRANTED and Plaintiffs' Motion for Summary Judgment (d/e 94) is DENIED.

## I.   BACKGROUND

The Court draws the following facts from the parties' statements of undisputed facts and discusses any material factual disputes in its analysis.

### a. Illinois Day Care Homes

The Illinois Department of Children and Family Services ("DCFS") was created for the purpose of providing social services to children and their families, to operate children's institutions, and to provide other rehabilitative and residential services related to children and their families. d/e 89, p. 7; d/e 96, p. 3. Section 7 of the Illinois Child Care Act of 1969 requires DCFS to "prescribe and publish minimum standards for licensing" of child care facilities including day care homes and foster family homes.[1] 225 ILCS 10/7.

---

[1] The Illinois Department of Early Childhood ("IDEC") began operations focusing on early childhood programs and services on July 1, 2026. See IDEC Agency News, Illinois Department of Early Childhood Officially Launches July 1 as New State Agency, ILL. DEPT. EARLY CHILDHOOD (July 28, 2026),

3:18-cv-03085-SEM-DJQ    # 104    Filed: 08/03/26    Page 3 of 116

DCFS' obligation to protect children's safety extends to day care homes. d/e 89, p. 10; d/e 96, p. 4. Illinois law requires that day care homes—businesses run out of the licensee's home where parents pay the day care licensee for child care services—have licenses from DCFS to operate lawfully. d/e 89, p. 9; d/e 96, pp. 3-4. Consistent with the Illinois legislature's grant of licensing authority, DCFS has created minimum licensing standards for day care homes. d/e 89, p. 10; d/e 96, p. 4.

Under Subsection 7(a) of the Illinois Child Care Act of 1969, DCFS is required to issue regulations including:

> (13) Provisions prohibiting handguns on day care home premises except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside on the premises of a day care home;

> (14) Provisions requiring that any firearm permitted on day care home premises, except handguns in the possession of peace officers, shall be kept in a disassembled state, without ammunition, in locked storage, inaccessible to children and that ammunition permitted on day care home premises shall be kept in locked storage separate from that of

https://idec.illinois.gov/news/2026/illinois-department-of-early-childhood-officially-launches-july-.html.

Page **3** of **116**

disassembled firearms, inaccessible to children;

(15)    Provisions requiring notification of parents or guardians enrolling children at a day care home of the presence in the day care home of any firearms and ammunition and of the arrangements for the separate, locked storage of such firearms and ammunition

225 ILCS 10/7(a)(13)–(15).

In order to comply with §§ 7(a)(13)–(15) of the Illinois Child Care Act of 1969, DCFS has promulgated the following rules:

(17)    Handguns are prohibited on the premises of the day care home except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside in the day care home. The licensee shall post a "no firearms" sign, as described in Section 65(d) of the Firearm Concealed Carry Act, in a visible location where parents pick up children.

(18)    Any firearm, other than a handgun in the possession of a peace officer or other person as provided in subsection (a)(17), shall be kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children.

A)    Ammunition for such firearms shall be kept in locked storage separate from that of the disassembled

Page **4** of **116**

firearms, inaccessible to children.

B) The operator of the home shall notify the parents or guardian of any child accepted for care that firearms and ammunition are stored on the premises. The operator shall also notify the parents or guardian that such firearms and ammunition are locked in storage inaccessible to children. The notification need not disclose the location where the firearms and ammunition are stored.

89 Ill. Admin. Code §§ 406.8(a)(17)–(18) ("the Day Care Home Rule").

Although Plaintiffs deny that compelling compliance with the Day Care Home Rule protects children's health and safety and assert the opposite, the parties agree that the Day Care Home Rule's purpose is to protect children's health and safety by preventing death, injury, and suicide by firearms. d/e 89, p. 11, d/e 96, pp. 5-6.

Additionally, day care home licensees must allow DCFS to inspect their homes to determine compliance with the licensing standards at any time during operating hours, at least once a year. d/e 89, p. 10; d/e 96, p. 4. Day care home licensees must also comply with requirements concerning the physical facility of the day care home to ensure children's safety: storing knives, medication, scissors, and hazardous materials in places inaccessible to

children; ensuring the home is free from lead paint; refraining from smoking while children are present; ensuring that there is an outdoor space that is safe for children to play; ensuring swimming pools are inaccessible to children; and ensuring that the day care space is kept at a certain temperature, depending on the time of the year. Id.; see also 89 Ill. Admin. Code § 406.8.

DCFS designated representative Meaghan Jorgensen testified that, if a day care home licensee had a handgun on the premises outside of operating hours, he or she would not be in violation of the Day Care Home Rule. d/e 89, p. 11; d/e 96, p. 5; see also d/e 89-3, p. 64. The maximum penalty for violating the Day Care Home Rule is revocation of the license to operate a day care home. d/e 89, p. 11; d/e 96, p. 4.

### b. Illinois Foster Homes

When DCFS is awarded guardianship of a child, DCFS receives the rights and responsibilities of legal custody and is required by law to act in the child's best interests. d/e 89, p. 7; d/e 96, p. 3. DCFS may place children in its care in a licensed child care facility, such as a foster home in DCFS' foster care program,

which the Illinois legislature has mandated must ensure child safety and protection. d/e 89, p. 7; d/e 96, p. 3.

DCFS requires that foster homes and foster parents be licensed by DCFS and subsidizes foster parents' expenses incurred in caring for a foster child. d/e 89, p. 8; d/e 96, p. 3. Among other requirements, foster care licensees must: agree to allow DCFS workers to inspect their homes, both as part of the licensing process and on an ongoing basis; refrain from making derogatory comments about the foster child or the child's family; and submit to a background check and be approved by DCFS to live in the foster home (as must all residents and potential residents of the foster home). d/e 89, p. 8; d/e 96, p. 3. Foster care licensees must also agree to store tools, medicine, and other dangerous household supplies away from young children, refrain from smoking, and maintain at least one operable fire extinguisher. d/e 89, pp. 8-9; d/e 96, p. 3.

DCFS has also promulgated the following rule regarding firearms in foster homes:

> (o) Any and all firearms and ammunition shall be stored and locked up separately at all times and kept in places

> inaccessible to children. No firearms possessed in violation of a State or federal law or a local government ordinance shall be present in the home at any time. Loaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures.

89 Ill. Admin. Code § 402.8(o) ("the Foster Home Rule").

DCFS created the Foster Home Rule to increase the health and safety of foster children by protecting them from injury and death from firearms, including by suicide. d/e 89, p. 9; d/e 96, p. 15. The maximum penalty for violating the Foster Home Rule is revocation of the foster caregiver license. d/e 89, p. 9 (citing d/e 89-3, pp. 40-45); d/e 96, p. 5.

### c. Procedural History

Plaintiffs Jennifer Miller and Darin Miller ("the Millers") are DCFS-licensed foster parents. d/e 89, p. 25; d/e 96, p. 4. Jennifer Miller is also a DCFS-licensed day care home operator, operating a day care out of the Millers' home. d/e 89, p. 28; d/e 96, p. 4. The Millers are members of each of the three organizational Plaintiffs—the Second Amendment Foundation, the Illinois State Rifle Association, and Illinois Carry—which are membership

organizations that promote awareness of the Second Amendment. d/e 89, p. 33; d/e 96, pp. 4-5.

The Millers are in compliance with the DCFS Rules. d/e 89, pp. 28, 32; d/e 96, pp. 23, 24. But, the Millers both testified that, in the absence of the DCFS Rules, they would like to store at least one loaded firearm locked in a safe. d/e 89, p. 32; d/e 96, p. 4. Darin Miller further testified that he wishes to have the option to carry a concealed, loaded firearm on his person in his home, including during day care hours, and carry at least two loaded handguns on his person. d/e 89, pp. 32-33; d/e 96, p. 4.

On April 16, 2018, Plaintiffs filed a Complaint (d/e 1) in this Court alleging that the Day Care Home Rule was an unconstitutional restriction on the Second Amendment right to keep and bear arms. On May 29, 2019, Plaintiffs filed an Amended Complaint (d/e 19), alleging that both the Day Care Home Rule and the Foster Home Rule (together, "the DCFS Rules") are unconstitutional restrictions on the Second Amendment right to keep and bear arms. Defendants Heidi Mueller, Director of DCFS, and Kwame Raoul, Attorney General of the State of Illinois, are both sued in their official capacities. Id. at p. 1.

On November 12, 2021, Defendants jointly filed a Motion for Summary Judgment (d/e 55), as well as a supporting Memorandum of Law (d/e 56), asserting that both DCFS Rules withstood constitutional scrutiny. On March 14, 2022, this Court issued an Order (d/e 65) granting Defendants' Motion for Summary Judgment, finding that both DCFS Rules were subject to intermediate scrutiny and passed constitutional muster. See id. at pp. 25-38; 38-45.

This Court considered Plaintiffs' claims under the two-step inquiry the Seventh Circuit set forth in Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011) ("Ezell I") to determine the constitutionality of state and local laws and regulations challenged on Second Amendment grounds. See d/e 89, pp. 31-38; 39-45. At the first step of Ezell I, the reviewing court was to undertake a "textual and historical inquiry into original meaning" to determine whether the restricted activity is "categorically unprotected" by the Second Amendment. Ezell I, 651 F.3d at 701, 703. At the second step of Ezell I, the Government bore the burden of "justifying its action[s] under some heightened standard of judicial review." Id. at 706 (emphasis in original). The applicable standard of review was "akin

to intermediate scrutiny" but could be more or less strict depending on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." <u>Kanter v. Barr</u>, 919 F.3d 437, 441-42 (7th Cir. 2019) (internal citations omitted).

On March 15, 2022, this Court entered judgment accordingly (d/e 66). On March 24, 2022, Plaintiffs appealed to the United States Court of Appeals for the Seventh Circuit from this Court's Order (d/e 65) and Judgment (d/e 66). <u>See</u> d/e 67.

On January 20, 2023, the Seventh Circuit vacated this Court's Order (d/e 65) granting summary judgment for the State of Illinois and remanded this case to this Court for further proceedings consistent with the Seventh Circuit's order. <u>See</u> d/e 77. The Seventh Circuit directed this Court to allow the parties to engage in further discovery, including seeking additional expert reports, and further briefing on the unconstitutional conditions doctrine and the sensitive places doctrine. <u>See</u> <u>id.</u> at p. 3. The Seventh Circuit directed this Court to then evaluate additional motions under the text, history, and tradition framework in <u>New York State Rifle & Pistol Association, Inc. v. Bruen</u>, 597 U.S. 1 (2022) and to consider

the interaction of <u>Bruen</u> and the unconstitutional conditions doctrine. <u>See</u> d/e 77, p. 3.

On October 4, 2024, Plaintiffs filed a Second Amended Complaint (d/e 83) against Defendants, alleging that both DCFS Rules are unconstitutional restrictions on the Second Amendment right to keep and bear arms as applied to the states under the Fourteenth Amendment. <u>Id.</u> at pp. 8-9, 19. Plaintiffs requested a declaration that the DCFS Rules are unconstitutional, as well as preliminary and permanent injunctions enjoining Defendants from enforcing the DCFS Rules. <u>Id.</u> at p. 19.

On September 5, 2025, Defendants filed a Motion for Summary Judgment (d/e 89), to which Plaintiffs filed a Response (d/e 96) on September 25, 2025, to which Defendants filed a Reply (d/e 97) on October 8, 2025. On September 8, 2025, Plaintiffs filed a Motion for Summary Judgment (d/e 94), to which Defendants filed a Response (d/e 95) on September 24, 2025, to which Plaintiffs filed a Reply (d/e 98) on October 8, 2025.

On November 12, 2025, Plaintiffs filed an advisory opinion from the South Carolina Attorney General as supplemental authority (d/e 100). On November 18, 2025, Defendants filed a

Response (d/e 102). The Court notes that the advisory opinion does not address the DCFS Rules, but another state's demonstrably different statute. See generally d/e 100.

## II.   LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the non-moving party. Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).

When ruling on a motion for summary judgment, the Court must construe facts in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008). "At summary judgment, 'a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" Paz v. Wauconda Healthcare & Rehab. Ctr., LLC, 464 F.3d 659, 664 (7th Cir. 2006).

The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (internal citation omitted)). After the moving party does so, the non-moving party must then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (quotation and footnotes omitted).

### III.   SECOND AMENDMENT ANALYSIS

#### a. Legal Precedent.

#### 1. Supreme Court precedent on the Second Amendment.

The Second Amendment to the United States Constitution enshrines the "right of the people to keep and bear Arms." U.S. CONST., amend. II. "[T]he Second Amendment right is fully

applicable to the States." <u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. 742, 750 (2010).

Since 2008, the Supreme Court has held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." <u>District of Columbia v. Heller</u>, 554 U.S. 570, 635 (2008). The Supreme Court in <u>Heller</u> noted that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." <u>Id.</u> at 581. However, the Court in <u>Heller</u> also cautioned that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." <u>Id.</u> at 626.

The Justices in <u>Heller</u> considered a District of Columbia law generally requiring residents to keep their lawfully owned firearms "unloaded and disassembled or bound by a trigger lock or similar device[.]" <u>Id.</u> at 575 (<u>quoting</u> D.C. Code § 7–2507.02). The Court ultimately found that the requirement at issue, as applied to the respondent—"that firearms in the home be rendered and kept inoperable at all times"—"makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." <u>Id.</u> at 630. The Court also cautioned in <u>Heller</u>

that its analysis should not "be taken to cast doubt on…laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" nor to "suggest the invalidity of laws regulating the storage of firearms to prevent accidents." Id. at 626, 632.

In New York State Rifle & Pistol Association, Inc. v. Bruen, the Supreme Court built upon Heller and its other prior Second Amendment decisions to clarify its position on who the Second Amendment protects and how to determine whether a law is consistent with those protections. 597 U.S. 1 (2022). The Court restated that "the people" protected by the Second Amendment include "ordinary, law-abiding, adult citizens." Bruen, 597 U.S. at 31. The Court explained that the Second Amendment "surely elevates above all interests the right of law-abiding, responsible citizens to use arms" for self-defense. Id. at 26 (quoting Heller, 554 U.S. at 635).

The Supreme Court in Bruen also announced a new framework for analyzing Second Amendment challenges to firearms regulations. First, the presiding court must determine whether "the Second Amendment's plain text covers an individual's conduct."

Bruen, 597 U.S. at 17. "If the government can prove that the regulated conduct falls beyond the Amendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected." Id. at 18 (internal citations omitted).

But, if the conduct falls within the plain text of the Second Amendment, the conduct is presumptively protected. Id. at p. 17. The analysis then moves to the second step, where the government bears the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 19.

If a challenged regulation addresses a longstanding societal problem, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Id. at 26. If the Founders could have adopted a particular regulation to confront a longstanding problem and did not do so, that could suggest that the law today is unconstitutional. Id. at 27. For "modern regulations that were unimaginable at the founding," the government must produce historical evidence that is "relevantly similar." Id. at 28-29.

The Supreme Court did not provide lower courts with any

exhaustive list of features or factors to consider that would render a

modern regulation similar enough to historical analogues to pass

muster. Id. at p. 29. Rather, the Court directed lower courts to

consider "how and why regulations burden a law-abiding citizen's

right to armed self-defense"—in other words, "whether modern and

historical regulations impose a comparable burden on the right of

armed self-defense and whether that burden is comparably

justified"—to identify historical analogues to modern firearm

regulations. Id. Citing "Heller's discussion of longstanding laws

forbidding the carrying of firearms in sensitive places such as

schools and government buildings," the Bruen court found that

"courts can use analogies to those historical regulations of sensitive

places to determine that modern regulations prohibiting the carry of

firearms in new and analogous sensitive places are constitutionally

permissible." Id. at 30 (emphasis in original) (internal quotations

omitted).

   In United States v. Rahimi, 602 U.S. 680 (2024), the Supreme

Court heard a challenge to § 922(g)(8), which prohibits the

possession of firearms by persons subject to a domestic violence

restraining order. Id. at 684. The Rahimi Court clarified that the

Bruen standard should not be misunderstood to mean that modern firearm regulations require close founding-era comparators. Id. at 691-92. Rather, the Court examined both historical surety laws, which "authorized magistrates to require individuals suspected of future misbehavior to post a bond," and "going armed laws," which involved judicial determinations of whether a particular defendant was likely to threaten another with a weapon. Id. at 695-97. The Rahimi Court found that § 922(g)(8) passed Second Amendment muster because, when considering the surety and going armed laws, "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." Id. at 700.

The Rahimi Court also noted that a statute's penalty constituted a "relevant aspect of the burden" that a statute "imposes on the right to bear arms." Id. at 698-99. Because, under the going armed laws, "imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." Id. at 699. The Justices also rejected the defendant's argument that bans on firearms in the home were

categorically unconstitutional under <u>Heller</u>:

> Rahimi argues <u>Heller</u> requires us to affirm, because Section 922(g)(8) bars individuals subject to restraining orders from possessing guns in the home, and in <u>Heller</u> we invalidated an "absolute prohibition of handguns ... in the home." But <u>Heller</u> never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by "felons and the mentally ill," are "presumptively lawful."

<u>Id.</u> (internal citations omitted) (quoting <u>Heller</u> at 636, 626, 627 n.26).

### 2. Seventh Circuit Court of Appeals precedent on the Second Amendment.

The Seventh Circuit most recently addressed the sensitive places discussed in <u>Bruen</u> in <u>Schoenthal v. Raoul</u>, 150 F.4th 889 (7th Cir. 2025), <u>cert. denied</u>, 146 S. Ct. 2158 (2026). In <u>Schoenthal</u>, the Seventh Circuit sought to determine the "unifying principle" among the four sensitive places specified in <u>Heller</u> and <u>Bruen</u>—schools, legislative assemblies, polling places, and courthouses—by "look[ing] at 'how' and 'why' the government historically burdened the right to carry weapons" in each place. <u>Id.</u> at 910. Reading <u>Heller</u> and <u>Bruen</u> "to say that schools are places where firearms can be prohibited for all individuals," the Seventh Circuit noted that "what

makes schools 'sensitive' must be something other than <u>in loco parentis</u>" authority over students. <u>Id.</u> at 909.

The Seventh Circuit found that schools, legislative assemblies, polling places, and courthouses "are all discrete places with unavoidable characteristics that potentially render it ill-advised to allow firearms":

> What happens within these places means that there is a pre-existing vulnerability or societal tension that would be exacerbated by the presence of firearms. And crucially, they are a list of dispersed places within a community, not the community itself, so regulation deprives the Second Amendment right only for a limited time.

<u>Id.</u> at 910.

In other words, "the sensitive places doctrine tells us that the appropriate balance" of armed self-defense and its risks, as settled by the Second Amendment, nonetheless "allows for temporary restrictions in scattered discrete places where the risk is simply different, and reminiscent of risks addressed by regulations in our past." <u>Id.</u> As relevant here, the Seventh Circuit found that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children." <u>Id.</u>

The government comparing modern laws "to regulations at those four sensitive places benefits from an already-completed historical analysis," and all the reviewing court "must do is make the analogy." Id. at 908. "When a modern law does not neatly compare to the regulations on the four prototypical sensitive places, as it often might not, the government should present additional historical evidence of analogous place-based restrictions to help locate the challenged law within our tradition." Id.

The Seventh Circuit then, if briefly, addressed day care firearms restrictions in this context:

> The government certainly should not try to convince us that a law's benefits outweigh the costs. It should show no more, and no less, than that the trade-off is one that accords with our history.
>
> Some place-based restrictions will look much like those in the past. (Think of a rule banning firearms at a daycare.) Other times, they will appear rather different.

Id. at 911 (emphasis added). The Seventh Circuit also noted, in response to the proposed analogy that children regularly take public transit:

> For many students, [the Chicago Transit Authority] serves as the functional equivalent of a school bus. To be sure, we are careful not to put too much weight on this similarity to schools. The Second Amendment does not vanish in the

presence of children. But the fact that public transit serves the "vulnerable population[]" of children is a "why" that Section 65(a)(8) [the transit concealed carry ban at issue in Schoenthal] shares with historically permissible restrictions in schools.

Id. at 917 (citing Wolford v. Lopez, 116 F.4th 959, 1001 (9th Cir. 2024)).

As also relevant here, the Seventh Circuit established that "evidence stretching into the nineteenth century is useful to a Bruen inquiry," especially "when reviewing a state law, given that the states were not bound by the Second Amendment until the Fourteenth Amendment was ratified in 1868." Id. at 913.

**b. The Second Amendment's plain text covers the DCFS Rules.**

In Bruen, the Supreme Court held that, as to the first step of applying the Second Amendment, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. 1, 17 (2022).

Defendants argue that, while the Second Amendment protects the individual right to self-defense, "it does not speak to what an individual may or may not do when she voluntarily takes on the government's work as a foster care home operator or when

exploiting a state-conferred benefit such as the ability to operate a state-licensed commercial day care from her home." d/e 89, pp. 47-48.

The Second Amendment protects the "right of the people to keep and bear Arms," U.S. Const., amend. II—specifically, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635. The DCFS Rules explicitly regulate based on place—private homes operating as day care homes and/or foster homes—and therefore predominantly impact those living in such homes. The regulations limit how and when firearms are to be maintained in the physical homes themselves: disassembled, unloaded, and locked in a safe free of ammunition for day care homes; and unloaded and locked in a safe free of any ammunition for foster homes. See 89 Ill. Admin. Code §§ 402.8(o); 406.8(a)(17)–(18) (the DCFS Rules).

While the DCFS Rules only regulate who may have firearms in such homes by virtue of who is in such homes, the Court has no reason to believe the Millers to be anything other than "law-abiding, responsible citizens," see Heller, 554 U.S. at 635, especially considering their attested compliance with the day care home and

foster home licensing requirements. See d/e 89, pp. 25-26, 28-30; d/e 96, pp. 4, 21-24; see also d/e 91 at DCFS000408–411, DCFS000195, DCFS002365–66.

Thus, the Court finds that "the Constitution presumptively protects th[e] conduct" regulated by the DCFS Rules of individuals seeking to maintain firearms in and in order to defend their homes. See Bruen, 597 U.S. at 24; see also Heller, 554 U.S. at 635. Defendants must, therefore, "justify [their] regulation[s] by demonstrating that [they are] consistent with the Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 24.

### c. The DCFS Rules are consistent with the Nation's historical tradition of firearm regulation in sensitive places.

### 1. Day care homes are sensitive places analogous to schools pursuant to Bruen and Schoenthal.

As a threshold matter, the parties agree that licensed, regulated day care—with standards protecting children's safety—emerged only in the early- to mid-20th century. See d/e 89, p. 15; d/e 96, p. 18; see also d/e 89-6 (Decl. of C. Rymph and Expert Report of C. Rymph), pp. 34–39. Defendants do not argue that there is evidence before or "stretching into the nineteenth century"

constituting a history and tradition of regulating firearms in day cares, much less in day care homes. See Schoenthal v. Raoul, 150 F.4th 889, 913 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026); see also d/e 89, p. 15.

Plaintiffs argue that "common sense shows that one's home, with or without children in it, is nothing like public transportation, or a polling place, or a courthouse, nor – despite Defendants' arguments to the contrary – even a school." d/e 96, p. 46. Further, Plaintiffs argue that "if the home became a 'sensitive place,' the Second Amendment would be nullified." Id. The Court notes, however, that the question is not whether ordinary private homes are sensitive places, but whether licensed day care homes—the homes of individuals who sought and obtained that specific licensure—are sensitive places.

Defendants argue that licensed day care homes are analogous to schools. See d/e 89, p. 55. Defendants also provide several examples of witness testimony and historical laws in support of their argument that states have regulated firearms in places where children are present. Id. at 21-23; see also d/e 89-11 (Decl. of Patrick J. Charles ¶¶ 14-25 and accompanying footnotes).

This Court's prior Order (d/e 65) found that making "a determination as to whether day care homes are 'sensitive places' [would] inform the Court's" subsequent analysis under the means-end framework since overturned by Bruen. Id. at p. 29, see also Bruen, 597 U.S. at 19 ("Heller and McDonald do not support applying means-end scrutiny in the Second Amendment context."). Before assessing the DCFS Rules under means-end scrutiny, the Court found:

> The fact that day cares are designated spaces for the care of young children is a powerful indicator that they may be "sensitive places." Moreover, a ban on firearms in day cares is closely analogous to a ban on firearms in schools, which is one of the core "presumptively lawful" measures referenced in Heller. For these reasons, the Court finds that licensed day cares are "sensitive places" in which unusually restrictive firearms prohibitions may be permissible.

d/e 65, p. 31.

Bruen did not disturb any of the reasoning in Heller on which this Court relied in concluding that day cares are sensitive places. However, for the sake of thoroughness, this Court will now analyze whether day care homes are sensitive places pursuant to Bruen and Schoenthal.

When comparing modern laws "to regulations at those four sensitive places," including schools, the government "benefits from an already-completed historical analysis" and all the reviewing court "must do is make the analogy." Schoenthal, 150 F.4th at 908. Specifically, the Seventh Circuit found that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children." Id. Therefore, the Court accepts the already-completed historical analysis of schools as sensitive places and now assesses whether day care homes are, in fact, analogous to schools.

### A. The Millers' testimony and their compliance with the day care home licensure requirements establish that compliant day care homes, including their own, are learning environments.

The parties agree to the following facts about Plaintiff Jennifer Miller ("Miller") and her day care home. Miller cares for very young children during the day, as well as school-aged children, five years and up, after school. d/e 89, p. 31; d/e 96, p. 4; see also d/e 89-5 (Dep. of J. Miller) at 157:1-22, 158:10-20, 163:19-25. As a day care home operator, Miller provides help to school age children with homework, and during the COVID pandemic, she "ha[d] to do home

schooling." Id.; see also d/e 89-5 at 159:3–10, 163:19–25, 165:8–10. Miller uses her "teaching license" as part of running a day care home. Id.; see also d/e 89-5 at 159:6-13, 159:10–11. For younger children, Miller runs her day care "like a preschool program," featuring "a set schedule" with "circle time," "meal time," and "nap times." d/e 89, p. 32; d/e 96, p. 4; see also d/e 89-5 at 163:8–13. Miller has "had many preschool teachers tell [her] that [her] kids are well prepared for preschool." Id.; see also d/e 89-5 at 163:16–18.

The parties also agree that Miller has a day care home license and that she has completed and signed DCFS forms three times stating that she "will comply with all [license] requirements" after the day care home license is issued or renewed. d/e 89, pp. 28-30; d/e 96, pp. 4, 23; see also d/e 91 at DCFS000411, DCFS002115, and DCFS003878. Rule 406 contains DCFS' minimum licensing standards for day care homes, including the Day Care Home Rule regulating firearms. See 89 Ill. Admin. Code § 406; see also id. at § 406.8(a)(17)-(18).

For example, under Section 406.9, titled "Characteristics and Qualifications of the Day Care Family," day care home caregivers "shall exhibit competence in…[k]nowledge of the child's need to

explore and manipulate and the willingness to provide and maintain a home where children can enjoy living and learning." Id. at § 406.9(q)(5).

Section 406.15, titled "Guidance and Discipline," requires day care home licensees to teach children how to comport themselves through safe, age-appropriate behavior correction. See 89 Ill. Admin. Code § 406.15. Under Section 406.15(a), the day care home licensee "shall use disciplinary measures designed and carried out in such a way as to help individual children develop self-control and assume responsibility for their own acts." Id. at § 406.15(a). Section 406.15(a)(1) states that the day care home licensee "shall establish simple, understandable rules so that expectations and limitations are clear to the child." Id. at § 406.15(a)(1).

Similarly, Section 406.16, titled "Activity Requirements," requires day care home licensees to teach children basic subjects and skill building through participation. See 89 Ill. Admin. Code § 406.16. Under Section 406.16(b)(2), "[c]hildren shall be encouraged to participate in age appropriate household routines such as preparing food, setting tables, and cleaning up." Id. at § 406.16(b)(2). Other sections similarly direct day care home

licensees' caregivers to spur children's development around food and feeding: children under 30 months old "shall be allowed and encouraged to feed themselves when they indicate a readiness to do so," id. at § 406.22(d)(4), and "[c]hildren shall be encouraged but not forced to try new foods," id. at § 406.17(l)(2).

Section 406.16(b)(5) and (6) state that "[t]here shall be activities, both indoors and outdoors, in which children make use of both large and small muscles" as well as "a variety of chores and activities at the child's developmental level." Id. at § 406.16(b)(5)-(6). "Each child's individuality shall be respected and a sense of self and development of self esteem shall be encouraged." Id. at § 406.16(b)(7). Under Section 406.16(c)(1) and (3), "[s]imple play equipment, suitable to the age and developmental needs of the children, shall be available for use indoors and outdoors," and "[t]here shall be stimulating play and learning materials; these may include household items used creatively." Id. at § 406.16(c)(1), (3). Section 406.21 requires that, for school age children, "[a]ge appropriate materials shall be provided, including, but not limited to: puzzles, games, books, art supplies." Id. at § 406.21(b)(5).

The Court finds that day care homes are learning environments. Under Rule 406, day care home licensees and their supporting caregivers agree to demonstrate "willingness to provide and maintain a home where children can enjoy living and learning" and to encourage children's "sense of self and development of self esteem." Id. at §§ 406.9(q)(5), 406.16(b)(7). In other words, day care home licensees agree to cultivate a safe setting where children can "develop self-control and assume responsibility for their own acts;" understand "expectations and limitations" through "simple, understandable rules;" "participate in age appropriate household routines such as preparing food, setting tables, and cleaning up" and activities "mak[ing] use of both large and small muscles;" and use age- and developmentally-appropriate "play equipment" and "stimulating play and learning materials." Id. at §§ 406.15, 406.16. Miller has, admirably, exceeded these DCFS requirements using her background and experience in education by providing homework help for school-age children and implementing "a set schedule" "like a preschool program" with "circle time," "meal time," and "nap times" for younger children. See generally d/e 89-5.

The parties raise, and the Court is aware of, no reason why the historical prohibition on firearms in schools as sensitive places would be conditional on a specific curriculum taught or child age group served at a school. Thus, the Court finds that day care homes are learning environments, just as schools are. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children.").

### B. Day care homes, by complying with the DCFS day care home licensure requirements, are overwhelmingly dominated by the presence of children, both physically and regulatorily.

Under Section 406.13, titled "Numbers and Ages of Children Served," "[t]he maximum number of children under the age of 12 cared for in a day care home by a caregiver alone shall be 8," which "includes the caregiver's own children, related children and unrelated children under age 12 living in the home." Id. at § 406.13(a). A caregiver and an assistant may care for an additional four children who attend school full-time. Id. at § 406.13(c)-(d).

The Court finds that a personal home licensed to contain eight to twelve children supervised by two adults so as to operate as a day care home is overwhelmingly dominated by the physical presence of children.

The Court also notes that among DCFS' minimum licensing standards for day care homes in Rule 406 are several physical requirements for day care homes. See 89 Ill. Admin. Code § 406.8 ("General Requirements for Day Care Homes"). Day care home licensees must ensure that their homes have: a first aid kit, a fire extinguisher, protective coverings over electrical outlets, an operational smoke detector on every floor, a carbon monoxide detector within 15 feet of where children sleep if the home has an attached garage or uses fossil fuels, barriers around fixed heating sources in child-occupied areas, an operable telephone with emergency numbers posted, bathroom doors openable from the outside, closet doors openable from the inside, fencing or sidewalls and locked gates around any pools, and safe outdoor space for active play. See id.

Day care home licensees must ensure that their homes do not have: portable space heaters during the hours that child care is

provided; walls with lead paint, chipped or peeling paint, carpeting, fabric or plastic products; flammable or combustible art work exceeding 20% of any wall area; observable hazards; or fire hazards. See id.

Day care home licensees must maintain: written plans for ensuring children's safety when any wood-burning stoves or fireplaces are used during the hours that child care is provided; clean and well-ventilated indoor space; specific, seasonally-appropriate ambient temperatures; any hazardous materials stored in places inaccessible to children; written fire and tornado emergency plans and monthly drill logs; clear escape routes with operable lighting; daily escape route and monthly fire safety inspection logs; all blind, shade, and drape cords out of the reach of children; and radon tests every three years. See id.

The Court finds that these extensive physical restrictions on a day care home structure itself support the finding that day care homes are overwhelmingly dominated by the presence of children by way of necessitating safety requirements. Therefore, the Court finds that day care homes are overwhelmingly dominated by the presence of children, just as schools are. See Schoenthal v. Raoul,

150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children.").

### C. The Day Care Home Rule is a temporary restriction on day care homes, which are scattered, discrete places.

The Supreme Court in Bruen directed lower courts to consider "how and why regulations burden a law-abiding citizen's right to armed self-defense"—in other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—to identify historical analogues to modern firearm regulations. New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 29 (2022). Within that framework, "[t]he sensitive places doctrine tells us that the appropriate balance" of armed self-defense and its risks, as settled by the Second Amendment, nonetheless "allows for temporary restrictions in scattered discrete places where the risk is simply different, and reminiscent of risks addressed by regulations in our past." Schoenthal, 150 F.4th at 909.

This Court has addressed the "why" in finding that day care homes are learning environments overwhelmingly dominated by the presence of children and thus analogous to schools—"the risk is simply different, and reminiscent of risks addressed by regulations in our past" governing schools, see id., such that the burden on day care home licensees' "right of armed self-defense...is comparably justified." See Bruen, 597 U.S. at 29. The Court now considers the "how"—whether the Day Care Home Rule imposes "a comparable burden," id., on day care home licensees' right of armed self-defense as a "temporary restriction[] in scattered discrete places." Schoenthal, 150 F.4th at 909.

Plaintiffs argue that "[t]he spatial difference" between the "burden on the right of armed self-defense" posed by the sensitive place restrictions identified in Bruen and the DCFS Rules "can be described in terms of the Second Amendment's text: while the restrictions identified in Bruen limited 'the carrying of firearms in sensitive places,' id. (emphasis added), the [DCFS Rules] here bar law-abiding citizens from keeping them—in their own homes." d/e 94, p. 43 (emphasis in original).

But Plaintiffs' argument misses a crucial point: day care home licensees and foster home licensees, by seeking licensure, invite the state into their homes for the very purpose of regulating them. Regulation, by its very nature, may require change—not blanket permission. The licensure process that day care home licensees and foster home licensees seek requires state approval for relevant items to <u>remain</u> within—in a regulatory sense, to be carried <u>back</u> into— the licensee's private home in its capacity as a day care home or foster home. The constitutionality of such conditioning relative to government contracting or licensure, which this Court later addresses, does not change the fact that individuals <u>choose</u> to invite the state in to regulate their homes to license them as day care homes—with the same agency that those individuals may choose not to invite the state into their homes in pursuit of licensure or may choose to instead operate a day care outside of their homes.

As to whether the Day Care Home Rule is a "temporary restriction[]," <u>see</u> <u>Schoenthal</u>, 150 F.4th at 909, DCFS designated representative Meaghan Jorgensen testified that, if a day care home licensee had a handgun on the premises outside of operating hours, the licensee would not be in violation of the Day Care Home Rule.

See d/e 89, p. 11; d/e 96, p. 5. However, Plaintiffs claim that "the governing statute and Rules have no such limitation" and therefore are "a 24/7 restriction." d/e 98, p. 16. Further, Plaintiffs argue that while firearms restrictions in public places "only apply for as long as an individual is in one of those places—and the individual can avoid the disability by avoiding those places," the Day Care Home Rule "appl[ies] whenever the individual is home and cannot be avoided in this way." d/e 96, p. 46.

Even assuming that the Day Care Home Rule were to operate at all hours while the day care home licensee holds the license, the Court sees no reason why the Day Care Home Rule would apply either to day care home licensees' homes for longer than they choose to apply for and maintain the license or permanently to the individual or their private home after the day care home license expires. The Court notes the Seventh Circuit's finding in Schoenthal that it "is entirely possible to avoid Section 65(a)(8) [the transit concealed carry ban at issue in Schoenthal], as Plaintiffs currently do. And, when an individual decides the benefit of using public transit outweighs the burden on his right to carry, the trade-off is temporary." Schoenthal, 150 F.4th at 915.

The Court finds such logic applicable here—when an individual day care home licensee decides that the benefit of operating a licensed day care out of his or her home outweighs the burden on his or her right to "use arms in defense of hearth and home," that trade-off is also temporary. See District of Columbia v. Heller, 554 U.S. 570, 635 (2008); see also Schoenthal, 150 F.4th at 915. In other words, day care home licensees can avoid the disability by avoiding self-imposed government regulation of their homes and not seeking day care home licensure. Therefore, the Court finds that the Day Care Home Rule is a temporary restriction on day care homes.

As to whether the day care homes regulated by the Day Care Home Rule are "scattered discrete places," see Schoenthal, 150 F.4th at 909, the Rule is among the minimum licensing standards for day care homes, see d/e 89, p. 10; d/e 96, p. 4, and thus only applies to the homes of day care home licensees. As this Court noted in its prior Opinion, and as remains unchanged by Bruen, relatively few people are affected by the Day Care Home Rule. See d/e 65, p. 33. The parties agree that none of the Organizational Plaintiffs have identified any members other than the Millers who

are day care home licensees. d/e 89, p. 34; d/e 96, p. 5. In other words, "[u]nlike the regulation struck down in Bruen," the Day Care Home Rule "does not broadly restrict arms uses by the public generally," but in the select homes of individuals who sought and obtained day care home licenses. See United States v. Rahimi, 602 U.S. 680, 698 (2024). Thus, the Court finds that day care homes regulated by the Day Care Home Rule are scattered, discrete places.

In determining whether the Day Care Home Rule imposes "a comparable burden" to historical regulations on schools, see Bruen, 597 U.S. at 29, this Court looks to the Seventh Circuit's reading of Heller and Bruen "to say that schools are places where firearms can be prohibited for all individuals." See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026). The Day Care Home Rule prohibits handguns "on the premises of the day care home except in the possession of peace officers or other adults who must possess a handgun as a condition of employment and who reside in the day care home" and requires any other firearm be "kept in a disassembled state, without ammunition, in locked storage in a closet, cabinet, or other locked storage facility inaccessible to children." 89 Ill. Admin. Code

§§ 406.8(a)(17)–(18). The Court, having found day care homes analogous to schools, finds the Day Care Home Rule's prohibition—and, notably, employment and disassembly exceptions—constitutes "a comparable burden" to constitutional firearms regulations prohibiting firearms in schools. See Bruen, 597 U.S. at 29.

As to the Day Care Home Rule's "penalty—another relevant aspect of the burden," see United States v. Rahimi, 602 U.S. 680, 698 (2024), the parties agree that the maximum penalty for violating the Day Care Home Rule is revocation of the license to operate a day care home. d/e 89, p. 11; d/e 96, p. 4. According to Defendants' expert Patrick J. Charles, punishments for violating firearms prohibitions at schools, colleges, universities, and other institutions of higher learning included expulsion or other punishment imposed by the institution, fines, or forfeiture of the weapon. See d/e 89-11, p. 19 nn.37-38, p. 21 n.50, p. 22 n.54, p. 23 n.55, p. 24 nn.58-59, p. 27 n.67 (expulsion or school punishment); see also id. at pp. 8-9, p. 9 n.5, p. 19 n.40, p. 20 n.44, p. 24 n.61 (fines); see also id. at pp. 8-9, p. 9 n.5 (forfeiture of the weapon). The Court finds that the Day Care Home Rule, in, at most, revoking the license to operate a day care home, imposes a

comparable penalty to those historical regulations, if not a lesser penalty. See Rahimi, 602 U.S. at 698.

In sum, the Court finds that the Day Care Home Rule temporarily restricts day care homes as scattered, discrete places and imposes a comparable burden to constitutional firearms regulations prohibiting firearms in schools. The Court also finds that, by the Millers' own accounts and pursuant to the day care home regulations with which they comply, day care homes are learning environments overwhelmingly dominated by the presence of children, both physically and regulatorily, and are therefore analogous to schools. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children."); see also Schoenthal v. Raoul, No. 22-50326, 2024 WL 4007792, at *17 (N.D. Ill. Aug. 30, 2024), rev'd and remanded, 150 F.4th 889 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that analogizing "playgrounds and other adjoining school grounds" to schools to be "a seemingly straightforward analysis" and "[i]n a similar vein, childcare facilities have also been deemed

'sensitive.'"); <u>Stickley v. City of Winchester</u>, 110 Va. Cir. 300, 325 (Va. Cir. 2022) (analogizing recreation or community centers to schools); <u>LaFave v. Cnty. of Fairfax, Virginia</u>, No. 23-1605, 2024 WL 3928883, at *13-14 (E.D. Va. Aug. 23, 2024), <u>aff'd in part, vacated in part, remanded,</u> 149 F.4th 476 (4th Cir. 2025), <u>cert. denied</u> 146 S. Ct. 1799 (2026) (analogizing summer camps to schools); <u>Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland</u>, 680 F. Supp. 3d 567, 584 (D. Md. 2023) (analogizing childcare facilities to schools); <u>Mintz v. Chiumento</u>, 724 F. Supp. 3d 40, 64–65 (N.D.N.Y. 2024) (analogizing day cares to schools).

Therefore, the Court finds that the Day Care Home Rule is "consistent with the Nation's historical tradition of firearm regulation" "in sensitive places such as schools[.]" <u>New York State Rifle & Pistol Association, Inc. v. Bruen</u>, 597 U.S. 1, 24, 30 (2022); <u>see also Schoenthal</u>, 150 F.4th at 911 (deeming "a rule banning firearms at a daycare" to be a "place-based restriction[] [that] look[s] much like those in the past" in explaining the government's burden to "show no more, and no less, than that the trade-off [between a law's benefits and costs] is one that accords with our history.").

## 2. Foster homes are sensitive places analogous to schools pursuant to <u>Bruen</u> and <u>Schoenthal</u>.

The parties agree that, while the modern foster care system descended from systems established during the 18th century colonial period—largely private practices centered on indigent children providing labor in exchange for support—as of the late 20th century, foster care has assumed a fundamentally different model focused on the child's welfare and safety and rejecting the idea that children must work for their care. <u>See</u> d/e 89, pp. 11-12; d/e 96, p. 18; <u>see also</u> d/e 89-6 (Decl. of C. Rymph and Expert Report of C. Rymph), pp. 5–25, 27, 37.

In the 18th century through the 1830s, indenture was the "preferred solution for the care of dependent children," in which contracts specified indigent children's service term and expected training—"the heart of the matter" was to turn children into self-sufficient workers. <u>See</u> d/e 89, p. 12; d/e 96, pp. 4, 16; <u>see also</u> d/e 89-6, pp. 5–10. The mid-19th century saw a rapid expansion of orphanages, in which older children (including poor children with living parents) were often bound out to provide labor; as well as "orphan train" programs, in which indigent urban children (many

with at least one living parent) were "plac[ed] out," or sent to live with and work for rural farm households. See d/e 89, pp. 12-13; d/e 96, p. 16; see also d/e 89-6, pp. 10-13.

"Boarding out," in which the government paid families small sums to board dependent children, became the third and preferred 19th-century precursor to modern foster care as child welfare reformers grew uncomfortable with the labor expected of placed-out children. See d/e 89, p. 13; d/e 96, pp. 16-17; see also d/e 89-6, pp. 14-15. This "led to greater state oversight," as "boarding out" "necessitated visits to the home, created opportunities to discuss the child's circumstances, and provided leverage for demands that a child be allowed to go to school or receive better support." See d/e 89, p. 13; d/e 96, p. 17; see also d/e 89-6, pp. 15-16.

State oversight of such programs accelerated in the 20th century. See d/e 89, p. 14; d/e 96, p. 16; see also d/e 89-6, pp. 17-18. With such oversight came increased professionalization and regulation, and a "significant goal of these standards was to ensure the health and safety of children placed in the custody of the state," including the "psychological well-being of foster children." See d/e 89, p. 14; d/e 96, pp. 17-18; see also d/e 89-6, pp. 22, 25-37. The

modern notion that "children of all economic classes should have a right to a sheltered childhood" marks "a considerable departure from the [18th] and [19th] century expectation that dependent children would work for their support." See d/e 89, p. 14; d/e 96, p. 18; see also d/e 89-6, pp. 34-37.

Defendants do not argue that there is evidence before or "stretching into the nineteenth century" constituting a history and tradition of regulating firearms in foster homes. Schoenthal v. Raoul, 150 F.4th 889, 913 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026); see also d/e 89, pp. 11-14.

The Court finds that most pre-19th century programs for housing children in need underwent such a "considerable departure" as to be comparably unrecognizable, and even antithetical, to modern foster care, given the radical transformation of the purpose behind such systems. See d/e 89, p. 14; d/e 96, p. 18; see also d/e 89-6, pp. 31-32. Turning children into self-sufficient workers through contracts for their service and possible demands, but no guarantee, that a child be allowed to go to school, is a wholly different purpose than ensuring the health, safety, and psychological well-being of children placed in the state's custody—

and ensuring that foster children are placed in "a foster family home…qualified to care for children," which Subsection 7(a) of the Illinois Child Care Act of 1969 requires that DCFS regulate. 225 ILCS 10/7(a)(17).

> This Court's prior Order (d/e 65) found, in relevant part, that:

> Foster homes, like day cares and schools, are characterized by the presence of children. However, Defendants do not argue that foster homes are "sensitive places" like schools and day cares. Moreover, a foster home does not have defined hours in which children are present, but rather functions simultaneously as a home and a child care service at all times when a foster child is present. Accordingly, while the Court does not find that foster care homes are among Heller's "sensitive places," the Court will consider the unique and sensitive domestic nature of the foster home when the Court analyzes the Foster Home Rule under the two-step Ezell I framework.

Id. at pp. 38-39.

At the time of the prior Order including that dicta, Defendants did not argue that foster homes are "sensitive places" like schools and day cares, and the Court made its "sensitive places" determinations to inform, but not replace, the ultimately determinative means-ends analysis under step two of the Ezell I framework prescribed by the Seventh Circuit. See id. at pp. 29, 38. Critically, the Supreme Court had not yet issued Bruen establishing

the present two-step framework and the Seventh Circuit had not yet issued <u>Schoenthal</u> assessing the sensitive places, including schools, discussed in <u>Bruen</u>. For the sake of thoroughness and to ensure compliance with both <u>Bruen</u> and <u>Schoenthal</u>, this Court will now analyze whether foster homes are sensitive places.

Plaintiffs argue that "common sense shows that one's home, with or without children in it, is nothing like public transportation, or a polling place, or a courthouse, nor – despite Defendants' arguments to the contrary – even a school." d/e 96, p. 46. Further, Plaintiffs argue that "if the home became a 'sensitive place,' the Second Amendment would be nullified." <u>Id.</u> The Court notes, however, that the question is not whether ordinary homes are sensitive places, but whether licensed foster homes—the homes of individuals who sought and obtained that specific licensure—are sensitive places.

Defendants argue that the Foster Home Rule is consistent with this nation's history and tradition of restricting firearms in sensitive places such as schools and government buildings. d/e 89, p. 58. Defendants ask the Court to apply "nuanced judgments," as referenced in <u>Bruen</u>, in its analysis "[b]ecause modern foster homes

are profoundly different from anything that existed at the time of the founding" and "the analogy between foster homes and schools is strong." Id. at p. 59 (citing Bruen, 597 U.S. at 25).

When comparing modern laws "to regulations at those four sensitive places," including schools, the government "benefits from an already-completed historical analysis" and all the reviewing court "must do is make the analogy." Schoenthal, 150 F.4th at 908. Specifically, the Seventh Circuit found that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children." Id. Therefore, the Court accepts the already-completed historical analysis of schools as sensitive places and now assesses whether foster homes are, in fact, analogous to schools.

### A. The Millers' compliance with the foster home licensure requirements establishes that compliant foster homes, including their own, are learning environments.

The parties agree that the Millers have a foster home license and that they have completed and signed DCFS forms three times stating that the information provided was true and two times acknowledging their compliance with Rule 402. d/e 89, pp. 25-26;

d/e 96, p. 22; see also d/e 91 at DCFS000002, DCFS002259, DCFS000033–36, DCFS002297-98, DCFS000193, DCFS002266, DCFS000195, DCFS002365–66. Rule 402 contains DCFS' minimum licensing standards for foster homes, including the Foster Home Rule regulating firearms. See 89 Ill. Admin. Code § 402; see also id. at § 402.8(o).

Section 402.20, titled "Education," requires foster parents to be directly involved in overseeing the formal education of the foster children in their care. See id. at § 402.20. "Foster parents shall encourage each child to complete high school or vocational training in accordance with his or her aptitude" and "shall cooperate with the supervising agency in the child's educational plan." Id. at § 402.20(a). Further, "[t]he supervising agency shall ensure that the foster parents shall maintain contact with those serving the educational needs of their children and seek their cooperation to assure that: 1) children are placed in appropriate grades and program; and 2) there is periodic evaluation of individual children." Id. at § 402.20(c).

Further, a "foster home license shall not be renewed until" a foster parent has completed DCFS-approved "educational advocacy

training," id. at § 402.12(m), which Rule 402 defines as "the 6-hour training that prepares foster parents to effectively advocate for the special educational needs of the children in their care by providing information on children's educational rights and foster parents' responsibility to protect those rights." Id. at § 402.2.

Rule 402 also requires foster home licensees to be involved in several non-academic aspects of the foster children's advancement. For example, Section 402(16), titled "Meeting Basic Needs of Children," requires foster home licensees to develop the foster child's personal and interpersonal skills and interests. See id. at § 402(16). Section 402.16(c) states that "[f]oster parents are expected to use" two concepts "for decision-making regarding the child's participation in extracurricular, cultural and social activities that are appropriate for the child's normal growth and development and enrichment." Id. at § 402.16(c).

One concept is the "reasonable and prudent parent standard," which Section 402.2 defines as the standard "that a caregiver shall use when determining whether to allow a child in out-of-home care to participate in extracurricular, enrichment, cultural, and social activities" and that is "characterized by careful and sensible

parental decisions that maintain the child's health, safety, and best interests while at the same time supporting the child's emotional and developmental growth." Id. at § 402.2 ("Definitions"; "Reasonable and prudent parent standard").

The other concept is "normalcy parenting," which Section 402.2 defines as "empowering a foster parent to approve or not approve a child's participation in appropriate extracurricular enrichment, cultural and social activities based on the caregiver's assessment using the reasonable and prudent parent standard, without prior approval of the Department, the caseworker or the court." Id. at § 402.2 ("Definitions"; "Normalcy parenting"). Section 402.2 continues, "[t]he goal of normalcy parenting and the reasonable and prudent parent standard is to allow the child's participation in extracurricular, enrichment, cultural and social activities that are appropriate for the child's normal growth and development." Id.

Under Section 402(16)(d), "[f]oster parents shall provide the child with enrichment and expanded learning opportunities to explore a wide variety of interest areas to expand his or her knowledge of learning possibilities that may lead to the child's

systematic and lifelong involvement in one or more interest areas." Id. at § 402(16)(d). Section 402(16)(e) states that "[f]oster parents shall help and support children in developing a relationship with their siblings, including siblings with whom the children do not yet have a relationship, and encourage and facilitate contact between the siblings." Id. at § 402(16)(e). Under Section 402(16)(j), "[e]ach child shall have the opportunity to learn to assume some responsibility for himself and for household duties in accordance with his age, health, and ability." Id. at § 402(16)(j).

Various provisions of Section 402 direct foster home licensees to permit and even urge foster children to try things: "[c]hildren shall be encouraged to eat the food that is served, but shall not be subjected to coercion or forced feeding[;]" "[e]ach child shall be given the opportunity to develop social relationships through participation in schools, and other community and group activities" and "to invite friends to the foster home and to visit in the home of friends[;]" "[c]hildren shall be permitted and encouraged to participate in appropriate indoor and outdoor recreation[;]" and "[c]hildren shall be permitted and encouraged to participate in extra-curricular activities including sports, art and music to the

extent of their interests, abilities, and talents." Id. at §§ 402.10(g), 402.16(f), 402.19, 402.20(b).

Similarly, Section 402.21, "Discipline of Children," requires foster home licensees to approach discipline in a safe and instructive manner. Id. at § 402.21. Section 402.2 defines "discipline" as "the process of helping children to develop inner controls so that they can manage their own behavior in socially acceptable ways." Id. at § 402.2. For example, under Section 402(21), "[d]iscipline shall be appropriate to the developmental age of the child" and "[t]he personal spending money of a child may be used as a constructive disciplinary measure to teach the child about responsibility and the consequences of his behavior." Id. at § 402.21(a), (i).

The Court finds that foster homes are learning environments. Under Rule 402, foster parents "shall" support the foster children's formal education by taking actions that inevitably occur, at least in part, in the licensed foster home: foster parents must "encourage" children in their care to complete high school or job training, help ensure those children receive "appropriate grades and program[ming]" and "periodic evaluation," and learn "to effectively

advocate for" those children's education rights that it is their "responsibility to protect." See §§ 402.20(a) and (c), 402.12(m), 402.2.

But Rule 402 also goes further and requires foster care licensees to help the foster children in their care learn to grow and to grow up—by providing the children "with expanded learning opportunities to explore a wide variety of interest areas to expand his or her knowledge of learning possibilities" and by making decisions on those children's "extracurricular, enrichment, cultural, and social activities" that "maintain the child's health, safety, and best interests while at the same time supporting the child's emotional and developmental growth" with the goal "to allow the child's participation[.]" See §§ 402.16(c)-(d), 402.2. Many of the developmental opportunities that foster care home licensees must provide directly involve the home: sibling relationships, play dates, household chores, food choices, spending money, discipline and behavioral management, and hobby preferences among indoor and outdoor recreation, sports, art, and music. See id. at §§ 402(16)(e), (f) and (j), 402.10(g), 402(21)(i), 402.19, 402.20(b).

Page **56** of **116**

The parties raise, and the Court is aware of, no reason why the historical prohibition on firearms in schools as sensitive places would be conditional on the subject matter taught or learned being exclusively academic. Thus, the Court finds that foster homes are learning environments, just as schools are. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children.").

### B. Foster homes, by complying with the DCFS foster home licensure requirements, are overwhelmingly dominated by the presence of children, both physically and regulatorily.

Under Section 402.15, titled "Number and Ages of Children Served," "[t]he maximum number of children permitted in a foster family home shall be six children less than 18 years of age who do not require specialized services except as permitted through Expanded Capacity waivers." 89 Ill. Admin. Code § 402.15(a)(2). The appendices on Extended Capacity foster homes state that, under specific circumstances including no foster child needing specialized care and all youth in care having the same mother or father, the

number of children allowed in a foster family home with an expanded capacity license is "[a]s needed in order to keep siblings together." Id. at § 402.Appendix B.

The Court finds that a personal home licensed to contain six to "as needed" foster children supervised by one to two foster parents so as to operate as a foster home is overwhelmingly dominated by the physical presence of children.

The Court also notes that among DCFS' minimum licensing standards for foster homes in Rule 402 are several physical requirements for foster homes. See 89 Ill. Admin. Code § 402.8 ("General Requirements for the Foster Home"). Foster home licensees must ensure that their homes have: a kitchen with properly operating standard appliances; a bathroom with properly operating standard fixtures; a water supply compliant with local and State health department requirements; a maximum hot water temperature of up to 115° Fahrenheit from all showers and bathtubs if the foster family home accepts children under age ten or who are developmentally disabled; specific fences or sidewalls and locked gates for any pools; an operating telephone; at least one approved operating smoke detector on every floor level and within

15 feet of every room used for sleeping; at least one operable fire extinguisher; two exits from any basements and attics used for sleeping; at least one approved carbon monoxide detector within 15 feet of every room used for sleeping (unless exempted by statute); adequate closet and dresser space to accommodate foster children's personal belongings; and rooms exposed to an outside window or with auxiliary means of ventilation. See id.

Foster home licensees must ensure that their homes do not have: "observable hazards," fire hazards, "any unsafe children's product as described in the Children's Product Safety Act [430 ILCS 125] and 89 Ill. Adm. Code 386 (Children's Product Safety)," an operational "commercial rooming or boarding house on the premises," smoking and vaping materials of any kind, any person smoking tobacco or other substances in—or within 15 feet of entrances, exits, openable windows, and ventilation intakes that serve—the foster family home, portable space heaters used in rooms where children sleep, or rodent and/or insect infestations. See id.

Foster home licensees must maintain: a first aid kit and supplies; life saving devices approved by the U.S. Coast Guard for any swimming pools; any alcoholic beverages and toxic/hazardous

materials where youth in care cannot access them; fire resistant partitions or barriers separating any portable and fixed space heaters in areas occupied by children; any dangerous household supplies and tools stored and disposed of in safe places inaccessible to children under 12 years of age; any prescription and nonprescription drugs in places not readily accessible to children under 12 years of age; rabies vaccine certificates for any pets and compliance with all State, tribal and local law and/or municipal code household pet requirements; a comprehensive list of emergency telephone numbers, including poison control, posted in a prominent place; and fire and emergency evacuation plans discussed and rehearsed quarterly with the foster children in the home. See id.

The Court finds that these extensive physical restrictions on a foster home structure itself support the finding that foster homes are overwhelmingly dominated by the presence of children by way of necessitating safety requirements. Therefore, the Court finds that foster homes are overwhelmingly dominated by the presence of children, just as schools are. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026).

(finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children.").

### C. The Foster Home Rule is a temporary restriction on foster homes, which are scattered, discrete places.

The Supreme Court in Bruen directed lower courts to consider "how and why regulations burden a law-abiding citizen's right to armed self-defense"—in other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—to identify historical analogues to modern firearm regulations. New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 29 (2022). Within that framework, "[t]he sensitive places doctrine tells us that the appropriate balance" of armed self-defense and its risks, as settled by the Second Amendment, nonetheless "allows for temporary restrictions in scattered discrete places where the risk is simply different, and reminiscent of risks addressed by regulations in our past." Schoenthal, 150 F.4th at 909.

This Court has addressed the "why" in finding that foster homes are learning environments overwhelmingly dominated by the presence of children and thus analogous to schools—"the risk is simply different, and reminiscent of risks addressed by regulations in our past" governing schools, id., such that the burden on foster home licensees' "right of armed self-defense…is comparably justified." Bruen, 597 U.S. at 29. The Court now considers the "how"—whether the Foster Home Rule imposes "a comparable burden," id., as a "temporary restriction[] in scattered discrete places." Schoenthal, 150 F.4th at 909.

As to whether the Foster Home Rule is a "temporary restriction[]," see id., the Foster Home Rule is one of DCFS' minimum licensing standards for foster homes. See 89 Ill. Admin. Code § 402; see also id. at § 402.8(o). The Court sees no reason why the Foster Home Rule would apply to foster home licensees' homes for longer than they choose to apply for and maintain the license or permanently to the individual or their private home after the foster home license expires, and neither party argues otherwise.

Plaintiffs argue that while firearms restrictions in public places "only apply for as long as an individual is in one of those places—

and the individual can avoid the disability by avoiding those places," the Foster Home Rule "appl[ies] whenever the individual is home and cannot be avoided in this way." d/e 96, p. 46.

This Court found in its prior order, as remains unchanged by Bruen, that "the Millers can, at any time, escape the application of the Foster Home Rule by giving up their foster caregivers' license." See d/e 65, pp. 42-43. The Court notes the Seventh Circuit's finding in Schoenthal that it "is entirely possible to avoid Section 65(a)(8) [the transit concealed carry ban at issue in Schoenthal], as Plaintiffs currently do. And, when an individual decides the benefit of using public transit outweighs the burden on his right to carry, the trade-off is temporary." Schoenthal, 150 F.4th at 915.

The Court finds such logic applicable here—when an individual foster home licensee decides that the benefit of operating a licensed foster home outweighs the burden on their right to "use arms in defense of hearth and home," that trade-off is also temporary. District of Columbia v. Heller, 554 U.S. 570, 635 (2008); see also Schoenthal, 150 F.4th at 915. In other words, foster home licensees can avoid the disability by avoiding self-imposed government regulation of their home and not seeking foster home

licensure. Therefore, the Court finds that the Foster Home Rule is a temporary restriction on foster homes.

As to whether the foster homes regulated by the Foster Home Rule are "scattered discrete places," see Schoenthal, 150 F.4th at 909, the Rule is among the minimum licensing standards for foster homes, see d/e 89, p. 8; d/e 96, p. 3, and thus only applies to the homes of foster home licensees. The parties agree that none of the Organizational Plaintiffs have identified any members other than the Millers who are foster home licensees. See d/e 89, p. 34; d/e 96, p. 5. In other words, "[u]nlike the regulation struck down in Bruen," the Foster Home Rule "does not broadly restrict arms uses by the public generally," but the select homes of individuals who sought and obtained foster home licenses. See United States v. Rahimi, 602 U.S. 680, 698 (2024). Thus, the Court finds that the foster homes regulated by the Foster Home Rule are scattered, discrete places.

In determining whether the Foster Home Rule imposes "a comparable burden" to historical regulations on schools, see Bruen, 597 U.S. at 29, this Court looks to the Seventh Circuit's reading of Heller and Bruen "to say that schools are places where firearms can

be prohibited for all individuals." See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026). The Foster Home Rule states, "[a]ny and all firearms and ammunition shall be stored and locked up separately at all times and kept in places inaccessible to children." 89 Ill. Admin. Code § 402.8(o).

Like the Day Care Home Rule, the Foster Home Rule has an exception—that "[l]oaded guns shall not be kept in a foster home unless required by law enforcement officers and in accordance with their law enforcement agency's safety procedures." Id., see also 89 Ill. Admin. Code § 406.8(a)(17)–(18). And unlike the Day Care Home Rule, the Foster Home rule does not require disassembly of the firearm, as this Court previously noted and remains unchanged by Bruen. See id., see also d/e 65, p. 40 ("However, the Foster Home Rule imposes a much less substantial burden on the Second Amendment rights of affected individuals than the Day Care Home Rule.").

The Court, having found foster homes analogous to schools, finds the Foster Home Rule's prohibition and accompanying employment exception constitutes "a comparable burden" to

constitutional firearms regulations prohibiting firearms in schools, if not a lesser burden. See Bruen, 597 U.S. at 29; see also D.C. v. Heller, 554 U.S. 570, 632 (2008) ("Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents."); see also Schoenthal v. Raoul, 150 F.4th 889, 915 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) ("Undoubtedly the Second Amendment does not bar a state legislature from finding ways to regulate firearms in a manner less restrictive than relevant historical traditions.").

As to the Foster Home Rule's "penalty—another relevant aspect of the burden," see United States v. Rahimi, 602 U.S. 680, 698 (2024), the parties agree that the maximum penalty for violating the Foster Home Rule is revocation of the foster caregiver license. d/e 89, p. 9; d/e 96, p. 5. According to Defendants' expert Patrick J. Charles, punishments for violating firearms prohibitions at schools, colleges, universities, and other institutions of higher learning included expulsion or other punishment imposed by the institution, fines, or forfeiture of the weapon. See d/e 89-11, p. 19 nn.37-38, p. 21 n.50, p. 22 n.54, p. 23 n.55, p. 24 nn.58-59, p. 27 n.67 (expulsion or school punishment); see also id. at pp. 8-9, p. 9

n.5, p. 19 n.40, p. 20 n.44, p. 24 n.61 (fines); see also id. at pp. 8-9, p. 9 n.5 (forfeiture of the weapon). The Court finds that the Foster Home Rule, in, at most, revoking the license to operate a foster home, imposes a comparable penalty to those historical regulations, if not a lesser penalty. See Rahimi, 602 U.S. at 698.

In sum, the Court finds that the Foster Home Rule temporarily restricts foster homes as scattered, discrete places and imposes a comparable burden to—if not a lesser burden than—constitutional firearms regulations prohibiting firearms in schools. The Court also finds that, pursuant to the foster home regulations with which the Millers comply, foster homes are learning environments overwhelmingly dominated by the presence of children, both physically and regulatorily, and are therefore analogous to schools. See Schoenthal v. Raoul, 150 F.4th 889, 909 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that schools constitute sensitive places because they "are learning environments overwhelmingly dominated by the presence of children."); see also Schoenthal v. Raoul, No. 22-50326, 2024 WL 4007792, at *17 (N.D. Ill. Aug. 30, 2024), rev'd and remanded, 150 F.4th 889 (7th Cir. 2025), cert. denied, 146 S. Ct. 2158 (2026) (finding that analogizing

"playgrounds and other adjoining school grounds" to schools to be
"a seemingly straightforward analysis" and "[i]n a similar vein,
childcare facilities have also been deemed 'sensitive.'"); Stickley v.
City of Winchester, 110 Va. Cir. 300, 325 (Va. Cir. 2022)
(analogizing recreation or community centers to schools); LaFave v.
Cnty. of Fairfax, Virginia, No. 23-1605, 2024 WL 3928883, at *13-
14 (E.D. Va. Aug. 23, 2024), aff'd in part, vacated in part,
remanded, 149 F.4th 476 (4th Cir. 2025), cert. denied 146 S. Ct.
1799 (2026) (analogizing summer camps to schools); Maryland
Shall Issue, Inc. v. Montgomery Cnty., Maryland, 680 F. Supp. 3d
567, 584 (D. Md. 2023) (analogizing childcare facilities to schools);
Mintz v. Chiumento, 724 F. Supp. 3d 40, 64–65 (N.D.N.Y. 2024)
(analogizing day cares to schools).

Therefore, the Court finds that the Foster Home Rule is
"consistent with the Nation's historical tradition of firearm
regulation" "in sensitive places such as schools[.]" New York State
Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 24, 30 (2022).

## IV.    UNCONSTITUTIONAL CONDITIONS DOCTRINE ANALYSIS

Plaintiffs' challenge to the DCFS Rules pits the quintessential
Second Amendment "right of an ordinary, law-abiding citizen to

possess a handgun in the home for self-defense," <u>Bruen</u>, 597 U.S. at 9, against the quintessential exception to that right that "arms carrying [can] be prohibited" "in sensitive places such as schools" and "in <u>new</u> and analogous sensitive places" "consistent with the Second Amendment," <u>id.</u> at 30 (emphasis in original). As this dynamic arises in the context of Plaintiffs' government licensee and government contractor relationships with the State of Illinois, the Court, having assessed the DCFS Rules pursuant to <u>Bruen</u>, now considers the interaction of <u>Bruen</u> and the unconstitutional conditions doctrine.

### a. Legal Precedent.

### 1. Supreme Court Precedent on the Unconstitutional Conditions Doctrine and Government Contractors.

The unconstitutional conditions doctrine is "an overarching principle" "that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." <u>Koontz v. St. Johns River Water Mgmt. Dist.</u>, 570 U.S. 595, 604 (2013). The doctrine "aims to prevent the government from achieving indirectly what the Constitution prevents it from

achieving directly." <u>Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health</u>, 699 F.3d 962, 986 (7th Cir. 2012).

The Supreme Court has repeatedly "recognized that the Government has a much freer hand in dealing 'with citizen employees than it does when it brings its sovereign power to bear on citizens at large.'" <u>Nat'l Aeronautics & Space Admin. v. Nelson</u>, 562 U.S. 134, 148–49 (2011) ("<u>NASA</u>") (citing <u>Engquist v. Oregon Dept. of Agric.</u>, 553 U.S. 591, 598 (2008); <u>Waters v. Churchill</u>, 511 U.S. 661, 674 (1994) (plurality opinion)). The Justices have grounded this distinction "on the 'common-sense realization' that if every 'employment decision became a constitutional matter,' the Government could not function." <u>NASA</u>, 562 U.S. at 148–49 (citing <u>Connick v. Myers</u>, 461 U.S. 138, 143 (1983); <u>Bishop v. Wood</u>, 426 U.S. 341, 350 (1976)).

As this Court previously recognized, the Millers, as foster caregivers, are government contractors. <u>See</u> <u>Dupuy v. Samuels</u>, 397 F.3d 493, 514 (7th Cir. 2005) (agreeing that foster care is a "contractual role created by the State for the purpose of assisting the unfortunate victims of child abuse or neglect"); <u>see</u> <u>also</u> <u>Fulton v. City of Philadelphia, Pennsylvania</u>, 593 U.S. 522, 535-36 (2021)

(recognizing foster care agency as government contractor and holding licensing requirement for foster care agency unconstitutional under the Free Exercise Clause of the First Amendment); see also d/e 65, p. 41. "[T]he Government's broad authority in managing its affairs" does not "apply with diminished force" when dealing with "contract employees and not civil servants." NASA, 562 U.S. at 150.

In Engquist v. Oregon Department of Agriculture, the Supreme Court noted that "the government as employer indeed has far broader powers than does the government as sovereign," which stem "from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible." 553 U.S. 591, 598 (2008) (quoting Waters, 511 U.S. at 671 (plurality opinion)). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Engquist, 553 U.S. at 598–99 (quoting Waters, 511 U.S. at 675 (plurality opinion)).

The Justices reiterated that the Fourth Amendment does not require public employers to obtain warrants before searching an employee's office, see Engquist, 553 U.S. at 599 (citing O'Connor v. Ortega, 480 U.S. 709, 721–722 (1987) (plurality opinion)), that the Due Process Clause does not protect a public employee from even mistaken or unreasonable discharge, see Engquist, 553 U.S. at 599 (citing Bishop v. Wood, 426 U.S. 341, 350 (1976)), and that the First Amendment protects only public employee speech on matters of public concern and thus falling within the core of First Amendment protection, see Engquist, 553 U.S. at 600 (citing Connick v. Myers, 461 U.S. 138 (1983)). The Court affirmed two main principles of the public employee context:

> First, although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context. Second, in striking the appropriate balance, we consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer.

Engquist, 553 U.S. at 600.

In NASA v. Nelson, government contractor scientists working at a NASA facility alleged that the government's background check

violated a constitutional right to informational privacy. See NASA, 562 U.S. at 138-42. The contractors specifically challenged questions for the contractors about recent illegal drug use, treatment or counseling and "open-ended questions" for their references and landlords about their "honesty or trustworthiness," "violations of the law," "financial integrity," "abuse of alcohol and/or drugs," "mental or emotional stability," or "general behavior or conduct." Id. at 141-42.

The Supreme Court "assume[d], without deciding, that the Constitution protects a privacy right" related to "avoiding disclosure of personal matters." Id. at 138 (internal citations omitted). The Justices held that, whatever the scope of a "privacy interest of constitutional significance," "it does not prevent the Government from asking reasonable questions of the sort included on [the government contractors'] employment background investigation that is subject to the Privacy Act's safeguards against public disclosure." Id. at 147–48. Specifically, both challenged sets of questions "consist of reasonable, employment-related inquiries that further the Government's interests in managing its internal operations." Id. at 151.

The government had "good reason to ask employees [questions] about their recent illegal-drug use" because, "[l]ike any employer, the Government is entitled to have its projects staffed by reliable, law-abiding persons who will efficiently and effectively discharge their duties" and such questions "are a useful way of figuring out which persons have these characteristics." Id. at 152 (internal citations omitted). The Court cited in support an article indicating that "illicit drug use negatively correlated with work place productivity[.]" Id. (citing Breen & Matusitz, An Updated Examination of the Effects of Illegal Drug Use in the Workplace, 19 J. Human Behavior in the Social Environment 434 (2009)).

The Supreme Court also accepted the question about treatment or counseling for recent illegal drug use as "a reasonable, employment-related inquiry," as the government considering responses indicating treatment efforts "as a mitigating factor in determining whether to grant contract employees long-term access to federal facilities" constituted "a reasonable, and indeed a humane, approach." NASA, 562 U.S. at 152-53. The Justices flatly "reject[ed] the argument that the Government, when it requests job-related personal information in an employment background check,

has a constitutional burden to demonstrate that its questions are 'necessary' or the least restrictive means of furthering its interests," especially "where the Government acts, not as a regulator, but as the manager of its internal affairs." Id. at 153. The Court found the government's position that "phrasing the question in more permissive terms would result in a lower response rate, and the question's effectiveness in identifying illegal-drug users who are suitable for employment would be 'materially reduced'" to be reasonable and, citing Engquist, "falling within the 'wide latitude' granted the Government in its dealings with employees." Id. at 154.

Similarly, the Court found the open-ended questions for references and landlords to be "reasonably aimed at identifying capable employees who will faithfully conduct the Government's business" and "an appropriate tool for separating strong candidates from weak ones." Id. at 154. The questions' reasonableness, the Justices found, "is illustrated by their pervasiveness in the public and private sectors," and their use "furthers [the government's] interests in managing its operations." Id. at 154-55.

Absent precedent on when government contractors can be contractually required to relinquish their Second Amendment

rights, the Court also looks to relevant precedent in the more developed caselaw of freedom of speech under the First Amendment, to which the Supreme Court has "repeatedly compared the right to keep and bear arms." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 24, (2022) (citing D.C. v. Heller, 554 U.S. 570, 582, 595, 606, 618, 634–635 (2008)). The Supreme Court has established that government employees' statements made pursuant to their professional duties are categorically unprotected by the First Amendment. See Garcetti v. Ceballos, 547 U.S. 410, 426 (2006). Government contractors also "accept certain restrictions on their freedom as part of the deal." Fulton, 141 S. Ct. at 1878. Considerations of managerial efficiency require that governments be allowed considerable freedom in the management of their contractual relationships. See Comsys, Inc. v. Pacetti, 893 F.3d 468, 471 (7th Cir. 2018) (holding, in part because of the need to allow governments to flexibly manage their internal affairs, that the First Amendment does not protect public contractors from retaliation for job-related speech).

This Court also notes the Supreme Court's finding in Bruen that "[t]his Second Amendment [history and tradition] standard

accords with how we protect other constitutional rights," and that "our focus on history also comports with how we assess many other constitutional claims." New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 24-25 (2022). "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" Id. at 70 (quoting McDonald v. Chicago, 561 U.S. 742, 780 (2010) (plurality opinion)).

### 2. Seventh Circuit Precedent on Illinois Foster Care.

Foster care in Illinois is "a contractual role created by the State for the purpose of assisting the unfortunate victims of child abuse or neglect." Dupuy v. Samuels, 397 F.3d 493, 514 (7th Cir. 2005). Under the Due Process Clause of the Fourteenth Amendment, "a state has no constitutional duty to protect a child against parental abuse" except "where the danger to the child is "state-created," and "[o]nce a child is placed with a foster family prior to adoption, the state's duty continues through the period of foster care, as the state at that point is still legally the children's guardian." Lewis v. Anderson, 308 F.3d 768, 773–74 (7th Cir. 2002) (citing Terry B. v. Gilkey, 229 F.3d 680, 682 (8th Cir. 2000)). The

Seventh Circuit has also found that the State can violate foster children's constitutional rights by placing them "in a position of danger":

> [T]he state[,] [having] removed a child from the custody of her parents;...could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, without violating his rights either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner, or the due process clause if he was awaiting trial.

K.H. Through Murphy v. Morgan, 914 F.2d 846, 849 (7th Cir. 1990) (internal citations omitted).

District courts in this circuit have found that licensed foster caregivers agree to partially relinquish their Fourth Amendment right to be free from unreasonable searches and seizures in exchange for licensure. See Van Dyke v. Fultz, No. 13-CV-5971, 2018 WL 1535141, at *4 (N.D. Ill. Mar. 29, 2018) ("Absent clearly established law to the contrary, a [DCFS contractor] social worker could reasonably have believed that Plaintiff had provided consent for a social worker to enter the home to retrieve [the foster child]

K.C., in exchange for Plaintiff being permitted to keep her grandchild K.C. in her home."); see also Courtney v. Murphy, No. 19-00174, 2021 WL 12310140, at *7 (S.D. Ind. Sept. 16, 2021) ("Because Daughter was a ward of the state and the Courtneys did not have a clearly established liberty interest in the foster arrangement with Daughter, it was not clearly established that the Fourth Amendment would prohibit the removal of Daughter.").

### 3. Supreme Court and Seventh Circuit Precedent on the Unconstitutional Conditions Doctrine and Government Benefit Recipients.

The unconstitutional conditions doctrine also "forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." Koontz, 570 U.S. at 606 (2013). The Supreme Court has included business licenses among such benefits. Id. at 608 (citing Frost v. R.R. Comm'n of State of Cal., 271 U.S. 583, 592-93 (1926)).

In Frost, the Supreme Court noted that the government "may not impose conditions which require the relinquishment of constitutional rights." Id. at 594. The Justices found that requiring private carriers to have a "certificate of public convenience and necessity" like common carriers to provide transportation for

compensation over public highways, or be prohibited from using public highways, violated the due process clause of the Fourteenth Amendment. Id. at 590, 599. The Court determined that the requirement "is in no real sense a regulation of the use of the public highways" but "a regulation of the business of those who are engaged in using them" intended "to protect the business of those who are common carriers in fact by controlling competitive conditions." Id. at 606.

The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit." Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013) (citing Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 59 (2006)) (internal citations omitted); see also Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin., 24 F.4th 640, 650 (7th Cir. 2022) (citing both).

"[T]he government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit

sought has little or no relationship to the property." Dolan v. City of Tigard, 512 U.S. 374, 385 (1994); see also Sheetz v. Cnty. of El Dorado, California, 601 U.S. 267, 275–76, (2024) (citing Dolan).

In Burgess v. Lowery, 201 F.3d 942 (7th Cir. 2000), the Seventh Circuit has found that:

> What the law of "unconstitutional conditions" boils down to, so far as it might be thought to help governments seeking to curtail the usual freedoms—in which application it ought to be called something like the doctrine of "constitutional conditioning"—is simply that conditions can lawfully be imposed on the receipt of a benefit—conditions that may include the surrender of a constitutional right, such as the right to be free from unreasonable searches and seizures—provided the conditions are reasonable.

Id. at 947; see also United States v. Cranley, 350 F.3d 617, 620 (7th Cir. 2003).

On the specific benefit of government licenses, the Supreme Court in Federal Communications Commission v. National Citizens Committee for Broadcasting considered regulations prospectively barring formation or transfer of co-located newspaper-broadcast combinations and requiring ownership diversity for all new broadcast station licenses. 436 U.S. 775, 779, 786 (1978) ("F.C.C."). When plaintiffs argued that the "regulations unconstitutionally

Page **81** of **116**

condition receipt of a broadcast license upon forfeiture of the right to publish a newspaper," the Court found that "[u]nder the regulations, however, a newspaper owner need not forfeit anything in order to acquire a license for a station located in another community." Id. at 800.

**b. The DCFS Rules are reasonable restrictions on government contractors and licensees under the unconstitutional conditions doctrine.**

**1. Plaintiffs do not establish that the Second Amendment is exempt from restrictions on government contractors' and licensees' constitutional rights compliant with the unconstitutional conditions doctrine.**

Plaintiffs argue that the Supreme Court in Bruen did not announce a "government contractor exception" to its rule that a firearms restriction must be "consistent with this Nation's historical tradition of firearm regulation" to pass constitutional muster, and that Defendants do not show under that rule "that [the State] enjoys broad powers to limit the Second Amendment rights of government contractors." d/e 96, p. 51 (citing New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 17 (2022)) (internal citations omitted).

The Supreme Court found in Heller that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense" and in Bruen "that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." Bruen, 597 U.S. at 8–9 (citing D.C. v. Heller, 554 U.S. 570 (2008)) (emphasis added).

Justice Kavanaugh stated in his concurrence in Bruen that "all that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 76 (2022) (J. Kavanaugh, concurring). Justice Kavanaugh continued:

> Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in Heller [554 U.S. 570 (2008)] or McDonald v. Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns.

Bruen, 597 U.S. at 72 (J. Kavanaugh, concurring).

While the Court has no reason to doubt the Millers to be "law-abiding citizens" as referenced in <u>Heller</u> and <u>Bruen</u>, the Court has found that the Millers are not "ordinary." They are not only government contractors in their capacity as foster parents, but are among a limited subset of individuals who <u>choose</u> to invite DCFS in to regulate their homes for licensing as day care homes and foster homes in order to legally care for children whose safety DCFS is legally obligated to protect. <u>See</u> d/e 89, p. 10; d/e 96, p. 4.

The Court also notes that the Supreme Court in <u>Bruen</u> explained the consistency of rooting the Second Amendment framework in history and tradition by highlighting the consideration of history and tradition in determining compliance with the First Amendment:

> This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which <u>Heller</u> repeatedly compared the right to keep and bear arms. 554 U.S. at 582, 595, 606, 618, 634–635, 128 S.Ct. 2783. In that context, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." <u>United States v. Playboy Entertainment Group, Inc.</u>, 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); <u>see also</u> <u>Philadelphia Newspapers, Inc. v. Hepps</u>, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). In some cases, that burden includes showing whether the expressive conduct falls

outside of the category of protected speech. See Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 620, n. 9, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003). And to carry that burden, the government must generally point to historical evidence about the reach of the First Amendment's protections. See, e.g., United States v. Stevens, 559 U.S. 460, 468–471, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (placing the burden on the government to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)).

Bruen, 597 U.S. 1, 24–25 (2022).

All but one of the four First Amendment cases referenced in that passage pre-date Engquist—which neither party disputes to be good law, predated Bruen, and reiterated that the First Amendment protects only public employee speech on matters of public concern and thus falling within the core of First Amendment protection. Engquist v. Oregon Dept. of Agric., 553 U.S. 591, 600 (2008) (citing Connick v. Myers, 461 U.S. 138 (1983). Just as an assessment of history and tradition may not constitute the entire analysis of a First Amendment claim involving government employee speech, so, too, may a Second Amendment claim involving law-abiding but unordinary citizens—in this case, government contractors and licensees caring for children who the state has a statutory duty to

safeguard—require addressing analytical factors other than history and tradition.

At least one court analyzing the interplay between the Second Amendment post-Bruen and the unconditional conditions doctrine has relied on the Supreme Court's finding in Engquist. See Tyson-Phipps v. Blinken, No. 23-2316, 2024 WL 4128445 (S.D.N.Y. Sept. 10, 2024), report and recommendation adopted, No. 23-2316, 2024 WL 4444281 (S.D.N.Y. Oct. 8, 2024).

In Tyson-Phipps v. Blinken, a Special Agent with the United States Department of State's Bureau of Diplomatic Security received a reprimand after he was found carrying a personal firearm while on assignment and alleged a cause of action under the Second Amendment, alongside claims concerning other incidents under other controlling law. Id. at *3, *12. The presiding magistrate judge considered the Supreme Court's finding in Engquist that courts must balance government employees' constitutional rights "against the realities of the employment context" by "consider[ing] whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can

more readily give way to the requirements of the government as employer." Id. at *13 (quoting Engquist, 553 U.S. at 600 (2008)).

The magistrate judge, considering the plaintiff's Second Amendment claim independently from his other claims, found that this balancing principle in Engquist "counsels that the analysis contemplated in Heller and Bruen does not apply," a finding that the magistrate judge's district court did not disturb in accepting the magistrate judge's report and recommendation. See Tyson-Phipps, 2024 WL 4128445 at *13; see also Tyson-Phipps v. Blinken, No. 23-CV-2316, 2024 WL 4444281 at *2 (S.D.N.Y. Oct. 8, 2024). This Court agrees.

For all of these reasons, the Court finds that Bruen does not preclude the government from limiting government contractors' and licensees' Second Amendment rights subject to the unconstitutional conditions doctrine just as the government can limit government contractors' and licensees' other constitutional rights. See Bruen, 597 U.S. at 70 (finding that the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees."") (quoting McDonald v. Chicago, 561 U.S. 742, 780

(2010) (plurality opinion)); see also Tyson-Phipps, 2024 WL 4128445 at *13.

## 2. The Day Care Home Rule does not violate the unconstitutional conditions doctrine.

The parties agree that Jennifer Miller privately contracts with parents who pay for her licensed child care services, see d/e 89, p. 30; d/e 96, p. 4; such that she is a government licensee running a private business with her day care home license and is not a government contractor. The parties also agree that DCFS' obligation to protect children's safety extends to day care homes. d/e 89, p. 10; d/e 96, p. 4.

Defendants cite their Experts Dr. Matthew Miller and Dr. Deborah Azrael's report ("the Miller-Azrael Report") as relying on studies published in peer-reviewed public health and epidemiological literature and employing sound epidemiologic research designs and methods. See d/e 89, p. 15; see also d/e 89-7, 89-8. The Miller-Azrael Report states, in relevant part:

> [I]t is our opinion that the findings of the studies we cite apply equally to households in which children live and households in which children spend time…Fewer children attending in-home day care and/or housed in foster homes in Illinois will die or be injured by gunfire if the

Foster Home Rule (Rule 402.8(o)) and the Day Care Home Rule (Rule 406.8(a)(17) and (18)) are in effect, compared to what would be the case if these regulations were not in place or relaxed.

d/e 89, pp. 15-16; see also d/e 89-7, pp. 2, 14, d/e 89-8, pp. 2, 14.

As and for the reasons the Court stated in its prior order, and unchanged by Bruen, the Court accepts the Miller-Azrael Report. Id.; see also d/e 65, pp. 35-37. Specifically, the Courts accepts the determinations that "the findings of the studies [Miller and Azrael] cite apply equally to households in which children live and households in which children spend time" and that "[f]ewer children attending in-home day care and/or housed in foster homes in Illinois will die or be injured by gunfire if [the DCFS Rules] are in effect, compared to what would be the case if these regulations were not in place or relaxed." See id.

### A. Plaintiffs do not establish that the Day Care Home Rule denies Jennifer Miller the benefit of a day care home license on a basis that infringes her Second Amendment rights.

Plaintiffs cite the Supreme Court's finding in Rumsfeld that "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if

he has no entitlement to that benefit" and argue that it "has become clear in Second Amendment jurisprudence…that the right is entitled to no less protection than those of the First Amendment." d/e 98, p. 7 (quoting Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 59 (2006)).

However, the Court finds that the Day Care Home Rule does not "deny a benefit to a person on a basis that infringes his constitutionally protected … [Second Amendment rights] even if he has no entitlement to that benefit." See Rumsfeld, 547 U.S. at 59; see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013) (quoting Rumsfeld); see also Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin., 24 F.4th 640, 650 (7th Cir. 2022) (quoting Rumsfeld). Just as a newspaper owner subject to a requirement of ownership diversity for all new broadcast station licenses "need not forfeit anything in order to acquire a license for a station located in another community," see F.C.C. v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 800 (1978), a day care home licensee need not forfeit any Second Amendment right related to possessing a firearm in their home "in

order to acquire a license for a [day care] located in another"

location that is not their home. See id.

Similarly, Plaintiffs cite the Supreme Court's finding in Frost v.

Railroad Commission of State of California, 271 U.S. 583, 598

(1926), that "a state is without power to impose an unconstitutional

requirement as a condition for granting a privilege." d/e 96, p. 57

(citing Frost). The Frost Court found unconstitutional a state

requirement for private carriers to have a "certificate of public

convenience and necessity" like common carriers to provide

transportation for compensation over public highways or be

prohibited from using public highways. Frost, 271 U.S. at 590, 599.

A parallel requirement in the day care home licensing context

might require day care home licensees to comply with the Day Care

Home Rule or be prohibited from exercising their Second

Amendment rights. But the Day Care Home Rule does not so

punish violators—the maximum penalty for violating the Day Care

Home Rule is revocation of the license to operate a day care home,

see d/e 89, p. 11; d/e 96, p. 4, not forfeiture of any violating

firearm.

The <u>Frost</u> Court also found that the certificate requirement was "in no real sense a regulation of the use of the public highways" but "a regulation of the business of those who are engaged in using them" intended "to protect the business of those who are common carriers in fact by controlling competitive conditions." <u>Frost</u>, 271 U.S. at 591. Private carriers, the Supreme Court reasoned, faced a choice to "forego a privilege [of using the public highways] which may be vital to his livelihood or submit to a requirement"—of "dedicat[ing] his property to the quasi public use of public transportation" to get the certificate—"which may constitute an intolerable burden." <u>Id.</u> at 591, 593.

A parallel Second Amendment restriction would be "in no real sense a regulation of the use of [firearms protected by the Second Amendment]" but "a regulation of the business of those who are engaged in using them" intended "to protect the business of those who are [favored by the state] in fact by controlling competitive conditions." <u>See id.</u> at 591. Even assuming that, absent the Day Care Home Rule, Jennifer Miller would maintain in her home assembled, loaded firearms not locked in a safe free of ammunition as part of her business of running a day care home, perhaps to

provide protection, Plaintiffs offer no evidence that the Day Care Home Rule seeks "to protect the business of those who are [exercising their Second Amendment rights in a state-favored manner] in fact by controlling competitive conditions." See id. Although Plaintiffs deny that compelling compliance with Day Care Home Rule protects children's health and safety and assert the opposite, the parties agree that the Day Care Home Rule's purpose is to protect children's health and safety by preventing death, injury, and suicide by firearms. See d/e 89, p. 11, d/e 96, pp. 5-6.

Further, even assuming that maintaining assembled, loaded firearms that were not locked in a safe free of ammunition in a licensed day care home was protected by the Second Amendment, there is no indication that doing so would be "vital to [Jennifer Miller's] livelihood" or that submitting to the Day Care Home Rule "constitute[s] an intolerable burden" on her day care home business. Frost, 271 U.S. at 593. Miller attests that she has a day care home license and that she has completed and signed DCFS forms three times stating that she "will comply with all [license] requirements," which include the Day Care Home Rule, after the day care home license is issued or renewed. d/e 89, pp. 28-30; d/e

96, pp. 4, 23; see also d/e 91 at DCFS000411, DCFS002115, and DCFS003878; see also 89 Ill. Admin. Code § 406; see also id. at § 406.8(a)(17)-(18).

Therefore, the Court finds that Plaintiffs do not establish that the Day Care Home Rule denies or would deny Jennifer Miller the benefit of a day care home license on a basis that infringes her Second Amendment rights as established in Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 59 (2006).

### B. The Day Care Home Rule, though sharing commonalities with constitutional conditions as determined by other government benefits tests, is best addressed under Burgess v. Lowery.

Defendants propose several tests from different cases for determining what makes a government-imposed condition of employment reasonable. d/e 89, pp. 48-50. For the sake of judicial thoroughness, the Court considers each test, assuming that the Day Care Home Rule infringes on Jennifer Miller's Second Amendment rights through the government benefit of her day care home license.

First, Defendants reference the standard applied to government spending programs in Camelot Banquet Rooms, Inc. v.

<u>United States Small Business Administration</u>: to "tell the difference between an unconstitutional condition and a permissible congressional choice about whom to include in a government spending or subsidy program," 24 F.4th 640, 650 (7th Cir. 2022), the Supreme Court has indicated that the relevant distinction "is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." <u>Id.</u> (quoting <u>Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.</u>, 570 U.S. 205, 214-15 (2013)); <u>see</u> <u>also</u> d/e 89, pp. 48-49. Plaintiffs argue that the considerations in <u>Camelot</u> are "irrelevant [because] [n]o one is asking the Defendants to fund the exercise of Second Amendment rights." d/e 98, pp. 6-7.

While the Day Care Home Rule does not involve government funding, both <u>Camelot</u> and the underlying Supreme Court case, <u>Agency for International Development v. Alliance for Open Society International, Inc.</u>, concerned freedom of speech claims under the First Amendment, to which the Supreme Court has "repeatedly compared the right to keep and bear arms." <u>New York State Rifle &</u>

Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 24, (2022) (citing D.C. v. Heller, 554 U.S. 570, 582, 595, 606, 618, 634–635 (2008)). Further, several concepts underlying this test align with aspects of the Day Care Home Rule.

For example, even assuming that the Day Care Home Rule were to operate at all hours while the day care home licensee holds the license, the Court sees no reason why the Day Care Home Rule would apply either to day care home licensees' homes for longer than they choose to apply for and maintain the license or permanently to the individual or their private home after the day care home license expires. Thus, the Day Care Home Rule "define[s] the limits," temporally, of the day care home program under DCFS' obligation to protect children's safety in day care homes and does not "seek to leverage funding to regulate [firearm use] outside the contours of the program itself" by operating after the day care home license expires. See Camelot, 24 F.4th at 650.

Further, the parties agree that DCFS is obligated to protect children's safety in day care homes. d/e 89, p. 10; d/e 96, p. 4. Defendants' Miller-Azrael Report states, and this Court accepts, that "[f]ewer children attending in-home day care…in Illinois will die

or be injured by gunfire if...the Day Care Home Rule (Rule 406.8(a)(17) and (18)) [is] in effect, compared to what would be the case if [the Day Care Home Rule was] not in place or relaxed." d/e 89, p. 16; see also d/e 89-7, 89-8. Thus, the Day Care Home Rule "specif[ies] the activities"—day care children's safety regarding firearms—that DCFS "wants to" license. See Camelot, 24 F.4th at 650.

Defendants also reference the "two-part test modeled on the unconstitutional conditions doctrine" outlined in Sheetz v. County of El Dorado, California: constitutional permitting conditions must have "an essential nexus to the government's land-use interest" and a "rough proportionality to the development's impact on the land-use interest," such that they may not "require[] a landowner to give up (or pay) more than is necessary to mitigate harms resulting from new development." 601 U.S. 267, 268 (2024) (internal citations omitted); see also d/e 89, p. 49. Plaintiffs argue that the necessity consideration in Sheetz was "specifically eliminated from Second Amendment analysis in Bruen." d/e 98, p. 6.

Regardless of the necessity consideration, this Court again sees similarities between this test and elements of the Day Care

Home Rule: the Rule, by regulating firearms, shares "an essential nexus" with Defendants' Miller-Azrael Report's finding that "[f]ewer children attending in-home day care...in Illinois will die or be injured by gunfire if...the Day Care Home Rule (Rule 406.8(a)(17) and (18)) [is] in effect," see d/e 89, p. 16, and a "rough proportionality" in lasting for the duration of the day care home license. See Sheetz, 601 U.S. at 268.

Lastly, Defendants reference the Seventh Circuit's finding in Burgess v. Lowery, 201 F.3d 942, 947 (7th Cir. 2000) that conditions "that may include the surrender of a constitutional right" "can lawfully be imposed on the receipt of a benefit...provided the conditions are reasonable." Id.; see also d/e 89, p. 48.

Plaintiffs argue that the purportedly "reasonable" conditions referenced in Burgess fail for several reasons: Burgess "did not clearly impose a 'rational basis' test in the unconstitutional conditions context;" the "suggest[ion] that any conditions must be 'reasonable' [is] best read as limited to the Fourth Amendment context specifically at issue in Burgess, where the underlying constitutional standard is itself 'reasonableness;'" and that any "'reasonableness' standard that existed before Bruen surely cannot

apply in the Second Amendment context now, given that decision's deliberate repudiation of this type of approach." d/e 96, p. 53.

The Court agrees that <u>Burgess</u> does not reference a rational basis test. However, the Seventh Circuit in <u>Burgess</u>, while directly addressing a Fourth Amendment claim, endorsed reasonableness as the standard used in the Supreme Court case <u>Snepp v. United States</u> addressing a First Amendment claim: "People who work for the CIA accept that they will have less freedom of speech than if they worked for McDonald's, but since the condition is a reasonable one the restriction on their freedom of speech is not considered unconstitutional." <u>Burgess</u>, 201 F.3d at 947 (citing <u>Snepp v. United States</u>, 444 U.S. 507 (1980) (per curiam)).

The Court also notes that the Supreme Court in <u>Bruen</u> clearly rejected the so-called "second step" in which courts considering Second Amendment claims would "apply 'strict scrutiny' and ask whether the Government can prove that the law is 'narrowly tailored to achieve a compelling governmental interest'" or, otherwise, "apply intermediate scrutiny and consider whether the Government can show that the regulation is 'substantially related to the achievement of an important governmental interest.'" <u>New York State Rifle &</u>

Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 18–19 (2022) (internal

citations omitted). However, this Court does not read Bruen to

categorically reject all reasonableness considerations in the Second

Amendment context, with the Justices noting that:

> The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly. None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose.

Id. at 59–60 (emphasis in original). Further, the Supreme Court

found that "[t]he Second Amendment guaranteed to 'all Americans'

the right to bear commonly used arms in public subject to certain

reasonable, well-defined restrictions," which did not include

"requir[ing] law-abiding, responsible citizens to 'demonstrate a

special need for self-protection distinguishable from that of the

general community' in order to carry arms in public" like the New

York statute at issue in <u>Bruen</u>. <u>Id.</u> at 70 (citing <u>D.C. v. Heller</u>, 554 U.S. 570, 581 (2008)).

The Court finds that the test outlined in <u>Burgess</u> is the most applicable for assessing the Day Care Home Rule under the unconstitutional conditions doctrine, as it does not specify a specific medium, such as land use or government spending programs. Therefore, the Court applies the test in <u>Burgess</u> as the most appropriate fit for assessing the Day Care Home rule.

### C. The Day Care Home Rule is a Reasonable Condition Imposed on Receiving the Benefit of a Day Care Home License.

In <u>Burgess</u>, a government benefits case, the Seventh Circuit referenced <u>Snepp</u>, a government contractor case, and another Fourth Amendment government benefits case before the Seventh Circuit, <u>Edmond v. Goldsmith</u>. 183 F.3d 659 (7th Cir. 1999), <u>aff'd sub nom.</u> <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32 (2000); <u>see also</u> <u>Snepp v. United States</u>, 444 U.S. 507 (1980); <u>see also</u> <u>Burgess v. Lowery</u>, 201 F.3d 942, 947 (7th Cir. 2000).

In <u>Snepp</u>, the Supreme Court considered a CIA agent who had signed a contract agreeing to seek agency review before publishing

any CIA-based material, but the agent published a book without submitting it for review. 444 U.S. 507, 507-508 (1980). The Justices noted the CIA's need to "guarantee the security of information that might compromise [foreign sources] and even endanger the personal safety of foreign agents." Id. at 512. The Supreme Court cited substantial precedent allowing the government "to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment," and deemed the pre-publication review requirement reasonable:

> The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service. The agreement that Snepp signed is a reasonable means for protecting this vital interest.

Id. at 510, n.3 (internal citations omitted).

The Seventh Circuit in Burgess also cited Edmond for the proposition that metal detector requirements for air travel passengers are reasonable because they are unintrusive and protective:

> Clearly it is reasonable, regardless of the doctrinal rubric, for the government to require airline passengers to step

> through a metal detector even though there is no reasonable suspicion that a given passenger is carrying a weapon. In part because the search is not intrusive, and in part because of the danger that an armed passenger poses on an airplane in flight, this condition on the right to travel by air is reasonable.

Burgess v. Lowery, 201 F.3d 942, 947 (7th Cir. 2000) (citing

Edmond v. Goldsmith, 183 F.3d 659, 664 (7th Cir.1999).

The Seventh Circuit elaborated on this point further in

Edmond itself, which addressed the City of Indianapolis erecting

roadblocks to catch drug offenders. Edmond, 183 F.3d at 661.

Behind the "administrative searches conducted without any basis to

suspect any particular individual of wrongdoing, but rather

pursuant to a program of inspections incidental to a general

scheme of licensing or other regulation" that the Supreme Court

had upheld, the Seventh Circuit identified "concern...with securing

safety or efficiency of the activity in which the people who are

searched are engaged." Id. at 663-64. The Seventh Circuit cited as

examples:

> The [transport worker] employee who uses drugs will perform badly in his work, to the detriment of fellow employees or the general public; and the most effective preventive measure may be to test all or a random selection of applicants or employees. Similar are sobriety checkpoints, which are designed to protect other users of

the road from the dangers posed by drunk drivers; administrative searches that are ancillary to concededly lawful systems of inspection; and the use of metal detectors and x-ray machines to screen entrants to government buildings and embarking air travelers. These cases rest on the commonsense principle that employers and other proprietors (such as the state as the owner of public roads), including the quasi-proprietor that is the government in heavily regulated industries, see, e.g., United States v. Biswell, 406 U.S. 311, 316–17, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), have a right to take reasonable measures to protect the safety and efficiency of their operations. These measures, moreover, usually make only limited inroads into privacy, because a person can avoid being searched or seized by avoiding the regulated activity, though we hesitate to put much weight on this point; people are unlikely to feel they can afford to "ground" themselves in order to avoid airport searches.

Edmond, 183 F.3d at 664 (emphasis added) (out-of-circuit internal citations omitted) (citing the "pervasively regulated business" of firearms dealing in Biswell, see 406 U.S. at 316.). The Court noted that Indianapolis in seeking the roadblocks "does not claim to be concerned with protecting highway safety against drivers high on drugs" and ultimately found that the restriction did not satisfy the regulatory search exception to the principle requiring a basis to believe a search "will yield evidence or fruits or instrumentalities of crime." Edmond, 183 F.3d at 664-66.

To summarize, Snepp involved a government contractor bringing suit under the First Amendment, Burgess involved a Fourth Amendment challenge concerning the government benefit of prison visit free from strip searches, and Edmond involved a Fourth Amendment challenge against city-sponsored roadblocks to catch drug offenders. Nonetheless, this Court notes a common thread among all three cases: courts have found that the government, as both contractual employer and as quasi-proprietor in heavily regulated industries, may impose restrictions on employees or industry participants that are reasonable, in that they are partial restrictions on the involved individuals' constitutional rights to protect the public's physical safety.

CIA agents access classified information that can jeopardize the physical safety of both foreign agents abroad and citizens at home, so the Supreme Court found a pre-publication review, as opposed to a full publication ban, to be reasonable. See Snepp, 444 U.S. at 510, n.3; see also Burgess, 201 F.3d at 947. Armed airplane passengers are uniquely dangerous to their fellow passengers in a miles-high capsule, so the Seventh Circuit found a warrantless metal detector requirement, as opposed to a more invasive search,

to be reasonable. See id.; see also Edmond, 183 F.3d at 664. Conversely, requiring prison visitor strip searches "without regard to the inmate's crime or punishment," when the prisoners were strip searched beforehand and guards continuously surveilled the visits, was "manifestly unreasonable." Burgess, 201 F.3d at 947.

Turning to the facts at bar, day care homes are extensively regulated, namely by Rule 406's minimum licensing standards for day care homes. See 89 Ill. Admin. Code § 406. While not at the level of DCFS' legal custody and guardianship of foster children, DCFS is nonetheless obligated to protect children's safety in day care homes. See d/e 89, pp. 7, 10; d/e 96, pp. 3-4. As such, the government operates as "quasi-proprietor…in [the] heavily regulated industr[y]" of licensing day care homes. See Edmond, 183 F.3d at 664.

Even assuming that the Day Care Home Rule were to operate at all hours while the day care home licensee holds the license, the Court sees no reason why the Day Care Home Rule would apply either to day care home licensees' homes for longer than they choose to apply for and maintain the license or permanently to the individual or their private home after the day care home license

expires. As such, the Day Care Home Rule imposes a more moderate restriction on Jennifer Miller's firearms. Day care home licensees also "can avoid being [subject to the Day Care Home Rule] by avoiding the regulated activity" of running a day care home out of their home—though the Court declines "to put much weight on this point," in case existing day care home licensees are "unlikely to feel they can afford to [not run a home day care] in order to avoid" the Rule. Id., see also F.C.C. v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 800 (1978) (when plaintiffs argued that the "regulations unconstitutionally condition receipt of a broadcast license upon forfeiture of the right to publish a newspaper," finding that "[u]nder the regulations, however, a newspaper owner need not forfeit anything in order to acquire a license for a station located in another community.").

However, the Day Care Home Rule clearly serves to protect the public's physical safety—specifically, the safety of children cared for in licensed day care homes. Defendants' Miller-Azrael Report states, and this Court accepts, that "[f]ewer children attending in-home day care…in Illinois will die or be injured by gunfire if…the Day Care Home Rule (Rule 406.8(a)(17) and (18)) [is] in effect, compared to

what would be the case if [the Day Care Home Rule were] not in place or relaxed." d/e 89, p. 16; see also d/e 89-7, 89-8. Although Plaintiffs deny that compelling compliance with Day Care Home Rule protects children's health and safety and assert the opposite, the parties agree that the Day Care Home Rule's purpose is to protect children's health and safety by preventing death, injury, and suicide by firearms. See d/e 89, p. 11, d/e 96, pp. 5-6. Therefore, the Day Care Home Rule is a government measure "to protect the safety and efficiency of their operations" of licensing day care homes. See Edmond, 183 F.3d at 664.

The Court finds that the Day Care Home Rule, assumed to infringe on Jennifer Miller's Second Amendment rights, is a reasonable government restriction on her day care home license because the Rule is a partial restriction on those rights in order to protect the physical safety of the children in her day care home who DCFS is obligated to protect. See Burgess, 201 F.3d at 947; see also Edmond, 183 F.3d at 664; see also Snepp, 444 U.S. at 510-12; see also d/e 89, p. 10; d/e 96, p. 4.

As the Court found previously, Plaintiffs do not establish that the Day Care Home Rule denies Jennifer Miller a government

Page **108** of **116**

benefit on a basis that infringes her Second Amendment rights.

Therefore, the Court does not find that the Day Care Home Rule

"burdens[] the Constitution's enumerated rights by coercively

withholding benefits from those who exercise them" so as to violate

the unconstitutional conditions doctrine. Koontz v. St. Johns River

Water Mgmt. Dist., 570 U.S. at 606 (2013).

### 3. The Foster Home Rule does not violate the unconstitutional conditions doctrine.

The Court now follows the Supreme Court's directive in

Engquist to balance government contractors the Millers'

constitutional rights "against the realities of the employment

context" by "consider[ing] whether the asserted employee right

implicates the basic concerns of the relevant constitutional

provision, or whether the claimed right can more readily give way to

the requirements of the government as employer." Engquist v.

Oregon Dept. of Agric., 553 U.S. 591, 600 (2008).

The Foster Home Rule requires that firearms be unloaded and

locked in a safe free of any ammunition for foster homes. See 89 Ill.

Admin. Code § 402.8(o). Unlike the Day Care Home Rule, the Foster

Home Rule does not require disassembly of the foster home

licensee's firearms. See id., see also d/e 65, p. 40 ("the Foster Home Rule imposes a much less substantial burden on the Second Amendment rights of affected individuals than the Day Care Home Rule.").

The Supreme Court in Heller cautioned that its analysis should not be taken to "suggest the invalidity of laws regulating the storage of firearms to prevent accidents" under the Second Amendment, D.C. v. Heller, 554 U.S. 570, 632 (2008), and the parties agree that DCFS created the Foster Home Rule to increase the health and safety of foster children by protecting them from injury and death from firearms, including by suicide. d/e 89, p. 9; d/e 96, p. 15. Thus, the Court finds that the asserted employee right does not "implicate the basic concerns of the relevant constitutional provision." Engquist, 553 U.S. 591, 600 (2008).

As the Court has noted, after the Millers choose to no longer maintain their foster home license or it expires, the Millers may have loaded firearms that are not locked in a safe free of any ammunition. Further, DCFS is "charged by law with doing particular tasks," see Engquist, 553 U.S. at 598—specifically, acting in the best interests of the foster children of whom it has legal

custody and guardianship. d/e 89, p. 7; d/e 96, p. 3. DCFS

contracts with foster home licensees "to help do those tasks as

effectively and efficiently as possible." See Engquist, 553 U.S. 591,

598 (2008) (quoting Waters, 511 U.S. at 671 (plurality opinion)).

"The government's interest in achieving its goals as effectively

and efficiently as possible is elevated…to a significant one when it

acts as employer." See Engquist, 553 U.S. at 598–99 (quoting

Waters, 511 U.S. at 675 (plurality opinion)). Additionally, Illinois—

like any other parent or legal guardian—must be afforded

considerable latitude to make its own reasonable decisions

regarding how best to ensure the physical safety of the children in

its custody. Therefore, the Court finds that "the claimed right can

more readily give way to the requirements of the government as

employer." See Engquist, 553 U.S. 591, 600 (2008).

The Court also considers the reasonableness determinations

made by the Supreme Court in NASA, which found that questions

about government contractors' potential drug use and overall

integrity "consist[ed] of reasonable, employment-related inquiries

that further the Government's interests in managing its internal

operations." NASA v. Nelson, 562 U.S. 134, 151 (2011). The

Justices, in determining the challenged drug questions' reasonableness, cited as relevant considerations: the government's "entitle[ment] to have its projects staffed by reliable, law-abiding persons who will efficiently and effectively discharge their duties," the questions' "useful[ness] [in] figuring out which persons have these characteristics," a scholarly article indicating that "[the questions' subject matter] negatively correlated with work place productivity," and that "phrasing the question in more permissive terms would result in a lower response rate" and "materially reduce[]" "the question's effectiveness in identifying illegal-drug users who are suitable for employment." Id. at 152, 154.

The Supreme Court, in determining the challenged integrity-related questions' reasonableness, similarly cited as relevant considerations: that the questions were "reasonably aimed at identifying capable employees who will faithfully conduct the Government's business" and "an appropriate tool for separating strong candidates from weak ones," the questions' "pervasiveness in the public and private sectors," and that their use "further[ed] [the government's] interests in managing its operations." Id. at 154-55.

The Court finds that the Foster Home Rule satisfies these reasonableness metrics. DCFS is required by law to act in the child's best interests, see d/e 89, p. 7; d/e 96, p. 3, and Defendants cite the Miller-Azrael Report for the proposition that "[f]ewer children …housed in foster homes in Illinois will die or be injured by gunfire if [the Foster Home Rule is] in effect, compared to what would be the case if [the Rule were] not in place or relaxed." See d/e 89, pp. 15-16; see also d/e 89-7, 89-8.

Thus, the Foster Home Rule is "useful" in keeping children safe around firearms—Defendants' expert report demonstrates that the Rule is positively correlated with keeping foster children safe around firearms and that implementing it "in more permissive terms would result in a lower" benefit and "materially reduce[]" its "effectiveness in" keeping children safe around firearms, as part of serving as a government contractor foster care parent. See NASA, 562 U.S. at 154.

In addition to the rule being "aimed at" "further[ing] [the government's] interests in managing its operations," the "pervasiveness in the public and private sectors" of a gun restriction like the Day Care Home Rule also cuts in favor of its

Page **113** of **116**

reasonableness. See id. In Tyson-Phipps v. Blinken, the magistrate judge found that the balancing principle in Engquist "counsels that the analysis contemplated in Heller and Bruen does not apply. Instead, it is enough to say that just as a private employer engaged in security would obviously be justified in barring its employees from carrying their personal handguns on the job, so too may the Government here." See Tyson-Phipps v. Blinken, No. 23-2316, 2024 WL 4128445 (S.D.N.Y. Sept. 10, 2024). The Court agrees that a private employer—whether engaged in security, child care, or both, as foster home parents may well be categorized—would be "justified in barring its employees from carrying their personal handguns on the job" or from keeping firearms and ammunition where they are on the job that are not "stored and locked up separately at all times and kept in places inaccessible to children." See 89 Ill. Admin. Code § 402.8(o).

In sum, the Foster Home Rule properly balances government contractors the Millers' constitutional rights "against the realities of the employment context" as a reasonable measure compliant with the unconstitutional conditions doctrine. See Engquist v. Oregon

Dept. of Agric., 553 U.S. 591, 600 (2008); see also NASA v. Nelson, 562 U.S. 134, 151 (2011).

## V.    CONCLUSION

The Court finds that the plain text of the Second Amendment covers the Day Care Home Rule and the Foster Home Rule, that day care homes and foster homes are sensitive places analogous to schools where firearms may be restricted, and, therefore, that the Day Care Home Rule and the Foster Home Rule restricting firearms kept in day care homes and foster homes, respectively, are constitutional. The Court also finds that both the Day Care Home Rule and the Foster Home Rule are reasonable restrictions on government contractors' and licensees' assumedly implicated Second Amendment rights.

For the reasons set forth, Defendants' Motion for Summary Judgment (d/e 89) is GRANTED and Plaintiffs' Motion for Summary Judgment (d/e 94) is DENIED. The Clerk is DIRECTED to enter final judgment in favor of Defendants Heidi Mueller and Kwame Raoul and against the Plaintiffs. Any pending motions are DENIED as MOOT, any pending deadlines are TERMINATED, and any scheduled settings are VACATED. This case is CLOSED.

**ENTERED: August 3, 2026.**
**FOR THE COURT:**

/s/ Sue E. Myerscough
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**